**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, et al., |
| *Plaintiffs*, |
| v. |
| DEUTSCHE TELEKOM AG, et al., |
| *Defendants*. |

Civil Action No. 1:19-cv-02232-TJK

**COMPETITIVE IMPACT STATEMENT**

The United States of America, under Section 2(b) of the Antitrust Procedures and

Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact

Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust

proceeding.

## I.     NATURE AND PURPOSE OF THE PROCEEDING

On April 29, 2018, Defendant T-Mobile US, Inc. ("T-Mobile") agreed to acquire

Defendant Sprint Corporation ("Sprint") in an all-stock transaction valued at approximately $26

billion.  The United States filed a civil antitrust Complaint on July 26, 2019, seeking to enjoin

the proposed acquisition.  The Complaint alleges that the likely effect of this acquisition would

be to substantially lessen competition for retail mobile wireless service in the United States,

resulting in increased prices and less attractive service offerings for American consumers, in

violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

At the same time the Complaint was filed, the United States filed a Stipulation and Order and proposed Final Judgment, which are designed to preserve competition by enabling the entry of another national facilities-based mobile wireless network carrier.  The proposed Final Judgment, which is explained more fully below, requires T-Mobile to divest to DISH Network Corporation ("DISH") certain retail wireless business and network assets, and supporting assets (collectively, the "Divestiture Assets").  It also requires that T-Mobile provide to DISH certain transition services in support thereof and all services, access, and assets necessary to facilitate DISH operating as a Full Mobile Virtual Network Operator ("Full MVNO", and together with the Divestiture Assets, the "Divestiture Package").[1]  Additionally, the Final Judgment requires that T-Mobile and Sprint extend their current Mobile Virtual Network Operator ("MVNO") agreements until the expiration of the Final Judgment, and that T-Mobile, Sprint, and DISH support remote SIM provisioning and eSIM technology.

The primary purpose of the proposed Final Judgment is to facilitate DISH building and operating its own mobile wireless services network by combining the Divestiture Package of assets and other relief with DISH's existing mobile wireless assets, including substantial and currently unused spectrum holdings, to enable it to compete in the marketplace.  The proposed Final Judgment thus obligates DISH to build out its own mobile wireless services network and offer retail mobile wireless service to American consumers.  DISH's long-term build out of a new network, along with the short-term requirement that DISH and T-Mobile negotiate a lease for DISH's currently unused 600 MHz spectrum, promise to increase output and put currently

---

[1] Deutsche Telekom, T-Mobile, SoftBank, Sprint, and DISH are referred to collectively as "Defendants."

fallow spectrum into use by American consumers.  The required Divestiture Package and related obligations in the proposed Final Judgment are intended to ensure that DISH can begin to offer competitive services and grow to replace Sprint as an independent and vigorous competitor in the retail mobile wireless service market in which the proposed merger would otherwise lessen competition.  Further, the proposed Final Judgment would allow the potential benefits of the merger to be realized, including expanding American consumers' access to high quality networks.

Under the terms of the Stipulation and Order, T-Mobile will take certain steps to ensure that, prior to the completion of all of the proposed divestitures, the Divestiture Assets are preserved and remain economically viable and ongoing business concerns.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA.  Entry of the proposed Final Judgment will terminate this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.  DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.    The Defendants and the Proposed Transaction

Deutsche Telekom AG ("Deutsche Telekom"), a German corporation headquartered in Bonn, Germany, is the controlling shareholder of T-Mobile, with 63% of T-Mobile's shares. Deutsche Telekom is the largest telecommunications operator in Europe, with net revenues of €75.7 billion (approximately $85 billion) in 2018.

T-Mobile, a Delaware corporation headquartered in Bellevue, Washington, is the third largest mobile wireless carrier in the United States.  In 2018, T-Mobile had nearly 80 million

wireless subscribers and approximately $43.3 billion in total revenues.  T-Mobile sells postpaid mobile wireless service under its T-Mobile brand and prepaid mobile wireless service primarily under its Metro by T-Mobile brand.  T-Mobile also sells mobile wireless service to businesses and indirectly through MVNOs, which resell the service to consumers.

SoftBank Group Corp. ("SoftBank"), a Japanese corporation and the controlling shareholder of Sprint, owns 85% of Sprint's shares.  SoftBank's operating income during its 2018 fiscal year was ¥2.3539 trillion (approximately $21.25 billion).

