## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

                  *Plaintiffs*,

v.

DEUTSCHE TELEKOM AG, *et al.*,

                  *Defendants*.

Case No. 1:19-cv-02232-TJK

## RESPONSE OF PLAINTIFF UNITED STATES TO
## PUBLIC COMMENTS ON THE PROPOSED FINAL JUDGMENT

**TABLE OF CONTENTS**

I.     Introduction.............................................................................................................. 1

II.    Procedural History .................................................................................................. 3

III.   Standard of Judicial Review ................................................................................... 4

IV.    The Investigation and the Proposed Final Judgment ............................................. 8

V.     Summary of Public Comments and the United States' Response ........................ 15

    A.   Comments that Fail to Acknowledge the Context of Tunney Act Review ...................... 16

    B.   Comments Regarding DISH's Viability as a Competitor .................................. 19

          1.   *DISH's Assets and Track Record*.............................................................. 19

          2.   *DISH's Incentive and Ability to Compete* ................................................ 25

    C.   Comments Regarding the Enforceability of the Proposed Final Judgment...................... 31

    D.   Other Comments Opposing Entry of the Proposed Final Judgment................................. 37

          1.   *Comments Regarding Harms Outside the Scope of the Complaint* ........................... 37

          2.   *Comments Regarding Services Provided to MVNOs*.................................. 40

          3.   *Comments Regarding Other Regulatory Matters* ...................................... 42

          4.   *Other Negative Comments* ....................................................................... 44

    E.   Comments Regarding Procedural Aspects of this Review ............................... 45

          1.   *Sufficiency of the Filings*........................................................................ 45

          2.   *Comments Regarding the Timing of This Review* ...................................... 46

    F.   Comments Supporting Entry of the Proposed Final Judgment......................................... 48

VI.    Conclusion ............................................................................................................ 52

## I.        Introduction

As required by the Antitrust Procedures and Penalties Act (the "APPA" or "Tunney Act"), 15 U.S.C. §§ 16(b)–(h), the United States hereby responds to the public comments received about the proposed Final Judgment in this case regarding the proposed merger between T-Mobile US, Inc. ("T-Mobile") and Sprint Corporation ("Sprint").  For the reasons set forth below, the remedy the United States obtained addresses the competitive harm alleged in this action and is in the public interest.  Accordingly, the United States recommends no modifications to the proposed Final Judgment.

This remedy, now adopted by the Attorneys General of eight states who have joined this lawsuit[1] and endorsed by two more through comments in this proceeding, promises to expand output in the mobile wireless market and be a boon for American consumers.  The Federal Communications Commission has concluded that the proposed transaction, as modified by the FCC's own set of conditions, would be in the public interest.[2]  In reaching this conclusion, the FCC recognized the significant benefits that the proposed Final Judgment would yield.  Commenters in this proceeding recognize these benefits as well—the United States received 32 comments regarding the settlement, the majority of which were supportive of the merger and/or the proposed Final Judgment.

The proposed Final Judgment provides for a substantial divestiture which, when combined with the mobile wireless spectrum already owned by DISH Network Corp. ("DISH"), will enable DISH to enter the market as a new 5G mobile wireless services provider and a fourth nationwide

---

[1] The Complaint filed on July 26, 2019 was joined by the states of Kansas, Nebraska, Ohio, Oklahoma and South Dakota.  Dkt. No. 1.  An Amended Complaint adding the state of Louisiana as a plaintiff was entered on Aug. 16, 2019. Dkt. No. 28.  The United States' Consent Motions for Leave to Amend the Complaint to add the states of Florida and Colorado as plaintiffs remain pending.  Dkt. Nos. 33, 40.

[2] *In the Matter of Applications of T-Mobile US, Inc., and Sprint Corporation, et al.*, Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, WT Docket No. 18-197, FCC 19-103 (rel. Nov. 5, 2019) ("FCC Order").

facilities-based wireless carrier.  T-Mobile and Sprint must divest to DISH Sprint's prepaid businesses, including more than 9 million Boost Mobile, Virgin Mobile, and Sprint-branded prepaid subscribers, and make available to DISH more than 400 employees currently running these businesses.  The proposed settlement also provides for the divestiture of certain spectrum assets to DISH, and it requires T-Mobile and Sprint to make available to DISH at least 20,000 cell sites and hundreds of retail locations.  T-Mobile must also provide DISH with robust access to the T-Mobile network for a period of seven years while DISH builds out its own 5G network.

The United States expects the proposed Final Judgment will provide substantial long-term benefits for American consumers by ensuring that large amounts of currently unused or underused spectrum are made available to American consumers in the form of advanced 5G networks that this proposed Final Judgment will help facilitate.  Under commitments made to the FCC that have been incorporated into the proposed Final Judgment, DISH, which has been joined as a defendant in this action, is required to bring its existing spectrum resources online in a nationwide, greenfield 5G wireless network or risk substantial penalties at the FCC and in this Court.  Under T-Mobile's commitments to the FCC, which are also incorporated into the proposed Final Judgment, the merged firm will combine T-Mobile's and Sprint's existing complementary spectrum resources and build out a 5G network to deliver network capacity that exceeds the sum of what either carrier could achieve on its own.  Additionally, T-Mobile, Sprint, and DISH must support remote SIM provisioning and eSIM technology, which have the potential to lower barriers to entry and increase the options available to consumers.

The proposed Final Judgment also includes several temporary provisions to protect against a decline in near-term competition during the transition period.  To facilitate DISH's transition to an independent wireless network, the proposed Final Judgment requires T-Mobile and Sprint to enter into a full mobile virtual network operator agreement ("Full MVNO Agreement") with DISH

at extremely favorable terms.  This agreement will enable DISH to operate as a Full MVNO, initially using the T-Mobile network to carry its subscribers' traffic and shifting this traffic to its own network facilities as it deploys them.  The unprecedented required divestitures and related obligations in the proposed Final Judgment are intended to ensure that DISH can begin to offer competitive services and become an independent and vigorous competitor in the retail mobile wireless service market in which the proposed merger would otherwise lessen competition. Finally, the proposed Final Judgment requires that T-Mobile and Sprint extend certain current Mobile Virtual Network Operator ("MVNO") agreements until the expiration of the Final Judgment, maintaining the status quo until DISH's network becomes a potential option for MVNOs.

The comments that the United States received reflect a wide array of views. After careful consideration of these comments, the United States has determined that nothing in them casts doubt on its conclusion that the public interest is well-served by the proposed remedy.  In accordance with the Court's order granting the Unopposed Motion of the United States to Excuse *Federal Register* Publication of Comments,[3] the United States is publishing the comments and this response on the Antitrust Division's website and is submitting to the *Federal Register* this response and the website address at which the comments may be viewed and downloaded.  Following *Federal Register* publication, the United States will move the Court to enter the proposed Final Judgment.

## II.        Procedural History

On April 29, 2018, T-Mobile and Sprint, together with their parent entities Deutsche Telekom AG ("Deutsche Telekom") and SoftBank Group Corp. ("SoftBank"), agreed to combine their respective businesses in an all-stock transaction.[4]  On July 26, 2019, the United States filed a

---

[3] Minute Order, Dkt. No. 41 (Nov. 5, 2019) (granting motion to excuse publication of the full text of each comment in the Federal Register).

[4] Deutsche Telekom, T-Mobile, SoftBank, Sprint, and DISH are referred to collectively as "Defendants."

civil antitrust Complaint seeking to enjoin the proposed transaction because it would substantially

lessen competition for retail mobile wireless services in the United States, in violation of Section 7

of the Clayton Act, 15 U.S.C. § 18.

Simultaneously with the filing of the Complaint, the United States filed a proposed Final

Judgment and a Stipulation signed by the parties that consents to entry of the proposed Final

Judgment after compliance with the requirements of the Tunney Act.[5]  The United States

subsequently filed a Competitive Impact Statement describing the transaction and the proposed

Final Judgment.  The United States caused the Complaint, the proposed Final Judgment, and

Competitive Impact Statement to be published in the *Federal Register* on August 12, 2019, *see*

84 Fed. Reg. 39862 (Aug. 12, 2019), and caused notice regarding the same, together with

directions for the submission of written comments relating to the proposed Final Judgment, to be

published in *The Washington Post* on August 3-9, 2019.[6]  The 60-day period for public

comment ended on October 11, 2019.

## III.        Standard of Judicial Review

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in

antitrust cases brought by the United States be subject to a 60-day comment period, after which the

Court shall determine whether entry of the proposed final judgment "is in the public interest." 15

U.S.C. § 16(e)(1).  In making that determination, the Court, in accordance with the statute as

amended in 2004, is required to consider:

(A)    the competitive impact of such judgment, including termination of alleged
violations, provisions for enforcement and modification, duration of relief sought,
anticipated effects of alternative remedies actually considered, whether its terms are
ambiguous, and any other competitive considerations bearing upon the adequacy of

---

[5] *See* Stipulation and Order, Dkt. No. 2-1; Proposed Final Judgment, Dkt. No. 2-2 ("PFJ").

[6] On Sept. 6, the United States filed a Notice of Determinative Documents, as required by 15 U.S.C. § 16(b), along with an accompanying motion to file these documents with limited redactions of confidential information.  *See* Dkt. No. 31. This motion remains pending. The redacted versions of these documents have been available to the public since before the Competitive Impact Statement was filed on July 30, 2019.  Dkt. No. 20.

such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)     the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed final judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties.  *See Microsoft*, 56 F.3d at 1458–62.  With respect to the adequacy of the relief secured by the proposed final judgment, a court's role is "not to make de novo determination of facts and issues."  *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16 (D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3.  Instead, "[t]he balancing of competing social and political

5

interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577 (quotation marks omitted). "The court should bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (quotation marks omitted). More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent. *Id.* at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." *Id.*

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms.") (internal citations omitted); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case"). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (quoting *W. Elec. Co.*, 900 F.2d at 309).

Moreover, Congress limited the court's role under the APPA to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and did not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not "effectively [to] redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using consent judgments in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). Courts can, and do, make Tunney Act determinations

based solely on the competitive impact statement, comments filed by the public, and the United States' response thereto, even when there is opposition to the proposed remedy. A recent example is *United States v. Bayer AG*, in which the court entered the proposed Final Judgment without further factfinding despite opposition from a number of commenters, including several of the states now involved in the lawsuit seeking to enjoin the T-Mobile/Sprint transaction in the U.S. District Court for the Southern District of New York ("S.D.N.Y. Litigation"). *See* Order, *United States v. Bayer AG*, No. 18-1241 (D.D.C. Feb. 8, 2019); *see also United States v. US Airways,* 38 F. Supp. 3d 69, 76 (D.D.C. 2014) (entering proposed Final Judgment over the opposition of commenters and explaining that "[a] court can make its public interest determination based on the competitive impact statement and response to public comments alone.") (citing *Enova*, 107 F. Supp. 2d at 17).

IV.          **The Investigation and the Proposed Final Judgment**

     The proposed Final Judgment is the culmination of a comprehensive, fifteen-month investigation conducted by the Antitrust Division of the U.S. Department of Justice into T-Mobile's proposed acquisition of Sprint. The proposed Final Judgment addresses and ameliorates the harms alleged in the Complaint by enabling DISH's entry as a fourth nationwide facilities-based wireless competitor, expediting deployment of advanced 5G networks for American consumers, and providing other relief. The proposed Final Judgment has several components, by which the parties agreed to abide during the pendency of the Tunney Act proceeding, and which the Court ordered in the Stipulation and Order of July 29, 2019, Dkt. No. 16.

     *Divestiture of Sprint's Prepaid Businesses*: Under the proposed Final Judgment, T-Mobile must divest to DISH Sprint's prepaid retail wireless service businesses and provide DISH an exclusive option to acquire cell sites and retail stores decommissioned by the merged firm.

- Prepaid Assets.  The proposed Final Judgment requires T-Mobile to divest to DISH almost all of Sprint's prepaid wireless businesses,[7] including the Boost-branded, the Virgin-branded, and the Sprint-branded businesses.  These Prepaid Assets, coupled with required network support from T-Mobile described more fully below, will provide an existing business, with assets including customers, employees, and intellectual property, that will enable DISH to offer retail mobile wireless service.  Acquiring this existing business will enhance DISH's incentives to invest in a robust facilities-based network.

- 800 MHz Spectrum Licenses.  The proposed Final Judgment further requires T-Mobile to divest to DISH Sprint's 800 MHz spectrum licenses.  This spectrum would add to DISH's existing spectrum assets in order to ensure DISH has sufficient spectrum to provide mobile wireless service to customers.[8]

- Cell Sites and Retail Stores.  The proposed Final Judgment also requires T-Mobile to provide to DISH an exclusive option to acquire all cell sites and retail store locations being decommissioned by the merged firm.  This requirement will enable DISH to utilize such existing cell sites and retail stores that are useful to DISH in

---

[7] The divestiture does not include subscribers that Virgin Mobile serves under the Assurance Wireless brand as part of the federally subsidized Lifeline program administered by the FCC.  The baseline Assurance Wireless plan, which includes unlimited voice and text and a fixed allotment of data, is free to qualifying subscribers.  Virgin Mobile receives a subsidy from the FCC for each of these subscribers that it serves.  Subscribers may also purchase additional data for a fee.  Because Virgin Mobile's revenue for Assurance Wireless subscribers comes primarily from federal subsidies rather than user fees, this segment of the market does not raise the same competitive issues as the unsubsidized prepaid segment.  Moreover, T-Mobile has publicly committed to maintaining the Assurance Wireless service indefinitely, barring material changes to the Lifeline program.  *See* Letter from T-Mobile CEO John Legere to Rep. Tony Cardenas (Mar. 6, 2019), *available at* https://cardenas.house.gov/sites/cardenas.house.gov/files/3-6-19%20T-MOBILE%20RESPONSE%20-%20Final%20Cardenas%20Response%20030619%200908%20am%20est_Executed%20%28002%29%281%29.pdf.  The settlement is not affected by recent news reports concerning Sprint's compliance with the Lifeline program's requirements because the Lifeline customers are not included in the divestiture.  The divestitures also do not include Sprint's prepaid customers receiving services through its Swiftel and Shentel affiliates, due to contractual obligations.

