# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

              *Plaintiffs*,

v.

DEUTSCHE TELEKOM AG, *et al.*,

              *Defendants.*

Case No. 1:19-cv-02232-TJK

## APPENDIX
## PUBLIC COMMENTS RECEIVED

### VOLUME II

| Exhibit | Commenter |
|---|---|
| 20 | NTCH, Inc. |
| 21 | Overland Park Chamber of Commerce |
| 22 | Public Knowledge *et al.* (Public Knowledge, Consumer Reports, Electronic Frontier Foundation, and New America's Open Technology Institute) |
| 23 | Randolph May and Seth Cooper (Free State Foundation) |
| 24 | Rural Wireless Association |
| 25 | Scott Wallsten (Technology Policy Institute) |
| 26 | Tech Freedom |
| 27 | United States House of Representatives (Representatives Anna G. Eshoo, Billy Long, Adam Smith, Doug Lamborn, Gregory W. Meeks, Roger W. Marshall, Suzan DelBene, Dan Newhouse, Anthony G. Brown, Ron Estes, Mike Thompson, Blaine Luetkemeyer, and Kurt Schrader) |
| 28 | Vermont Telephone Co. |
| 29 | Viaero Wireless |

# EXHIBIT 20
# TO RESPONSE

# Fletcher, Heald & Hildreth

1300 NORTH 17th STREET, 11th FLOOR
ARLINGTON, VIRGINIA 22209

OFFICE: (703) 812-0400
FAX: (703) 812-0486
www.fhhlaw.com
www.commlawblog.com

DONALD J. EVANS
(703) 812-0430
EVANS@FHHLAW.COM

KEENAN P. ADAMCHAK
(703) 812-0415
ADAMCHAK@FHHLAW.COM

August 26, 2019

## VIA U.S. MAIL

Scott Scheele,
Chief, Telecommunications and Broadband Section,
Antitrust Division,
U.S. Department of Justice,
450 Fifth Street, N.W., Suite 7000,
Washington, D.C. 20530

> **RE:** **Tunney Act Comments of NTCH, Inc.**
> *United States v. Deutsche Telekom AG*, **Civil Action No. 1:19-cv-02232-TJK**

Dear Mr. Scheele:

NTCH, Inc., by its undersigned counsel, and pursuant to 15 U.S.C. § 16(b), hereby files the attached comments in response to the Competitive Impact Statement, dated July 30, 2019, filed by the Antitrust Division – Telecommunications and Broadband Section of the U.S. Department of Justice ("DOJ") with respect to the Proposed Final Judgment in *United States. v. Deutsche Telekom AG*, Civil Action No. 1:19-cv-02232-TJK, currently pending before the U.S. District Court for the District of Columbia.

Should you have any questions regarding this transmission, please contact the undersigned.

Respectfully submitted,

Donald J. Evans
Keenan P. Adamchak

*Counsel to NTCH, Inc.*

Enclosures

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:19-cv-02232-TJK |
| DEUTSCHE TELEKOM AG, et al., | |
| *Defendants.* | |

**TUNNEY ACT COMMENTS OF NTCH, INC.
ON THE PROPOSED FINAL JUDGMENT AND
COMPETITIVE IMPACT STATEMENT**

Donald J. Evans, Esq.
Keenan P. Adamchak, Esq.
Fletcher, Heald & Hildreth, PLC
1300 N. 17th Street, Suite 1100
Arlington, VA  22209
Tel:    (703) 812-0400
Fax:    (703) 812-0486
evans@fhhlaw.com
adamchak@fhhlaw.com

*Counsel for NTCH, Inc.*

Dated: August 26, 2019

## SUMMARY

NTCH, Inc. ("NTCH"), through these comments, seeks to advise the Court and the U.S. Department of Justice that the adoption of the current terms and conditions of the Proposed Final Judgment with respect to the Sprint-T-Mobile merger would not be in the public's interest. Specifically, NTCH observes that: (1) there is a good possibility that DISH will be unable to comply with its obligations under the Proposed Final Judgment as it is currently at risk of losing its AWS-4 and H Block spectrum licenses – thereby preventing DISH from operating as the nation's fourth largest wireless carrier following the merger; (2) DISH's record at constructing and operating a wireless mobile network cast doubt on its willingness or competence to deliver the broad and ambitious commitments necessary to achieve the pro-competitive aims of the Proposed Final Judgment; and (3) the Proposed Final Judgment fails to impose any conditions on the parties to mitigate the adverse impact of the merger on the data roaming submarket and further raises the bar for any competitor to enter this space. For these reasons, NTCH believes that the current terms and conditions of the Proposed Final Judgment fail to remediate the anticompetitive effects of the Sprint-T-Mobile merger in a reliable manner.

**TABLE OF CONTENTS**

SUMMARY ........................................................................................................................... i

**I.    BACKGROUND** ........................................................................................................ 2

A.      The Complaint, Competitive Impact Statement, and Proposed Final Judgment ............. 2

B.      DISH's AWS-4 and H Block Licenses .......................................................................... 3

   1.   *Award of DISH's AWS-4 Licenses* ................................................................................ 3

   2.   *Award of DISH's H Block Licenses* ............................................................................... 4

   3.   *DISH's Request for Extension and Modification of Final Build-out Requirements* ........ 5

C.      The Data Roaming Market ............................................................................................. 6

**II.   DISCUSSION** ............................................................................................................. 8

A.      Standard of Review ....................................................................................................... 8

B.      DISH may fail to Comply with its Obligations Under the Proposed Final Judgment ..... 9

   1.   *DISH is Currently Struggling to Comply with its AWS-4 and H Block Buildout Obligations* ........................................................................................................................ 9

   2.   *The Commission must Deny DISH's Extension Request* ................................................. 11

   3.   *DISH could lose its AWS-4 and H Block Licenses as a Result of NTCH's Appeals Pending Before the D.C. Circuit* ....................................................................................... 14

C.      The Proposed Final Judgment Fails to Consider the Impact of the Merger on the Data Roaming Submarket ........................................................................................................... 15

**CONCLUSION** ................................................................................................................. 20

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, et al., |
| *Plaintiffs,* |
| v. |
| DEUTSCHE TELEKOM AG, et al., |
| *Defendants.* |

Civil Action No. 1:19-cv-02232-TJK

**TUNNEY ACT COMMENTS OF NTCH, INC.
ON THE PROPOSED FINAL JUDGMENT AND
COMPETITIVE IMPACT STATEMENT**

NTCH, Inc. ("NTCH"),[1] by its undersigned attorneys and pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA," or "Tuney Act"), 15 U.S.C. § 16(b), hereby

files comments in response to the Competitive Impact Statement, dated July 30, 2019, filed by

the Antitrust Division – Telecommunications and Broadband Section of the U.S. Department of

Justice ("DOJ") with respect to the Proposed Final Judgment in the above captioned proceeding.

Through these comments, NTCH seeks to advise the Court and the DOJ of circumstances that

will make it either unlikely or impossible for DISH to implement the responsibilities that it

purports to shoulder under the Proposed Final Judgment. Accordingly, NTCH respectfully

requests that the Court and the DOJ consider whether adoption of the terms and conditions of the

Proposed Final Judgment would be in the public's interest.

---

[1]     NTCH, a Delaware corporation, is a licensee of wireless radio systems licensed by the
Federal Communications Commission ("FCC", or the "Commission"). NTCH is also involved
in the construction and leasing of cellular towers.

1

## I.    BACKGROUND

### A.    The Complaint, Competitive Impact Statement, and Proposed Final Judgment

The Complaint alleges that T-Mobile's proposed acquisition of Sprint "would remove competition from Sprint and restructure the retail mobile wireless service market . . . leav[ing] the market vulnerable to increased coordination among the remaining three carriers" – i.e., T-Mobile, Verizon, and AT&T.[2]  To remedy this, the Proposed Final Judgment requires T-Mobile to divest "certain retail wireless business and network assets," including some of T-Mobile's wireless licenses, to DISH.[3]  The DOJ asserts that "[t]he primary purpose of the Proposed Final Judgment is to facilitate DISH building and operating its own mobile wireless services network by combining the Divestiture Package of assets and other relief with DISH's existing mobile wireless assets . . . to enable [DISH] to compete in the marketplace."[4]  The Proposed Final Judgment "obligates DISH to build out its own mobile wireless services network and offer retail mobile wireless service to American consumers"[5] – with the intent that "DISH build out its own national facilities-based mobile wireless network to replace the competition lost as a result of Sprint being acquired by T-Mobile."[6]  Accordingly, the Proposed Final Judgment requires DISH to "comply with the June 14, 2023 *AWS-4*, 700 MHz, *H Block*, and Nationwide 5G Broadband

---

[2]    Competitive Impact Statement at 7, *United States v. Deutsche Telekom AG*, 1:19-cv-02232-TJK (D.D.C., July 30, 2019) ("Competitive Impact Statement").  *See also* Complaint at 3, ¶¶ 3-6, *United States v. Deutsche Telekom AG*, 1:19-cv-02232-TJK (D.D.C., July 26, 2019).

[3]    Competitive Impact Statement at 2 & 8-10.  *See also* Proposed Final Judgment at 6-18, *United States v. Deutsche Telekom AG*, 1:19-cv-02232-TJK (D.D.C., July 26, 2019) ("Proposed Final Judgment").

[4]    Competitive Impact Statement at 2.

[5]    *Id.*

[6]    *Id.* at 12.

build commitments made to the FCC on July 26, 2019" in order to ensure that DISH has the
requisite facilities to provide nationwide wireless service.[7]

### B.    DISH's AWS-4 and H Block Licenses

#### 1.    *Award of DISH's AWS-4 Licenses*

In 2012, the FCC created the AWS-4 licenses by repurposing spectrum formerly used for
mobile satellite service ("MSS") on the premise that the spectrum would be used to accelerate
mobile broadband deployment.[8]  Simultaneously, the Commission awarded the new AWS-4
licenses to the incumbent licensee in the MSS band – i.e., DISH.[9]  The FCC found that awarding
the AWS-4 licenses solely to DISH was in the public interest as doing so ensured the expedited
deployment of mobile broadband services in the AWS-4 band[10] – based in part on DISH's
pledge to "aggressively" buildout the band.[11]

To accomplish this, the Commission required DISH to meet the following construction
benchmarks:  (1) *Interim Build-out Requirement* – provide service to at least 40% of the total
population of its AWS-4 service area within 4 years; and (2) *Final Build-out Requirement* –
provide service to 70% of the AWS-4 population within 7 years.[12]  The FCC also adopted rules
that would penalize DISH if failed to meet either its interim or final AWS-4 build-out

---

[7]      *Id.* at 11 (emphasis added). *See also* Proposed Final Judgment at 23.

[8]      *See Service Rules for Advanced Wireless Services in the 2000-2020 MHz and 2180-220
MHz Bands*, Report and Order and Order of Proposed Modification, 27 FCC Rcd. 16102, 16103,
¶ 1 & 16116, ¶ 34 (2012) ("*AWS-4 Report and Order*").

[9]      *Id.* at 16164, ¶ 161.

[10]     *See id.* at 16169-71, ¶¶ 176-80.

[11]     *See id.* at 16176, ¶ 194 ("[DISH] generally support[s] our seven year end-of-term build-
out benchmark and [has] committed to 'aggressively-build out a broadband network' if [it]
receives terrestrial authority to operate in the AWS-4 band." (quoting DISH Comments at 18
(other citations omitted))).

[12]     *Id.* at 16174, ¶ 187.

benchmarks:  (1) *Failure to Meet Interim Build-out Deadline* – Acceleration of the final AWS-4

build-out deadline by 1 year; and (2) *Failure to Meet the Final Build-out Deadline* – DISH's

AWS-4 licenses would automatically terminate and be recovered by the Commission for

reauctioning.[13]

### 2.    *Award of DISH's H Block Licenses*

The FCC announced its intention that the H Block spectrum (1915-1920 MHz and 1995-

2000 MHz) be used for mobile service when it allocated the band for terrestrial operations in

2013.[14]  That same year, the Commission granted DISH a one-year extension of its final AWS-4

build-out deadline in exchange for DISH committing to bid $1.564 billion in the auction the FCC

was planning to conduct for the H Block.[15]  The Commission adopted DISH's proposed payment

as the reserve price for the H Block auction to ensure that this deal would be effectuated.[16]  That

very high reserve price exceeded what all other bidders were willing to bid for the licenses, and

DISH accordingly won all of the H Block spectrum at auction.[17]

DISH's H block licenses are subject to the following build-out requirements:  (1) *Interim*

*Build-out Requirement* – provide service to at least 40% of the total population of its H Block

license areas within 4 years; and (2) *Final Build-out Requirement* – provide service to 75% of the

---

[13]     *Id.* at 16174, ¶ 188.

[14]     *See Service Rules for Advanced Wireless Services H Block*, Report and Order, 28 FCC Rcd. 9483, 9484, ¶ 1 & 9488, ¶ 9 (2013) ("*H Block Report and Order*").

[15]     *DISH Network Corporation*, Memorandum Opinion and Order, 28 FCC Rcd. 16787, 16805, ¶ 45 (Wireless Bureau 2013) ("*2013 DISH Waiver Order*").

[16]     *Auction of H Block Licenses in the 1915-1920 MHz and 1995-2000 MHz Bands*, Public Notice, 28 FCC Rcd. 13019, 13064, ¶ 172 (2013).

[17]     *Auction of H Block Licenses in the 1915-1920 MHz and 1995-2000 MHz Bands*, Public Notice, 29 FCC Rcd. 2044, Attachment A (2014).

of the total population of its H Block license areas within 10 years.[18]  DISH is subject to the

following penalties in the event it fails to meet its H Block build-out requirements:  (1) ) *Failure*

*to Meet Interim Build-out Deadline* – acceleration of the final H Block build-out deadline by

2 years; and (2) *Failure to Meet the Final Build-out Deadline* – DISH's H Block licenses would

automatically terminate and be recovered by the Commission for reauctioning.[19]

### 3.    *DISH's Request for Extension and Modification of Final Build-out Requirements*

DISH has already failed to meet its interim build-out deadlines for its H Block and AWS-

4 licenses.[20]  Accordingly, the current buildout deadlines for DISH's AWS-4 and H Block

licenses have been accelerated to March 7, 2020, and April 29, 2022, respectively.[21]  On July 26,

2019, however, DISH requested another extension to June 14, 2023 of the accelerated final

buildout deadlines for both its AWS-4 and H Block licenses.[22]  In the letter attached to each of

the extension requests, DISH stated that extending its AWS-4 and H Block construction buildout

deadlines was necessary due to its "anticipated acquisition of Boost Mobile and other assets" as a

result of its commitments relative to the Sprint-T-Mobile merger.[23]

---

[18]    *H Block Report and Order*, 28 FCC Rcd. at 9558, ¶ 195.

[19]    *Id.*

[20]    *See* Letter from Donald K. Stockdale, Jr., Chief, Wireless Bureau, FCC, to Jeffrey H. Blum, Senior Vice President & Deputy Gen. Counsel, DISH at 2 (Jul. 9, 2018) ("FCC July 8, 2018 Letter").

[21]    *See id.*

[22]    *See, e.g.*, FCC ULS File Nos. 0008741236 (filed July 26, 2019) (H Block licenses), 0008741420 (filed July 26, 2019) (AWS-4 licenses).

[23]    Letter from Jeffrey H. Blum, Senior Vice President & Deputy Gen. Counsel, DISH, to Donald K. Stockdale, Jr., Chief, Wireless Bureau, FCC at 1-2 (July 26, 2019) ("DISH Extension Request Letter").

Furthermore, in exchange for DISH's voluntary waiver of its flexible use rights under its AWS-4 and H Block licenses, DISH requested that the FCC modify DISH's buildout obligations for its licenses by requiring DISH to provide 5G Broadband Service to at least: (1) 20% of the U.S. population by June 24, 2022 (in addition to deployment of a core network); and (2) 70% of the U.S. population by June 14, 2023.[24]  If DISH failed to comply with those modified construction benchmarks for its AWS-4 and H Block licenses, however, the licenses would be subject to automatic cancellation under the Commission's rules.[25]  DISH additionally proposed that it would be obligated to pay the FCC a voluntary forfeiture of $2.2 billion for failure to meet the construction deadlines.[26]  DISH's extension requests remain pending before the Commission as of the date of these comments.

## C.    The Data Roaming Market

Over the past 10-15 years, rapid consolidation in the wireless industry has adversely affected the data roaming submarket, with the result that smaller wireless carriers are unable to negotiate reasonable roaming rates with major carriers such as AT&T and Verizon.[27]  The loss of literally dozens of independent competitive carriers from the market – including such larger ones

---

[24]    *Id.* at Attachment A, p. 2.

[25]    *See id.* at Attachment A, p. 3 ("If DISH is offering 5G Broadband Service with [its] AWS-4 Licenses *to less than 50%* of the U.S. population by 6/14/2023, DISH's AWS-4 Licenses are subject to automatic termination in any [license area] where DISH is offering 5G Broadband Service with respect to the AWS-4 Licenses *to less than 70%* of the U.S. population in such [license area]." (emphasis added)); *id.* at Attachment A, p. 4 ("If DISH is offering 5G Broadband Service with [its] [H Block] Licenses *to less than 50%* of the U.S. population by 6/14/2023, DISH's [H Block] Licenses are subject to automatic termination in any [license area] where DISH is offering 5G Broadband Service with respect to the [H Block] Licenses *to less than 75%* of the U.S. population in such [license area]." (emphasis added)).

[26]    *Id.* at Attachment A, pp. 4-5.

[27]    Letter from Donald J. Evans, Esq., Counsel for NTCH, Inc. & Wise Electronics, Inc., to Fredrick S. Young, Esq., Antitrust Division, DOJ at 1 (June 14, 2019) ("NTCH Letter").

as MetroPCS, Leap Wireless, Atlantic Telenetwork, and Allied – are both a primary cause and a

result of the growing crisis in roaming rates.[28]  Many carriers found it difficult to sustain

business models (especially to higher end traveling customers) with impossibly high prices they

had to pay to allow their subscribers to roam on the large national carriers' networks when those

subscribers were outside their home network.[29]  Those carriers determined that they could not

compete under those circumstances, forcing them to exit the market.[30]  This is how a vibrant

national market of hundreds of independent local, regional, and national carriers transformed into

one dominated by 4 national carriers with no incentive to offer reasonable roaming rates.[31]

The FCC has largely ignored the growing crisis in the data roaming market.  Despite

evidence presented to the Commission in several agency proceedings, including the *T-Mobile*

*Declaratory Ruling* proceeding,[32] Verizon's acquisition of SpectrumCo.'s AWS holdings,[33] and

several formal complaints filed with the Commission,[34] the FCC has largely ignored the glaring

reality that roaming rates charged by the majors to small carriers are grossly excessive.  In effect,

these astronomical rates amount to a denial of roaming service to these small carriers and their

---

[28]    *Id.*

[29]    *Id.*

[30]    *Id.* at 2.

[31]    *Id.*

[32]    *See generally Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services*, Declaratory Ruling, 29 FCC Rcd. 15483 (Wireless Bureau 2014).

[33]    *Cellco Partnership d/b/a Verizon Wireless*, Memorandum Opinion and Order and Declaratory Ruling, 27 FCC Rcd. 10698, 10730, ¶ 84 (2012).

[34]    *See, e.g.*, *Flat Wireless v. Cellco Partnership d/b/a Verizon Wireless*, Order, 33 FCC Rcd. 7972 (2018); *NTCH, Inc. v. Cellco Partnership d/b/a Verizon Wireless*, Order, 31 FCC Rcd. 7165 (EB 2016), *recon. denied*, 33 FCC Rcd. 7972 (2018); *Worldcall Interconnect, Inc. a/k/a Evolve Broadband v. AT&T Mobility LLC*, Order, 31 FCC Rcd. 3527 (Enforcement Bureau 2016).

subscribers in violation of Sections 201(b) and 202(a) of the Communications Act of 1934, as amended ("Communications Act").[35]

## II.    DISCUSSION

### A.    Standard of Review

The APPA requires that the Court determine whether entry of the Proposed Final Judgment "is in the public interest."[36]  In doing so, the Court must consider *inter alia* "the impact of entry of such judgment upon competition in the relevant markets [and] upon the public generally . . . ."[37]  The "[C]ourt's inquiry is limited" in Tunney Act settlements.[38]  The Court only "inquires 'into whether the government's determination that the proposed *remedies will cure the antitrust violations alleged in the complaint was reasonable*, and whether the mechanism to enforce the final judgment are clear and manageable.'"[39]  While the Court "must accord deference to government's predictions about the efficacy of its remedies,"[40] the Court "can make its public interest determination based on the competitive impact statement and response to public comments alone."[41]

---

[35]    47 U.S.C. §§ 201(b) (unjust and unreasonable rates and practices are unlawful), 202(a) (discrimination in rates an practices unlawful).

[36]    15 U.S.C. § 16(e)(1).

[37]    *Id.* at § 16(e)(1)(B).

[38]    *United States v. U.S. Airways Grp., Inc.*, 38 F.Supp.3d 69, 75 (D.D.C. 2014).

[39]    *United States v. Graftech Int'l Ltd.*, No. 10-02039, 2011 WL 1566781, at * 12 (D.D.C. Mar. 4, 2011) (emphasis added) (quoting *United States v. InBev N.V./S.A.*, No. 08-1965(JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009)). *See also id.* ("[T]he court's role under the APPA is limited *to reviewing the remedy in relationship to the violations* that the United States has alleged in its Complaint, and does not authorize the court to 'construct [its] own hypothetical case and then evaluate the decree against that case.'" (emphasis added) (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995))).

[40]    *United States v. SBC Commc'ns, Inc.*, 489 F.Supp.2d 1, 17 (D.D.C. 2007).

[41]    *U.S. Airways Grp.*, 38 F.Supp.3d at 76 (citing *United States v. Enova Corp.*, 107 F.Supp.2d 10, 17 (D.D.C. 2000)).

