# EXHIBIT B

## Part 2

## APPENDIX A

### List of Applications

**SECTION 310(d) APPLICATIONS**

*Parts 22, 24, 27, 30, 87, 90, and 101 – Wireless Radio Services*

Applications for consent to the transfer of control of licenses held by subsidiaries of Sprint from Sprint to T-Mobile:

| **File No.** | **Licensee** | **Lead Call Sign** |
|---|---|---|
| 0008224209[1] | Sprint Spectrum Realty Company, LLC | KNLF200 |
| 0008235840 | American Telecasting Development, LLC | B002 |
| 0008235852 | American Telecasting of Anchorage, LLC | WMX713 |
| 0008235851 | American Telecasting of Columbus, LLC | B095 |
| 0008235858 | American Telecasting of Ft. Collins, LLC | B149 |
| 0008235667 | American Telecasting of Green Bay, LLC | B018 |
| 0008235679 | American Telecasting of Lansing, LLC | B241 |
| 0008235685 | American Telecasting of Lincoln, LLC | B256 |
| 0008235694 | American Telecasting of Medford, LLC | B288 |
| 0008235698 | American Telecasting of Michiana, LLC | B126 |
| 0008235705 | American Telecasting of Monterey, LLC | B397 |
| 0008235708 | American Telecasting of Redding, LLC | B371 |
| 0008235723 | American Telecasting of Yuba City, LLC | B485 |
| 0008236000 | Clearwire Hawaii Partners Spectrum, LLC | B192 |
| 0008235280 | Clearwire Spectrum Holdings II LLC | B085 |
| 0008235060 | Clearwire Spectrum Holdings III, LLC | B020 |
| 0008236496 | Clearwire Spectrum Holdings LLC | B266 |
| 0008236687 | Fixed Wireless Holdings, LLC | B014 |
| 0008235294 | Nextel West Corp. | KNAN853 |
| 0008234511 | NSAC, LLC | B004 |
| 0008236561 | PCTV Gold II, LLC | B011 |
| 0008236568 | Sprint (Bay Area), LLC | WHT700 |
| 0008236543 | Sprint PR Spectrum LLC | KNLH423 |
| 0008236514 | Sprint Puerto Rico Holdings LLC | WQYU424 |
| 0008236415 | Sprint Spectrum License Holder LLC | WLK242 |
| 0008235383 | Sprint Spectrum, L.P. | KNLF208 |
| 0008236216 | SprintCom, Inc. | B075 |
| 0008236163 | TDI Acquisition Sub, LLC | WMI303 |
| 0008236117 | WBSY Licensing, LLC | B228 |
| 0008235860 | APC Realty and Equipment Company, LLC | WPSH342 |
| 0008235866 | Nextel Communications of the Mid-Atlantic, Inc. | WPSG221 |
| 0008235873 | Nextel of New York, Inc. | WPUJ847 |
| 0008235874 | Nextel of Puerto Rico, Inc. | WPRQ760 |
| 0008235879 | Nextel South Corp. | WPEF425 |
| 0008235890 | PRWireless PR, LLC | WPNN780 |
| 0008235895 | Sprint Administrative Services Group | WPPD279 |
| 0008235898 | Sprint Communications Company, LP | 794SE |
| 0008235903 | Sprint Communications, Inc. | WOJ40 |

---

[1] This application is the lead application for the wireless radio services.

| File No. | Licensee | Lead Call Sign |
|---|---|---|
| 0008235919 | Sprint Spectrum License Holder II LLC | KNLH500 |
| 0008235946 | Sprint Spectrum License Holder III LLC | WPVC984 |
| 0008235388 | Sprint Telephony PCS, LLC | WPON274 |
| 0008831419 | WCOF, LLC | B152 |
| 0008831426 | People's Choice TV of St. Louis, LLC | B066 |

Applications for consent to the *pro forma* transfer of control of licenses held by subsidiaries of T-Mobile:

| File No. | Licensee | Lead Call Sign |
|---|---|---|
| 0008245816 | T-Mobile Puerto Rico LLC | KNLF249 |
| 0008243638 | SunCom Wireless License Company, LLC | KNKN557 |
| 0008243417 | Powertel Memphis Licenses, Inc. | KNLF255 |
| 0008253402 | T-Mobile License LLC | KNLF202 |
| 0008243390 | Iowa Wireless Services Holding Corporation | KNLG769 |

### *Parts 27, 30, and 90 – Wireless Radio Services Spectrum Leasing Arrangements*

Applications for consent to the transfer of control of spectrum leasing arrangements pursuant to which subsidiaries of Sprint are the spectrum lessee from Sprint to T-Mobile:

| File No. | Lessee/Sublessee | Lead Lease ID |
|---|---|---|
| 0008234826 | American Telecasting of Denver, LLC | L000002648 |
| 0008235055 | American Telecasting of Fort Myers, LLC | L000002337 |
| 0008235066 | American Telecasting of Little Rock, LLC | L000000199 |
| 0008235084 | American Telecasting of Louisville, LLC | L000000262 |
| 0008235095 | American Telecasting of Santa Barbara, LLC | L000003594 |
| 0008235605 | American Telecasting of Sheridan, LLC | L000002493 |
| 0008235608 | Fresno MMDS Associates, LLC | L000000485 |
| 0008235643 | Kennewick Licensing, LLC | L000005239 |
| 0008235647 | PCTV Sub, LLC | L000003929 |
| 0008235661 | People's Choice TV of Houston, LLC | L000001677 |
| 0008235682 | People's Choice TV of St. Louis, LLC | L000002312 |
| 0008235699 | SpeedChoice of Phoenix, LLC | L000001990 |
| 0008235710 | Transworld Telecom II, LLC | L000003931 |
| 0008235724 | WBS of America, LLC | L000004063 |
| 0008235733 | WBS of Sacramento, LLC | L000003003 |
| 0008235774 | Wireless Broadband Services of America, LLC | L000001595 |
| 0008235800 | SpeedChoice of Detroit, LLC | L000001759 |
| 0008235828 | Alda Wireless Holdings, LLC | L000022687 |
| 0008235836 | American Telecasting Development, LLC | L000000259 |
| 0008235854 | American Telecasting of Anchorage, LLC | L000002488 |
| 0008235819 | American Telecasting of Columbus, LLC | L000001638 |
| 0008235831 | American Telecasting of Ft. Collins, LLC | L000002549 |
| 0008235675 | American Telecasting of Green Bay, LLC | L000002048 |
| 0008235683 | American Telecasting of Lansing, LLC | L000002690 |
| 0008235690 | American Telecasting of Lincoln, LLC | L000002703 |
| 0008235696 | American Telecasting of Medford, LLC | L000002516 |
| 0008235701 | American Telecasting of Michiana, LLC | L000001625 |
| 0008235706 | American Telecasting of Monterey, LLC | L000000225 |

**Federal Communications Commission**                                    **FCC 19-103**

| File No. | Lessee/Sublessee | Lead Lease ID |
|---|---|---|
| 0008235711 | American Telecasting of Redding, LLC | L000002487 |
| 0008235718 | American Telecasting of Seattle, LLC | L000003953 |
| 0008266885 | American Telecasting of Seattle, LLC | L000031135 |
| 0008235726 | American Telecasting of Yuba City, LLC | L000010348 |
| 0008235732 | ATI Sub, LLC | L000003928 |
| 0008235737 | Broadcast Cable, LLC | L000002011 |
| 0008236390 | Clearwire Hawaii Partners Spectrum, LLC | L000001566 |
| 0008235279 | Clearwire Spectrum Holdings II LLC | L000000886 |
| 0008235203 | Clearwire Spectrum Holdings III, LLC | L000005241 |
| 0008235205 | Clearwire Spectrum Holdings III, LLC | L000039732 |
| 0008236558 | Clearwire Spectrum Holdings LLC | L000000253 |
| 0008266905 | Clearwire Spectrum Holdings LLC | L000000945 |
| 0008236715 | Fixed Wireless Holdings, LLC | L000000159 |
| 0008266899 | Fixed Wireless Holdings, LLC | L000001180 |
| 0008235293 | Nextel West Corp. | L000026606 |
| 0008234513 | NSAC, LLC | L000000168 |
| 0008236564 | PCTV Gold II, LLC | L000001637 |
| 0008236559 | Sprint (Bay Area), LLC | L000000341 |
| 0008236524 | Sprint PR Spectrum LLC | L000023619 |
| 0008236502 | Sprint Puerto Rico Holdings LLC | L000023616 |
| 0008236405 | Sprint Spectrum License Holder LLC | L000020418 |
| 0008235384 | Sprint Spectrum, L.P. | L000013987 |
| 0008236182 | SprintCom, Inc. | L000017748 |
| 0008236156 | TDI Acquisition Sub, LLC | L000003926 |
| 0008236108 | WBSY Licensing, LLC | L000003476 |
| 6042EDSL18[2] | Clearwire Spectrum Holdings II LLC | L000003688 |
| 6043EDSL18[3] | Clearwire Spectrum Holdings III, LLC | L000008676 |
| 6046EDSL18[4] | NSAC, LLC | L000006063 |
| 6045EDSL18[5] | SpeedChoice of Detroit, LLC | L000001836 |
| 6044EDSL18[6] | Sprint PR Spectrum LLC | L000009842 |

Applications for consent to the *pro forma* transfer of control of spectrum leasing arrangements pursuant to which subsidiaries of T-Mobile are the lessee:

| File No. | Lessee/Sublessee | Lead Lease ID |
|---|---|---|
| 0008253328 | T-Mobile License LLC | L000017243 |
| 0008245179 | Iowa Wireless Services Holding Corporation | L000001109 |

[2] This application is a manual filing, and can be located as an attachment to the ULS licensing record for lease identifier L000003688.

[3] This application is a manual filing, and can be located as an attachment to the ULS licensing record for lease identifier L000008676.

[4] This application is a manual filing, and can be located as an attachment to the ULS licensing record for lease identifier L000006063.

[5] This application is a manual filing, and can be located as an attachment to the ULS licensing record for lease identifier L000001836.

[6] This application is a manual filing, and can be located as an attachment to the ULS licensing record for lease identifier L000009842.

| File No. | Lessee/Sublessee | Lead Lease ID |
|---|---|---|
| 0008253834 | Iowa Wireless Services Holding Corporation | L000020146 |

### Part 25 – Earth Station Licenses

Applications for consent to the transfer of control of licenses held by subsidiaries of Sprint from Sprint to T-Mobile:

| File No. | Licensee | Lead Call Sign |
|---|---|---|
| SES-T/C-20180618-01523 | Nextel Communications of the Mid-Atlantic, Inc. | E040169 |
| SES-T/C-20180618-01532 | Sprint Communications Company, LP | E6241 |

### Part 78 – Cable Television Relay Service (CARS)

Applications for consent to the transfer of control of licenses held by subsidiaries of Sprint from Sprint to T-Mobile:

| File No. | Licensee | Call Sign |
|---|---|---|
| CAR-20180621AA-09 | Fixed Wireless Holdings, LLC | WLY-681 |
| CAR-20180621AB-09 | Fixed Wireless Holdings, LLC | WLY-803 |
| CAR-20180622AB-09 | NSAC, LLC | WLY-928 |
| CAR-20180622AC-09 | NSAC, LLC | WLY-929 |
| CAR-20180627AA-09 | NSAC, LLC | WLY-930 |
| CAR-20180627AB-09 | NSAC, LLC | WLY-931 |

### Part 5 – Experimental Radio Station Authorizations

Applications for consent to the *pro forma* transfer of control of licenses held by subsidiaries of T-Mobile:

| File No. | Licensee | Lead Call Sign |
|---|---|---|
| 0031-EX-TU-2018 | T-Mobile License LLC | WI2XHR |
| 3032-EX-TU-2019 | T-Mobile License LLC | WK2XAE |

## INTERNATIONAL SECTION 214 AUTHORIZATIONS

Applications for consent to the transfer of control of international section 214 authorizations held by subsidiaries of Sprint from Sprint to T-Mobile:

| File No. | Authorization Holder | Lead Authorization Number |
|---|---|---|
| ITC-T/C-20180618-00118 | Sprint Communications Co., LP | ITC-214-19960117-00018 |
| ITC-T/C-20180618-00119 | SprintCom, Inc. | ITC-214-19991110-00692 |
| ITC-T/C-20180618-00120 | Sprint Communications, Inc. | ITC-214-19970723-00428 |
| ITC-T/C-20180618-00121 | Sprint Spectrum, L.P. | ITC-214-1991203-00766 |
| ITC-T/C-20180618-00122 | PRWireless PR, LLC | ITC-214-19990615-00426 |
| ITC-T/C-20180618-00123 | US Telecom, Inc. | ITC-214-19851107-00004 |
| ITC-T/C-20180618-00124 | Virgin Mobile USA, L.P. | ITC-MOD-20151207-00294 |

Applications for consent to the *pro forma* transfer of control of international section 214 authorizations held by subsidiaries of T-Mobile:

| **File No.** | **Authorization Holder** | **Lead Authorization Number** |
|---|---|---|
| ITC-T/C-20180618-00100 | T-Mobile USA, Inc. | ITC-214-19960930-00473 |
| ITC-T/C-20180618-00101 | T-Mobile Puerto Rico LLC | ITC-214-20070626-00246 |
| ITC-T/C-20180618-00102 | Iowa Wireless Services LLC | ITC-214-20020513-00251 |

**SUBMARINE CABLE LANDING LICENSES**

Application for consent to the transfer of control of interests in international cable landing licenses held by the subsidiary of Sprint listed below from Sprint to T-Mobile:

| **File No.** | **Interest Holder** | **Lead Authorization Number** |
|---|---|---|
| SCL-T/C-20180618-00015 | Sprint Communications Co., LP | SCL-LIC-19920201-00010 |

**DOMESTIC SECTION 214 AUTHORIZATION**

Sprint and T-Mobile Joint Application for Consent to Transfer Control of International and Domestic Authority Pursuant to section 214 of the Communications Act of 1934, as Amended, filed in WT Docket No. 18-197.

## APPENDIX B

### Petitioners and Commenters

#### Petitions To Deny Filed on or Before August 27, 2018

Alexander Yusupov Petition To Deny (filed August 27, 2018) (Yusupov Petition)

Altice USA. Inc. (Altice) Petition To Condition or Deny (filed Aug. 27, 2018) (Altice Petition)

Atif Khan Petition To Deny and Comments (filed August 23, 2018) (Atif Khan Petition)

The American Antitrust Institute Petition To Deny (filed Aug. 27, 2018) (American Antitrust Institute Petition)

Broadcast Data Corp. Petition To Deny (filed Aug. 27, 2018) (Broadcast Data Corp. Petition)

CarrierX d/b/a freeconferencecall.com (Free Conferencing) Petition To Deny (filed Aug. 27, 2018) (Free Conferencing Petition)

Cellular South d/b/a C Spire Petition To Condition, or in the Alternative, Deny Any Grant of the Sprint/T-Mobile Application (filed Aug. 27, 2018) (C Spire Petition)

Common Cause, Consumers Union, New America's Open Technology Institute, Public Knowledge, and Writers Guild of America, West, Inc., Petition To Deny (filed Aug. 27, 2018) (Common Cause et al. Petition)

Console Enterprises Petition To Deny (filed Aug. 27, 2018) (Console Enterprises Petition)

DISH Network Corporation Petition To Deny (filed Aug. 27, 2018) (DISH Petition)

Free Press Petition To Deny (filed Aug. 27, 2018) (Free Press Petition)

The Greenlining Institute Petition To Deny (filed Aug. 27, 2018) (Greenlining Petition)

Iowa Network Services, Inc. d/b/a Aureon Network Services (Aureon) Petition To Deny, or in the Alternative, Request To Condition Approval of Applications To Transfer Control of Licenses and Authorizations (filed Aug. 27, 2018) (Aureon Petition)

Liberty Cablevision of Puerto Rico LLC (Liberty Cablevision) Petition To Deny (filed Aug. 27, 2018) (Liberty Cablevision Petition)

NTCA—The Rural Broadband Association (NTCA) Petition To Deny (filed Aug. 27, 2018) (NTCA Petition)

Rural South Carolina Operators (Rural Operators) Petition To Condition or Deny the Transfer of Control of Licenses and Authorizations (filed Aug. 27, 2018) (Rural Operators Petition)

Rural Wireless Association, Inc. (RWA) Petition To Deny (filed Aug. 27, 2018) (RWA Petition)

Stanley D. Besecker Conditional Petition To Deny (filed Aug. 27, 2018) (Stanley Besecker Petition)

Union Telephone Company, Cellular Network Partnership, an Oklahoma Limited Partnership, Nex-Tech Wireless, L.L.C., SI Wireless, LLC (Union Telephone Company et al.), Petition To Deny (filed Aug. 27, 2018) (Union Telephone Petition)

Voqal Petition To Deny the Above-Captioned Applications as Currently Proposed (filed Aug. 27, 2018) (Voqal Petition).

#### Comments Filed on or Before August 27, 2018

Alex C. Ingram Comments (filed July 20, 2018) (Alex C. Ingram Comments)

Andrea Rice (Member, Missouri Farm Bureau) Comments (filed Aug. 27, 2018) (Andrea Rice Comments)

Americans for Tax Reform and Digital Liberty Comments (filed Aug. 27, 2018) (Americans for Tax Reform Comments)

AT&T Services, Inc. (AT&T) Comments (filed Aug. 27, 2018) (AT&T Comments)

California Public Utilities Commission (CPUC) Comments (filed Aug. 27, 2018) (CPUC Comments)

Charter Communications, Inc. (Charter) Comments (filed Aug. 27, 2018) (Charter Comments)

Christian Sorgi Comments (filed Aug. 27, 2018) (Christian Sorgi Comments)

Christopher Price Comments (filed Aug. 27, 2018) (Christopher Price Comments)

Communications Workers of America (CWA) Comments (filed Aug. 27, 2018) (CWA Comments)

Consumer Policy Solutions (CPS) Comments (filed Aug. 27, 2018) (CPS Comments)
Digital Policy Institute (DPI) Comments (filed Aug. 27, 2018) (DPI Comments)
Free Press Member Comments (filed Aug. 27, 2018) (Free Press Member Comments)
Free State Foundation Comments (filed Aug. 27, 2018) (Free State Foundation Comments)
Frontier Communications Corporation (Frontier) and Windstream Services, LLC (Windstream),
      Comments (filed Aug. 27, 2018) (Frontier/Windstream Comments)
Kim Keenan Comments (filed Aug. 27, 2018) (Kim Keenan Comments)
Kingsley Ross Comments (filed Aug. 27, 2018) (Kingsley Ross Comments)
Maneesh Pengasa Comments (filed July 30, 2018) (Pengasa July 2018 Coments)
NE Colorado Cellular, Inc., d/b/a Viaero Wireless (Viaero) Comments (filed Aug. 23, 2018) (Viaero
      Comments)
Steven Fletcher Comments (filed Aug. 1, 2018) (Steven Fletcher Comments)
Tucows Comments (filed Aug. 27, 2018) (Tucows Comments)

**Comments in Opposition to the Petitions To Deny Filed September 17, 2018**

Letter from Colleen Boothby, counsel to the Ad Hoc Telecom Users Committee, to Marlene H. Dortch,
      Secretary, FCC, WT Docket No. 18-197 (filed Sept. 17, 2018) (Ad Hoc Opposition)
Information Technology and Innovation Foundation (ITIF) Opposition to Petitions To Deny (filed Sept.
      17, 2018) (ITIF Opposition)
International Center for Law and Economics (ICLE) Comments in Opposition to Petitions to Deny (filed
      Sept. 17, 2018) (ICLE Opposition)
Free State Foundation Reply Comments (filed Sept. 17, 2018) (Free State Foundation Reply)
NENA, the National Emergency Number Association (filed September 17, 2018) (NENA Comments)
TechFreedom Comments (filed Sept. 17, 2018) (TechFreedom Opposition)

**Reply Comments Filed on or Before October 31, 2018**

Altice USA, Inc., Reply (filed Oct. 31, 2018) (Altice Reply)
American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) Comments in
      Opposition to the Merger (filed Oct. 31, 2018) (AFL-CIO Reply)
CarrierX Reply in Support of Petition To Deny (filed Oct. 31, 2018) (Free Conferencing Reply)
Cellular South d/b/a C Spire Reply (filed Oct. 31, 2018) (C Spire Reply)
Citizens Against Government Waste Reply Comments (filed Sept. 17, 2018) (CAGW Reply)
Communications Workers of America Reply Comments (filed Oct. 31, 2018) (CWA Reply)
DISH Network Corporation Reply (filed Oct. 31, 2018) (DISH Reply)
Enterprise Wireless Alliance Reply Comments (filed Oct. 31, 2018) (EWA Reply)
Free Press Reply to Opposition (filed Oct. 31, 2018) (Free Press Reply)
Free State Foundation Reply Comments (filed Sept. 17, 2018) (Free State Reply)
Huawei Technologies Co., Ltd., and Huawei Technologies USA, Inc., Reply Comments (filed
Sept. 18, 2018) (Huawei Reply)
Liberty Cablevision of Puerto Rico LLC Reply to Opposition of T-Mobile US, Inc. and Sprint
      Corporation to Petition To Deny (filed Oct. 31, 2018) (Liberty Cablevision Reply)
National EBS Association (NEBSA) and Catholic Technology Network (CTN) Joint Reply Comments
      (filed Oct. 31, 2018) (NEBSA/CTN Reply)
New America's Open Technology Institute (OTI) Reply Comments (filed Oct. 31, 2018) (OTI Reply)
NTCA—The Rural Broadband Association Reply to Opposition (filed Oct. 31, 2018) (NTCA Reply)
Public Knowledge, Open Markets Institute, Writers Guild of America, West, Inc., Common Cause, and
      Consumers Union Reply (filed Oct. 31, 2018) (Public Knowledge Reply)
Rural Wireless Association, Inc., Reply to Opposition (filed Oct. 31, 2018) (RWA Reply)
Spotlight Media Corporation and Buffalo-Lake Erie Wireless Systems Co., LLC d/b/a Blue Wireless
      Reply (filed Oct. 31, 2018) (Blue Wireless Reply)
Union Telephone Company, Cellular Network Partnership, an Oklahoma Limited Partnership, Nex-Tech

Wireless, L.L.C., SI Wireless, LLC (Union Telephone Company et al.), Reply to Opposition to Petition To Deny (filed Oct. 31, 2018) (Union Telephone Reply)
Voqal Reply to Joint Opposition of T-Mobile US, Inc. and Sprint Corporation (filed Oct. 31, 2018) (Voqal Reply)

**Comments on New Econometric Study filed December 4, 2018**

Communications Workers of America Comments on Applicants' New Econometric Study (filed Dec. 4, 2018) (CWA Dec. 4 Comments)
DISH Network Corporation Comments in Response to Public Notice Regarding Cornerstone Report (filed Dec. 4, 2018) (DISH Dec. 4 Comments)
OpenMedia Comments in Opposition to the Merger of T-Mobile US, Inc. and Sprint Corp. (filed Dec. 4, 2018) (OpenMedia Dec. 4 Comments)

**Comments on New Network and Fixed Wireless Broadband Services filed March 28, 2019**

Communications Workers of America Comments on Applicants' Revised Network Combination Plan and Economic Analysis and "New T-Mobile In-Home Internet" (filed Mar. 28, 2019) (CWA Mar. 28 Comments)
DISH Network Corporation Comments in Response in Response to Public Notice (filed Mar. 28, 2019) (DISH Mar. 28, 2019 Comments)
Liberty Cablevision of Puerto Rico LLC Supplemental Comments in Support of Petition To Deny (filed Mar. 28, 2019) (Liberty Cablevision Mar. 28, 2019 Comments)
Rural Wireless Association, Inc., Supplemental Comments (filed Mar. 28, 2019) (RWA March 28, 2019 Comments)

**Comments Filed on Other Dates**

Gene Retske Comments (filed Aug. 28, 2018) (Gene Retske Comments)
Ultra Mobile and Mint Mobile Comments (filed Aug. 28, 2018) (Ultra Mobile/Mint Mobile Comments)
Cell Nation, Inc. (Cell Nation) Comments (filed Aug. 29, 2018) (Cell Nation Comments)
Crown Castle International Corp. (Crown Castle) Comments (filed Aug. 29, 2018) (Crown Castle Comments)
Tillman Infrastructure Comments (filed Aug. 29, 2018) (Tillman Infrastructure Comments)
Consumer Action for a Strong Economy (CASE) Comments (filed Aug. 30, 2018) (CASE Comments)
Honorable J. Kenneth Blackwell Comments (filed Aug. 30, 2018) (Blackwell Comments)
Prepaid Wireless Group (PWG) Comments (filed Aug. 30, 2018) (PWG Comments)
Assila LLC (Assila) Comments (filed Aug. 31, 2018) (Assila Comments)
Digital Bridge Holdings, LLC (Digital Bridge) and Vertical Bridge Holdings LLC (Vertical Bridge) Joint Comments (filed Aug. 31, 2018) (Digital Bridge/Vertical Bridge Joint Comments)
National Hispanic Council on Aging (NHCOA) Comments (filed Sept. 6, 2018) (NHCOA Comments)
National Puerto Rican Chamber of Commerce (NPRCC) Comments (filed Sept. 10, 2018) (NPRCC Comments)
Center for Individual Freedom Comments (filed Sept. 13, 2018) (Center for Individual Freedom Comments)
Operation Military Family Cares (OMF Cares) Comments (filed Sept. 13, 2018) (OMF Cares Comments)
TracFone Wireless, Inc. (TracFone) Comments (filed Sept. 13, 2018) (TracFone Comments)
Consumers' Research Comments (filed Sept. 17, 2018) (Consumers' Research Comments)
Advanced Communications Law & Policy Institute (ACLP) Comments (filed Sept. 17, 2018) (ACLP Comments)
Latino Coalition Comments (filed Sept. 17, 2018) (Latino Coalition Comments)
Shenandoah Telecommunications, Inc. (Shentel) Comments (filed Sept. 17, 2018) (Shentel Comments)
Will Rinehart Comments (filed Sept. 17, 2018) (Will Rinehart Comments)

Hispanic Heritage Foundation Comments (filed Sept. 18, 2018) (Hispanic Heritage Foundation
      Comments)
Hispanic Information and Telecommunications Network, Inc. (HITN) Comments (filed Oct. 25, 2018)
      (HITN Comments)
Media Alliance Comments (filed Dec. 3, 2018) (Media Alliance Comments)
Mayor John Cheminiak (Bellevue, Washington) Comments (filed Dec. 4, 2018) (Cheminiak Comments)
Saint Paul Regional Labor Federation Comments (filed Dec. 13, 2018) (Saint Paul RLF Comments)
Minnesota AFL-CIO Comments (filed Jan. 2, 2019) (Minnesota AFL-CIO Comments)
Howard Media Group Comments (filed Jan. 9, 2019) (Howard Media Comments)
Smith Bagley, Inc. d/b/a Cellular One of North East Arizona Comments (filed Feb. 20, 2019) (Smith
      Bagley Comments)
Northwest Broadcasting Comments (filed March 13, 2019) (Northwest Broadcasting Comments)
Pennsylvania State Legislative Delegation Comments (filed March 14, 2019) (Pennsylvania Legislature
      Comments)
Governor Laura Kelly (Kansas) Comments (filed March 15, 2019) (Kelly Comments)
Tennessee Chamber of Commerce & Industry Comments (filed April 17, 2019) (Tennessee Chamber
      Comments)
Tennessee State Legislative Delegation Comments (filed March 25, 2019) (Tennessee Legislature
      Comments)
Mayor Sylvester James, Jr. (Kansas City, Missouri) Comments (filed April 18, 2019) (James Comments)
Maneesh Pangasa Comments (filed May 13, 2019) (Pangasa May 2019 Comments)
Atom Tickets Comments (filed May 16, 2019) (Atom Tickets Comments)
Mayor Ken McClure (Springfield, Missouri) Comments (filed May 28, 2019) (McClure Comments)

**Filers of *Ex Parte* Submissions and Letters**

4C Competition Coalition
AFL-CIO, Blue Wireless, Common Cause, Consumer Reports, CWA-Union, Demand Progress Education
      Fund, DISH Network, Fight For The Future, The Greenlining Institute, Institute for Local Self-
      Reliance, INCOMPAS, Mobile Beacon, New America's Open Technology Institute, Next
      Century Cities, North American Catholic Educational Programming Foundation, NTCA-The
      Rural Broadband Association, Open Markets Institute, Pine Belt Cellular, Public Knowledge,
      Rural Wireless Association, Telsasoft, United Wireless Communications, Wireless Internet
      Service Providers Association, and Writers Guild of America West
Dr. Allen Pratt, Executive Director, National Rural Education Association
Altice USA, Inc.
AT&T Services, Inc.
Barry J. Hobbins
Betsy E. Huber, President, National Grange
Brian Brady, Founder and Chief Executive, Northwest Broadcasting
Brien J. Sheahan, Chairman and CEO, Illinois Commerce Commission
California Emerging Technology Fund
Carlo A. Scissura, President and Chief Executive, New York Building Congress
CarrierX, LLC
Cellular South, Inc. d/b/a C Spire
Charter Communications, Inc.
Christopher Rosario, Representative, Connecticut State House of Representatives
Comcast Corporation and Charter Communications, Inc.
Communications Workers of America
Communications Workers of America, Public Knowledge, and CTC Technology and Energy
Communications Workers of America, Public Knowledge, New America's Open Technology Institute,
      Consumer Reports, and Free Press
Communications Workers of America, Public Knowledge, NTCA—The Rural Broadband Association,

Free Press, Common Cause, and Open Technology Institute
CWA District 2-13
DISH Network Corporation
Ericsson
Eric Steinmann, Development Manager, NTCH, and Thomas Wise, President, Wise Electronics
Free Press
Herring Networks, Inc., dba One America News Network and AWE
ION Media Networks
Jeff Colyer, Governor, Nebraska
Kyle Davis, Government Relations and Public Policy Specialist, Greater Binghamton Chamber of
        Commerce
Legacy Equity Advisors
Mach FM Corp.
Maine Office of the Public Advocate
Michael G. Francis, Commissioner, District 4–Louisiana Public Service Commission
Michele N. Siererka, President and Chief Executive, New Jersey Business and Industry Association
Michelle Merriweather, President and Chief Executive, Urban League of Metropolitan Seattle
National EBS Association and Catholic Technology Network
National Hispanic Media Coalition
Navajo Nation
New America's Open Technology Institute
New America's Open Technology Institute and Free Press
Nokia
North American Catholic Educational Programming Foundation, Inc., and Mobile Beacon
NTCH, Inc. and Wise Electronics, Inc.
PCs for People
Pennsylvania Retailers' Association
Peter Adderton
Public Knowledge, Free Press, New America's Open Technology Institute, Consumer Reports, Open
        Markets Institute, Common Cause, and Writers Guild of America, West
Puerto Rico Telecommunications Bureau
Richard Blumenthal, Senator, United States Senate, et al.
Rich Young (Sprint Corporation employee)
Ronald Duncan, Chief Executive, GCI
Rural Wireless Association, Inc.
Sean D. Reyes, Attorney General, Utah, and Hector Balderas, Attorney General, New Mexico
Softbank Group Corp.
Softbank Group Corp. and T-Mobile US, Inc.
Sprint Corporation
Tech Knowledge
T-Mobile US, Inc.
T-Mobile US, Inc. and Sprint Corporation
Tony Vargas, Senator, Nebraska State Legislature
TracFone Wireless, Inc.
Union Telephone Company and Cellular Network Partnership
United States Cellular Corporation
Urban One, Inc.
Verizon
Vermont Telephone Co., Inc. and VTel Wireless, Inc.
Voqal
Voqal, North American Catholic Educational Programming Foundation, Inc., and Mobile Beacon
Wireless Infrastructure Association
Wireless Internet Service Providers Association

# APPENDIX C





Federal Communications Commission                    FCC 19-103

APPENDIX E

CMAs that Trigger Enhanced Factor Review

| CMA Number | CMA Name | 2010 Population | 2010 Population Density (POPS/square mile) |
|---|---|---|---|
| 91 | San Juan-Caguas, PR | 2,138,876 | 1,964 |
| 117 | Colorado Springs, CO | 645,613 | 240 |
| 147 | Ponce, PR | 243,147 | 1,152 |
| 169 | Mayaguez, PR | 222,035 | 874 |
| 202 | Arecibo, PR | 199,471 | 842 |
| 204 | Aguadilla, PR | 188,648 | 1,091 |
| 298 | Bismarck, ND | 108,779 | 31 |
| 392 | Idaho 5 - Butte | 188,681 | 14 |
| 527 | Montana 5 - Mineral | 227,235 | 17 |
| 579 | North Carolina 15 - Cabarrus | 577,701 | 274 |
| 584 | North Dakota 5 - Kidder | 43,140 | 4 |
| 586 | Ohio 2 - Sandusky | 254,394 | 149 |
| 629 | South Carolina 5 - Georgetown | 362,511 | 148 |
| 670 | Texas 19 - Atascosa | 251,889 | 19 |
| 720 | Wyoming 3 - Lincoln | 170,579 | 4 |
| 723 | Puerto Rico 1 - Rincon | 15,200 | 1,086 |
| 724 | Puerto Rico 2 - Adjuntas | 267,174 | 469 |
| 725 | Puerto Rico 3 - Ciales | 124,606 | 381 |
| 726 | Puerto Rico 4 - Aibonito | 275,162 | 673 |
| 727 | Puerto Rico 5 - Ceiba | 40,351 | 498 |
| 728 | Puerto Rico 6 - Vieques | 9,301 | 182 |
| 729 | Puerto Rico 7 - Culebra | 1,818 | 152 |

Federal Communications Commission                         FCC 19-103

# APPENDIX F

## Technical Appendix

1.      This Appendix contains a summary of the Commission's engineering staff's analysis of the technical information that was submitted by the Applicants to support their claimed efficiencies in connection with the proposed combination of the T-Mobile and Sprint networks.

2.      The proposed transaction would combine the terrestrial access networks and spectrum holdings of standalone T-Mobile and standalone Sprint, which the Applicants claim would substantially increase the combined entity's overall network capacity, improve user experience and decrease marginal network capacity costs.  As explained below, we find that the proposed transaction likely will generate significant benefits in several areas that will facilitate the combined company's deployment of its 5G network.  The projected nationwide 5G offered traffic of New T-Mobile will substantially exceed the combined traffic of standalone Sprint and T-Mobile in a range of between **[BEGIN HIGHLY CONF. INFO.]**                      **[END HIGHLY CONF. INFO.].** Furthermore, the Applicants will be able to leverage their complementary spectrum holdings to achieve a depth and quality of 5G coverage that would be infeasible for either company to achieve on a standalone basis.  This will be important not only for densely populated areas, but also for more rural areas.  The combined company will also benefit from significant economies of scale as compared to the standalone entities.

3.      We note, however, that predicting future network performance is a complicated and sometimes imprecise exercise.  In some cases, we identified questions about the inputs and outputs provided by the Applicants that create uncertainty for long-term predictions.  In particular, we credit significant network marginal cost savings, but evaluate two downward variations on the Applicants' predictions for purposes of conducting an assessment verifiably robust to reasonable variation of uncertain inputs.  Moreover, staff review of predicted coverage claims is approximate, not precise, and our internal analysis found in some cases greater and in some cases lesser covered population than the Applicants' predictions.  The Applicants' network build commitments, discussed in the body of this MO&O, satisfy us that the committed network performance metrics reflect verifiable network benefits of the proposed transaction.

4.      This Appendix first defines and explains the terminology used in section A-I.  Section A-II describes the Network Build Model submitted by the Applicants.  Section A-III addresses the network complementarities from combining the T-Mobile and Sprint networks.  Section A-IV addresses capacity benefits, including the proposed in-home broadband service.  Section A-V analyzes the Network Build Model submitted by the Applicants to translate network performance and capacity into a set of incremental network solutions, and evaluates additional factors that may have warranted consideration in the Applicants' models.  Section A-V also analyzes the Financial Backend model, which converts the output of the Network Build Model into per-subscriber marginal costs for use in the economic modeling of the transaction.  Finally, in section A-VI, this Appendix discusses the results of engineering staff's coverage analysis for the Applicants' predicted tower site and spectrum deployment submissions.

## I.      TERMINOLOGY

5.      *Spectrum* is the set of radio wave frequencies used by an operator to provide communications services to its subscribers.[1]  It is measured in Hertz (Hz) which represents the number of wave cycles that will pass a point in one second.[2]  Since radio waves travel at the speed of light, the wave

---

[1] Newton's Telecom Dictionary 1187 (31st ed. 2018) (Spectrum is defined as "[a] continuous range of frequencies, usually wide in extent within which waves have some specific common characteristics.").

[2] Weisman, C.J. (2002). *The essential guide to RF and wireless*. Pearson Education, at 9 (Weisman (2002)) ("The number of times a signal goes through a complete up and down cycle (from point A to point E) in one second is the signal's *frequency* (measured in Hertz and abbreviated Hz).").

length is easily calculated from the wave's frequency. When referring to radio spectrum used for mobile broadband services, frequency is typically measured in kilohertz (1000 Hertz), megahertz (MHz) (1 million Hertz), or gigahertz (GHz) (1 billion Hertz). Note that these units can refer to either the frequency of a radio wave, or the bandwidth between two frequencies. For example, there is five megahertz of bandwidth between the radio frequency 1930 MHz (1.93 GHz) and 1935 MHz (1.935 GHz). Spectrum used by mobile providers is typically licensed; however, technologies that use unlicensed spectrum, such as Wi-Fi and Licensed Assisted Access (LAA),[3] can also complement and be used to relieve congestion on networks that also use licensed spectrum.

6.      *Millimeter wave spectrum* (mmWave or mmW), in the context of this transaction, is spectrum in the frequency range from 24 GHz to 86 GHz.

7.      The portion of spectrum used in the cell consists of one or more *radio channels*. *Radio Frequency carrier* (or RF carrier) refers both to the radio equipment for a radio channel and the signals broadcast over the air on that radio channel.[4] For example, both LTE and 5G-NR can operate with 5+5 megahertz RF carriers, where 5 megahertz is used for uplink transmissions from subscriber devices to the network and another 5 megahertz is used for downlink transmissions from the network to subscriber devices. One RF carrier can support many devices concurrently.

8.      *Network equipment* includes *cell sites* that make up the radio network.[5] Cell sites typically include a support structure (i.e., a tower, building, or other structure that provides a desired height above the ground), antennas, cables, radios, processors, etc. One *site* contains one or more *sectors*,[6] with most sites having three sectors.[7] A *sector* corresponds to a geographic *cell* of radio coverage that uses a portion of the spectrum to communicate with a number of *subscriber devices*, such as

---

[3] LAA is the LTE feature that leverages the unlicensed 5 GHz band (using carrier aggregation) in combination with the service provider's licensed spectrum to deliver higher throughput performance for some mobile users. Qualcomm, *Progress on LAA and its relationship to LTE-U and MulteFire* (Feb. 22, 2016), https://www.qualcomm.com/media/documents/files/laa-webinar-feb-2016.pdf.

[4] Weisman (2002) at 9-10 ("Frequency is what separates one [Radio Frequency or RF] signal from another and it is what distinguishes one wireless application from another."); *Id.* at 11-12 ("Only analog signals (sine waves) are used to carry information 'on their backs' as they travel through the air. These analog 'carrier' signal s can carry either analog or digital 'information' signals. The process of combining information signals on top of carrier signals is called modulation. . . . When an information signal is combined with a carrier signal the result is known as wireless communications, and the analog signal doing the carrying is called RF or the *carrier*. . . ."); Calhoun, G., *Digital cellular radio*. Artech House, at 206-07 (1988) ("Most radio transmission utilizes a continuous wave of a fixed frequency, called the *carrier* . . . The modulated carrier—i.e., the carrier with the information . . . actually occupies a narrow region of the spectrum . . . the width of this region—the *occupied bandwidth*—is also measured in KHz or MHz. This is what is commonly referred to as a radio *channel*.").

[5] Tabbane, S. (2000). Handbook of Mobile Radio Networks. Artech House, at 206-07 (Tabbane (2000)) ("The cellular architecture was originally designed as a means of providing a region of substantial geographic size . . . with a communications network using a limited frequency allocation and servicing an increasing traffic demand . . . The mechanism is based on the pathloss property of radio waves, which means that a frequency used on one site can be reused on another site provided that the two sites are sufficiently far from each other. Each site covers an area called a *cell*, the size of which usually depends on user density.").

[6] *Sectorization* is defined in the Commission's rules as:

"The use of an antenna system at any broadband station, booster station and/or response station hub that is capable of simultaneously transmitting multiple signals over the same frequencies to different portions of the service area and/or simultaneously receiving multiple signals over the same frequencies from different portions of the service area."

47 C.F.R. § 27.4; *see also* Tabbane (2000) at 220 (graphical examples of sites having between one to three sectors).

[7] Tabbane (2000) at 295.

smartphone devices, within that geographic area.[8]  A *sector* may contain more than one *cell* providing wireless services with different technologies and spectrum bands.[9]  A *cell* is a subset of a *sector* when there is more than one *cell* in a *sector*—different cells in a sector have different bands.[10]

9.      *Macrocell* refers to a traditional large-scale cell site with traditional antennas or remote radio heads mounted on a tower, building rooftop, or similar large structure, which are then connected to an equipment cabinet or shelter at the base of the tower or within the building or structure.[11]

10.     *Small cell* refers to a low powered radio that operates in the licensed and unlicensed spectrum bands with a small equipment footprint providing limited coverage in typically urban and densely populated areas.  *Small cells* can also be used to deal with the growth in usage and can be strategically deployed in highly congested areas to offload traffic from the macrocells.  Small cells can employ both licensed and unlicensed spectrum with Wi-Fi or LAA, but they have limited coverage footprints.

11.     The *capacity* of a cell is typically measured by the number of simultaneous voice calls that can be made on the cell or the total volume of data throughput provided by the cell.[12]  This capacity is a function of both the amounts of spectrum available in the cell and the spectral efficiency.[13]  *Spectral efficiency* refers to the amount of traffic a given amount of spectrum in a cell can support.[14]  Newer technologies generally increase spectral efficiency compared to older technologies, for example, 5G-NR has a greater spectral efficiency than LTE and therefore provides more capacity per RF carrier of equal size.

12.     The *total capacity* of the radio network is determined by the summation of the capacity of the individual cells.  The network traffic is often distributed unevenly over the cells, with the result that the busiest cells are the first to be congested and they drive the need to increase network capacity by deploying additional network solutions.  Common ways to increase network capacity are adding cells, adding spectrum, adding sectors, and increasing spectral efficiency through network technology or handset upgrades.

13.     *Sector Add* refers to splitting an existing sector into more sectors to serve the same geographical area by using more directional antennas (narrower beam-width) to increase the overall site capacity.  A typical site has three sectors with each serving a 120 degrees coverage arc angle.  An additional *sector add* will reduce the coverage arc angle by half.[15]

---

[8] *Id.*  Each sector can be considered a new cell as it uses a different set of channels and a directional antenna.

[9] Submission by Nancy Victory, Counsel to T-Mobile, "T-Mobile 114 K Info. Backup" (Apr. 18, 2019) (T-Mobile 114 K Info. Backup Apr. 18, 2019 Submission), Attach. 5G Backup, Input "114K_Hourly_Throughput_vs_Loading - Aug 3 2018.xlsx."

[10] T-Mobile Information Request Response (Sept. 5, 2018), Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 1.

[11] The distinctions between *macro-*, *micro-* or *pico-* cells relates to the concept of "cell layering"—different types of cells are superimposed to serve different groups of people and environments. Tabbane (2000) at 297.  Macrocells are traditionally defined having a radius between 1 and 30 km and can be used for filling coverage holes between microcells.  *Id.*  A microcell is a smaller cell served by a low power base station located in streets or large indoor spaces.  *Id.* at 298.

[12] Redl, S. M., Weber, M. K., & Oliphant, M. W. (1995). *An introduction to GSM*. Artech House, at 6.

[13] *See generally* Tabbane (2000) at 288-300.

[14] Spectral efficiency is a measure of modulation efficiency and can be defined as the number of "bits per second per Hertz" or the number of bits that are transmitted in a given period of time, usually one second, over a radio channel with a defined bandwidth.  George Calhoun, Digital Cellular Radio 304-05, 394 (1988).

[15] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document
(continued….)

14.     *Cell splitting* refers to building one or more new sites to off-load traffic from the congested cell to increase capacity.  A new site is placed so that at least one of its sectors overlaps with a congested sector on a pre-existing site and takes over some of its coverage area and some of its traffic.  This effectively splits a congested cell of coverage into two or more cells that can share the traffic load.[16] *Cell splitting* in cellular networks is a common but costly and often time-consuming way to add capacity.[17]

15.     *Carried Traffic* is the amount of traffic usage or traffic demand of the network.

16.     *Offered Traffic* is the amount of available network capacity.[18]  The total capacity of the network is determined by the number of cells in the network and the capacity of each cell.  The capacity of each cell is determined by its amounts of deployed spectrum multiplied by the spectral efficiency of that cell.  There are many ways to increase network capacity: adding spectrum, adding sectors, adding small cells, cell splitting, and increasing spectral efficiency.

17.     *Loading* refers to the ratio of the carried traffic to offered traffic.[19]

18.     *Busy Hour* refers to the busiest hour of the day with the highest amount of traffic of the network or the sector.

19.     *Network efficiencies* refer to the ability of the network to carry more traffic for the same cost, thus lowering the cost per unit of traffic.

20.     *Increasing the spectral efficiency* of cells is generally accomplished by deploying new wireless technologies at both the cells and the user devices.  This can involve upgrading some of the radios at a cell site and user devices from an older, less efficient technology to a newer, more efficient technology, such as upgrading to different releases of LTE or replacing LTE with 5G-NR.

21.     *Coverage* (area) refers to the geographic footprint within which user access to a wireless network is predicted to be available with high confidence and with an estimated minimum downlink user speed.

22.     *RF Link Budget* is an accounting of the RF gains and losses that are budgeted between the radio transmitter and receiver, for either the uplink (Mobile transmitting to Base Station) or the downlink (Base Station transmitting to Mobile), necessary to achieve a minimum uplink and/or downlink user throughput speed.  A typical output of an RF Link Budget is a calculated value called the "Maximum Allowable Path Loss (MAPL)" (through the spatial path between the transmitter and receiver).  The

(Continued from previous page) ————————————————
21, "Solution Sets.docx" at 5.  The Applicants claim that it typically takes **[BEGIN HIGHLY CONF. INFO.]**  **[END HIGHLY CONF. INFO.]** months of lead time for a *sector add*.  *Id.*

[16] Tabbane (2000) at 293 ("The cell splitting technique consists of reducing cell sizes with an immediate consequence of increasing network capacity.  Each cell is split up into a number of cells of a smaller size.").

[17] The Applicants claim that it typically takes **[BEGIN HIGHLY CONF. INFO.]** **[END HIGHLY CONF. INFO.]** months to build a new macrocell site.  T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 5.  A macrocell split requires the addition of one or more macrocell to add capacity within the same geographical area as the original cell.  The additional capacity is generated by each new site reusing the same amount of spectrum of the original site.  Public Interest Statement, Ray Declaration at para. 30.  Cellular network capacity can also always be added by building more cells, so theoretically no more spectrum is needed.  However, spectrum acquisition is often more economically attractive than cell splitting, in part because acquiring additional spectrum in a geographic area increases the potential capacity of all cells in that area.  Building new sites is often the most time-consuming and expensive network solution to increase network capacity.

[18] Public Interest Statement, Ray Declaration at paras. 55, 57.

[19] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 1.

MAPL is typically used as an input to an RF Propagation Model, used to predict the extent of the geographic coverage area over which users can expect to receive at least the minimum specified downlink (and/or uplink) speed in the Link Budget.

23.    *Rural Area*, according to the Census Bureau, is defined as an area encompassing all population, housing, and territory not included in an urban area.[20]

24.    *In-Home Broadband* is a term used by the Applicants to refer to a proposed residential broadband service with minimum speeds of 25 Mbps in the downlink and 3 Mbps in the uplink.

25.    *Eligible Household* refers to a household located in an area where New T-Mobile's network will provide sufficient signal quality as well as capacity suitable to support the in-home broadband.[21]

## II.    DESCRIPTION OF THE NETWORK BUILD MODEL

26.    A "model" normally embodies mathematical structures and logic, based on a set of data "inputs," whereby model calculations produce certain "outputs" that are used for one or more engineering and financial purposes. For example, a network engineering model may be a set of Excel spreadsheet software calculations, with a certain set of input assumptions, such as the locations of cell sites, spectrum deployed at these cell sites, user traffic demand, RF link budgets, the number of subscribers or population (pops) served by a cell site sector, etc., which are used by the model to calculate certain outputs, such as offered capacity, average user throughput, and the type and amount of incremental capacity solutions required to meet the minimum network performance for assumed levels of user traffic demand.

27.    The term "model" may also be used in various industry contexts to refer to an RF propagation model, network coverage model, or 5G channel model, etc. To avoid confusing the term "model" with RF propagation model formulations and logic that have not been presented in the record, in the context of this review, we use the term "*coverage input*" data to characterize Applicant data, such as cell sites locations, antenna properties, and RF link budgets, etc. We also use "*coverage output*" data to characterize submitted data, such as coverage maps and shapefiles.

28.    In this transaction, the Applicants base their network build and performance claims on a broad variety of engineering data and calculations submitted in six iterations between August 1, 2018 and April 22, 2019 and which, taken together, constitute the Applicants' Network Build Model.[22] The Network Build Model includes six major versions of the Excel software tool with formulas, logic and input assumptions used to calculate (at the sector level) the projected carried traffic, baseline offered traffic, network congestions, incremental network solutions, and average user throughput experience for the planned LTE and 5G networks of T-Mobile, Sprint, and New T-Mobile.

29.    The Applicants use various iterations of the Network Build Model to quantify network benefit claims for this proposed transaction, and in particular to quantify per-subscriber costs for utilization in their economic merger simulation. The Network Build Model generates the types and amounts of incremental network solutions needed to achieve the LTE and 5G user experience objectives for T-Mobile as a standalone company, Sprint as a standalone company, and the proposed combined company, New T-Mobile.[23] The Network Build Model calculates the incremental network solutions at

---

[20] The Census Bureau states, "To qualify as an urban area, the territory identified according to criteria must encompass at least 2,500 people, at least 1,500 of which reside outside institutional group quarters." Census, 2010 Census Urban and Rural Classification and Urban Area Criteria, https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural/2010-urban-rural.html (last visited Oct. 14, 2019).

[21] T-Mobile/Sprint May 20, 2019 Commitments Letter, Attach. 1 at 6.

[22] The Applicants also refer to the Network Build Model as the Engineering Model. T-Mobile Information Request Response at 30 (Sept. 5, 2018).

[23] The incremental network solutions generated by the Network Build Model are 5G Upgrades, Low-band Overlay,

(continued….)

the sector level, from the baseline network, based on the forecasted numbers of baseline sites, subscribers, usage per subscriber, traffic distributions, amount and type of deployed spectrum, and spectral efficiencies for LTE and 5G.[24]  The Applicants then use the outputs of the Network Build Model to calculate the marginal cost value per additional subscriber as inputs into their IKK model.[25]  Specifically, the Network Build Model along with the Financial Backend Model calculate the marginal cost per gigabyte of additional usage of the network, which is then converted to the monthly marginal cost per additional subscriber based on the amount of expected usage per subscriber per month.[26]

30.     The Applicants submitted the original basic Network Build Model on August 1, 2018 which was used to state the public interest benefits in the Public Interest Statement on June 18, 2018 (August 1 Model).[27]  A more extensive Network Build Model that calculates the incremental network solutions was submitted on September 5, 2018 (September 5 Model).[28]  Another update to the Network Build Model with minor changes was submitted on September 17, 2018 (September 17 Model).[29]  Subsequent major updates to the Network Build Model were submitted on February 21, 2019 with some modifications along with modeling results for the gap years from 2019 to 2021 (February 21 Model),[30] and on March 6, 2019 (March 6 Model) with the in-home broadband modeling results for New T-Mobile.[31]  The latest Network Build Model update was submitted on April 22, 2019; in this update, the Applicants revised the mmW portion of the Network Build Model to develop site-specific estimates of the percentage of traffic addressable by mmW deployment using actual measurements of subscribers' locations.[32]

## III.    NETWORK COMPLEMENTARITIES

31.     We generally agree with the Applicants' assessment that the combination of their networks would generate fundamental network efficiencies.  As a matter of basic network planning, combining complementary spectrum and cell sites allows the resulting network to become more efficient at providing both capacity and coverage, and in turn speed and reliability.  The ability to deploy multiple spectrum bands simultaneously with different propagation and capacity characteristics would help New T-Mobile to provide higher quality mobile broadband service with greater breadth and depth than either standalone firm could provide.  Furthermore, by deploying more spectrum on each cell site, New T-Mobile would be able to increase its overall network capacity substantially at a lower cost than either standalone company.

(Continued from previous page) ———————————————

Mid-band Overlay, Small Cells, Sector Adds, and Cell Splits.  Each solution assumes a specific amount of capacity and an associated cost.

[24] The forecasted number of users served by each sector is based on the LTE network historical user distributions.

[25] Joint Opposition, Compass Lexecon Declaration at para. 53.

[26] Joint Opposition, Compass Lexecon Declaration at para. 87.

[27] Letter from Nancy J. Victory, Counsel to T-Mobile, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 18-197 (filed Aug. 1, 2018) (T-Mobile Aug. 1, 2018 Engineering Model Response).

[28] T-Mobile Information Request Response, Attach. Network Build Models.

[29] T-Mobile Supplement to and Revision of Information Request Response (Sept. 17, 2018), Attach. Network Build Models.

[30] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Models.

[31] T-Mobile Mar. 6, 2019 In-Home Broadband *Ex Parte* Letter, Attach. Network Build Model.

[32] T-Mobile Apr. 22, 2019 *Ex Parte* Letter, Attach. Network Build Models.

### A.    Cell Site Equipment Deployment Efficiencies

32.    The Applicants assert that all of T-Mobile's current PCS radios can immediately accommodate an additional 10 (or 5+5) megahertz and **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]**% of its radios can accommodate an additional 20 (or 10+10) megahertz of PCS spectrum.[33]  By deploying higher capacity radios in multiple bands utilizing more available spectrum at any cell site, New T-Mobile can add more capacity at lower per unit capacity costs when splitting a cell or adding a new sector compared to the standalone Sprint and standalone T-Mobile.[34]

33.    We generally agree with the Applicants' claim that cell site complementarities can lead to capacity benefits and that the retained Sprint sites can provide congestion relief to existing T-Mobile sites. We recognize that standalone T-Mobile potentially could acquire access to some of the retained sites by co-locating and leasing with the third-party tower companies since all of Sprint's macrocell sites are leased.[35]  We note, however, that deploying more spectrum on each cell site would be more cost effective in terms of cell site utilization.  Adding capacity to an existing cell site by adding higher capacity radios or reconfiguring underutilized radios is a less costly solution than adding a sector or cell splitting.

### B.    Spectrum Complementarities

34.    T-Mobile's network currently utilizes licensed spectrum in the 600 MHz, Lower 700 MHz, 1900 MHz (PCS), and 1700/2100 MHz (AWS) bands, and it will utilize the mmW spectrum bands (28 GHz and 39 GHz) in the future.  T-Mobile currently holds approximately 30 megahertz of 600 MHz spectrum nationwide and 10 megahertz of Lower 700 MHz spectrum for a total of approximately 40 megahertz in the low-band (below 1 GHz) portion.  For the mid-band portion (1 to 6 GHz), T-Mobile holds approximately 30 megahertz of PCS spectrum and 40 megahertz of AWS spectrum nationwide for a total of approximately 70 megahertz.[36]

35.    Sprint's network currently utilizes licensed spectrum in the 800 MHz (ESMR), 1900 MHz (PCS), and 2.5 GHz (BRS/EBS) bands.  Sprint currently holds approximately 14 megahertz of ESMR spectrum nationwide, which is limited to 10 (5+5) megahertz LTE carriers and 2.5 (1.25+1.25) megahertz CDMA carriers in the low-band portion, and 40 megahertz of PCS spectrum.  Sprint also holds approximately 160 megahertz of 2.5 GHz spectrum in the top 100 U.S. markets.[37]

36.    The Applicants state that New T-Mobile's ability to efficiently and optimally utilize low-band and mid-band spectrum will be enabled by the Layer Management capability,[38] which would allocate, when possible, the 2.5 GHz band as the primary resource to maximize the network performance and capacity.[39]  At further distances from the cell site, the Layer Management would utilize other mid-band and low-band spectrum with superior coverage characteristics to provide seamless broadband services.[40]  The Layer Management uses two main mechanisms, Active Load Balancing and Coverage-based Inter-frequency Handover, to optimally allocate traffic across different bands based on customer

---

[33] T-Mobile Mar. 8, 2019 New T-Mobile Network Migration Overview at 7.

[34] *Id*. at 7-8.

[35] Public Interest Statement, Saw Declaration at para. 6.

[36] Public Interest Statement, Ray Declaration at para. 6.

[37] Public Interest Statement, Saw Declaration at para. 7.

[38] T-Mobile uses Layer Management today, in the ordinary course of business, to allocate users and traffic between bands and optimize efficiency and customer experience in the network.  T-Mobile Apr. 2, 2019 Engineering *Ex Parte* Letter, Attach. C at 1.

[39] T-Mobile Apr. 2, 2019 Engineering *Ex Parte* Letter, Attach. B at 3.

[40] *Id*.

Federal Communications Commission          FCC 19-103

network experience.[41]  The Active Load Balancing relies on the cell air interface scheduler and inter-cell connections to monitor and actively balance the cell traffic loads among different bands based on network settings to improve user experience.[42]  The Coverage-based Inter-frequency Handover optimizes cell transitions as users' RF signal quality changes, moving users to a higher quality cell when the current serving cell signal quality degrades below a target threshold.[43]

37.     For illustrative purposes, the coverage area for a cell with 600 MHz, PCS/AWS, 2.5 GHz, and mmW spectrum would resemble a circle with four concentric rings in which the 600 MHz spectrum would cover the entire area within the outermost ring, the PCS/AWS spectrum would cover the area within the third ring, the 2.5 GHz spectrum would cover the area within the second ring, and the mmW spectrum would only cover the area within the first ring, as shown in Fig. A1 below.

38.     The Applicants' spectrum holdings are, in large part, complementary.  T-Mobile holds more low-band spectrum, specifically the 600 MHz spectrum, that is more suitable for coverage deployment.  Sprint holds more mid-band spectrum, specifically a large amount of 2.5 GHz spectrum, that is more suitable for high capacity deployment.  We find that, by simultaneously deploying both low-band and mid-band spectrum, New T-Mobile would provide higher network coverage and capacity performance than either standalone Sprint or standalone T-Mobile could.  New T-Mobile's Layer Management would effectively allocate most of the low-band spectrum to mainly serve the outermost or other coverage-challenged areas, leaving the high-capacity mid-band 2.5 GHz spectrum to serve only the inner areas and PCS spectrum to serve mostly the middle areas of the typical cell coverage areas as shown in Fig. A1 below.

**Fig. A1: Site Coverage Areas of Different Spectrum Bands (not drawn to scale)**



## IV.    CAPACITY BENEFITS

39.     To enable our review of their network claims, the Applicants provided detailed sector level physical site data, types and amounts of spectrum to be deployed, anticipated average sector spectral efficiencies, technology gains, congestion measurements and thresholds, congestion solution gains, and traffic demands related to New T-Mobile, standalone Sprint and standalone T-Mobile.  We note that capacity predictions vary depending on which of the several iterations of the Applicants' modeling we employ.  However, in all cases, the transaction yields substantial increases in capacity for the merged firm

---

[41] T-Mobile observed higher throughputs in both high and low frequency bands by using active load balancing and inter-frequency handovers optimization.  T-Mobile Apr. 2, 2019 Engineering *Ex Parte* Letter, Attach. C.

[42] *Id*.

[43] T-Mobile Apr. 2, 2019 Engineering *Ex Parte* Letter, Attach. C at 1-2.

relative to the standalone firms.  We therefore do not identify which modeling approach and associated set of assumptions is the best reflection of likely capacity, but for purposes of presentation utilize the Applicants' February 21 baseline network offered 5G traffic calculations,[44] which, as indicated in Figs. A2, A3, and A4 below, shows that, based on our calculations, New T-Mobile can offer substantially more baseline network capacity than the combined standalone companies.  We also note that the Applicants' network commitments, including their in-home broadband commitments, will tend to increase New T-Mobile's overall capacity relative to the capacity calculations from the February 21 model presented below.

40.    For each spectrum band and company, Fig. A2 shows the baseline average amount of spectrum deployed nationwide, Fig. A3 shows the baseline number of sectors deployed, and Fig. A4 shows the nationwide baseline offered traffic.  The nationwide 5G offered traffic of New T-Mobile substantially exceeds the combined traffic of standalone Sprint and T-Mobile, ranging from **[BEGIN HIGHLY CONF. INFO.]**                                                                                    **[END HIGHLY CONF. INFO.]** as shown in Fig. A4.[45]  Furthermore, the Applicants have committed to a substantial 5G network build-out, within six years of the merger closing date, of "**[BEGIN HIGHLY CONF. INFO.]**          **[END HIGHLY CONF. INFO.]** 5G sites nationwide; an average of **[BEGIN HIGHLY CONF. INFO.]**     **[END HIGHLY CONF. INFO.]** megahertz of low-band and mid-band 5G spectrum deployed across the 5G sites; 99% of the population experiencing download speeds equal to, or greater than, 50 Mbps; and 90% of the population experiencing download speeds equal to, or greater than, 100 Mbps."[46]  This commitment will ensure that the theoretical capacity gains projected by the Network Build Model are realized.

**Fig. A2: Nationwide Baseline Spectrum Deployment**
**[BEGIN HIGHLY CONF. INFO.]**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| **Average 5G 600 MHz Band DL Spectrum Deployed (MHz)** | | | | | | |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |
| **Average 5G 2.5 GHz Band DL Spectrum Deployed (MHz)** | | | | | | |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |
| **Average 5G AWS Band DL Spectrum Deployed (MHz)** | | | | | | |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |
| **Average 5G PCS Band DL Spectrum Deployed (MHz)** | | | | | | |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |
| **Average 5G mmWave Band DL Spectrum Deployed (MHz)** | | | | | | |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |

**[END HIGHLY CONF. INFO.]**

---

[44] Baseline scenarios refer to network deployment scenarios before any incremental network solutions are needed due to network congestion.

[45] The network integration period is up to the first three years after the closing of this proposed transaction.  New T-Mobile's total network capacity will also include legacy Sprint's capacity because Sprint's sites are not yet decommissioned.  T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. A, Declaration of Mark McDiarmid, at paras. 5, 8.c, 12.

[46] T-Mobile/Sprint May 20, 2019 Commitments Letter at 3.

Federal Communications Commission                    FCC 19-103

**Fig. A3: Nationwide Baseline Sectors Deployment**
**[BEGIN HIGHLY CONF. INFO.]**

| Number of 5G 600 MHz Band Sectors Deployed | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |
| **Number of 5G 2.5 GHz Band Sectors Deployed** | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |
| **Number of 5G AWS Band Sectors Deployed** | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |
| **Number of 5G PCS Band Sectors Deployed** | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |
| **Number of 5G mmWave Band Sectors Deployed** | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |

**[END HIGHLY CONF. INFO.]**

Federal Communications Commission                    FCC 19-103

Fig. A4: Nationwide Baseline Offered Traffic[47]
[BEGIN HIGHLY CONF. INFO.]

| Baseline 5G 600 MHz Band Offered DL Traffic (PB/month) | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| T-Mobile | | | | |
| Sprint | | | | |
| New T-Mobile | | | | |
| Baseline 5G 2.5 GHz Band Offered DL Traffic (PB/month) | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | |
| Sprint | | | | |
| New T-Mobile | | | | |
| Baseline 5G mmWave Band Offered DL Traffic (PB/month) | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | |
| Sprint | | | | |
| New T-Mobile | | | | |
| Baseline 5G PCS Band Offered DL Traffic (PB/month) | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | |
| Sprint | | | | |
| New T-Mobile | | | | |
| Baseline 5G AWS Band Offered DL Traffic (PB/month) | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | |
| Sprint | | | | |
| New T-Mobile | | | | |
| Baseline 5G Total Offered DL Traffic (PB/month) | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | |
| Sprint | | | | |
| New T-Mobile | | | | |
| New T-Mobile 5G Total Offered DL Traffic Gain Over Standalone T-Mobile + Sprint | | | | |

[END HIGHLY CONF. INFO.]

41.    For consumers, the New T-Mobile capacity gains we predict will necessarily yield some combination of quality and quantity benefits because the quality of network services are a function of available capacity and the number of simultaneous users attempting to access that capacity. Assuming hypothetically that the same number of subscribers access the network, they would experience significantly increased speeds and network quality. On the other hand, with greater capacity, many more users could access the network, while still achieving the same speed and quality of the standalone networks. As with any wireless network, the degree to which additional capacity is apportioned to improve user experience or to serve additional users on the network will be determined by the service provider.

---

[47] New T-Mobile's offered traffic in this table is based on its default deployment baseline in 2021 as increased each year based on the February 21, 2019 iteration of the network build model. T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Model, "Montana_Capacity_Analysis_Submission_New_T-Mobile.xlsx," in Scenarios tab. We note that New T-Mobile would have higher offered traffic based on its actual planned deployment baseline in 2024, which includes further network deployment beyond the minimum performance builds predicted by the network build model with lower demand assumptions. We further note that the network planned under the network build commitments will likely further increase offered capacity relative to the predictions from this iteration of the model. We do not reach a conclusion as to the best precise estimate of likely network capacity, but find that the merged firm would have sufficiently increased overall network capacity compared to the sum of the standalone companies for us to credit it as a significant public interest benefit of the transaction.

42.    The Applicants have also committed to provide in-home broadband service using excess capacity that the combined 5G network will yield in certain specific areas.  The in-home broadband service will rely upon indoor Customer Premise Equipment (CPE) to provide minimum download and upload speeds of 25 Mbps and 3 Mbps, respectively.[48]  The Applicants commit to market this service to 28.0 million Eligible Households, including 5.6 million Rural Households within six years of the merger closing date.[49]  The Applicants provided the March 6 Network Build Model to demonstrate the effects of providing New T-Mobile's in-home broadband service.[50]  We have analyzed the assumptions, methodology, and unused network capacity claims the Applicants identified to enable them to provide the in-home broadband service.[51]  We have also analyzed the Network Build Model's sector-level data submitted by the Applicants.  We find that New T-Mobile should be able to provide this service in selected areas consistent with the throughput and usage metrics to which the Applicants have committed.[52]  As shown in Fig. A5, there are no additional incremental network solutions triggered for the in-home broadband service as the incremental network solutions are the same as those for the scenario without the in-home broadband service.  We observe, however, that the in-home broadband service commitment does not account for higher monthly usage limits than those assumed by the Applicants.  Incremental network solutions will likely need to be implemented at certain higher usage limits as also shown in Fig. A5 below.

**Fig. A5: Incremental Solutions With and Without In-Home Broadband Service under Different Data Usage Conditions**
**[BEGIN HIGHLY CONF. INFO.]**

| Incremental Solutions | 2024 New T-Mo, no IHB (Sc #17) | 2024 New T-Mo, with IHB (Sc #20), 500 GB | 2024 New T-Mo, with IHB (Sc #20), 600 GB | 2024 New T-Mo, with IHB (Sc #20), 700 GB |
|---|---|---|---|---|
| 5G Upgrade | | | | |
| Lowband Overlay | | | | |
| Midband Overlay -- 2.5G | | | | |
| Midband Overlay -- AWS/PCS | | | | |
| Small Cells | | | | |
| Sector Adds | | | | |
| Cell Splits | | | | |

**[END HIGHLY CONF. INFO.]**

---

[48] T-Mobile Mar. 6, 2019 In-Home Broadband *Ex Parte* Letter, Appx. B, Declaration of Mark McDiarmid, at para. 3.

[49] T-Mobile/Sprint May 20, 2019 Commitments Letter, Attach. 1 at 2.

[50] T-Mobile Mar. 6, 2019 In-Home Broadband *Ex Parte* Letter, Attach. Network Build Model, "Montana_Capacity_Analysis_In-Home_Broadband_Submission_New_T-Mobile.xlsx."

[51] Applicants provided details about the in-home broadband service in several submissions, along with assumptions, methodologies and claims regarding this service.  T-Mobile Information Request Response at 49-50; T-Mobile Information Request Response, Attach. Specs. 29, 30; Letter from Nancy J. Victory, Counsel to T-Mobile, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 18-197 (filed Oct. 30, 2018), Attach. Engineering Material Update (attaching documents, "53. Broadband Capability.docx" and "53. supplement - Site Level Broadband Households in 2024.xlsx"); T-Mobile Mar. 6, 2019 In-Home Broadband *Ex Parte* Letter (attaching Exh. A to Declaration of Mark McDiarmid, 53a. Home Broadband Support in the New T-Mobile Network); T-Mobile May 1, 2019 *Ex Parte* Letter.

[52] T-Mobile/Sprint May 20, 2019 Commitments Letter, Attach. 1 at 6-7 (defining "In-Home Broadband Service," and "Supported Households").

Federal Communications Commission    FCC 19-103

## V.    ANALYSIS OF THE NETWORK BUILD MODEL AND THE FINANCIAL BACKEND MODEL

### A.    Methodology, Assumptions, and Calculations

#### 1.    Overview of Network Build Model Methodology and Assumptions

43.    The August 1 Model was the first version of the Network Build Model submitted by the Applicants.[53]  It only calculates the baseline offered traffic at the site level, in 2021 and 2024, for the 5G networks of T-Mobile, Sprint, and New T-Mobile based on the forecasted amounts of spectrum deployed in 600 MHz, AWS, PCS, 2.5 GHz, and mmW bands and the associated spectral efficiency assumptions, as shown in Fig. A6.  In addition, a separate LTE module of the August 1 Model calculates the sector offered traffic for LTE in 2021 based on the forecasted amounts of spectrum deployed in 600 MHz, AWS, PCS, and 2.5 GHz bands and the associated spectral efficiency assumptions, as also shown in Fig. A6.[54]

**Fig. A6: Spectral Efficiency Assumptions of the Network Build Model**

| Average LTE Spectral Efficiency (bps/Hz) | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| Low-Band 4x2 MIMO | 2.1 | 2.1 | 2.1 | 2.1 |
| Mid-Band 4x4 MIMO | 2.5 | 2.5 | 2.5 | 2.5 |
| **Average 5G Spectral Efficiency (bps/Hz)** | **2021** | **2022** | **2023** | **2024** |
| Low-Band 4x2 MIMO | 2.5 | 2.5 | 2.5 | 2.5 |
| Mid-Band 4x4 MIMO | 3.8 | 3.8 | 3.8 | 3.8 |
| mmWave mMIMO | 7 | 7 | 7 | 7 |

44.    All of the Network Build Models, except the April 22 version, assumed a constant mmW propagation factor of **[BEGIN HIGHLY CONF. INFO.]**    **[END HIGHLY CONF. INFO.]** that tried to address the limited propagation characteristics of mmW spectrum.  Standalone T-Mobile's and New T-Mobile's average LTE and 5G carried traffic is calculated by applying the same average of T-Mobile's historical carried traffic in 2016 and 2017 of **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]**%.[55]  In addition, standalone Sprint's average LTE and 5G carried traffic is calculated by applying the same average of Sprint's historical carried traffic in 2016 and 2017 of **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]**%.[56]

45.    The September 5 Model is an updated and completely revised Network Build Model for the period from end-of-year 2021 to 2024.  It is much more extensive and sophisticated than the August 1 Model and includes two distinct but integrated network modules—one for the LTE network and one for the 5G network.  The LTE module of the September 5 Model is based on an extended version of T-

---

[53] T-Mobile Aug. 1, 2018 Engineering Model Response at 1; *see also* T-Mobile Supplement to and Revision of Information Request Response at 2 (Sept. 17, 2018).

[54] Public Interest Statement, Ray Declaration at para. 49, Table 3; T-Mobile Aug. 1, 2018 Engineering Model Response, Attach. Network Build Models.

[55] Public Interest Statement, Ray Declaration at paras. 55-58.

[56] *Id.*

Mobile's ordinary course LTE capacity planning model,[57] and it is integrated with the 5G module, which was based on the same fundamental concepts, such as throughput, congestion, user demand, and network solution sets to demonstrate this transaction's potential 5G network benefits.[58]  Both the 5G and LTE modules in the September 5 Model and subsequent models calculate the outputs as incremental network solutions needed to maintain the target network congestion thresholds and the average subscriber all-day throughput experience.[59]  The incremental network solutions generated by the September 5 Model, in the order of increasing costs and deployments, are 5G Upgrades, Low-band Overlay, Mid-band Overlay, Small Cells, Sector Adds, and Cell Splits.  Each incremental network solution assumes a specific amount of capacity and an associated cost.  The outputs of the September 5 Model and subsequent models are then used to inform the economic studies that the Applicants claim to demonstrate the quantifiable marginal cost efficiencies of this proposed transaction.[60]  In addition, the September 5 Model's output of the subscriber average all-day throughput experience is used to calculate the consumer valuation of increased throughput, or customer's willingness to pay for increased throughput.

46.    The September 17 Model represents a further revision of the Network Build Model that corrects some rare instances of "impermissible mixing of sector adds and cell splits as the model resolves congestion for the second technology," which is inconsistent with the least costly incremental network solutions objective.[61]  The September 17 Model process is the same for standalone T-Mobile and standalone Sprint, and the parameters for modeling New T-Mobile are aggregated from the standalone companies.  In its ordinary course of business, T-Mobile seeks to maintain an average user busy hour congestion throughput of at least **[BEGIN HIGHLY CONF. INFO.]   [END HIGHLY CONF. INFO.]** Mbps for the LTE network, with key areas in all markets at **[BEGIN HIGHLY CONF. INFO.]   [END HIGHLY CONF. INFO.]** Mbps.  These congestion criteria enable reliable video and other LTE applications.[62]  Any sector with the average user LTE throughput below this threshold during the busy hour is considered congested and the Network Build Model would trigger incremental LTE network solutions to meet the congestion throughput target.  T-Mobile measures the LTE network load based on the number of radio resource control (RRC) connections during the busy hour as a representation of active users in each sector.[63]

47.    The LTE module of the September 17 Model relies on the number of RRC connections per 5 megahertz to deliver the target minimum user throughput of **[BEGIN HIGHLY CONF. INFO.] [END HIGHLY CONF. INFO.]** Mbps as the congestion threshold.[64]  The RRC connections

---

[57] The LTE module of the Sept. 5, 2018 and Sept. 17, 2018 versions of the Network Build Model, to the extent possible, "uses the same assumptions, methodology, algorithms, and solutions that T-Mobile and Sprint use in the ordinary course process" of capacity planning.  T-Mobile Supplement to and Revision of Information Request Response at 2 (Sept. 17, 2018).

[58] We note that the 5G network module utilizes a new "loading curve" concept derived from historical LTE network measurements which is different from the LTE network module.  Joint Opposition, Ray Reply Declaration at paras. 21, 26.

[59] T-Mobile Supplement to and Revision of Information Request Response at 2.

[60] *See infra* section A-V.C: Crediting Cost Benefits from the Network Build Model for Purposes of Predicting Merger Price Effects (explaining that the Applicants used a Financial Backend Model to convert Network Build Model solutions into marginal costs).

[61] T-Mobile Supplement to and Revision of Information Request Response at 1 (Sept. 17, 2018).

[62] Joint Opposition, Ray Reply Declaration at paras. 10-11.

[63] Joint Opposition, Ray Reply Declaration at para. 8.

[64] LTE RRC number of connections is used as a proxy for the number of user connections in a specific sector which is indicative of the sector loading.  The number of RRC connections congestion thresholds are **[BEGIN HIGHLY CONF. INFO.]       [END HIGHLY CONF. INFO.]** connections per 5 megahertz for **[BEGIN HIGHLY CONF. INFO.]  [END HIGHLY CONF. INFO.]** Mbps user throughput; and **[BEGIN HIGHLY CONF.**

(continued….)

Federal Communications Commission                                      FCC 19-103

corresponding to the congestion thresholds were obtained from the correlation analyses between millions of collected radio network and Ookla data points.[65] T-Mobile states that its ordinary course LTE network congestion model has been highly accurate in predicting sector congestions, with an accuracy of 99.4%, and that it had helped to direct approximately $10 billion in network expenditures over the past five years.[66]

48.     The September 17 Model also incorporates Sprint's business rules for capacity planning of the standalone Sprint's version of the model.[67]  The version of the September 17 Model for standalone Sprint uses a single LTE congestion threshold of **[BEGIN HIGHLY CONF. INFO.]  [END HIGHLY CONF. INFO.]** Mbps user throughput, or **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** RRC connections per 5 megahertz.[68]  This version of the Network Build Model did not model the time periods from 2019 to 2021 because the Applicants claimed that integration efforts would not be completed until 2021.[69]

49.     The 5G module of the September 17 Model, although contained in the same Excel file, is distinct from the LTE module.  Each module has its own input assumptions and calculations, which are integrated only after a 5G Upgrade is selected as the first incremental network solution when any LTE sector is congested.  The Applicants state that the congestion criteria for the 5G network would need to be higher than LTE congestion criteria because of the expected higher quality video service.[70]  The congestion threshold for the 5G network is **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** Mbps, which is based on the minimum throughput requirement for unimpaired 4K Ultra HD video experience.[71]  To ensure similar 5G user experience in instances where 5G users can only connect to the LTE network, the equivalent 5G congestion threshold of **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** RRC connections per 5 megahertz is used on the LTE network.

50.     The 5G module of the September 17 Model uses completely different algorithms, compared to the LTE module, to calculate 5G network congestions, the required incremental network solutions, and the average subscriber all-day throughputs.  Instead, a loading curve (derived by the Applicants based on T-Mobile's 4x4 MIMO LTE network measurements) correlates the 5G busy hour user throughputs and the 5G busy hour sector loadings and is used as the basis for calculations to determine network congestions, the required incremental network solutions, and the average subscriber all-day throughputs for the 5G module of the Network Build Model.[72]  The 5G module of the September

---

(Continued from previous page) ——————————————
**INFO.]    [END HIGHLY CONF. INFO.]** connections per 5 megahertz for **[BEGIN HIGHLY CONF. INFO.]  [END HIGHLY CONF. INFO.]** Mbps user throughput.  Joint Opposition, Ray Reply Declaration at para. 11.

[65] Ookla is an independent company that collects crowdsourcing end-to-end user speed experience data.  Joint Opposition, Ray Reply Declaration at para. 11.

[66] Joint Opposition, Ray Reply Declaration at para. 13.

[67] *Id.* at para. 14.

[68] T-Mobile Supplement to and Revision of Information Request Response, Attach. Network Build Model, "Montana Capacity Analysis_Sprint.xlsx."

[69] Joint Opposition, Ray Reply Declaration at para. 15.

[70] *Id.* at para. 25.

[71] *Id.*

[72] Loading refers to the ratio of the carried traffic to offered traffic.  In general, higher network loading correlates with lower user throughputs, and lower network loading correlates with higher user throughputs.  T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 1; *see also* Joint Opposition, Compass Lexecon Declaration at para. 56.

Federal Communications Commission                    FCC 19-103

17 Model, while similar in concept, is fundamentally different from the LTE module which is based on T-Mobile ordinary course of business capacity planning model.

51.     The September 17 Model also revised upward the amounts of forecasted spectrum that could be refarmed for 5G deployment compared to the Public Interest statements based on the August 1 Model.[73]  In addition, there are two different modeling demand scenarios for the September 17 version—one scenario with relaxed (or unconstrained) usage per subscriber forecasts and the other scenario with maintained (or constrained) usage per subscriber forecasts that are used as the basis for the IKK model. As shown in Fig. A7, the maintained usage forecasts are significantly lower than the relaxed usage scenario.  Fig. A7 also shows that the nationwide baseline 5G offered traffic of New T-Mobile is significantly higher than the baseline offered traffic of the combined standalone Sprint and T-Mobile, which range from approximately 2.3 times to 1.7 times higher in 2021 and 2024, respectively.

**Fig. A7: Two Different Data Usage Scenarios for the September 17 Model**
**[BEGIN HIGHLY CONF. INFO.]**

| | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| **5G Relaxed (Unconstrained) Usage (GB/month/user)** | | | | |
| T-Mobile | | | | |
| Sprint | | | | |
| New T-Mobile | | | | |
| **5G Maintained (Constrained) Usage (GB/month/user) - Compass Lexecon** | | | | |
| T-Mobile | | | | |
| Sprint | | | | |
| New T-Mobile | | | | |
| **Baseline 5G Offered Traffic Nationwide (PB/month)** | | | | |
| T-Mobile | | | | |
| Sprint | | | | |
| New T-Mobile | | | | |
| New T-Mobile/(Sprint & T-Mobile) Ratio | | | | |
| **5G Carried Traffic Nationwide (PB/month)** | | | | |
| T-Mobile | | | | |
| Sprint | | | | |
| New T-Mobile - Maintain | | | | |
| New T-Mobile - Relax | | | | |
| **5G Network Utilization (%)** | | | | |
| T-Mobile | | | | |
| Sprint | | | | |
| New T-Mobile - Maintain | | | | |
| New T-Mobile - Relax | | | | |

**[END HIGHLY CONF. INFO.]**

52.     The February 21 Model, the fourth version of the Network Build Model, addresses the modeling network integration years from 2019 to 2021 that were not included in the previous versions.  In addition, there are some changes to the calculations of the LTE user throughputs, which now use "an empirical loading curve that maps sector loading (measured as by busy-hour users per 5 MHz) to all-day

---

[73] Joint Opposition, Ray Reply Declaration at para. 20.

Federal Communications Commission                    FCC 19-103

Ookla throughputs," similar to the 5G module's algorithms to calculate 5G user throughputs.[74]  The calculations of LTE incremental network solutions, based on ordinary course model functionality, remain the same as the September 17 Model, which is based on the number of RRC connections per 5 megahertz of spectrum.  In addition, there are updates to the inputs of the model to use the most current information.[75]  The history of forecasted maintained usage per subscriber is shown in Figs. A7-A8.  This version of the Network Build Model allows for **[BEGIN HIGHLY CONF. INFO.]**

**[END HIGHLY CONF. INFO.].**[76]

**Fig. A8: New Data Usage Forecasts for the February 21 Model**
**[BEGIN HIGHLY CONF. INFO.]**

| Maintained Usage - Compass Lexecon (GB/month/user) | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |
| **Baseline 5G Offered Traffic Nationwide (PB/month)** | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile | | | | | | |
| **5G Carried Traffic Nationwide (PB/month)** | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile - Maintain | | | | | | |
| New T-Mobile - Relax | | | | | | |
| **5G Network Utilization (%)** | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| T-Mobile | | | | | | |
| Sprint | | | | | | |
| New T-Mobile - Maintain | | | | | | |
| New T-Mobile - Relax | | | | | | |

**[END HIGHLY CONF. INFO.]**

53.     The March 6 Model, the fifth version of the Network Build Model, includes New T-Mobile's proposed in-home broadband service that would target underutilized capacity of lightly loaded sectors of its mobile 5G network.  This version of the Network Build Model calculates incremental network solutions for the combined mobile broadband service and in-home broadband service of New T-Mobile.[77]  This model incorporates traffic from the in-home broadband service by using three additional parameters in the Scenarios tab, namely, the in-home subscriber count scenario, the in-home usage per subscriber per month, and the in-home busy hour factor.[78]

---

[74] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Compass Lexecon Attach. at 23.

[75] This version now also uses Sprint's internal customer demand forecasts for the number of subscribers and the LTE/5G handset mix.  T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Compass Lexecon Attach. at 31.

[76] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Compass Lexecon Attach. at 29-30.

[77] T-Mobile Mar. 6, 2019 In-Home Broadband *Ex Parte* Letter, Appx. C at 2.

[78] T-Mobile Apr. 1, 2019 Engineering Model Adjustments *Ex Parte* Letter at 4-5; *see also* T-Mobile Mar. 6, 2019 In-Home Broadband *Ex Parte* Letter, Attach. Network Build Model, "Montana_Capacity_Analysis_In-Home_Broadband_Submission_New_T-Mobile.xlsx," Scenarios tab.

54.    The April 22 Model, the sixth version of the Network Build Model, mainly addresses the 5G modeling of mmW deployment with effective utilization variations for each site condition.  More specifically, the April 22 Model uses a "traffic addressable by mmWave" factor instead of a constant "propagation adjustment" factor per sector, based on the percentage of measured traffic that could be addressed by mmW spectrum for that sector.[79]  The **[BEGIN HIGHLY CONF. INFO.]**

**[END HIGHLY CONF. INFO.]**.[80]  In addition, the mmW incremental network solution has to meet one additional condition for deployment—the minimum threshold of the "traffic addressable by mmWave" factor.[81]  The Applicants state that this specific threshold level was selected because it provides a viable and cost-effective solution compared to other incremental network solutions.[82]

### 2.    Calculations of the Network Build Model

55.    The Network Build Model is composed of two network modules, LTE and 5G, which are separated by different tabs in Excel.  There is one outputs tab labeled, Scenarios, and four assumption input tabs labeled, Demand, Curve, InputCalcs, and SiteRef.  The algorithms and calculations are contained in five tabs labeled, Level1, Level2_LTE, Level3_LTE, Level2_5G, and Level3_5G.  There are three levels or stages of the network module calculations.  Level 1 calculates the baseline offered traffic for each sector for both LTE and 5G networks, Level 2 calculates sector congestion and average user throughput before any incremental network solution, and Level 3 calculates the required incremental network solutions and the average all-hour user throughput for each sector after the incremental network solutions are deployed.  The main outputs of the Network Build Model are the nationwide incremental network solutions required to meet the user throughput objectives with the main inputs of (1) site configurations, (2) deployed spectrum, (3) spectral efficiencies, (4) minimum user throughput objectives, (5) LTE feature gains, (6) incremental network solution capacity gains, (7) number of subscriber forecasts, (8) usage per subscribers, and the (9) loading curve of the relationship between average user throughputs and the busy hour sector loadings.[83]

### a.    LTE Network Module

56.    The LTE network calculations for each sector are performed in three different tabs labeled, Level1, Level2_LTE, and Level3_LTE.  Level1 calculates the baseline LTE offered traffic as the product of deployed LTE spectrum and the associated LTE spectral efficiencies for low-band and mid-band spectrum.  Level2_LTE calculates the sector congestion, before any incremental network solution, by comparing the number of LTE users assigned to that sector per 5 megahertz, including otherwise 5G

---

[79] **[BEGIN HIGHLY CONF. INFO.**

                                                                        **[END HIGHLY CONF. INFO.]**.  T-Mobile Apr. 22, 2019 *Ex Parte* Letter, Kapoor Declaration at paras. 17-18.

[80] **[BEGIN HIGHLY CONF. INFO.**
                          **[END HIGHLY CONF. INFO.]**.  Letter from Nancy J. Victory, Counsel to T-Mobile, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 18-197, Attach. C at 2 (filed Apr. 22, 2019).

[81] The minimum threshold of the "traffic addressable by mmWave" factor to be considered for incremental network solution deployment is **[BEGIN HIGHLY CONF. INFO.] [END HIGHLY CONF. INFO.]**%.  Letter from Nancy J. Victory, Counsel to T-Mobile, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 18-197, Attach. C at 3; T-Mobile Apr. 22, 2019 *Ex Parte* Letter, Kapoor Declaration at para. 13.

[82] *Id.*

[83] Busy hour sector loading is the ratio of carried traffic to offered traffic for the sector during the busy hour.  T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Model, "Montana_Capacity_Analysis_Submission_New_T-Mobile.xlsx."

users who would be connecting to the LTE sector if that sector is not yet 5G deployed, against the target congestion threshold of maximum RRC connections per 5 megahertz. The target RRC connections per 5 megahertz congestion thresholds are **[BEGIN HIGHLY CONF. INFO.]**

**[END HIGHLY CONF. INFO.]** user throughput for 5G users connecting to LTE-only sites.[84] Level3_LTE calculates the sector incremental network solutions, with increasing solution costs for 5G upgrade, small cells, sector adds and cell splits when the LTE sector is determined to be congested at Level2_LTE. For each incremental network solution deployed with the associated capacity gain,[85] a new revised number of LTE users per 5 megahertz are compared to the target maximum RRC connections per 5 megahertz. LTE congestion is triggered when the revised number of users per 5 megahertz exceeds the maximum RRC connections per 5 megahertz for that sector. The average LTE user throughput for each sector is calculated as: the product of the average Ookla user throughput,[86] the total LTE features gain since 2017, and the incremental solution gain, divided by the total LTE traffic growth since 2017.[87]

### b. 5G Network Module

57.    The 5G network calculations for each sector also are performed in three different tabs labeled, Level1, Level2_5G, and Level3_5G. Level1 calculates the baseline 5G offered traffic as the product of deployed 5G spectrum and the associated 5G spectral efficiencies for low-band, mid-band, and mmW spectrum.[88] Level2_5G calculates the sector congestion, before any incremental network solution, by calculating the busy hour sector loading to look up the average busy hour user throughput using the 5G busy hour loading curve data.[89] If the average busy hour user throughput for the sector is below the 5G target congestion threshold of **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** Mbps, then that sector is marked as congested.[90] Level3_5G calculates the sector incremental network solutions, with increasing solution cost and deployment priority, for 5G upgrade, low-band overlay, mid-band overlay, mmW overlay, small cells, sector adds and cell splits when the 5G sector is determined to be congested at Level2_5G, as illustrated in Fig. A9.

---

[84] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Model, "Montana_Capacity_Analysis_Submission_New_T-Mobile.xlsx," in SiteRef, InputCalcs, Level1 and Level2_LTE tabs.

[85] In the LTE network module of the Network Build Model, incremental capacity gains (over a macrocell sector's capacity) of a small cell, a sector, and a cell split are **[BEGIN HIGHLY CONF. INFO.]          [END HIGHLY CONF. INFO.]**, respectively. T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Model, "Montana_Capacity_Analysis_Submission_New_T-Mobile.xlsx," in Level3_LTE tab; T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 4-6.

[86] The average Ookla user throughputs data were collected in 2017.

[87] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Model, "Montana_Capacity_Analysis_Submission_New_T-Mobile.xlsx," in Level3_LTE tab.

[88] The amount of mmWave spectrum is adjusted by the propagation adjustment factor of **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]**% to yield the effective mmWave spectrum used in calculating the offered traffic of mmWave deployment.

[89] Sector busy hour loading is calculated as the ratio of the busy hour carried traffic, which is the product of the assigned number of subscribers in that sector and the busy hour usage per subscriber, to the offered traffic, which is the product of the amount of spectrum, the associated spectral efficiencies and 3,600 seconds/hour. The sector loading curve data is in the Curve tab.

[90] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Model, "Montana_Capacity_Analysis_Submission_New_T-Mobile.xlsx," in SiteRef, InputCalcs, Level1 and Level2_5G tabs.

**Fig. A9: The Network Solution Modeling Process**



58.       For each incremental network solution deployed with the associated capacity gain,[91] a revised user throughput is recalculated from the revised sector loading to look up the average busy hour user throughput via the 5G busy hour loading curve data.  The revised sector loading is calculated as the product of the previous sector loading and the ratio of the previous sector throughput to the revised sector throughput after each incremental network solution is deployed.[92]  In addition, the all-day average user throughput is calculated as the product of the busy hour average user throughput and the ratio of the all-day to busy hour user throughput to sector throughput ratio at the final loading.[93]  For each 5G sector, the model calculates its busy hour traffic loading, which is the ratio of busy hour carried traffic to busy hour offered traffic where:

**[BEGIN HIGHLY CONF. INFO.]**

**[END HIGHLY CONF. INFO.]**

59.       If the sector is marked as congested when the average busy hour user throughput is less than **[BEGIN HIGHLY CONF. INFO.]**    **[END HIGHLY CONF. INFO.]** Mbps based on its loading and offered traffic, then subsequent network solutions are applied.  For each subsequent network solution

---

[91] In the 5G network module of the Network Build Model, incremental capacity gains (over a macrocell sector's capacity) of a small cell, a sector, and a cell split are **[BEGIN HIGHLY CONF. INFO.]**                    **[END HIGHLY CONF. INFO.]**, respectively.  T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Model, "Montana_Capacity_Analysis_Submission_New_T-Mobile.xlsx," in Level3_5G tab; T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 4-6.

[92] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Model, "Montana_Capacity_Analysis_Submission_New_T-Mobile.xlsx," in Level3_5G tab.

[93] *Id.*

deployment, the model recalculates a revised sector loading and the average user throughput to determine if a sector remains congested.  The final and most expensive network solution is the cell split, which is a new cell site to be built near the original congested sector in order to off-load some traffic from it.  The Applicants state that the average cell split solution gain is **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]**% of a macrocell capacity based on T-Mobile's network statistics of the reduction of the number of RRC connected users in the congested sector.[94]

60.    The model determines the 5G sector congestion by calculating the average user throughput using a table lookup from the busy hour traffic loading curve.[95]  The traffic loading curve was obtained by using spline regression analysis of the network measured data relationship between the ratio of Ookla user throughput to sector throughput and the cell loading during the busy hour.[96]  For the low-band and mid-band spectrum overlay network solutions, the revised sector loading after each implemented solution is recalculated as:

$$Revised\ Loading = Previous\ Loading * \left(\frac{Previous\ Sector\ Throughput}{New\ Sector\ Throughput}\right)$$

61.    The new user throughput is recalculated using the revised sector loading.  The sector is still marked as congested if the new average busy hour user average throughput is still below **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** Mbps congestion threshold based on the user to sector throughput ratio using the loading curve table look-up, as shown in Fig. A10.[97]

---

[94] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 5.

[95] The average user throughput in a sector is the product of the sector offered traffic and the ratio of user to sector throughput, which is a function of the busy hour loading.

[96] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 2.

[97] *Id*. at 4.

$$User\ Throughput = User2Sector\ Throughput\ Ratio * Revised\ Sector\ Throughput$$

**Fig. A10: 5G Loading Curve**
**[BEGIN HIGHLY CONF. INFO.]**



**[END HIGHLY CONF. INFO.]**

62.    For the small cells, sector additions, and cell splits network solutions, the model calculates the number of each solution required to reduce the sector loading to the required level that would yield the average busy hour user throughput of at least **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** Mbps.  The required number of each solution, rounded up to the closest integer value, is calculated as:

**[BEGIN HIGHLY CONF. INFO.]**

**[END HIGHLY CONF. INFO.]**

63.    The solution gain for each sector addition and cell split is **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]**% of a macrocell capacity, and **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]**% of a macrocell capacity for each small cell solution gain.[98] The revised sector loading after each implemented solution is recalculated as:

**[BEGIN HIGHLY CONF. INFO.]**

**[END HIGHLY CONF. INFO.]**

---

[98] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 4-5.

64.    The model steps through each congestion mitigation solution, subject to certain constraints such as the maximum number of cell splits and which sectors can deploy a small cell solution, and then recalculates the new average busy hour user throughput using the revised sector loading. The sector is still flagged as congested, if the new average user throughput remains below **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** Mbps during the busy hour.

c.    **5G Loading Curves**

65.    The Applicants estimate the 5G busy-hour and the 5G all-day loading curves based on their 4x4 MIMO LTE network observations with 4x4 MIMO capable devices for multiple hours of Ookla throughputs from March 1, 2018 to June 18, 2018 and cover **[BEGIN HIGHLY CONF. INFO.]       [END HIGHLY CONF. INFO.]** sectors and **[BEGIN HIGHLY CONF. INFO.]       [END HIGHLY CONF. INFO.]** cells.[99] The 5G busy-hour loading curve is used for two purposes:[100] (1) to determine if a site is congested in their 5G network models,[101] and (2) to calibrate a 5G all-day loading curve.[102] The 5G busy-hour loading curve[103] maps the user throughput ratio[104] and loading[105] at the sector level.[106] Since the Applicants have not built their future 5G networks, and therefore have no actual network measurements for their future 5G networks, the Applicants use measurement data from T-Mobile's 4x4 MIMO LTE network to estimate the 5G busy-hour loading curve.[107] The 5G all-day loading curve maps a 5G sector-level busy-hour loading to a weighted average all-day user throughput for each sector of their 5G networks.[108] The averaged all-day user throughput is

---

[99] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 1.

[100] We note that this is a "multi-hour" loading curve, rather than a "busy-hour" loading curve since it was estimated using Ookla observations in multiple hours, which are not necessarily busy hours in a day. T-Mobile 114 K Info. Backup Apr. 18, 2019 Submission, 5G Backup, "114K_Hourly_Throughput_vs_Loading - Aug 3 2018.xlsx."

[101] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Models, "Montana_Capacity_Analysis_Submission_New_T-Mobile.xlsx," "Montana_Capacity_Analysis_Submission_T-Mobile.xlsx," and "Montana_Capacity_Analysis_Submission_Sprint.xlsx," in Curve tab, Level2_5G tab (Columns K-P), and Level3_5G tab (Columns L-T).

[102] T-Mobile Sept. 5, 2018 Network Modeling Filing, Document 41, "Loading Curve Analysis.docx" at 2-3.

[103] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Models, "Montana_Capacity_Analysis_Submission_New_T-Mobile.xlsx," "Montana_Capacity_Analysis_Submission_T-Mobile.xlsx," and "Montana_Capacity_Analysis_Submission_Sprint.xlsx," in Curve tab, Level2_5G tab (Columns L and M), and Level3_5G tab (Columns O and P).

[104] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 1 ("the ratio of user experience to SE-based throughput"), at 1 & n.1 ("User experience throughput is measured using data from Ookla.").

[105] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 1 & n.1 ("Loading is defined as the ratio of carried traffic to offered traffic.").

[106] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Models, Curve tab in the Excel workbooks. Since the networks are dimensioned at the busy hour, the estimated cell-level 5G multi-hour loading curve is used as the busy-hour loading curve in the Applicants' network models.

[107] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 1.

[108] Joint Opposition, Compass Lexecon Declaration at para. 137; T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 1-6.

then used to estimate consumer valuations of merger-specific increased average user throughputs between the New T-Mobile 5G network and that of the standalone networks during the busy hour.[109]

66.     The 5G multi-hour loading curve is estimated using a spline regression at the cell level. The dependent variable is the hourly cell throughput ratio, and the independent variables are the cell loading with knots (or breakpoints) at **[BEGIN HIGHLY CONF. INFO.]**

**[END HIGHLY CONF. INFO.]** values.[110]  This organizational structure divides the loading variable into five equal-sized groups.[111]  The Applicants calculate the cell loading as the carried traffic in the cell divided by the offered traffic in the sector which contains the cell.[112]  Both site and day dummies are also included in the spline regression to account for site- and day-specific fixed effects.[113]  Based on the above cell-level 5G busy-hour regression result, the Applicants calculate the sector-hour throughput ratio for any given sector-hour loading as:[114]

**[BEGIN HIGHLY CONF. INFO.]**




**[END HIGHLY CONF. INFO.]**

67.     The sector level non-busy-hour (i.e., Hours 2-24) loading is calculated by projecting busy-hour loading to non-busy-hours using the distribution of T-Mobile's traffic across the day.[115]  Specifically, the sector level non-busy-hour loading is calculated as the busy-hour loading times the ratio of non-busy-hour traffic relative to the busy-hour traffic for each sector for each of 23 non-busy hours in a

---

[109] Joint Opposition, Compass Lexecon Declaration at para. 137.

[110] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 1-3.

[111] *Id*. at 1.

[112] *Id*. at 1 & n.1; the Applicants state that "(l)oading is defined as the ratio of carried traffic to offered traffic." However, after careful examination of the data file provided by the Applicants, the cell loading is calculated as the carried traffic in the cell divided by the offered traffic in the sector which contains the cell, not by the offered traffic in the cell itself.  The data file from the Applicants does not have cell level offered traffic, it only has sector level offered traffic.  T-Mobile 114 K Info. Backup Apr. 18, 2019 Submission, 5G Backup, "114K_Hourly_Throughput_vs_Loading - Aug 3 2018.xlsx" (Columns G-I).

[113] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 1.

[114] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 2 (Table 1); *see also* T-Mobile 114 K Info. Backup Apr. 18, 2019 Submission, 5G Backup, Output "reg_sp_combined.doc."

[115] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 2.

day.[116]  For example, if the busy-hour loading is 0.8, and the ratio of a non-busy hour traffic relative to the busy-hour traffic is 0.9, then the loading in the non-busy hour is calculated as 0.8*0.9 or 0.72.  The 5G all-day loading curve is obtained using almost the same spline regression of the sector-level traffic weighted average all-day user throughput ratio on the sector-level busy-hour loading.[117]  The all-day loading curve is used by the Applicants to estimate the average user throughput in the Network Build Model, which is then used to estimate consumer valuations of network quality improvements.[118]

### 3.    Network Solution Description

68.    The network solutions are a set of available solutions to solve the radio network congestions.  Each network solution has a cost associated with building and deploying the solution as well as a maintenance cost.  The LTE module of the Network Build Model has the following available network solutions in the order of increasing costs and deployment priority: 5G upgrade, small cells, sector adds, and cell splits.  The 5G module of the Network Build Model has the following available network solutions in the order of increasing costs and deployment priority: low-band overlay, mid-band overlay, mmW overlay, small cells, sector adds, and cell splits.  The role of these solutions is as follows:

### a.    5G Upgrades

69.    This congestion-avoidance solution is available for any congested LTE site to upgrade to a 5G site with higher spectral efficiencies.  T-Mobile has been deploying and will continue to deploy 5G software upgradeable LTE radios at many of its existing sites.  In addition, these new radios are much more capable and efficient at handling broader spectrum bands for 5G and LTE.

### b.    Spectrum Overlays

70.    The "low-band, mid-band and mmWave spectrum overlay congestion-avoidance solution" refers to the addition of radio resources that can accommodate additional deployed spectrum.[119]  And if needed, new antennas for new spectrum bands are also added, which is the preferred network solution because it is the cheapest solution per incremental unit of capacity and it also provides the fastest relief to sector congestion.[120]  However, we note that the overall congestion relief benefits of the overlay solution depend on the overall penetration of devices capable of supporting the new overlay band.  The additional spectrum overlay capacity gain for spectrum in the same band is simply the ratio of the newly added amount of spectrum to the total existing amount of spectrum.[121]  However, mmW spectrum requires special treatment because of its limited propagation characteristics using a "propagation adjustment" factor or "traffic addressable by mmWave" factor to calculate the effective amount of spectrum that mmW overlay can be used to off-load the sector traffic.[122]

---

[116] T-Mobile 114 K Info. Backup Apr. 18, 2019 Submission, 5G Backup, Code, "5g_backup.do" (lines 143-66).

[117] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 3; and T-Mobile 114 K Info. Backup Apr. 18, 2019 Submission, 5G Backup, Code, "5g_backup.do" (lines 203-22).

[118] T-Mobile Information Request Response (Sept. 5, 2018), Attach. T-Mobile Documentations for Network Build Model, Document 41, "Loading Curve Analysis.docx" at 2-3; *see also* Joint Opposition, Compass Lexecon Declaration at paras. 137-38.

[119] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 3.

[120] Typical spectrum overlay deployment lead time is **[BEGIN HIGHLY CONF. INFO.]**          **[END HIGHLY CONF. INFO.]** months.  T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 4.

[121] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 3.

[122] Version 6th of the Network Build Model uses the site-specific "traffic addressable by mmWave" factor and all

(continued….)

### c.    Small Cells

71.    The small cells solution offers small coverage footprints and is suitable for built-up areas with heavy traffic demand.  Small cells can offer an effective network solution to deploy the radio resources to only those locations with the highest traffic concentrations.  However, the Applicants state that "this niche fit has resulted in limited adoption in the industry, given the added difficulty of siting and distributed transport challenges."[123]  There are only **[BEGIN HIGHLY CONF. INFO.]         [END HIGHLY CONF. INFO.]** small cells within the small cell polygon, typically in high population density and high site density areas, compared to a total of **[BEGIN HIGHLY CONF. INFO.]         [END HIGHLY CONF. INFO.]** cells in the **[BEGIN HIGHLY CONF. INFO.]  [END HIGHLY CONF. INFO.]** Mbps polygon, which is typically the core urban areas.[124]  One additional small cell capacity gain is **[BEGIN HIGHLY CONF. INFO.]   [END HIGHLY CONF. INFO.]**% of the macrocell capacity which is the average gain based on T-Mobile network statistics of the reduction of the number of RRC connections in the congested sector of a macrocell.[125]

### d.    Sector Additions

72.    The sector add solution refers to adding an extra sector or effectively splitting an existing congested sector into two sectors while still serving the same coverage area.  This solution adds additional network capacity by deploying two sectors to cover an area previously served by only one sector.  One additional sector capacity gain is **[BEGIN HIGHLY CONF. INFO.]   [END HIGHLY CONF. INFO.]**% of the macrocell capacity which is the average gain based on T-Mobile network statistics of the reduction of the number of RRC connections in the congested sector.[126]

### e.    Macrocell Splits

73.    The macrocell split solution refers to building a new macrocell site that will provide more capacity and increase radio network densification.  This solution adds additional network capacity by deploying two or more macrocell sites to cover an area previously served by only one site.  One additional site capacity gain is **[BEGIN HIGHLY CONF. INFO.]   [END HIGHLY CONF. INFO.]**% of the macrocell capacity, which is the average gain based on T-Mobile network statistics of the reduction of the number of RRC connections in the congested sectors in a site.  Cell splitting is the most expensive and time-consuming option which is used as the last network solution to address the sector congestion.[127]

(Continued from previous page) ━━━━━━━━━━━━━━━━━━
older versions use the "propagation adjustment" factor.

[123] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 4.

[124] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 28, "Polygons Map - 2Mbps vs 4Mbps and Small Cells.docx" at 1.

[125] RRC connections is a proxy for the number of connected LTE users on the cell site.  Typical small cell deployment lead time is at least **[BEGIN HIGHLY CONF. INFO.]   [END HIGHLY CONF. INFO.]** months.  T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 4.

[126] Typical sector add deployment lead time is **[BEGIN HIGHLY CONF. INFO.]         [END HIGHLY CONF. INFO.]** months.  T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 4.

[127] Typical cell split deployment lead time is **[BEGIN HIGHLY CONF. INFO.]         [END HIGHLY CONF. INFO.]** months.  T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 21, "Solution Sets.docx" at 4.

Federal Communications Commission                FCC 19-103

B.     **Additional Considerations**

1.     **Dynamic Spectrum Sharing for 5G**

74.     The Network Build Model treats portions of the LTE spectrum as refarmed for the 5G network even if 5G is not yet ubiquitously deployed in a market.[128]  We are concerned that this may be an inefficient use of spectrum because some LTE-only sites would have less spectrum for LTE after the refarm even though they have yet to deploy 5G.  Furthermore, the Network Build Model predicts that some sectors with lightly loaded LTE traffic have highly congested 5G traffic requiring multiple expensive site splits.[129]  The upcoming availability of Ericsson's RAN dynamic spectrum sharing feature (to be available in the second half of 2019 for all base stations newer than 2015), which is a base station software that Ericsson says can dynamically share the same carrier (or spectrum) between LTE and 5G in milliseconds depending on the real time traffic demand of LTE and 5G users and increase the efficiency of spectrum utilization and minimize spectrum wastage.[130]

75.     The Applicants note that there are several limitations of dynamic spectrum sharing deployments,[131] such as additional control signaling overheads, **[BEGIN HIGHLY CONF. INFO.]**
**[END HIGHLY CONF. INFO.]**, feature compatibility restrictions (for e.g., NB-IoT), and the commercial availability risk.[132]  While these points are well-taken, nonetheless, we find that the dynamic spectrum sharing feature, if technologically and commercially feasible, would likely increase the network efficiencies during the 5G transition period for either of the Applicants or New T-Mobile.  Dynamic spectrum sharing would be particularly beneficial for the standalone companies, which have less spectrum.  The Applicants would no longer need to dedicate a fixed amount of spectrum for 5G migration (a traditional spectrum refarming method) and the base station software would dynamically, in milliseconds, utilize the appropriate amount of spectrum resource for each technology depending on different demands.  This would greatly simplify the Applicants' network planning and spectrum refarming for 5G deployment, although we note that there are some overhead inefficiencies, costs for acquiring the software, and some older base stations are not supported—in addition to the technological and commercial risk of relying on a new product from a single vendor.  Furthermore, LTE-only devices performance will not likely be negatively affected compared to static refarming, when 5G devices penetration is low, since the spectrum resources are dynamically allocated in real time or near real time.

2.     **Cell Splits Utilization of LTE Spectrum**

76.     Typical cell splits utilize all the available spectrum to maximize the spectrum utilization.  The 5G module of the Network Build Model assumes that only the spectrum reserved for 5G deployment can be used for subsequent 5G split cells, as shown in Fig. A11.  However, the available LTE spectrum

---

[128] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Network Build Model, "Montana_Capacity_Analysis_Submission_New_T-Mobile.xlsx," in SiteRef, Level1, Level2_LTE, Level3_LTE, Level2_5G, Level3_5G tabs.

[129] *Id.*

[130] Ericsson, *Ericsson and Intel to show live demo of 4G + 5G dynamic spectrum sharing at MWC 2019* (Feb. 22, 2019), https://www.ericsson.com/en/press-releases/2019/2/ericsson-and-intel-to-show-live-demo-of-4g--5g-dynamic-spectrum-sharing-at-mwc-2019; Ericsson, *Ericsson Spectrum Sharing*, https://www.ericsson.com/en/portfolio/networks/ericsson-radio-system/radio-system-software/ericsson-spectrum-sharing (last visited Oct. 14, 2019).

[131] Dynamic spectrum sharing is a 5G feature that would enable complete utilization and dynamically efficient sharing of the deployed spectrum for both 5G and LTE demands.  Ericsson, *Ericsson Spectrum Sharing*, https://www.ericsson.com/en/portfolio/networks/ericsson-radio-system/radio-system-software/ericsson-spectrum-sharing (last visited Oct. 14, 2019).

[132] T-Mobile Apr. 2, 2019 Engineering *Ex Parte* Letter, Attach. G at 1-2.

deployed in the original congested site is completely unutilized in the newly split 5G cells, which generates a high number of cell splits for some highly congested sectors where the amount of available 5G spectrum is limited compared to LTE spectrum primarily in 2021 and 2022 for standalone T-Mobile.

**Fig. A11: Network Build Model 5G Cell Splitting Process**



77.     A fully utilized LTE spectrum deployment in the newly split 5G cells could serve as a more cost-effective network solution as shown in Fig. A12 below. Additional 5G cell splits could fully deploy LTE spectrum with software defined LTE radios that also could off-load 5G traffic when a sector is congested, although at lower spectral efficiencies. The LTE radios could be software upgraded to 5G radios later when needed.[133] New 5G capable devices will have both LTE and 5G capabilities that can connect to either or both 5G and LTE networks.[134] It is important to note that this proposed LTE solution for 5G congestion would not relieve 5G congestion per se nor would it affect the marginal cost of delivering 5G data. The solution would instead downgrade traffic from 5G to LTE when LTE is available and a 5G cell is congested, depriving users of 5G's full performance benefits. Furthermore, if both LTE and 5G are deployed, the solution provides users capacity only when both the 5G and the LTE capacity of a particular cell are congested simultaneously. The Network Build Model does not allow offloading of 5G traffic to LTE, so if the 5G capacity of the original cell is congested but the LTE capacity is not, adding LTE capacity to the new cells (Cells A1 and A2 in the diagram) would have little or no effect on the performance of data exchanges with users.

78.     T-Mobile claims that the "**[BEGIN HIGHLY CONF. INFO.]**

**[END HIGHLY CONF. INFO]**."[135]  However, T-Mobile previously had stated that the "T-Mobile (the anchor network) has been deploying radio resources that are software upgradeable to 5G at many of its existing cell sites and will continue to do so during the transition process."[136]

---

[133] Joint Opposition, Ray Reply Declaration at para. 51.

[134] GSMA White Paper, *Road to 5G: Introduction and Migration*, at 16 and 21 (Apr. 2018), https://www.gsma.com/futurenetworks/wp-content/uploads/2018/04/Road-to-5G-Introduction-and-Migration_FINAL.pdf.

[135] T-Mobile Supplemental Information Request Response at 2 (Dec. 6, 2018).

[136] Joint Opposition, Ray Reply Declaration at para. 51.

**Fig. A12: Alternative Network Build Model 5G Cell Splitting Process**



### 3.     mmWave Spectrum Modeling

79.     Existing T-Mobile mmW spectrum could play a more critical role in solving congestion in T-Mobile core areas for highly congested sectors that require multiple cell splits. The Network Build Model[137] assumes that the mmW spectrum has a constant "propagation adjustment" factor of 10% because the Applicants consider mmW propagation only covers approximately **[BEGIN HIGHLY CONF. INFO.]   [END HIGHLY CONF. INFO.]**% of the coverage area of the average macrocell site in the core areas.[138] This constant propagation adjustment factor assumption is based on the average inter-site distance (ISD) of all existing macrocell sites within the core of T-Mobile's markets.[139] We believe that a constant propagation adjustment factor may be too restrictive and inflexible for sites with ISDs smaller than **[BEGIN HIGHLY CONF. INFO.]      [END HIGHLY CONF. INFO.]** meters. A variable propagation adjustment factor based on each macrocell site ISD may be more suitable and should have been considered; this would more accurately reflect the effective amount of mmW spectrum that can be used for congestion relief at each site. The Applicants' April 22, 2019 version of the Network Build Model has improved the mmW modeling, such that the propagation adjustment factor is now site-specific based on network measurements of coverage areas addressable by mmW spectrum.[140]

---

[137] Up to the "March 6, 2019" version of the Network Build Model.

[138] T-Mobile Apr. 22, 2019 *Ex Parte* Letter, Compass Lexecon Attach. at 2; T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 18, "mmWave Factor.docx" at 2, stating that the **[BEGIN HIGHLY CONF. INFO.]**

**[END HIGHLY CONF. INFO.]**.

[139] T-Mobile Information Request Response, Attach. T-Mobile Documentations for Network Build Model, Document 18, "mmWave Factor.docx" at 2, stating **[BEGIN HIGHLY CONF. INFO.]**
**[END HIGHLY CONF. INFO.]**.

[140] The site-specific "addressable traffic by mmWave" factor is used to determine the amount of effective mmWave spectrum that can be used to off-load traffic from the macrocells. This factor is calculated **[BEGIN HIGHLY CONF. INFO.]**
**[END HIGHLY CONF. INFO.]**.

80.      The Applicants' Network Build Model assumes that current small cell polygons are constant until 2024, and their models use these as the locations where they can deploy small cells. The small cells, with small equipment footprints, have lower transmission power and antenna heights and are network solutions to solve congestion suitable for small areas with heavy traffic concentration. In highly congested areas with a high number of macrocell splits and small ISDs, cheaper solutions, such as small cells, could offer a more cost-effective solution when the coverage area of a macrocell approaches that of a microcell. While the Network Build Model does not address these issues, we note that the availability of backhaul, power, and appropriate attachment locations, in addition to the siting authorization process, can determine which solution is most cost-effective.

81.      We evaluated the September 17 version of the Network Build Model for standalone T-Mobile congested sectors and found that only **[BEGIN HIGHLY CONF. INFO.]      [END HIGHLY CONF. INFO.]** congested sectors, out of the **[BEGIN HIGHLY CONF. INFO.]          [END HIGHLY CONF. INFO.]** total congested sectors, are allowed to deploy small cells solution.[141] However, there are **[BEGIN HIGHLY CONF. INFO.]          [END HIGHLY CONF. INFO.]** congested sectors that have the nearest inter-site distances (ISD) less than **[BEGIN HIGHLY CONF. INFO.]          [END HIGHLY CONF. INFO.]** meters, which is the average ISD for the first national launch polygon in the core areas of T-Mobile's markets. Macrocell splits are expensive and time consuming to deploy and there are many sectors in the Network Build Model for standalone T-Mobile that have a high number of cell splits to solve congestion. For Sprint, the cell split limits range from two to eight cell splits for one originally congested sector and for T-Mobile, the limits range from six to twenty-four cell splits. Clearly for some congested sectors in urban or suburban areas, it is likely not practical to deploy that many macrocells that close to each other. Small cells could offer a more cost-effective solution in at least some cases, but are unable to be deployed because they fall outside of the small cell polygon.

### 4.      Static Spectrum Holding Assumption

82.      Acquiring spectrum is another way to ubiquitously increase capacity throughout a large area that the additional spectrum is licensed. Spectrum is generally acquired over a geographic area, such as a CMA, which can be used at every cell in that market. The total capacity for the network is simply the product of the number of cells, deployed spectrum per cell, and the spectral efficiency. Furthermore, the additional spectrum also reduces the costs of adding additional capacity by cell splitting because each new cell will have the extra amount of additional capacity generated by the additional spectrum. Additional mmW, CBRS, and other spectrum, although constrained by limited propagation, could play a role in denser areas as one of the more cost-effective network solutions to solve the predicted severe 5G network congestions for standalone T-Mobile. Although the Commission has an aggressive strategy to put more spectrum into the marketplace, the amount, timing, bands, and cost of the spectrum are uncertain.

### C.      Crediting Cost Benefits from the Network Build Model for Purposes of Predicting Merger Price Effects

83.      In order to predict merger price effects in their static unilateral effects economic model, the Applicants used a Financial Backend Model to convert Network Build Model solutions into marginal costs. Each version of the Network Build Model, beginning with the September 17 submission as described above, has an associated Financial Backend Model.[142] We find that significant marginal cost reductions are creditable as verifiable merger efficiencies quantified by these models, but in light of questions parties raised in the record as to several inputs, we examine two alternative cost savings.[143]

---

[141] The analysis was based on sites that fall within the small cell polygon.

[142] See supra section A-II: Description of the Network Build Model (describing each iteration of the Network Build Model that was submitted.).

[143] See infra section A-V.C: Crediting Cost Benefits from the Network Build Model for Purposes of Predicting

(continued….)

84.    The Network Build Model produces as an output a solution set of incremental network solutions for each year it is run.[144]  The Applicants then feed this yearly output into the Financial Backend Model, which is used to convert the output into a dollar figure.  Each solution has an associated annual operating cost (OpEx) and capital cost (CapEx).  The OpEx and CapEx costs are then totaled, with CapEx amortized over five years (for T-Mobile and New T-Mobile) or seven years (for Sprint).  The total cost is then compared with the cost of incremental network solutions suggested by the Network Build Model in response to 10% changes in total traffic, to produce a marginal total network cost.[145]  Specifically, the Applicants compare the costs of the baseline total 5G or LTE traffic levels with the costs of total traffic at 90% and 110% of the baseline levels for 5G or LTE.  This marginal cost is converted to a monthly figure and divided by the total traffic amount to produce a marginal cost per GB, as indicated by Equation (1)

$$MC_{GB} \equiv f_{GB}(OpEx, CapEx) \quad (1)$$

where $f_{GB}$ represents a function which for a given year takes as inputs the levels of OpEx and CapEx under different traffic assumptions, denoted $\boldsymbol{OpEx}$ and $\boldsymbol{CapEx}$, and maps them into a marginal cost per GB for that year.[146]  Finally, marginal cost per GB is multiplied by the per subscriber monthly demand from the Network Build Model to calculate a marginal cost per additional subscriber per month.  As demonstrated by Equation (2), this marginal cost per additional subscriber is a function of the marginal cost per FB and the per-subscriber monthly demand.

$$MC_{SUB} \equiv f_{SUB}(MC_{GB}, D_{SUB}) \quad (2)$$

85.    The Financial Backend Model also keeps 5G marginal costs separate from LTE marginal costs—solution sets with 10% changes to traffic were run separately for 5G and LTE.[147]  A key input of the Financial Backend Model is the cost for each solution.  On September 17, the Applicants asserted the following costs, as shown in Fig. A13.

---

(Continued from previous page) ────────────────

Merger Price Effects (explaining the two different versions of marginal cost that staff ran through the IKK model).

[144] See supra section A-II: Description of the Network Build Model (explaining that the Network Build Model generates the types and amounts of incremental network solutions).

[145] T-Mobile Supplement to and Revision of Information Request Response (Sept. 17, 2018), Attach. Financial Backend Model.

[146] More precisely, $\boldsymbol{OpEx}$ and $\boldsymbol{CapEx}$ are vectors containing two elements, including OpEx and CapEx based on 100% traffic and either OpEx and CapEx based on 90% traffic or 110% traffic as deemed appropriate by the Applicants for a given year.  We note that $f_{GB}$ and other functions specified in this Appendix can vary by year, but for concision we have withheld year identifiers.

[147] T-Mobile Supplement to and Revision of Information Request Response (Sept. 17, 2018), Attach. Financial Backend Model.

Federal Communications Commission                    FCC 19-103

Fig. A13: Applicants' Solution Costs–September 2018
[BEGIN HIGHLY CONF. INFO]

| | | Incremental Solutions | | | | | |
|---|---|---|---|---|---|---|---|
| Stand-Alone T-Mobile | | 5G Upgrade | Lowband Overlay | Midband Overlay | Small Cells | Sector Adds | Cell Splits |
| | CapEx ($/Unit) | | | | | | |
| | OpEx ($/Unit/Year) | | | | | | |
| Stand-Alone Sprint | | Incremental Solutions | | | | | |
| | | 5G Upgrade | Mini Macros | Cell Splits | | | |
| | CapEx ($/Unit) | | | | | | |
| | OpEx ($/Unit/Year) | | | | | | |
| New T-Mobile | | Incremental Solutions | | | | | |
| | | 5G Upgrade | Lowband Overlay | Midband Overlay | Small Cells | Sector Adds | Cell Splits |
| | CapEx ($/Unit) | | | | | | |
| | OpEx ($/Unit/Year) | | | | | | |

[END HIGHLY CONF INFO.]

86.    When the Applicants resubmitted the model in February 2019 with new incremental solution options, they also submitted new costs for solutions.[148]  The costs for the new solutions as shown in Fig. A14 are:

---

[148] T-Mobile Feb. 21, 2019 *Ex Parte* Letter, Attach. Financial Backend Model.

**Fig. A14: Applicants' New Solution Costs–February 2019**
**[BEGIN HIGHLY CONF. INFO]**

| | | Incremental Solutions | | | |
|---|---|---|---|---|---|
| **Stand-Alone T-Mobile** | | mmWave Overlay | Add-on: Lowband w/o Clubbing | Add-on: Cell Split w/ mmWave | Add-on: mmWave w/o Clubbing |
| | CapEx ($/Unit) | | | | |
| | OpEx ($/Unit/Year) | | | | |
| **Stand-Alone Sprint** | Incremental Solutions | | | | |
| | | Add-On: Cell Splits with FD-MIMO | | | |
| | CapEx ($/Unit) | | | | |
| | OpEx ($/Unit/Year) | | | | |
| **New T-Mobile** | | Incremental Solutions | | | |
| | | mmWave Overlay w/ Clubbing | Add-on: mmWave w/o Clubbing | Add-on: Lowband w/o Clubbing | Add-on: AWS/PCS w/o Clubbing |
| | CapEx ($/Unit) | | | | |
| | OpEx ($/Unit/Year) | | | | |
| **New T-Mobile (cont.)** | | Incremental Solutions | | | |
| | | Add-on: Small Cell w/ AWS/PCS | Add-on: Sector Add w/ AWS/PCS | Add-on: Cell Split w/ AWS/PCS | Add-on: Cell Split w/ mmWave |
| | CapEx ($/Unit) | | | | |
| | OpEx ($/Unit/Year) | | | | |

**[END HIGHLY CONF INFO.]**

87.    In addition to these new solutions, the Applicants submitted new costs for their original solutions for standalone T-Mobile and New T-Mobile as shown in Fig. A15.[149]  Unlike in their original submission, standalone T-Mobile and New T-Mobile were not assumed to have the same costs for all solutions.  Sprint's original costs remained unchanged.

---

[149] *Id.*

Federal Communications Commission    FCC 19-103

**Fig. A15: Applicants' Updated Solution Costs–February 2019**
**[BEGIN HIGHLY CONF. INFO]**

| Stand-Alone T-Mobile | | Incremental Solutions | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 5G Upgrade | Lowband Overlay | Midband Overlay | Small Cells | Sector Adds | Cell Splits | |
| | CapEx ($/Unit) | | | | | | | |
| | OpEx ($/Unit/ Year) | | | | | | | |

| New T-Mobile | | Incremental Solutions | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 5G Upgrade | Lowband Overlay | Midband Overlay - 2.5 GHz | Midband Overlay - AWS/PCS | Small Cells | Sector Adds | Cell Splits |
| | CapEx ($/Unit) | | | | | | | |
| | OpEx ($/Unit/ Year) | | | | | | | |

**[END HIGHLY CONF. INFO]**

88.    The Financial Backend Model is highly sensitive to changes in demand.  This is because per-user demand is an input in not just the Financial Backend Model (see Equation (2)), but also in the Network Build Model.  A decrease or increase in per-user demand will produce a smaller or greater incremental network solution set from the Network Build Model, which will, in turn, result in a decrease or increase in OpEx and Cap Ex, as demonstrated by Equations (3) and (4).

$$OpEx \equiv g_{OpEx}(D_{SUB}) \text{ (3)}$$
$$CapEx \equiv g_{CapEx}(D_{SUB}) \text{ (4)}$$

This results in a change in marginal cost per GB.  Substituting (3) and (4) into (1) yields Equation (5).

$$MC_{GB} = f_{GB}(\boldsymbol{g_{OpEx}(D_{SUB})}, \boldsymbol{g_{CapEx}(D_{SUB})}) \text{ (5)}$$

where bold font indicates that OpEx and CapEx at 100% traffic and following a 10% change are entering the marginal cost per GB function.[150]  Finally, substituting (5) into (2) result in Equation (6).

$$MC_{SUB} = f_{SUB}(f_{GB}(\boldsymbol{g_{OpEx}(D_{SUB})}, \boldsymbol{g_{CapEx}(D_{SUB})}), D_{SUB}) \text{ (6)}$$

As demonstrated in (6), per-user demand factors into three different components of the right-hand side of the equation.

89.    In addition, we note that the Maintain Usage Scenario for standalone T-Mobile is responsive to the Financial Backend Model.  To calculate demand in the Maintain Usage case, the Applicants constrained demand based on the total OpEx costs (but not CapEx) of the solution sets from the 5G network model as calculated in the Financial Backend Model,[151] implying that demand is a function of OpEx (Equation (7)).

$$D_{SUB} = h(OpEx) \text{ (7)}$$

---

[150] In other words, $\boldsymbol{g_{OpEx}(D_{SUB})}$ and $\boldsymbol{g_{CapEx}(D_{SUB})}$ are vector functions.  As before, we omit year indicators.

[151] Joint Opposition, Ewens Reply Declaration at 16.

Substituting (7) into (3) and (4), gives us Equation (8) which indicates that both OpEx and CapEx are functions of OpEx.[152]

$$OpEx = g_{OpEx}(h(OpEx)) \quad CapEx = g_{CapEx}(h(OpEx)) \quad (8)$$

Equation (8) suggests that demand must be calculated recursively; when per-user demand is constrained, OpEx costs decrease, and when OpEx costs decrease, per-user demand is relaxed.[153]

90.    This relationship between OpEx and constrained demand indicates that the cost of each of the incremental solutions in the Financial Backend Model is an input into demand. Accordingly, when the OpEx costs submitted in February 2019, as described in the Figures above, were reduced for some solutions, this resulted in a substantial increase in per-user demand in the Maintain Usage case. However, the majority of costs for any solution, and thus for any solution set, are not OpEx, but CapEx. Accordingly, the increase in per-user demand that resulted from reduced OpEx costs had the seemingly counterintuitive effect of raising total costs, as the model allowed for more capital-intensive solutions. As a result, marginal cost per additional subscriber increased by as much as [BEGIN HIGHLY CONF. INFO] [END HIGHLY CONF. INFO]% in a given year between the September and February submissions. In the Maintain Usage case, a decrease in OpEx costs leads to an increase in per-user demand and to investment decisions that have non-obvious outcomes. We thus have concerns with the results from the Maintain Usage case outputs.

91.    In addition to the Maintain Usage case, separate demand assumptions exist for Sprint and for unrestrained T-Mobile usage (Relaxed Case) for each year through 2024. Projecting usage six years into the future is not a standard practice and introduces additional uncertainty.[154] Moreover, there are specific concerns relating to the development of the demand projections for use in the Network Build Model. The Sprint demand forecast increases from [BEGIN HIGHLY CONF. INFO.] [END HIGHLY CONF. INFO.] GB per month in 2019 to [BEGIN HIGHLY CONF. INFO.] [END HIGHLY CONF. INFO.] GB per month in 2024,[155] whereas the T-Mobile Relax demand forecast increases from [BEGIN HIGHLY CONF. INFO.] [END HIGHLY CONF. INFO.] GB per month in 2019 to [BEGIN HIGHLY CONF. INFO.] [END HIGHLY CONF. INFO.] GB per month in 2024.[156] The disparity in the two demand forecasts range from T-Mobile projecting [BEGIN HIGHLY CONF. INFO.] [END HIGHLY CONF. INFO.] usage than Sprint in 2019, to projecting [BEGIN HIGHLY CONF. INFO.] [END HIGHLY CONF. INFO.] than Sprint in 2024. The record indicates that the T-Mobile relaxed case demand estimates do not reflect an ordinary course business planning exercise. The Sprint demand estimates are more conservative, and staff acknowledges

---

[152] This implies that functions $h$ and $g_{OpEx}$ are inverse functions (over a certain interval).

[153] The record did not allow us to verify whether this recursive procedure is undertaken by the Applicants in the ordinary course of business or was applied exclusively in support of the proposed transaction. Additionally, we do not have sufficient inputs—which include best course of action judgements by the Applicants' executives—to replicate the procedure ourselves in response to changes in efficiencies.

[154] See, e.g., TMUS-FCC-07845583 "Demand Forecast." This October 2016 forecast projected out through 2021. For year 2019, it forecasted monthly per-subscriber usage of [BEGIN HIGHLY CONF. INFO] [END HIGHLY CONF. INFO] GB. However, in the submission made by the parties in September 2018, the 2019 projection had dropped to [BEGIN HIGHLY CONF. INFO [END HIGHLY CONF. INFO] GB per month, a reduction of approximately [BEGIN HIGHLY CONF. INFO] [END HIGHLY CONF. INFO]% in a period of just two years for a projection that was originally only three years.

[155] SPR-FCC-08669596, at 13 [BEGIN HIGHLY CONF. INFO] [END HIGHLY CONF. INFO.].

[156] TMUS-FCC-07978714, at "Subs and Tonnage Forecast" tab (T-Mobile, "Subscriber and Traffic Forecast – with comments.xlsx," June 20, 2018).

that those estimates could easily turn out to be too conservative.[157] Fig. A16 below shows demand forecasts that appear in the record or are publicly available.

### Fig. A16: Sample of Record and Publicly Available Demand Forecasts
**[BEGIN HIGHLY CONF. INFO]**

| Forecast | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | CAGR | Network |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sprint May 2018 LTE[158] | | | | | | | | | | | 4G |
| Cisco Feb. 2019 4G[159] | | 3.5 | | | | | 6.4 | | | 13% | 4G |
| T-Mobile April 2018[160] | | | | | | | | | | | 4G |
| AT&T April 2017[161] | | | | | | | | | | | ALL |
| Ericsson June[162] 2019 | | 5.7 | 7 | | | | | | 39 | 32% | ALL |
| AT&T Sept. 2017[163] | | | | | | | | | | | ALL |
| T-Mobile 4G/5G forecast[164] | | | | | | | | | | | ALL |
| Cisco Feb. 2019 per capita[165] | | 3.8 | | | | | 16.4 | | | 34% | ALL |

---

[157] *See supra* section V.B.3: Unilateral Effects, paras. 157-59.

[158] *See* SPR-FCC-08669596 "18.2 Customer Demand Forecast" at 13. Usage per subscriber on Sprint's 4G LTE network.

[159] Cisco, VNI Mobile Forecast Highlights Tool, publicly available at https://www.cisco.com/c/m/en_us/solutions/service-provider/forecast-highlights-mobile.html (last visited Oct. 14, 2019). United States, Mobile Network Type, Traffic by Network Type—5G, 4G, 3G, 2G. Usage per 4G connection in USA; Cisco forecasts 1.5 and 3.1 total connections per user in 2017 and 2022, respectively.

[160] TMUS-FCC-07080092. Usage per LTE device (including IoT) on T-Mobile network.

[161] ATT-STMOFCC-00104369 at Fig. 1. Usage per post-paid smartphone on T-Mobile network.

[162] Ericsson, Ericsson Mobility Report, at 35 (June 2019), publicly available at https://www.ericsson.com/49d1d9/assets/local/mobility-report/documents/2019/ericsson-mobility-report-june-2019.pdf. Usage per smartphone in North America.

[163] *See* ATT-STMOFCC-00113604 "Wireless Cost Structure" at 8. Usage per subscriber on AT&T network, unmanaged and unlimited data. The observed and projected usages of **[BEGIN HIGHLY CONF. INFO]**
**[END HIGHLY CONF. INFO]** GB in 2016 and 2021, respectively, were derived from a subset of AT&T consumers of **[BEGIN HIGHLY CONF. INFO]**                    **[END HIGHLY CONF. INFO]** plans.

[164] *See generally* T-Mobile Record Submissions. Usage per 4G and 5G subscriber on T-Mobile network, weighted by percentage of subscribers by standard.

[165] Cisco, VNI Mobile Forecast Highlights Tool, publicly available at https://www.cisco.com/c/m/en_us/solutions/service-provider/forecast-highlights-mobile.html (last visited Oct. 14,

(continued….)

**Federal Communications Commission**                    **FCC 19-103**

| Forecast | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | CAGR | Network |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ericsson Nov. 2018[166] | | 6.6 | 8.6 | | | | | | 50 | 34% | ALL |
| Ericsson June 2018[167] | 5.2 | 7.2 | | | | | | 49 | | 38% | ALL |
| Sprint May 2018 5G[168] | | | | | | | | | | | 5G |
| T-Mobile 5G forecast[169] | | | | | | | | | | | 5G |
| Cisco Feb. 2019 5G[170] | | | | | | | 21.7 | | | N/A | 5G |

[END HIGHLY CONF. INFO]

92.    In light of the foregoing, we find that the Applicants' models yield verifiable quantifications of marginal cost benefits, but with some uncertainty as to certain modeling choices and inputs. In order to undertake an economic analysis robust to reasonable variations along those lines, staff adjusted the Network Build Model and Financial Backend Models to produce various alternative scenarios. In the Sprint demand scenario, staff adjusted the Network Build Model and Financial Backend Model to apply the Sprint demand forecast to standalone Sprint, standalone T-Mobile, and New T-Mobile, while accepting all other assumptions in the Network Build Model. Staff then passed the resulting efficiencies through the IKK model to test the effects on market prices with these reduced efficiencies, which are shown in Fig. 3c of this MO&O.[171]

93.    Finally, staff ran multiple simulations of the Network Build Model and Financial Backend Model to test the sensitivities based on various adjustments made to the Network Build Model to account for issues discussed above, such as dynamic spectrum sharing, cell split utilization of 5G spectrum, and millimeter-wave spectrum deployment. After analyzing various combinations of these simulations' effects on network marginal costs and taking into account the uncertainty with other

(Continued from previous page) ——————————
2019). United States, 2022 Forecast Highlights. Usage per capita in USA, reduced by growth of users as proportion of population.

[166] Ericsson, Ericsson Mobility Report, at 31 (Nov. 2018), publicly available at https://www.ericsson.com/491e34/assets/local/mobility-report/documents/2018/ericsson-mobility-report-november-2018.pdf. Usage per smartphone in North America.

[167] Ericsson, Ericsson Mobility Report, at 35 (June 2018), publicly available at https://www.ericsson.com/en/mobility-report/reports. Usage per smartphone in North America.

[168] Usage per 5G subscriber on Sprint network; assumes that initially "a 5G smart phone consumes [BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]% more data than a 4G smartphone if 5G coverage reaches 100% of 4G coverage." SPR-FCC-04338918 at 5.

[169] See generally T-Mobile Record Submissions. Usage per 5G subscriber on T-Mobile network.

[170] Cisco, VNI Mobile Forecast Highlights Tool, publicly available at https://www.cisco.com/c/m/en_us/solutions/service-provider/forecast-highlights-mobile.html (last visited Oct. 14, 2019). United States, Mobile Network Type, Traffic by Network Type—5G, 4G, 3G, 2G. Usage per 5G connection in USA; Cisco forecasts 3.1 total connections per user in 2022.

[171] See supra Fig. 3c: Marginal Cost Savings; New T-Mobile Baseline Scenario with Sprint-Demand Adjustment.

elements of the model, staff cut 50% of the Applicants' stated marginal cost benefits.[172]  Due to insufficient information in the model provided, however, staff did not evaluate how that marginal cost cut would stimulate the build out of additional network capacity, which in turn very likely would increase the final marginal cost calculation above the level of the initial cut.  These efficiencies estimates were also used as inputs into the IKK model as a sensitivity test against the demand adjustment described above.

## VI.    NETWORK COVERAGE ANALYSIS

94.    Prospectively predicting the coverage of any network is a complicated undertaking.  Actual coverage will depend on various technical factors, including the characteristics of technology deployed, the specifics of the network deployment, and the strength of the available RF signal.  It also depends on environmental considerations including topography, density, and type of physical infrastructure in the covered area and even atmospheric conditions.  There are additional challenges to predicting the coverage provided by a new technology like 5G.  In this case, however, in addition to a robust network build plan, the Applicants have provided extensive coverage commitments, with significant associated penalties if they are not met, that add significant additional certainty to our analysis.  The Public Interest Statement presents predictions of 5G covered population, coverage maps, and network throughput speeds by covered population of the New T-Mobile network in comparison to the predicted coverage and network throughput speeds of both the T-Mobile and Sprint networks on a standalone basis.[173]

95.    To assess the Applicants' claims, staff requested additional information about each of the networks.[174]  In response, the Applicants supplied additional coverage input data, including base station site locations, pertinent antenna information, information about proprietary 5G radio planning software, and LTE link budgets for the existing standalone T-Mobile network and 5G networks.[175]  Staff analyzed the population coverage of the Applicants' network deployment plan at the census block level, using the Applicants' predicted site locations and 5G RF link budgets, along with the propagation and antenna models in a LTE RF system scenarios technical report provided by 3GPP and ETSI.[176]  However, we note that some formulas and calculations used to produce the submitted coverage data were not presented in the record and thus cannot be directly verified.[177]

---

[172] See supra Fig. 3b: Marginal Cost Savings; New T-Mobile Baseline Scenario at 50% of Claimed Efficiencies.

[173] Public Interest Statement at 23, 26-27, 46-47 (showing Figs. 2, 4-5, 9-10, and Table 9, respectively).  Information provided in the Public Interest Statement included: coverage maps of 5G Coverage in 2024 for T-Mobile and Sprint standalone networks (Fig. 2 and Fig. 9), and New T-Mobile network (Fig. 10); 5G Throughput by Covered Pops (2021–Fig. 4, 2024–Fig. 5); and 5G Coverage Comparisons (Table 9).

[174] Upon reviewing the Applicants' Public Interest Statement, the Commission requested information (Information Request) with a number of specific requests, two of which (#20 and #21) were focused on, a) RF coverage maps (along with propagation model assumptions and link budget calculations for producing coverage map shapefiles) of the Applicants' current networks (#20), and b) RF coverage maps by average download data rates for the projected networks in 2021 and 2024 (#21).  T-Mobile Information Request at 6 (Aug. 15, 2018); Sprint Information Request at 5-6 (Aug. 15, 2018).

[175] Applicants' Information Request Response #20 included LTE RF link budgets, user reference guide documentation, input configuration data information used by a proprietary 5G radio planning tool suite by TEOCO Ltd., and resulting coverage maps and shapefiles.  T-Mobile Information Request Response, Attach. Spec. 20 (Sept. 5, 2018).

[176] ETSI, TR 36.942, Evolved Universal Terrestrial Radio Access (E-UTRA), Radio Frequency (RF) system scenarios (3GPP TR 36.942 version 15.0.0 Release 15) (July 24, 2018), https://www.etsi.org/deliver/etsi_tr/136900_136999/136942/15.00.00_60/tr_136942v150000p.pdf (describing antenna and propagation models in sections 4.2 and 4.5, respectively).

[177] T-Mobile Dec. 28, 2018 Ex Parte Letter at 1-2.  T-Mobile described their use of a proprietary RF engineering database (Asset) (stating that "[i]n generating population coverage figures, all sites/sectors/bands for each network

(continued....)

96.    We find that the Applicants' 2024 coverage estimates likely reflect probable coverage areas for New T-Mobile based on the submitted site configurations and coverage claims,[178] within a reasonable margin of error.  First, we predict that approximately 89.5% U.S. population coverage with 5G would be achieved for the submitted build-plan by New T-Mobile in the mid-band PCS, AWS, and 2.5 GHz spectrum.  This compares to the 86% coverage that was claimed by the Applicants in year 2024.[179]  By contrast, staff's coverage analysis suggests that the submitted build-plan for New T-Mobile would achieve approximately 94% U.S. population 5G coverage using the Applicants' **[BEGIN HIGHLY CONF. INFO.]  [END HIGHLY CONF. INFO.]** Mbps cell edge user throughput RF link budget in the 600 MHz band.[180]  This compares to the 99% coverage that was claimed.[181]  We note, however, that the Applicants' coverage commitments do not specify the precise equipment locations used for these modeling exercises, and we expect that any coverage shortfall will be met by additional builds as required by the Applicants' commitments.

97.    The distribution of the 5G speeds to covered populations can also be confirmed.  The Applicants submitted data to show 5G speeds versus covered population distribution for years 2021 and 2024, for each of the three networks (i.e., New T-Mobile and each of the standalone Sprint and T-Mobile networks).  We observe that the calculations were performed correctly for the population that T-Mobile assigned to each sector, however, the method used to calculate the specific number of covered pops for each sector could not be directly verified from the data presented.[182]  Similarly, our analysis shows that the distribution of user throughput by covered population in the Applicants' Network Build Model is similar to the distribution of 5G user downlink throughput independently calculated by staff, assuming the use of carrier aggregation across multiple frequency bands.[183]

(Continued from previous page) ———————————————————
scenario are propagated in T-Mobile's RF engineering database (Asset) providing simulated coverage to a geographic area.  **[BEGIN HIGHLY CONF. INFO.**



**[END HIGHLY CONF. INFO.].**  This process is the basis of the throughput population served in Fig. 1 along with the creation of the spaghetti graphs in Figs. 4-5 of the Public Interest Statement."); *see also* Public Interest Statement at 18, 26-27 (showing Figs. 1, 4-5, respectively).

[178] *See generally* Public Interest Statement, Ray Declaration; T-Mobile Information Request Response (Sept. 5, 2018); Joint Opposition, Ray Reply Declaration; Letter from Nancy J. Victory, Counsel to T-Mobile, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 18-197 (filed Oct. 30, 2018), Attach. Engineering Material Update.

[179] Public Interest Statement, Ray Declaration at para. 39, Table 1 (stating "14% uncovered" in mid-band spectrum by New T-Mobile by 2024).

[180] T-Mobile Information Request Response, Attach. Spec. 20, "S20_LTE Link Budgets.xlsx"; T-Mobile Dec. 28, 2018 *Ex Parte* Letter at 2, stating, "T-Mobile has utilized adapted LTE link budgets as provided in Specification 20 to represent and project 5G coverage."

[181] Public Interest Statement, Ray Declaration at para. 39, Table 1 (stating "1% uncovered" in low-band spectrum by New T-Mobile by 2024).

[182] T-Mobile Dec. 28, 2018 *Ex Parte* Letter at 1-2 (stating that a proprietary RF engineering database (Asset) was used to provide simulated coverage to a geographic area in generating population coverage figures).  The proprietary nature of this RF engineering tool suite made it impractical to directly and independently verify the Applicants' calculations of the covered population for each base station site, sector, and frequency band.

[183] Staff calculations are based on the Applicants' submitted, predicted, build plan and do not account for additional or modified builds undertaken by Applicants to meet their commitments.  While the committed level of coverage and throughput appear technically feasible, doing so may require additional deployment costs beyond those incorporated into the Applicants' original submitted, predicted build plan, and they may deviate from that plan in order to meet technical and marketplace needs while still meeting the commitments.

Federal Communications Commission                                      FCC 19-103

## APPENDIX G

### Applicants'
### Commitments

May 20, 2019

*VIA HAND DELIVERY*

Marlene H. Dortch
Secretary
Federal Communications Commission
445 Twelfth Street, S.W.
Washington, DC 20554

**HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER
IN WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS
COMMISSION**

Re:    **Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer
Control of Licenses and Authorizations; WT Docket No. 18-197**

Dear Ms. Dortch:

T-Mobile US, Inc. ("T-Mobile") and Sprint Corporation ("Sprint", and collectively with T-Mobile, "Applicants") hereby file this written *ex parte* presentation in the above-referenced docket pursuant to Section 1.1206(b) of the Commission's Rules, 47 C.F.R. § 1.1206(b). Based on the record in this proceeding and subject to the commitments set forth herein, the Applicants request grant of their applications for transfer of control to permit the merger of T-Mobile and Sprint.

In their Public Interest Statement ("PIS") and subsequent business, engineering and economic showings, Applicants have demonstrated that their merger will produce enormous consumer benefits and intensify competition.  The merged company ("New T-Mobile") will be able to leverage a unique combination of complementary spectrum and cell sites to unlock massive synergies.  This will allow New T-Mobile to invest nearly $40 billion within three years of closing to deliver a more robust nationwide 5G network and next-generation services than either company can achieve on its own.  New T-Mobile's 5G network will have Sprint's mid-band spectrum to create massive capacity, T-Mobile's low-band spectrum to provide broad coverage, and lower costs so that American consumers will pay less and get more.  The nationwide 5G network will deliver transformative fiber-like speeds for mobile services; bring broadband wireless service to millions of unserved and underserved rural Americans; unleash a competitive alternative to in-home, fixed broadband providers; benefit MVNOs; and accelerate 5G deployment in the United States, thereby ensuring American leadership in the next-generation of wireless technology.

The Applicants recently have discussed the merger's benefits with the Commission and listened to concerns about certain aspects of the transaction.  In order to respond to these concerns and

**HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED**

Federal Communications Commission                    FCC 19-103

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

Ms. Marlene H. Dortch
May 20, 2019
Page 2

address them definitively, the Applicants submit herewith proposed commitments to ensure that:
(1) New T-Mobile builds a world-leading 5G network; (2) rural Americans receive robust 5G
broadband service; (3) in-home broadband competition is enhanced and choice becomes a reality
for American consumers; and (4) Boost Mobile is divested to a serious and credible buyer who
can compete aggressively in prepaid services on a long-term basis. These commitments will be
enforced by strong verification measures, substantial voluntary contributions for missed
deadlines, and continuation of the voluntary contributions until unmet obligations are fulfilled.
In addition, the Applicants reconfirm their prior commitment to make available the same or
better rate plans as those offered by T-Mobile or Sprint as of February 4, 2019 for three years
following the merger. Finally, the Applicants make commitments concerning the Altice post-
merger MVNO relationship with New T-Mobile. Each of these commitments is summarized
below and set forth in detail in the attachments.

**Commitment to Build a World-Leading Nationwide 5G Network**

New T-Mobile's ability to create an unprecedented, world-leading, nationwide 5G network is the
uncontested keystone of this merger. By combining Sprint's mid-band spectrum and T-Mobile's
low band spectrum, the merger will position the United States to lead the 5G era by not only
accelerating the deployment of a nationwide 5G network, but also increasing competitive
pressure on other mobile wireless carriers to accelerate and expand their planned 5G
deployments. New T-Mobile's 5G network will be the competitive spark that will ensure
America remains the world's leading technological incubator for next-generation services and
applications – bringing untold benefits to the American people. The record conclusively
demonstrates that New T-Mobile's 5G network will be capable of using the combined low-band
and mid-band spectrum of T-Mobile and Sprint to provide virtually ubiquitous and deep 5G
coverage across the country, including in rural areas. Within three years of the merger's close,
this unique combination of complementary spectrum will enable New T-Mobile to provide fiber-
like speeds to hundreds of millions of Americans[1] and deliver average speeds of over 150 Mbps
and peak speeds of 1.6 Gbps.[2] Within six years of the merger's close, average and peak speeds
will have surged to 450 Mbps and 4.2 Gbps, respectively.[3]

Applicants are confident in their 5G network plan. Accordingly, they are willing to back it up
with firm commitments, set forth in Attachment 1 at Section I, that include a detailed network
build schedule with hard deadlines for providing coverage of the country based on population
covered and deploying 5G spectrum and sites. The firm commitments also include speed

---

[1] *Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of Licenses
and Authorizations*, WT Docket No. 18-197, Joint Opposition of T-Mobile US, Inc. and Sprint
Corporation ("Joint Opposition"), Appx. B, Declaration of Neville Ray, Executive Vice President and
Chief Technology Officer, T-Mobile US, Inc. at 15 (Sept. 17, 2018).

[2] Joint Opposition at 42.

[3] *Id.*

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

Federal Communications Commission                          FCC 19-103

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

Ms. Marlene H. Dortch
May 20, 2019
Page 3

commitments verified by nationwide drive tests. The Applicants commit that within three years
of the merger's closing, New T-Mobile will blanket three-fourths of the country's population
with mid-band spectrum and cover 97 percent of the country's population with low-band
spectrum. This broad and deep spectrum deployment will result in almost two-thirds of
Americans receiving speeds in excess of 100 Mbps within three years of closing. Within six
years of the merger's close, the Applicants commit to deploy a 5G network with: low-band
coverage of at least 99 percent of the population; mid-band coverage of at least 88 percent of the
population;         5G sites nationwide; an average of         megahertz of low-band and mid-band
5G spectrum deployed across the 5G sites; 99 percent of the population experiencing download
speeds equal to, or greater than, 50 Mbps; and 90 percent of the population experiencing
download speeds equal to, or greater than, 100 Mbps. New T-Mobile's 5G network will be able
to achieve these exceptional performance targets through the combined capabilities of T-
Mobile's low-band and Sprint's mid-band spectrum, and, in doing so, help lead the U.S. to
victory in the global race to 5G.

**Commitment to Provide High-Speed 5G Services for Rural America**

Applicants' plan of record for rural 5G deployment recognizes that consumers in many rural
areas have limited choices for wireless service and that entrenched rural incumbents have failed
to deliver the quality of service that consumers in rural America deserve. Applicants' filings
detailed how rural America represents an untapped business opportunity for New T-Mobile to
create much-needed competition, seize customers from unchallenged incumbents, and deliver a
new and higher standard of service for rural customers by expanding outdoor 5G coverage to
59.4 million rural residents, and indoor 5G coverage to 31 million rural residents.[4]

The Applicants detailed their plan for New T-Mobile to become an aggressive new competitor in
rural America by taking advantage of merger synergies and leveraging its low-band (600 MHz)
rural deployment to simultaneously deploy mid-band (2.5 GHz and/or PCS/AWS) radios in
rural areas at a very low incremental cost.[5] The deployment of mid-band spectrum in rural
America means that New T-Mobile's broad and deep 5G coverage will not be reserved for urban
areas only, but will create tremendous benefits in rural areas as well. Building on this aggressive
planned rural deployment, the Applicants now propose to expand and accelerate their rural
deployment plans and back it up with a strong commitment, ensuring that even more rural
Americans receive the same world-class speed and service from New T-Mobile's mid-band
coverage as the rest of the country.

---

[4] *See Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of the
Licenses and Authorizations*, WT Docket No. 18-197, Description of Transaction, Public Interest
Statement, and Related Demonstrations at 65-66 (filed June 18, 2018) ("Public Interest Statement"); *see
also* Joint Opposition at 94.

[5] Joint Opposition at 96-97.

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

Federal Communications Commission                                    FCC 19-103

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

Ms. Marlene H. Dortch
May 20, 2019
Page 4

Applicants' rural service commitment set forth in Attachment 1 at Section II, accelerates and increases the Applicants' previously submitted 5G broadband coverage plan for rural Americans – by going further than any company has before to help bridge the rural Digital Divide. Specifically, New T-Mobile will accelerate the deployment of approximately ▮ mid-band sites in rural America, deploying them within three years of closing – years sooner than previously planned. New T-Mobile will also add 5G mid-band to approximately ▮ additional low-band sites within six years of closing to further accelerate rural 5G deployment.

This rural mid-band acceleration will mean that the advantages of high-capacity mid-band spectrum will be extended to 6.5 million more rural Americans in the first three years of deployment – faster than originally planned. Further, by year six, New T-Mobile will increase its mid-band coverage of rural America by an additional 6.1 million rural Americans who would not have been covered with 5G mid-band spectrum in the original plan. As a result, within three years of closing, New T-Mobile will deliver 50 Mbps or higher to two-thirds of the rural population and 100 Mbps or higher to over half the rural population.

Within six years of the merger's close, New T-Mobile will deploy a 5G network with low-band coverage of at least 90 percent of the rural population; mid-band coverage of at least 66.7 percent of the rural population; ▮ 5G sites in rural areas; an average of ▮ megahertz of low-band and mid-band 5G spectrum deployed per 5G site; 90 percent of the rural population experiencing download speeds equal to, or greater, than 50 Mbps; and 66.7 percent of the rural population experiencing download speeds equal to, or greater than, 100 Mbps. No other company has rural 5G deployment plans even remotely as aggressive as New T-Mobile, and New T-Mobile is the only company that will bring the benefits of 5G mid-band spectrum to millions of rural Americans. Again, New T-Mobile will lead the way for the U.S. to be the global champion for 5G.

**Commitment for In-Home Broadband**

Applicants have detailed thoroughly their plan to leverage the unprecedented coverage, capacity, and speed of New T-Mobile's 5G network to offer a groundbreaking in-home broadband service, ("New T-Mobile Home Internet") covering over half the country's households at a low price to consumers and a low incremental cost to New T-Mobile.[6] Applicants have demonstrated how this new service will create direct benefits for all in-home broadband consumers, regardless of whether they subscribe to New T-Mobile, by forcing incumbent broadband providers to lower prices and improve services to respond to an aggressive new broadband competitor.

Applicants' plans for New T-Mobile Home Internet will break the mold for in-home broadband. As described in Applicants' filings, New T-Mobile Home Internet will: provide minimum

---

[6] *See generally* Letter from Nancy J. Victory, Counsel to T-Mobile US, Inc., to Marlene T. Dortch, Secretary, Federal Communications Commission, WT Docket No. 18-197 (Mar. 6, 2019) ("In-home Broadband Ex Parte").

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

Federal Communications Commission                                    FCC 19-103

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

Ms. Marlene H. Dortch
May 20, 2019
Page 5

speeds of 25 Mbps downlink and 3 Mbps uplink (more than fast enough for streaming 4K Ultra
HD video); provide average speeds above 100 Mbps downlink; be priced significantly
per month) below incumbent provider prices for service with comparable speeds; have no extra
charge for the router; have no installation charge; have no contract; and provide customer care
from T-Mobile's award-winning Magenta Glove Team.[7]  Indeed, New T-Mobile Home Internet
is poised to fundamentally shift the competitive landscape of one of the least-competitive
industry segments in America.

Rural Americans who want and need access or choice for in-home broadband will benefit from
the newly accelerated and increased rural deployment of the 5G network described above.
Indeed, the in-home broadband service deployment in rural areas also will be accelerated and
increased.  The number of supported rural households will be approximately 300,000 more
within three years and approximately 400,000 more within six years from the closing than
originally planned.  Here again, rural Americans will be big beneficiaries of the commitments.

Applicants stand behind their representations in the record about their incentive and ability to
deliver in-home broadband to millions, including in rural areas.  As set forth in Attachment 1 at
Section III, Applicants commit that, within three years of closing, New T-Mobile will market the
in-home service to 9.6 million eligible households, of which at least 2.6 million are rural
households and will have at least ▮▮ million supported households, of which at least ▮▮ million
are rural households.  In addition, within six years of closing, New T-Mobile will market its in-
home broadband service to at least 28 million eligible households, of which 5.6 million are rural,
and will have at least ▮▮ million supported households, of which at least ▮▮ million are rural
households.

**Commitment for Divestiture of Boost Mobile**

Applicants' original business plan involved incorporating the Sprint prepaid brands, including
Boost Mobile ("Boost"), into a diverse portfolio of prepaid options that could leverage the
powerful New T-Mobile 5G network to provide a high-quality, 5G prepaid service at a low price.
While Applicants had planned that Boost would continue to be an effective and meaningful
competitor as part of the New T-Mobile portfolio of brands, Applicants now commit to divest
and sell the Boost business to remove any remaining doubts regarding the impact of the merger
on prepaid wireless customers and competition.

Therefore, as described in Attachment 2, Applicants will divest Boost through a market-based
process to a serious and credible buyer.  New T-Mobile will offer the Boost buyer terms for a
six-year wholesale MVNO agreement that will include wholesale rates that will meaningfully
improve upon the commercial terms reflected in the most favorable of T-Mobile's and Sprint's
three largest MVNO agreements.  The wholesale network arrangement will also ensure that New
T-Mobile and New Boost retain strong incentives to compete against each other for customers.

---

[7] See id.

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

Ms. Marlene H. Dortch
May 20, 2019
Page 6

The Applicants further commit that the MVNO arrangement will prevent New T-Mobile from
treating New Boost in a discriminatory or anticompetitive manner relative to Metro, such as
through unwanted discriminatory throttling, de-prioritization, or limitations on access to new
network technologies. New T-Mobile will also offer other standard commercial support
arrangements to the buyer, including a transition services agreement that is customary for a
transaction of this nature. This will ensure that New Boost will be an aggressive competitor to
New T-Mobile and other facilities-based, and non-facilities-based operators going forward.

New T-Mobile commits to identify the buyer of Boost and submit the negotiated MVNO
agreement to the FCC within 120 days of closing the merger (subject to two 30-day extensions).
The divestiture process implemented by New T-Mobile will result in the orderly transfer of
Boost customers to the Boost buyer. It will also ensure the continued and seamless operation of
Boost during the pendency of the divestiture. New T-Mobile commits to make significant
voluntary contributions to the U.S. Treasury should it fail to timely negotiate and submit to the
Commission an MVNO agreement that adheres to the principles in its commitment or maintain
the competitiveness of Boost during the divestiture process.

**Pricing Commitment**

Applicants demonstrated through business and economic evidence that wireless consumers will
pay less for 5G service and get far better service and more data as a result of the merger.
However, on February 4, 2019, to enhance the public interest benefits of the merger and simplify
the Commission's expeditious review, the Applicants submitted a firm commitment that "New
T-Mobile will make available the same or better rate plans as those offered by T-Mobile or
Sprint as of today's date for three years following the merger."[8]

The Applicants once again take this opportunity to unequivocally reaffirm the February 4, 2019,
pricing commitment and include it for convenience as Attachment 3. As previously stated, this
commitment not only ensures that prices cannot go up, but that 5G comes at no extra cost – in
contrast to surcharges imposed by Verizon and planned by AT&T. In light of the proposed
Boost divestiture, the commitment will cover the Boost plans only until Boost is divested.

**Commitments Regarding Altice**

As Applicants have demonstrated in the record, the same economic principles that will drive
lower prices for retail consumers will also apply to wholesale prices and MVNOs, creating a
unique value proposition for New T-Mobile's MVNOs.[9] New T-Mobile's additional network

---

[8] *See* Letter from Nancy J. Victory, Counsel for T-Mobile US, Inc., to Marlene H. Dortch, Secretary,
Federal Communications Commission, WT Docket No. 18-197 (Feb. 4, 2019) ("Pricing Commitment
Letter").

[9] Joint Opposition at 88-91.

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

**HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION**

Ms. Marlene H. Dortch
May 20, 2019
Page 7

capacity and lower per unit costs will create an incentive for the combined company to lower
wholesale prices to MVNOs in order to ensure that the new network capacity is not wasted by
sitting idle.[10]  MVNOs will benefit not only from the capabilities of the New T-Mobile network,
but also the unprecedented capacity and lower cost per GB, which will translate into lower
wholesale costs, and, ultimately, lower prices for MVNO subscribers.[11]  In addition to these
competitive incentives, T-Mobile has publicly represented that New T-Mobile will honor the
terms of existing Sprint and T-Mobile MVNO agreements, including Sprint's agreement with
Altice.[12]

As described in Attachment 4, Applicants now commit that New T-Mobile will not exercise any
termination rights under Altice's MVNO agreement with Sprint that might be triggered by the
merger. In addition, New T-Mobile commits to engage in good faith negotiations to expand the
existing Sprint/Altice agreement to the New T-Mobile 5G network.

**Verification and Enforcement**

Applicants take these commitments seriously, expect to be held to their word, and they are
prepared for financial consequences if they fail to do so. Accordingly, Applicants commit to a
verification and enforcement regime of unprecedented rigor. Failure to meet New T-Mobile's
obligations will trigger severe, increasing, and continuing voluntary contributions that will make
failure prohibitively expensive and incentivize New T-Mobile to meet its commitments.

At the same time, New T-Mobile's commitments will set a new standard for regulatory
transparency, providing regular and robust information in annual reports regarding its progress in
meeting its nationwide 5G, rural 5G, and in-home commitments. For New T-Mobile's three-
year and six-year commitment dates, the company will provide a comprehensive report that
includes data from drive tests, polygon coverage shapefiles, population and household coverage
figures, site lists, marketing figures, and executive certifications.

Applicants' rigorous verification processes will be accompanied by an even more exacting
enforcement structure. Voluntary contributions will be calculated separately for each missed
commitment. Furthermore, each of New T-Mobile's six-year commitments will continue until
satisfied and, accordingly, their respective voluntary contributions will continue to accrue and
increase during their pendency. This enforcement standard is unprecedented in its strength.

The Applicants are prepared to submit to the substantial financial consequences of missed
deadlines or obligations because all of the deadlines and obligations are consistent with the New
T-Mobile plan. They simply ensure that New T-Mobile does post-merger what the Applicants

---

[10] *Id.* at 88.

[11] *Id.*

[12] *Id.* at 89.

**HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED**

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

Ms. Marlene H. Dortch
May 20, 2019
Page 8

have described will happen in their Public Interest Statement and subsequent filings, as well as
the accelerated and expanded deployment of the 5G network to rural America included in the
merger commitments the Applicants make today.

**Commission Grant of the Transfer of Control Applications**

In view of the record in this merger proceeding and the commitments submitted herewith, the
Applicants request prompt grant of their applications for transfer of control as serving the public
interest.

Please direct any questions regarding the foregoing to the undersigned counsel for the
Applicants.

Respectfully submitted,

SPRINT CORPORATION                    T-MOBILE US, Inc.

By: /s/ *Regina M. Keeney*            By: /s/ *Nancy J. Victory*
    Regina M. Keeney                      R. Michael Senkowski
    A. Richard Metzger, Jr.               Nancy J. Victory
    Lawler, Metzger, Keeney & Logan, LLC  DLA Piper LLP (US)
    1717 K Street, NW, Suite 1075         500 Eighth Street, N.W.
    Washington, DC 20006                  Washington, DC 20004
    (202) 777-7700                        (202) 799-4000

cc:    Kathy Harris

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

231

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

# ATTACHMENT 1

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

## NETWORK AND IN-HOME COMMITMENTS

I.  Nationwide 5G Network Deployment.  T-Mobile and Sprint commit that:

    (A) within three (3) years of the closing date of the T-Mobile/Sprint merger, New T-Mobile will deploy a 5G network with:

        1.  a Low-band 5G Coverage Area covering at least 97% of the U.S. Population;
        2.  a Mid-band 5G Coverage Area covering at least 75% of the U.S. Population;
        3.      5G Sites nationwide;
        4.     MHz of low-band and mid-band 5G Spectrum averaged over all 5G Sites deployed nationwide (the sites described in Section I.A.3 above);
        5.  75% of the U.S. Population having access to download speeds equal to or greater than 50 Mbps, as verified by a drive test; [1] and
        6.  63% of the U.S. Population having access to download speeds equal to or greater than 100 Mbps,[2] as verified by a drive test.

    (B) within six (6) years of the closing date of the T-Mobile/Sprint merger, New T-Mobile will deploy a 5G network with:

        1.  a Low-band 5G Coverage Area covering at least 99% of the U.S. Population;
        2.  a Mid-band 5G Coverage Area covering at least 88% of the U.S. Population;
        3.      5G Sites nationwide;
        4.     MHz of low-band and mid-band 5G Spectrum averaged over all 5G Sites deployed nationwide (the sites described in Section I.B.3 above);
        5.  99% of the U.S. Population having access to download speeds equal to or greater than 50 Mbps, as verified by a drive test; and
        6.  90% of the U.S. Population having access to download speeds equal to or greater than 100 Mbps,[3] as verified by a drive test.

II.  Rural 5G Network Deployment.  With regard to the nationwide 5G network deployment described above, T-Mobile and Sprint further commit that:

---

[1] New T-Mobile will fund the drive tests to take place at the end of years 3 and 6. The drive tests will utilize a methodology mutually agreed to by New T-Mobile and the Wireless Telecommunications Bureau ("Bureau") within 60 days of the closing of the T-Mobile/Sprint merger. The goal of the drive testing is to reflect actual user experience under ordinary utilization and compare them to the speed and coverage commitments stated in Sections I and II. The drive testing will involve oversight by an independent third party, but may be conducted by T-Mobile personnel. The drive testing will commence at the three (3) and six (6) year anniversary of the close of the transaction and be completed within nine (9) months thereafter in each case. The drive test would make use of T-Mobile-Certified 5G Devices.

[2] While not a part of the formal commitment, the 63% of the U.S. Population having access to download speeds equal to or greater than 100 Mbps are expected to experience average upload speeds of 15-20 Mbps.

[3] The 90% of the U.S. Population having access to download speeds equal to or greater than 100 Mbps are expected to experience average upload speeds of 15-20 Mbps. See n.2.

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

Federal Communications Commission                    FCC 19-103

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

(A) within three (3) years of the closing date of the T-Mobile/Sprint merger, New T-Mobile will deploy a 5G network with:

1. a Low-band 5G Coverage Area covering at least 85% of the Rural Population;
2. a Mid-band 5G Coverage Area covering at least 55% of the Rural Population;
3. [        ] 5G Sites Deployed in Rural Areas;
4. [      ] MHz of low-band and mid-band 5G Spectrum averaged over 5G Sites deployed in Rural Areas (the sites described in Section II.A.3 above);
5. 66.7% of the Rural Population having access to download speeds equal to or greater than 50 Mbps, as verified by a drive test; and
6. 55% of the Rural Population having access to download speeds equal to or greater than 100 Mbps,[4] as verified by a drive test.

(B) within six (6) years of the closing date of the T-Mobile/Sprint merger, New T-Mobile will deploy a 5G network with:

1. a Low-band 5G Coverage Area covering at least 90% of the Rural Population;
2. a Mid-band 5G Coverage Area covering at least 66.7% of the Rural Population;
3. [        ] 5G Sites Deployed in Rural Areas;
4. [      ] MHz of low-band and mid-band 5G Spectrum averaged over 5G Sites deployed in Rural Areas (the sites described in Section II.B.3 above);
5. 90% of the Rural Population having access to download speeds equal to or greater than 50 Mbps, as verified by a drive test; and
6. 66.7% of the Rural Population having access to download speeds equal to or greater than 100 Mbps,[5] as verified by a drive test.

III.  In-Home Broadband.  T-Mobile and Sprint commit that:

(A) within three (3) years of the closing date of the T-Mobile/Sprint merger, New T-Mobile will:

1. Market its In-home Broadband Service product to at least 9.6 million Eligible Households, of which at least 2.6 million are Rural Households; and
2. have at least [    ] million Supported Households, of which at least [    ] million are Rural Households.

(B) within six (6) years of the closing date of the T-Mobile/Sprint merger, New T-Mobile will:

1. Market its In-home Broadband Service product to at least 28.0 million Eligible Households, of which 5.6 million are Rural Households; and
2. have at least [    ] million Supported Households, of which at least [    ] million are

---

[4] The 55% of the Rural Population having access to download speeds equal to or greater than 100 Mbps are expected to experience upload speeds of 15-20 Mbps.  See n.2.

[5] The 66.7% of the Rural Population having access to download speeds equal to or greater than 100 Mbps are expected to experience upload speeds of 15-20 Mbps.  See n.2.

2

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

Federal Communications Commission                FCC 19-103

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

Rural Households.

Provided, however, that the requirements of Sections III.A.1 and III.B.1 will terminate
once New T-Mobile has 9.5 million simultaneous In-home Broadband Service
subscribers.

IV.    Verification. T-Mobile and Sprint commit that:

(A) Within 60 days following each of the first, second, fourth and fifth annual
anniversaries of the closing date of the T-Mobile/Sprint merger, New T-Mobile will
submit to the Bureau a report that details the progress the company is making toward
meeting the site and spectrum deployment and other commitments described in
Sections I-II and the In-home Broadband commitments described in Section III
(including the number of subscribers) as of the corresponding anniversary date.

(B) Within 9 months following each of the third and sixth annual anniversaries of the
closing date of the T-Mobile/Sprint merger, New T-Mobile will submit to the Bureau
a report that will include:

1. drive test results;
2. polygon shapefiles showing New T-Mobile's Low-band 5G Coverage Area and
   Mid-band 5G Coverage Area as of the 3-year or 6-year date (whichever is
   applicable);
3. a statement quantifying the U.S. Population and Rural Population covered by each
   of the Low-band 5G Coverage Area and Mid-band 5G Coverage Area as of the 3-
   year or 6-year date (whichever is applicable);
4. a list of 5G Sites (including information identifying individual sites, e.g., latitude
   and longitude) and spectrum deployed, broken into rural and non-rural categories;
5. a certification from New T-Mobile's Chief Technology Officer that the
   representations in the shapefiles, population coverage numbers, site and spectrum
   deployment numbers, and speeds are true and correct;
6. a statement describing the means by which New T-Mobile has Marketed its In-
   home Broadband Service product to date;
7. the number of households, with reasonable precision, that received or were
   covered by each form of In-home Broadband Service Marketing as of the 3-year
   or 6-year date (whichever is applicable);
8. the number of Supported Households, and of those the number of Rural
   Households;
9. the number of subscribers of New T-Mobile's In-home Broadband Service as of
   the 3-year or 6-year date (whichever is applicable); and
10. a certification from New T-Mobile's executive in charge of the In-home
    Broadband Service business that the representations in the report regarding In-
    home Broadband Service Marketing, Supported Households and number of
    subscribers are true and correct.

V.    Enforcement. T-Mobile and Sprint agree that, in the event that the Bureau determines
that New T-Mobile has failed to meet any of the commitments described in Sections I-III

3

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

above, New T-Mobile will make a voluntary contribution to the U.S. Treasury in the manner directed by the Bureau within 60 days of such determination. This voluntary contribution will be in lieu of the Commission taking any action under its forfeiture authority for failure to meet the commitments described in Sections I-III above. The amount of the voluntary contribution will be calculated in accordance with this section:

(A) In the event that the Bureau determines that New T-Mobile has failed to meet any of the 3-year commitments, the applicable voluntary contribution shall be calculated as follows:

    1. The amount of the voluntary contribution shall be cumulative, calculated separately for each missed commitment (Sections I(A), II(A), and III(A) each constituting an individual commitment) commensurate with the percentage by which New T-Mobile missed the commitment. The total amount of the voluntary contribution shall be the sum of the amounts assessed for each missed commitment;

    2. Where a commitment has multiple elements (as in Sections I(A), II(A), and III(A)), the Bureau shall determine the percentage by which New T-Mobile has fallen short under each element[6] and calculate the voluntary contribution for the particular missed commitment based on the highest calculated percentage missed of any element;

    3. Each 1% of shortfall with respect to the commitment in Sections I.A.5 and II.A.5 shall constitute 0.5% for purposes of the calculation in 2; and

    4. The following contribution scale will apply:

| Missed Percentage | Voluntary Contribution |
|---|---|
| >0%-5% | $10,000,000 |
| >5%-10% | $25,000,000 |
| >10%-25% | $50,000,000 |
| >25%-50% | $100,000,000 |
| >50% | $250,000,000 |

(B) In the event that the Bureau determines that New T-Mobile has failed to meet any of the 6-year commitments, the applicable voluntary contribution shall be calculated as

---

[6] For example, if there is a commitment to serve 55% of the population (180.1M people out of a total population of 327.48M) and New T-Mobile is able to serve only 160.3M by the deadline, the company would fall short by 19.8M people, which would be a percentage missed of 11% (19.8M ÷ 180.1M X 100 = 11%).

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

Federal Communications Commission                    FCC 19-103

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

follows (with a maximum contribution for such a determination of $2.4 billion repeatable as described in Section V.C.):

1. The amount of the voluntary contribution shall be cumulative, calculated separately for each missed commitment (Sections I(B), II(B), and III(B) each constituting an individual commitment) commensurate with the percentage by which New T-Mobile missed the commitment. The total amount of the voluntary contribution shall be the sum of the amounts assessed for each missed commitment;

2. Where a commitment has multiple elements (as in Sections I(B), II(B), and III(B)), the Bureau shall determine the percentage by which New T-Mobile has fallen short under each element and calculate the voluntary contribution based on the highest calculated percentage missed of any element;

3. Each 1% of shortfall with respect to the commitment in Sections I.B.5 and II.B.5 shall constitute 0.5% for purposes of the calculation in 2;

4. The voluntary contribution for each 1% (rounded to the nearest tenth of a percent) up to 20% that a commitment is missed shall be $10,000,000, and $5,000,000 for each 1% thereafter; however, the minimum contribution amount shall be $25,000,000; and

5. The voluntary contribution calculated for failure to meet the commitment described in Section II shall be doubled.[7]

(C) New T-Mobile's obligation to fulfill the commitments in Sections I(B), II(B), and III(B) remains until satisfied. Within one year after a Bureau determination that New T-Mobile was deficient with respect to any element of these commitments, New T-Mobile shall submit to the Bureau a report demonstrating whether it has satisfied any remaining deficient element(s). A determination by the Bureau that New T-Mobile has failed to meet any of the remaining deficient elements shall be subject to the same voluntary contribution amounts described in Section V(B) and the process described in this section V(C) until satisfied.

(D) In making a determination regarding New T-Mobile's compliance under Sections IV(A)-(C) above, the Bureau shall take into account and, in its reasonable discretion, appropriately reduce the metric, extend the deadline or reduce the contribution amount associated with commitments missed due to unanticipated circumstances beyond the company's control (*e.g.*, acts of God, such as fire, flood, earthquake, or other natural disasters; terrorist events, riots, insurrections, war, strikes or national emergencies; law or order of any government body; or significant interruptions in the supply chain).

VI.   Definitions. The following terms are used in this document:

(A) "5G" is defined as the 5G New Radio air interface standard as described in 3GPP Release 15. *Available at* https://www.3gpp.org/release-15.

---

[7] For example, a 20% shortfall on each of the commitments in Sections I(B), II(B) and III(B) would translate into a combined $800M voluntary contribution ($200M + (2 X $200M) + $200M = $800M).

5

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

**Federal Communications Commission**                    **FCC 19-103**

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

(B) "5G Sites" is defined as macro sites on which 5G radios are deployed.

(C) "5G Sites Deployed in Rural Areas" means 5G Sites that are physically located within a Rural Area.

(D) "5G Spectrum" is defined as dedicated licensed spectrum used for downlink or uplink with 5G radios and does not include spectrum shared dynamically with LTE.

(E) "Access" to specified speeds means that users of T-Mobile-Certified 5G Devices will experience the specified download speeds on average (mean) across actual utilization.

(F) "Eligible Household" is defined as a household located in a geography: (A) over which New T-Mobile's network will provide signal quality suitable to support the In-home Broadband Service; and (B) in which New T-Mobile's network has sufficient capacity to serve one or more households with In-home Broadband Service, as shown in the polygon shapefile submitted to the Bureau.

(G) "In-home Broadband Service" is defined as a residential broadband service with minimum speeds of 25 Mbps downlink and 3 Mbps uplink.

(H) "Low-band 5G Coverage Area" is defined as that area included within the bounds of the polygon shapefile submitted to the Bureau representing geographic coverage for 5G service using Low-band Frequencies with coverage based on T-Mobile's ordinary course coverage analysis. The coverage shapefiles used to calculate covered pops will be verified by a drive test at the 3 and 6 year intervals. *See* n.1.

(I) "Low-band Frequencies" is defined as those radiowave frequencies below 1 GHz including, but not limited to, frequencies in the 600 MHz, 700 MHz, and 800 MHz bands.

(J) "Market" is defined as to advertise and offer a product or service for sale including, but not limited to, through TV, radio, Internet, digital, electronic, voice, print, mail, or in-person channels.

(K) "Mid-band 5G Coverage Area" is defined as that area included within the bounds of the polygon shapefile submitted to the Bureau representing geographic coverage for 5G service using Mid-band Frequencies with coverage based on T-Mobile's ordinary course coverage analysis. The coverage shapefiles used to calculate covered pops will be verified by a drive test at the 3 and 6 year intervals. *See* n.1.

(L) "Mid-band Frequencies" is defined as those radiowave frequencies above 1 GHz and below 6 GHz including, but not limited to, the AWS, PCS, and 2.5 GHz bands.

(M) "Rural Area" is as defined by the 2010 U.S. Census.

(N) "Rural Households" is defined as households located within a Rural Area.

(O) "Rural Population" is defined as the population within Rural Areas derived from the population data licensed through the 2016 Pitney Bowles study, which provides population at the census block level. The 2016 Pitney Bowles study is based on the

6

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

2010 U.S. Census, but then updated based on more recent information.  According to
the 2016 Pitney Bowles study, the Rural Population is 61.98M.  That population
number is fixed for purposes of calculating compliance with these commitments as is
the population per census block through which covered pops will be determined.

(P) "Supported Households" is defined as those Eligible Households that New T-Mobile
will have the capacity to serve with its In-home Broadband Service at any given time
(based upon an average usage across the sector of ▮▮▮ GB per month per household
as of 3 years following the close of the T-Mobile/Sprint merger and an average usage
across the sector of ▮▮▮ GB per month per household as of 6 years following the
merger closing).  Supported Households will be calculated according to the
methodology set out in T-Mobile's *ex parte* filing detailing its In-Home Broadband
plans.  *See* Letter from Nancy Victory, Counsel for T-Mobile, to Marlene H. Dortch,
Secretary, Federal Communications Commission, WT Docket No. 18-197 (Mar. 6,
2019).  Within 60 days of the closing of the T-Mobile/Sprint merger, New T-Mobile
and the Bureau will work in good faith to refine this methodology to utilize actual
deployment numbers.

(Q) "T-Mobile-Certified 5G Device" means a device that T-Mobile or New T-Mobile has
certified as compatible with its 5G network (it is expected that all 5G devices
available through New T-Mobile retail will be T-Mobile-Certified 5G Devices).

(R) "U.S. Population" is defined as the population of the United States (including the 50
states, Puerto Rico and the U.S. territories) as derived from population data licensed
through the 2016 Pitney Bowles study, which provides population at the census block
level.  The 2016 Pitney Bowles study is based on the 2010 U.S. Census, but then
updated based on more recent information.  According to the 2016 Pitney Bowles
study, the U.S. Population is 327.48M.  That population number is fixed for purposes
of calculating compliance with these commitments as is the population per census
block through which covered pops will be determined.

7

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

# ATTACHMENT 2

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

Federal Communications Commission                    FCC 19-103

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

### BOOST MOBILE DIVESTITURE

T-Mobile and Sprint commit to divest the Boost Mobile business. The market-based process implemented by the Applicants will ensure that New T-Mobile will divest Boost Mobile to a serious and credible buyer ("Buyer") and receive fair value for the assets. As part of the process contemplated in this commitment, the Applicants and Buyer will be free to agree to commercial terms of their choosing, subject only to the limitations set out below:

I.  Overview of Divested Business. The Boost Mobile assets and operations to be divested (the "Divested Business" or "New Boost") include:

   A.  Boost Mobile-branded customers with an "active" Boost Mobile account;[1] and

   B.  "Dedicated" Boost Mobile assets, properties, systems, management team and employees that are necessary to operate the Boost Mobile business as it is conducted as of the merger closing date.[2] The Divested Business will include all ownership interests in, and rights to use, the Boost Mobile brand and its associated brands and trademarks.[3]

II. Obligation to Maintain Divested Business Prior to Divestiture. New T-Mobile must undertake commercially reasonable efforts to maintain Boost's competitiveness prior to completion of the divestiture.

III. Commercial Arrangements with Buyer. To allow for the continued operation and growth of New Boost, New T-Mobile will offer two principal support arrangements to the Buyer:

   A.  *Wholesale MVNO Agreement.* The terms of the wholesale MVNO agreement will be consistent with the following principles:

      1.  Wholesale Network Pricing

         a.  New Boost's wholesale network pricing will create a strong incentive and ability for New T-Mobile to compete against New Boost for customers, and vice versa, similar to their respective competitive incentives and capabilities

---

[1]  For purposes of this submission, an "active" Boost Mobile account includes any account that (i) has had a positive account balance at any time during the 120 days immediately prior to the Boost Mobile divestiture closing date, and (ii) has not been suspended, cancelled or otherwise terminated during such 120-day period. Divested customers do not include Boost Mobile customers of third parties who are not controlled by Sprint and offer wireless service under the Boost brand.

[2]  For purposes of this submission, "dedicated" means any asset, property, system or employee that is solely and exclusively allocated for use by Boost Mobile.

[3]  The divestiture of the Boost Mobile business will ensure all third parties who have rights to utilize the Boost brand and marks shall retain such rights.

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

Federal Communications Commission                    FCC 19-103

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

today.  For clarity, the pricing will not prevent New T-Mobile from recouping its full network costs associated with serving New Boost customers.

b. New Boost's wholesale network pricing will allow it to benefit from the long-run network cost efficiencies of New T-Mobile's 5G network deployment.

c. New Boost's wholesale network pricing will meaningfully improve upon the commercial terms reflected in T-Mobile's and Sprint's 3 largest MVNO agreements based on 1Q 2019 wholesale revenues.  For clarity, the commercial terms will meaningfully improve on those reflected in each of the 6 agreements, taking each as an entire agreement.

2. Discrimination and Competitive Constraints

a. New Boost's agreements will prevent New T-Mobile from treating New Boost in a discriminatory or anticompetitive manner as compared to Metro or any successor to Metro as New T-Mobile's leading low cost brand, such as through unwanted discriminatory throttling, de-prioritization, or limitations on access to new network technologies.  For the avoidance of doubt, reducing Metro's rates to win subscribers from New Boost would not constitute anticompetitive treatment.

b. New Boost's agreements will not constrain how it prices or packages its retail services.

3. Long-Term Competition and Facilities Deployment

a. New Boost's agreements will permit it to deploy and utilize its own spectrum, systems, network infrastructure, and other facilities if it chooses, and enjoy reasonable cost benefits of doing so.

b. New Boost's agreements will permit it to compete effectively on a long-term basis, with a minimum wholesale agreement term of six years, and New T-Mobile will not unreasonably withhold consent to changes in New Boost ownership (for example, it would not be unreasonable for New T-Mobile to withhold consent to a change of control to a facilities-based provider who refuses to provide New T-Mobile with reciprocal access to the provider's facilities on reasonable terms; it would be unreasonable to withhold consent to a sale with the objective of keeping New Boost in the hands of an unsuccessful owner).

4. Stable Transition of New Boost's Operations

a. New T-Mobile will maintain Boost's competitiveness through its transition to independent ownership.

b. New Boost's agreements will provide New Boost with access to the New T-Mobile network on the same timeline as Sprint, the ability to activate on the

2

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED


**Federal Communications Commission** FCC 19-103

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

New T-Mobile network on a nondiscriminatory basis, and reasonable advance notice of network transition plans that could affect New Boost customers.

B. *Transition Services Agreement.* The Transition Services Agreement offered to the Buyer will include up to a two-year term (as required by Buyer) with customary transition services offered at cost to the Buyer. The terms of the Transition Services Agreement (or any other related agreement) shall be consistent with, and not undercut, the principles in Section III.A., to the extent they are applicable.

IV. Commission Review of Buyer and New Boost Wholesale MVNO Agreement. New T-Mobile must submit the wholesale MVNO agreement negotiated with the Buyer to the Wireless Telecommunications Bureau ("Bureau") for review prior to consummating the divestiture.

A. The Buyer must be a "serious and credible third-party buyer," which will be an entity that:

   1. has, or has access to, the financial resources to acquire, maintain and expand the Divested Business, and

   2. is unrelated to either of the Applicants.

B. A New Boost wholesale MVNO agreement, consistent with the principles in Section III.A., must be submitted to the Bureau for review within 120 days after closing of the T-Mobile/Sprint merger.

   1. No later than seven (7) days prior to the deadline, New T-Mobile may request from the Bureau a thirty-day extension of the deadline. To obtain an extension from the Bureau, New T-Mobile would have to provide a status report and certify that it is both undertaking commercially reasonable efforts to reach a final agreement as quickly as practicable and to meet its obligation in Section II. Under this process, New T-Mobile may request, and the Bureau may grant, up to two thirty-day extensions.

   2. Once the New Boost wholesale MVNO agreement is submitted, the Bureau will have 30 days to make a decision as to whether the agreement is consistent with the principles set forth in Section III.A. and whether New T-Mobile has fulfilled its obligation in Section II. This 30-day review timeline can be extended only with the consent of New T-Mobile.

V. Enforcement. In the event that the Bureau determines that New T-Mobile has failed to meet the requirements in Sections II and/or IV, New T-Mobile shall make a voluntary contribution to the U.S. Treasury in the manner directed by the Bureau within 60 days of such determination. This voluntary contribution will be in lieu of the Commission taking any

3

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

action under its forfeiture authority for failure to meet the commitments in Sections II and
IV. The voluntary contribution shall be assessed and calculated in accordance with this
section:

A. If New T-Mobile fails to submit to the Bureau a wholesale MVNO agreement with the
   Buyer of the Divested Business (or in the case of a submitted agreement that has been
   rejected, a revised agreement) by the deadline set forth in Section IV.B., New T-Mobile
   shall owe a voluntary contribution of $3.5 million per day until a new agreement is
   submitted.

B. If the Bureau decides that the submitted wholesale MVNO agreement is not consistent
   with the principles set forth in Section III.A., then the clock (if not yet expired) will
   continue without pause or, if the clock (and any extensions) has expired, a $3.5 million
   per day voluntary contribution will begin to accummulate immediately and continue until
   a revised wholesale MVNO agreement is submitted to the Bureau.

C. If the Bureau finds that New T-Mobile did not have a good faith and reasonable belief
   that the wholesale MVNO agreement was consistent with the principles set forth in
   Section III.A., New T-Mobile shall owe a voluntary contribution of $3.5 million per day
   for the period during which the Bureau was reviewing the agreement.

D. If the Bureau decides that the wholesale MVNO agreement is consistent with the
   principles set forth in Section III.A., but that New T-Mobile has not met the obligation in
   Section II, then New T-Mobile must take appropriate steps to restore Boost's
   competitiveness to the Bureau's satisfaction and shall make a voluntary contribution of
   $3.5 million per day starting from the date that the wholesale MVNO agreement was
   submitted until those steps are complete.

E. If the Bureau decides both that the agreement was not consistent with the principles set
   forth in Section III.A. and that New T-Mobile has not met the obligation in Section II,
   then New T-Mobile shall make a voluntary contribution of $3.5 million per day from the
   date that the wholesale MVNO agreement was submitted until both of these problems
   have been remedied and the divestiture is complete.

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

# ATTACHMENT 3

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

**HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION**



DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
www.dlapiper.com

Nancy Victory
nancy.victory@dlapiper.com
T 202.799.4216
F 202.799.5616

February 4, 2019

*VIA ECFS*

Marlene H. Dortch
Secretary
Federal Communications Commission
445 Twelfth Street, S.W.
Washington, DC 20554

Re:    **Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer
       Control of Licenses and Authorizations; WT Docket No. 18-197**

Dear Ms. Dortch:

Pursuant to Section 1.1206(b) of the Commission's Rules, 47 C.F.R. § 1.1206(b), notice is
hereby provided of a written *ex parte* presentation in the above-referenced docket. T-Mobile US,
Inc. ("T-Mobile") and Sprint Corporation ("Sprint", and collectively with T-Mobile,
"Applicants") have stated in the Public Interest Statement, and reiterated repeatedly since, that
the merger will ensure that "American consumers will pay less and get more".[1]  Our merger will
enable the deployment of a world-class nationwide 5G network with massive capacity and lower
marginal costs per customer, with the result that customers get better service and more data at the
same or lower prices.[2]  The Applicants' representation that consumers will pay less as a result of
the merger is supported by the New T-Mobile business plan,[3] declarations from T-Mobile

---

[1] *See, e.g., Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of
the Licenses and Authorizations*, WT Docket No. 18-197, Description of Transaction, Public Interest
Statement, and Related Demonstrations at i (June 18, 2018) ("Public Interest Statement"); *Applications of
T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of Licenses and
Authorizations*, WT Docket No. 18-197, Joint Opposition of T-Mobile US, Inc. and Sprint Corporation at
i (Sept. 17, 2018) ("Joint Opposition").

[2] Public Interest Statement at 51.

[3] *Id.*

**HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED**

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION



Ms. Marlene H. Dortch
February 4, 2019
Page 2

executives,[4] merger simulations focused on New T-Mobile prices,[5] and economic work showing
all wireless consumers will benefit from a decrease in price per GB due to competitive responses
from AT&T and Verizon.[6]

The Public Interest Statement also provided further assurances to existing customers of T-Mobile
and Sprint that prices will not go up following the close of the merger. Specifically, the
Applicants stated that "New T-Mobile will guarantee each [Sprint] customer a rate plan that is
equal or better than the plans they currently enjoy with Sprint."[7] The Applicants also noted the
T-Mobile Un-contract rate promise to their customers and that it would be extended to Sprint
customers post-closing.[8] These assurances were intended to address any concerns about post-
closing price increases and they are fully consistent with the New T-Mobile business plan.

Despite all this, merger opponents tried to raise questions about New T-Mobile's pricing
incentives during the three-year period from merger closing until completion of the network
combination and customer migration. The Applicants believe that the myriad showings on the
record fully answer those questions. However, to remove all doubt and simplify the
Commission's review of the merger, the Applicants are providing the following statement to
remove any doubts, concerns or ambiguity:

> New T-Mobile will make available the same or better rate plans as those offered
> by T-Mobile or Sprint as of today's date for three years following the merger.

T-Mobile and Sprint legacy rate plans will continue as New T-Mobile plans for three years after
the merger or until better plans that offer a lower price or more data are made available,

---

[4] Public Interest Statement, Appx C, Declaration of G. Michael Sievert, President and Chief Operating
Officer, T-Mobile US, Inc. at ¶21; Public Interest Statement, Appx. D, Declaration of Peter Ewens,
Executive Vice President, Corporate Strategy, T-Mobile US, Inc. at ¶8 ("Ewens Decl.").

[5] Joint Opposition, Appx. F, Declaration of Compass Lexecon, Mark Israel, Michael Katz, and Bryan
Keating at ¶6; John Asker, Timothy F. Bresnahan, and Kostis Hatzitaskos, *Economic Analysis of the
Proposed T-Mobile/Sprint Merger*, Cornerstone Research at 1-6 (Nov. 6, 2018).

[6] Public Interest Statement, Appx. G, Declaration of David S. Evans, Market Platform Dynamics,
"Economic Analysis of the Impact of the Proposed Merger of T-Mobile and Sprint on the Deployment of
5G Cellular Technologies, the 5G App Ecosystem, and Consumers, Enterprises, and the Economy," at
¶¶220-44.

[7] Ewens Decl. at ¶8.

[8] *Id.*

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

Federal Communications Commission                     FCC 19-103

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION



Ms. Marlene H. Dortch
February 4, 2019
Page 3

whichever occurs first.[9]  The retained legacy rate plans may be adjusted to pass through cost
increases in taxes, fees and surcharges as well as services from third party partners that are
included in the rate plans, as these increased costs are not within the control of New T-Mobile.
The legacy plans may also be adjusted to modify or discontinue third party partner benefits based
on changes in the terms of the offering initiated by the third party partner, as this is also not
within the control of New T-Mobile.[10]

As New T-Mobile CEO John Legere has said, we would be pleased to discuss the details of this
commitment with the Chairman, Commissioners and Transaction Team.  As noted, this
representation is fully consistent with the New T-Mobile business plan and responsive to merger-
specific questions that have been raised.  For those reasons, the Applicants have no objection to
this representation being included as a formal merger condition in the order approving the
transaction.

Please direct any questions regarding the foregoing to the undersigned counsel for Deutsche
Telekom and T-Mobile.

Respectfully submitted,

**DLA Piper LLP (US)**

*/s/ Nancy Victory*

Nancy Victory
Partner

cc:    Chairman Ajit Pai
       Commissioner Michael O'Rielly
       Commissioner Brendan Carr
       Commissioner Jessica Rosenworcel
       Commissioner Geoffrey Starks
       David Lawrence
       Kathy Harris
       Linda Ray
       Kate Matraves

---

[9] When a better post-merger plan is offered, New T-Mobile may discontinue a less appealing legacy plan.

[10] Device/handset offerings are not included in this pricing commitment.

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION



Ms. Marlene H. Dortch
February 4, 2019
Page 4


        Jim Bird
        David Krech


HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

# ATTACHMENT 4

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

HIGHLY CONFIDENTIAL INFORMATION – SUBJECT TO PROTECTIVE ORDER IN
WT DOCKET NO. 18-197 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

### ALTICE MVNO COMMITMENT

T-Mobile and Sprint commit that:

(A) Sprint Spectrum L.P. ("Sprint") will not exercise any termination right set forth in the Master Wireless Wholesale Agreement by and between Sprint and Altice USA, Inc. ("Altice") dated November 5, 2017 (the "Altice MVNO Agreement"), or in any other existing agreement between Sprint and Altice, that arises from consummation of the merger between T-Mobile and Sprint Corporation; and

(B) New T-Mobile will negotiate in good faith an amendment of the Altice MVNO Agreement to include the networks, including 5G network, operated by New T-Mobile.

HIGHLY CONFIDENTIAL TEXT HIGHLIGHTED

Federal Communications Commission                                    FCC 19-103

## APPENDIX H

## DISH Buildout Commitments



*Jeffrey H. Blum*
*Senior Vice President, Public Policy &*
*Government Affairs*
*Jeffrey.Blum@dish.com*
*(202) 463-3703*

July 26, 2019

**VIA ULS**

Donald Stockdale
Chief, Wireless Telecommunications Bureau
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554

Re:    DBSD Corporation, AWS-4, Lead Call Sign T070272001; Gamma Acquisition L.L.C.,
       AWS-4, Lead Call Sign T060430001; Manifest Wireless L.L.C., Lower 700 MHz E
       Block, Lead Call Sign WQJY944; American H Block Wireless L.L.C., H Block, Lead
       Call Sign WQTX200; ParkerB.com Wireless L.L.C., 600 MHz, Lead Call Sign
       WQZM232

Dear Mr. Stockdale:

    The Commission has called on government and industry to work together to promote
American leadership in 5G. We share the Commission's 5G goals. DISH has a long history as a
market disruptor and low-cost provider, particularly for customers in rural America. In the
1990s, we introduced competition against cable providers by offering disruptive pricing and
packaging and innovative consumer technology, which helped us quickly gain market share. In
2015, DISH launched the first live-streaming over-the-top service, Sling TV. Sling TV has been
a market leader, providing consumer choice and additional competition in the pay-TV market.
As we have described previously, DISH plans to enter the wireless market as a new nationwide
facilities-based provider.[1] We believe our deployment will promote U.S. leadership in 5G
through an American company with a proven track record of disrupting the communications
industry.

    We also see a path to accelerate DISH's competitive entry into the wireless market. In
addition to our anticipated acquisition of Boost Mobile and other assets, the modified deadlines,
commitments, and conditions set forth in Attachment A align our deployment plans with the

---

[1] *See* DBSD Services Limited, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C.'s Consolidated
Interim Construction Notification for AWS-4 and Lower 700 MHz E Block Licenses, ULS Lead File No.
0007690535 (Mar. 7, 2017); American H Block Wireless L.L.C. Interim Construction Notification for H
Block Licenses, ULS Lead File No. 0008210492 (May 14, 2018); Letter from Jeffrey H. Blum, Senior
Vice President, Public Policy & Government Affairs, DISH Network Corporation, to Donald Stockdale,
Chief, Wireless Telecommunications Bureau, attached to license record for AWS-4 call sign T070272001
(Sept. 21, 2018).

1110 Vermont Avenue NW • Suite 750 • Washington, D.C. 20005

expected finalization of 5G standards and equipment, and will facilitate and expedite DISH's
entry into the wireless market as a nationwide facilities-based competitor.

DISH therefore requests that the Commission extend the construction deadlines
associated with its AWS-4, 700 MHz E Block, and AWS H Block licenses as enumerated in
Section I (C), (E), and (G) of Attachment A, pursuant to its authority under 47 U.S.C. § 308.[2]  As
conditions of the grant of the requested extensions, DISH is willing to accept the terms of
Attachment A, including the significant voluntary contributions (up to $2.2 billion) and potential
license forfeitures for failure to meet certain commitments.  DISH will also consent to the
Commission including a "5G Broadband Service"[3] obligation as a special condition of its 600
MHz, AWS-4, 700 MHz E Block, and AWS H Block licenses.  Further, DISH will consent to the
sale and leasing restrictions described in Attachment A for its 600 MHz and AWS-4 spectrum
licenses.

Grant of the requested extensions and adopting the terms set out in Attachment A will
promote the Commission's public interest objectives by enabling and accelerating DISH's
facilities-based wireless deployment.  DISH's entry will pressure incumbent carriers to expand
their own 5G plans and inject disruptive pricing and packaging in the wireless market, all to the
benefit of the American public.  In addition, the modified deadlines reflected in Attachment A
will align DISH's construction milestones with our deployment goals, leading to a more efficient
network build.

These commitments will ensure that (1) DISH's nationwide 5G deployment meets certain
specifications; (2) DISH deploys a 5G Broadband Service on its AWS-4, 700 MHz E Block, and
AWS H Block spectrum licenses on an aggressive schedule; (3) DISH deploys a 5G Broadband
Service on its 600 MHz spectrum licenses on an accelerated timeline; and (4) DISH adheres to
certain restrictions on its ability to sell or lease network capacity on its AWS-4 and 600 MHz
spectrum.  These commitments will be enforced through strong verification measures, including
significant voluntary contributions and potential license forfeitures for missed commitments.
Moreover, aligning the milestones for DISH's spectrum bands is in the public interest because
doing so will enable DISH to deploy its spectrum at the same time to provide a better overall 5G
service, at lower cost, and on a more efficient deployment schedule.

**Nationwide 5G Broadband Commitment**

DISH plans to deploy a first-of-its-kind 5G network built from the ground up with an
architecture that can take full advantage of expected 5G functionality.  In furtherance of this
goal, DISH will commit to concrete milestones related to its 5G deployment.  In particular, DISH

---

[2] DISH recognizes that some of the terms of Attachment A may require modifications under 47 U.S.C. §
316.  If the requested extensions are granted, DISH will not protest the modifications the Commission
makes to its licenses in order to effectuate the terms of Attachment A.

[3] "5G Broadband Service" is defined as at least 3GPP Release 15 capable of providing Enhanced Mobile
Broadband (eMBB) functionality.

**Federal Communications Commission**                                                  **FCC 19-103**

will commit that by **June 14, 2023**, it will deploy a nationwide 5G network using DISH's spectrum with:

- At least 70% of the U.S. population having access to download speeds equal to or greater than 35 Mbps, as verified by a drive test;

- At least 15,000 5G sites deployed; and

- At least 30 MHz of DISH's downlink 5G spectrum averaged over all DISH 5G sites deployed nationwide.

By meeting these commitments, DISH will become a nationwide facilities-based wireless competitor deploying next-generation technology to benefit the public and U.S. leadership in 5G.

**Commitment to Deploy 5G Broadband Service on AWS-4, 700 MHz E Block, and AWS H Block Spectrum Licenses**

DISH's AWS-4, 700 MHz E Block, and AWS H Block spectrum licenses are currently subject to construction deadlines of March 7, 2020 (for AWS-4 and 700 MHz E Block) and April 29, 2022 (for AWS H Block). Absent the conditions DISH is prepared to accept if granted the requested extensions, the licenses would be subject to the Commission's "flexible use" policies, which allow licensees to deploy any lawful technology to meet their construction milestones. To promote the Commission's broadband deployment goals and further U.S. leadership in 5G, DISH will voluntarily waive its flexible use rights, and commit to deploy 5G Broadband Service using its AWS-4, 700 MHz E Block, and AWS H Block spectrum licenses. Specifically, DISH will consent to include a 5G Broadband Service obligation as a special condition of each such license.

DISH will further commit to deploy 5G Broadband Service by the following deadlines:

- **DISH 5G Broadband Service to At Least 20% of U.S. Population by 2022:** With respect to the AWS-4, 700 MHz E Block and AWS H Block licenses, DISH commits to offer 5G Broadband Service to at least 20% of the U.S. population and to have deployed a core network no later than June 14, 2022.

- **DISH 5G Broadband Service to At Least 70% of U.S. Population by 2023:** With respect to the AWS-4, 700 MHz E Block and AWS H Block licenses, DISH commits to offer 5G Broadband Service to at least 70% of the U.S. population no later than June 14, 2023.

**Commitment to Deploy 5G Broadband Service on 600 MHz Spectrum Licenses on an Accelerated Timeline**

As a successful participant in the broadcast incentive auction, DISH holds 486 licenses in the 600 MHz band, with at least one license in each of the 416 Partial Economic Areas (PEAs) in the U.S. The 600 MHz spectrum licenses are subject to the Commission's flexible use policies, and have construction deadlines that do not come due until June 14, 2027 (interim construction milestone) and June 14, 2029 (final construction milestone). DISH will commit to deploy 5G

3

Federal Communications Commission                                    FCC 19-103

Broadband Service on each of its 600 MHz licenses *__four years earlier__* than required by the
Commission's rules, and will consent to including a 5G Broadband Service obligation as a
special condition of the licenses if granted the requested construction deadline extensions.
Specifically, DISH will commit to meet the following accelerated deadlines:

- Using the 600 MHz licenses, offer 5G Broadband Service to at least 70% of the
  U.S. population no later than June 14, 2023.

- Using the 600 MHz licenses, offer 5G Broadband Service to at least 75% of the
  population in each PEA no later than June 14, 2025.

Through this substantial acceleration of the 600 MHz construction deadlines, DISH will
put important low-band spectrum to use far sooner than originally required to offer 5G
Broadband Service in all PEAs nationwide, to the benefit of Americans living in all parts of the
country.

**Restrictions on Sale of Licenses and Leasing Capacity**

In furtherance of DISH's goals to provide both competitive retail and wholesale wireless
services, DISH will consent not to sell its AWS-4 and 600 MHz spectrum for six years without
prior DOJ and FCC approval. DISH will also consent, for six years, not to lease, directly or
indirectly, to any of the three largest wireless providers, or any combination thereof, traffic
accounting for more than 35% of the network capacity on its 5G network without prior FCC
approval. These restrictions will become effective on the date of an FCC order effectuating
Attachment A. Such terms ensure that key spectrum assets remain in DISH's hands to support
DISH's deployment. Further, they demonstrate DISH's commitment to entering the market,
becoming a viable competitor, and remaining a nationwide wireless carrier for the long term.

**Verification and Enforcement**

The commitments described above and enumerated in Attachment A will align DISH's
deployment plans with the availability of 5G standards and the associated ecosystem, while
accelerating our transformation to a next-generation communications company. DISH retains
powerful business incentives to meet these obligations on time. But, to demonstrate our
commitment to these terms, DISH will consent to rigorous verification and enforcement
procedures, with severe financial contributions and potential license forfeitures for failure to
meet the commitments.

Among other provisions, DISH will be required to file detailed status reports with the
Commission, above and beyond what is required of licensees today. DISH will also be subject to
verification using drive tests to ensure download speeds comply with the 35 Mbps metric, and
will be required to submit to the Commission a number of detailed coverage maps and related
data to demonstrate compliance with the June 2023 milestones.

Failure by DISH to meet these commitments will subject the company to up to $2.2
billion in voluntary contributions and potential license forfeitures, with the contributions
calculated separately for each commitment that is not met. For example, DISH's voluntary

4

contribution for failing to meet its 2022 commitments with respect to its AWS-4, 700 MHz E Block, and AWS H Block licenses will be calculated cumulatively by band, for a maximum voluntary contribution of $200,000,000. DISH will also be subject to voluntary contributions if it fails to meet the 2023 Nationwide 5G Broadband commitment, based on the single highest missed percentage of any missed element. This contribution will be calculated by multiplying each percentage missed, rounded up to the nearest decimal, by $10,000,000, for a maximum voluntary contribution of $1 billion. In the event that DISH fails to meet the 2023 milestones related to its AWS-4, 700 MHz E Block, and AWS H Block licenses, the voluntary contributions will be calculated based on the missed percentage, with maximum voluntary contributions ranging from $200,000,000 to $600,000,000 per band.

This verification and enforcement structure provides powerful additional incentives for DISH to meet its 5G commitments, which substantially advance the public interest.

<p style="text-align:center">*                 *                 *</p>

The framework set out in Attachment A will facilitate and accelerate DISH's entry as a new nationwide facilities-based wireless provider, promote competition, and help ensure America's leadership in 5G, all to the benefit of American consumers and industry. For these reasons, among others, DISH and its wireless license-holding subsidiaries[4] hereby request, pursuant to the Commission's authority under 47 U.S.C. § 308, the construction deadline extensions set forth in Section I (C), (E), and (G) of Attachment A. We are willing to accept the conditions as set forth in Attachment A to the grant of our request for extensions of the construction deadlines. We recognize that some of the conditions may require modification of our licenses under 47 U.S.C. § 316 and we do not object to those modifications.

*/s/ Jeffrey H. Blum*
Jeffrey H. Blum

Enclosure (Attachment A)

cc:    David Lawrence

---

[4] DISH's wireless licenses are held in indirect, wholly-owned subsidiaries as follows: ParkerB.com Wireless L.L.C. (holder of licenses in the 600 MHz band); Gamma Acquisition L.L.C. (holder of licenses in the AWS-4 band); DBSD Corporation (holder of licenses in the AWS-4 band); American H Block Wireless L.L.C. (holder of licenses in the AWS H Block); and Manifest Wireless L.L.C. (holder of licenses in the Lower 700 MHz E Block).

<p style="text-align:center">5</p>

Federal Communications Commission                                     FCC 19-103

ATTACHMENT A

DISH NETWORK 5G BUILDOUT COMMITMENTS AND RELATED PENALTIES

I.      LICENSE MODIFICATIONS/EXTENSIONS

(A) DISH's existing Final 600 MHz Construction Milestone is accelerated to **6/14/2025**.

(B) DISH's existing Interim 600 MHz Construction Milestone is suspended.

(C) DISH's existing Final AWS-4 Construction Milestone is extended to **6/14/2023**.

(D) DISH's AWS-4 Licenses are extended from **3/7/2023** to **6/14/2023**.

(E) DISH's existing Final 700 MHz E Block Construction Milestone is extended to **6/14/2023**.

(F) DISH's Lower 700 MHz E Block Licenses are extended from **3/7/2020** to **6/14/2023**.

(G) DISH's existing Final AWS H Block Construction Milestone is extended to **6/14/2023**.

(H) DISH's AWS H Block Licenses are extended from **4/29/2022** to **6/14/2023**.

II.     WAIVER OF FLEXIBLE USE RIGHTS

With respect to the 600 MHz Licenses, the AWS-4 Licenses, the 700 MHz E Block Licenses, and the AWS H Block Licenses, DISH voluntarily waives its right to use the licenses under the FCC's "flexible use" policies. Specifically, DISH voluntarily consents to the FCC conditioning each of the 600 MHz Licenses, the AWS-4 Licenses, the 700 MHz E Block Licenses, and the AWS H Block Licenses to include a 5G Broadband Service obligation as a special condition of the licenses.

III.    5G BUILDOUT COMMITMENTS

**Nationwide 5G Deployment Commitment:**

DISH commits that by **6/14/2023**, DISH will deploy a nationwide 5G network using DISH's spectrum with:

(A) At least 70% of the U.S. population having access to download speeds equal to or greater than 35 Mbps, as verified by a drive test;[1]

---

[1] DISH will fund the drive tests to commence after June 14, 2023. The drive tests will utilize devices and an industry-standard methodology mutually agreed to by DISH and the Federal Communications Commission's Wireless Telecommunications Bureau (the "Bureau") within 180 days. The parties agree to revisit the methodology at least 3 months before the drive tests begin. The goal of the testing is to reflect the actual user experience under ordinary utilization and compare them to the stated speed commitment. The drive testing will involve oversight by an independent third party, but may be conducted by DISH personnel. The drive

1

**Federal Communications Commission**                                    **FCC 19-103**

(B) At least 15,000 5G Sites deployed; and

(C) At least 30 MHz of DISH's downlink 5G spectrum averaged over all DISH 5G Sites deployed nationwide (in the event that DISH has more than 15,000 5G Sites, DISH may choose the 15,000 sites that will be used to calculate its compliance with this commitment).

**Band-Specific 5G Deployment Commitments:**

**Commitment #1**: With respect to the 600 MHz Licenses, DISH commits to offer 5G Broadband Service to at least **70%** of the U.S. population and to have deployed a core network no later than **6/14/2023**.

**Commitment #2**: With respect to the 600 MHz Licenses, DISH commits to offer 5G Broadband Service to at least **75%** of the population in each PEA no later than **6/14/2025**.

**Commitment #3**: With respect to the AWS-4 Licenses, DISH commits to offer 5G Broadband Service to at least **20%** of the U.S. population and to have deployed a core network no later than **6/14/2022**.

**Commitment #4**: With respect to the AWS-4 Licenses, DISH commits to offer 5G Broadband Service to at least **70%** of the U.S. population no later than **6/14/2023**.

**Commitment #5**: With respect to the Lower 700 MHz E Block Licenses, DISH commits to offer 5G Broadband Service to at least **20%** of the U.S. population who are covered by DISH's Lower 700 MHz E Block Licenses and to have deployed a core network no later than **6/14/2022**.

**Commitment #6**: With respect to the Lower 700 MHz E Block Licenses, DISH commits to offer 5G Broadband Service to at least **70%** of the U.S. population who are covered by DISH's Lower 700 MHz E Block Licenses no later than **6/14/2023**.

**Commitment #7**: With respect to the AWS H Block Licenses, DISH commits to offer 5G Broadband Service to at least **20%** of the U.S. population and to have deployed a core network no later than **6/14/2022**.

**Commitment #8**: With respect to the AWS H Block Licenses, DISH commits to offer 5G Broadband Service to at least **70%** of the U.S. population no later than **6/14/2023**.

---

testing will commence at the final commitment deadlines and will be completed within six (6) months thereafter. Only DISH 5G subscriber traffic using DISH's spectrum routed through the DISH core network may satisfy DISH's coverage and speed requirements.

2

Federal Communications Commission                                        FCC 19-103

IV.    **RESTRICTIONS ON SALE AND OTHER COMMITMENTS**

(A) DISH agrees not to sell its 600 MHz Licenses for a period of six years without prior FCC and DOJ approval (unless such sale is part of DISH selling itself; in that case, the purchaser shall be subject to the commitments and penalties herein unless the FCC and DOJ decide otherwise). For purposes of this commitment, to "sell" means (i) to transfer, assign, or dispose of the 600 MHz Licenses in any manner, either directly or indirectly; (ii) to transfer control of an entity holding the 600 MHz Licenses; or (iii) to enter into a lease arrangement or any other arrangement that results in the transfer of *de jure* or *de facto* control of the 600 MHz Licenses.

(B) For a period of six years, DISH agrees not to provide, in any Partial Economic Area for its 600 MHz Licenses, in any rolling 12-month period (as determined at the end of every calendar quarter), directly or indirectly, via its 5G network, to any of the three largest wireless providers, or any combination thereof, traffic accounting for more than 35% of the network capacity on its 5G network, without prior FCC approval.

(C) DISH agrees not to sell its AWS-4 Licenses for a period of six years without prior FCC and DOJ approval (unless such sale is part of DISH selling itself; in that case, the purchaser shall be subject to the commitments and penalties herein unless the FCC and DOJ decide otherwise). For purposes of this commitment, "sell" mean (i) to transfer, assign, or dispose of the AWS-4 Licenses in any manner, either directly or indirectly; (ii) to transfer control of an entity holding the AWS-4 Licenses; or (iii) to enter into a lease arrangement or any other arrangement that results in the transfer of *de jure* or *de facto* control of the AWS-4 Licenses.

(D) For a period of six years, DISH agrees not to provide, in any Economic Area for its AWS-4 Licenses, in any rolling 12-month period (as determined at the end of every calendar quarter), directly or indirectly, via its 5G network, to any of the three largest wireless providers, or any combination thereof, traffic accounting for more than 35% of the network capacity on its 5G network, without prior FCC approval.

V.    **CONTINGENT EXTENSIONS**

(A) If DISH is offering 5G Broadband Service with respect to the AWS-4 Licenses to less than **50%** of the U.S. population by **6/14/2023,** DISH's AWS-4 Licenses are subject to automatic termination in any EA where DISH is offering 5G Broadband Service with respect to the AWS-4 Licenses to less than **70%** of the population in such EA. If DISH is offering 5G Broadband Service with respect to the AWS-4 Licenses to greater than **50%** of the U.S. population by **6/14/2023,** then DISH's Final AWS-4 Construction Milestone shall be automatically extended to **6/14/2025.**

(B) If DISH is offering 5G Broadband Service with respect to the Lower 700 MHz E Block Licenses to less than **50%** of the total U.S. population covered by DISH's Lower 700 MHz E Block Licenses by **6/14/2023,** then DISH's Lower 700 MHz E Block Licenses are subject to automatic termination in any EA where DISH is offering 5G Broadband Service with respect to the Lower 700 MHz E Block Licenses to less than **70%** of the population in such EA. If DISH is offering 5G Broadband Service with respect to the Lower 700 MHz E Block Licenses to greater than **50%** of the total U.S. population covered by DISH's Lower 700 MHz E Block

3

Federal Communications Commission                                FCC 19-103

Licenses by **6/14/2023,** then DISH's Final 700 MHz E Block Construction Milestone shall be automatically extended to **6/14/2025.**

(C) If DISH is offering 5G Broadband Service with respect to the AWS H Block Licenses to less than **50%** of the U.S. population by **6/14/2023,** DISH's AWS H Block Licenses are subject to automatic termination in any EA where DISH is offering 5G Broadband Service with respect to the AWS H Block Licenses to less than **75%** of the population in such EA. If DISH is offering 5G Broadband Service with respect to the AWS H Block Licenses to greater than **50%** of the U.S. population by **6/14/2023,** then DISH's Final H Block Construction Milestone shall be automatically extended to **6/14/2025.**

VI.    **STATUS REPORTS**

Within 30 days of the date of each commitment set forth in Section III, DISH shall file with the Bureau a report that includes information concerning the status of DISH's efforts to meet the terms of the commitments. *See* 47 C.F.R. § 27.14(l). The status report shall include the following information for each commitment:

(A) Polygon shapefiles showing DISH's 5G Coverage Area for the applicable commitment;

(B) A statement quantifying the U.S. Population covered by DISH's 5G Coverage Area as of the applicable commitment deadline;

(C) A list of 5G Sites (including information identifying individual sites, *e.g.*, latitude and longitude), spectrum deployed by band per sector, and antenna details; and

(D) A certification from a DISH engineering executive that the representations in the shapefiles, population coverage numbers, and site and spectrum deployment numbers are true and correct.

VII.    **ENFORCEMENT**

In the event that the Bureau determines that DISH has failed to meet any of the commitments related to nationwide 5G deployment and/or its AWS-4, 700 MHz and H Block holdings, DISH will make a voluntary contribution to the U.S. Treasury in the manner directed by the Bureau within 60 days of such determination of up to a total of $2.2 billion.[2]

---

[2] The total contribution could be as high as $2.2 billion, calculated as $200 million for the Interim Commitments, plus $1 billion for the Nationwide 5G Deployment Commitment, plus $600 million for Commitment #4, plus $200 million for Commitment #6, plus $200 million for Commitment #8. For the avoidance of doubt, license termination or forfeiture, if applicable, may impose additional costs and obligations over and above the $2.2 billion in contributions pursuant to this section.

4

Federal Communications Commission                                    FCC 19-103

**Interim Commitments:**

In the event that the Bureau determines that DISH has failed to meet Commitment #3, Commitment #5, or Commitment #7, the applicable voluntary contribution shall be calculated as follows for each commitment that is not met, cumulative by band:

| Missed Population Percentage | Voluntary Contribution |
|---|---|
| >0-25% | $16,000,000 |
| >25-50% | $32,000,000 |
| >50-75% | $48,000,000 |
| >75-100% | $66,000,000 |

In the event DISH fails to deploy a core network by **6/14/22**, DISH shall pay a voluntary contribution of $200,000,000, regardless of shortfalls in the population coverage commitment. However, the maximum voluntary contribution for all failures to meet Commitments #3, #5, or #7 shall not exceed $200,000,000.

**Final Nationwide 5G Deployment Commitment:**

In the event the Bureau determines that DISH has failed to meet the Nationwide 5G Deployment Commitment (see Section III), the applicable voluntary contribution for missing that commitment shall be calculated as follows:

(A) The Bureau shall determine the percentage by which DISH has fallen short under each element. The voluntary contribution will be based on the single highest missed percentage of any missed element.

(B) The following contribution scale will apply: the applicable voluntary contribution shall be calculated by multiplying each percentage missed, rounded to the nearest decimal, by $10,000,000. For example, if DISH deploys only 7,500 5G Sites (thus missing the applicable buildout element by 50%), and if 50% is the highest percentage missed of any element, DISH's voluntary contribution would be $500,000,000. The maximum possible total voluntary contribution for the Nationwide 5G Deployment Commitment would be $1 billion.

**Final Band-Specific 5G Deployment Commitments:**

In the event that the Bureau determines that DISH has failed to meet Commitment #4 (AWS-4), the applicable voluntary contribution shall be calculated by multiplying each percentage missed, rounded to the nearest decimal by $6,000,000. For example, if DISH offers 5G Broadband Service to 63% of the U.S. Population (thus, missing the applicable buildout by 10%),[3] DISH's voluntary contribution would be $60,000,000, corresponding to a 10% miss, times $6,000,000. The maximum possible voluntary

---

[3] If there is a commitment to serve 70% of the U.S Population (218,992,544 out of 312,846,492), and DISH is able to serve only 197,093,290 (63% of the U.S. Population), the company would fall short by 21,899,254, which would be a percentage missed of 10% (21,899,254/218,992,544 x 100 = 10%).

5

contribution for covering zero percent of the U.S. Population for Commitment #4 would be $600,000,000.

In the event that the Bureau determines that DISH has failed to meet Commitment #6 (Lower 700 MHz E Block), the applicable voluntary contribution shall be calculated by multiplying each percentage missed, rounded to the nearest decimal by $2,000,000.  For example, if DISH offers 5G Broadband Service to 63% of the U.S. Population (thus, missing the applicable buildout by 10%), DISH's voluntary contribution would be $20,000,000, corresponding to a 10% miss, times $2,000,000.  The maximum possible voluntary contribution for covering zero percent of the U.S. Population for Commitment #6 would be $200,000,000.

In the event that the Bureau determines that DISH has failed to meet Commitment #8 (AWS H Block), the applicable voluntary contribution shall be calculated by multiplying each percentage missed, rounded to the nearest decimal by $2,000,000.  For example, if DISH offers 5G Broadband Service to 63% of the U.S. Population (thus, missing the applicable buildout by 10%), DISH's voluntary contribution would be $20,000,000, corresponding to a 10% miss, times $2,000,000. The maximum possible voluntary contribution for covering zero percent of the U.S. Population for Commitment #8 would be $200,000,000.

**Verification Metrics:**

(A) Within six months of June 14, 2023, DISH will submit to the Bureau a report that will include:
   a. Drive test results;[4]
   b. Polygon shapefiles showing DISH's 5G Coverage Area as of June 14, 2023;
   c. A statement quantifying the U.S. Population covered by DISH's 5G Coverage Area as of June 14, 2023;
   d. A list of 5G Sites (including information identifying individual sites, *e.g.*, latitude and longitude), spectrum deployed by band per sector, and antenna details; and
   e. A certification from a DISH engineering executive that the representations in the shapefiles, population coverage numbers, site and spectrum deployment numbers, and speeds are true and correct.

(B) In making a determination regarding DISH's compliance with any of the commitments, the Bureau shall take into account and, in its reasonable discretion, appropriately reduce the metric, extend the deadline or reduce the contribution amount associated with commitments missed due to unanticipated circumstances beyond the company's control (*e.g.*, 600 MHz broadcaster transition for 600 MHz spectrum,[5] acts of God, such as fire, flood, earthquake, or other natural disasters; terrorist events, riots, insurrections, war, strikes or national emergencies; law or order of any government body; or significant interruptions in the supply chain).  For clarity, "unanticipated circumstances" would not include anticipated supply chain or standards process

---

[4] *See* Note 1.

[5] A delay in the relocation in a particular PEA will result in a commensurate extension of the deadline for that market.  For example, if the broadcaster relocation is delayed by 3 months in a PEA, the final buildout deadline for that PEA will be extended by 3 months.

6

**Federal Communications Commission**                                   **FCC 19-103**

delays, or Commission action or inaction on requests by DISH to waive or change regulatory requirements.

## VIII.     EFFECTIVE DATE

The existing Final AWS-4 Construction Milestone, the existing Final 700 MHz E Block Construction Milestone, and the existing March 7, 2020 expiration of the Lower 700 MHz E Block Licenses shall be tolled, effective upon the date of a release of an Order adopting these 5G Buildout Commitments and Related Penalties, until the earliest of the following: (1) Sprint and T-Mobile cease to have a pending agreement to merge; (2) a final judgment blocking the merger from any Federal U.S. District Court; (3) or any other circumstance or event that effectively eliminates the ability of Sprint and T-Mobile to effectuate their merger agreement.

## IX.     DEFINITIONS

**"5G"** is defined as the 5G New Radio air interface standard as described in 3GPP Release 15, *available at* https://www.3gpp.org/release-15, or 3GPP Release 16 within 3 years of 3GPP final approval.

**"5G Broadband Service"** means at least 3GPP Release 15 capable of providing Enhanced Mobile Broadband (eMBB) functionality.

**"5G Coverage Area"** is defined as that area included within the bounds of the polygon shapefile representing geographic coverage for 5G service with coverage based on DISH's ordinary course coverage analysis.

**"5G Sites"** is defined as macro sites on which 5G radios are deployed.

**"5G Spectrum"** is defined as dedicated licensed spectrum used for 5G radios.

**"600 MHz Licenses"** means all authorizations in the 600 MHz band (ULS Service Code WT) licensed to ParkerB.com Wireless L.L.C.

**"Access"** to specified speeds means that users of DISH-Certified 5G Devices will experience the specified download speeds on average (mean) across actual utilization.

**"AWS-4 Licenses"** means all authorizations in the AWS-4 band (ULS Service Code AD) licensed to Gamma Acquisition L.L.C and DBSD Corporation.

**"AWS H Block Licenses"** means all authorizations in the AWS H Block (ULS Service Code AH) licensed to American H Block Wireless L.L.C.

**"DISH-Certified 5G Device"** means a device that DISH has certified as compatible with its 5G network (it is anticipated that all 5G devices available from DISH will be DISH-Certified 5G Devices).

 **"Final 600 MHz Construction Milestone"** means 47 C.F.R. § 27.14(t)(2).

**"Final 700 MHz E Block Construction Milestone"** means 47 C.F.R. § 27.14(g)(2) as subsequently waived by the Commission. *See* Promoting Interoperability in the 700 MHz Commercial Spectrum, *Report and Order and Order of Proposed Modification*, 28 FCC Rcd. 15122, 15148 ¶¶ 56-57 (2013).

7

**Federal Communications Commission**                    **FCC 19-103**

**"Final AWS-4 Construction Milestone"** means 47 C.F.R. § 27.14(q)(2), as subsequently waived by the Commission. *See* DISH Network Corporation, Petition for Waiver of Sections 27.5(j) and 27.53(h)(2)(ii) of the Commission's Rules and Request for Extension of Time, *Memorandum Opinion and Order*, 28 FCC Rcd. 16787, 16787-78 ¶ 1, 16804-05 ¶ 43 (2013).

**"Final H Block Construction Milestone"** means 47 C.F.R. § 27.14(r)(2).

**"Interim 600 MHz Construction Milestone"** means 47 C.F.R. § 27.14(t)(1).

**"Lower 700 MHz E Block Licenses"** means all authorizations in the Lower 700 MHz E Block (ULS Service Code WY) licensed to Manifest Wireless L.L.C.

**"U.S. Population"** is defined as the population of the United States (including the 50 states, Puerto Rico and the U.S. territories) reported in either the 2010 U.S. Census (312,846,492) or the 2020 U.S. Census (which is expected to be reported in 2021).  In its sole discretion, DISH may choose whether to utilize the 2010 or 2020 versions of the U.S. Census in calculating its compliance with its commitments, but DISH must apply the same population total and population distributions to all calculations uniformly.

8

# STATEMENT OF
# CHAIRMAN AJIT PAI

Re:    *Applications of T-Mobile US, Inc., and Sprint Corporation For Consent To Transfer Control of
Licenses and Authorizations; Applications of American H Block Wireless L.L.C., DBSD
Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, WT
Docket No. 18-197

After a lengthy and painstaking review process, the Commission has correctly concluded that this
transaction is in the public interest.  In particular, the transaction will help secure United States leadership
in 5G, close the digital divide in rural America, and enhance competition in the broadband market.

I'll start with 5G, the next generation of wireless connectivity.  This transaction will provide New
T-Mobile with the scale and spectrum resources necessary to deploy a robust 5G network across the
United States.  Specifically, its 5G network will cover 97% of our nation's population within three years
of the closing of the merger and 99% of Americans within six years.  What does this mean for American
consumers?  With New T-Mobile's network, 90% of Americans would have access to mobile broadband
service at speeds of at least 100 Mbps, and 99% would have access to speeds of at least 50 Mbps.

In particular, this merger will put critical mid-band spectrum to much more productive use for 5G
deployment.  New T-Mobile will be far better positioned to deploy Sprint's extensive 2.5 GHz spectrum
holdings than would Sprint standing alone, given that company's financial situation.  Indeed, New T-
Mobile's network will cover at least 88% of Americans with mid-band 5G within six years, a far wider
deployment than either Sprint or T-Mobile would be able to accomplish on their own.  So let's be clear:
A vote against this transaction is a vote against strong, swift mid-band 5G deployment.

Turning to rural America:  This transaction will also help close the digital divide.  New T-
Mobile's 5G network will reach deep into rural areas, with 85% of rural Americans covered within three
years and 90% covered within six years.  Moreover, its network will cover at least two-thirds of our
nation's rural population with high-speed, mid-band 5G, which would strengthen our overall economy
and improve the quality of life in many small towns across the country.  This Commission is committed
to ensuring that all Americans benefit from the transformative impact of 5G, not just those living in big
cities like New York City and Los Angeles.  And this transaction is an important step toward
accomplishing that goal.  So let's be clear:  A vote against this transaction is a vote against ensuring that
rural Americans are beneficiaries, as opposed to spectators, of the 5G innovation to come.

And finally, this transaction will enhance competition in a number of ways.  New T-Mobile will
make the mobile broadband market more competitive in large swaths of rural America where neither
Sprint nor T-Mobile is currently a strong competitor to AT&T and Verizon.  New T-Mobile will make
more competitive the enterprise wireless market, where neither Sprint nor T-Mobile is currently a strong
competitor to AT&T and Verizon.  And it will provide more competition in the home broadband market,
by allowing New T-Mobile to offer widely an in-home broadband product that would give many
Americans another option for residential broadband service.

To be sure, there are some who have claimed that this transaction would harm competition,
arguing that it would reduce the number of national wireless carriers from four to three.  But the record
makes clear that is a simplistic, backward-looking claim that doesn't capture the reality of today or
tomorrow.  For example, as described above, in many rural parts of our country, this transaction would
actually increase the number of meaningful competitors in the market from two to three.  Across the
United States, this transaction would increase the number of strong competitors for many quality-
conscious consumers from two to three.  And again, as we emerge into a 5G environment, this transaction
would ensure a strong third competitor with the resources necessary to develop spectrum and

infrastructure assets needed for a robust nationwide 5G network (remember: the two largest companies in this space together have over 90% of the free cash flow in the entire industry). So let's be clear: A vote against this transaction is a vote against the creation of a strong 5G competitor.

I do agree that for price-conscious consumers in urban areas, this transaction, had it been approved without conditions, would have run the serious risk of harming competition. And that is why I insisted that T-Mobile and Sprint divest Boost Mobile, Sprint's largest pre-paid brand, and agree to a series of conditions to ensure that Boost would remain a strong and independent competitor in the wireless marketplace following the transaction. With this structural remedy, we have eliminated the potential for competitive harm while preserving the transaction's many benefits.

As we analyze the competitive effects of this transaction, it is also important to recognize that the wireless marketplace is quite dynamic. It is a significant mistake to adopt a backward-looking view and assume that the marketplace will be the same tomorrow as it is today. For example, while Sprint is not on the brink of financial collapse, there are serious questions about how strong a competitor it can be in the years to come on a standalone basis.

For all of these reasons, this transaction is in the public interest. It would bring the benefits of the next generation of wireless technology to American consumers and advance American leadership in 5G. It would help millions in rural America benefit from high-speed 5G mobile broadband service. And it would promote competition. That's why both the FCC and the Department of Justice have approved this transaction, and that's why I hope that it is consummated soon.

Finally, I want to thank the amazing staff of the Federal Communications Commission (as well as those detailed from the Department of Justice) who put in countless hours reviewing the extensive record and bringing this proceeding to the right conclusion for the American public: Jim Bird, Ashley Boizelle, Babette Boliek, Jonathan Campbell, Steven Carpenter, Saurbh Chhabra, Matthew J. Collins, Kimberly Cook, Nicholas Copeland, Patrick DeGraba, Monica DeLong, Judith Dempsey, William Dever, Connie Diaz, Stacy Ferraro, Ben Freeman, Chris Gao, Garnet Hanly, Kathy Harris, Jonathan Henly, Pramesh Jobanputra, Eugene Kiselev, David Krech, Paul Lafontaine, David Lawrence, Katherine LoPiccalo, Marcus Maher, Charles Mathias, Kate Matraves, Sara Mechanic, Murtaza Nasafi, Susan OConnell, Robert Pavlak, Joel Rabinovitz, Linda Ray, Ronald Repasi, Jim Schlichting, Dana Shaffer, Sharif Shahrier, David Sieradzki, Ziad Sleem, Chris Smeenk, Michael C. Smith, Max Staloff, Donald Stockdale, Cecilia Sulhoff, Sean Sullivan, Patrick Sun, Thuy Tran, Brenda Villanueva, Weiren Wang, Ramon Williams, Aleks Yankelevich, and Morasha Younger.

Federal Communications Commission                                   FCC 19-103

### STATEMENT OF
### COMMISSIONER MICHAEL O'RIELLY

Re:    *Applications of T-Mobile US, Inc., and Sprint Corporation For Consent To Transfer Control of Licenses and Authorizations, Applications of American H Block Wireless L.L.C., DBSD Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time,* WT Docket No. 18-197

Most rational market onlookers, from the Wall Street experts to individual users to the casual observer, will agree that some type of major transaction involving Sprint was inevitable. For a multitude of reasons, Sprint has struggled to keep pace with its competitors, and the record contains strong evidence that, going forward, Sprint would have been extremely unlikely to be able to compete on its own. While some will surely argue that the company is still making capital expenditures, its network has fallen behind others and the evidence suggests it is struggling to maintain its customer base, even while slashing prices. The application may not have been officially based on a failing firm defense, but the company's position suggests that would not be far from reality. And, the challenges – and expenses – for Sprint were only going to increase dramatically with the advent of 5G. In fact, Sprint admits that it is "unlikely to play a meaningful competitive role as a standalone company in the years to come" and that "[its] network is deficient, it is losing customers, and it cannot generate enough cash to invest in its network, pay its debt obligation, and compete effectively."[1] I am amazed by how people speculate about the health and viability of a company for years, but, when an actual transaction comes to fruition, the company is suddenly made out to be some sort of industry juggernaut without which the vibrant and competitive marketplace as we know it will cease to exist.

Therefore, only after thoroughly reviewing the draft order, the docket materials, and considering the views of a wide range of participants, do I vote in support of the merger of T-Mobile and Sprint, as it is in the public interest, consistent with the provisions of the statute, and will result in a more competitive and dynamic marketplace. Contrary to some accusations, I did not vote or indicate my vote without doing the accompanying, and necessary, review. Substantively, combining spectrum holdings and networks, along with the efficiencies resulting from the combined company, will lead to improved quality, faster deployment of 5G and other new, innovative offerings, and cost savings that will benefit American consumers through greater choice, better service, and lower prices. It will also lead to a less leveraged company, which is an important factor from my viewpoint. Because of all of this, I am at a loss to see any merit in the collection of states challenging the transaction or to see their efforts as more than an influence campaign being driven by larger political motives.

While I am supportive of this transaction, there are portions of today's item and our merger reviews, in general, that are woefully out of date and need to be improved. That said, I acknowledge that these issues arise because of Commission precedent and policy that predate the current administration.

In particular, it's important to recognize that the communications sector has changed remarkably in the last few years. Discrete industry segments are now converging: mobile and fixed wireless are providing broadband speeds; video and audio content are carried over the Internet using various distribution paths; and satellite offerings have also improved, providing a viable alternative to traditional offerings. Americans have more options for receiving information and communicating than ever before. And, this is just the tip of the iceberg, the promise of 5G could revolutionize the role of wireless networks, making them truly indistinguishable from their wired cousins, or perhaps even launching them well beyond traditional networks.

---

[1] Ex Parte Letter from Regina M. Keeney, Lawler, Metzger, Keeney & Logan, LLC, to Marlene H. Dortch, Secretary, Federal Communications Commission 2-3 (Apr. 19, 2019).

But, nonetheless, the Commission's merger review process still takes a very siloed view of competition. I frequently raise that the Commission and others, including the Department of Justice (DOJ), need to update and modernize their requisite market definitions. Even if you look solely at the myopic and out-of-date mobile broadband and telephony market used in this item, there isn't much consideration given to the cable offerings, unlicensed systems, or satellite services, among others. To act as if these services are not substitutes for one another is turning a blind eye to reality.

Unfortunately, this view permeates much of our merger analysis. It undergirds both our initial spectrum and competition, or HHI, screens. Although these metrics were initially set up as transaction tools to provide clarity to parties about those markets where the Commission would take a closer look and those that were presumed to have no competitive effect,[2] these artificial limits have instead been used to demarcate where the Commission will start imposing conditions or, worse yet, signal that a merger cannot be approved. These should be, at best, eliminated or, at a minimum, seriously reconsidered and modified accordingly.

Even more egregious is the seriously flawed enhanced factor review for transactions involving frequencies under 1 GHz, which was formally added to our spectrum screen, prior to the Broadcast Incentive Auction in 2014.[3] This more stringent look at low-band spectrum aggregation has never had any effect whatsoever on the Commission's analysis, and it is still unclear exactly what it entails. I am pleased that others are now seeing its futility and requesting that the Commission reevaluate this extra hurdle, whatever it may be. There may be some merit in reviewing the competitive effects of a transaction and ensuring that it is in the public interest, but a loosey-goosey standard with no defined parameters is not transparent, leads to uncertainty, and can result in arbitrary and capricious findings.

Further, this item contains of a lot of back and forth about the pros and cons of various economic models, and, in the record, interested parties spend a lot of time and effort ripping apart different submissions. Each and every model appears to have a flaw of some kind, and each and every input seems to be debated. In the end, determining the true effects of a merger is not an exact science. These models are informative, not determinative; we cannot predict the future. There is no model or metric that will take into account the benefits of upgraded 5G networks and new service offerings, greater capacity and lower costs, and the overall expense and resources that it takes to compete in the mobile sector.

Having a third, strong nationwide wireless competitor that is capable of more effectively competing with the two market leaders is in the public interest. For this reason and others, I am skeptical about whether the conditions imposed are absolutely necessary. The presence of AT&T and Verizon will act as a constraint on T-Mobile's ability to change its rates drastically. Further, there are other offerings, including other MVNOs and the entry of cable companies into the wireless space, that will also constrain pricing in urban markets. To the extent the merged company steps away from what the market will support, it merely invites new and expanded competitors to out-maverick it.

I am also concerned any time I see conditions that appear to be an attempt to resolve larger policy issues of general applicability better suited for a Commission proceeding, such as requiring heightened construction requirements. Additionally, in response to critics, T-Mobile has made a three-year pricing commitment that they will maintain or offer better rate plans. During this three-year period, T-Mobile

---

[2] *Applications of AT&T Wireless Inc. and Cingular Wireless Corporation For Consent To Transfer of Control of Licenses and Authorizations*, Memorandum Opinion & Order, 19 FCC Rcd 21522, ¶¶ 108-109 (2004).

[3] *Policies Regarding Mobile Spectrum Holdings; Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, WT Docket Nos. 12-269, 12-268, Report and Order, 29 FCC Rcd 6133, 6237-6240 ¶¶ 279-289 (2014).

will experience huge cash outlays as it seeks to deploy 5G.  I will be watching to see if this commitment hinders T-Mobile's upgrade or expansion plans.  These various conditions were offered by the parties to ease an approval, so, while I don't think they are necessary, I will not object to them.  As I have stated before, I cannot stop a company from stabbing itself in the foot.

As for the DOJ conditions and process, which I was not privy to, I am concerned about the precedent set when another agency takes an action that forces the Commission's hands.  Unfortunately, these conditions are necessary to get another agency's approval and, as I am in favor of the overall merger, I am not in a position to realistically reject them.  But, I worry that the applicant is divesting more than needed to mitigate the imaginary concerns of some other regulators.  All told, however, that is not to suggest that I don't see the possibilities of DISH's expansive entry into the market as intriguing.

In closing, I fervently believe that there is no magical number of entities that make a marketplace competitive.  It would be nice if it were that simple, but you also need to take into consideration the strength of the participants, the structure of the market, and the future demands placed on networks and providers as they seek to respond to consumer demand.  Those who solely look at a number are taking the easy way out.  This merger will lead to a more competitive marketplace, hasten the delivery of next-generation services, and improve the combined company's service quality and network reach beyond what either company can do on its own.  Thus, I look forward to the new company meeting its commitments and bringing its fervent competitive style to bear on the market for the betterment of the American consumer.

I thank Chairman Pai for his work to bring the transaction to a conclusion at the Commission, his willingness to accommodate my edit suggestions, and his overall leadership on the matter.  I approve.

## STATEMENT OF
## COMMISSIONER BRENDAN CARR

Re:    *Applications of T-Mobile US, Inc., and Sprint Corporation For Consent To Transfer Control of
Licenses and Authorizations, Applications of American H Block Wireless L.L.C., DBSD
Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*,
WT Docket No. 18-197

Advancing 5G in the United States has been a leading focus of this Commission. In our monthly
Commission meetings in the past year alone, the FCC has approved more than 10 major items aimed at
providing more spectrum, modernized infrastructure rules, and greater flexibility so that providers can
connect Americans to 5G.[1]

We have made 5G our priority for at least two reasons.

First, robust 5G networks will be the platforms upon which the next wave of our economy's jobs
and services will be created. All of the life-changing technologies we hear about—from autonomous cars
to smart cities, from remote surgery to virtual reality—won't work or won't work well without 5G. The
truth is that as impactful as this first wave of inventions built on 5G will be, they only scratch the surface
of what is to come for American families. When the U.S. upgraded from 3G to 4G, few predicted the rise
of Uber, Airbnb, or Venmo. Entrepreneurs and inventors created trillions of dollars of value on
America's world-leading 4G networks. With 5G's capabilities, we expect the resulting economic growth
to surpass the previous generations of wireless. 5G therefore is a national priority beyond mere
communications. If it is deployed quickly and robustly it promises to give the U.S. an edge in economics,
security, education, and other dimensions that are vital to Americans' lives.

Second, 5G accelerates competition in the communications marketplace. As regulators bent on
realizing more choice for the Americans we serve, we delight in competition between previously siloed
industries. Deregulation and technological progress brought down long-distance phone rates to a point
where today many young people never have heard of such charges. Cable companies first provided
quality and competitive video alternatives to broadcast, they were later challenged by satellite providers,
and they all now face myriad competitors that deliver video over-the-top of Internet connections.
Wireless companies are battling cable companies and others to provide Americans broadband access.
Indeed, cable companies now are adding more wireless subscribers each quarter than some of the largest
wireless companies.[2]

---

[1] *Auction of Priority Access Licenses for the 3550-3650 MHz Band*, AU Docket No. 19-244, Public Notice, 2019
WL 4785555 (2019); *Transforming the 2.5 GHz Band*, WT Docket No. 18-120, Report and Order, 34 FCC Rcd
5446 (2019); *Incentive Auction of Upper Microwave Flexible Use Service Licenses in the Upper 37 GHz, 39 GHz,
and 47 GHz Bands for Next-Generation Wireless Services*, AU Docket No. 19-59, Public Notice, 34 FCC Rcd 5532
(2019); *Allocation and Service Rules for the 1675-1680 MHz Band*, WT Docket No. 19-116, Notice of Proposed
Rulemaking and Order, 34 FCC Rcd 3552 (2019); *Incentive Auction of Upper Microwave Flexible Use Service
Licenses in the Upper 37 GHz, 39 GHz, and 47 GHz Bands for Next-Generation Wireless Services*, AU Docket No.
19-59, Public Notice, 34 FCC Rcd 2656 (2019); *Use of Spectrum Bands Above 24 GHz for Mobile Radio Services*,
GN Docket No. 14-177, Fifth Report and Order, 34 FCC Rcd 2556 (2019); *Updating the Commission's Rule for
Over-the-Air Reception Devices*, WT Docket No. 19-71, Notice of Proposed Rulemaking, 34 FCC Rcd 2695 (2019);
*FCC Opens Spectrum Horizons for New Services & Technologies*, ET Docket No. 18-21, First Report and Order, 34
FCC Rcd 1605 (2019); *Use of Spectrum Bands Above 24 GHz for Mobile Radio Services*, GN Docket No. 14-177,
Fourth Report and Order, 33 FCC Rcd 12168 (2018); *Unlicensed Use of the 6 GHz Band*, ET Docket No. 18-295,
GN Docket No. 17-183, Notice of Proposed Rulemaking, 33 FCC Rcd 10496 (2018); *Promoting Investment in the
3550-3700 MHz Band*, GN Docket No. 17-258, Report and Order, 33 FCC Rcd 10598 (2018).

[2] *See* News Release, Comcast, Comcast Reports 3rd Quarter 2019 Results, (Oct. 24, 2019),
https://www.cmcsa.com/news-releases/news-release-details/comcast-reports-3rd-quarter-2019-results (announcing
(continued….)

5G's performance characteristics will greatly expand the head-to-head competition for Americans' broadband dollars.  If an operator can offer fast Internet access ubiquitously, it does not matter to the consumer whether the operator calls itself a cable company or a wireless company.  As to investment and network engineering, it does not matter much whether the operator places itself into the cable silo, the wireless silo, or neither—it will have to build small cells connected to fiber, regardless.  What does matter to consumers and companies alike is the disruptive competition that we are about to witness.  For consumers, next-gen connectivity will mean more choice, which we know will decrease prices and improve quality.  For companies, it will mean new markets to address—and greater pressure on resources, performance, and agility.

The merger of T-Mobile and Sprint, our country's smallest nationwide wireless providers, comes to us at this moment of immense transition.  To judge whether the transaction is in the public interest then, the Commission must rely on our experience with regulating not only the wireless industry but other industries that will compete against wireless companies for Americans' broadband dollars.

The analysis begins with 5G's impact on demand for data and services.  It turns to understanding how our wireless providers are positioned to meet that demand based on the detailed engineering and financial models we have studied over the last year.  Finally, to keep pace with the industries we regulate, we must pull back from a cramped, backward-looking view of wireless and take account of the way 5G will rearrange the field of competition.

I.        The 5G Data Demand Boom

We know from our experience with regulating wireless carriers in the 4G era that demand for data will surge with 5G.  As more bandwidth is available to content creators and app makers, more bandwidth will be used.  And as these data-rich services proliferate, consumers' hunger for data tends to increase.  We observed this trend in the upgrade from 3G to 4G.[3]  One measurement of users who have upgraded from 4G to 5G thus far shows an immediate 260 percent spike in data consumption to 24 GB per user per month.[4]  Early indicators suggest that the capacity pressure from the 5G upgrade will dwarf the upgrade from 3G to 4G.

In conducting our demand analysis, the Commission obtained data forecasts from T-Mobile, Sprint, and other wireless providers, as well as those that are publicly available.  We display the range of forecasts in the Technical Appendix at Fig. A16.

---

(Continued from previous page) ————————————
that Comcast added 204,000 wireless lines in the third quarter of 2019); Earnings Release, Charter Communications, Charter Announces Third Quarter 2019 Results (Oct. 25, 2019), https://ir.charter.com/static-files/76cf320f-4610-448b-9768-c1a27f2d2c2e (announcing that Charter added 276,000 mobile lines in the third quarter of 2019).

[3] *See* Calum Dewar, *4G driving data usage but not all markets are reaping the rewards*, GSMA INTELLIGENCE (Jan. 20, 2014), https://www.gsmaintelligence.com/research/2014/01/4g-driving-data-usage-but-not-all-markets-reaping-the-rewards/412/ (reporting in the early adoption of 4G that "4G users typically consum[ed] twice as much data per month as other users").

[4] *See* Philip Kendall, *5G Data Use Surges in South Korea*, STRATEGY ANALYTICS (Aug. 1, 2019), https://www.strategyanalytics.com/strategy-analytics/blogs/service-providers/mobile-operators/service-providers/2019/08/01/5g-data-use-surges-in-south-korea; Mike Dano, *Early Usage of 5G Off the Charts, but Profits May Not Be*, LIGHT READING (Oct. 25, 2019), https://www.lightreading.com/mobile/5g/early-usage-of-5g-off-the-charts-but-profits-may-not-be/a/d-id/755136 (explaining that Sprint's 5G customers "are consuming three to five times more data than its 4G LTE customers").

Several common features emerge from the forecasts. They all show data growth accelerating from 4G to 5G; not only does the quantity of data increase, but the rate of the increase increases. Among the 5G networks and the networks with a mix of standards, the forecasts have remarkably similar growth rates. With the exceptions of the low forecast **[BEGIN HIGHLY CONF. INFO.]** **[END HIGHLY CONF. INFO.]** and the high forecast **[BEGIN HIGHLY CONF. INFO.]** **[END HIGHLY CONF. INFO.]**, the forecasts show compound annual growth rates of between **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** percent and **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** percent, with the majority in the low **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]**. The forecasts produce different projected data demands in the out years less because of differing views on growth rates than because they make different assumptions about base year demand.

Our record strongly indicates that actual demand in the out years will be on the high end of the Technical Appendix's forecasts. The base year figures from **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]**, Cisco, and Ericsson are estimates of the usage on various networks in 2016 or 2017. We need not rely on base year estimates, however, because we know what T-Mobile and Sprint customers actually used. In 2017, Sprint customers used an average of **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** GB of data per month, and the average was **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** GB for T-Mobile customers. **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]**. Forecasting off of the companies' actual usage—as opposed to an estimate or an average of other networks' usages—produces striking results. If we take 2017 as our base year, assume usage to be the average between T-Mobile and Sprint's actual usage in that year (**[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** GB), and apply the median compound annual growth rate of the 5G and mixed network forecasts (**[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** percent), we come to a forecast of **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** GB in 2024. That is **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** GB higher than the demand we used to model marginal cost savings in Figs. 3a and 3b and more than **[BEGIN HIGHLY CONF. INFO.]    [END HIGHLY CONF. INFO.]** the demand used to model Fig. 3c.

II.    The Wireless Industry's Options to Meet Demand

Americans' immense 5G data demand is a critical challenge to the wireless industry, and it is the core of the present transaction. For the wireless industry, the status quo is not an option. The assets and business plans that carriers have used to meet 4G data demand will not be enough in this new 5G era.

Wireless providers have a few options to cope with consumers' inexorable demand for more and more data. They could cap customers' data consumption. This is, in fact, what providers experimented with when 4G was nascent and data use skyrocketed under preexisting unlimited plans. Consumers hated caps, and T-Mobile capitalized on their distaste by being among the first to reintroduce unlimited data plans.[5] If we want 5G to hasten the breakdown of old industry silos and challenge traditionally wired services, it will have to do so with data offerings on par with those services.

Another route is to allow quality to dip during busy hours. Wireless networks are built to peak usage—to provide at least a minimum level of service during data's rush hour. A provider could

---

[5] *See* Richard Feloni, *The T-Mobile CEO who calls his competition 'dumb and dumber' explains how he doubled customers in 4 years, and how a group of employees made him cry*, Bus. Insider (Oct. 7, 2016, 8:30 AM), https://www.businessinsider.com/t-mobile-ceo-john-legere-interview-2016-10 ("The biggest pain point that a million customers told me about is that they hate data buckets. And we . . . wanted to turn our company into somebody that's selling a monthly subscription to the internet, all in, unlimited.").

underinvest for a time, thinking that customers would accept degraded service during busy hours. But some argue that a strategy of underinvestment is what led to Sprint's subscriber losses and other business challenges, and few would claim that underinvestment in infrastructure is a public interest benefit.

Providers' other solution to their 5G data demand problem—and the one that yields the greatest quality and choice for consumers—is to expand their networks' capacity. For the most part, this has been the providers' strategy in the lead up to 5G. In the last year, the industry made capital investments of over $27 billion, bringing the total private sector investment since the advent of 4G to an astounding quarter trillion dollars.[6] And yet while investment has increased, prices have decreased. "Subscriber saturation and increasing commoditization have limited market growth despite a significant increase in data demand," according to an international consulting firm.[7] In the last four years, the key average revenue metrics have fallen at all of the nationwide providers: by 15 percent at Verizon,[8] 9.1 percent at AT&T,[9] 4.3 percent at T-Mobile,[10] and 10.1 percent at Sprint.[11]

III.        T-Mobile and Sprint Cannot Meet Demand like the Market Leaders

To build out enough capacity to meet Americans' needs, T-Mobile and Sprint each bring some strengths and some weaknesses relative to the two largest nationwide providers, Verizon and AT&T. T-Mobile has executed a high-data, low-cost strategy that has been popular with consumers. In the last four years, T-Mobile added more than 24 million customers, at a time when the rest of the industry experienced moderate growth.[12] Sprint has rights to about 160 MHz of 2.5 GHz spectrum in the top 100 markets,[13] which is extremely useful for deploying mobile 5G.[14] This national asset, however, has not

---

[6] *2019 Annual Survey Highlights*, CTIA (June 20, 2019), https://www.ctia.org/news/2019-annual-survey-highlights.

[7] Rawia Abdel Samad, Florian Gröne & Udayan Gupt, Grasping at differentiated straws: Commoditization in the wireless telecom industry 39 (2018) (calculating a -2.7% compound annual growth rate in U.S. wireless revenue from 2011 to 2016).

[8] Verizon Communications Inc., Condensed Consolidated Statements of Income 5 (2015), https://www.verizon.com/about/file/7833/download?token=9F_EILlS; Verizon Communications Inc., Condensed Consolidated Statements of Income 5 (2019), https://www.verizon.com/about/file/36119/download?token=WXIhckLH.

[9] Phil Goldstein, *AT&T adds fewer postpaid subs in Q2 than expected as it loses 322K postpaid phone customers*, FierceWireless (July 23, 2015, 5:37 PM), https://www.fiercewireless.com/wireless/at-t-adds-fewer-postpaid-subs-q2-than-expected-as-it-loses-322k-postpaid-phone-customers; AT&T Inc., AT&T 2Q19 Highlights 2 (2019), https://investors.att.com/~/media/Files/A/ATT-IR/financial-reports/quarterly-earnings/2019/2q-2019/2Q19_Highlights.pdf.

[10] *T-Mobile Reports Double-Digit Revenue Growth and Strong Profitability in Q2*, T-Mobile (July 29, 2015), https://www.t-mobile.com/news/q2-earnings-2015; T-Mobile US, Inc., T-Mobile Sets More Records in Q2: Strongest Q2 Customer Growth in Years, Record-Low Churn and Record Financial Results 3 (2019), https://s22.q4cdn.com/194431217/files/doc_financials/2019/Q2/TMUS-06_30_2019-Earnings-release.pdf.

[11] News Release, Sprint Corp., Sprint Reports Continued Progress in its Turnaround During the First Fiscal Quarter of 2015 (Aug. 4, 2015), https://s21.q4cdn.com/487940486/files/doc_financials/quarterly/2015/1500074514.PDF; News Release, Sprint Corp., Sprint Reports Fiscal Year 2019 First Quarter Results (Aug. 2, 2019), https://s21.q4cdn.com/487940486/files/doc_financials/quarterly/2019/q1/01_Fiscal-1Q19-Earnings-Release-FINAL.pdf.

[12] T-Mobile US, Inc., 2nd Quarter 2015 Financial Results, Supplementary Data and Non-GAAP Reconciliations 3 (2015), https://s22.q4cdn.com/194431217/files/doc_financials/2015/q2/1500074333.pdf; T-Mobile US, Inc., Q2 2019: Financial Results, Supplementary Data, Non-GAAP Reconciliations, Reconciliation of Operating Measures 5 (2019), https://s22.q4cdn.com/194431217/files/doc_financials/2019/Q2/Financial-Results-PDF.pdf.

[13] *See* Technical Appendix, para. 35.

been very widely deployed because of Sprint's precarious financial position. There are so many signs of this stress: the company's inability to turn a consistent profit, its more than $30 billion of net liabilities, its repeated goodwill impairments that value the company at little more than parts plus debt.[15] Sprint simply does not have the resources to build the physical infrastructure necessary to provide robust 2.5 GHz coverage, and "our technical analysis predicts that on a standalone basis it would fail to cover nearly half of the country with 5G services on its 2.5 GHz spectrum, even assuming it has the financial ability to reach its previously planned deployment level."[16]

T-Mobile, on the other hand, lacks the assets to continue its aggressive growth trajectory into 5G. Verizon and AT&T have larger infrastructure builds, stronger balance sheets, deeper spectrum portfolios, and greater scale. These advantages position the market leaders to serve 5G demand in ways stand-alone T-Mobile cannot. T-Mobile's Network Build Model attests to this disadvantage. As demand increases, stand-alone T-Mobile has to squeeze more data capacity out of its limited spectrum portfolio. The more data it needs to deliver, the more costly the physical infrastructure becomes, until ultimately the company is forced to build numerous new towers at **[BEGIN HIGHLY CONF. INFO.]**        **[END HIGHLY CONF. INFO.]** a piece.[17] Our staff's marginal cost savings runs shed some light on how this would impair stand-alone T-Mobile. At **[BEGIN HIGHLY CONF. INFO.]**    **[END HIGHLY CONF. INFO.]** GB of usage in 2024, the cost of adding a post-paid customer to stand-alone T-Mobile would be **[BEGIN HIGHLY CONF. INFO.]**        **[END HIGHLY CONF. INFO.]** higher per month than the new company's cost.[18]

There are two key insights we gained from the complex engineering and cost calculations that produced this figure. First, data demand greatly affects costs and stand-alone T-Mobile's ability to remain competitive. The huge difference in cost efficiencies between Fig. 3a and Fig. 3c ([**BEGIN HIGHLY CONF. INFO.**]        **[END HIGHLY CONF. INFO.]** versus **[BEGIN HIGHLY CONF. INFO.]**        **[END HIGHLY CONF. INFO.]** per additional user) is entirely the result of different assumptions in data demand—**[BEGIN HIGHLY CONF. INFO.]**    **[END HIGHLY CONF. INFO.]** GB and **[BEGIN HIGHLY CONF. INFO.]**    **[END HIGHLY CONF. INFO.]** GB, respectively. If our **[BEGIN HIGHLY CONF. INFO.]**    **[END HIGHLY CONF. INFO.]** GB data demand assumption in Fig. 3a is too low—and there is overwhelming evidence that it is, based on early 5G customers' usage as well as the consensus of industry estimates—the cost for stand-alone T-Mobile to serve customers will skyrocket.[19] These costs would have to be passed on to customers through increased prices, countering T-

(Continued from previous page) ─────────────

[14] *See, e.g., Expanding Flexible Use of the 3.7 to 4.2 GHz Band*, GN Docket No. 18-122, Order and Notice of Proposed Rulemaking, 33 FCC Rcd at 6915, para. 5 ("Mid-band spectrum is well-suited for next generation wireless broadband services due to the combination of favorable propagation characteristics (compared to high bands) and the opportunity for additional channel re-use (as compared to low bands).").

[15] *See, e.g.,* Michael Hodel, *Sprint Will Continue to Struggle As It Waits on the States' T-Mobile Challenge*, MORNINGSTAR (Oct. 1, 2019) ("Sprint simply doesn't have the scale or financial resources to overcome the disadvantages it faces . . . . Sprint's competitive disadvantages are legion. Its unconventional technology choices and unusual spectrum portfolio have limited its ability to serve customers well over the years, causing its market share to shrink. Small scale compared with Verizon, AT&T, and even T-Mobile leaves it with a relatively weak cost structure. Finally, a stretched balance sheet has forced it to undertake complex financing transactions to refinance debt, limiting its strategic flexibility and ability to aggressively attack operational problems.").

[16] *Infra* para. 98.

[17] *See* Technical Appendix, Fig. A15.

[18] *Infra* Fig. 3a.

[19] The **[BEGIN HIGHLY CONF. INFO.**    **[END HIGHLY CONF. INFO.]** GB model run does not reflect the Commission's view as to consumers' actual data demand in the out years. Instead, it results from Applicants' cost constraint: that is, Applicants' view as to what costs consumers would be willing to bear. Applicants calculate that consumers actually will demand around **[BEGIN HIGHLY CONF. INFO.]**        **[END HIGHLY CONF. INFO.]**

(continued….)

Mobile's popular strategy of high data at low prices, which has resulted in consumer welfare gains across the industry.  Second, Sprint's 2.5 GHz spectrum theoretically allows it to respond more cost-effectively to demand increases than T-Mobile, as is seen in the small Sprint marginal cost savings due to the transaction relative to T-Mobile's cost savings in Fig. 3a.  However, Sprint lacks the financial wherewithal and scale to put that 2.5 GHz spectrum to use, precisely at the moment when Americans need that additional capacity.

Combining the two companies allows them to leverage the strengths and address the weaknesses of each.  T-Mobile contributes high and low-band spectrum for performance and coverage plus management capabilities and strategy that have changed the industry.  Sprint contributes mid-band spectrum that is critical to mobile 5G, and it enables the combined company to compete for the first time at the same scale as Verizon and AT&T.

IV.    Market Segment Benefits

Even if we focused solely on the wireless industry as constituted today, providing a strong third competitor provides obvious benefits to a number of market segments.  Indeed the benefits to rural America and to every customer who demands quality, including enterprises, are not strongly challenged in our record.  New T-Mobile will cover 99 percent of Americans with 5G, an enforceable condition of this transaction.  T-Mobile and Sprint today do not compete meaningfully for profitable enterprise accounts, and injecting choice into that market should have downstream economic benefits.

But what about price-conscious, urban consumers?  This Commission is well-aware of the economics of building networks in dense urban areas versus rural communities.  We collect around $10 billion per year in Universal Service Fund fees, and spend the lion's share of that money on supporting rural service.  Urban networks are cheaper per capita to build, and our wireless carriers use profits from urban centers to help pay for coverage outside of cities.  Treating urban users as their own market undermines the way carriers finance network coverage and is blind to the market's demand for national pricing plans and free roaming.

Nonetheless, the record shows that this transaction will not lead to small but significant price increases even for the price-conscious, urban sub-market.  The foundation of our belief rests in the capacity increases in combining the two networks.  The complementarity of T-Mobile's and Sprint's networks results in about a doubling of capacity compared to the stand-alone networks.[20]  Wireless networks entail high fixed costs and low marginal costs.  Because the cost of a network is disproportionately in building it, once built, the incentive is to sell all of the network's capacity.  After integrating the networks over the next two years, the new firm will be faced with a problem: It will have double the capacity of the stand-alone companies and yet about the same number of customers as before.  All of that excess capacity will make onboarding each additional customer cheap, since the capacity already will be paid for and will represent wasted investment if not used.  Doubling the "production" of 5G data that can be delivered on new T-Mobile compared to stand-alone T-Mobile and Sprint will put strong downward pressure on prices.

(Continued from previous page) ───────────────────

GB of data per month in 2024, but the cost of providing the data given the companies' assets and high marginal costs would be unaffordable.  If we disregarded the cost constraint and modeled what it would cost the stand-alone firms to deliver what consumers want (**[BEGIN HIGHLY CONF. INFO.]**      **[END HIGHLY CONF. INFO.]** GB per month), the marginal costs of adding users would increase sharply and the cost savings of the merger—the benefit to Americans in the form of lower prices—would be much higher.  Due to limitations in the model provided to the Commission, we were unable technically to model the marginal costs at that heightened level of usage.

[20] *See* Technical Appendix, Fig. A4.

To confirm the protection against higher prices that I view as inherent in new T-Mobile's surplus capacity, we now require certain actions from the combined company. We require the combined company to divest Boost, which has focused on serving price-conscious consumers. Aside from the name, however, there won't be much in common between new and old Boost. The new company will have best-in-class access to new T-Mobile's network—a far improved experience over Boost's current access to Sprint's network. With DISH's acquisition, it also would increase the overall wireless industry's data production. DISH has a deep spectrum portfolio that lies fallow, and its plan absent the Boost transaction was to use a small fraction of its capacity, in what some criticized as a "save build" aimed only at trying to preserve its licenses. DISH's more robust build commitments made as a condition of the transaction would put more spectrum to work, increase capacity, and put additional downward pressure on wireless prices. We also require that new T-Mobile keep the existing companies' rate plans for three years. That period is significant because it spans the time it will take the new company to integrate the networks and realize the major capacity expansion that will naturally push down prices.

V.        A More Accurate View of 5G Competition

The foregoing analysis should leave no doubt that our decision promotes the public interest and encourages greater competition for the benefit of all Americans.

And yet the Order represents a missed opportunity for the Commission. Instead of formally updating our view of competition to reflect 5G, we conduct our initial screen using the market definition of "mobile telephony/broadband services."[21] The Commission created that market definition in November 2008—more than two years before any of the nationwide wireless providers had deployed 4G LTE. Even at that time, we saw how faster wireless service would combine the markets for talk, text, and low-data uses on phones with the market for high-data uses on computers and non-voice devices. The new market definition recognized how "mobile broadband services" (enabled by upgraded 3G and 4G networks) would break down previously siloed industries. And so when we reviewed a transaction between wireless companies in 2008, we took the opportunity to update our market definition, "conclud[ing] that there are risks associated with defining product markets too narrowly, since doing so may thwart this and future pro-competitive deals that take place in the context of rapidly evolving markets and services."[22]

The Commission shows no such prescience in defining the relevant market here. Rather, it applies the same definition that both the FCC and antitrust authorities have been using for a decade. By sticking with a pre-4G market definition, we miss an essential feature of 5G: the blurring of wired and wireless networks and the enhanced competition that results. While our legacy market definition may track FCCs and antitrust authorities past, it prevents the expert agency Congress created to regulate telecommunications from helping our sister agencies modernize their approach to this technology.[23] That's a shame, because it forces us to understate the benefits of this transaction to the Americans we serve.

This overly constrained view distorts the Order's treatment of in-home broadband, for example. We discuss the new competition for Internet access within the Order's public interest benefits section. While providing a choice for home Internet access to at least 28 million families is undoubtedly a

---

[21] *Infra* para. 60.

[22] Applications of Cellco Partnership d/b/a Verizon Wireless and Atlantis Holdings LLC For Consent to Transfer Control Licenses, WT Docket No. 08-95, Memorandum Opinion and Order, 23 FCC Rcd 17444, 17470 (Nov. 10, 2008).

[23] *See generally* Advanced Communications Law & Policy Institute at New York Law School, Comments, WT Docket No. 18-197 (Sept. 17, 2018), https://go.usa.gov/xp4D9.

significant public interest benefit, a modern approach would consider in-home broadband in the basket of services offered by new T-Mobile, "wireless" companies, "cable" companies, and others.  As the connections become increasingly fast and mobile, all of the connection companies begin competing against each other, injecting competitive pressure into services that increasingly look substitutable.

We don't have to rely on predictions of coming convergence because we see it already. Verizon's first 5G offering is for in-home broadband, taking on cable.  Cable is offering wireless service even on an unbundled, stand-alone basis—and buying spectrum and building small cells in the process. Wireless, cable, and satellite companies are offering next-gen smart city and IoT applications.  We risk making ourselves a restraint on competition if we don't pay adequate attention to how connectivity businesses are changing all around us.

\*        \*        \*

But let's step back from the minutiae of competition analysis, transaction conditions, spectrum bands, and engineering models.  Fundamentally, our job at the FCC is to see clearly the generational upgrade in communications that is taking place before us.  We have to grasp how 5G will challenge every part of the communications industry, how it will reshape competition.  It would be unwise for the expert agency created to regulate telecommunications to blinker ourselves to the coming 5G convergence and what that means for everyday Americans.  Analysis that looks backwards to the age of talk-and-text may prolong those dying use cases, but it lacks relevance to how consumers use high-speed connections today and, certainly, tomorrow.  Put simply, our decision must understand and encourage 5G competition.

Verizon and AT&T have built the leading national wireless networks.  They have dominant coverage and capacity in many rural and urban markets; they generate almost all of the industry's profits. In the coming converged market for 5G connectivity, they are well positioned to take on new competitors from cable and elsewhere, and they are most able to meet 5G's data demand.  T-Mobile has been successful in a 4G industry but is running out of room to grow and is impaired by structural disadvantages to the market leaders.  Sprint is a flailing firm whose future is in doubt absent this merger.  What Sprint does have is a trove of mid-band spectrum that is extraordinarily useful for 5G, but no ability to put it to use outside a handful of cities.

By approving this merger, a true third national competitor can be created, pressing the two market leaders in wireless like they have not been pressed before.  And it prepares the wireless industry to advance not two but three contenders in the battle with other companies from other industries to serve Americans' connectivity needs.

That is the intense competition that best serves the public interest.  And so I strongly support this Order's approval of the transaction.

### STATEMENT OF
### COMMISSIONER JESSICA ROSENWORCEL
### DISSENTING

Re:    *Applications of T-Mobile US, Inc., and Sprint Corporation For Consent To Transfer Control of Licenses and Authorizations, Applications of American H Block Wireless L.L.C., DBSD Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, WT Docket No. 18-197

Our economy thrives on competition.  Over history, it has inspired innovation, increased choice, and improved our resourcefulness and efficiency.  It is the reason the United States has birthed some of the most dynamic companies in the world.

The proposed tie-up of T-Mobile and Sprint will reduce competition.  This merger will combine two of the four nationwide competitors in the wireless industry in the United States.  As a result, three companies will control 99 percent of the wireless market.  By any metric, this transaction will raise prices, lower quality, and slow innovation, just as we start to deploy the next-generation of wireless technology.

We've all seen what happens when market concentration increases following a merger.  A condensed airline industry brought us baggage fees and smaller seats, even as the price of fuel fell.  A condensed pharmaceutical industry has led to a handful of drug companies raising the prices of lifesaving medications, taking advantage of those struggling with illness.

There's no reason to think the mobile-phone industry will be different.  Shrinking the number of national providers from four to three will hurt consumers, harm competition, and eliminate thousands of jobs.  In deciding to overlook these harms, the Federal Communications Commission and the Department of Justice have been wooed by a few unenforceable concessions and hollow promises from the two companies involved.

The T-Mobile-Sprint merger will end a golden age in wireless that helped bring to market lower prices and more innovative services.  It will mean an end to the competitive rivalry that reduced prices by 28 percent during the last decade.  Similarly, the pressure to support unlimited data plans and free international roaming will fade.  Offers to pay early termination fees to help families switch to plans that fit their lives will fall by the wayside.  And the network improvements that will bring us the next generation of wireless service, known as 5G, will proceed more slowly and yield fewer jobs without the fuel of competitive pressure.

In short, our existing wireless market will devolve into a cozy oligopoly dominated by just three carriers.  This will do nothing to make it easier for Americans to stay connected.  After all, our wireless phones are how we communicate, pay for all kinds of services, seek out jobs, keep up on the news, and stay in touch with the world around us.  Arguably, no service is now more central to our daily lives.  But for all this connectivity, we pay a price.  Most households now spend over $1,000 a year on wireless service.  Moreover, that figure probably understates the true cost because it does not include the expanding range of devices, applications, and content we use with this service.  So it's no small problem that, according to the Department of Justice's complaint and the FCC's own analysis, this merger is likely to raise consumer rates.

Why are the two agencies so eager to approve this blatantly anticompetitive deal?  T-Mobile and Sprint have promised that if they are allowed to merge, they will hold off on raising prices for three years.  They have committed to deploying 5G networks nationwide within six years.  In addition, they have agreed to divest some assets to help prop up Dish Network as a new wireless competitor to replace Sprint.

But as I discuss below, these promises do little more than camouflage the competitive problems with this transaction. They do nothing to reign in the merged company's market power, which is what really counts. The Editorial Board at the New York Times likens the parties' promises to "pay[ing] the government what amounts to a minor toll on the road to bigger profits."

Moreover, the remedies the FCC and the Department of Justice design around these promises betray the free-market principles that for decades have made us the world's leader in wireless. Instead of promoting vigorous competition among providers, today's order justifies increased concentration by jerry-rigging a new provider dependent on the government dictating who sells what to whom and when. In addition, the agency retreats from nimbler and more decentralized approaches to spectrum management—like flexible use licenses and technology-neutral rules—that have served us so well in the past. To add insult to injury, it made these choices behind closed doors with a remarkable lack of transparency.

Both the FCC and Department of Justice should know better than to think that tinkering around the edges of this deal can save it. Across our economy and across our geography, we are already struggling with the consequences of a seemingly never-ending wave of mergers and lax enforcement. So many of America's most pressing economic and political problems can be traced back to this kind of market consolidation. This includes dwindling opportunity in rural America as farmers struggle against agriculture conglomerates. It includes plunging rates of entrepreneurship as concentrated markets choke off small businesses. It includes falling wages as mergers reduce the need for employers to compete to keep their workers. And it includes income and wealth inequality that are higher than they've been in a hundred years.

The FCC and the Department of Justice should know what is fundamental: with less competition, rates rise and innovation falls. All the evidence demonstrates this is true here, too, and consumers will pay the price. In fact, with 5G on the horizon, our dependence on wireless connectivity is bound to grow. It will extend beyond our phones, creating new opportunities with wearables, video, and more in sectors like healthcare, transportation, and manufacturing. It's not the time to count on higher prices and less vigorous competition to help the benefit of this new technology reach us all.

So I dissent to the FCC's decision to consolidate the wireless market in the hands of three companies. I dissent to the process the agency used to reach this result, which hid too much of the negotiations and this decision out of view from the public. And I dissent to the remedies the FCC adopts that gamble our 5G future on a new wireless entrant and put all the risk of this merger on the backs of American consumers.

I address these aspects of today's decision below.

## I.

So many people already think that Washington is rigged against them. It saddens me when on too many occasions this agency proved them right. At every twist and turn in the FCC's year-long review of the T-Mobile-Sprint merger, this agency's decision-making overlooked the work of expert staff, undermined other agencies with oversight authority like the Department of Justice, and deprived the public a meaningful opportunity to participate. Rather than inspire confidence that our laws were being scrupulously administered, the agency's brazenness throughout this proceeding was Kafka-esque: "[t]he law is whatever the nobles do."

Three of my colleagues agreed to this transaction months ago without having any legal, engineering, or economic analysis from the agency before us. They agreed to this transaction before the Department of Justice could finish its review, ending a longstanding practice of coordinating efforts

between the agencies.  Consumers deserve better from Washington authorities charged with reviewing this transaction.

But that was only the first troubling sign in the review process.  On July 26, 2019, the Department of Justice announced that it reached a settlement with T-Mobile and Sprint that fundamentally changed the underlying transaction as originally proposed.  The settlement raised substantial new issues involving the state of competition and the public interest, including the waiver of Dish's build-out obligations, new license and deployment conditions, and significant transfers of spectrum and other assets.  These new facts were central to the agency's analysis of the public interest benefits of the merger.  As such, the FCC should have sought public comment on what was fundamentally a new transaction.  In fact, more than seven groups representing a mix of rural, labor, and other interests asked this agency for an opportunity to participate in the FCC's review.  But they were all shut out.

Then, on September 24, 2019, the FCC announced that Sprint may have fraudulently received tens of millions of dollars in federal subsidies by falsely claiming it provided Lifeline service to 885,000 inactive subscribers.  This represents nearly one-third of Sprint's Lifeline subscriber base and nearly 10 percent of the entire Lifeline program.  Given the seriousness of the allegation and the importance of making the Lifeline program whole, the FCC should have paused its review of the merger while it investigated Sprint's alleged fraud.  Nine organizations filed a petition asking for exactly that.  That request also fell on deaf ears.

Once the agency finally had legal, engineering, and economic analysis produced by expert staff, key parts of it were rewritten by the FCC's political leadership behind closed doors.  While it is not unusual for a draft document to change once it is circulated for review, this effort went far beyond what is routine.  Significant parts of the initial draft decision were rewritten in the eleventh hour and behind closed doors to suggest less harm to competition and prices than initially found; adopt the merging companies' arguments in place of more balanced discussion about where those arguments were unconvincing; and even replace the underlying data used to analyze marginal cost efficiencies with more merger-friendly data supplied by T-Mobile.

What is most troubling is that these changes were made after no less than nine *ex parte* meetings between FCC leadership and the merging companies that took place after the agency denied other parties a further public comment period and after the Department of Justice expert that had been tapped to lead our review had left the building.  Moreover, Nine organizations filed a petition with this agency pointing out that these meetings were not sufficiently disclosed on the record pursuant to the FCC's rules.  Yet no effort was made to fix this problem.

Sunlight is the best disinfectant.  That is why I think the FCC should make public the initial draft of this decision that was prepared by our expert staff and circulated for review in the agency in addition to the decision we release today.  Congress, the courts, and the public should know what was changed and why.

Finally, in June, nine states filed a lawsuit to block the merger of T-Mobile and Sprint after finding that the merger would reduce competition and drive up the cost of cellphone service.  Since then, the list of states suing to block this deal has grown to fifteen plus the District of Columbia.  The discovery being undertaken for this litigation has revealed that the merging companies may have improperly withheld thousands of pages of responsive, non-privileged documents from the FCC's review.  Specifically, the states found that the companies withheld 38 percent of more than 25,000 documents that were produced as privileged.  In fact, the companies now are turning over some these documents to the states after acknowledging that they may have been improperly withheld.

We should have these documents too.  In fact, I don't think our review is complete without them.  We also need to investigate whether the companies' failure to turn over these documents to the FCC

violated our rules. Otherwise, we are simply rubber stamping this deal without the oversight the public deserves.

Ensuring that the public has a say in what happens in Washington matters, because trust in public institutions matters. Expert agencies like the FCC are duty bound to hear from everyone, not just the merging parties that have applications pending before us. Our merger reviews should be transparent and participatory and in critical respects this one was not.

II.

There is widespread consensus that the merger of T-Mobile and Sprint will substantially reduce competition. This will mean higher prices for consumers, as confirmed by economic analysis and empirical evidence. While the FCC tries to soften these competitive harms in today's decision in order to justify blessing this transaction, its efforts ultimately prove unavailing.

The Department of Justice acknowledged the serious harm this merger would cause to competition in the United States in its complaint to block the merger as it was originally proposed. According to the Department of Justice, "by combining two of the only four national mobile facilities-based wireless carriers . . . the merger of T-Mobile and Sprint would extinguish substantial competition." This would "cause the merged T-Mobile and Sprint . . . to compete less aggressively." Additionally, it would "make it easier for the three remaining national facilities-based mobile wireless carriers to coordinate their pricing, promotions, and service offerings." For American consumers, this means "increased prices and less attractive service offerings."

Another lawsuit filed by a bipartisan group of attorneys general from 15 states and the District of Columbia recognizes that the merger, even as conditioned, will eliminate direct, head-to-head competition between T-Mobile and Sprint "that has led to lower prices, higher quality service, and more features for consumers." According to the states' case, "[p]reliminary estimates based on the submissions made by economists for Sprint and T-Mobile show that the merger could cost Sprint and T-Mobile subscribers at least $4.5 billion annually and the harm to all retail mobile wireless telecommunications subscribers could be even larger."

Similarly, in today's decision even the FCC concedes—using the merging parties' own data— that this four-to-three merger "would likely lead to significant price increases." How much? Well, regrettably the agency keeps that information highly confidential. I don't think that's fair to consumers. After all, they bear the burden of the higher prices that will result from this decision. They should know what they are in for.

The experience in other countries is a helpful guide. A 2016 study of mobile prices in 25 countries by the United Kingdom's communications regulator found that removing a carrier in a four-competitor market could raise prices by 17.2 percent to 20.5 percent, on average. Another study by the Centre on Regulation in Europe Market Consolidation in Mobile Communications that looked at 33 countries found that an average four-to-three merger would lead to an increase in the bill of end users by 16.3 percent. This study further found that countries with four or more mobile operators generally see better service, quality, and price discipline than countries with three mobile operators. Canada, too, offers a cautionary tale. A study commissioned by the Canadian government found that Canada's three-carrier wireless market had some of the highest mobile prices anywhere in the world. Today's decision does not address any of this literature.

In addition, four-to-three mergers create the potential for collusion and price signaling—which happens when a carrier raises its prices and it serves as a signal for others to do the same. We know from the past, for instance, that when traditional long distance phone services were dominated by three players,

the price leader would set rates that the remaining two providers would simply match. But today's decision does not address this history either.

The FCC tries—unconvincingly—to soften some of these competitive harms in today's decision. In doing so, the agency finds itself at odds with the expert findings of the Department of Justice. I think it is worth highlighting where the FCC and the Department of Justice disagree—even after examining nearly the same record—and why.

*First*, the Department of Justice's complaint plainly asserts that the wireless market in the United States must have four competitors to ensure effective competition. The FCC's decision does not reach this same conclusion.

Rather, the FCC suggests that, while the competitive harms of a four-to-three merger are real, they might be offset by dynamic competition. Dynamic competition entails the prediction of future competitive outcomes, such as considerations of entry, investment, innovation, price, output, and quality. In this case, the FCC suggests that a bigger T-Mobile would engender bigger competitive responses from AT&T and Verizon Wireless—including in network investment and capacity growth. The FCC tries to fall back on dynamic (future) competition because the static (immediate) competition model shows clear harm to consumers.

So how much weight should we afford the FCC's argument? It bears noting at the outset that the static model of competition dominates modern antitrust analysis. This is for good reason. Agencies do not have anything like a reliable and consistent process for predictive fact finding. That's in large part because the complex relationship between static product market competition and the incentive to innovate is not well understood. One view suggests innovation stimulates competition. Another suggests that vigorous market competition is a precondition for innovation. In sum, nothing supports a confident conclusion as to which policies will elicit a higher rate of innovation or dynamic competition.

The reality is that T-Mobile already engenders the kind of competitive responses from AT&T and Verizon Wireless that the FCC now touts as a benefit of the merger—as demonstrated by its successful "Uncarrier" campaign. Moreover, there is overwhelming evidence that T-Mobile would have less incentive to actually act competitively against AT&T and Verizon Wireless in the first place in a three-carrier market. Perhaps this explains why even the FCC ultimately concedes that "it cannot confidently conclude" that new dynamic competition "will entirely outweigh the competitive harms . . . particularly for price sensitive customers in densely populated areas."

*Second*, the Department of Justice's complaint concludes that this merger would facilitate anticompetitive coordination among the three remaining wireless carriers. Meanwhile, the FCC decides that it cannot conclude that this deal would make coordination more likely—even though the agency previously found in its order denying the proposed AT&T-T-Mobile merger that the wireless market already was conducive to coordinated action.

So who is right? The FCC's decision acknowledges that several factors make the wireless market more vulnerable to price-based coordination. After all, prices are set nationwide, can be readily monitored, and are easily changed. Plus, as a related matter the Department of Justice already is investigating alleged collusion in the industry relating to eSIM technology and customer switching.

Then, the FCC throws cold water on all of this evidence by blindly suggesting that local network quality could mitigate concerns about this kind of coordination. There is no evidence to support this claim. The reality is that the merger of T-Mobile and Sprint would leave three roughly equal-size firms in the wireless market. In such an environment, the three remaining companies would have stronger incentives to fix prices or to follow each other on pricing—either explicitly or implicitly. They also could decide to act together to get rid of certain types of plans, like unlimited data plans, or to avoid bringing to

market new and better service plans.  In sum, the merged company might simply find that it is more profitable to settle in with its equals rather than compete aggressively on price or other metrics.  All of this suggests more coordination, not less.

*Third*, the Department of Justice's complaint finds unmistakable harm to the wholesale market, asserting that "the merger's elimination of [wholesale] competition likely would reduce future innovation."  But in this decision, the FCC concludes that the merger will not harm the wholesale market.

Again, the Department of Justice gets it right.  T-Mobile and Sprint are the two largest companies in the wholesale market, accounting for nearly 70 percent of all wholesale connections.  The record also shows that these companies are more willing to enter into wholesale agreements for a variety of competitive reasons—not the least of which is they have less risk of losing share to a resale competitor.  The merger would change these dynamics.

*Finally*, it bears noting that both the FCC's Order and the Department of Justice ignores the harm that this merger poses to our already squeezed 5G supply chain.  We face enormous challenges with network security, and with supply chain security in particular.  The number of vendors supporting the wireless ecosystem has shrunk.  Consider that at the turn of the century, there were 13 equipment vendors vying to serve carriers.  In the run up to 4G, that number was down to seven.  And now as we embark on 5G, it looks more and more like we could move to a world where there might be only one option for some 5G equipment—and that option could expose our networks to undue foreign influence.  Further consolidating the wireless market means limiting the number of prospective purchasers.  This will not make it any easier to induce new entrants into the equipment market—which we sorely need in order to build a more diverse market for more secure 5G equipment.

Ultimately, the procedural irregularities that have plagued the FCC's review of this transaction make it difficult to ensure this agency's findings are credible—especially when in so many key respects they are at odds with the findings of the Department of Justice.  While the record evidence shows that the proposed merger of the nation's third- and fourth-largest wireless providers will reduce competition, the FCC appears to have contorted facts and law to craft an approval where up is down, less is more, and bigger is better.  As a result, this decision represents the end of a decade-long history of careful wireless merger review at this agency and the consumer benefits that have followed.

We deserve better and more accountable decision-making from our expert agencies.  For this reason, I believe the FCC needs to develop a process for retrospective analysis of mergers of this magnitude.  To this end, three years following this transaction the agency should assess whether or not the merger resulted in more competition and lower prices.  This retrospective analysis also should assess just how the FCC's predictions about dynamic competition—so fundamental to the approval of this merger— were borne out.  We should deliver this report to Congress and make it publicly available.  That way, we can form a stronger and more evidence-based foundation for our merger analyses going forward.

III.

While competition is at the core of the assessment of this transaction by authorities in Washington, under the Communications Act the FCC's evaluation of this merger is broader.  Under the law, the agency is charged with determining if this transaction is in the "public interest, convenience, and necessity."

As a starting point, I do not believe that a transaction that so obviously violates the Clayton Act can be in the public interest.  Nevertheless, the FCC tries to sell this merger as producing one primary public interest benefit:  5G deployment.  This effort is unavailing for the simple reason that this merger is by no means the best path to achieving nationwide 5G service.

As the FCC has recognized on many occasions, all four nationwide carriers already are upgrading their networks to 5G, without the merger. All four carriers also have backed up their 5G deployments with aggressive and independent capital build out plans. In fact, T-Mobile has already announced plans to spend $25.9 billion to deploy 5G services through 2022. At the same time, Sprint has indicated that it planned to spend a total of $26 billion on 5G deployment during the same period. So as these very public statements suggest, this merger is not a necessary prerequisite for either company's 5G plans.

That said, there is a kernel of truth in this decision's skepticism about ongoing 5G efforts in the United States. To date, 5G deployments are generally limited to our most densely populated and urban areas. That's because as a result of FCC policy decisions nationwide we've prioritized bringing high-band, millimeter wave spectrum to market to support early 5G efforts. Yet recent commercial launches of 5G service in the United States are confirming what we already know—that commercializing the millimeter wave will not be easy, given its propagation challenges. The network densification these airwaves require is costly. This is especially true in rural America, where the challenging economics of service presently do not support the high cost of high-band infrastructure.

If we want to serve everywhere in this country—and not create communities of 5G haves and have-nots—we need a healthy mix of airwaves that provide coverage and capacity, and we require them now. That means we need mid-band spectrum.

It bears repeating that sixteen countries have already auctioned mid-band spectrum specifically for the provision of 5G wireless service. They include Australia, Finland, Germany, Italy, Ireland, Japan, Kuwait, Latvia, Mexico, Oman, Qatar, Saudi Arabia, South Korea, Spain, the United Arab Emirates, and the United Kingdom. In addition, China allocated mid-band spectrum for 5G use last year. In the United States, we have yet to auction a single swath of mid-band spectrum. We have brought exactly zero megahertz of mid-band airwaves to auction in the 5G age. Instead, this agency auctioned two millimeter wave bands earlier this year and has plans to auction another three millimeter wave bands later this year—a total of five different bands newly available for 5G service.

At its core, the proposed merger is the market's response to the mid-band problem in the United States. If you spend time combing through the Technical Appendix, one detail stands out: the role of the 2.5 GHz band. It is front and center in every discussion about merger efficiencies.

Given the dearth of mid-band spectrum available for 5G in the United States, the 2.5 GHz band is arguably the nation's most valuable spectrum asset at the moment. And the Technical Appendix demonstrates that, given Sprint's financial hardships, this merger may be the most expeditious path to putting this spectrum to use for American consumers.

But all that means is that the FCC believes that this merger is the logical answer to a policy failure it created. I disagree. The right answer is to fix our policies to support competitive, nationwide 5G service. We can do that by pivoting now and making it a priority to bring more mid-band spectrum to market. Merging T-Mobile and Sprint might result in more comprehensive use of the 2.5 GHz band, but it means we lose out on years of head-to-head competition between the companies and with their rivals that could produce even greater investment in next-generation technologies.

Worse, the FCC's plan could backfire. There is good reason to think that removing a competitor actually could lead to less 5G investment—not more. That's because evidence in the record demonstrates that a combined T-Mobile-Sprint may not have the incentive to actually build the 5G network that they are promising. Instead, additional capacity gained from the merger could incentivize the companies to extend the life of their 4G networks rather than invest considerable resources in building out a low- or mid-band 5G network that offers only marginal improvements in speed.

This is not just an abstract concern. It's the reason why the FCC is forced to condition this merger on the companies agreeing to actually build the network they promised, or pay hefty fines if they do not. But as I discuss below, those commitments are fraught with their own problems. Moreover, we should care that we are creating a market that no longer incentivizes investment absent government mandate. It will have consequences for the future of the industry beyond 5G.

The FCC's Order ultimately includes a lot of hand waving about 5G to distract from the competitive harms of this transaction. Don't be fooled by that effort. The FCC's decision makes it less likely that carriers will invest in 5G—especially in rural areas—because it takes away the fuel that fires competition and powers greater deployment. The FCC's commitments then try to fix the very problem it creates. The public interest would be better served if the FCC pursued alternative paths to enabling 5G without the merger—including making critical mid-band spectrum available in at auction, so that companies like T-Mobile are not forced to look for it only in the secondary market.

IV.

This merger is anticompetitive, and its public interest benefits do not outweigh the harms it will cause to the wireless market in the United States. Nonetheless, the FCC suggests that a series of commitments from T-Mobile and Sprint can replicate the competition that is lost as a result of this merger. In critical part, these commitments include three things: a commitment to freeze prices for three years; a commitment to deploy a 5G network nationwide within six years, and a commitment to divest some assets to help prop up Dish as a new wireless competitor to replace Sprint.

But the commitments that T-Mobile and Sprint are making do little more than camouflage the damage this transaction will do to competition. And as camouflage goes, it is not all that compelling. That's because it is dressed up in a fundamentally flawed premise: that thanks to a mishmash of merger-related mandates, Dish will seamlessly slide in the marketplace to take over the position currently occupied by Sprint.

A.

*First*, T-Mobile's answer to the overwhelming evidence that this merger will lead to higher prices is a promise to "freeze" prices for three years. Specifically, T-Mobile promises to: "continue T-Mobile and Sprint legacy rate plans for three years after the merger or until better plans that offer a lower price or more data are made available, whichever occurs first. The retained legacy rate plans may be adjusted to pass through cost increases in taxes, fees, and surcharges as well as services from third party partners that are included in the rate plans, as these increased costs are not within the control of New T-Mobile. The legacy plans may also be adjusted to modify or discontinue third party partner benefits based on changes in the terms of the offering initiated by the third party partner, as this is also not within the control of T-Mobile."

Does that sound overly legalistic to you? It does to me. It is full of loopholes. It's a promise that is tantamount to saying we won't raise your prices unless we actually do.

This language provides the merged company with plenty of leeway to get out of its commitment to not raise prices. It could point to small improvements in network quality to get rid of cheaper rate plans. It could increase your bill through handset or device costs. It could also add fees and surcharges—and it has happened before, because not too long ago Sprint paid millions of dollars to settle allegations that it added bogus fees to customers' bills. Finally, T-Mobile can bundle offerings together in creative ways that ultimately mean you pay more for wireless service.

Even if the merged company keeps its promise, keeping rates constant is not an especially good deal for consumers when wireless prices have been falling. According to data compiled by the

Department of Labor, wireless prices in the United States fell by 28 percent over the last decade as consumers benefitted from intense price competition among the four nationwide carriers. According to data compiled by the FCC, the cost per megabyte of data declined even more dramatically over this time period—by between 72 and 83 percent. All indicators point to this trend continuing absent the merger. That means a price freeze meant to temporarily mask upward pricing pressure caused by industry consolidation isn't an especially good deal for consumers.

Nor does it bode well for what comes next. Once this promise expires in 36 months, customers will be left at the mercy of the merged company—assuming it even waits that long before using any one of the loopholes set out above to raise rates.

B.

*Second*, the merged company's commitment to serve rural and urban areas with next-generation 5G service may sound attractive for a nation struggling with the digital divide, but it ultimately falls flat. To gain the FCC's sign off, T-Mobile has promised to deploy a 5G network covering 97 percent of the United States population within three years, and 99 percent within six years.

However, both carriers have already pumped out a stream of press releases promising to build this network before the transaction. In fact, according to Sprint itself, far from failing, its 5G network today covers more Americans than any other carrier. This is important—but today's decision fails to make note of this fact. In addition, this decision ignores history because it was competition that spurred carriers to build 4G networks that today cover 99 percent of the population in the United States—and this competition would serve us best in the 5G era, too.

Moreover, if you scratch at the surface of this commitment, its 5G veneer is alarmingly thin. The 5G standard, as defined by the International Telecommunication Union, calls for gigabit speeds to start and gigabit-plus speeds in the future. But for much of the United States, the merging parties commit to speeds between 50 and 100 Mbps, with some portion of the country getting faster speeds. That is less than what is possible with today's 4G networks. Even at 100 Mbps, the merged company will offer only one-tenth of the speeds we were promised with 5G. The parties' commitments also do not offer anything regarding lower latency, another critical aspect of 5G capabilities.

On top of that, real questions remain about the willingness of the FCC to actually enforce these 5G build-out promises. In the year before last, the FCC let another company, Charter Communications, off the hook for new, competitive broadband networks that it agreed to deploy to get approval for its merger with Time Warner Cable. The facts aren't much different this time around. When it comes to holding companies accountable for their premerger promises to build new infrastructure, history suggests this FCC will look the other way.

C.

*Third*, the centerpiece of the promises T-Mobile has made to justify this transaction is the creation of a new fourth carrier to fill the void left by Sprint. Under the settlement agreement negotiated by the Department of Justice, Sprint will divest certain assets to Dish so that it can enter the wireless market as a fourth competitor—first as a mobile virtual network operator reselling T-Mobile's service and eventually as a national facilities-based wireless carrier. This is important because the Department of Justice freely admits that competition in the wireless market requires four carriers. But try as it might, these two things ultimately prove incompatible: approving a four-to-three merger while acknowledging the need for a fourth carrier to ensure competition.

Ultimately, the proposed remedy fails for at least three reasons: (i) it accepts significant harm to competition in the short and medium term while adopting an unreasonably optimistic view of possible

benefits in the long term; (ii) it requires ongoing entanglement between T-Mobile and Dish that undermines the notion that Dish will be a truly independent competitor; and (iii) it puts all the risk of failure on consumers if Dish is unable to build out a nationwide network and serve as a capable replacement for Sprint.

i.

At the outset, the proposed remedy fails because it accepts significant harm to competition in the near term while adopting an unreasonably optimistic view of competition in the long term.

Under the Department of Justice's Policy Guide to Merger Remedies, an effective merger remedy must quickly restore lost competition in the relevant market. In fact, according to remarks from the Assistant Attorney General for the Antitrust Division at the annual Antitrust Law Leaders Forum last year, the goal of a divestiture should be to preserve the status quo competitive dynamic in the market from "day one."

By any measure, the effort to replace Sprint with Dish in the marketplace fails that test.

The commitments secured by the Department of Justice and the FCC will not restore the status quo competitive dynamic for many years. Under the settlement agreement, Dish initially will enter the market only as a mobile virtual network operator reselling strictly prepaid wireless service. This means for the immediate future Dish will simply resell a rebranded version of T-Mobile's service using T-Mobile's facilities. As a result, when this transaction closes, even with the remedy in place, there will only be three facilities-based nationwide wireless competitors. During this time, the Department of Justice's concerns about a four-to-three merger will be realized.

Consequently, in the near term there is no way Dish can replace the competition lost as a result of this merger. In fact, both the Department of Justice and the FCC have long recognized that mobile virtual network operators do not meaningfully compete with facilities-based providers. To this end, in its wireless competition reports to Congress the FCC routinely excludes mobile virtual network operators from the same category as facilities-based providers and instead attributes their subscribers to their facilities-based hosts. This approach is entirely correct. Applied here, it means that for purposes of assessing wireless competition the FCC would continue to count Dish customers as T-Mobile customers. If that is not telling enough, the decision approving this transaction itself acknowledges that it "consider[s] only facilities-based entities" in its competitive analysis and that it will continue to exclude mobile virtual network operators from consideration of market concentration measures.

Furthermore, we know that mobile virtual network operators can never be truly disruptive because they rely on competitors for their success. As a mobile virtual network operator Dish will be completely dependent on T-Mobile. It will require wholesale inputs for service from its retail competition. This is not an easy path to market success. The ability Dish has to compete will depend entirely on the margin between the wholesale price T-Mobile charges for service and the retail price it can offer to consumers. So what is that margin? We don't know. At some point in the future, the parties will enter into a resale agreement that they will then submit to the FCC for approval. But that means we are being asked to vote this remedy without actual knowledge of the terms of the agreement that is supposed to protect Dish and protect competition. That not only makes no sense, it is irresponsible. If the companies fail to reach an agreement that passes muster, the harm to competition will already have been done.

On top of that, the FCC has no experience regulating wholesale rates in the modern and evolving wireless market. There's no guarantee that we will get it right during the next seven years. That's important, because the consequences of getting it wrong are tremendous for both companies and for consumers.

Then, within one year, Dish will start to provide a postpaid wireless service too, using cell sites and retail stores that are "decommissioned" by the merged company. This will mean that Dish will operate as an "infrastructure mobile virtual network operator." The decommissioning of cell sites meant to support this limited facilities-based entry will take place gradually over five years. Meanwhile, the merged company will have to provide Dish with access to its cell sites.

Finally, if all goes as planned, Dish will emerge as a full-fledged facilities-based provider in seven years. At this point, Dish can start to replace the competition lost by the removal of Sprint from the marketplace.

Count me as skeptical. Seven years is an awfully long time to wait for full-fledged competition. It may never arrive. Moreover, in addition to the complexities of relying on wholesale inputs from T-Mobile in the short term, Dish has been provided with a limited set of assets from which to launch its entry into the wireless market. Specifically, Dish will acquire Sprint's prepaid customers, retail locations, personnel, licenses, data, and other associated assets. As a result of these divestitures, Dish will have only 2.5 percent of all wireless subscribers in the United States. This set of subscribers is widely known to have one of the highest churn rates in the industry. Consequently, the subscribers Dish takes from Sprint could easily disappear long before the seven-year period in which the company launches its own network.

Finally, it is worth noting that a 2017 study of merger remedies by our colleagues at the Federal Trade Commission found that partial divestitures involving selected assets—like the prepaid divestiture here—pose greater risk of failure. The FTC found that in nine out of ten decisions where it required partial divestitures of key assets, the divestures did not effectively maintain competition. The reasons why these divestitures failed vary. In some cases, the selected asset package was too limited, preventing buyers from competing with the merged company offering a wider range of products. In others, brand loyalty was greater than was anticipated and the divestiture of only selected assets was insufficient to persuade customers to switch. In one case, the buyer quickly exited the market. Finally, in another case, employees did not transfer with the selected assets, and the buyer was unable to hire the right employees under advantageous terms. What is striking is that every one of these risks is present here, too.

Ultimately, the parties' own words are the best evidence that Dish will not remedy the competitive harm of this merger in the short or medium term. On an investor call right after the settlement with the Department of Justice was announced, T-Mobile leadership acknowledged that Dish's entry would have no effect on the merged company's profitability: "It's important to point out that the target synergies, profitability and long-term cash generation have not changed for T-Mobile." These are their own words, and we should believe them.

ii.

The proposed remedy also fails because it requires ongoing entanglement between T-Mobile and Dish that undermines the notion that Dish will be a truly independent competitor.

Under the commitments in the settlement agreement, Dish would need to enter into numerous support agreements with T-Mobile that would leave it dependent on one of its biggest competitors to operate successfully. This kind of ongoing entanglement between the merged company and a divestiture buyer does not meet the requirements of Horizontal Merger Guidelines developed by the Department of Justice and it is not consistent with judicial precedent. For that reason, we should reject it.

Under the proposed settlement, Sprint will identify all employees of its existing prepaid operations so that Dish can vet, interview, and negotiate with those employees for renewed employment with Dish. Sprint also will identify retail locations that the merged company plans to decommission, so

that Dish can inspect them, review environmental, zoning, or other permits, and begin the process of assignment. Over a period of five years, the merged company also is expected to provide Dish with access to its own cell sites while it undertakes the lengthy process of decommissioning redundant sites and making them available to Dish. The settlement also details a number of obligations that T-Mobile must observe in its resale agreement with Dish, including traffic and device non-discrimination. Finally, T-Mobile and Sprint must also provide certain "transition services" to Dish for three years, including billing, customer care, SIM card procurement, device positioning, and more.

When assessing a remedy, the Department of Justice's Policy Guide on Merger Remedies requires the agency to consider whether the buyer will be independent of the merging parties. Similarly, courts that have reviewed merger remedies have expressed that it can be a problem to allow continuing relationships between the seller and buyer of divested assets after divestiture, such as a supply arrangement or technical assistance requirement, which may increase the new entrant's vulnerability to the merged company's behavior. (*See, e.g.*, *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 59 (D.D.C. 2009) (finding that "[i]n order to be accepted, curative divestitures must be made to . . . a willing, independent competitor capable of effective production"); *see also FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015)). But that is exactly what the remedy here entails. At a minimum, for seven years, Dish will have the right to resell T-Mobile services under a resale agreement. On top of this, for three years, Dish will rely on the merged entity for a wide range of transition services. Dish, therefore, will not be a truly independent competitor for many years. That undermines the remedy proposed here and demonstrates its inadequacy under standards used by both the Department of Justice and the courts.

For its part, T-Mobile has no real incentive to help a competitor and will have opportunities to routinely handicap Dish's competitive impact. The remedy depends on the FCC managing this tense relationship from afar—but nothing in the decision suggests that we will do that effectively. In past transactions, the agency has identified an ombudsman to oversee implementation and ensure that parties abide by their commitments. We don't do that here, which brings into question our resolve to act as mediator. And while the Department of Justice at least creates a role for a trustee to manage its complex settlement with the parties, that person will be paid for by T-Mobile. In addition, he or she will be restricted from doing little more than certifying disputes for the Department of Justice, where they will undergo a long, bureaucratic resolution process. By then, any competitive harm to Dish may already have been accomplished.

iii.

Finally, the proposed remedy fails because it places all the risk of failure on consumers if Dish is unable to build out a nationwide network and serve as a capable, competitive replacement for Sprint.

The remedy proposed by the Department of Justice and FCC carries enormous execution risk. In particular, the divestiture of many of the assets at issue—like subscribers, employees, and stores—cannot be assigned without the consent of other parties that are not part of the settlement agreement. Meanwhile, Dish will try to enter a market in which it has never competed, transition to a brand-new back office operation, and re-brand T-Mobile wholesale service at its own while also trying to compete with the merged firm and build out a first-of-its-kind 5G network. These stumbling blocks are not insubstantial.

Moreover, the idea that Dish can enter the wireless market by building its own nationwide network also deserves special scrutiny. As one analyst noted, over its now forty-year history, the wireless industry has never generated a return on invested capital meaningfully in excess of its cost of capital. The idea that Dish can build a new network and then slug it out in a mature wireless market suggests in this decision that the Department of Justice and FCC have ignored the facts on the ground.

Consider that existing facilities-based carriers like AT&T and Verizon have spent over $100 billion on building up their own networks in the past decade. Verizon spends $15 billion annually just to

maintain a network they've already built. Given these facts, Dish's $10 billion estimate for building its nationwide 5G wireless network does not seem serious. Like Sprint, Dish also is highly leveraged with significant debt maturing soon. Yet nothing in the FCC decision even discusses Dish's financial capability to build the network it has promised. This is an especially striking omission given the attention those who support this decision have given to noting Sprint's financial challenges.

Then, following the seven-year period in which Dish will rely on wholesale inputs from T-Mobile to provide service, should it emerge as a true facilities-based provider, Dish will be in a difficult competitive position. The company will lack important qualities that matter to wireless customers, such as nationwide coverage, a track record for effectively serving customers across the country, and the scale necessary to ensure a broad mix of services and devices. Even if the company is successful, under the proposed remedy, its plans call for covering only 70 percent of the population by 2023. That could leave 100 million Americans without a full range of competitive choice.

Given these challenges, as numerous parties have noted, Dish might be better off sticking to operation as a mobile virtual network operator. Under these circumstances the company would simply profit from whatever arbitrage opportunity is handed to them via a regulated resale agreement and then sell its spectrum at a later date instead of investing billions to compete with the largest operators and building a facilities-based 5G network from scratch. In fact, nothing prevents Dish from taking this route, save for a $2.2 billion financial penalty that is laid out in a letter to the FCC. But that penalty may just be the cost of doing business. After all, the penalty sounds de minimis when compared to the upwards of $10 billion Dish projects it will need to fully build out this network.

That's not fair. The risk of removing a competitor from the marketplace should not fall on consumers. That's fundamental. This is not just my opinion. It's one I share with the Assistant Attorney General for the Antitrust Division, who has said: "I believe the Division should fairly review offers to settle but also be skeptical of those consisting of behavioral remedies or divestitures that only partially remedy the likely harm. We should settle federal antitrust violations only where we have a high degree of confidence that the remedy does not usurp regulatory functions of law enforcement, and fully protects American consumers and the competitive process. Decrees should avoid taking pricing decisions away from the markets, and should be simple and administrable . . . [.] We have a duty to American consumers to preserve economic liberty and protect the competitive process, and we will not accept remedies that risk failing to do so."

Yet the remedy before us has all the hallmarks of a remedy that is interventionist, behavioral, and fails to fully protect competition or consumers. It should be rejected by the Department of Justice. It should be rejected by the FCC.

*       *       *

American consumers are savvy. They know what less competition looks like. This transaction makes the wireless market look more like the one they know with airlines and pharmaceuticals. When Washington blesses consolidation like this consumers routinely wind up with higher prices and lower quality services. It's not fair. Moreover, it's not smart. We are at an important point in the development of wireless technology, on the cusp of a new world of 5G wireless services connecting so much more in the world around us, and this decision denies that new world the powerful fire of competitive pressure to help ensure deployment to everyone, everywhere. This is a shame.

However, all is not lost. While Washington has failed to perform a fair review and stop this merger, states are stepping forward. A bipartisan group of attorneys general from 15 states and the District of Columbia are now suing to halt this transaction. They have determined that this merger results in an unacceptable loss of competition and that the remedies proposed fail to fix the harms that will befall wireless consumers. These state officials understand what Washington apparently does not: with less

competition rates rise and innovation falls.  All the evidence demonstrates this is true.  Consumers should hope these state officials succeed.  Count me among them.

## STATEMENT OF
## COMMISSIONER GEOFFREY STARKS
## DISSENTING

Re:    *Applications of T-Mobile US, Inc., and Sprint Corporation For Consent To Transfer Control of Licenses and Authorizations, Applications of American H Block Wireless L.L.C., DBSD Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, WT Docket No. 18-197

### INTRODUCTION

T-Mobile and Sprint propose to merge their companies. They claim that New T-Mobile will invest nearly $40 billion to combine the companies' spectrum, sites, and other assets to deliver a nationwide 5G network that will dwarf what the companies could do on their own, and that will force AT&T and Verizon to improve and accelerate their own 5G network investment and deployment plans. T-Mobile and Sprint present their proposed merger as a necessary step for the United States to accelerate deployment and "win" the race for 5G.

Our desire to lead on the world stage, however, must not distract us from the reality of the transaction before us – the proposed merger of the third and fourth largest players in an already highly concentrated mobile wireless telecom service market. T-Mobile and Sprint's promises of 5G leadership sound tempting but, as this order concedes, the facts tell a different story. The proposed transaction is exactly the type of merger that the Justice Department and the Commission have discouraged and rejected in the past: one that would harm competition and result in higher prices and poorer service, particularly for the most vulnerable consumers.

Moreover, this proceeding has been characterized by unprecedented procedural irregularities. We've departed from agency practice by failing to solicit public comment on <u>two</u> rounds of significant changes to one of the largest wireless transactions in FCC history. In addition, we proceed with today's decision even though we are currently investigating Sprint for possible violations that could pose hundreds of millions of dollars in liability and raise questions about the company's fitness to hold Commission authorizations.

Contrary to the conclusion in today's Order, the harm to competition caused by this transaction will not be cured by the parties' commitments of future performance. These commitments not only suffer from serious infirmities but will do little to preserve, let alone enhance, competition. Indeed, the Justice Department found that the parties' commitments to this agency fell so short of protecting competition that it negotiated its own, additional guarantees.[1] As the Assistant Attorney General for Antitrust recently observed: "We were prepared to sue to block that transaction had we not gotten the settlement we did."[2]

Based on my review of the record, I believe that T-Mobile and Sprint have failed to prove that their merger will benefit the public interest. While the parties promise their merger will accelerate the availability of <u>some</u> form of "5G" for <u>some</u> Americans, history teaches us that the most likely effect of

---

[1] *See* Proposed Final Judgment at 6-24, United States v. Deutsche Telecom AG, No. 19-cv-02232 (D.D.C. July 26, 2019), ECF No. 2-2 (*DOJ Proposed Final Judgment*) (requiring, *inter alia*, (a) divestiture of Sprint's prepaid assets to DISH Network; (b) transfer of certain spectrum licenses to DISH Network; and (c) entry into an MVNO agreement between DISH Network and New T-Mobile).

[2] Assistant Attorney General Makan Delrahim, Remarks Before Sen. Subcomm. on Antitrust, Competition Policy, and Consumer Rights (Sept. 17, 2019). Due to the manner in which this proposed transaction appears before the Commission, the DOJ negotiated remedies are not squarely before us in today's Order.

this merger will be higher prices and fewer options for all Americans.  In the short term, this merger will result in the loss of potentially thousands of jobs.  In the long term, it will establish a market of three giant wireless carriers with every incentive to divide up the market, increase prices, and compete only for the most lucrative customers.  The merger will reduce competition, harm consumers, and exacerbate the digital divide between the broadband "haves" and "have-nots."

The vague promise of 5G does not change what was true when this deal was first proposed and what remains true today—the benefits of this merger, if any, simply do not outweigh the harms.  Accordingly, I dissent.

## DISCUSSION

Before discussing the merits of the proposed transaction, we must begin with our standard of review.  Under the Communications Act, before granting its approval, the Commission must determine whether a proposed transaction would serve "the public interest, convenience, and necessity."[3]  Competition principles are a key element to this review, but other factors are also relevant.  The Commission must find that a transaction affirmatively serves the public interest, and therefore must determine "whether a transaction would enhance, rather than merely preserve, existing competition."[4]  Throughout the review, moreover, the applicants to any proposed transaction "bear the burden of proving, by a preponderance of the evidence, that their proposed transaction, on balance, will serve the public interest."[5]

With this standard in mind, let's turn to the specifics of the proposal.  T-Mobile and Sprint describe themselves as "disruptors" of the mobile wireless telecommunications services market, and by any measure they have done so.  These companies developed rollover minutes, competitive pricing, soft data caps, and unlimited plans, many of which have pressured Verizon and AT&T to adopt similar innovations.  Additionally, competition has driven T-Mobile and Sprint to focus on many communities largely ceded by Verizon and AT&T, including low-income, minority, and rural consumers.[6]  By their merger, T-Mobile and Sprint propose to consolidate two disruptive carriers into a single large carrier.  Ordinarily, reduction in the number of carriers would be considered a reduction in competition – where once four parties competed, only three remain.

But the parties allege that their merger will increase competition by combining two smaller carriers into a single carrier with the resources to compete nationwide with AT&T and Verizon in the delivery of 5G service.  As T-Mobile's CEO put it: "This isn't a case of going from 4 to 3 wireless companies . . . . [I]n 5G, we'll go from 0 to 1.  Only the New T-Mobile will have the capacity to deliver real, nationwide 5G."[7]

---

[3] 47 U.S.C. § 310(d).

[4] *Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership for Consent to Assign or Transfer Control of Licenses and Authorizations*, MB Docket No. 15-149, Memorandum Opinion and Order, 31 FCC Rcd. 6327, 6338, para. 29 (2016).

[5] *Applications of AT&T Inc. and Cellco Partnership for Consent to Assign or Transfer Control of Licenses and Authorizations and Modify a Spectrum Leasing Agreement*, WT Docket No. 09-104, Memorandum Opinion and Order, 25 FCC Rcd 8704, 8716, para. 22 (2010).

[6] *See* Sheila Deng & Diane Bartz, *Poorest U.S. Consumers Seen Hit Hard by T-Mobile, Sprint Merger* (May 2, 2018), https://www.reuters.com/article/us-sprint-corp-m-a-low-income/poorest-u-s-consumers-seen-hit-hard-by-t-mobile-sprint-merger-idUSKBN1I32VX.

[7] Press Release, T-Mobile, T-Mobile and Sprint to Combine, Accelerating 5G Innovation & Increasing Competition (Apr. 29, 2018), https://www.t-mobile.com/news/5gforall.

**Federal Communications Commission**                    **FCC 19-103**

This counterintuitive conclusion is at odds with both FCC precedent and mainstream antitrust thought.  Eight years ago, the Commission reviewed a very similar transaction with the proposed AT&T/T-Mobile merger, which was blocked by the Justice Department and the FCC.  That transaction also promised technological benefits for consumers that would outweigh any potential harm to competition.[8]  But as the Justice Department complaint challenging the merger stated: "The substantial increase in concentration that would result from this merger, and the reduction in the number of nationwide providers from four to three, likely will lead to lessened competition due to an enhanced risk of anticompetitive coordination . . . . Such harm would affect consumers all across the nation, including those in rural areas with limited T-Mobile presence."[9]  Similarly, in 2014, the parties before us today called off a planned merger application after the Commission signaled its likely disapproval by blocking the carriers from making a joint bid in an upcoming wireless spectrum auction.[10]

These outcomes reflect how traditional antitrust analysis generally treats four-to-three mergers.  As one commentator has said, "[t]he anticompetitive perils of 4-3 mergers feature prominently in the economic analysis of mergers and enforcement decisions."[11]  Other commentators have said, "[a] four-to-three merger is a natural break point for creating a presumption of harm to competition from coordinated effects based solely on the number of firms."[12]

Consistent with this approach, antitrust enforcers have rejected similar four-to-three mergers in other industries.  For example, in *Anthem/Cigna* & *Aetna/Humana,* the Justice Department sued to stop two proposed mergers in the health insurance industry that would otherwise have consolidated the "Big Five" health insurers in the United States to three.[13]  Similarly, in *Koninklijke Ahold/Delhaize Group,* the Federal Trade Commission found the proposed merger of two supermarket chains to be presumptively

---

[8] *See* Press Release, AT&T, AT&T to Acquire T-Mobile USA from Deutsche Telekom (Mar. 20, 2011), https://www.businesswire.com/news/home/20110320005040/en/ATT-Acquire-T-Mobile-USA-Deutsche-Telekom (arguing that the transaction would "improve network quality" and would "bring advanced LTE capabilities to more than 294 million people").

[9] Complaint ¶ 36, United States v. Deutsche Telecom AG, No. 11-cv-01560 (D.D.C. Aug. 31, 2011), ECF No. 1 (DOJ Complaint); *see also Applications of AT&T Inc. and Deutsche Telekom AG*, WT Docket No. 11-65, Staff Analysis and Findings, 26 FCC Rcd 16184, 16227, para. 76 (WTB 2011) (*AT&T/T-Mobile Staff Report*) ("The retail mobile wireless services market would be more vulnerable to coordination post-transaction. Features of this market make it likely that the remaining three nationwide providers would be able to reach a consensus on the terms of coordination (by identifying a mutually agreeable coordinated price), deter cheating on that consensus (by undercutting the coordinated price to steal high-margin business from its rivals), and prevent new competition in this market. Because these providers offer the same plans and charge the same prices nationwide, increased coordination would most likely take the form of raising the level of prices.").

[10] *See* Michael J. De La Merced, *Sprint and Softbank End Their Pursuit of a T-Mobile Merger* (Aug. 5, 2014), https://dealbook.nytimes.com/2014/08/05/sprint-and-softbank-said-to-abandon-bid-for-t-mobile-us/.

[11] American Research Institute, Why the Proposed Sprint-T-Mobile Merger Should be DOA at the DOJ, at 7 (2018), https://www.antitrustinstitute.org/wp-content/uploads/2018/08/AAI_Sprint-T-Mobile_Comm_6.5.18.pdf.

[12] Jonathan Baker & Carl Shapiro, *Reinvigorating Horizontal Merger Enforcement*, in How the Chicago School Overshot the Mark 235, 262 nn.152-53 (Robert Pitofsky ed., 2008).

[13] *See* U.S. Dep't of Justice, *Attorney General Loretta E. Lynch Delivers Remarks a Press Conference Announcing the Justice Department's Actions to Block Aetna's Acquisition of Humana and Anthem's Acquisition of Cigna* (July 21, 2016), https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-remarks-pressconference-announcing-justice.

unlawful, where it would have reduced the number of meaningful competitors from four to three in 18 geographic markets.[14]

Nor is this approach unique to the United States. European regulators have repeatedly rejected four to three telecommunications mergers,[15] and when they have permitted the transactions to proceed, have found that prices increase.[16] This lesson is also borne out by the experience in Canada, which has only three major wireless carriers—Bell, Rogers, and Telus—and service plans that are priced similarly due to reduced competition.[17]

But each transaction deserves assessment on its own merits. This proceeding has been as active as any in recent memory, with nearly 40,000 submissions and 26 million pages of exhibits. T-Mobile, Sprint, and parties interested in this transaction have employed armies of lawyers and economists to argue about whether the Commission and the Justice Department should approve this deal. While I disagree with the conclusions of this Order, I recognize the outstanding job performed by the Commission's staff in reviewing this mountain of arguments and evidence.

And what does the Commission's expert staff conclude? Bottom line—that even after considering the parties' claims of merger-related cost savings, the transaction as proposed would almost certainly result in "price increases in each year modeled" both industry-wide and for the Applicants' brands from 2019 through 2024, particularly for "price-sensitive consumers" in urban areas.[18]

The reasons for this conclusion are clear. Anyone who has ever shopped for wireless service knows that the relevant market here — the mobile wireless industry — is already highly concentrated. According to the Order, this market is so dominated by the four largest carriers that T-Mobile and Sprint's merger would trigger the Herfindahl-Hirschman Index (HHI) market concentration screen based on the

---

[14] *Koninklijke Ahold, N.V.*, 2016 WL 4010995 (2016).

[15] *See, e.g.*, Summary of Commission Decision 357/15 of 11 May 2016 Declaring a Concentration Incompatible with the Internal Market, 2016 O.J. (C 357) 15, https://ec.europa.eu/competition/mergers/cases/decisions/ m7612_6555_3.pdf (rejecting a four-to-three merger of mobile operators in the United Kingdom); European Commission, *Statement by Commissioner Vestager on Announcement by Telenor and TeliaSonera to Withdraw from Proposed Merger* (Sept. 11, 2015), http://europa.eu/rapid/press-release_STATEMENT-15-5627_en.pdf (regarding the end of a proposed four-to-three merger of mobile carriers in Denmark).

[16] *See, e.g.*, Austrian Regulatory Authority for Broadcasting and Telecommunications, *Price Increases Caused by Mergers Were Followed by Price Decreases Due to Entry of New Mobile Operators* (Mar. 14, 2016), https://www.rtr.at/en/pr/PI14032016TK (concluding that a four-to-three merger among mobile virtual network operators led to "average [price] increases of 20-30% in the pre-paid segment and 13-17% in the post-paid segment.").

[17] *See* Luke Filipowicz & Daniel Bader, *Which Canadian iPhone Carrier and Plan Should You Get: Bell, Rogers, Telus, or Another Option?* (Oct. 19, 2018), https://www.imore.com/which-canadian-iphone-carrier-should-you-get. *See also* Chris Mills, *Canada's Embarrassingly Bad Data Plans Are Another Reason to Hate the TMobile-Sprint Merger* (May 2, 2018), https://bgr.com/2018/05/02/t-mobile-sprint-merger-competition-regulation-canada-example/; Chris Welch, *What a Combined T-Mobile and Sprint Would Look Like* (Apr. 30, 2018), https://theverge.com/2018/ 4/30/17301392/t-mobile-sprint-merger-preview-phone-carrier; Sabrina Wilkinson, *Canada's Wireless Sector Has a Competition Problem* (June 19, 2018), https://blogs.lse.ac.uk/mediapolicyproject/2018/06/19/canadas-wireless- sector-has-a-competition-problem/.

[18] *Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of Licenses and Authorizations; Applications of American H Block Wireless L.L.C., DBSD Corp., Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, WT Docket No. 18-197, Memorandum Opinion & Order, Declaratory Ruling, and Order of Proposed Modification, FCC 19-103, paras. 163, 175 (Oct. 16, 2019) (*Sprint/T-Mobile Order*).

number of connections throughout the country, creating a presumption that the merger is likely to increase market power and thereby reduce competition. Specifically, the order finds that the merger would trigger the HHI screen in <u>99 of the 100</u> most populous Cellular Market Areas (CMAs), including 362 CMAs constituting 82 percent of the U.S. population. This merger's impact will be felt in many large local markets, including both New York and Los Angeles, where New T-Mobile will have more than 50 percent of the retail mobile wireless telecommunications revenues.[19] But this merger will not only affect large cities. Smaller cities and towns across America will experience even greater increases in market concentration.[20] For these towns, New T-Mobile may be the only practical option left for wireless service. Nationwide, New T-Mobile will control more than 31 percent of the wireless market on day one.[21]

But the problems don't stop there. Entry into the wireless industry is hard. You must spend literally billions of dollars on network infrastructure. Before you do that, you must obtain the spectrum to carry your customers' communications. But you can't do so if all the spectrum in that market has already been snapped up. And that's exactly the case in most of the markets in the United States.

This merger would make the spectrum crunch much worse. Specifically, the Order concludes that New T-Mobile would hold spectrum above the Commission's 240 megahertz "spectrum screen" in a whopping 356 CMAs covering about 82 percent of the U.S. population.[22] By comparison, the rejected AT&T/T-Mobile deal would have exceeded the spectrum screen in "just" 274 CMAs.[23] The numbers get even more eye-popping at the individual market level. The Commission considers 715.5 megahertz of spectrum in each market to be "suitable" and "available" for mobile wireless service.[24] This merger would result in a single carrier—New T-Mobile—controlling <u>more than half</u> of that spectrum in nearly 150 CMAs. New T-Mobile would hold nearly three times as much spectrum per subscriber as Verizon and more than twice as much spectrum per subscriber as AT&T.[25]

Given these outcomes, it's not surprising that the Order concludes that the proposed merger as originally structured would harm competition. Ordinarily, such a conclusion would mean the end of a proposed transaction. That's what happened with the AT&T/T-Mobile merger, where both the Justice Department and FCC staff reached a similar conclusion and the parties ultimately withdrew their application. It's also what happened when these same parties proposed to merge five years ago.

---

[19] Third Amended Complaint ¶¶ 49, 51, *New York v. Deutsche Telekom AG*, No. 19-05434-VM (S.D.N.Y. Sept. 18, 2019), ECF No. 214 (State AG Complaint).

[20] *See Sprint/T-Mobile Order* at Appx C.

[21] *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions with Respect to Mobile Wireless, Including Commercial Mobile Services*, Twentieth Report, 32 FCC Rcd 8968, 8982, Tbl. II.B.1. (2017) (*20th Mobile Wireless Competition Report*) (listing T-Mobile and Sprint as having 17.1% and 14.3%, respectively, of total mobile wireless connections).

[22] *See Sprint/T-Mobile Order* at para. 97.

[23] *AT&T/T-Mobile Staff Report*, 26 FCC Rcd at 16211, para. 45.

[24] *See Sprint/T-Mobile Order* at para. 99.

[25] Letter from Allen P. Grunes, Counsel to Communications Workers of America, to Marlene H. Dortch, Secretary, FCC, Docket No. 18-197, at 11 (filed May 31, 2019) (CWA Commitments Response Letter). The Order turns the Commission's spectrum screen analysis on its head, suggesting that New T-Mobile's massive share of mobile wireless spectrum will actually benefit the public interest because it will allow the company to deploy a "highly robust nationwide 5G network." *See Sprint/T-Mobile Order* at para. 97.

In this case, however, the parties have made several commitments to the Commission. These commitments include the divestiture of Boost Mobile, Sprint's pre-paid mobile wireless brand; promises to deploy 5G service throughout the country, with particular emphasis on rural consumers; a three-year price freeze; guarantees to honor existing mobile virtual network operator (MVNO) agreements; and a pledge to market and provide an in-home broadband service, again with a nod towards rural consumers.[26] The Order concludes that these commitments, paired with a verification and compliance regime, remedy the potential harm to competition from the merger of Sprint and T-Mobile, as originally proposed. In addition, while ostensibly not relying on the commitments by the merging parties and DISH in the *DOJ Proposed Final Judgment*,[27] the Order repeatedly notes where those commitments will further strengthen the allegedly pro-competitive nature of this transaction.

As I outline below, however, I have little confidence that these commitments will protect competition and result in deployment of 5G services beyond what might have occurred in the absence of a merger. The Justice Department apparently shares my skepticism, given that it negotiated the additional requirements in the *DOJ Proposed Final Judgment* even after the parties had memorialized their promises to this agency. As the Justice Department's press release announcing those requirements states:

> [W]ithout the divestiture, the proposed acquisition would eliminate competition between two of only four facilities-based suppliers of nationwide mobile wireless services . . . . The combination of T-Mobile and Sprint would eliminate head-to-head competition between the companies and threaten the benefits that customers have realized from that competition in the form of lower prices and better service.[28]

<u>This Decision Has Serious Procedural Issues</u>. Before discussing my substantive concerns with the commitments, I must first review the procedural shortcomings of this proceeding. First, our review should have been held in abeyance following the Chairman's recent announcement of an investigation into Sprint's alleged misappropriation of Lifeline support for 885,000 ineligible accounts.[29] If substantiated, this would represent the misuse of nearly 10 percent of the funds for the entire program.[30]

The fact that the Commission did not learn about potential violations of this gravity until the 11th hour of this proceeding raises serious questions about the accuracy and completeness of our merger review. Based solely on the information disclosed to date, Sprint may be responsible for the most egregious violations of our Lifeline rules in FCC history. Until that investigation is complete, we cannot fully evaluate the character and fitness of the applicants and exercise our statutorily defined obligation to

---

[26] Letter from Regina M. Keeney, Counsel to Sprint Corporation, and Nancy J. Victory, Counsel to T-Mobile US, Inc., to Marlene H. Dortch, Secretary, FCC, Docket No. WT 18-197, at 2-7 (filed May 20, 2019) (Sprint/T-Mobile Commitments Letter).

[27] *See Sprint/T-Mobile Order* at para. 36 n.110. ("[W]hile our conclusion that the transaction as conditioned serves the public interest does not depend on the *DOJ Proposed Final Judgment*, as discussed elsewhere in this MO&O, we find that the *DOJ Proposed Final Judgment* provides further confidence that the proposed transaction as conditioned is unlikely to cause public interest harms.").

[28] Press Release, U.S. Dep't. of Justice, Justice Department Settles with T-Mobile and Sprint in Their Proposed Merger by Requiring a Package of Divestitures to Dish (July 26, 2019), https://www.justice.gov/opa/pr/justice-department-settles-t-mobile-and-sprint-their-proposed-merger-requiring-package.

[29] Press Release, FCC, FCC Learns that Sprint Received Tens of Millions in Lifeline Subsidies-But Provided No Service (Oct. 1, 2019), https://docs.fcc.gov/public/attachments/DOC-359820A1.pdf.

[30] *Id.*

grant only license transfers that serve the public interest.[31] I therefore requested that we suspend our review of the merger application until completion of the investigation and any related enforcement action. Unfortunately, the majority rejected my request.

I similarly requested that the Commission seek public comment on the parties' commitments from the May 20, 2019 filing and the *DOJ Proposed Final Judgment.* Under the Administrative Procedure Act, agencies must provide "an adequate opportunity for comment" on Commission proceedings.[32] Failure to seek comment on "an important aspect of the problem" before the Commission is deemed arbitrary and capricious.[33] Given that the Order concludes that the agency would otherwise deny this merger but for T-Mobile and Sprint's commitments, it is difficult to imagine a more important aspect of the "problem" at hand. Yet despite repeated calls to put both sets of commitments out for public comment, the agency has failed to do so.[34]

Instead, the Order argues that a formal Public Notice and comment period is unnecessary because (1) it isn't required under the Administrative Procedure Act or Commission rules; (2) the Order adequately assesses the parties' commitments; and (3) interested parties have had an adequate opportunity to comment during the pendency of the transaction.[35] The Order also claims that it does not rely on the commitments in the *DOJ Proposed Final Judgment* to justify its approval[36] and that, in any event, the commitments relating to DISH will be subject to notice and comment as separate proceedings.[37]

Regarding the first objection, public notice and comment are required as a practical matter under the Administrative Procedure Act for the reasons discussed above. As courts have observed, "[w]hen an agency departs from past practice, it 'must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.' It must, in short, explain why it changed its policy."[38] To seek public notice and comment would be consistent with Commission precedent and practice both generally and in this proceeding.

---

[31] *See* Supplement to Petition to Deny of Rural Wireless Association, Inc., et al., WT Docket No. 18-197, at 2-3 (filed Oct. 3, 2019) (arguing that the Commission's longstanding precedent makes clear that "a company cannot sell or transfer a license when the company's fitness to hold a license is at issue") (RWA Supplement). The majority dismisses this argument, claiming that the potential violations do not rise to the level of potential disqualification. *See Sprint/T-Mobile Order* at para. 45. Given the unknown scale, scope and duration of the potential violations, I believe that we should have completed our fact-finding before making this determination.

[32] *United Keetoowah Band of Cherokee Indians in Oklahoma v. FCC*, 933 F.3d 728 (D.C. Cir. 2019).

[33] *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

[34] *See, e.g.*, Press Release, FCC, Commissioner Geoffrey Starks Calls for Withdrawal on Draft Sprint/T-Mobile Merger Order Based on Serious Misconduct Allegations (Sept. 24, 2019); RWA Supplement at 4-6 (calling the failure to consider the effects of both the *DOJ Proposed Final Judgment* and the DISH commitments through public comment "the epitome of arbitrary and capricious decision making").

[35] *Sprint/T-Mobile Order* at para. 36 n.110. Though the Order suggests that the pendency of the Tunney Act proceedings afforded parties two months to submit comments to the Commission, this ignores the fact that the district court's proceedings are separate from the Commission's review, do not direct comments to the Commission, and use a different standard of review. Further, the deadline to submit comment in the Tunney Act proceeding passed only five days before the Commission adopted the Order, and the Department of Justice did not publicly file the comments it received before the Commission acted. Thus, the Tunney Act proceedings can hardly be said to have benefitted the Commission's record.

[36] *Id.*

[37] *Id.*

[38] *CBS Corp. v. FCC*, 785 F.3d 699, 708 (D.C. Cir. 2015).

For example, in the *Sinclair/Tribune* merger proceeding, the parties filed their original merger application, then nearly one year later, proposed to divest several more stations. Rather than immediately proceeding with a decision, the Commission issued a Public Notice asking for public comment on the revised deal and directing the parties to provide more details about the divestiture.[39] Nor is such treatment unique to broadcast divestitures. In the *USWest/Qwest Merger Order*, the Commission sought another round of public comment where divestitures materially changed the nature of the proposed transaction.[40] And it has done so in its review of other major transactions as well.[41] Even in this proceeding, the Commission has twice sought public comment on new information in the record,[42] and has recognized that it "has a strong interest in ensuring a full and complete record upon which to base its decision in this proceeding."[43]

The Order dismisses the need for formal public notice and comment on the parties' commitments because the Order supposedly adequately discusses these issues. As the U.S. Court of Appeals for the D.C. Circuit has stated, however, notice and comment "reintroduce public participation and fairness to affected parties after governmental power has been delegated to unrepresentative agencies," and "assure that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions."[44] By skipping formal notice and comment on critical changes to the original merger proposal – modifications that the Order itself states are dispositive to the outcome here – the majority ignores these important policy objectives.[45]

---

[39] *Media Bureau Establishes Consolidated Pleading Cycle for Amendments to the June 26, 2017 Applications to Transfer Control of Tribune Media Co. to Sinclair Broadcasting Group, Inc. Related New Divestiture Applications and Top-Four Showings in Two Markets*, MB Docket No. 17-179, Public Notice, 33 FCC Rcd 4960 (MB 2018).

[40] *See Qwest Commc'ns Int'l Inc. and US WEST, Inc. Applications for Transfer of Control of Domestic and International Sections 214 and 310 Authorizations and Application to Transfer Control of a Submarine Cable Landing License*, CC Docket No. 99-272, Memorandum Opinion and Order, 15 FCC Rcd 53276, 53278, para. 3 (2000).

[41] *See, e.g.*, *Applications of Ameritech Corp. and SBC Communications Inc. for Consent to Transfer Control of Corporations Holding Commissions Licenses and Lines Pursuant to Sections 214 and 301(d) of the Communications Act and Parts 5, 22, 25, 25, 63, 90, 95, and 101 of the Commission's Rules*, CC Docket No. 98-141, 14 FCC Rcd 14712, paras. 349, 351 (1999); *Commission Seeks Comment on Proposals Submitted by AT&T and BellSouth Corp.*, WC Docket No. 06-74, Public Notice, 21 FCC Rcd 11490 (WCB 2006).

[42] *Commission Announces Receipt of Supplemental Analysis from T-Mobile; Establishes Comment Deadline*, WT Docket No. 18-197, Public Notice, 33 FCC Rcd 11157 (WTB 2018) (seeking public comment on the Applicants' Cornerstone economic study); *Commission Announces Receipt of Additional Analysis and Information Requests from T-Mobile and Sprint; Establishes Comment Deadline*, WT Docket No. 18-197, Public Notice, 34 FCC Rcd 1122 (WTB 2019) (seeking comment on new economic simulations, engineering, and home broadband commitments).

[43] Letter from David B. Lawrence, Director, T-Mobile/Sprint Transaction Task Force, FCC, to Kathleen O'Brien Ham, T-Mobile US, Inc. and Vonya B. McCann, Spring Corporation (Sept. 11, 2018) (on file in 18-197), https://docs.fcc.gov/public/attachments/DOC-354053A1.pdf.

[44] *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987) (quoting *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980) and *Guardian Federal Savings & Loan Insurance Corp.*, 589 F.2d 658, 662 (D.C. Cir. 1978)).

[45] Moreover, it deprives the Commission of a complete record on which to premise its findings, a fact which has not gone unnoticed by the parties. For example, DISH has noted that the various economic analyses submitted into the record do not pertain to the current form of the transaction. See Letter from Jeffrey H. Blum, Senior Vice President, Public Policy & Government Affairs, DISH Network Corp. to Marlene H. Dortch, Secretary, FCC, WT Docket No. 18-197, at 2 (Aug. 1, 2019).

Second, while the Order points out that the parties' commitments to both the Commission and the Justice Department have been publicly available in the record, such an argument undermines the point of public notice and comment in the first place. Simply having a document in the public record is not the same as a formal Public Notice describing the new information and identifying the questions on which the Commission is seeking public input. If this were the case, we could dispense with issuing Public Notices in the first place, and simply open a docket whenever we consider a policy issue. By their nature, Public Notices draw heightened attention from the media, Congress and other stakeholders and therefore are more likely to result in useful comments than no announcement at all. They focus attention on a given issue, and often describe the questions on which the Commission seeks feedback. Moreover, as noted above, any Public Notice could also direct the merging parties to provide additional information to clarify the nature of their commitments.[46] Instead, T-Mobile, Sprint and other interested parties simply engaged in the continued filing of *ex partes* without any guidance from the Commission.

Finally, these procedural problems are not cured by the Order's claim that its decision does not rely on the *DOJ Proposed Final Judgment* commitments and that the public will have adequate opportunity to comment on the license modifications and transfers of control reflected therein. Notwithstanding the Order's claims to the contrary, the decision repeatedly cites the *DOJ Proposed Final Judgment* commitments for support of its conclusion of the public interest benefits of the transaction.[47] And even if the public can someday comment on aspects of the DOJ commitments, that opportunity will come too late to prevent any public interest harm, as the transaction likely will have closed by the time the Commission issues its decision on the proposed license modifications and transfers of control.

The Sprint/T-Mobile Merger Will Harm Competition—Boost Mobile Divestiture. Turning to the substance of the commitments, the parties have agreed to divest Sprint's Boost Mobile business, including its stores, employees, and current subscribers, as well as to provide the buyer with a wholesale agreement containing rates and terms that "will ensure that New Boost will be an aggressive competitor."[48] The Order concludes that the Boost divestiture conditions will create a strong competitor that will address the potential competitive harms raised by the merger, "particularly in the densely-populated areas where the transaction raises the greatest risk of net competitive harm."[49]

But this divestiture will do little to address the harmful effects of the proposed merger.[50] First, as the Order acknowledges, Boost will not be a wholly independent, facilities-based competitor. Instead, it will be an MVNO, wholly <u>dependent</u> on New T-Mobile's spectrum and network, making it a weak check on anticompetitive behavior. Non-facilities-based operators have no ability to create capacity, upgrade their networks, or extend their network coverage. Moreover, as industry observers have noted, even well-

---

[46] *See, e.g., infra* n.64.

[47] *See, e.g.*, *Sprint/T-Mobile Order* at paras. 292, 374, 381 (referring approvingly to the commitments contained in the DOJ Proposed Final Judgment: "[w]e expect that combining DISH's 5G deployment commitments with the assets it is receiving from and agreements it has reached with T-Mobile and Sprint, pursuant to the *DOJ Proposed Final Judgment*, will advance the deployment of advanced 5G wireless services. We anticipate these arrangements will promote competition;" "the divestiture and wholesale-related provisions in the Applicants' commitments to the Commission, and in the *DOJ Proposed Final Judgment*, give us further confidence that the transaction is unlikely to cause competitive harm due to impacts on wholesale providers;" "in addition to our imposing DISH's commitments as conditions of our approval, we note that the *DOJ Proposed Final Judgment*, to which DISH has been joined as a defendant, would require DISH comply with these commitments, and provides for appointment of a monitoring trustee . . . .").

[48] Sprint/T-Mobile Commitments Letter at 5-6.

[49] *Sprint/T-Mobile Order* at para. 196.

[50] *See* CWA Commitments Response Letter at 3-5.

funded MVNOs from established telecom companies do not pose a competitive threat to facilities-based carriers in the same manner as AT&T and Verizon.[51]

Moreover, Boost Mobile will not even be a strong MVNO. At nine million customers, Boost Mobile is not even the largest pre-paid brand involved in this transaction—T-Mobile's Metro business has more than twice as many customers.[52] As internal Sprint documents from 2018 show, even Sprint executives have questioned Boost's value and potential competitiveness.[53] Analysts claim that Boost Mobile has a churn rate of five percent per month, meaning that over the course of a year, it must replace 60 percent of its customers just to stay at existing subscriber levels.[54] Compare that to T-Mobile, which has a churn rate of about one percent for its post-paid service.[55] In addition, due to poor performance over the last year,[56] Sprint's pre-paid business, including Boost Mobile, has lost about 3,000 retail outlets at Target,[57] Best Buy, and Meijer.[58]

---

[51] Susan Crawford, *Why an Army of Small Companies Is Defending the Sprint/T-Mobile Merger* (Sept. 11, 2018), https://www.wired.com/story/sprint-t-mobile-merger-army-of-telecom-defenders/.

[52] John Legere, *Delivering on Our Promises: From MetroPCS to the New T-Mobile* (Apr. 24, 2019), https://www.t-mobile.com/news/delivering-on-promises-metropcs.

[53] *See* Letter from Pantelis Michalopoulos, Counsel to DISH Network Corp., to Marlene H. Dortch, Secretary, FCC, WT Docket No. 18-197, at 2 (filed May 23, 2019) (citing SPR-FCC-11655063 through SPR-FCC-11655069).

[54] Mark Davis, *Sprint Struggles in Prepaid Competition* (Jan. 27, 2016), https://www.kansascity.com/news/business/technology/article56889863.html.

[55] *See, e.g.*, *Sprint/T-Mobile Order* at para. 86 n.273; T-Mobile, *T-Mobile Posts Its Best Customer Results Yet, Reports Lowest Ever Q4 Postpaid Phone Churn, Beats Customer Guidance for FY 2018* (Jan. 9, 2019), https://www.t-mobile.com/news/t-mobile-customer-results-q4-2018; Mike Farrell, *Dishing Sprint T-Mobile* (June 17, 2019), https://www.multichannel.com/blog/dishing-sprint-t-mobile; and Jon Tenebruso, T-*Mobile Earnings Jump on Subscriber Gains, Lower Churn* (May 1, 2019), https://www.fool.com/investing/2019/05/01/t-mobile-earnings-jump-on-subscriber-gains-lower-c.aspx.

[56] Roger Entner, *Industry Voices-Entner: The Skinny on the T-Mobile/Sprint/Dish Deal* (Aug. 2, 2019), https://www.fiercewireless.com/wireless/industry-voices-entner-sorting-out-good-and-bad-t-mobile-sprint-DISH-deal.

[57] *See, e.g.*, Diana Goovaerts, Sprint Checks Out of Target (Mar. 28, 2019), https://www.mobileworldlive.com/featured-content/top-three/sprint-checks-out-of-target/ (noting that Sprint pulled both Boost Mobile and Virgin Mobile brands from Target in mid-2018).

[58] The fact that the majority finds that the *DOJ Proposed Final Judgment* provides "further confidence" on top of their approval strikes me as topsy-turvy. *See Sprint/T-Mobile Order* at para. 36 n.110. To the contrary, the mere fact that the Justice Department sought further concessions from T-Mobile and Sprint despite their promise to divest Boost Mobile demonstrates DOJ's judgment that the original divestiture plan did not adequately protect competition. It is not altogether clear to me that the current shortcomings in this transaction are remedied by DISH's proposed acquisition of Boost Mobile and Sprint's other pre-paid assets, i.e., Virgin Mobile and the Sprint-branded pre-paid business. Given Boost Mobile's rapidly disappearing retail presence and its high churn rate (5.4 million customers per year for a company with only nine million subscribers), once its acquisition of the Sprint pre-paid businesses is complete, DISH will hit the starting line, in my opinion, at a significant disadvantage. The company will need to invest substantial resources simply to maintain its position and, according to press accounts, has nearly $15 billion in debt today, is obligated under the *DOJ Proposed Final Judgment* to pay as much as $5 billion for Sprint pre-paid and spectrum assets, and will invest another $10 billion in building out a nationwide 5G network by 2023. *See* Motley Fool, *DISH Network Corp Q2 2019 Earnings Call Transcript* (July 29, 2019), https://www.fool.com/earnings/call-transcripts/2019/07/30/dish-network-corp-dish-q2-2019-earnings-call-trans.aspx; Nabila Ahmed et al., *DISH Agrees to $5 billion Deal for Wireless Assets* (July 23, 2019), https://www.bloomberg.com/news/articles/2019-07-24/dish-is-said-to-agree-to-5-billion-deal-to-buy-wireless-assets; Simply Wall St., *Here's Why DISH Network Has a Meaningful Debt Burden* (July 31, 2019), https://finance.yahoo.com/news/heres-why-dish-network-nasdaq-120652551.html.

(continued….)

The Order Overstates the Public Interest Benefits of the 5G Deployment Commitments, Particularly for Rural America.  The Order also places tremendous importance on another major component of T-Mobile and Sprint's commitments—buildout of a nationwide 5G network.[59]  The record is replete with upbeat statements by T-Mobile and Sprint executives about the companies' plans to deploy 5G in the absence of a merger.[60]  But the Commission's Network Build Model suggests that the merger isn't necessary to fuel 5G deployment or U.S. leadership on 5G,[61] and the Order admits that it can neither quantify nor verify various network efficiency and complementarity claims from T-Mobile and Sprint.[62]  Notwithstanding this evidence, however, the Order concludes that this merger "will enable deployment of a more robust, nationwide 5G network than either standalone company could deploy on its own."[63]  Once again, the Order bases this conclusion largely on the strength of the commitments from the parties, pointing to the buildout commitments, which lay out the timetable and scope of a nationwide 5G buildout.

(Continued from previous page) 

DISH will need to make those investments as well as those required for building out a retail presence (estimated at $2-3 billion, *see* Roger Entner, *supra* note 56) and maintaining and improving its network year-to-year, given that the existing facilities-based carriers invest $10 billion or more each year on such expenses.  For example, the merging parties claim that New T-Mobile will invest "nearly $40 billion within three years of closing to deliver a more robust nationwide 5G network."  Sprint/T-Mobile Commitments Letter at 1.

Further, if DISH marshals the financial resources to fund its new business, there are technical and logistical challenges presented by its buildout deadlines.  DISH has committed to deploying a "nationwide 5G network" using the latest 5G standard covering 70 percent of the U.S. population by June 14, 2023 – about 3 ½ years from now.  *See* Letter from Jeffrey H. Blum, Senior Vice President, Public Policy & Government Affairs, DISH Network Corp. to Donald Stockdale, Chief, Wireless Telecommunications Bureau, FCC, DBSD Corporation, AWS-4, Lead Call Sign T070272001, et al., at 3 (filed July 26, 2019) (DISH Commitments Letter).  The obstacles to meeting such a commitment are daunting and will require a start-from-scratch deployment at an unprecedented pace, using resources that have not been arranged, technology for which the standard has not yet been finalized, at sites that have not yet been voluntarily decommissioned by New T-Mobile.  Indeed, in an earlier proceeding regarding its AWS-4 commitments, DISH claimed that it needed at least 4 years to deploy a 4G network covering only 20 percent of the population.  *See* Comments of DISH Corporation, WT Docket No. 12-70 at 22-23 (filed May 17, 2012) ("Even at four years, a 30 percent POPs coverage requirement is aggressive and likely unrealistic.").

Finally, even if DISH somehow evolves from the Boost and other Sprint assets into a facilities-based competitor, I am concerned that that the new "Big 3" wireless carriers will use the buildout period between now and 2023 to divide up the market, capture the most lucrative customers, and leave DISH at a significant financial disadvantage.  Four years is a long time.

[59] Notably, this isn't the first time that the Commission has reviewed a proposed wireless carrier merger where the parties promised broadband deployments that would take place only if the merger was approved.  Eight years ago, AT&T and T-Mobile promised their merger would deliver "a significant expansion of LTE-based mobile broadband coverage" that would result in the "upgrading of the entirety of [New AT&T's] wireless footprint within six years of closing."  *See AT&T/T-Mobile Staff Report* at para. 245.  Like here, AT&T and T-Mobile further argued that rural Americans would experience much of the benefits of the transaction, including higher speeds and lower latency. *Id.* at para. 247.  Nevertheless, in that proceeding, the staff rejected the parties' claims that only merger approval would adequately fuel broadband deployment.

[60] *See Sprint/T-Mobile Order* at para. 225 n.760.

[61] *Id.* at para. 250.  *See also id.* at para. 236 n.816.

[62] *Id.* at para. 240 ("Although we do not have a basis in the record to precisely quantify this [network complementarities] effect, we acknowledge that it provides additional reason to credit the substantial network deployment claimed by the Applicants and imposed as a condition of our approval."); *id.* at 241 ("There remain disputes regarding the verifiability of particular benefit claims because the Applicants' claimed benefits involve 5G technologies and marketplaces that will continue to develop over time—rather than long-established technologies and services.").

[63] *Id.* at para. 217.

T-Mobile and Sprint's deployments under these commitments are unable to be verified. T-Mobile and Sprint claim that New T-Mobile will provide mid-band coverage to 6.5 million more rural Americans three years after the merger, and an additional 6.1 million rural Americans six years after the merger. But T-Mobile and Sprint have not explained how they calculated the numbers attached to the commitments, have offered no updated coverage maps, and have failed to provide an updated version of the engineering model, all of which leave unresolved questions in my mind.[64]

<u>The Merger Will Undermine Rural Service by Making Roaming Agreements More One-Sided.</u>
On the subject of rural broadband, the Order ignores the impact of this transaction on the roaming agreements that have been critical to providing service to rural America. Without the low-band spectrum necessary to provide coverage outside of urban areas,[65] Sprint has been forced to enter into roaming agreements with rural carriers, allowing them to more effectively provide services to their communities.[66] T-Mobile and the other major facilities-based carriers, however, have ample low-band spectrum and therefore offer roaming on less favorable terms, as they can service these areas on their own.[67] With respect to T-Mobile specifically, commenting parties allege that the carrier charges roaming rates as high as 20 times those of Sprint,[68] has been slow or unwilling to adopt Voice-over-LTE (VoLTE) roaming agreements with rural carriers, and has a history of turning off outbound roaming for its own customers when they travel out of network, depriving those customers of service and rural wireless carriers of their roaming fees.

New T-Mobile will have plenty of low-band spectrum and therefore will have no incentive to serve rural carriers in the way that Sprint does today. But the parties claim that their network improvements will allow New T-Mobile to offer better terms to roaming partners. They also have agreed to permit parties with existing roaming agreements with both Sprint and T-Mobile to pick what rates will govern their relationship with New T-Mobile.[69]

---

[64] *See* CWA Commitments Response Letter at 6.

[65] *20th Mobile Wireless Competition Report*, 32 FCC Rcd at 8996, Tbl. II.E.3. While Sprint licenses a total of 188.3 population-weighted MHz, only 13.9 MHz is in low-band spectrum. By comparison, AT&T, T-Mobile, and Verizon, hold 148.4 MHz, 109.7 MHz, and 114.9 MHz respectively, of which 55.4 MHz, 40.7 MHz, and 46.9 MHz is low-band. The merged Sprint and T-Mobile would hold 54.6 MHz.

[66] *See, e.g.*, Marina Lopes & Alina Selyukh, *Sprint Grabs Lifeline with Rural U.S. Roaming Deals* (Aug. 29, 2014) ("Sprint's . . . CEO Marcelo Claure said that the networks of rural carriers 'are really important in places where we haven't and don't intend to build our network.'").

[67] *See, e.g.*, Petition to Deny of the Rural Wireless Association, Inc., WT Docket No. 18-197, at 6-9, 11-16 (filed Aug. 27, 2018) (RWA Petition). *See also* Petition to Deny of the Greenlining Institute, WT Docket No. 18-197, at 8 (filed Aug. 27, 2018), (Greenlining Petition); Petition to Deny of NTCA-The Rural Broadband Association, WT Docket No. 18-197, at 8-9 (filed Aug. 27, 2018); Petition to Deny of Union Telephone Co. et al., WT Docket No. 18-197, at 39-41 (filed Aug. 27, 2018); RWA Reply at 3; Union Telephone Reply at 14-16; and Letter from Eric Steinmann, Development Manager, NTCH, Inc. and Thomas Wise, President, Wise Electronics, Inc., to Hon. Ajit Pai, Chairman, FCC, WT Docket No. 18-197, at 2 (filed June 12, 2019).

[68] RWA Petition at 13.

[69] Public Interest Statement of T-Mobile US, Inc. and Sprint Corporation, WT Docket No. 18-197, at 69 (filed June 18, 2018) (Public Interest Statement); Joint Opposition of T-Mobile US, Inc. and Sprint Corporation, WT Docket No. 18-197, at 98-99 (filed Sept. 17, 2018) (Joint Opposition); Letter from R. Michael Senkowski, Counsel to T-Mobile, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 18-197, at 2 (filed Nov. 19, 2018) (T-Mobile Nov. 19, 2018 *Ex Parte* Letter).

But these short-term commitments do not address the concerns raised by commenters about the long-term impact on their roaming arrangements. As commenters have pointed out, there is nothing in these commitments governing <u>future</u> roaming agreements, including what happens when existing agreements expire. With respect to 5G services, where existing agreements are silent, rural carriers will have no guarantees of access to roaming for such advanced services, and the Order doesn't deal with this issue. I am left with serious concerns about the impact of this transaction on rural carriers and service to rural Americans.

The Sprint/T-Mobile Merger Will Harm Competition—Pricing. As noted above, the Order finds that the proposed merger would likely result in increased consumer prices, particularly in the first few years after the transaction closes.[70] To address concerns about price increases, T-Mobile and Sprint have promised that New T-Mobile "will make available the same or better rate plans as those offered by T-Mobile or Sprint as of [February 4, 2019] for three years following the merger."[71] The parties have clarified that the phrase "better plans" refers to "the same plan with a lower price; the same plan with more data for the same price; or the same plan with a lower price and more data."[72] The Order finds that "the price commitment will help to address some of the predicted static harms arising from the proposed transaction in the first three years [after the merger]" and that "it would help offset, in concert with other commitments, the prospective harms associated with the predicted unilateral effects [of the merger]."[73]

Mobile wireless prices in the United States have steadily declined in the last few years.[74] As the Order acknowledges, this is due in large part to the efforts of "maverick" carriers like T-Mobile and Sprint, who have sought to compete with larger carriers by introducing innovative pricing plans and features that the larger carriers have been forced to match.[75] Elimination of one of these maverick carriers—as the Order also acknowledges—will remove these incentives and encourage the remaining carriers to increase prices.[76] Given that prices have been declining due to competition, promising to keep prices flat does not address the harm to competition resulting from the merger. Moreover, a time-limited pricing guarantee is not a substitute for preserving the competition that will be lost with the permanent elimination of Sprint as a nationwide facilities-based carrier, particularly regarding the promotions and device deals that T-Mobile and Sprint have used to attract customers.

Moreover, as DISH pointed out when it was in opposition to the merger, the parties' pricing commitment raises numerous questions, including the definitions of the phrases "same plan" and "same price."[77] For example, what happens if New T-Mobile introduces a non-monetary benefit (e.g., Netflix)

---

[70] *Sprint/T-Mobile Order* at para. 163 (finding consumer price increases to be likely for each year modeled through 2024).

[71] Letter from Nancy Victory, Counsel to T-Mobile US, Inc. to Marlene H. Dortch, Secretary, FCC, WT Docket. No. 18-197, at 2 (filed Feb. 4, 2019).

[72] Letter from Nancy Victory, Counsel to T-Mobile US, Inc. to Marlene H. Dortch, Secretary, FCC, WT Docket. No. 18-197, at 3 (filed Feb. 12, 2019).

[73] *Sprint/T-Mobile Order* at para. 212.

[74] *Communications Marketplace Report et al.*, GN Docket No. 18-231 et al., Report, 33 FCC Rcd 12558, 12574-75, paras. 19-20 (2018).

[75] *Sprint/T-Mobile Order* at para. 181.

[76] *Id.* at para. 179.

[77] *See* Letter from Pantelis Michalopoulos, Counsel to DISH Network Corp. to Marlene H. Dortch, Secretary, FCC, WT Docket. No. 18-197 (filed Feb. 7, 2019); Letter from Pantelis Michalopoulos, Counsel to DISH Network Corp. to Marlene H. Dortch, Secretary, FCC, WT Docket No. 18-197 (filed Feb. 14, 2019).

to a legacy plan?  May it change the price at that point?  In addition, the parties admit that the pricing commitment does not include device or handset offerings, which would allow New T-Mobile to impose a fee on customers using certain handsets or increase the cost to purchase or upgrade a new phone.  As it deploys 5G service, it might even require 5G-enabled phones to be on a new plan.  The parties also state that New T-Mobile "can cancel or modify benefits under legacy plans if those benefits are provided by third-party services."  This would allow the carrier to terminate benefits like free in-flight Wi-Fi service and free subscriptions to streaming services and restrict or eliminate third-party promotions.  For me, this is entirely too many loopholes to a merger commitment.

The Sprint/T-Mobile Merger Will Harm Resellers and their Customers.  As stated earlier, MVNOs offer mobile wireless service by reselling service purchased wholesale from facilities-based carriers like T-Mobile and Sprint.  According to one estimate, T-Mobile and Sprint "provide network service for more than 60% of MVNOs' subscribers through the wholesale network hosting contracts between the MVNOs and the merging firms."[78]  Sprint, in particular, has a record of favorable MVNO agreements, and is the only facilities-based carrier that has granted MVNOs "core control," allowing an MVNO to use its own spectrum and facilities in addition to Sprint's.  Through such arrangements, an MVNO can reduce its wholesale costs and provide customers with new and improved services.

For example, Sprint has an innovative "iMVNO" arrangement with Altice, under which Sprint has granted Altice "core control" in exchange for the use of Altice's sites and services to install its own radio equipment and efficiently densify its network in areas where necessary.[79] This has benefited both Altice and Sprint, which "advertises that it has increased download speeds in Long Island . . . by 135% and is now the 'most improved network' in New York City and on Long Island."[80]  Such arrangements are particularly advantageous for cable providers, which already have extensive infrastructure in addition to some spectrum holdings.  Indeed, before the merger announcement, Sprint had entered negotiations to grant core control with both Comcast and Charter.[81]

Sprint has entered into these favorable MVNO agreements for reasons similar to its roaming arrangements – it simply lacks enough low-band spectrum.  As noted previously, Sprint has the least amount of low-band spectrum of the four nationwide facilities-based carriers.  Arrangements like the Altice iMVNO agreement allow Sprint to avoid the difficult choice between incurring the expense of building more facilities to utilize its mid-band spectrum or allowing its service to suffer.  By contrast, however, New T-Mobile has no plans to grant MVNOs core control.[82]  Reducing the options available to MVNOs will reduce the quality of service they can provide, stifle innovation, and increase prices to consumers.

---

[78] Declaration of Joseph Harrington et al., Exh. B to Petition to Deny of DISH Network Corp., at 11 (Harrington/Brattle Decl.).  *See also id.* at 38 ("Based on our estimates of the number of the wholesale connections, Sprint and T-Mobile (combined) account for more than 60% of wholesale connections (i.e., 26.6 million of the estimated 42.5 million connections.").

[79] Altice states that it "rel[ies] critically, but minimally, on mobile network operator ('MNO') partners, utilizing only the radio access network ('RAN') of the MNO . . . . [while] supply[ing] all other aspects of the mobile offering, including the SIM, roaming and network partners, data and Internet access, voice messaging, rate charging, customer care, and billing."  Altice Reply at 2 (rec. Oct. 31, 2018).

[80] Altice Information Request Response, Exh. 1, Declaration of Michael Cragg and Eliana Garcés at 35 (Jan. 28, 2019).

[81] State AG Complaint ¶ 89.

[82] *Id.* ¶ 90.

The Order dismisses these concerns as "speculative," and claims that MVNOs will benefit from New T-Mobile's expanded network capacity.[83]  Consistent with the overall approach in the decision, the Order even comes to the counterintuitive conclusion that "even though the number of providers would be fewer, the market for wholesale services could become more competitive."[84]  Finally, to the extent concerns remain, the Order notes that the parties have agreed that New T-Mobile will honor their existing MVNO agreements, including the deal with Altice.[85]

But if an extensive network were the key to providing service to MVNOs, the larger facilities-based carriers like AT&T and Verizon would already be doing so.  Instead, however, these large carriers have little incentive to enter into agreements like the iMVNO agreement between Altice and Sprint – they simply don't need Altice's infrastructure to obtain sufficient coverage.  Instead, they are more likely to regard such arrangements as cannibalizing their own customer base.[86]  This is consistent with the concerns raised by the Justice Department in its Complaint challenging the merger, even after the parties' May 20, 2019 commitments.  As the Complaint states:

> Competition between Sprint and T-Mobile to sell mobile wireless service wholesale to MVNOs has benefited consumers by furthering innovation, including the introduction of MVNOs with some facilities-based infrastructure. *The merger's elimination of this competition likely would reduce future innovation.*[87]

At a minimum, New T-Mobile is likely to seek higher prices from new MVNO agreements.[88]  And existing MVNO agreements are unlikely to be renewed on the currently favorable terms.[89]  By raising prices for MVNO providers, this merger is likely to both discourage new infrastructure based carriers like Altice and result in higher prices to consumers that rely on such providers, including 45 percent of pre-paid service customers, who tend to have lower incomes.[90]

---

[83] *Sprint/T-Mobile Order* at para. 290.

[84] *Id.* at para. 291.

[85] *See Sprint/T-Mobile Order* at para. 289; Sprint/T-Mobile Commitments Letter at 7, Attach. 4 (commitment to amend existing agreement, subject to good-faith negotiations, to expand Altice's access to New T-Mobile's 5G and other network facilities).

[86] *See* Roger Linguist, Chairman and CEO, MetroPCS Communications Inc., Remarks at the Sanford C. Bernstein Strategic Decisions Conference (June 4, 2010) ("[A reseller is] completely at the mercy of the carrier that's selling you the bits and the -- or the bytes and the minutes. So I think it's really the question about what the – it's not a question of what TracFone does, it's a question of what does Verizon, AT&T, and T-Mobile and Sprint do. And that question can only be answered by how many degrees of separation do they want so that the cannibalization of their more treasured contract business doesn't get impacted by what they end up doing selling minutes and bytes to the -- to these resellers.").

[87] DOJ Complaint ¶ 22 (emphasis added).

[88] Harrington/Brattle Decl. at 11-12. ("We calculate increases in vertical 'upward pricing pressure' index values of 22.7% for T-Mobile's current wholesale contracts and 48.0% for Sprint's current wholesale contracts.").

[89] *See* Declaration of Michael Cragg and Eliana Garcés, Exh. 1 to Altice Information Request Response, at 41, Appx. 1.

[90] *See* Harrington/Brattle Decl. at 37, 54, Tbl. 13. These concerns are unlikely to be remedied by the *DOJ Proposed Final Judgment.*  The Order argues that DISH, as a facilities-based provider, will provide an excellent counterweight to any reduction in competition for the provision of wholesale services caused by this transaction.  The DOJ agreement also requires New T-Mobile to extend its existing MVNO agreements until seven years after consummation of the merger.  As with the pricing guarantee, time-limited commitments regarding the MVNO agreements are no substitute for the structural protections inherent in the current robust competition.

Harm to Lifeline Customers.  Relatedly, the loss of competition in the MVNO market will negatively affect the Lifeline program, which provides communications services to the most vulnerable in our society.  With the exception of Sprint (now alleged to have committed the largest set of Lifeline violations in FCC history), none of the four largest mobile wireless carriers is a nationwide Lifeline provider.[91]  Thus, most Lifeline participants are MVNOs and will be impacted by the above issues – rising prices and lack of access to infrastructure sharing arrangements.

But the harm to the Lifeline program could extend beyond the harm to Lifeline MVNOs.  T-Mobile currently offers Lifeline service in nine states through its Metro pre-paid brand, while Sprint offers Lifeline nationwide through both Virgin Mobile (as its Assurance brand) and Boost Mobile.  While the parties have committed that New T-Mobile will "continue the Lifeline services currently offered by T-Mobile and Sprint,"[92] that commitment provides no specifics about the duration of this commitment and is ambiguous at best about the scope.  What we do know is that T-Mobile previously expressed no interest in participating in the program as a facilities-based carrier, eliminated T-Mobile's Lifeline participation in seven states, referred to Lifeline as "non-sustainable," and has stated that the company would look to phase out its current Lifeline customers."[93]

In-Home Broadband Service.  T-Mobile's CEO has promised to use New T-Mobile's 5G network to offer in-home broadband service and create a strong alternative to cable and other fixed broadband service.[94]  The Order finds that this in-home broadband service will constitute a significant public benefit weighing in favor of the transaction.  On this aspect of the transaction, I too am excited.  However, I am unable to assign much weight to the parties' claims.  First, even the Order admits both that it "cannot verify the Applicants' quantification of benefits," and that it makes no "determinations or assumptions

[91] T-Mobile currently offers Lifeline service in nine states.  Greenlining Petition at 10.

[92] Public Interest Statement at 51 n.177.  T-Mobile also has publicly stated that "New T-Mobile will maintain the existing T-Mobile and Sprint Lifeline program throughout the country indefinitely, barring fundamental changes to today's program." Eli Blumenthal, *T-Mobile Promises to Support Low-Income Lifeline Program 'Indefinitely' if Merger Approved* (Mar. 11, 2019), https://www.usatoday.com/story/tech/2019/03/11/t-mobile-well-keep-low-income-offers-indefinitely-merger/3129108002/.  Notably, however, the Order does not expressly condition its approval of the transaction on New T-Mobile's continued support to the Lifeline program.  *See Sprint/T-Mobile Order* at paras 387-400.  To the extent New T-Mobile honors this promise, the phrase "barring fundamental changes to today's program" creates a significant loophole that the company can utilize at its sole discretion.  For example, the Commission is currently considering elimination of resellers from the program.  *See Bridging the Digital Divide for Low-Income Consumers*, Lifeline and Link Up Reform and Modernization, Telecommunications Carriers Eligible for Universal Service Support, WC Docket Nos. 17-287, 11-42, and 09-197, Fourth Report and Order, Order on Reconsideration, Memorandum Opinion and Order, Notice of Proposed Rulemaking, and Notice of Inquiry, 32 FCC Rcd 10475, 10499 para. 67 (2017).  Would that constitute a "fundamental change to today's program"?

[93] Petition to Deny of Common Cause et al., WT Docket No. 18-197, at 29 (filed Aug. 27, 2018) (citing Joan Engebretson, *CFO: 'Non-Sustainable' T-Mobile Lifeline Business to be Phased Out* (June 8, 2017), https://www.telecompetitor.com/cfo-non-sustainable-t-mobile-lifelinebusiness-to-be-phased-out/.  I also note that the *DOJ Proposed Final Judgment* says nothing about DISH continuing to offer Lifeline service following its acquisition of Boost Mobile.

[94] *See* John Legere, New T-Mobile: Creating a True Alternative to Fixed Broadband (Mar. 7, 2019), https://www.t-mobile.com/news/new-t-mobile-fixed-broadband-alternative ("With the New T-Mobile and our unique 5G capabilities, we'll be able to offer a fast and reliable alternative for in-home broadband – yes, a real alternative option! And we aren't just going to offer a new alternative. No. We're the Un-Carrier! – and if there's ever been an industry more in need of disruption than wireless, it's the Cableopoly. So we are going to change it the same way we changed wireless! Aggressive prices, rapid innovation, listening to customers and fixing what's broken. That's just what we do – we are not going to simply do more of what the other guys do!").

regarding [New T-Mobile's in-home broadband service] substitutability with particular competitors' fixed broadband offerings."[95]  Second, the benefits of New T-Mobile's in-home broadband service cannot be ascribed to the transaction.  Specifically, T-Mobile already has plans to offer such services.[96]  And third, according to DISH, New T-Mobile will lack the millimeter wave spectrum after the merger necessary to provide fixed wireless broadband at the speeds necessary to compete with fixed wireline providers.[97]

        <u>This Merger Will Result in Fewer Overall Jobs.</u>  As the Order states, job losses and gains are relevant to the Commission's assessment of whether a transaction is in the public interest.[98]  Notwithstanding the fact that the bulk of the savings realized through this merger will undoubtedly come from consolidating operations and thereby reducing staffing,[99] the Order only grudgingly concedes that "the transaction has 'the potential to lead to store closings'" and that "some job losses are possible . . . ."[100]  But the record contains evidence that between 20,000 and 30,000 U.S. jobs could be lost as a result of this transaction, the bulk of them in retail, with the remainder in "overhead" positions at the headquarters of T-Mobile and Sprint.[101]  While much of our work on this proceeding has focused on abstract issues of competition, I am very concerned about the direct impact that this transaction will have on thousands of workers around the country.

<div align="center">

**CONCLUSION**

</div>

        Despite claims that 5G hangs in the balance, I find that this merger is fundamentally no different than past attempts to consolidate the wireless market that the Justice Department and the FCC have rejected.  In this respect, today's decision represents an inflection point in the history of mobile wireless competition.  In 2003, there were eight major national wireless carriers, with the largest being Verizon with a 23.4% market share.  Since then, the large carriers have steadily acquired smaller wireless carriers while shunting off less-profitable wireline assets.  Consummation of this merger will leave only three national facilities-based wireless carriers, each with more market share than even the largest carrier in 2003.[102]

        In short, I believe that T-Mobile and Sprint have not proven that their merger will benefit the public interest.  Vague promises do not change what was true when this deal was first proposed and what remains true today – the harms from this merger are not overcome by any condition imposed in the majority's order.  While I hope for the sake of consumers that I am wrong, I fear that we will one day look back at this decision and recognize it as a moment that forever changed the U.S. wireless industry, and not for the better.

---

[95] *Sprint/T-Mobile Order* at para. 282 & n.978.

[96] *See* T-Mobile, *T-Mobile Home Internet FAQ*, https://www.t-mobile.com/isp/FAQs (last visited Oct. 3, 2019).

[97] *See* DISH Reply at 89-91 (rec. Oct. 31, 2018).

[98] *Sprint/T-Mobile Order* at para. 321.

[99] Petition to Deny of DISH Network Corp., WT Docket No. 18-197, at 42 (filed Aug. 27, 2018) (DISH Petition).

[100] *Sprint/T-Mobile Order* at paras. 329, 330.

[101] *See* Communications Workers of America, Methodology for Estimating Job Losses from T-Mobile/Sprint Merger (2018), https://www.cwaunion.org/sites/default/files/tmobile_sprint_estimating_job_losses_20180626.pdf; Karl Bode, *The Jobs-and-Competition-Killing T-Mobile/Sprint Merger Is Back On* (Apr. 13, 2018), https://motherboard.vice.com/en_us/article/gymm3w/sprint-t-mobile-merger-can-stillhappen.

[102] DISH Petition at 58-59.