**IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ORGANIC TRADE ASSOCIATION,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 1:17-cv-01875-RMC** |
| **vs.** | ) | |
| | ) | |
| **UNITED STATES DEPARTMENT** | ) | |
| **OF AGRICULTURE, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT BY *AMICI CURIAE* THE STATES OF MISSOURI, ALABAMA,
ARKANSAS, INDIANA, IOWA, KANSAS, LOUISIANA, NEBRASKA, NORTH
DAKOTA, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, UTAH, AND
WYOMING**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..........................................................................................................ii

TABLE OF AUTHORITIES ...............................................................................................iii

INTRODUCTION ..............................................................................................................1

STATEMENT OF INTEREST OF *AMICI CURIAE* ..................................................3

BACKGROUND ................................................................................................................4

ARGUMENT ......................................................................................................................8

I.      USDA rationally withdrew the OLPP Rule because the Organic Foods Production Act does not authorize such animal-welfare regulations. ..............................................8

II.     USDA rationally withdrew the OLPP Rule because it improperly conflated organic and animal-welfare certification, which would have created significant market inefficiencies, hurt organic farmers, and driven up consumer costs...........................................14

        A.      The OLPP Rule would have hurt organic farmers who had made significant infrastructure investments in reliance on USDA's longstanding interpretation of the Act. ................................................................................................................... 14

        B.      The OLPP Rule would have created a fifty-percent supply shortage for organic eggs and dramatically increased consumer prices. ............................................. 17

        C.      The OLPP Rule's overbroad reading of "organic" would have restricted free market competition, while the ordinary meaning of "organic" will lead to better consumer options and higher profits................................................................. 19

CONCLUSION.................................................................................................................21

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### Cases

*Cyan, Inc. v. Beaver Cnty. Emp. Retirement Fund*,
138 S. Ct. 1061 (2018) ................................................................................................... 13, 14

*Douglas v. Xerox Bus. Servs., LLC*,
875 F.3d 884 (9th Cir. 2017) ................................................................................................ 15

*Encino Motorcars, LLC v. Navarro*,
138 S. Ct. 1134 (2018) ................................................................................................... 9, 11

*In re Haas*,
48 F.3d 1153 (11th Cir. 1995) ............................................................................................. 11

*Mass. Indep. Cert., Inc. v. USDA*,
486 F. Supp. 2d 105 (D. Mass. 2007) ....................................................... 15, 16, 17, 19

*Nat'l Ass'n of Mfrs. v. Dep't of Defense*,
138 S. Ct. 617 (2018) ........................................................................................................... 11

*Nat'l Labor Relations Bd. v. Bildisco and Bildisco*,
465 U.S. 513 (1983) .............................................................................................................. 11

*Organization for Competitive Markets v. U.S. Department of Agriculture*,
912 F.3d 455 (8th Cir. 2018) ............................................................................................... 8

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
136 S. Ct. 1938 (2016) .......................................................................................................... 8

### Statutes

7 U.S.C. Section 2132(g) ........................................................................................................ 11

7 U.S.C. Section 2143(a) ......................................................................................................... 11

7 U.S.C. Section 6501 ......................................................................................................... 4, 14

7 U.S.C. Section 6502(14) ....................................................................................................... 9

7 U.S.C. Section 6503(a) .......................................................................................................... 8

7 U.S.C. Section 6504 .............................................................................................................. 5

7 U.S.C. Section 6505(a) .......................................................................................................... 5

7 U.S.C. Section 6505(c) .......................................................................................................... 5

7 U.S.C. Section 6506................................................................................................................ 5

7 U.S.C. Section 6506(a) & (b)...................................................................................... 5, 13, 14

7 U.S.C. Section 6506(a)(7)..................................................................................................... 14

7 U.S.C. Section 6506(a)(11).................................................................................................... 13

7 U.S.C. Section 6507................................................................................................................ 5

7 U.S.C. Section 6508........................................................................................................... 9, 10

7 U.S.C. Section 6509.................................................................................... 5, 6, 9, 10, 13, 20

7 U.S.C. Section 6509(a) ........................................................................................................ 10

7 U.S.C. Section 6509(b) ........................................................................................................ 10

7 U.S.C. Section 6509(c) ........................................................................................................ 10

7 U.S.C. Section 6509(d) ..................................................................................................... 6, 10

7 U.S.C. Section 6509(d)(2) ................................................................................................ 6, 12

7 U.S. C. Section 6509(e) ....................................................................................................... 10

7 U.S.C. Section 6509(f)......................................................................................................... 10

7 U.S.C. Section 6509(g) ........................................................................................ 6, 10, 12, 13

7 U.S.C. Section 6512.......................................................................................................... 11, 13

7 U.S.C. Section 6513................................................................................................................ 5

7 U.S.C. Section 6514................................................................................................................ 5

7 U.S.C. Section 6515................................................................................................................ 5

7 U.S.C. Section 6516................................................................................................................ 5

7 U.S.C. Section 6517................................................................................................................ 5

## Regulations

C.F.R. Section 205.237 ........................................................................................................... 10

C.F.R. Section 205.238 ........................................................................................................... 10

C.F.R. Section 205.239 ....................................................................................................... 10, 15

National Organic Program,
65 Fed. Reg. 80,548 (Dec. 21, 2000) ................................................................................ 6, 15

National Organic Program, Access to Pasture (Livestock),
75 Fed. Reg. 7154 (Feb. 17, 2010) ...................................................................................... 6

Nat'l Organic Prog.; Organic Livestock and Poultry,
Pracs., 81 Fed. Reg. 21,956 (April 13, 2016) ...................................................................... 6

