# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DEUTSCHE TELEKOM AG, *et al.*,<br><br>Defendants. | Case No. 1:19-cv-02232-TJK |

**BRIEF OF INCOMPAS AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS**

Pantelis Michalopoulos
D.C. Bar. No. 453179
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C. 20036
(202) 429-3000
pmichalopoulos@steptoe.com
*Counsel for INCOMPAS*

January 24, 2019

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 7(o)(5) of this Court and Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, amicus curiae INCOMPAS is a not-for-profit corporation and has not issued shares or debt securities to the public.  INCOMPAS does not have any parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

/s/ *Pantelis Michalopoulos*
Pantelis Michalopoulos
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C.  20036
pmichalopoulos@steptoe.com
(202) 429-3000

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ iv
IDENTITY AND INTEREST OF AMICUS CURIAE ........ 1
INTRODUCTION ........ 2
ARGUMENT ........ 3
A. Background ........ 3
B. Benefits to Small Wireless Providers ........ 4
CONCLUSION ........ 6

# TABLE OF AUTHORITIES

**Page(s)**

**Administrative Decisions**

Applications of T-Mobile US, Inc., and Sprint Corp., for Consent to Transfer Control of Licenses and Authorizations, *Memorandum Opinion and Order, Declaratory Ruling, Order Proposing Modification*, 34 FCC Rcd. 10578 (2019) ....................2, 3, 4, 5

**Other Authorities**

DOJ Response to Public Comments, ECF 42 ....................3, 4

Proposed Final Judgment, ECF 2-2 ....................3, 5, 6

US Mobile, *What Is eSIM?*, https://www.usmobile.com/blog/esim ....................5

## IDENTITY AND INTEREST OF AMICUS CURIAE

INCOMPAS is the leading industry association representing competitive telecommunications carriers, including fixed and mobile voice and broadband carriers, throughout the United States.[1] Composed of more than 70 members, INCOMPAS advocates for laws and policies that promote competition, innovation and economic development. Many INCOMPAS members are small providers, serving low-income and senior consumers in rural areas. INCOMPAS works to ensure that competitive communications and technology providers can continue to develop and deliver better service and greater innovation to consumers and businesses. INCOMPAS counts Defendant DISH Network as one of its members.

INCOMPAS writes in support of the proposed merger, conditioned on entry of DISH Network as the nation's fourth consumer wireless carrier. In its proposed brief, INCOMPAS offers a perspective not covered by any other party—specifically, why the proposed merger, conditioned on the Department of Justice settlement, is in the interest of small telecommunications carriers throughout the United States.

[1] Under Local Rule 7(o)(5) of this Court and Federal Rules of Appellate Procedure Rule 29(a)(4)(E), amicus curiae INCOMPAS states that (i) undersigned counsel authored this brief (INCOMPAS's longstanding counsel, Steptoe & Johnson LLP, also serves as DISH's counsel); (ii) no party or party's counsel contributed any money that was intended to fund preparing or submitting this brief; and (iii) no other person other than INCOMPAS and its members contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION

While INCOMPAS opposed the merger as originally structured, it announced its support for the merger as conditioned when the Department of Justice reached an agreement with T-Mobile and Sprint that would allow DISH to enter as a vibrant fourth competitor. This creative settlement not only remedies the effects of what would otherwise be an increase in market concentration, but affirmatively improves the competitive conditions in that market to boot. The Proposed Final Judgement would result in better service and lower prices for wireless customers and smaller providers alike, including those in rural America. As the FCC found, "rural communities will see especially large benefits from 5G connectivity. . ." FCC Order ¶ 266.[2] In particular, the creation and empowerment of DISH as the fourth carrier will result in a state-of-the-art fifth generation ("5G") network with vast amounts of available capacity. DISH is likely to use this network to provide nationwide retail service but also to provide wholesale capacity to carriers and enterprises at low prices reflecting its low marginal costs.

Competition would benefit in other ways, too. By requiring the adoption of eSIM technology by all parties to the transaction, the Proposed Final Judgment will endow consumers with greater portability and flexibility to switch providers: consumers today get to keep their number when switching providers; with eSIM, they will also get to keep their phone. Nor would DISH be unduly dependent on T-Mobile in its efforts to compete. DISH is a disrupter with a long history of low-price offerings to underserved rural Americans. DISH also has a proven capability of competing successfully against vertically integrated providers whose inputs it uses. DISH will thus be positioned to compete with the three larger carriers.

---

[2] Applications of T-Mobile US, Inc., and Sprint Corp., for Consent to Transfer Control of Licenses and Authorizations, *Memorandum Opinion and Order, Declaratory Ruling, Order Proposing Modification*, 34 FCC Rcd. 10578 (2019) ("FCC Order").

## ARGUMENT

### A. Background

DISH has a substantial spectrum portfolio, including substantial low-band spectrum, making it uniquely positioned to enter the retail mobile wireless market. DISH has more low-band spectrum than Sprint and more spectrum for downlink use than Verizon. The divestiture will provide DISH with more than 9 million current Boost subscribers. DISH will charge lower prices than Boost charges today, and lower prices than the competition, for a service superior to what Boost customers receive today. DISH will also assume contracts for about 7,500 retail locations, and have the option to acquire retail locations that New T-Mobile decommissions.

From day one, DISH will provide services to an unlimited number of subscribers using T-Mobile's network under a nationwide mobile virtual network operator ("MVNO") agreement. *See* Proposed Final Judgement, ECF 2-2 at 4. This agreement lasts at least seven years, *id.* at 19, and gives DISH "extremely favorable terms," as described by the Department of Justice, which helped facilitate the agreement. DOJ Response to Public Comments, ECF 42 at 3. DISH will thus have the ability to offer customers a low-cost service on a greenfield network with significant excess capacity.

