**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:19-cv-02232-TJK |

UNITED STATES OF AMERICA,
Department of Justice, Antitrust Division
450 5th Street, N.W.
Washington, D.C. 20530

STATE OF KANSAS,
120 S.W. 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597

STATE OF NEBRASKA,
2115 State Capitol
Lincoln, Nebraska 68509

STATE OF OHIO,
150 East Gay Street, 22nd Floor
Columbus, Ohio 43215

STATE OF OKLAHOMA,
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105-4894

and

STATE OF SOUTH DAKOTA,
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501-8501

                    Plaintiffs,

            v.

DEUTSCHE TELEKOM AG,
Friedrich-Ebert-Allee 140
Bonn, Germany 53113

T-MOBILE US, INC.,
12920 SE 38th Street
Bellevue, Washington 98006

SOFTBANK GROUP CORP.
1-9-1 Higashi-shimbashi, Minato-ku,
Tokyo, Japan 105-7303

and

SPRINT CORPORATION
6200 Sprint Parkway,
Overland Park, Kansas 66251-4300

                    Defendants.

**BRIEF OF AMICI CURIAE NICHOLAS ECONOMIDES, JOHN KWOKA, THOMAS PHILIPPON, ROBERT SEAMANS, HAL SINGER, MARSHALL STEINBAUM, AND <u>LAWRENCE J. WHITE IN SUPPORT OF PLAINTIFFS</u>**

BEINS AXELROD

Jonathan G. Axelrod (D.C. Bar No. 210245)
1717 K Street, NW
Washington, DC 20006
212-328-7222
jaxelrod@beinsaxelrod.com

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

Fred T. Isquith
Veronica Bosco
270 Madison Avenue
New York, New York 10016
212-545-4600
isquith@whafh.com
bosco@whafh.com

*Counsel for Amici Curiae*

Lawrence J. White
Nicholas Economides
John Kwoka
Thomas Philippon
Robert Seamans
Hal Singer
Marshall Steinbaum
44 West Fourth Street, 7-65
New York, NY 10012

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

IDENTITY, INTERESTS, AND AUTHORITY TO FILE OF AMICI . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Replies to the Department of Justice's Response to the "Economics Professors
        Comment". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Evidence Uncovered During the States' Case Confirms That the Department of
        Justice's Proposed Final Judgment Fails Under the Tunney Act . . . . . . . . . . . . . . . . . 8

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

i

# 1.TABLE OF AUTHORITIES

**STATUTES AND RULES**

D.D.C. Local Rules
  Rule 7(o) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Antitrust Procedures & Penalties Act ("Tunney Act") , 15 U.S.C. § 16 . . . . . . . . . . . . .  2, 5, 6, 8

**OTHER AUTHORITIES**

Capitol Forum, *T-Mobile/Sprint: States, Carriers Clash on Caselaw, Efficiencies, Dish Remedy During Closing Arguments*, Jan. 16, 2020, *available at* https://thecapitolforum.cmail19.com/t/ViewEmail/j/D8412D3DEB2594BA2540EF23F30FEDE D/A39F287382D2114516B21F2806CB3AEB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Dissenting Statement of Commissioner Rosenworcel, Applications of T-Mobile US, Inc., and Sprint Corporation For Consent To Transfer Control of Licenses and Authorizations, Applications of American H Block Wireless L.L.C., DBSD Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time, WT Docket No. 18-197, *available at* https://docs.fcc.gov/public/attachments/FCC-19-103A5.pdf . . . . . . . . . . . . . . . . . . . . . . . . .  7

Reuters, *Shares in 1&1 Drillisch soar after Germany 5G auction*, June 13, 2019, https://www.reuters.com/article/germany-telecoms/shares-in-11-drillisch-soar-after-germany-5g-auction-idUSS8N22R022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

## 2.IDENTITY, INTERESTS, AND AUTHORITY TO FILE OF AMICI

As economists with significant experience in competition and regulatory matters, Nicholas Economides, John Kwoka, Thomas Philippon, Robert Seamans, Hal Singer, Marshall Steinbaum, and Lawrence J. White (the "Amici") are scholars and experts in competition, industrial organization, and the economic analysis of antitrust issues.[1] Each of the Amici are scholars and experts in competition, industrial organization, and the economic analysis of antitrust issues.

