# EXHIBIT A

JCKTSTA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
STATE OF NEW YORK, *et al.*,

                    Plaintiffs,              New York, N.Y.

               v.                            19 Civ. 5434(VM)

DEUTSCHE TELEKOM AG, *et al.*,

                    Defendants.
------------------------------x

                                             December 20, 2019
                                             9:05 a.m.

Before:

                    HON. VICTOR MARRERO,

                                             District Judge

                         APPEARANCES

MUNGER, TOLLES & OLSON LLP
     Attorneys for Plaintiffs State of California
BY:  GLENN POMERANTZ
     KURUVILLA JOSEPH OLASA
     KYLE W. MACH

STATE OF CALIFORNIA
Department of Justice
Office of the Attorney General
     Attorneys for  State of California
BY:  PAULA L. BLIZZARD

STATE OF NEW YORK
Office of the Attorney General
     Attorneys for State of New York
BY:  ELINOR R. HOFFMANN
     BEAU W. BUFFIER

discuss with your Honor that I think we agree -- Mr. Gelfand and I agreed we should defer that until after we get the witnesses on and off the stand and then take up these other issues afterwards.

THE COURT:  Sure.

MR. POMERANTZ:  Your Honor, we call Professor Scott Morton as our next witness.

FIONA SCOTT MORTON,
     called as a witness by the Plaintiffs,
     having been duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. POMERANTZ:

THE COURT:  State your name and spell it for the record.

THE WITNESS:  Fiona Scott Morton, F-I-O-N-A  S-C-O-T-T M-O-R-T-O-N.

THE COURT:  All right.  Mr. Pomerantz, yesterday you gave us an estimate of your time with this witness, can we have your reconsidered estimate?

MR. POMERANTZ:  Shorter.  I hate to predict, but I think it will be shorter than the estimate I gave.

THE COURT:  Thank you, proceed.

MR. POMERANTZ:  May I approach, your Honor?

THE COURT:  Yes.

Q.  Good morning, Professor Scott Morton.

A.  Good morning.

THE COURT:  Mr. Pomerantz, as has been the practice to date with expert witnesses, the plaintiffs have submitted the curriculum vitae for Professor Scott Morton.  I have reviewed it very closely, and I am persuaded that the witness should be permitted to testify as an expert for the areas in which she has been presented.  Is there any objections from defendants on this score?

MR. GELFAND:  Yes, your Honor, we object not because of the qualifications, Professor Scott Morton is clearly a qualified economist, but based on the reports that were submitted and what we have learned through deposition and then what we see in the slides that were provided yesterday, it seems clear to us that the areas that she's going to testify about are not really expert areas that she's qualified to talk about.  So that's point one.

Point two is that a piece of it, really half of it, so I think they're proffering her to talk about a critique of our efficiency calculations, and her opinion about that is based entirely -- well, not entirely, there are a couple of pieces that are not, but mostly on the testimony of Dr. Kolodzy who testified yesterday.  Dr. Kolodzy testified that he did sensitivity analyses that you could think about maybe the model could have done this or could have done that, but every time he was asked a question is this going to happen, what is your

opinion about whether this value is correct or not, do you know the right value, is this technology going to be employed by the parties, every time he was asked that question, your Honor, he said I don't know, I'm simply presenting scenarios or possibilities, however he worded it, and he gave no opinion as to any of these technologies being employed by the companies, what the values of those technologies would be, whether there's going to be any spectrum available.

And I'm sure Professor Scott Morton will readily admit she's not an expert in engineering or in wireless networks, she has to rely on Dr. Kolodzy. But given Dr. Kolodzy's waffling and inability to make any predictions, I don't think it's a proper basis under Rule 703 for Professor Scott Morton to rely on. So that's going to be half of our objections.

The other half is I believe she's going to testify unless the examination has been modified, about the likelihood that DISH is going to be successful and reach a certain amount of competitiveness or something like that. That's really not in her bailiwick, your Honor, she has no experience reviewing business plans and predicting whether a business plan and wireless industry is going to succeed or not. She hasn't done any analysis of cash flow or net present value or anything like that.

I think she is going to give her views, I have no doubt about that, that DISH has got risks, maybe they won't do

this, maybe they won't do that, but that's in the Court's realm, your Honor, that doesn't help the Court to give opinions to the Court about how you can think about, for example, the fact that DISH has in the past supposedly missed a deadline or two when they were dealing with the FCC on other licenses.

So I apologize for the long speech, your Honor, I just want to make clear that we don't agree that any of the testimony that's about to be provided is either within her expertise or is supported by a valid basis under Rule 703.

THE COURT:  Thank you.

Mr. Pomerantz, briefly.

MR. POMERANTZ:  Yes.  I think what your Honor will see is that what Professor Scott Morton is doing is responding precisely to what Professor Katz did in his efficiencies analysis.  Professor Katz takes inputs from engineering people at T-Mobile, and particularly Mr. Kapoor, and then he does some additional analysis with those inputs to come up with his calculations of efficiencies.  Professor Scott Morton will directly respond to that by taking alternative inputs that she received from Dr. Kolodzy and then responding to what Professor Katz did.

In addition, she will look at some of the assumptions that Professor Katz had to rely upon to reach his efficiencies calculations and assess whether those were reasonable or not in view of:  Are they the kind of assumptions that economists

would reasonably rely on?  This is directly responsive to what Professor Katz testified to, and there is as similar a relationship between Professor Katz and Mr. Kapoor as there is between Professor Scott Morton and Dr. Kolodzy.  So I think what your Honor will find is this is directly responsive and appropriate testimony from a trained economist.

With respect to DISH, I think your Honor will see that we have a very narrow set of questions that are designed only with respect to what an economist would view the potential entry of a company like DISH into this particular market, and the kind -- the way that an economist would look at a remedy that creates the kind of entanglements that we see here.

A lot of things that Mr. Gelfand was referring to are not part of this examination.  And I would ask that we be allowed to proceed, if he has an objection to a particular question or to a particular exhibit or demonstrative, we could take it up at the time, but I think your Honor will find that this is directly responsive to what they did.

THE COURT:  All right.  Thank you.  Let's proceed with the examination.  I already indicated yesterday that I have some skepticism about some of the proffered testimony as it relates to DISH.  To the extent that they are based on economic considerations and properly within the scope of economists, I have no problem with that.  To the extent it goes into speculations and predictions about whether or not DISH will be

operationally successful, I think that that would cross the line, so let's proceed.

MR. POMERANTZ:  Thank you, your Honor.  I think you will find, by the way, if this goes 90 minutes or so, about 80 of those minutes will be on topics other than DISH and ten minutes or less will be on DISH.

THE COURT:  Whether it's only ten minutes, if it's inappropriate, it's still inappropriate.

MR. POMERANTZ:  Fair point, and accepted.

BY MR. POMERANTZ:

Q.  Professor Scott Morton, in preparing for your testimony today, did you create some slides to help describe your opinions?

A.  Yes, I did.

Q.  So let's go to the next slide.

Could you briefly describe to the Court what is are reflected on this slide.

A.  Yes.  My assignment today is to evaluate Professor Katz's efficiency claims, and these fall into three buckets:  Network costs -- that's the cost of building the network -- speed, and a small bucket of non-network costs.  I'm also going to evaluate the competitive impact of DISH's proposed entry as a facilities-based carrier.

Q.  And what are your bottom line conclusions?

A.  My bottom line conclusions are that Professor Katz's

efficiency claims are neither merger specific nor are they verifiable, that Professor Katz's estimate of how much consumers value additional speed is unreliable, and that DISH's entry would not be, under the merger guidelines description of timely, likely and sufficient to replace the competitive significance of Sprint.

Q. Now in analyzing the various information you considered to come up with these opinions, did you prepare reports of your analysis and opinions?

A. Yes, I did, two reports, they're quite lengthy, and I am happy to say we won't be going through most of that material today.

MR. POMERANTZ: Your Honor, I have placed the reports in front of Professor Scott Morton in the event she needs to refer to them during my examination or Mr. Gelfand's. I think your Honor has a copy of them as well. We're not offering them into evidence, I think they're there to assist the examination.

Q. We're going to go through some of your analysis in a little bit of detail, but at a high level, what framework did you apply to reach the opinions you reached in this matter?

A. At a high level what we're interested in in efficiencies is whether the efficiencies are cognizable. Under the merger guidelines, efficiencies have to be cognizable, which means they're verifiable and merger specific, in order to offset any anticompetitive harm.

Q.   What information did you rely upon to in order to reach your opinions?

A.   The information I relied upon was my own training and experience in conducting economic analysis in both the public and private sector, the academic literature in this area, the record in the case, of course I relied on Dr. Kolodzy for some engineering inputs.  And as my charge was to evaluate Professor Katz's efficiencies, I spent a good deal of time with his model.

Q.   When you say reviewed the record in this case, did you review documents created by T-Mobile or Sprint that were created during the ordinary course of their business activities?

A.   Yes, I did.

Q.   And are those kinds of documents helpful to an economist in evaluating something like efficiencies?

A.   Yes, they are.

Q.   Why are they?

A.   They're helpful because they're in some sense market tested, they're reflective of behavior that the firm has actually carried out in the marketplace, and therefore, it's possible to see that that's a reliable way of understanding competition or the industry practices.

Q.   Now sometimes parties that want to merge create documents for purposes of regulatory review or on occasion court

proceedings.  Would an economist typically rely on those as well?

A.  Yes, an economist would.  When the document or model that's been created in the course of regulatory review comes up, it's subjected to more scrutiny because it hasn't been market tested.  And so an economist needs to look to see whether it is consistent with ordinary course documents, it's consistent with economic principles and so forth.

MR. GELFAND:  Objection, your Honor, this is exactly what I was talking about.  Your Honor knows how to look at documents that were created in different contexts and evaluate their credibility.  Professor Scott Morton's entire report was created with the idea with this litigation in mind.  It is not within the purview of an economist to tell the Court how to judge the credibility of documents that were created with a merger in mind versus ordinary course business documents.  So that would be an example where I just don't think the testimony is of assistance to the Court.

THE COURT:  Thank you.  Overruled.

MR. POMERANTZ:  Your Honor, if you want me to respond.

THE COURT:  No, let's proceed.  But the Court acknowledges that there are going to be lots of areas here where the testimony is going to be close to the line, just be aware that I am aware.

MR. POMERANTZ:  Thank you, your Honor.

BY MR. POMERANTZ:

Q. Let's turn to efficiencies. From an economist perspective, what is an efficiency?

A. An efficiency is something that the merging parties can do that enhances competition and helps consumers.

Q. And so the merger guidelines that the Court has seen on a number of occasions from both sides' experts discuss efficiencies. How does an economist evaluate merger efficiencies?

A. As I mentioned before, and this document details, cognizable efficiencies, those that are allowed to offset the anticompetitive harm, are merger specific, that arise from the merger itself, and they have to be verifiable.

Q. What does an economist mean when he or she says that an efficiency is merger specific?

A. Professor Katz covered this also. It has to be an efficiency that is achievable through the merger itself and not something that the standalone firms can do on their own.

Q. And are benefits that arise due to technological developments, are those merger specific efficiencies?

        MR. GELFAND: Objection vague, lack of foundation.

        THE COURT: Lay a foundation. Clarify the question.

Q. Can technological developments be merger specific efficiencies?

A. Merger specific efficiencies have to occur because of the

merger and not something that would happen anyway.  So if technological developments are occurring and they're not caused by the merger, standalone firms will have them also.  So a merger specific efficiency, in terms of technological developments, has that to be caused by the merger.

Q.  And how do you determine whether an improvement or benefit is merger specific in an industry where technology is constantly improving?

A.  I think I have a demonstrative for that.  It's again something that Professor Katz covered.  The issue is not whether you look at the standalone firms today and the combined firm tomorrow.  If technology is moving along, then you need to look at apples-to-apples comparison, which is the firms tomorrow and the combined firm tomorrow.

Q.  So I think what you are referring to, and I was a little slow on the uptake here, is this slide and the next slide.  So if you could explain to the Court what is happening here.

A.  Yes, we could look at T-Mobile and Sprint today, and they have certain speeds and capacity and technology.  And if we compared that to new T-Mobile in the future, new T-Mobile in the future will be much better, it will have 5G and different kinds of handsets and capabilities, but that would not be the appropriate way to think about efficiencies.  What we really need to do is move T-Mobile and Sprint into the future also so we're comparing apples to apples; all three entities have

access to the same technology and are in the same year with the same state of technology.

Q.   So we have just discussed merger specificity.  Now you also said that efficiencies have to be verifiable.  Again, what does an economist mean when he or she says that an efficiency has to be verifiable?

A.   As the horizontal merger guidelines say, efficiencies can't be vague or speculative, we have to be able to verify them by reasonable means using our economist tool kit and available evidence.

Q.   So now let's turn to the efficiencies that Professor Katz has claimed in this matter.  Could you briefly explain, using this chart, what efficiencies are claimed by Dr. Katz in his testimony?

MR. GELFAND:  Your Honor, we object to this for the following reasons:  We looked at this last night.  We can't figure out what it is.  It cites to three different tables in Dr. Katz's report which have a variety of numbers, some are low bound of efficiencies, some high bound of efficiencies.  Plaintiffs put no numbers on this graph.  We have no way to determine whether this is the low bound, the upper bound, the middle bound.  We just can't figure it out.  And it certainly does not reflect the information in a fair way that is in the tables that are cited.

I also point out this was never presented in Professor

Scott Morton's report, it's been produced for the first time for us yesterday, and therefore, we think it's a meaningless demonstrative exhibit that's of no assistance.

THE COURT:  Mr. Gelfand, you will have sufficient opportunity during your cross to examine all of these questions.  And I think if you object now to every item that is going to be coming up, we're going to be here all day, so I think it's better if you reserve your concerns for your cross-examination.  Again, I'm sensitive to the issues that you raise.  To the extent you have questions about what the document means, the witness is here to explain, and you will have your chance to challenge.

MR. GELFAND:  I appreciate that, your Honor, but I do think I need to point out to the Court when we're objecting as the documents come up.  I will keep them short.

BY MR. POMERANTZ:

Q.  What efficiencies has Professor Katz claimed in his analysis and testimony here in this courtroom?

A.  These are the efficiencies that Professor Katz has calculated.  They fall, as I said, into three buckets, speed, cost of the network, and non-network cost efficiencies, and he calculated them over time through 2024.

Q.  Did you and your team put together this chart?

A.  Yes, we added up the numbers from Professor Katz's report.

Q.  Based on your review of Professor Katz's reports and the

tables cited, do you believe that these graphs accurately reflect both the time period in which Professor Katz predicts the efficiencies will occur and the amount of the efficiencies divided up into three categories?

MR. GELFAND:  Object to question, your Honor.  It doesn't make any sense.  It can't possibly reflect it when the tables that are cited have different values.  It doesn't say what values are being used.  I apologize, your Honor.

MR. POMERANTZ:  Your Honor, that is exactly what cross-examination is all about.

THE COURT:  I agree.  Let's proceed.

Q.  Do you remember the question?

A.  I think it was about accuracy.  I believe these were taken from Professor Katz, and it was his number I'm reflecting here.

Q.  Now the little red bar down at the bottom which refers to non-network cost efficiencies, do we have any plans of going through that today?

A.  We do not.

Q.  All right.  So are the efficiencies that Professor Katz has claimed the same every year across the five-year period that he examined?

A.  No, they grow over time.

Q.  Is it relevant to your analysis when the efficiencies are predicted to occur?

A.  Yes, it is.  It is relevant because, as the merger

guidelines say, delayed benefits from efficiencies are given less weight. Why is that? They're further in the future, and they're inherently more difficult to predict, they're inherently more speculative as we go out in time.

Q. So I want to first focus on the network cost efficiencies component of Professor Katz's testimony here. Does Professor Katz provide a model with a calculation of these efficiencies?

A. Yes, he does.

Q. What is that model based on that?

A. That model is based on, originally, T-Mobile's 4G congestion planning model, augmented. I believe Professor Katz and Compass Lexecon helped T-Mobile build a 5G module and include some Sprint analysis.

Q. And did you evaluate the economic results of Professor Katz's model?

A. Yes, I did.

Q. So let's turn to the next slide. What does Professor Katz's model predict regarding the economics of the standalone firms and the merged firm?

A. What his model predicts is that the standalone firms will have dramatically higher per subscriber per month cost of marginal cost of capacity relative to the combined firm.

Q. And I am not sure if we have it on this slide, but is this for a particular year that Professor Katz analyzes?

A. I believe so.

Q.   And do you recall if that's 2024?

A.   I think so, yes.

Q.   And so for T-Mobile, he predicts that the marginal costs for the standalone and T-Mobile will be about 25 times greater than the merged firm?

A.   That's correct.

Q.   And for Sprint he predicts it will be -- the standalone Sprint will have about 11 times greater marginal costs than the merged firm?

A.   That's correct.

Q.   Now we heard a lot of testimony about Sprint's current situation, financially and competitively, compared to T-Mobile's.  But Professor Katz predicts that the standalone T-Mobile will have much higher network costs in the future than standalone Sprint.  Do you understand why Professor Katz reaches that result?

A.   Yes, I do.  Sprint doesn't have a capacity problem, they have less coverage.  That's the reason that people are concerned about, well, how their competitive position is described.  T-Mobile needs access to more capacity.  And this model generates, in my opinion, a very unrealistic path forward for T-Mobile.

         MR. GELFAND:  Objection, your Honor, there's no foundation for her to give an opinion about whether that is unrealistic or not.  This is outside her area of expertise.

JCKTSTA1                        Scott Morton - Direct

THE COURT:  Overruled.

Q.  So let's look at the T-Mobile side of this chart.  What is driving the difference in cost between new T-Mobile and standalone T-Mobile?  Is there a big drop in new T-Mobile's costs after the merger?

A.  The primary factor that's creating this enormous difference is the rising cost of standalone T-Mobile.

Q.  I think Professor Katz covered this in some detail, so I don't think we need to, but could you briefly describe how Professor Katz arrives at the numbers we see here for new T-Mobile, T-Mobile and Sprint?

A.  Yes, he takes his congestion model and he has a baseline of what the network looks like, he expands to 90 percent of demand and then again to 100 percent of demand.  The engineers give him the solutions for 90 and 100, and he subtracts, takes the difference, and values that.  That gives him an economic measure of the marginal cost of the network capacity, and I agree with Professor Katz that that is a good way to think about marginal costs.

Q.  So I take it that your testimony is going to be that there is some flaws in the analysis we see that are reflected on the screen right now?

A.  That's correct.

Q.  And those flaws primarily relate to the large costs for the standalone firms.

A.   That's correct.

Q.   So let's go and look at those flaws.  We heard some testimony yesterday from Dr. Kolodzy about the way the model works on a site-by-site level.  Did you read that or hear that?

A.   Yes, I did.

Q.   So I want to focus on the economic implications of that. Let me go to the next slide.

What does this slide describe about the economic implications of the model that the defendants are relying on for their efficiencies defense here?

A.   What it shows is that the choices that a carrier has to give itself more capacity are only partially reflected in the model.  Dr. Kolodzy described what the model recommends in the top half of this demonstrative, spectrum overlays, small cells, cell splits, that kind of thing.  The model does not have as a choice that the standalone firm can go out and purchase new spectrum, that they could deploy new technology, that they could increase the amount of refarming of spectrum over from 4G to 5G, that they could develop partnerships like the one Sprint has with Altice, none of these options are contained in the network congestion model.

Q.   And why do these kinds of restrictions or limitations on the model matter from an economic perspective?

A.   They're very important from an economic perspective because limiting the standalone firms from, for example, buying

spectrum or using new technology in a dynamic industry essentially freezes them.  So they're stuck with what they have in 2019 and they aren't able to go through to 2024 and buy spectrum or deploy new technology.  And this is not an economically sensible approach because in the ordinary course, we see that indeed firms do that.

Q.   How does freezing the standalone firms affect costs that are then generated by the model, that's that skyrocketing cost that we saw on the prior slide.

A.   Because the model only gives standalone firms to access to about half of the options that they need, they're constrained, and that means that their costs go up in a very dramatic way because they do not have access to other less costly options.

Q.   So I want to go first to the first restriction that the defendants have placed on their model, the restriction about the standalone firms not being able to purchase new spectrum. I don't want to go into the factual predicate for that, several witnesses have done that, including Dr. Kolodzy yesterday.  Did you evaluate what happens from an economic perspective if you actually added spectrum to the standalone firm's options?

A.   Yes, I did.  If you add spectrum to the standalone firm's options, their marginal cost of capacity drops dramatically.

Q.   In this particular area, what analysis did Dr. Kolodzy do that you relied upon to make these economic calculations?

A.   Dr. Kolodzy took spectrum and he added it to the congestion

model and calculated the solutions that would be needed to meet demand with that extra spectrum in place.  What I am doing is taking Professor Katz's economic model and using those solutions and valuing them to obtain the marginal covelets of increased capacity.

Q.  So if you could use this slide that I just put on, slide 15 here, to explain your part of that analysis.  What did you do with the information that had been provided to you?

