# EXHIBIT B

JCITSTA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
STATE OF NEW YORK, *et al.*,

                    Plaintiffs,              New York, N.Y.

            v.                               19 Civ. 5434(VM)

DEUTSCHE TELEKOM AG, *et al.*,

                    Defendants.
-------------------------------x

                                             December 18, 2019
                                             8:30 a.m.

Before:

                    HON. VICTOR MARRERO,

                                             District Judge

                         APPEARANCES

MUNGER, TOLLES & OLSON LLP
     Attorneys for Plaintiffs State of California
BY:  GLENN POMERANTZ
     KURUVILLA JOSEPH OLASA
     KYLE W. MACH

STATE OF CALIFORNIA
Department of Justice
Office of the Attorney General
     Attorneys for  State of California
BY:  PAULA L. BLIZZARD

STATE OF NEW YORK
Office of the Attorney General
     Attorneys for State of New York
BY:  ELINOR R. HOFFMANN
     BEAU W. BUFFIER

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

JCIPSTA2                          Ergen — Cross

Q.   Okay.  And if I could pull up the transcript, page 1615, this is the transcript from yesterday, lines 16 through 25. And the court asked you:  "There's been a lot of testimony in this trial on this issue of DISH's commitments to the FCC, and allegations that DISH has made commitments to the FCC which it has then either backed away from or not implemented in good faith.  What is behind that, and what is your answer?"

And you responded:  "Maybe we'll go into more detail on that, but the short answer is that we've never missed a final milestone commitment from the FCC for a terrestrial build-out, and we've met the ones we've needed to."

Do you see that?

A.   Yes, I do.

Q.   So let's focus for the minute on this word "terrestrial," which you mentioned several times yesterday and was on your slides.  Do you see that?

A.   Yes.

Q.   Okay.  Now, you added the word "terrestrial" repeatedly because you have, in fact, missed final satellite deadlines; isn't that correct?

A.   That's true.

Q.   Can I see Plaintiff's Exhibit 1303, please.

So this is a Memorandum and Opinion Order from the FCC dated July 29th, 2010, issued by the International Bureau; do you see that?

1682

JCIPSTA2                          Ergen - Cross

A.   Yes.

Q.   And if you look at the first paragraph, in the middle, it says that, the second sentence:  Applicants have an established pattern of missing satellite implementation milestones as defined by section 25.159(d), are prohibited by that rule from filing applications for new satellites until they rebut the presumption that they acquired one or more of their licenses for speculative purposes.

Do you see that?

A.   Yes.

Q.   In an almost three-year period, from December 2006 through September 2019, EchoStar did not implement five of its licensed satellites.  Further, EchoStar currently has five authorized but unbuilt satellites.  Under these circumstances, EchoStar cannot file additional applications until it rebuts the presumption that it engaged in speculative activity.  Because -- and EchoStar, in fact, has not rebutted the presumption and it is prohibited -- I was reading the next sentence above, but that's okay -- it is prohibited from filing additional applications for new satellites at this time.

Do you see that?

A.   Yes.

Q.   And when the FCC was referring to "speculative activity," that was getting licenses or permissions from the FCC, not acting on them and reselling them later; is that right?

JCIPSTA2                        Ergen - Cross

A.   Not exactly.

Q.   Would some people call it hoarding?  Is it different from hoarding spectrum?

A.   No, it's in the -- in the satellite -- terrestrial build-out, the reason we use terrestrial build-out is that the terrestrial rules at the FCC are materially different than the satellite rules.

        The satellite licenses, it's based on the -- the terrestrial, in auction you pay billions of dollars for the right to spectrum.  In satellites, in this time frame, it's a first-come, first-serve basis; so companies tend to apply for licenses because it's first-come, first-serve.

        And then you have obligations to meet, or you will lose those licenses.  And that's what happened to DISH, or EchoStar, which is our sister -- which is a sister company. That's what happened here, which is, EchoStar applied for licenses and didn't ultimately built those satellites, and so they -- normally, you would just give those licenses back.  You just give those licenses back, and that's generally what we did here.

Q.   Let's look at another FCC order.  Can we turn to Plaintiff's Exhibit 1305, please.  This is another order from the FCC.  This one is dated another year later, July 16th, 2011.  And if I look at the first paragraph of this one, in the middle, it says "EchoStar did not meet license conditions

JCIPSTA2                    Ergen - Cross

requiring it to complete its critical design review two years after grant and to complete construction of the satellite within four years of grant."

Do you see that?

A.   Yes.

Q.   Okay.  "Instead, EchoStar decided not to construct the authorized new satellite, but rather, seeks to use the eight-year-old, in-orbit EchoStar 8 satellite to meet the milestone deadlines."

