# EXHIBIT E

172

JCAPSTA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
STATE OF NEW YORK, *et al.*,

                    Plaintiffs,              New York, N.Y.

          v.                                 19 Civ. 5434(VM)

DEUTSCHE TELEKOM AG, *et al.*,

                    Defendants.
------------------------------x

                                             December 10, 2019
                                             9:05 a.m.

Before:

                    HON. VICTOR MARRERO,

                                             District Judge


                         APPEARANCES


MUNGER, TOLLES & OLSON LLP
     Attorneys for Plaintiffs State of California
BY:  GLENN POMERANTZ
     KURUVILLA JOSEPH OLASA
     KYLE W. MACH

STATE OF CALIFORNIA
Department of Justice
Office of the Attorney General
     Attorneys for  State of California
BY:  PAULA L. BLIZZARD

STATE OF NEW YORK
Office of the Attorney General
     Attorneys for State of New York
BY:  ELINOR R. HOFFMANN
     BEAU W. BUFFIER

203

JCAPSTA1                    Hottges - Direct

colleagues would intend to come back to other parts of this thread at other times, but at this time, all I'm offering it for is this one text message from Mr.~Legere and the date on it.

THE COURT:  All right.

MR. PARKER:  That's all right for now.

BY MR. POMERANTZ:

Q.   And Mr.~Legere is referring to the merger of T-Mobile and Sprint as a four-to-three merger, correct?

A.   Yes.

Q.   He didn't say it was like a 10-to-nine merger because you have to include all the MVNOs, right?

THE COURT:  Asked and answered.

MR. POMERANTZ:  Sorry?

THE COURT:  Asked and answered.

MR. POMERANTZ:  Thank you, your Honor.

Q.   Let's change topics.  Is it fair to say that you and T-Mobile have learned a lot since 2012 about what it takes to succeed in the U.S. wireless market?

A.   We did.

Q.   So let's talk about some of the things that it takes to succeed in the U.S. wireless market.  One of those things is capital, correct?

A.   Yes, sir.

Q.   To succeed in the U.S. wireless market, a carrier has to

204

JCAPSTA1                    Hottges - Direct

continue to invest in its network, correct?

A.  Heavily.

Q.  This is a pretty dynamic industry, right?

A.  We had seen 2G, 3G, 4G, and now the investment is coming with 5G; so this is coming with a very capital-intensive requirement.

Q.  It's an industry in which technology rapidly changes, correct?

A.  That's correct, sir.

Q.  And it's hard to predict what technology is going to be five years from now, correct?

A.  Not really.  We know where the technology is heading to, but we have to build networks, and to build them, sometimes I would say it's difficult to predict what's beyond 10 years.

Q.  Well, it's fair to say that predicting the future is always a challenging exercise, correct?

A.  That's correct.

Q.  And it's even more challenging in a market like the wireless market that has rapid technology changes, correct?

A.  Yes.  We are in an infrastructure business; so it's a little bit easier to predict the future than being in a software industry, which is much more dynamic than our infrastructure business.

Q.  Well, it's fair to say that even a very good CEO will regularly get his future predictions wrong, correct?

JCAPSTA1                        Hottges - Direct

A.   That's the name of the game.

Q.   Now, another thing that a successful wireless carrier needs is experience and expertise, correct?

A.   Yes, sir.

Q.   And to have a chance of succeeding as a wireless competitor, you need to have business people with real experience and expertise in the retail mobile wireless business, correct?

A.   Most important ingredient for entrepreneurial success.

Q.   So you agree with me?

A.   Yes.

Q.   And it's fair to say that the years and years of experience in the T-Mobile and Deutsche Telekom business, people have been absolutely necessary for the success we've seen at T-Mobile, correct?

A.   Yes.

Q.   And another thing that you need to succeed as a wireless carrier is scale, correct?

A.   That's correct.

Q.   And by scale, what you mean is that you need a lot of customers so that you can cover the significant costs of operating a wireless network, correct?

A.   That's right.

Q.   And you think that scale requires a U.S. wireless carrier to have tens of millions of customers in order to be able to

JCAPSTA1                    Hottges - Direct

successfully compete, correct?

A.   Competition is always a function about the players in the market, and if you have two players in this market who have capital, and you talked about capital, market capitalization of 150 or 200 billion while you're operating in a market cap of 50 billion, when we have 18 million customers while these guys have customer bases from 100 million and above, then it's very difficult to utilize your infrastructure in this environment, that's correct.

Q.   So the end of that question, "that's correct," was answering my question?

A.   Look --

Q.   Let me go back.  That's a terrible question.  I withdraw it.

A.   Because if you compare European market with the U.S. market, it's a totally different game.

Q.   So let's go back to the answer you gave.  When you said somebody has over a hundred million customers, you were referring to Verizon and AT&T, correct?

