# EXHIBIT F

JCBTSTA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
STATE OF NEW YORK, *et al.*,

                    Plaintiffs,            New York, N.Y.

            v.                             19 Civ. 5434(VM)

DEUTSCHE TELEKOM AG, *et al.*,

                    Defendants.
------------------------------x

                                           December 11, 2019
                                           9:00 a.m.

Before:

                    HON. VICTOR MARRERO,

                                           District Judge


                         APPEARANCES


MUNGER, TOLLES & OLSON LLP
     Attorneys for Plaintiffs State of California
BY:  GLENN POMERANTZ
     KURUVILLA JOSEPH OLASA
     KYLE W. MACH

STATE OF CALIFORNIA
Department of Justice
Office of the Attorney General
     Attorneys for  State of California
BY:  PAULA L. BLIZZARD

STATE OF NEW YORK
Office of the Attorney General
     Attorneys for State of New York
BY:  ELINOR R. HOFFMANN
     JEREMY KASHA
     BEAU W. BUFFIER


                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

THE COURT:  Yes, you may.

The clerk will swear in the witness.

CARL SHAPIRO,

   called as a witness by the Plaintiffs,

   having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. POMERANTZ:

THE COURT:  State your name and spell it for the record.

THE WITNESS:  Carl Shapiro, Carl with a C, S-H-A-P-I-R-O.

THE COURT:  Before Mr. Pomerantz starts, let me just indicate that we are taking this case in a different protocol than you may have been familiar with when you testified as an expert, and the parties essentially laid a foundation for your expertise to testify to the subject.  If there is no objection to Professor Shapiro testifying on this subject, the Court will admit you and allow you to testify as an expert without going into the details of your 20 pages of CV, which will save us a lot of time.  I have read the 20 pages and I am sufficiently impressed and we'll accept that you're an expert in this area and allow you to testify in that context.

Yes?

MR. CARY:  Your Honor, we have no objection.

THE COURT:  Okay.

MR. POMERANTZ:  So will offer into evidence the CV at the end of the examination, your Honor.

THE COURT:  All right.

BY MR. POMERANTZ:

Q.  So Professor Shapiro, good afternoon.

In preparing for your testimony today, did you create some slides to help describe your opinions to the Court?

A.  Yes, I did.

Q.  So I'm going to control the clicker, but you tell me if you need me to move back or forward as we move along.

Let's go to the first slide here.  What was your assignment in this case?

A.  Well, as indicated here, the first part was to identify the relevant market or markets in which to analyze this proposed merger, then measure market shares and concentration in those markets, and how the merger would affect concentration, and then go on and analyze the likely competitive effects of the proposed merger in those markets.

Q.  We'll spend quite a of time going through your conclusions in detail, but what is the bottom line conclusion on the likely competitive effects of this proposed merger?

A.  As indicated here, I believe that it is likely -- the merger is likely to substantially lessen competition and harm consumers in the market for retail mobile wireless telecommunications services -- and this would be both in the

United States as a whole and in a number of local markets within the United States -- unless the merger would generate substantial cognizable efficiencies.

Q.  We'll spend the next hour or so, maybe two, going through the basis of that conclusion, but based on that conclusion, what does that mean to consumers?

A.  So your Honor, this slide depicts some calculations I have done to show the type of harm or the magnitude of harm, I should say, that consumers could suffer as a result of price increases following the merger and caused by the merger.

The upper panel, as you see in the heading there, if the new T-Mobile, Verizon and AT&T together coordinate and simply avoid price declines, so if prices stabilize rather than decline for the next year, that would itself, if that is the impact, then annual consumer harm resulting from that in one year, annual, would be $8.7 billion.  That is calculated off a revenue base for those three firms in this market nationally of 138 billion.  So that's one mode of analysis, the coordinated effects mode that we'll be talking about, or coordinated effects as a type of specious of effect from the merger.

The second panel relates to unilateral price increases, so this doesn't involve AT&T and Verizon raising price, or stabilizing price, I should say, this is simply if the new T-Mobile sets higher prices themselves as a result of the merger, in that case we have a smaller revenue base, about

42.8 billion as shown here annual revenue base, but I calculated a larger percentage increase, for reasons we'll get into, and so the harm calculated with that method is $4.6 billion a year.

Q.  All right.  So we'll go now through this in detail, but at a high level, what analysis did you perform to reach the conclusions that you just described?

A.  I followed what I would call the standard techniques and methods that antitrust economists use to analyze horizontal mergers.  And these are I think laid out in the horizontal merger guidelines from the Justice Department and the Federal Trade Commission, and that's the framework which is the standard framework that antitrust economists use, and that's what I did here.

Q.  I want to be careful here and make sure we always define terms.  You used the term "horizontal merger."  There's also a "vertical merger," correct?

A.  Indeed.

Q.  And this is a horizontal merger that we're evaluating here, correct?

A.  Yes, that simply means that the merging parties are competitors.

Q.  They're in the same level of the market?

A.  They're in the same market.

Q.  So what are the horizontal merger guidelines?

A.  So these are guidelines issued by the two federal antitrust enforcement agencies, updated now and again, that describe for the business community and for the courts how they analyze horizontal mergers, typically as part of the Hart-Scott-Rodino review process by which these agencies review proposed mergers.

Q.  All right.  And the slide that we have on the screen here has a date at the bottom of August 19, 2010.  Is that the most recent revision to the horizontal merger guidelines?

A.  Yes, it is.

Q.  Did you have any role in that revision process?

A.  Yes.  This is during the time when I served as the chief economist at the Justice Department, and I look a lead on the DOJ side in organizing efforts to do the updating for these guidelines.  There was a comparable team -- large teams on both sides, but a comparable team at the Federal Trade Commission.

Q.  And in performing your analysis in this case, what information did you rely upon?

A.  Well, there's a number of different sources, and they're detailed in great length in my reports, but certainly a lot of data that has been made available to me and my team that supports me and the economists supporting me on this, documents that have been produced in discovery, depositions, public information in some cases.  Those are the main ones that come to mind.

Q.  And did you also rely upon certain economic literature and

training in this area?

A.   Certainly.

Q.   Why did -- you said one of the categories of information that you considered were documents produced by the parties in this case, correct?

A.   Yes.

Q.   So documents produced by T-Mobile and Sprint, correct?

A.   Yes.

Q.   Why did you consider those documents in connection with your analysis?

A.   Well, in my experience, the documents, particularly in larger firms where they're doing strategy analysis and forth, are very informative about how the companies view the markets, how competition plays out.  For example, we were just talking about MVNOs, mobile virtual network operators, and it's part of my analysis, certainly, and it's helpful for me to see how T-Mobile, for example, uses MVNOs.

Q.   Is one way to refer to these documents as ordinary course of business documents?

A.   Yes, that's a term commonly used, particularly by lawyers.

Q.   Well, I'm a lawyer, so I will keep using it.  Are ordinary course of business documents typically relied upon by a economists when they evaluate mergers?

A.   Absolutely.  The advantage is they're not prepared for litigation, or we hope at least, they're a depiction of how the

executives or companies see the market, not stilted in some way for litigation.

Q.  Now I said before we started your examination that you had prepared to two reports in this matter.  Could you briefly describe at a very high level what the nature is of each of those reports?

A.  It's a nice fat report.  The first report that was filed in September really lays out my analysis of the case, why I ultimately reached the conclusions that you will hear about that the merger is likely to generate anticompetitive effects; so going through all the elements that we talked about, there's tendencies to all these things.

And the second report, my reply report, was in response to economic experts for T-Mobile and Sprint who didn't totally agree with me, and so I defended myself, effectively, in replying to what they said, and that's my reply report.

I also was able to update some of the data, particularly I think most important, your Honor, the market share data.  The first report only had data through June of 2018, and the second report has data through December of 2018.

Q.  What steps do antitrust economists typically take to analyze a merger such as the one we're facing here?

A.  Well, again, we're still at a pretty high level.  There's defining relevant market and measure market shares and concentration, that's kind of one set of tasks.  Then there's

evaluating competitive effects in those markets, that's a second set.  And then if those two steps indicate a concern about competition, then we would typically go to a third step and see whether there are mitigating factors, such as would entry save the day, new firms coming into the market, or efficiencies.

Q.  So briefly, what was your conclusion regarding the first step, that is, the relevant market and the market shares and concentration?

A.  So the relevant market here is the -- as you know, your Honor, retail mobile wireless telecommunications services, that's the product market.  We have a national geographic market, and in my view also a number of local of markets as well.  So that's the market definition piece.

And then we have market shares.  Is that still the question?

Q.  Yes.

A.  Market shares.  These markets are highly concentrated, but I will talk about the national market to save time now.  It will be significantly more concentrated as a result of combining T-Mobile and Sprint.  So that's the first large chunk of what we'll work on, that piece.

(Continued on next page)

Q.   All right.  And then what was your conclusion about, with regard to the second step, that is the anticompetitive effects?

A.   So we break this up into coordinated effects and unilateral effects, and we'll be spending time on those.  Both of those are a concern here.  Coordinated effects, and this reflects the numbers I showed you a few minutes ago, your Honor.

Coordinated effects will be concerns of softening the competition between the remaining big three, namely, new T-Mobile, Verizon and AT&T.  And I think there are reasons to be quite concerned about that.  I'll tell you that.

Unilateral effects would be simply new T-Mobile raising price because they're no longer competing against Sprint.  They've acquired Sprint.  That also was a concern in this case.  So on both of those fronts, my analysis indicated the merger is likely to generate anticompetitive effects.

Q.   And then the third step that you described, did you consider whether there were any mitigating factors that would prevent or reverse those anticompetitive effects?

A.   So yes, I did.  So I mentioned, in particular, entry and efficiencies are the two -- or remedy would also come in here.  So the efficiencies, I have not myself analyzed.  Another expert, Professor Fiona Scott Morton from Yale will be analyzing the efficiencies that the parties have claimed; so I'm not doing that part of the overall analysis.

Q.   And then did you do any analysis relating to an entry or

any remedies in this case?

A.   Right.  So I did look at entry.  I think it's clear that there are very high entry barriers into the markets, especially nationally, and but I also considered DISH, the DISH arrangement.  DISH is planning to be an entrant; so that's part of the analysis.  Again, that part I also share with Professor Scott Morton.

I am looking in the near term at the effect of DISH as they come in for the first two, three years, and she is looking at a longer term in terms of their build-out plans and possible entry as a network operator.

Q.   All right.  So with that background, let's now go through each of those three steps in a little more detail, and we'll start with relevant markets.  What are the components of a relevant antitrust market?

A.   As I indicated, we would have a product component and a geographic component.

Q.   And what are your conclusions regarding the product market in this case?

A.   So retail wireless -- retail mobile wireless telecommunication services would be the mouthful, but that's the term we're using, I'm using, as the relevant product or service in this case.

Q.   All right.  And so let's start with the product.  Does a product market typically include every single substitute of a

product?

A.  No, no.  It does not.  So, for example, your Honor, if we had a merger between two companies that made beer, we might very well have a market for beer.  Although, we would understand that hard liquor would be a substitute, to some degree, or maybe soft drinks would be too, right, to some degree, but those are more distant substitutes.  So the idea is to capture a set of reasonable substitutes that will be informative for analyzing the merger, not all substitutes.

Q.  All right.  And what was your conclusion regarding the relevant geographic market in this case?

A.  Well, there is a national market for these services, and there are also a number of local markets.  I've used the cellular market areas or CMAs as my local markets.

Q.  And where -- I'm sorry.  I didn't mean to interrupt.

A.  Go ahead.

Q.  Where does CMAs, where does that concept come from?

A.  Well, this originally comes from the Federal Communication Commission, FCC, based on the original license areas for spectrum, but it's over the years the standard way in which the Federal Trade Commission has analyzed local markets and competition in this industry.

Q.  Okay.  So let's drill down a little bit deeper.  Is there any kind of a test that antitrust economists typically use to help identify the appropriate relevant antitrust market?

A.   Yes.   We have something called the hypothetical monopolist test.

Q.   And what is that?

A.   So this test is designed -- well, first off, it's been a standard tool for 30 or 40 years now for antitrust economists. It's designed to do what I said before, which is identify reasonable substitutes for merger analysis but not all substitutes.

So, you know, in the beer merger, we would end up with beer, very possibly.   We don't know that ahead of time but that's the idea.   Let's draw some boundaries so we capture a reasonable set of substitute that is informative for the analysis.

Q.   All right.   And the defendants have retained two economists to testify in this case.   You responded to them in your reply report, correct?

A.   Yes.

Q.   Did either of them identify a different test, a different way of going about and defining a relevant market?

A.   No.

Q.   Okay.   And so how does an economist apply the hypothetical monopolist test to define the relevant product markets?

A.   Well, a key concept here is the notion of a candidate market and then the hypothetical monopolist.   Those are the elements.

So if I give an example, sticking with beer, suppose we had a merger between two companies that were really quite strong in selling light beer. We might say, well, is there a market for light beer that we would analyze that merger in? So you would take light beer as a candidate market. You don't know if it's going to end up being the market yet, that's why it's a candidate. And then you ask if a single firm, that's the hypothetical monopolist, controlled all the sales of light beer, would they significantly raise price above the current levels?

Current levels are based on some degree of competition; so a monopolist would probably raise price, but how much? If the hypothetical monopolist would raise price at least 5 percent, then the candidate market is going to pass the test. If not, it's going to fail the test.

Now, what's that going to come down to, you imagine you raise the price of light beer, some people will buy less of it. The normal rule of law of economics, if the price goes up, people buy less. But then what's left? If a lot of people would say, hey, light beer went up 5 percent, I'm buying regular beer, then a lot of people would move out, and this price increase would not be profitable. The monopolist would lose some of these sales.

So if a lot of people would shift to regular beer, then light beer would fail the test. And that would reflect

the fact that there's really quite a close substitute, regular beer, and it would be a mistake to not include that.  So that's how you do the test.

Now, suppose you were testing all beer.  You'd say, well, if we raise the price of all beer, would very many people stop drinking beer or reduce their usage?  And we probably would find, I would think, that that would be profitable for the hypothetical monopolist even though some people would shift from beer to soft drinks or hard liquor.  So in that case, all beer would satisfy the test.  Light beer might not.

You start with a candidate market.  You do this test until you have a group of substitutes that's large enough so the test is satisfied.  So that's how it goes.  That's as simple as I can make it.

Q.   What candidate product market did you start with here?

A.   So I started with the market, the retail mobile wireless telecommunication services, and I ran the test and it was satisfied; so I didn't have to keep expanding beyond that.

Q.   And what specifically did you include in what we're calling retail mobile wireless telecommunications services?

A.   All right.  So now we have to get kind of into the weeds a bit because we want to measure these things and, you know, I need to be very precise, at least as precise as I can be with the available data.

So first, retail, we're talking about basically

consumers and not large businesses.  So that's what we mean by retail, and I'm not going to include the enterprise sales, which are a separate category that are tracked.

Q.  Let me just stop you for one second.  When you use the word "enterprise," that means the same thing as large businesses?

A.  Yes, it does.

Q.  And they buy in a different way than consumers?

A.  Yes, they often buy through a procurement process.  It's a different category of customer than retail customers.

Q.  All right.  So then what else did you specifically end up including in retail mobile wireless telecommunication services?

A.  So then for the consumers, I'll call them, I then also have to decide, well, which lines or devices am I going to include in the market?  And so I have included, basically, cell phones but not what are called connected devices and not what are called internet of things, these other categories of devices. So a connected device would be like a smartwatch.  I've not included those.  I am sticking with devices that are basically well suited and designed to handle data and voice services and mobility.

Q.  Does the candidate product market that you just described, did it satisfy the hypothetical monopolist test?

A.  Yes, it did.

Q.  And how did you reach that conclusion?

A.  So there's two ways we can see that more quantitatively.

First, we -- I think you've already seen a fair bit of evidence, your Honor, that we have seen that competition among the large four, the four MNOs, over the past several years. Floor plans for exactly these devices for consumers has driven the price down substantially more than 5 percent; so competition has lowered price quite a bit.  We're all benefiting from that.

That tells me if you took away the competition and you had a single firm setting the prices, it would be profitable to set them quite a bit higher, more than 5 percent, because the competition has caused prices to go down more than 5 percent. So we can see the direct effects of competition, lowering price.  The hypothetical monopolist would set a higher price; so that's a fairly easy and indirect way to see that this group of products satisfies the test.

Q.  All right.  And did you apply any other methods to evaluate whether the proposed product market satisfies the hypothetical monopolist test?

A.  Yes, I did.  There is another quantitative method that economists have developed that I applied.

Q.  Could you describe that method, please?

A.  Yes, sure.  So what we do is we ask -- we have a form that we've developed, and it involves asking -- really, we're trying to figure out to what extent to the firms compete with each other directly, and if there's a lot of that, then this market

will pass the test.

If they're competing with more distant products than they can market, may not pass the test.  So we ask if one of the firms, let's take T-Mobile in our case, raise their price, they're going to lose some customers.  Some of those customers will go to the other firms in our candidate market, other cell phone suppliers, AT&T, Verizon, Sprint.  Some will leave the market entirely, drop their cell phone service, let's say.

We have a quantitative test that says how many people would have to leave this market entirely in order for the test to fail, and that depends on the profit margins that come into this calculation.

And so I used -- I applied that test, and with the profit margins we've got here, if T-Mobile alone were to raise the price, more than 80 percent of the lost customers would have to move outside the market in order for this group not to pass the test, such as dropping their cell service or maybe getting a smartwatch instead, something not in my market, and that is an implausibly high number.

From all of the evidence we see, that when one of these firms raises or lowers their price, predominantly they're winning business from the other firms involving the products in the market that we're looking at; so this test is also satisfied.  When we do this test, this candidate market satisfies the test.

Q.   All right.  So now, let's move from the product market that we were just talking about to the geographic market.  How does an economist apply the hypothetical monopolist test to the geographic market?

A.   We do exactly the same thing.  It's the same idea, but applied to geography.  So if we had a merger of grocery stores, we might say, oh, these two companies, they both have grocery stores in Brooklyn, maybe a high share in Brooklyn.  Is that a market, or do we need to have a broader market or a narrower a part of Brooklyn?

So you would ask if the price went up in Brooklyn, would people go and buy their groceries someplace else?  Would people leave the market.  Same idea.  Here, when you start with the United States as the candidate market, it's undisputed that if the price of cell service in the United States went up, very few people would get service somewhere else, and so the test is easily satisfied.

Q.   So I think you answered the question.  You apply the hypothetical monopolist test to the national market consisting of the entire United States?

A.   Yes.

Q.   And your conclusion was?

A.   That the test is easily satisfied in that market.  Again, the key point being if the price went up in the United States, almost nobody would go get service outside the United States as

a substitute.  That's not plausible.

Q.  All right.  So we've had some discussion already during the course of this trial about local markets; so let's turn to local markets.  You also ended up defining some local markets in this case, correct?

A.  Yes.

Q.  Why did you define local markets, as well as the national market?

A.  Because some dimensions of competition take place locally, and those are best analyzed in local markets.

Q.  And if you didn't analyze the local markets in addition to the national market, what would happen?

A.  Well, you would just -- you would miss those dimensions of competition or you could miss them.  You could very easily do so.

So to give an example, suppose that we had two of our carriers -- suppose we had a merger with four national carriers.  Two of them, or the only two -- this is an extreme case, but just to get the idea across, but the only two to serve a certain locale of a certain area.  The other two national didn't cover that area.

If you look at national market share, you would miss the fact that there would be a merger to monopoly in that local area.  You need to look at the local market in order to capture that or see whether that is a problem.  And in fact, we're

going to see the market shares vary quite a bit from one region

to another.  If they were the same everywhere, it wouldn't

really -- this wouldn't get us so far, but there are

significant differences.

Q.  And what aspects of competition take place at the local

level?

A.  Well, certainly the investments to provide local service,

service quality in a given area, the cell towers, the

purchasing and deployment of spectrum; so network quality

varies quite a bit from one locale to the other.  So those are

an important dimension of local competition.  Retail stores is

another clear example, and there are local promotions as well.

Q.  Now, do the business documents of T-Mobile and Sprint that

you considered in this case support the conclusion that certain

important aspects of competition take place locally?

A.  Yes, they do.

Q.  All right.  I just want to look at a couple of the

documents that you relied upon in reaching your opinions.  This

is Exhibit 160.  It's in your binder.  Professor Shapiro, just

at anytime you need to look at an exhibit that I put on the

screen, it's also in your binder.

A.  Thank you.

Q.  Is this an example of a document that you looked at in

connection with assessing local quality?

A.  Yes.  So this, Sprint is touting the fact that it has fast

speed in Boston; so that's a local area, faster than the others.  So that's a good example of what I was talking about.

Q.  If you look at the box in the lower left-hand corner of this slide, there are these bar charts, and I think it says "fastest download speeds" and I can't read the white writing here, but I think this is a test run by somebody independent of any of these companies, some third party; do you see that?

A.  I can't read the white writing either, but I get -- I hear you.

Q.  Okay.  And is it your understanding that -- and I'm assuming again.  I can't read it.  I'm assuming that yellow in this particular chart is Sprint?

A.  That, actually, I can read.  I'm proud of myself.  Now, I took off my glasses.  So yellow is Sprint is the highest, and AT&T and T-Mobile and Verizon are shown there with slower download speeds in this chart.

Q.  And because things like spectrum and towers vary from location to location, this particular speed chart would look different if you were looking at Denver or Seattle or Dallas, right?

A.  Certainly.

Q.  All right.  So now, let's go to the next document.  Could you just briefly describe what this document is, and how it affected your local market analysis?

A.  Well, this document, your Honor, is illustrative of a

different dimension of local competition, namely, retail stores.  You can see the box on the right, 300 stores, 100 stores.  This is a T-Mobile document from a few years ago, and you can see what they say, "Spend to strength in high-performing markets;" so they're opening stores in areas where they have, it says, 700 megahertz license markets or newly expended covered.  So they've got some strength in terms of their network, and it's 300 stores.

The lower panel is spend to opportunity, Greenfield markets; so there is where they can have good coverage but they need distribution.  So retail stores are clearly a dimension of competition that occurs locally.

Q.  So using these two exhibits, these two examples, one of speed and one of retail locations, why would it be a problem in this case if we only defined a national market and only looked at competition at the national level?

A.  Because we would be missing these local dimensions of competition.  In particular, if we're going to -- we are going to see, your Honor, some quite high market shares for the merging firms in certain local markets, considerably higher than their national average.  So the concern is that in those markets, because they have a high share and the concentration will go up a lot in those areas, the anticompetitive effects will be greater there on the dimensions where they compete locally, which we've identified.

Q.   So as a matter of antitrust economics, does it make sense to define a national market and also to define local markets that are contained within that same national market?

A.   It does.  I find talking to people, some people find this counter intuitive, but it is correct as a matter of economics and merger analysis.

     The way to do this is you -- the national market will be a good market to analyze dimensions of competition that occur nationally, and by and large, the national plans and the basic plans and pricing by the nationwide carriers are done nationally, and I think that's agreed by all.

     But at the same time, there are dimensions of competition that take place locally, and if you didn't define local markets, you would not be properly evaluating those dimensions of competition.  So since competition with different dimensions occurs with a different geographic scope, it is informative and correct to define the two types of geographic markets.

Q.   All right.  So what local area did you select as your candidate geographic market?

A.   So these are the cellular market areas, the CMAs, that we talked about briefly already.

Q.   All right.  So let's look at an example of a CMA.  I put on the slide -- I'm sorry, on the screen a slide that, on the top, says New York City CMA.  Using this slide, could you just

Case 1:19-cv-02232-TJK   Document 60-8   Filed 01/24/20   Page 26 of 199   637

JCBPSTA6                        Shapiro - Direct

explain a little more what a CMA is?

A.  Well, the whole country is divided into these CMAs.  This happens to be a metropolitan one in the New York area; so, you know, there's going to be adjacent CMAs.  This is the New York one.  It's just shown on the map.  I don't have more to say than that.

Q.  How many -- do you recall how many CMAs there are in the United States?

A.  700-something.

        MR. POMERANTZ:  And, your Honor, I think in the report it's 734.  I don't think there will be any dispute about that.

Q.  Have CMAs been used as geographic markets in prior merger reviews?

A.  Yes, they have, regularly.

Q.  Okay.  And what did you --

A.  The FCC has done that and the DOJ used CMAs in the AT&T and T-Mobile merger some years ago.

Q.  And does the FCC regularly use CMAs in merger reviews?

A.  Yes, that's what the FCC does.  I thought that's what --

Q.  I might have said FTC.  I meant FCC.

A.  I said FCC.

Q.  I think we both either got it right or wrong.

        What did you find when you conducted the hypothetical monopolist on the CMAs as the candidate markets?

A.  They satisfied the test.

                            (212) 805-0300

Q.  And how did you reach that conclusion?

A.  So it's the same calculation we had before.  We asked if T-Mobile raised the price of their services in the New York region, in this one shown, they would lose a bunch of customers.  Would at least 80 percent of those customers move out and get service outside the candidate market, the products I've talked about, and this region?

And, no, it's not plausible that people who are living in New York, in response to a 5 percent price increase, are going to go get service that doesn't cover New York.  The hypothetical monopolist here is the only one providing service here in this region.  So it's very -- this CMA satisfies the test as a geographic market.

Q.  Now, has Sprint previously expressed the view that it is informative to define a national market, as well as local markets in this very industry?