Sprint is a Delaware corporation headquartered in Overland Park, Kansas.  It is the fourth largest mobile wireless carrier in the United States.  At the end of its 2018 fiscal year, Sprint had over 54 million wireless subscribers, and its fiscal year 2018 operating revenues were approximately $32.6 billion.  Sprint sells postpaid mobile wireless service under its Sprint brand, and prepaid mobile wireless service primarily under its Boost and Virgin Mobile brands.  Sprint also sells mobile wireless service to businesses and indirectly through MVNOs, which resell the service to consumers.  Sprint also operates a wireline telecommunications business throughout the United States.

DISH is a Nevada corporation with its headquarters in Englewood, Colorado.  It is the owner of satellite and wireless spectrum assets and currently offers television and related services and products to American consumers nationwide.  At the end of its 2018 fiscal year, DISH had over 12 million Pay-TV subscribers, and its fiscal year 2018 operating revenues were approximately $13.6 billion.

On April 29, 2018, T-Mobile and Sprint agreed to combine their respective businesses in an all-stock transaction.  In recognition of the significant competitive concerns raised by the

proposed merger, T-Mobile has agreed to divest certain retail mobile wireless business and spectrum assets, and supporting assets, and to provide certain transitional and network services. As discussed in Section III.E, *infra*, DISH has agreed to be bound by the terms of the proposed Final Judgment.

T-Mobile and Sprint also are subject to obligations contained in their commitments to the Federal Communications Commission ("FCC") as reflected in a statement issued by FCC Chairman Ajit Pai on May 20, 2019.

B.      *The Competitive Effects of the Transaction*

The Complaint alleges that the proposed merger likely would substantially lessen competition in the retail mobile wireless service market in the United States.  Retail mobile wireless service includes voice, text, and data services that consumers access on phones, tablets, and other devices.  Mobile wireless carriers deliver retail mobile wireless service over a network of facilities, including, for example, towers, radios, antennas, and fiber, that support the various frequencies of spectrum that transmit wireless service.  Mobile wireless carriers with their own such facilities that offer service throughout the United States are called national facilities-based mobile wireless carriers.  Unlike the facilities-based mobile wireless carriers, traditional MVNOs do not operate their own mobile wireless networks and instead buy capacity wholesale from facilities-based carriers and then resell mobile wireless service to consumers.  By contrast, a Full MVNO owns some facilities that it can use to carry a portion of its traffic, while relying on wholesale agreements to carry the remainder.

Currently, the national facilities-based mobile wireless carriers in the United States are Verizon Communications, Inc., AT&T Inc., T-Mobile, and Sprint.  These four national facilities-

based mobile wireless carriers compete for retail mobile wireless service customers by offering a variety of service plans and devices at different price points and by promoting their prices, plan features, device offerings, customer service, and network quality.  Without the merger, T-Mobile and Sprint would continue competing vigorously for market share as "challenger" brands to Verizon and AT&T, the largest and second largest national facilities-based mobile wireless carriers in the United States, respectively.  If the merger is permitted to proceed unremedied, that competition would be lost.

1.      Relevant Market

As alleged in the Complaint, retail mobile wireless service is a relevant product market under Section 7 of the Clayton Act.  Retail mobile wireless customers include consumers and small and medium businesses who buy their mobile wireless services at retail stores or online, choosing pricing and plans made available to the general public.  Retail customers cannot substitute the mobile wireless service they purchase with the mobile wireless service purchased by large businesses and government entities, who purchase services through a distinct process and receive different pricing than the general public.  Accordingly, a hypothetical monopolist of retail mobile wireless service profitably could raise prices.

The Complaint alleges a national geographic market for retail mobile wireless service. Wireless carriers generally price, advertise, and market their retail mobile wireless service on a nationwide basis.  Because the wireless carriers compete against each other on a nationwide basis, a hypothetical monopolist of retail mobile wireless service in the United States profitably could raise prices.

2.      Competitive Effects

The market for retail mobile wireless service in the United States is highly concentrated and would become more so if T-Mobile were allowed to acquire Sprint.  As discussed above, currently four national facilities-based mobile wireless carriers compete for retail mobile wireless service customers: Verizon and AT&T are the two largest, and T-Mobile and Sprint are the smaller two.  The merger would result in three national facilities-based mobile wireless carriers, each with roughly one-third share of the national market.