[8] DISH may, at its option, elect not to acquire the spectrum if DISH can meet certain network buildout and service requirements without it.  *See infra* at 23.  In such case, T-Mobile will auction the 800 MHz spectrum licenses to any person who is not already a national facilities-based wireless carrier.

9

building out its own wireless network and providing mobile wireless service to
consumers.

- <u>Transition Services</u>.  At DISH's option, T-Mobile and Sprint shall enter into one or
  more transition services agreements to provide billing, customer care, SIM card
  procurement, device provisioning, and all other services used by the Prepaid Assets
  prior to the date of their transfer to DISH for an initial period of up to two years after
  transfer.  Such transition services will enable DISH to use the Prepaid Assets as
  quickly as possible and will help prevent disruption for Boost, Virgin, and Sprint
  prepaid customers as the businesses are transferred to DISH.

The divestiture of Sprint's prepaid businesses must be completed in such a way as to satisfy
the United States in its sole discretion that it can and will be operated by DISH as a viable, ongoing
business that can compete effectively in the retail mobile wireless service market.  DISH is required
to offer retail mobile wireless services, including offering nationwide postpaid retail mobile
wireless service within one year of the closing of the sale of the Prepaid Assets.[9]  As set forth in the
Stipulation and Order, DISH has agreed to be joined to this action for purposes of the divestiture.
Including DISH is appropriate because the United States has determined that DISH is a necessary
party to effectuate the relief obtained; the divestiture package was crafted specifically taking into
consideration DISH's existing assets and capabilities, and divesting the package to another
purchaser would not preserve competition.  Thus, as discussed above, the proposed Final Judgment
imposes certain obligations on DISH to ensure that the divestitures take place expeditiously and

---

[9] To ensure that DISH and T-Mobile remain independent competitors, Section XV of the proposed Final Judgment
prohibits T-Mobile from reacquiring from DISH any part of the Divestiture Assets, other than a limited carveout for T-
Mobile to lease back a small amount of spectrum for a two-year period.  Further, Section XV of the proposed Final
Judgment prohibits DISH from selling, leasing, or otherwise providing the right to use the Divestiture Assets to any
national facilities-based mobile wireless carrier.  These provisions ensure that T-Mobile and DISH cannot undermine
the purpose of the proposed Final Judgment by later entering into a new transaction, with each other or with another
competitor, that would reduce the competition that the divestitures have preserved.

that DISH meet certain deadlines in building out and operating its own mobile wireless services network to provide competitive retail mobile wireless service.

*Full MVNO Agreement*:  The proposed Final Judgment requires T-Mobile and Sprint to enter into a Full MVNO Agreement with DISH for a term of no fewer than seven years.  Under the agreement outlined in the proposed Final Judgment, T-Mobile and Sprint must permit DISH to operate as an MVNO on the merged firm's network on commercially reasonable terms that are approved by the Department of Justice and to resell the merged firm's mobile wireless service.  As DISH deploys its own mobile wireless network, T-Mobile and Sprint must also facilitate DISH operating as a Full MVNO by providing the necessary network assets, access, and services.  These requirements will enable DISH to begin operating as an MVNO as quickly as possible after entry of the Final Judgment, and provide DISH the support it needs to offer retail mobile wireless service to consumers while building out its own mobile wireless network.[10]  They will also permit DISH to begin to market itself as a national retail mobile wireless provider immediately after the divestiture closes.

Notably, T-Mobile will provide DISH with a broader array of rights under the Full MVNO Agreement than wholesale providers generally grant to their partners in traditional MVNO agreements.  This will benefit competition and American consumers.  In particular, traditional MVNO agreements generally do not permit the MVNO partner to construct its own network facilities and carry a portion of its traffic on these facilities while relying on the wholesale provider to carry the remainder of the MVNO's traffic.  The Full MVNO Agreement will provide DISH with this ability.  In addition, unlike traditional MVNO agreements, full MVNO agreements grant

---

[10] To guard against the possibility that implementation and execution of the proposed Final Judgment and any associated agreements between T-Mobile and DISH could facilitate coordination or other anticompetitive behavior during the interim period before DISH becomes fully independent of T-Mobile, T-Mobile and DISH are required to implement firewall procedures to prevent each company's confidential business information from being used by the other for any purpose that could harm competition.  T-Mobile and DISH submitted their respective firewall procedures to the United States on Sept. 10, 2019.

the MVNO control over a broader range of technological components, which allow the MVNO to manage the customer relationship more directly.[11] By providing these capabilities, full MVNO agreements promise to enable more robust competition than traditional MVNO agreements have in the past.[12] The Full MVNO Agreement in this case will allow DISH to begin competing with the other carriers in short order and will facilitate DISH's transition into a full, facilities-based mobile wireless service provider.[13]

*Facilities-Based Entry and Expansion*: The proposed Final Judgment requires T-Mobile and Sprint to comply with all network build commitments made to the Federal Communications Commission (FCC)[14] related to their merger or the divestiture to DISH as of the date of entry of the Final Judgment, subject to verification by the FCC.[15] The FCC concluded that the transaction, as

---

[11] Full MVNO agreements have been used to enable entry in wireless markets outside of the United States as well. *See* European Commission, DG Competition, Case M.7758-Hutchinson 3D Italy/Wind/JV § 5.2.4 (Jan. 1, 2016) ("So-called 'full MVNOs' typically do not have radio network access or spectrum, but own some of the core infrastructure, issue their own SIM cards, have network codes, a database of customers and back-office functions to manage customer relations."), *available at* https://ec.europa.eu/competition/mergers/cases/decisions/m7758_2937_3.pdf.

[12] For example, cable provider Altice has launched a wireless service based on an infrastructure-based MVNO agreement that it plans to leverage to compete with facilities-based carriers across a variety of geographic areas. *See* Letter to Marlene H. Dortch (FCC) from Jennifer L. Richter, WT Docket No. 18-197 (June 6, 2019) ("Altice's model to enter the U.S. wireless market by investing in wireless core infrastructure and utilizing a full infrastructure mobile virtual network operator ('MVNO') will position Altice to provide true competition in the retail markets, providing significant benefits for consumers in Altice's diverse markets, from the urban centers in New York and New Jersey to the rural communities in West Virginia and Texas."), *available at* https://ecfsapi.fcc.gov/file/10607282312243/Altice %20USA%20Inc.%20- %20Ex%20Parte%206.4.19%20Meetings.pdf.

[13] Given the difference between traditional MVNO agreements and Full MVNO agreements like the one at issue here, comparisons between DISH and traditional MVNOs that have failed in the past are inapposite. *See, e.g.*, RWA Comment (Exhibit 24) at 6. Similarly, CWA is incorrect in suggesting that there is a "mismatch" between the Complaint and the remedy. CWA Comment (Exhibit 10) at 1. The Complaint alleges that the competitive constraint imposed by *traditional MVNOs* is limited, while the remedy will allow DISH to enter as a *Full MVNO* and ultimately transition into a facilities-based carrier. *See also* FCC Order ¶ 205 (finding that "generalized references to prior Commission decisions regarding the competitive significance of MVNOs fail to account for the unique aspects of the wholesale agreement required by the Boost Divestiture Conditions").

[14] The FCC conducted its own independent review of this transaction and concluded that the transfer of licenses from Sprint to T-Mobile is in the public interest. *See* FCC Order ¶ 4. As part of its review, the FCC accepted T-Mobile's voluntary commitments on various elements of its post-merger plans, including with respect to the post-merger buildout of its 5G network. *Id.* ¶¶ 25-32. In accepting T-Mobile's voluntary commitments in its order, the FCC has transformed them into legally binding commitments. *Id.* ¶ 388.

[15] *See* Letter to Marlene H. Dortch (FCC) from Nancy J. Victory and Regina M. Keeney (Counsel for T-Mobile and Sprint, respectively), WT Docket No. 18-197, Attachment 1 (May 20, 2019), *available at* https://www.fcc.gov/sites/default/files/t-mobile-us-sprint-letter-05202019.pdf.

modified by these commitments, would "result in a number of benefits," including "the deployment of a highly robust nationwide 5G network" and "substantially increased coverage and capacity (and in turn, user speeds and cost structure) compared to the standalone companies."[16]  The FCC's order contains a comprehensive Technical Appendix detailing the benefits of T-Mobile's post-merger network plan.[17]  The commenters in this proceeding generally do not attempt to criticize T-Mobile's network build commitments or the associated benefits they are expected to bring to consumers.

In turn, DISH is required to comply with the June 14, 2023 AWS-4, 700 MHz, H Block, and Nationwide 5G Broadband network build commitments made to the FCC on July 26, 2019, subject to verification by the FCC.[18]  The FCC concluded that modifying DISH's spectrum licenses to include these commitments would be in the public interest and has directed its Wireless Telecommunications Bureau to do so once the divestiture of Boost has been consummated.[19] Incorporating these obligations into the proposed Final Judgment is intended to increase the incentives for the merged firm to achieve the promised efficiencies from the merger and for DISH to build out its own national facilities-based mobile wireless network to replace the competition lost as a result of Sprint being acquired by T-Mobile.  Increasing DISH's incentives to complete the buildout of a fourth standalone 5G nationwide wireless network also serves to decrease the likelihood of anticompetitive coordinated effects that may arise out of the merger.[20]

---

[16] FCC Order ¶ 236.

[17] *Id.* Technical App'x ¶¶ 31-42 (explaining complementarities between the two firms' spectrum holdings, potential efficiencies regarding cell site equipment deployment, and the merger's benefits to network capacity).

[18] *See* Letter to Donald Stockdale (FCC) from Jeffrey H. Blum (DISH), Attachment A (July 26, 2019) ("Blum July 26, 2019 Letter"), *available at* https://www.fcc.gov/sites/default/files/dish-letter-07262019.pdf.

[19] FCC Order ¶ 365.

[20] *See* Complaint ¶ 5 (alleging that, absent the remedy, "the merger likely would make it easier for the three remaining national facilities-based mobile wireless carriers to coordinate their pricing, promotions, and service offerings"); *see also id.* ¶¶ 21-22.  Notably, the FCC "d[id] not conclude that the likelihood of coordination would increase post-transaction."  *See* FCC Order ¶ 186.

13

*600 MHz Spectrum Deployment*: The proposed Final Judgment requires DISH and T-Mobile to enter into good-faith negotiations to allow T-Mobile to lease some or all of DISH's 600 MHz spectrum for use in offering mobile wireless services to its subscribers. Such an agreement is expected to expand output by making the 600 MHz spectrum available for use by consumers even before DISH has completed building out its network, and would assist T-Mobile in transitioning consumers to its 5G network.

*MVNO Requirements*: The proposed Final Judgment obligates T-Mobile and Sprint to extend all of their current MVNO agreements until the expiration of the proposed Final Judgment. This obligation will ensure that T-Mobile's and Sprint's MVNO partners remain options for the consumers who currently use them. This will also permit T-Mobile's and Sprint's MVNO partners to retain the benefits of their existing agreements until the expiration of the proposed Final Judgment, by which time DISH is expected to have become an additional provider of wireless services.

*T-Mobile's and DISH's eSIM Obligations*: The proposed Final Judgment requires T-Mobile and DISH to support eSIM technology and prohibits T-Mobile and DISH from discriminating against devices based on their use of remote SIM provisioning or use of eSIM technology. The more widespread use of eSIMs and remote SIM provisioning may help DISH attract consumers as it launches its mobile wireless business. These provisions are intended to increase the disruptiveness of DISH's entry by making it easier for consumers to switch between wireless carriers (particularly between the merged firm and DISH) and to choose a provider that does not have a nearby physical retail location, thus lowering the cost of DISH's entry and expansion.[21]

---

[21] The FCC has recognized the benefits of eSIM technology and the potential for this condition to promote competition among mobile wireless service providers. *See id.* ¶ 206 ("[R]equirements related to the use of eSIM will tend to lower switching costs for wireless consumers, increasing the ability of Boost to win subscribers from T-Mobile and, in turn, Boost's ability to constrain pricing for T-Mobile's brands.").

## V.        Summary of Public Comments and the United States' Response

The United States received 32 comments from different categories of commenters, the majority of which were supportive of the merger and/or the proposed final judgment. The commenters include: The Advanced Communication Law & Policy Institute; the American Antitrust Institute; Americans for Tax Reform; the Asian Business Association; Attorneys General for the States of Utah and Arkansas; Mr. Daniel M. Bellemare; the CalAsian Chamber of Commerce; the California Emerging Technology Fund; the Center for Individual Freedom; the Communications Workers of America; the Competitive Enterprise Institute; Economics Professors (Nicholas Economides, John Kwoka, Thomas Philipon, Robert Seamans, Hal Singer, Marshall Steinbaum, and Lawrence J. White); the Enterprise Wireless Alliance; the Greater Kansas Chamber of Commerce; Mr. Edward S. Hasten; the International Center for Law & Economics; the National Diversity Coalition; the National Hispanic Caucus of State Legislators; the National Puerto Rican Chamber of Commerce; NTCH, Inc.; the Overland Park Chamber of Commerce; a coalition of advocacy groups (Public Knowledge, Consumer Reports, Electronic Frontier Foundation, and New America's Open Technology Institute); Randolph May and Seth Cooper of the Free State Foundation; the Rural Wireless Association; Scott Wallsten of the Technology Policy Institute; Tech Freedom; Members of the United States House of Representatives (Representatives Anna G. Eshoo, Billy Long, Adam Smith, Doug Lamborn, Gregory W. Meeks, Roger W. Marshall, Suzan DelBene, Dan Newhouse, Anthony G. Brown, Ron Estes, Mike Thompson, Blaine Luetkemeyer, and Kurt Schrader); Vermont Telephone Co.; Viaero Wireless; Voqal, Inc.; Mr. R. Bruce Williamson; and Mr. Josh Wool.