### B.    DISH may fail to Comply with its Obligations Under the Proposed Final Judgment

NTCH has serious doubts whether DISH is able to comply with its obligations under the

Proposed Final Judgment.  The Proposed Final Judgment requires DISH to "comply with the

June 14, 2023 *AWS-4*, 700 MHz, *H Block*, and Nationwide 5G Broadband build commitments

made to the FCC on July 26, 2019 . . . ."[42]  NTCH believes that DISH is at risk of failing to

comply with these conditions because:  (1) DISH has a history of noncompliance with spectrum

buildout deadlines; and (2) adverse outcomes of pending appeals before the D.C. Circuit could

lead to DISH losing its AWS-4 and H Block licenses.

### 1.    *DISH is Currently Struggling to Comply with its AWS-4 and H Block Buildout Obligations*

DISH has a demonstrated track record of failing to comply with its construction buildout

obligations for its spectrum licenses.  It has already failed to meet its interim construction

deadlines for both its AWS-4 and H Block licenses.[43]  Indeed, after DISH failed to meet those

construction deadlines, T-Mobile noted in a letter to the FCC that DISH's buildout plan proposed

in the DISH Sept. 21, 2018 Letter for its AWS-4 and H Block licenses was "inconsistent with the

Company's obligations under the Commission's rules and the spectrum it holds will be

recaptured if it only takes the very limited actions it described."[44]  Specifically, T-Mobile noted

that DISH "would use only a fraction of the available spectrum capacity" by its construction

---

[42]    See Proposed Final Judgment at 23.

[43]    *See* FCC July 8, 2018 Letter at 2; Jeffrey H. Blum, Senior Vice President & Deputy Gen. Counsel, DISH, to Donald K. Stockdale, Jr., Chief, Wireless Bureau, FCC at 2 (Sept. 21, 2018) ("DISH Sept. 21, 2018 Letter").

[44]    *See* Letter from Kathleen O'Brien Ham, Senior Vice President, Gov't Affairs, T-Mobile, to Donald K. Stockdale, Jr., Chief, Wireless Bureau, FCC at 1 (Oct. 25, 2018) ("T-Mobile Oct. 25, 2018 Letter").

deadlines – only *1%* of its AWS-4 licensed spectrum and *6.0%* of its H Block licensed spectrum.[45] Based on its minimal usage and "warehousing" of authorized spectrum, T-Mobile concluded that "DISH's efforts . . . constitute nothing more than a 'license saving' deployment scheme and are insufficient to meet its performance obligations."[46] Indeed, T-Mobile rightly concluded that DISH's plan to leave *98%* of its authorized spectrum vacant was "contrary to the public interest and inconsistent with the Commission's statutory obligation to 'prevent stockpiling or warehousing of spectrum by licensees.'"[47]

Moreover, T-Mobile contended that DISH's inability to comply with its buildout requirements are "part of a clear pattern of DISH's lack of commitment to use its wireless spectrum"[48] to provide mobile wireless services.[49] T-Mobile noted that DISH had no immediate intentions to deploy a mobile broadband network with its AWS-4 and H Block licenses.[50] Instead, DISH would initially deploy a narrowband Internet-of-Things ("NB-IoT") system in an attempt to minimally comply with the Commission's buildout obligations and then somehow make a rapid upgrade to a nationwide 5G wireless mobile broadband network by July 2023.[51] While DISH claimed that its immediate deployment of its NB-IoT system served as a "bridge" to

---

[45]     *See id.* at 2-3.

[46]     *Id.* at 3.

[47]     *Id.* at 5-6 (quoting 47 U.S.C. § 309(j)(4)(B)-(C)).

[48]     Letter from Kathleen O'Brien Ham, Senior Vice President, Gov't Affairs, T-Mobile, to Donald K. Stockdale, Jr., Chief, Wireless Bureau, FCC at 2 (Jan. 29, 2019) ("T-Mobile Jan. 29, 2019 Letter") (citing *2013 DISH Waiver Order*, 28 FCC Rcd. at 16796, ¶ 23 (extension of AWS-4 buildout deadline) (other citations omitted)).

[49]     *See id.* at 5, n.17 (citing *AWS-4 Report and Order*, 27 FCC Rcd. at 16103, ¶ 1); *id.* at 6, n.25 (citing *H Block Report and Order*, 28 FCC Rcd. at 9484, ¶ 1 & 9488, ¶ 9).

[50]     *See id.* at 2 (citing Letter from Jeffrey H. Blum, Senior Vice President & Deputy Gen. Counsel, DISH, to Marlene H. Dortch, Secretary, FCC (June 7, 2018)).

[51]     *See id.*

its eventual rollout of a 5G network,[52] T-Mobile noted the vast differences between the two

systems – and the large "jump" DISH would need to undertake by 2023 to buildout and operate a

national wireless broadband network.[53] Accordingly, it is not at all evident that DISH has the

ability to comply with the construction buildout obligations imposed by the Proposed Final

Judgment. It is also worth noting that DISH was awarded its AWS-4 license in 2012 on a sole

source rather than competitive bidding basis because the FCC thought that that would be the

fastest way to get a nationwide AWS-4 network operational. Seven years later, not a single

customer has been offered AWS-4 service, and there is no imminent prospect of such service. If

experience is the best teacher, the Court should conclude that betting on DISH to meet its current

commitments is not likely to be a winner.

## 2.    *The Commission must Deny DISH's Extension Request*

It is possible that the FCC may deny DISH's pending extension and waiver request for its

AWS-4 and H Block licenses' final build-out requirements. The FCC may grant a waiver for

good cause shown.[54] Section 1.946(e)(1) of the Commission's rules provides that "[a]n

extension request may be granted if the licensee shows that failure to meet the construction or

coverage deadline is due to involuntary loss of site or *other causes beyond its control*."[55] And,

---

[52]    Letter from Jeffrey H. Blum, Senior Vice President & Deputy Gen. Counsel, DISH, to
Donald K. Stockdale, Jr., Chief, Wireless Bureau, FCC at 1 (Nov. 27, 2018).

[53]    *See* T-Mobile Oct. 25, 2018 Letter at 4; T-Mobile Jan. 29, 2019 Letter at 2-5.

[54]    Section 1.925 of the Commission's rules requires applicants to show that: (1) "the
underlying purpose of the rule(s) would not be served or would be frustrated by the application
to the instant case, and that a grant of the requested waiver would be in the public interest;" or
(2) "in view of the unique or unusual factual circumstances of the instant case, application of the
rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the
applicant has no reasonable alternative." 47 C.F.R. § 1.925(b). *See also Ne. Cellular Tel. Co. v.
FCC*, 897 F.2d 1164 (D.C. Cir. 1990).

[55]    47 C.F.R. § 1.946(e)(1) (emphasis added).

11

the FCC "has consistently found that a licensee's *own business decisions* are not circumstances

beyond the licensee's control and are therefore not an appropriate basis for regulatory relief."[56]

It is evident that DISH's latest extension request for its H Block and AWS-4 licenses

does not comport with the FCC's rules.  DISH claims that extending its final build-out deadlines

"will promote the Commission's public interest objectives by *enabling and accelerating* DISH's

facilities-based wireless deployment."[57]  Yet DISH acknowledges that the further delay is based

upon its own new commitment to enter the wireless marketplace to effectuate the Sprint-T-

Mobile merger.[58]  Nevertheless, DISH's request rings hollow in light of the fact that the FCC

adopted construction deadlines for wireless services "to promote the productive use of

spectrum," and "to encourage licensees to provide service to customers expeditiously . . . ."[59]

Just because DISH's plans on entering the wireless market have been altered due to its

recent commitments in connection with the Sprint-T-Mobile merger does not excuse it from

---

[56]     *Alligator Communications, Inc.*, Memorandum Opinion and Order, 30 FCC Rcd. 2823, 2825, ¶ 9 (Wireless Bureau 2015) (citations omitted).  *See also Eldorado Communications LLC*, Order, 17 FCC Rcd. 24613 (Wireless Bureau 2002) (licensee's determination to initially deploy TDMA system and subsequently to adopt GSM with months remaining before construction deadline was business decision within its control); 47 C.F.R. § 1.946(e)(2) ("Extension requests will not be granted for failure to meet a construction or coverage deadline due to delays caused by a failure to obtain financing, to obtain an antenna site, or to order equipment in a timely manner.").

[57]     DISH Extension Request Letter at 2 (emphasis added).  *See also id.* at 2 ("[T]he modified deadlines . . . will align DISH's construction milestones with our deployment goals, *leading to a more efficient network build*." (emphasis added)).

[58]     DISH, however, only makes a cursory reference to the role of the Sprint-T-Mobile merger in its extension request as impacting the effective date of its final build-out deadline.  *See id.* at 7.

[59]     *2013 DISH Waiver Order*, 28 FCC Rcd. at 16804, ¶ 43 (discussing adoption of AWS-4 build-out requirements) (quoting *AWS-4 Report and Order*, 27 FCC Rcd. at 16173-74, ¶ 187).  *See also H Block Report and Order*, 28 FCC Rcd. at 9563, ¶ 209 ("[The] penalties for failure to meet the interim and final benchmarks . . . are necessary to ensure that licensees utilize the spectrum in the public interest . . . [and] to ensure that the buildout requirements fulfill their purpose of bringing about timely deployment . . . .").

having to deploy wireless services expeditiously. DISH remains bound by FCC's strict policy underlying construction build-out obligations – i.e., to promote the expeditious deployment of spectrum and to prevent spectrum warehousing.

Given DISH's historical struggle in comporting with these underlying objectives – there is little ground to argue that *further* delay of spectrum deployment would be in the public interest. Moreover, in light of DISH's bold commitments to enter the wireless market as the fourth largest provider, DISH's utter lack of experience in building out a terrestrial wireless network indicates that DISH will likely struggle to meet – or fail to meet altogether – its final build-out deadlines for its AWS-4 and H Block licenses. Accordingly, DISH's decision to comply with its obligations under the Proposed Final Judgment does not constitute circumstances beyond the licensee's control which under long held and applied FCC precedent might justify extension of its final H Block and AWS-4 build-out deadlines.

For this reason, the Commission is bound by its own policy to deny DISH's extension request; if not denied, the Commission's action would have to be overturned by the Court of Appeals. And, as discussed above, DISH is likely unable to meet the current construction deadlines – which would result in the automatic termination of DISH's licenses. Without its AWS-4 and H Block licenses, DISH will be unable to comply with its commitments and obligations under the Proposed Final Judgment to construct and operate a new facilities-based nationwide wireless network.

### 3.    *DISH could lose its AWS-4 and H Block Licenses as a Result of NTCH's Appeals Pending Before the D.C. Circuit*

In September 2018, NTCH appealed a series of FCC decisions to the D.C. Circuit which involve the disposition of wireless spectrum to DISH.[60]  In each proceeding, NTCH contended that the Commission failed to comply with provisions of the Communications Act, and/or the agency's regulations, in awarding H Block and AWS-4 spectrum licenses to DISH.[61]  NTCH noted that the FCC turned a blind eye to DISH's inexperience in building out a national mobile wireless network in awarding DISH its spectrum licenses.[62]  NTCH has requested that the D.C. Circuit reverse the FCC's award of H Block and AWS-4 spectrum licenses to DISH as unlawful.[63]

Without going into too much detail on the substance of the pending appeals, we will note here that NTCH is challenging the award of the AWS-4 license on several grounds, including the

---

[60]    *See DISH Network Corporation*, Memorandum Opinion and Order, 33 FCC Rcd. 8456 (2018), *appeal filed*, *NTCH, Inc. v. FCC*, Case No. 18-1241 (D.C. Cir., Sept. 7, 2018) (concerning DISH's H Block licenses); *NTCH, Inc.*, Memorandum Opinion and Order, 33 FCC Rcd. 8446 (2018), *petition for review filed*, *NTCH, Inc. v. FCC*, Case No. 18-1242 (D.C. Cir., Sept. 7, 2018) (concerning DISH's H Block licenses); *Service Rules for Advanced Wireless Services in the 2000-2020 MHz and 2180-2200 MHz Bands*, Order on Reconsideration, 33 FCC Rcd. 8435 (2018), *petition for review filed*, *NTCH, Inc. v. FCC*, Case No. 18-1243 (D.C. Cir., Sept. 7, 2018).  Case Nos. 18-1241 and 18-1242 have been consolidated. *See* Order, *NTCH, Inc. v. FCC*, Case Nos. 18-1241 & 18-1243 (D.C. Cir., Oct. 25, 2018).

[61]    *See* Notice of Appeal, *NTCH, Inc. v. FCC*, Case No. 18-1241 (D.C. Cir., Sept. 7, 2018) (contending that granting DISH waiver of FCC rules gave it an unfair advantage in the H Block auction); Petition for Review, *NTCH, Inc. v. FCC*, Case No. 18-1242 (D.C. Cir., Sept. 7, 2018) (objecting to the H Block auction rules as unlawful); Petition for Review, *NTCH, Inc. v. FCC*, Case No. 18-1242 (D.C. Cir., Sept. 7, 2018) (objecting to FCC's award of AWS-4 licenses to DISH as unlawful).

[62]    *See* Final Consolidated Reply Brief of Petitioner at 15-18, *NTCH, Inc. v. FCC*, Case No. 18-1243 (D.C. Cir., Apr. 9, 2019).

[63]    *See* Final Brief of Appellant-Petitioner at 61, *NTCH, Inc. v. FCC*, Case Nos. 18-1241 & 18-1242 (D.C. Cir., Mar. 28, 2019); Final Brief of Petitioner at 44, *NTCH, Inc. v. FCC*, Case No. 18-1243 (D.C. Cir., Apr. 9, 2019).

14

determination that such an award without any opportunity for others to bid on the new licenses violated the Communications Act and was based on blind faith that DISH would actually meet its commitment to "aggressively" build out its network.  DISH's recent request for yet another extension of time to initiate the build-out underscores the unreliability of its commitments.  The FCC's award of the H Block licenses is also highly suspect since it involved the Commission's unprecedented acceptance under unusual circumstances of a payment of over a billion and a half dollars from DISH in exchange for waivers and extensions which were not justified under the Commission's rules and not available to other participants in the auction.  This highly irregular FCC deal with one bidder in an auction to the detriment of all others makes it probable that the grant of the H Block license will have to be reversed.[64]  Oral argument in each of these proceedings is scheduled for October 8, 2019.[65]

Until the D.C. Circuit rules in these cases, there can be no confidence at all that DISH will have either of the spectrum resources which the DOJ is depending on for the creation of a fourth wireless network.  Reversal of the FCC's license grants would doom this entire DISH-to-the-rescue plan to failure, and leave the country with a deeply consolidated three major carrier structure – without DISH to even theoretically remediate the anticompetitive harms that all agree will ensue.

## C.   The Proposed Final Judgment Fails to Consider the Impact of the Merger on the Data Roaming Submarket

The Sprint-T-Mobile merger, if approved, will further worsen the plight of the smaller wireless carriers given the already anticompetitive data roaming submarket.  The impact of the

---

[64]   *See* Final Consolidated Reply Brief of Appellant-Petitioner, *NTCH, Inc. v. FCC*, Case Nos. 18-1241 & 18-1242 (D.C. Cir., Mar. 28, 2019).

[65]   *See* Order, *NTCH, Inc. v. FCC*, Case Nos. 18-1241 & 18-1242 (D.C. Cir., July 30, 2019); Order, *NTCH, Inc. v. FCC*, Case No. 18-1243 (D.C. Cir., July 30, 2019).

15

merger on the data roaming submarket, however, is not addressed in either the Competitive

Impact Statement or the Proposed Final Judgment. In fact, data roaming is addressed only once

in the Proposed Final Judgment with respect to prohibiting DISH from "sell[ing], leas[ing], or

otherwise provid[ing] the right to use the Divestiture Assets (including, but not limited to, selling

wholesale wireless network capacity) to any national facilities-based mobile wireless

provider . . . *except for a roaming agreement*, without prior approval of the United States . . . ."[66]

While that clause *permits* DISH to enter into roaming agreements with other wireless providers,

it does not *require* DISH to offer reasonable roaming rates to offset the anticompetitive effects of

the merger. And, as discussed above, the Commission has largely abdicated its statutory

responsibility for enforcing reasonable rates in the data roaming market.[67] For this reason,

NTCH believes that the Court's adoption of the Proposed Final Judgment, in its current form,

would not be in the public interest.

Instead, if the Court chooses to approve the Proposed Final Judgment – despite the clouds

that hang over it – NTCH proposes the following amendments to the Proposed Final Judgment to

mitigate the adverse impact of the Sprint-T-Mobile merger on competition in the wireless

market, and to prevent further increases in data roaming rates:

*First*, DISH and T-Mobile must not charge roaming rates to independent carriers that

exceed the retail rates they charge their own customers or MVNOs for the same services. Doing

so would ensure that the roaming rates comply with Sections 201(b) and 202(a) of the

Communications Act. Furthermore, requiring benchmark parity between the roaming rates

charged to independent carriers and the retail rates DISH and T-Mobile charge their own

---

[66]    Proposed Final Judgment at 31, § XV.C (emphasis added).

[67]    *See also* NTCH Letter at 1-2.

16

customers would be an easy-to-use benchmark for the Commission and the Court to use in ensuring that these entities comply with the conditions of the merger.

*Second*, T-Mobile must continue providing CDMA service for at least five more years. In support of their transfer of control application filed with the FCC, Sprint and T-Mobile included a public interest statement in which they committed to allow their existing roaming partners to select the preferable roaming rate schedule of either company going forward.[68] NTCH has no problem with T-Mobile and Sprint's commitment for the *immediate* future since Sprint's roaming rates are considerably more reasonable than either AT&T or Verizon's rates. But because Sprint and T-Mobile make no commitment to retain their current roaming rates, those could rise as soon as the dust settles on the merger. Indeed, as the history of Leap Wireless and MetroPCS teaches us, roaming rates immediately jump once a smaller competitive company is acquired by one of the majors.

If T-Mobile phases out Sprint's CDMA service as it did with MetroPCS's service, there will be no national carrier which offers CDMA-based service besides Verizon – leaving scores of smaller carriers who have CDMA networks with nowhere for their customers to roam in most of the country (While LTE technology will eventually blur the distinction between CDMA and GSM carriers for roaming purposes, LTE roaming is priced exponentially higher than ordinary voice roaming.). Currently, Sprint's coverage area is only a fraction of Verizon's coverage area, so a roaming customer is often left with only Verizon as an option – an option so expensive as to be unavailable at all.[69]  The crushing impact of this situation on smaller CDMA carriers cannot

---

[68]     Description of Transaction, Public Interest Statement, and Related Demonstrations at 69, *Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of Licenses and Authorizations*, WT Docket No. 18-197 (filed June 18, 2018).

[69]     The FCC's annual 2015 *Mobile Wireless Competition Report* shows that Sprint served only 24% of the U.S. land area, while Verizon served 63.7%. *Implementation of Section 6002(B)*

be overstated since it will be difficult for them to offer competitive service to their local customers if they cannot roam on reasonable terms when outside their home territory.

Mandating that T-Mobile continue providing CDMA service for at least five more years will allow existing smaller CDMA carriers to gradually transition to other technology standards without being forced out of the marketplace, and, just as importantly, enable new carriers to enter the market as new sources of competition. The parties to the Proposed Final Judgment all recognize that the availability of reasonable roaming rates from T-Mobile is critical to DISH's success as a new entrant into the market. Such rates are equally, if not more, essential to the ability of small carriers and other new entrants who lack nationwide spectrum resources to survive. Yet the Proposed Final Judgment ignores the plight of such carriers while actually worsening their access to reasonable rates. The key here is that roaming rates must be set at nondiscriminatory levels that do not exceed retail and MVNO rates charged by T-Mobile for equivalent services. Smaller carriers are also hampered by the general unavailability of handsets at reasonable prices from the major handset vendors. This problem will worsen as prohibitions on purchases from Huawei and ZTE go in to effect, but that issue will likely require remediation outside the scope of this Proposed Final Judgment. The availability of reasonable roaming rates and reasonably priced handsets would be a game-changer in establishing the conditions under which competition from smaller carriers could flourish.

*Third*, DISH and T-Mobile must make their roaming rates public – a simple remedy that would incentivize AT&T and Verizon to offer non-discriminatory rates. In 2014, NTCH filed a

---

*of the Omnibus Budget Reconciliation Act of 1993*, Eighteenth Report, 30 FCC Rcd. 14515, 14584, Chart VI.B.1 (2015). While Sprint remains a CDMA alternative, Verizon's own advertising demonstrate that Sprint's coverage was significantly smaller than Verizon's footprint.

with the FCC requesting that the Commission to lift its forbearance from Section 211 of the

Communications Act that generally requires carriers to make copies of their contracts with other

carriers public.[70]  In 1994, the FCC had cursorily forborne from this bedrock provision of the

Communications Act on the grounds that the industry was highly competitive, and therefore,

there was no need for such information to be public.[71]  In a roaming market which is already

noncompetitive and likely to become dramatically less so if the Sprint-T-Mobile merger is

approved, the need for public rates is compelling as a check on discrimination and unreasonable

rates. Almost five years later, the Commission has yet to take action on NTCH's petition.

*Finally*, the Court should modify the conditions applicable to DISH's acquisition of the

Boost-branded business from T-Mobile.[72]  DISH should be required to grant small facilities-

based carriers a license to use the Boost tradename and platform – subject to reasonable licensing

standards set by DISH. These small carriers would be allowed to offer Boost's prepaid services

to customers under their current terms or under terms reasonably negotiated with DISH that

would provide a reasonable gross margin of at least 30% on services and handsets offered

through this arrangement. At the same time, T-Mobile would be required to offer these carriers a

non-exclusive right to lease up to 20 MHz of former Sprint spectrum in the 1900 MHz or lower

band at a rate not exceeding $0.05 per megahertz pop in the areas leased annually. The leased

spectrum would enable them to offer their own competitive product in addition to Boost's

prepaid services. NTCH believes that this final condition could restore real structural

---

[70]     NTCH, Inc., Petition to Rescind Forbearance and Initiate Rulemaking Proceeding (filed
July 2, 2014).