Nat'l Organic Prog.; Organic Livestock and Poultry,
Pracs., 82 Fed. Reg. 7042 (Jan. 19, 2017) ....................................................................... 6, 7

Nat'l Organic Prog.; Organic Livestock and Poultry,
Pracs., 83 Fed. Reg. 10775 (Mar. 13, 2018) ....................................................................... 7

## Other Authorities

Am. Farm. Bur. Comment Letter ............................................................................... 16, 17, 21

F. A. Hayek, *The Use of Knowledge in Society*, 35 AM. ECON. REV. 519, 526 (1945) ................19

Merriam-Webster Collegiate Dictionary def. 3(2) at 819 (10th ed. 1993) ...................................9

Nat'l Ass'n of State Dep'ts of Agriculture, Comment Letter (July 6, 2016) ..................................4

Oxford English Dictionary (2d Ed. 1989) ...................................................................................9

S. Rep. 101-357 (1990) .......................................................................................................4, 15

Senate Letter To Sec'y Vilsack (July 26, 2016) ......................................................................4, 21

Anthony J. Tjan, *Pros and Cons of Bundled Pricing*, HARVARD BUS. REV. (Feb. 2010) ............19

U.S.D.A., Nat'l Agric. Statistics Serv., Certified Organic Survey 2016 Summary ....................3, 5

U.S.D.A., Nat'l Agric. Statistics Serv., Poultry–Production & Value Final 2016 Summary .........3

**INTRODUCTION**

The United States Department of Agriculture's (USDA) decision to withdraw the Organic Livestock and Poultry Practices Rule (the "OLPP Rule") before it took effect was the best result for the farmers and consumers of organic products who would have borne its high costs.

USDA properly withdrew the OLPP Rule because USDA did not have statutory authority to enact animal-welfare regulations under the guise of the Organic Foods Production Act (the "Act"). The Act imposed specific feed and medicinal production standards for "USDA certified organic" products like poultry eggs. Rather than implementing the organic standards found in the Act, the OLPP Rule imposed new animal-welfare standards including, for example, detailed and stringent requirements for poultry to have outdoor access to vegetative soil. It did not have authority to do so. *First*, the plain language shows the Act is limited to regulating "organic" production; that is, to regulating what an animal ingests. The Act does not regulate other aspects of production, such as living conditions and soil access. *Second*, the statutory context and structure show that Congress set out the kind of production standards it meant to implement. Those standards are limited to food and medicinal standards. *Third*, Congress did not authorize USDA to create new animal-welfare standards. It only instructed USDA to implement existing statutory standards. *Fourth*, the Act explicitly says that practices not prohibited by the Act or otherwise "inconsistent" with its standards must be permitted. The OLPP Rule improperly prohibited animal-welfare practices that were perfectly consistent with the Act. And *fifth*, similar statutes show that when Congress intends for USDA to set animal-welfare standards, it says so expressly.

USDA also properly withdrew the OLPP Rule because it would have been a disaster for small organic farmers and consumers across the country. The OLPP Rule undercut organic farmers who relied on USDA's prior interpretations of the Act to make significant infrastructure

1

investments—farmers who supply some 70% of organic eggs. Such reliance interests deserve consideration. Moreover, the high cost of complying with the OLPP Rule likely would have driven many of these producers out of the organic egg business altogether, leading to estimated annual losses of $80-86 million. As producers dropped out of the organic egg market, the OLPP Rule also would have hurt the many organic feed producers who sell their crops to support organic poultry.

As organic farmers dropped out of the business, the supply of organic eggs would have plummeted. USDA estimated that organic egg supply would have dropped 50 percent as a result of the OLPP Rule. As supply falls, prices increase, and the resulting high prices would have hurt organic consumers and discouraged them from buying organic products. Indeed, such a significant market disruption might have crippled the growth the organic egg market has seen over the last decade. That would have been bad for everyone, even those organic farmers who were already in compliance with the OLPP Rule.

The OLPP Rule also would have restricted market competition, while the withdrawal of the OLPP Rule leaves consumers with more options. By requiring compliance with additional animal-welfare requirements for particular types of outdoor access, the OLPP Rule would have effectively blocked the sale of eggs that are simply *organic* in the ordinary sense Congress outlined in the Act: organically fed, and free of growth promoters, hormones, and unnecessary synthetic medications. Taking that product off the market would have punished organic farmers for doing precisely what Congress asked. And it would have punished the many consumers who buy that product. If some producers want to offer organic products that also meet stringent animal-welfare requirements, and other consumers want to purchase those products, they are free to do so on the open market. But the "organic" label should not be hijacked to artificially advance those products.

2

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici curiae* Missouri, Alabama, Arkansas, Indiana, Iowa, Kansas, Louisiana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Utah, and Wyoming ("*Amici* States") have a strong interest in this case based on their responsibility to promote the welfare of their own consumers and organic farmers.  For example, Missouri farmers have played a significant role in the National Organic Program's success.  At last count, Missouri had 302 certified organic farms, encompassing 41,078 acres.   U.S.D.A, Nat'l Agric. Statistics Serv., Certified Organic Survey 2016 Summary at 3 (Sept. 2017), *available at* https://www.nass.usda.gov/Publications/Todays_Reports/reports/census17.pdf.  Those farms sold organic products worth over $101 million in 2016.  *Id.*  Poultry accounted for a sizable portion of those sales.  Missouri farmers produced about 386 million organic eggs in 2016, which generated over $70.4 million in revenue.  *Id*. at 126.  Missouri farmers are also major players in the egg market as a whole, producing about 3.15 billion eggs in 2017 and generating over $270 million in revenue. *See* U.S.D.A., Nat'l Agric. Statistics Servs., Poultry–Production & Value Final Estimates 2013-2017, at 14 (June 2019), *available at* https://www.nass.usda.gov/ Statistics_by_State/Idaho/Publications/Census_Press_Releases/2019/ppdvsb19.pdf.