Simultaneously with offering service under New T-Mobile's network, DISH will be building out its own 5G wireless network. Under commitments DISH has undertaken to the FCC, this greenfield network will cover 70% of the United States by 2023. FCC Order ¶ 369. DISH will also deploy at least 15,000 5G sites, and offer 5G broadband to at least 75% of the service in each of the country's partial economic areas by 2025. *Id*. As the FCC concluded, "the proposed transaction will result in significant coverage improvements in rural areas . . ." *Id*. ¶ 257. Just as relevant to regional and rural carriers, DISH will make significant capacity on a new 5G network available on a wholesale basis.

### B. Benefits to Small Wireless Providers

**Lower Prices for Better Service**.  INCOMPAS members include both facilities-based carries such as C-Spire and rural internet service providers.  Both of these categories of companies may need to enter into roaming agreements or purchase wholesale capacity from national wireless carriers.  The entrance of DISH, as well as T-Mobile's own wholesale and buildout commitments, will increase the availability of wholesale to small rural carriers.  As the DOJ found, "as a new entrant untethered to legacy business models, DISH may be especially willing to partner with innovative [carriers]."  ECF 42 at 41.  And the FCC has likewise found that DISH will "emerge as a nationwide facilities-based provider that would be capable of supplying, among other things, robust wireless services to MVNOs."  FCC Order ¶ 292.  This greater wholesale capacity will also entice other small companies, including INCOMPAS members, to enter the wireless market and increase competition.  These potential new entrants are well-positioned to innovate on pricing, service plans, and products.  For example, a rural ISP could potentially offer a bundled package of internet and wireless services to its customers, with the wireless service running on DISH's greenfield 5G network.  Both existing carriers and potential new entrants will benefit from the high-quality networks with substantial excess capacity of both New T-Mobile and DISH through lower wholesale prices and higher quality.  Other INCOMPAS members are providers of fiber capacity; they could benefit by being able to provide fiber backhaul for increased traffic and a new 5G wireless network.

DISH's spectrum resources will be activated thanks to the tools given DISH by the Proposed Final Judgment, which permit DISH to build its own 5G network.  This will be a boon to regional MVNO carriers for a simple reason:  with as much downlink spectrum as Verizon, DISH will start its network services with a significantly smaller base than the 94 million customers of Verizon.  Add to this the effectiveness of 5G technology, which will milk more

capacity from many frequency bands through densification and spectrum reuse. And add the fact that DISH will be able to avail itself of these efficiencies without being burdened by a legacy network (in contrast with all national carriers today). The result is that DISH will have ample capacity to make available wholesale, and that the marginal cost of deploying that capacity will be low. The net result will be low prices for wholesale 5G services.

**eSIM**. In another success scored by the Proposed Final Judgment, both T-Mobile and DISH will be required to support eSIM technology, which will give consumers greater portability and flexibility to switch providers. ECF 2-2 at 21 ("Divesting Defendants and Acquiring Defendant agree to support eSIM technology . . ."). eSIM makes it easier for consumers to switch wireless carriers without replacing a physical card in their device, or even having to purchase a new phone.[3] In other words, by lowering barriers to entry, eSIM will allow consumers to switch from their legacy providers to the potential future service offered by INCOMPAS member, thus increasing the options available to consumers. In the FCC's words: "requirements related to the use of eSIM will tend to lower switching costs for wireless consumers . . ." FCC Order ¶ 206.

**No Risk of T-Mobile Misconduct**. Nor need the Court concern itself with the supposed dependence of DISH on T-Mobile. First of all, DISH will be building its own network even as it uses T-Mobile's network under the wholesale agreement with T-Mobile, and indeed it can use the two in tandem; as a consumer moves in and out of a market that DISH has already built, her call would move seamlessly between the two networks. Second, the monitor appointed by the DOJ and approved by this Court (ECF 51) will have the power to police T-Mobile's compliance with its commitments. In addition, New T-Mobile risks contempt of court if it violates the

[3] *See* US Mobile, *What Is eSIM?*, https://www.usmobile.com/blog/esim (last visited Jan. 23, 2020).

Proposed Final Judgment. ECF 2-2 at 34. Third, New T-Mobile cannot limit DISH's subscriber growth because DISH has unlimited capacity on New T-Mobile's network. Fourth, T-Mobile could not shut DISH out of the market by charging predatory prices for its own prepaid services because such low prices would result in lower fees paid by DISH to T-Mobile under the agreement, thereby lowering DISH's costs, too.

Finally, DISH has a proven record of competing against vertically integrated incumbents even as it needs their inputs. DISH's satellite distribution services compete with cable and satellite operators that control programming content needed by DISH, such as Comcast and AT&T, which control NBC and Time Warner respectively. Likewise, DISH's online video service Sling relies on broadband access controlled by the aforementioned companies, as well as Charter, Verizon, and others—all companies that compete against Sling. Yet both of DISH's services have won many millions of customers and revolutionized their industries with low prices and good service.

## CONCLUSION

For these reasons, this Court should approve the proposed merger between T-Mobile and Sprint, conditioned on the settlement and conditions mandated by the Department of Justice.

Respectfully submitted,

*/s/ Pantelis Michalopoulos*

Pantelis Michalopoulos
D.C. Bar. No. 453179
**STEPTOE & JOHNSON LLP**
1330 Connecticut Avenue NW
Washington, D.C. 20036
Telephone: (202) 429-6494
Facsimile: (202) 429-3902
pmichalopoulos@steptoe.com
*Counsel for Amicus Curiae INCOMPAS*