Amici have a special interest in the issues raised in this litigation and can offer their unique perspective as scholars in this field as the Court considers key economic issues. Amici share a professional, economics-principles-based interest in seeing that this case—and the merger that is the basis for this case—has an outcome that maintains competition in the relevant markets for wireless services.  Amici draw on decades of experience—in academia, in practice, and in government—studying mergers and their competitive effects.

Pursuant to Local Rule 7(o), Amici affirm that no counsel for a party authored this brief in whole or in part, no party or counsel for a party contributed money that was intended to fund preparing or submitting this brief, and no person other than Amici or their counsel contributed money that was intended to fund preparing or submitting this brief. Amici submit this brief to the Court pursuant to the Court's granting of Amici Motion for Leave to File Amici Curiae Brief.

---

[1]     The Amici affiliations are as follows: Nicholas Economides, Professor of Economics, NYU Stern School of Business; John Kwoka, Neal F. Finnegan Distinguished Professor of Economics, College of Social Sciences and Humanities, Northeastern University; Thomas Philippon, Max L. Heine Professor of Finance, NYU Stern School of Business; Robert Seamans, Associate Professor of Management and Organizations, NYU Stern School of Business; Hal Singer, Managing Director at Econ One, Adjunct Professor at Georgetown McDonough School of Business; Marshall Steinbaum, Assistant Professor, Economics Department, University of Utah; and Lawrence J. White, Robert Kavesh Professor of Economics, NYU Stern School of Business.

### 3.<u>ARGUMENT</u>

Amici previously provided Comments to the United States Department of Justice ("DOJ") explaining why the proposed remedy of the DOJ (the "Proposed Final Judgment") flowing from the proposed merger of Sprint Corporation ("Sprint") and T-Mobile US, Inc. ("T-Mobile") (the "Merger"), as recognized by the DOJ Complaint,[2] would not plausibly and predictably resolve the competitive concerns raised by the Merger.[3] The DOJ has filed a Response to Public Comments on its action,[4] a response that in a number of places specifically takes issue with Amici comments.

This brief aims to address the DOJ's responses to Amici comments, explaining why each of its responses is not supported by the facts and in several instances is directly contravened by evidence from *State of New York et al. v. Deutsche Telekom AG et al.*, Case No. 1:19-cv-05434-VM (S.D.N.Y. June 11, 2019) (the "States' Case"). This brief provides further evidence concluding that the DOJ's remedy in its Proposed Final Judgment[5] fails to resolve the central issue of the DOJ Complaint: the anti-competitive nature of the Merger, and thus the need to restore the level of pre-Merger competition in wireless markets.

---

[2] *United States  et al v. Deutsche Telekom AG, T-Mobile Us, Inc., Softbank Group Corp., and Sprint Corporation,* No. 1:19-cv-02232 (the above-captioned action), ECF No. 1 at 3 (D.D.C. July 26, 2019) (the "DOJ Complaint").

[3]. Nicholas Economides, John Kwoka, Thomas Philippon, Robert Seamans, Hal Singer, Marshall Steinbaum, and Lawrence J. White, Economists' Tunney Act Comments on the DOJ's Proposed Remedy in the Sprint/T-Mobile Merger Proceeding, filed with the U.S. Department of Justice, October 10, 2019, *U.S. et al. v. Deutsche Telekom AG et al.*, ECF No. 42  ECF No. 42-1 at 123 (Ex. 12) (the "Economics Professors Comment").