A.  So Professor Katz's economic model lets him take the output from the engineers and calculate this marginal cost of capacity.  And you see that the blue bars represent his answers.  When I take Dr. Kolodzy's engineering solutions and I place them in that same economic model, you can see that the marginal costs of capacity drops dramatically.  The light green is adding 10 megahertz of spectrum and the gray is adding 30 megahertz of spectrum.

Q.  Let's take one example so we're clear what this chart reflects.  Let's take 2022.  Could you go through the three bars in 2022 and explain to the Court what this chart reflects?

A.  Yes.  So the $6.21 again is Professor Katz's output, what he calculates from Mr. Kapoor's solutions.  Then if we add 10 megahertz of spectrum and give that to standalone T-Mobile, we imagine that they bought it, for example, then Dr. Kolodzy calculates what congestion release solutions would be needed, and I put that in the model and I get $1.60 as the marginal

JCKTSTA1                        Scott Morton - Direct

cost per subscriber per month.  If you increase that to 30 megahertz, you see the marginal costs difference drops dramatically down to 40 cents.

Q.  And from the materials that you have reviewed, is 10 megahertz of spectrum a lot of spectrum for a wireless carrier like T-Mobile?

A.  Well, I know that T-Mobile has 100 megahertz today, so that's about a ten percent increase.

Q.  Now as an economist, does this slide reveal a problem with the way that Professor Katz has calculated marginal costs and his efficiencies?

MR. GELFAND:  Objection, your Honor.  There's no basis to say there's a problem because there's no evidence in the record that either the 10 megahertz or the 30 megahertz scenarios are realistic, and there's no evidence in record about what that is or how that should be involved.

THE COURT:  If you have any questions, Mr. Gelfand, you can put that in your bucket of questions for the witness.

MR. GELFAND:  It's an ever-increasing bucket, your Honor.

BY MR. POMERANTZ:

Q.  Do you have the question in mind, Professor Scott Morton?

A.  I think do.  This is a fundamental problem with the economic model because it rules out ordinary business decisions that we see in the real world.

Q.   Could you give us an example to explain why this is a problem?

A.   Suppose you ask me to model Starbucks going forward to 2024, but you told me that I had to eliminate the possibility that Starbucks could build new stores.  Now more people want coffee, and we get long lines at the Starbucks stores because I'm not allowed to let Starbucks build more stores.  And this is something that is contradicted by what Starbucks is actually doing, and that is important to include in an economic model what the firms are actually doing.

Q.   And do economists look at what firms are actually doing in order to try to model what they might do in the future?

A.   Yes, they do.

Q.   So I don't want you to go over this document at all, because this is something that I believe both Professor Katz reviewed in his testimony and that Dr. Kolodzy reviewed in his. Is this a document that you did rely on in your evaluation of Professor Katz's economic analysis?

A.   Yes, it is.

Q.   Why did you find this document informative?

A.   Because it shows an ordinary course pattern of T-Mobile purchasing spectrum over many years.

Q.   Now the Court has heard T-Mobile witnesses come in and testify about other sources of spectrum.  Have you either heard or read some of that testimony?

A.  Yes, I have.

Q.  Let me put one example on the screen, this is Mr. Höttges. Does Professor Katz's economic analysis allow for the possibility that T-Mobile could lease spectrum from anyone, whether it be DISH or anyone else?

A.  No, it does not.

Q.  And let me put another document on here.  This is a document that you relied on in your analysis of Professor Katz's model.  How did this document inform your analysis of the reliability of Professor Katz's efficiencies analysis?

A.  Well, we have seen this kind of assumption of no ability to get spectrum before.  This is a document from the AT&T/T-Mobile merger where again the parties say we're going to assume we can't get any spectrum and that's the reason that we have to merge.

Q.  And what actually happened after this 2011 merger?  Did AT&T and T-Mobile obtain more spectrum?

A.  Yes, they did.

        MR. POMERANTZ:  And for the record, that's Exhibit 211.

Q.  So now let's turn not to the assumption about no spectrum for the standalone firms but to other assumptions that are in Professor Katz's model.  Did you test Professor Katz's analysis to see how it reacts to changes in these other assumptions that we put on the screen?

JCKTSTA1                    Scott Morton - Direct

A.   Yes, I did.

Q.   And you've divided the assumptions into two different categories, is that right?

A.   Yes, one category is assumptions about the kinds of technology that the standalone firms could deploy, could they deploy dynamic spectrum sharing, millimeter wave, spectral efficiency, this kind of thing.

        The other category is demand assumptions, how quickly, for example, will people purchase 5G handsets.

Q.   Where did Professor Katz get his inputs that fed into the these assumptions?

A.   I believe he obtained his technology inputs from Mr. Kapoor.

Q.   And did you use alternative inputs to test these assumptions?

A.   Yes, my inputs for these assumptions come from Dr. Kolodzy again.

Q.   So when you use the alternative assumptions that were provided to you by Dr. Kolodzy, does this chart reflect what you found?

A.   Yes, it does.

Q.   Could you briefly explain what this chart reflects.

A.   Yes.  You can see, your Honor, in the solid bars for both Sprint and then T-Mobile the output of Professor Katz's calculations, what the marginal cost of capacity would be for

the standalone firms, and then in black we have the combined firm.

If you change the assumptions to those that Dr. Kolodzy talked about yesterday in terms of access to technology and adoption of 5G, and you can calculate the marginal cost of capacity again, you get the hashed bars, and you will notice that they are considerably lower than the solid bars.  So Sprint's marginal costs drop by a lot and T-Mobile's drop really dramatically.

This means that if we were to look at the efficiencies from the merger and we were to use the hashed bars, we would see that the combined firm has very low marginal cost and so does T-Mobile, and Sprint's are a little bit bigger.  So the difference between the combined firm and the standalone firm has really shrunk because the hashed bars are close to the same height.

MR. GELFAND:  Sorry, your Honor, I know I'm trying the Court's patience, but this came from Professor Scott Morton's report, it reflects a lot more than what Dr. Kolodzy testified to yesterday, I will talk about that in cross-examination, but we object to this demonstrative as not accurately reflecting --

THE COURT:  You want to do your cross-examination now, it may save some time?

MR. GELFAND:  Thank you, your Honor.

THE COURT:  Yes.

BY MR. POMERANTZ:

Q.  So you just testified about the difference between the hash lines for standalone Sprint and standalone T-Mobile versus the hash lines for new T-Mobile over on the right side of the screen.

A.  That's correct.

Q.  Does the difference between the new T-Mobile hash line boxes and the standalone ones, does that matter to an efficiencies analysis?

A.  It does, because the point of a merger-specific efficiency is something that the merged firm can obtain uniquely and the standalone firms cannot.  But if the standalone firms have access to spectrum and technology and the other things that Dr. Kolodzy analyzed, then they actually can achieve quite a lot of efficiencies as standalone firms.

Q.  And we previously discussed spectrum in the earlier part of this examination.  Does this chart that's in front of the Court right now, which is figure 39 from your rebuttal report, slide 20, does this make any assumptions about spectrum availability?

A.  No, it does not.  The first chart we looked at was solely about adding spectrum and what that would do to the claimed efficiencies.  This chart is other technologies and demand assumptions.  And so the two are actually not overlapping.

Q.  Now are the numbers you present in this graph a corrected efficiencies number that the Court should accept?

A.  No, this is actually not correct efficiencies because, for example, Professor Katz's model is not designed to go out this far.  And it's inherently asking the wrong question because it's leaving out partnership with Altice and leaving out things like the combination of partnerships with Altice spectrum and all the technology improvements that you would want to do together in a good model.

Q.  Do your conclusions about the model that defendants have offered in this case depend on Dr. Kolodzy's revised inputs for technology and spectrum?

A.  I'm using them to illustrate that the model is very sensitive, so the answer to the model gives you is really different if you put in spectrum or put in the technology changes.  I am not taking a position that one of these is the right answer, that's something nobody can know in 2024, but if we're thinking about how reliable are the efficiencies and are they speculative, it's important to understand whether they change a lot when the inputs change.  And what my graph shows is when you change the inputs, you get a really big change in the efficiencies.

Q.  All right.  Now the way this process worked in this case is that the merging parties came up with their explanation of efficiencies then you analyzed that and responded.  Is that a common approach for antitrust economists who evaluate mergers?

MR. GELFAND:  Objection, your Honor, that's asking a

for a legal conclusion about how these cases are litigated.

THE COURT:  Rephrase the question.

Q.  Let me go to here.  We're on the horizontal merger guidelines.  Does an economist approach an analysis of merger efficiencies by first trying to find out what the merging parties plan to do with the merged assets?

A.  Yes.  As you can see from the horizontal merger guidelines, the standard practice is it's incumbent upon the merging firms to substantiate the efficiency claims.  And that is just logical because it's only the merging firms who know what they plan to do; they know if they plan to close a factory or produce a new product.  They have some plans of how they're going to use the assets that they're getting.

Q.  I want to turn to a different subject.  I put on the screen testimony from Professor Katz about whether the model that he is using is a part of the ordinary course of the company's business.  Do you see that?

A.  I do.

Q.  Let's first focus on why we're even talking about whether this model is or is not in the ordinary course.  Why does that matter?

A.  It matters to an economist, again, because ordinary course documents, models, whatever they may be, are market tested.  If they're actually being used by companies, then we know that they reflect the industry and competition.  When they're not

ordinary course, if they're developed just for regulatory review, then they're subject to a higher degree of scrutiny because we don't know that the market has tested them.  We're going to compare them to ordinary course documents, we're going to compare them to economic analysis.

Q.  And I've put on the screen section 10 from the merger guidelines.  Is the principle that you just articulated set forth in the merger guidelines themselves?

A.  Yes, it is.  It's not that efficiencies sort of brought forward in the merger process are disregarded, they're regarded by an economist, but they're viewed more skeptically because they have not met that market test of actually being used in practice.

Q.  And why does it matter in this particular case whether T-Mobile's model is used in the ordinary course in the same way that Professor Katz and the defendants are using it in this case?

A.  Well, the economics of the model really depend -- you saw, your Honor, that the efficiencies went out to 2024.  In the ordinary course, this network congestion model that T-Mobile had for LTE was not used to make network improvements five years in the future.  Mr. Kapoor and others have said the model is rerun every year and it's a short-run model.  So this is one of the reasons why an economist would not want to use a model that was not actually functioning as a long-run model to

calculate long-run efficiencies.

Secondly, that model wasn't used for 5G at all, and here we have a major shift in the industry toward 5G, and the model is predicting 5G in 2024 and it's never been used for that.

Q. And has T-Mobile itself previously described this model as not being an ordinary course model?

A. Yes, they have.

Q. And could you explain to the Court what's on the screen.

A. Yes.  This is a letter that T-Mobile sent to the Department of Justice explaining that the 5G engineering model was not developed in the ordinary course by T-Mobile because they didn't have any 5G network so they didn't need a model to plan congestion on it.  And in particular, the T-Mobile counsel say that any model created in the ordinary course would not have attempted to model as far into the future, and that makes sense, given what we heard from Mr. Kapoor.

Q. So this letter from T-Mobile's counsel to the Department of Justice makes exactly the two points that you made, that the model was not used for 5G and it was not used to model that far out in the future?

A. That's correct.

MR. GELFAND:  Objection, your Honor.

THE COURT:  I think that went over the top, Mr. Pomerantz.

Q.  From your perspective as an economist, why does it matter that the model used by Professor Katz was not used in the ordinary course at T-Mobile either for 5G or to predict four to five years out in the future?

A.  Because then we need to understand -- he has these very extreme assumptions that generate really high costs for the standalone firms, and if this is not an ordinary course model, then there needs to be some economic explanation for why those assumptions are a good idea, why they're reasonable.

Q.  So we have been focusing on T-Mobile, let's talk about Sprint.  Could you talk about the testimony from Mr. Saw in his deposition and how that relates to your considerations of the ordinary course use of this model.

A.  Yes.  Professor Katz is using the model for Sprint's congestion, but Sprint did not have a congestion model because they didn't have a congestion problem.  And we can see here that Mr. Saw from Sprint says we don't have plans to use a model like this because we don't have a congestion challenge.  So the model is not representing Sprint's ordinary course activities.

Q.  So what is your conclusion about Professor Katz's model that he uses to analyze network efficiencies?

A.  The model is not reliable.  It does not address what the standalone firms could do.  It artificially constrains the standalone firms, and therefore the results are neither merger

JCKTSTA1                         Scott Morton - Direct

specific nor are they verifiable.

Q.  All right.  So now let's turn to the other component of efficiencies that Professor Katz addresses, which is network speed efficiencies.  Did you also analyze this claim?

A.  Yes, I did.

Q.  To make sure we're all on the same page, what improved speeds are we talking about here?

A.  We're talking again about the merger-specific improved speeds.  Professor Katz's model gives him speeds for the standalone firms and speed for the combined firms, and the merger-specific increase is the difference between those two.

Q.  So let's look at the components of Professor Katz's analysis.  How does Professor Katz go about calculating the network speed efficiencies in this case?

A.  Two inputs.  One is the additional speeds that I just mentioned predicted by the model as comparing the standalone firms and the combined firm, and then he needs a way to figure out how much consumers value that additional speed, and he uses an estimate from research article in the economics literature to do that.

Q.  Now you were just previously describing the model that he used and the concerns you have about whether the mergers are -- the efficiencies are merger specific or verifiable.  Is it the same model that he uses to take his input on additional speeds?

A.  That's correct.  Congestion and speed are closely related

JCKTSTA1                    Scott Morton – Direct

in that model, so if you have higher congestion you have lower speed, and that's the model that is generating the speeds used here.

Q.   And the concerns that you just raised in your prior testimony, are those same concerns raised with respect to speed as well?

A.   They are.

Q.   So let's now go to the second box at the bottom here, which is the value of additional speed, and you say from the Nevo article.  Do you see that?

A.   I do.

Q.   That's Professor Katz's contribution to the calculation of network speed efficiencies, correct?

A.   He's going to use information from that article to attempt to value the merger-specific speed increases, yes.

Q.   Do you believe he has placed a reasonable value on that speed difference?

A.   No.

Q.   And why not?

A.   He is taking a setting with very low speeds and extrapolating out really far in a way that I think is not economically appropriate.

Q.   So let's step back.  Do you think that mobile wireless consumers value faster speed?

A.   Yes, but they value the speed insofar as it lets them do

something.  So it's not that consumers value speed per se, they value user experience, they value the thing they want to do. And if speed lets them do that thing, then the speed is valuable.

Q.  And is there a term in economics for the principle you just articulated?

A.  Yes, it's called derived demand.

Q.  Can you briefly explain the related principle of diminishing marginal returns?

A.  Yes, diminishing marginal returns is a very common economic concept, and it goes to the idea that a consumer gets less value the more they have of something.  So suppose I were to give you a shirt, you might value that; the second shirt perhaps a little bit less.  By the time I gave you the 12th or 13th or 14th shirt, your value for that shirt is starting to go down because you have so many of them.  This is true of almost all goods.  It's just the way consumers behave.

Q.  So let's go to our favorite analogy in this case, and that's cars and roads.  Can you tell us what this chart is showing about diminishing marginal returns and derived demand?

A.  Yes.  So let's imagine that I was driving to work in the first lane on this chart.  There's congestion on that lane and I'm only driving 25 miles an hour.  Let's imagine I'm offered a chance for there to be a second lane, how much would I pay for that second lane on the road?  Well, the second lane lets me go

at 65, that's pretty great, and I'm willing to pay to go at 65.

Now I'm going close to speed that I want to be traveling at, and we could ask:  Does the consumer want to pay for a third or fourth lane of traffic?  And that's the bottom chart.  And the answer is well, what would happen I'm going pretty close to the speed I would like to travel at, maybe the additional lanes lets me get up to 68.  That's a relatively small improvement in my experience, I therefore have a relatively low willingness to pay for incremental lanes of traffic.  So the first lane is very valuable, the second, third and additional lanes are less valuable.  That's diminishing returns.

(Continued on next page)

Q.  And how does this car-and-lane analogy translate to wireless speed for mobile phones?

A.  Well, let's go to the next chart.  Probably the most popular use case that requires speed with a mobile phone is watching video.  High definition video streaming requires a certain speed, and if the user wants to stream high definition video, then she's going to be happier and happier as her speed goes up to that level that she needs to watch the movie.

If the speed is slow, the movie is buffering, it's going the way it's supposed to, and the experience is not very good.  But as the speed gets faster, the movie plays like it's supposed to and that's valuable to the consumer.

Once the consumer is watching the moving like it's supposed to play, additional speed becomes less valuable, perhaps not valuable at all.  The consumer experience is unchanged.  She is watching the movie, that's all good.  And speeds above the level needed to watch the movie no longer have much value to the consumer.  That's diminishing returns. Again, you can see the shape of the curve here.

Q.  Now, we've heard a lot about video streaming in this case already.  What kind of speeds are needed for standard definition video that one may watch today?

A.  Three megabits per second.

MR. GELFAND:  Objection, your Honor, lack of foundation.  She's not an expert on network speeds and

applications.

MR. POMERANTZ:  You Honor, this information comes directly from Professor Scott Morton's report.  We're not making it up here.  She looked into this in order to assess the very principle that she's raising here, which is, at what point do consumers value speed and at what point does that become less of a value to consumers.  It's exactly that point.

THE COURT:  Overruled.

BY MR. POMERANTZ:

Q.  If you could explain this chart and start with the standard definition and high definition video on the left?

A.  So today, there are two levels of video watching that are common and popular in that standard definition, and the more fine, high definition video, more pixels, and the speeds needed for those are three and six megabits per second.

We've heard a little bit in this case about a video format that is not popular now but might be in the future.  That's 4K video.  The speed required for that is about 25 megabits per second.

Q.  And if I recall, I think it was Mr. Kapoor who testified about the number of T-Mobile users who, right now, had the ability to access 4K video; do you recall his testimony?

A.  Yes.  I think he said there were 10,000 handsets out of 80 million that could look at 4K video.

Q.  All right.  Now, according to Professor Katz, what kind of

speeds will be available through the standalone firms in the future?

A.   Here, I show Professor Katz's projected 5G speeds.  We see that in 2021, he's predicting standalone T-Mobile will be at 127 megabits per second, and Sprint at 210 megabits per second, on average.

I did skip over current speeds, which are themselves already well above high definition video, the video format that is popular today.  Those speeds are 31 and 24 and that, as I said, is considerably bigger than six.

Q.   Okay.  So what Professor Katz predicts is that by 2021, standalone T-Mobile's speed will be 127?

A.   Yes.

Q.   And standalone Sprint's will be 210, correct?

A.   Yes.

Q.   Okay.  And what do the two bars on the right reflect?

A.   This is the combined firm in 2021 and then again in 2024, where Professor Katz's model predicts that speeds will be 380 megabits per second and then 660 megabits per second.

Q.   Let's stay with 2021, since we have the comparables from Professor Katz.  So we have standalone T-Mobile at 127, standalone Sprint at 210, and new T-Mobile at 380, correct?

A.   Yes.

Q.   Has Professor Katz identified a reliable way to measure the difference in value to consumers between the standalone Sprint

and T-Mobile numbers and the new T-Mobile number?

A.  No, he has not because these are very high speeds beyond anything anybody is using today.

Q.  All right.  So now, let's go to this chart.  This is a chart that looks at the analysis that Professor Katz did relating to the Nevo article, correct?

A.  Yes, it is.

Q.  And can you explain to the Court what this is reflecting, starting with the left and moving your way right?

A.  Yes.  Your Honor, what is happening in the Nevo article is that those authors have a dataset of home broadband use from 2012; so these are people at home, watching Netflix or similar activities.  And what that paper does is it looks at the value those people place on additional speed.

Now, on the chart, what I've shown is that the average speed in his dataset is 15 megabits per second; so that means only some people are below, some people are above, but the average speed is 15 megabits per second.  And this is a time when multiple devices might be streaming in a household, and the value of speed around 15 could be substantial and, indeed, Dr. Nevo finds evidence that people value speed.

What's then happening is that Professor Katz has standalone Sprint and standalone T-Mobile out here at 222 and 285 in the year 2024, and he is extrapolating the estimate from the 15 megabits per second for home broadband in 2012 to the

difference between the standalone firms and new T-Mobile, which, as you can see, are enormously bigger.  Right?  That's just a whole different category of speed out there.

Q.  And do you believe that that extrapolation by Professor Katz, the way he relied on the Nevo article, is reasonable?

A.  No, I do not.

Q.  And why not?

A.  Because we don't know -- consumers have diminishing returns to speed.  They're able to watch -- the current use case is video.  They're able to watch video at much slower speeds than this.  So it's just unclear how you would value what a consumer would do with the difference between 285 and 660.

We don't know what they're going to do.  It's far in the future.  We don't have any data, and what Professor Katz is doing is taking a 15 megabits estimate and saying, oh, I'll just apply it out here, and I think that there's no economic foundation for doing that.

Q.  And to bring it back to our favorite analogy, where we're looking at the cars and the lanes and you put up a slide, which I won't go back to, but which had speeds at 25 and then 65 and 68, using that analogy, how does that relate to what Professor Katz is doing with the Nevo article?