Do you see that?

A.   Yes.

Q.   And the FCC denied your request for a waiver of the completing construction milestone, correct?

A.   Correct.

Q.   Thank you.  Let me turn to the next page, page 2, paragraph 4.  At the top line it says "Now, in its third milestone date completing construction, EchoStar states that it has changed its business plans."

Do you see that?

A.   Yes.

Q.   So you changed your business plans and decided, instead, not to finish and meet the construction milestone, correct?

A.   That's correct.

Q.   Okay.  Now, I want to turn to some other testimony from yesterday.  If I could pull up the transcript again from page

JCIPSTA2                      Ergen - Cross

1617, lines 18 and 19.  You were talking about companies criticizing DISH, and you were referring to them -- sorry, do you have it?  There you go.  Okay.

You were talking about -- noting again that, of course, you had not, in your view, you have not missed any terrestrial build-out dates or milestones, but that the FCC had approved the merger.  And they approved the merger because they believe it's in the public interest, and they don't believe DISH is a bad company, as some people might want to whisper.

Do you see that?

A.   Yes.

Q.   And you were talking about companies who were whispering quietly about DISH's bad behavior to the FCC; that's what you thought was going on, right?

A.   I don't know that that's exactly right, but we're a pretty small company compared to the incumbents, and they do not want us in the business, just like the cable companies did not want us in the television business, and so they know that we'll provide real competition.

And one of the ways that these companies try to stop you is they try to pass laws to stop you.  They try to use regulatory agencies against you, and it is not beyond them, as I said yesterday, to be sneaky about it.  Sometimes they normally -- they may use third parties to do it.

It's a tough business, but the fact is, we haven't

1686

JCIPSTA2                    Ergen - Cross

missed a terrestrial final milestone at the FCC, that I'm aware of, from a license perspective.  The fact is that in this merger, the FCC found DISH to be a credible and financially and savvy enough company to -- "savvy" may not be the right word, but a company that can compete in this business.

So the good news is that some of those sneaky campaigns weren't factual and didn't work.

Q.  Can I get Plaintiff's Exhibit 1306.  I'm not interested, at the moment, in taking about sneaky campaigns.  Let's talk about Chairman Pai.  This is a statement of Commissioner Ajit Pai -- he was a commissioner at the time; he's now the Chairman of the FCC -- on abuse of the designated entity program.  And this is not a whisper, is it, Mr. Ergen?

A.  This is a statement by the Commissioner.

Q.  Yes.  Now the Chairman, right?

A.  That's correct.

Q.  In fact, what he states is that this designated entity program, in the second paragraph, "The discounts that were received came through the FCC's designated entity program, which is intended to make it easier for small businesses to purchase spectrum and compete with large corporations.  DISH, however, has annual revenues of almost 14 billion, a market capitalization of over 32 billion and over 14 million customers.  Its participation makes a mockery of the designated entity program."

JCIPSTA2                          Ergen - Cross

Do you see that?

A.   Yes, I do.

Q.   You would agree with me that that's not a whisper by some third party, right?  That is the Chairman of the FCC criticizing DISH for abuse of the designated entity program, correct?

A.   That is a statement by the then-Commissioner Pai.

Q.   And if you look down a little farther, in fact, commissioner, then-Commissioner Pai, refers to DISH's actions as shenanigans; do you see that?

A.   I see the word "shenanigans," yes.

Q.   Do you doubt that he's referring to DISH's actions with respect to this designated entity program?

A.   He's talking about giant corporations.  I read that to -- giant corporations, we're probably not a giant corporation; so -- but it's certainly corporations.  So I read that that he's talking about several companies.  Perhaps DISH was one of them.

Q.   All right.  Let's go back up.

A.   It's logical that DISH was one of them.

Q.   It's logical that DISH was one of them?

A.   When I read it, he talks about giant corporations.  The Commissioner, obviously, did not like the designated entity program, which was passed by Congress and the FCC, and he thinks that giant corporations engaged in some kind of

JCIPSTA2                      Ergen - Cross

shenanigans, and perhaps it's logical, given the context that DISH was one of the giant corporations he was referring to.

Q.   And he says:  "The American people should be outraged by this.  I certainly am."  Do you think he's talking about anybody other than DISH right there?

MR. GELFAND:  Your Honor, I object to this line of questions as hearsay, it's five years old, it has no probative value.  It's a different issue.  It seems to be some kind of 404 evidence, and I object to the line of questioning, your Honor.

THE COURT:  Overruled.

MS. BLIZZARD:  Thank you, your Honor.

THE COURT:  I understand part of the purpose of the questioning to be impeachment and not necessarily substance.