A.   That's correct, yes.

Q.   And when you said that you only had 80 million customers, you were saying that wasn't sufficient scale, correct?

A.   Yes.

Q.   So you think that a national wireless carrier in the U.S., to successfully compete, needs to have more than 80 million

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

207

JCAPSTA1                       Hottges - Direct

customers?

A.   That's correct, yes.

Q.   And another thing that a successful U.S. wireless carrier needs is a brand that U.S. consumers recognize, correct?

A.   Very important.

Q.   And you need a brand that consumers not only recognize but a brand that they like and respect, correct?

A.   A brand is whether you fulfill your promise towards your customers every single day with regard to price, credibility, service, attitude and your ethical values.

Q.   And so you need a brand that consumers would recognize as providing good, quality wireless services, correct?

A.   Yes.

Q.   At a fair price, correct?

A.   Yes.

Q.   And it takes time for someone to develop that kind of a brand, correct?

A.   That's correct.

Q.   T-Mobile has spent the last seven, eight, nine years working really hard to try to improve its brand, correct?

A.   That's not a hundred percent correct because the Deutsche Telekom brand, T-Mobile, was invented in 1999, and then expanded across the globe and was then reinvented, reignite by the U.S. management team around John Legere and Mike Sievert and the team in 2011 and '12.

208

JCAPSTA1                        Hottges — Direct

Q.   You're right.  Because you manage a global enterprise, and I was focused on the United States; so I was not clear.  Let me restate the question.

T-Mobile, in the United States, has been working hard for years to try to improve the T-Mobile brand in the eyes of the consumer, correct?

A.   That's what we did.

Q.   And it takes years to develop a successful brand?

A.   It is a very successful brand.

Q.   All right.  Let me go now to Dish.  T-Mobile recently entered into a deal with Dish, correct?

A.   We did, yes.

Q.   And that was part of T-Mobile's arrangement with the Department of Justice, correct?

A.   That's correct.

Q.   And you understand that T-Mobile's agreement with the Department of Justice and with Dish were designed to try to enable Dish to become a meaningful fourth competitor in the U.S. wireless market, correct?

A.   That's correct, yes.

Q.   Now, you've had discussions within Deutsche Telekom about the likelihood that Dish will ever become a meaningful fourth competitor, correct?

A.   We had very intense discussions, and we were very concerned about this remedies.

209

JCAPSTA1                        Hottges - Direct

Q.   And some of your most senior executives expressed those concerns, correct?

A.   Whom are you talking about?

Q.   Well, for example, your CFO?

A.   This might be the case.  We had all concerns in the management team around this remedies.

Q.   Your CFO's name is Mr. Dannenfeldt, right?

A.   He is our former CFO, retired by the end of last year.

Q.   Okay.  At the time that you were deposed, you mentioned Mr. Dannenfeldt as somebody who had expressed concerns about whether Dish could become a meaningful competitor, correct?

A.   Would you mind to repeat that?

Q.   Yes.  Do you recall stating at your deposition that you thought Mr. Dannenfeldt expressed concerns about Dish becoming a meaningful competitor?

A.   Yes.

Q.   And that's still your recollection?

A.   Yes.

Q.   And the concerns that you were hearing within Deutsche Telekom was about whether Dish would really be able to build its own 5G network, correct?

A.   That's correct.

Q.   And you were hearing concerns about whether, even if they built their 5G network, whether they would then be able to successfully compete, right?

210

JCAPSTA1                          Hottges – Direct

A.   Yes.

Q.   And the concerns you were hearing were whether Dish would be able to really build an entire network infrastructure from nowhere, correct?

A.   Yes.

Q.   Now, it's fair to say that the senior executives in Deutsche Telekom -- let me withdraw that, Mr. Hottges.

Is it fair to say that there was no consensus within Deutsche Telekom's senior management about whether Dish would ever become a competitively relevant competitor against T-Mobile?

A.   Look, they're different positions where we discussed Dish in the past.  There was a time when he wasn't a stand alone perspective.  We saw that he had a very juicy and strong position in the spectrum area, and then we had this discussion around the remedies and some of this here.  And since then, we are very concerned, and I got your question the way that you're talking about this time period.  We were very concerned, and we are very concerned, about the capability that Dish is becoming a nationwide fourth player.  He had a very favorable deal on the table from other DOJ.

Q.   Was there a consensus view within Deutsche Telekom about whether or not Dish would become competitively relevant in competition against T-Mobile?

A.   Sorry, I missed this question.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300