A.  Yes, that would be back at the time of the -- I believe they did that during the AT&T/T-Mobile merger review in 2011.

Q.  All right.  So let's look at what Sprint said.  Could you just explain this slide to the Court?

A.  Of course.  So if you see the blown-up parts, this is Sprint Nextel, they were called then, I guess, petition to deny -- petition to the FCC to deny the AT&T/T-Mobile merger.

Q.  Hold on one second, Professor Shapiro.  I'll try to be better for this because I'm not saying, for the record

purposes, what the exhibit is, and I probably should do that as we pull up each slide.  This is Exhibit 655.

MR. POMERANTZ:  One other thing, your Honor, for, I guess, housekeeping purposes.  We're going to get to some slides that have a whole bunch of numbers on them, like HHIs, and I don't want to have Professor Shapiro read every single number into the record; so that we have them in the record right now.  These are not exhibits.  There will be certain slides, which I'll try to remember, I'll ask the other side to stipulate that that particular slide will come into evidence; so that we can get it in more easily in front of your Honor.

THE COURT:  All right.

MR. POMERANTZ:  Not this one, but we're getting to it very soon.

THE COURT:  Let me ask, just for my own curiosity and totally unrelated to this litigation.

MR. POMERANTZ:  Okay.

THE COURT:  This exhibit contains 377 pages, by my count.  How many of those pages are you going to be using for your case here?

MR. POMERANTZ:  Well, so far as I know, it's not even a matter of pages.  It may be a matter of lines.  In other words, if you want to --

THE COURT:  You get my point.

MR. POMERANTZ:  Yes, I get your point, and I can work

with the other side.  I just don't want to put it in there and say you left out the most important counter-piece of evidence. But once we finish the examination, I'm happy to work with the other side and give you like a paragraph or a page, whatever it is, that's necessary for the record.

THE COURT:  If you had read the Court's individual practices on this point, you would have done it the other way around.

MR. POMERANTZ:  I apologize, your Honor.  I'm sorry.

THE COURT:  No need to apologize.  It's my own personal quirk about these kinds of situations, where we're tearing down a forest in order to get a couple of lines of evidence into a case.

MR. POMERANTZ:  I hope it's the only one of your individual rules that I missed.  We've been working fast, and I apologize, your Honor.  We'll try to deal with that going forward.

BY MR. POMERANTZ:

Q.  All right.  So we were on this one paragraph, four lines from Exhibit 655.  Could you just briefly explain them to the Court?

A.  So the heading there, I think, makes the key point that Sprint is saying regarding that merger, that it would increase concentration in the wireless industry and harm competition in national and local markets alike.  So that's the point, that

this is like -- Sprint took the same view that I think is correct and am taking here, that it makes sense to define a national and a local market.

And the quote, that paragraph 28 quote, is from a joint declaration by a number of economists that Sprint retained that made the same point.  It's not that some believe there is only a single relevant market in which to analyze the effects of a merger, that is not correct.

Q.  All right.  And then this next slide is also from that same time period, but this one was submitted by Mr. Alling of T-Mobile, and briefly, if you could explain to the Court what this is?

A.  Right.  So this is, again, before the FCC, and I'm just going to read this sentence:  "Supports T-Mobile's view that wireless providers compete for customers on a local basis."

Q.  All right.  And just one more.  This is from something that T-Mobile previously used with -- about CMAs.  I think it's in connection with the California Public Utilities Commission.  Could you briefly describe what this is?

A.  All right.  So this is, as you say, and they're urging the commission here, meaning the California Public Utilities Commission, they're saying should follow the FCC's lead in defining relevant markets as local, and they specifically mention CMAs, as well as CEAs, a related concept.

And they have some rationale for why it's important to

define a local market, but specifically CMAs, they're advocating for.

Q. And just to be clear, this is something that T-Mobile itself submitted, correct?

A. Yes, that's right.

Q. All right. So T-Mobile here says that CMAs is the relevant geographic market, and you also are here saying in this court that CMAs are the -- are a relevant geographic market, correct?

A. That's correct.

Q. Why did you pick CMAs rather than some other region as your local geographic market?

A. Well, this has been the standard practice in the industry. It fits with the -- I can do this with the data I have available that we'll talk about from the -- we'll talk about to measure market shares.

Ultimately, you want to measure market shares. That's where this is going to. If we can't measure market shares, we've got some problems; so it's workable and practical, and those are the main things. It's also worth noting that the companies, in some cases, refer to CMAs in their own planning documents as markets as well.

Q. Well, let's look at a couple of those documents. Could you briefly explain this document to the Court and how it supports your selection of CMAs?

A. So this is Exhibit 911, a T-Mobile document from 2016, and

they're talking about launching in 305 markets.  It says MSAs there.  The CMAs, your Honor, consist of MSAs, which are metropolitan areas, and rural areas, RSAs.  Together, they form the CMAs.  So the MSA is a CMA.  It's a little confusing.

And they talk about license owned includes nine of top 10, 26 of top 30 metro areas, CMA-based ranking.  So they're just using these for the purpose of their planning and reporting.

Q.  All right.  So I want to show you one more document.

MR. POMERANTZ:  It's a Verizon, document, your Honor.

Verizon designated it as highly confidential.  So, Mr. Nichols, I want to turn off the public screens, if we can.  I'll tell you what, let me just use the binders if I may.  Let's not worry about the screens, Mr. Nichols.

Q.  Professor Shapiro, can you look in the binder at Exhibit 1235?

A.  Yes, this is slide 13.  So understanding the confidentiality, this is a Verizon document, and they are also talking about capital planning.

Q.  Hold on one second, Professor Shapiro.

A.  Oh, should I not --

Q.  Hold on.  I want to make sure we're all on the same page.  What page of Exhibit 1235 are you on?

A.  It says --

Q.  The page, look at the bottom right-hand corner.

A.   This is slide 13, but internally it's page 30 of Exhibit 1235.

Q.   Just so we're clear, on the bottom right-hand corner where there's a typed number?

A.   Oh, I see.  I get it.  Page 30.

Q.   What?

A.   Page 30.

Q.   Just wait for second so that I can get there and so that the Court can get there.

All right.  And so, Professor Shapiro, without discussing the substance of what's on this page, I think you're just referring to the reference to CMAs, correct?

A.   Yes, in the context of an important decision being made by Verizon.

MR. POMERANTZ:  All right.  So, your Honor, I'll just give a moment so you can see that, and I think we're done.

Now, I guess I'm going to have to ask everybody in the audience to close their eyes for a second so I can quickly flip through one slide here, but -- or, Phil, did you get me through this?  Okay.  I'll just kind of go really fast here.

All right.

THE WITNESS:  Now you're going to make them all want to look.

(Pause)

MR. POMERANTZ:  That's okay.

JCBPSTA6                          Shapiro - Direct

THE COURT:  Mr. Pomerantz, perhaps this material is cumulative at this point.

MR. POMERANTZ:  I'm just going to go past it.  I'm just trying to figure out how to get past it.  I have no more questions to ask on this subject.  I want to go to slide 14.

Q.  So let's turn to the next subject, which is the concentrations in this market.  What did you -- where did you get the data that you used to then calculate the market shares in the markets that you have now defined?

A.  So we have data from all four of the large MNOs.  We have data on their subscribers and their revenues that are relevant to measure these things.  We have data from U.S. Cellular, which is the largest regional.  We have data from TracFone, which is the largest MVNO, and we have some data from the FCC as well.

Q.  All right.  So let's look at the market shares.  Could you briefly explain this chart to the Court?

A.  So this is, first off, national market shares, and we're measuring this.  This is our most recent data from December 2018.  If you look at the rows, they are the different mobile network operators.  You see the four big players listed, and then the others, which would be the regionals are lumped together in one row.  So those are the suppliers we're measuring.

We're going to -- I note, of course, there are MVNO

subscribers.  They are attributed to these MNOs.  I'll talk about that later, why I did it that way.  Then for each of those suppliers, we've got to now look at the columns.  The first pair of columns counts number of subscribers, which is how the data comes, which you should think of as number of lines.  So a family with multiple lines would be counted as multiple subscribers here.  So let's look at those.

Those columns, if you see the total, there's close to 300 million subscribers in the United States, and then if you look at the shares, you could see Verizon is the lead with around 32 percent, and we go down from there.  T-Mobile and Sprint having 23 percent, and about 15 percent respectively.  So that's the subscriber shares.

Then before we -- but I also mentioned share based on revenue.  There are advantages and disadvantages of both those metrics.  I'm showing you both.  So the revenue -- and you can see -- by the way, this is -- the monthly revenue here is $13 million.  That's the total there under the revenue line.

And then again, you can see the shares, and they're a little different, right?  And it's, as I'm sure you -- worth knowing, T-Mobile's share is 20.6, instead of the subscriber share is 23.2, and Sprint's share of revenue is also slightly smaller, 13.8 rather than 14.7.  That reflects the fact that they, on average, are earning a bit less per subscriber.  They tend to be -- especially Sprint has a lower price, and so we

JCBPSTA6                         Shapiro - Direct

get these different shares in revenue.

So that's the basic market exercise, the first half of this table.

Q.  Okay.  So let's stop with the upper.  Now, the lower half is some calculations you used related to HHIs, and our discussion with the Court on Friday at the pretrial conference let's us all know that the Court understands HHIs.

So rather than having any explanation of what they are and why they matter, if you could go to the basic calculations themselves?

A.  Okay.  First off, before I get to HHI, there's a row there, combined share; so that means T-Mobile and Sprint put together.  So that would be the share of the new T-Mobile that we're getting.  As you can see, that's 37.8 percent subscriber share, 34.4 percent revenue share.  I consider that informative, as well as the HHI measures.

And then the HHI measures, let me just focus on the subscriber shares, since that's the one I prefer to use.  Without the merger, as of December 2018, we'd have around 2500, and it goes up by 679, that's a large amount, to 3186 with the merger, and you can see the revenue shares.  The Herfindahl numbers are slightly different but not significantly so, in my view.

Q.  All right.  So the threshold in the merger guidelines for a presumption of an enhancement of market power is a 200 increase

in HHIs and a 2500 total post-merger HHIs, correct?

A.   That's correct.

Q.   Now, does it make a difference to an economist, and the way you look at these numbers, whether the increase in the HHI is 201, just one over the 200 threshold, or 679?  Does that matter to you as an economist?

A.   Well, certainly.  These metrics, the higher the number, the more concerning, everything else equal.  So these are, you know, very substantial increases in HHI, and that's -- look, that's what you get when you add a 23 percent player and a 15 percent player.  That's what you get.  You get roughly a 700 point increase in the Herfindahl.

        Another way to think about it, your Honor, is the 200 Herfindahl change threshold, that would occur if you had two ten percent firms merging.  You would get a 200 increase in Herfindahl.  It's a lot more than that.  If it's 23 and 15, you get a 600 or so point increase.  So it is significantly different, far above the threshold.

Q.   All right.  Now, let's go over a few of the issues that had been raised by the defendants' economist relating to these calculations and HHIs.  Defendants have suggested that connected devices should be included in the market.  Do you agree with that?

A.   No, I don't.  Again, that would be smartwatches, a tablet or my mother's emergency -- personal emergency device.  I don't

think it should be included.  I explained earlier why.

Q.  All right.  And in any event, how would including connected

devices in the market effect these national market shares?

A.  Well, that's our next slide.

Q.  Well, then I should go there.  Okay.

A.  So, your Honor, the middle column here is the one you just

saw.  This is subscriber counts that we just had with the

Herfindahl, going up from 2507 to 3186.  If we include

connected devices, it's true that T-Mobile and Sprint's shares

each falls a little bit.  We still have a Herfindahl going out

from 2558 to 3169; so it's not a material difference.

         MR. POMERANTZ:  All right.  Your Honor, I would move

slides 15 and 16 into evidence at this time.

         MR. CARY:  No objection, your Honor.

         THE COURT:  Admitted without objection.

         MR. POMERANTZ:  Thank you, your Honor.

         (Plaintiff's Exhibits Slides 15 and 16 received in

evidence)

BY MR. POMERANTZ:

Q.  Now, defendants have also suggested that enterprise

accounts, or large business accounts, should be included in the

relevant market; do you agree?

A.  No, I don't.  Mostly, these are what are called corporate

liable, which means the company is paying for it, and I don't

think, if you ran my hypothetical as I did, the hypothetical

monopolist test would be satisfied without including those.

Q.  All right.  Now, in addition to calculating the market shares at the present time, or as of the end of 2018, did you also calculate projected national market shares in 2020?

A.  Yes, I did.

Q.  All right.  So turning to this chart, maybe you can use this to explain what you did?

A.  So first all, let me explain.  The numbers I showed your Honor for December 2018, that's a year ago.  So it's a fair question.  Well, are they out of date?  Has the market changed, or is it predictably going to change in a significant way that we don't want to use those numbers from a year ago?  That's my most recent data; so I'm looking into that question.  So that is about in looking at trends and doing projections.

This chart here shows the trends of the market shares.  In some industries, the market shares move a lot.  Maybe one firm is really growing and another firm is really dropping.  You'd want to take that into account.  That's not the case here.  These are quite stable.  These are subscriber market shares.  They're quite stable, as you can see.

In fact, the only real change you see here is the little bump up in the blue, which is AT&T, in early 2017, which we think is actually just an artifact of they changed -- it looks like they changed the way they reported, and so they reclassified a bunch of devices.  So we have stable market

JCBPSTA6                        Shapiro - Direct

shares for the last three years.

Q.   Now, the Court has heard a lot of testimony in just the first few days of this trial about Sprint's situation in the market in recent years.  What does this slide tell you about Sprint's situation?

A.   Well, you can see their share is virtually unchanged. Perhaps it's gone down one percentage point.  This is subscriber share again, and we've also looked at revenue share; so it's quite stable.

Q.   All right.  So then how did you go about calculating market shares for 2020?

A.   What I wanted to do was come up with a market share for 2020 so we could say what they'll probably be next year, rather than just what they were a year ago, based on actual data.  So I did -- so the standard thing, which is just to do some projections, I used the last year or so of the trend to -- the last four quarters, to project, and you can see here the projection.  So I'm projecting out two years from the end of my data, which is the end of 2018, to the end of 2020.  And unsurprisingly, it stays pretty flat because the shares have been so stable.

Q.   Now --

A.   And then what I do is I take the projected shares here in 2020, and I use that to calculate Herfindahles and the like. That's where we're going.

Q.   Yes.  So before we get to your calculations for 2020, are the projections that you're doing on this slide 18, these dotted lines going forward, are those projections consistent with the defendant's own submissions during this merger?

A.   Yes, they are, and I'm very much aware that the defendants have -- are making the argument that Sprint is in trouble and declining, and of course, that's something I want you to look at.  If I'm going to do these projections and use market shares and the documents that Sprint and T-Mobile themselves put in to DOJ and the FCC, showed stable shares, and the materials their economist put in also showed stable shares going out several years.  So this is what the other data show as well.

Q.   So your own analysis, plus the data put in by the defendants in connection with the merger review by the federal authorities, do not predict that Sprint will not be viable two years from now, correct?

A.   The market share projections don't show anything of the like.  The historical data don't show that, and the market share projections, mine and the ones from the merging parties, do not show any such decline.

Q.   And you've reviewed a lot of documents in this case, including public statements by Sprint executives to the federal government and to the SEC.  Did any of the Sprint statements publicly say that we're not going to be viable in two years?

A.   Not that I can recall.

Q.   All right.  So you said that you then calculated HHIs for 2020.  What did that show?

A.   Well, I'm pretty sure that's our next slide.

Q.   Well, then I should go there.

A.   Though the right-hand column here uses the projected shares for the four big carriers for 2020 and then recalculates the Herfindahles, there's no significant difference.  The level of Herfindahl, the post-merger Herfindahl and the increased Herfindahl are slightly higher with the projections, but basically there's no difference.

          MR. POMERANTZ:  All right.  Your Honor, again, I'd like to go back and move into evidence slides 16, 17, 18 and 19.

          MR. CARY:  No objection, your Honor.

          THE COURT:  Admitted without objection.

          (Plaintiff's Exhibits Slides 16, 17, 18 and 19 received in evidence)

          MR. POMERANTZ:  Thank you.

BY MR. POMERANTZ:

Q.   Let's turn to local markets and the shares and HHIs.  I take it you looked at both those shares and HHI as well?

A.   Yes, the data allowed us to do calculations at the CMA level.

Q.   All right.  So let's look at, first, what does this chart reflect?

A.   This chart, your Honor, is a list of all the CMAs in the 13 litigating states, plus the District of Columbia, that trigger the structural presumption based on Herfindahl indices that's found in the horizontal merger guidelines.  That is to say, a post-merger Herfindahl of at least 2500 and an increase in the Herfindahl of at least 200.

Q.   All right. And if you look at the next, I think, four slides, here's the first one, what does this slide show?

A.   So this lists the CMAs in California, and this is actually, the first one, it's a good example.  It's a big CMA because of the population in the LA area.  The buy share is actually 57 percent between the two firms there, and the increased Herfindahl you can see, 1281, post-merger Herfindahl 4158.  So we've calculated that for each of these CMAs.  This page shows California and then subsequent pages show other states and DC.

         MR. POMERANTZ:  So I'll just quickly flip through them.  Your Honor, we won't have any testimony on them.  22 is Connecticut, Hawaii, Illinois; 23 is Maryland, Massachusetts, Michigan; 24 is Minnesota, New York, Oregon; and 25 is Pennsylvania, Virginia, Wisconsin.  We would ask to move into evidence slides 20, 21, 22, 23, 24 and 25.

         MR. CARY:  Your Honor, we wouldn't object to the inclusion of these, but we would like the backup so that we can also introduce it if, we need to do so, in recalculating these summary slides.

MR. POMERANTZ:  My understanding is that the backup is provided, is already provided in connection with Professor Shapiro's report, but I will -- maybe you can confirm that, Professor Shapiro.

A.  These numbers are out of my report.  I believe the one thing we did was added the shares so we can report the combined share.

MR. CARY:  So again, we haven't been in a position to validate those numbers, and if Mr. Pomerantz will stipulate that he will not object if we want to introduce that backup material at a later date, if we find some inaccuracies, we will not object.

MR. POMERANTZ:  So stipulated.

THE COURT:  All right.  Yes, admitted.

(Plaintiff's Exhibits Slides 20, 21, 22, 23, 24 and 25 received in evidence)

BY MR. POMERANTZ:

Q.  Now, let's go to slide 26, and if you could just briefly explain this one?

A.  Okay.  So this is illustrative, your Honor, of instead of looking at dozens and dozens of CMAs, these are the top 10 CMAs in the plaintiffs' states based on number of subscribers, and it shows just the numbers that were in those long charts, namely, for each CMA.  The combined shares are actually shown down at the bottom.

So the first is New York.  Combined share of Sprint and T-Mobile in New York is 58 percent, subscriber counts again.  Then it shows the post-merger Herfindahl, New York 4284, and so forth for the other cities.

What is notable, I think, is that all of these cities, these top 10 CMAs, the post-merger Herfindahl is above the national level.  So this is indicating that Sprint and T-Mobile's shares are larger in these cities than they are on average nationally.

Q.  All right.  And to move this along, I'm going to skip some slides.

A.  Actually, what I just said isn't quite right.  Their markets are more concentrated, the next slide will show, with the increase in Herfindahl because that's about the shares of the merging firms.  That shows that the increase in the Herfindahl in all of these markets are higher than the national average, and that goes along with the two firms having higher shares, the higher combined shares than they do nationally, as indicated in the -- with the names of the cities.

Q.  Okay.  So let's step back from all of these numbers and just, what does your analysis of market shares and concentrations tell you about the impact of this merger in local markets?

A.  So we have a large number of local markets, CMAs, where the merger will combine two firms with, in many cases, nearly

50 percent.  At least 40 to 50 percent combined share will lead to very highly concentrated market and will cause really a very large increase in the Herfindahl index.  We've got 800 to 1400 roughly on this chart.

Q.  Would your analysis of market concentration in local markets change significantly if you looked at a smaller geographic region, such as a county rather than a CMA?

A.  No, it would not.  In my reply report, I present analysis based on the county level Herfindahl indices, and shows that one tends to get similar but, if anything, slightly higher increases in the Herfindahl index if you do it at that level, county rather than CMA.

Q.  Okay.  So let's skip slides 28 and 29.  All right.  So let's go to MVNOs.  How did you account for MVNOs, like TracFone, in the market share calculations that we just presented to the Court?

THE COURT:  Mr. Pomerantz, to the extent you're going to a different topic, why don't we break at this point for 10 minutes?

MR. POMERANTZ:  That would be fine, your Honor.

(Recess)

THE COURT:  Thank you.  Be seated.

Mr. Pomerantz, you may resume.

MR. POMERANTZ:  Thank you, your Honor.  We were just about to discuss MVNOs.

BY MR. POMERANTZ:

Q.  Professor Shapiro, how did you account for MVNOs like TracFone in the marker share calculations that we just presented to the Court?

A.  As I mentioned, I attributed MVNO subscribers to the MNOs, the network operators that are providing the underlying services that the MVNOs are reselling.

Q.  And why did you treat MVNOs in this manner?

A.  The underlying principle here, your Honor, is that when we're measuring markets shares in the merger analysis we want to measure the ability of different firms to independently compete to serve the customers.  And MVNOs do not have the ability to independently compete because they rely so heavily on the network operators in order to provide service.  That's the guts of it, but we'll go through more detail.

Q.  So I think you put together this chart to go through the more detail, so could you use this chart to explain to the Court why MVNOs are not independent competitors, in your view?

A.  Yes.  So you see I set them side by side with TracFone as my example.  They're the largest MVNO by far.  The first bullet, they're paired here, the MVNOs have massive investments

in cellular networks, billions of dollars a year.  I will talk about TracFone, as an example, does not invest in a cellular network; very different creature.

For that reason, the second bullet, of course of carriers compete on network quality, improving speeds, making investments and so forth.  It's a critical dimension of competition.  MVNOs just cannot compete on that dimension. They don't have their own investments and their own networks, so they're not able to compete on that critical dimension.  So they look very different as businesses and business models, and the MVNOs cannot compete on network quality.

Q.  The next two points on each side referred to cost margins and marginal cost, and I think you put together this chart to help explain these points.

A.  Go back, actually.  I think that's a little too fast, because --

Q.  I think the judge liked my way more than yours, but go ahead.

A.  I don't know.  The point is if we look at price cost margins, T-Mobile, as an example, had about a 50 percent price plus margin.  This is a marginal cost, they're incremental costs of serving the subscriber, while TracFone has a very thin margin, it's about one percent, which is to say 99 percent of their revenues are going to the costs, the marginal costs of serving the customer.  That's a very thin margin.

And that goes along with the point there about low versus high marginal costs, a critical element for an economist of a firm's ability to compete is its marginal costs.  Firms that have high marginal costs are disadvantaged.  So the network marginal cost, using Metro here to go along with T-Mobile as their prepaid brand, is $1.75 per subscriber per month.  And TracFone has a much higher cost.  They have to pay a wholesale price to whatever the MNO is that they're using, and that's 14.75, on average.  So very, very different.  They have a much higher marginal cost, so that's a big disadvantage that the MVNO inherently faces.

So those points go together as the MVNOs have very different economics, thin margins, and this very much limits their ability to compete.

Now you can go to the next slide.

Q.  Go ahead.

A.  So this, if you look at the title, your Honor, if we take a subscriber, TracFone subscriber, who is making money?  We're following the money here.  Who is actually making money on that subscriber, and how much?  Well, TracFone makes some money, but so does -- let's suppose this is a subscriber carried on the T-Mobile network, served by the T-Mobile network, so we can see who is actually making money on the subscriber.

So let's look at the TracFone column first.  And this is from TracFone, the data we got from them.  So the ARPU, the

monthly average revenue per user, $25.70.  After deducting their costs, the profit margin is only about 29 cents.  That's our calculation.  Why is it so low?  Or one percent, basically, one percent margin.  That's what I referred to earlier on the previous slide.  Why is it so low?

First, they have to pay a substantial fee to T-Mobile --

Q.  That's the 12.50 you have on the slide?

A.  That's the 12.50, or on average it's larger for them, but that's the same concept, the wholesale price.

And they also have other costs, most notably subscriber acquisition costs that they have to account for.  And so when you take away those other costs, they have a very thin margin, one percent of their revenue, roughly.

Now to go to T-Mobile, that same subscriber, again the TracFone customer served by T-Mobile, T-Mobile will get on average for its MVNO subscriber it's serving, they get 12.50 a month.  That's essentially the wholesale price they're getting.  And they have a very low cost, less than a dollar of marginal cost of serving the customer.  These are the marginal network costs.  So they have a margin that's $11.52.

So on this customer, who is really making the money?  It's T-Mobile, not TracFone.  For that reason, the underlying economics is telling us it would make no economic sense to assign that customer to TracFone when there's market shares,

the money is being made by T-Mobile, and that's what I have done.

Q.  So let's go back now to your prior slide, and I think we have covered all the bullet points except the last one on each column.  So if you could address:  Why does it matter that MVNOs are heavily dependent on MNOs?

A.  Well, the -- it's easier to think first in the longer run. Merger is a fundamental structural change of the industry.  The MVNOs need to sign contracts, and they're dependent on the MNOs, but it also means that the MNOs can lever control of the MNO and limit them.  I think the key point is market shares -- you're trying to measure independent competitors, I think the key point is that an MVNO is not a competitor for the MNO that is serving it.  They're partners, they're not competitors.  And that, again, points to attributing the subscribers to the MNOs.