The elimination of a fourth national facilities-based mobile wireless carrier would remove competition from Sprint and restructure the retail mobile wireless service market.  The combination of T-Mobile and Sprint would eliminate head-to-head competition between the companies and threaten the benefits that customers have realized from that competition in the form of lower prices and better service.  The merger would also leave the market vulnerable to increased coordination among the remaining three carriers.  Increased coordination harms consumers through a combination of higher prices, reduced innovation, reduced quality, and fewer choices.  Finally, competition between Sprint and T-Mobile to sell wireless service wholesale to MVNOs has benefited consumers by facilitating innovation by some MVNOs.  The merger's elimination of this competition likely would reduce future innovation.

3.      Entry and Expansion

A national facilities-based mobile wireless carrier needs to have spectrum and network assets deployed nationwide to provide retail mobile wireless service in the United States.  Thus, de novo entry by a facilities-based mobile wireless carrier is very difficult.  Without the relief provided in the proposed Final Judgment, neither entry nor expansion is likely to occur in a

timely manner or on a scale sufficient to replace the competitive influence now exerted on the market by Sprint.

### III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment requires structural relief in the form of divestitures designed to ensure the development of a new national facilities-based mobile wireless carrier competitor to ultimately remedy the anticompetitive harms that flow from the change in the market structure that otherwise would have occurred as a result of the merger.

After careful scrutiny of Defendants' businesses, the United States identified a divestiture package to address the United States' concerns about the likely anticompetitive effects of the acquisition.  The proposed divestiture requires T-Mobile to divest to DISH certain retail mobile wireless business assets and to facilitate DISH building its own mobile wireless network with which it will compete in the retail mobile wireless service market.

A.    *Divestitures and Other Relief*

1.    Divestitures

Under the terms of the proposed Final Judgment, T-Mobile must divest to DISH certain assets, including Sprint's prepaid retail wireless service business and certain spectrum licenses, and provide DISH an exclusive option to acquire cell sites and retail stores decommissioned by the merged firm.

- Prepaid Assets.  The proposed Final Judgment requires T-Mobile to divest to DISH almost all of Sprint's prepaid wireless business,[2] including the Boost-

---

[2] The divestiture would not include subscribers to the Assurance Lifeline program (part of the Virgin Wireless business), or Sprint's prepaid customers receiving services through its Swiftel and Shentel affiliates, due to various contractual and regulatory obligations.

branded, the Virgin-branded, and the Sprint-branded businesses.  These Prepaid Assets, coupled with required network support from T-Mobile described more fully below, will provide an existing business, with assets including customers, employees, and intellectual property, that will enable DISH to offer retail mobile wireless service.  Acquiring this existing business will enhance DISH's incentives to invest in a robust facilities-based network, because acquiring an installed base of existing customers is expected to increase the returns on such investment.

- 800 MHz Spectrum Licenses.  The proposed Final Judgment further requires T-Mobile to divest to DISH Sprint's 800 MHz spectrum licenses.  This spectrum would add to DISH's existing spectrum assets in order to ensure DISH has sufficient spectrum to meet its buildout and service requirements and provide mobile wireless service to customers.  DISH may, at its option, elect not to acquire the spectrum if DISH can meet certain network buildout and service requirements without it.  In such case, T-Mobile will auction the 800 MHz spectrum licenses to any person who is not already a national facilities-based wireless carrier.

- Cell Sites and Retail Stores.  The proposed Final Judgment also requires T-Mobile to provide to DISH an exclusive option to acquire all cell sites and retail store locations being decommissioned by the merged firm.  This requirement will enable DISH to utilize such existing cell sites and retail stores that are useful to DISH in building out its own wireless network and providing mobile wireless service to consumers.

The assets must be divested in such a way as to satisfy the United States in its sole discretion that they can and will be operated by DISH as a viable, ongoing business that can compete effectively in the retail mobile wireless service market.  DISH is required to use the Divestiture Assets to offer retail mobile wireless services, including offering nationwide postpaid retail mobile wireless service within one year of the closing of the sale of the Prepaid Assets. Defendants are also prohibited from taking any action that would jeopardize the divestitures ordered by the Court.

2.      Transition Services

Under the terms of the proposed Final Judgment, and at DISH's option, T-Mobile and Sprint shall enter into one or more transition services agreements to provide billing, customer care, SIM card procurement, device provisioning, and all other services used by the Prepaid Assets prior to the date of their transfer to DISH for an initial period of up to two years after transfer.  Such transition services will enable DISH to use the Prepaid Assets as quickly as possible and will help prevent disruption for Boost, Virgin, and Sprint prepaid customers as the business is transferred to DISH.