The comments can be grouped into categories: (1) comments that fail to acknowledge the context of this Court's Tunney Act review; (2) comments regarding DISH's viability as a competitor; (3) comments regarding the enforceability of the proposed Final Judgment; (4) other

comments opposing entry of the proposed Final Judgment; (5) comments regarding procedural

aspects of this review; and (6) other comments supporting entry of the proposed Final Judgment.

A.        Comments that Fail to Acknowledge the Context of Tunney Act Review

A number of comments do not actually address the question presented to this Court, which

is whether or not entry of the United States' proposed Final Judgment remedy is in the public

interest under the Tunney Act.  If these commenters acknowledge the Tunney Act at all, they make

arguments that do not consider the governing legal standards discussed above, or the fact that the

allegations in the United States' complaint have not been tested in any court.  Nor do they

acknowledge the benefits to the public from the merger itself.  Several commenters presuppose that

the standard relevant here is the same standard governing how a court is to fashion a remedy *after*

an antitrust violation has been proven in court.[22]  As discussed above, however, this is not the

standard Congress and case law prescribe for courts reviewing settlements under the Tunney Act.

Instead, courts recognize that a proposed final judgment necessarily represents a compromise

between the parties, and give deference to the United States' views of the likely effects of the

settlement.

Entry of the proposed Final Judgment here is fully in keeping with established Tunney Act

standards.  In *United States v. US Airways*, Judge Kollar-Kotelly entered the proposed Final

Judgment in the merger of U.S. Airways and American Airlines over the objections of commenters.

While noting that the "the Final Judgment does not create a new independent competitor nor

replicate American's capacity expansion plans nor affirmatively preserve the Advantage Fares

program," the court credited the United States' "predict[ion] that it will impede the airline

---

[22] *See* CWA Comment (Exhibit 10) at 6 and n.10 (quoting a statement in the Antitrust Division's remedies guide that "The relief in an antitrust case must be 'effective to redress the *violations,*'" which quotes *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972), a case addressing post-trial relief) (emphasis added); Economics Professors Comment (Exhibit 12) at 2 (referring to "restor[ing] "the *ex ante* competitive conditions in the affected antitrust product markets.").

industry's evolution toward a tighter oligopoly."[23]  By reducing slot concentration at Reagan

National, the settlement provided low-cost carriers ("LCCs") "with substantial assets at key

airports," and the Court credited the United States' prediction that "providing LCCs with these

otherwise unavailable opportunities will create incentives for LCCs to invest in new capacity,

expand into new markets, and provide more meaningful system-wide competition to the three

remaining legacy airlines."[24]  Ultimately, the Court found that the "United States has provided a

reasonable basis for concluding that the settlement will mitigate the anticompetitive effects of

combining two of the remaining legacy airlines."[25]

       In *United States v. Bayer AG*, Judge Boasberg entered the proposed Final Judgment, over

commenters' criticisms similar to those here.[26]  Additionally, in *United States v. Abitibi–*

*Consolidated, Inc.,* Judge Collyer entered the proposed Final Judgment where the "United States

has provided a factual basis for concluding that the . . . divestiture was reasonably adequate."[27]

"Irrespective of whether that conclusion [was] correct," the court recognized that the "United States

has established an 'ample foundation for [its] judgment call' and thus shown 'its conclusion [was]

reasonable.'"[28]

---

[23] *US Airways*, 38 F. Supp. 3d at 77.

[24] *Id.* at 78.

[25] *Id.* at 79.

[26] In *Bayer*, as here, commenters questioned both the ability of the divestiture buyer, BASF, "to succeed with the divested assets" and its "incentives to compete aggressively against the merged company."  *See* Response of the United States to Public Comments on the Proposed Final Judgment at 14, *United States v. Bayer AG*, No. 1:18-cv-1241 (JEB) (D.D.C. Jan. 29, 2019).  There, as here, the United States "carefully considered these issues in crafting the proposed remedy" and required the merged company to make an appropriate divestiture and to provide an array of transitional services, all while "specifically taking into account [the divestiture buyer's] existing assets and capabilities."  *Id.*  And while there, as here, it was "impossible to predict with certainty how well [the buyer, BASF] will perform with the divested assets (just as [the merged firm's] own performance with those assets absent the merger is not certain)," the proposed remedy "ensure[d]" that it "will be as well-positioned as possible and have the necessary incentives" to "replace the competition that otherwise would be lost through the merger."  *Id.*

[27] *United States v. Abitibi–Consolidated, Inc.,* 584 F. Supp. 2d 162, 166 (D.D.C.2008).

[28] *Id.* (quoting *Microsoft,* 56 F.3d at 1461).

Almost all the comments opposing the proposed Final Judgment also ignore the benefits to the public from this merger.[29]  For example, the Economics Professors attempt to dismiss the value of increasing capacity by arguing that the merger will not result in reductions in marginal cost. Specifically, they state that "the merger purportedly will increase capacity … [but] there is no explanation of how a purported increase in capacity reduces the merged firm's marginal cost of serving the next customer or the next neighborhood." [30]  In fact, the relationship between an increase in capacity and a reduction in marginal cost is a well-understood economic phenomenon in industries with capacity constraints. In the market for mobile wireless services, the marginal cost of an additional customer on a capacity-constrained network includes the costs of the congestion caused by adding that customer to the network. Thus, a merger-induced expansion of capacity would result in a reduction in marginal costs for a network facing congestion.[31]

Other commenters, however, recognize the substantial benefits that the proposed Final Judgment promises to bring.  The Advanced Communications Law & Policy Institute (ACLP) at New York Law School states that it supports entry of the proposed Final Judgment because it believes the public interest benefits from the merger "are substantial," and because the settlement "will ensure that valuable spectrum resources will finally be put to productive use by Dish Network, an entity that has long lingered on the periphery of the U.S. wireless space."[32]  In ACLP's view, DISH is "well positioned to become a viable player" in wireless, not only because of its existing "treasure trove" of spectrum licenses, but also because the proposed Final Judgment will

---

[29] *See* U.S. Department of Justice, Antitrust Division Policy Guide to Merger Remedies, at 2 (Oct. 2004), https://www.justice.gov/sites/default/files/atr/legacy/2011/06/16/205108.pdf ("2004 Remedies Guide") ("Effective remedies preserve the efficiencies created by a merger, to the extent possible, without compromising the benefits that result from maintaining competitive markets.").

[30] Economics Professors Comment (Exhibit 12) at 6.

[31] Notably, the FCC found that "New T-Mobile will have significantly lower marginal costs for providing advanced wireless services."  FCC Order ¶ 236.

[32] ACLP Comment (Exhibit 1) at 4.

enable DISH to "leverage numerous resources either divested by or leased from the merging parties to support deployment of a standalone mobile service."[33]  ACLP further notes that, in addition to the fact that DISH "finally leveraging its stockpile of spectrum licenses . . . is a major win for consumers and the public interest writ large," consumers also will "likely see additional price and service offerings over the next few years as [DISH] rolls out its service and seeks to respond to and one-up its competitors."[34]

        B.                Comments Regarding DISH's Viability as a Competitor

Several commenters object to the proposed Final Judgment on the basis that DISH will not be a sufficiently strong competitor to AT&T, Verizon, and T-Mobile.  These commenters point to DISH's asset base and track record to support their claim that the company will lack the incentive and ability to compete vigorously in the mobile wireless market.  The United States disagrees with these assertions.

              1.     *DISH's Assets and Track Record*

Some commenters take issue with the fact that DISH has been acquiring spectrum for a number of years but has not yet deployed a network that operates over that spectrum.  For example, the CWA and Economics Professors accuse DISH of "warehousing" spectrum and claim that DISH has missed FCC network buildout deadlines.[35]  Mr. Wool asks, "given DISH Network's failure to meet prior Federal Communications Commission (FCC) build-out requirements on its existing spectrum . . . how is the proposed Final Judgment consistent with 'a low risk tolerance'?"[36]  Several

---

[33] *Id.* at 6.

[34] *Id.*

[35] CWA Comment (Exhibit 10) at 16-18; Economics Professors Comment (Exhibit 12) at 9.

[36] Wool Comment (Exhibit 32) at 3.

commenters point to T-Mobile's past criticism of DISH as a basis for questioning DISH's viability as a competitor.[37]

Far from undermining the efficacy of the proposed Final Judgment, DISH's spectrum assets make it a prime candidate for entry into the mobile wireless market. DISH has invested more than $20 billion in spectrum licenses.[38] As a result, DISH currently has far more spectrum at its disposal than any other company aside from the existing nationwide wireless carriers.[39] The Division's 2004 Remedies Guide notes that "[t]he circumstances of potential bidders may vary in ways that affect the scope of the assets each would need to compete quickly and effectively."[40] DISH's spectrum assets provide it with the ability to compete more quickly and more effectively than another entrant could. The proposed Final Judgment promises to put this spectrum to use for the benefit of consumers.[41]

These commenters' line of argument also fails to address what incentive DISH could have to acquire $20 billion in spectrum licenses and spend billions of dollars on the divestiture in this matter and risk billions more in fines, only to sit on these assets. The more logical inference, which aligns with DISH's economic incentives, is that DISH will deploy its spectrum and enter the mobile wireless market. DISH has explained to the FCC that the company has engaged in efforts to develop technology that operates over its spectrum but that it opted not to construct a 4G/LTE

---

[37] *See, e.g.*, CWA Comment (Exhibit 10) at 16; Economics Professors Comment (Exhibit 12) at 9; NTCH Comment (Exhibit 20) at 9-11.

[38] "DISH to Become National Facilities-Based Wireless Carrier" (July 26, 2019), http://about.dish.com/2019-07-26-DISH-to-Become-National-Facilities-based-Wireless-Carrier ("DISH July 26, 2019 Press Release") ("These developments are the fulfillment of more than two decades' worth of work and more than $21 billion in spectrum investments intended to transform DISH into a connectivity company"); *see also* Todd Shields & Scott Moritz, Bloomberg, "A $20 Billion Wireless Stockpile Is the Key to T-Mobile Merger" (July 6, 2019), https://www.bloomberg.com/news/articles/2019-07-06/a-20-billion-wireless-stockpile-is-the-key-to-t-mobile-merger.

[39] FCC Communications Marketplace Report, 33 FCC Rcd 12558, 12587 Fig. A-25 (Dec. 26, 2018), *available at* https://docs.fcc.gov/public/attachments/FCC-18-181A1_Rcd.pdf.

[40] 2004 Remedies Guide at 11.

[41] *See* ACLP Comment (Exhibit 1) at 6.

network at a time when 5G technology was on the horizon.[42]  Now that mobile wireless providers are beginning to deploy 5G, DISH has issued three wide-ranging requests for information/requests for production to vendors of wireless equipment, software, and services to begin the process of sourcing inputs for the construction of a 5G network.[43]

DISH has not, as some commenters suggest, violated the FCC's construction requirements for its spectrum licenses.  Those licenses have two relevant dates:  an interim construction milestone and a final construction milestone.  The FCC provides licensees (and in this case, DISH) with the choice of (1) satisfying both construction milestones, or (2) missing the interim milestones and agreeing to accelerate the final milestones by one year.  DISH chose not to meet the interim construction milestones for its licenses, which meant that its final construction milestones were accelerated.[44]  These final milestones have not yet passed, and prior to the remedy discussions in this case, DISH had provided the FCC with a proposal on how it planned to meet them.  Specifically, DISH planned to rely on the FCC's "flexible use" policy, which permits licensees to choose the technology they use to meet their construction milestones, in order to execute a two-phase network deployment plan:  (1) deploy a narrowband Internet of Things ("NB-IoT") network

---

[42] *See* DBSD Services Limited, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C.'s Consolidated Interim Construction Notification for AWS-4 and Lower 700 MHz E Block Licenses (filed Mar. 7, 2017) ("DISH March 7, 2017 Buildout Report"), *available at* https://wireless2.fcc.gov/UlsEntry/attachments/attachmentViewRD.jsp; ATTACHMENTS=1fTvdTtC8v1mzWxXqsWNxw2BFWwHpdcSQM90fP1g21sy8CTyXHgB!-784178296!-1151086485?applType=search&fileKey=1888085105&attachmentKey=20103063&attachmentInd=applAttach.

[43] *See* "DISH to release deployment services RFP for standalone 5G network buildout" (Oct. 21, 2019), https://ir.dish.com/news-releases/news-release-details/dish-release-deployment-services-rfp-standalone-5g-network; Letter from Jeffrey Blum (DISH) to Marlene H. Dortch (FCC), WT Docket No. 18-197, at 4 (Aug. 1, 2019) ("Blum Aug. 1, 2019 Letter"), *available at* https://ecfsapi.fcc.gov/file/10801235883258/2019-08-01%20DISH%20Ex%20Parte%20WT%20Docket%20No%2018-197%20(w%20summary).pdf; *see also* Martha DeGrasse, Fierce Wireless, "Dish Casts Wide Net to Vendor Community" (Aug. 12, 2019), https://www.fiercewireless.com/wireless/dish-casts-wide-net-to-vendor-community.