[71]     *Implementation of Sections 3(n) and 332 of the Communications Act, Regulatory
Treatment of Mobile Services*, Second Report and Order, 9 FCC Rcd. 1411, 1480, ¶ 181 (1994).

[72]     *See* Proposed Final Judgment at 8-9.

19

competition from local and regional carriers in the wireless market that have been forced out or marginalized by market consolidation over the past 10-15 years.

Collectively, NTCH believes that these amendments to the Proposed Final Judgment will mitigate the deleterious anticompetitive effects that the Sprint-T-Mobile merger will have both on the wireless market and the data roaming submarket. The amendments, if adopted, have the felicitous effects of: (1) eliminating the crushing weight of exorbitant roaming rates on small independent carriers; (2) establishing a network of experienced agents for Boost's prepaid services – thereby providing DISH with expertise in rolling out a nationwide wireless service; (3) preserving locally-based sources of innovation and competition to offset the national carriers; and (4) accelerating the availability of 5G broadband services nationwide. Accordingly, the suggested conditions will ensure that the approval of the proposed merger does not perpetuate the existing issues created by the consolidated wireless industry.

### CONCLUSION

For the foregoing reasons, NTCH respectfully requests that the Court and the DOJ take into account its comments in considering whether the terms and conditions of the Proposed Final Judgment in this proceeding are in the public's interest.

Respectfully submitted,

Donald J. Evans, Esq.
Keenan P. Adamchak, Esq.
Fletcher, Heald & Hildreth, PLC
1300 N. 17th Street, Suite 1100
Arlington, VA 22209
Tel:    (703) 812-0400
Fax:    (703) 812-0486
evans@fhhlaw.com
adamchak@fhhlaw.com

*Counsel for NTCH, Inc.*

Date:   August 26, 2019

21

## CERTIFICATE OF SERVICE

I, Keenan P. Adamchak, of Fletcher, Heald & Hildreth, PLC, hereby certify that I caused

a true copy of the foregoing Comments to be sent this 26th day of August, 2019, via U.S. First

Class Mail, postage prepaid, to the following individual:

Scott Scheele, Chief
Telecommunications and Broadband Section,
Antitrust Division
U.S. Department of Justice
450 Fifth Street, NW, Suite 7000
Washington, DC 20530

Keenan P. Adamchak

# EXHIBIT 21
# TO RESPONSE



October 6, 2019


Scott Scheele
Chief, Telecommunications and Broadband Section
Antitrust Division, U.S. Department of Justice
450 Fifth Street NW, Suite 7000
Washington, D.C. 20530
scott.scheele@usdoj.gov

Dear Mr. Scheele:

I am writing on behalf of the Overland Park Chamber of Commerce to express our support for the proposed merger between Sprint and T-Mobile. With roots dating back over 100 years, Sprint is a household name in the Kansas City area, representing a company which has deep roots in our community's technology, cultural and philanthropic growth over the years.

We believe the combined company will bring several key advantages to the status quo. It will have the necessary resources to deploy a truly nationwide 5G network quickly. By utilizing economies of scale, the company can focus on innovation, bringing new services such as wireless in-home broadband which is key to rural customers so we can close the digital divide in states like Kansas.

The proposed merger builds upon Sprint's footprint in our region and promises positive impacts for economic growth, job creation and telecommunication leadership. As our region's sixth largest private sector employer, Sprint plays an integral role in supporting the community and its people through civic leadership, philanthropy and capital investment. As they aspired for continued innovation and growth in the rapidly changing world of wireless communication and connectivity, we've recognized that change could come for Sprint. This merger provides opportunities for net job growth and innovation at the new company's second headquarters. This recognizes the incredible assets our region and Sprint bring to the table: Kansas City's innovative, hard-working talent; our low cost of living; and the unique real estate asset of the Sprint Campus in Overland Park. This positions us well for Kansas City to remain at the center of wireless innovation for the combined company.

Basic infrastructure used to mean roads, water and wastewater. Now it's also connectivity of people and data. The new T-Mobile stands to produce benefits far beyond the Kansas City region with promises of expansive coverage, including underserved rural communities. With a

mix of low-, mid-, and high-band spectrum, the new company will be uniquely positioned to develop and deploy a nationwide 5G network. Estimates are 5G provides 20 times the speed of 4G, extending beyond our current devices to the Internet of Things.

By comparison, 5G would download ten movies in the time that 4G would download half of the first movie. And the Internet of Things? That's nearly everything with an on/off switch that can connect to the Internet and exchange data, from our phones to our cars, refrigerators, coffee makers, lamps, garage doors, wearables, traffic signals and oil rigs. The 5G build-out means we'll be able to leverage the full power of the next wave of connected devices, virtual reality, and artificial intelligence. This brings great opportunities for tele-medicine, distance learning and first responders.

The new T-Mobile will build on Sprint's regional commitment and recently announced national retail and network improvements. It will bring targeted benefits for us in Kansas City, plus deliver connectivity and access nationwide. We are proud of the Sprint legacy and look forward to the bright future that lies ahead with the new T-Mobile.

For these reasons we support approval of the proposed merger and thank you for your consideration.

Respectfully submitted,

Tracey Osborne Oltjen
President & CEO

# EXHIBIT 22
# TO RESPONSE

October 11, 2019

Scott Scheele, Chief
Telecommunications and Broadband Section
Antitrust Division, Department of Justice
450 Fifth Street NW, Suite 7000
Washington, DC 20530

Re: *United States of America et al. v. Deutsche Telekom AG, T-Mobile US, Inc., Softbank Group Corp., Sprint Corporation, and DISH Network Corporation, United States District Court for the District of Columbia, Case 1:19-cv-02232.*

Mr. Scheele:

      The Department of Justice's Competitive Impact Statement ably describes why the proposed merger between Sprint and T-Mobile would substantially lessen competition for retail mobile wireless service. It is therefore troubling that the same agency argues that the merger should be allowed to go through nonetheless. And all the more troubling, the DOJ does so not because it has devised a set of conditions that it can demonstrate will reliably preserve the competition that exists today, or that would increase competition beyond its current level. Instead, it has put forward conditions that, at most, and only if all goes well, *might* bring back a semblance of the current level of competition some years from now. In the meantime, it adopts a complex set of regulatory measures to allow DISH to operate as a mobile virtual network operator (MVNO). This convoluted proposal violates many, if not all, of the Justice Department's guiding principles for merger remedies.[1]

      The proverb states that "A bird in the hand is worth two in the bush." But here, the DOJ isn't even proposing that we give up competition now to get even more competition later—it's proposing that we give up the bird we have today in the hope that it eventually flies back. This proposed merger substantially lessens competition in violation of antitrust law. Betting the future of wireless competition in this country on a shaky set of promises and hopes would not serve the American consumer.

## MVNOs Are Not Competitors to Facilities-Based Providers

      The DOJ states that,

---

[1] Antitrust Division Policy Guide to Merger Remedies, October 2004, https://www.justice.gov/atr/page/file/1175136/download.

The proposed Final Judgment requires T-Mobile and Sprint to enter into a Full MVNO Agreement with DISH for a term of no fewer than seven years. Under the agreement outlined in the proposed Final Judgment, T-Mobile and Sprint must permit DISH to operate as an MVNO on the merged firm's network on commercially reasonable terms and to resell the merged firm's mobile wireless service.[2]

But seven years of DISH operating as an MVNO is seven years of only three meaningful national wireless competitors: T-Mobile, AT&T, and Verizon. DISH will be a nonfactor, as all MVNOs are, because its viability as a business will be dependent on T-Mobile.

MVNOs resell to consumers at retail mobile wireless service obtained at wholesale from a carrier that has network facilities. While many MVNO customers might not perceive the difference between facilities-based competitors like Sprint or Verizon and MVNOs like TracFone, the difference is significant: the facilities-based providers who supply MVNOs with network access would not do so unless they found the arrangement to be beneficial to themselves. The relationship between MVNOs and facilities-based providers is only beneficial to the extent that since MVNOs serve customer segments, and offer pricing plans, that facilities-based providers might not want to bother with. The marketing and brand differentiation services that MVNOs provide to augment what facilities-based carriers offer is real. But MVNOs would never be permitted to cut significantly into the sales of their suppliers and provide true competition.

And after those seven years, even those minimal conditions go by the wayside. Unless and until, at some uncertain, speculative time in the future, if and when, after investing billions of dollars, DISH succeeds in creating a brand-new wireless network, it will simply be an MVNO, reselling T-Mobile network access. The conditions proposed by the DOJ do not even attempt to address this: They merely require that T-Mobile provide access to DISH on "commercially reasonable and mutually beneficial terms."[3] These terms (as contrasted with, for example, a requirement that T-Mobile sell DISH spectrum and network access *at cost*) by definition will simply resemble the MVNO terms currently prevalent in the marketplace. But those terms, again, are for facilities resellers, not competitors, and it is difficult to see how it could ever be beneficial to T-Mobile to sell network access to DISH under terms that could allow the MVNO to steal away T-Mobile customers.

---

[2] Competitive Impact Statement 11.

[3] Proposed Final Judgement 18.

Further, as T-Mobile itself has argued, a "commercially reasonable" standard is in general ambiguous and likely to be ineffective without significant elaboration.[4]

It is true that during the seven years, these terms "must be acceptable to the United States"[5] But no conditions, however stringent, proposed by the DOJ and imposed by a federal court can change the inherent economic hierarchy of the relationship between an MVNO and its suppliers, and it is to be expected that during the time when DISH is an MVNO it will not be a significant competitive presence in the wireless market. And again, once the conditions expire, T-Mobile's ability to set the terms of how it chooses to provide MVNO access to DISH would be completely unrestrained.

**The Hope of Future Entry Does Not Alleviate Competition Problems Today**

Recognizing the inadequacy of MVNO "competition," the DOJ does optimistically envision that DISH will eventually construct a new wireless network. The details of how this might happen are rather scarce in the DOJ's documentation, and merely require that DISH follow its existing legal obligation to "comply with the June 14, 2023 AWS-4, 700 MHz, H Block, and Nationwide 5G Broadband network build commitments made to the FCC as of the date of entry of this Final Judgment."[6] Beyond that, the DOJ merely wants to get status reports, and requests that T-Mobile not "interfere" with DISH's legal obligations.

It is far from clear how the DOJ simply re-requiring DISH to undertake its existing legal obligations does anything to promote or preserve competition. In fact, it shows how the order is likely to *lessen* competition. Absent the merger, DISH is currently under an obligation to enter the market as a wireless carrier, or else give up wireless spectrum holdings. Entry on those terms, as has been envisioned, could usefully create an additional nationwide wireless carrier, potentially giving users five options. Instead, if the DOJ's proposal is accepted, and even if these very optimistic hopes for DISH's success all go according to plan, the best we can hope for is that consumers will be left with only the equivalent of what they already have, four options. That does not seem like a smart trade.

Certainly, the divested assets might help make DISH's entry easier than it might otherwise have been. But it remains a daunting and uncertain challenge, even with those assets. Without the merger, the worst-case scenario was that DISH would not build that

---

[4] Petition for Expedited Declaratory Ruling of T-Mobile USA in WT Docket No. 05-265, Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services (filed May 27, 2014), https://ecfsapi.fcc.gov/file/7521151798.pdf.

[5] Proposed Final Judgment 17.

[6] Proposed Final Judgment 23.

new network, and customers would be left with the level of competition they have now—four national wireless competitors. But under the DOJ's plan, the worst-case scenario is far worse — that customers are left with *three* national wireless competitors. The proposed conditions do not even have a "Plan B" for restoring competition in the event that DISH's efforts to enter the market are unsuccessful or insufficiently pursued. This is simply too great a risk.

## This Matter Should Be Paused During the Pendency of the State Lawsuit, and It Warrants an Evidentiary Hearing Before the Court Acts

Aside from the considerations expressed elsewhere in this document, we respectfully request that the DOJ ask the court to wait to decide whether to accept its proposed consent decree until the pending state enforcement action to block this merger is resolved. First, actions taken by the District Court for the District of Columbia—which has not had the benefit of briefing by the states as to the extensive harms of this merger—could interfere with the pending litigation. It seems likely that the states will put forward a strong case as to why this merger harms competition and consumers in the wireless marketplace. The District Court in New York hearing the state challenge is no doubt well aware of this. But in the event that the DC District Court grants the DOJ's request that the merger be approved, based on the more limited record before it, it is likely that defendants would then attempt to frame the DC court's ruling as somehow dispositive, creating unnecessary complexity and delay. The DOJ can help avoid that scenario, and should.

Second, if the states are successful in their challenge, any actions taken in the DC court could simply be redundant, or moot, and an unnecessary diversion of DOJ and judicial resources.

Both these reasons counsel for delay in considering this proposed consent decree unless and until it is actually necessary.

If and when it becomes time to consider this proposed consent decree, we ask that the court conduct an in-depth review that includes an evidentiary hearing. This remedy, and the process that has surrounded it, is unprecedented, at least in the recent memory of merger reviews in this sector. The Department of Justice, the Federal Communications Commission, and state attorneys general—entities that usually speak with one voice on telecommunications mergers—reached different conclusions. This unusual circumstance, and the strong evidence against the proposed remedy, warrants a closer examination than has been typical in Tunney Act proceedings.

**Conclusion**

Merger conditions generally try to retain for consumers the benefits of competitive markets, by restricting how the newly merged firm can behave, or by spinning off assets to either lessen harms or generate new competition. The proposed conditions in this matter do not take that route. Instead, the DOJ proposes to simply allow a merger that substantially lessens competition to go through, in violation of the law, and put its hope in new market entry down the line. This is a stark departure from DOJ precedent and is not a risk worth taking. Even with the proposed conditions, this merger should be blocked.

Respectfully submitted,

Public Knowledge
Consumer Reports
Electronic Frontier Foundation
New America's Open Technology Institute

By:

John Bergmayer
*Legal Director*
Public Knowledge

October 11, 2019

# EXHIBIT 23
# TO RESPONSE



# The Free State Foundation
## P. O. Box 60680
## Potomac, MD 20859
## 301-984-8253

October 8, 2019

Scott Scheele
Chief, Telecommunications and Broadband Section
Antitrust Division
Department of Justice
450 Fifth Street NW, Suite 7000
Washington, DC 20530

Re: *United States of America et al. v. Deutsche Telekom AG et al.*, No. 1:19-cv-02232-TJK.

Dear Mr. Scheele,

These comments are filed pursuant to the Antitrust Procedures and Penalties Act (commonly referred to as the Tunney Act) regarding the proposed settlement for the T-Mobile/Sprint merger. They express the views of Randolph May, President of the Free State Foundation, and Seth Cooper, Senior Fellow and Director-Policy Studies.[1] The Free State Foundation is an independent, nonpartisan, non-profit free market-oriented think tank focusing heavily on communications and Internet law and policy. Consistent with the Free State Foundation's practice, these comments do not specifically endorse or oppose the proposed merger or the proposed settlement. Rather they set forth our views concerning the merger's likely public interest benefits and conclude that the proposed merger meets the Tunney Act's public interest standard.

There is strong evidence that the proposed T-Mobile/Sprint merger, if approved pursuant to the proposed settlement, would be in the public interest. A combined "New T-Mobile" would benefit consumers and enterprises by rapidly deploying a 5G mobile wireless

---

[1] The views expressed do not necessarily represent the views of others associated with the Free State Foundation.

**A Free Market Think Tank......Because Ideas Matter**

Letter to Scott Scheele, Antitrust Division, Department of Justice, October 8, 2019

network offering significantly faster speeds, higher data capacity, and reduced per-megabit prices. The New T-Mobile would be in a position to compete more effectively against current wireless market leaders AT&T and Verizon. And pursuant to the proposed settlement's divesture and access provisions, which we do not believe necessarily were required to satisfy the public interest standard, DISH Network, Corp. will be in a position to be a leader in the prepaid market segment and also a prospective nationwide 5G network services provider. Moreover, post-merger consumers will still have choice of competing regional and local wireless providers, as well as recent cable operator wireless entrants.

The New T-Mobile would deploy a nationwide 5G network by combining Sprint's 2.5 GHz spectrum with T-Mobile's nationwide 600 MHz spectrum and other assets. This next-generation network may have up to 30 times more capacity than T-Mobile's existing network. Near-future 5G wireless networks will feature faster speeds, higher capacity, and improved reliability. Indeed, 5G potentially will enable average speeds up to 10 times faster than 4G networks and peak speeds up to 100 times faster.[2] Advanced 5G networks will enable "smart city" capabilities for street lighting and public transportation. Cities are expected to realize millions of dollars in cost savings from such capabilities. Industrial, manufacturing, and other enterprise sectors will benefit from Internet of Things (IoT) devices connected via 5G. Accenture has projected global IoT-related real GDP contributions of $10.6 trillion dollars by 2030.[3] Indeed, 5G's capacity will be essential to supply forecasted increases in demand. And increased data traffic supply will surely put continued downward pressure on per-megabit prices for retail consumers and businesses.

T-Mobile and Sprint significantly trail the two largest nationwide providers in subscribers. At the end of 2017, their market shares of subscribers were 17% and 12.8% compared to Verizon's 35.5% and AT&T's 32.4%.[4] The New T-Mobile would be a stronger match for the market leaders in today's robustly competitive mobile wireless services market. Also, the proposed settlement's required divestures of Sprint's prepaid brands plus spectrum assets as well as required cell site and retail outlet access provisions will establish DISH Network as a prospective nationwide 5G network provider. Post-merger, consumers would still have a choice from rural and regional providers. Multi-regional service providers U.S. Cellular and C Spire, as well as dozens of other facilities-based providers in rural areas, combined serve several million consumers. Moreover, relevant to the public interest determination, T-Mobile has made specific commitments to expand coverage substantially to heretofore unserved rural markets.

---

[2] See Thomas K. Sawanobori & Paul V. Anuszkiewicz, "High Band Spectrum: The Key to Unlocking the Next Generation of Wireless," CTIA, at 5 (June 13, 2016), at http://www.ctia.org/docs/default-source/default-document-library/5g-high-band-white-paper.pdf.

[3] Accenture Strategy, "Smart Cities: How 5G Can Help Municipalities Become Vibrant Smart Cities" (January 2017), at 1, at: https://newsroom.accenture.com/content/1101/files/Accenture_5G-Municipalities-Become-Smart-Cities.pdf.

[4] FCC, Communications Marketplace Report, GN Docket No. 18-231 (released Dec. 26, 2018), at ¶ 9.

2

Letter to Scott Scheele, Antitrust Division, Department of Justice, October 8, 2019

Wireless market entry by Comcast and Charter Communications using hybrid Wi-Fi/cellular mobile wireless networks further diminish the likelihood of significant price increases or other anti-competitive conduct post-merger. Traditional cable operators are established providers of bundled voice, video, and data services. They are well suited to provide competitive mobile wireless services by leveraging their existing broadband network capacity and nationwide deployment of Wi-Fi hotspots and leasing network capacity for out-of-area voice and data transmission. As of the second quarter of 2019, Xfinity Mobile reportedly served 1.6 million subscribers and Spectrum Mobile reportedly served 518,000 subscribers.[5] Those subscriber numbers are widely expected to increase.

Importantly, many consumers routinely switch providers – a further indication of vigorous competition that will continue post-merger. According to industry data cited in the FCC's *Communications Marketplace Report* (2018), the amount of "churn," or percentage of subscriber connections that have cancelled mobile wireless service, was 15.9% in 2017, with a monthly churn rate of 1.3%.[6]

Given the competitive conditions of the wireless market, it is quite unlikely that the T-Mobile/Sprint merger would result in increases in wholesale prices for wireless resellers or for price increases in the pre-paid market segment. However, any such concern is further alleviated by divestures of prepaid brands Boost Mobile, Sprint Mobile, and Virgin Mobile to DISH Network, Corp., as set forth in the proposed settlement.

Significantly, T-Mobile and Sprint likely separately would not have the capital resources to deploy 5G networks that could compete timely and effectively against AT&T and Verizon. T-Mobile lacks mid-band spectrum while Sprint lacks low-band spectrum. Separately, the two providers would require longer periods to transition spectrum from older-generation networks to 5G. Also, Sprint's recent financial history and analysts' projections indicate a standalone Sprint likely would be less competitive and perhaps not even viable in the 5G era. Sprint reportedly has substantial debt relative to its capitalization, assets, and cash flow. Furthermore, Sprint's supposed role as a market disruptor may have been overstated, as it has suffered declines in subscriber market share since late 2006. And Sprint's market share of service revenues also has declined.

We have addressed these matters in much more detail in comments and reply comments filed on the record in the FCC's T-Mobile/Sprint merger review proceeding.[7] In both sets of comments, we concluded that, as originally proposed, the merger likely would be in the public interest. While we do not believe the divestitures demanded by the Department

---

[5] Comcast Corp., Press Release: "Comcast Reports 2nd Quarter 2019 Results" (July 25, 2019), at: https://www.cmcsa.com/news-releases/news-release-details/comcast-reports-2nd-quarter-2019-results; Charter Communications, Inc., Press Release: "Charter Announces Second Quarter 2019 Results" (July 26, 2019), at: https://newsroom.charter.com/press-releases/charter-announces-second-quarter-2019-results/.
[6] FCC, Communications Marketplace Report, at ¶ 11.
[7] Comments of the Free State Foundation, Applications of T-Mobile US, Inc. and Sprint Corp., WT Docket No. 18-977 (August 2019, at http://fsfwebsite.wpengine.com/wp-content/uploads/2019/08/FSF-Comments-T-Mobile-Sprint-Merger-082718.pdf; Reply Comments of the Free State Foundation (September 17, 2018), at http://fsfwebsite.wpengine.com/wp-content/uploads/2019/08/FSF-Reply-Comments-T-Mobile-Sprint-091718.pdf.