*Amici* States have an interest in promoting the welfare of organic farmers and consumers of organic products in their own States.  Plaintiff organizations do not adequately represent these interests.  Two of the Plaintiffs are animal-welfare organizations that do not purport to represent the organic farmers the OLPP Rule would have hurt the most.  *See* 2d. Amend. Compl. ¶¶ 28, 38.  The third Plaintiff, the Organic Trade Association, is the lobbying organization that pushed for adoption of the OLPP Rule "for many years."  2d. Amend. Compl. ¶¶ 21-22.  And no Plaintiff purports to represent the interests of consumers.   Plaintiffs tell only a small part of the story.

3

*Amici*'s concerns with the OLPP Rule were raised by many parties at the comment stage. The National Association of State Departments of Agriculture (NASDA), for instance, expressed "considerable doubt" about USDA's statutory authority, and noted significant concerns about "animal health, biosecurity, and the economic viability of organic producers" if the OLPP Rule became effective. *See* NASDA Comment Letter (July 6, 2016), Doc. 43-4, at 5-6. A bipartisan Senate letter to Agriculture Secretary Vilsack also expressed "significant concerns regarding the [Rule's] impact on current organic poultry and egg producers as well as access and price for organic consumers." Senate Letter To Sec'y Vilsack (July 26, 2016), *available at* https://www.agriculture.senate.gov/imo/media/doc/7%2026%2016%20Letter%20to%20USDA% 20re%20Organic%20Concerns.pdf. In their role as sovereign States, *amici* assert their sovereign and quasi-sovereign interests in promoting the welfare of both producers and consumers of organic products.

## BACKGROUND

**A. The Act.** When Congress passed the Organic Foods Production Act in 1990, it listed three purposes of the Act: "(1) to establish national standards governing the marketing of certain agricultural products as organically produced products; (2) to assure consumers that organically produced products meet a consistent standard; and (3) to facilitate interstate commerce in fresh and processed food that is organically produced." 7 U.S.C. § 6501. Uniform standards were needed "so that farmers know the rules, so that consumers are sure to get what they pay for, and so that national and international trade in organic foods may prosper." S. Rep. 101–357 (1990), 1990 U.S.C.C.A.N. 4656, 4943.

The Act sets national standards for selling or labeling agricultural and animal products as "organically produced." 7 U.S.C. § 6504. Organically produced agricultural products cannot

4

include synthetic chemicals, inconsistent seed and plantings practices, or inconsistent soil mix-ins, poisons, or other inconsistent treatments. *See* 7 U.S.C. §§ 6504, 6508. The Act also governs processed foods that contain organic ingredients. 7 U.S.C. § 6505(c). Parallel requirements govern livestock and poultry. *See* 7 U.S.C. § 6509. Such animals may only eat organic feed and cannot be given preventative antibiotics and parasiticides. *Id.* Other standards govern animal breeding and identification. *Id.* USDA regulations maintain a "National List" stating whether individual substances are permitted or prohibited in organic production. 7 U.S.C. § 6517. Producers who do not meet the Act's standards may not market or label their products as organic. 7 U.S.C. § 6505(a).

To implement these standards, the Act directs USDA to establish a certification program. 7 U.S.C. § 6506. It sets mandatory and discretionary procedures for that program. 7 U.S.C. § 6506(a) & (b). It governs the accreditation and management of certifying agents. 7 U.S.C. §§ 6514-6516. And it instructs organic producers to submit an "organic plan." 7 U.S.C. § 6513. States may, with the approval of USDA, establish state organic certification programs that exceed the Act's requirements. 7 U.S.C. § 6507. USDA regulations established the National Organic Program for certification in 2000.

USDA organic certification has been a success. In 2016, U.S. farms sold $7.6 billion in certified organic commodities, up 23 percent from 2015. Organic farms increased 11 percent to 14,217 and the number of certified acres increased 15 percent to 5.0 million. *See* USDA, Certified Organic Survey 2016 Summary, at Intro. V (Sept. 2017).

**B. USDA's regulatory authority.** Production practices for livestock and poultry are outlined in 7 U.S.C. § 6509. The Act authorizes USDA to issue implementing regulations for

livestock and poultry standards in § 6509(g).  The Act also instructs the National Organic

Standards Board to make recommendations in § 6509(d)(2).  Those provision are as follows:

> (d) Health care
>> (1) Prohibited practices
>> For a farm to be certified under this chapter as an organic farm with respect to the livestock produced by such farm, producers on such farm shall not--
>>> (A) use subtherapeutic doses of antibiotics;
>>> (B) use synthetic internal parasiticides on a routine basis; or
>>> (C) administer medication, other than vaccinations, in the absence of illness.
>> (2) Standards
>> The National Organic Standards Board shall recommend to the Secretary standards in addition to those in paragraph (1) for the care of livestock to ensure that such livestock is organically produced.
>
> . . .
>
> (g) Notice and public comment
> The Secretary shall hold public hearings and shall develop detailed regulations, with notice and public comment, to guide the implementation of the standards for livestock products provided under this section.

7 U.S.C. § 6509(d) & (g).

**C.  The OLPP Rule**.  USDA first proposed the OLPP Rule in 2016.  *See* U.S.D.A., Nat'l

Organic Prog.; Organic Livestock and Poultry Pracs., 81 Fed. Reg. 21,956 (April 13, 2016).

USDA finalized the OLPP Rule in January 2017.  *See* U.S.D.A., Nat'l Organic Prog.; Organic

Livestock and Poultry Pracs., 82 Fed. Reg. 7042 (Jan. 19, 2017).