[4]. Response of Plaintiff United States to Public Comments on the Proposed Final Judgment, *U.S. et al. v. Deutsche Telekom AG et al.*, ECF No. 42 (the "DOJ Response").

[5]. *U.S. et al. v. Deutsche Telekom AG et al.*, ECF No. 2-2.

A.      **Replies to the Department of Justice's Response to the "Economics Professors Comment"**

Public remarks from T-Mobile's Chief Executive Officer ("CEO") admitted that the DOJ's remedy would not reduce T-Mobile's expected post-Merger profits.[6] In its response, the DOJ takes issue with Amici interpretation of the CEO's remarks, noting that "[t]he relevant question for the Court is not how these two competing effects net out for T-Mobile, but rather whether [DISH Network Corporation ("Dish")] will introduce new competition into the marketplace that will benefit consumers."[7] What the DOJ misses, however, is that in fact the absence of any impact of the DOJ's remedy on T-Mobile's expected post-Merger profits strongly supports the Amici claim that Dish will *not* replace the lost competition from Sprint. If the DOJ's remedy strengthened competition, it would be detrimental to T-Mobile, as Dish's competitive gains would come at the expense, at least in part, of T-Mobile's profits. And, given the tight oligopoly in wireless, the post-Merger reduction in competition would harm not only T-Mobile customers but also those of AT&T Inc. ("AT&T") and Verizon Communications Inc. ("Verizon").

Additionally, Dish's prior warehousing of spectrum was a good indicator of Dish's likely future behavior with additional spectrum.[8] The DOJ counters that Dish's spectrum inventory is proof that it will have an ability and incentive to enter the market.[9] In reality, Dish's history shows that it has chosen warehousing spectrum rather than building in the past, and accepted

---

[6]. Economics Professors Comment ¶25 (citing T-Mobile's CEO John Legere on Q2 2019 Results - Earnings Call Transcript, Seeking Alpha, July 29, 2019, *available at* https://bit.ly/2m38U4o).

[7]. DOJ Response at 27.

[8]. Economics Professors Comment ¶20 (citing Letter from Nancy Victory to Marlene Dortch, In Re Notification of Written Ex Parte Presentation Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Transfer Control of Licenses and Authorizations, WT Dkt. No. 18-197, Mar. 11, 2019, at note 3, *available at* https://bit.ly/2kVbOrI).

[9]. DOJ Response at 21 ("Dish's spectrum assets provide it with the ability to compete more quickly and more effectively than another entrant could.").

penalties for failing to build out its network, precisely when it is more profitable to do so, just as might well be the case here. Indeed, while Dish has had this spectrum trove for years, it has yet to enter the wireless marketplace as a facilities-based carrier. It is logical to question why is: this spectrum infusion would be any different. The DOJ points to Dish's planned Internet of Things ("IoT") network as evidence of experience in the wireless industry.[10] Yet an IoT network merely connects electronic gadgets such as refrigerators and parking meters to the Internet. Because IoT has nothing to do with operating a customer-oriented mobile broadband network, Dish's IoT network is clearly not a substitute for a Sprint-like experience in the wireless industry.

Because the coverage requirement in the DOJ's remedy is denominated in terms of population, not geography, certain parts of the country will lose out relative to Sprint's existing coverage, even if those targets are met.[11] In response, the DOJ asks this Court to accept Dish's commitment as a "floor," arguing that Dish might have incentives to do more: "DISH may ultimately have business incentives to provide substantially broader coverage and faster speeds than the minimums required to meet its network build commitments. By focusing on the floors set by the [P]roposed Final Judgment rather than the likely effects of the divestiture, these commenters miss the relevant inquiry."[12] As a matter of merger analysis, this is precisely the kind of pure speculation that Amici, as economists, are not supposed to rely on. In any event, the DOJ cannot count on market forces solving this problem, especially when Dish is strongly incentivized *not* to build out the spectrum, but instead to sell or lease the spectrum to a wireless incumbent.