A.  Suppose that -- so the Nevo paper, article is about the consumer driving at 25 and feeling congested and valuing going up to 65 miles an hour.  And that's, as I said, a valid

JCKPSTA2                      Scott Morton - Direct

exercise, and the consumer does appreciate going from 25 to 65 miles an hour.

When you extrapolate it, however, it's like the consumer is on a 20-lane highway already, and we're going to ask whether the consumer values having another 20 lanes to the 20-lane highway.  And if she's on the 20-lane highway driving 70 already, it's not clear why -- how do you value the additional 20 lanes beyond that.

Q.  And is it fair to say that what Professor Katz failed to do is to consider diminishing marginal returns?

A.  Yes, that's correct.

THE COURT:  Let me interject here for a moment. Beyond the question of whether or not there is an economic model to explain what might happen in the future, what about looking at the reality of what has been transpiring in telecommunications over the last 10, 15 years?

If you go back to the time when a mobile phone was a brick, could you have conceived at that time that that brick, 10 years out, would be showing movies, getting internet, shopping?

THE WITNESS:  Right.

THE COURT:  Do you take that into account?

THE WITNESS:  Yes, I take your point, your Honor.  I think that as time goes forward, this is a dynamic, fast-moving industry, with lots of innovation and something will happen.

There's a lot of reason to think that these speeds will be useful.  A lot of the time in commercial applications, factories, autonomous vehicles and things like that are applications that we've all read about, but that's different than saying I've got an anticompetitive merger, and I'm going to find some cognizable efficiencies.

I have to be able to grasp those.  I have to be able to say what they are and how much consumers value them today in order to say, well, we're sure we're getting this.  The kinds of innovation we're going to get tomorrow is we don't know what it is.  I mean, it will probably be exciting, but could anybody predict exactly what it will be, whether it will be in this market or a market like autonomous vehicles, I think we don't know.

MR. POMERANTZ:  And I'm sorry, your Honor, were you --

THE COURT:  Well, we don't know, but in this field, again, you could look at science fiction and make a prediction that ideas that would have been fiction five years ago are now reality.  You probably don't know about the Dick Tracy watches.

THE WITNESS:  I am a little young for that, your Honor, you're right.  But, yes, I take your point, and I do not disagree with the idea that there will be innovation here.  The question is, we've got a relevant market of retail wireless communications and what's going to happen to the consumers in that market, and those consumers are the ones that we're

worried about.  And innovation could occur literally anywhere in any way because it's so uncertain, the future.

BY MR. POMERANTZ:

Q.  Professor Scott Morton, I want to follow up on the Judge's questions with this chart in front of us, chart 33.  So the standalone Sprint and standalone T-Mobile companies, they might innovate in some unknown way in the future, correct?

A.  Absolutely.

Q.  And the new T-Mobile might innovate in some unknown way in the future, correct?

A.  That's right.  In my answer to the Court I did not talk about merger specificity.  So, your Honor, one of the things that is really important, that Mr. Pomerantz has reminded me of, is while fantastic innovations will happen in the future, no doubt there's an important question about whether we need this merger to get them or whether Verizon by itself and T-Mobile by itself is going to be able to innovate just as well.

Q.  And that's the merger specificity part of the efficiencies analysis.

       Verifiable, why does the -- why do economists look to verifiability, and how does that relate to the Judge's question?

A.  Verifiability says, look, you can't assert an efficiency by itself.  You have to back it up with some means that a third

JCKPSTA2                          Scott Morton - Direct

party can verify that it's true and give some quantification so that we know how to compare it to potential harms from a merger.

And here, saying that there's going to be innovation in the future is, as your Honor pointed out, undoubtedly true, but if we don't know who it's going to benefit, what type it is, it might not even be speed, it might be the latency that turns out to be really important to innovation, I have no idea. But that means that we don't have a verifiable situation here. We have just a lot of uncertainty and speculation.

Q.   And here in this case, the defendants didn't come in and just say we innovate a lot and we're in a dynamic industry. They actually presented a model that you evaluated, correct?

A.   That's correct.

Q.   All right.  Let's go to the last subject that you're going to -- that we're going to be discussing today, and that's the proposed DISH remedy.  And let me put up Professor Katz's testimony in which he was asked about whether he had reached any conclusions about the competitive effects of the transaction before the Court, and he specifically references then that the transaction will facilitate the entry of DISH. Did you see or read this testimony?

A.   Yes, I did.

Q.   All right.  Did you also consider the competitive impact of the potential entry of DISH into the market, like Professor

Katz did?

A.   Yes, I did.

MR. GELFAND:   Objection, your Honor.  Professor Scott Morton did not do a competitive effects analysis in this case. She testified that she deferred to Professor Shapiro on that. So basically, what she's done with DISH is she said, well, I don't think it's going to be as big a competitor as Sprint.

But just to be clear, the question I believe that Mr. Pomerantz just asked is, did you look at its competitive significance, which is outside the scope of her report and outside the area that she's offering here.

MR. POMERANTZ:   Your Honor, actually, she has offered significant testimony, both through her reports and in depositions, about the -- whether the entry of DISH into the market would be timely, likely and sufficient, which is the standard set forth in the merger guidelines and in some case law.  And I'm just following up on that in the similar way that the defendants addressed this issue with Professor Katz.

THE COURT:   All right.  Overruled.

BY MR. POMERANTZ:

Q.   So what framework would you use, as an economist, in order to analyze whether the entry of a competitor can resolve the competitive concerns of a merger?

A.   As you alluded to, we used the framework from the horizontal merger guidelines.  Entry is -- it's necessary that

entry is timely, likely and sufficient in its magnitude to counteract the competitive effects of concern in the transaction.

Q.  And in order to do the analysis that you just testified to and that's reflected in section nine of the merger guidelines, do you have to do a comparison?

A.  A comparison of -- yes.  So let's say your transaction involves a reduction in competition, then you would want to compare the entrant to that lost competition.  The goal of the entry is to restore the lost competition; so if the transaction has resulted in less competition, you want the entry to be of sufficient magnitude and character to restore that lost competition.

Q.  And so what is the comparison that would need to be done in this case?

A.  The comparison here is whether -- since we're losing Sprint as an independent competitor, whether DISH would come in and replace the competitive impact of Sprint.

Q.  And based upon your analysis of the evidence that was provided to you during the course of this proceeding, what is your bottom-line opinion on whether entry by DISH would be timely, likely and sufficient in its magnitude, character and scope?

MR. GELFAND:  Objection, your Honor.  There is no foundation.  She has not testified as to any analysis of what

the competitive significance of Sprint is in the market and, in fact, she's deferring to Professor Shapiro for that analysis. So she can -- I think what she's really testifying to is whether DISH is going to look like Sprint in terms of some metric, like number of subscribers.

She did not do a competitive analysis of Sprint in the market. She was very clear at her deposition, and I believe it's clear in her report that she defers to Professor Shapiro for that. So I do object for lack of foundation, outside the scope of her expert report.

MR. POMERANTZ:  Your Honor, I think that's a mistake as to what Professor Scott Morton has done, but I'll bring that out as to lay a foundation.

THE COURT:  Proceed.

BY MR. POMERANTZ:

Q.  Professor Scott Morton, did you analyze the entry of -- the potential entry of DISH as a potential new competitor in the market as part of your work in this matter?

A.  Yes, I did.

Q.  And did Professor Shapiro also analyze that?

A.  Yes, he did.

Q.  And what's the difference between what the two of you did?

A.  Professor Shapiro looked at the short-term entry of DISH as an MVNO, and my assignment was to look at the longer-term entry of DISH as it built out its facilities.

Q.   And what kind of evidence did you rely upon to do that kind of analysis?

A.   I relied upon DISH's business plan, upon my analysis of the industry, entry barriers, and what's needed to compete in that industry, and also, I relied upon the competitive impact of Sprint.

Q.   And based upon your consideration of that evidence, what opinion did you reach about DISH's likely entry into the market?

          MR. GELFAND:  Objection, lack of foundation, your Honor.

          THE COURT:  Overruled.

A.   I concluded that DISH's entry is neither timely, likely nor sufficient in magnitude to counteract the competitive loss.

Q.   All right.  One last topic.  This is a section of the antitrust division policy guide to merger remedies.  You're familiar with this guide, aren't you?

A.   Yes, I am.

Q.   And the first sentence here refers to the merged firm's incentive not to promote competition with itself; do you see that?

A.   I do.

Q.   And there's other provisions in this section.  And this concerns how economists look at remedies for a merger that might be anti-competitive, correct?

A.   That's correct.

Q.   All right.  And as an economist, is it relevant to your analysis of DISH's entry into the market whether DISH will be an independent competitor from T-Mobile?

A.   It absolutely does.  Your Honor, this is a really key point, that DISH is not going to be an independent competitor. And the remedies guidelines are very skeptical of a situation where the entrant is tied to the incumbent firm because of just what it says here, the merged firm's incentive not to promote competition with itself.

And so competitors who rely on the merged firm for key inputs are likely to be disadvantaged in the long term, and that's a kind of a harm to competition that doesn't occur when competitors are completely independent and are able to choose prices, decide on their costs and their strategies in an independent way.

MR. GELFAND:  I'm sorry, your Honor.  Professor Scott Morton just contradicted herself just a few minutes ago.

THE COURT:  You can bring that out in your cross-examination, Mr. Gelfand.

Q.   One last slide.  What does this slide reflect regarding your concerns about the remedy in this case?

A.   The remedy in this case lasts for seven years, and during that time, DISH and T-Mobile -- new T-Mobile are entangled in a way that is very difficult for them to compete independently.

So, for example, DISH gets the quality that T-Mobile chooses to give to its Metro plan.  DISH gets the wholesale cost that's half of what T-Mobile chooses to charge for its most popular unlimited plan.  So prices and quality between the two are really tied together in a way that stops them from running independently.

Q.  Now, there's been testimony in this case that the kind of entanglements that you're talking about will be completely resolved by the appointment of a monitor to monitor the agreements that the parties have reached with the Department of Justice and the FCC.

How do you view whether a monitor can resolve the competition problems that arise from the relationship between DISH and T-Mobile going forward?

MR. GELFAND:  Objection, outside the scope of economic expertise.

THE COURT:  Sustained.

MR. POMERANTZ:  All right.  No further questions, your Honor.

THE COURT:  Why don't we take the morning break at this point.

MR. GELFAND:  Thank you, your Honor.

(Recess)

THE COURT:  Thank you.  Be seated.  All right. Mr. Gelfand, now you can begin.

MR. GELFAND:  Thank you, your Honor.  I'm grateful for that.

Before I begin with my questioning, I'd like to introduce the Court Tobias Kraft, one of the lawyers in our firm who's been assisting with the case.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. GELFAND:

Q.  Professor Scott Morton, before the break, a few minutes before the break, you had mentioned a division between you and Professor Shapiro, where Professor Shapiro looked at the competitive effects, I think in what you called the short term, and your analysis was of DISH as a facilities-based competitor. Do I remember that right, or correct me if I've got it wrong?

A.  Yes, we divided it essentially by MVNO versus a facilities-based carrier, that's right.

Q.  So he had responsibility for looking at the competitive effects while this MVNO agreement was in place?

A.  Well, the MVNO agreement lasts for seven years; so that's not quite right.  But DISH's plan, of course, is to transition to building its own facilities within that seven years, and that's the part that I am tasked with analyzing.

Q.  And the last part of your testimony, when you mentioned, I think, some guideline that says sometimes it's a concern when there's this entanglement, that was intended to apply to the

MVNO agreement, correct?

A. As I said, the MVNO agreement lasts for seven years, and so that is a significant entanglement, yes.

Q. Okay. But any impact that that would have on competition in the next couple of years, that would be in Professor Shapiro's division of responsibilities?

A. I'm not quite sure what you're driving at. It's a long MVNO agreement, seven years, and there's some distinction between just the immediate impact when the Boost customers ride on the T-Mobile network, as I understand it.

And my responsibility was to think about whether DISH was entering as an independent competitor and, of course, that requires them to build facilities if they're going to be an independent competitor.

Q. Okay. But just to be clear on this, the part where it's the short-term DISH competing as an MVNO, that would be in the short term, that would be Professor Shapiro's responsibility, correct?

A. Yes.

Q. Okay. Thank you.

Now, I want to just make sure, for the Court, that we have a clear idea of what you did and didn't do in this case. You've testified that you looked at efficiencies, but you did not analyze the relevant product market, for example, correct?

A. That's right.

Q.  And you did not analyze what the relevant geographic market is?

A.  I relied on Professor Shapiro for that, yes.

Q.  You did not analyze what the competitive effects of the transaction would be, correct?

A.  The issue of competition is throughout my report; so I would say broadly.  I mean, that's my area of research interest; so competition is definitely included in my report.

Q.  Did you do any analysis of unilateral effects in your reports?

A.  No, I did not.

Q.  You relied on Professor Shapiro for that?

A.  For unilateral effects, I relied on Professor Shapiro, yes.

Q.  And you didn't do any analysis of coordinated effects, correct?

A.  Of coordinated effects?

Q.  Yes.

A.  No, I did not.

Q.  You relied on Professor Shapiro?

A.  Yes, that's correct.

Q.  And you didn't do any analysis of market share, correct?

A.  No.  The market share analysis was not part of my assignment.

Q.  And you didn't do any analysis of diversion ratios?

A.  That's correct.

Q.   You didn't do any analysis of the competitive significance of any particular player in the retail mobile wireless industry as of today, correct?

A.   That's not quite right because I analyzed the question of whether DISH would replace Sprint as an independent competitor and restore the lost competition, and that necessarily involved looking at the role of Sprint and the potential role of DISH.

Q.   What analysis did you do of the role of Sprint in the current market?  Did you analyze any diversion ratios between Sprint and other competitors?

A.   No.  I read Professor Shapiro's report to learn about those things.

Q.   All right.  Did you analyze whether Sprint is a price constraint on any other competitors?

A.   Price -- use price constraint?  I'm not sure I understand the question.

Q.   Did you analyze whether Sprint's activities in this market constrain the pricing of any other retail mobile wireless players?

A.   In general, yes, this will be true in an oligopoly, like this one, where you have only four competitors and they're competing on price to get consumers, yes.

Q.   I didn't ask whether it would be true in general.  I just want to know whether, in your reports, you did any analysis of the particular role Sprint plays as a competitive constraint in

the market?

A.  As I said, comparing Sprint and DISH, I have to look at Sprint's role, and this is a very standard setting for firms, a relevant market, their competing price and quality, and that general principle is throughout my report, as I said.

Q.  The general principle throughout your report.  Is there any part of your report that we can turn to and say here's the analysis of the competitive significance of Sprint in today's market?

A.  I think the section of my report where I compare Sprint and DISH would be the place to look.

Q.  And you're not an engineer?

A.  That's correct.

Q.  So you rely on Dr. Kolodzy for the engineering information?

A.  That's correct.

Q.  I asked you at your deposition how many matters you have worked on in your career involving the mobile wireless industry, and you said two, right?

A.  Yes, the AT&T, T-Mobile merger and this one, that's correct.

Q.  And do you recall also telling me that, because of all the changes in the market, the circumstances of AT&T, T-Mobile in 2011 are not relevant to today's situation?

A.  I wouldn't say that they're not relevant.  The facts have changed; so, of course, if we're thinking about whether there

are cognizable efficiencies, then those would need to be updated to reflect current technology and standards and so forth.  It is the same market.  It is the same retail wireless market, with the same general price and quality competition.

Q.  Can we go to slide 11 from Professor Scott Morton's presentation, please.

Okay.  Professor, this is a slide you showed to the Court, and you testified that this slide, which was -- do I have it correct that this was taken directly from your report?

A.  That's correct.

Q.  Okay.  And you testified that this slide represented the changes that would occur to the various cost calculations if you were to inject into the model the sorts of things that Dr. Kolodzy had told you could be injected into the model.  Do I have that right?

A.  His engineering inputs, that's correct.

Q.  Okay.  And do feel free, if you wish, to turn to paragraph 186, page 109 of your rebuttal report, if you wish.

A.  Sorry, was that paragraph?

Q.  Paragraph 186.

MR. POMERANTZ:  Your Honor, may I just go get my copy of the report?

THE COURT:  Yes.

MR. GELFAND:  These are your copies?  Now I've got to get my copies.

JCKPSTA2                    Scott Morton - Cross

THE WITNESS:  Okay.

BY MR. GELFAND:

Q.  Okay.  Are you there?

A.  Yes.

Q.  All right.  And in that paragraph, you say:  "I now combine my adjustments to 5G spectral efficiency, 5G congestion thresholds, mmWave offload factor, DSS implementation and 5G forecasted data usage and device penetration, to show the impact of Professor Katz's estimates when these assumptions are considered jointly.  Correct?

A.  Yes, that's correct.

Q.  So if we go back to the slide -- slide 11 I think it was, Mr. Klein -- that reflects all of those adjustments, correct?

A.  That's right.

Q.  All right.  Let's take those one by one.  The first one was spectral efficiency.  Dr. Kolodzy did not testify about spectral efficiency yesterday, did he?

A.  I read his testimony, and I don't recall.  But he included it in his analysis, and it's included in my report.

Q.  The Court did not hear any analysis from Dr. Kolodzy about spectral efficiency, correct?

A.  I don't know.

Q.  You don't know of any measurement of spectral efficiency that was provided by Dr. Kolodzy yesterday?

A.  I don't know.

Q.   Okay.  Now, let's take the next item from your report, which was 5G congestion thresholds, and if we could pull up the trial testimony from Dr. Kolodzy at page 2141, starting at line 25 and going to the end of the page and carrying over.  Thank you, Mr. Klein.

And starting at line 25, we see a question:

"Turning to congestion thresholds, you testified that you did a sensitivity analysis on the congestion thresholds T-Mobile applied in its 5G model, correct?"

And he said:  "That is correct."

"Q.   And for that analysis, you were just running sensitivities to show how sensitive the model is to changes in the congestion thresholds, right?"

He said:  "That is correct."

"And you're not covering any opinion today on what congestion criteria standalone T-Mobile would, in fact, use for 5G, correct?"

And he said:  "I am not offering opinion as to the exact value, but I was offering an opinion that I thought the value that was selected seemed to be too high, given the state of what the usage of the 5G network might be and the applications that might be out there."

So Dr. Kolodzy did not offer any particular value of the congestion threshold, correct?

A.   I'm sorry, do you mean value in dollars, or value in terms

of the level that he was proposing?

Q.   What value did you take from Dr. Kolodzy when you prepared your adjusted slide 11 that you showed the Court?

A.   I took his engineering outputs when he applied a lower level, and I -- and then I took those and put them into the economic model to calculate the network marginal costs.

Q.   So when he gave you a value for that, do you remember what the value was?

A.   So I think I'm not supposed to talk about congestion threshold numbers in open court, but in particular, what he gave me --

Q.   I appreciate that.  Thank you.

A.   -- was all the solutions, the remedies to congestion, that those are, of course, many, sales blitz, radio and different things, and then those get put into the economic model; so it isn't one number that he's giving me.

Q.   Okay.  But you found some numbers to put into your model, correct?

A.   Well, I got them from Dr. Kolodzy.  I didn't find them.

Q.   Fair enough.  But you got the numbers from Dr. Kolodzy, and Dr. Kolodzy testified that he's not making a prediction that any of those numbers will, in fact, apply to standalone T-Mobile; isn't that right?

A.   That's correct.  What he says in the portion you highlighted is that it seemed like a rather extreme assumption

to him, that's a technology assumption.

I'll say, from the economics side, the assumption the standalone firm is using is extremely costly to it, and so you would want to see, in the ordinary course, some benefit to doing that.  And I believe Dr. Kolodzy was questioning whether the benefit was really there.

Q.  The next item from your report was mmWave offload factor.  That's millimeter wave offload factor, correct?

A.  Yes.

Q.  And, in fact, Dr. Kolodzy did not testify about that factor yesterday, correct?

A.  I don't recall.

Q.  All right.  Do you know if he provided any value to the Court that could be used in looking at the millimeter wave offload factor?

A.  I don't know.

Q.  Okay.  The next one is DSS implementation, correct?

A.  Yes.

Q.  Okay.  And if we could pull up the trial transcript at 2137, lines 3 to 15, Mr. Klein.

And there Dr. Kolodzy was asked:

"And you're not offering any opinion on what, in fact, standalone T-Mobile would do in the real world, are you?"

And his answer was:  "Well, I can't comment on what they're going to do in the real world.  All I was doing was

saying they could do something on this order, and it would make an impact.

"Q.   But you don't have sufficient information to provide such an opinion, correct?

"A.   Provide such an opinion as to if a real network was deployed and they used -- put down in the spectrum what the impact would be, is that the question?

"Q.   Whether what T-Mobile, as a standalone company, will in fact do in the real world."

And he said:  "I can't predict what the company is going to do."

correct?

A.   I see that.

Q.   And you took one of his values for how this DSS impacts the model, and you plugged it into your analysis when you did that slide that appeared at slide 11, correct?

A.   I did because the economic model that Professor Katz developed makes the assumption that there is no DSS.  It's not that the firm optimizes by choosing the lowest-cost solutions and chooses not to use DSS.  They're not allowed to consider it.  It's eliminated from the model.  So that's a bias.