MS. BLIZZARD:  Thank you, your Honor.

THE WITNESS:  Can you repeat the question?  I'm sorry.

BY MS. BLIZZARD:

Q.   There's no question pending, Mr. Ergen.

A.   Okay.

Q.   So after DISH's shenanigans, the FCC did a thorough investigation of how DISH had set up shell companies to fraudulently participate in the designated entity program, correct?

A.   That is not correct.

MR. GELFAND:  Your Honor, I object.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JCIPSTA2                          Ergen - Cross

A.   That is not correct.

MR. GELFAND:  If the purposes is impeachment, he did not testify about this particular program.  The impeachment is, apparently, of testimony about not missing terrestrial deadlines.  That would be the impeachment.

THE COURT:  At this point, sustained.

MS. BLIZZARD:  Your Honor, if I may?

THE COURT:  Yes.

MS. BLIZZARD:  He did testify that the FCC thought they were, quote, a good company, and I can bring that one up, if you would like also, your Honor.  But that was his testimony, and I think I'm entitled to bring in testimony that the FCC has very serious concerns about DISH's behavior.

THE COURT:  Proceed.

MS. BLIZZARD:  Thank you, your Honor.

BY MS. BLIZZARD:

Q.   Can I bring up Plaintiff's Exhibit 1308.  So this is a memorandum opinion and order from the FCC from August 2015 evaluating this designated entity dispute.

I need to see what page I need to go to.  And let me actually jump to -- this is the actual memorandum and opinion and order, which is very lengthy, but let me jump to the statement by Chairman Pai, which would be Plaintiff's Exhibit 1309, because he summarizes here the findings.

So this is the statement of Commissioner Pai that was

attached to that order, and he says, in the second paragraph: "Having completed that investigation, my colleagues and I now conclude that the two companies, Northstar Wireless and SNR Wireless, are controlled by DISH and, thus, are ineligible for any small business discounts. They now owe the U.S. government $3.3 billion."

Do you see that?

A.  Yes, I do.

Q.  And then if you go down, there's a paragraph that says, here's what the FCC found, here's what the staff found. "DISH maintains an extensive level of control over SNR and Northstar, thus, eliminating any possibility that they are independent small businesses."

Do you see that?

A.  Yes.

Q.  Okay. To begin, SNR and Northstar are deeply indebted to DISH. Combined, the two companies generated revenues of zero dollars leading up to the FCC spectrum auction. As a result of their spectrum purchase, now owe DISH approximately 10 billion."

Do you see that?

A.  Yes.

Q.  Okay. And, in fact, Chairman Pai notes in this order that the behavior appeared to be bid rigging and suggested that the antitrust division look into it; do you recall that?

JCIPSTA2                          Ergen – Cross

MR. GELFAND:  I object, your Honor.  This is getting even farther afield.  This, apparently, is some kind of commissioner statement that went along with an FCC decision. It seems to be out of context, seems to be now drifting into a different subject matter.  We've not had an opportunity to question the witness about this.  I just think this is really far afield from what we're talking about.

THE COURT:  You can question the witness on your redirect.

MS. BLIZZARD:  Thank you, your Honor.

BY MS. BLIZZARD:

Q.  If I could now turn to Commissioner O'Reilly that was attached to this and part of the same FCC order.  This is part of Exhibit 1310.

And Commissioner O'Reilly is still a commissioner on the FCC, right?

A.  He is.

Q.  And in the middle of that first paragraph, it talks about -- it also describes the strategic bidding strategy employed not only by the DISH designated entities, but also DISH's wholly owned subsidiary, American AWS 3 Wireless; do you see that?

A.  Yes.

Q.  And Commissioner O'Reilly's concern, which is down a few paragraphs, is that he's not sure he agrees with the decision

JCIPSTA2                    Ergen - Cross

that this matter should not be referred to the Department of Justice.  But in the interest of finality, he agrees.

Do you see that?

A.   Yes.

Q.   And he was concerned about bid rigging, was he not, strategic bidding?  Strategic bidding strategy that he referenced in the paragraph above?

A.   Was there a question?  I'm sorry.

Q.   We'll move on.  Let's talk a little bit about the DOJ and FCC negotiations in this case, can we?

We talked yesterday that you negotiated with Mr. Makan Delrahim, the head of the DOJ's antitrust division, correct?

A.   I did have several discussions with him, yes.

Q.   And if I could bring up Plaintiff's Exhibit 1278 and, in fact, you conducted a lot of these negotiations or these discussions with Mr. Delrahim by texting directly with him; is that correct?

A.   I did engage in some texts.

Q.   Okay.  And for the public screen, we have blacked out the phone numbers and just left the area codes, but I would think on your screen, or certainly in your binder, you have the full phone numbers.  So the number that begins -- that says "Charlie Ergen" and "303," that's you, correct?