Q.  Let's look at some of the underlying ordinary course of business documents that you reviewed in connection with this issue, and let's start with Exhibit 1031.

Could you explain how this document, which is a T-Mobile document, relates to the opinions you just gave about MVNOs.

A.  So you see this is an MVNO strategy review document from T-Mobile about two years ago.  I have chosen to highlight the title there of the slide that they're describing MVNOs as their partners.  That is, I think, an important point.  There's

underlying economics that we have been talking about.  And point of this slide is the three main levers that they have to steer these partners, and the levers are -- you can see the three grayish boxes, they have pricing and contract, network, and they have distribution.

Q.  So let's go -- I take it the way this slide is laid out there's a red, yellow, green, and red would be where you wanted to stop or deter the MVNO, yellow is neutral, and green is you want to grow the relationship, as you see at the top.  So if you go down the red column and briefly explain the levers that an MNO has against an MVNO that affects the MVNO's ability to compete.

A.  So pricing, so this is wholesale pricing now, if you want to harvest the relationship or wind it down, T-Mobile would increase the pricing when they can, which would be at contract expiration.  And they can also take a hard line in enforcing contract terms.  That's the second point there.

Q.  And then on the network?

A.  Well, since the network quality available to the MVNO is only what the MNO is offering them, they could degrade that, I will say, or they say reduce network priority, so they could choose to give lower priority and therefore lower quality service to the MVNO.

Q.  And so we see some distribution restrictions as well, and they're in the record, so we won't belabor the point.

Let's, if we can then, look at the next slide, and if you can just address what this is saying.

A.  So this is an article from a industry outlet, I guess, where the Verizon --

MR. CARY:  Your Honor, we're going to object to reading this document into the record.  This is just some random press article quoting some random third party from some random fourth company.  I guess it's Verizon purportedly, but we have not basis for that.  This is not the kind of, I would think, scientific evidence that an expert economist would rely upon.

MR. POMERANTZ:  Your Honor, we're not offering it as an exhibit in the case, however, it is the kind of information that an economist would use.  It doesn't have to be scientific.  In fact, here, as we heard some prior testimony, Fierce Wireless is one of the publications in this industry that business people read and rely upon.  I forget which witness it was, but one of the witnesses in particular testified about Fierce Wireless.  And this is just one of the little pieces of information that Professor Shapiro relied on.  It was cited in his report in footnote 75, as indicated on the slide.

THE COURT:  Thank you.  Overruled.  To extent the document is not coming into evidence but it was part of what the professor considered, along with a hundred other books and treatises I presume that he read and prepared for this report

and would not have been admitted into evidence either, but he did consult them.

MR. POMERANTZ:  That's correct, your Honor.

BY MR. POMERANTZ:

Q.  Professor Shapiro, if you could please proceed.

A.  So the idea is that Verizon sees TracFone as their prepaid product.  Going beyond the particular quote, the reality is that has been Verizon's strategy is to generally not have its own prepaid brand but to use TracFone to reach that segment.

Q.  So we heard testimony already in this case about how Sprint has Boost as its prepaid brand and T-Mobile has Metro as its prepaid brand, is it your understanding that historically Verizon has not had its own prepaid brand but instead used TracFone as its prepaid brand?

A.  They definitely have not had their own prepaid brand historically.  They did launch a brand, I think it's very small still, but they have used TracFone for this purpose.

Q.  So now let's move on to Exhibit 655.  This is a declaration of Mr. Kolinoski, who is employed by Sprint, and his deposition actually was taken in this case as well.  He is still employed by Sprint.  Did you consider Exhibit 655 in evaluating whether MVNOs are competitors to their MNO hosts?

A.  Yes.  So this is just another illustration of the same point that Mr. Kolinoski, on behalf of Sprint, viewed Cox, which is an MVNO utilizing Sprint's network, not a direct

competitor; same idea, they're a partner instead of a competitor.

Q.  And the next slide is also a quote from Mr. Kolinoski.  Did you rely on this?

A.  Yes.  This is more recent now from 2016, and it's this -- again the key economic idea is that the MNO is using MVNO, as he said, to reach niches of customers not typically targeted by Sprint.  To get to incremental business, this is their strategy, and I would say that fits with the idea of the MVNO being their partner, not their competitor.

Q.  One more, and this is from AT&T.

      MR. POMERANTZ:  And again, your Honor, we're not offering this into evidence here.

Q.  But is this something else that you relied on in connection with your analysis in this case?

A.  Yes, it's the same idea, that AT&T, in describing their MVNO relationship, said in the second part:  MVNO solutions are incremental to our other businesses, that's the goal, as opposed to being directly competitive.

Q.  So now what are the implications of the way that MNOs treat MVNOs for the calculation of market shares in this matter?

A.  Well, what I have been -- as I said, I attributed MVNO subscribers to the network operators, and I have been seeking in the last part of my testimony to explain why I think this is clearly the correct approach as a matter of economics,

antitrust economics.

Q.  So we have now a T-Mobile document, Exhibit 813.  Is this a document that you considered in your analysis?

A.  Yes, it is.

Q.  And why is this document relevant to your MVNO analysis?

A.  This maybe is icing on the cake, if you will.  This is simply showing when T-Mobile measured shares, in this case nationwide prepaid shares, they are reporting the four carriers.  As indicated in the highlight, all carriers include MVNO activity.  So in this instance, they attributed the MVNO subscribers to the carriers, as I am doing.

Q.  And you're referring to the box, that says "special notes," and then you highlighted something next to it that says "all carriers include MVNO activity," correct?

A.  Correct.

Q.  And this is a T-Mobile document, correct?

A.  Yes, from 2017.

Q.  And one last one.  I do not want you to talk about any of the arrows or numbers, but if you would just please explain to the Court how this, another T-Mobile document, supports your views about how MVNOs should be treated for market share calculations.

A.  So this is another T-Mobile document, it's about what they call internal migrations, and my sole point here is that they are including in what they call internal migrations customers

switching or moving between the brands -- their own brands, T-Mobile and Metro.  And they have an MVNO here in the lower part of the diagram, and they are including MVNO as calling it an internal migration.  That's the whole point here.

Q.  So defendants' economists have argued that MVNOs should be treated as separate competitors when calculating market shares. How do you respond?

A.  I think I responded pretty fully.  I think it's not correct as a matter of economics, by which I mean measuring market shares in a way that accurately reflects the ability of the firms to compete independently and basically their competitive impact in the market.  Furthermore, it's inconsistent with how the FCC has generally analyzed these markets over the years, and how the -- I don't know about DOJ, I should not say that, FCC.

Q.  Let's move on to anticompetitive effects.  What are the different kinds of anticompetitive effects that can be generated by a merger between companies, between competitors?

A.  So we generally think of these two large buckets of possible anticompetitive effects, coordinated effects and unilateral effects.  I mentioned them briefly at the beginning of my testimony this afternoon.

Q.  So let's go to coordinated effects first.  What are coordinated effects in a merger analysis?

A.  Coordinated effects refer to -- I'm not going to keep

saying it, but we mean by these anticompetitive coordinated effects, I mean as a result of the merger, the merged firm and its remaining competitors will compete less aggressively than they would otherwise have. So not just the firm, the merged firm itself, but with its competitors they will pull their punches more. That's the concern.

Q. And are coordinated effects a standard element of merger analysis?

A. Absolutely. For many years they were the predominant element, and then unilateral effects have taken on a bigger role in the last 20 years.

Q. Let's start with the way the merger guidelines address coordinated effects. Could you briefly describe what's on this slide.

A. This is a quote from the merger guidelines, "Coordinated interaction involves conduct by multiple firms that is profitable for each of them only as a result of the accommodating reactions of the others."

So there's this notion of accommodation, or it's not simply one firm changing its behavior, we have got a change in the behavior of several firms, more than one, anyhow, typically the largest firms, that were concerned about, by which we mean compete less aggressively.

Q. And so we're absolutely clear here, in this particular matter we're not saying that coordinated effects means that new

T-Mobile is going to call up AT&T and Verizon and say let's fix the price at a higher level, that's not what you're addressing here in this particular analysis, correct?

A.   No, it's not simply -- it's not just about expressed cartels, it's really a much more general concept that there will be weaker competition, that the firms won't go after each other as much as the merger.

Q.   So did you have an opportunity to read the testimony of Mr. Solé from this particular trial earlier this week?

A.   Yes, I know he was on the witness stand on Monday.

Q.   All right.  And I am not asking you about the substance of this document, I'm going to ask you to read it, but do you understand this was one of the documents that he was asked to testify about on Monday?

A.   Yes.

Q.   And this is Exhibit 566.  Does Exhibit 566 address the general idea of coordinated effects?

A.   Yes, it's talking about the benefit of a consolidated market being a higher price, $5 ARPU he mentions here, and he mentions the three players, obviously new T-Mobile, AT&T and Verizon.  So this is exactly the concept that we're talking about, higher prices set by the big players after a merger that consolidates the market.

Q.   What is the basic concern regarding coordinated effects in this case?

A.  In this case, to distill it down I would say, my central concern is that after the merger the remaining three big carriers will not, as I guess I said, not fight so hard, not press so hard with lower prices, they will pull their punches, because Sprint will be gone and T-Mobile will be a much bigger market share.

Q.  Have you heard the term "parallel accommodating conduct" in connection with coordinated effects analysis?

A.  Yes, that's a term used in the merger guidelines.

Q.  What is it?

A.  So it refers one flavor of coordinated effects, which is really what I have been talking about in the sense it does not necessarily involve any agreement or prior understanding among the firms, in this case, the big three carriers, but simply a lessening of competition by virtue of the greater concentration in the market and just a mutual awareness that they could all benefit by competing less.

Q.  How do economists analyze the likelihood of coordinated effects following a merger?

A.  So we do this sort of in two big parts, this analysis. First we try to assess the market in which this is happening, and is this market vulnerable and susceptible to competitive effects?  So we look at the market, and then we look at:  How is the merger changing things?  Is the merger really going to make this a greater danger?  Those are the two big pieces.

Q.   So now if we look at this slide, this is from the merger guidelines again, is this the approach taken in the horizontal merger guidelines relating to what you were just describing?

A.   Yes.  So this lays it out.  I won't read it, your Honor, but item two here is what I said:  Is the market vulnerable, susceptible to coordinated conduct?  That's one.

And then:  If so, is the merger going to make it worse?  And one element that will make it worse is increase in concentration, there are other elements we'll talk about.

Q.   Let's start with the first thing that you said, which is the susceptibility of the post-merger market to coordination. How does an antitrust economist determine whether an industry is generally susceptible to coordinated effects?

A.   There's been decades of research on this issue with concerns about oligopolies going to back to genesis of the antitrust laws.  So we have a slide here to describe a number of factors that economists look at.  And it's kind of a checklist approach, which is industries are so different we have things we systematically look at to assess whether a market is susceptible to coordinated effects, and I listed items here that tend to make a market more susceptible.  It's not yes or no, it's not like you need all these, these are just things economists have found it's useful to look at.

Q.   And does the relevant market for retail mobile wireless telecommunications have features that you believe make it

susceptible to coordination?

A.  Yes, quite a few, and we can go through those on this list.

Q.  If you could.

A.  So small number of firms, or basically going from four to three in terms of nationwide carriers, so that's small.

Similarity among larger firms.  Well, after the merger particularly we would have three similarly-sized firms in terms of market shares.  They are different in some other respects, but we would have that situation.  We saw the market shares earlier.  They will all be in the 30s.

Inelastic demand.  What that means is if they manage to pull their punches and keep prices up, would they lose business as a group?  Inelastic demand means no, they will not lose much.  Here it's not disputed that the demand for cell service overall is quite inelastic.  Most people will get the service, even if it costs a bit more.  So that would be a factor that would apply in this industry as raising concerns.

Higher barriers to entry.  Could other firms come in easily?  Not at all here.

Predicable or stable demand.  We're going to talk more about this, I think, but the basic idea is if a group of firms are trying to coordinate, it's natural for them to be looking out and seeing:  Are the other guys going along?  Are they kind of cheating on the deal; quote, unquote "cheating."  If demand is pretty stable, along with the last point that you could

watch each other in realtime pretty closely, then it's easier to hold that together and the coordination to persist. So here we have quite stable demand. I understand, of course, technology changes a lot. This is not a static industry, I don't mean that, but demand is not fluctuating a great deal from one month to the next. That applies here.

Absence of large buyers. This is a consumer market, so the -- there are no large buyers. Even the enterprise people, who are still small in the overall market, are in a separate segment.

So all these points are -- all these factors are pointing towards concerns.

The transparent pricing and rapid monitoring, this is the same idea I mentioned in the context of predictable, stable demand, which is if the firms are feeling each other out and not competing too much, then if one firm is thinking maybe I will get a jump on the other guys by lowering the price, how much of a jump can you get? If they find out quickly and respond, you don't gain very much. So if the prices can be monitored rapidly and have rapid responses, the prices are transparent, that tends to support coordination. And we have that here, and we will talk about that a little more.

So those were all these elements. I am aware that the economists on the other side have pointed out that there's some complexity in pricing. There are a lot of different components

of pricing, I expect to be asked about it, and I agree that is a factor that, everything else equal, could push the other way, but looking at these in total and with many other things we'll talk about, I think this is definitely a market that is susceptible to coordinated effects.

Q.   I want to briefly look at a few documents that go to this last point, which is the transparency of pricing in this industry and the ability to rapidly monitor what your competitor is doing.  Is this one, Exhibit 1021, one of the documents you relied upon in this matter in connection with this very point?

A.   Yes.  So it's a T-Mobile document, Executive Dashboard Key Metrics is the title of it.  And you see weekly promotion overview post-paid.  And so they're tracking Sprint, Verizon, AT&T on multiple dimensions.  And you could see some of the complexity I mentioned.  My key point is that they are doing this on a weekly dashboard here weekly reports.  That's quite rapid.

Q.   This next one, is this another regular document that you have seen in their productions, and what does it tell you?

A.   Again, the T-Mobile document, again executive dashboard, and they're monitoring particularly these porting trends.  So I think you heard about this.  Porting is when a person moves their number from one carrier to another.  So that's something they're pretty interested in:  Are they gaining port-ins and

port-outs?  And they have a weekly view of port-ins and port-outs by carrier.  So that's a lot of detail.  In a lot of industries it's more the fog of war:  I lost customers, I don't know what happened.  Here they know a lot quickly, and that tends to support coordination.

Q.  And this document, does it relate to the same point about monitoring and also transparency of pricing?

A.  Yes, exactly.

Q.  And this one here?

A.  Sorry, I wasn't looking.  I didn't understand.  There's a point about signaling, a slightly related point, which is you could monitor and then signal.  So there's a clear mutual awareness among the big players of what they're doing and trying not to trigger an overreaction, say no need to panic, they say.  They don't want the other firm to think they're doing something dramatic on an ongoing basis, because that would trigger a response that would be essentially bad for both or all of them, because it would be like initiating a price war.  They don't want that to happen, so they're signaling.  That's the type of thing that we look at when talking about coordinating effects.

Q.  You were just discussing Exhibit 777, and the next one, Exhibit 856, is of a similar nature?

A.  Again a signaling example.

Q.  So let's turn now to the second part of your analysis of

coordinated effects, which is whether the merger itself is likely to increase the danger of anticompetitive coordination in this market.

A.   Okay.

Q.   Why would the proposed merger between T-Mobile and Sprint make coordination more likely?

A.   So there are three reasons, all of them quite strong, in my view.  First, the merger will significantly increase concentration, and that creates inherent dangers.  That's one.

Second, Sprint will be eliminated as a competitor. And they have been a disruptive force.  We call them a maverick.  I will talk about that term in a moment.

And T-Mobile has also been rather disruptive, and they will go from being the scrappy number three to being the market leader.  And that is transformation that will tend to raise the concerns about coordinated effects.  So those three reasons.

Q.   Let's go to the first one.  How does increased market concentration affect the likelihood of coordination?

A.   Well, this is the intuitive idea that if there are fewer players, not as many have to coordinate.  And when the players are bigger, in terms of the market share, they are happier with the status quo.  And if they were to start a price war, they would be more at risk, basically, because they would have more to lose.  So it's just the general idea of market concentration as related to less competition.

Q.   And how does that concern, the number of competitors, et cetera, relate to the HHIs that we were previously talking about and the changes in HHIs?

A.   Well, that's the link between that quantitive measurement of market shares we spent a while on with those large increases in Herfindahl tendencies, 600, 700, highly concentrated market, 3,000 plus after the merger.  So that directly links to this concern.  And going back to the guidelines, back to 1982, that's been the linkage, the Herfindahl and coordinated effects.

Q.   So let's go to your second and third reasons about the concerns about this merger and its effects on coordination, both of which relate to the maverick concept.  Could you explain what a maverick is in the context of coordinated effects?

A.   Certainly.  So the term is used in the literature, sometimes also use the term "disruptive firm."  Basically it's a firm that tends to initiate competitive moves and is less likely to go along with coordination by others, or let's say with price increases or other moves that are not in favor of consumers.  So the firms that have been disruptive have been lowering prices, and it's often a smaller firm, could be, or a firm with lower costs, for example, or a firm that has some other -- those would be two good examples, yeah.

Q.   So T-Mobile likes to say that being a maverick is in their

JCBTSTA7                         Shapiro - Direct

DNA, it's parts of their culture.  Does the way that the merger guidelines and antitrust economists look at the concept of maverick, does it have anything to do with the corporate culture of a particular firm?

A.   It's not about that, no, it's really about the economic incentives facing the firm.  If you have a firm with a relatively small share but has the prospect to grow that, they may figure look, we're going to cut price, we could pick up some share doing that.  The attribute there that makes them a maverick is a small share, or in my other example, the cost, it's not about cooperate culture.  So this is important because when you have a merger, the incentives of the firms are going to change.  And so a firm that has been a maverick might not be one anymore.  That's what I'm concerned about here for T-Mobile.

Q.   So I want to go back to slide 45.  So what is the role of maverick?  We see that in the next to last line here.  What is the role of maverick firms in a merger analysis?

A.   Well, the last sentence here is worth my referencing.  It says:  An acquisition eliminating the maverick firm -- explained elsewhere -- in a market vulnerable to coordinated conduct is likely to cause adverse coordinated effects.

So the idea is if a market is susceptible, and I explained that this one is, to eliminate a maverick firm is inherently worse.  I'm giving a little overlay here, but we'll

talk about Sprint, for example, they have been a low price firm.  T-Mobile has their uncarrier strategy.  If you eliminate a maverick for a moment -- let me stick with Sprint, because it's the firm being eliminated -- it's inherently worrisome in terms of coordinated effects if you're in a market where such effects -- it's vulnerable, it's susceptible.  So it's a really central part of coordinated effects analysis.  It's not the only path for one to find these effects in analysis, but it's a central one, and it's identified here in the merger guidelines.

Q.  Let's skip forward six slides to slide 51.

You said both Sprint and T-Mobile have been mavericks. Let's start with Sprint.  How will the elimination of Sprint as a maverick increase the danger of coordination?

A.  So we're on the left-hand side here, your Honor, then we'll turn to T-Mobile next.

So I just listed here some of the ways -- significant ways in which Sprint has acted as a maverick, and let me translate that, meaning engaged in competitive initiatives that have been pro-consumer and have put pressure on the other firms.  So they have this cut-your-bill-in-half promotion, this was around 2015 where they offered to -- well, I think you heard about it -- where they offered to -- if you moved from one of the other carriers you only paid 50 percent, and that triggered responses.  They were one of the leaders with T-Mobile in introducing low cost unlimited plans.  That

triggered responses.  So they have been initiating these competitive modes and triggering responses, some by T-Mobile, some by AT&T and Verizon.

They also were the first to get into cell phone leasing.  They have been supportive of eSIM technology.  I don't know how much you heard about that yet, but this is mostly with Google Prime now.  It's a way for the cell phone to be able to automatically shift from one carrier to another.  So this is a pro-competitive technology that Sprint has been supportive of and the other carriers have not.  So that's initiating the competitive move in that sense.  And they both have done that with MVNOs with giving them core control, some additional autonomy, a little bit, some additional scope of action, I will say.

So these are all dimensions in which Sprint has been a maverick, initiated competitive moves.  So naturally if they're gone as an independent firm, that's not happening.  So we worry:  Is somebody else going to do that?  Who is going to do that without Sprint to do it?  It's the concern.

Q.   Let's turn to T-Mobile.  How will the transformation of T-Mobile into new T-Mobile increase the danger of coordination?

A.   So again I listed some ways in which T-Mobile has been a maverick.  I think they're rather proud of it, and I applaud them and their CEO for shaking up the industry.  They have put a lot of pressure on AT&T and Verizon over the years, competed

with Sprint, too, we'll talk about that a little more.  The whole uncarrier strategy, there's been a lot of pieces to it. They eliminated long-term contracts, the low cost unlimited plans, eliminated overcharges and others.

So they have initiated a lot of moves, and it's generated enormous value for the consumers; not just their consumers, but AT&T and Verizon subscribers also benefit because they have been forced to respond.  So again, now the question is not they will be eliminated, T-Mobile, but they're going to be transformed.  They will have the largest market share, and one just has to ask whether they will have the same incentives to compete when they are the market leader as opposed to number three trying to gain ground.

Q.   And Professor Shapiro, you mentioned the CEO of T-Mobile, Mr. John Legere, right?

A.   Yes.

Q.   He has a rather big personality, right?

A.   Yes.

Q.   And the way you're looking at this, does this have anything to do with Mr. Legere's personality or Mr. Sievert, who is about to succeed him, or Mr. Kerry, who might succeed Mr. Sievert, or whoever the head of it is, does this have anything to do with the personality of the individual or does it have to do the economic incentives of the company?

A.   As I said, it's not about corporate culture or about

individual leaders, at least in my analysis.  I will testify as an economist here, so I'm talking about the economic incentives.  And this is deep in the DNA of an antitrust economist:  If this merger goes through, what will the incentives of these firms be?  They're going to be trying to make profits, where will that take us?  It's all about economic incentives and capabilities.

Q.  How do MVNOs factor into your analysis of the likelihood of coordination among new T-Mobile, Verizon and AT&T?

A.  So I have accounted for the MVNOs in my analysis of coordinated effects.  I hope you will remember, your Honor, I said a while ago that because the MVNOs have these really low margins, they cannot initiate price cuts.  They can't significantly lower price because that will put them under water.  They're basically on very thin margins as resellers.

So if new T-Mobile, AT&T and Verizon pull their punches, don't lower prices as much, without the mavericks pushing -- without Sprint, let's say, to push them down, the MVNOs will not disrupt that.  They can't be the one to initiate the price increases.  They don't have the margin.  They would be under water.  So this type of coordination in the MVNOs, I'm not saying they're going to be coordinated or part of it, but they also can't restrain it.  So the concern is not reduced by recognizing that there are MVNOs out there.  I have done that.  I recognized them.

Q.   So based on your coordinated effects analysis, how are consumers going to be harmed?

A.   So that's the slide here, your Honor, now, potential harm to consumers.  So the specific scenario, new T-Mobile, Verizon, AT&T coordinate to avoid price declines in 2020.  So I have been telling the story a bit already, which is without -- after the merger, instead of having prices go down, they just stand pat, they pull their punches, as I have been calling it.

Now why would that harm consumers?  Well, consumers would be missing out on the price reductions that would otherwise take place.  So I have a way of quantifying that.  We can look at what the price reductions have been over a several year period as reported by the FCC, and that's the middle row here.  This is the most recent data we have from them on this, that's why it's 2014 to 2017.  It's the ARPU, the ARPU have been declining at a rate of 6.3 percent a year.

So I will call it an illustrative calculation for your Honor based on the scenario.  If the coordination involves prices stay where they are instead of going down 6.3 percent, and it's just the three big players who do that, that would cause annual consumer harm of 8.7 billion.  That's taking the 6.3 percent and multiplying it by that revenue base of 138 billion.  There's so much money in these markets.  These are huge markets.  That's a lot of consumer harm simply by avoiding price increases for one year.

Q.  So now let's turn to unilateral effects, the other kind of anticompetitive effect.  Just briefly, if you could explain what unilateral effects are.  And I put on the screen another provision in the horizontal merger guidelines relating to unilateral effects.

A.  So as I say here, a merger between firms selling differentiated products may diminish competition by enabling the merged firm to profit by unilaterally raising the price of one or both products above the premerger level.

So here we're talking about T-Mobile and Sprint, they're selling differentiated products.  The unilateral means the merged firm, new T-Mobile, would set higher prices than T-Mobile and Sprint would otherwise set if they weren't combined.  So unilateral, we're focusing very much on T-Mobile and Sprint.  The coordinated effects discussion, there was a lot about AT&T and Verizon, now we can kind of put them aside a bit in the sense they're out there, they're competing, but let's take their prices as given, and just looking at T-Mobile and Sprint combining, would that create incentive to raise price?

And that's what the effects are about, and I am going to explain why I believe it would.  The idea is rather simple, I think, and intuitive.  After the merger, if T-Mobile raises their price, they won't have to worry about losing customers to Sprint, they own Sprint.  That's what we're talking about.

Q.   Let's step back for a second and focus on the term "higher prices" in the context of a unilateral price effect.  How in this context should we interpret the term "higher prices?"

A.   It means higher prices with the merger than without the merger.  In this industry, where price has been coming down, what I'm really thinking about is prices will stop coming down or won't go down as fast.  So it's prices with the merger compared to without.  And that's what this -- we'll get into some quantification here -- that's what the techniques are focused on is the difference between the merger with or without the merger, not over time.