3.      600 MHz Spectrum Deployment

The proposed Final Judgment requires DISH and T-Mobile to enter into good faith negotiations to allow T-Mobile to lease some or all of DISH's 600 MHz spectrum for use in offering mobile wireless services to its subscribers.  Such an agreement would expand output by making the 600 MHz spectrum available for use by consumers even before DISH has completed building out its network, and would assist T-Mobile in transitioning consumers to its 5G network.

4.      Full MVNO Agreement

The proposed Final Judgment requires T-Mobile and Sprint to enter into a Full MVNO

Agreement with DISH for a term of no fewer than seven years.  Under the agreement outlined in

the proposed Final Judgment, T-Mobile and Sprint must permit DISH to operate as an MVNO on

the merged firm's network on commercially reasonable terms and to resell the merged firm's

mobile wireless service.  As DISH deploys its own mobile wireless network, T-Mobile and

Sprint must also facilitate DISH operating as a Full MVNO by providing the necessary network

assets, access, and services.  These requirements will enable DISH to begin operating as an

MVNO as quickly as possible after entry of the Final Judgment, and provide DISH the support it

needs to offer retail mobile wireless service to consumers while building out its own mobile

wireless network.

5.      Facilities-Based Entry and Expansion

The proposed Final Judgment requires T-Mobile and Sprint to comply with all network

build commitments made to the Federal Communications Commission (FCC) related to their

merger or the divestiture to DISH as of the date of entry of the Final Judgment, subject to

verification by the FCC.[3]  In turn, DISH is required to comply with the June 14, 2023 AWS-4,

700 MHz, H Block, and Nationwide 5G Broadband network build commitments made to the

FCC on July 26, 2019, subject to verification by the FCC.[4]  Incorporating these obligations into

---

[3] *See* Letter to Marlene Dortch (FCC) from Nancy J. Victory and Regina M. Keeney
(Counsel for T-Mobile and Sprint, respectively), May 20, 2019 at Attachment 1, *available at*
https://www.fcc.gov/sites/default/files/t-mobile-us-sprint-letter-05202019.pdf.
[4] *See* Letter to Donald Stockdale (FCC) from Jeffrey H. Blum (DISH's S.V.P. for Public
Policy & Government Affairs), July 26, 2019 at Attachment A, *available at*
https://www.fcc.gov/sites/default/files/dish-letter-07262019.pdf.

the proposed Final Judgment is intended to increase the incentives for the merged firm to achieve the promised efficiencies from the merger and for DISH to build out its own national facilities-based mobile wireless network to replace the competition lost as a result of Sprint being acquired by T-Mobile.  Increasing DISH's incentives to complete the buildout of a fourth nationwide wireless network also serves to decrease the likelihood of coordinated effects that arise out of the merger.

6.      MVNO Requirements

The proposed Final Judgment obligates T-Mobile and Sprint to extend all of its current MVNO agreements until the expiration of the proposed Final Judgment.  This obligation will ensure that T-Mobile's and Sprint's MVNO partners remain options for the consumers who currently use them.  It also permits T-Mobile's and Sprint's MVNO partners to retain their current presence until the expiration of the proposed Final Judgment, by which time DISH is expected to have become an additional potential provider of services.

7.      T-Mobile's and DISH's eSIM Obligations

The proposed Final Judgment requires T-Mobile and DISH to support eSIM technology and prohibits T-Mobile and DISH from discriminating against devices based on their use of remote SIM provisioning or use of eSIM technology.  The more widespread use of eSIMs and remote SIM provisioning may help DISH attract consumers as it launches its mobile wireless business.  These provisions are intended to increase the disruptiveness of DISH's entry by making it easier for consumers to switch between wireless carriers and to choose a provider that does not have a nearby physical retail location, thus lowering the cost of DISH's entry and expansion.  These benefits also decrease the likelihood of coordinated effects by increasing

DISH's ability to reach consumers with innovative offerings.