[44] *See* DISH March 7, 2017 Buildout Report at 4 (certifying that DISH planned to meet the accelerated final construction milestones); Letter from Jeffrey Blum (DISH) to Donald Stockdale (FCC) (Sept. 21, 2018) (explaining that "[s]uch a bridge to a 5G deployment is necessary because, among other things, equipment/installation availability for full standalone 5G (3GPP Release 16) will only be available after the March 2020 buildout milestones for our AWS-4 and E Block licenses, making it impractical for us to deploy 5G before such date."), *available at* https://wireless2.fcc.gov/UlsEntry/attachments/attachmentViewRD.jsp?applType=search&fileKey=1089751155&attachmentKey=20454822&attachmentInd=licAttach.

before the final construction milestones had passed, and (2) use this NB-IoT network as a foundation to ultimately deploy a 5G network at a later date.[45]  The United States agrees with commenters who argue that having DISH construct a 5G network immediately is preferable to this two-stage plan, but any suggestion that DISH has violated the FCC's requirements is simply incorrect.[46]

The economics of DISH's entry under the proposed Final Judgment are fundamentally different—and more favorable to DISH—than what was available to DISH before the proposed Final Judgment.  Much of the relief in the proposed Final Judgment is to provide DISH with assets and resources to make its entry as a nationwide, facilities-based wireless carrier easier and more certain.  DISH has explained that the proposed Final Judgment "will facilitate and accelerate DISH's entry into the wireless market as a 5G competitor by, among other things, enabling DISH to deploy its spectrum at the same time to provide a better overall 5G service, at lower cost, and on a more efficient deployment schedule."[47]  In particular, the divestiture of Sprint's prepaid businesses will enable DISH to serve an existing base of 9 million subscribers.  This customer base will put DISH into the wireless business immediately upon the closing of the divestitures, without first having to construct a network from scratch.  DISH will have the option of acquiring more than 20,000 cell sites and upwards of 400 retail locations directly from T-Mobile, further reducing the burdens of building out a new network.  As DISH completes its network buildout, it will be in position to move existing subscribers onto its new network in short order, allowing it to

---

[45] *Id.* at 6-7.

[46] Given this background, the Economics Professors' claim that Dish has "no history or presence in this industry" is also incorrect.  Economics Professors Comment (Exhibit 12) at 3.  In connection with its NB-IoT plans, DISH had established relationships with vendors, leased towers, and acquired equipment for a core network.  *See* Mike Dano, Fierce Wireless, "DISH's First Wireless Partners Revealed:  Ericsson and SBA" (Nov. 8, 2019), https://www.fiercewireless.com/iot/dish-s-first-wireless-partners-revealed-ericsson-and-sba.

[47] Blum Aug. 1, 2019 Letter at 3; *see also* FCC Order ¶ 372 ("We agree with DISH that its acquisition of Sprint's prepaid assets along with the set of MVNO, wholesale, and roaming rights agreed to with the Applicants provides DISH the means to provide nationwide service on a competitive 5G network.").

immediately monetize its own network by shifting away from using a third-party network to serve subscribers. Finally, the Full MVNO Agreement will give DISH the flexibility to serve customers the most efficient and cost-effective way, whether on post-merger T-Mobile's network, DISH's new network, or a combination of both. In light of these changes, DISH has agreed to waive its "flexible use" rights and deploy a 5G network immediately rather than taking the intermediate step of deploying an NB-IoT network first.[48]

RWA raises concern over the fact that the proposed Final Judgment provides DISH with a degree of flexibility as to which of T-Mobile's assets it will ultimately acquire.[49] RWA suggests that DISH should be required to purchase the 800 MHz Spectrum, regardless of whether it deems it necessary, as well as every one of the cell sites and retail locations that T-Mobile plans to decommission.[50] Such an obligation, however, would be counterproductive. The proposed Final Judgment gives DISH the flexibility to decline purchase of the 800 MHz spectrum if it is able to make significant progress in deploying its network without that spectrum.[51] Likewise, the proposed Final Judgment provides DISH with the option to purchase only those cell sites and retail locations that it needs to support its network deployment and business plans. The proposed Final Judgment requires DISH to comply with specific build commitments, including relating to nationwide 5G.[52] Requiring DISH to purchase assets that turn out to be unnecessary would increase DISH's costs and impede its entry as a mobile wireless provider. In contrast, by giving DISH the flexibility to purchase only the assets that it needs in order to comply with the overarching directive to meet its

---

[48] Blum July 26, 2019 Letter at 3 ("DISH will voluntarily waive its flexible use rights"); Blum Aug. 1, 2019 Letter at 3 ("Rather than approaching a network build in two phases, DISH will be able to shift the resources it has dedicated to building out a narrowband Internet of Things network to a 5G network deployment.").

[49] RWA Comment (Exhibit 24) at 17-18.

[50] Id. at 18.

[51] While AAI claims that the 800 MHz spectrum is "necessary to build out a 5G network" (AAI Comment (Exhibit 2) at 8), the proposed Final Judgment recognizes that DISH may find that it is able to deploy a competitive network that does not rely on this spectrum.

[52] PFJ § VIII.A.

nationwide 5G commitment, the proposed Final Judgment will allow DISH's entry to proceed efficiently.

Moreover, DISH will be subject to substantial penalties if it fails to satisfy its commitments. Failure to meet its network buildout obligations would cause DISH to incur penalties of up to $2.2 billion under its commitments to the FCC alone.[53]  Failure to meet certain buildout milestones would also result in "automatic termination" of some of DISH's spectrum licenses.[54]  The proposed Final Judgment further provides for DISH to pay a penalty of $360,000,000 if it elects not to purchase the 800 MHz Spectrum Licenses, unless it has already made significant progress in constructing its network.[55]  All of this would be in addition to other penalties that this Court could impose if it were to find DISH to be in violation of the Final Judgment.[56]

CWA includes in its comment a declaration from engineering consultant Andrew Afflerbach, Ph.D., P.E., which purports to support CWA's criticisms of the proposed Final Judgment.  Dr. Afflerbach begins by highlighting several potential risks that DISH will be unable to build a successful facilities-based mobile wireless business.  He notes that DISH will be highly dependent on T-Mobile as an MVNO for years following entry of the proposed Final Judgment, and notes the "criticality of the MVNO agreement terms" for DISH's success.[57]  However, DISH itself has explained that the Full MVNO Agreement will provide DISH with "more attractive economics than traditional MVNO agreements, including pricing, packaging and marketing

---

[53] Blum July 26, 2019 Letter, Attachment A at 4.

[54] *Id.* at 3-4.  Thus, claims that DISH's financial penalties alone would be insufficient to ensure compliance are misplaced.  *See, e.g.*, RWA Comment (Exhibit 24) at 15-16.  Nor do DISH's commitment to the FCC that it will not sell certain of its spectrum licenses for six years somehow suggests that they are planning to exit the mobile wireless market after that time period concludes, as RWA claims.  *Id.* at 18-19.  RWA provides no support for this assertion.  DISH's commitment to the FCC merely ensures that it will maintain ownership of its wireless licenses while its network buildout advances.

[55] *See* PFJ § IV(B)(2).

[56] *See id.* § XVIII(A) ("The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court.").

[57] Afflerbach Decl. ¶¶ 7, 11.

flexibility, a mechanism for costs to drop over time, and access to core control."[58]  The FCC

likewise recognizes that "New Boost's wholesale network access agreement will be unique among

MVNO agreements in the industry, with more favorable terms and conditions that, in turn, will

enable New Boost to more effectively constrain potential price increases."[59]

Dr. Afflerbach also argues that "DISH's execution risks are substantial."[60]  His criticisms

about DISH's prospects for building a 5G network overstate some of the challenges that DISH

faces.  For instance, Dr. Afflerbach suggests that DISH will be disadvantaged because "[h]andset

equipment (i.e. smartphones) is not currently manufactured for DISH's spectrum bands."[61]  The

current generation of smartphones, however, does support LTE service in DISH's holdings in the

600 MHz band (Band 71), the AWS-3 band, and the AWS-4 band (collectively, Band 66).[62]  This is

because other established players like T-Mobile and Verizon each offer LTE service in one or more

of those bands.  There is no reason to believe that DISH will not similarly be able to find support

for 5G service in at least some of its spectrum bands as equipment-makers design handsets for the

other carriers.

> 2.    *DISH's Incentive and Ability to Compete*

Some commenters also question whether DISH will have the incentive and ability to

compete vigorously in the mobile wireless marketplace.  For example, CWA asserts that "DISH has

---

[58] Blum Aug. 1, 2019 Letter at 2.

[59] FCC Order ¶ 201.

[60] Afflerbach Decl. ¶ 36.

[61] Afflerbach Decl. ¶ 45.

[62] *See* Chris Holmes, Whistle Out, "Cell Phone Networks and Frequencies Explained: 5 Things To Know" (Oct. 14, 2019) (noting Verizon, AT&T and T-Mobile are currently using Band 66, and T-Mobile is currently using Band 71), https://www.whistleout.com/CellPhones/Guides/cell-phone-networks-and-frequencies-explained; Dan Meyer, RCR Wireless News, "T-Mobile LTE network beats AT&T and Verizon with AWS-3 spectrum support" (Oct. 17, 2016) (noting T-Mobile "touting itself as the first domestic carrier to launch commercial services across the AWS-3 spectrum band"), https://www.rcrwireless.com /20161017/carriers/t- mobile-lte-network-beats-att-verizon-aws-3-spectrum-support-tag2.

powerful incentives to create something less than a fully competitive 5G network."[63]  Mr. Bellemare claims that "Sprint is a maverick" but "[w]hether DISH would become a maverick in a more concentrated oligopoly is by no means assured."[64]  Other commenters argue that the fact that DISH's wireless business will initially have only 9 million subscribers will inhibit its competitiveness.[65]

As an initial matter, commenters overlook the substantial advantages on which DISH currently can draw to grow its wireless business.  The fact that DISH is unburdened by any need to support a legacy infrastructure based on older technology and has an established presence in a complementary video business, may enhance its ability to price aggressively and attract customers. In addition, and contrary to the commenters' claims, the proposed Final Judgment will position DISH to be an effective competitor to the existing carriers.  As described above, the merger, when combined with the proposed Final Judgment, promises to expand output.  A significant amount of unused and underused spectrum will be made available by both DISH and T-Mobile for use by consumers within the first years following the closing of the divestiture.  Principles of economics tell us that expanded output provides further downward pressure on prices moving forward. Indeed, competition in the wireless industry has often been driven by the smallest of the nationwide carriers, to the benefit of consumers.[66]  T-Mobile was previously branded as the maverick and had success in growing its share.  Such a firm can discipline prices based on its ability and incentive to

---

[63] CWA Comment (Exhibit 10) at 19.

[64] Bellemare Comment (Exhibit 6) at 13-14.

[65] *See, e.g.*, RWA Comment (Exhibit 24) at 8 ("[T]he various Sprint prepaid subscriber bases, which Dish estimates to include approximately 9.3 million users, are a fraction of Sprint's overall subscriber base.").  AAI and RWA both point to the fact that DISH will initially serve only prepaid subscribers, who are generally less profitable to serve than postpaid subscribers.  *See* AAI Comment (Exhibit 2) at 7; RWA Comment (Exhibit 24) at 8, 12.  DISH, however, has committed to providing postpaid mobile wireless service within one year of the closing of the sale of the prepaid assets.  PFJ § IV(F).  Moreover, after spending the significant resources required to become a mobile wireless service provider, DISH will have strong business incentives to serve all profitable segments of the market.

[66] Given the potential for smaller market participants to drive competition, RWA is simply incorrect in claiming that increased coordination among AT&T, Verizon, and T-Mobile will be "inevitable" given that "DISH on Day One" will have fewer subscribers than Sprint and T-Mobile do today.  RWA Comment (Exhibit 24) at 13.

expand production rapidly using available capacity, or on its willingness to resist otherwise-prevailing industry norms to cooperate on price setting or other terms of competition.[67]  Moreover, even during the period in which DISH is relying on the Full MVNO Agreement, other mobile wireless providers will have full knowledge of DISH's obligations to deploy network infrastructure in the coming years, which itself may have a further constraining effect on their decision-making.

The Economics Professors point to T-Mobile CEO John Legere's statement that T-Mobile's agreement with DISH will not diminish the merged firm's synergies, profitability, and long-term cash generation as evidence that DISH will not be a disruptive competitor.[68]  This line of argument assumes that the remedy would have to be harmful to T-Mobile in order to be good for consumers.  In fact, T-Mobile stands to benefit by selling DISH wholesale access to its network, even as it stands to lose retail customers to DISH.[69]  The relevant question for the Court is not how these two competing effects net out for T-Mobile, but rather whether DISH will introduce new competition into the marketplace that will benefit consumers.  In a portion of the same investor call that the Economics Professors do *not* cite, Mr. Legere told investors that "it's very clear that with the spectrum that DISH has, with the acquisition of Boost, with the MVNO arrangement, [with] the transition services agreement while they build out their network, with the ability to get some of the decommissioned towers and stores, DISH has a real significant opportunity to be a very credible disruptive fourth wireless carrier,"[70] which is consistent with T-Mobile's other public

---

[67]  Dep't of Justice & Fed Trade Comm'n, Horizontal Merger Guidelines § 2.1.5 (2010).

[68]  Economics Professors Comment (Exhibit 12) at 11.

[69]  *See* T-Mobile US, Inc. (TMUS) CEO John Legere on Q2 2019 Results - Earnings Call Transcript, Seeking Alpha, (July 29, 2019), at 9 (noting that the agreement "will be accretive to our business because the pricing allows us to monetize DISH's access of our network").

[70]  *Id.* at 10.

statements.[71]  Indeed, DISH has disrupted other established industries in the past, and disrupting the

mobile wireless market would be a welcome continuation of that trend.[72]

Some commenters focus on the near-term period prior to DISH's construction of its

forthcoming mobile wireless network.  For example, Public Knowledge *et al.* claim that "DISH

will be a nonfactor, as all MVNOs are" during this period.[73]  Under the terms of the proposed Final

Judgment, DISH will be able to compete for subscribers immediately using the wholesale

agreement and will transition into a full, facilities-based competitor as it constructs its planned

network.  As discussed above, the broad array of rights that T-Mobile will provide to DISH under

the Full MVNO Agreement will empower DISH to become a more effective competitor than

traditional MVNOs have been in the past.  Additionally, the proposed Final Judgment's

requirement that DISH begin offering postpaid plans within one year ensures that DISH will begin

to restore the lost competition promptly, and, in any event, well before T-Mobile's commitments to

---

[71] *See, e.g.*, Monica Alleven, Fierce Wireless, "T-Mobile CFO on Dish Rivalry: Bring It On" (Sept. 24, 2019) (quoting T-Mobile CFO Braxton Carter remarks that DISH will be "extremely viable" and "a fierce competitor, there's no doubt about it"), https://www.fiercewireless.com/wireless/t-mobile-cfo-dish-rivalry-bring-it.