3

Letter to Scott Scheele, Antitrust Division, Department of Justice, October 8, 2019

of Justice necessarily were required from a competition standpoint, in any event, given the potential benefits of 5G deployment enabled by the proposed T-Mobile/Sprint merger and the competitive conditions in the market, the merger meets the Tunney Act's public interest requirement.

Sincerely,



Randolph J. May

Seth L. Cooper

The Free State Foundation
P.O. Box 60680
Potomac, MD 20859
301-984-8253

October 8, 2019

4

**A Free Market Think Tank for Maryland**

# EXHIBIT 24
# TO RESPONSE

**RWA**
RURAL WIRELESS ASSOCIATION

October 11, 2019

Scott Scheele, Esq.
Chief, Telecommunications and Broadband Section
Antitrust Division, U.S. Department of Justice
450 Fifth Street NW, Suite 7000
Washington, DC 20530

Re: United States v. Deutsche Telekom AG, et al., No. 1:19-cv-02232-TJK

TUNNEY ACT COMMENTS OF THE
RURAL WIRELESS ASSOCIATION, INC.

## I.    INTRODUCTION

The Rural Wireless Association, Inc. ("RWA") is a trade association representing rural wireless carriers who each serve fewer than 100,000 subscribers. RWA's members provide mobile and fixed wireless services to their subscribers and to the subscribers of larger carriers, while those customers roam in RWA members' rural service areas. On August 27, 2018, RWA filed with the Federal Communications Commission ("FCC" or "Commission") a Petition to Deny the proposed merger between Sprint Corp. ("Sprint") and T-Mobile US, Inc. ("T-Mobile").[1] Since that date, RWA has filed numerous subsequent pleadings and *ex parte* letters in the FCC docket.[2]

---

[1] *In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations*, Petition to Deny of The Rural Wireless Association, Inc., WT Docket No. 18-197 (August 27, 2018).

[2] *In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations*, Petition to Deny of The Rural Wireless Association, Inc., WT Docket No. 18-197 (August 27, 2018); Reply to Opposition of the Rural Wireless Association, Inc. (October 31, 2018); RWA *Ex Parte* (December 10, 2018); RWA *Ex Parte* (February 13, 2019); RWA *Ex Parte* (March 7, 2019); RWA *Ex Parte* (April 1, 2019); RWA Supplemental Comments (April 1, 2019); RWA *Ex Parte* (April 17, 2019); Joint Open Letter to DOJ and FCC *Ex Parte* (April 18, 2019); RWA *Ex Parte* (May 30, 2019); Informal Request for Commission Action of The Rural Wireless Association, Inc. and NTCA – The Rural Broadband Association (August 5, 2019); Public Interest and Labor Organizations

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("Tunney Act")[3], RWA respectfully submits the following comments on the Proposed Final Judgment ("PFJ" or "Consent Decree")[4] submitted by the United States' Department of Justice ("DOJ") in the above-referenced matter. In the present case, on July 26, 2019, the DOJ filed with the court: (a) a Complaint detailing how "without appropriate remedies, the merger of T-Mobile and Sprint would extinguish substantial competition"[5]; (b) a Stipulation and Order[6], which among other things, adds Dish Network Corp. ("Dish") as a defendant in the current proceeding; and (c) a PFJ/Consent Decree that purports to "preserve competition by enabling the entry of [Dish as] another national facilities-based mobile wireless network operator."[7] Our country's antitrust laws unequivocally provide that after any proposed final judgment is "submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States," concerned parties may also submit "[a]ny written comments relating to such proposal."[8] RWA files these comments in this case so that the court may have a more educated understanding of the anticompetitive effects that the Sprint/T-Mobile merger will have on rural consumers, and more importantly, how the entrance of Dish as a white-knight fourth nationwide

---

*Ex Parte* (August 13, 2019); Reply to Joint Opposition to Informal Request for Commission Action of The Rural Wireless Association, Inc. and NTCA – The Rural Broadband Association (August 22, 2019); Supplement to Petition to Deny of The Rural Wireless Association, Inc., *et. al*, (October 3, 2019).

[3] 15 U.S.C. § 16(e).

[4] U.S. Department of Justice, Proposed Final Judgment, *U.S. and Plaintiff States v. Deutsche Telekom AG, T-Mobile US, Inc., Softbank Group Corp., Sprint Corp., and Dish Network Corp.*, No. 1:19-cv-02232 (D.C. Cir. July 26, 2019).

[5] U.S. Department of Justice, Complaint, *U.S. and Plaintiff States v. Deutsche Telekom AG et. al*, No. 1:19-cv-02232 (D.C. Cir. July 26, 2019) at para. 3.

[6] U.S. Department of Justice, Stipulation and Order, *U.S. and Plaintiff States v. Deutsche Telekom AG, et. al*, No. 1:19-cv-02232 (D.C. Cir. July 26, 2019).

[7] PFJ at p. 2.

[8] 15 U.S.C. § 16(b).

ND: 4830-9134-2338, v. 1

competitor, via the Consent Decree, does nothing to mitigate the very concerns the DOJ raised in its Complaint.

### A. Standard of Review

Prior to any consent decree becoming final, § 16(e) of Title 15 mandates that the district court make an "independent determination"[9] that "entry of such judgment is in the public interest."[10] Indeed, when originally passing the Tunney Act, Congress felt the courts had an "independent duty"[11] to ensure that they would not act as a mere "judicial rubber stamp."[12] Additionally, district courts presiding over antitrust matters have been advised by the U.S. Supreme Court to "pay close attention" to the enforcement provisions contained in any proposed consent decree.[13] Furthermore, to the extent there are third-party claims that the proposed consent decree is not just insufficient, but "will cause affirmative harm, the district court should at least pause or 'hesitate' in order to consider these claims before reaching a conclusion."[14]

The role of the court is to take the public interest harms clearly identified in the Complaint and weigh them against the proposed remedies described in the PFJ and then "determine whether the remedies negotiated between the parties and proposed by the Justice Department clearly and effectively address the anticompetitive harms initially identified."[15] There is no need for the court to look beyond

---

[9] *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C. Cir. 1995).

[10] 15 U.S.C. § 16(e).

[11] 119 Cong. Rec. 3452 (1972) (remarks of Sen. Tunney).

[12] *United States v. Thomson Corp.*, 949 F. Supp. 907, 914 (D.D.C. 1996) (quoting H.R. REP. NO. 1463, 93rd Cong., 2d Sess. 8 (1974)); see also *United States v. Microsoft Corp.*, 56 F.3d at 1458.

[13] *United States v. Microsoft Corp.*, 56 F.3d at 1462.

[14] *United States v. Microsoft Corp.*, Memorandum Opinion (Nov. 1, 2002) at p. 6.

[15] *United States v. Thomson Corp.*, 949 F. Supp. at 913.

ND: 4830-9134-2338, v. 1

the four corners of the Complaint to identify how anticompetitive the proposed merger between T-Mobile and Sprint is and how American consumers – whether in rural or urban markets – will be negatively impacted by such consolidation. The DOJ absolutely recognizes the multitude of likely harms and shines a bright light on them. However, what is crucial in the present case, and what must be scrutinized by the district court in its Tunney Act review, is the likelihood that the "Dish solution" as envisioned by the Defendants will alleviate the known harm identified by the DOJ. RWA explains below why the PFJ is ineffective and more importantly why Dish is not an adequate substitute for Sprint as a fourth nationwide wireless service provider.

**B.**      **Summary of RWA's Comments**

Section II of RWA's Tunney Act Comments provides a summary of the public interest harms identified by the DOJ in its Complaint filed against T-Mobile and Sprint. Section III broadly speaks about why Dish's entry into the mobile wireless marketplace does not eradicate the antitrust concerns raised by the DOJ in its Complaint. Specifically, Section III.A addresses why the same barriers to entry, that exist for any hypothetical new market player, also exist for Dish, and that these barriers are difficult, if not impossible, to overcome. Section III.B explains why market forces are likely to diminish Dish's marketplace power, and in the process, allow the other nationwide carriers to raise prices on consumers. Section III.C discusses in-depth how the elimination of Sprint as a reliable, stand-alone provider of domestic wholesale mobile virtual network operator ("MVNO") access and nationwide roaming services not only hurts millions of Americans, but stymies marketplace innovation in the MVNO and Internet-of-Things ("IoT") sectors. Section III.D explains why it is likely that after the elimination of Sprint, and with Dish facing overwhelming market forces, AT&T, Verizon, and a merged Sprint and T-Mobile ("New T-Mobile") are likely to act in an anti-competitive manner as equally-sized nationwide players. Finally, Section IV describes in detail why the provisions contained in the PFJ, the modified deadlines

ND: 4830-9134-2338, v. 1

sought by Dish from the FCC, and the plethora of commitments made by Dish to both the DOJ and FCC are not enough to mitigate the harms likely to occur after Sprint exits the marketplace.

## II.    SUMMARY OF PUBLIC INTEREST HARMS IDENTIFIED BY THE DOJ

The DOJ's Complaint found that the proposed merger between Sprint and T-Mobile, if allowed to proceed without any federal antitrust intervention, "would extinguish substantial competition."[16] Today, Sprint and T-Mobile each act as disruptive competitors to Verizon and AT&T. The DOJ recognizes that allowing Sprint and T-Mobile to merge "would cause the merged T-Mobile and Sprint ("New T-Mobile") to compete less aggressively."[17] Rather, the union would cement AT&T, Verizon, and New T-Mobile as equally-sized behemoths[18] with little incentive to try and win-over customers, like Sprint and T-Mobile do on a daily basis today. The DOJ also noted that the proposed merger "would substantially lessen competition for retail mobile wireless service"[19] and "harm consumers" in the process.[20] Finally, the DOJ determined that "[a]ny efficiencies generated by this merger are unlikely to be sufficient to offset the likely anticompetitive effects on American consumers in the retail mobile wireless service market, **particularly in the short term**, unless additional relief is granted."[21]

## III.    THE DOJ'S PROPOSED REMEDIES WILL NOT CURE THE PUBLIC INTEREST HARMS IDENTIFIED BY THE DOJ, INCLUDING THE ADVERSE IMPACT ON COMPETITION

While the DOJ correctly identifies the public interest harms that will result from the proposed

---

[16] Complaint at ¶ 3.

[17] *Id*. at ¶ 5.

[18] *Id*. at ¶ 16.

[19] *Id*. at ¶ 6.

[20] *Id*. at ¶ 16.

[21] *Id*. at ¶ 24 (emphasis added). While the "relief" contemplated by the DOJ is not defined in the Complaint, RWA believes the DOJ is referring to the existence of a fourth nationwide wireless operator.

ND: 4830-9134-2338, v. 1

merger, its recommended prescription for curing them is based on false assumptions and fails to reflect the realities of what makes a successful, facilities-based wireless service provider. The blind assumption that Dish will immediately succeed Sprint as the country's fourth nationwide carrier is not supported by any historical evidence of a new, facilities-based mobile wireless carrier entering the marketplace at the national, or even regional, level. Rather, the history of the wireless industry in the last two decades is replete with nothing but rampant consolidation, including many notable and well-backed MVNO failed ventures.[22] If anything, what Dish is attempting to do is launch not one, but two highly speculative business ventures: the first venture is an MVNO, which have a verifiable and notoriously high churn rate; and the second is a nationwide, facilities-based 5G network built from the ground-up, which it plans to accomplish in less than seven years.

Unlike service providers in other tech industries such as e-commerce, content development, or software, where new industry actors can scale quickly to reach some level of market maturity and stable income streams, mobile wireless carriers require tens of billions of dollars of entrenched capital and assets (*e.g.*, towers, network core, FCC licenses) in order to compete effectively at the national level.[23] History has shown that this level of market maturity requires decades to achieve. [24] It is not credible to

---

[22] *See* "Cox Hangs Up on Cell Phone Service", CNET (November 26, 2011), *see* https://www.cnet.com/news/cox-hangs-up-on-cell-phone-service/; "Disney Will Shut Down Cellphone Service", Wall Street Journal (September 28, 2007), *see* https://www.wsj.com/articles/SB119094140401842103; "ESPN to Shut Down Wireless Network Operations", MarketWatch (September 28, 2006), *see* https://www.marketwatch.com/story/espn-to-shut-down-wireless-network-operations; "Amp'd Mobile to Shut Down Service", FierceWireless (July 23, 2007), *see* https://www.fiercewireless.com/tech/amp-d-mobile-to-shut-down-service.

[23] "US Wireless Leaders Ramp Up Capital Spending Amid 5G Deployments", S&P Global (February 11, 2019) ("Combined, the four operators recorded a total capital expenditure of $55.71 billion during calendar year 2018, up from $53.72 billion in 2017, according to S&P Global Market Intelligence data. These expenditures include any cash spent to maintain, improve or construct operators' networks, including interest. Among the carriers, the biggest year-over-year jump came from Sprint Corp., which reported capex of $12.26 billion for the year, up from $9.68 billion in 2017."), *see* https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/us-wireless-leaders-ramp-up-capital-spending-amid-5g-deployments.

[24] "T-Mobile Says It Has Seven Major Competitors, Which is Complete Nonsense," The Verge (April 30, 2018) ("Conventional wisdom, as well as facts and history, say that there are four major US wireless carriers: Verizon, AT&T, T-

ND: 4830-9134-2338, v. 1

believe or even argue that Dish will be able to compete against AT&T, Verizon, and New T-Mobile within seven years, let alone in the first few quarters or even years after the merger is consummated. The DOJ Complaint notes that the proposed merger of Sprint and T-Mobile is likely to incentivize collusion amongst the remaining players, fortify the barriers to entry by new market entrants, raise consumer prices, and decimate innovation and the ability for start-ups, like MVNOs, and IoT providers (and rural roaming partners) to remain or enter the marketplace.[25] RWA's comments address each of these likely harms and explain why Dish is incapable of becoming and remaining a nationwide competitor that can effectively compete against AT&T, Verizon, and New T-Mobile.

### A. Barriers to Entry

The DOJ has rightly concluded that "[g]iven the high barriers to entry in the retail mobile wireless service market, entry or expansion of other firms is unlikely to occur in a timely manner or on a scale sufficient to replace the competitive influence now exerted on the market by Sprint."[26] Even more, the DOJ recognizes that nationwide, facilities-based wireless carriers need both spectrum and network assets deployed nationwide in order to compete, and that "de novo entry by a facilities-based mobile wireless carrier is very difficult."[27] The Consent Decree's proposed solution to overcoming these undisputed barriers to entry is to allow Dish to acquire, upon approval of the deal, the Boost Mobile, Virgin Mobile, and Sprint pre-paid subscriber bases, and the Boost Mobile retail operations.[28]

---

Mobile, and Sprint. This has basically been true for two decades, and remains true today. If you want cellphone service in the US, you're likely going to have to pay one of those four companies or their subsidiaries, which includes the brands Virgin Mobile, Boost Mobile, and MetroPCS."), *see* https://www.theverge.com/2018/4/30/17302454/tmobile-sprint-merger-internet-competition.

[25] Complaint at ¶ 21.

[26] *Id*. at ¶ 23.

[27] Competitive Impact Statement at p. 7.

[28] PFJ at p. 4.

**1 0 G S t r e e t , N E . S u i t e 7 1 0 W a s h i n g t o n , D C       2 0 0 0 2**
**2 0 2 - 5 5 1 - 0 0 2 5 w w w . r u r a l t e l e c o m g r o u p . o r g**
Page 7

ND: 4830-9134-2338, v. 1

Additionally, the DOJ recognizes that Dish intends to enter into a "Full MVNO Agreement" with New T-Mobile while it attempts to construct a facilities-based 5G network.[29] Such a proposed solution is fraught with problems. First, the various Sprint prepaid subscriber bases, which Dish estimates to include approximately 9.3 million users, are a fraction of Sprint's overall subscriber base.[30] More importantly, that pre-paid subscriber base will generate only a fraction of the operating revenue Sprint currently enjoys, yet Dish must rely on this revenue-stream to re-invest in the type of new 5G network necessary to compete with AT&T, Verizon, and New T-Mobile. Second, the subscribers Dish stands to inherit are 100% pre-paid. If the current Sprint pre-paid "churn" rate of 4.23%[31] holds firm, and there is zero evidence it would decrease under Dish management, that subscriber pool of 9.3 million customers inherited by Dish will dwindle to zero before Dish can launch services on its own 5G network, barring sales increases and better customer retention. Notably, the PFJ only requires Sprint and T-Mobile to decommission "not…fewer than four hundred (400) Retail Locations, available to Acquiring Defendant immediately after such Decommissioning,"[32] and such decommissioning can take up to five years. Put differently, there is no guarantee that Dish's retail footprint will ever match what Sprint/Boost/Virgin have today. Third, while New T-Mobile is required to decommission Retail Sites, Dish is under no obligation to actually purchase them nor keep them open. Accordingly, there is no realistic basis to

---

[29] "DISH to Become National Facilities-based Wireless Carrier," Dish Press Release (July 26, 2019), *see* http://about.dish.com/2019-07-26-DISH-to-Become-National-Facilities-based-Wireless-Carrier; *see also* "T-Mobile and Sprint Receive Clearance from Department of Justice for Merger to Create the New T-Mobile," T-Mobile Press Release (July 26, 2019), *see* https://www.t-mobile.com/news/t-mobile-sprint-merger-doj-clearance.

[30] "Press Release Details," Sprint Press Release (August 2, 2019) (As of June 30, 2019, Sprint had 54.3 million subscribers), *see* https://investors.sprint.com/news-and-events/press-releases/press-release-details/2019/Sprint-Reports-Fiscal-Year-2019-First-Quarter-Results/default.aspx.

[31] *Id*. (Sprint ended its Q1, Fiscal Year 2019 with a pre-paid churn rate of 4.23%. By comparison, Sprint's post-paid churn rate for the same quarter was 1.74%.).

[32] PFJ at p. 16.

ND: 4830-9134-2338, v. 1

assume that Dish will be capable of operating as a legitimate fourth nationwide retail carrier starting on Day One after the merger.

The DOJ believes that the proposed merger of Sprint and T-Mobile will make it *harder* for a new competitor to emerge, and yet its proposed solution is to hope that Dish, with no guarantees or oversight, quickly scales-up a retail operation that under optimal circumstances has a shrinking subscriber base, a revenue stream a fraction the size of Sprint's today, and a non-guaranteed sales distribution system. In truth, the PFJ makes Dish nothing more than a second-tier MVNO, well behind TracFone with its 21.4 million subscribers.[33] As discussed more fully below, the cost and length of time it would take Dish to execute on its commitment to deploy a facilities-based 5G network with the depth and breadth of AT&T, Verizon, and New T-Mobile is a legitimate, and much bigger, barrier to entry than any of the hurdles faced by Dish in trying to successfully operate as a mid-sized, retail MVNO.

### B. Higher Prices

Another concern raised by the DOJ in its Complaint is the prospect of higher prices once Sprint disappears. Indeed, the DOJ predicts that the merger will usher in "increased prices and less attractive service offerings for American consumers."[34] More specifically, the U.S.'s antitrust watchdog anticipates that "[a]fter the elimination of Sprint, the industry's low-cost leader, New T-Mobile would have the incentive and the ability to raise prices," as would "the other remaining facilities-based mobile wireless carriers, Verizon and AT&T."[35] It is extremely unlikely that Dish could offer prices competitive with AT&T, Verizon, and New T-Mobile. Starting on Day One, New T-Mobile will control

---

[33] "About Us," América Móvil (Tracfone, the country's largest MVNO, will have post-merger over twice as many subscribers as Dish stands to inherit.), *see* https://www.americamovil.com/English/about-us/footprint/default.aspx.

[34] Complaint at ¶ 5.

[35] *Id.* at ¶ 21.

ND: 4830-9134-2338, v. 1

the coverage footprint, network performance, and, most importantly, the wholesale access costs paid by Dish. All of these factors will impact Dish's retail offerings and price points. If Dish's wholesale access costs are increased, it will be forced to make corresponding increases to its retail prices, which will result in decreased retail competition to AT&T, Verizon, and New T-Mobile. Dish will not control its operating budget as the country's fourth nationwide service provider - - New T-Mobile will control that key metric.

### C. MVNO/Roaming

The DOJ anticipates that the proposed "merger's elimination of [MVNO competition provided by Sprint] likely would reduce future innovation."[36] This decrease in competition for the MVNO marketplace extends into the domestic roaming marketplace as well. Given that the Full MVNO Agreement between Dish and New T-Mobile has not been entered into, neither the DOJ nor the court have any idea of the terms, conditions, and prices that will affect Dish as an MVNO, and in return, the retail pricing Dish will be able to offer to consumers. The loss of Sprint and the creation of New T-Mobile is harmful to all American consumers (whether urban, suburban, or rural), but especially to those mobile wireless consumers in rural markets who are dependent upon nationwide, facilities-based mobile wireless carriers who provide out-of-market roaming to their local, rural mobile wireless carriers when those rural consumers travel to urban and suburban areas not served by the rural carrier. Today, AT&T, Sprint, T-Mobile, and Verizon all provide wholesale (to MVNOs) and roaming (to other domestic rural carriers) access. Noticeably, the Full MVNO Agreement between Dish and New T-Mobile is alleged to strictly forbid Dish from "re-selling" its 4G/LTE and 5G access on the New T-Mobile network to other

---

[36] *Id*. at ¶ 22.

1 0 G S t r e e t , N E . S u i t e 7 1 0 W a s h i n g t o n , D C    2 0 0 0 2
2 0 2 - 5 5 1 - 0 0 2 5 w w w . r u r a l t e l e c o m g r o u p . o r g

Page 10

ND: 4830-9134-2338, v. 1

carriers[37], while Sprint, more than any of the Big Four, has been a champion of roaming deals with small and rural U.S. carriers.