The USDA had previously issued regulations that touched on animal-welfare and living

conditions, but they looked very different.  The initial rule in 2000, for example, while largely

outlining USDA's new certification program, gave general direction about housing and living

conditions.  *See* U.S.D.A., National Organic Program, 65 Fed. Reg. 80,548 (Dec. 21, 2000).  A

2010 rule provided some additional clarification on such matters.  U.S.D.A., National Organic

Program, Access to Pasture (Livestock), 75 Fed. Reg. 7154 (Feb. 17, 2010).

Unlike previous regulations, the newly proposed rule focused almost entirely on animal

care and living conditions and did so in detail.  In general, it outlined new requirements for how

organic farmers were to "treat livestock and poultry to ensure their wellbeing." 82 Fed. Reg. at 7042. To that end, the OLPP Rule included new animal care practices, *id.* at 7050-57; new avian and mammalian living condition requirements, *id.* at 7057-75; and altered slaughter and transport rules, *id.* at 7075-82. The most controversial parts of the OLPP Rule set new and detailed indoor space and outdoor access requirements for poultry. Through its definition of "outdoor space," the OLPP Rule banned commonly used poultry "porches," which are multi-storied and screened to protect poultry from predators or infection by wild birds. *Id*. at 7045. It also specifically required access to outdoor space with soil, at least half of which had to be "maximally covered with vegetation." *Id.*

Despite significant and bipartisan criticism, the OLPP Rule was initially finalized in January 2017. USDA withdrew the Rule in March 2018. *See* U.S.D.A., Nat'l Organic Prog.; Organic Livestock and Poultry Pracs., 83 Fed. Reg. 10775 (Mar. 13, 2018). The OLPP Rule never went into effect.

**ARGUMENT**

For decades, USDA has consistently taken the position that the Organic Foods Production Act (and USDA's regulations under the Act) does not require outdoor ground access or other animal-welfare practices.  No other reading of the Act has ever had the force or effect of the law.  This Court should uphold USDA's decision to continue this longstanding approach by rescinding the OLPP Rule before it took effect.  USDA cannot regulate animal welfare under a statute expressly limited to organic production.  Moreover, conflating organic and animal-welfare certification—as the OLPP Rule proposed—would have hurt the small farmers who had relied on USDA's longstanding reading, pushed many of those farmers out of the organic-product market, dramatically increased prices, and limited consumer choices.

## I.  USDA rationally withdrew the OLPP Rule because the Organic Foods Production Act does not authorize such animal-welfare regulations.

Statutory interpretation "begins" and "'should end'" with unambiguous text.  *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1946 (2016) (citation omitted).  USDA properly withdrew the OLPP Rule because it was based on an overbroad reading of the Act.  At best, such agency overreach would have led to protracted litigation and weakened the "organic" brand.  At worst, the agency's overreach was blatantly unauthorized by law, and USDA rightly backed off.  Either way, withdrawal of the OLPP Rule was a rational decision in accordance with law. *See Organization for Competitive Markets v. U.S. Department of Agriculture*, 912 F.3d 455, 460 (8th Cir. 2018) ("USDA's conclusion that the . . . proposed regulations would result in protracted litigation that 'serves neither the interests of the livestock and poultry industries' nor USDA is a rational reason *not* to adopt a proposed change of course.") (citation omitted).

*First*, the plain text of the Act is limited to ensuring "*organic*" production, and organic production does not encompass animal welfare.  7 U.S.C. §§ 6503(a); 6509(a).  The Act defines

8

"organically produced" to mean "an agricultural product that is produced and handled in accordance with this chapter." 7 U.S.C. § 6502(14). Right away, this definition suggests the relevant organic standards are those found in the Act itself, suggesting USDA does not have freewheeling authority to redefine what "organic" means. While Plaintiffs criticize USDA's plain text approach, Pls. MSJ Memo. at 7, nothing in the statutory definition of "organically produced" allows USDA to implement regulations that go beyond the dictionary definition of the term "organic." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018). In 1990, the ordinary meaning of "organic" was something not fed or treated with processed or synthetic substances. *See* Merriam-Webster Collegiate Dictionary def. 3(2) at 819 (10th ed. 1993) ("[O]f, relating to, yielding, or involving the use of food produced with the use of feed or fertilizer of plant or animal origin without employment of chemically formulated fertilizers, growth stimulants, antibiotics, or pesticides."); Oxford English Dictionary def. g at 921 (2d Ed. 1989) ("Of food: produced without the use of chemical fertilizers, pesticides, etc."). As these definitions show, food is or is not "organically produced" based on what an animal eats or otherwise takes in. Because the Act's plain text is limited to ensuring *organic* production, the Act does not govern other aspects of production, such as living conditions or welfare.

*Second*, Congress spelled out the production and handling standards it references in the definition of "organically produced," and those standards confirm that the OLPP Rule exceeded USDA's authority. The Act's production and handling standards are found in 7 U.S.C. § 6508 (crop production), § 6509 (animal production), and § 6510 (handling). Plaintiffs criticize USDA for looking only at these sections, and § 6509 in particular, to determine the scope of the act. Pls. MSJ Memo. at 8. But that is where the Act's production and handling standards are housed. When the definition of "organically produced" references the standards in the rest of the Act, it means

9

§§ 6508-6510.  The relevant standards for animal production specifically are found in § 6509(c) & (d).  Subsection (c) governs feed practices: it requires organically produced feed, prohibits the use of certain non-organic feed types, and prohibits the use of growth promotors and hormones. Subsection (d) sets medicinal standards by prohibiting the preventative use of antibiotics, parasiticides, or other medication in the absence of illness.  Section 6509(e) applies these standards to poultry meat, eggs, and livestock dairy.  The remaining subsections do not create animal-welfare standards either, *see* § 6509(a) (general rule); § 6509(b) (breeder stock); § 6509(f) (livestock identification).  In sum, all these standards closely track the ordinary meaning of "organic." Nothing in § 6509 creates animal-welfare standards for livestock or poultry.