---

[10]. *Id.* at 22 n.46 ("In connection with its NB-IoT plans, DISH had established relationships with vendors, leased towers, and acquired equipment for a core network.").

[11]. Economics Professors Comment ¶24.

[12]. DOJ Response at 32.

Moreover, the DOJ's remedy would not address harms in the wireless wholesale market.[13] In response, the DOJ takes the position that because it did not technically define a wholesale market in the DOJ Complaint—even though the DOJ Complaint acknowledged merger-related harms in the wholesale segment[14] of the wireless marketplace—its remedy need not address those harms: "The [DOJ] Complaint alleges only one relevant product market: the market for retail mobile wireless services. It does not, however, allege the existence of a distinct wholesale market."[15] This is an untenable position. It would mean that the DOJ could avoid addressing a known or likely merger-related harm by simply not defining the market in which that harm occurred. The very point of the Tunney Act review and Congressional intent is to consider carefully the basis for the DOJ's decision, not simply to replicate the analytical framework of the agency.

The DOJ's Response also suggests that Amici comments are "internally contradictory" when it comes to the competitive impact of wireless resellers or mobile virtual network operators ("MVNOs").[16] In these comments, Amici cite the Federal Communications Commission's (FCC) 20th Annual Wireless Competition Report for the proposition that MVNOs do not constrain the pricing of facilities-based carriers.[17] That we also acknowledge that MVNOs allow facilities-based carriers to price discriminate—and thereby extract more consumer surplus than they

---

[13]. Economics Professors Comment ¶¶7-8.

[14]. DOJ Complaint ¶22 ("Competition between Sprint and T-Mobile to sell mobile wireless service wholesale to MVNOs has benefited consumers by furthering innovation, including the introduction of MVNOs with some facilities-based infrastructure. The [M]erger's elimination of this competition likely would reduce future innovation.").

[15]. DOJ Response at 40 n. 117.

[16]. DOJ Response at 41 n. 119.

[17]. Economics Professors Comment ¶10 n. 25.

otherwise would under uniform pricing—is not "championing the competitive benefits" of MVNOs,[18] as the DOJ asserts. MVNOs are merely resellers of the major carriers.

Any Dish investment in towers and other facilities would not add value to the most likely buyers of the spectrum, as evidenced by the sharp drop in the stock valuation of 1&1 Drillisch AG ("Drillisch"), a German telecommunication service provider, when it started to invest in spectrum to build out its own network in Germany.[19] The DOJ responded by noting that Drillisch purchased 70 MHz of spectrum in June 2019, citing a Reuters article on how its stock "soared" thereafter.[20] Although Drillisch's stock did rise modestly after the auction,[21] it has since fallen by a third from its October 2019 high, and it is now at a six-year low.[22] If anything, the experience of Drillisch is a stark warning to Dish that it could lose significant market value if it were to build out its network.

In its response, the DOJ claims that the standard employed to measure the efficacy of a remedy—namely, restoring *ex ante* competitive conditions—is not appropriate for a Tunney Act proceeding.[23] This is a peculiar critique, as the DOJ's own 2011 and 2004 Guide to Merger

---

[18]. DOJ Response at 41 n. 119 ("Later, in going on to attack the settlement for not doing more to help MVNOs, the comment champions the competitive benefits that MVNOs provide, including allowing carriers in effect to offer the same service at different price points under a different brand, and enabling cable companies to compete in wireless.") (emphasis in original).

[19]. Economics Professors Comment ¶21.

[20]. DOJ Response at 31 n.75 (citing Reuters, *Shares in 1&1 Drillisch soar after Germany 5G auction*, June 13, 2019).

[21]. Reuters, *Shares in 1&1 Drillisch soar after Germany 5G auction*, June 13, 2019, https://www.reuters.com/article/germany-telecoms/shares-in-11-drillisch-soar-after-germany-5g-auction-idUSS8N22R022 ("Shares in 1&1 Drillisch, until now a 'virtual' mobile player, rose 9.4% at 0754 GMT. United Internet, which controls 1&1, *surged 5%*.") (emphasis added).