I mean, the firm might or might not use DSS, but it should be in a model because it's a real technology that's being brought forward now and that firms have already announced that they're going to use.  So it's not -- we don't know what

T-Mobile is going to do, but we do know that zero and eliminating it is not the correct answer.

Q.   Okay.  Professor, I just want to be clear, since you have a long answer there, that you took a value from Dr. Kolodzy and plugged it into the model to get your adjusted values on slide 11, correct?

A.   That's correct.

Q.   All right.  Thank you.  And then you also talked about 5G forecasted data usage and device penetration, right?

A.   Yes.

Q.   And that's something that you looked at to adjust the marginal cost numbers that appear on slide 11, correct?

A.   Again, Dr. Kolodzy takes values, puts them into the engineering model.  The engineering model gives me outputs that I put into the economic model and come out with the marginal costs.

Q.   And data usage would be a reflection of consumer demand; is that right?

A.   Of consumer demand, did you say?

Q.   Yes.

A.   Yes, in part, and competition.

Q.   Okay.  And if we could go to trial testimony at page 2145, lines 3 through 9, please, Mr. Klein.

        MR. POMERANTZ:  Is this Dr. Kolodzy?

        MR. GELFAND:  I'm sorry, Dr. Kolodzy.

MR. POMERANTZ:  No, that's fine.  If you can tell us who the witness is.

MR. GELFAND:  That was Dr. Kolodzy's testimony.  I'm sorry.

BY MR. GELFAND:

Q.  Okay.  And in that portion of Dr. Kolodzy's testimony he was asked:

"I want to be clear.  You don't have expertise in evaluating consumer demand, do you?"

And he said:  "No"

"And you aren't offering any opinion on what consumer demand will be in the future, are you?

"No, I am not."

Are you aware of Dr. Kolodzy's testimony on that point?

A.  I didn't recall it, but I see it there.

Q.  Okay.  Thank you.

And I'm just going to do one more, if I could, from Dr. Kolodzy trial transcript at 2126, lines 18 to 21.  If you could bring that up, Mr. Klein.

"Q.  And you're not offering any opinions today on whether the standalone firms will pursue the strategies reflected in your sensitivity analysis, correct?"

And he said:  "No, I am not."

Are you familiar with that testimony from Dr. Kolodzy?

A.   I don't recall it.  The economic version of that is a little bit different because the way the model --

Q.   Professor, professor, please.

      MR. POMERANTZ:  Your Honor.

Q.   Do you recall the testimony?

      MR. POMERANTZ:  He shouldn't be interrupting the witness' answer.

      THE COURT:  Did the witness answered the question? What was the question?

      MR. GELFAND:  I'm sorry, your Honor?

      THE COURT:  What was the question?

BY MR. GELFAND:

Q.   The question is:  Were you aware that Dr. Kolodzy gave this testimony yesterday?

A.   I don't recall it.

Q.   All right.  Thank you.

      Let's talk about spectrum acquisitions.  So one of your criticisms of the modeling work that was done is that it doesn't incorporate the acquisition of any new spectrum in the standalone companies, correct?

A.   That's correct.

Q.   And you're not an expert on spectrum, can we agree on that?

A.   I'm not as an engineering matter, no.

Q.   And you've never worked on any spectrum auctions?

A.   That's correct.  Auctions is not my area.

JCKPSTA2                      Scott Morton – Cross

Q.   You've never worked on any project relating to the acquisition of spectrum, correct?

A.   Both the AT&T, T-Mobile merger and this merger involve the question of a wireless carrier buying inputs, and spectrum is possibly the most important input for a wireless carrier.  So this is an economic point that definitely applies to spectrum, as it would apply to any input.

Q.   That's fair.  Other than those two matters that we've discussed, though, you haven't worked on any matters involving spectrum acquisition?

A.   I don't recall any.

Q.   And you're not offering any actual opinion on how much spectrum Sprint or T-Mobile are likely to acquire if they remain standalone companies, correct?

A.   No, I'm not predicting the future like that, definitely.

Q.   All right.  And are you aware that Dr. Kolodzy acknowledged that there is no low-band spectrum coming up for auction in the foreseeable future?

A.   I don't recall.

Q.   Well, let's just show it for a moment.  I won't do this too many more times, but if we could go to the trial transcript at 2133, starting at line 25, please.

        And again, this is Dr. Kolodzy:

"Q.   And there are no low-band spectrum options."

        I have to confess.  I don't know whether he said

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

"options" or "auctions."  I think either one works, but --

          "There are no low-band spectrum options anticipated at all?"

          And he answered:  "That is correct."

          "So whether T-Mobile or Sprint could acquire any low-band or mid-band spectrum at auction is speculative, correct?"

          And he said:  "Yes, it is speculative."

          Were you aware of that?

A.   They could get low-band spectrum other places, but in terms of whether I'm aware of it, I see it there.

          (Continued on next page)

BY MR. GELFAND:

Q.   And low band spectrum is the spectrum that Sprint desperately needs to improve its coverage, correct?

A.   I don't know about the desperate part.  I certainly read documents that said Sprint would like that spectrum, yes.

Q.   If we could go to figure 19 on page 76 of your rebuttal report.

MR. GELFAND:  If you could pull that up, Mr. Klein.

Q.   Do I have that right, page 76, figure 19?

A.   I don't think so.

Q.   Page 68, I apologize.

This was a table that you included in your report.  Do you recall that?

A.   Yes, I do.

Q.   It was an attempt to catalog the spectrum auctions that have taken place over the last ten years, right?

A.   That's correct.

Q.   If you look at the column titled "Sprint," Sprint won none of those auctions, correct?

A.   That's correct.

Q.   You included a sensitivity, and you even showed a slide, I don't recall what the slide number was.  I will try to figure that out quickly here.  It showed the scenarios where the standalone companies could buy -- I think standalone T-Mobile could buy 10 megahertz or 30 megahertz.  Do you remember that?

A.   Yes.

Q.   Do you happen to remember what slide number it was?

A.   No, sorry.

          MR. GELFAND:  I think they're unnumbered.  Your Honor.
We'll go with the screen.

Q.   You presented this slide to the Court?

A.   It says 7 in the little corner of my screen.

Q.   Okay, thank you.  So slide 7, thank you.  Adding spectrum.

          And the sensitivities you did were around 10 megahertz
and 30 megahertz, correct?

A.   Yes, that's right.

Q.   What kind of spectrum was that in those scenarios?  Was it
millimeter wave spectrum?

A.   I think it was mid band spectrum.

Q.   Do you know which part of the mid band?

A.   No.

Q.   It wasn't low band spectrum?

A.   As far as I recollect, it was not.

Q.   And these numbers of 10 megahertz and 30 megahertz were
selected just to be illustrative?

A.   I think they are of a magnitude that's important, but not
so large as to be -- I mean they're 10 percent and 30 percent
of T-Mobile's current spectrum holdings.  That seems like, for
the next five years, a reasonable range to consider.

Q.   Do you have any idea how much it would cost to acquire, for

example, 30 megahertz of mid band spectrum?

A.  Well, what is really important is that the model doesn't let the firm figure out that cost.  The model doesn't have a cost for spectrum in it because spectrum is ruled out.  If spectrum costs were known, they could be in the model and compared to very expensive cell splits.  The very expensive cell splits, because they occur everywhere in the country, might --

Q.  We're getting off track now.

Do you have any idea how much 30 megahertz of spectrum would cost a wireless carrier in today's market if it were even available?

A.  I do not, but I also think there's a lot of qualifications on the type of other aspects of that spectrum that would create some variation around what that number would be.

Q.  Would it surprise you if it costs tens of billions of dollars to acquire 30 megahertz of spectrum?

A.  Certainly I have seen documents from the standalone firms that are in the 5 to 10 billion range.  That's how much we expected to spend on spectrum, so that sounds reasonable.

Q.  You expect to spend on 30 megahertz of spectrum?

A.  Looking forward to satisfy spectrum needs, that's the kind of document I'm talking about, reference those levels of numbers.

Q.  Do you recall what documents you saw that said satisfying

spectrum needs would cost 5 to $10 billion?

A.   I believe these are confidential documents, so I'm not sure I should -- I do recall, but I'm not sure I should say it.

Q.   I'm grateful for that.

And you are not offering an opinion to how much spectrum is available on the secondary market, correct?

A.   No, I'm relying on Dr. Kolodzy.

Q.   Do you know what Dr. Kolodzy said about spectrum available on the secondary market?

A.   I remember he talked about DISH and the upcoming C band and CBRS action, and something about a new initiative of Chairman Pai to get yet more spectrum out there.

Q.   You talked a little bit about the efficiencies framework that is set forth in the merger guidelines.  Do you remember that?

A.   Yes, I do.

Q.   And would you agree that one of the ways to verify efficiencies is to look at prior transactions that are comparable or similar in nature?

A.   That's one possibility, but I would say to the extent that the prior transactions are not a pattern or that they did differ in their scope or nature, then they become less helpful to that inquiry.

Q.   So did you -- were you aware T-Mobile previously acquired a company called Metro PCS?

A.   Yes, I'm aware of that.

Q.   Actually I think it was a merger.

You did not do any analysis of whether the T-Mobile/Metro PCS merger resulted in a cognizable efficiencies, did you?

A.   No, that was not part of my assignment.

MR. GELFAND:  I would like to put up a slide, if I could.  Mr. Klein, could you put up the demonstrative that we sent to the other side yesterday, please.

Oh, we did not?

I apologize, we're not going to use that.  Sorry, your Honor, we plead sleep deprivation.

Q.   Let me ask you this, Professor.  I want to understand -- I want the Court to understand very clearly what your role was here.  I will ask you the following question:  The network model that has been presented to the Court by my client, it does a couple of things, tell me if you agree with this or not.  It looks at what the future new T-Mobile is going to look like in terms of capacity, speed, marginal cost, so that's one thing it looks at.  Can we agree on that?

A.   I wouldn't say that -- it goes through a process of calculating congestion solutions and proposing answers of technology or other solutions, and it goes out five years.  But that's not a prediction, the model wasn't used to predict the firm five years out, it was used to figure out what to deploy

next year.  So I don't actually think that it predicts the future, that's the whole problem.

Q.  That's a helpful clarification of your view.  But it does calculate or model what a possible new T-Mobile would look like over the next five years in terms of capacity, speed, marginal cost, correct?

A.  I think I have the same answer.  I think in the short term the LTE portion of this model that was used in the ordinary course does tell us what capacity solutions the firm is likely to choose the next year.  But once we start going out five years in the future, technology is going to change, spectrum positions might change, demand might change, it might be a whole range of things that cause the model to not be doing in 2024 what it's predicted to do in 2019, because in the ordinary course it was reestimated every year.

Q.  I understand that.  But it does have a calculation of what that company is going to look like in 2024, correct?

A.  So how about the following:  We agree it has a calculation.  You think it's what the company looks like, I don't think it's what the company would look like.

Q.  That's fair.  But in the analysis that you have done, you don't have an analysis like you did with the standalone companies to do the sensitivity on the standalone companies, do you, or do you?

A.  I think I don't understand your question, because we just

went through the sensitivities as applied to the standalone firms and the merged firm.  So if we're talking about the graphs that we just reviewed, all of them compare the standalone firms and the merged firm.

Q.  And in doing that, when you put into the model these various things that you got from Dr. Kolodzy, are you putting them into just the standalone part of the model or are you also putting them into the new T-Mobile part of the model?

A.  I see your question.  So the standalone firms -- I'm just putting them into the standalone firms, for example, spectrum, because the combined firm has an enormous amount of spectrum that it just obtained from Sprint.  So in fact, the combined firm does not have very much congestion, and therefore, giving the combined firm more spectrum doesn't accomplish anything compared to giving it to the standalone firms.  And indeed, the model is asymmetric because in merger gives the combined firm this enormous trove of spectrum, and that costs $26 billion, but the standalone firms don't get to spend billions of dollars buying spectrum, which is what they would normally do.  As we discussed, in a standalone case they would go and spend billions of dollars also getting spectrum.  So the model is asymmetric and I'm fixing that asymmetry.

Q.  I'm trying to get it in terms that we can all agree on, because it's important in my view for the Court to understand what the comparison is here.  And I apologize for what might be

a repeat question, but if I understand your answer correctly, and maybe without giving all the rationale for why you did it, but if I understand your answer correctly, when you do the Kolodzy adjustments, if I can call them that, you only do the Kolodzy adjustments to the part of the model that is looking at the standalone firms, you don't do the Kolodzy adjustments to the part of the model that is looking at in you T-Mobile, correct?

A.   Because new T-Mobile has so much spectrum, I am trying to fix that asymmetry, and yes, I only give it to the standalones.

Q.   Thank you.  Then would you agree with me that the way this model works is it has these two paths, what do the two standalone firms look like going into future and what does new T-Mobile look like going into the future, and the fundamental logic of the model is to compare the costs of those two future worlds, right?

A.   That's correct.

Q.   Okay.  And if there's a big difference and in the marginal cost from one to the other, then that is potentially a cognizable efficiency.  If there's not much of a difference, it's not much of an efficiency.

A.   If the model were a verifiable model doing the things that -- fixing the things that I pointed out, and if the inputs were correctly specified so that every firm had a choice of all the available ordinary course choices, then your statement is

exactly right, yes.

Q.  All right.  And the reason you think these efficiencies are not cognizable is because when you do the Kolodzy inputs on the standalone companies, the difference at the end of the day almost disappears between the two in terms of marginal cost. That's the basic logic of what you're saying, correct?

A.  When combined for using spectrum they almost disappear for T-Mobile, and they're substantially smaller for Sprint.

Q.  But still not zero for Sprint.

A.  For Sprint I believe if you look at the charts will see the hash bars are positive.  Much smaller, but not zero.

Q.  So I do want to -- well, I want to ask you about quality, if I could, for a couple of minutes.

You talked about the value of quality, and you used the lanes of traffic, which is a metaphor we have been using.

A.  Speed.

Q.  Speed.  To be clear, when you were giving that example and it went from one lane to two lanes and then to four lanes, you kept the same number of cars?

A.  That's correct.

Q.  So that analogy that you were drawing there didn't take into consideration the possibility that as a result of having a four lane highway, maybe people would drive more often and there would be more cars on the road?

A.  That's a more complicated model, what you're describing.

I'm asking the question: Does a particular consumer -- so I'm driving to work in my car, does that person value an additional lane? And to do that, we'll hold everything else constant, because that's the narrow question we're asking.

Q. I think you testified, but I want to make sure we understand this, that this diminishing marginal return concept that you had, that what I think you testified -- I wrote it down that what matters is how much consumers would value that today. Is that what your testimony was?

A. If it was about shirts or traffic, then there's no time element, I'm giving you a 12th and a 13th shirt, and at some point your value of those shirts is diminishing.

Q. But to do a proper analysis, which I think we all agree this merger analysis exercise is looking at the future world when there are more cars on the highway or more apps on the phone or new technologies that are consuming more and more data and going faster and faster, you would agree with me, would you not, that what matters is not how a consumer today who just likes to watch Star Wars on her phone, that's not what matters so much, what matters is how is the consumer of the future is going to value that additional speed. You would agree with that, right?

A. You have said very well, Mr. Gelfand, the exact problem with Professor Katz's analysis. He is taking that person watching Star Wars and applying it to the future at 300

JCKTSTA3                          Scott Morton - Cross

megabits per second, when you correctly point out we would want a long look at the future; what is the consumer doing, how much data does she consume, what are the use cases, how could we evaluate the value she is getting from incremental speed from 250 to 300, for example.

Q.   So we agree on that, and you disagree that Professor Katz's model can capture that in any way.  You have not endeavored to place any value on additional speed, right, you're not offering your own empirical work to say that speed in the future is going to have some particular value?

A.   No, as I discussed in my direct testimony, it's the role of the merging parties to bring forward what it is they're going to do, and therefore, why it's enhancing competition and helping consumers.

Q.   So I'm not asking so much how the Court process works, I'm just asking you:  You have not attempted in any empirical way or economic analysis, or you haven't done anything to figure out what the value of that additional speed might be in the future, right?

A.   No, the previous answer was an economic answer, that the economist in my position is waiting to hear from the merging parties what it is that their plans are, what the economics of that is, how they're going to deploy their new assets, and then it is my role to evaluate that to see if it's a cognizable efficiency.  So no, I'm not one putting forward the model.

Q.  But you acknowledge there is going to be some value to additional speed, right?

A.  I think, as the Court pointed out, almost certainly there will be, but the issue is:  Is it, for example, merger specific?  If speeds get faster and all kinds of fantastic things get invested and we have four wireless carriers and we have a lot of choice, that's terrific, and enormous consumer value is created, but it's not because of the merger.  So we have to learn somehow that this merger is going to give consumers value, and that both means we need merger specific speed increases and then something to do with those speed increases, and neither of those have come forth in the record in a verifiable way.

Q.  So I would like to go to one of your slides, and I think it's the paragraph with the different speeds for the standalone companies.

A.  Figure 41?

Q.  Which one?

A.  Figure 41 from my report?

         MR. POMERANTZ:  32 in our deck.

         MR. GELFAND:  Slide 32 in Professor Scott Morton's.

         Thank you.  I'm not going to get high grade on the smoothness of the transition there.

Q.  I want to look at this slide for a moment.  Now you had testified about this hypothetical user who wanted to watch Star

Wars, do you remember?

A.   Yes.

Q.   And that hypothetical user only needed six megabits per second to watch Star Wars, correct?

A.   About that, yes.

Q.   That's not a representative user in today's world, is it?

A.   I don't know the distribution between standard definition video and high definition video, so I couldn't tell -- certainly high definition is popular, they're both popular, so in terms of video use cases in the mobile setting, I think those two would be my leading examples.

Q.   In your slide here you have the current speeds of T-Mobile and Sprint, which are average speeds, I assume.

A.   Yes.

Q.   And T-Mobile is at 31 megabits per second, correct?

A.   That's right.

Q.   And Sprint is at 24 megabits per second, correct?

A.   That's correct.

Q.   So those two companies have invested the money needed to create a network that would operate at significantly higher speeds than 6 megabits per second, correct?

A.   That's right.

Q.   And they wouldn't invest in that if the speed had no value to consumers.  Would that be an economist prediction?

A.   My understanding here is going to veer into the lay

understanding of how the engineering works, but if you take these speeds and then you interact them with perhaps things like the nature of the back haul of the user, the kind of server the user is getting the video from, the location of that server, that sort of stuff, that you might end up with a speed that is not as high as the one that T-Mobile is delivering.  So watching the video depends on more than what T-Mobile is doing, it depends on a lot of other things, and the possibility of something going wrong might cause T-Mobile therefore to invest above what the video speed is in order to try to help the user experience to some degree.

Q.  So you can't look at something like, well, video takes six megabits per second, so a user who just wants to watch video, they won't value any additional speed.  That wouldn't be a fair to do it in light of what you just said.

A.  It is diminishing, and I believe the increment needed above let's say six to have a good quality video does not require going up to 200.  I'm talking about relatively modest increases over the level that the technology requires.

Q.  Now over to the right we have a standalone T-Mobile in the year 2021, and that's at 127 megabits per second, correct?

A.  I see that.

Q.  And we have a standalone Sprint, which is at 210 megabits per second, correct?

A.  I see that.

Q.  And then the network model that Professor Katz relied on has new T-Mobile at 380 megabits per second in that period, correct?

A.  Yes.

Q.  So the network model that Professor Katz has relied on makes calculations saying that standalone T-Mobile and standalone Sprint are going to be at those lower speeds, and new T-Mobile is going to be at that higher speed, correct?

A.  That's right, and that's related to the congestion. Congestion slows down speeds.  Because Professor Katz's model has a lot of congestion that the firms can't resolve in a cost effective manner, it's going to have slower speeds.

Q.  That's excellent.  So if we look at the standalone companies in that model, what you have done to criticize Dr. Katz is you say well, the standalone models, we're going to let them do all the things that Dr. Kolodzy says maybe they could do, correct?

A.  So here we're talking about speed, and you just shifted gears to the marginal cost of expanding the network.

Q.  Actually talking about speeds right now.

A.  Okay.

Q.  And part of what you're saying is that Dr. Kolodzy -- well, let me ask you that question then.  Would the Kolodzy inputs, if applied to the standalone companies, would they bring the speed up to the speed that Professor Katz has calculated for

the new T-Mobile?

A.   I have not done that calculation in my report.  They would bring the speeds up definitely, because there's less congestion, but I don't know to exactly what number.

Q.   So you have no sensitivity analysis to suggest that that gap in speeds could be closed with any of the Kolodzy inputs, you just haven't done the analysis?

A.   It would close it by logic, but I have not provided a table or a chart in my report about that, that's correct.

Q.   And you haven't done any analysis to suggest whether standalone T-Mobile or standalone Sprint, if left to their own devices without this merger, would continue to invest and improve these speeds and get faster and faster, you have not done that analysis, have you?

A.   Well, I have in the sense at that it's very important that competition drives investment, and so if you have got more competition, you're likely to have these firms investing in the network and investing in speed.  So all else equal, I would say that competition would get us faster speeds, to the extent they're valued in the marketplace, of course.