A.   Is there an exhibit?

Q.   Yes.  Why don't you go to 1278, that might help you, in the

JCIPSTA2                          Ergen - Cross

A.   Yes.

Q.   Okay.  You would not have been including other companies that have MVNO arrangements like Comcast, Charter or TracFone, correct?

A.   I would not have been thinking of them in that way.

Q.   And you don't think of them in that way because they don't have facilities-based services, and they don't have owner economics, correct?

A.   They are different from the four that you mentioned in that regard.

Q.   So the four-to-three would be Sprint, T-Mobile, AT&T and Verizon?

        THE COURT:  Asked and answered.

        MS. BLIZZARD:  Thank you, your Honor.

Q.   Do you recall that Mr. Delrahim, at one point, gave you his personal e-mail address?

A.   He did.

Q.   And he sent that to you in a text message, right?

A.   I believe he sent me his -- I believe I asked him for his e-mail address, and he gave me his Department of Justice e-mail address and he gave me his personal e-mail address.

Q.   But my question was, that was in a text message to you, right?

A.   I believe so.

Q.   And you don't have any idea why he was giving you his

1698

JCIPSTA2                          Ergen - Cross

personal e-mail address, do you?

A.   I do not.

Q.   In your discussions with Mr. Delrahim, did you ever have the impression -- you, yourself, have the impression he was trying to keep discussions off of his official DOJ e-mail address?

A.   I did not.

MR. PARKER:  Objection.  That calls for speculation about what Mr. Delrahim had in mind.

THE COURT:  Sustained.

MS. BLIZZARD:  Your Honor, let me rephrase the question.  I'm not asking about what Mr. Delrahim had in mind. I'm asking what, in his discussions, Mr. Ergen had in mind when he was given the personal e-mail address.

MR. PARKER:  She's talking about impression.

THE COURT:  Sustained.

MR. PARKER:  Impression is another word for speculation.

THE COURT:  Sustained.

BY MS. BLIZZARD:

Q.   So do you recall you sent a proposed remedy to Mr. Delrahim on May 27th?  We looked at that e-mail yesterday.  Do you recall that?

A.   I do.

Q.   Okay.  But you didn't send it to his personal e-mail, did

1699

JCIPSTA2                          Ergen - Cross

you?

A.   I did not.

Q.   Now, in addition to these discussions with the Department of Justice, you also needed to get DISH's FCC spectrum build-out deadlines extended, correct?

A.   In the particular remedy, we did not need to do that because we were prepared to finish our IoT network, which would have met our commitment.  So we did not need to change our licenses to compete.

Q.   You didn't need to change your licenses to complete your internet of things network, that's what you're saying?

A.   I'm saying two things, to be clear.  One is that we didn't need to change our licenses because we were down the path of finishing our IoT network, and we didn't need to change our licenses to compete because we had something called a flexible-use license, which meant that we could do IoT, but we also could do broadband with that license; so it was a very flexible license.

Q.   But if the Department of Justice wanted you to enter quickly with a consumer mobile broadband network, you could not do both, that and deploy your internet of things network, in time to meet your FCC deadlines, correct?

A.   That's not true.

Q.   So why did you negotiate with the FCC to extend your FCC deadlines?

JCIPSTA2                     Ergen - Cross

A.   We were going to need -- we were interested in the 850 megahertz spectrum, and we were going to need FCC approval for that.  And so we wanted to be -- so with the meeting with the FCC, they had things that they wanted, and they wanted to -- this is my recollection.

They wanted to make sure that a broadband network was built -- they were desirous of a broadband network being built as soon as possible, and were less interested in an IoT network; so in that negotiation, we agreed to build a much more robust network, obviously, with nine million subscribers, and to forego our IoT network to build a more robust network with the totality of the deal that gave us the tools to compete with, day one, with the rest of the industry.  So it was a bit of a negotiation, I guess, would be the answer.

Q.   So your testimony is that the FCC wanted you to build a more robust consumer mobile broadband network faster, correct?  That's what they wanted, and so you had to change your deadlines to meet that request, yes?

A.   We -- it's a little more complicated because we already had deadlines.  The narrow band IoT network would have met those deadlines; so we voluntarily, in the interest of getting -- because we thought this deal was good for our company, and we thought it was good for competition, we took our deadlines and made them broad -- we took the flexible-use license and made it a specific license to broadband, which since we weren't

1701

JCIPSTA2                    Ergen – Cross

building a broad network at the time, would require that if it was a broadband license, the time would need to be extended.

But we didn't need to extend it if we'd have just finished our IoT network. I'm not sure I'm clear. I hope that's clear.