Q.   And bottom line, what is your conclusion regarding unilateral price effects?

A.   So there are -- I expect there to be significant unilateral price effects associated with this merger, and that will harm consumers.

Q.   What are the factors that drive you to that conclusion?

A.   The central element of that conclusion is that there is significant direct competition between T-Mobile and Sprint that will be eliminated.

          (Continued on next page)

Q.  Now, wouldn't there be a loss of head-to-head competition between the merging parties in any horizontal merger?

A.  Yes, there would be.  So we need to -- it's desirable, to the extent we can, to quantify the extent of this loss of competition.  It's the same idea of the Herfindahles, your Honor.  Any horizontal merger will raise the Herfindahl in the relevant market.  We don't make a big deal of it if those changes are small or if the Herfindahl is low.

In this case, we need to see how big is this effect, how much do they compete directly, and that's what we want to quantify and that's what I'm going to do.

Q.  So what evidence did you look at to help determine the extent of the head-to-head competition between T-Mobile and Sprint?

A.  Well, there's a lot of company documents that naturally talk about competition, and let me be clear here, of course, they each compete with AT&T and Verizon.  What we were just trying to quantify is the extent to which they compete with each other.  So we have documents, and then I have data that I particularly like.

Q.  All right.  Okay.  We're not going to go over that data too much here.  Were you able to quantify the extent of head-to-head competition between T-Mobile and Sprint?

A.  Yes.  So the way we do that is through something we call a diversion ratio, and basically it runs like this:  If T-Mobile

raises their price, they're going to lose some customers. They're going to lose customers basically to AT&T, Verizon and Sprint. We want to measure how many would they lose to Sprint. If they're losing a lot to Sprint, then that's significant head-to-head competition.

So the diversion ratio is of the customers they lose, what share go to Sprint, and then we do the same thing in the opposite direction. If Sprint raised the price, what share of the customers they lose would go to T-Mobile; so that way, we can quantify the head-to-head competition through this measure called the diversion ratio. You may have seen in other cases, maybe not, something in the conversation called cross-elasticity of demand. It's the same idea.

THE COURT: Mr. Pomerantz, let me interrupt here because a lot of questioning that you have been asking have raised some questions of my own, which perhaps at this point --

MR. POMERANTZ: That's more important than mine, your Honor.

THE COURT: There's an assumption that I think is implicit in your analysis that essentially if the merger goes forward, Verizon and AT&T and now the new T-Mobile are essentially going to sit on their hands. You say that they're not going to compete as aggressively.

THE WITNESS: That would be the coordinated effects part.

THE COURT:  Yes, the coordinated effect.  Is there evidence or experience about head-to-head competition between Verizon and AT&T, under current conditions?  In other words, they don't just sit back and see the scrappy ones down below fighting one another and they just sort of take a back approach and do nothing.

What is the likelihood that, in a merger situation, AT&T and Verizon will see that, won't want to have T-Mobile in their league, so to speak, and take actions, whatever they may be, to compete even more aggressively in order to increase their market and lower T-Mobile's?

THE WITNESS:  Well, what we've --

THE COURT:  Let me amend that by saying something else.  Part of the assumption also seems to be that price is everything and that competition could not take place in other ways.

And I think you alluded to something else, which is the third point, that these firms don't increase prices the way that we've seen Sprint do it, by cutting things in half immediately and then boasting about it, and two years later it turns out it was counterproductive.  That experience is out there.

So to what extent do you assume somehow, if there's going to be price increases, it necessarily will be in the aggressive way that Sprint did it and/or to what extent are

these price increases in a market that's really not transparent, that they find ways of increasing prices through other kinds of services, by bundling, for example, so that it doesn't appear on the surface that you're really paying higher, but you really are because you're paying a little bit more for another service and a little bit less for wireless?  So all of these complications may somehow raise questions about the analysis you've given, at least in my mind.

THE WITNESS:  Your mind is the one that matters.  So the first point, so no doubt Verizon and AT&T do compete against each other.  They're the two leaders.  What I think the evidence shows, as I've read it and seen it, your Honor, is that they have been rather reactive or passive, and so that's the flip-side of what I said --

THE COURT:  That's not been a danger or threatened, the way that this merger would, because now they're going to be less, they will have less of a market share or one, T-Mobile, is going to have larger share than they?

THE WITNESS:  Well, if you want to be the No. 1 firm, you're not No. 1 anymore, if you're Verizon, after this. T-Mobile would have a somewhat higher share.  I don't think I would call that threatened, though.  Under the coordinated effects analysis I've just been through, it might be welcomed because you wouldn't have to face scrappier No. 3 and No. 4 anymore.  So I don't think of this as threatening Verizon.  It

might be welcome.

In any event, on the coordinated effects part --

THE COURT:  If they welcome it, would that not suggest that they would try to find ways of either making sure that they retain their market share or that they increase it at the expense of T-Mobile?

THE WITNESS:  Well, so I think, to the extent that Verizon reacted to this merger by saying, hey, we're used to being No. 1, and we don't like it anymore, and they responded with price cuts, say, well, that would be against the coordinated effects theory.  Okay?  That's not -- we don't really know about that exactly because what we've seen -- what I can go on is the historical record, is AT&T and Verizon have, as I said, been more reactive or passive.  They haven't been initiating these moves.

My analysis is they would have some interest, as would AT&T, in not competing as much after the merger due to the market consolidation, but we can't predict these things perfectly.  So that's your first question.  Can I go onto the the --

THE COURT:  Yes, please.  Go ahead.

THE WITNESS:  Then you said there's a lot about price competition, and actually we often get criticized, like, price, price, price with you people.  Right?  Quality is really important here.  I think you're going to hear it a lot.

THE COURT:  That is my question precisely.  It may not be just price.  Quality is important.

THE WITNESS:  So the bulk of my analysis of coordinated effects and unilateral effects is about prices.  That is what the tools we have to do, and I'm presenting that to you.

The quality competition, which is really through network investment, I mean, the biggest thing -- I'm not offering specific opinions about how that will be affected.  I did mention the local markets, and so the concern would be, in local markets that are very highly concentrated, there would be a slower investment going on because it wouldn't be as competitive.  Okay?  But I don't have a way to quantify that, but I think I would certainly agree, quality competition is very important here and technology is changing.  So I just can't quantify that for you.

THE COURT:  All right.

THE WITNESS:  And then, well, I guess maybe I answered your other -- oh, the hidden fees in the bundling.

THE COURT:  Transparency, price increases.

THE WITNESS:  Right.  So there are -- as I acknowledge, there is a fair bit of complexity of the pricing and bundling, equipment discounts; so that's the reality of this business.  I think you were picking up on the possibility of hidden fee increases.  I haven't really looked at those.

I've been thinking more about the other side, which is if one company lowers the price, will the others respond quickly.

And when that happens, if that's going to happen, it's not worth starting a price war, you know. After a week, you guys notice you've got your comparative intelligence. I lower a price. Where does it get me? You match it in a week. So that's been my point. I've not looked at hidden fees through bundling. It's not something I analyzed.

THE COURT: Thank you.

MR. PARKER: Thank you, your Honor.

BY MR. PARKER:

Q. So we're talking about diversion ratios, which is looking at when -- you know, how many consumers would switch, let's say, from T-Mobile to Sprint. They would be diverted, depending on what happens to price. When a consumer moves from T-Mobile to Sprint or Sprint to T-Mobile, that may be based on whatever factors that consumer values, correct?

A. Certainly.

Q. And so when you are looking at diversion ratios, people who are moving from one to another, would that look at the factors that are important to the consumer, whatever might be important to them?

A. Well, if we're tracking people who are actually switching, it would be based on their -- you know, their situation, you know, the quality offered by the different suppliers, prices

and so forth.

So I'm going to track subscribers switching from one firm to another.  That's going to be my primary data.

Q.  And to just go to the Judge's questions to you.  So when somebody is moving from T-Mobile to Sprint or to another carrier, that would include the factors of price, quality and whatever other things that the consumer or the consumers on average value, correct?

A.  Yes.  So when we track these movements, it would be all factors that matter to the consumer would be built in because we're looking at the consumer's choices.

Q.  All right.  So I think we were looking at diversion ratios. You had explained what they are, and I wanted to ask you, in specifically with this matter, what data did you rely on to calculate the diversion ratios?

A.  So we have a number of sources of data here, your Honor. We have porting data, which measures when people move their service, move their phone number from one service to another, and we have that from -- we have porting data from the FCC and porting data from Comlink and porting data that the parties track on their own, from their own business, you know, experience when they're porting people in and out.

And then I have switching data, which is when people switch carriers but may not necessarily keep the same phone number.

Q.   All right.  And do Sprint and T-Mobile rely on switching data in their ordinary course of business?

A.   Yes, they do.  It's a natural thing to track.  It's like wins and losses, port in, port out.  This is a common thing in their documents.

Q.   Let's turn now to this slide.  Could you explain this slide, and what you found when you looked at this switching data?

A.   Certainly.  So these are measuring diversion ratios, let me -- again, between the two firms.  That's the key thing we want to measure, to quantify, the extent to which they compete directly with each other.

So let's look at the left-hand side.  That's the diversion from T-Mobile to Sprint.  So they're around 40 percent.  That's telling us that when people switch away from T-Mobile, 40 percent of them end up at Sprint.  I'm doing this at the firm level.  I'm adding all the brands together.

Okay.  And the switches within the firm are not counted as switches.  That's just different products within the same firm.  So that's quite a large number.  It's a very large number, your Honor.  Remember, Sprint's market share is about 15 percent and, yet, when people leave T-Mobile, 40 percent of them go to Sprint.  That's quite striking, actually, in terms of the extent of direct competition.

THE COURT:  To what extent is the Boost factor?

THE WITNESS:  Yes.  So we're going to show this by brand in a moment.  A significant part of this is Boost, and so when I evaluate the effects, I have to account for the Boost divestiture; so these will overstate -- these don't -- these do include Boost, and I have to break that out, and I'm getting there.  That's exactly right.

And likewise, in the other direction -- oh, the four sources are listed there.  Local number portable, that's the FCC data.  Comlink is a commercial service that tracks the port.  Parties have their own porting, and Facebook is the switching data that is not just porting but others switching.  I will tend to use the Facebook data in the subsequent analysis, but they're very close here.

And then in the other direction, people leaving Sprint, around half of them end up at T-Mobile.  And you're quite right, your Honor, a significant part of that involves prepaid; so this would be leaving perhaps -- Sprint here is all the brands; so it would include Boost going to Metro is what would be included in these numbers.

BY MR. PARKER:

Q.  And what do these numbers tell you about the head-to-head competition between T-Mobile and Sprint?

A.  It's significant, and it's larger than one would expect just based on the market shares.

Q.  Okay.  And then did you also look at diversion ratios by

JCBPSTA8                          Shapiro - Direct

brand?  I take it that's what you did?

A.   Right.  So that --

Q.   And before we get to the slides, did you consider another source of switching data to measure the competitive effects here?

A.   Yes.  So there's another source of data.  It's called Harris X that I looked at.  I decided not to use it, rely on it, and I expect to be questioned about that.  It's a survey. These data are actual switches, okay, that are observed.  It's a survey; so it's self reported, which is neither here nor there.

I prefer actual data to surveys when I have it, but one of the things they do and ask in that survey is if you switch, where did you switch?  Did you port your number?  And people say "yes" or "no."  And for the people that say they ported, the data don't line up very well with the actual porting data; so I don't consider that as reliable.  It does lead to some lower numbers.  I think that's why the merging parties like it instead, but I stand by these.  I think they're more reliable.

Q.   All right. So let's look at it by brand now.  What did you find when you measured the diversion ratios at the brand level?

A.   Right.  So let's talk about Boost and Sprint just because your Honor asked about it, and you do see significant diversion there.

So the Metro, you see if you look at the Metro, from Metro to Boost is 30 percent, which is a lot.  Boost's market share is not that big.  A lot of Metro people, people who leave Metro, are going to Boost and, likewise, Boost to Metro.  Down at if bottom is 45 percent; so there's quite a lot of competition in prepaid.  It's what we'd expect.  I mean, prepaid is a segment.

We're not defining it as a separate market, but it is a distinct segment, and there's more switching within that.  We don't really need to get into these numbers, your Honor.  I just wanted to put them in the record, your Honor, and I do need these numbers for the analysis that is going to come because I have to account for the Boost divestiture; so I have to break out Boost.

Q.   All right.  So you were talking about a calculation.  So economists have a method for using these diversion ratios to estimate the magnitude of the unilateral price increases that could arise from a merger?

A.   Yes.  So in terms of the quantification, I said we can measure direct competition through these diversion ratios.  We've done that, and then we have a method to build on that and estimate or get to evaluate, to quantify how much upward pricing pressure is what we call it, the merger will cause.  So how much incentive the elimination of competition between T-Mobile and Sprint, how much incentive that will create for

the merged company to set higher prices for the brands they control.  So that's this upward pricing pressure metric that's -- that I'm going to calculate, and it builds upon the diversion ratios.

Q.  All right.  And do the merger guidelines use upward pricing pressure?

A.  Yes.  We have a slide here, your Honor.  It says, when they can, the agencies assess the value of diverted sales.  That's sales going from one firm to another.  In this case, T-Mobile, Sprint, which can serve as an indicator of the upward pricing pressure on the first product resulting from the merger.  So that's the merger between the two products that I referred to that.

So yes, the merger guidelines include this metric of upward pricing pressure, and that's what I've calculated.

Q.  And then could you -- how do economists compute upward pricing pressure?

A.  So we take the diversion ratios we've talked about, which is measuring head-to-head competition, and then the other thing we need is the profit margins because that's going to determine how much incentives are created by this, by putting the two products or by combining the two firms, and then we're going to need the prices of the product.  So we need diversions, margins and prices, three inputs, and we've got those all here; so I did the calculation.

Q.  And is this a common approach for economists to use in assessing unilateral effects for a horizontal merger?

A.  Yes, it's quite common, especially the last 10 years, since it's in the guidelines.

Q.  So before the 2010 revision, it wasn't in the guidelines and it was added in 2010?

A.  Well, there were elements of this that agencies were practicing, but it wasn't in the guidelines.  It was put in the guidelines, and it's been used more since then.

Q.  Did you calculate the upward pricing pressure metric here?

A.  Yes, I did.

Q.  All right.  If you could briefly describe this slide to the Court?

A.  So we do this at the brand level; so we're trying to measure this pressure for each of the three brands that the merged company will control, T-Mobile post-paid, Metro and Sprint post-paid.  Boost is not here in this chart because they will be divesting Boost, and I've accounted for that.

So the key column is the one labeled Upward Pricing Pressure as a percent; so that percent is -- think about it as being applied to the monthly prices, the $40 for T-Mobile post-paid.  So this is the metric that we've calculated, I've calculated, and the key numbers are the 21 percent, 30 percent and the 16 percent.

And economically, it's as though there's going to be

pressure for the T-Mobile to raise prices unilaterally, economically comparable to if new T-Mobile's costs went up by these amounts as a fraction of its price -- of its ARPU; so these are quite high numbers, 21, 30 and 16.  Those are the pricing pressure metric.  I can't really bring it home in terms of the implication until we get to the last column; so that's probably the next question.  So that's the metric that's calculated, those three numbers.

Q.   All right.  So if you could then take us through the analysis here, all the way to the right-hand column, and discuss how you did it and what the -- and how you used the passthrough rates?

A.   So this upward pricing pressure is not itself a prediction of a price increase.  It's what I think of as a rather elegant method, but it doesn't lead to a price increase prediction.  One needs to introduce an additional assumption to get to a price increase.

So we need to introduce an assumption about what percentage of this pressure will be passed through to consumers.  And I've assumed 50 percent as a passthrough, which is a standard assumption in the literature, which goes along with a straight line or linear demands.  It's an assumption.  I think of it as sort of a neutral assumption, 50 percent.

Applying that, we then take the numbers in the upward pricing pressure column, we cut them in half, and we get the

price increase that's the final column.  So with that additional assumption of a 50 percent passthrough rate, then we would have implied price increases for each of the brands.  I mean, these are significant price increases, 11, 15 and 8 percent, that would be resulting from the merger.

Again, the incentive for new T-Mobile to raise price on its own, taking as given the prices that Verizon and AT&T are setting.  So they're still competing.  They're in the market, absolutely, but we're taking as a given their prices and just looking at the results of the combination, the unilateral incentives caused by it.

Q.   And how do these percentage price increases translate into consumer harm?

A.   So if we take those percentage price increases, multiply them by annual revenue for each of the three brands that new T-Mobile will control, we get a bottom line annual consumer harm of $4.6 billion.

Q.   And you said that these calculations and your upward pricing pressure calculations, they already take into account the Boost divestiture, correct?

A.   This all does, yes.  The last couple of slides have accounted for the Boost divestiture.

Q.   And do your calculations also account for MVNOs?

A.   Yes, in that I have accounted for the fact that T-Mobile will be making money on MVNO subscribers and that affects the

incentive.  I have not assumed any increases in wholesale prices, however; so that's not part of the analysis.  Those are taken as a given.

Q.  All right.  So you said earlier in your testimony that after you go through and assess and determine whether there's a likelihood of anticompetitive effects, which you have found, you then look to see whether there's any mitigating factors and the first one you mentioned was entry.  What is involved in analyzing entry?

A.  Well, the basic question is:  Will entry save the day?  We've determined that there are significant likely anticompetitive effects.  Haven't accounted for entry yet, though.  Will entry by new firms be sufficient?  Well, timely, likely and sufficient are the words we're going to use to either deter those effects so they won't happen, or to counteract them rapidly.  That's the question.  To restore competition essentially that's lost.

Q.  All right.  And I think you said timely, likely and sufficient.  I take it that comes from the merger guidelines?

A.  Yes, that's right.  That's the standard analysis we do.

Q.  Okay.  So I want to put aside for a moment DISH as a potential entrant.  So putting DISH aside for the moment, would entry into the national market for retail mobile wireless telecommunications services be timely, likely and sufficient to deter or counteract the adverse anticompetitive effects that

you have found from this merger?

A.  So putting aside DISH, the answer is absolutely not.  It takes years to enter.  It's usual hugely expensive, and we're talking about Sprint, a company that has 45, 50 million subscribers, covers 93 percent of the country.  That's not -- I just don't see that happening anytime soon; so it doesn't seem timely.  It doesn't seem likely that it would be sufficient.  This is a very hard market to enter and nobody's entered this market -- no new nationwide carriers have come in for years.  It just, entry is not going to save the day.

Q.  And what about entry into the local markets?

A.  Well, the trend has been the opposite.  There were more regional carriers years ago, and they were rolled up or acquired.  All of the regional MNOs together have maybe a percent and a half, if I remember, small share of the overall market.  It just doesn't seem like that's very plausible, and even if there were entry in some local markets, which I wouldn't expect there to be, it wouldn't solve the question about another local market.

Q.  So I want to go back to the Judge's question about, well, would Verizon and AT&T compete when the new T-Mobile comes in as the new market leader by lowering their price?  I take it that if we went instead of from four to three, we went from three to two, one could argue that that remaining competitor would lower its price, and there would still be some

competition, correct?

A.  You would want to consider that.  There is still some competition if it's not one.

Q.  So if we went instead of from four to three, we went from three to two, and they were competing on the quality and price, from an antitrust economist's perspective, would there be a serious concern about the likelihood of anticompetitive effects?

A.  Well, I mean, if you took all my analysis and applied it to a three to two rather than from a four to three, somehow imagine that, the concerns would be greater.  I'm not sure where you're going, frankly.  The fact that there's remaining competitors is not a get-out-of-jail-free card in terms of a merger.  In other words, it's not simply merges to monopoly that we're concerned about.

Q.  Right.  I guess what I was trying to get at was that, of course it's possible that the remaining merger would price compete, but that's true in every merger theoretically, you have to look at the facts of the case, and you have to look at the underlying economic incentives?

A.  That's true.  That's true, and that's why I was telling the Judge that, historically, AT&T and Verizon have not been the ones who have been initiating price cuts or these competitive moves, and so it would be a change for them to do that.

Q.  All right.  Let's go now to the next potential mitigating

factor, which is efficiencies.  Have you analyzed the -- we understand that the defendants are making efficiency claims in this case; you understand that, correct?

A.  I sure do.

Q.  Have you analyzed the efficiency claims that have been made by the merging parties?

A.  No, that's not part of my analysis.  Professor Scott Morton have been analyzing the efficiency claims put forward by the merging parties, and I'm relying on her for that part of the analysis.

Q.  So in your analysis, have you accounted for efficiencies in terms of the anticompetitive effects analysis?

A.  Well, the analysis I did was not crediting efficiencies, or I guess the way you put it is, treating the efficiencies as not cognizable in the language of the merger guidelines.  So that's what I've been doing.

Q.  All right.  Have you estimated the magnitude of efficiencies that would be required for the merger to benefit consumers, rather than to harm them?

A.  Yes, I have.  For the unilateral effects part of my analysis, we have a method to do that, and I've implemented it.

Q.  And what is that amount?

A.  So we have, as I said, in unilateral price effects, this upper pricing pressure metric I described, tells the incentive of the merge firm to raise price.  Well, if the merge firm can

lower its costs through efficiencies, that could be offset or even overcome.  So we have a way of calculating how much of a cost saving the merged firm would have to be able to achieve in order to neutralize the upper pricing pressure, and I've done that calculation.

Q.  All right.  And I've put up on the screen slide 64.  Could you explain slide 64 to the Court?

A.  Certainly.  So this is, again, the three brands -- at the brand level again for the three brands that will be controlled by new T-Mobile.  If you see there in the middle, the upper pricing pressure metric that we talked about earlier.  Then I've added the marginal cost of serving -- this is per subscriber per month; so it's comparable units to the ARPU.  And then I've calculated how much of a drop, a reduction in marginal costs new T-Mobile would have to achieve, brand by brand, to offset the upward pricing pressure, and that's what's reported in the final column.

Q.  All right.  So just to make sure we understand this chart, t-Mobile post-paid would have a marginal cost of $12.75, correct?

A.  That's their current marginal cost.

Q.  And how much would that marginal cost need to come down because of efficiences, to reduce the upward pricing pressure?

A.  So it would need to come down quite a lot, $11.47, bringing it down to around a buck 50; dramatically lower than what it

is.  So that's something like a 90 percent reduction in marginal costs, and again, economists think of marginal costs as the types of costs that drive pricing.  That's why we're using marginal costs.  So that's a very -- that's a large percentage cost reduction.

I should point out there's a note here, but I don't want it submerged.  I'm measuring marginal costs not including subscriber acquisition costs because it does not appear that the efficiencies that are claimed would significantly apply to subscriber acquisition costs.  We have calculations in my report that do the other calculation.

Then we see the same thing here for the other two brands, and these are just very large price reductions for Sprint post-paid.  They'd have to -- marginal costs would have to drop even more as a percentage down to just, you know, 15 cents or something, and it's not possible -- well, they'd have to drop even more than $7.95 for the Metro brand.  So using the standard metric, it would seem very difficult for the efficiencies to be of a magnitude to offset the upward pricing pressure.  To neutralize -- they might partially offset it, but to fully neutralize it so that consumers were not harmed, looks like it would be very difficult.

Q.  All right.  And I'll put off the rest of the efficiencies issues until Professor Scott Morton testifies.

Now, I want to turn to the last subject of your direct

examination, which is the proposed remedies that the parties have negotiated with the federal authorities, and I want to focus on two of them, and the first one is price commitments. Are you aware of the parties' price commitments to the FCC?

A.   I am.

Q.   And how do these commitments effect your analysis of the merger?

A.   Well, what I'm asking when I look at any remedy is, does it restore the competition that's lost due to the merger, any merger remedy?  And a price commitment may help consumers. We'll talk about that, but it does not restore competition. It's a form of regulation.  It's a patch that is trying to put a patch onto when the wound is a loss of competition, a significant loss of competition.  So I don't tend to think of this type of short-term price commitment as restoring that competition.  It doesn't serve that function.

Q.   And even if the commitments would do nothing to restore the competition that's lost because of this merger, would it at least protect consumers from post=merger price increases?

A.   No, I don't -- well, it might protect consumers from post-merger price increases if it's enforceable, but that's not going to protect consumers from loss of competition because consumers would still be denied the price decreases that would result without the merger.

Q.   So if you could explain that.  I put a chart up there.

Could you explain to the Court what you mean when that it

wouldn't protect them from lower price, you know, from the loss

of lower prices?

A.   So this is a conceptual depiction, your Honor.   On the

horizontal axis are the prices of cell service plans.   They

have been coming down.   I already mentioned the ARPUs and the

FCC data.   They've been coming down due to competition.

          Let us imagine, for the purposes of a point, that they

would continue to come down due to competition if there's no

merger.   That's the blue line continuing.   And the price

commitment, suppose it's very effective and prices are frozen.

Let's just say we're talking about T-Mobile's prices right now,

not getting into Verizon and AT&T.   That's not protecting

consumers.   Consumers would have had lower prices and, instead,

the prices are frozen or stabilized.   These price commitments

simply cannot replace competition.   Competition does wonderful

things and regulation cannot replace it.

Q.   Right.   And we've seen a lot of evidence of prices going

down just in the last three days.   What about recently, what

has happened to prices very recently in this market, as best

you can tell?