B.     *Monitoring Trustee*

The proposed Final Judgment provides that the United States may appoint a monitoring trustee with the power and authority to investigate and report on the Defendants' compliance with the terms of the Final Judgment and the Stipulation and Order during the pendency of the divestiture, including, but not limited to, T-Mobile's sale of the Divestiture Assets, T-Mobile's compliance with exclusive option requirements for cell sites and retail store locations, and DISH's progress toward using the Divestiture Assets to operate a retail mobile wireless network. The United States intends to recommend a monitoring trustee for the Court's approval.  The monitoring trustee will not have any responsibility or obligation for the operation of the Defendants' businesses.  The monitoring trustee will serve at T-Mobile's and Sprint's expense, on such terms and conditions as the United States approves, and Defendants must assist the trustee in fulfilling its obligations.  The monitoring trustee will provide periodic reports to the United States and will serve until the divestiture of all the Divestiture Assets is finalized and the buildout requirements are complete, or until the term of any Transition Services Agreement has expired, whichever is later.

C.     *Firewall*

Section XIII of the proposed Final Judgment requires T-Mobile and DISH to implement firewall procedures to prevent each company's confidential business information from being used by the other for any purpose that could harm competition.  Within thirty days of the Court approving the Stipulation and Order, T-Mobile and DISH must submit their planned procedures for maintaining firewalls.  Additionally, T-Mobile and DISH must explain the requirements of

the firewalls to certain officers and other business personnel responsible for the commercial relationships between the two companies about the required treatment of confidential business information.  T-Mobile and DISH's adherence to these procedures is subject to audit by the monitoring trustee.  These measures are necessary to ensure that the implementation and execution of the obligations in the proposed Final Judgment and any associated agreements between T-Mobile and DISH do not facilitate coordination or other anticompetitive behavior during the interim period before DISH becomes fully independent of T-Mobile.

   D. *Prohibition on Reacquisition or Sale to Competitor*

   To ensure that DISH and T-Mobile remain independent competitors, Section XV of the proposed Final Judgment prohibits T-Mobile from reacquiring from DISH any part of the Divestiture Assets, other than a limited carveout for T-Mobile to lease back a small amount of spectrum for a two-year period.  Further, Section XV of the proposed Final Judgment prohibits DISH from selling, leasing, or otherwise providing the right to use the Divestiture Assets to any national facilities-based mobile wireless carrier. These provisions ensure that T-Mobile and DISH cannot undermine the purpose of the proposed Final Judgment by later entering into a new transaction, with each other or with another competitor, that would reduce the competition that the divestitures have preserved.

   E. *Enforcement Provisions*

   The proposed Final Judgment also contains provisions designed to promote compliance and make the enforcement of the Final Judgment as effective as possible.  As set forth in the Stipulation and Order, DISH has agreed to be joined to this action for purposes of the divestiture.  Including DISH is appropriate because the United States has determined that DISH is a

necessary party to effectuate the relief obtained; the divestiture package was crafted specifically taking into consideration DISH's existing assets and capabilities, and divesting the package to another purchaser would not preserve competition.  Thus, as discussed above, the proposed Final Judgment imposes certain obligations on DISH to ensure that the divestitures take place expeditiously and DISH meets certain deadlines in building out and operating its own mobile wireless services network to provide competitive retail mobile wireless service.

Paragraph XVIII(A) provides that the United States retains and reserves all rights to enforce the provisions of the proposed Final Judgment, including its rights to seek an order of contempt from the Court.  Under the terms of this paragraph, Defendants have agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Defendants have waived any argument that a different standard of proof should apply.  This provision aligns the standard for compliance obligations with the standard of proof that applies to the underlying offense that the compliance commitments address.

Paragraph XVIII(B) provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment.  The proposed Final Judgment seeks to restore competition that would otherwise be permanently harmed by the merger.  Defendants agree that they will abide by the proposed Final Judgment, and that they may be held in contempt of this Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Paragraph XVIII(C) of the proposed Final Judgment further provides that if the Court finds in an enforcement proceeding that Defendants have violated the Final Judgment, the United States may apply to the Court for a one-time extension of the Final Judgment, together with such other relief as may be appropriate.  In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the proposed Final Judgment, Paragraph XVIII(C) provides that in any successful effort by the United States to enforce the Final Judgment against a Defendant, whether litigated or resolved before litigation, that Defendants will reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with any enforcement effort, including the investigation of the potential violation.

Section XVIII(D) states that the United States may file an action against a Defendant for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated.  This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated.  This provision, therefore, makes clear that, for four years after the Final Judgment has expired or been terminated, the United States may still challenge a violation that occurred during the term of the Final Judgment.

Finally, Section XIX of the proposed Final Judgment provides that the Final Judgment will expire seven years from the date of its entry, except that after five years from the date of its entry, the Final Judgment may be terminated upon notice by the United States to the Court and

Defendants that the divestitures have been completed and that the continuation of the Final

Judgment is no longer necessary or in the public interest.