[72] As noted in the Wall Street Journal, DISH's controlling shareholder, Charlie Ergen, "has often played the role of disrupter."  Drew Fitzgerald, Wall Street Journal, "A TV Maverick Is Going All-In on a New Wireless Bet" (July 27, 2019), *available at* https://www.wsj.com/articles/a-tv-maverick-is-going-all-in-on-a-new-wireless-bet-11564200000. The article notes that Mr. Ergen and his partners began selling "10-foot-wide satellite dishes from a Denver storefront," then "switched to hubcap-size dishes and took on cable-TV monopolies by slashing prices."  *Id.* (noting the "service now has 12 million customers across the country and his controlling stake in Dish is worth about $9 billion").  DISH also launched "one of the first live-TV streaming services, Sling TV, in early 2015.  *Id.* (noting that with "a small package of channels and lower price, it made it easy for millions of people to cut their TV bill - even many of Dish's own satellite customers").  The settlement enables DISH to continue its disruptive history in the wireless business.  *See id.* (Ergen noting that "with four, there's always somebody that will be a rabble rouser," and that while somebody "will say I don't have enough market share," "I've only got 9 million subs and want 10 million. That person is going to be more aggressive.").  *See also* DISH July 26, 2019 Press Release ("When we entered pay-TV with the launch of our first satellite in 1995, we faced entrenched cable monopolies, and our direct competitor was owned by one of the largest industrial corporations in the world.  As a new entrant, DISH encountered many skeptics who questioned our ability to succeed.  But, customers loved the disruption we brought to the marketplace with innovations such as a 100-percent digital experience, local-into-local broadcast, the DVR and ad-skipping.  Our substantial investments, constant innovation, aggressive pricing and commitment to the customer led us to become the third largest pay-TV provider.  As we enter the wireless business, we will again serve customers by disrupting incumbents and their legacy networks, this time with the nation's first standalone 5G broadband network.").

[73] Public Knowledge et al. Comment (Exhibit 22) at 2; *see also* Wool Comment (Exhibit 32) at 2 ("Mr. Wool asks, "[g]iven the time required for DISH Network to build a national facilities-based network (i.e. DISH Network has until June 2023 to construct a network covering 70% of the population), how does the proposed Final Judgment 'preserve the status quo ante in affected markets.'").

the FCC expire.[74]  The favorable terms in the Full MVNO Agreement will provide DISH with an attractive cost structure, and thus, an incentive to compete immediately.  DISH's incentive to expand its output will only increase as DISH begins to realize cost savings by shifting traffic from T-Mobile's network onto its own.[75]

Other commenters raise concerns regarding the portion of the country that DISH's mobile wireless network will cover and its future network performance.  For example, RWA argues that DISH could meet its population-based buildout obligations while covering "only a small fraction of the country's geography."[76]  Similarly, the Economics Professors assert that "because the coverage requirement is denominated in terms of population, not geography, it is clear that certain parts of the country will lose out."[77]  CWA argues that at a speed of 35 Mbps "the result will not be a bona fide fourth network, but a niche network closer to the limited internet of things (IoT) network

---

[74] See FCC Order ¶ 206 ("[T]he requirement that DISH offer postpaid services bolsters our conclusion that the Boost divestiture buyer will not merely constrain price increases within the prepaid segment, but across the differentiated retail mobile wireless services market.").

[75] Suggestions that DISH will find it in itself too comfortable as an MVNO and decline to carry out its obligations under the decree overlook the various ways the decree guards against this risk.  See Economics Professors Comment (Exhibit 12) at 9 ("Why would Dish invest and become a facilities-based provider if the margins from resale are large and guaranteed for seven years?").  For example, the proposed Final Judgment limits the term of any Transition Services Agreement to two years, with the possibility of a third subject to approval by the United States after consultation with its co-Plaintiff States.  PFJ § IV.A.4.  Thus, DISH is required to wean itself from T-Mobile's transitional support in "billing, customer care, SIM card procurement, device provisioning, and all other services used by the Prepaid Assets" by 2022 or 2023.  The deadline of 2022 coincides with DISH's commitment to the FCC to offer broadband service to at least 20% of the United States population.  Blum July 26, 2019 Letter at 2.  Thus, by 2022 DISH is required to establish itself as an independent, facilities-based operator, and its achievement of these commitments will be supervised closely by the Monitoring Trustee.  In an attempt to cast further doubt on DISH's plans, the Economics Professors compare DISH to 1&1 Drillisch, an MVNO in Germany that has announced its intention to become the fourth German facilities-based mobile wireless provider by constructing its own 5G network.  Economics Professors Comment (Exhibit 12) at 10; see also Juan Pedro Tomas, RCR Wireless News, "1&1 Drillisch Confirms Intention to Become Germany's Fourth Mobile Carrier" (Jan. 25, 2019), https://www.rcrwireless.com/20190125/5g/drillisch-confirms-intention-become-germany-fourth-mobile-carrier.  The Economics Professors ignore the fact that, since the date of the article they cite, 1&1 Drillisch successfully secured financing to participate in a German spectrum auction and won 70 MHz worth of spectrum licenses to support its network deployment plan.  See Reuters, "Shares in 1&1 Drillisch soar after Germany 5G auction" (June 13, 2019) ("Shares in 1&1 Drillisch surged on Thursday after it won spectrum in Germany's 5G mobile auction that ensured its position as a new fourth operator in a market that has lagged globally."), available at https://www.reuters.com/article/germany-telecoms/shares-in-11-drillisch-soar-after-germany-5g-auction-idUSS8N22R022.

[76] RWA Comment (Exhibit 24) at 14.

[77] Economics Professors Comment (Exhibit 12) at 11.

proposed by DISH prior to the T-Mobile deal."[78]  These arguments reflect a misunderstanding of DISH's network build commitments. These commitments were incorporated into the proposed Final Judgment to increase the incentives for DISH to build out its own national facilities-based mobile wireless network.[79]  These commitments should not, however, be interpreted as predictions of the likely breadth of DISH's network coverage or its likely speed.  The proposed Final Judgment does not dictate the scope of DISH's future investments, but rather provides DISH with necessary assets and appropriate incentives, and then relies on market forces to guide DISH's long-term decisions about where to target its investments.  DISH may ultimately have business incentives to provide substantially broader coverage and faster speeds than the minimums required to meet its network build commitments.  By focusing on the floors set by the proposed Final Judgment rather than the likely effects of the divestiture, these commenters miss the relevant inquiry.

Separate criticisms that the proposed merger benefits rural customers at the expense of urban ones and that the United States' remedy benefits urban customers at the expense of rural ones illustrate why entry of the proposed Final Judgment is in the public interest.  The Economics Professors argue that "even if one were to credit" (as the FCC now has[80]) the claimed benefit from the merger of "enhanced 5G deployment in otherwise unprofitable-to-deploy neighborhoods," these "largely rural households are distinct from those urban and suburban households that likely will incur a price increase on 4G services resulting from the merger."[81]  In turn, Andrew Afflerbach, the engineer whose declaration was submitted along with the CWA comments, observes that the "most straightforward way [for DISH] to serve 70 percent of the population is to focus on urban areas," which would mean DISH's "2023 benchmark stops well short of the scale of the networks operated

---

[78] CWA Comment (Exhibit 10) at 3.

[79] See Competitive Impact Statement (Dkt. No. 20) at 11-12.

[80] *See* FCC Order ¶¶ 257-76 (explaining the benefits of the merger for consumers in rural areas).

[81] Economics Professors Comment (Exhibit 12) ¶ 11.

by the four existing MNOs."[82]  Together, these concerns only confirm that the proposed Final Judgment fulfills the twin goals of a merger remedy.  It permits the merger to proceed, enabling rural consumers to benefit from its promised efficiencies, while adopting remedies that will protect consumers in and bring new competition to urban areas that may have been at greater risk from this merger without this settlement.

C.              Comments Regarding the Enforceability of the Proposed Final Judgment

Other commenters claim that the proposed Final Judgment is too complicated or too "behavioral" to be enforced.  CWA and others cite statements in which current and former leaders of the Antitrust Division have identified challenges associated with behavioral conditions.[83]  The commenters claim that the proposed Final Judgment is inconsistent with these statements, and they suggest that these inconsistencies should be a basis for denial.[84]  These types of argument lack legal support and do not accurately describe the inquiry before the Court.  They also misstate the facts of the proposed Final Judgment and the Division's policies.

Objections to the settlement that are based on parsing which elements are structural and which are behavioral miss the important larger point.  The overall objective of the remedy is profoundly structural, as it is designed to stand up a fourth nationwide, facilities-based wireless carrier.  The mechanisms for doing so begin immediately with a structural divestiture to prevent the consolidation of Sprint's prepaid business into T-Mobile's, and the non-structural elements of the proposed Final Judgment are largely aimed at enabling DISH to begin providing wireless services

---

[82] Afflerbach Dec. ¶ 51.

[83] *See* CWA Comment (Exhibit 10) at 10-12, 23.

[84] *Id.*; *see also* Wool Comment (Exhibit 32) at 2, 3.  Based on his skepticism, Mr. Wool asserts that the proposed Final Judgment "dramatically reinterprets the risk-allocation framework intended by Section 7 of the Clayton Act." Wool Comment at 1.  This argument disregards the principle that "[a] district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case." *United States v. Archer-Daniels-Midland Co.*, 272 F.Supp.2d 1, 6 (D.D.C. 2003).

to consumers immediately, to grow that business as it builds its own network, and to enable it to stand on its own as an effective facilities-based competitor before the end of the decree's term.[85]

Indeed, while the Antitrust Division has expressed a preference for structural remedies, it has not taken the position that behavioral conditions are never appropriate. In fact, the 2004 Remedies Guide explains that "there are limited circumstances when conduct remedies will be appropriate: (a) when conduct relief is needed to facilitate transition to or support a competitive structural solution, i.e., when the merged firm needs to modify its conduct for structural relief to be effective or (b) when a full-stop prohibition of the merger would sacrifice significant efficiencies and a structural remedy would also sacrifice such efficiencies or is infeasible."[86] As to (a), the guide provides examples of potentially appropriate behavioral conditions that can help "perfect structural relief," such as transitional supply agreements between the merged firm and the divestiture buyer and temporary limits on the merged firm's ability to reacquire personnel from the divestiture buyer.[87] The guide further notes that enforcing behavioral conditions may be easier, and thus such conditions may be more appropriate, in markets subject to ongoing oversight by regulatory agencies.[88]

The remedy in this case is ultimately structural, and fits squarely within the first circumstance described in the 2004 Remedies Guide—it is intended to bring about the entry of an

---

[85] Although Mr. Wool takes issue with the proposed Final Judgment's condition requiring the merged firm to extend existing MVNO agreements, he simultaneously argues (1) that the condition is too behavioral, and (2) that the condition does not do enough to protect future innovation. Wool Comment (Exhibit 32) at 3-4 & n.8. By relying on existing agreements, the condition as written does not require regular, ongoing oversight by the United States. In contrast, additional intervention to control the merged firm's conduct with respect to other MVNOs in the future would have required further involvement by the United States in the marketplace.

[86] 2004 Remedies Guide at 18. *Cf.* "Assistant Attorney General Makan Delrahim Delivers Keynote Address at American Bar Association's Antitrust Fall Forum" (Nov. 16, 2017) (stating the Antitrust Division would accept behavioral remedies "where an unlawful vertical transaction generates significant efficiencies that cannot be achieved without the merger or through a structural remedy"), *available at* https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-keynote-address-american-bar.

[87] 2004 Remedies Guide at 18-19.

[88] *Id.* at 22.

independent, facilities-based mobile wireless network operator with the incentive and ability to compete with the other national carriers. DISH has agreed to acquire Sprint's prepaid businesses for $1.4 billion and Sprint's 800 MHz spectrum for $3.6 billion, and it has the option to acquire cell sites and retail locations from the merged firm. Other aspects of the proposed Final Judgment are intended to ensure that these divestitures (and DISH's entry into the mobile wireless market more generally) are successful. Several of these provisions are akin to the examples of appropriate conditions set forth in the Remedies Guide. The Full MVNO Agreement will require T-Mobile to supply DISH with network access on a transitional basis. This will allow DISH to enter the market immediately, providing for MVNO-based competition while DISH works to deploy network facilities. DISH's network buildout obligations will ensure that this transition proceeds in a timely manner. The temporary prohibition on T-Mobile rehiring employees from the divested business will assist DISH in maintaining the personnel required to compete effectively.

The proposed Final Judgment in this case also fits within the second circumstance that the Remedies Guide describes as an appropriate context for behavioral relief—at least in the short term. The merger promises to yield significant efficiencies by enabling T-Mobile to offer 5G mobile wireless services more cost-effectively. These efficiencies would not be realized if the merger were blocked or if T-Mobile were required immediately to divest all of Sprint's existing infrastructure. Further, T-Mobile's network buildout obligations and associated penalties provide additional incentives to ensure that the merged firm will invest in a robust 5G network that becomes available to consumers quickly. These efficiencies will work in combination with the new competitive threat posed by DISH to offset any further harm that may arise from the transaction. By the time the proposed Final Judgment expires, and likely sooner, DISH will provide a fourth nationwide retail mobile wireless option for American consumers, and neither the Antitrust Division nor this Court will need to maintain ongoing entanglements with the company's business.

Including a transitional period in which certain behavioral conditions are present, however, will ensure that consumers get the immediate benefits expected from the merger without risking anticompetitive harm.