The elimination of Sprint and the entry of Dish will mean the nation will go without a fourth wholesale or nationwide domestic roaming alternative to compete against AT&T, Verizon, and New T-Mobile for an extended period of time. It will take at least seven years for Dish to even approach what Sprint and T-Mobile each separately offer today. The inability of rural U.S. carriers to get competitive roaming deals (or independent or start-up telecommunications providers to get MVNO deals) with Dish will only further eliminate retail competition and innovation (provided by MVNOs and IoT providers) across the nation. What's more, Dish's complete inability to offer MVNO or roaming services could further reduce facilities-based competition in rural markets if rural carriers are unable to survive independently due to a dearth of commercially reasonable nationwide data roaming agreements offered by AT&T, Verizon, and New T-Mobile. Dish proclaims that it will offer 5G services, but as soon as Sprint is eliminated, rural carriers (and the consumers they serve) will lose a roaming option for 3G, 4G/LTE, and 5G services. Dish, by its own admission, will be years away from offering 5G services on a nationwide basis.

**D. Increased Coordination Between AT&T, Verizon and New T-Mobile**

According to the DOJ's Complaint, "the merger would make it easier for the three remaining national facilities-based mobile wireless carriers to coordinate their pricing, promotions, and service offerings."[38] In turn, such increased coordination "harms consumers through a combination of higher

---

[37] "DISH's 5G Deployment: Exploring Opportunities with Rural Carriers," RWA Webinar Presented by Dish Corp. (August 29, 2019) ("But to be clear, the access to the [Full] MVNO Agreement is not available under [a RWA Carrier Member] brand."), *see* https://ruralwireless.org/rwa-webinars/.

[38] Complaint at ¶ 5.

ND: 4830-9134-2338, v. 1

prices, reduced quality, reduced innovation, and fewer choices."[39] The proposed remedy for such ills is to have Dish fill the void left by the loss of Sprint and attempt to mimic the three remaining, and firmly-entrenched, facilities-based market participants. Unfortunately, Dish would begin on Day One with one arm tied behind its back. As discussed above, unlike Sprint today, Dish has no facilities-based network that it can utilize to sell capacity on a wholesale basis to MVNOs and IoT providers. Nor can Dish enter into roaming agreements with rural carriers to allow for roaming in urban and suburban markets. Accordingly, the merger will result in one less competitor providing wholesale MVNO access, roaming access, and nationwide facilities-based voice and data services directly to retail consumers, making this a 4-to-3 market consolidation. The necessary network "ramp-up" by Dish will take many years to achieve, which the company acknowledges in its own submissions to the FCC.[40] During the intervening years, Dish is very unlikely to be successful, based not only on the low margins and low retention rate of the pre-paid subscribers it plans on inheriting, but also because its mainline business of video satellite service is also losing hundreds of thousands of subscribers each quarter, which will hurt the parent company's finances for the foreseeable future.[41] Additionally, Dish has yet to come forward with any specifics about the true cost of building a nationwide 5G network, and just as importantly, how it intends to finance such a massive project. While Dish Chairman Charlie Ergen has stated on earnings conference calls that he believes a new network might cost as little as $10 billion, the wireless industry analysts call this figure "silly" and note that Verizon spends $15 billion per year just to maintain its

---

[39] *Id.* at ¶ 21.

[40] Dish Ex Parte (July 26, 2019), Attachment A.

[41] "Cord-Cutting Clips Dish Network's Profit," *Wall Street Journal* (May 3, 2019) ("'It's still a declining business,' Executive Chairman Charlie Ergen said during a conference call."), *see* https://www.wsj.com/articles/cord-cutting-clips-dish-networks-profit-11556911471.

ND: 4830-9134-2338, v. 1

existing network.[42] Post-merger marketplace collusion by AT&T, Verizon, and New T-Mobile will not only be easier, as recognized by the DOJ, but almost inevitable given the fact that Dish on Day One will be a mere shadow of Sprint and/or T-Mobile today, and those two companies took over 20 years to become what they are.

## IV. THE PROVISIONS IN THE PFJ, THE MODIFIED DEADLINES SOUGHT BY DISH FROM THE FCC, AND THE COMMITMENTS MADE BY DISH TO THE DOJ AND FCC ARE NOT ENOUGH TO MITIGATE THE HARMS LIKELY TO OCCUR FROM T-MOBILE'S ACQUISITION OF SPRINT.

The PFJ is based on a flawed premise – namely, that Dish will be able to serve as a capable replacement for Sprint. Today, Sprint can offer nationwide roaming and MVNO access, and it can base its retail plans and operating budget on its control of its own FCC licenses and facilities-based network. Starting on Day One, Dish can do none of these things. Additionally, while Sprint can lease spectrum to rural carriers and roaming partners (something it has done for decades), Dish has no history of doing so, and Dish does not even control some of the spectrum it intends to use once it starts operating its own 5G network. Each of these factors limits Dish from acting as a true "stand alone" nationwide, facilities-based mobile wireless operator, at least in the first decade of its existence. If the DOJ thought that effective competition after the loss of Sprint could be achieved merely by the creation of a new nationwide MVNO, it would not have required Dish to comply with its "Nationwide 5G Broadband network build commitments" to the FCC.[43] It stands to reason that the long-term success of a nationwide, facilities-based mobile wireless operator should be the focal-point of this court's review, not just the emergence of a successful, short-term, retail MVNO provider, which itself is not even

---

[42] "Dish's $10B Estimate for 5G Wireless Network Build 'Just Silly', Analyst Says," Multichannel News (July 26, 2019), *see* https://www.multichannel.com/news/10-billion-dollar-price-estimate-for-dish-5g-buildout-is-silly-analyst-says.

[43] PFJ at p. 23.

ND: 4830-9134-2338, v. 1

guaranteed.

**A.  <u>The Proposed Remedies Are Not Reasonably Adequate to Assure That Antitrust Concerns Will Not Remain Post-Merger</u>**

As the DOJ states in the Competitive Impact Statement, "the government need not prove that the settlements will perfectly remedy the alleged antitrust harms…it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms."[44] Applying this standard, the court should find that the various settlements reached are not reasonably adequate remedies for the likely harms initially raised by the DOJ. Furthermore, the "remedies" proposed by the DOJ in the PFJ are either insufficient, not feasible, based on faulty premises, and/or not capable of being accomplished in a timely manner. There is no dispute about the likely competitive harms should the market decrease the number of nationwide, facilities-based mobile wireless providers from four to three. The Complaint makes this clear.

Dish, by its own admission, will not be a 100%, self-dependent, facilities-based, nationwide mobile wireless carrier until at least *six years* from now, and even achieving that goal is highly speculative and contingent on factors well outside of Dish's control.[45] Even assuming Dish makes good on its 5G Broadband Service deployment commitments, it has only promised to offer wireless services to 75% of the country's *population*, which is only a small fraction of the country's geography. Sprint, which delivers 4G/LTE and 5G services today to over 90% of the country's population and has 5G services deployed to nine of the country's largest cities (with new 5G deployment increasing daily) is in a different league than Dish as Dish promises to deliver 5G services to only 75% of the country's

---

[44] Competitive Impact Statement at p. 21.

[45] Dish Ex Parte, Attachment A. Dish never commits to deploying 5G to more than 75% of the country's population before the year 2025, and its Full MVNO Agreement with T-Mobile expires after seven years.

ND: 4830-9134-2338, v. 1

population in six years' time.[46] Moreover, as discussed in more detail below, it is questionable whether Dish has any intention of actually becoming a nationwide mobile wireless competitor. Dish has no real-world wireless network experience to speak of, which should speak volumes to the court. Operating a video satellite system that does not involve an interconnected, terrestrial network is akin to Dish playing checkers while AT&T, Verizon, and a New T-Mobile play 3-D chess.

### B. The PFJ's Proposed Enforcement Measures do not Provide a Sufficient Incentive for Dish to Meet its Buildout Obligations.

In its July 26, 2019 Ex Parte, Dish makes various commitments to the FCC, including a promise to pay up to $2.2 billion if it is unsuccessful in meeting certain network deployment targets.[47] Indeed, the DOJ relied on these network build-out commitments when making its decision to entrust Dish as a fourth nationwide competitor.[48] A closer examination of these self-imposed financial penalties for failing to meet core-deployment and RAN deployment deadlines (which are tax-deductible because they are voluntary) shows that the penalties are not as striking or severe as DOJ appears to believe, and are heavily back-loaded. For example, $200,000,000 of that potentially $2.2 billion penalty is for failure to deploy a core network (which is a key element to being a self-sufficient network operator), and this commitment does not have to be accomplished until June 2022.[49] Similarly, if Dish fails to meet 100% of its interim build-out commitments for its AWS-4, AWS H Block, and 700 MHz licenses[50], which also

---

[46] Sprint currently offers 5G in Atlanta, Chicago, Dallas-Fort Worth, Houston, Kansas City, Los Angeles, New York, Phoenix, and Washington, DC. See https://www.sprint.com/en/landings/5g.html.

[47] Dish Ex Parte, Attachment A.

[48] PFJ at p. 23.

[49] Dish Ex Parte, Attachment A.

[50] Having already missed its FCC-imposed interim construction deadlines for its AWS-4, 700 MHz Lower E Block, and AWS H Block licenses, Dish is currently required to build out to 70% of the population for each AWS-4 and 700 MHz Lower E Block license by March 7, 2020, and 75% of the population for each AWS H Block license by April 29, 2022. Letter from Donald K. Stockdale, Jr., Chief, FCC Wireless Telecommunications Bureau to Dish Network Corp. (July 9, 2018), see https://docs.fcc.gov/public/attachments/DOC-352379A1.pdf. The FCC's interim license build-out deadlines, let

ND: 4830-9134-2338, v. 1

have a self-imposed deadline of June 2022, the most it will pay is $198,000,000.[51] What this effectively means is that Dish can attempt to operate only as an MVNO and not deploy any core network or any 5G Broadband Services, and it will only face a total financial penalty of less than $400,000,000 by June 2022. Indeed, Dish would be better off biding its time, operating only as an MVNO, and then selling its spectrum at a later date rather than invest the tens of billions of dollars needed to build a nationwide, facilities-based 5G network in several years. With respect to building a nationwide, 5G network in seven years, it would be impossible for any carrier to accomplish that if they are starting from basically nothing, which is where Dish is starting.

### C. Other Dish Commitments to the DOJ and FCC Are of Little Value or Significance

In addition to relying on Dish's promise to deploy 5G to only 75% of the country's population by 2025 (leaving a quarter of the country's population without a fourth nationwide provider for at least six years), the DOJ relies on other Dish commitments that may sound impressive on paper but are highly speculative, not capable of being completed in a timely manner, or completely infeasible. First, Dish promises to deploy services using its 600 MHz licenses on an "accelerated" basis.[52] However, Dish only agrees to this commitment if it also gets build-out extensions for hundreds of its other FCC licenses in the 700 MHz and AWS Bands.[53] Second, Dish offers to "waive" its flexible use rights for all of these FCC licenses and instead voluntarily consent to deploying 5G Broadband Service "as a special condition of the licenses."[54] However, in so doing, Dish is not forgoing anything meaningful. All it is doing is

---

alone its final build-out deadlines, are generally not that difficult to meet for established and well-intentioned wireless carriers.

[51] Dish Ex Parte, Attachment A.

[52] *Id.*

[53] *Id.*

[54] Dish Ex Parte, Attachment A.

ND: 4830-9134-2338, v. 1

waiving its right to deploy a non-5G, narrowband IoT ("NB-IoT") network that would allow it to meet its current buildout deadlines for its AWS-4, Lower 700 MHz E Block, and AWS H Block licenses. A key part of the PFJ is that the FCC extend the construction deadlines for those very same licenses. Because Dish is committed to deploying 5G and would be required to do so in the timeframe mandated by the PFJ, there is no reason Dish would choose to exercise its flexible use rights. Accordingly, its offer to waive such rights is simply a meaningless gesture.

For Dish to successfully operate as a nationwide, facilities-based mobile wireless operator, it must deploy a facilities-based network and manage that network and a correspondingly vast retail operation, day-in and day-out. Dish has no history of deploying wireless facilities on a nationwide basis, and its commitments to the DOJ and FCC that it would do so are clouded by numerous caveats. Moreover, Dish has also made commitments that seem to suggest it has no intent to be a "carrier" beyond six or seven years.

### D. Various Dish Commitments Provide It An Opportunity to Exit the Mobile Marketplace In Six or Seven Years.

The Tunney Act requires a reviewing court to determine that any consent decree entered into between the defendants and the DOJ is in the public interest. Whatever proposed settlement is reached must have some reasonable expectation of addressing the antitrust concerns raised by the U.S. government. In the present case, the Complaint is unequivocal in determining that a 4-to-3 consolidation of the marketplace is inherently anticompetitive and against the public interest. Should Sprint be allowed to exit the marketplace, a legitimate fourth facilities-based, truly nationwide, competitive carrier needs to take its place. RWA's comments list numerous reasons why Dish is unable to meet this burden. In addition, Dish by its own words, has created specific opportunities to exit the marketplace. For example, Dish never actually agrees to acquire and deploy 800 megahertz spectrum

ND: 4830-9134-2338, v. 1

currently held by Sprint. According to the terms of the PFJ, New T-Mobile is definitely required to divest "all of Sprint's 800 MHz spectrum holdings."[55] However, Dish is not mandated to acquire any of the divested 800 MHz licenses, so long as it pays a financial penalty. The PFJ stipulates that Dish can bypass its option to purchase this spectrum and instead "pay a penalty of $360,000,000 to the United States" government.[56] However, even the entirety of this financial penalty can be waived if Dish "has deployed a core network and offered 5G Service to at least 20% of the U.S. population over DISH's facilities-based network within three (3) years of the closing of the divestiture of the Prepaid Assets,"[57] a goal that can be accomplished by Dish deploying rudimentary service to just the top six or seven Metropolitan Statistical Areas,[58] which means the rest of the nation is stuck with only three nationwide, facilities-based competitors who can act in concert to raise pricing. Similarly, just as with the Boost Retail Locations and the 800 MHz licenses, Dish is not obligated to purchase any New T-Mobile Decommissioned Cell Sites. What the PFJ demands is that New T-Mobile divest no fewer than 20,000 Cell Sites, but Dish is under no obligation to actually purchase any of these 20,000 Cell Sites.[59]

In its July 26, 2019 Ex Parte, Dish also "consents" within six years of the transaction closing "not to sell its AWS-4 and 600 MHz spectrum" or "lease, directly or indirectly, to any of the three largest wireless providers, or any combination thereof, traffic accounting for more than 35% of the

---

[55] PFJ at p. 5.

[56] *Id.* at 12.

[57] *Id.*

[58] The U.S. Census Bureau estimates the current U.S. Population at 327 million people. The combined populations of the New York-Newark, Los Angeles-Long Beach-Anaheim, Chicago, Dallas-Fort Worth-Arlington, Houston, Washington-Alexandria-Arlington, and Miami-Fort Lauderdale-West Palm Beach is nearly 70 million people. *See* https://www.census.gov/topics/population/data.html.

[59] PFJ at p. 13.

ND: 4830-9134-2338, v. 1

network capacity on its 5G network."[60] These are peculiar voluntary commitments. They suggest that Dish wants to be able to exit the mobile wireless industry after six years, and just prior to when its Full MVNO Agreement with T-Mobile expires. After seven years, if Dish has a radio access network ("RAN") that cannot operate on a geographic level competitive with AT&T, Verizon, or New T-Mobile, it will be forced to rely on roaming agreements, just like RWA's members. And because the Full MVNO Agreement with New T-Mobile expires after seven years, New T-Mobile has no incentive to extend whatever initial pricing it has extended to Dish after such date, which means that Dish cannot rely on New T-Mobile coverage long-term. Accordingly, Dish has sought specific language that makes it entirely possible to sell its entire spectrum portfolio (and subscriber base) to one of the three remaining legacy carriers and face no Department of Justice or Federal Communications Commission repercussions.

## V.     CONCLUSION

Prior to a court adopting any proposed consent decree, 15 U.S.C. § 16(e)(1) requires a court to first make a public interest determination. When making this determination, a court is obligated to consider:

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from the determination of the issues at trial.[61]

---

[60] Dish Ex Parte at p. 4.

[61] 15 U.S.C. § 16 (e)(1)(A) and (B).

**1 0 G S t r e e t , N E . S u i t e 7 1 0 W a s h i n g t o n , D C     2 0 0 0 2**
**2 0 2 - 5 5 1 - 0 0 2 5 w w w . r u r a l t e l e c o m g r o u p . o r g**

Page 19

ND: 4830-9134-2338, v. 1

As demonstrated above, the proposed merger is not in the public interest. In the present case, the competitive impact of the PFJ is rather straight forward. First, there is no guarantee that New T-Mobile, together with AT&T and Verizon, will promote MVNO and roaming access to other companies, refrain from raising prices, or abstain from coordinating their efforts, in large part because Sprint, a wireless company which has been operating nationwide for decades, will cease to exist, and Dish, which has zero experience constructing or operating a commercial, terrestrial mobile wireless network, will not be a facilities-based operator for at least three years, if at all. Second, all of the court-imposed checks-and-balances and Dish-proposed voluntary financial penalties do nothing to address the actual level of consumer choice in the marketplace or benefit consumers in any way. Potential enforcement mechanisms administered by the FCC and DOJ come many months or even years after they are triggered and the consumer harms are incurred. Additionally, the potential monetary "fines" go to the U.S. Treasury, which also does nothing to aid American consumers. Third, some of the terms contained in the PFJ, if not "ambiguous" on their face, at least raise eyebrows about Dish's intent to quickly scale-up a retail operation comparable to that of Sprint or deploy a facilities-based wireless network the size and breadth of Sprint's. It is worth reminding the court that Dish has already failed to meet FCC construction build-out deadlines in the recent past, and has admitted it will be unable to offer any type of MVNO or roaming access to consumers, rural carriers, or innovative IoT providers in the short and medium terms. Finally, all of these harms likely to emerge from the merger between Sprint and T-Mobile, which Dish will be incapable of mitigating, will not be localized and in fact will be felt across

ND: 4830-9134-2338, v. 1

the country.  For all of these reasons, RWA respectfully requests that the court reject the PFJ submitted by the DOJ and the Plaintiff States.

Respectfully submitted,

The Rural Wireless Association, Inc.

By: _____

Carri D. Bennet
*General Counsel*
Daryl Zakov
*Assistant General Counsel*

October 11, 2019

ND: 4830-9134-2338, v. 1

# EXHIBIT 25
# TO RESPONSE



**The DOJ's Proposed Remedies Reasonably Address Competition Concerns Regarding the T-Mobile Sprint Merger**
Scott Wallsten[*]

**October 2019**

* President and Senior Fellow, Technology Policy Institute. The views expressed here represent only those of the author, and not necessarily those of anyone affiliated with TPI.

409 12ᵗʰ Street SW ● Suite 700 ● Washington, DC 20024
Tel: (202) 828-4405 ● Email: info@techpolicyinstitute.org ● www.techpolicyinstitute.org

## Introduction

The proposed T-Mobile – Sprint transaction is a horizontal merger that has the potential to transform the cellular mobile landscape in the United States and possibly the overall broadband market. As with any merger, the question facing antitrust authorities is whether the expected efficiencies gained by combining the firms outweigh the possibility that the combined firm could harm competition either on its own or by coordinating with its competitors.

In March 2019, I evaluated the relevant markets and explained why it is reasonable to believe the combined T-Mobile – Sprint (henceforth, "New T-Mobile") would be a stronger competitor to the current largest mobile firms, AT&T and Verizon, than either T-Mobile or Sprint is today, particularly with respect to what is expected to be a capital-intensive 5G rollout. I noted that although merger opponents express concerns about a 4-to-3 merger, empirical research on such mergers of wireless providers does not suggest that such combinations necessarily harm consumers, and in some cases even lead to lower prices.[1]

In my testimony, I also identified areas in which the merger might pose some concerns. In particular, T-Mobile and Sprint together provide a significant share of the wholesale network access that MVNOs depend on to operate. Such control could potentially affect low-income people, who disproportionately purchase mobile service from MVNOs, and companies like Google, Comcast, Charter, and others who are launching mobile services that rely on wholesale access.[2]

After an extensive review period, the U.S. Department of Justice (DOJ), in a Proposed Final Judgment, has outlined actions it believes T-Mobile and Sprint should take to address potential competition concerns.[3] Probably the most consequential conditions proposed by DOJ direct the firms to:

- Divest
    - All 800 MHz spectrum licenses to DISH
    - "Almost all" of Sprint's prepaid wireless businesses, including Boost Mobile and Virgin Mobile to DISH for $1.4 billion
    - About 20,000 cell sites and 400 retail stores.
- Enter into a 7-year MVNO agreement with DISH to ensure it is able to sell a competitive mobile product.
- Extend all current MVNO agreements until the end of the Final Judgment period.

Taken together, the DOJ conditions address the concerns by aiming to lock in existing MVNO agreements while lowering the barriers to entry by a facilities-based carrier (DISH). The conditions outlined by the DOJ appear designed to reduce the chances of consumer harm in the

---

[1] Scott Wallsten, "An Economic Analysis of the T-Mobile Sprint Merger," Written Testimony of Scott Wallsten, PhD President and Senior Fellow, Technology Policy Institute, Before the Subcommittee on Antitrust, Commercial, and Administrative Law Committee on the Judiciary United States House of Representatives, March 12, 2019.
[2] Wallsten.
[3] Antitrust Division, Department of Justice, "United States et al. v. Deutsche Telekom AG et al.; Proposed Final Judgment and Competitive Impact Statement," Federal Register, August 12, 2019.

2

areas otherwise most likely to be affected while allowing the New T-Mobile to retain sufficient assets to compete with AT&T and Verizon.

The remainder of this note addresses these conditions in more detail.

## A Mobile Inflection Point?

Like all merger investigations, this one involves predicting the future under different states of the world, meaning that it is not possible to know the answers with certainty. While the Horizontal Merger Guidelines note that "certainty about anticompetitive effect is seldom possible and not required for a merger to be illegal,"[4] this merger arguably involves more uncertainty than most.

The imminent arrival of 5G means the industry is on the cusp of radical changes in its underlying technology. Antitrust analysis requires some understanding of the equilibrium state of the industry or at least what we believe to be an efficient industrial organization. Nobody knows what 5G demand or supply will look like, making it especially difficult to estimate the medium- to long-term costs and benefits of the merger.