*Third*, Congress did not grant USDA authority to create new standards that governed animal welfare.  Instead, the statute instructs USDA to "develop detailed regulations . . . to guide the implementation of the standards for livestock products provided under this section."  7 U.S.C. § 6509(g).  This sentence marks the parameters of USDA authority:  start with the statutory standards provided, and then determine whether the regulation "guide[s] the implementation" of those standards.  The OLPP Rule did not "guide the implementation" of any of these standards, it enacted *new* and *different* standards.  USDA's existing regulations illustrate this: livestock feed regulations are found in C.F.R. § 205.237 and livestock health care regulations in C.F.R. § 205.238.  Animal welfare regulations are categorized separately in C.F.R. § 205.239 because they are not implementing regulations at all.  Plaintiffs' Second Amended Complaint concedes this.  It alleges that the OLPP Rule did not implement the "livestock standards [Congress] placed in the [Act]"; it "augmented" them.  2d. Amend. Compl. ¶ 71.  That is plainly contrary to the statute's text.

*Fourth*, the Act expressly cabins the Act's scope to the production and handling practices listed in the statute.  7 U.S.C. § 6512.  All production and handling practices "not prohibited or otherwise restricted under this chapter . . . *shall be permitted*."  7 U.S.C. § 6512 (emphasis added).  The only exception is for practices that are "inconsistent" with the organic certification program.  *Id*.  As explained below, organic farmers and producers should be able to rely on this safe harbor provision as they build their businesses.  Using it as a sword to tear down existing farming operations, as Plaintiffs suggest, flips the provision on its head.  Pls. MSJ Memo. at 9.  Plaintiffs offer no argument explaining how the animal-welfare standards in the OLPP Rule are in any way "inconsistent" with the feed and medicinal standards in the Act itself.  To be "inconsistent" the disputed practices must at least be of the same class or category—and that is not the case here.  Section 6512 restricts agency discretion.

*Fifth*, other statutes show the distinction between organic and animal-welfare standards.  Had Congress wanted to instruct USDA to develop animal-welfare standards, it could have done so, as it did under the Animal Welfare Act.  *See Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 633 (2018); *Nat'l Labor Relations Bd. v. Bildisco and Bildisco*, 465 U.S. 513, 522-23 (1983); *In re Haas*, 48 F.3d 1153, 1156 (11th Cir. 1995) ("Where Congress knows how to say something but chooses not to, its silence is controlling."), *abrogated on other grounds*, *In re Griffith*, 206 F.3d 1389 (11th Cir. 2000).  The Animal Welfare Act instructs USDA to "promulgate standards to govern the humane handling, care, [and] treatment" of animals, including requirements for housing, physical environment, and psychological well-being.  7 U.S.C. § 2143(a)(1)-(2).  That Act, however, does not apply to livestock and poultry.  7 U.S.C. § 2132(g).  USDA's authority under the Organic Foods Production Act is different from the Animal Welfare Act in two ways: it is limited to implementation of existing standards rather than promulgation of

11

new standards; and existing standards are limited to feed-and-medicinal standards, not animal-welfare standards.  Plaintiffs cannot expand the Animal Welfare Act under the guise of organic certification.

Plaintiffs' contrary reading, *see* Pls. MSJ Memo at 5-19, is inconsistent with the statutory text and lacks a limiting principle.  Plaintiffs' complaint relied heavily on § 6509(g), which states: "The Secretary shall hold public hearings and shall develop detailed regulations, with notice and public comment, to guide the implementation of the standards for livestock products provided under this section."  This provision authorizes "detailed regulations" governing the *implementation* of existing *statutory* standards, not the creation of new standards.  Ignoring the plain language, Plaintiffs suggest § 6509(g) creates an expansive "Congressional mandate . . . to create additional standards 'for the care' of livestock."  2d. Amend. Compl. at ¶ 207.  But this "for the care of" language is not found in § 6509(g) at all.  It is instead borrowed from § 6509(d)(2), which instructs the National Organic Standards Board to "recommend to the Secretary standards in addition those in paragraph (1) for the care of livestock to ensure that such livestock is organically produced."  Section § 6509(d)(2) does not and cannot authorize the USDA to do anything.  The Board cannot *sua sponte* expand USDA's authority by making broad and unrelated recommendations.  And, at any rate, Plaintiffs misread § 6509(d)(2).  The Board is to make recommendations "in addition those in paragraph (1)" which contains baseline medicinal standards.  Paragraph (2) authorizes the Board to recommend more detailed medicinal standards, most likely marking the difficult divide between preventative and prescriptive use of antibiotics and medications.  Congress would not have written an entire Act providing detailed standards relating to organic production without the use of synthetic substances, only to give USDA expansive authority to issue any standards necessary for the care of livestock.  Plaintiffs' reading lacks any limiting principle.  "Congress

12

does not 'hide elephants in mouseholes.'" *Cyan, Inc. v. Beaver Cnty. Emp. Retirement Fund*, 138 S. Ct. 1061, 1071-72 (2018) (citation omitted).

Perhaps realizing this, Plaintiffs' current motion urges this Court to look anywhere *but* § 6509—going so far as to label it a statutory dead end.  Pls. MSJ Memo. at 8, 13-16.  Nor can Plaintiffs rewrite § 6509(g) by reference to the definition of "organically produced," *id.* at 18-19, because that definition just redirects the reader back to § 6509's substantive production standards, as explained above.