[22]. As of January 17, 2020, Drillisch's stock closed at 22.66 EUR. The last time the stock was at this level was January 17, 2014. *See* ETR: DRI, *available at* https://bit.ly/36chtvq.

[23]. DOJ Response at 16 n. 22.

Remedies articulate this as the proper standard.[24] The current DOJ's Deputy Assistant AG also states what constitutes an acceptable remedy.[25] The DOJ appears to assert that its own guidelines and statements simply do not describe its decision process here and so cannot inform how a court should judge the proposed merger remedy. Acceptance of that position would render this review process moot.

Finally, the DOJ claims without citation to any economics literature that a marginal-cost savings from enhanced network capacity, which is purportedly a "well-understood economic phenomenon,"[26] was overlooked. The DOJ cites the Federal Communication Commission's ("FCC") merger order for this economic proposition,[27] but an inspection of the cited paragraph in the FCC order reveals that the FCC merely said that it agreed with the merging parties, who have a litigation-inspired interest in arriving at this result. And FCC Commissioner Jessica Rosenworcel, who dissented from the order, has asserted that T-Mobile fed the FCC staff favorable data on marginal-cost savings.[28] Indeed, Commissioner Rosenworcel stated that key

---

[24]. Economics Professors Comment ¶2 n.7.

[25]. *Id.* ¶1 n.5.

[26]. DOJ Response at 18 ("In fact, the relationship between an increase in capacity and a reduction in marginal cost is a *well-understood economic phenomenon* in industries with capacity constraints. In the market for mobile wireless services, the marginal cost of an additional customer on a capacity-constrained network includes the costs of the congestion caused by adding that customer to the network.") (emphasis added).

[27]. *Id.* at 18 n.31 (citing FCC Order ¶236).

[28]. *Dissenting Statement of Commissioner Rosenworcel*, Applications of T-Mobile US, Inc., and Sprint Corporation For Consent To Transfer Control of Licenses and Authorizations, Applications of American H Block Wireless L.L.C., DBSD Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time, WT Docket No. 18-197, at 3, *available at* https://docs.fcc.gov/public/attachments/FCC-19-103A5.pdf ("Significant parts of the initial draft decision were rewritten in the eleventh hour and behind closed doors to suggest less harm to competition and prices than initially found; adopt the merging companies' arguments in place of more balanced discussion about where those arguments were unconvincing; and even replace the underlying data used to analyze marginal cost efficiencies with more merger-friendly data supplied by T-Mobile."). Further, during the States' Case December 2019 Bench Trial, Dr. Fiona Scott Morton, one of the states' economics experts,

parts of the FCC's order originally written by staff were reworked to soften the competitive harms of the Merger.[29]

### B. Evidence Uncovered During the States' Case Confirms That the Department of Justice's Proposed Final Judgment Fails Under the Tunney Act

Evidence uncovered as part of the States' Case shows that Dish is unlikely to replace Sprint as a facilities-based fourth rival for a number of reasons. To begin, there is evidence that Dish has gamed the regulatory system and does not have incentives to build-out its own network.[30] Sprint CEO Marcelo Claure testified under cross examination that Dish's business plan was to warehouse spectrum.[31] Discussing the termination of Sprint's prior negotiations with Dish, Mr. Claure testified at his DOJ deposition that Dish connected just enough IoT devices to satisfy the FCC's buildout requirements:

> Again, Charlie Ergen, his plan, I think he's basically somebody who holds spectrum for the value to continue to go up, and he'll build—I think his latest thing, he's going to spend a billion dollars to build a nationwide network so that he can claim he has a network. As long as he connects one or five devices or ridiculous amounts of low devices, then he's out of—he's out of trouble with the FCC.[32]

T-Mobile Director Thornsten Langheim similarly testified that, as late as June 2019, the view of the T-Mobile executive team was that "they were very skeptical that much [of Dish's]

---

testified that the marginal costs that the merged entity would achieve would be quite similar to what the two merging parties could achieve as standalone firms.  Excerpts of relevant portions of the transcript from the December 2019 Bench Trial showing relevant testimonies are attached to the accompanying Declaration of Jonathan G. Axelrod in Support of Brief of Amici Curiae ("Axelrod Decl.") as Exhibits A-F. Axelrod Decl. Ex. A at 2198:13-16.