Q.   Well, that's a big qualification at the end there, a very big qualification.  Do you have a view as to whether they would be valued in the marketplace such that companies in the standalone world would invest and try to create those faster speeds?  Do you have a view on that?

A.  I think that my view is divided into two buckets.  There are many applications I read about that seem to be business applications that are not in our relevant market here.  And there may be great value to those that I haven't studied, so autonomous vehicles and factories and things like that, Internet of Things.

In terms of consumer applications, I have heard only a couple of words like augmented reality, but no business that is doing that with data that you could assess to see whether consumers would value it.  So I have an opinion, as the court has pointed out, that someone is going to invent things in the future that are marvelous, that I'm pretty confident about, but as to whether we could specify those and measure them today, I don't think so, not in the consumer wireless side.

Q.  It was interesting what you just said.  So you think that on the business application side of this industry there could be demands for higher and higher speeds, correct?

That's what you just said.

A.  I'm just saying the record -- I have read more examples or speculation about businesses adopting technology that requires low latency, it's not really about the speed, it's about the latency, but those are outside the market so I have not been spending time thinking about that.

Q.  But it's the same network, right?

A.  I don't know.

Q.  So if Verizon, for example, were using the same network to satisfy its business enterprise customers as well as its retail wireless services customers and they had a demand to increase speeds in order to satisfy the enterprise side of the business, they would end up delivering those higher speeds on consumer sides as well, right?

A.  It would depend on competition and demand.  If consumers didn't demand it, maybe they would throttle the consumers to a level that let consumers do what was valuable to them and save the capacity for higher value uses.

Q.  I think you mentioned autonomous cars.  Those are used by consumers, right?

A.  Well, my understanding of the way this proceeding works is that we have a relevant market, and those are the consumers with their handsets, and the autonomous vehicles aren't in it. But as you pointed out earlier in my cross-examination, that wasn't part of my analysis, so I should probably stop there.

Q.  I asked you a question and you mentioned autonomous cars. These are autonomous cars that would be used by the same consumers who might have handsets, right?

          MR. POMERANTZ:  Objection, your Honor, relevance. There's nothing about autonomous cars that's relevant in this case.

          THE COURT:  Sustained.

          MR. GELFAND:  Your Honor, might I have a moment to

JCKTSTA3                    Scott Morton - Cross

consult with my colleagues?

THE COURT:  Sure.

MR. GELFAND:  Thank you.

(Pause)

MR. GELFAND:  Your Honor, I have no further questions, thank you.

THE COURT:  Thank you.

MR. POMERANTZ:  Your Honor, I have no further questions for Professor Scott Morton.

THE COURT:  Thank you, you're excused.  You may step down.

THE WITNESS:  Thank you, your Honor.

MR. POMERANTZ:  Your Honor, I have two exhibits to offer into evidence, Exhibit 211 and Exhibit 75.

THE COURT:  Mr. Gelfand?

MR. GELFAND:  Could I reserve on that, your Honor?  I will say no objection now and I will come back if we have anything.  We may have a relevance objection to both of those documents, your Honor.  May I come back to that?

THE COURT:  You may.  Do you have any documents, exhibits to offer?

MR. GELFAND:  I do not.

THE COURT:  All right.  Thank you.

Next, Mr. Pomerantz.

MR. POMERANTZ:  Your Honor, we call Professor Carl

JCKTSTA3                     Shapiro – Direct

Shapiro as our next and last witness.

 CARL SHAPIRO,

     called as a witness by the Plaintiffs,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. POMERANTZ:

          MR. MACH:  May I approach, your Honor?

          THE COURT:  Yes.

          MR. POMERANTZ:  May I approach, too, and provide

Professor Shapiro with his reports?

          THE COURT:  Yes.  Mr. Pomerantz, what's your estimate

of the time for this witness?

          MR. POMERANTZ:  I think I'm still in the same range I

was yesterday, probably in the 45 minute range, give or take.

          THE COURT:  All right.  Proceed.

BY MR. POMERANTZ:

Q.  Good morning, Professor Shapiro.

A.  Good morning, Mr. Pomerantz.

Q.  Have you had an opportunity to review the testimony of

Professor Katz in this case?

A.  Yes, I have.

Q.  And have you had a chance to consider responses to some of

the specific testimony that Professor Katz offered?

A.  I have.

Q.  And we're going to take some time this morning to go

through a few of those items of testimony by Professor Katz and get your response.  Is there anything in the testimony that you heard or read from Professor Katz or any other testimony from this case that you have read or heard about that that has caused you to revise any of your opinions in this matter?

A.  No, the bulk of what Professor Katz testified to was not a surprise because we had back and forth already, so my opinions remain unchanged.

MR. POMERANTZ:  And do we have the slide ready to go?

Q.  So this is testimony from Professor Katz on the subject of CMAs and whether they are a relevant geographic market in this case.  Have you had an opportunity to review this testimony?

A.  Yes, I have.

Q.  And while Professor Katz at the top discusses the fact that competition does take place at the local level, he disagrees with your opinion that CMAs are an appropriate market.  Do you see that?

A.  I do.

Q.  What is your reaction?

A.  Well, I think it's helpful in terms of focusing the differences between us on his acknowledgment that competition takes place at the local level.  I've emphasized when I was here before, the network quality and investment, the retail stores and local promotions as examples of that, but I stand by my view that look, and therefore, I think it's very important

to define some local market to capture that competition, and so the issue is really are CMAs acceptable or reasonable or is there some problem with them. That's how I see the issue.

Q. And you just said that you felt that it was important that in some way it would capture the competition that is happening locally. Why is that important?

A. Well, if we didn't define local markets at all, then we would miss, for example, areas such as New York City where the two firms have particularly high market shares and high diversions. We would be just missing important dimensions of competition by looking at the national market shares, so I think that would be a mistake.

Q. So why did you pick CMAs as the relevant geographic market to capture local competition?

MR. CARY: Your Honor, I object. This is not rebuttal testimony, this is the exact same testimony that he gave in his opening.

THE COURT: Sustained.

Q. During Professor Katz's testimony the judge asked Professor Katz about whether any work had been done to compare CMAs to some other region, such as counties or congressional districts. Did you include such an analysis in your report?

A. Yes, I did.

MR. CARY: Your Honor, I object. Again, we're going back over the same ground that he covered originally, and if he

wanted to amplify on it originally, Professor Katz could have responded, but he's repeating the prior testimony.

THE COURT:  Sustained.

MR. POMERANTZ:  Your Honor, just to be clear, this is not repeating prior testimony.  Your Honor asked a very specific question.  Dr. Katz said to you I don't know -- he knew that Professor Shapiro had done the analysis at a county level and that he had not.  He did not tell you that Professor Shapiro had done that analysis.  When I had Professor Shapiro on the stand at the outset of this case, he did not offer you the results of his analysis at the county level.  That only came up in response to your Honor's question.  I would like your Honor to at least have that information as you consider the issues in the case.

THE COURT:  My recollection is that Dr. Shapiro testified that you could have the competition even at a block level or a zip code, so I don't don't see that there's any material difference between zip codes, block by block, election district or a county.  As far as I'm concerned, he testified to this issue.

MR. POMERANTZ:  The difference is that he has done HHI calculations at the county level, not at those other levels, and that's not in the record right now.

When your Honor asked is there a difference if you looked at it at the county level, the relevant question here

is:  Is there a difference in the concentrations such that you might come to a different conclusion as to, for example, the presumption in this case.  Professor Shapiro has actually done the HHI calculations at the local level, the county level, one the regions your Honor selected, and all we're trying to do is to make sure the evidence in this case provides the answer at the HHI level to the question that your Honor posed and that Professor Katz did not answer.

THE COURT:  All right.  Since I posed the question, let him answer it.

MR. POMERANTZ:  Thank you, your Honor.

MR. CARY:  Your Honor, I would like to point out one other fact, and then of course Professor Shapiro should answer, this is exactly the problem with trying to backfill their case in rebuttal.  There has been work done at various levels. Professor Asker looked at zip code data, he noticed that there were wide variations of HHIs in zip codes, counties, CMAs, et cetera.  If this was going to become a centerpiece of Professor Shapiro's analysis, perhaps we would have called Professor Asker.  Again, the only point is this should be rebuttal, not backfilling the case.

THE COURT:  Your objection is noted, let's move on.

BY MR. POMERANTZ:

Q.  Professor Shapiro, I put on the screen a slide that I know you created.  Could you just explain to Court what this slide

JCKTSTA3                        Shapiro - Direct

reflects?

A.   Certainly.  Your Honor, so this is the top ten CMAs in the country within the plaintiffs' states by number of subscribers. The blue bars are at the CMA level.  So that is what I showed you last time I was here, this is the HHI level, and the main point was that in all ten of these heavily populated CMAs, the post-merger would be well above the 2500 threshold.

Now the question that has arisen is if you looked at counties, how would it come out?  So what I did is I looked at the county level -- so take New York, I looked at the county level, the green bar is a bit higher than the blue bar.  What did I do?  I looked at each county and calculated the HHI in that county, and then you have to add up a bunch of counties within the New York CMA.  So I did that, counting the counties that had more people more heavily, which is weighting by population.

So in this case, New York, I see that while, when you break it down more narrowly, the level of Hirfindahl is somewhat higher when you break down to the county level, that depicted on the green bar being taller than the blue bar.  Then if you look at all ten of these, I think maybe nine or all ten, the green bar is a bit higher than the blue bar.

So the conclusion here is that when one does look at the county level, which we can do with these data, you also find very highly concentrated markets after the merger in these

CMAs.

Q. All right. And then the next slide here, if you could briefly explain what this shows.

A. So this is exactly the same type of analysis, looked at the county level with the green bars rather than the CMA level with the blue bars, same ten CMAs, but it's on the vertical axis here we're measuring the increase in Hirfindahl. Last time I was here I told you we could see these are very large increases in the Hirfindahl in all ten of these, that was the blue bar, they're all 800 or more. And if you break it down to the county level, again you see it's slightly larger increases in the Hirfindahl.

So my overall point here is that it's not critical to my analysis of market concentration, I want to look at the CMA level. One could look more narrowly, I have done that, and the same issues arise as I already reported at the CMA level.

Q. Now still sticking with the local geographic markets, Professor Katz testified that there was no statistically significant relationship between average speed, number of company-owned stores and save desk offers on the one hand and HHIs at the CMA level on the other hand. What is your response?

A. So as I believe -- well, in my view, this methodology -- these are a number of progression analyses that Professor Katz ran, and I believe this methodology is inappropriate and

uninformative for the purposes at hand, the question for the Court, which is to evaluate the effect of a merger that increases the Hirfindahl.  This is a well-recognized problem in the economics literature, and I believe reading Professor Katz's trial testimony that he acknowledged that with the caveat that there are serious limitations to this type of analysis for reasons that I said have been very well developed in the economics literature, particularly over the past 25 or 30 years.

I could illustrate those with an example.  Suppose that we observe that Verizon decides to -- as a market leader, decides to build out their network in a particular area, and they already have a big market share and they decided to build on strength by adding to their network in a certain city, and they gain share because of that.  That's pro-competitive.

What Professor Katz will see in his data is that the Hirfindahl will go up when the Verizon gains share.  When the number one firm gains share, the Hirfindahl goes up.  So he will see this city, let's say, or CMA, that the Hirfindahl will be high and speeds will be high.  And so he says look, a high Hirfindahl goes along with high speeds, what is the problem with high Herfindahl?  But that is a completely different exercise than asking:  In that same CMA, in that same circumstance, what if Sprint and T-Mobile were to merge?  It's a completely different question, and his observations do not

address that question.  So they are not informative regarding this merger.

Q.  All right.  Let's turn now to MVNOs.  You read Professor Katz's testimony regarding MVNOs?

A.  I did.

Q.  And you read that Professor Katz disagreed with you about how to treat MVNOs for the purposes of measuring market shares, correct?

A.  Yes, we disagree about that.

Q.  He said that the MVNOs should be assigned their own market shares, correct?

A.  That is correct.

Q.  What is your response?

A.  So just to compare to make sure we understand the difference, for a subscriber -- an MVNO subscriber I attributed that subscriber to the company that's being -- network operator who is actually providing the network services.  So I think that I strongly disagree with Professor Katz's view on this, and I believe he's departing from a core principle, which is the market shares should measure the independent ability of firms to compete, and he has not following that principle.

Q.  So let's look at some testimony that Professor Katz provided on the issue of MVNOs.  He stated yes, they buy wholesale services from somebody else, but almost every firm ends up buying inputs from somebody else.  Do you recall

reading that testimony?

A.  I do.

Q.  And what's your response?

A.  Well, it really matters who you are buying your inputs from.  He says "somebody else," but let's talk about who that somebody is.  Let me give an example.  Suppose I am running a railroad, trying to serve people with a railroad, and I need to buy railroad cars, passenger cars.  There are a number of suppliers, so I'm dependent on that input.  Yes, I buy that input.  Suppose your Honor, if I may, that you are also running a railroad -- maybe I'm getting into trouble, Mr. Pomerantz is running a railroad, and we each have to buy railroad cars, of course.

Now suppose that Mr. Pomerantz owns the track, and I don't have have track, and if I'm going to serve people I have to run my railroad cars on his track.  That's a whole different matter than buying railroad cars.  I'm dependent on him, and in the way that you described when I was last here, your Honor, he's going to have a conflicts of interest, he's going to want to make money on his own customers.  If he makes his track available to me, he will only do that if that serves his interest, and that's not independent competition.  So it really matters who you are buying the inputs from, and the MVNOs are getting the track the network from the MNOs, they are not independent.

Q.   Is Professor Katz's approach to MVNOs consistent with how the FCC has treated MVNOs when the FCC has studied this industry?

MR. CARY:  Your Honor, I object.  During Professor Katz's testimony we saw the plaintiffs pull out a document from another aspect of FCC review, and that was the spectrum screen that they used in local markets.  We're now getting another quote randomly from an FCC document and asking this witness to talk about the FCC.  Unlike Professor Katz, who was chief economist at the FCC, this witness was not at the FCC, this document is irrelevant, and this, again, is part of their relitigating their case trying to backfill their arguments.

MR. POMERANTZ:  Your Honor, first of all, to be continually accused of backfilling is just totally inappropriate here.  Professor Katz took a position.  Rebuttal is to rebut what he said.  This particular statement by the FCC is something that Professor Shapiro cited in his reports.

MR. CARY:  Exactly, your Honor.

MR. POMERANTZ:  This is a direct response to it.  The fact that it's in his report but we didn't bring it out, now that we have Professor Katz's testimony, this rebuts what he said because the FCC expressly disagrees with Professor Katz, and this is something that an economist typically would rely upon because Professor Katz relied upon it -- sorry, Professor Shapiro relied upon it here.

THE COURT:  All right.  Overruled.  To the extent the testimony goes to rebuttal of Professor Katz, I will allow it.

A.  Well, I think the quote is powerful, actually, informative, because it says following widespread industry practices, the commission generally attributes the subscribers of MVNOs to their host facilities-based service providers, including when it calculates markets concentration metrics.

And I should add that this is in the annual report from the FCC that analyzes competitive market conditions in -- I guess they're calling it mobile wireless, including commercial mobile services.  So I think it's meaningful.  The expert agency is taking this view, and I think Professor Katz's view is not only inconsistent with the fundamental economic principle I described a moment ago, but is an outlier in terms of how this industry has been analyzed in the past.

Q.  And Professor Shapiro, has T-Mobile itself attributed MVNO subscribers to the host MVNOs in a way that is inconsistent with what Professor Katz testified to in this case?

A.  So yes, they have.  I see you pulled up the next exhibit.

MR. CARY:  Your Honor, I'm going to object again. This is a document which shows T-Mobile tracking usage on their network, wholesale and retail.  This case is about retail.  The fact that they tracked in wholesale categories who is riding on their network is irrelevant to the question of this case, which is in the retail market, and it's again backfilling and trying

to get new evidence in on a point where they had the burden and they had the case in chief.  I object.

MR. POMERANTZ:  Your Honor, first of all, that could be brought out in cross-examination.  Secondly, they were the ones who actually elicited testimony from Professor Katz about the wholesale market because it relates to the retail market.  And in fact, that's their position here, that these MVNOs are actually competing down at the retail level.  So this testimony and this document, which is a document that Professor Katz relied on in his examination, this is not just something that we pulled out from some file box, this is something they used in his examination, and I think it's proper rebuttal.

THE COURT:  Overruled.

A.  So just to be clear what document we're talking about, this is, as it indicates, T-Mobile market planning model.  This is something that Professor Katz relied upon in his analysis.  And the point is -- it's a specific point that it's highlighted here for the year 2018 on the display, and particularly over on the right-hand side, which has been made in larger image, that the T-Mobile in this planning document ends up calculating the subscriber shares for the MNOs, and they have included in those calculations of shares the subscribers who are MVNO subscribers.  They also in this case included some additional M to M, so it doesn't exactly line up with the market, the relevant market, but it makes the point.

JCKTSTA3                         Shapiro - Direct

Q.   Now I want to turn to Altice.  Do you recall reading or reading this testimony from Professor Katz, "If you look at an MVNO that is also a cable MSO, so you look at someone like Altice or Comcast, they bring a lot to the table."

          Do you see that?

A.   I do.

Q.   How do you respond?

A.   So first, I think it's useful, your Honor, to distinguish these types of MVNOs, the cable ones, which has really historically been Comcast, Charter, and then a slightly different creature, Google Fi, from the other MVNOs like TracFone who don't have these types of facilities like the cable company.

          In terms of market shares, the total market share of these cable-type companies as MVNOs, including Google, is only around one percent of the market.  So whether you -- if you want to treat them somewhat differently or think of this somewhat differently, because they do have some facilities that bring some things to the table that TracFone does not, it would not matter in terms of concentration, because that group collectively is about slightly over -- I think it's 1.2 percent.

          So in terms of the importance in terms of subscriber count of the MVNOs, they're relatively small, and it's TracFone and the other MVNOs that have the real numbers.  So I agree

that they do bring something more to the table because they have some facilities and can offer some bundled deals for customers, with their cable customers in their footprints, but they are still heavily dependent on the MVNOs.

Q.  So Professor Katz is offering a view that Altice should be viewed as an independent competitor of let's say Sprint who it has a deal with, correct?

A.  Yes, that seems to be his view.  Certainly he wants to attribute their subscribers to them as -- attribute that to their own market share rather than to Sprint, which is carrying their traffic.

Q.  I want to focus on Altice, and I want to look at whether they really should be viewed as an independent competitor to Sprint.

MR. CARY:  Your Honor, I'm going to object to this document and this line of inquiry.  This is demonstrative of the prejudice that we are undergoing here.  Dr. Shapiro testified in his initial testimony about the irrelevance of MVNOs in calculating his market shares.  We have had testimony here from Altice, we have had testimony here from Sprint that have addressed this relationship.  They're now pulling one fact out of the contract which is tens of pages long to try to make the point.  Had they made it originally we could have had the Sprint witnesses and the Altice witnesses address it.  They chose not to make it initially, they're now bringing it in to

substantiate their case, and we object.  We think it's unfair.

MR. POMERANTZ:  Your Honor, Professor Katz was fully aware of this contract when he offered his testimony about Altice.  Because he offered his testimony about Altice that they should be treated as an independent competitor, we have every right to come in here and show that, in fact, Professor Katz had access to evidence that shows they're nothing close to an independent competitor.  What this provision provides, and what Professor Shapiro would explain if permitted, is if Altice were to take a customer from Sprint or Sprint were to take a customer from Altice, they had to pay each other money.

MR. CARY:  Your Honor, I object to Mr. Pomerantz doing his closing argument.

MR. POMERANTZ:  I would rather have Professor Shapiro testify to it.

THE COURT:  Overruled.

A.   So I think the question is to explain what's on the slide here.

Q.   Yes, please.

A.   I lost track.  Your Honor, this is from, as you could see, master wireless wholesale agreement between Altice and Sprint. And what I'm doing here is highlighting a provision, as Mr. Cary points out in that agreement, and I'm going to read it just so we all get it.

For each Sprint subscriber -- purchaser, that's

JCKTSTA3                    Shapiro - Direct

Altice --

Q.   Carl --

A.   I'm not supposed to do that?

          MR. POMERANTZ:   Could we take this down from the public screen?

          MR. MACH:   It's not on the public screen.

Q.   The Court can see the text, so testify without giving specifics.

A.   Without the specific numbers?

Q.   Yes.

A.   Let me -- the idea that's in here, and your Honor can read it, is the arrangement specifies that -- so Altice is planning to launch, and they did launch a couple months ago, so when they launch, if they get a subscriber that ports from Sprint, then they are required to pay an amount of money shown here to Sprint.  That's what Sprint negotiated with them.  And furthermore, after some period of time, that arrangement would be reciprocal, that is to say, if the subscriber ended up going back in the other direction, the money would go from Sprint to Altice.

          So I guess I want to make two points about that. First, it very explicitly is an example of how the MNO, in this case Sprint, can control and influence the ability of the MVNO to compete by imposing this cost.  And of course what Sprint, I would think, is trying to do is they're happy if Altice gets a

customer from Verizon because then Sprint gets their profit margin on that customer. But they don't want to lose their own customers to Altice, so they put in this fee. So it's a type of steering, and they're partners, as they describe it.