Q. Well, I think we can at least agree you needed to -- you did enter into some negotiations with the FCC to alter the build-out deadlines on your spectrum licenses; can we agree on that?

A. We agreed to two things, one was to alter the license, and then altering the license to a more narrow license for broadband. And in that, I think you're correct that in narrowing to a broadband license, by definition, we had to extend the deadline because the deadline was like eight months away. So you, obviously, couldn't build a broadband network in eight months.

Q. Okay. You obviously couldn't build a broadband network in eight months. Okay.

On June 10th, which I'll represent to you is the day before this lawsuit was filed, on June 10th, Mr. Delrahim asked you to contact members of Congress, specifically the Senate, to speak to Chairman Pai about the deal, correct?

A. I think what he said -- I wouldn't say -- I think he wanted -- I think he said I should talk to my -- I can't remember if he said my Senate friends or Washington friends.

1702

JCIPSTA2                         Ergen – Cross

Q.   Can we have Exhibit 1278 again, at page 1222, to refresh your recollection about what Mr. Delrahim asked you to do. "Today would be a good day to have your Senator friends contact the chairman."  Do you see that?

A.   Yes.

Q.   And "the Chairman" would be Chairman Pai, correct?

A.   That's correct.

Q.   And, in fact, you reached out to Senator Gardner of Colorado, correct?

A.   I did.

Q.   And you also spoke with Senate Majority Leader Mitch McConnell, correct?

A.   I did.

Q.   And you asked the -- see if I can see page 23 -- sorry, 1278, page 23 -- Exhibit 1278, page 23.  Part of the way down, you say -- that's where you confirm:  "Very good.  Talked with Leader McConnell by phone as well."

          Do you see that?

A.   Yes.

Q.   And you asked the Senators to contact Chairman Pai and say that they supported DISH's efforts to negotiate with the FCC, correct?

A.   That's not correct.  I asked Senator Gardner to contact the Chairman because he knew our -- he was our state Senator from Colorado.  He was our -- I'd known him for probably 15 years.

JCIPSTA2                    Ergen - Cross

He had been our congressional representative; so he knew our company. He knew our plans. He'd been to our office many times. So he knew how serious we were about entering the business.

So I asked him -- and he's also on the Senate commerce committee, which has some oversight to the FCC; so he knew the Chairman, and I asked him to reach out to him in that context. I don't believe I asked Leader McConnell to reach out to anyone.

Q. So you're saying here, when you are reporting back to Mr. Delrahim, this is what we have on the screen is a text message, again, between you and Mr. Delrahim, correct?

A. Yes.

Q. And you say: "Very good. Talked with Leader McConnell by phone as well," and you're saying you didn't talk to him about the Sprint/T-Mobile merger?

A. I told him that the Sprint/T-Mobile merger was going on and that DISH might be involved in that in some fashion, but I did not ask him -- I think your question was -- or your statement was, did I ask him to reach out to the Chairman, and that is not true.

Q. Okay. So when Mr. Delrahim said -- asked you to reach out to your Senator friends and have your Senator friends contact the chairman, Chairman Pai, you reached out to Leader McConnell, but you didn't take the next step of asking him to

JCIPSTA2                    Ergen – Cross

contact Chairman Pai?

A.   I did not.  In full -- I also reached out to Senator Bennet, who was the other Colorado Senator, who knows our company very well, but was unable to reach him; so I didn't have a conversation with him.

Q.   Can I have the litigation depo at page 150, lines 1 through 20, please.

        And I was asking you about this series of events, and actually, on line 8 I say:

        So again, I am not asking you for why he was doing it, why Mr. Delrahim was suggesting that you reach out to your Senator friends, I'm asking what your understanding was of why he was asking you to.

        And your response is:  I think because we were talking about 5G, pretty sophisticated technology that is not necessarily well understood at this time frame, even at the FCC and even by the Chairman.

        So you believed that the FCC, at that time, didn't have -- the FCC chairman did not have an understanding of the 5G technology; so it would be helpful for the Senators to talk to him?

        MR. PARKER:  Your Honor, I don't believe this is impeachment.  I don't know why we're reading this deposition here.  I object.

        THE COURT:  Ms. Blizzard?

JCIPSTA2                          Ergen - Cross

A.   Okay.

Q.   Okay.  DISH and new T-Mobile have a seven-year agreement where new T-Mobile will provide services to DISH, correct?

A.   That's true.

Q.   Okay.  And at the same time that they are proceeding under this contract, you're going to be competing for wireless customers, correct?