A.   Well, we have a slide just to illustrate what I'm talking

about, and the prices have been coming down.   This is a

comparison over a year ago to last month of plan prices by

T-Mobile.   These are some of the leading plans, and the magenta

plan went down from 40 to 35.  The magenta plus plan went down from 50 to 43.  So this is common.

The price commitment to not raise price wouldn't create an incentive -- wouldn't replace this type of price drop that is being driven by competition.

Q.  All right.  So now, let's turn to the very last subject here, which is DISH.  Have you considered whether the proposed remedy involving DISH would restore the competition that would otherwise be lost from this merger?

A.  I have, but I also should clarify, I have shared this part of the analysis with Professor Scott Morton.  I've looked at the impact of the DISH remedy, DISH arrangement over the next two, three years, and Professor Scott Morton has evaluated it over a longer period of time during which DISH has plans to build out its network.

Q.  All right.  And how does this analysis of DISH relate to your more general analysis about entry?

A.  So I am asking here, again, in the next few years, will DISH's presence, as arranged through these -- through this, I'll call it the settlement, I don't know what I'm supposed to call it, will that be timely, likely and sufficient as an entrant, initially as an MVNO, to replace the competition that's lost due to the acquisition, the elimination of Sprint?  So I'm still asking that question, is this adequate to replace the lost competition?

Q.   And in your view, is DISH likely to be able to satisfy the requirements of timely, likely and sufficient?

A.   So, no, I don't think it does the trick, and I think I break it up.  In the short term, DISH will be -- well, they're going to come out of the box with about nine million subscribers from Boost subscribers, and they're an MVNO.  I mean, just right away.  Of course, they have plans to build; so they're different than other MVNOs in that respect.  But right away, that's what their market presence will be.  So that is not coming close to replacing Sprint for various reasons.

Q.   So let's go a year out from now?

A.   Okay.

Q.   Do you recall what DISH projects in terms of the number of subscribers that would be on its own network, versus the number of subscribers that it would be handling through the MVNO with new T-Mobile?

A.   So according to DISH's own plans that we've had from September, as I recall the numbers, during 2020, the first, let's say, the next year, only 2 percent of their subscribers would be on their own network, and during 2021, it grows to something like 10 or 12 percent.

Q.   All right.  So over the next two years, we'll still have the vast majority of the subscribers that DISH would be serving being -- getting their network services through the MVNO with the new T-Mobile?

A.   Through the master network services agreement with new T-Mobile.  So that's really what we're talking about in terms of the entity that's been enabled for the next couple of years through this arrangement.  And while they're building, you know, I'm assuming they follow the business plan as it's been presented.  That's what I'm doing here.

Q.   I think Professor Scott Morton may not make that assumption, but you are making that assumption?

A.   Correct.  That is exactly the point.

Q.   Why does it matter to your analysis, at least looking at the first two or three years, why does it matter to you that DISH will be Reliant on the new T-Mobile network?

A.   So there's several elements.  I mean, I'm calling them an MVNO just in the sense that they are not the new T-Mobile to provide the services; so we had a long discussion about the limited way in which MVNOs can compete, and a lot of that, not all of that but a lot of that, applies to DISH.

        Most notably, they cannot compete independently on quality until they have their own network, and they're going to have much higher marginal costs.  Boost, in DISH's hands, will have much higher marginal costs than Boost has had as part of Sprint, and that makes them a weaker competitor.  Higher marginal costs make any company a weaker competitor.

Q.   And in your MVNO analysis that you testified to a little while ago, you were showing that the MNO, the new T-Mobile,

would be making money with respect to each new subscriber that the MVNO, here DISH, brought in, correct?

A.   That's correct.  Certainly, there's a wholesale price that DISH will be paying to new T-Mobile under their agreement, yeah.

Q.   And at the same time, new T-Mobile and DISH are competing with each other to go find those subscribers, correct?

A.   That's true.

Q.   How does that effect new T-Mobile's incentives vis-a-vis DISH?

A.   Right.  So new T-Mobile would have some -- have muted incentives to go after subscribers of DISH because when they grab a DISH -- if they convince a DISH subscriber to come to new T-Mobile, they lose the wholesale fee on that.  So it's just DISH and new T-Mobile will be very much entangled as business entities.  They won't be separate, independent competitors by any means.

        This particular component means that the new T-Mobile won't compete as hard, to the extent they would be getting customers from DISH.  The bigger fact is that DISH is so reliant on new T-Mobile, that, you know, they just won't have autonomy and independence.  The same point I made about MVNOs.

        THE COURT:  You're saying there's a built-in conflict of interest?

        THE WITNESS:  Yes, exactly, which I translate as muted

JCBPSTA8                      Shapiro - Direct

incentives to compete because I'm thinking about competition.

THE COURT:  Mr. Pomerantz, we're almost at the end of the day.  Two more minutes?  Have you completed your examination on these issues?

MR. POMERANTZ:  I have about two more minutes to go.

THE COURT:  Oh, all right.  I'll give you two minutes.

MR. POMERANTZ:  Thank you, your Honor.

MR. CARY:  Your Honor, I believe that the chart that Mr. Pomerantz is putting on the screen --

MR. POMERANTZ:  Okay.  Get it off.  Get it off.  Sorry.  My apologies.  Do you have the ability to turn it off?  Thank you.  Okay.  I apologize.

BY MR. PARKER:

Q.  In your view, will DISH be at a competitive disadvantage due its reliance on new T-Mobile?

MR. CARY:  It's back on the screen.

MR. POMERANTZ:  I think it's off to the public.  Only people with really good eyesight can see.

A.  So in addition to -- I call Boost in DISH's hands, Boost DISH, to distinguish them from Boost in Sprint's hand, Boost Sprint.

So not only will Boost in DISH's hands be very reliant on new T-Mobile, they will have substantially higher marginal costs, and I won't read the numbers because I guess it's confidential.  But the Boost DISH column here, the bigger one,

JCBPSTA8                          Shapiro - Direct

this is reflecting the -- basically the wholesale price, the rate that DISH has agreed to pay new T-Mobile per subscriber per month, and that is, you know, substantially larger than the column on the left, which is the -- this is network marginal cost, is what's being measured for Boost in 2019 as a part of Sprint.

MR. POMERANTZ:  Your Honor, like we did with the Altice witness, I would ask permission to submit something like, I guess, an interrogatory response to put these two numbers into the record?

THE COURT:  Yes.

MR. CARY:  Can you turn off the screen?

MR. POMERANTZ:  Yes, yes.

BY MR. POMERANTZ:

Q.  So what about over the longer term, what's going to happen to this market with DISH's potential entry over the longer term?

A.  So if we go back to timely, likely --

MR. CARY:  Your Honor, I'm going to object to this question as it's beyond the scope of the reports that Professor Shapiro submitted to us in which he claimed he was only doing analysis for a year or two.  He's now extending that analysis while previously disclaiming that that was his responsibility, and that belonged to Professor Scott Morton.

MR. POMERANTZ:  Your Honor, I think if I may ask, I

think Professor Shapiro is only going to reiterate what's in his report and pass the baton to Professor Scott Morton. If Mr. Cary thinks it's gone beyond that, he can entertain a motion to strike.

THE COURT:  Why don't we put the answer off until tomorrow morning.

MR. POMERANTZ:  That's fine.  Thank you, your Honor.

THE COURT:  Let him sleep on it.

I'm sorry, let me ask questions that I've asked earlier.  You may step down.

(Witness temporarily excused)

Mr. Pomerantz, who's on deck and how long?

MR. POMERANTZ:  I think that will go to Mr. Schwartz next; is that right?  I don't see Sarah here.  Okay.  So we're going to go to Mr. Schwartz, who's from Comcast, and that will be our last witness that we're calling in our case.  And then I believe it's Mr.~Legere and Mr. Sievert.

MR. CARY:  Mr.~Legere and Mr. Sievert will follow, yes.

THE COURT:  All right.  How long do you expect with Mr. Schwartz?

MR. POMERANTZ:  Less than an hour.  I'm not sure. Between 30 minutes and 60 minutes, your Honor.  It's not my witness, but I think it's between 30 and 60 minutes, your Honor.

THE COURT:  Anything else?

MR. PARKER:  Your Honor, Richard Parker for Deutsche Telekom.  Yesterday we had the dust up about PX1034.  We deferred it to see if Mr. Ewens was going to testify.  He is not; so we took the liberty of summarizing our position in a three-page letter brief to you with some attachments, and we hope that's helpful to the Court.  I'm sure the plaintiffs will respond in due course, and the matter will be ripe for decision.

THE COURT:  All right.  Thank you.  Good evening.

MR. POMERANTZ:  Thank you, your Honor.

THE COURT:  Can I have your attention, please?  In terms of time used, I want to share my numbers with you, to the extent that it might be helpful in how you prepare for the proceedings.  The plaintiffs' number is now 13 and the defendants -- 13, plus change.  Defendants' roughly three plus, three and a half hours.  All right?

(Adjourned to December 12, 2019, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

JAY BLUHM

Direct By Mr. Buffier  . . . . . . . . . . . . 454

Cross By Mr. Sunshine  . . . . . . . . . . . . 504

Redirect By Mr. Buffier  . . . . . . . . . . . 525


ABDEL HAKIM BOUBAZINE

Direct By Mr. Kasha  . . . . . . . . . . . . . 537

Cross By Mr. Sunshine  . . . . . . . . . . . . 572

Redirect By Mr. Kasha  . . . . . . . . . . . . 603


CARL SHAPIRO

Direct By Mr. Pomerantz  . . . . . . . . . . . 614

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

425, 437, 720, 436, 649, 447, 729, 695, . . . 534
         733, 1202 and 1255

0321    . . . . . . . . . . . . . . . . . . . 607

0232 and 0233   . . . . . . . . . . . . . . . 607

Slides 15 and 16  . . . . . . . . . . . . . . 649

Slides 16, 17, 18 and 19  . . . . . . . . . . 653

Slides 20, 21, 22, 23, 24 and 25  . . . . . . 655


DEFENDANT EXHIBITS

Exhibit No.                                    Received

6003    . . . . . . . . . . . . . . . . . . . 534

7063, 7070 and 7076   . . . . . . . . . . . . 608

JCCPSTA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
STATE OF NEW YORK, *et al.*,

                    Plaintiffs,              New York, N.Y.

            v.                               19 Civ. 5434(VM)

DEUTSCHE TELEKOM AG, *et al.*,

                    Defendants.
------------------------------x

                                             December 12, 2019
                                             9:07 a.m.

Before:

                    HON. VICTOR MARRERO,

                                             District Judge

                         APPEARANCES

MUNGER, TOLLES & OLSON LLP
      Attorneys for Plaintiffs State of California
BY:  GLENN POMERANTZ
      KURUVILLA JOSEPH OLASA
      KYLE W. MACH

STATE OF CALIFORNIA
Department of Justice
Office of the Attorney General
      Attorneys for  State of California
BY:  PAULA L. BLIZZARD

STATE OF NEW YORK
Office of the Attorney General
      Attorneys for State of New York
BY:  ELINOR R. HOFFMANN
      BEAU W. BUFFIER

JCCPSTA1

                              APPEARANCES
                              (continued)


STATE OF WISCONSIN
Consumer Protection and Antitrust Unit
     Attorneys for State of Wisconsin
BY:  GWENDOLYN J. COOLEY


COMMONWEALTH OF MASSACHUSETTS
Office of the Attorney General
Public Protection and Advocacy Bureau
     Attorneys for Commonwealth of Massachusetts
BY:  WILLIAM T. MATLACK


OFFICE OF THE ATTORNEY GENERAL STATE OF VIRGINIA
     Attorneys for the Commonwealth of Virginia
BY:  SARAH OXENHAM ALLEN


CLEARY GOTTLIEB STEEN & HAMILTON, LLP
     Attorneys for Defendants T-Mobile and Deutsche Telekom
BY:  DAVID I. GELFAND
     GEORGE CARY


WILMER CUTLER PICKERING HALE & DORR, LLP
     Attorneys for Defendants T-Mobile and Deutsche Telekom
BY:  HALLIE B. LEVIN


SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
     Attorneys for Defendant Sprint
BY:  KAREN HOFFMAN LENT
     STEVEN C. SUNSHINE


GIBSON DUNN
     Attorneys for Defendant Deutsche Telekom
BY:  RICHARD G. PARKER


MORRISON & FOERSTER, LLP
     Attorneys for Defendants SoftBank and Sprint
BY:  DAVID L. MEYER


CLEARY GOTTLIEB STEEN & HAMILTON, LLP
     Attorneys for T-Mobile US
BY:  MARK W. NELSON


T-MOBILE
BY:  LAURA BUCKLAND, Senior VP Litigation & IP

JCCPSTA1

(Trial resumed; in open court)

THE COURT:  Good morning.  Thank you.  Be seated.  One moment, Mr. Pomerantz.

(Pause)

All right.  Let me begin by something that I wanted to reference.  Yesterday, I was informed that there had been a large number of requests by counsel, and perhaps others, to bring in coffee cups into the courtroom in addition to whatever other beverage containers you may have.  I indicated that that would not be welcome.  There are a number of good reasons for that.

Coffee cups, when they're hot, tend to sometimes stain the tables; similarly, sometimes soda cans tend to create possible stains on the woodwork.  There are cases that I've heard where somebody has knocked over a coffee cup and has ruined papers on the tables.  So for those practical reasons, we ask that you not bring coffee cups or soda cans into the courtroom.  Water bottles are fine.

One last reason is that it's a question of aesthetics. We don't want to have the courtroom turned into a cafeteria. In our increasingly indecorous and uncivil society would like to think that there's one last bastion where decorum and civility and dignity still prevail, and that's the courtroom. So for that additional reason, I would appreciate if you not bring anything other than water for a beverage.

JCCPSTA1

Mr. Pomerantz, let us begin with your order of the day. You gave us some indication yesterday. If there is anything that has changed, please let us know, and also, what is your understanding of the amount of time remaining on your case?

MR. POMERANTZ: I believe that I will be -- I will try to stay within my two-minute estimate for completing the examination of, at least direct examination of, Professor Shapiro.

After we finish him, all of our examinations, we will then go to Mr. Schwartz from Comcast. I think the estimates are roughly 45 each side on that one.

Dave, is that right?

MR. GELFAND: Yes. Yes, your Honor.

MR. POMERANTZ: So I think -- and then that is the last witness that we are calling in our case in chief. They are then going to be calling Mr.~Legere and Mr. Sievert as their first two witnesses, and I think we all believe that will take us through the end of today and maybe into tomorrow.

MR. CARY: That's right, your Honor.

THE COURT: I project that we'll go until 5:30 today as well. All right. Thank you, Mr. Pomerantz.

MR. POMERANTZ: If I may ask, I think we are equal offenders of the coffee cup rule, can we have until at least the first break to clear the courtroom?

JCCPSTA1                      Shapiro - Direct

THE COURT:  Yes.

All right.  Let me remind the witness that you took an oath to tell the truth yesterday.  You remain under oath.

Mr. Pomerantz.

MR. POMERANTZ:  Thank you, your Honor.

CARL SHAPIRO, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. POMERANTZ:

Q.  Professor Shapiro, have you heard the term "quality adjusted prices"?

A.  Yes.

Q.  And do you recall using that term in your initial report in this matter?

A.  Yes, I think I did.

Q.  Could you turn to paragraph 223 of your initial report, and the first sentence says -- no, Phil; you don't need to pull it up -- "Throughout this section, I discuss how the merger would create incentives for new T-Mobile to charge higher prices." Do you see that?

A.  Yes, I do.

Q.  And then I want to go to the top of the next page.  The first point there we've already talked about.  The second point:  "Furthermore, the decline in prices without the merger could involve quality adjusted prices, taking the form of faster service or more data usage.  Likewise, what appear here

JCCPSTA1                      Shapiro - Direct

as higher prices resulting from the merger could involve higher quality adjusted prices, such as would arise if lower quality service or a slower improvement in service quality over time."

Could you explain how you use "quality adjusted prices" in your analysis of prices in this market?

A.  Certainly.  So first, what is the quality we're talking about?  It's usually speed or data, how much data you're allowed to use, sort of other non-priced features of plans that consumers value.

And so what we've observed in recent years is not only have the monthly charges that people pay gone down some, and I talked about that.  At 6.3 percent a year, we have significant increases in quality of service.  Notably, people are using more data and they're allowed to use more data without paying more charges, without paying overage charges.  And I think that is a form of quality.

And I think T-Mobile is certainly emphasizing for itself the argument that they will improve quality for their efficiency claims.  So we agree that quality is an important dimension of competition, and one of my concerns is that the improvement in quality that would take place with competition will not take place as much after the merger.

THE COURT:  What about convenience to the consumer as part of what they will look for in determining whether to stay with one company versus another?  Convenience, service may be

offered from one but not from another, such as we talked about yesterday in bundling.

THE WITNESS:  Yes, so quality would have a number of different dimensions.  I've been emphasizing speed or perhaps breadth of coverage.  If it's one-stop shopping or convenience for the customer, in terms of buying a group of services together, cable companies certainly do this.  That could -- if it's a convenience for the customer, then that's pro-consumer.  That's fine.  If it's forcing people to maybe pay for things they don't really want or hidden charges, that's another matter.

MR. POMERANTZ:  I have no further questions, your Honor.

THE COURT:  All right.  Thank you.

CROSS-EXAMINATION

BY MR. CARY:

Q.  Good morning, Professor.

A.  Good morning, Mr. Cary.

Q.  George Cary for T-Mobile and Deutsche Telekom.

Dr. Shapiro, you talked yesterday about the horizontal merger guidelines.  Is it the case that in the horizontal merger guidelines, changes in market share and concentration are an initial screen for potential anticompetitive effects arising from a transaction?

A.  I say they are a screen in the sense that if the

Herfindahles are very low, it's unlikely there will be a challenge.

Q.  Right.  And so if the Herfindahls were higher, that's an occasion for the Department of Justice or the FTC to take a closer look, right?

A.  To take a closer look or reach a presumption of an anticompetitive market.

Q.  Well, the Department of Justice and the FTC, when they're looking at mergers, they don't rest on a presumption.  They take a detailed look at the characteristics of the market to determine if there are going to be anticompetitive effects, don't they?

A.  Yes.  As part of the overall analysis, one would typically include competitive effects, as I have done.

Q.  Right.  Now, do you agree that in recent decades, industrial organization scholars and courts have been more apt to stress that high concentration can be compatible with vigorous competition and efficiency market performance?

A.  Well, let me take them in turn.  I think in terms of industrial organization, the economic literature, the answer is yes and not necessarily related to mergers, though.  We've come to understand better that some markets may be highly concentrated and be quite competitive, nonetheless.

So, for example, Boeing and Airbus, there's only two of them, but they often compete very vigorously.  So that's in

terms of we have understood that.  The relationship between concentration and mergers is still concerning for the reasons I've talked about.

In terms of the courts, I think there's been a decline in the structural presumption, the strengths of it over time, but I suspect you don't want me to talk too much about the law.

Q.  Fair enough.  Now, you would agree that an appropriate antitrust analysis should put less weight on market shares and concentration, and more on an integrated approach; is that fair?

A.  I guess I don't quite know what you mean by the "less" and "more" there.  I guess I would put it this way, that the -- a full analysis should include competitive effects, and part of that -- but with significant concerns being raised.  If you've got high Herfindahls, high increases in Herfindahls, high diversions and the maybe other elements, such as high entry barriers, those trigger concerns, but yes, you do a full analysis.

Q.  And a full analysis takes into account efficiencies; does it not?

A.  Yes, it does.

Q.  And that's because efficiencies can make a firm more competitive, right?

A.  Correct.

Q.  It creates an ability and incentive to compete more

JCCPSTA1                          Shapiro - Cross

aggressively if you realize efficiencies through a merger,

correct?

A.   Yes, that's correct.  Merger, specific efficiencies,

particularly ones that lower marginal costs economists would

generally effect those to cause the firm to compete more

aggressively, everything else equal.

Q.   Right.  So that more aggressive competition can include

lower prices, correct?

A.   Yes, it can.

Q.   And improved quality?

A.   It could.

Q.   Enhanced service?

A.   Yes.

Q.   And new products entering into the market?

A.   These are all subspecies of efficiencies that can occur and

arise in mergers, yes.

Q.   And you agree that an appropriate antitrust analysis of

mergers should incorporate an analysis of cognizable

efficiencies generated by the merger, correct?

A.   That is what I do as an antitrust economist, yes.

Q.   In fact, you've written that an antitrust economist surely

should take into account efficiencies, haven't you?

A.   I might have said "surely."  I'm not disputing it.

Q.   Now, when looking -- you mentioned the term merger

specific.  When looking at merger specificity, only

JCCPSTA1                           Shapiro - Cross

alternatives to the merger that are practical in the business

situation faced by the firm should be considered in terms of

defining whether it's merger specific or not; is that right?

A.   I think that's the general tone, I would say.  That's in

the horizontal merger guidelines.  I don't have the specific

language in my head, but one does not want to include purely

theoretical possibilities that are not practical or at all

likely to arise.

Q.   Right.  And you've written that the inquiry into merger

specificity should be a realistic one, correct?

A.   That seems reasonable, yes.

Q.   Focusing on what will happen with and without the merger,

correct?

A.   Yes, both regarding the efficiencies that are going to be

achieved and what would happen without the merger.

Q.   So would you agree with me that there are some efficiencies

that are very difficult to achieve without a merger?

A.   You mean as a general proposition?

Q.   As a general proposition.

A.   We're not talking about this case in particular?

Q.   As a general proposition.

A.   That can happen, yes.

Q.   Particularly if you have the integration of the parties'

unique and hard-to-trade assets, that would be an example,

correct?

A.  I would say, yes.  Hard to trade, I think I would put it in terms of efficiencies or combining assets in a way that could not be accomplished through some other means such as a contract or a partnership arrangement.  If that's what "hard to trade" means, then I'll buy -- I'll accept that.

Q.  And you've called these synergies in your academic work, right?

A.  That's the word I like to use.

Q.  So synergies allow a firm to make output in cost choices that wouldn't be feasible otherwise, correct?

A.  Yes, again, we're using the term synergies in this specific sense of what I'll also call more in the legal setting, cognizable efficiencies.

Q.  Right.  You would agree with me that not all horizontal mergers between competitors are anticompetitive?

A.  I do.

Q.  And you would agree with me that, in fact, not all four-to-three mergers between horizontal competitors are anticompetitive, would you?

A.  I wouldn't have a general rule concluding all four-to-three mergers are anticompetitive.  One would need to look at it.  Market share might be small, for example.

Q.  Right.  So one of the reasons that a four-to-three merger might not be anticompetitive is because it generates merger-specific cognizable efficiencies, right?

JCCPSTA1                          Shapiro - Cross

A.   That's fair.

Q.   Now, in response to one of Mr. Pomerantz's questions, you quantified consumer harm, and I just want to be very clear about this.  Without looking at the efficiencies generated from a transaction, you cannot testify under oath that there will be consumer harm from this transaction; is that right?

A.   I believe I was clear that my -- all of my analyses, I am not crediting the efficiencies claimed by the merging parties because I'm relying on Professor Scott Morton's analysis that they do not qualify under the stringent standards we've just been talking about.

Q.   You have not, yourself, examined the efficiencies to form a view?

A.   That is correct.  I am relying on Professor Scott Morton for that part of the overall analysis.

Q.   So you've done half the analysis, and she's done the other half; is that right?

A.   I am not in a position to quantify the relative contributions.

Q.   All right.  Let me put it this way, then.  Your analysis does not provide a complete assessment of the competitive effects of the merger, correct?

          THE COURT:  Asked and answered.

Q.   You would agree that the Court, in reaching a decision about the merger, should account for the efficiencies,

JCCPSTA1                        Shapiro - Cross

notwithstanding that you have not, correct?

A.   If you mean by "account for the efficiencies" the Court should seriously consider the claimed deficiencies and the arguments against them, yes.

Q.   Now, one of the terms that you used in talking about efficiencies was "verifiable," I believe, correct?

A.   Yes.

Q.   One of the ways that a Court or an economist, an academic economist looking at a merger, the agencies, might determine whether a merger generated verifiable efficiencies was to look at historical experience, right?

A.   That happens, yes.

Q.   So if a firm has previously engaged in a merger, and if that merger generated efficiencies in a comparable market situation, you would credit that as a way to verify efficiencies?

A.   I think that would be relevant.  It doesn't address merger specificity, but it does address verifiability.

Q.   You would consider that real-world proof that the efficiencies are verifiable?

A.   Well, of course, it depends on how comparable this prior experience is to the current one that's being evaluated, but it's relevant.

Q.   Yes.  And you would also agree with me that if the firm that is proposing the new merger is applying the same standard

JCCPSTA1                          Shapiro - Cross

cookbook that it applied in the past merger, that that would make it even more of a proof point in terms of their applicability of the efficiencies, correct?

A.   Well, I think if I understand what you mean by standard cookbook, that would suggest the current claim deficiencies are very similar in terms of what's involved to the ones that have been achieved in the past; so that would support comparability and, therefore, make that evidence more relevant.

Q.   The fact that efficiencies would not be realized right away does not mean that you should simply ignore the efficiencies, right?

A.   No.   They would be counted less because they're discounted and maybe less certain, but I wouldn't ignore them.

Q.   Right.   It could be that efficiencies that happened in year two, three, four and off into the future are sufficiently large that even if there's upward pricing pressure in year one, those efficiencies would make the merger pro-consumer, correct?