      *F.     Stipulation and Order*

      Until the divestitures required by the proposed Final Judgment are accomplished, the

Defendants are required to take all steps necessary to comply with a Stipulation and Order

entered by the Court.

## IV.     REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

      Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages the person has suffered, as well as costs and reasonable

attorneys' fees.  Entry of the proposed Final Judgment neither impairs nor assists the bringing of

any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act, 15

U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private

lawsuit that may be brought against Defendants.

## V.     PROCEDURES AVAILABLE FOR MODIFICATION<br>OF THE PROPOSED FINAL JUDGMENT

      The United States and Defendants have stipulated that the proposed Final Judgment may

be entered by the Court after compliance with the provisions of the APPA, provided that the

United States has not withdrawn its consent.  The APPA conditions entry upon the Court's

determination that the proposed Final Judgment is in the public interest.

      The APPA provides a period of at least sixty days preceding the effective date of the

proposed Final Judgment within which any person may submit to the United States written

comments regarding the proposed Final Judgment.  Any person who wishes to comment should

do so within sixty days of the date of publication of this Competitive Impact Statement in the

Federal Register, or the last date of publication in a newspaper of the summary of this

Competitive Impact Statement, whichever is later.  All comments received during this period

will be considered by the U.S. Department of Justice, which remains free to withdraw its consent

to the proposed Final Judgment at any time before the Court's entry of the Final Judgment.  The

comments and the response of the United States will be filed with the Court.  In addition,

comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website

and, under certain circumstances, published in the Federal Register.

Written comments should be submitted to:

Scott Scheele
Chief, Telecommunications and Broadband Section
Antitrust Division
U.S. Department of Justice
450 Fifth Street NW, Suite 7000
Washington, D.C. 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the

parties may apply to the Court for any order necessary or appropriate for the modification,

interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered a full trial

on the merits challenging the merger.  The United States could have continued this litigation and

sought preliminary and permanent injunctions against T-Mobile's acquisition of Sprint.  The

United States is satisfied, however, that the relief described in the proposed Final Judgment will

provide a reasonably adequate remedy for the harm to competition in the retail mobile wireless

service market.  Thus, the proposed Final Judgment would achieve all or substantially all of the

relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII.   STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A)   the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)   the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust

violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[5]

The United States' predictions about the efficacy of the remedy are to be afforded

---

[5] *See also BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").

deference by the Court.  *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." (internal citations omitted)); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case.").  The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'"  *Microsoft*, 56 F.3d at 1461 (*quoting United States v. Western Elec. Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990)).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case."  *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by

comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged[.]").  Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue.  *Microsoft*, 56 F.3d at 1459-60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using consent judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237, § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene."  15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act).  This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974.  As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process."  119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney).  "A court can make its public interest determination based on the competitive impact statement and response to public comments alone."  *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000)).

## VIII.   DETERMINATIVE DOCUMENTS

In formulating the proposed Final Judgment, the United States considered (1) the

"Network and In-Home Commitments" commitments made to the FCC by T-Mobile and Sprint,[6]

and (2) the "DISH Network 5G Buildout Commitments and Related Penalties" commitments

made to the FCC by DISH.[7]  These documents were determinative in formulating the proposed

Final Judgment, and the Department will file a notice with the Court that includes these

documents to comply with 15 U.S.C. § 16(b).


Dated: July 30, 2019

                Respectfully submitted,


                _____
                Frederick S. Young
                D.C. Bar No. 421285
                Trial Attorney
                Telecommunications and Broadband Section
                Antitrust Division
                U.S. Department of Justice
                450 Fifth Street NW, Suite 7000
                Washington, D.C. 20530
                Telephone (202) 307-2869

---

[6] *See* Letter to Marlene Dortch (FCC) from Nancy J. Victory and Regina M. Keeney (Counsel for T-Mobile and Sprint, respectively), May 20, 2019 at Attachment 1, *available at* https://www.fcc.gov/sites/default/files/t-mobile-us-sprint-letter-05202019.pdf.
    [7] *See* Letter to Donald Stockdale (FCC) from Jeffrey H. Blum (DISH's S.V.P. for Public Policy & Government Affairs), July 26, 2019 at Attachment A, *available at* https://www.fcc.gov/sites/default/files/dish-letter-07262019.pdf.