These goals are consistent with the position on behavioral remedies expressed in the 2004 Remedies Guide and with the enforcement decisions made by the Antitrust Division.  As noted, the Remedies Guide states that transitional behavioral remedies are appropriate for ensuring the effectiveness of structural relief.[89]  In keeping with that principle, the Final Judgment submitted by the United States and adopted by Judge Boasberg in *United States v. Bayer* contained substantial divestitures to ensure a long-term structural solution, along with shorter-term behavioral relief including supply agreements with the possibility of extension for up to a total of six years.[90]

More fundamentally, the remedies here are consistent with longstanding guidance that the remedy must be tailored to the particular facts of the industry at hand.[91]  Here, building a mobile wireless network takes several years.  That fact alone does not bar the adoption of appropriate remedies, and the remedy here necessarily and appropriately reflects that fundamental fact in the interim and final buildout timelines and the overall term of the decree.  The timelines also account for the ongoing transition from 4G to 5G, which ultimately will permit DISH to put into service a

---

[89] 2004 Remedies Guide Section III.E.1 ("Limited conduct relief can be useful in certain circumstances to help perfect structural relief.").

[90] Final Judgment, *United States v. Bayer AG*, No. 18-cv-1241, at 22-23, 24, 25 (D.D.C. Feb. 08, 2019).

[91] 2004 Remedies Guide at 2 (encouraging the Division to "[f]ocus[] carefully on the specific facts of the case at hand" to "permit the adoption of remedies specifically tailored to the competitive harm,"  and noting that "there must be a significant nexus between the proposed transaction, the nature of the competitive harm, and the proposed remedial provisions").  CWA pulls quotations from the 2004 Remedies Guide that it believes call into question the proposed remedy here.  CWA Comment (Exhibit 10) at 4-11, 13, 19.  As discussed in this section, the United States vigorously disputes the notion that the proposed Final Judgment is at bottom inconsistent with the Antitrust Division's own guidance.  CWA simply ignores the Remedies Guide provisions discussed in this section that explain why this remedy is in keeping with Division policy, and it also ignores the stated purpose of the Guide itself.  The Guide "is a policy document, not a practice handbook," it does not list or give "particular language or provisions that should be included in any given decree," but instead it "sets forth the policy considerations that should guide Division attorneys and economists when fashioning remedies for anticompetitive mergers."  2004 Remedies Guide at 1-2.  As called for by its own Guide, and as explained in this Response to Comments, in arriving at this proposed Final Judgment the Antitrust Division has applied "the pertinent economic and legal principles, appropriate analytical framework, and relevant legal limitations" to "craft and implement the proper remedy for the case at hand."  *Id.* at 2.

new, greenfield 5G wireless network unencumbered by older technology.  This is consistent with guidance that the remedy be tailored to the specific characteristics of the divestiture buyer.[92]  With this remedy, DISH will bring spectrum (that it currently has no obligation to build out in this way) into service as a mobile broadband 5G service that will serve consumers across the country.  With a proposed merger that promises public benefits in the form of stronger 5G competition and expanding output, it is consistent with the Antitrust Division's announced policies to craft this settlement in a way that protects those efficiencies, increases output further through the choice of divestiture buyer, while still guarding against competitive harm.

Moreover, the proposed Final Judgment contains substantial monitoring and enforcement mechanisms.  These mechanisms will operate in parallel with the ongoing regulatory oversight that the FCC will perform to ensure compliance with its own conditions.[93]  The United States will be moving this Court to appoint a monitoring trustee with the power and authority to investigate and report on the Defendants' compliance with the terms of the Final Judgment and the Stipulation and Order during the pendency of the divestiture.  The monitoring trustee will help ensure, among other things, that T-Mobile complies with its obligations relating to its sale of the Divestiture Assets, the exclusive-option requirements for cell sites and retail store locations, and DISH's progress toward using the Divestiture Assets to operate a retail mobile wireless network.

The United States retains and reserves all rights to enforce the provisions of the proposed Final Judgment, including its rights to seek an order of contempt from the Court.  Defendants have agreed that in any civil contempt action, any motion to show cause, or any similar action brought

---

[92]*See* 2004 Remedies Guide at 31 n.43 (noting that "if harmful coordination is feared because the merger is removing a uniquely-positioned maverick, the divestiture would have to be to a firm with maverick-like interests and incentives"); *id.* at 5 (noting that "assessing the competitive strength of a firm purchasing divested assets requires more analysis than simply attributing to this purchaser past sales associated with those assets").

[93] *See, e.g.*, FCC Order ¶ 204 ("The Boost Divestiture Conditions also provide for strong Commission oversight to ensure the effectiveness of these principles to ensure New Boost is a meaningful competitor."); *id.* ¶ 378 ("DISH continues to be subject to all of the Commission's other enforcement and regulatory powers, including the loss of part or all of any of its licenses for failing to meet its build-out requirements.").

by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Defendants have waived any argument that a different standard of proof should apply.[94]  This provision aligns the standard for compliance obligations with the standard of proof that applies to the underlying offense that the compliance commitments address.  Defendants also agree that they may be held in contempt of this Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of the goal of the proposed Final Judgment to restore competition that would otherwise be permanently harmed by the merger.[95]

The United States may also apply to the Court for a one-time extension of the Final Judgment, together with other relief as may be appropriate, if the Court finds in an enforcement proceeding that Defendants have violated the terms of the decree.[96]  In addition, in any successful effort by the United States to enforce the Final Judgment against a Defendant, whether litigated or resolved before litigation, Defendants will reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with any enforcement effort, including the investigation of the potential violation.[97]

Finally, although the Final Judgment is set to expire seven years from the date of its entry,[98] the United States may file an action against a Defendant for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated.[99]  This provision is meant to

---

[94] PFJ §XVIII(A).

[95] *Id.* § XVIII(B).

[96] *Id.* §XVIII(C).

[97] *Id.*

[98] *Id.* §XIX.  The Final Judgment may be terminated after five years from the date of its entry upon notice by the United States to the Court and Defendants that the divestitures have been completed and that the continuation of the Final Judgment is no longer necessary or in the public interest.  *Id.*

[99] *Id.* §XVIII(D).

address circumstances such as when evidence that a violation of the Final Judgment occurred

during the term of the Final Judgment is not discovered until after the Final Judgment has expired

or been terminated or when there is not sufficient time for the United States to complete an

investigation of an alleged violation until after the Final Judgment has expired or been terminated.

This provision thus makes clear that the United States may still challenge a violation that occurred

during the Final Judgment's term, for four years after it expired or was terminated.

       D.                <u>Other Comments Opposing Entry of the Proposed Final Judgment</u>

             *1.*       *Comments Regarding Harms Outside the Scope of the Complaint*

      Some commenters raise harms that are outside the scope of the complaint filed in this case,

and they propose remedies to address those harms.  These comments extend beyond the permissible

scope of the Tunney Act review.[100]  A few commenters, claiming to rely on a recent opinion

interpreting the Tunney Act, urge this Court to engage in a broader inquiry.[101]  That opinion,

however, agreed that the Court cannot evaluate claims beyond those raised in the complaint.[102]  To

the extent that commenters read that opinion—and encourage this Court to apply that opinion—in a

way that would permit this Court to evaluate legal theories, competitive effects, or claims that the

United States chose not to bring, it would violate the Constitution.  The D.C. Circuit recognized

this fact in *Microsoft* when holding that district courts are "barred from reaching beyond the

complaint to examine practices the government did not challenge."[103]  Reading the Tunney Act in a

way that allows courts to second-guess the United States' exercise of prosecutorial discretion

---

[100] *See supra* § III.

[101] *E.g.*, Economics Professors Comment (Exhibit 12) at 3; AAI Comment (Exhibit 2) at 13.

[102] *United States v. CVS Health Corp.*, No. 18-2340, 2019 WL 4194925, at *5 (D.D.C. Sept. 4, 2019) ("Courts cannot, of course, 'force the government to make [a] claim.'  The Government, alone, chooses which causes of action to allege in its complaint." (citation omitted)).

[103] *Microsoft*, 56 F.3d at 1460; *see also Heckler v. Chaney*, 470 U.S.821, 832 (1985) (citing Article II, Section 3 of the Constitution for the proposition that the decision about what claims to bring "has long been regarded as the special province of the Executive Branch"); *United States v. Fokker Servs.*, 818 F.3d 733, 738 (D.C. Cir. 2016) (recognizing the "long-settled understandings about the independence of the Executive with regard to charging decisions).

would violate separation-of-powers principles, and contravene the guidance that courts should "not construe [a] statute in a manner that renders it vulnerable to constitutional challenge."[104]  Put directly, "any agency with limited resources and an investigative mission has the power, absent an express statute to the contrary, to assess a complaint to determine whether its resources are best spent on the violation, whether the agency is likely to succeed, whether the enforcement requested fits the organization's overall policies, and whether the agency has enough resources to undertake the action."[105]  Thus, public comments that criticize the Complaint for taking too narrow a scope or that point to a broader set of practices that they also would have liked the government to challenge have no bearing on the public interest inquiry currently before the Court.

For example, RWA and NTCH both express concern about the impact of the merger on roaming services.  RWA states that "[t]he elimination of Sprint and the entry of Dish will mean the nation will go without a fourth wholesale or nationwide domestic roaming alternative to compete against AT&T, Verizon, and New T-Mobile for an extended period of time."[106]  Likewise, NTCH asserts that "[t]he FCC has largely ignored the growing crisis in the data roaming market," and alleges that data roaming rates that exist today "amount to a denial of roaming service to [] small carriers and their subscribers in violation of Sections 201(b) and 202(a) of the Communications Act of 1934, as amended."[107]

The Complaint, however, does not allege that the merger will eliminate competition in a market for roaming services, or that it will impact roaming rates.  RWA attempts to tie its concern to a paragraph in the Complaint that pertains solely to the elimination of "[c]ompetition between

---

[104] *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 68 (D.C. Cir. 2016); *cf. Maryland v. United States*, 460 U.S. 1001, 1003-06 (1983) (Rehnquist, J., dissenting) (noting concerns about the ability to formulate judicially manageable standards for the Tunney Act inquiry).

[105] *Caldwell v. Kagan*, 865 F. Supp. 2d 35, 44 (D.D.C. 2012).

[106] RWA Comment (Exhibit 24) at 11.

[107] NTCH Comment (Exhibit 20) at 7-8.

Sprint and T-Mobile to sell mobile wireless service to MVNOs."[108]  This paragraph does not allege

harm to rural facilities-based mobile wireless carriers that purchase roaming services.  RWA and

NTCH are free to advocate their positions on this issue to the FCC, and both did so in this

proceeding.[109]  Given that these concerns are outside the scope of this proceeding, the Court should

not factor them into its public interest evaluation.  For the same reason, the Court should reject

NTCH's proposed new conditions, which it claims are designed to address these alleged harms.[110]

Similarly, Voqal—a coalition of 2.5 GHz spectrum licensees—claims that the merger will

cause T-Mobile's spectrum holdings to exceed a "spectrum screen" that has been applied by the

FCC in certain past merger reviews.[111]  They further allege that New T-Mobile will have "buyer

market power in the 2.5 GHz band."[112]  Voqal proposes new, self-designed divestitures of 2.5 GHz

spectrum that they claim would alleviate their concerns.[113]  The question of whether and in what

manner a regulatory "spectrum screen" should apply to this transaction is not before the Court.[114]

Moreover, the Complaint does not allege a relevant market consisting of 2.5 GHz spectrum, nor

does it allege that the merger would cause T-Mobile to acquire "buyer market power" in such a

market.[115]  Thus, the Court should not factor these claims into its public interest determination, and

---

[108] RWA Comment (Exhibit 24) at 11 (citing Complaint ¶ 22).

[109] *See* FCC Order ¶ 297 (concluding that concerns raised by RWA, NTCH, and others regarding the impact of the transaction on roaming rates were adequately addressed by existing FCC regulations).

[110] NTCH Comment (Exhibit 20) at 16-20.

[111] Voqal Comment (Exhibit 30) at 7-9.

[112] *Id.* at 10.

[113] *Id.* at 12-14.

[114] This question was addressed directly by the FCC, which found that, although its spectrum screen was triggered in much of the nation, the transaction should be approved because of its potential to increase spectrum utilization and accelerate the deployment of 5G networks.  *See* FCC Order ¶¶ 97-99.

[115] The FCC also declined to define such a market.  *See id.* ¶ 64 (declining to "define a separate product market for the sale or lease of 2.5 GHz spectrum").

it should reject Voqal's proposal for new divestitures to be added to the proposed Final Judgment under review.[116]

      2.     *Comments Regarding Services Provided to MVNOs*

The proposed Final Judgment requires the merged firm to extend T-Mobile's and Sprint's existing MVNO agreements for the term of the proposed Final Judgment, subject to certain conditions. Nevertheless, the Economics Professors and others argue that this does not sufficiently address potential harm that could arise from the loss of competition between T-Mobile and Sprint in providing wholesale mobile wireless services to MVNOs.[117] They claim that future competition between the firms could yield *even better* rates and terms than those in the existing agreements, and that MVNOs will have no protection once the proposed Final Judgment expires. Neither of these arguments warrants finding that this portion of the proposed Final Judgment is not in the public interest.

---

[116] Voqal proposes that T-Mobile be required to divest certain 2.5 GHz licenses because, it claims, no other spectrum bands are sufficient substitutes for the deployment of 5G mobile wireless services. *See* Voqal Comment at 6-7, 12-14. The FCC has rejected this view and is actively working to make additional mid-band spectrum available for 5G. FCC Order ¶¶ 99, 110; *see also In re Promoting Investment in the 3550-3700 MHz Band*, Notice of Proposed Rulemaking and Order Terminating Petition, 32 FCC Rcd 8071, ¶ 2 (2017) ("[I]t has become increasingly apparent that the 3.5 GHz Band will play a significant role as one of the core mid-range bands for 5G network deployments throughout the world. . . . In the two years since the Commission first adopted rules for this 'innovation band,' it has authorized service in other bands that also will be critical to 5G deployment, and we are currently evaluating additional bands for 5G use."); *In re Expanding Flexible Use of the 3.7 to 4.2 GHz Band*, Order and Notice of Proposed Rulemaking, 33 FCC Rcd 6915, ¶ 1 (2018) ("Today, we seek to identify potential opportunities for additional terrestrial use—particularly for wireless broadband services—of 500 megahertz of mid-band spectrum between 3.7-4.2 GHz. . . . Today's action is another step in the Commission's efforts to close the digital divide by providing wireless broadband connectivity across the nation and to secure U.S. leadership in the next generation of wireless services, including fifth-generation (5G) wireless, Internet of Things (IoT), and other advanced spectrum-based services.").