## Evidence on 4-to-3 Mergers[5]

Opponents of the merger argue that this combination should be blocked due to evidence of harms from previous 4-to-3 mobile mergers. It is worth reviewing the empirical studies on such mergers, because they do not support the opponents' claim that such mergers will necessarily harm consumers.

While every merger is unique and requires fact- and situation-specific analysis, analysis of previous mergers helps guide and shape our analysis. The T-Mobile Sprint combination represents a 4-to-3 merger. If the history of 4-to-3 mergers revealed consistent harm to consumers, then we should be wary of allowing such mergers to proceed, all else equal. Similarly, if the history of 4-to-3 mergers revealed consistent benefits to consumers, then we should generally be inclined to allow such mergers to proceed.

The history of 4-to-3 mobile mergers, however, yields no consistent results, highlighting the importance of case-specific analysis. The Body of European Regulators for Electronic Communications (BEREC) reviewed 14 separate existing empirical studies of 4-to-3 mergers.[6] Some empirical studies find higher prices after a merger, with some price increases being persistent and other price increases disappearing quickly. Some empirical studies find decreasing prices. Some empirical studies find no change in prices after a merger. One study found that 4-

---

[4] U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010, 1, http://www.justice.gov/atr/public/guidelines/hmg-2010.html.

[5] Much of this section is copied from the relevant section in my testimony: Wallsten, "An Economic Analysis of the T-Mobile Sprint Merger."

[6] Body of European Regulators for Electronic Communications, "BEREC Report on Post-Merger Market Developments - Price Effects of Mobile Mergers in Austria, Ireland and Germany," n.d., https://berec.europa.eu/eng/document_register/subject_matter/berec/download/0/8168-berec-report-on-post-merger-market-devel_0.pdf.

to-3 mergers resulted in price increases but also increased investment.[7] And each of the 14 empirical studies has flaws. Most importantly, none properly addressed reasons why the merger happened in the first place (i.e., endogeneity).

**Table 1: 4-to-3 Merger Studies Reviewed in BEREC (2018)**

Table 1: Overview of Related Literature

| No. | Study by | Prepared For | Scope | Specific Merger Examined? | Effects of 4-to-3 Mergers on | | | Effects of 5-to-4 Mergers on | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Price | Invest-ment | Quality | Price | Invest-ment |
| 1 | Affeldt/Nitsche (2014) | Telefónica | EU, 2003-2012 | no | ~/- 1) | | | | |
| 2 | Houngbonon/Jeanjean (2014) | Orange | World, 2000-2014 | no | | + | | | |
| 3 | CERRE (2015) | | ≥28 countries, 2002-2014 | no | + | +/~ 2) | | ~ | +/~ 2) |
| 4 | Csorba, Pápai (2015) | | 27 countries, 2003-2010 | no | + | | | ~ | |
| 5 | Frontier Economics (2015) | GSMA | EU, 2010-2014 | no | ~ | ~ | | | |
| 6 | Houngbonon (2015) | Orange | 40 countries, q1/13-q3/14 | AT, 2013 | - | | | | |
| 7 | HSBC (2015) | | see 2) and 6) | AT, 2013 (price) | - | + | | | |
| 8 | WIK (2015) | Ofcom | 12 countries | no | ~ | ~ | ~ | ~ | |
| 9 | Aguzzoni et al / ACM, EC, RTR (2015) | | AT, NL and 12 controls, 2004-2010 | AT, 2006, NL, 2007 | + | | | ~ | |
| 10 | RTR (2016) | | AT and 10 controls, 2011-2014 | AT, 2013 | + | | | | |
| 11 | BWB (2016) | | AT, 2011-2014 | AT, 2013 | + | | | | |
| 12 | Ofcom (2016) | | 25 countries, 2010-2015 | no | + | | | | |
| 13 | GSMA (2017) | | AT and 17 controls, 2011-2016 | AT, 2013 | | | + | | |
| 14 | Lear/DIW Berlin/Analysys Mason (2017) | EC | UK and 9 controls, 2007-2014 | UK, 2010 | | | | - | +/~ 3) |

+: increasing effect, -: decreasing effect, ~: no significant effect
1) No evidence for positive relationship between concentration and prices; some indications that the relationship may be negative
2) positive effects at the operator-level, no effects at the market level
3) increase in total investment, no effect on investment per subscriber

Source: BEREC (2018), Table 1

In its report, BEREC also examined three 4-to-3 European mergers—in Austria, Germany, and Ireland. They found weak evidence of short-term retail price increases, but the findings were not robust. A separate OECD study also supports these generally inconsistent results with data from 2018. Today, the OECD considers retail prices in Austria to be "inexpensive," Germany to be "relatively inexpensive," and Ireland to be "expensive."[8]

The history of 4-to-3 mergers provides little guidance on future results, especially in forecasted prices for 5G service in the T-Mobile and Sprint merger. Opponents of the merger can point to examples of price increases as evidence that the proposed merger will harm consumers, while proponents of the merger can point to examples of prices decreases or unchanged prices.

A more useful approach in this merger is to identify specific areas in which the evidence suggests reasons to be concerned, and devise remedies for those problems rather than blocking the merger outright. That is the approach the DOJ has taken.

---

[7] "Using data from 28 European countries from 2002-2014, the Centre on Regulation in Europe (CERRE, 2015) investigates the effect of market structure on prices and investment. The paper finds that 4-to-3 mergers on average result in price increases and more investment per operator. The combined effects of higher investment per operator and the reduction from four to three operators result in no significant effect on total investment by all operators in the market." Body of European Regulators for Electronic Communications, 7.

[8] http://ec.europa.eu/newsroom/dae/document.cfm?doc_id=50378, p.33

**Preserving Wholesale/Resale Competition and Reducing Barriers to Future Facilities-Based Competition**

The DOJ proposes that Sprint sell 14 MHz of spectrum in the 800 MHz band to DISH for $3.6 billion[9] as well as its choice of about 20,000 cell sites and 400 retail stores. These structural remedies, along with the requirement of a 7-year MVNO agreement between the New T-Mobile and DISH, lower the barriers to DISH's entry into mobile cellular. Lowering the cost of entry also increases the chances DISH will enter the market, thereby increasing competitive pressure on the New T-Mobile (and other incumbents) from the threat of new entry.

DISH still faces real barriers. Launching a new nationwide network will require billions more dollars in investment capital. And even if DISH can build a network more or less from scratch, there is no guarantee it will become large enough to compete effectively. After all, T-Mobile and Sprint argue that a key reason to approve the merger is that neither firm on its own is large enough to compete with the bigger companies. If that argument is correct, then DISH, as a smaller entrant, faces an uphill battle for market share as well.

Consider two possibilities. One is that the T-Mobile-Sprint claim that the minimum scale necessary to compete is larger than either of the two firms on its own. The other is that they are incorrect, and such scale is not necessary.

If the claim of needing very large scale is correct, then DISH is unlikely to succeed and poses a minimal competitive threat. However, in this case, allowing the merger is the correct policy because neither T-Mobile nor Sprint would be able compete effectively in the 5G world, leaving two major competitors if the merger were blocked. If the parties' claim is incorrect, and scale in 5G provision matters less than the parties believe, then T-Mobile by itself could be competitive and Sprint might survive. Under this minimum scale scenario, however, DISH could pose a competitive threat. Because we cannot know for sure how industry economics will evolve, DOJ's proposals create a kind of insurance policy: allowing the merger in case such scale is necessary, but reducing entry barriers for DISH in case minimum efficient scale turns out to be less than the parties predict.

In other words, the DOJ proposal avoids the possibility of leaving only two competitors while increasing the possibility of four, depending on how the economics evolve.

**Conclusion**

In a previous, detailed, analysis of the proposed merger between T-Mobile and Sprint, I concluded that there was little evidence supporting a decision to challenge the merger overall. In particular, empirical analyses of 4-to-3 mergers show no consistent outcome, meaning it is not possible to conclude that reducing the number of facilities-based firms to three would necessarily harm consumers. In my testimony, I explained that the structure of certain mobile segments affected by this merger raised concerns that the firms may potentially be amenable to

---

[9] Douglas Mitchelson, "Thoughts Across Our Coverage From TMUS/S/DISH DOJ Deal" (Credit Suisse, July 29, 2019).

anticompetitive behavior. Specifically, Sprint and T-Mobile have outsize shares of wholesale access to networks and resale of mobile services to MVNOs, making it possible that a merger could harm consumers in prepaid markets, in particular.

The conditions proposed by the DOJ appear to target this concern on wholesale access. The DOJ believes it can ensure competitive discipline in this area in the short- and medium-term by requiring Sprint to sell its prepaid business to DISH and be subject to specific rules regarding resale services for seven years. Similarly, through the time period covered by the Proposed Final Judgment, the New T-Mobile must maintain its existing MVNO relationships. For the longer run, the DOJ also proposes to reduce barriers to entry into facilities-based provision for DISH.

There is no guarantee these conditions will be effective, just as there is no guarantee for shareholders that the New T-Mobile will be more successful than the current T-Mobile. But given that the balance of the arguments suggests allowing the merger to proceed, the conditions proposed by the DOJ are a reasonable approach to managing potential concerns.

6

# EXHIBIT 26
# TO RESPONSE



September 27, 2019

Scott Scheele
Chief, Telecommunications and Broadband Section
Antitrust Division, U.S. Department of Justice
450 Fifth Street NW, Suite 7000
Washington, D.C. 20530

    Re: *United States of America v. Deutsche Telekom AG, T-Mobile US, Inc., Softbank*
      *Group Corp., and Sprint Corp., et al.*, Case 1:19-cv-02232
      Comments of TechFreedom

Dear Mr. Scheele:

On behalf of TechFreedom,[1] and in response to the procedures set forth in the Antitrust
Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "APPA" or "Tunney Act"), we file these
comments in support of the proposed Final Judgment and Stipulation and Order (the
"Measures") in the above-reference case.

We urge the Court to approve these Measures and the proposed transaction between T-Mobile
U.S., Inc. and Sprint Corporation because the combined company, New T-Mobile, will be in a far
better position to deploy wireless services to all Americans than would either company alone. In
terms of the number of companies able to deploy the expensive 5G networks that consumers of
the future will demand, and to extend service to currently unserved rural areas, this is not a 4-
to-3 merger but a 2-to-3 merger.

While we believe that the Measures actually go too far in their alleged attempt to protect
competition under Section 7 of the Clayton Act, 15 U.S.C. § 18, (especially the requirement of the
creation of a "new" fourth carrier in DISH), in light of the parties' agreement to the Measures,
TechFreedom believes that the quickest path to bringing forth the benefits of the merger is for
the court to approve the merger as agreed.

We agree with the recent analysis conducted by the International Center for Law & Economics
entitled "A Review of the Empirical Evidence on the Effects of Market Concentration and

---

[1] TechFreedom is a non-partisan think tank dedicated to promoting the progress of technology that
improves the human condition. To this end, we seek to advance public policy that makes
experimentation, entrepreneurship, and investment possible, and thus unleashes the ultimate
resource: human ingenuity. Wherever possible, we seek to empower users to make their own
choices online and elsewhere.

Mergers in the Wireless Telecommunications Industry."[2] In the ICLE Study, the authors reviewed 18 empirical analyses of mergers within the wireless industry across the world. Their conclusions are worth noting:

> Of those studies that considered the effect on investment in 4-to-3 mergers, all found that capital expenditures, a proxy for investment, increased post-merger.

> Several recent studies that looked more broadly at the effects of market concentration in the mobile telecommunications industry indicate that the highest levels of country-wide investment occurred in markets with three facilities-based operators (though total investment was not significantly lower in markets with four facilities-based operators). In addition, a recent analysis found that U.S. markets with higher concentration of ownership of spectrum had faster, more reliable cellular service.

> Studies of investment also found that markets with three facilities-based operators had significantly higher levels of investment by individual firms. The implication is that in such markets, individual firms have stronger incentives to invest in the infrastructure that supports the range, quality, and quantity of services provided to consumers. Studies also suggest this effect may be strengthened when the merger results in a market structure that is more symmetrical (i.e. the various facilities-based providers become more equal in market share).

> From an investment perspective, the optimal number of wireless firms in a given market appears, in some studies, to be three; however, in some jurisdictions (such as those that are more densely populated), the optimal number may well be four, while in others (such as those with small populations that are widely dispersed) the optimal number may well be two. Regardless, there is little or no support for categorically claiming that the optimal number of firms in larger jurisdictions, or indeed in any jurisdiction, is four.

> When evaluating the merits of a merger, authorities are charged with identifying the effects on the welfare of consumers. On the basis of the studies that we review, 4-to-3 mergers appear to generate net benefits to consumer welfare in the form of increased investment, while the effects on price are inconclusive.[3]

These findings are consistent with the comments TechFreedom filed at the FCC, which we attach hereto. These findings also undercut the conclusions reached in the Justice Department's

---

[2] E. Fruits, J. Hurwitz, G. Manne, J. Morris & A. Stapp, A Review of the Empirical Evidence on the Effects of Market Concentration and Mergers in the Wireless Telecommunications Industry, ICLE (Sept. 09, 2017), [hereinafter "ICLE Study"], available at https://laweconcenter.org/wp-content/uploads/2019/09/ICLE-Telco_Merger_Lit_Review_Jud_Rpt_FINAL.pdf.

[3] *Id.* at 2-3.

Competitive Impact Statement, filed in this case.[4] There, the Justice Department determined that: "The elimination of a fourth national facilities-based mobile wireless carrier would remove competition from Sprint and restructure the retail mobile wireless service market. The combination of T-Mobile and Sprint would eliminate head-to-head competition between the companies and threaten the benefits that customers have realized from that competition in the form of lower prices and better service."[5]

Both the ICLE Study and our comments to the FCC dispute this finding, based on the fact that a combined T-Mobile/Sprint will be in a much better position to compete with the dominant carriers AT&T and Verizon on both price and service. More importantly, when it comes to investing in 5G, the merged entity will be in a far better position, both in terms of economics and current combined spectrum assets, to compete in that "race." Indeed, the Measures may, in fact, slow or otherwise impede the ability of the merged entity to deploy 5G technologies, which the FCC has concluded is vital to the public interest and consumer welfare under the Communications Act.[6]

In perhaps no other industry are the economies of scale larger than in broadband, and wireless broadband in particular.[7] Indeed, American wireless broadband companies have long been the leading capital investors in America.[8]

Nor is there any indication that the merged entity will somehow drive up prices for consumers, when there continues to be a downward pressure on consumer prices in the market. The best indicators of the competitiveness of the wireless market are price and quality. The FCC's most recent wireless competition report notes that "it is difficult to compare prices of mobile wireless service plans because providers offer a variety of plans, frequently under multipart pricing

---

[4] *United States v. Deutsche Telekom AG*, No. 1:19-cv-02232-TJK (D.D.C., July 26, 2019) ("Competitive Impact Statement"), *available at* https://www.justice.gov/opa/press-release/file/1189336/download.

[5] *Id.* at 7.

[6] *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WT Docket No. 17-79, 33 FCC Rcd. 7705 (Aug. 3, 2018), *available at* https://docs.fcc.gov/public/attachments/FCC-18-111A1.pdf; *see also The FCC's 5G FAST Plan*, FCC.gov, https://www.fcc.gov/5G (last visited Sept. 26, 2019). ("Forward-thinking spectrum policy, modern infrastructure policy, and market-based network regulation form the heart of our strategy for realizing the promise of the 5G future," FCC Chairman Ajit Pai).

[7] *See, e.g.,* Aswath Damodaran, *Capital Expenditures by Sector (US)*, N.Y.U. Stern School of Business (last updated Jan. 2019), *available at* http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/capex.html.

[8] *See* J.B. Maverick, *Which Types of Industries Have the Largest Capital Expenditures,* INVESTOPEDIA (last updated Sept. 9, 2018), *available at* https://www.investopedia.com/ask/answers/020915/which-types-industries-have-largest-capital-expenditures.asp, ("The companies that consistently have the largest capital expenditures are naturally those with operations that ongoing investments in expensive items, such as land, facilities, infrastructure and major manufacturing equipment. Energy companies and telecommunications firms traditionally top the list.").

schemes, which also vary in non-price terms and features, such as early termination fees and the consequences of reaching usage limits."[9] Instead, the Report notes:

> Average Revenue Per Unit [(ARPU)] can be used as a reasonable proxy for understanding pricing changes, particularly where there are multiple pricing plans and/or pricing structures are complicated as is the case for mobile wireless services." As shown in Chart III.A.3 below, according to CTIA, the *industry ARPU fell sharply during 2016 from $44.65 to $41.50, a decline of approximately 7 percent.* Recent changes by service providers, such as the removal of overage charges, the move toward unlimited data plans, and EIPs have all contributed to the reported decline in ARPU. [10]

The chart below shows that, *despite* the "increased concentration" complained about by petitioners, overall wireless prices have continued to fall over the past 25 years:[11]



Source: Based on CTIA Wireless Industry Indices Year-End 2016. Appendix III: Elements of Inter-Firm Rivalry, Table III.A.ii provides more detail.

The fact that prices (using the ARPU as a proxy) fell by 7% from 2015 to 2016 tells us far more about the competitiveness of this market than any HHI measure ever could. Indeed, the

---

[9] Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions with Respect to Commercial Mobile Services, Twentieth Report, WT Docket No. 17-69, 32 FCC Rcd. 8968, ¶ 57 (Sept. 27, 2017), [hereinafter "Twentieth Report"], available at https://www.fcc.gov/document/fcc-releases-20th-wireless-competition-report-0.

[10] *Id.* ¶ 59 (emphasis added).

[11] *Id.*

Department of Justice has previously acknowledged that such measures fail to assess the competitiveness of broadband markets:

> We do not find it especially helpful to define some abstract notion of whether or not broadband markets are "competitive." Such a dichotomy makes little sense in the presence of large economies of scale, which preclude having many small suppliers and thus often lead to oligopolistic market structures. The operative question in competition policy is whether there are policy levers that can be used to produce superior outcomes, not whether the market resembles the textbook model of perfect competition.[12]

Finally, while much has been made of T-Mobile's self-created image as a "maverick" in the industry, in its Public Interest Statement filed at the FCC in support of the merger, the company itself has attributed its success in recent years not to the price-cutting moves, or offerings like unlimited data, but to the company's 2013 merger with MetroPCS:

> T-Mobile's Un-carrier strategy has worked, but it alone is not enough to overcome the scale and spectrum advantages of Verizon and AT&T. While T-Mobile has gained some market share, those gains have amounted to only a few percentage points after five years of continuous aggressive implementation of its Un-carrier strategy. And, much of that gain is attributable to its successful acquisition and integration of MetroPCS, rather than taking share through organic gains in the marketplace.[13]

This candid statement reveals, once again, the importance of scale: allowing T-Mobile to acquire MetroPCS made the two companies worth more than the sum of their parts. Just as that combination served the public interest well, there is every reason to think this one will too.

In terms of extending service into rural America, the merger will enhance that national goal, not deter it. Currently T-Mobile and Sprint offer no service or spotty service to compete with Verizon and AT&T in much of rural America. The merger thus would actually be a 2-to-3 merger. In delivering a wireless home broadband service comparable to existing wired service, this merger may be a 1-to-2 merger, if not a 2-to-3 merger. Both Verizon and AT&T have announced plans for limited 5G deployments that rely heavily on their millimeter wave spectrum. The propagation characteristics of this spectrum mean that Verizon's and AT&T's planned deployments will focus on high density areas. New T-Mobile's plans for a nationwide 5G network, which will not rely on millimeter wave spectrum, will be easier to deploy in rural areas.[14] T-Mobile's demonstrated

---

[12] *Ex Parte* Submission from U.S. Dept. of Justice, *Economic Issues in Broadband Competition: A National Broadband Plan for Our Future*, GN Docket No. 09-51, at 11 (Jan. 4, 2010), *available at* http://www.justice.gov/atr/public/comments/253393.pdf.

[13] *See* T-Mobile and Sprint Description of Transaction, Public Interest Statement, and Related Demonstrations, WT Docket No. 18-197 at 98 (filed June 18, 2018), [hereinafter "Public Interest Statement"], *available at* https://newtmobile.com/wp-content/uploads/2018/06/T-Mobile-Sprint-Public-Interest-Statement.pdf.

[14] *Id.* at 102.

commitment to lower pricing would serve consumers directly, while also forcing Verizon and AT&T, which have long had superior networks, to accelerate and expand their 5G deployment plans and quickly lower prices.[15]

Furthermore, T-Mobile and Sprint say the new network enabled by the merger will support "... a robust wireless broadband solution for residential use that will have equipment, service packages, and products matching or exceeding those of traditional ... in-home wired broadband providers."[16] This service will support high definition and 4K video streaming,[17] making the service an alternative to existing, wired broadband providers. This will allow New T-Mobile to compete not just with AT&T and Verizon, but also with cable and telco companies.

There is ample reason to believe this transaction will serve the public interest — and, indeed, plenty of reason to fear that, without this transaction, T-Mobile and Sprint will fall further and further behind market leaders AT&T and Verizon. Blocking this merger, or placing any further conditions on it, would deny American consumers the benefits of having three, rather than two, strong players in the market for wireless services. For all these reasons, the transaction should be approved — and the sooner, the better for consumers. Delay will only cost New T-Mobile money and, perhaps even more importantly, time; the company will need both if it is to catch up, and perhaps even surpass Verizon and AT&T.

Respectfully submitted,

**TECHFREEDOM**

By: _____ /s/ _____

Berin Szóka
James E. Dunstan

TechFreedom
110 Maryland Ave NE
Suite 409
Washington, DC 20002

---

[15] *Id.* at 50, 102.

[16] *Id.* at 60.

[17] *Id.* at 59.