Instead, Plaintiffs now suggest rulemaking authority can be found elsewhere in the Act, such as in 7 U.S.C. § 6506(a)(11).  *See* Pls. MSJ Memo. at 10-12.  Plaintiffs call this an "ancillary jurisdiction" rule, *id.*—as if USDA could pass regulations not authorized by the statute so long as they were related to regulations that *are* authorized by the statute.  But if Congress intended to authorize animal-welfare regulations like the OLPP Rule, it would have done so in the section governing livestock and poultry, 7 U.S.C. § 6509.  Congress instead explicitly authorized any "production or handling practices" not expressly prohibited by statute or otherwise "inconsistent with" the statute.  7 U.S.C. § 6512.  Unsurprisingly, then, 7 U.S.C. § 6506(a)(11) does not authorize USDA to create animal-welfare standards either.  Section 6506(a) governs general *procedures* for the National Organic Program; it does not govern substantive standards.  Section § 6506(a)(11) is a catch-all provision, which says the program should "require such other terms and conditions as may be determined by the Secretary to be necessary."  Read in light of the ten preceding requirements, "other terms and conditions" plainly means additional procedures, not new substantive standards.  At the very least, § 6506(a)(11) is discretionary, and so cannot be used as a sword to force USDA to pass new regulations.

13

Plaintiffs reliance on "Section 6506(B)(7)" is mistaken for similar reasons.  Pls. MSJ Memo. at 12.  In fact, there is no § 6506(B)(7).  Instead, the language Plaintiffs cite is found in § 6506(a)(7).  Like the rest of § 6506(a), this provision governs "enforcement *procedures*" not new substantive standards.

Nor does the Act's "purposes" or legislative history authorize animal-welfare standards.  Pls. MSJ Memo. at 13, 16, 18.  One cannot overcome "recalcitrant statutory language" by appealing to purpose.  *Cyan*, 138 S. Ct. at 1072.  But even if one could, § 6501 could only authorize USDA to provide a "consistent standard" to ensure "*organically* produced products."  7 U.S.C. § 6501 (emphasis added).   It says nothing about regulating other aspects of production, such as living conditions and soil access.  And the legislative history cited by Plaintiffs shows that Congress meant to include substantive "standards" in the statute, leaving only procedural details to the agency.  *See* Pls. MSJ Memo. at 16.  Thus, the Act's purpose and legislative history confirm its text.

## II. USDA rationally withdrew the OLPP Rule because it improperly conflated organic and animal-welfare certification, which would have created significant market inefficiencies, hurt organic farmers, and driven up consumer costs.

Rushed through in the final days before a change of administration, the OLPP Rule failed to account for the many (and bipartisan) public comments pointing out its widespread harmful effects on organic farmers and consumers.  Thus, USDA's withdrawal of the OLPP Rule was not arbitrary and capricious for at least three independent reasons.

### A. The OLPP Rule would have hurt organic farmers who had made significant infrastructure investments in reliance on USDA's longstanding interpretation of the Act.

The OLPP Rule would have hurt organic farmers who had made significant infrastructure investments based on USDA's longstanding interpretation of the Act.  According to USDA

14

estimates, some 70 percent of organic eggs come from organic farmers whose facilities comply with the Act's standards, but would have been out of compliance under the OLPP Rule. *See* U.S.D.A., Regulatory Impact Analysis, Organic Livestock and Poultry Practices Withdrawal at 12-13 (Mar. 2018) ("Withdrawal RIA"). When there are substantial reliance interests like these, agencies should disfavor significant regulatory changes, as USDA ultimately did here. *See, e.g., Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 887 (9th Cir. 2017) (favoring a "longstanding administrative construction" rather than a new statutory reading "when reliance interests are at stake"). This is doubly true here, where the whole point of the Act was to create consistent standards so that organic farmers could "know the rules" and rely on them. S. Rep. 101–357 (1990), 1990 U.S.C.C.A.N. 4656, 4943.

USDA regulations first required outdoor access of some kind around 2000. *See* 65 Fed. Reg. 80548 at 80561; C.F.R. § 205.239. At the time, some commentators pressured USDA to establish more stringent outdoor-access standards similar to those proposed by the OLPP Rule twenty years later. *See, e.g.*, 65 Fed. Reg. at 80571. But USDA chose to adopt a more flexible requirement. *Id*. at 80561.

In reliance on USDA interpretation of the Act, organic farming operations invested in capital improvements that provided outdoor access using covered porches. Even USDA documents supporting the OLPP Rule conceded that the use of porches "gained traction among producers" *precisely because* a 2002 administrative appeal decision approved it. *See* U.S.D.A., Regulatory Impact Analysis, Organic Livestock and Poultry Practices Final Rule (Jan. 2017), Doc. 43-7, at 84 ("Initial RIA"); *see Mass. Indep. Cert., Inc. v. USDA*, 486 F. Supp. 2d 105, 113 (D. Mass. 2007) (discussing 2002 Decision Letter requiring certification of operation that used poultry porches). Today, at least 70 percent of organic eggs are produced in facilities that comply with

15

the Act's standards, but would not have complied with the OLPP Rule.  *See* Withdrawal RIA at 12-13.