[29]. *Dissenting Statement of Commissioner Rosenworcel.*

[30]. Other evidence uncovered as part of the States' Case revealed that Dish repeatedly missed FCC milestones with respect to satellite launches. The FCC issued orders in 2010 and 2011 finding that Dish's Echostar affiliate had an established pattern of missing non-terrestrial (satellite) deadlines. Axelrod Decl. Ex. B at 1681-84.

[31]. Axelrod Decl. Ex. C at 1346:19-21. ("I'm sure he's going to find—his latest trick is to build this really, really thin network to say he's built a network.").

[32]. *Id.* at 1347:14-21.

network would be built."[33] He acknowledged that "the result of [his] team's impact analysis at that time was that Dish was not likely to build its own wireless network,"[34] and that if Dish "would build out more than 50 percent of the United States, it may have a negative [net present value]."[35] His team observed that "unless the MVNO taker [Dish] finds a significant lever to improve network economics, the outside end view doesn't provide a lot of rationale for substantial buildout."[36] When modeling the cash flows associated with Dish's buildout scenario, the T-Mobile team found "this case very unlikely. Buildout not realistic."[37] One member of the T-Mobile team, Joe Boorman, reasoned that "it's economically illiterate to argue he [Ergen] actually builds it. . . .In the end, Dish might build something the lawyers can use, but not something customers can use."[38] In another analysis, Mr. Boorman observed that "Even assuming the assumptions are right, Dish burns 15 billion over ten years, and they have horribly negative terminal value. You need tens of billions of subs to justify it."[39] T-Mobile's team concluded that "Charlie is mostly interested in resolving his milestone issue, gain two to three years, keep his status as a poker player, and be a seller when spectrum becomes scarce."[40]

Timotheus Höttges, the CEO of Deutsche Telekom, testified as part of the States' Case that a U.S. carrier would need more than 80 million subscribers to compete successfully against

---

[33]. Axelrod Decl. Ex. D at 319:17-23.

[34]. *Id.* at 326:20-24.

[35]. *Id.* at 327:9-10.

[36]. *Id.* at 328:7-11.

[37]. *Id.* at 329:23-25.

[38]. *Id.* at 333:1-9.

[39]. *Id.* at 335:11-13.

[40]. *Id.* at 340:12-17.

incumbents such as AT&T and Verizon.[41] Under the DOJ's remedy, Dish will acquire and seek to maintain a small prepaid business with roughly nine million customers—or about one tenth of what Mr. Höttges believes is needed to compete effectively as a facilities-based carrier. According to testimony from Dr. Carl Shapiro, one of the states' economic experts, according to Dish's own plans from September 2019, only two percent of Dish's subscribers would be on their own network during 2020, and only ten to twelve percent of Dish's subscribers would be on their own network during 2021.[42]

Still other evidence in the States' Case highlighted entanglements that will likely prevent Dish from succeeding as a facilities-based carrier. For example, Judge Victor Marrero asked Dish's Charlie Ergen about the inherent conflict of interest built into the DOJ's remedy, under which "T-Mobile will be trying to steal customers from Dish."[43] Judge Marrero asked Mr. Ergen if T-Mobile will "work competitively within the rules to try to push [Dish] out of business," to which Mr. Ergen responded "I think they'll try."[44] In response to Dr. Shapiro testifying that Dish "won't have autonomy and independence" in its relationship with New T-Mobile, Judge Marrero asked Shapiro "[y]ou're saying there is a built-in conflict of interest?"[45] To which Dr. Shapiro replied, "[y]es, exactly, to which I translate as muted incentives to compete because I am thinking about competition."[46] This exchange highlights the contradiction inherent in the DOJ's