The other thing that I think is worth noting is that we have a situation where the companies agree to pay each other if they get business from each other. If they were genuine competitors of each other, that would be a blatantly anticompetitive customer allocation agreement. But they are partners here, they are not direct competitors.

Q. Let's turn to Professor Katz's calculations of HHIs. He offered testimony, which you probably saw, which calculated HHIs at the national level and came up with a post-merger HHI of under 2500. Do you recall that?

A. I do.

Q. So I will skip two slides here and skip this one to this one. Can you explain to the Court what this chart is.

A. Yes, I can. First, your Honor, you will see from the source this is taken from Professor Katz's rebuttal report, the one where he responded to my original work, and, as indicated, it's revenue shares and concentration measures.

And the key thing is that there are two rows here, and let's start with the second row, which is MVNOs as independent entities. So this is what Professor Katz put in his report. And he's using, remember -- I should back up. The title,

Revenue Shares, his preferred measure of market shares is to use revenues. I've reported both to you, but I explained why I thought the subscriber counts were somewhat better, but he likes revenue shares, and that's what he put here.

So using revenue shares -- and he likes MVNOs as independent entities, that's his point, that's where we disagree. That's the second row. Using the measure in the report he found that the post-merger Hirfindahl was 2611 and the increase in Herfindahl was 313. He was contrasting that with the row above that, which is using -- what I think is using the correct method of MVNOs attributed to MNOs, which led to a higher increase in Hirfindahl and a higher-post merger Hirfindahl and higher combined shares. But by his own preferred approaches, namely using revenue shares and treating MVNOs as an independent entity, he also finds, again, post-merger Herfindahl 2611, increase in Herfindahl of 313. This is from his report.

(Continued on next page)

JCKPSTA4                        Shapiro - Direct

Q.  So to be clear, I want to make sure it's clear what happened here in the courtroom.  Professor Katz came into this courtroom and only offered concentration measures based on subscribers, correct?

A.  Well, the -- what I know -- what I have in my mind and remember, he has very colorful demonstratives with pie charts that showed market shares with subscriber counts.

Q.  But in his report, he didn't do it that way; he only did it by revenue share, correct?

MR. CARY:  Object as asked and answered and leading, your Honor.

THE COURT:  Overruled.

A.  So this table was based on his preferred metric of revenue shares.  I can't recall, there might have been some backup materials where he calculated by subscriber shares.  It wasn't in the table that I'm remembering from his main body of his report.

Q.  All right.  So if we calculate HHIs by revenue share, but treat MVNOs as Professor Katz treats them, then the post-merger HHI is 2611 and the change is 313, correct?

A.  Yes, that's what I said.  That's correct.

Q.  Now, do Dr. Katz's testimony in trial here about market shares and HHIs change your views on how the merger will change market concentration?

A.  No, not fundamentally.  You know, there's, obviously, some

back and forth about the specific metrics.  In the end, I think, if you kind of pull back from that a little bit, your Honor, it's a four-to-three merger among nationwide carriers in this country, and that is inherently troubling for reasons I've talked about.  And nothing Professor Katz said has caused me to alter that view.

Q.  All right.  Let's move on to another topic, a related topic, and this concerns how to view Sprint's market share in making market share calculations.  I've put up on the slide here the testimony from Professor Katz about Sprint's performance; do you see that?

A.  I do.

Q.  And does this testimony -- by the way, the testimony comes from transcript page 1841, lines 19 to 24.

Does this testimony by Professor Katz change your view about whether the elimination of Sprint will harm consumers?

A.  No, it does not.  I stand by my view that Sprint has been a disruptive influence, a maverick I called them.  They've been a low priced -- they've offered low prices, and I expect that to continue, if the merger does not go forward, and I did myself projections to support that conclusion that Sprint would continue to be a significant competitive influence if this merger does not take place.

Q.  All right.  So Professor Katz testified that Sprint is going to have a limited ability to compete in the future,

correct?

A.  He did.

Q.  And he then tried to project out, or he at least tried to project out, some market shares based upon that decline, correct?

A.  He offered some share projections and revenue projections, yes.

Q.  And you looked at that issue in connection with your report, correct?

A.  Yes, I did.

Q.  Could you please explain to the Court what this slide reflects?

A.  Yes.

MR. CARY:  I need to object again.  This is a slide that Professor Katz had submitted at the FCC using projections from Sprint's business plans in early 2019.  They don't reflect current data.

If Professor Katz were here, he could explain exactly what this was.  They chose not to cross-examine him with his own work but to, instead, get it in through the back door, through Professor Shapiro, when we don't have an opportunity to bring Professor Katz in to explain exactly what these numbers represent.

Professor Katz has shown you the actual data during the relevant period and used Professor Shapiro's technique to

project further.  To go back into an early report at the FCC and come up with new numbers at this stage, we believe, is beyond the scope of rebuttal and inappropriate, and we object.

MR. POMERANTZ:  Your Honor, this information was set forth in Professor Shapiro's report.  Nothing was hidden from the other side.  They chose to have Professor Katz come in here and testify to predictions about Sprint's market share going forward that they knew were inconsistent with what he had said to the FCC earlier in the review process.

If they want to cross-examine Professor Shapiro about that, they can.  If they wanted to clarify that with Professor Katz, they could have, but it doesn't deprive us of showing through rebuttal testimony to rebut what they did in this courtroom.  They provided an estimate from Professor Katz of a decline in revenue share that is inconsistent with what he had previously told the FCC.

MR. CARY:  Your Honor, that's exactly the point.  This draft or this table was in Professor Shapiro's initial report.  He didn't present it.  Therefore, there was no reason for Professor Katz to go through things that were not in dispute and talk about them.

Had he presented it, Professor Katz would have made the point that these were just projections from Sprint's plan, and he was attempting to be conservative.

THE COURT:  Thank you.  Overruled.  Mr. Cary, you'll

JCKPSTA4                         Shapiro - Direct

have the opportunity to cross-examination Professor Shapiro,

and you can bring these matters out at that time.

MR. CARY:  Thank you, your Honor.

A.   So what this slide depicts is -- I'll just read the title,

Sprint's projected subscriber share based on submissions that

Professor Katz made to the FCC in connection with this merger,

and these went out from -- until 2021, and I would just

basically say stable.

I should note for the record, so there's no confusion,

these shares are smaller than the ones that I am putting

forward, and I believe that's because Professor Katz has

attributed the -- has given MVNOs -- he has a different way of

measuring the shares with the MVNOs in particular.  So my point

is, not about the level.  It's about the stable Sprint share,

as projected, as shown here, and this is consistent with the

projections for subscriber share that I produced and presented

to the Court last week.

Q.   All right.  So let's now move on to coordinated effects.

You have read Professor Katz's testimony about coordinated

effects, correct?

A.   Yes, I have.

Q.   And I've put up on the screen here some of that testimony

by Professor Katz; do you see that?

A.   I do.

Q.   And he talks about how difficult it would be to coordinate

in this industry because of complexity; do you see that?

A.   I do.

Q.   How do you respond?

A.   I guess I just go back, your Honor, to what I've seen in the documents, which is -- well, I should say I agree there's a fair bit of complexity here.  You look at the plans and the features.  So we agree about that, but I've seen in the documents a lot of competitive intelligence activities, and as I -- and I would emphasize that the companies monitor each other closely on a high-frequency basis, daily or weekly.

They're watching each other, and because it's a consumer market, the companies can see what they're each offering to consumers.  So there is complexity, but there's close monitoring.  And I am concerned -- would be concerned about coordination or pulling punches on a number of dimensions.  You know, it doesn't have to be all of them.

I kind of got the impression from Professor Katz's testimony that he thought, well, if they tried to restrict competition on one dimension, it would just come out somewhere else.  He didn't say it this way; so admittedly, this is my interpretation, that somehow it wouldn't matter very much or it wouldn't be successful.  And I don't think that's consistent with the monitoring activities here and what we see in other industries, where there is successful coordination or even collusion, even on some dimensions, even when companies compete

on many.

Q.  And have you seen examples of coordination in complex industries in your economic work?

A.  So, yes, this does come up.  We see it.  Coordination, it's hard to know exactly when it's happening, to be honest, or for us to measure it.  But for cartel cases, real hard core cartel cases, we see coordination even in industries that are very complicated.

There was a cartel in the air cargo industry, where they agreed to fix fuel surcharges, one component of -- while they competed on many dimensions.  So this is something that happens in other industries, and companies find it profitable.

Q.  So did you create a couple of slides to try to explain how the merger might affect the coordination and how that compares to complexity in the marketplace?

A.  Yes, I did.

Q.  All right.  So let's look at those.  So what are you trying to depict here?

A.  I'm simply trying to depict that if the firms are monitoring each other and watching each other, there is some complexity.  If there's four companies, they each have to keep an eye on three, and the arrows here depict watching each other in both directions.

Now, traditionally, markets with a few firms like this have always been a concern to industrial organization

JCKPSTA4                        Shapiro - Direct

economists.  And four is -- so this just sort of gives a sense of the complexity of monitoring with four companies.

Q.  So if there's a merger, and there's only three companies, how does that affect your concerns about coordinated effects?

A.  So the number of arrows has gone down quite a bit, actually.  If there's three companies, you only need to keep an eye on two of them.  I mean, it's, I think, a straightforward point, but it relates to complexity and monitoring.

THE COURT:  Let me ask, Mr. Shapiro, because this raises an obvious question that DISH might ask.  What are we, chopped liver?

THE WITNESS:  I believe I get your reference.  Right.  So I, in my analysis and discussion of coordinated effects, I have not been thinking that DISH would be part of this club, if it were -- if they were coordinating.

So the question then arises, that I've addressed and I know you all have to as well, your Honor, is if DISH is not playing along, will this coordination still be profitable and still harm consumers?  And I think the answer is yes.

And one reasons is DISH, starting off, at least for the first couple of years, they're starting off with a 3 percent market share with Boost, about nine million subscribers, and it's all in prepaid.  Now, they're going to grow that over time.  So you know, the combined market share of these three firms is well into the 90s, and so even if they

JCKPSTA4                          Shapiro - Direct

lose some sales to DISH, because they're not competing as hard, if they make more money on the 90-plus percent of subscribers that they serve, that's still going to pay.

So we tend to think if you have a small firm, who's not part of a coordinating group, if they're small, unless they can grow enormous, really quite dramatically, they probably will not restrain or defeat that coordination; so that's how I think about DISH.

THE COURT:  But I think implicit in what you're saying is what you've also suggested, unless they grow dramatically. Are you discounting that as a possibility?

THE WITNESS:  Okay.  So when I said unless they grow dramatically, if we think of coordination, let's think first of a one-year time frame, say.  If there were some less competition among these three big firms, for DISH to grow from 3 percent to 5 percent, for example, you know, it might very well not make that coordination unprofitable.  That wouldn't document as dramatic growth.

So if we're thinking -- I sense in your question, we think about DISH growing over a multiyear period as they built out their network, that is not the growth that would be relevant for the question I was addressing, which is:  Could they take advantage of this coordination in a shorter period of time?

So, yeah, so one could ask, over a longer period of

time, well, I would be concerned then about harm to consumers for several years from the coordination when DISH would grow some but not very much, and then we'd get into Professor Scott Morton's territory about the longer-range effects of DISH.

BY MR. POMERANTZ:

Q.   Maybe if we can follow up on that immediately.  Could you switch us to slide 21.

So this is -- we were going to address this in a different segment, but I think it's directly responsive to the questions posed by the Court.

Does this comparison of Sprint and DISH, I want you to focus more on the DISH side of this.  Does this help to explain why or whether DISH is likely to grow dramatically in the short term in order to -- and would counteract the risks of coordinated effects?

A.   So, yes, it's comparing Sprint and DISH, just to be clear. This slide was prepared for that purpose.  And for a number of reasons, you know, DISH is not going to look anything like Sprint anytime soon, in terms of its subscriber shares and it has these higher costs.

So this means that DISH will be less -- much less able to discipline coordination among AT&T, Verizon and T-Mobile than Sprint has been doing in the -- recently.  And so from that point of view, which again is -- the relevant issue in the merger is will DISH replace Sprint, in this case, in terms of

discipline and coordination by the other three, and I don't believe it will, certainly for the next few years.

Q.   Could you bring us back to slide 16.

Okay.  This is testimony by Professor Katz when he was discussing coordinated effects, and he compared it to sitting on a balloon; do you recall that?

A.   Yes, I do, and yes, I see this.

Q.   All right.  And have you seen examples of this in this case that relate to Dr. Katz's point he's making here using the balloon example?

A.   Yes.  I guess I have seen examples where there was communication or signaling on specific dimensions of competition that was going on.

Q.   All right.  So just to give one example, could you explain to the Court how this relates to the coordinated effects concerns that you have and that Professor Katz disagreed with?

A.   Certainly.  So this is an e-mail.  They were talking about having an end date on the promotion of the iPhone, and it says: "to signal our competition, that it was really just our turn to run our promo."  So this is a signaling.

And I think in terms of Professor Katz's quote, let's suppose this was successful in terms of limiting that promotion.  So it, as I said that, it wouldn't last for a longer period of time, and they said so they wouldn't panic was their word.  So if it was successful -- so my view would be if

JCKPSTA4                        Shapiro - Direct

that was coordination, or we had this after the merger, same idea, then consumers might have gotten the promotional rate on the iPhone for a week, or whatever it was, rather than a month or a longer period of time, and that would constitute harm, that would cause harm to consumers notwithstanding that -- well, I guess Professor Katz, with his balloon analogy, is suggesting at least, well, don't worry about it very much because they'll be competing on some other dimension, and I just don't think that fits with this evidence.

THE COURT:  Mr. Cary?

MR. CARY:  Yes, your Honor.  I was going to object and move to strike this last testimony.  Again, this was the subject of the direct original testimony.  We had Mr. Sievert and others that are on this e-mail chain who could testify and explain this, if Professor Shapiro brought it up in time.  And therefore, I object to the use of the document and move to strike the testimony.

THE COURT:  Mr. Pomerantz?

MR. POMERANTZ:  Yes.  Okay.  Two things.  Mr. Mach just whispered to me that he actually questioned Mr. Sievert about this document; so we actually do have Mr. Sievert's response on this document.

But what we were trying to do was use this document to explain why Professor Shapiro disagrees with the testimony of Professor Katz that he used by using the balloon example.  And

SOUTHERN DISTRICT REPORTERS, P.C.

what he was looking at is a specific example in this case that is inconsistent with what Professor Katz was saying.

THE COURT:  All right.  Overruled.

MR. POMERANTZ:  And for the record, that was Exhibit 777.

BY MR. POMERANTZ:

Q.  Let's turn to unilateral effects.  Now, you heard, or you read, Professor Katz had a variety of criticisms about your unilateral effects analysis?

A.  Yes, I did.  I read that.

Q.  And among other things, he criticized your diversion ratios and how you used them in your unilateral effects analysis; do you recall that?

A.  I do.

Q.  So if you could use this pricing example from the record to explain why Professor Katz is wrong in the way he analyzed your unilateral effects analysis, and why you still have concerns about unilateral effects?

A.  Okay.  So let's talk about T-Mobile's pricing incentives and the unilateral pricing incentives.  And again, we're asking how will those change because -- when they're facing Sprint as a competitor, compared to after they acquire Sprint.

So here, we have T-Mobile is in the middle here in the pricing.  Let's look at the top row, the two lines per month price, $120.  Before the merger, or now or in recent years, it

might be reasonable for them to say, well, maybe we should lower our price because we're not the lowest. Sprint is lower and that will -- if we don't lower it, we might lose customers to Sprint. And if we do lower it, maybe we'll get some of their customers. So that's part of the calculus of lowering that price, and that can happen over time.

Of course, AT&T is also in the picture. I'm not ruling them out, but we want to focus on what's changing from the merger, which is Sprint is going to go away here. So as I said, they might be very well tempted to lower their price to either capture customers from Sprint or avoid losing customers to Sprint, who's lower priced.

Now, after the merger, we basically take away the Sprint column and the calculus changes. For T-Mobile, they go, well, if we lower our price, it's not like we're going to get customers from Sprint. We own them. They're not there anymore. We still might get some customers from AT&T, but it's just less attractive to do so.

So that's the guts of it and the diversions that we're talking about here. So it's very important, then, when they lower their price, how many of the customers they would be picking up from Sprint or keeping from going to Sprint, and that's what we've measured.

And the diversions I've calculated fit with a lot of the other evidence here, which is that Sprint and T-Mobile are

JCKPSTA4                        Shapiro - Direct

quite close competitors, closer than you would think, just looking at their market shares.  And so that's why this whole diversion and upward pricing pressure way of measuring things, I think, is both well suited to unilateral effects and adds a lot to what we get from the other main metric, namely, the Herfindahl measurement.

Q.  Okay.  And just so that we're clear, this is completely separate from whether AT&T and Verizon might have an increased risk of coordinating with T-Mobile, correct?

A.  Yes.  I thought we were just talking about unilateral effects here.  So I am aware in that analysis, AT&T is in the market, Verizon is in the market, but I'm taking their prices as given and just focusing on eliminating Sprint.

Q.  Now, Professor Katz says that you failed to make an adjustment using the Facebook data when you calculated unilateral effects.  Did you read that testimony?

A.  Yes.  This goes specifically to the diversion ratios that I just talked about.

Q.  Okay.  So what's your response to Professor Katz's testimony about your use of Facebook data?

A.  So there's two responses I'd like to give.  First, and this is in my -- clearly stated in my reply report, that I do not believe any such adjustment is needed.  I stand by the calculations I gave, and I explained in detail the basis for that view in my reply report.

We had had a back -- exchange on this, but I also then went further in the reply report. It's now cited here by this demonstrative to show that there's really very little at stake in this particular back and forth between me and Professor Katz. So what -- again, straight out of my reply report, your Honor.

This is the brand-level diversions, which we had to do it at the brand level to properly account for Boost. And the first column here, where it just says "Facebook," those are the numbers I used in my analysis that I presented to the Court. If one makes the adjustments that Professor Katz has been advocating, then you would use the second column.

I should be clear. What's being reported here is the upward pricing pressure. That's how the divergence gets used to ultimately measure these concerns about higher prices, and these are small differences. Again, I don't think this adjustment was necessary, but if you made it, it would not in any significant way change the results of my analysis or my opinion.

Q. All right. Let's turn to DISH. This is testimony from Professor Katz about DISH, and he testified that DISH does not have to fully replace Sprint for the deal to strengthen competition and benefit consumers; do you see that?

A. I do.

Q. What's your response?

A.  So I think it's just to crystalize where we agree and where we disagree.  I understand him to be saying that the reasons -- he is counting on efficiencies.  I think he's saying ultimately, look, the deal is going to create a bunch of efficiencies, and he says that here and between that and the DISH, it's good enough to protect consumers, or maybe more than good enough.  I don't want to characterize.  He's putting the two together.

          And so I think my part of this analysis is to look at DISH and what its impact will be on competition in the near term, especially.  And so there's -- and my point is simply DISH falls far short of replacing Sprint for the next few years, and so if you -- in order to conclude that consumers will be protected during that period of time, despite Sprint's absence, you would need to have significant efficiencies.

Q.  And this is a slide that we looked at previously when we were discussing coordinated effects.  How does this relate now to your response to Professor Katz about DISH?

A.  So it's this point about falling far short.  I just -- DISH, during the next two, three years, certainly two years, is going to be predominantly serving customers over its own network.  I gave the data.  Only 2 percent of their subscribers will be on their own network in 2020.  They will have higher costs.

          This is a -- the prepaid segment that they're starting

with those subscribers tend to churn much more quickly than post-paid; so they're going to have to run to stay in place, as it were.  They have to deal with that.  And they're still heavily dependent on T-Mobile's network.  So this is -- this is nothing -- they don't look anything like Sprint.  I understand that they've got these plans to build out, and I'm not looking at the longer term.  But I'm concerned about consumers and the impact in the near term.

Q.  All right.  One more topic.

The Court asked Professor Katz a question about what you are predicting about what will happen to prices in the future, and Professor Katz did his best to explain what he thought your position was about prices in the future.

I wanted to give you a chance to answer the Judge's question about what you believe will happen to prices in the future because of this merger.

And I thought it would be helpful for you, in explaining your answer, to have an example of a current T-Mobile program that's being offered in the market right now. If you could explain what's going to happen, using this as an example?

A.  Okay.  Thank you.  So first, what is this?  We just pulled this off the web yesterday or the day before.  It's just meant to illustrate the type of plan that T-Mobile is offering. "Magenta," it says, "our signature unlimited plan packed with

JCKPSTA4                      Shapiro - Direct

benefits," and it's $35 per line.  So that's where we are now.

My view, expectation, hope, your Honor, is that if we don't have the merger, we continue to have the four companies compete vigorously.  That T-Mobile will, because of competitor pressure, offer even better terms to consumers in the future.  And so one way that could happen is they might lower this $35 a line to 30.  I'm not -- that's not a specific prediction.  It's just an example of how competition can lead to real benefits for real consumers and real households.