A.   Yes, we are.

Q.   And DISH will be trying to steal customers from new T-Mobile, right?

A.   We will.

Q.   And I assume, based on your knowledge of the industry and general business, that T-Mobile will be trying to steal customers from DISH, correct?

A.   I believe they will.

Q.   Okay.  And certainly, DISH would rather that any customer be a DISH customer than a new T-Mobile customer, right?

A.   That is correct.

Q.   And the opposite would be true --

A.   I should say, just to be clear, if they pay their bill, we wish them to be a DISH customer.  If they don't pay their bill, we wish them to be a T-Mobile customer.

Q.   Understood.  And the opposite would also be true, right, that T-Mobile wants the customers that pay their bills and wants the ones that don't to go to DISH, correct?

1717

JCIPSTA2                          Ergen - Cross

A.   That's right.

Q.   Okay.  But T-Mobile will be getting some revenue from DISH to support its customers under this seven-year agreement, correct?

A.   When we use the T-Mobile network, they will receive some revenue from DISH, even though that customer will be DISH's customer.

Q.   And would you agree with me that DISH will put its interests above T-Mobile and vice versa, T-Mobile will put its interests above DISH's?

A.   I think that will generally be the case.

Q.   Now, despite this need to work together going forward, DISH and T-Mobile have a long history, in fact, of not getting along; would you agree with that?

A.   There have certainly been times when we did not get along.

Q.   And DISH has publicly accused T-Mobile of trying to stifle competition, agreed?

A.   I think we may have said that.

Q.   Okay.  Would you like to see where you said it?

A.   Sure.  I'm here to answer any question I can for you.

Q.   All right.  Let's just -- very quickly, can I have Plaintiff's 269?

         Okay.  And this is an e-mail actually transmitting to Matthew Pearl at the FCC from DISH employees, and it says: "Please find attached for your reference an as-copy filed of

JCIPSTA2                          Ergen – Cross

DISH's response to T-Mobile's letter regarding DISH's build-out plans."

Do you see that?

A.   I do.

Q.   And then if I could flip to the first page of the letter, this is a letter to Donald Stockdale at the Wireless Bureau responding to a letter from T-Mobile.

And then you say, I believe in the first paragraph, the last sentence of the first paragraph:  "The T-Mobile letter is a blatant attempt to stifle competition, factually inaccurate, legally without merit, and should be disregarded in its entirety."

Do you see that?

A.   I do.

Q.   And that was a true statement when you submitted it to the FCC?

A.   I believe so.

Q.   Do you still feel that way about T-Mobile?

A.   I still feel the way about that particular document.

Q.   Okay.

A.   I mean, look, do our company -- me, personally, want to compete against T-Mobile?  We can't wait, and I hope I get done today because I'm going to go back and figure out ways to compete with them on the plane, and I'm going to figure out in the middle of the night tonight how to compete, and that's what

Case 1:19-cv-02232-TJK    Document 60-4    Filed 01/24/20    Page 26 of 36

1719

JCIPSTA2                    Ergen - Cross

we're trying to do.

And so does that mean we get along with T-Mobile?  No, we probably don't.

Q.  And yet, at the same time, under the seven-year MVNO agreement, you're going to have to get along with T-Mobile at some level, right?

A.  We're going to have to make sure we're protected from any mischief that they might try to cause, and I think that -- look, I think that's a possibility.  And I think, in this particular case, the Department of Justice appointed a monitor Mr. Ullyot, that we talked about yesterday, and for the sole purpose of making sure that that doesn't happen.

THE COURT:  Let me jump in at this point on what you just indicated.

THE WITNESS:  Sure.

THE COURT:  You said before that T-Mobile is going to get paid for customers that use the DISH Network?

THE WITNESS:  Yes.

THE COURT:  But they're DISH's customers; so that's on a plus side financially for T-Mobile.

Now, on the other side, are there costs that T-Mobile will be incurring in carrying out its commitments to the DOJ, for example, in providing a network at wholesale, below-market price?

THE WITNESS:  So T-Mobile -- I'll make it really

(212) 805-0300

JCIPSTA2                    Ergen - Cross

simple.  If we charge -- T-Mobile charges us two ways.  One is by the megahertz at a low rate or a bucket of unlimited plans at a rate.  They will make revenue -- I'm just going to give a simple example, and this by no means is -- okay.

But if we may pay them 50 cents of every dollar of revenue we receive.  Right?  That's a made-up number, but it's just to give you a ratio.  They then have costs for that 50 cents.  They have to maintain the network.  They have to build the network.  They have to invest in the network, but if that was their customer, right, they might have made 90 cents on the customer.  Right?

So they're torn between trying to make 90 cents and only maybe making 40 cents.  Right?  They'd much rather make the 90 cents.  The great thing about this particular transaction that the Justice Department put in place is that while they may make 40 cents on that customer, when we build our network, as we build our city out, and that customer is solely on our network, they now make zero on that customer.