A.   Well, it is possible.   What you'd want to do is look at possible consumer harm in earlier years.   It's kind of difficult, but balance that against consumer benefits later with a proper discounting, and often there can be extra costs and extra harms during a transition period.   You'd want to include that too.

Q.   You'd want to look at the whole thing, the entire transaction?

A.  Well, yes, with recognizing that the farther out you look, the more speculative things tend to get by their nature.

Q.  Okay.  You would agree with me that cost reductions in future years could cause a firm to lower prices in the first year, after a merger, if there are sufficient linkages between the first year and future years, correct?

A.  Certain specific type of linkages would -- could, in theory, cause that connection to occur, that's correct.

Q.  And one of those linkages might be the impact on a firm's reputation if they were to raise the price in year one, in advance of realizing merger efficiencies in the future, correct?

A.  I'm not following you there.  I thought you were talking about an incentive to lower the price at the beginning, and now you're talking about raising the price; so you threw me off.

Q.  I'm sorry.  Let me try it again.  One reason that a firm that is going to realize efficiencies in the future might not raise prices in year one, would be the impact on its reputation, correct?

A.  Well, I think that would be a general proposition if a firm raises a price -- if a firm raises a price and makes more money in year one, I think that's what you're talking about, a price increase that's profitable, might a firm not do that because it might harm its reputation.

Q.  Exactly.  I think you testified to that in your deposition,

didn't you?

A.  So I think, as a general rule, that could be a factor effecting price.  I don't think firms just maximize profit based on a quarter or year at a time, notwithstanding what people say about the financial markets.

Q.  Right.  So now your analysis in this case, your unilateral effects analysis, was only done for, or at least reported for, the year 2020 in your report; is that right?

A.  I think that's right.  Although, I think there's kind of a hybrid of 2019 and '20; so we have to use 2019 data.

Q.  Right.  So it's a one-year analysis, correct?

A.  It's an analysis of the upward pricing pressure caused by the merger.  That's the way this methodology works.  It's not a projection about what's going to happen in years in the future.  It's what can we tell based on this merger and what we know about the products and how closely they're competing now.

Q.  For a one-year period?

A.  It's not -- no, that's not -- the methodology is measuring the market conditions or the pressure at the time of the merger.  It's not a projection.  It's an evaluation of the merger, like measuring Herfindahls.  You measure at a particular point in time.

Q.  I see.  Okay.  So it's not even good for a full year.  It's the day after the merger, given historical conditions, this is what your UPP would indicate; is that fair?

A.  Well, no, I don't agree with that.  It's a measure of the upward pricing pressure from the merger based on current conditions and that has durability, but of course, conditions will change.  But it's beyond, I think, our capabilities usually to know what the diversion ratio will be two or three years from now.  You know what it was based on switching historically, so you use those data.

Q.  Okay.  So let's talk about your unilateral effects analysis and the UPP work that you performed.

First, let's start with some understanding, a little more understanding about the model that you've employed.  Is it correct that the model that you've employed would generate upward pricing pressure in any horizontal merger?  It's an automatic, almost mechanical mathematical result in any horizontal merger?

A.  In any horizontal merger, one would have -- so long as the two firms had positive diversion between them, their products and positive margins, you would have some positive upward pricing pressure.  That's why we need to quantify it the same as we want to quantify Herfindahls.

Q.  Right.  So you would also agree with me, though, that not every horizontal merger is illegal?  We've established that, right?

A.  I'm glad I get to testify about the law.  I usually don't get to do that.

JCCPSTA1                    Shapiro - Cross

Q.  Let me rephrase the question.  Not every four-to-three transaction is anticompetitive; we've agreed to that?

A.  We have.

Q.  Now, the UPP analysis has a lot of limitations, right?

A.  Sure.  I love it, but sure.

Q.  In fact, I think at your deposition you said we could spend the whole day talking about its limitations, didn't you?

A.  Okay.

Q.  You said it was --

A.  Maybe I was hoping we'd spend the day that way, instead of other questions, but go ahead.

Q.  You said it was an infinite list?

A.  It's a tool.  Of course, there's limitations.  That's why the economic literature is actively working to make it better and better.

Q.  Right.  One such limitation is that it does not account for the repositioning of firm products or services in the relevant market after the merger, correct?

A.  The UPP takes the products as given because that's what we have data on, is the diversions between the brands that have been in the market.  So that is correct, it does not account for how products may be repositioned in the future.

Q.  And repositioning can mitigate upward pricing pressure, correct?

A.  I guess it could, or it could exacerbate it.  You'd have to

JCCPSTA1                        Shapiro - Cross

be more specific about what you mean by the type of
repositioning.

Q.   Well, for example, you're aware that Verizon recently came
out with a prepaid product, right?

A.   Yes, I think it was last year.

Q.   That would be an example of repositioning?

A.   Well, I don't think so.  I think it's a new brand, isn't
it?  I thought that was a new brand for them, unless I'm
mistaken.

Q.   Would you consider that new entry into the prepaid segment,
then?

A.   New entry.  It's a brand.  I think of it as a brand entry,
but look, it's very similar to repositioning.  I don't want to
overstate the difference.

Q.   Okay.

A.   It's just they didn't move an existing brand; they just
created a new one, if I understand it correctly.

Q.   Exactly.  So that would be an example of a strategic
decision that is not taken into account by the UPP analysis?

A.   That's fair.

Q.   And the UPP analysis does not take into account new entry,
right?

A.   That's correct.

Q.   And the UPP analysis does not take into account
reputational effects that might flow from actually raising

prices pursuant to that upward pricing pressure, correct?

A.   I think, in this case, it mostly does because the upper pricing pressure we're talking about does not involve raising prices.  It involves not lowering prices, as I've said a few times.  I don't think that reputational argument comes in; so I think the analysis that I've done is not subject to that criticism.

Q.   That wasn't my question, though, Dr. Shapiro.  My question was whether the UPP analysis itself takes that into account, and we will talk about your --

A.   I said, as applied here, I believe it does.

        THE COURT:  Mr. Cary, I'm going to pause at this moment.  I need to take a call.

        MR. CARY:  Yes, your Honor.

        THE COURT:  I'll be right back.

        (Recess)

        THE COURT:  All right.  Thank you.  Apologies for the inconvenience and interruption.  Let's proceed.  Mr. Cary.

        MR. CARY:  Thank you, your Honor.

BY MR. CARY:

Q.   Can you bring up tab one, page 52, please.

        Dr. Shapiro, I asked you a question about the reputational effects on the UPP, and I'd like to refer you to your deposition.  Do you recall I asked you:  "So just to be clear on the testimony, the impact on reputation could be such

JCCPSTA1                        Shapiro - Cross

a linkage that" -- meaning a linkage between the first year and future years per our previous conversation -- "that would prevent a firm from exercising upward pricing pressure in the short term when it's going to be realizing efficiencies after a year, correct?"

And you answered:  "So the upward pricing pressure index talks about internalizing the competition between the two firms.  Because it is based on diversion and margins, it is not an analysis that incorporates longer-term effects of reputation.  It's not part of the methodology.  It's not trying to do everything."

Do you recall that question and that answer?

A.  I do now.

Q.  So, Dr. Shapiro, one of the things that the UPP analysis, the way you used it, does not take into account is efficiencies, correct?

A.  Well, the UPP analysis is for accounting for efficiencies usually, and then we have the compensating marginal cost reduction that works with it to account for efficiencies, and I did both of those.

Q.  Right.  So if you did the complete analysis and quantified the efficiencies, those efficiencies would offset the upper pricing pressure, and it could be that the transaction would end up being net pro-competitive for consumers, right?

A.  Are you asking in general or about this specific

JCCPSTA1                           Shapiro - Cross

transaction?

Q.  I'm asking about -- you've testified you didn't do the analysis of the efficiencies in this specific transaction; so I'm just asking about how the UPP test works.

A.  Okay.  So, in general, it works by, yes, you calculate the upward pricing pressure, you calculate the cost savings that would be required to neutralize or offset that, and then if you have cognizable efficiencies, you see whether they're sufficient, large enough, as has been identified as required, to offset the upward pricing pressure, and that's the way the whole analysis works as a group.

Q.  Right.  And you testified, I believe, yesterday, in response to one of Mr. Pomerantz's questions, that the upward pricing pressure is comparable to costs going up in terms of pushing prices up, right?

A.  Yes, that's -- some of my writings on this explain that it's like a cost increase for the merged firm and that's creating the upward pricing pressure; that's correct.

Q.  Right.  So the converse of that would be if you have cost reductions, it reduces the upward pricing pressure, correct?

A.  If you have reduction in marginal costs that would offset or count against the upward pricing pressure and if they're large enough, they could neutralize it.

Q.  Right.  And it's really a one-for-one tradeoff in that regard; is that right?

JCCPSTA1                           Shapiro - Cross

A.   I'm not sure what you mean by that.

Q.   Well, if you're attributing a dollar of imputed costs that are pushing prices up and then you have a dollar of efficiencies, it's a direct one-to-one comparison, right?

A.   The compensating marginal cost reduction, what we presented to your Honor as the required cost reduction, marginal cost reductions, in the literature it's called compensating marginal cost reduction, is subtracted from the upward pricing pressure and you look at the net.

Q.   Right.  So the passthrough to consumers for the cost savings is equivalent to the passthrough to consumers of price increases, right?

A.   We haven't been talking about passthrough.  We're just talking about the pricing pressure index.  It's a different topic, passthrough.  Just to be clear, that's not what we were talking about.

Q.   Well, you did testify yesterday about the way that the passthrough works in the UPP analysis, right?

A.   So I said you take the UPP analysis and then you apply a passthrough rate to get a price increase that would be indicated.

Q.   Right.  So my question is whether you would apply the same passthrough rate to any efficiencies realized?

A.   Yes, you would.

Q.   Thank you.

A.  So long as they're cognizable.

Q.  Right.  Would you agree with me, Dr. Shapiro, that the diversion numbers that you use in your UPP analysis are not going to be helpful if they are not representative of the market?

A.  I don't quite know what you mean by "representative of the market."  It sounds like a bad thing not to have, but what do you mean by that?

Q.  Well, the data that you used did not purport to represent all switching in the entire cellular market, correct?

A.  The data are not a complete census of all switches.

Q.  Right.  So in order to be reliable, in terms of the upward pricing pressure, the subset that you used has to be representative of the larger set, right?

A.  Well, it has -- what we -- to be reliable, or ideally, I'll put it that way, it would accurately measure the diversions if one or observing all of them rather than just a subset.

Q.  Right.  And if the sample that you're using is distorted in some way, then it can't be relied upon to generate diversion ratios purporting to show the market as a whole?

A.  Well, distorted, again, if it's -- if it's significantly different, then the true diversion ratios, then that's -- then you have an inaccuracy.  I don't know which direction that would go in, but I would accept that as a principle.

Q.  The data that you used was -- that you put up on the screen

JCCPSTA1                        Shapiro - Cross

was porting data, and it was Facebook data, correct?

A.   That's correct.

Q.   Are you aware -- well, first, do you know how the Facebook data is generated?

A.   In a general sense, I could describe it, yes.

Q.   Go ahead, please?

A.   If you want me to.

Q.   Yes.

A.   Yes?  So as I understand it, I can try and get a look at my report, it has more details, if you want.  But basically, when people have the Facebook app and they switch carriers, Facebook is able to detect that, and they put that data together and make it available.

Q.   Is it correct that Facebook data only captures about 60 percent of the wireless subscribers?

A.   I believe that's correct, yes.

Q.   And the Facebook data, is it correct that the Facebook data tends toward a younger demographic?

A.   I'd have to look here to check that.  I believe that, in my mind, that used to be true of Facebook, but it isn't necessarily true anymore.  Now they have Instagram, but I can look here for more detail, if you want me to answer more specifically.

Q.   Why don't we move on because, again, my time is a little bit limited.  But if the Facebook data were skewed younger

JCCPSTA1                    Shapiro - Cross

demographically, then they wouldn't represent the entire

population, right?

A.  Well, it doesn't represent the entire population.  It's

only 60 percent.  We already established that.

Q.  Okay.  And to the extent -- are you aware that T-Mobile's

demographics tend to skew towards the younger demographic as

well?

A.  That sounds right to me.  I don't know how significant that

is.

                (Continued on next page)

BY MR. CARY:

Q.   Okay.  So to the extent that you used the Facebook data in your UPP analysis, it would overstate the presence of T-Mobile, correct?

A.   It might.  There was a whole back and forth between me and Professor Katz on this, and I addressed that in my reply report, but I take your point.  We have quantified that, and I have analysis of that in my reply report.

Q.   Dr. Shapiro, is it correct that port-in data also does not represent -- actually before we move on from the Facebook data, were you in the courtroom when Ms. Rittgers of Boost testified with respect to Boost's experience with Facebook data?

A.   I was not in the courtroom, no.

Q.   So you didn't hear her say that they used that data on one occasion --

          THE COURT:  Asked and answered.

Q.   Okay.

          THE COURT:  He could not have heard it since he was not in the courtroom.

          MR. CARY:  He might have read the transcript, but that's fair, your Honor.

          THE COURT:  Did you read the transcript?

          THE WITNESS:  I did.

          THE COURT:  Do you want to ask your question?

          THE WITNESS:  He's good at this.

JCCTSTA2                          Shapiro - Cross

BY MR. CARY:

Q.  Dr. Shapiro, you're aware Ms. Rittgers indicated, at least in her experience Facebook, is not a reliable indicator of trends in the wireless industry, correct?

A.  I looked at her testimony, I don't believe -- I think it's called Facebook -- something like flow data, I'm not sure she's talking about the same Facebook data, I thought it was Facebook analytics.  Am I mistaken?  I'm not sure, but I thought it might be a different data set.

Q.  We'll compare and get back to you.

A.  Okay.

Q.  So let's move on to port-in data.  You're aware that port-in data does not capture the entire market, right?

A.  You mean all switches?  I think you mean that.

Q.  Yes.

A.  That is correct.

Q.  Actually since you brought up switching, let me go on a slight diversion, no pun intended.  Switching and diversion are not the same thing, are they?

A.  Well, switching is -- what do you mean by diversion?  It was a little unclear what the question is.

Q.  For an economist, diversion has a pretty precise meaning that is different from all switching, right?

A.  Well, diversion ratios relate to price switching. Economists are interested in diversions, could be quality

switching or other reasons, so there are different types of

diversion.  Diversion ratio is about pricing.  Switching data

does not just measure price switching, it captures all

switching.

Q.  So the focus should be on price-based switching, not all

switching, correct?

A.  Well, for the purpose of the diversion ratios as defined,

since it's price-based switching, we would be -- we're most

interested in the price-based switching, that's correct.

Q.  But your data captures all switching?

A.  That's correct, yes.

Q.  Port-in data, it only captures switches among people who

port their number, correct?

A.  That correct.

Q.  That's not everybody, is it?

A.  Not everybody who switches.

Q.  Right.

A.  Right.  Some people get a new number when they switch.

Q.  Again, it's a sample.

A.  Correct.

Q.  And to the extent it's a sample, it is only useful to

extent it is representative of all price-based switching,

correct?

A.  Again, I wouldn't put it that way, I would say one would

be -- it could be a source of concern if you had reason to

believe there was a significant difference between diversion measured this way and if you had a complete census of all the switches.

Q.   And again you read Ms. Rittgers' testimony, she indicated that the port-in data was not representative of the entire market, correct?

A.   I don't remember exactly what she said about that, but both companies track and use the port-in data in the normal course of business, and I considered it informative, but it's not perfect.

Q.   It's not perfect, and when companies take account of it, they adjust for what they know about its imperfections, don't they?

A.   It depends the usage you're talking about.  I'm not sure what adjustments you're referring to.

Q.   Isn't it the case, Dr. Shapiro, that the port-in data underrepresents certain switches to MVNOs, for example?

A.   That could be.  Some of these data sources don't track the MVNO's separately, so it's not in the data.

Q.   So to the extent that Verizon, for example, has more MVNO customers than AT&T, T-Mobile, Sprint and others, then it would understate switches to Verizon, given the way you're calculating market shares, which is to treat the MVNO with its carrier.

A.   I guess I need to look at each of these sources.  I don't

have memorized exactly how they treated the MVNOs, that's it's not uniform.  For example, Comlink, they have a proprietary method of calculating these things, so I don't believe that there's -- I'm not aware of any bias here, I don't believe the issue was brought up by the experts on your side.

Q.  Where did you hear that from?

A.  From what I remember, from their rebuttal reports is what I'm saying.

Q.  Finally, UPP does not purport to give a precise dollar figure for what will happen after the merger, isn't that fair?

A.  UPP is an indication, as the term upward pricing pressure, and in itself does not indicate price changes.  One still needs to apply a passthrough rate in order to get to that step.

Q.  But even there what we're talking about with UPP is to show direction, it's not to measure a precise price increase that will result from a transaction, right?

A.  It's not just to show direction, because as you pointed out earlier, we would always have some upper pricing pressure.  The magnitude is important.  This is a quantification method.  So it is not just a direction, but it is not itself coming up with a price prediction, price increase prediction.

Q.  Would you agree with me, Dr. Shapiro, that the UPP test, in terms of its robustness, gains its robustness and elegance eschewing attempts to estimate magnitudes?

A.  Well, I'm pretty sure that's something that I wrote.

JCCTSTA2                         Shapiro - Cross

Q.  I'm sure it is, too.

A.  But I need to see the context, because the magnitude of upward pricing pressure does matter, and I expect that what I was referring to in that writing was the magnitude of the price effects, which requires a passthrough, as I have been saying.

Q.  And again, the passthrough rate that you used was not one that you derived from a statistical analysis of the marketplace, right?

A.  That is correct.

Q.  It was just one that you picked?

A.  Well, it's a standard one based on linear demand, it's 50 percent.  It has a simplicity to it.  A hundred percent would be full passthrough, zero percent would be none, it's in the middle.  It's commonly used.

Q.  Let's move to coordinated effects.  The prospect of cognizable merger specific efficiencies can make coordinated effects less likely also, right?

A.  Yes.

Q.  In fact, you talked yesterday in explaining to his Honor how the UPP works -- I'm sorry, how the hypothetical monopoly test works, to switch subjects, how the hypothetical monopoly test works, yesterday you gave the example of beer, right?

A.  I did.

Q.  And in fact, you have written about beer merger when you were the deputy assistant attorney general for antitrust, the

DOJ reviewed the MillerCoors transaction in 2008.

A.   I was not there at the time for that.

Q.   No, but you wrote about it when you arrived there the next year, correct?

A.   No, what happened was there's an annual report that the economists group there publishes in the industrial organization, that annual report included -- what was the transaction MillerCoors.

Q.   MillerCoors?

A.   MillerCoors transaction.  One of the sections of that report covered that transaction because it was handled within the last year, but since I was not there for that transaction that is a section -- I was not part of or an author of that section of the paper.

Q.   Your name was on the paper overall, but that particular chapter --

A.   I suspect the paper indicates what I just said; but if not, I'm telling you that is the case.

Q.   That was a transaction in which the national brewers of the United States consolidated from three to two, correct?

        Anheuser-Bush, MillerCoors.

A.   Okay.  Yes, that's right.  I'm thinking -- okay, go on.

Q.   The report that has your name on it that we just talked about --

A.   It's not my paper, just to be clear.  You can use -- its my

JCCTSTA2                          Shapiro - Cross

name on it, but that's misleading.

Q.  Okay.  Ken Heyer, Carl Shapiro, Jeffrey Wilder, the year in review, economists of the antitrust division 2008/2009 35 review of the industrial organization.  That's the paper we're talking about.

A.  If you want to show me a copy of the paper I will see whether -- I believe we were careful and said I wasn't contributing to that section, I can't say for sure.

Q.  I will take your word for it.  I need to identify the paper I'm talking about first.  They called it Heyer paper, if you prefer.

A.  I'm happy to have my name associated with the other sections of the paper.

Q.  That report indicates that the reason that that three to two transaction was approved was because of the prospect of significant cognizable efficiencies, correct?

A.  I would have to look at it.

Q.  And why don't we turn to tab 19 in your binder at page 3.

I apologize, Dr. Shapiro it's not in your binder.

A.  There is no tab 19.

Q.  I just realized that.

MR. CARY:  May I approach, your Honor?

THE COURT:  Yes.

THE WITNESS:  Thank you.

A.  Yes, says here:  Shapiro joined the division in March 2009

JCCTSTA2                          Shapiro - Cross

and was not a party to any decisions made prior to that time.

Q.   Yeah, it's clear you were not party to the decision, it doesn't indicate that you weren't an author of that section of the report.

A.   But you have to understand what this is is a report from the antitrust division economists about what they did in the last year.

Q.   In any event, you see that the document indicates -- and we'll bring it up on the screen -- that the prospect of significant cognizable efficiencies discussed below made net anticompetitive coordinated effects even less likely?

          MR. POMERANTZ:   Your Honor, if he could direct us to where in the article you're reading from.

          THE COURT:   What page?

          MR. NIKELS:   351.

A.   If there's a question, I didn't catch it, Mr. Cary.

Q.   The question was:   Isn't it true that in that transaction the DOJ concluded that the prospect of significant cognizable efficiencies made net anticompetitive coordinated effects less likely?

A.   I see that, but we happen to know that this was incorrect because later when Anheuser-Bush went to merge -- acquire part of Modello, the antitrust division challenged that transaction, and the complaint includes information about coordination between Anheuser-Bush and Miller that had happened after this

merger.  This is a mistake in the enforcement action that they did not challenge this merger.

Q.  Was the Microsoft Yahoo transaction also a mistake by the antitrust division?

A.  Microsoft Yahoo transaction?  What transaction is that?

Q.  That was another three to two transaction, this time while you were at the DOJ.

A.  I'm having trouble -- I'm not sure what transaction you're referring to.  Could you be more specific?

Q.  Why don't we move on to other aspects of coordinated interaction.  You gave us a list yesterday of factors that make a market susceptible to coordinated effects, right?

A.  Yes, I did.

Q.  You did not give us a list of factors that make a market less susceptible to coordinated interaction, right?

A.  Well, it's the same set of factors.

Q.  Well, let's see if there are some others.

A.  Sorry, if I --

Q.  Would you agree with me that if a firm gets more capacity so that it is no longer bumping up against capacity constraints, it could produce more output before marginal costs start to turn up, and that could make coordination, all other things equal, less likely?

A.  That's reasonable.

Q.  Do you agree that firms can increase -- by increasing

capacity, could lower their marginal costs?

A.   That could happen, yes.

Q.   And if you do lower your marginal costs by increasing your capacity, that would make it more profitable to sell more units by lowering price, all else equal, correct?

A.   I think so.  All else equal, yes, that sounds correct.

Q.   Do you agree that where firms have asymmetrical capacity utilization that that is a factor that is disruptive of coordination?

A.   I think it's going to depend on the circumstances.  That could happen, yes.

Q.   If one firm has greater excess capacity than others, that firm has a greater incentive than others to cut its price, correct?

A.   Well, all else equal, I think that's correct.  The firms that did not have any excess capacity would not have an incentive to cut their price because they would not be able to accommodate the increased demand resulting from the price decrease.

Q.   And in that context, it's also the case that that firm's rivals have less of an ability to discipline that firm as well, correct?

A.   I'm not quite understanding that.

Q.   You've got a firm with excess capacity and they drop price, the other firms would have less of an ability to discipline

that firm.

A.   Why?  What is it about the other firms we're talking about, the fact that they don't have much excess capacity?

Q.   Yes, sir.

A.   I see.  I think that's not clear, because if one firm lowers their price to gain customers, the other firms don't need excess capacity to respond because they're trying to gain back the customers they had.  So they could respond that way, could be quite aggressively to get the customers back, and they wouldn't need any extra capacity to do that, they're trying to refill -- get back to the capacity utilization rate they were at before the first firm cut its price.

Q.   So that would be an example of competition basically.  In other words, the firm that used to be capacity constrained has now lost its customers to other firm that has cut price, and it's responding by trying to get them back by lowering its own price, correct?

A.   We're talking -- the whole context was coordinated effects.  One firm tries to gain customers, the question is:  Do the other firms notice quickly respond so it actually doesn't end up helping?  The second -- the other firms respond, let's say they match the price cut, they don't need excess capacity in order to get the customers back, and the whole thing basically is a price war that didn't work out.  The whole analysis is the point that the first firm might not ever cut its price because

the others would discipline that, and I'm saying you don't need

excess capacity to discipline that for the reason I just

explained.

Q.  Dr. Shapiro, I would like to refer you to tab one, page 102

of your binder there of your deposition.

A.  Okay.  Tab one, you said, page number?

Q.  Yes, 102.

A.  Okay.

Q.  Do you recall in your deposition I asked you the following

question and you gave the following answer:

"Q.  More precisely, for a given level of total capacity,

collusion is more difficult if capacity is distributed unevenly

across the firms.  If one firm has greater excess capacity,

that firm has a greater incentive than others to cut its price,

and its rivals have less of an ability to discipline that

firm."

        Do you recall saying, "That's correct, I stand by

that."

        MR. POMERANTZ:  Your Honor, I don't believe that's on

page 102.

        MR. CARY:  Page 101.

        MR. POMERANTZ:  Okay.

        MR. CARY:  Sorry.

        MR. POMERANTZ:  Starting what line?  You have to

reread it.

MR. CARY: Line 6.

A. Okay. Shall I continue?

Q. The question is: Was that the question I put to you, and is that the answer that I you gave?

A. That's the answer I gave. It's perfectly consistent with the answer I just gave in court.

Q. Okay. Mr. Shapiro --

MR. CARY: We have a document, your Honor, that is confidential, so we can only put it up on the Court screen, the witness' screen and the counsel table's screen, but I would like to question the witness about it.