[117] Economics Professors Comment (Exhibit 12) at 4, 9-11; *see also* Wool Comment (Exhibit 32) at 3. As an initial matter, the Economics Professors are incorrect in claiming that "the DOJ's Complaint spells out harms in two markets: the wholesale market and the retail market." Economics Professors Comment (Exhibit 12) at 3. The Complaint alleges only one relevant product market: the market for retail mobile wireless services. See Complaint ¶ 14. The Complaint does contain one paragraph alleging that "competition between Sprint and T-Mobile to sell mobile wireless service wholesale to MVNOs has benefited consumers by furthering innovation" and that "[t]he merger's elimination of this competition likely would reduce future innovation." Complaint ¶ 22. It does not, however, allege the existence of a distinct wholesale market. To the extent that the concerns expressed by the Economics Professors are premised on the existence of such a market, they are outside the scope of the Complaint. *See, e.g.*, Economics Professors Comment (Exhibit 12) at 4 (calculating an HHI for "the national wholesale market" and arguing that there is a "presumption of enhanced market power"). *See also* FCC Order ¶ 63 (declining to define "a separate product market for wholesale service offerings").

*First*, T-Mobile and Sprint have both been selling wholesale services to MVNOs for many years, and the rates and terms in existing MVNO agreements are what have resulted from this competition. These terms will remain in place for the duration of the proposed Final Judgment, and the commenters cite no support for their prediction that maintaining this same level of competition would have yielded terms that are better than these. Moreover, by increasing the capacity of T-Mobile's network and reducing its cost of providing service to MVNOs who need to compete against DISH, the merger and proposed Final Judgment may combine to increase T-Mobile's incentive to provide wholesale service to MVNOs.[118] The Economics Professors fail to account for this effect.[119]

*Second*, when the protections of the proposed Final Judgment expire, MVNOs will not be limited to purchasing wholesale service from AT&T, Verizon, or T-Mobile. By that point, DISH will have constructed a mobile wireless network that could serve as an alternative host network for MVNOs.[120] Indeed, as a new entrant untethered to legacy business models, DISH may be especially willing to partner with innovative MVNOs. Thus, the Department believes that the

---

[118] *See* FCC Order ¶ 290 ("New T-Mobile's vastly increased network capacity will likely give it incentives to offer appealing terms and reasonable prices to wholesale service customers so as to put that capacity to productive use by carrying as much revenue-generating traffic as it can.").

[119] More generally, the Economics Professors Comment (Exhibit 12) is internally contradictory on the influence of MVNOs in the marketplace. On the one hand, to attack the settlement the comment dismisses any benefit from the divestitures that will stand DISH up as an MVNO. Economics Professors Comment (Exhibit 12) at 2-3. Later, in going on to attack the settlement for not doing *more* to help MVNOs, the comment champions the competitive benefits that MVNOs provide, including allowing carriers in effect to offer the same service at different price points under a different brand, and enabling cable companies to compete in wireless. Economics Professors Comment (Exhibit 12) at 4. In fact, while observing that by "bundl[ing] wireless offerings with other products like broadband and pay television, cable companies such as Comcast and Charter have competed aggressively on price," *id.*, the comments overlook that this is precisely one of the benefits DISH will be able to provide consumers. *See* Chris Welch, The Verge, "Dish loses more satellite TV customers as it embarks on a mobile future" (July 29, 2019) ("Like other carriers, you can count on Dish combining its video and mobile products. A Sling TV and Dish Mobile bundle is all but guaranteed."), https://www.theverge.com/2019/7/29/20746191/dish-q2-2019-earnings-mobile-carrier-plans-sling-tv-5g. The remedy thus creates an innovative MVNO immediately, and further establishes DISH as a likely future wholesale network provider.

[120] *See* FCC Order ¶ 292 (explaining that the proposed Final Judgment "would enable DISH to emerge as a nationwide facilities-based provider that would be capable of supplying, among other things, robust wholesale wireless services to MVNOs.").

proposed Final Judgment provides sufficient protections to address the narrow wholesale-related harm alleged in the Complaint.

> 3.    *Comments Regarding Other Regulatory Matters*

NTCH claims that DISH could lose some of its wireless licenses in the future, and if this were to occur, DISH would be unable to construct a network that satisfies the provisions of the proposed Final Judgment.[121]  It argues that DISH's licenses could be revoked for one of two reasons, but neither provides a credible basis to reject the decree.

*First*, NTCH argues that "it is possible that the FCC may deny" DISH's request for an extension of the upcoming construction deadlines for its AWS-4 and H Block licenses.[122]  NTCH argues that, in the event of such a denial, DISH would likely fail to meet its future construction deadlines for these licenses, which could result in forfeiture of the licenses.  The FCC, however, has concluded that granting these extensions would be in the public interest, and accordingly, has directed the relevant bureau of the agency to do so.[123]

*Second*, NTCH contends that it might prevail in its pending appeals of certain FCC orders that enabled DISH's purchase of the H Block spectrum and granted DISH the ability to use the AWS-4 spectrum to offer mobile wireless service.[124]  NTCH argues that "reversal of the FCC's license grants would doom this entire DISH-to-the-rescue plan to failure."[125]  NTCH failed, however, in its opposition of these orders at the FCC, and there is no reason to believe that NTCH will prevail in its appeals.  As the FCC and the United States have explained in that litigation, NTCH lacks standing to bring several of these challenges, and even if NTCH were found to have

---

[121] NTCH Comment (Exhibit 20) at 11-15.

[122] *Id.* at 11.

[123] *See* FCC Order ¶ 365.

[124] NTCH Comment (Exhibit 20) at 14-15.

[125] *Id.* at 15.

standing, its arguments for why the FCC should not have adopted the orders at issue lack merit.[126] In any event, it would be improper for the Court to deny entry of the proposed Final Judgment on the basis of a pending appeal in a separate matter whose outcome is uncertain.

Separately, CWA argues that DISH is not fit to be a divestiture buyer because of the existence of a dispute between DISH and the FCC over a past spectrum auction.[127]  The referenced dispute arose from the FCC's auction of so-called AWS-3 spectrum.  In that auction, two entities (Northstar and SNR Wireless) purchased spectrum licenses using bidding credits intended for use by small businesses.  The FCC subsequently found that Northstar and SNR Wireless were ineligible for the bidding credits they used because they were under the *de facto* control of DISH and therefore were not small businesses.  Accordingly, the FCC revoked the credits and imposed a fine.  After Northstar and SNR Wireless appealed the FCC's order, the U.S. Court of Appeals for the District of Columbia Circuit found that the FCC had reasonably interpreted its rules but had not provided sufficient notice of its interpretation.[128]  Thus, it ordered the FCC to provide Northstar and SNR Wireless an opportunity to cure the violation by amending its agreements with DISH.[129] These efforts are ongoing.  Significantly, the D.C. Circuit went out of its way to note that the FCC's finding that DISH exercised de facto control "does not compel a finding that the applicants lacked candor."[130]  It also emphasized that the FCC explicitly said that SNR and Northstar appropriately disclosed their relationships with DISH, that no other auction participant was harmed by their conduct, and that no evidence showed that SNR and Northstar "colluded with one another

---

[126] *See* Corrected Brief for Respondent/Appellee and Respondent, *NTCH, Inc. v. Fed. Commc'ns Comm'n*, Nos. 18-1241 & 18-1242 (D.C. Cir. Mar. 28, 2019).

[127] CWA Comment (Exhibit 10) at 18-19.

[128] *See SNR Wireless LicenseCo, LLC v. Fed. Commc'ns Comm'n*, 868 F.3d 1021, 1024-25 (D.C. Cir. 2017) (summarizing the background of the case and the court's opinion).  In discussing *de facto* control, the D.C. Circuit noted that while "the question of whether one business exercises *de jure* control over another is binary, the highly contextual question of *de facto* control is a matter of degree."  *Id.* at 1026.

[129] *Id.* at 1043-46.

[130] *Id.* at 1028.

in violation of federal antitrust laws."[131]  Without wading into the merits of that ongoing matter, the United States rejects CWA's contention that this should disqualify DISH from being a divestiture buyer here.

### 4.    Other Negative Comments

CWA objects that the proposed Final Judgment "uses open-ended, vague and ambiguous language with reference to defendants' obligations and/or the time within which certain actions must be taken," and that such language is "deeply problematic" in a court order.[132]  Such terminology, however, is not unusual and has been present in final judgments previously approved under the Tunney Act.[133]  Moreover, the Final Judgment minimizes any enforceability risks by providing for resolution of any disputes that may arise without the need to involve this Court.  For example, if there is no agreement (regardless of the reason), the monitoring trustee will report to the United States, and the Department of Justice can resolve the dispute at its "sole discretion" or at its sole discretion "after consultation with the affected Plaintiff States."[134]  Additionally, should any disputes be brought before he Court, the Final Judgment provides standards for resolving disputes over interpretation of any such terms.  This is accomplished both by reference to the purpose of the decree "to give full effect to the procompetitive purposes of the antitrust laws," and by empowering

---

[131] *Id.*

[132] CWA Comment (Exhibit 10) at 21, 22.

[133] *See, e.g.,* Final Judgment, *United States v. Bayer AG*, No. 18-cv-1241, at 19 (D.D.C. Feb. 08, 2019) ("The divestitures shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between BASF and Bayer and Monsanto give Bayer and Monsanto the ability unreasonably to raise BASF's costs, to lower BASF's efficiency, or otherwise to interfere in the ability of BASF to compete effectively."); *id.* at 26 ("The terms and conditions of all agreements reached between Bayer and BASF under Paragraph IV(G) must be acceptable to the United States, in its sole discretion."); *id.* ("Bayer shall perform all duties and provide all services required of Bayer under the agreements reached between Bayer and BASF under Paragraph JV(G)."). *See also US Airways* Final Judgment at 12 (requiring divestiture to be "accomplished so as to satisfy the United States in its sole discretion, in consultation with the Plaintiff States, that none of the terms of any agreement between an Acquirer(s) and Defendants gives Defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer(s) to effectively compete."); *id.* at 13 ("Defendants shall use their best efforts to assist the Divestiture Trustee in accomplishing the required divestiture.").

[134] *See* PFJ § IV.A.4.

the Court to enforce any provision of the Final Judgment, as "interpreted by the Court in light of these procompetitive principles and in applying ordinary tools of interpretation," to terms that are "stated specifically and in reasonable detail, whether or not [they are] clear and unambiguous on [their] face."[135]

E.        Comments Regarding Procedural Aspects of this Review

1.        *Sufficiency of the Filings*

Mr. Bellemare argues that the "materials published in the Federal Register do not allow meaningful public comments."[136]  He asserts that the United States was required to include additional information in its filings, such as "pre- and post-merger levels of concentration (Herfindahl-Hirschman Index) (HHI); increase in HHI numbers as a result of the merger; exact pre- and post- merger market shares of all entities in the relevant market; trend toward concentration (or recent acquisitions)" as well as "substantial information . . . on regulatory or nonregulatory entry barriers in the relevant market."[137]  Mr. Bellemare does not identify a source for his claim that these categories of information are required, and for good reason—neither the Tunney Act itself nor the caselaw interpreting the Act identifies such requirements.  Under the Tunney Act, the United States must file a Competitive Impact Statement that recites "(1) the nature and purpose of the proceeding; (2) a description of the practices or events giving rise to the alleged violation of the antitrust laws; (3) an explanation of the proposal for a consent judgment, including an explanation of any unusual circumstances giving rise to such proposal or any provision contained therein, relief to be obtained thereby, and the anticipated effects on competition of such relief; (4) the remedies available to potential private plaintiffs damaged by the alleged violation in the event that such

---

[135] PFJ § Section XVIII.B.  Another commenter expressed general opposition to the proposed remedy but did not provide a sufficient basis for his concern to allow the United States to respond.  *See* Hasten Comment (Exhibit 15) ("No! No! No! No! No! You don't need me to tell you the reasons why.").

[136] Bellemare Comment (Exhibit 6) at 1.

[137] Bellemare Comment (Exhibit 6) at 7-8.

proposal for the consent judgment is entered in such proceeding; (5) a description of the procedures available for modification of such proposal; and (6) a description and evaluation of alternatives to such proposal actually considered by the United States."[138]  The Competitive Impact Statement filed in this case amply satisfies these requirements.[139]

### 2.    Comments Regarding the Timing of This Review

Some commenters seek to delay this Court's proceedings until after the conclusion of the litigation initiated by a group of state attorneys general in the Southern District of New York ("S.D.N.Y. Litigation").  AAI asks the Court to "defer a public interest determination and keep the public comment period open pending a final judgment in the States' challenge to the proposed transaction."[140]  Similarly, Public Knowledge *et al.* "request[s] that the DOJ ask the court to wait to decide whether to accept its proposed consent decree until the pending state enforcement action to block this merger is resolved."[141]  These commenters assert that this approach would impose no hardship on the merging parties and would be in the best interests of both the Department and the public.  They claim that this approach would be appropriate because it would allow for a more comprehensive public comment process and would promote the efficient use of judicial resources. As discussed below (and in greater detail in the United States's Response to States' Motion to File Brief as Amici Curiae ("Response to States' Brief") filed with this Court on October 23, 2019), AAI's assertions are incorrect.

*First*, delay would prejudice the public interest, the Department, and DISH.  As the Department explained in its Response to States' Brief, T-Mobile's obligation to begin preparing its

---

[138] 15 U.S.C. § 16(b)(1)-(6).

[139] Mr. Bellemare also points to the standards that apply to motions to dismiss and motions for summary judgment under the Federal Rules.  *See* Bellemare Comment (Exhibit 6) at 2, 8.  Those standards have no bearing on this proceeding.