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Applications of T-Mobile U.S., Inc. and | )    WT Docket No. 18-197 |
| Sprint Corporation for Consent to Transfer | ) |
| Control of Licenses and Authorizations | ) |
| | ) |
| To: Wireless Telecommunications Bureau | ) |

## COMMENTS OF TECHFREEDOM

TechFreedom,[1] pursuant to Sections 1.415 and 1.419 of the Commission's rules (47 C.F.R. §§ 1.415 & 1.419), submits these Comments in the above-referenced proceeding in response to the Commission's Public Notice of July 18, 2018.[2] We urge the Commission to approve the proposed transaction between T-Mobile U.S., Inc. and Sprint  Corporation  because the combined company, New T-Mobile, will be in a far better position to deploy wireless services to all Americans than would either company alone. In terms of the number of companies able to deploy the expensive 5G networks that consumers of the future will demand,

---

[1] TechFreedom is a non-partisan think tank dedicated to promoting the progress of technology that improves the human condition. To this end, we seek to advance public policy that makes experimentation, entrepreneurship, and investment possible, and thus unleashes the ultimate resource: human ingenuity. Wherever possible, we seek to empower users to make their own choices online and elsewhere.

[2] T-Mobile US, Inc., and Sprint Corporation Seek FCC Consent to the Transfer of Control of the Licenses, Authorizations, and Spectrum Leases Held by Sprint Corporation and its Subsidiaries to T-Mobile US, Inc., and the *Pro Forma* Transfer of Control of the Licenses, Authorizations, and Spectrum Leases Held by T-Mobile US, Inc. and its Subsidiaries, WT Docket No. 18-197, Public Notice, DA 18-740 (rel. July 18, 2018).  The Public Notice established September 17, 2018 as the filing date for Oppositions to Petitions to Deny. *Id*. These Comments serve as an opposition to the various petitions to deny which were filed by Common Cause, Consumers Union, New America's Open Technology Institute, Public Knowledge, & Writers Guild of America, West, Inc. and American Antitrust Institute and are timely filed. *See infra* note 7.

and to extend service to currently unserved rural areas, this is not a 4-to-3 merger but a 2-to-3 merger.

## I.    Consumer Welfare Is Lodestar for Merger Review

Sections 214(a) and 310(d) of the Communications Act command the Commission to determine whether applicants have demonstrated that the proposed transfers of control of licenses and authorizations will serve the public interest, convenience, and necessity.[3] The Commission has explained its analysis as follows:

> Our public interest evaluation necessarily encompasses the "broad aims of the Communications Act," which include, among other things, a deeply rooted preference for preserving and enhancing competition in relevant markets, accelerating private sector deployment of advanced services, promoting a diversity of license holdings, and generally managing the spectrum in the public interest. Our public interest analysis may also entail assessing whether the proposed transaction will *affect the quality of communications services or will result in the provision of new or additional services to consumers.* In conducting this analysis, we may consider technological and market changes, and the nature, complexity, and speed of change of, as well as trends within, the communications industry.

> Our competitive analysis, which forms an important part of the public interest evaluation, is informed by, but not limited to, traditional antitrust principles. The Commission and DOJ each have independent authority to examine the competitive impacts of proposed communications mergers and transactions involving transfers of Commission licenses, but the standards governing the Commission's competitive review differ somewhat from those applied by DOJ. Like DOJ, the Commission considers how a transaction will affect competition by defining a relevant market, looking at the market power of incumbent competitors, and analyzing barriers to entry, potential competition and the efficiencies, if any, that may result from the transaction. The Antitrust Division of DOJ, however, reviews telecommunications mergers pursuant to section 7 of the Clayton Act, which prohibits mergers that may substantially lessen competition. The Antitrust Division's review is also limited solely to an examination of the

---

[3] 47 U.S.C. § 214(a); 47 U.S.C. § 310(d).

competitive effects of the acquisition, without reference to diversity, localism, or other public interest considerations. The Commission's competitive analysis under the public interest standard is somewhat broader, for example, considering whether a transaction will enhance, rather than merely preserve, existing competition, and takes a more extensive view of potential and future competition and its impact on the relevant market.[4]

We have previously urged the Commission to define its competition analysis to be entirely consistent with the well-established standards of antitrust law.[5] We believe that harmonization of these standards will serve the public interest by providing a clear analytical framework for merger review — with the FCC adding its own industry-specific expertise to the review performed by either the Department of Justice (DOJ) or the Federal Trade Commission (FTC). Harmonization will also minimize the potential for arbitrary or politicized enforcement, or, most importantly, for the Commission to engage in a kind of regulatory blackmail by refusing to grant approval of a merger until the parties assent to "volunteering" some condition that may have little, if any, connection to the transaction, and that the Commission might not be able to require by regulation, either because it lacks the statutory authority to do so or even because such a condition might be unconstitutional.[6] This merger would be an excellent

---

[4] Applications of Cellco Partnership d/b/a Verizon Wireless and Atlantis Holdings LLC For Consent to Transfer Control of Licenses, Authorizations, and Spectrum Manager and De Facto Transfer Leasing Arrangements and Petition for Declaratory Ruling that the Transaction is Consistent with Section 310(b)(4) of the Communications Act, Memorandum Opinion and Order and Declaratory Ruling, File Nos. 0003463892, et al., WT Docket No. 08-95 ¶¶ 27-28 (Nov. 10, 2008), https://docs.fcc.gov/public/attachments/FCC-08-258A1.pdf.

[5] Comments of CEI & TechFreedom, *In the Matter of Commission Launches Modernization of Media Regulation Initiative*, MB Docket No. 17-105 at 7 (July 5, 2017), http://docs.techfreedom.org/TF_CEI_Comments_FCC_Media_Modernization.pdf.

[6] *See* Letter from Berin Szóka, President, TechFreedom & Geoffrey Manne, Exec. Director, Int'l Center for Law & Econ. to Members of the House of Representatives' Energy and Commerce Committee (May 20, 2015), http://docs.techfreedom.org/TF_ICLE_Letter_FCC_Process_Reform_5.20.15.pdf.

opportunity for the Commission to clarify its merger review standards, ideally by issuing a policy statement accompanying the decision on the merger.

But whether the Commission's analysis of the competitive effects of a transaction is "somewhat broader" than that of the antitrust laws, or exactly the same as the antitrust laws, the outcome of this review should be the same. Either way, the Commission's focus should be on whether the transaction will enhance consumer welfare — and this transaction clearly will. Many of the arguments raised by Petitioners simply fall outside the consumer welfare standard, even under the somewhat more expansive form of that standard articulated by the Commission in the past.

## II.    Petitioners Understate the Competitiveness of the Wireless Market

Petitioners make two central claims: (1) that the market is heavily concentrated today, (a) because it features only four nation-wide carriers, and (b) because the Herfindahl-Hirschman Index (HHI) measures for the industry today are high; and (2) that the merger will only increase that concentration, (a) reducing the market from four to three players and (b) raising HHI scores even higher.[7] None of these claims in any way measures consumer welfare, which should be the sole focus for the Commission's inquiry. Under any circumstance, these static measurements are rough proxies for consumer welfare; but in a market such as that for wireless services, these proxies are fundamentally misleading.[8]

---

[7] *See, e.g.,* Petition to Deny of Common Cause, Consumers Union, , Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of Licenses and Authorizations, WT Docket No. 18-197 (Aug. 27, 2018), https://tinyurl.com/ya64tj34 [hereinafter Public Knowledge, *Petition to Deny*]; Petition to Deny of the American Antitrust Institute, WT Docket No. 18-197 (Aug. 27, 2018), https://tinyurl.com/y8aob6qm [hereinafter AAI Petition].

[8] Some issues with using static measures, such as HHI, include (1) HHI is somewhat arbitrary and not really tied to consumer welfare in any way, and (2) market power might not necessarily be driven by market share. *See, e.g.,* Craig M. Newmark, Ass. Professor of Economics, N.C. State University, *Price-Concentration Studies: There You Go Again*, Prepared for the DOJ/FTC Merger

## A. Static Measures of Market Concentration Are Poor Indicators of the Competitiveness of the Market

Even the Obama Administration's Department of Justice conceded that static measures of the competitiveness of a market mean little in markets with high fixed costs, such as — indeed, *specifically* referencing — that for wireless services.[9] In 2010, when the FCC sought comment on how to analyze the broadband market for purposes of crafting the National Broadband Plan, the DOJ said the following:

> We do not find it especially helpful to define some abstract notion of whether or not broadband markets are "competitive." Such a dichotomy makes little sense in the presence of large economies of scale, which preclude having many small suppliers and thus often lead to oligopolistic market structures.[10]

---

Workshop "Concentration and Market Shares" panel (Feb. 14, 2004), https://www.justice.gov/sites/default/files/atr/legacy/2007/08/30/202603.pdf ("Differences in market size could induce a positive price-concentration relationship, but as with competitive superiority, a price concentration relationship resulting from this cause does not imply consumers are being harmed. Market size differences may well account for the observations that the FTC attributed to non-competitive behavior in *Staples*.").

[9] *See Ex Parte* Submission of the United States Department of Justice, In re Economic Issues in Broadband Competition, GN Docket No. 09-51 (Jan. 4, 2010), *available at* http://www.justice.gov/atr/public/comments/253393.pdf

[10] *Id.* at 11. That filing does go on to note, in the next sentence, that "The operative question in competition policy is whether there are policy levers that can be used to produce superior outcomes, not whether the market resembles the textbook model of perfect competition. In highly concentrated markets, the policy levers often include: (a) *merger control policies*; (b) limits on business practices that thwart innovation (e.g., by blocking interconnection); and (c) public policies that affirmatively lower entry barriers facing new entrants and new technologies." *Id.* But this does not make change the fundamental point: even in applying "merger control policies," whatever static, simplistic measurements tell us about mergers in industries with lower economies of scale (and economies of scale) for consumer, they are far less useful — if useful at all — in industries like wireless service. *Id.*

In perhaps no other industry are the economies of scale larger than in broadband, and wireless broadband in particular.[11] Indeed, American wireless broadband companies have long been the leading capital investors in America.[12]

The best indicators of the competitiveness of the wireless market are price and quality. The FCC's most recent wireless competition report notes that "it is difficult to compare prices of mobile wireless service plans because providers offer a variety of plans, frequently under multipart pricing schemes, which also vary in non-price terms and features, such as early termination fees and the consequences of reaching usage limits."[13] Instead, the Report notes:

> Average Revenue Per Unit [(ARPU)] can be used as a reasonable proxy for understanding pricing changes, particularly where there are multiple pricing plans and/or pricing structures are complicated as is the case for mobile wireless services." As shown in Chart III.A.3 below, according to CTIA, the *industry ARPU fell sharply during 2016 from $44.65 to $41.50, a decline of approximately 7 percent.* Recent changes by service providers, such as the removal of overage charges, the move toward unlimited data plans, and EIPs have all contributed to the reported decline in ARPU.[14]

---

[11] *See, e.g.,* Aswath Damodaran, *Capital Expenditures by Sector (US)*, N.Y.U. Stern School of Business (last updated Jan. 2018), http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/capex.html.

[12] *See* J.B. Maverick, *Which types of industries have the largest capital expenditures,* INVESTOPEDIA (last updated Sept. 9, 2018), https://www.investopedia.com/ask/answers/020915/which-types-industries-have-largest-capital-expenditures.asp ("The companies that consistently have the largest capital expenditures are naturally those with operations that ongoing investments in expensive items, such as land, facilities, infrastructure and major manufacturing equipment. Energy companies and telecommunications firms traditionally top the list.").

[13] Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993; Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services, Twentieth Report, WT Docket No. 17-69, ¶ 57 (Sept. 27, 2017), https://www.fcc.gov/document/fcc-releases-20th-wireless-competition-report-0 [hereinafter "Twentieth Report"].

[14] *Id.* ¶ 59 (emphasis added).

That chart shows that, *despite* the "increased concentration" complained about by petitioners, overall wireless prices are clearly falling:[15]



Source:  Based on CTIA Wireless Industry Indices Year-End 2016.  Appendix III:  Elements of Inter-Firm Rivalry, Table III.A.ii provides more detail.

The fact that prices (using the ARPU as a proxy) fell by 7% from 2015 to 2016 tells us far more about the competitiveness of this market than any HHI measure ever could.

### B.  T-Mobile as a "Maverick": Incentives and Ability to Deliver *on the Margin*

Many opponents of the proposed merger argue that New T-Mobile will have less of an incentive to force down prices, offer innovative service plans (like unlimited data), *etc.* Specifically, the Public Knowledge's Petition to Deny asserts that Verizon and AT&T have been held in check from raising prices on and limiting data to consumers because competitors T-

---

[15] *Id.*

Mobile and Sprint "aggressively marketed unlimited data plans."[16] While opponents of the merger claim that this was due to the fact that there were four competitors in the market, there is nothing in their quoted or cited evidence that required either (a) a fourth competitor to prompt AT&T and Verizon to return to offering unlimited data plans, or (b) that the number three competitor be *less than half* the size of the two larger companies to have sufficient incentive to make such a "maverick" move.[17]

Indeed, as the T-Mobile Public Interest Statement makes clear,[18] New T-Mobile would have an increased footprint and greater ability to expand further into areas currently dominated by Verizon and AT&T to enhance competition in those geographic areas. They will also still have a strong incentive to attempt to lure customers away from AT&T and Sprint. According to T-Mobile's Public Interest Statement, the pre- and post-merger market shares would be as follows:[19]

| Pre-Merger | Market Share (percent) | | Post-Merger | Market Share (percent) |
|---|---|---|---|---|
| Verizon | 36.80% | | Verizon | 36.80% |
| AT&T | 32.80% | | AT&T | 32.80% |
| T-Mobile | 15.40% | | New T-Mobile | 28.80% |
| Sprint | 13.40% | | | |

Put differently, Verizon would still be 27% larger than New T-Mobile, and AT&T would be still

---

[16] Public Knowledge, *Petition to Deny, supra* note 7, at 8 (quoting a Wall Street Journal article claiming that AT&T and Verizon were forced to reintroduce unlimited data plans because T-Mobile and Sprint "aggressively marketed unlimited data plans").

[17] *Id.*

[18] *See* T-Mobile and Sprint Description of Transaction, Public Interest Statement, and Related Demonstrations, WT Docket No. 18-197 at ii (filed June 18, 2018), https://newtmobile.com/content/uploads/2018/06/T-Mobile-Sprint-Public-Interest-Statement.pdf [hereinafter "Public Interest Statement"].

[19] *Id.* at 85.

be 13.8% larger. In a business where scale is the chief driving force, New T-Mobile will still have a strong incentive to try to catch up with its still-significantly larger rivals.

But as in all economic questions, this question is not a binary one ("Will new T-Mobile still be a maverick?") but a *marginal* one — in fact, *two* marginal questions: (1) How much will the merger change the *incentive* of New T-Mobile to lower prices and enhance service offerings to attract customers; and (2) how much will the merger change the *ability* of New T-Mobile to actually win over customers? It is entirely possible that the merger might, on the margin, lessen New T-Mobile's *incentive* to lower prices to achieve scale yet do more to increase New T-Mobile's *ability* to build, operate, maintain and upgrade networks that will win over customers. The available evidence — indeed, the simple the fact that the two companies want to combine — suggests that a marginally less desperate, but significantly better resourced, capable and better run combined company will do more for consumers than could two separate companies that (a) lack the combined resources of the two and (b) must compete with each other as well as with AT&T and Verizon.

In 2017, T-Mobile CFO Braxton Carter candidly admitted to investors that "[T-Mobile's] disadvantage all along has been scale. ... And to achieve the margins that are possible to be achieved in the U.S., we have to have that scale."[20] T-Mobile's lack of scale has made the company eager — even desperate — to attract customers, with offerings such as moving to unlimited data plans. But industry analysts worry that such moves, a result of T-Mobile's historic focus on growth instead of profitability, will be unsustainable unless the merger is

---

[20] *See* Adam Levy, *This is T-Mobile's Biggest Disadvantage*, The Motley Fool (Nov. 21, 2017), https://www.fool.com/investing/2017/11/21/this-is-t-mobiles-biggest-disadvantage.aspx.

approved.[21] T-Mobile is considerably less profitable per subscriber — no doubt in part because of these aggressive moves to achieve scale — as is evident from each company's EBITDA (earnings before interest, taxes, depreciation, and amortization) margins: 13.67% for T-Mobile,[22] 38.94% for AT&T,[23] and 34.47% for Verizon.[24]

As McKinsey & Company noted in a 2017 analysis of the trade-off between growth and profit margins, companies who "generally place less emphasis on profitability" may be beneficial in the short term, but "they must eventually increase their focus on profitability to achieve sustainable growth."[25] Ultimately, T-Mobile's ability to raise the capital needed to invest in better networks — whether that means expanding coverage of rural areas or deploying 5G in more densely populated areas — depends on the company's profitability. With such low profit margins, how is the company going to keep up with Verizon and AT&T in investment?

Indeed, Verizon and AT&T are currently so far ahead of T-Mobile and Sprint that even the prospect of the two companies combining doesn't seem to concern Verizon CEO Lowell McAdam: when asked by *The Seattle Times* about the merger, he replied: "We don't have a point

---

[21] *See* Trefis Team, *What Lies Ahead For T-Mobile in 2018*, Forbes (Jan. 2, 2018), https://www.forbes.com/sites/greatspeculations/2018/01/02/what-lies-ahead-for-t-mobile-in-2018/#28de3d874647 (noting that T-Mobile's "growth could slow down, amid saturation in the wireless market, increasing competition from AT&T and Verizon's unlimited plans and T-Mobile's relatively lower promotional activity" and that "T-Mobile has historically traded profitability in favor of growth, with its margins and profits coming in below its larger peers").

[22] *See T-Mobile US's EBITDA Margin by quarter*, CSIMarket (last visited Sept. 17, 2018), https://csimarket.com/stocks/singleProfitabilityRatios.php?code=TMUS&ebit.

[23] *See AT&T's EBITDA Margin by quarter*, CSIMarket (last visited Sept. 17, 2018), https://csimarket.com/stocks/singleProfitabilityRatios.php?code=T&ebit.

[24] *See Verizon Communication's Inc's EBITDA* Margin by quarter, CSIMarket (last visited Sept. 17, 2018), https://csimarket.com/stocks/singleProfitabilityRatios.php?code=VZ&ebit.

[25] Chandra Gnanasambandam, Allen Miller, & Kara Sprague, *Grow fast or die slow: The role of profitability in sustainable growth*, McKinsey & Company (Oct. 2017), https://www.mckinsey.com/industries/high-tech/our-insights/grow-fast-or-die-slow-the-role-of-profitability-in-sustainable-growth.

of view on whether it goes through or it doesn't. *We frankly don't care.*[26] AT&T Communications CEO John Donovan addressed the merger at the MoffettNathanson Media & Communications Summit this week and didn't seem worried: "We certainly won't contest it…. If you look at where we are as an industry in wireless, each of the competitors out there is embarking on a very different strategy."[27]

Roger Entner, Founder and Analyst of telecommunications research and analytics firm Recon Analytics believes this will effectively be a two-to-three merger: "having three operators that are within 20% of phone subscribers compared to one another is a good thing. Consumers should benefit if three strong companies fight for customers with intense rivalry."[28]

Opponents of the merger point to recent statements by either company about that company's ability to deploy a 5G network. These are, of course, the kinds of claims companies make all the time to reassure their investors. Furthermore, the fact that these claims were made *shortly before the announcement of the merger* suggests that what both companies really had in mind was that *the merger would allow them to deliver on such claims.*[29] Indeed, Petitioners point to statements made by T-Mobile CTO Neville Ray that were made on February 28, 2018 — a mere two months prior to the announcement of this merger with Sprint — that "T-Mobile will be the first to give customers a truly transformative, nationwide 5G network

---

[26] *See* Aaron Pressman, *Verizon CEO Dismisses Sprint-T-Mobile Merger: 'We Don't Care'*, Fortune (May 2, 2018), http://fortune.com/2018/05/03/verizon-ceo-sprint-t-mobile/ (emphasis added).

[27] Monica Alleven, *AT&T's Donovan on T-Mobile/Sprint merger: We won't contest it*, Fierce Wireless (May 15, 2018), https://www.fiercewireless.com/wireless/at-t-s-donovan-t-mobile-sprint-combo-we-won-t-contest-it.

[28] Roger Entner, *Details matter in the T-Mobile/Sprint merger*, Fierce Wireless (Aug. 17, 2918), https://www.fiercewireless.com/wireless/industry-voices-entner-details-matter-t-mobile-sprint-merger.

[29] *See* Public Knowledge, *Petition to Deny, supra* note 7, at 33.

they deserve."[30] Similarly, Petitioners point to a statement made by then-Sprint CFO Michele

Combs on March 8, 2018 — less than two months prior to the merger's announcement — that

"[Sprint has] the best assets in order to [deploy 5G]. [Sprint has] the best in terms of

spectrum."[31] Yet, both T-Mobile and Sprint have been trying to merge with each other, and

other providers, for years.[32] It would be surprising if the companies' statements about their

future plans did *not* assume they would eventually merge with *some* other company, if not with

each other. That Sprint and T-Mobile were anticipating a future merger when making those

statements is even more likely when considering that, in Sprint's statement, it spoke of its

unique access to spectrum — the very issue T-Mobile argues in its Public Interest Statement

will prevent it from deploying 5G absent the merger.[33]

Finally, while much has been made of T-Mobile's self-created image as a "maverick" in

the industry, the company itself has attributed its success in recent years not to the price-

cutting moves, or offerings like unlimited data, but to the company's 2013 merger with

MetroPCS:

> T-Mobile's Un-carrier strategy has worked, but it alone is not enough to
> overcome the scale and spectrum advantages of Verizon and AT&T. While T-
> Mobile has gained some market share, those gains have amounted to only a few
> percentage points after five years of continuous aggressive implementation of its

---

[30] *Id.*

[31] *Id.* at 35.