Had the OLPP Rule gone into effect, organic farmers would have had two bad options: stay in the organic-products market and front enormous infrastructure costs, or leave the market and sell their organic products at the lower market price for non-organic products.  Staying in the market meant investing in selling a more expensive product that meets both organic and animal-welfare standards.  This would not have been easy fix.  Bringing aviary structures (multi-level housing systems) into compliance might have required purchasing additional real property (if available), demolishing or altering existing facilities, and building new facilities.  *Id.*  As the National Association of State Departments of Agriculture explained, "[c]onstructing new infrastructure" could have proved "cost-prohibitive for a number of producers, especially small-scale producers with limited access to credit."  NASDA Comment Letter, Doc. 43-4, at 5.  But leaving the organic-product market would cripple their operations: they would be selling hitherto *organic* products at *non-organic* prices.

While it is hard to predict which of these bad choices producers would have made, USDA estimated that many of these producers would have simply left the organic-product market rather than comply with the OLPP Rule.  *See* Withdrawal RIA at 13.  In fact, USDA ultimately estimated that as much as 50 percent of organic eggs would leave the market and instead be sold at lower non-organic prices.  *Id.*  USDA estimated resulting annual losses of $80-86 million based on the price for cage-free, non-organic eggs.  Initial RIA at 4-5.  That massive market shift also would have had negative downstream effects on organic agricultural farmers.  Poultry consumes about "33 percent of the corn and 56 percent of soybean meal consumed as livestock feed," and those percentages are much larger within the organic market.  *See* Am. Farm. Bur. Comment Letter,

16

Doc. 43-5, at 8. If poultry farmers stopped producing organic eggs, the price of organic feed products would also drop significantly. *Id.* And if organic farmers started selling eggs on the cage-free market instead, their eggs would flood that market, "result[ing] in a catastrophic decline in cage-free egg prices." *Id.*

Plaintiffs suggest the OLPP Rule was necessary to create *consistent* standards for outdoor access. *See, e.g.*, Pls. MSJ Memo. at 9-10. But USDA's standards are consistent. They are simply not what Plaintiffs want them to be. Organizations like the Plaintiffs have pushed USDA to adapt more stringent requirements since 2000. USDA refused to do so in 2000, and a 2002 administrative ruling said the same thing, *see Mass. Indep. Cert., Inc.*, 486 F. Supp. 2d at 113 (discussing administrative ruling). USDA's withdrawal of the OLPP Rule continued that consistent, decades-long practice.

### B. The OLPP Rule would have created a fifty-percent supply shortage for organic eggs and dramatically increased consumer prices.

The OLPP Rule also would have led to significant supply shortages and corresponding dramatic price increases for organic eggs. These sudden changes might have crippled the rapidly expanding organic-egg market altogether.

USDA estimated that "*50 percent* of total organic egg production" would likely have disappeared under the OLPP Rule. *See* Withdrawal RIA at 13 (emphasis added). In this scenario, organic farmers would have shifted their products to other markets because compliance with the OLPP Rule's new standards was simply too expensive. *Id.* As supply dropped fifty percent, prices would jump significantly. USDA estimated price increases of $0.62 to $1.55 per dozen. Initial RIA at 48. And even that is a conservative estimate. The American Farmer Bureau estimated prices closer to $12 a dozen based on a different set of figures. *See* Am. Farm Bur. Comment Letter, Doc. 43-5, at 9-10.

17

As prices increased, demand would have dropped significantly. *See* Initial RIA at 50. USDA estimated that *some* consumers might be willing to pay \$0.16-\$0.25 more per dozen for eggs from hens raised in conditions that complied with the OLPP Rule. Withdrawal RIA at 10-11. The actual cost would have been well over twice that amount. Initial RIA at 48. So even if those consumers were willing to pay \$0.21-\$0.49 more, as Plaintiffs argue, Pls. MSJ Memo. at 30-31, consumers would still have been priced out of the market because prices would have increased by at least \$0.62 and as much as \$1.55. Initial RIA at 48. In other words, the OLPP Rule would not have helped anyone. Even those organic producers already in compliance with the OLPP Rule would be hurt by the rapid destabilization of the market as prices skyrocketed beyond what consumers were willing to pay.

Withdrawing the OLPP Rule avoided these negative market effects. When they filed their complaint, Plaintiffs expressed concern that growth of the organic dairy and egg market was decreasing and might go negative. *See* Lee Dec., Doc. 16-4, at ¶ 8. Even at the time, they offered no reason why this decrease should be attributed to the withdrawal of the OLPP Rule rather than to other market forces. At most, they suggest that decreased profit margins were caused by greater supply coming from "organic production systems that were set to be disallowed under" the OLPP Rule. *Id*. ¶ 10. That explanation seems implausible because such facilities have been permitted for decades. Supply increases were more likely caused by supply catching up to demand after the shortages that followed the 2015 avian influenza outbreak, which claimed some 42 million chickens. *See* U.S.D.A., 2016 HPAI Preparedness and Response Plan at 3, *available at* https://www.aphis.usda.gov/animal_health/downloads/animal_diseases/ai/hpai-preparedness-and-response-plan-2015.pdf. Consistent with that explanation, 2018 figures show that Plaintiffs' concerns were misplaced. PLS. MSJ Memo. at 39. According to Plaintiffs, organic dairy and egg

18

sales increased by 0.8% in 2018—showing a stable and growing market.  *See* Organic Industry Survey 2019, Doc. 98-5 at 3.

> **C. The OLPP Rule's overbroad reading of "organic" would have restricted free market competition, while the ordinary meaning of "organic" will lead to better consumer options and higher profits.**

Finally, the Rule's overbroad reading of "organic" would have prevented fair competition on free-market terms.  It would have forced farmers offering a less expensive product out of the market even though they were offering a product consumers wanted.  And it would have forced some consumers to purchase a more expensive good that they did not want.