---

[41]. Axelrod Decl. Ex. E at 206:21-25 – 207:1-2 ("Q: And when you said that you only had 80 million customers, you were saying that wasn't sufficient scale, correct? A: Yes. Q: So you think that a national wireless carrier in the U.S., to successfully compete, needs to have more than 80 million customers? A: That's correct, yes.").

[42]. Axelrod Decl. Ex. F at 712:17-21.

[43]. Axelrod Decl. Ex. B at 1716: 13-14.

[44]. *Id.* at 1721:23-25 – 1722:1.

[45]. Axelrod Decl. Ex. F at 714:21-24.

[46]. *Id.* at 714:25 -715:1.

Final Proposed Judgment: the merging parties' incentives and the DOJ's hopes for Dish's eventual emergence as a full-fledged competitor are at odds with each other.

## 2.CONCLUSION

The DOJ-brokered access arrangement, as acknowledged by T-Mobile's lawyer in his closing argument in the States' Case, is for Dish the "most advantageous wholesale arrangement in the history of the industry."[47] It is not clear how awarding Dish such a generous access arrangement would nudge Dish in the direction of building out its spectrum; if anything, it could do the opposite, giving Dish an added incentive *not* to build out. Nor would it solve the "conflict of interest" identified by Judge Marrero.

The conclusions of Amici in the initial Comment to the DOJ—that the DOJ's proposed remedy in its Proposed Final Judgment cannot reasonably be expected to restore the level of pre-merger competition in wireless markets—remain valid and are further strengthened by evidence that has appeared in the States' Case. Amici urge this Court to consider this disconnect between the serious competitive concerns expressed in the DOJ Complaint and the Proposed Final Judgment. Amici respectfully request this Court to reject the latter as not plausibly adequate to remedy those concerns.

Dated: January 24, 2020
New York, New York

Respectfully submitted,

BEINS AXELROD

/s/ Jonathan G. Axelrod

---

[47]. Capitol Forum, T-*Mobile/Sprint: States, Carriers Clash on Caselaw, Efficiencies, Dish Remedy During Closing Arguments*, Jan. 16, 2020, *available at* https://thecapitolforum.cmail19.com/t/ViewEmail/j/D8412D3DEB2594BA2540EF23F30FEDE D/A39F287382D2114516B21F2806CB3AEB (quoting T-Mobile's attorney in closing arguments).

Jonathan G. Axelrod (D.C. Bar No. 210245)
1717 K Street, NW
Washington, DC 20006
212-328-7222
jaxelrod@beinsaxelrod.com

WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP

Fred T. Isquith
Veronica Bosco
270 Madison Avenue
New York, New York 10016
212-545-4600
isquith@whafh.com
bosco@whafh.com

*Counsel for Amici Curiae*


Lawrence J. White
Nicholas Economides
John Kwoka
Thomas Philippon
Robert Seamans
Hal Singer
Marshall Steinbaum
44 West Fourth Street, 7-65
New York, NY 10012
212-998-0880
lwhite@stern.nyu.edu

*Amici Curiae*

12

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)</u>

I certify that on this day, the foregoing Amici Curiae Brief complies with applicable rules and orders because it does not exceed 20 pages in length and contains 3,604 words, as determined by the word-counting feature of Microsoft Word.

/s/ Jonathan G. Axelrod
Jonathan G. Axelrod

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this day, I filed the foregoing Amici Curiae Brief with the Court via its Electronic Case Filing (ECF) system, which will send notification of filing to the counsel of record as identified on the Notice of Electronic Filing (NEF).

/s/ Jonathan G. Axelrod
Jonathan G. Axelrod