So harm would arise that because of the merger, they stay pat at $35 because they don't have to face Sprint, and all the other reasons I've given.  Consumers are losing that $5 a month.  They would have gained that lower price, and they don't get it.  That's real harm.  So that would be a price -- just in terms of price, that would be a harm to consumers resulting from the merger and loss of competition, and I'm definitely concerned about that.

There's also a non-price side to it.  Let me just give an example based on this, their plan now.  So they say Netflix on us, basic, one screen in standard definition, SD.  So that's a nice goody.  I like Netflix.  Particularly, as usage goes up, you know, people like -- Professor Scott Morton was talking about high definition.  It seems to me the type of thing the competition can deliver for consumers in the future would be extra goodies, maybe.  Again, not a specific prediction.  Just

an example.

Competition would press them to offer two screens or high definition, okay, as part of their package and the companies pull their punches.  Maybe it's coordinated effects and they don't offer that, that would be a form of consumer harm because quality would not go up.  It would stay where it is.  So those are tangible things that I'm concerned about that will hurt consumers as a result of this merger.

THE COURT:  Let me ask Professor Shapiro.  You're concerned that in the post-merger world, that T-Mobile will sort of pull -- you used "pull their punches," in the realm of possibilities.  Is it also possible that rather than pulling their punches, they may go out in the ring, like Rocky, and say:  Come on out?

THE WITNESS:  Well, look, I think that's --

THE COURT:  Essentially, that's what Mr.~Legere said in his testimony, that he is looking forward to being out there in the ring with the two big guys.

THE WITNESS:  Right.  Well, he's already in the ring.  It's just as scrappy No. 4.  Look, I understand T-Mobile's basic point here, which is, they're claiming they will become a stronger competitor to go after the big guys.  Okay?

The way antitrust economists think about these things, and it's certainly it's used through all of my testimony, the merger guidelines, decades of research, for that matter, is we

JCKPSTA4                        Shapiro - Direct

tend to think, and we have empirical basis for this, that when we go from four to three -- well, when we go from six to five to four, as we start to slim down the number of competitors, we're more concerned, generally concerned competition will lessen.  And that's why economists worked on this for decades that ultimately lead to the Philadelphia National Bank Presumption, actually, in the law.  This is where it started in the '50s.

So that's our sort of bedrock principle.  Now, but we understand that that might not apply in every case, and if a company is going to achieve a lot of efficiencies because of this deal, that might be the exception, and those things happen.

THE COURT:  Let me ask you.  That's precisely my point.  Are you aware of specific instances in the last, let's say, 20, 30 years, where four-to-three mergers have produced sufficient benefits to justify their merger?

THE WITNESS:  You mean in any industry?

THE COURT:  Yes, just generally.

THE WITNESS:  That's a tough one.  I think, yes, there would be some.  I would say there would be some.  I don't have things off the top of my head, but, you know, there's sometimes where it is a struggling firm -- I mean, the types of things that T-Mobile is arguing, those are not crazy concepts in general.  Those happen.  Okay?  I'm not denying that.  It's a

question about this case.

THE COURT:  All right.  I think that I saw in one of the briefs there was a footnote that listed a dozen or so four-to-three mergers that have been approved, or not objected to, and the suggestion was that there's nothing inherently wrong about going from four to three, and that there may be some instances, again, in the realm of possibilities where four to three could produce efficiencies sufficient to justify the merger.

THE WITNESS:  Again, it can happen.  What the economic research has been showing the last 10 years or so, your Honor, is that mergers, unfortunately, in the United States have generally been too lax; so there's a lot of evidence that mergers have gone through, hospital mergers, for example, airlines mergers, other industries, not this one, where -- a beer I mentioned, actually did come up already, where it's -- I think there's a growing view, not a consensus yet, that merger enforcement has been too lax, and so there's a lot of studies of mergers.

Some four-to-threes have worked out fine.  A lot of them have not as well, and so we have the presumptions that are based on our empirical work, generally.  We have evidence from this industry, as well in other countries that I won't refer to, but you know, we're in uncharted territory with the four-to-three of the nationwide carriers here.  So I think we

JCKPSTA4                         Shapiro - Direct

need to fall back, to some degree, on our presumptions, but I haven't entirely done that.  I've looked at the effects in detail as well.

THE COURT:  Thank you.

Mr. Pomerantz.

BY MR. POMERANTZ:

Q.  So one of the reasons why a four-to-three merger may not be anti-competitive is because of efficiencies, correct?

A.  That is correct.  That would be the primary reason.

Q.  And an economist would only credit those efficiencies if they were both merger-specific and verifiable, correct?

A.  That is correct.

Q.  And so to the extent that this merger is being justified based upon efficiencies, you'd have to look at those kinds of issues, at least from an economist's perspective, correct?

A.  Yes, and that's exactly what Professor Scott Morton did earlier this morning.

Q.  Now, another reason why a four-to-three merger may be -- may not be a problem for competition is if one of the two parties that are merging is so weak that they would be an irrelevant competitor, a meaningless competitor in the future, correct?

A.  That's correct.

Q.  And there is a very high test that economists apply before they would ever credit that kind of a defense, correct?

A.  Well, we -- antitrust economics is a practical area.  We basically do economics to try to -- I think you were referring to the failing firm defense.  So that's something economists at the antitrust division, for example, look and see whether those stringent requirements are met.

But more often, in my experience at least, particularly when I was with the antitrust division, is it's more of something called a flailing firm defense, that they're just weak.  And that's one reason I looked at the projected market share, to see how much there is behind that argument.

Q.  And if you didn't have the kind of efficiencies that economists recognize, or a flailing or failing firm, then what do economics teach us about four-to-three mergers?

A.  Well, and this is what I was trying to explain to the Judge, that we have decades of experience that, as a general principle, we see four to three as definitely in the zone that is worrisome, in terms of loss of competition and that underlies the market share thresholds, which have been in the merger guidelines since 1968.  Changed a bit, but it's because of that deep empirical work in the field that that has been translated into practice, at least at the agencies through these structural presumption, the Herfindahls, and so that's based on, basically, the knowledge in my field.

MR. POMERANTZ:  No further questions, your Honor.

THE COURT:  Thank you.  Mr. Cary, how long do you need

JCKPSTA4                     Shapiro - Direct

with the witness?

MR. CARY:  45 minutes, your Honor.

THE COURT:  All right.  Let's take the lunch break then.

(Luncheon recess)

(Continued on next page)

JCKTSTA5                        Shapiro - Cross

AFTERNOON SESSION

(1:30 p.m.)

THE COURT:  Welcome back, Mr. Cary.

MR. CARY:  Thank you, your Honor.

Your Honor, we went back and took advantage of the lunch break to go through the questions that were asked and compared them to the earlier trial testimony, and I'm hoping that I will be able to shorten this examination relative to my prediction.

THE COURT:  That's good, thank you.

CROSS-EXAMINATION

BY MR. CARY:

Q.  Professor Shapiro, good afternoon.

A.  Good afternoon, Mr. Cary.

Q.  I will ask you a series of questions, and so we can all get out of here, given the last day of trial, I request that you stay very closely to my question, if that you would be okay with you.

A.  Yes, sir.

Q.  Thank you.  I would like to start by asking you whether you calculated Sprint's revenue share to be 13.8 percent at the end of the year 2018 in your report, correct?

And I can put on the screen a demonstrative or the report to help you speed through this.

MR. POMERANTZ:  What page?

MR. CARY:  This is Shapiro reply report, page 171, figure 37.

Q.  Do you see where it shows Sprint's retail share at 13.8?

A.  I do.

Q.  And this is for the end of the year 2018, correct?

A.  December 2018.

Q.  And in your report you also made a prediction that Sprint's revenue share would be 11 percent by the end of the year 2020, is that correct?

I refer you to Shapiro initial report figure 34, tab 4, page 294.  Do you see that?

A.  I do.

Q.  Is that in your report?  Was that your projection?

A.  This looks correct.  Are you showing me figure 34 from my first report?

Q.  Yes, sir.

A.  I'm not disputing it's there.  If you pull out, I could confirm.

Yes, that looks correct.

Q.  Thank you very much.  I would like to refer you to the slide that you put up with respect to Altice in your direct testimony today.

MR. CARY:  Mr. Klein, if you could get to tab 31, page 9.

Not public, please.

JCKTSTA5                    Shapiro - Cross

MR. POMERANTZ:  Your Honor, just to be clear, I made one error and Professor Shapiro made one error in terms of saying something on the record that should not have been on the record, so I ask after the proceeding to work with counsel and the court reporter to have that portion deemed under seal.

THE COURT:  All right, granted.

Q.  So Dr. Shapiro, you explained through this demonstrative that the Altice-Sprint contract has a clause that penalizes Altice when it takes a Sprint customer, is that correct?

A.  Correct.

Q.  Isn't it true that there are many MVNO contracts that do not include such a clause?

A.  I think that's correct, yes.

Q.  In fact, this clause is pretty unusual, is it not?

A.  I have not done a survey, I can't speak to the frequency with which this type of clause occurs.

Q.  Altice has -- well, let me put it this way, your report did not contain any analysis of how prevalent this is, correct?

A.  I think that's correct.

Q.  Altice has an incentive to compete with Verizon, doesn't it?

A.  Well --

Q.  It has to get its customers somewhere, right, Professor?

A.  Sorry, what?

Q.  It has to get its customers somewhere, and Verizon has a

lot of customers, right?

A.   Certainly, yes, that's true.

Q.   And if Verizon responds to competition from Altice by lowering its prices generally, that might harm Sprint, correct?

A.   I think your logic is correct.

Q.   And Altice would not take into account the impact of Verizon's price reduction on Sprint, would it?

A.   Well, they're not the same company as Sprint, I'm not quite sure what they would take into account.

Q.   Fair enough.  As a separate company they would not have a particular interest in watching out for Sprint.

        You said Boost's incentives would change in two ways post-divesture.  Do you remember that testimony?

A.   Why don't you tell me specifically what you're referring to, please.

Q.   When you spoke you said the first post-merger Boost in the context of DISH would have an incentive to decrease price, because unlike the premerger Boost, it would not internalize the value of sales lost by Sprint when the Boost price is lowered, right?

        MR. POMERANTZ:  Your Honor, was that stated today?

        MR. CARY:  No, I'm sorry that was in Professor Shapiro's initial report at paragraph 258.

        MR. POMERANTZ:  Your Honor, I want to make sure that it's responsive to something that Professor Shapiro said today,

because that's all that he should be asking about.

THE COURT:  Thank you.

Mr. Cary?

MR. CARY:  Well, Professor Shapiro testified to the various incentives of MVNOs, and he testified to the incentives of DISH post merger, so I'm pursuing it.

THE COURT:  All right.

MR. POMERANTZ:  Your Honor, I don't see the connection, but if maybe he will follow up and we'll see the connection.

THE COURT:  Subject to connection.

THE WITNESS:  I'm supposed to answer it?

THE COURT:  Yes.

THE WITNESS:  Thank you.

A.  So I see this paragraph.  This is part of the analysis of upward pricing pressure.

Q.  Right.  So again, to repeat the question, the post-merger Boost would have an incentive to decrease price, because unlike the premerger Boost, it would not internalize the value of sales lost by Sprint when the Boost price is lowered.  Is that right?

A.  That's correct.  You read that correctly.

Q.  So before the divesture, when Boost is owned by Sprint, they will take into account the effects of their pricing on the rest of Sprint, correct?

JCKTSTA5                    Shapiro - Cross

MR. POMERANTZ:  Your Honor, this is specifically looking at Boost.  This was not all the subject of the examination here today.

MR. CARY:  The examination was about DISH.  DISH will be Boost, boost will be DISH post-divesture.  That's what the divesture is all about.  So he was asked about DISH's incentives to coordinate and to compete.  DISH will be competing through Boost, your Honor.

THE COURT:  All right.  Overruled.

A.  I agree that -- if I remember the question -- that Boost will not go to be part of Sprint, and therefore the same direct internalization of the cost of capturing Sprint subscribers would not apply to Boost in DISH's hands.

Q.  After the divesture when Boost/DISH is an MVNO, they won't take into account the effects of their pricing on the rest of Sprint, correct?

A.  That's correct.  That's the point of this.  This is one side of the balancing here in this paragraph, that's correct.

Q.  That is one difference between Boost being a division of Sprint and Boost being owned by DISH and being an MVNO, correct?

A.  Correct.

Q.  And in your view, the post-merger Boost would have a separate incentive, you say, to increase price because it would have higher marginal cost as an MVNO reselling new T-Mobile's

network than Boost did, right?

A.   That is correct.

Q.   But you did not account for any change in the post-merger Boost business model or business strategy, such as operating at lower margins in your UPP analysis, correct?

A.   The UPP analysis studies the effect of the merger on price incentives, so I don't know what you're referring to about lower margin.  That's what the analysis is about, pricing and margins.

Q.   Right.  But you did not -- in applying your UPP analysis, you did not take into account any changes in post-merger Boost's business model or business strategy, such as operating on lower margins, correct?

A.   The analysis shows exactly what would happen to the margins, and that's what I put in my analysis.

Q.   You did not take into account the fact that MVNOs operate on much thinner margins than MNOs in doing your upward price calculation, correct?

A.   The upward pricing -- excuse me, the upward pricing pressure analysis is designed to isolate the effect of the change of ownership, and so that takes other things as given, and that's what I did.

Q.   And the other thing it took as given was the Boost margins would remain where they were.

A.   No, I did not take Boost margins as given.  The whole

analysis is about the pricing, which given the costs, which I also accounted for, showed in the margins.  The margins are endogenous in that sense.

Q.  Let me be more precise.  You did not take into account the fact that MVNOs operate on much thinner margins than MNOs when you calculated your UPP.

A.  This is simply about Boost.  The whole methodology is about Boost and how price incentives change as a result of ownership changes, and that's exactly what I did.

Q.  Could you answer my question, please.

A.  I don't understand what you mean.  Taking into account some other firm's pricing incentives, that's not what the analysis does.

Q.  You did not attribute the typical margin for an MVNO to Boost when you calculated the upward pricing pressure.

A.  That's correct.  I looked at the margins, how they would -- excuse me, the pricing, how it would be affected by the merger. That's what this methodology does.

Q.  To be clear, the answer to my question was, "That's correct."

THE COURT:  Asked and answered.

Q.  Is that right?

THE COURT:  Asked and answered.

Q.  And you also did not account for the possibility that post-merger DISH would set its prices based on marginal costs

and the projection it will have in the future, correct?

A.  My calculations did not include that element of pricing, but I addressed it in some detail in my reply report because Professor Katz brought it up in his report, and I explained why that did not change my results.

Q.  Your results are only for one year in your UPP analysis, correct?

A.  I think we covered this last time I was here, and I don't think of there being a particular time frame --

Q.  Professor Shapiro, could I please ask, we're all trying to get out of here, is it correct that your UPP analysis only accounted for one year?

MR. POMERANTZ:  Your Honor, I did not ask any questions that this question would be relevant to.

MR. CARY:  Your Honor, he asked him a series of questions about unilateral effects, so I'm responding to his questions on unilateral effects.

MR. POMERANTZ:  Your Honor, I asked specific questions about unilateral effects, and they had nothing to do with the questions Mr. Cary asked.

THE COURT:  Subject to connection.

You can answer.

A.  Okay.  The UPP analysis -- the elements are based on diversions margins and prices.  Necessarily we need to use historical data for that purpose, which is what I did.  So it's

not keyed to any particular time frame, so I don't know what else to say in response to your question about one year.

Q.  Your analysis of coordinated effects was limited to just a year or two, correct?

A.  Well, I think generally I find it more difficult to predict effects going out many years, but the overall nature of the problem that I identified about coordinated effects is more long lasting because it goes to the underlying structural change in this industry.

Q.  Professor Shapiro, do you recall that we had a deposition and I asked what the time frame was for your analysis, and you testified that the coordinated effects analysis, I think of it as a year or two out.

Do you recall that?

A.  Yes, and that's what I was trying to say in my previous answer, which is the specifics of the analysis are based on the market as we see it now.  Three years, four years out, it's harder to tell exactly what would happen, but the underlying structure analysis is a longer-term thing.

Q.  And you talked in response to Mr. Pomerantz's questions about coordinated interaction, correct?

A.  We addressed coordinated interaction.

Q.  Is it correct that where there is bundling of products, let's say wire line from AT&T and wireless from AT&T, that that could be a way for AT&T to lower prices in wireless in a

non-transparent way?

A.  Well, I think it could be less obvious or visible, the price reduction, if it occurred that way, but if it's known to consumers, I would expect it still to be observable to the competitors with their competitive intelligence units.

Q.  Would you agree that since the price of the bundle is usually less than the sum of the component prices, a bundle of two products is effectively a way of offering to customers a discount who would buy the other at a small incremental price than the standalone prices?

A.  I didn't actually understand the structure of your question, but I will say that I think it's immediate that if they offer -- if a company offered a bundle, and the bundled price is less than the sum of let's say two component prices, one could think of that as a discount in comparison with buying the products à la carte.

THE COURT:  Mr. Cary, let me ask Professor Shapiro a question concerning the issue of the timing of any coordination in the real world of cutthroat competition.  If there's going to be coordination of price, let's say, in the context of a transaction like this one, is it more likely that companies would act in the long term rather than in the short term?

In the short term there will be a lot of focus and attention and interest of the public and regulators and everybody that will be concerned about reputation and promises

made.  What are the chances that they're not going to do anything in the short term?

THE WITNESS:  Well, I certainly agree with all the attention, and you asked a similar question when I was here last time about wouldn't it be odd if T-MO raised the price next week after the merger.

So I think there is scrutiny, there's public relations issues, and those are heightened following the merger, for sure.  Let me give the example of how consumers could be harmed if T-Mobile does not lower the price from 35 to $30 for the magenta line.  I will use that as an illustrative example. That doesn't require them to do anything.  They just sit at 35. So if we're losing out the benefits of the $30 deal, that will happen soon, and it wouldn't create any of these public relations issues that you raise.

THE COURT:  Mr. Cary.

BY MR. CARY:

Q.  Would you agree with me that the presence of DISH under the advantageous MVNO agreement with T-Mobile reduces the benefits of coordination among the three MNOs?

A.  Yes, I agree.

Q.  Professor Shapiro, you're not purporting to quantify the extent to which coordination will be a greater danger after this merger than before, correct?

A.  I am not quantifying that, that is correct.

JCKTSTA5

MR. CARY:  I have no further questions, your Honor.

THE COURT:  Thank you.

Mr. Pomerantz?

MR. POMERANTZ:  No further questions, your Honor.

THE COURT:  Thank you, you may step down, you're excused.

THE WITNESS:  Thank you, your Honor.

THE COURT:  Mr. Pomerantz.

MR. POMERANTZ:  I think we have a handful of matters to clean up before we all depart.  I think Mr. Mach has a few and then I might have one or two.

THE COURT:  Mr. Mach.

MR. MACH:  Thank you, your Honor.

Your Honor, as my colleague mentioned, the parties together have talked about and tried to identify open items that exist that your Honor should be aware of.  If history is any guide, the parties will think of even more before we walk out the door today.  I hope I can speak for everyone, we will work to resolve those as efficiently as possible, ideally without burdening the Court in any respect, but certainly to the most minimal degree.

The first item that is still open that we wanted to make sure that your Honor is aware of is that even though trial is over, there will be some additional evidence coming into the record through deposition designations.  The deposition

JCKTSTA5

designations come in, in some instances, with documents that weren't used in the trial, but will be put in the record through those designations.  The parties I think have agreed to submit those next Friday.  We will work to limit the objections on the designations and the documents to the greatest degree possible in the course of negotiating those down.

The second item is that there are a handful of documents that the parties are actively negotiating on certain discrete issues.  There is, for example, the declaration of Mr. Boubazine, there are some documents where there are redactions to make, things of that nature.  I think we can resolve those shortly and get those documents into the record before your Honor.

The third item is that the plaintiffs would like to, just for clarity of the record, formally offer the documents that were subject to the two motions that were briefed before the Court.  Those five documents that I think were subject to those letters are 1034, 339, 329, 800 and 802, and I tried to pull those numbers directly from the letter briefs in order to identify what the documents are.

THE COURT:  All right.

(Plaintiffs' Exhibits 1034, 339, 329, 800 and 802 received in evidence)

MR. MACH:  We also have two documents from the examination of Professor Katz that are subject to objections

JCKTSTA5

that we were not able to resolve.  Those were documents that I used with Professor Katz in his examination.  I understand that the defendants have objections to Exhibit 1296 and Exhibit 1263.  I will, with your Honor's permission, hand the podium to them to raise whatever objections that they have, and with your permission we would like to argue those issues before you at this moment.

THE COURT:  All right.

MR. CULLEY:  Good afternoon, your Honor, Daniel Culley for Deutsch Telekom.

On Exhibit 1296 that Mr. Mach mentioned, this was comments that -- a declaration that Dr. Katz filed on behalf of AT&T in an FCC matter about spectrum, and we object on hearsay ground to that declaration.  Mr. Mach told me that he intends to offer this statement as an inconsistent statement of a declarant witness, but there is nothing inconsistent between the statement that Dr. Katz made in that declaration and the statements that he made on the stand; one was about the spectrum purchase market, the other is about the retail market, and Mr. Mach laid no foundation whatsoever to connect those two during his examination of Dr. Katz.