So when you put those factors together, that they make materially less money than they otherwise would if it was their customer, and then as our network is being built out and those customers switch to our network and they make nothing, they are not going to want DISH to have customers.  And from a practical point of view, the fact that we ride on their network is not really a competitive factor because they are not going to want

JCIPSTA2                    Ergen – Cross

DISH to get customers, but, you know, certainly, in the long run, they do not.

THE COURT:  All right.  Are you suggesting that, bottom line, that, on balance, this deal is going to cost T-Mobile more than it is going to give them benefits?

THE WITNESS:  It will.  It will, because as we compete with them and they have less customers than they otherwise would have, that would be one way that will cost them, and the second way it will cost them is they won't be able to raise their prices as much as they otherwise might be able to.

So it's going to hit them in the ability to raise price, and it's going to hit them in lost customers, thus, lost revenue.

THE COURT:  Let's pursue that for a moment.  Now, putting your concern aside about mischief, which the DOJ is going to be monitoring, if T-Mobile decides that it's going to start a war with DISH for customers, that would not be mischief, that's competition.

THE WITNESS:  They could do that under this agreement.

THE COURT:  And if, looking at their bottom line, they see that over the course of the next three to seven years it's going to cost them tens of millions of dollars for this agreement, why is there not an incentive for them to work competitively within the rules to put you out of business?

THE WITNESS:  I think they'll try.  I think they'll

1722

JCIPSTA2                          Ergen - Cross

try.

THE COURT:  They will.

THE WITNESS:  Look, competition is always a concern, but as a company, I mean, we compete against AT&T and Verizon and T-Mobile in video today, and we compete against AT&T in satellite television, and so we do pretty well.  The -- the point I was going to make is --

THE COURT:  AT&T does not have an agreement with you that is a negative for them.

THE WITNESS:  Yes.  No, my point is that I do believe T-Mobile will try to compete, and I think, outside of mischief, they will try their darnedest to out-market us, get customers and be aggressive in the marketplace.

I was going to say the -- I lost my train of thought. The difference is that as we get -- if they lower their price, our formula -- we talked about that deflater yesterday as one of the parts.  That formula, because of the buckets that are in that formula, our price, if they lowered their price for their popular packages, our price would go down as well.

So they can't do what -- it would be difficult for them to lower their price and enter a price war and eliminate us as a competitor.  They would certainly have an impact on the industry.  It certainly would reduce our profits as well, but it wouldn't eliminate us as a competitor because there's a formula that protects us.

JCIPSTA2                          Ergen - Cross

THE COURT:  All right.  Proceed.

(Continued on next page)

1724

JCITSTA3                     Ergan - Cross

THE COURT:  All right, you may proceed.

MS. BLIZZARD:  Thank you, your Honor, I will try to move a little faster here.

BY MS. BLIZZARD:

Q.  One quick question on dynamic calling spectrum sharing, DSS.  You know what that is, right, Mr. Ergan?

A.  I do.

Q.  And you testified at your deposition that DISH intends to use dynamic spectrum sharing.  Do you recall that?

A.  I think that at the time of the deposition it was one of the things -- it's one of the technologies that we're looking at.  With the addition of some of the high level engineers that we talked about yesterday, we are probably a little less optimistic about dynamic spectrum sharing, but it's still AN option for us, but we have other options.

Q.  I'm going to move on.  Let's talk a few more moments about broken promises and some of the missed deadlines which we started with.

MR. PARKER:  I object to that characterization.

THE COURT:  Sustained.  Ms. Blizzard, have we not exhausted this topic already?

MS. BLIZZARD:  Sadly, we haven't, your Honor.

MR. PARKER:  For the record, I think we have, your Honor.

BY MS. BLIZZARD:

JCITSTA3                          Ergan - Cross

Q.   Mr. Ergan, has a federal court ever found that you failed to uphold promises that you had made to the court under penalty of perjury?

A.   I can remember a case years ago where a judge found that I personally had broken a promise.

Q.   And that case was *CBS Broadcasting v. EchoStar*, correct?

A.   It was a case with -- I remember it was in Miami, and I remember it was a case against broadcasters, it might have been a lot of broadcasters or might have just been CBS, I don't remember.

Q.   And that district court found in its findings of fact that you had made a formal pledge under penalty of perjury to terminate certain subscribers from EchoStar services, correct?

A.   That's my recollection.

Q.   And the court found that the promise was in fact made in an effort to dissuade this court from issuing a preliminary injunction, correct?

A.   I don't remember the exact details of why they found it, but they certainly felt like that I personally had broken a promise.