THE COURT: All right.

Q. Dr. Shapiro, could you please turn to tab 12 in your binder.

A. Okay, I am there.

Q. His Honor asked you questions about quality competition and coordinated interaction. Do you recall those questions from his Honor?

A. Yes.

Q. So this document is a 5G strategy update dated September 2019 from Verizon. Do you see that?

A. I do.

Q. Did you review this document in forming your opinions in this matter?

A. I'm not certain.

JCCTSTA2                           Shapiro - Cross

Q.  I would like to refer you to the executive summary.

A.  Okay.

Q.  And the executive summary, referring you to the second bullet, do you see that Verizon is expressing concern about its position coming under competitive pressure?

A.  I see that.

Q.  And do you see in the second to bottom bullet there where Verizon expresses concern that they will be challenged by new T-Mobile as a result of combination of Sprint and T-Mobile.

A.  They don't say it's a result of the combination, they say it's new T-Mobile.  They don't compare how they're challenged without the merger.

Q.  They say we will be challenged by the Sprint asset leveraged in the new T-Mobile model, right?

A.  That's what they say.

Q.  Then it says they need, in the near term, to consider this in terms of their own strategy, right?

A.  I see that.

Q.  And then they say, if you look over to the right-hand side, they question whether they have to change their strategy to respond, correct?

A.  I see that.

Q.  So they're not -- in this document, at least, they're not saying that they're going to coordinate, they're saying they have to come up with a plan to deal with the challenge posed by

a more powerful competitor, aren't they?

A.   They're talking about the challenging period coming in 2020.  I wouldn't expect them to write down they were planning to coordinate.

Q.   Could we look on page 6, and I would like to refer you to the right-hand side down at the bottom it says "competitive landscape."  Do you see that?

A.   I see that now, yes.

Q.   And you see in the competitive landscape they're talking about an emerging fourth with a new business model as a competitive factor that they need to consider in defining their strategy going forward.

A.   I see that.

Q.   They say that they're facing new T-Mobile as the new T-Mobile uncarrier moves into the rural areas.  Do you see that?

A.   I don't see moving in, it says new T-MO uncarrier for rural mobile.

Q.   I would like to refer you to page 22, and in particular, we saw up above on the first page we saw a reference to their midterm challenges, and now this is their strategy to deal with those challenges.  Right?

A.   Okay.  I see it's -- Verizon 5G strategy is the topic.

Q.   And it's adapting or changing its strategy for the shifting competitive dynamics, right?

A.   That's the term they use, I see that.

Q.   Part of that network dynamic is they are no longer the unchallenged leader with a superior network relative to the new T-Mobile.

A.   I don't see that here.

Q.   Look at the middle bullet in the midterm challenges range.

A.   The no longer unchallenged part, I didn't see that here.

I see what you highlighted.

Q.   That indicates that their midterm challenge is new T-Mobile's launch of their 5G offering better performance, right?

I don't want to read the whole thing.

A.   I see it.

Q.   Okay.  So all of these aspects of the document would appear to show that Verizon plans to respond more aggressively to competition from new T-Mobile, doesn't it?

A.   More aggressively than what?

Q.   It is changing its strategy because it is perceiving a competitor who will be more capable of bringing competition to it than it was before, right?

That's of a fair reading of this document, isn't it?

A.   I guess you're reading more into this than I'm seeing without reading the whole document.  The document is not entitled "Response to T-Mobile," it's "5G Strategy Update." This is one of the factors they would be foolish not to think

about, what is happening with this huge merger in their

industry, so they're mentioning that.  I get that.  It's one of

the challenges they're facing.  I get that.  I don't see that

it's a comparison of the merger -- the world with the merger

than without, which is the relevant question.  Your questions

are pointed in that direction.  I think you're reading too much

into it.  It faces challenges.

Q.  When they say changing they're strategy in response to

something, that sounds like a reaction to me, but we'll move

on.

A.  In response to what, though?

Q.  Let's look at page 18, maybe that will show us the

response.

A.  I'm just not seeing it.  You may be right.

Q.  We talked about the importance of excess capacity in terms

of competition and coordinated interaction.  Do you see on this

chart that they are showing in the post-transaction world empty

capacity for one player and broad capacity for another player

and contrasting that with the situation for Verizon and AT&T

today, correct?

A.  I see what they're doing, but all they're doing in

post-transaction, as far as I can see, is adding up T-Mobile

and Sprint.  Sprint already has a huge amount of excess

capacity, according to this.  So they're adding them up and

putting them into one row, and Dish is slightly changed for

some reason, their low capacity is going down for a little bit. So this doesn't tell me anything about the merger other than just the two firms have been joined into one.

Q.  Well, but if I were to tell you and if I were to represent to you that it's the case that when you combine spectrum and tower assets into a single network, the result is to multiply the amount of available capacity within that network, then this would be -- if somebody understood that who had written this, this would be indicative of more capacity in the marketplace post-transaction than pre, correct?

A.  Well, there's some interpretation of these numbers.  I'm telling you what I see in front of me, added up the numbers, and you're telling me that for some other reason that means there's a lot of extra capacity, that's not what the numbers show here, that's all.  I understand the network equation that underlies your question.  That's not part of my analysis, the efficiencies, but that's not on the chart.

Q.  Well, it is on the chart in the sense that this chart is showing that the new T-Mobile has much more spectrum that either of the two the networks previously, correct?

A.  Much more spectrum?  It has the amount, there's some slight discrepancies, but basically the amount you would get by adding up the two constituent components.  That's just addition.  I don't understand what you're saying.

Q.  It's not addition, as you said, it's multiplication, right?

If you put the two networks together, the same amount of spectrum multiplies the amount of available capacity.  Isn't that the formula that underlies capacity in this market?

A.   Look, I am not an expert on network physics, all I'm saying is what you put in front of me shows -- it's average megahertz spectrum, that's what is on the vertical access here, and what's on this chart is addition.  There's no multiplication here.  You're telling me that this does these magical things through network physics.  I understand that's part of your efficiency plan.  I'm not analyzing efficiencies, but that's not on this chart, that's all I'm saying.

Q.   What is on the chart, going back to my previous question when I cited to you to your deposition testimony, is that this shows asymmetry of available capacity as between Dish and new T-Mobile on the one hand and Verizon and AT&T on the other hand, correct?

It shows mostly full and full on one side and empty on broad capacity on the other.  That's asymmetry, right?

A.   Yes, that's -- okay.

Q.   Let me point something else out on this chart.  You see that on this chart Verizon is reporting that Dish has more mid band spectrum than it does?

A.   That Dish does.  I see, 71 versus 70, yes.

Q.   Please don't use --

A.   Sorry.  Okay.  Who knows what these units are, it's just

JCCTSTA2                         Shapiro - Cross

numbers.

Q.  Are you also noticing that Dish has more low band spectrum than Sprint?

A.  Okay, I see what you're referring to.

Q.  You're aware, are you not, Professor Shapiro, that Dish's low band spectrum is totally unencumbered and will be devoted all to 5G, right?

A.  "Unencumbered" means not being used yet?

Q.  Not used, correct.

A.  I think Dish has been holding onto spectrum for a while, yes.

Q.  Whereas Sprint has to accommodate on its low band spectrum 2G and 3G users, therefore cannot convert that spectrum to and 5G without disadvantaging those 2G and 3G users.

A.  I accept that.

Q.  Dish is not part of the coordinated group that you have included in your analysis, is that right?

A.  That's true.

Q.  You do believe that Dish's presence in the market as an MVNO, all else equal, will reduce the incentives to coordinate, don't you?

A.  To some degree, in comparison with if they didn't exist in the market at all.

Q.  Right.  And the divestiture of Boost to Dish also is a factor, all else equal, that disrupts coordination in the

JCCTSTA2                        Shapiro - Cross

market, correct?

A.  Well, I don't want to have more to say than the previous answer.  I don't think it will disrupt coordination, but it would -- I think what I said was have some probably small moderating impact on the coordination.

Q.  Well, I think what you said was it reduces the benefits of coordinating among the other three.

A.  That's fine.  That's the same idea, yes.

Q.  And that's true for the presence of the other MVNOs as well, isn't it?

A.  Well, they have some impact, but for reasons I explained on my direct testimony, because the primary concern about coordination is to not lower prices, and since MVNOs cannot initiate price cuts, given their cost structure, I don't believe it will -- they will have -- MVNOs will have any meaningful impact in preventing that type of coordination, although other types they could possibly have more of an impact.

Q.  You said that the MVNOs cannot initiate price reductions? Are you familiar with TracFone's prices?

A.  With TracFone's prices?

Q.  Yeah.

A.  Yeah, we showed their ARPU of around $25 a month.

Q.  What is Verizon's ARPU?

A.  Much higher.

JCCTSTA2                        Shapiro - Cross

Q.  Much higher?

A.  Right.

Q.  TracFone can initiate price reductions, right?

A.  So maybe I need to be clear.  What I mean by that term is given their margin is so small, about one percent or less, they can't lower the price and still be making money.  That's what I meant by initiating a price reduction.  They're acting very competitively.  They're basically thin resellers with no margins.  They can't lower the price further.  That's what I meant by initiated a price cut.

Q.  But if others were to raise prices, they would be in a position to discipline those price increases during the period that their wholesale agreement is in place with a fixed price.

A.  That's why we need to distinguish between this coordination to raise prices versus coordination to simply hold prices fixed and not lower them.  I was talking about the latter.  That's what I emphasized in my direct testimony.  You want to talk about the former, coordination to raise prices, nominal prices.

Q.  Let's be very clear about this:  Are you or are you not predicting that there will be coordination to raise prices as a result of this transaction?

A.  So the coordination will be that -- my first and foremost concern is the coordination to stop the price reductions that consumers have been benefiting from.  I think I have been quite clear about this.  And that was the calculation with the

6.3 percent of preventing price reductions for the next year. That is, in merger lingo, higher prices as a result of the merger than not. So we call that raising prices, but to be more precise, it means not lowering them. That's the first and foremost pricing concern about coordinated effects. And the MVNOs and Dish -- well, let's say the MVNOs like TracFone, they cannot disrupt that type of coordination, given their wholesale prices.

Q. Again, I want to be clear, you are not giving the opinion that as a result of this transaction AT&T, Verizon and T-Mobile will coordinate to raise prices above current levels?

MR. POMERANTZ:  Objection, your Honor, asked and answered.

THE COURT:  Sustained.

Q. Well, let's go to your chart.

MR. CARY:  And again, I apologize, your Honor, we have some numerical confusion because the deck that was used yesterday was different from the one provided to us.

Q. But I'm looking for what we have in our tab 14. This is your chart from yesterday illustrating your point about --

A. I think the public display is still off.

Excuse me.

Q. Yes. So this is the chart you had yesterday to illustrate your point about the price increments not preventing an anticompetitive effect that prices will not fall as rapidly as

they otherwise would, correct?

A.   Correct.

Q.   Now I want a better understanding of this line.  It says planned prices, but it has no numbers on the vertical axis.  This is a hypothetical that you're reporting to us?

A.   I called it conceptual.

Q.   Conceptual.  Okay.  And in your conceptual you show that the line has fallen, right?

A.   The blue -- yes, the plan prices under this illustration are falling from one year to the next.

Q.   So I'm going to put up another hypothetical.  Now in this hypothetical the line is not falling, it's slightly increased but mostly flat, right?

A.   I see what you've done.

Q.   In this hypothetical, since you told us you you're not predicting the three carriers network operators are going to coordinate to raise prices, in this scenario price commitment would preclude the anticompetitive --

        MR. POMERANTZ:  Objection, your Honor, he misstated the testimony about higher prices.

        THE COURT:  Clarify, Mr. Cary.

Q.   In this example, the price commitment would prevent -- strike that.

        In this example, the consumer harm that you showed in your conceptual drawing does not exist, right?

A.   That is true.  As you've drawn it, you have eliminated it.

Q.   Well, it wasn't me who eliminated it.  Are you aware of the producer price index?

A.   Certainly.

Q.   The producer price index is generated by the Department of Labor statistics?

A.   That's correct.

Q.   And so if we go to the next chart, this chart shows the producer price index for the period from 2018 to 2019 for cellular and wireless communication.  Doesn't that indicate that prices have been flat over that last year?

A.   That's what you're showing.

Q.   And in terms of your analysis of this industry, you have seen documents where carriers have in fact predicted that prices would be flat or turning up as a result of capacity constraints, have you not?

A.   I have seen some things like that, but I don't even know what price we're measuring here now.  I understand ARPU.  I don't know what this index is.  What are we measuring?  Are we measuring dollars per gigabyte or usage?  I don't know what we're measuring.

Q.   It shows the producer price index is the source, down at the bottom says for --

A.   Price of what?

Q.   Wireless telecommunication carriers.

JCCTSTA2                    Shapiro - Cross

A.   That seems rather broad to me.  I just want to know what we're measuring.  If you tell me it flattened out, what to make of it.  Because the BLS, they have a consumer price index, they have a producer price index, these tend to be pretty broad buckets, and I would not tend to go there, but maybe this is a good measure.  But I can't tell because I need to see what is in this bucket that wireless industries -- I don't know what we're including here.

Q.   But you didn't look at the real data, the BLS on wireless carriers, in coming up with your conceptual drawing which showed the decline, right?

A.   I used -- I think that that is not -- I'm not -- actually I might have looked at those data, I can't remember, but much better data that I did look at I've got in my reply report a number of different measures of data of price drops.  The ARPU is a good one, that's been dropping.  What's really dramatic is the price drops dollar per gigabyte, because the usage is going up so much and we're not paying more per month.  So in terms of quality adjusted prices, it's dropping more rapidly than I showed in my diagram, and certainly not flattening out.

Q.   In terms of the ARPUs, the reality there is there was a big drop between 2013 and 2014, and even that then started to moderate, correct?

A.   I think there was -- I think in terms of we measured 2014 to 2017, that was the most recent three-year period from the

JCCTSTA2                          Shapiro - Cross

FCC data.  There might have been a larger drop before that, but then I wouldn't have been picking that up if I remember my time period right.

Q.  I think I misspoke, 2014 and '15 it went down and flattened, isn't that right?

A.  So I could accept there are some other measures that show -- I used the 6.3 percent annual drop, there are some other measures that show somewhat smaller drops, but the history is pretty clear here that prices have generally been falling and quality adjusted prices have been falling a lot.

Q.  You gave us another illustration yesterday.  Tab 14, please.  Do you recall this illustration you gave us?

A.  I do.

Q.  Now when this was put on the screen you said that this was evidence that prices had declined significantly from November 2018 to November 2019, right?

A.  Well, those are the dates at which these screen shots were -- I have to double-check, but yes, I put this forward as indicating a reduction in plan price by T-Mobile, yes.  I don't know that I said -- I don't exactly what dates those reductions actually went into force, this is just, I believe, what was observed at these different dates.

Q.  Observed by you?

A.  I have to check my reply report.  I think it would be going to website.  I would have to double-check that.

Should I look it up or not?

Q.  Well, let me ask, are you aware -- I don't know how well you could read this, I'm having a little bit of trouble.

MR. CARY:  Maybe we could make the names of plans a little bigger so everybody could see the names of the plans.

THE WITNESS:  Yep.

Q.  Do you see that it shows -- let's take the middle one, it says Magenta $40, per line.

A.  I see that.

Q.  Are you aware that there was no Magenta plan in November of 2018?

A.  No, my understanding was that this was, again, the plans that were offered at those times.  If that's not correct, it's a mistake and I have to withdraw it.  That's my understanding.

Q.  Let's look on the right side, the November 4, 2019.  Are you aware that this is a promotional plan, not the wrap rate plan?

A.  I don't know the details here.  I guess I can tell you more detail what I do know, but I am not sure promotional -- I thought this was signature unlimited plan, my understanding was this was a primary offering by T-Mobile.

Q.  The offering is primary, but the pricing is promotional pricing.

A.  And is it any different than the one in the previous year in that respect?

JCCTSTA2                    Shapiro - Cross

Q.   Yes, the previous year was a wrap rate.

        Turn to tab 9 at page 5.

A.   Okay.  I see that.

Q.   This is a document -- this is the real document that shows prices of T-Mobile's post-paid plans, right?

A.   I don't know.  I'm not familiar with this document.

Q.   I'm going to refer you to the T-Mobile One plan, which was the plan that was in place in November of 2018, because there was no Magenta plan at that time, and I will refer you to the bottom where it is showing the price.  Do you see that?

A.   I see that.

Q.   And this is for four lines.  Do you see that over on the left there, four lines for 140?

A.   I do.

Q.   And four lines at 140 is how much per line?

A.   $35.

Q.   So the price in November of 2018, $35, is the same as the price in November 2019 that you showed on your exhibit for $35, correct?

A.   Well, I don't know what -- I'm not following, to tell you the truth.  You're slowing me a document that says they have the One plan and it was $35 a line for this four line as shown here, and now I think you're telling me that was their -- what the promotional rate is in November 2018?

Q.   Yes, sir.

A.  Okay.  Okay.  If you're telling me that, and you're telling me that the $35 rate that was in my exhibit was also a similar promotional rate a year later, is that what you're saying?

Q.  Yes, sir.

A.  Well, then if that's all true, then this would not illustrate what I was putting it forward to, and that would need to be corrected.  I may be missing something here, but I'm following you and taking your representations, that's my reaction.

Q.  Okay.  You spoke yesterday about geographic market definition.

A.  Yes.

Q.  And you used a slide that showed a map of the New York metro that I would like to put up on the screen.

So the CMA that's on the screen is the New York CMA, and you've testified that you believe that that is a relevant geographic market for antitrust purposes for examining this transaction?

A.  Yes, that's a relevant geographic market, the New York CMA.

Q.  And you came to that conclusion by applying the hypothetical monopoly test?

A.  I applied that test to this region and it was satisfied.

Q.  Did you apply that test for smaller regions within the New York CMA?

A.  No, I did not do that.  I did not need to do that to reach

the conclusions that this was a relevant market.

Q.  So let's take an example of the Bronx.  We have circled a couple of geographies here, what is supposed to be the Bronx but it's in the wrong place, should be lower and to the left. The map is a little small.  Would you agree with me that applying the hypothetical monopoly test that you are using to define markets that the Bronx would satisfy that test?

A.  I think it would.

Q.  And would you agree with me that Manhattan would satisfy that test?

A.  I think it would.

Q.  Would you agree with me that a subsection of Manhattan would satisfy that test?

A.  Yes, some would, yes.

Q.  Would you agree with me that a zip code would satisfy that test?

A.  I expect it would because people want service where they live in their homes and where they work.

Q.  Would you agree with me that a city block would satisfy that test?

A.  Small regions would satisfy that test.  It would not be as informative, but it would satisfy the test.

Q.  So the extent to which the definition is informative is relevant to you, right?

A.  I don't understand the question.

Q.   There could be different levels of information provided by looking at different geographic areas.

A.   Certainly.

Q.   Now you are testifying -- well, let me go a step further. You would agree that a city block would satisfy the hypothetical monopoly test?

A.   I think it would in this industry, yes.

Q.   Would you agree with me that the Northeast region would satisfy the hypothetical monopoly test?

A.   Yes.

Q.   Would you agree with me that the Eastern United States would satisfy the hypothetical monopoly test?

A.   Yes.

Q.   Would you agree that the entire of the United States satisfies the test?

A.   I would.  I do.

Q.   Basically everything from a city block to the United States of America would satisfy the test?

A.   That is correct.

Q.   And then applying the methodology that you used, if we went down to a city block and we found Herfindahls above 2,500, you would say that the transaction is anticompetitive on the city block.

A.   No, I would not.

Q.   You would not?

A.   No.

Q.   Why wouldn't you?

A.   Because as I --

Q.   Withdraw that question.

There are wide variations in Hirfindahls within CMAs, correct?

A.   I don't know what you mean by "within."  I have looked at things at the county level and there is some variation there, so I'm not quite sure what you mean.

Q.   Let's take Washington DC, for example.  Within the Washington DC CMA there's a county with a Herfindahl of around 3,000 and another county with a Herfindahl of around 8,000, right?

A.   I don't know that.  I don't have that county level CMAs memorized, happily enough.

Q.   But your position is --

A.   County level Hirfindahls, I meant to say.

Q.   To the extent that the entire CMA has a certain Hirfindahl, you would condemn the transaction even in counties where the Hirfindahl is much lower, right?

A.   Finding high concentration and changes in concentration in CMA levels I think is informative about the danger to competition associated with consolidation in those regions. The fact that there's variation within the CMA in terms of market shares and Hirfindahls does not undermine that point, in

my view.

Q.   There's wide variations within the CMA and there's wide variations across CMAs, right?

A.   I think that is true, yes.  To be clear, we're talking about in let's say the levels of Hirfindahl and the change in Hirfindahl, the two metrics we're focusing on.

Q.   Right.

A.   Yes.

Q.   Now economists looking at mergers across geographic markets occasionally will do an analysis of the pricing across those markets to determine whether those really are areas of competitive concern, don't they?

A.   Could you be more specific?  To a lot of things that sounds reasonable, but I'm not sure what you meant.

Q.   So one of the ways that economists looking at mergers that are in multiple markets, one of the techniques that they use to determine whether there are going to be anticompetitive effects is to look at markets where there are high concentration and other markets where there are low concentration and see whether there's a differential in the competitive outcomes in those two geographies, right?

A.   Well, that is a method used for some purposes, but that's not so good for merger analysis, really, because we want -- much better would be to look at the effective mergers in different local markets, if I could.

JCCTSTA2                      Shapiro - Cross

Q.   I was going to get to that as well.  And that's another technique, to look at cross markets to see if concentration is correlated with performance, and they look within the market to see whether over time with mergers there's a change in performance or exit and entry, right?

A.   Those two types of methodologies are definitely included in literature, yes.

Q.   Not only the literature, but in the real world analysis of mergers by the DOJ of FCC.

A.   In those cases those techniques can be and are used, that's correct.

          (Continued on next page)

JCCPSTA3                        Shapiro - Cross

Q.  Now, here we have a situation, for example, where you have, let's say, Milwaukee, Wisconsin, where the pre-merger HHI is 2000, and then you have Rochester, New York, where the HHI is close to 4000, 3788 to be precise.  Did you look to see whether the competitive outcomes in Rochester v. Milwaukee are any different as a result of those differences in HHIs?

A.  I have not looked across CMAs in the way you've described. I don't think that would be a fruitful line.  I have not done that.

Q.  Okay.  And if you looked, for example, in Miami, when T-Mobile bought Metro PCS, the market shares went up.  Did you look to see whether competitive performance in Miami was better or worse as a result of that increase in concentration?

A.  I have not conducted case studies in different CMAs that -- it could be informative, I'm not quite sure how you would do it.  It's not part of the analysis I presented to the Court.

        THE COURT:  Mr. Cary, how much longer do you think you need on this subject?

        MR. CARY:  Your Honor, if you're looking for a time to take a break, this would be it.

        THE COURT:  All right.  Let's take a ten-minute break.

        (Recess)

        THE COURT:  Thank you.  Be seated.

        Mr. Cary, do you want to resume, please.

        MR. CARY:  Yes, your Honor.  Thank you.

THE COURT:  Before you proceed, let me acknowledge that the Court received a memorandum from defendants dated December 11th, regarding that controversy related to Exhibit No. 1034.

Plaintiffs, do you contemplate a response to this memorandum?

MR. POMERANTZ:  Yes, your Honor, we do.  If we may have until Monday to submit the response?

THE COURT:  All right.

MR. POMERANTZ:  Thank you.

THE COURT:  Mr. Cary?

MR. CARY:  Your Honor, may I approach?

THE COURT:  Yes.

MR. CARY:  Thank you.

BY MR. CARY:

Q.  Professor Shapiro, I've handed you a press release announcing the introduction of the magenta plan, consistent with our last conversation about your pricing comparison.  I wanted to refer you to page 3 of 7, where it says:  Introducing magenta, new name, same price, more benefits.

And I just wanted to put this before you, pursuant to our conversation about your pricing data.  You don't need to do anything with it, but I will be introducing it into evidence.

A.  All right.

Q.  So before we broke, we were talking about geographic

market, and I just wanted to confirm a few things with you. You are aware that T-Mobile and Sprint price nationally, right?

A.  I think generally their pricing plans are national, yes.

Q.  So the price that a consumer gets in Milwaukee with a 2000 Herfindahl is the same price as they get in New York City with a 3800 Herfindahl; there's no difference relative to the concentration ratio, correct?

A.  Before we would factor in local promotions and the like, that's correct.

Q.  And the local promotions, have you looked at the magnitude of those local promotions?

A.  I've seen some documents related to them, some localization plans and the like, yes.

Q.  Is it fair to describe the total dollar value of those local promotions as miniscule?

A.  I don't -- that sounds rather demeaning.

Q.  Very, very, very small, right?

A.  I don't know what you mean by that.  I've seen individual documents, if I remember them right, that were talking about promotions in the millions, single-digit millions and handfuls of CMAs, for example.  If that's minuscule, that's the sort of thing that I've seen.

Q.  You know that T-Mobile's marketing budget is in the billions, right?

A.  I don't know off the top of my head their marketing budget,

but I'm saying in specific CMAs I don't think that's minuscule when you look at it, but I accept that in the overall scheme of this industry or the total revenues, you know, in the whole country, it's a small -- it's a small item compared with, you know, the national efforts in terms of pricing and marketing. I'm not disputing that.