[140] AAI Comment (Exhibit 2) at 11.

[141] Public Knowledge *et al*. Comment (Exhibit 22) at 4.

network for DISH subscribers is triggered by entry of the proposed Final Judgment.[142]  No useful

purpose would be served by delaying this process and thus delaying the date by which DISH can

begin offering mobile wireless service to the public.  In addition, the Department has a broader

interest in ensuring that its proposed settlements are entered in an efficient manner.  Jeopardizing

this ability would require the Department to devote resources to matters it has decided to settle

rather than matters it has not.[143]  For its part, DISH has an interest in prompt entry of the proposed

Final Judgment because of its fixed-date network deployment deadlines.  The proposed Final

Judgment requires DISH to reach certain milestones by June 14, 2023, and delaying the Court's

consideration of the proposed Final Judgment would shorten the time available to DISH to comply

with this requirement.[144]

    *Second*, contrary to these commenters' claims,[145] the Court need not allow third parties to

file "new or supplementary" comments after conclusion of the S.D.N.Y. Litigation.  Much of the

record developed in the S.D.N.Y. Litigation will pertain to the merits of the states' Section 7

challenge and thus will not be relevant here.  Some of that evidence will also pertain to legal claims

that the United States did not assert.  Considering these claims would violate separation-of-powers

principles.[146]  Even as to evidence that could arguably be relevant, the United States will not have

participated in the creation of that record, and it would violate fundamental principles of procedural

fairness to rely on such evidence.

---

[142] *See* PFJ § IV.A.1; Response to States' Brief at 7-8.

[143] *See Microsoft*, 56 F.3d at 1459 (noting in an appeal of a Tunney Act decision that "a settlement, particularly of a major case, will allow the Department of Justice to reallocate necessarily limited resources"); *see also Heckler*, 470 U.S. at 831 (explaining that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion" because the agency must consider, among other things, "whether agency resources are best spent on this violation or another").

[144] *See* PFJ § VIII.A.

[145] AAI Comment (Exhibit 2) at 12-13.

[146] *See Heckler*, 470 U.S. at 832 (noting that the decision about which claims to bring "has long been regarded as the special province of the Executive Branch"); *Microsoft*, 56 F.3d at 1461 (noting that district courts engaging in Tunney Act review are "barred from reaching beyond the complaint to examine practices the government did not challenge").

*Third*, adopting the proposed delay would not promote the efficient use of judicial resources.  When it passed the Tunney Act, Congress expressed its intent for courts making public interest determinations to "adduce the necessary information through the least complicated and least time-consuming means possible."[147]  Consistent with this intent, courts routinely make Tunney Act determinations on the basis of only the Competitive Impact Statement, comments filed by the public, and the response filed by the Department.[148]  With the benefit of the Department's Competitive Impact Statement in this proceeding, the comments filed, and this response, the Court now has before it a record sufficient to support a public interest determination.[149]

        F.               <u>Comments Supporting Entry of the Proposed Final Judgment</u>

Several commenters stated that although they believe the settlement is unnecessary, they nevertheless endorse entry of the proposed Final Judgment.  Scott Wallsten of the Technology Policy Institute refers to an earlier analysis he conducted that concluded the empirical evidence was mixed as to whether 4-to-3 mergers "necessarily harm" consumers, but that also "identified areas in which the merger might pose some concerns."[150]  Mr. Wallsten goes on to state that, "[t]aken together, the DOJ conditions address the concerns by aiming to lock in existing MVNO agreements while lowering the barriers to entry by a facilities-based carrier (DISH)." [151]  Mr. Wallsten observes that these conditions "appear designed to reduce the chances of consumer harm in the areas otherwise most likely to be affected while allowing the New T-Mobile to retain sufficient assets to compete with AT&T and Verizon."[152]  Mr. Wallsten states that these "remedies lower the barriers

---

[147] S. Rep. No. 93-298, at 6 (1973).

[148] *See supra* Section III.

[149] For this reason, the Court should also reject Public Knowledge *et al.*'s unsupported request for an evidentiary hearing.  *See* Public Knowledge *et al*. Comment (Exhibit 22) at 4.

[150] Wallsten Comment (Exhibit 25) at 1.

[151] *Id.* at 1-2 (citing, *inter alia*, the divestiture of Sprint's prepaid businesses, the MVNO agreement "to ensure [DISH] is able to sell a competitive mobile product," and the extension of all current MVNO agreements).

[152] *Id.*

to DISH's entry into mobile cellular," and that "[l]owering the cost of entry also increases the chances DISH will enter the market, thereby increasing competitive pressure on the New T-Mobile (and other incumbents) from the threat of new entry."[153]  After noting that, "[f]or the longer run, the DOJ also proposes to reduce barriers to entry into facilities-based provision for DISH," Mr. Wallsten concludes that "the conditions proposed by the DOJ are a reasonable approach to managing potential concerns."[154]

Similarly, Randolph May and Seth Cooper of the Free State Foundation state that, while they "do not specifically endorse or oppose the proposed merger or the proposed settlement," they believe there is "strong evidence" that the proposed merger, "if approved pursuant to the proposed settlement, would be in the public interest.[155]"  And the Enterprise Wireless Alliance states that it supports the merger because it "would promote competition in the nationwide commercial wireless marketplace and accelerate the deployment of a 5G network covering much of the population including substantial expansions in coverage to rural areas," and that it also "supports the introduction of DISH as a potential fourth national wireless carrier" through the consent decree.[156]

A number of other commenters expressed support for the merger generally, without specifically commenting on the settlement.  For example, several scholars affiliated with the International Center for Law & Economics submitted a letter along with their recent report that

---

[153] *Id.* at 5.

[154] *Id.* at 6.

[155] May & Cooper Comment (Exhibit 23) at 1.

[156] EWA Comment (Exhibit 13) at 1.  Two additional commenters explain that, after their initial concerns were satisfied by negotiating additional relief directly with T-Mobile, they now also support entry of the proposed Final Judgment.  *See* California Emerging Technology Fund Comment (Exhibit 8) at 1-2 (after becoming a legal party in proceedings before the California Public Utilities Commission and negotiating a Memorandum of Understanding "that provides unprecedented public benefits for California consumers, especially the digitally-disadvantaged," states that the "subsequent commitments secured by DOJ ensure that there is increased competition and additional choices for all U.S. consumers"); National Hispanic Caucus of State Legislators Comment (Exhibit 18) at 1, 4 (after securing "commitments regarding deployment and hiring" through an "extensive Memorandum of Understanding" between T-Mobile and the National Diversity Coalition, supports the DOJ's proposed settlement because it "addresses some residual concerns we had previously identified").

"reviews 18 empirical analyses in the last five years that study the effects of changes in market concentration (such as by merger) in the wireless telecommunications industry."[157]  These scholars express the view that the divestiture package "is likely unnecessary to ensure that the market remains competitive."[158]  Nevertheless, and "regardless" of the proposed remedy, the scholars state that they "believe that the DOJ was correct."[159]  The United States construes these submissions[160] as comments in favor of entry of the proposed Final Judgment.

Other states besides the Co-Plaintiff States in this matter have also indicated their support for the proposed Final Judgment.  The Attorneys General of Arizona and New Mexico have also expressed their support for this settlement.[161]  The State of Mississippi went so far as to withdraw

---

[157] ICLE Report at 2.

[158] *Id.*

[159] *Id.* at 1-2.  Similarly, Tech Freedom filed "comments in support of the proposed Final Judgment and Stipulation and Order" and "urge[s] the Court to approve these Measures."  TechFreedom Letter (Exhibit 26) at 1 (also attaching "Comments of TechFreedom" filed with the FCC on Sept. 17, 2018).  TechFreedom states that it agrees with the analysis in the ICLE report discussed in the text above, and that while it believes the remedy measures "actually go too far," it "believes that the quickest path to bringing forth the benefits of the merger is for the court to approve the merger as agreed."  *Id.  See also* Competitive Enterprise Institute Comment (Exhibit 11) at 1, 5, 7 (after stating the proposed merger "more-than passes muster" under the DOJ/FTC horizontal merger deadlines, discusses the benefits of T-Mobile's commitments to the FCC and "respectfully encourage[s] DOJ to accept the proposed settlement").

[160] *See also* National Puerto Rican Chamber of Commerce Comment (Exhibit 19) (asking DOJ to "approve the merger to help Puerto Rico expedite its [hurricane] recovery and grow its economy"); Overland Park Chamber of Commerce Comment (Exhibit 21) ("we support approval of the proposed merger"); Vermont Telephone Co. Comment (Exhibit 28) ("Rural America has so much to gain from this [merger], and so much to lose if it does not go forward"); Viaero Wireless Comment (Exhibit 29) (the merger "will directly benefit consumers and rural carriers like Viaero"); Center for Individual Freedom Comment (Exhibit 9) (CFIF and its supporters "urge swift approval of the proposed merger"); Greater Kansas City Chamber of Commerce Comment (Exhibit 14) (writing to "express the KC Chamber's support" for the merger); National Diversity Coalition Comment (Exhibit 17) (stating it is "one of many organizations that support the merger"); Asian Business Association Comment (Exhibit 4) (stating "our believe that this merger has the potential to greatly benefit everyone in America"); Williamson Comment (Exhibit 31) ("I strongly support the T-Mobile-Sprint merger and am hopeful that the Department of Justice will approve the Merger."); Americans for Tax Reform Comment (Exhibit 3) at 1 ("I urge the Department of Justice to approve the merger."); CalAsian Chamber of Commerce Comment (Exhibit 7) ("We have been outspoken in our support for the merger of T-Mobile with Sprint . . . ."); Members of the United States House of Representatives Comment (Exhibit 27) (Oct. 10, 2019 letter resubmits "in support of the proposed Final Judgment" Jan. 25, 2019 letter sent to the FCC and the DOJ "to express our support for, and encourage your prompt consideration of, the proposed merger of T-Mobile U.S., Inc. and Sprint Corporation.").

[161] *See* "Attorney General Brnovich Statement on DOJ-T-Mobile/Sprint Merger Settlement" (stating "the divestiture, the FCC commitments, and PFJ provide Dish the realistic ability to become a competitive and fourth facilities-based wireless carrier" and that the PFJ "also facilitates Dish's ability to exercise its option to acquire the spectrum assets, cell sites, and retail assets to establish itself as a viable competitor in the retail mobile wireless services market"), *available at* https://www.azag.gov/press-release/attorney-general-brnovich-statement-doj-t-mobilesprint-merger-settlement; "AG Balderas' Statement on the Department of Justice's Announced Agreement on T-Mobile/Sprint Merger," July 26, 2019 (the AG is "pleased" by the settlement), *available at* https://www.nmag.gov/uploads/

from the S.D.N.Y. Litigation and enter an agreement with T-Mobile that relies on the relief

obtained by the FCC and in this proposed Final Judgment.[162]  The State of Colorado has now also

withdrawn from the S.D.N.Y. Litigation and has requested to join as a plaintiff in this action.[163]

Finally, the Attorneys General of Utah and Arkansas filed a comment in this proceeding

stating that they "have studied – and agree with – the conclusions in the DOJ's Competitive Impact

Statement."[164]  In their view, the proposed settlement "contains a powerful divestiture component"

and will "greatly increase the probability that Dish will become a successful and significant fourth

competitor in the market."[165]  They conclude that "the settlement embodied in the proposed Final

Judgment is in the public interest, mitigates the potential harms that the merger could otherwise

have created, and offers benefits to rural communities while maximizing output and consumer

choice for all Americans."[166]

---

PressRelease/48737699ae174b30ac51a7eb286e661f/AG_Balderas%E2%80%99_Statement_on_the_Department_of_Justice%E2%80%99s_Announced_Agreement_on_T_mobileSprint_Merger.pdf.

[162] *See* "AG Hood Settles Concerns on T-Mobile-Sprint Merger, Increases Services Available for Mississippians" (Oct. 9, 2019), *available at* https://www.ago.state ms.us/releases/ag-hood-settles-concerns-on-t-mobile-sprint-merger-increases-services-available-for-mississippians/; Letter Agreement, "T-Mobile and Sprint Pledged Commitments in Mississippi" ("Mississippi Letter Agreement") *available at* http://www.ago.state ms.us/wp-content/uploads/2019/10/MS-T-Mobile-agreement-executed.pdf.

[163] *See* Consent Motion for Leave to File Third Amended Complaint (Oct. 28, 2019), Dkt. No. 40; *see also* "Attorney General's Office Secures 2,000 Jobs, Statewide 5G Network Deployment Under Agreements with Dish, T-Mobile" (Oct. 21, 2019), https://coag.gov/press-releases/attorney-generals-office-secures-2000-jobs-statewide-5g-network-deployment-under-agreements-with-dish-t-mobile-10-21-19/.

[164] Utah/Arkansas Comment (Exhibit 5) at 1.

[165] *Id.* at 2 (citing the "multifaceted and detailed nature" of the Divestiture Assets, DISH's willingness to be bound as a party, provisions allowing for DOJ and FCC verification, "all backed by the potential of significant monetary penalties for non-compliance").

[166] *Id.* at 3.

**VI.        Conclusion**

After careful consideration of the public comments, the United States continues to believe that the proposed Final Judgment, as drafted, provides an effective and appropriate remedy for the antitrust violations alleged in the Complaint, and is therefore in the public interest.  The United States will move this Court to enter the proposed Final Judgment after the comments and this response are published as required by 15 U.S.C. § 16(d).

Dated: November 6, 2019

Respectfully submitted,

_____/s/_____
Frederick S. Young
Matthew R. Jones
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 4100
Washington, D.C. 20530
(202) 307-2869
Frederick.Young@usdoj.gov

## CERTIFICATE OF SERVICE

I, Frederick S. Young, hereby certify that on November 6, 2019, I caused a copy of the

foregoing document to be served upon all counsel of record via the Court's CM/ECF system.


_____/s/_____
Frederick S. Young
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 4100
Washington, D.C. 20530
(202) 307-2869
Frederick.Young@usdoj.gov