[32] *See, e.g.,* Alex Heath, *Only Winner of Failed AT&T Merger is T-Mobile,* Cult of Mac (Dec. 20, 2011), https://www.cultofmac.com/136415/only-winner-of-failed-att-merger-is-t-mobile/; Mike Dano, *T-Mobile execs lament failure of Sprint merger, but 'you never say never',* Fierce Wireless (Jan. 9, 2018), https://www.fiercewireless.com/wireless/t-mobile-execs-lament-failure-sprint-merger-but-you-never-say-never.

[33] *See* Public Interest Statement, *supra* note 18, at 98-99 ("As discussed in greater detail above, as a standalone company, T-Mobile does not have the spectrum portfolio required to launch a competitive, broad, and deep nationwide 5G network during the next few years. T-Mobile's thin layer of 600 MHz spectrum provides excellent coverage, but is inadequate for purposes of providing target 5G speeds, low latency, or robust capacity.").

Un-carrier strategy. And, much of that gain is attributable to its successful acquisition and integration of MetroPCS, rather than taking share through organic gains in the marketplace.[34]

This candid statement reveals, once again, the importance of scale: allowing T-Mobile to acquire MetroPCS made the two companies worth more than the sum of their parts. Just as that combination well served the public interest, there is every reason to think this one will, too.

### C.  Public Knowledge's Repeated Analogies to the Withdrawn AT&T/T-Mobile Merger Are Not Applicable to the Current Proposed Merger

Public Knowledge's Petition to Deny portrays the proposed merger as virtually identical to the withdrawn[35] merger in 2011 between AT&T and T-Mobile.[36] While both that merger and this merger would result in the elimination of one of the current four nationwide carriers,[37] the two deals are completely different in their effects on the market: the 2011 proposed merger would have combined the *second and third* largest competitors (in terms of nationwide subscribers), while the current proposed merger would combine the *third and fourth* largest competitors. As noted above, the combined market shares of T-Mobile and Sprint here would

---

[34] *See* Public Interest Statement, *supra* note 18, at 98.

[35] It is critical to note that while the DOJ filed a complaint against the AT&T/T-Mobile merger, *see* Complaint, *United States v. AT&T Inc.*, 2011 WL 5347178 (D.D.C. 2011) (No. 1:11-CV-01560 ESH) (filed August 31, 2011) [hereinafter "DOJ 2011 Complaint"], *available at* https://www.justice.gov/atr/case-document/file/487776/download, and FCC bureau staff concluded that the proposed 2011 merger was not in the public interest AT&T withdrew the application for merger prior to any final decision being rendered by the FCC or the courts. *See Applications of AT&T Inc. and Deutsche Telekom AG For Consent To Assign or Transfer Control of Licenses and Authorizations*, Order, WT Docket No. 11-65 (Nov. 29, 2011), https://www.fcc.gov/proceedings-actions/mergers-transactions/att-and-t-mobile. As such, AT&T and T-Mobile never had "their day in court" to prove that the public interest benefits involved in the merger outweighed the dangers of increased market concentration. So at the same time that the proposed 2011 merger is factually distinct from the current proposed merger, the 2011 proposed merger cannot be cited as precedent in this proceeding, because there was never a final adjudication of the merits.

[36] *See* Public Knowledge, *Petition to Deny*, *supra* note 7, at 3-4, 6, 9, 13, 21, 31.

[37] *But see* Public Interest Statement, *supra* at 13 (in many geographic markets, neither T-Mobile nor Sprint currently offers wireless service; in these markets, the merger would be a 2-to-3 merger).

still be substantially less (28.8%) than the market share held by either Verizon (36.80%) or AT&T (32.80%), and T-Mobile would be the third largest wireless competitor both before, **and after**, the merger.[38] By contrast, in 2011, an AT&T/T-Mobile merger would have created the largest wireless carrier by a double-digit margin. The HHI increase in the 2011 proposed merger was over 700, nearly twice the HHI increase that would be caused by the current proposed merger.[39]

For both factual and legal reasons, the proposed 2011 merger between AT&T and T-Mobile can have no impact on the analysis of a proposed merger today between T-Mobile and Sprint.[40]

## III.    Capital Expenditures Tell the Clearest Story of the Market Today

While falling ARPU, as the clearest indicator for proxy for overall prices, tells a clear story of the current competitiveness of the wireless market, the best measure of the current ability of each of the four wireless companies to continue serving consumers is the amount they are able to invest in their networks. Writing in May for the Reuters "Breakingviews" column at *The New York Times*, Jennifer Saba declared "T-Mobile's 5G Argument to Regulators Is Compelling," noting this critical fact about relative investment levels:

> The investment would dramatically boost the industry's levels of capital expenditure. ***The larger rivals AT&T and Verizon, which are competing to be leaders in 5G, dedicated approximately $22 billion and $17 billion to network investments last year. T-Mobile and Sprint together mustered just $6 billion, according to Eikon data***. And 5G is an expensive endeavor. New Street Research estimated that Verizon will spend $35 billion over the next five

---

[38] *See supra* p. 7.

[39] *See* DOJ 2011 Complaint at 12.

[40] *See Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc.*, Memorandum Opinion and Order, 26 FCC Rcd. 4238, 4258 ¶ 45 (2011) ("All adjudicatory findings are fact specific and based on the evidence in the record in a specific matter.").

years to cover just 20 percent of the country. The cost ratchets up "significantly" to expand beyond that, the research firm said.[41]

The FCC's own data tell a similar story, summarizing total capital expenditures by company over a seven-year period (2010-16):[42]



In only one year (2013) did the combined capex of T-Mobile and Sprint rank even second among the top three wireless companies by annual capex. On average, T-Mobile and Sprint *combined* represented just 73.77% of AT&T's capex (between 2010 and 2016 by year), for a 7-

---

[41] Jennifer Saba, *T-Mobile's 5G Argument to Regulators Is Compelling,* New York Times (May 3, 2018), https://www.nytimes.com/2018/05/03/business/dealbook/t-mobile-5g-regulators.html (emphasis added); *see also* Mike Dano, *No more penny pinching: Wireless carriers' capex to surge in 2018,* Fierce Wireless (Feb. 20, 2018), https://www.fiercewireless.com/wireless/no-more-penny-pinching-wireless-carriers-capex-to-surge-2018.

[42] *See* Twentieth Report, *supra* note 13, at 48.

year absolute difference in investment of $18.73 billion; and T-Mobile and Sprint *combined* represented just 76.21% of Verizon's capex (between 2010 and 2016 by year), for a 7-year absolute difference in investment of $16.45 billion. The two companies lag *very* far behind in investment.

## IV.    The Merger Will Benefit Consumers

### A.  The Merger Will Increase Combined Investment and Leverage that Investment Better.

The combination of the two companies will generate enormous cost-savings: roughly $43.6 billion in total net present value by 2024.[43] These synergies will allow New T-Mobile to invest nearly $40 billion on its 5G network over the next three years — or approximately *three times* the amount that T-Mobile could have invested on its own without the merger.[44] Indeed, T-Mobile and Sprint declare that they aim to deploy the *first* true, nationwide 5G network — leapfrogging Verizon and AT&T's networks.[45]

### B.  New T-Mobile Will Better Serve Rural Areas.

In better providing wireless service to rural America, where T-Mobile and Sprint currently offer no service or spotty service to compete with Verizon and AT&T, this merger is actually a 2-to-3 merger. In delivering a wireless home broadband service comparable to existing wired service, this merger may be a 1-to-2 merger, if not a 2-to-3 merger.

Both Verizon and AT&T have announced plans for limited 5G deployments that rely heavily on their millimeter wave spectrum. The propagation characteristics of this spectrum mean that Verizon's and AT&T's planned deployments will focus on high density areas. New T-

---

[43] Public Interest Statement, *supra* note 18, at 15.

[44] *Id.*

[45] *Id.* at 17

Mobile's plans for a nationwide 5G network, which will not rely on millimeter wave spectrum, will be easier to deploy in rural areas.[46] T-Mobile's demonstrated commitment to lower pricing would serve consumers directly, while also forcing Verizon and AT&T, which have long had superior networks, to accelerate and expand their 5G deployment plans and quickly lower prices.[47]

Furthermore, T-Mobile and Sprint say the new network enabled by the merger will support "a robust wireless broadband solution for residential use that will have equipment, service packages, and products matching or exceeding those of traditional . . . in-home wired broadband providers."[48] This service will support high definition and 4K video streaming,[49] making the service an alternative to existing, wired broadband providers. This will allow New T-Mobile to compete not just with AT&T and Verizon, but also with cable and telco companies.

## C.  The Merger Will Generate Enormous Efficiencies.

The merger will allow New T-Mobile to operate a more efficient combined network. Specifically, New T-Mobile will be able to eliminate around 35,000 Sprint cell base station sites as redundant. The cost savings from the elimination of leases, backhaul, utilities, upgrades, maintenance, and other recurring site-related expenses combined with having to build roughly 20,000 fewer macro sites and 40,000 fewer small cells than the two companies would have to build separately to achieve the same coverage will result in projected savings of roughly $6.6 billion by 2024.[50] Those sites that are retained in the interim will provide added network

---

[46] *Id.* at 102.

[47] *Id.* at 50, 102.

[48] *Id.* at 60.

[49] *Id.* at 59.

[50] Public Interest Statement, *supra* note 18, Appendix C: Declaration of G. Michael Sievert, President and Chief Operating Officer, T-Mobile US, Inc. at 6-7 [hereinafter "Sievert Declaration"].

capacity during the transition, helping to reduce spectrum congestion in urban areas and ensuring that Sprint customers migrating to the New T-Mobile network have the same or better coverage everywhere. New T-Mobile will save further on deployment costs by eliminating future individual network builds and upgrades.[51]

### D. Job Cuts Are a Merger-Specific Efficiency that Will Benefit Consumers, not a Harm.

Petitioners argue that the transaction will reduce overall employment by the two companies.[52] The merging parties dispute these claims. This evidentiary dispute is utterly irrelevant: even if the transaction were, somehow, to allow New T-Mobile to eliminate *all* employees, and rely entire on machines, this increased efficiency would be a public interest *benefit*, not a harm, of the transaction: it would allow New T-Mobile to operate far more efficiently and pass those efficiencies on to consumers, either in the form of lower prices, a better network or other measures of non-price quality. The Commission's inquiry should be focused squarely on the welfare of consumers — not employees of the merging firms.

The reason for this should be obvious — but apparently is not. The Commission cannot jointly maximize consumer welfare and variables that are inherently inconsistent with the welfare of consumers without its analysis becoming inherently arbitrary. Differences of evidentiary support and predictive judgment as to whether a transaction will benefit consumers can be resolved, at least in principle, by attempting to reconcile competing evidence and weighing the likely accuracy of competing predictions. Differences of opinion on the trade-

---

[51] Sievert Declaration at 6-7.

[52] Public Knowledge, *Petition to Deny*, supra note 7, at 30; *see also* CWA Calls on Sprint and T-Mobile to Make Binding Commitments to Address Potential Job Loss and Respect Workers' Rights, Communications Workers of America, (June 26, 2018), https://www.cwa-union.org/news/releases/cwa-calls-on-sprint-and-t-mobile-make-binding-commitments-address-potentialjob-loss.

off between lower prices for consumers and reduced employment by the two companies, however, are inherently value judgments as to the relative importance of two competing stakeholders; the Commission's judgment between these two groups is inherently arbitrary and political.

## V.    Conclusion

There is ample reason to believe this transaction will serve the public interest — and, indeed, plenty of reason to fear that, without this transaction, T-Mobile and Sprint will fall further and further behind market leaders AT&T and Verizon. Blocking this merger would make the FCC directly responsible for denying American consumers the benefits of having three strong players in the market for wireless services. For all these reasons, the transaction should be approved — and the sooner, the better for consumers. Delay will only cost New T-Mobile money and, perhaps even more importantly, time; the company will need both if it is to catch up, and perhaps even surpass Verizon and AT&T.

Respectfully submitted,

**TECHFREEDOM**

By: _____ /s/ _____

Berin Szóka
James E. Dunstan
Graham Owens
Alvaro Maranon
TechFreedom
110 Maryland Ave NE
Suite 409
Washington, DC 20002

Dated:  September 17, 2018

# EXHIBIT 27
# TO RESPONSE

# Congress of the United States
## House of Representatives
### Washington, DC 20515

October 10, 2019

Mr. Scott Scheele, Chief
Telecommunications and Broadband Section
Antitrust Division
United States Department of Justice
450 Fifth Street NW, Suite 7000
Washington, D.C. 20530

Re: *United States of America et al v. Deutsche Telekom AG et al*, 1:19-cv-02232

Dear Mr. Scheele,

In connection with the above-captioned matter, we would like to submit the attached letter to the record in support of the proposed Final Judgment resolving your investigation of the proposed merger of T-Mobile and Sprint.

Sincerely,

Billy Long
Member of Congress

Anna G. Eshoo
Member of Congress

Enclosure

# Congress of the United States
## House of Representatives
### Washington, DC 20515

January 25, 2019

The Honorable Ajit Pai, Chairman
Federal Communications Commission
445 12th Street, NW
Washington, D.C. 20554

The Honorable Makan Delrahim
Assistant Attorney General, Antitrust Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Dear Chairman Pai and Assistant Attorney General Delrahim,

We're writing to express our support for, and encourage your prompt consideration of, the proposed merger of T-Mobile U.S., Inc. and Sprint Corporation. We believe this merger will foster greater competition and consumer choice in the wireless market, preserve jobs, and help ensure the U.S. remains a world leader in next-generation wireless broadband technology.

The proposed merger of T-Mobile and Sprint will allow the third and fourth largest wireless carriers in the U.S. to combine their spectrum resources to deliver a more robust wireless broadband network for consumers, drive innovation and investment, and better compete with the top two wireless providers. We believe the new company will be better positioned to deploy a nationwide 5G network and invest in a next-generation wireless broadband network to reach underserved communities and help close the digital divide.

As your agencies consider the state of competition, we urge you to recognize that the U.S. telecommunications market has changed dramatically in recent years. Intermodal competition has become a new reality as companies in the cable, satellite, wireline, and wireless industries now compete fiercely for broadband consumers. Additionally, companies in this space are reliant upon a limited amount of available spectrum. We therefore ask that you carefully examine all dimensions of competition in this market, including investment, innovation, spectrum resources, the evolving nature of the wireless industry, and the prospect of expanded broadband deployment.

We anticipate that the combination of T-Mobile and Sprint, complete with the respective resources and strengths of each, will help to preserve the jobs of workers at each company. This holds the potential new demand for workers as a result of a more broadly robust, innovative, and thriving wireless telecommunications sector.

We believe the proposed merger between T-Mobile and Sprint will transform the wireless industry, drive innovation, help close the digital divide and provide consumers with more choices at lower costs. Accordingly, we hope that the Commission and Department will give its full and fair consideration to this merger.

Sincerely,


Anna G. Eshoo
Member of Congress

Billy Long
Member of Congress

Adam Smith
Member of Congress

Doug Lamborn
Member of Congress

Gregory W. Meeks
Member of Congress

Roger W. Marshall, M.D.
Member of Congress

Suzan DelBene
Member of Congress

Dan Newhouse
Member of Congress

Anthony G. Brown
Member of Congress

Ron Estes
Member of Congress

Mike Thompson
Member of Congress

Blaine Luetkemeyer
Member of Congress

Kurt Schrader
Member of Congress

cc:     Commissioner Michael O'Rielly
        Commissioner Jessica Rosenworcel
        Commissioner Brendan Carr
        Commissioner Geoffrey Starks

# EXHIBIT 28
# TO RESPONSE



Mr. Scott Scheele
Chief, Telecommunication and Broadband Section
Anti-Trust Division, U.S. Department of Justice
450 Fifth Street NW, Suite 7000
Washington, DC 20530

September 29, 2019

Dear Mr. Scheele,

I hope you will consider comments from our small rural enterprise, Vermont Telephone Co., Inc., in support of the T-Mobile-Sprint merger.

Attached please find a copy of a letter we sent June 15, 2018, to the U.S. Senate Sub-Committee on Antitrust, Competition Policy, and Consumer Rights, regarding a 2018 public hearing. This 2018 letter mentions VTel's collaboration with T-Mobile and Sprint to accelerate deployment of our 4G LTE wireless neutral roaming network, on approximately 150 Vermont sites, in the most remote regions of one of our nation's most rural states.

Some nine months after the attached 2018 letter was sent, a T-Mobile/Sprint May 20, 2019, agreement with the FCC was made public, with T-Mobile/Sprint committing almost $40 billion for 5G US rollout. As you are no doubt aware, this includes deployment of 600 MHz wireless spectrum to reach some 90% of rural populations, and deployment of 2.5 GHz spectrum to reach some 66.7% of rural households, with speeds over 50 Meg.

If I might speak personally for a moment, it is my respectful opinion that every federal and state regulator, and legislator, from Hawaii and Alaska to Maine should be rushing to embrace this once-in-a-lifetime rural 5G build-out opportunity. At our small company, in an effort to bring the latest wireless technologies to rural Vermont, we have been working to deploy similar Ericsson 2.5 GHz radios. Early indications are that the results are dazzling, but the capital costs for smaller wireless companies like ours are extraordinarily high. For T-Mobile/Sprint to have committed to do this roll-out nationally, deploying almost $40 billion, is breathtaking, and will cause competitors large and small to simultaneously increase their rural investments.

Rural America has so much to gain from this, and so much to lose if it does not go forward.

Yours truly,

Dr. Michel Guité
Chairman and CEO



June 15, 2018

The Honorable Mike Lee
Chairman
Subcommittee on Antitrust, Competition Policy and Consumer Rights
361A Russell Senate Office Building
Washington, DC 20510

The Honorable Amy Klobuchar
Ranking Member
Subcommittee on Antitrust, Competition Policy and Consumer Rights
302 Hart Senate Office Building
Washington, DC 20510

Dear Chairman Lee & Ranking Member Klobuchar,

I understand from media reports that, on June 27, 2018, your Subcommittee will hold a hearing to explore the proposed merger of T-Mobile and Sprint. As a small wireless provider, serving a predominately rural state such as Vermont, I wanted to share VTel Wireless's views on the merger, and specifically, why we believe this proposed merger serves the interests of not only Vermonters but also all rural Americans. Accordingly, I respectfully request that you make our views part of the hearing record.

When VTel Wireless began its rural Vermont build in 2012, many warned of the risks of building a 100% 4G wireless network without having or simultaneously constructing costly, arguably obsolete, but almost ubiquitous 2G and 3G facilities. No one else had tried 100% 4G LTE. The aphorism *"fools rush in, where angels fear to tread"* was clearly afoot in Springfield, and we went forward.

We could not have completed this buildout or successfully deployed 100% 4G LTE without initiatives by T-Mobile and Sprint designed to help rural wireless companies like VTel Wireless. Sprint engineers worked with us intensely for the past two years, integrating R&D by Ericsson, Syniverse, Samsung, Apple, Sprint, and VTel Wireless, for 4G LTE data roaming. We also have agreements in place to begin network integration with T-Mobile to turn-up 100% 4G Voice over LTE roaming in the next few months.

From what I can see, most rural wireless carriers in America today, which traditionally have been dependent on 2G and 3G voice roaming revenues, are barely surviving. Some ten years ago, there were approximately 165 rural wireless independents in the United States. Today, approximately 95 remain.

The problem is that, as the largest nationwide mobile carriers have become more dominant, former rural wireless partners increasingly are seen as competitors, whose geographic areas should be overbuilt and roaming fees slashed. Thankfully, Sprint and T-Mobile have developed an opposite strategy, seeking to develop and maintain a collaborative partnership with rural independent wireless carriers.

In my view, a combined Sprint/T-Mobile would have a positive impact at the local Vermont level. With the accelerant of VTel Wireless' 100% 4G LTE network, and Sprint/T-Mobile's more urban facilities, Vermonters would enjoy faster mobile speeds and enhanced wireless service on a daily basis.

Additionally, a combined Sprint/T-Mobile would undoubtedly create a stronger, more innovative, deeply needed, powerful 4G/5G competitor in the U.S. It also would, I believe, help many or most of the remaining rural independent wireless operators like VTel Wireless to similarly become more innovative and competitive. Enabling other rural independent wireless carriers to migrate to 100% 4G LTE, while also providing a path forward to move to 5G, would seem good for everyone.

Sincerely,

Michel Guité
Chairman and CEO

Cc: The Honorable Patrick Leahy

# EXHIBIT 29
# TO RESPONSE

**VIAERO WIRELESS**

1224 West Platte Ave
Ft. Morgan, CO 80701
Main 877.484.2376
Fax 970.867.3589
www.viaero.com

September 24, 2019

Mr. Scott Scheele
Chief
Telecommunication & Broadband Section
Anti-Trust Division
US Department of Justice
450 Fifth Street NW
Suite 7000, Liberty Square Building
Washington, DC 20530

Dear Chief Scheele:

NE Colorado Cellular, Inc. d/b/a Viaero Wireless ("Viaero") appreciates the Department of
Justice in promoting a vibrant and innovative wireless industry that serves the interests of the
American people. Viaero operates in Colorado, Nebraska, Kansas, South Dakota and Wyoming,
working tirelessly to bring mobile broadband service to un-served, underserved and rural
communities.

As you may know, when T-Mobile's customers leave the T-Mobile service area, they often roam
on Viaero's network in our service area. Likewise, many of our customers depend on T-
Mobile's network when they travel outside of our service area to access mobile voice and
broadband services. For nearly 20 years, T-Mobile has been our roaming partner, we have found
them to always be reasonable and fair to deal with.

The merger of T-Mobile and Sprint will directly benefit consumers and rural carriers like
Viaero.[1]

Accordingly, Viaero supports the merger of T-Mobile and Sprint.

Respectfully submitted,

NE Colorado Cellular, Inc.

FD/tjb

---

[1] **See, Comments of NE Colorado Cellular, Inc., d/b/a Viaero Wireless, WT Docket No. 18-197 (Aug. 23,
2018), available at:**
https://ecfsapi.fcc.gov/file/10823765702540/Viaero%20Comments%20Supporting%20TMobile%20signed%208.23.
2018.pdf