Basic economic principles dictate this conclusion.  Sellers often "bundle" products (or product characteristics) in order to get buyers to buy two products when they only want one.  *See* Anthony J. Tjan, *Pros and Cons of Bundled Pricing*, HARVARD BUS. REV. (Feb. 2010), https://hbr.org/2010/02/the-pros-and-cons-of-bundled-p.  For instance, few people would pay $10 for a bottle of water.  But when they pay for a hotel room, they often pay $10 more for the hotel room in exchange for "complimentary" bottled water.  *Id*.  Bundling favors sellers and hurts consumers by hiding price information, thus tricking consumers into paying an artificially high cost they would not otherwise pay.  *Id.*; *see also* F. A. Hayek, *The Use of Knowledge in Society*, 35 AM. ECON. REV. 519, 526 (1945).  Few transactions are lost in a competitive market—other sellers will be motivated to offer buyers each individual product.  But *imposing* market-wide bundling hurts both sellers and consumers because it leads to fewer transactions.  Sellers who can only competitively sell one product will be forced out of the market, reducing supply.  And buyers who would only buy one product are forced either to purchase the bundled goods, or buy a different product altogether.

The OLPP Rule would have done just that.  It imposed market-wide bundling of two

19

separate product characteristics: *organic* certification and *animal-welfare* certification for certain types of outdoor access. By forcing sellers to bundle these goods, the OLPP Rule would have effectively blocked the sale of eggs that are *organic* in the ordinary sense Congress outlined in the Act—eggs from hens raised only on organic feed, free of growth promoters and hormones, and free of unnecessary synthetic medications like antibiotics and parasiticides, 7 U.S.C. § 6509. If such products could not be labeled "organic," then the market price would not reflect the farmers' investment, and farmers would stop producing them. Thus, the OLPP Rule would have effectively shut down the market for eggs that were simply organic, thereby punishing organic farmers for doing precisely what Congress asked.

Data also show that many consumers wanted the very product the OLPP Rule would have taken off the market: eggs that are organic, but do not necessarily meet the OLPP Rule's exhaustive requirements for outdoor access. Plaintiffs and USDA disagree about how much more *some* consumers would be willing to pay for organic eggs that also met the OLPP Rule. One study often cited in favor of the OLPP Rule suggested that 59 percent of consumers were willing to pay an average of $0.25 more for eggs from hens given more outdoor access. *See* Withdrawal RIA at 10-11. But even that optimistic figure means that as many as 41 percent of consumers were not willing to pay more for such eggs, and even among the 59 percent who were willing to pay, many consumers were only willing to pay a small price increase. The OLPP Rule, and the much more drastic price increases it would have caused, would have prevented all these consumers from getting the product they wanted. Those who simply wanted organic eggs would be left with a choice: pay exorbitant prices for organic-and-outdoor-access eggs, or buy non-organic eggs. *See* Initial RIA at 50 (acknowledging that some consumers will end up "substituting non-organic eggs for organic eggs"). Withdrawing the OLPP Rule led to more market choices.

20

Plaintiffs speculate that producers whose eggs meet both organic and animal-welfare standards are worse off after USDA withdrew the OLPP Rule. *E.g.*, Asoudegan Dec., Doc. 16-2, at ¶¶ 6-8. That is not true, however, because the OLPP Rule never took effect. Those producers are in the same place they have been for the last twenty years. Moreover, those producers are selling a *different* product, and one that not all consumers demand. USDA's organic-certification program should not be captured by a market subset seeking to force out competitors, or by special-interest groups seeking to serve a different cause. *See* Am. Farm Bur. Comment Letter, Doc. 43-5 at 3 (noting that certification programs can "creep beyond the scope of their . . . mission").

The subset of sellers who currently satisfy the OLPP Rule's soil-access requirements are free to do what sellers in every market do—distinguish what they believe to be a superior product in an effort to obtain higher prices. Market competition does not create the same barriers that the OLPP Rule would have created. In addition, "[s]everal third party animal welfare certification systems embrace strong animal welfare standards" and are already established. Senate Letter to Sec'y Vilsack at 3 (July 26, 2016) (urging reconsideration of the OLPP Rule). Producers could, for example distinguish their organic products by seeking additional certification from the Humane Heartland Program of the American Humane Association. *See generally* http://www.humaneheartland.org (last accessed November 27, 2019). If consumers want organic products that also meet the OLPP Rule's detailed animal-welfare standards, then producers can offer that product at a premium. To the extent consumers do not want those products, producers are free to change their practices. But that choice has nothing to do with USDA's organic-practices standards.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for USDA.

21

Respectfully submitted,

ERIC S. SCHMITT
Attorney General of Missouri

D. JOHN SAUER
  Solicitor General
PETER T. REED
  Deputy Solicitor General

  /s/ *Julie Marie Blake*
JULIE MARIE BLAKE DC BAR 998723
  Deputy Solicitor General
Office of the Missouri Attorney General
P.O. Box 899
Jefferson City, Missouri 65102
(573) 751-3321
Julie.Blake@ago.mo.gov

*Attorneys for Amici Curiae*

Dated: January 3, 2019

STEVEN MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

CURTIS HILL
Attorney General of Indiana

THOMAS MILLER
Attorney General of Iowa

DEREK SCHMIDT
Attorney General of Kansas

JEFFREY LANDRY
Attorney General of Louisiana

DOUG PETERSON
Attorney General of Nebraska

WAYNE STENEHJEM
Attorney General of North Dakota

MICHAEL HUNTER
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

JASON RAVNSBORG
Attorney General of South Dakota

SEAN REYES
Attorney General of Utah

BRIDGET HILL
Attorney General of Wyoming

22

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of January 2020, the foregoing was filed electronically through the Court's electronic filing system to be served electronically on all parties, and a true and correct copy was further served by email on counsel for all parties.

_____/s/ *Julie Marie Blake*_____

2