And even if it were a prior inconsistent statement, only the very specific statements that Mr. Mach read, which are already in the transcript and in the record, would be admissible, not the entire document as a whole.

JCKTSTA5

THE COURT:  Thank you.

Mr. Mach?

MR. MACH:  Thank you.  My colleague is correct, we think that the statements that were made under oath by Professor Katz are a prior inconsistent statement admissible under 801(d)(1).  And I see that the focus of the issue is whether they were indeed inconsistent.  We believe they were clearly inconsistent because your Honor will recall that Dr. Katz testified that CMAs are not an appropriate level at which to address competition in court in this matter.  In that declaration he testified that CMAs not only were possible but were in fact the appropriate place to address competition.

I do not expect that the parties will reach agreement on the substantive implication or the degree of contradiction within those documents, but the way that issue is resolved under the rule is through cross-examination of Dr. Katz, both parties have had the opportunity to examine him, and the document is simply not hearsay under 801(d)(1) on account of the at least facial contradiction on the document, and no more is required to get the document in under that exception.

THE COURT:  Thank you.

Anything else?

MR. CULLEY:  I note again, your Honor, even if it was the case that Mr. Mach asserts they're inconsistent, only the specific statements that he asserts are inconsistent and

JCKTSTA5

already in the trial transcript should be admitted and not the entire document.

THE COURT:  All right.  Thank you.  I'm inclined to allow the document to be admitted.  I think there is facial inconsistency.  However, the problem is that the context in which the statements were made were not part of the testimony initially.  So if we take them in isolation, they are inconsistent, but if you give the explanation of the context, perhaps they're not.  And I think rather than engaging in a mini trial on that issue, it is best to follow the same rule that I indicated this morning, in bench trials the Court should err in the direction of admitting documents rather than excluding.

(Plaintiffs' Exhibit 1296 received in evidence)

MR. MACH:  Thank you, your Honor.  We also have the document 1263.

MR. CULLEY:  On Exhibit 1263 again we're objecting on hearsay grounds, your Honor.  It's the 2011 AT&T presentation to the Department of Justice regarding the AT&T/T-Mobile merger.  It was a presentation submitted by AT&T.  In that merger, AT&T had control of the antitrust strategy, and the plaintiffs have not laid any foundation about what input, if any, that T-Mobile had into that presentation.  It is a third-party statement about the document.  And Professor Katz said he had not seen the document, it was during the

JCKTSTA5

examination of Professor Katz, and in fact, Mr. Cary objected to the use of the document, and I believe your Honor said we should move on.  So that was the resolution of that document during the course of the examination.

THE COURT:  Thank you.

Mr. Mach?

MR. MACH:  Just for the assistance of the Court, Mr. Nikels, could I ask you to bring up the cover page of 1263.

Your Honor, this is a familiar issue now, and that's the standard of proof that's required to satisfy Federal Rule of Evidence 901.  Federal Rule of Evidence 901 gives a variety of different ways that a party can establish that something is what they purport it to be.  And here we have a variety of different ways to do that.

As your Honor mentioned this morning, of course, there is also Second Circuit precedent that tells us that circumstantial evidence is sufficient to meet that burden.  And the facts that the Court should be aware of here are, first, facially the document is presented by AT&T and T-Mobile.  This is something that appears page after page after page on this document.  We also have a history with this document from the investigation phase of this case, and that is that, in the investigation phase of the case, the defendants were asked to provide materials that were submitted to the Department of Justice on behalf of a party -- on behalf of this party, this

JCKTSTA5

is T-Mobile, in the transaction that is at issue in this slide deck. This slide deck specifically was provided and specifically identified as one of those documents that was provided on behalf of T-Mobile at that time in the investigation phase of the case.

So this is evidence that clearly meets the standard. And on questioning with Dr. Katz, Dr. Katz acknowledged that he had a role in reviewing presentations that were submitted to the Department of Justice, and he did not hesitate in agreeing that the positions shown here were presented to the Department of Justice at that time. I think that the minimal burden to get the document in is easily satisfied here.

THE COURT: Thank you.

MR. CULLEY: So Mr. Mach raised the logos on the front of the document. I don't know how much experience Mr. Mach has in merger advocacy, but that is a common technique that the parties use simply to present who is merging. And I don't think we can draw any inference from that as to what contributions, if any, were made by each of the parties to a presentation that was submitted by AT&T.

On the document request that Mr. Mach mentioned, that's not my recollection of the document request, which were broad all document requests related to the specific things. And in any event, the fact that the merging parties did not extremely narrowly construe their responses to discovery in an

JCKTSTA5

event to be amicable and move the matter along and not raise unnecessary objections should not be used against them here to try to admit specific documents in evidence.

THE COURT:  All right.  Thank you.  On this document, again, I will follow the rule of allowing admissibility.  If there are any objections on the content, they go to the weight.

(Plaintiffs' Exhibit 1263 received in evidence)

MR. MACH:  Thank you, your Honor.  I think that addresses the items on my list.  My colleague, Mr. Pomerantz, has a few open items.

THE COURT:  Thank you.

MR. PARKER:  Your Honor, Mr. Mach offered some documents that were in the letter that you ruled on this morning but I don't believe you ruled on, so I would like at some point an opportunity to object to those documents; not revisiting the one that you ruled on, but the other three documents.

THE COURT:  I understand.  In fact, there was on my open list I did not make specific reference to Exhibits 339, 800 and 801, although it was my intent to indicate that to the extent the documents are related, my ruling would apply not only to 329 but to the other three as well.

MR. PARKER:  The others were not used with a witness in court, and I thought that was a criterion.  I understand what you're saying on the testimony underlying it, but 329 was

used in court, the others were not.  I think that's disqualifying.

THE COURT:  Mr. Mach?

MR. MACH:  As I mentioned at the top of the clean-up items, your Honor, the parties have a stipulation that was put on the record in the pretrial conference that in order to enter the record a document doesn't have to be used in court, it could also be used in a deposition designation, and the documents that we raised in the letter I think were used in the depositions of people like Mr. Ewens, Mr. Langheim and Mr. Wittig, and they could come in that way, they don't have to meet the standards that counsel is raising.

MR. PARKER:  And those folks basically knew nothing about the documents except they thought it was a McKinsey document.  I am sorry, I didn't realize that testimony has been designated, but I think the record is at least highly ambiguous and does not meet the standard your Honor has been applying of control and adoption.  I don't think it's anywhere close.

THE COURT:  Thank you.  I made the ruling on this and given the indication for the reasons why.

Anything else, Mr. Pomerantz?

MR. POMERANTZ:  Not relating to that issue, different issues.

THE COURT:  All right.

MR. GELFAND:  Your Honor, I do have two exhibit

JCKTSTA5

issues, if I might.  There two were two exhibits Mr. Pomerantz tried to move into evidence at the end of Professor Scott Morton's testimony, and I reserved on those.  We went back and looked, Exhibit 211 we had not raised an objection, and therefore I have no objection to the admission of that document into evidence.

THE COURT:  Admitted without objection.

(Plaintiffs' Exhibit 211 received in evidence)

MR. GELFAND:  Exhibit 75 is a letter from counsel about a legal privilege issue.  We think it's irrelevant, and therefore we have a relevance objection to that document.

MR. POMERANTZ:  Your Honor, as your Honor has seen in the evidence, whether the complete model that the defendants used to try to prove their efficiencies was used in the ordinary course or not is a matter of relevance in this case, under the guidelines and otherwise.

That letter was a letter sent on behalf of the defendants to the Department of Justice and very specifically takes the position that the model was not created in the ordinary course for precisely the reasons that Professor Scott Morton addressed in her testimony, that is, that it addresses 5G, which is not part of the ordinary course model, and that it is used to project four or five years out in the future.  This is not Professor Scott Morton or us saying it, it's the defendants themselves saying that to the Department of Justice.

JCKTSTA5

I think it's not only relevant but highly relevant to one of the factors that it is to be considered under the merger guidelines.

MR. GELFAND:  Briefly, your Honor, there is no dispute about the facts about how that model was created, and the way it's characterized by counsel in exchange for a third party is not relevant.

THE COURT:  Thank you, Mr. Gelfand.  You know that the rules of relevance under the federal rules are fairly ample, and I'm inclined to rule that if your objection is based solely on relevance, I will overrule.

(Plaintiff's Exhibit 75 received in evidence)

MR. POMERANTZ:  Thank you, your Honor.  I want to formally move into evidence various slides or demonstratives that we used during the course of the proceeding that we have not yet moved into evidence with exhibit numbers.  I will put these on the record.  I would like to have the opportunity to leave to my colleagues the chance to double-check it, and if they think that anything is incorrect, first raise it with us and we'll probably resolve it; if not, we could come back, but I think they're agreed to.

If I may, for Professor Scott Morton I went over these with Mr. Gelfand beforehand, we're going to mark them as Exhibit 1319, and they are the following slides as we presented them, slide 13, slide 15, slide 20, slide 32, and slide 33.

JCKTSTA5

MR. GELFAND:  No objection, your Honor.

THE COURT:  All right.  Admitted without objection.

(Plaintiffs' Exhibit 1319 received in evidence)

MR. POMERANTZ:  Then with respect to Professor Shapiro during his case in chief testimony the following exhibits -- the following slides I believe have already been agreed upon without objection on the record.  We'll give Mr. Cary a chance to review this after this proceeding.  We have now marked them as Exhibit 1258, and they are the following slides:  15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25.

Separately, the very last slide that we used was a slide that had a couple of figures on it that were confidential, and therefore Professor Shapiro was not able to testify to them in court.  I would ask -- I showed this to Mr. Cary if he wants a chance to go back and review it, but we would mark that slide, slide 69, separately as Exhibit 1322.

MR. CARY:  Your Honor, consistent with Mr. Pomerantz's reservation of our rights to do due diligence, no objection.

THE COURT:  Admitted without objection.

(Plaintiffs' Exhibits 1258 and 1322 received in evidence)

MR. POMERANTZ:  With respect to the testimony today of Professor Shapiro, I would offer as exhibits demonstratives Exhibit 1320, the two slides related to county level HHIs, which are slides 2 and 3, the page from Professor Katz's

report, which has been mark as slide 10, the prior submission by Professor Katz to the FCC related to Sprint's projected market shares, slide 12.

MR. CARY:  On that one I think we would object, your Honor.  Again, Mr. Pomerantz could have laid the proper foundation for that slide with Professor Katz.  He chose not to do that.  At this point it's just a random slide without any explanation to what it is or what it isn't, more importantly, so I would object to that one.

MR. POMERANTZ:  And your Honor, I think Professor Shapiro addressed that in his subsequent testimony today regarding where it came from and why he was relying upon it.

MR. CARY:  Right.  He testified that it came from an FCC filing, but he didn't explain where the data came from.

THE COURT:  Sustained as to this one.

MR. POMERANTZ:  One more on this one, which is the comparison of the Facebook data with the adjustment, without the adjustment, and how it relates to upward pricing pressure.

MR. CARY:  No objection to that one.

MR. POMERANTZ:  And that's slide 19.

THE COURT:  All right.

MR. POMERANTZ:  From Dr. Kolodzy's testimony, these are the slides that we're seeking to admit, I think this has been agreed among counsel but in case it hasn't been fully agreed upon, but I think I was told it was, slides 1, 2, 3, 4,

JCKTSTA5

5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20 and 29.

MR. CARY:  No objection.

THE COURT:  Admitted without objection.

(Plaintiffs' Exhibits 1320 received in evidence)

THE COURT:  From Mr. Solomon's testimony, we'll mark as Exhibit 1315 slides 5, 6, 7, 16, 17, 18 and 25.

MS. LENT:  Your Honor, I think we agreed to this yesterday, and there's a new exhibit that's been entered.  I don't know the exhibit number off the top of my head, but these were marked as Exhibit 1315.

MR. POMERANTZ:  Yes.

MS. LENT:  Okay.

MR. POMERANTZ:  We're getting the exhibit number.  I think it's on the record which slides were agreed upon, but this is on an exhibit number so the record is clear.  And last, Dr. Kolodzy's CV is Exhibit 1316.

(Plaintiffs' Exhibits 1315 and 1316 received in evidence)

MR. POMERANTZ:  One other issue before we get to the schedule going forward is I know I speak on behalf of Mr. Cary and everyone here, your staff is terrific.  They made our lives a lot easier over the last two weeks.  The court reporters have suffered through a lot of fast talkers, your clerk really helped us out a lot.  And it was a really stressful two weeks,

JCKTSTA5

and your staff made it a lot less stressful, so we jointly thank you.

MR. CARY:  Absolutely, your Honor.

MR. PARKER:  The one I have, your Honor -- sorry, your Honor, I got two things, one was my own mistake.  After Mr. Ergan's testimony I offered Exhibit 8141 but misspoke and said it was 4141, it is in fact 8141.  It was certainly my error.

THE COURT:  All right.

(Defendant's Exhibit 8141 received in evidence)

MR. PARKER:  One other point, not to belabor, but document 339 is a hundred page document, and I don't have any record it was used in the deposition at all.  That was the point I was making.

MR. MACH:  We'll go and confirm the status of 339 and we can resolve that.  I don't have that record in front of me, your Honor.

MR. PARKER:  That's fine, your Honor.

THE COURT:  Let me come back to that issue because I may have misspoken when I addressed this issue.  I believe I said Exhibit 801, and it's really 802.

MR. MACH:  Thank you, your Honor.

THE COURT:  Mr. Gelfand?

MR. POMERANTZ:  Apparently when I gave you the slides from Dr. Kolodzy's examination I didn't give you the exhibit

JCKTSTA5

number for those slides, and that is Exhibit 1314.

(Plaintiffs' Exhibit 1314 received in evidence)

MR. GELFAND:  Your Honor, two other things.  First of all, obviously I join in Mr. Pomerantz's thanks to the Court and the courtroom personnel.  I also want to acknowledge the very large team of people who worked on the defense effort as well.  And as your Honor knows, the most important among them are the legal assistants, and we have two of them in the courtroom today that I will like to introduce your Honor to, Alicia DeLalla and also Korinna Garfield.  I would like to acknowledge their tremendous effort in working with the Court and keeping things organized and clean.

THE COURT:  Thank you.

MR. GELFAND:  The other thing that we need to do is a housekeeping matter but a very important one, your Honor.  I just seek your Honor's guidance.  There are some exhibits in this case that are very confidential and contain forward-looking strategic and competitively sensitive information, both for the parties and for third parties.  We made tremendous efforts, and I think we accomplished a lot even pretrial with the help of Magistrate Judge Lehrburger and just working together most of those issues were resolved, but there are still some documents that will eventually be in the record of this case that we will need to have confidentiality sealing protections for, and I would just ask your Honor to provide us

JCKTSTA5

guidance on how you would like us to do that.

THE COURT:  To the extent they're subject to the protective order, submit them either to myself or to Magistrate Judge Lehrburger and they will be marked as confidential and sealed, and they will be entered into the record as sealed documents.

MR. GELFAND:  Thank you very much, your Honor.

MR. POMERANTZ:  Just a couple more points.  Usually at the end of most trials I thank my colleagues on the other side, but this time I really mean it.  They have been terrific to work with as adversaries, and I hope I find myself on the same side of the case someday with all of them.  They have really been wonderful to work with.  I also want to thank my colleagues from New York and California and the other states for inviting me and my colleagues from our firm on this venture.  It's been quite a ride.

So to end is the schedule going forward.  I don't think that we have an agreement on a couple of things, so I will state our position and let someone from the other side address it.

What we would propose is that written submissions be filed the week of January 6 and that we hold closing arguments the week of January 13.

In terms of written submissions, your Honor made clear at the outset that you did not want post-hearing briefs, and if

JCKTSTA5

the way this case has gone over the last two weeks has not persuaded you otherwise, I will not try to argue otherwise here.  We would like the opportunity, but if your Honor doesn't feel that you need a brief from each side, then we respect that.

We also discussed proposed findings and conclusions, and your Honor did indicate at the outset that was something you were more open to consider.  What we did at the outset of this case is we asked your Honor to defer the submission of findings, which your rules typically would require in advance of trial, and we asked to defer that until after the trial so that we could put evidentiary citations in with the findings of fact.

So to the extent that we'll not have any briefing, we would request the opportunity to submit proposed findings and conclusions to your Honor, and we thought it might be helpful for you to have those at least a few days in advance of whenever the closing arguments are.  For that reason, plus some holiday vacations that some of us have planned, including myself, what we would ask for is that whatever written submissions your Honor would permit would be the week of January 6 and the closings would be the week of January 13.

THE COURT:  All right.  Mr. Gelfand?

MR. GELFAND:  Thank you, your Honor.  We discussed this in the defense group, and it is abundantly clear to us

JCKTSTA5

that your Honor heard a great deal of evidence over the last two weeks and has a full appreciation and understanding of the record.  We propose no post-trial written submissions of any sort, including no findings and no conclusions.  And we would ask, given the importance of this transaction and the fact that it has been pending for an extraordinarily long time, that we have post-trial arguments the week of January 6 and not wait until later in January, and we would suggest two hours per side.  Thank you, your Honor.

MR. POMERANTZ:  The transaction has been pending since April 29 of 2018.  I don't think one week is going to make a difference here.  I think it would be helpful and healthy for all of us to have a little bit of time to give your Honor something in writing that your Honor can use as a guide in whatever form your Honor would like.  And I think in terms of my personal schedule and other schedules, I think the week of January 13 is a somewhat better week so we are prepared to present your Honor with cogent closing arguments.

THE COURT:  All right.  Thank you.

Coming back to the question of briefs and briefing, my problem with a case like this is that the word "brief" is an oxymoron.  And consequently, if we want to move things along and get an expeditious resolution, it would be best to forego that process and follow the Court's inclination to have oral arguments.  Two hours each is acceptable to both sides, I will

JCKTSTA5

be glad to accommodate that.  I would have no problem with the parties submitting proposed findings of fact and conclusions of law a week before the closing arguments, and in terms of time, I think the second week in January would probably be more realistic.

MR. POMERANTZ:  I appreciate that.  Two hours is fine with us.  We're fine with the two hours.  And I just I guess in terms of the timing here, I would propose the findings and conclusions be due sometime in the middle of the week of January 6, and that the closing arguments be sometime in the middle of the week of January 13.

THE COURT:  Mr. Gelfand.

MR. GELFAND:  That schedule is fine, your Honor.  We propose a page limit on the findings and conclusions so we don't end up with telephone books, and our suggestion would be 30 pages for findings of fact and 20 pages for conclusions of law, double spaced, of course.

MR. POMERANTZ:  We're fine with that, your Honor.

THE COURT:  I would ask that you have 30 pages combined for both findings of fact and conclusions of law each.

Anything else?

MR. POMERANTZ:  Just the dates.

THE COURT:  Let's look at the calendar.

LAW CLERK:  January 8 for the findings, and January 15.

JCKTSTA5

MR. POMERANTZ:  That's fine for the plaintiff states, looking down here.

MR. BUFFIER:  Yes.

THE COURT:  January 8 and January 15.

MR. GELFAND:  That's acceptable, your Honor.

THE COURT:  All right.  Given the amount of time that each side has spent on the trial, let me give you a final tally.  The plaintiffs used up roughly 29 hours and the defendants roughly 25.  So the defendants ended up with fewer hours of trial, but Mr. Gelfand, if you wish to even the score, you are free to do a self-evaluation on the efficiency and quality of your presentations.

MR. GELFAND:  Thank you, your Honor, I think I can complete that self-evaluation within the four hours allotted.

THE COURT:  Thank you all very much.  I would also want to express my appreciation to both sides for the extraordinarily high level of cooperation and professionalism that you all have displayed which enabled us to conclude the trial within even less than the time allotted and without going into the extra days that we had indicated at the beginning of trial might be possible.  So for that, I thank you all and wish you all the very best for the holidays, and we will see you in January.

MR. POMERANTZ:  Thank you, your Honor.

(Adjourned)

INDEX OF EXAMINATION

Examination of:                                    Page

FIONA SCOTT MORTON

Direct By Mr. Pomerantz . . . . . . . . . . .2174

Cross By Mr. Gelfand . . . . . . . . . . . . .2224

CARL SHAPIRO

Direct By Mr. Pomerantz . . . . . . . . . . .2259

Cross By Mr. Cary . . . . . . . . . . . . . .2303

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 1034, 339, 329, 800 and 802  . . . . . . . .2316

 1296    . . . . . . . . . . . . . . . . . . .2319

 1263    . . . . . . . . . . . . . . . . . . .2322

 211    . . . . . . . . . . . . . . . . . . .2324

 75    . . . . . . . . . . . . . . . . . . .2325

 1319    . . . . . . . . . . . . . . . . . . .2326

 1258 and 1322   . . . . . . . . . . . . . . .2326

 1320  . . . . . . . . . . . . . . . . . . .2328

 1315 and 1316   . . . . . . . . . . . . . . .2328

 1314    . . . . . . . . . . . . . . . . . . .2330

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 8141    . . . . . . . . . . . . . . . . . . .2329