Q.   And following a bench trial the court made a finding that you had later elected to break a promise that you made under penalty of perjury to the court, correct?

A.   Again, I just remember that it was a very embarrassing time for me, because nobody wants a court to find that they have

1726

JCITSTA3                          Ergan – Cross

found that they believe you had broken a promise.

Q.   More recently, in United States Bankruptcy Court here in the Southern District of New York, did a court find that your testimony was not credible?

A.   They did, but the good news is that history has proven my testimony to be very, very, very credible.

Q.   So the courts -- the bankruptcy court at that time found that your testimony concerning a certain bid as a personal investment was not credible.  Do you recall that, that finding?

A.   My recollection was that the court found that our motivation for not pursuing a particular transaction was not credible because there was no interference, and I think the company at that time was called LightSquared, but today called Ligado, and yet here we are three years later and the NTIA, the Department of Defense, the federal transportation agency have said that what we said in our due diligence, that there was interference, was absolutely correct, that the judge didn't find it credible, but many places in the government have found that our due diligence was in fact accurate.

Q.   But I'm not interested in the substance of LightSquared. The issue is not the substance of whether your analysis is right, the issue is, and what the court found was what you told the court, your testimony, was not credible; not the substance, but your testimony was not credible.  Do you recall that?

A.   Well, again, the recollection I have is the credibility was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JCITSTA3                         Ergan – Cross

about -- again, there was probably -- there were parts of my testimony that the judge did not find credible, but that sometimes happens.  I think judges have to decide which witnesses are credible and which ones aren't, and in this particular case the judge did make some -- I just recall made some mention of my credibility.

Q.  Okay.  And in fact, the court found that you, Mr. Ergan, failed to testify truthfully about the reasons for your, quote, "no vote," and that was significant and part of a troubling pattern of non-credible testimony.

Do you recall that?

A.  Again, I think what you just said is exactly what I remember, which is that we had uncovered in due diligence there was interference problems with the LightSquared satellites, and we were the only -- of all the companies that had done due diligence, our company found and therefore we were no longer interested in purchasing or buying that company out of bankruptcy, the judge found that wasn't credible.  Later, as we sit here today, many parts of the U.S. government have found our due diligence was exactly correct.  And so while I would prefer that the judge didn't find our company not credible in that bankruptcy trial, I'm somewhat -- I feel somewhat vindicated that history has shown that we in fact were credible.

MS. BLIZZARD:  Mr. Nikels, do we have the LightSquared

JCITSTA3                          Ergan - Cross

opinion?

Q.   This is the opinion you were talking about?

Can we go on page, I believe it's 319.

THE COURT:  Ms. Blizzard, is there something new about what you are showing?

MR. PARKER:  Your Honor, I don't see how this --

MS. BLIZZARD:  I was just trying to refresh Mr. Ergan's recollection that the issue was not the substance, the issue was that when what was said to the court was not --

THE COURT:  I think the question was asked and answered, let's move on.

MS. BLIZZARD:  All right, your Honor.

BY MS. BLIZZARD:

Q.   Mr. Ergan, do you recall back in 2012 you were seeking to acquire certain AWS spectrum, do you recall that?

A.   I think we first started to acquire spectrum in 2011.

Q.   And in 2012, in the course of an FCC proceeding, you told the FCC that you planned to enter into the wireless market to support American consumers if you were allowed to get the spectrum.  Do you recall that?

A.   I have a general recollection of that.  Yes, I think that's accurate.

Q.   And even though you told the FCC that in 2012, to this day DISH has not built out a network to support mobile broadband for consumers, correct?

JCITSTA3                          Ergan – Redirect

A.   Well, we have built --

Q.   Yes or no, Mr. Ergan.

A.   We built a network -- ask the question again, I will make sure I respond to it.

Q.   Despite telling the FCC in 2012 that you plan to enter the wireless market for American consumers for broadband, that today, the end of 2019, DISH has not built a mobile broadband network for consumers.  As we sit here today, that network does not exist, correct?

A.   We have not built that network yet.

        MS. BLIZZARD:  Thank you, no further questions, your Honor.

REDIRECT EXAMINATION

BY MR. PARKER:

Q.   Good morning, Mr. Ergan.

A.   Good morning.

Q.   Let me go back on some of what Ms. Blizzard has talked about, but first I want to give some context.  Why are you agreeing to build a 5G network?

A.   That's what we're going to need.  We're going to need a 5G network with broadband to compete against -- if this merger is allowed, to compete against the three big incumbents.

Q.   And you're doing it in order for commercial purposes because you believe it is a profitable investment, am I right?

        MS. BLIZZARD:  Objection, leading, your Honor.