Q.   It's about 2 percent or less, right?

A.   I don't know that number.

Q.   Have you studied whether the amount that is spent in high-concentration CMAs, as a percentage of revenue, is different from the low-concentration CMAs?

A.   I've not related the spending to Herfindahls.  I've seen how it relates to strategy.  Sometimes building on strength. Usually companies are marketing where their speed is good.

Q.   My question was with respect to Herfindahls.

A.   So, no, I have not related it to Herfindahls.

Q.   Right.  And in terms of where their speed is good, where their speed is good, the consumer there gets higher-quality service, right?

A.   That's usually what's being touted in terms of the promoter -- not the discounting but in terms of the messaging.

Q.   Right.  So the messaging is you're getting more for less, not less for less?

A.   Well, for example, the Boston, the thing we showed for Boston with the higher speeds, there was touting the higher

speeds.

Q.   Right.  And it's your view, actually, as expressed in deposition, that higher market share will tend to be associated with higher quality network performance, right?

A.   Certainly, yes.  That's why the overlap, when we have CMAs where the two companies have a high combined share, we're especially worried.

Q.   But CMAs where one company has a low share and another has a high share, and they can improve their performance by adding those network assets together, consumers are going to get more for less, right?

A.   Well, if there are merchant-specific efficiencies, those could very well arise at the CMA level, and that would offset the effects I've talked about.

Q.   You do understand, do you not, that T-Mobile has a single national standard for its network performance?

A.   I'm not quite sure what you mean by a "single national standard."

Q.   What I mean is that they set a floor of megabits per second that is their benchmark, below which if the speeds fall, they will invest.  Are you familiar with that?

A.   I've seen documents about their investment plans, and I understand that element.  I wasn't quite sure about whether they go and successfully bring up all these areas to that benchmark, but I get the point.

Q.  The point is that they don't set -- that benchmark that they try to achieve everywhere is not set by reference to local competitive conditions, correct?  It's a national standard?

A.  Yes, what you've described, it sounds to me like the floor may be set, or at least aspirationally, set on a national basis, but of course, you do a lot better in some areas to attract customers who are located there and particularly care about the speed in that area.

Q.  You don't have any evidence -- you don't have any evidence that T-Mobile strives to achieve higher performance in a particular area because of competitive conditions in that area, do you?

A.  I think there's plenty of documented evidence that T-Mobile, when they're thinking of investing, that they're looking at their local performance and they want to improve their speeds in certain areas.

Q.  Okay.  Well, we'll have Mr. Kapoor who will come in and testify and explain that they have a uniform national standard.

A.  Well, that's --

MR. POMERANTZ:  Objection, your Honor.  He's not --

THE COURT:  Sustained.

Q.  In any event, you don't have any evidence that their investment decisions at T-Mobile are based upon CMA-level concentration?

A.  No, I don't think that's how their planning is done.  I

agree with that.

MR. CARY:  Okay.  Thank you, Dr. Shapiro.

Oh, your Honor, I need to introduce --

THE COURT:  Yes, some documents, exhibits?

MR. CARY:  Okay.  Your Honor, at this time, we'd like to move Defendant's Exhibits 7057 and Defendant's Exhibit 5489 into evidence.

MR. POMERANTZ:  Your Honor, I think Exhibit 7057 is a Verizon document.

MR. CARY:  Correct.

MR. POMERANTZ:  Am I correct?

MR. CARY:  Yes.

MR. POMERANTZ:  And I believe -- so with respect to Verizon, Verizon has provided a certification, a declaration that would establish -- intended to try to establish the business records exception, and they have provided us with a declaration signed by Verizon that attempts to satisfy it.

We, too, have obtained a declaration from Verizon that attempts to establish the business record exception for other Verizon documents.  We have asked them to agree -- they both establish it or they both don't.  It's the same declaration.  I think it's word for word the same declaration.  It's just simply different documents.

I will not object to them offering the Verizon document in this manner, so long as it goes both ways, your

Honor.

MR. CARY:  Your Honor, I'm not aware or familiar with the documents that Mr. Pomerantz is talking about.  When those documents come up, we'll take a look at them, and if they're legitimate business records, you know, we'll deal with it.

This document, obviously, is.  It's their 5G strategy update for their core team.  I think we've established a predicate for this.  If Mr. Pomerantz can do the same for his documents when we see them, we wouldn't object.

MR. POMERANTZ:  Your Honor, I would ask that you reserve your ruling on this.  There is no Verizon witness here to lay any foundation.  They could have deposed a Verizon witness in this matter.  They did not.  I think we can work it out, but I want it to go both ways.

THE COURT:  All right.  Let's proceed.  I will assume that if the principle is the same for both documents, then I will ask that they be admitted on the same basis.

MR. CARY:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. POMERANTZ:

Q.  Professor Shapiro, a few follow-up questions.  Mr. Cary started his examination with unilateral effects and, in particular, he asked you questions about UPP, upward pricing pressure.  Is upward pricing pressure, or UPP analysis, a methodology that is widely used by antitrust economists?

JCCPSTA3                          Shapiro - Redirect

A.  Yes, it is.

Q.  In fact, is it so widely used that it was expressly added to the merger guidelines?

A.  Yes.  Although, I would think it goes both ways.  The presence in the merger guidelines has spurred additional usage as well.

Q.  And is it fair to say that both the FTC and the DOJ use UPP analysis when they're assessing unilateral effects in a merger?

A.  Yes, when it's appropriate.  Of course, it has to fit the case.  The UK's Competition and Markets Authority also does this similar thing.

Q.  And just in general terms, why do antitrust economists, the FTC and the DOJ use UPP to analyze price effects of a horizontal merger?

A.  So this is -- in terms of quantifications that are workable in practice and in court, we have Herfindahls.  We've had those for a long time.  Herfindahls fit better with coordinated effects, that's really where they come from intellectually in this field.

       Unilateral effects have become increasingly a large part of merger enforcement over the past 20 years, and this methodology is a way of quantifying them.  It's better than Herfindahl for that.  The change in Herfindahl is also informative for coordinated effects -- excuse me, for unilateral effects.

But this is our best methodology that's relatively simple. It may not feel that way to you, your Honor, but relatively simple for quantifying these things. There are more complicated methodologies, such as merger simulation, but this one is relatively simple. Many people even believe it is quite reliable. There is still some academic debate about that, and it's workable in practice.

Q. All right. Let me turn to a different subject, the subject that Mr. Cary concluded on, and that is local markets and, in particular, CMAs. The defendants have retained two economists to look at your initial testimony, correct, your initial report?

A. Yes, that's correct.

Q. And that's Dr. Katz and Dr. Asker, correct?

A. Yes.

Q. And they're both here today, correct?

A. Yes, I believe so.

Q. Did either Dr. Katz or Dr. Asker, say in their reports that there is no local market that's a relevant market for assessing this merger? Did either of them say that affirmatively?

A. Well, as best -- in my mind, what they say in their reports that responded to mine, they criticized my use of CMAs as local markets. I don't know that they said there could not be any local market, but they were attacking this use of CMAs.

Q. Okay. So that's the point. That is, they didn't say there

is no local market competition out there; they just said that CMAs may not be the right way to define that local market, correct?

A.   That is how I have remembered and responded to their reports, yes.

Q.   And then, did they identify a different way to define the local market, like it should be a county or a borough or a neighborhood or a street?  Did they define a different local market?

A.   No, they did not.

Q.   Okay.  Now, Mr. Cary suggested that there may be smaller regions than a CMA that may satisfy the HMT, the hypothetical monopolist test.  Do you remember that question?

A.   And I acknowledged that there would be.

Q.   And then Mr. Cary also asked you whether there would be a larger region than a CMA that would satisfy the hypothetical monopolist test, and you agreed with that, too, correct?

A.   Yes, such as the United States.

Q.   So does that mean that because there are smaller local markets that satisfy the test and larger regional markets that satisfy the test, does that mean that the CMA is not a relevant market for analyzing this merger?

A.   No, it does not.  That question, I think, goes to that it's informative to look at these geographic regions.  They do satisfy the test, but since other regions do, you want to look

at this region if it's informative.  And I've explained, I hope, on the witness stand here why I believe it is regarding local dimensions of competition.

Q.  All right.  And then when we turn to the national market, Mr. Cary noted that there are wide variations of HHIs in various local markets; do you remember that?

A.  I do.

Q.  And then he also noted that nominal prices, that is, let's say, the rate plans, those are set nationally by T-Mobile and Sprint; do you remember that?

A.  I do.

Q.  Now, are we missing something here with respect to why the local HHIs vary significantly compared to the national?  If we just look at the nominal prices that are set nationally, are we missing something there?  Is there something that explains why the HHIs vary so much locally compared to the national market?

A.  Well, there's a -- I think we understand why.  It's not because prices are different in one area over the other, it's national pricing.  So one of my exhibits I showed in the New York CMA, the combined share of the merging firms is 58 percent.

Q.  Are you referring to a slide?

A.  I am.

Q.  What's the number on the slide?

A.  Slide 26 from the deck we presented yesterday.

JCCPSTA3                        Shapiro – Redirect

Q.  Mr. Nickels, could you put slide 26 up?

Okay.  Yes?

A.  Yes, that's the one.  So, your Honor, hopefully you can see this.  We saw this before.  So just look at New York.  So the combined share is 58 percent for the two firms.  That's substantially larger than their national combined share, which I think is about 38 percent.

So that is not because of local promotions in New York.  It's not because of price differences.  It's, I infer, that it's the quality.  It's the speed, that I think they've got -- they're more competitive in New York CMA than in the country as a whole because of the quality of their service in this area.  And we see considerable variation, and this is why certainly unilateral effects locally would be particularly concerned, and -- in a CMA such as New York because the combined share is so high.

Q.  All right.  And if we could, Mr. Nickels, if you could put slide six up on the screen.  So this is another slide.  This is Plaintiff's Exhibit 160, that we looked at during the course of your direct examination.  Mr. Cary was asking you questions about whether T-Mobile tries to come up with the same quality requirements across the United States.

In fact, all of the carriers have differences in their qualities in different localities around the country, correct?

A.  That's the reality of this industry, yes.

Q.   And, in fact, the carriers compete with each other locally based on quality, correct?

A.   I think so.  Yes, they do.

Q.   And Exhibit 160 is an example of how Sprint is using its speed in the Boston area to compete for consumers in Boston, correct?

A.   Yes, that's what I think this is about.  It's a press release touting their speed in Boston.

Q.   Now, Mr. Cary also asked you some questions about competition relating to AT&T and Verizon; do you remember that?

A.   Yes.

Q.   And he showed you a Verizon document, strategy document that addressed 5G, correct?

A.   I recall that.

Q.   And he was trying to suggest from that document, I think through his questioning, whether Verizon would really have any interest in coordinating with AT&T and the new T-Mobile if this four-to-three merger actually occurred; do you remember that line of questioning?

A.   I do.

Q.   So he selected one document that was produced to the parties and to us by Verizon.  I'm going to ask you to look at a different document.

A.   Okay.

Q.   Can you, Mr. Nickels, put this only on the private screen,

JCCPSTA3                          Shapiro - Redirect

not publicly.

Could you take a look at Exhibit 1234?

MR. POMERANTZ:  Your Honor, would you like a copy?  I have a --

THE COURT:  Yes.

MR. POMERANTZ:  And, Mr. Nickels, if you could highlight the first sentence of the top e-mail.

BY MR. POMERANTZ:

Q.  Now, I'm not going to ask you to read it out loud, Professor Shapiro, but is it fair to state that the contents of that first sentence would not suggest that this -- that Verizon is opposed to the merger?

A.  I very much agree with that, based on this sentence that I will not read.

Q.  And indeed, is it fair to say that you read this first sentence as being totally consistent with the testimony that you have provided here with respect to coordinated effects?

MR. CARY:  Your Honor, I'm going to object to the question, and I'm going to move to strike the last answer as well.  This is a document -- it took us a minute to read it, but this is a document not within Verizon, but to a Boston Consulting Group, and I think we're now getting into that area of the conversation.  This document, upon review, seems to be Boston Consulting Group trying to sell their services to help Verizon strategize, and Verizon is saying, no thank you.  It's

JCCPSTA3                    Shapiro - Redirect

not a business record.

MR. POMERANTZ:  Your Honor, to the contrary.  You can see the document.  The top e-mail is from Verizon.  It is not from Boston Consulting Group, and this is somebody, a senior executive at Verizon, offering a view about the merger.  It's clearly a business record, and we have a -- in fact, a declaration on this very document from Verizon that is identical to the declaration that they have offered for the documents they seek to enter into evidence from Verizon.

MR. CARY:  Your Honor, the difference is apparent on the face of these documents.  One document is the official Verizon strategy update, with facts and figures and data and proposals for the company to move forward in response to a competitive threat.

The other is one individual's e-mail to a third-party consultant, who's soliciting him for business to consult and strategize, and the Verizon executive says, no, thank you, and expresses a personal opinion.  It is not a document created in the ordinary course of business by someone with knowledge of the facts, kept in the ordinary course, and used as a decision-making document as the Verizon plan is.

MR. POMERANTZ:  Your Honor, to the contrary.  The evidence here is exactly the opposite of what Mr. Cary just said.  Verizon has sworn, in a declaration, that this is a business record, No. 1, and No. 2, Mr. Cary is looking at a

document that he relied on and then assuming things, as opposed to actually getting testimony from Verizon, if he wanted to offer it, saying all the things that he just said.

They had the opportunity to do that.  They didn't take the deposition.  We both have declarations that say exactly the same thing, which establish the business records exception.

THE COURT:  Do we know who Mr. --

MR. POMERANTZ:  I would ask you not to say the name.

THE COURT:  The individual who is sending this, where he places in the organization, whether he has authority to make the statement like this and have that statement be attributed to Verizon?

MR. POMERANTZ:  Yes, I understand.  And again, I don't want to -- I understand that he is a -- I want to say the title is Senior V.P. of Marketing.  I may not have it quite accurate, but he's of that level.

MR. CARY:  So, your Honor, I think that makes the point, a marketing guy responding to a consulting group saying we want to work for you, as opposed to 60 pages --

THE COURT:  I'm going to agree with the defense.  This, as I see, is somewhat different than the principle that applies to the prior Verizon document.

MR. POMERANTZ:  Your Honor, if I may.  As you allowed some briefing on the other exhibit, I really do think that there is no basis under the rules and under the evidence that

we have here, to include theirs and not ours, and I would like the opportunity, if I may, to brief it.

THE COURT:  If you wish to brief and spend your valuable time on those technical issues, which on appeal, as you know, Court rulings are very seldom reversed, you may.  But I just don't think it's a productive use of your time.  There are material differences that I see between the two issues, but --

MR. POMERANTZ:  No, your Honor, I certainly don't want to waste our time right now.  I certainly understand your message.  I just want to be clear that what this document says goes to the heart of the issue in this case.

MR. CARY:  Your Honor?

THE COURT:  Let's not prolong it.  The other thing is that Verizon may tell you that this is a business document, but the business document, as you know, is a legal principle under the rules of evidence, and it's to the Court to determine whether or not something is or is not a business record, and I am not necessarily bound by a determination of a third party.

MR. POMERANTZ:  I'll move on, your Honor.

THE COURT:  All right.

BY MR. POMERANTZ:

Q.  Professor Shapiro, Mr. Cary was asking you questions about spectrum and the difference between addition and multiplication; do you recall that testimony?

JCCPSTA3                         Shapiro - Redirect

A.   I do.

Q.   I think it was something about the law of physics, and I think what he said was that if you combine the spectrum of T-Mobile and Sprint, you get excess capacity through multiplication, not addition.  Do you recall that line of questions?

A.   Yes.

Q.   So if you combine the spectrum of AT&T and Verizon, then you would also get excess capacity through multiplication and not addition, correct?

A.   If the same principles apply, that sounds correct, yes.

Q.   And if you combined the spectrum of AT&T and Verizon and T-Mobile and Sprint, you would get an even higher result from that multiplication rather than addition, correct?

A.   As I understand the formula, unless there was some other factor, yes.

Q.   Do you think that the fact that you can combine these companies, whether it's AT&T and Verizon or the entire industry into a monopoly, do you think the fact that that multiplication leads to, let's say, better service?  Do you think -- as an economist, do you think that that answers the question of whether there will be a substantial lessening of competition?

          MR. CARY:  Your Honor, I'm going to object on the basis of foundation.  This witness has testified that he's not their efficiencies expert, he is not looked at the physics,

JCCPSTA3                    Shapiro - Redirect

he's not looked at the network combinations, and he, therefore, cannot answer that question without any scientific foundation.

THE COURT:  All right.  Mr. Pomerantz, perhaps you want to take another stab at the foundation.

MR. POMERANTZ:  Your Honor, Mr. Cary asked him that same question, only he limited it to T-Mobile and Sprint, and he very much asked him multiplication versus addition, and what that means to the antitrust analysis -- the economic analysis here.

I'm just going to the next step.  It's hard for me to imagine how there cannot be foundation for Professor Shapiro to answer this question, when Mr. Cary elicited the exactly the same testimony, but he chose to limit just to T-Mobile and Sprint, and I'm trying to show the logic of his argument and what that means to competition.

I have an antitrust economist on the stand, and his whole point is to talk about how do economists look at these kinds of issues in the context of assessing whether competition is improved or lessened?

THE COURT:  All right.  Thank you.  Overruled.

MR. POMERANTZ:  Thank you.

A.  I feel like after all that, I'm supposed to have something really good to say.  But, look, if you accept those network physics and those formulas, and this is, I think, the important part of the efficiency claims, those could qualify as

efficiencies, but we would always want to see whether they would be of a magnitude to offset the anticompetitive effects, and you're talking about, as the industry increasingly consolidates, that it would be a heavier and heavier lift.

BY MR. POMERANTZ:

Q.  All right.  Let me turn to a different subject.  You understand that defendant's position is that after this merger, the prices for new T-Mobile's services will go down?

A.  I'm sorry, I lost you.  The absence of the merger, is that what you said?

Q.  No, I'm sorry.  Defendant's position.

A.  I didn't hear that.

Q.  You understand that defendant's position is that after the merger, new T-Mobile's prices will go down?

A.  I do.

Q.  And you understand that their position is based upon the efficiencies that they claim will arise from the transaction?

A.  I think it is.

Q.  Now, you say that if new T-Mobile does not have the kind of efficiencies that are claimed by the defendants here, the kind of efficiencies that are recognized by economists and the law, then new T-Mobile's prices will go up, as compared to the prices that would prevail without the merger, correct?

A.  Yes, that's what I'm saying.

Q.  So they say prices will go down, and we say prices will go

up, correct?

A.   Again, up could mean not falling as rapidly, but up, compared with the merger not taking place.

Q.   Okay.  So if we are right, that new T-Mobile's prices will go up, what do economics tell us about whether AT&T and Verizon would have any incentive to lower their prices?

A.   So even if we just took the unilateral effects part of my analysis, that the new T-Mobile would raise the price of their brands, the -- what are normal, I would say, standard way of thinking about oligopoly is that AT&T and Verizon -- first off, they would welcome that because they've got a competitor raising price, and they would tend to raise their price somewhat without any coordination, just to -- in response somewhat.  So it would tend to be a broader set of price increases.  This is what the merger simulation models and our oligopoly models typically say.

Q.   So if there are no cognizable efficiencies in this case, do economics tell us that not only will new T-Mobile raise its price compared to pre-merger, but AT&T and Verizon have no incentive to lower their price?

A.   That's correct.  They have no incentive to lower their price, and they would tend to have some incentive to partially follow the price increase that T-Mobile would initiate as a result of the merger.

          MR. POMERANTZ:  Your Honor, I have no further

JCCPSTA3                       Shapiro - Redirect

questions.  Oh, I'm sorry.  I have to move into evidence a bunch of exhibits.  Okay.  911, 655, 1042, 1242, 1235, 1031, 585, 813, 892, 1021, 273 and 856.

THE COURT:  Any objections?  No?  These are admitted without objection.

MR. CARY:  We have no objection.  We were just looking over the list to make sure the other one isn't in there.

(Plaintiff's Exhibits 911, 655, 1042, 1242, 1235, 1031, 585, 813, 892, 1021, 273 and 856 received in evidence)

MR. CARY:  Your Honor, we also have the press release handed up, which we will mark as Defendant's 5490, and we move that in.

MR. POMERANTZ:  Your Honor, we would object to that. While we had an agreement that we would withdraw objections to press releases that were on the exhibit list, this is the first time we had any notice.  And we knew which ones those were. This is the first time we were aware of this one being used as an exhibit in the case.

MR. CARY:  Your Honor, the only reason we used it as an exhibit is because Dr. Shapiro put up that erroneous exhibit that showed -- purported to show differences in prices for a plan that didn't exist a year ago.  This press release is the announcement of the plan to demonstrate that it didn't exist a year ago; so that's why it wasn't on the list.  We were using it to -- in response to the witness' testimony.

JCCPSTA3                    Shapiro - Redirect

MR. POMERANTZ:  Your Honor, if I may ask.  I may not have any objection.  I saw it for the first time this morning.

THE COURT:  Do you want to wait on this one?

MR. POMERANTZ:  If I could wait until tomorrow morning and just let your Honor know?

THE COURT:  All right.  Mr. Cary, did you have any further questions?

MR. CARY:  No, your Honor.

THE COURT:  Let me just ask one question.

Dr. Shapiro, coming back to the issue of unilateral moves and whether or not T-Mobile would likely raise prices, one difficulty that I have with this unilateral strategy is that, and I alluded to this yesterday, it is unlikely that a competitor in these circumstances is going to be so bold as to on day one or day two or month one following the merger, say we're going to increase our prices, period.

It seems counterintuitive that if they're going to do that and know that the competition is going to also raise prices and lose reputation, I think we talked about that earlier, that they wouldn't do that.

If they're going to do it, they would probably say to their customers, we're going to double the speed or we're going to have many more network outlets, or we're going to give you a plan that will combine other improvements to service, but for that, you might have to pay a little bit more.

JCCPSTA3                        Shapiro - Redirect

There, conceivably, could be some people that say, yeah, that sounds reasonable, and that's a way of raising prices.  And if the other side then comes back and says, all right, they raised prices by this means, we're going to tinker with a package that we'll say, yeah, we also will raise prices but we're going to give you more speed.  Isn't that a more plausible scenario than just having a competitor raise price from day one?

THE WITNESS:  Absolutely.  Look, first off, when you have a high-profile merger like this, I don't think the company, even if they thought it was in their interest, just in terms of the demand elasticities, are going to come right out and raise prices.  It would look -- let me just emphasize, the primary concern I've identified is not that they will raise price, it's that they will pull back from some of the price cuts or other initiatives and price cuts.  I also mean quality improvements at the same price.

So they could -- there's no real reputational harm if they just sit back, don't offer new deals.  The next cool thing that I mentioned, Sprint and T-Mobile both as being Mavericks, making pro-consumer.  If they just pull back on those, it's not like consumers were going to go, hey, what happened?  Where's that offer I thought I was going to get?  People don't think that way.

So it's not really raising price.  Sitting back and

JCCPSTA3                          Shapiro - Redirect

not lowering prices or improving quality quickly, that would be the more realistic scenario.  Also, I don't think of these things as happening in a week or quarter after the merger.  A merger is basically a permanent change in the industry, and if it's for PR reasons or reputational reasons, you know, companies would take time.  They have to deal with transitions. It's a complicated situation.  I'm not predicting that, oh, this is what's going to happen a week or month after the merger.  That's not how I think about it.

THE COURT:  All right.

MR. POMERANTZ:  Your Honor, may I ask one follow-up question to your Honor's question?

THE COURT:  Sure.

REDIRECT EXAMINATION  RESUMED

BY MR. POMERANTZ:

Q.  So, Professor Shapiro, I had asked you, I think in my first question this morning, about something called quality adjusted prices.  And so in response to the Court's question, if new T-Mobile after the merger does not raise its nominal price, the rate plans have exactly the same dollar figures in there, is there anything that new T-Mobile could do after the merger to effect quality adjusted prices in a way that would be meaningful to the consumers, that is, that might be, in fact, of lesser value to the consumer even though the nominal price doesn't change?

JCCPSTA3                    Shapiro - Redirect

A.   Well, there are a lot of non-price dimensions such as, you know, the speed, how much throttling you would get if you exceed a certain amount of usage, things like that.  So not improving those elements over time would cause consumer harm.

THE COURT:  All right.  Thank you.  You may step down.  You're excused.

(Witness excused)

Next witness?

MR. POMERANTZ:  Your Honor, our next witness is Mr. Schwartz from Comcast.  Give me a minute to rearrange.

MR. GELFAND:  Your Honor, while we're waiting, as our Honor knows, I'm a fan of introductions.  I would like to introduce the Court to Tamara Wiesebron, a lawyer from my firm.

THE COURT:  Welcome.

MR. POMERANTZ:  Your Honor, this is my colleague, Ms. Sarah Boyce and she'll be questioning the witness.

THE COURT:  Welcome.

MS. BOYCE:  Good morning, your Honor.  My name is Sarah Boyce from Munger, Tolles and Olson, on behalf of the State of California.  The States would like to call Mr. Samuel Schwartz on behalf of Comcast.

THE COURT:  The clerk will swear in the witness.

SAMUEL SCHWARTZ,
     called as a witness by the Plaintiffs,
     having been duly sworn, testified as follows:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300