**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, STATE OF KANSAS, STATE OF NEBRASKA, STATE OF OHIO, STATE OF OKLAHOMA, STATE OF SOUTH DAKOTA, STATE OF LOUISIANA, STATE OF FLORIDA, STATE OF COLORADO, STATE OF ARKANSAS, and STATE OF TEXAS | |
| Plaintiffs, | No. 1:19-cv-02232-TJK |
| vs. | |
| DEUTSCHE TELEKOM AG, T-MOBILE US, INC., SOFTBANK GROUP CORP., and SPRINT CORPORATION | |
| Defendants. | |

**BRIEF OF AMICI CURIAE**

**THE RURAL WIRELESS ASSOCIATION, INC., NEW AMERICA'S**

**<u>OPEN TECHNOLOGY INSTITUTE, AND CONSUMER REPORTS</u>**

Lela M. Ames
WOMBLE BOND DICKINSON (US) LLP
1200 Nineteenth Street, NW
Suite 500
Washington, DC 20036
Tel:    (202) 857-4427
Email: Lela.Ames@wbd-us.com

*Counsel for Amici Curiae Rural Wireless
Association, Inc., New America's Open
Technology Institute, and Consumer Reports*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.............................................................................. 1

INTERESTS OF AMICI CURIAE................................................................................................. 1

SUMMARY OF ARGUMENT ...................................................................................................... 2

INTRODUCTION........................................................................................................................... 3

ARGUMENT .................................................................................................................................. 4

I.   The Concerns Raised by Amici and Other Commenters Deserve Serious Consideration by this Court............................................................................................................................................ 4

II.  The Division Has Failed to Show That the "DISH Fix" is Timely, Likely to Succeed, and Sufficient to Overcome the Numerous Public Interest Harms Identified by Commenters, Including Amici ............................................................................................................................ 7

   A.   No Distinction Between Traditional MVNOs and Full MVNOs and Lack of Post-Paid Customers Undermine DISH Prospects.............................................................................. 8

   B.   DISH's Promised 5G Network Is an Insufficient Substitute for the Coverage Provided by Sprint's Existing Wireless Network ...................................................................................10

   C.   The Division Ignores Legitimate Competitive Concerns in Both Its Proposed Final Judgment and Its Response to Commenters ......................................................................11

   D.   The Defendants' Failure to Focus on the DISH Fix Reflects the Persistent Problems Inherent in the Proposed Solution .....................................................................................12

III. The Division's Irregular Intervention Raises Further Questions that Warrant the Court's Attention...........................................................................................................................................13

CONCLUSION..............................................................................................................................15

# TABLE OF AUTHORITIES

**STATUTES AND REGULATIONS**

15 U.S.C. § 16........................................................................................................... 3

**CASES**

*United States v. CVS Health Corp. et al.*, 407 F. Supp. 3d 45 (D.D.C. 2019)...........................5, 6

*United States v. Am. Tel. & Tel. Co. et al.*, 552 F. Supp. 131 (D.D.C. 1982).............................. 5

*New York et al. v. Deutsche Telekom AG et al.*, No. 1:19-cv-05434 (S.D.N.Y. 2019) ................. 6

**LEGISLATIVE MATERIALS**

*Antitrust Criminal Penalty Enhancement and Reform Act of 2004*, Pub. L. 108-237, Title II, § 221(a)(1)(B), 118 Stat. 661 (June 22, 2004) ............................................................................... 5

*Hearing Titled "Online Platforms and Market Power, Part 4: Perspectives of the Antitrust Agencies" Before the Subcomm. on Antitrust, Commercial & Admin. Law of the H. Comm. on the Judiciary*, 116th Cong. (2019) .......................................................................................................14

*Senate Hearings*, 119 Cong. Rec. 3449 (1973)........................................................................ 5

S. REP. NO. 93-296 (1973)........................................................................................................15

*The Antitrust Procedures & Penalties Act, Hearings Before the Subcomm. on Antitrust & Monopoly of the S. Comm. on the Judiciary*, 93d Cong. 450 (1973)… ...............................13, 14

*Questions for the Record from the Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial & Admin. Law of the H. Comm. on the Judiciary*, 116th Cong. 5 (2019)................14

**ADMINISTRATIVE MATERIALS**

U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES (Aug. 19, 2010) ...........................................................................................................................7, 10

**ARTICLES**

Michael A. Gleeson et al., *It Ain't Over Till It's Over: Review of DOJ M&A Settlements Under the Tunney Act*, 23 M&A LAWYER (Oct. 2019) ........................................................................13

Sean Hollister, *Sprint is Killing Off Virgin Mobile USA, and Virgin is Getting the Rights Back*, THE VERGE (Jan. 8, 2020) ................................................................................. 9

Joseph G. Krauss et al., *The Tunney Act: A House Still Standing*, THE ANTITRUST SOURCE (June 2007) ................................................................................................ 6

*Wireless Subscriptions Market Share By Carrier in the U.S. from 1st Quarter 2011 to 3rd Quarter 2019*, STATISTA (last visited Jan. 23, 2020) ................................................................ 2

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, Amici disclose the following:

1.      The Rural Wireless Association, Inc. ("RWA") is a private 501(c)(6) trade association formed in Delaware, has no parent company, and issues no stock.

2.      New America's Open Technology Institute ("OTI") is a nonprofit organization under section 501(c)(3) of the Internal Revenue Code. It has no parent company and issues no stock.

3.      Consumer Reports is a nonprofit organization under section 501(c)(3) of the Internal Revenue Code. It has no parent company and issues no stock.

## INTERESTS OF AMICI CURIAE

RWA is a 501(c)(6) trade association dedicated to promoting wireless opportunities for rural telecommunications companies who serve rural consumers and those consumers traveling to and through rural America. RWA's members are small businesses holding Federal Communications Commission ("FCC" or "Commission") licenses and serving, or seeking to serve, secondary, tertiary, and rural markets, each of which will be affected by the proposed merger to T-Mobile US, Inc. ("T-Mobile"), and Sprint Corp. ("Sprint"). Each of RWA's member companies serves fewer than 100,000 subscribers.

New America's Open Technology Institute ("OTI") is a 501(c)(3) public interest organization dedicated to closing the digital divide and ensuring that all Americans have equitable access to open and secure communications networks. OTI advocates for competitive markets and has participated as a public interest advocate in the instant merger review and several other merger proceedings that involved T-Mobile, Sprint, and Dish Network Corp. ("DISH"). Moreover, OTI has worked with the FCC and the U.S. Department of Justice on

1

numerous regulatory matters pertaining to the wireless industry.  OTI has a strong interest in the Proposed Final Judgment entered into by Plaintiff United States, T-Mobile, Sprint, and DISH and in seeing its interests represented before this Court.

Consumer Reports is an expert, independent, non-profit organization, founded in 1936, that works side by side with consumers for a fair, transparent, truthful, and safe marketplace. It is the world's largest independent product-testing organization, using its dozens of labs, auto test center, and survey research department to rate thousands of products and services annually.  It has been active for decades on a wide range of policy issues affecting consumers, including promoting competition in telecommunications and supporting sound antitrust enforcement.

## SUMMARY OF ARGUMENT

Mobile wireless connectivity is a necessity for all Americans, whether they reside in rural, suburban, or urban markets.  With the prospect of 5th Generation ("5G") networks, the Internet-of-Things ("IoT"), and other revolutionary services emerging around the corner, the question of who controls access to wireless connectivity is of great importance.  Today, the country's four nationwide carriers control nearly 99 percent of the wireless marketplace,[1] and now two of those carriers are attempting to merge. The U.S. Department of Justice Antitrust Division (the "Division") has concluded that the merger between T-Mobile and Sprint, as it was proposed, is harmful to competition and consumers.  Yet the Division has elected to enter into the Proposed Final Judgement[2] with T-Mobile, Sprint, and DISH (collectively, the "Defendants"), touting DISH as a white night.  However, the "DISH Fix" does little to actually

---

[1]    *See Wireless Subscriptions Market Share By Carrier in the U.S. from 1st Quarter 2011 to 3rd Quarter 2019*, STATISTA, http://www.statista.com/statistics/199359/market-share-of-wireless-carriers-in-0the-us-by-subscriptions/  (last visited Jan. 24, 2020).

[2]    *See* Proposed Final Judgement (ECF No. 2-2).

correct or overcome the insurmountable harms described by the Division in its Complaint.

The seismic change in the marketplace resulting from a transition from four nationwide carriers to just three will be too much to bear. For entry of some new, fourth, facilities-based nationwide wireless carrier to effectively avert those harms by replacing the competition lost by Sprint's exit, it would have to bring a lot more to the marketplace than what DISH could possibly be expected to bring. Importantly, the entry of such a replacement carrier would need to be *timely*, and also sufficiently robust, to overcome the harms – *i.e.*, increased prices, curtailed competition, and lack of innovation – that will otherwise befall U.S. consumers were the market to contain only three nationwide carriers. That is far from the case here. Approval of the merger will harm the public interest. It is up to this Court to use its power under the Antitrust Procedures and Penalties Act (or "Tunney Act"),[3] to refuse to approve this merger as now proposed.

Amici have authority to file this brief by virtue of the Court's Minute Order dated January 10, 2020. No person or party besides Amici has contributed money to fund the preparation or submission of this brief.

## INTRODUCTION

The proposed merger between T-Mobile and Sprint would result in a four-to-three reduction in the number of nationwide wireless service providers, and the Division has already demonstrated that the merger as it was proposed would diminish competition substantially. The Division's solution to overcome this critical loss is to have DISH step into the role of Sprint and become the United States' fourth nationwide wireless provider. As part of the Tunney Act proceedings established in this case by the Court, amici and many others submitted comments to

---

[3]     15 U.S.C. § 16.

the Division explaining why the "DISH Fix" is wholly impractical and fails to protect consumers and maintain meaningful marketplace competition.[4]  In its November 6, 2019 Response to the Court, the Division attempted to counter these concerns and defend its Proposed Final Judgment.[5]

In this brief, amici will show that: (1) as a matter of legal precedent, the substantial issues raised by amici and others in this proceeding deserve serious consideration; (2) the Division failed to address, or inadequately addressed, numerous public interest arguments raised by amici and others, implicitly showing that the "DISH Fix" is not timely, is unlikely to succeed, and, even if viewed in a light most favorable to the Division and the Defendants, is utterly insufficient to counteract the substantial harms to competition and consumers stemming from the merger; and (3) the Division's negotiated "DISH Fix" threatens to undermine public confidence in our country's antitrust enforcement.  Accordingly, amici respectfully request that the Court conduct a hearing wherein the parties and *amici* are allowed to present witnesses to testify so that the Court may have access to all of the pertinent facts regarding how the Division arrived at the "DISH Fix" and how it determined the "DISH Fix" is allegedly in the public interest.

## ARGUMENT

### I.    The Concerns Raised by Amici and Other Commenters Deserve Serious Consideration by this Court

The evolution of Tunney Act reviews has reached a point where district courts cannot confidently take the various assumptions and solutions put forth by the Division at face value.

---

[4]     *See, e.g.,* Letter from Carri D. Bennet, General Counsel, Rural Wireless Ass'n, to Scott Scheele, Esq., Telecomms. & Broadband Section Chief, Dep't of Justice Antitrust Div., at 6-19 (Oct. 11, 2019) ("RWA Tunney Act Comments") (Exhibit A).

[5]     *See* Resp. of Pl. United States to Public Comments on the Proposed Final J. at 12, 23-24, 26, 29, 38 ("U.S. Resp. to Tunney Act Comments") (ECF No. 42).

Rather, courts reviewing proposed mergers and negotiated consent decrees need to conduct a "congressionally mandated public interest inquiry" in a completely "thorough" manner.[6] When Congress amended the Tunney Act in 2004, it noted that district courts should not be limited "to review antitrust consent judgments solely to determin[e] whether entry of [a] consent judgment[] would make a 'mockery of the judicial function.'"[7] Indeed, when the Tunney Act was first introduced in 1974, Senator John Tunney, the bill's principal author and namesake, remarked that courts should allow participation by "interested persons or agencies, including [] amicus curiae intervention."[8] Last year, when this Court reviewed the consent decree entered in the proposed CVS Health Corp.-Aetna, Inc. merger, it noted that the *amici curiae* submissions it had invited "meaningfully supplemented" the existing record.[9] More importantly, the Court noted that the *amici* filings entered therein inevitably raised "substantial issues that deserved serious consideration."[10]

This Court knows well that Tunney Act reviews are not routine matters. The first major application of the law was the Ma Bell break-up in the early 1980s, wherein Judge Greene warned that courts should abstain from "unquestioningly accept[ing] a proffered decree" and avoid reverting to a mere "'rubber stamp' role."[11] Nearly forty years later, this very Court

---

[6]    *United States v. CVS Health Corp. et al.*, 407 F. Supp. 3d 45, 48 (D.D.C. 2019).

[7]    *See Antitrust Criminal Penalty Enhancement and Reform Act of 2004*, Pub. L. 108-237, Title II, § 221(a)(1)(B), 118 Stat. 661, 668 (June 22, 2004); *see also CVS Health Corp.*, 407 F. Supp. 3d at 54 n.11.

[8]    *Senate Hearings*, 119 Cong. Rec. 3449 (1973) (statement of Sen. John Tunney).

[9]    *See CVS Health Corp.*, 407 F. Supp. 3d at 48.

[10]    *Id.*

[11]    *United States v. Am. Tel. & Tel. Co. et al.*, 552 F. Supp. 131, 151 (D.D.C. 1982), *aff'd sub. nom Maryland v. United States*, 460 U.S. 1001 (1983). While the Ma Bell case was technically a modification of a pre-Tunney Act consent decree, the court nonetheless followed Tunney Act procedures. *See* Joseph G. Krauss et al., *The Tunney Act: A House Still Standing*, THE ANTITRUST SOURCE, June 2007, at 2-3.

upheld this very same Tunney Act principal: a court's review of a proposed consent decree should not be "a mere formality or judicial rubberstamp."[12]

Decades of well-established legal precedent require this Court to seriously consider the various points and supporting evidence made in previously filed Tunney Act comments and in this (and other) *amici curiae* filings. Furthermore, recent legal precedent recommends that the Court hold hearings and allow the Division, the Defendants, and *amici* to call witnesses to testify.[13] Abandoning these procedures in a case of this importance would return this Court to the role of a rubber stamp.

While the Court has allowed the filing of *amici curiae* briefs, more must be undertaken to test the "DISH Fix." There is no evidence that the Division – in the short period over which the "DISH Fix" materialized – ensured that the commitments made by DISH are even capable of being kept. While there are some scant financial penalties for failing to keep those commitments, proper due diligence was not undertaken to determine if those promises actually hold up under scrutiny. Meanwhile, in the trial undertaken by the Attorneys General of thirteen states and the District of Columbia in the United States District Court for the Southern District of New York,[14] witnesses testified under oath, and evidence was presented, which demonstrated the inability of the Defendants to deliver on those promises in a manner that is timely, likely to succeed, and sufficient to overcome the harms identified by the Division in its Complaint.

Amici request that the Court take judicial notice of the testimony and evidence presented in the State AG Merger Challenge and review the transcripts when they are made available.[15]

---

[12]     *CVS Health Corp.*, 407 F. Supp. 3d at 52.

[13]     *Id.* at 51.

[14]     *New York et al. v. Deutsche Telekom AG et al.*, No. 1:19-cv-05434 (S.D.N.Y.) (hereinafter the "State AG Merger Challenge").

[15]     Unfortunately, Amici were unable to obtain copies of any transcripts from the State AG

Alternatively, this Court should conduct its own hearing to test the parameters of the "DISH Fix" and to determine if the "DISH Fix" is likely to occur in a timely and sufficient manner such that it will counteract the competitive concerns raised by the Division and those opposed to the merger.

**II.    The Division Has Failed to Show That the "DISH Fix" is Timely, Likely to Succeed, and Sufficient to Overcome the Numerous Public Interest Harms Identified by Commenters, Including Amici**

The ultimate question as to whether T-Mobile and Sprint should be allowed to merge comes down to whether the proposed entry by DISH is an effective substitute for the exit of Sprint. Under the Division's own Horizontal Merger Guidelines, the entry of a new market participant must be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern."[16] The Division also notes the following:

> Recent examples of entry, whether successful or unsuccessful, generally provide the starting point for identifying the elements of practical entry efforts. They also can be informative regarding the scale necessary for an entrant to be successful, the presence or absence of entry barriers, the factors that influence the timing of entry, the costs and risks associated with entry, and the sales opportunities realistically available to entrants.[17]

The evidence before the Court demonstrates that the "DISH Fix" is too little, and too uncertain, and that any meaningful benefits it might ultimately provide to consumers and the marketplace would come too late. In its Tunney Act Comments submitted to the Division on October 11, 2019, for example, RWA raised a half-dozen specific market entry issues,[18] which the Division summarily dismissed with either deflection or false premises. This Court should determine

---

Merger Challenge in time to prepare this *amici curiae* brief filing.

[16]    U.S. DEPT. OF JUSTICE & FED. TRADE COMMM'N, HORIZONTAL MERGER GUIDELINES § 9 (Aug. 19, 2010), http://www.justice.gov/atr/horizontal-merger-guidelines-08192010#9 ("DOJ Horizontal Merger Guidelines").

[17]    *Id*.

[18]    *See* RWA Tunney Act Comments at 6-10.

7

whether the Division adequately addressed these and other concerns raised before rendering any decision.

### A. No Distinction Between Traditional MVNOs and Full MVNOs and Lack of Post-Paid Customers Undermine DISH Prospects

For the "DISH Fix" to ever have a chance at succeeding, DISH must, at a minimum, maintain a subscriber base starting on day one, and continuing for several years and indefinitely thereafter, despite the fact that it has *zero* experience operating as or managing a mobile virtual network operator ("MVNO"). RWA noted in its Tunney Act Comments that the wireless industry is rife with well-financed MVNOs that are failing, and that operating a 100-percent MVNO network is an inherently riskier proposition than what the four nationwide carriers provide today.[19] In its Response, the Division addressed the success and/or failure of prior large-scale MVNOs and the relevance of those ventures on *this* proposed merger and divestiture by stating the following:

> Given the difference between traditional MVNO agreements and Full MVNO agreements like the one at issue here, comparisons between DISH and traditional MVNOs that have failed in the past are inapposite.[20]

This rebuttal is meritless. The Division's own definition of "Full MVNO Agreement" in the Proposed Final Judgment has three components – one of which it shares with "traditional" MVNO agreements. And the other two components identified by the Division – those requiring a core network and physical radio access network ("RAN") – are inapplicable, as they will not be operational upon divestiture, and maybe never.[21] Indeed, under the Full MVNO Agreement (which, importantly, has not been made available for public scrutiny), DISH's core network and

---

[19]    *See* RWA Tunney Act Comments at 6.
[20]    U.S. Resp. to Tunney Act Comments at 12 n.12.
[21]    *See* Proposed Final Judgment at 4.

physical RAN would, under even the best of circumstances, not be operational for years after the divestiture. This is highly relevant because that means there is no factual distinction between a "traditional" MVNO agreement and the proposed Full MNVO Agreement. Accordingly, DISH should be viewed by the Court as nothing more than a traditional MVNO, at least in its first few years and perhaps beyond, meaning the Court should be comparing this version of DISH with prior unsuccessful MVNOs.

Also important for the Court to consider is a critical fact raised in RWA's Tunney Act Comments: while the United States' four nationwide carriers each currently serve tens of millions of post-paid subscribers, post-divestiture DISH will control a subscriber base that consists 100 percent of pre-paid subscribers.[22] Here again, the Division's sole rebuttal to this point is that DISH promises to offer post-paid services within one year of the sale's closing.[23] This delayed entry into the post-paid market, combined with the higher churn and lower average revenue per unit ("ARPU") associated with the pre-paid segment, means these are not apples-to-apples comparisons. Also noteworthy is the fact that Sprint recently announced (without fanfare) that it was shuttering its Virgin Mobile brand.[24] To the extent there exists brand loyalty in the domestic pre-paid marketplace, there is far from any guarantee that existing Virgin Mobile subscribers in the United States will remain as Boost Mobile subscribers before any potential divestiture – and certainly not after a Boost Mobile divestiture to DISH. These are both clear examples of the "DISH Fix" being not timely as a possible substitute for Sprint's exit. Furthermore, the Division's own admission that pre-paid subscribers are "generally less

---

[22]   *See* RWA Tunney Act Comments at 8.

[23]   *See* U.S. Resp. to Tunney Act Comments at 26 n.65.

[24]   *See* Sean Hollister, *Sprint is Killing Off Virgin Mobile USA, and Virgin is Getting the Rights Back*, THE VERGE (Jan. 8, 2020), http://www.theverge.com/2020/1/7/21056054/sprint-kills-off-virgin-mobile-usa-boost-mobile-transfer-february-2020.

9

profitable to serve than postpaid subscribers"[25] further supports the likelihood that DISH will, at least at the outset, if not well beyond, lack the necessary scale and profit margins that its facilities-based nationwide competitors enjoy today, thus further diminishing its realistic prospect of success. DISH's entry into the retail marketplace is no different, and certainly no better, than that of any other pure MVNOs operating today.

### B. DISH's Promised 5G Network Is an Insufficient Substitute for the Coverage Provided by Sprint's Existing Wireless Network

The Division's Horizontal Merger Guidelines state that, even if a new competitor, like DISH, were in fact to enter the market and do so in a timely manner, its "entry may not be sufficient to deter or counteract concerns."[26] For example, DISH's entry may be "insufficient due to constraints that limit [its] competitive effectiveness" or because of its inability to replicate "the scale and strength" of existing competitors.[27] In its Tunney Act Comments, RWA raised the rather simple point that DISH has committed to building out a 5G network to only 70 percent of the country's population, whereas the country's current facilities-based providers each offer services to over 90 percent of the country's population.[28] In its Response, the Division dismisses this glaring concern by contending that the 70 percent population commitment is not a prediction of the likely population (or geographic) breadth of DISH's 5G RAN and serves only as a minimum level of service.[29] This rationale is fundamentally problematic.

In order to keep its AWS-4, AWS H Bloc, and Lower 700 MHz E Block licenses, DISH

---

[25]   U.S. Resp. to Tunney Act Comments at 26 n.65.

[26]   DOJ Horizontal Merger Guidelines § 9.

[27]   *Id.*

[28]   *See* RWA Tunney Act Comments at 14; *see also* Defs.' Proposed Findings of Fact & Conclusions of Law at 11-12 ¶ 28, *New York et al. v. Deutsche Telekom AG et al.*, No. 1:19-cv-05434 (S.D.N.Y. Jan. 8, 2020) (Exhibit B).

[29]   *See* U.S. Resp. to Tunney Act Comments at 30.

has a multi-billion-dollar incentive to commit to the Division that it can and will deploy as impressive of a service-level benchmark as it believes it can achieve in that timeframe. Existing wireless competitors know that each incremental percentage increase of population coverage is exponentially more difficult and more expensive to achieve than the last. DISH also knows this. If DISH could achieve an 80 percent or 90 percent service-level benchmark in that same timeframe, it would have committed to such. It did not. By promising only to provide coverage to just 70 percent of the United States population, which equates to *not* providing coverage to the combined population of California, Texas, and Florida (the three largest states by population), it is hard to argue that DISH can even potentially qualify as a worthy *nationwide* replacement for Sprint.

### C. The Division Ignores Legitimate Competitive Concerns in Both Its Proposed Final Judgment and Its Response to Commenters

Amici raised other competitive issues in Tunney Act comments, including DISH's inability to offer inbound 5G roaming services, the fact that it will not be required to purchase the 800 MHz licenses Sprint is required to divest, and the relatively small financial penalties DISH would face for missing deployment benchmarks.[30] Among other things, the Division frames these arguments as raising "counter-productive," "misplaced," or illegitimate competitive concerns.[31] However, all of the points raised by Amici reflect the larger concern that DISH's entry as a marketplace competitor would not be timely, likely, and sufficient enough to replace the competition lost by the exit of Sprint. The Division merely claiming that DISH does not need additional low-band spectrum to succeed, for example, or that rural consumers would not benefit by having a fourth nationwide roaming replacement to Sprint, ignores the elephant in the

---

[30]     *See* RWA Tunney Act Comments at 23-24, 39.
[31]     *See* U.S. Resp. to Tunney Act Comments at 23, 24 n.54.

room: the "DISH Fix" is woefully inadequate to overcome the obvious and substantial antitrust concerns.

For example, to date, Sprint has been a good wholesale roaming partner to rural carriers who are able to leverage Sprint when their rural customers travel away from their rural homes. On day one of the new-post-merger world, DISH does not have that network and will not for several years, if ever. Additionally, the Full MVNO Agreement DISH is allegedly negotiating with T-Mobile will not allow for rural carriers to "piggy-back" and access DISH as if it were a facilities-based operator – a benefit that Sprint currently provides. Furthermore, Sprint has leased its unused spectrum in rural markets to rural carriers, including RWA members. DISH has not offered to do this with its spectrum, nor is the spectrum that DISH holds compatible with the spectrum currently held by Sprint. Instead of tackling these thorny issues, the Division glossed over them and gave these concerns short shrift.

### D. The Defendants' Failure to Focus on the DISH Fix Reflects the Persistent Problems Inherent in the Proposed Solution

The Division is not the only party glossing over the problems plaguing the "DISH Fix." In the Proposed Findings of Fact and Conclusions of Law submitted by T-Mobile and Sprint in the State AG Merger Challenge, the Defendants merely re-hash the same talking points initially included in the Proposed Final Judgment. In contrast, in their own Proposed Findings of Fact and Conclusions of Law, the state attorneys general challenging the merger provide a very compelling analysis as to why the DISH commitments are unlikely to be timely and/or insufficient in magnitude, character, and scope to create a genuine competitive presence in the relevant marketplace.[32] This Court needs to take judicial notice of these filings and the evidence

---

[32]    *See* Pl. States' Proposed Findings of Fact & Conclusions of Law at 26-29 ¶¶ 101-16, *New York et al. v. Deutsche Telekom AG et al.*, No. 1:19-cv-05434 (S.D.N.Y. Jan. 8, 2020) (Exhibit

submitted in the State AG Merger Challenge and incorporate them into the record. The Court needs to scrutinize the various legal conclusions, party commitments, and underlying facts, and conduct a hearing and call witnesses before rendering any decision.

### III. The Division's Irregular Intervention Raises Further Questions that Warrant the Court's Attention

The genesis of the Tunney Act was a lack of institutional transparency within the Division as to how it reviewed antitrust matters and negotiated the terms of consent decrees with the companies involved in the matters that were under investigation. Specifically, questions arose after the Division settled litigation with conglomerate International Telephone and Telegraph ("ITT") in 1971 under favorable terms, and the following year ITT made a contribution of $400,000 to the Republican National Committee.[33] Legislators quickly pushed to enact a law that would, in the words of namesake sponsor Senator John Tunney, "establish[] a reasonable but specific set of standards and guidelines to govern the process by which antitrust suits may be settled and consent judgments entered."[34] But Senator Tunney also presented the following warning about the antitrust review process:

> Confidence in the process by which public decisions are made is an issue in which every public official has very immediate investment. Moreover, it is an investment which must be shared with every member of the electorate…. The decision to settle a case, and the components of that settlement, may affect the price, the quantity, and the quality of the most basic commodities…. But beyond the economic effect, there is a political effect. Increasing concentration of economic power, such as has occurred in the flood of conglomerate mergers, carries with it a very tangible threat of concentration of political power. Put simply, the bigger the company, the greater the leverage it has in Washington.[35]

---

C).

[33]     *See* Michael A. Gleason et al., *It Ain't Over Till It's Over: Review of DOJ M&A Settlements Under the Tunney Act*, 23 M&A LAWYER 1, 1-2 (Oct. 2019).

[34]     *The Antitrust Procedures and Penalties Act, Hearings Before the Subcomm. on Antitrust and Monopoly of the S. Comm. on the Judiciary*, 93d Cong. 450 (1973) (statement of Sen. John Tunney).

[35]     *Id.*

The need for antitrust reviews that focus solely and transparently on the legal merits is paramount to providing public confidence and ensuring that competition is being protected in accordance with the law. For this reason, apparent departures from that focus in the current matter warrant the court's attention.

On November 13, 2019, U.S. Assistant Attorney General Makan Delrahim testified before the U.S. House of Representatives Judiciary Subcommittee on Antitrust, Commercial and Administrative Law.[36] After providing testimony to Congress, Mr. Delrahim was sent follow-up questions from Representative David N. Cicilline, Chairman of the Subcommittee. One of the questions Representative Cicilline asked Mr. Delrahim was the following:

> The states' litigation recently revealed text messages between you and executives at DISH. In one of these texts, you wrote to DISH Chairman Charlie Ergen, 'Today would be a good day to have your Senator friends contact the chairman,' referring to FCC Chairman Ajit Pai.
>
> a. Please identify all other transactions in which you have offered merging parties political advice on how to secure approval for their merger.
>
> b. Do you believe it is appropriate for the Assistant Attorney General of the Antitrust Division to offer merging parties political advice on how to secure approval for their merger?[37]

The exchange of private text messages between company executives and enforcement authorities illustrates why the drafters of the Tunney Act wanted a "district court [to] make an independent determination as to whether or not the entry of a proposed consent decree is in the public

---

[36]   *See Hearing Titled "Online Platforms and Market Power, Part 4: Perspectives of the Antitrust Agencies" Before the Subcomm. on Antitrust, Commercial and Administrative Law of the H. Comm. on the Judiciary*, 116th Cong. (2019) (Exhibit D).

[37]   *See Questions for the Record from the Honorable David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Administrative Law of the H. Comm. on the Judiciary*, 116th Cong. 5 (2019) (Questions for the Honorable Makan Delrahim, Assistant Attorney General, Antitrust Division, U.S. Department of Justice) (Exhibit E).

14

interest."[38]

The text messages from Mr. Delrahim raise additional questions about the adequacy of the Division's review – whether the Division acted too hastily in crafting the "DISH Fix," and whether the Division sufficiently vetted the "DISH Fix." These questions warrant further examination by the Court. The text messages suggest that the idea of the "DISH Fix" was in its nascent stage in May and June 2019. This is also supported by the fact that DISH was an active participant in a diverse coalition working to block the merger until June 2019. Yet, less than two months later, on July 26, the Division announced a proposed settlement to approve the merger that relied heavily on DISH's involvement, participation, and cooperation. In a matter of weeks, the Division had apparently abandoned its preparations to block the transaction, regrouped, hosted multilateral negotiations with the Defendants, and played an instrumental role in crafting a highly complex and unprecedented proposal to create an entirely new wireless provider. We question how a few weeks is a reasonable amount of time to craft such a complex remedy, and sufficiently vet it, in a manner that is consistent with sound antitrust enforcement.

## CONCLUSION

When the Division and the Defendants entered into the Proposed Final Judgment, it was readily apparent that the proposed merger should be blocked. The "DISH Fix" was developed as a last-second Hail Mary pass to secure approval and win the game. Not only has the Division failed to rebut many of the legal and factual issues raised by Amici, but it has also conducted the entire merger review and associated divestiture and consent decree negotiations with *zero* transparency and under numerous false assumptions. The Tunney Act requires this Court to intercede and to not merely take the Division's words at face value. Amici urge the Court to

---

[38]     S. REP. NO. 93-296, at 5 (1973).

15

hold a hearing, enter into evidence the transcripts, filings, and evidence made available in the State AG Merger Challenge, and make an independent determination about whether the Proposed Final Judgment is in the public interest.


Dated: January 24, 2019                    Respectfully submitted,


                                           */s/ Lela M. Ames*
                                           Lela M. Ames
                                           WOMBLE BOND DICKINSON (US) LLP
                                           1200 Nineteenth Street, NW
                                           Suite 500
                                           Washington, DC 20036
                                           Tel:    (202) 857-4427
                                           Email: Lela.Ames@wbd-us.com

                                           *Counsel for Amici Rural Wireless
                                           Association, Inc., New America's
                                           Foundation Open Technology Institute, and
                                           Consumer Reports*

16

**INDEX OF EXHIBITS**

**IN SUPPORT OF BRIEF OF AMICI CURIAE**

**THE RURAL WIRELESS ASSOCIATION, INC., NEW AMERICA'S**

**OPEN TECHNOLOGY INSTITUTE, AND CONSUMER REPORTS**

| EXHIBIT | TITLE |
|---|---|
| **A** | Letter from Carri D. Bennet, General Counsel, Rural Wireless Association, to Scott Scheele, Esq., Telecommunications & Broadband Section Chief, Antitrust Division, U.S. Department of Justice (Oct. 11, 2019) |
| **B** | Defendants' Proposed Findings of Fact and Conclusions of Law, *New York et al. v. Deutsche Telekom AG et al.*, No. 1:19-cv-05434 (S.D.N.Y. Jan. 8, 2020) |
| **C** | Plaintiff States' Proposed Findings of Fact and Conclusions of Law, *New York et al. v. Deutsche Telekom AG et al.*, No. 1:19-cv-05434 (S.D.N.Y. Jan. 8, 2020) |
| **D** | *Hearing Titled "Online Platforms and Market Power, Part 4: Perspectives of the Antitrust Agencies" Before the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary*, 116th Cong. (2019) |
| **E** | *Questions for the Record from the Honorable David N. Cicilline, Chairman, Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary*, 116th Cong. (2019) (Questions for the Honorable Makan Delrahim, Assistant Attorney General, Antitrust Division, U.S. Department of Justice) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, STATE OF
KANSAS, STATE OF NEBRASKA, STATE OF
OHIO, STATE OF OKLAHOMA, STATE OF
SOUTH DAKOTA, STATE OF LOUISIANA,
STATE OF FLORIDA, STATE OF COLORADO,
STATE OF ARKANSAS, and STATE OF TEXAS

      Plaintiffs,

vs.

DEUTSCHE TELEKOM AG, T-MOBILE US,
INC., SOFTBANK GROUP CORP., and SPRINT
CORPORATION

      Defendants.

No. 1:19-cv-02232-TJK

**BRIEF OF AMICUS CURIAE BY**

**THE RURAL WIRELESS ASSOCIATION, INC., NEW AMERICA'S**

**OPEN TECHNOLOGY INSTITUTE, AND CONSUMER REPORTS**

# EXHIBIT A

**EXHIBIT A**

RWA
RURAL WIRELESS ASSOCIATION

**October 11, 2019**

**Scott Scheele, Esq.**
**Chief, Telecommunications and Broadband Section**
**Antitrust Division, U.S. Department of Justice**
**450 Fifth Street NW, Suite 7000**
**Washington, DC 20530**

**Re:  United States v. Deutsche Telekom AG, et al., No. 1:19-cv-02232-TJK**

**TUNNEY ACT COMMENTS OF THE**
**RURAL WIRELESS ASSOCIATION, INC.**

## I.    INTRODUCTION

The Rural Wireless Association, Inc. ("RWA") is a trade association representing rural wireless carriers who each serve fewer than 100,000 subscribers.  RWA's members provide mobile and fixed wireless services to their subscribers and to the subscribers of larger carriers, while those customers roam in RWA members' rural service areas.  On August 27, 2018, RWA filed with the Federal Communications Commission ("FCC" or "Commission") a Petition to Deny the proposed merger between Sprint Corp. ("Sprint") and T-Mobile US, Inc. ("T-Mobile").[1]  Since that date, RWA has filed numerous subsequent pleadings and *ex parte* letters in the FCC docket.[2]

---

[1] *In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations*, Petition to Deny of The Rural Wireless Association, Inc., WT Docket No. 18-197 (August 27, 2018).

[2] *In the Matter of Applications of T-Mobile US, Inc. and Sprint Corporation, Consolidated Applications for Consent to Transfer Control of Licenses and Authorizations*, Petition to Deny of The Rural Wireless Association, Inc., WT Docket No. 18-197 (August 27, 2018); Reply to Opposition of the Rural Wireless Association, Inc. (October 31, 2018); RWA *Ex Parte* (December 10, 2018); RWA *Ex Parte* (February 13, 2019); RWA *Ex Parte* (March 7, 2019); RWA *Ex Parte* (April 1, 2019); RWA Supplemental Comments (April 1, 2019); RWA *Ex Parte* (April 17, 2019); Joint Open Letter to DOJ and FCC *Ex Parte* (April 18, 2019); RWA *Ex Parte* (May 30, 2019); Informal Request for Commission Action of The Rural Wireless Association, Inc. and NTCA – The Rural Broadband Association (August 5, 2019); Public Interest and Labor Organizations

**EXHIBIT A**

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("Tunney Act")[3], RWA respectfully submits the following comments on the Proposed Final Judgment ("PFJ" or "Consent Decree")[4] submitted by the United States' Department of Justice ("DOJ") in the above-referenced matter.  In the present case, on July 26, 2019, the DOJ filed with the court:  (a) a Complaint detailing how "without appropriate remedies, the merger of T-Mobile and Sprint would extinguish substantial competition"[5]; (b) a Stipulation and Order[6], which among other things, adds Dish Network Corp. ("Dish") as a defendant in the current proceeding; and (c) a PFJ/Consent Decree that purports to "preserve competition by enabling the entry of [Dish as] another national facilities-based mobile wireless network operator."[7]  Our country's antitrust laws unequivocally provide that after any proposed final judgment is "submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States," concerned parties may also submit "[a]ny written comments relating to such proposal."[8]  RWA files these comments in this case so that the court may have a more educated understanding of the anticompetitive effects that the Sprint/T-Mobile merger will have on rural consumers, and more importantly, how the entrance of Dish as a white-knight fourth nationwide

---

*Ex Parte* (August 13, 2019); Reply to Joint Opposition to Informal Request for Commission Action of The Rural Wireless Association, Inc. and NTCA – The Rural Broadband Association (August 22, 2019); Supplement to Petition to Deny of The Rural Wireless Association, Inc., *et. al*, (October 3, 2019).

[3] 15 U.S.C. § 16(e).

[4] U.S. Department of Justice, Proposed Final Judgment, *U.S. and Plaintiff States v. Deutsche Telekom AG, T-Mobile US, Inc., Softbank Group Corp., Sprint Corp., and Dish Network Corp.*, No. 1:19-cv-02232 (D.C. Cir. July 26, 2019).

[5] U.S. Department of Justice, Complaint, *U.S. and Plaintiff States v. Deutsche Telekom AG et. al*, No. 1:19-cv-02232 (D.C. Cir. July 26, 2019) at para. 3.

[6] U.S. Department of Justice, Stipulation and Order, *U.S. and Plaintiff States v. Deutsche Telekom AG, et. al*, No. 1:19-cv-02232 (D.C. Cir. July 26, 2019).

[7] PFJ at p. 2.

[8] 15 U.S.C. § 16(b).

ND: 4830-9134-2338, v. 1

**EXHIBIT A**

competitor, via the Consent Decree, does nothing to mitigate the very concerns the DOJ raised in its Complaint.

### A.  Standard of Review

Prior to any consent decree becoming final, § 16(e) of Title 15 mandates that the district court make an "independent determination"[9] that "entry of such judgment is in the public interest."[10] Indeed, when originally passing the Tunney Act, Congress felt the courts had an "independent duty"[11] to ensure that they would not act as a mere "judicial rubber stamp."[12]  Additionally, district courts presiding over antitrust matters have been advised by the U.S. Supreme Court to "pay close attention" to the enforcement provisions contained in any proposed consent decree.[13]  Furthermore, to the extent there are third-party claims that the proposed consent decree is not just insufficient, but "will cause affirmative harm, the district court should at least pause or 'hesitate' in order to consider these claims before reaching a conclusion."[14]

The role of the court is to take the public interest harms clearly identified in the Complaint and weigh them against the proposed remedies described in the PFJ and then "determine whether the remedies negotiated between the parties and proposed by the Justice Department clearly and effectively address the anticompetitive harms initially identified."[15]  There is no need for the court to look beyond

---

[9] *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C. Cir. 1995).

[10] 15 U.S.C. § 16(e).

[11] 119 Cong. Rec. 3452 (1972) (remarks of Sen. Tunney).

[12] *United States v. Thomson Corp.*, 949 F. Supp. 907, 914 (D.D.C. 1996) (quoting H.R. REP. NO. 1463, 93rd Cong., 2d Sess. 8 (1974)); see also *United States v. Microsoft Corp.*, 56 F.3d at 1458.

[13] *United States v. Microsoft Corp.*, 56 F.3d at 1462.

[14] *United States v. Microsoft Corp.*, Memorandum Opinion (Nov. 1, 2002) at p. 6.

[15] *United States v. Thomson Corp.*, 949 F. Supp. at 913.

**1 0  G  S t r e e t ,  N E .  S u i t e  7 1 0  W a s h i n g t o n ,  D C   2 0 0 0 2**
**2 0 2 - 5 5 1 - 0 0 2 5  w w w . r u r a l t e l e c o m g r o u p . o r g**    Page 3

ND: 4830-9134-2338, v.  1

the four corners of the Complaint to identify how anticompetitive the proposed merger between T-Mobile and Sprint is and how American consumers – whether in rural or urban markets – will be negatively impacted by such consolidation.  The DOJ absolutely recognizes the multitude of likely harms and shines a bright light on them.  However, what is crucial in the present case, and what must be scrutinized by the district court in its Tunney Act review, is the likelihood that the "Dish solution" as envisioned by the Defendants will alleviate the known harm identified by the DOJ.  RWA explains below why the PFJ is ineffective and more importantly why Dish is not an adequate substitute for Sprint as a fourth nationwide wireless service provider.

### B.      Summary of RWA's Comments

Section II of RWA's Tunney Act Comments provides a summary of the public interest harms identified by the DOJ in its Complaint filed against T-Mobile and Sprint.  Section III broadly speaks about why Dish's entry into the mobile wireless marketplace does not eradicate the antitrust concerns raised by the DOJ in its Complaint.  Specifically, Section III.A addresses why the same barriers to entry, that exist for any hypothetical new market player, also exist for Dish, and that these barriers are difficult, if not impossible, to overcome.  Section III.B explains why market forces are likely to diminish Dish's marketplace power, and in the process, allow the other nationwide carriers to raise prices on consumers.  Section III.C discusses in-depth how the elimination of Sprint as a reliable, stand-alone provider of domestic wholesale mobile virtual network operator ("MVNO") access and nationwide roaming services not only hurts millions of Americans, but stymies marketplace innovation in the MVNO and Internet-of-Things ("IoT") sectors.  Section III.D explains why it is likely that after the elimination of Sprint, and with Dish facing overwhelming market forces, AT&T, Verizon, and a merged Sprint and T-Mobile ("New T-Mobile") are likely to act in an anti-competitive manner as equally-sized nationwide players.  Finally, Section IV describes in detail why the provisions contained in the PFJ, the modified deadlines

sought by Dish from the FCC, and the plethora of commitments made by Dish to both the DOJ and FCC are not enough to mitigate the harms likely to occur after Sprint exits the marketplace.

## II.    SUMMARY OF PUBLIC INTEREST HARMS IDENTIFIED BY THE DOJ

The DOJ's Complaint found that the proposed merger between Sprint and T-Mobile, if allowed to proceed without any federal antitrust intervention, "would extinguish substantial competition."[16] Today, Sprint and T-Mobile each act as disruptive competitors to Verizon and AT&T.  The DOJ recognizes that allowing Sprint and T-Mobile to merge "would cause the merged T-Mobile and Sprint ("New T-Mobile") to compete less aggressively."[17]  Rather, the union would cement AT&T, Verizon, and New T-Mobile as equally-sized behemoths[18] with little incentive to try and win-over customers, like Sprint and T-Mobile do on a daily basis today.  The DOJ also noted that the proposed merger "would substantially lessen competition for retail mobile wireless service"[19] and "harm consumers" in the process.[20]  Finally, the DOJ determined that "[a]ny efficiencies generated by this merger are unlikely to be sufficient to offset the likely anticompetitive effects on American consumers in the retail mobile wireless service market, **particularly in the short term**, unless additional relief is granted."[21]

## III.    THE DOJ'S PROPOSED REMEDIES WILL NOT CURE THE PUBLIC INTEREST HARMS IDENTIFIED BY THE DOJ, INCLUDING THE ADVERSE IMPACT ON COMPETITION

While the DOJ correctly identifies the public interest harms that will result from the proposed

---

[16] Complaint at ¶ 3.

[17] Id. at ¶ 5.

[18] Id. at ¶ 16.

[19] Id. at ¶ 6.

[20] Id. at ¶ 16.

[21] Id. at ¶ 24 (emphasis added). While the "relief" contemplated by the DOJ is not defined in the Complaint, RWA believes the DOJ is referring to the existence of a fourth nationwide wireless operator.

ND: 4830-9134-2338, v. 1

**EXHIBIT A**

merger, its recommended prescription for curing them is based on false assumptions and fails to reflect the realities of what makes a successful, facilities-based wireless service provider.  The blind assumption that Dish will immediately succeed Sprint as the country's fourth nationwide carrier is not supported by any historical evidence of a new, facilities-based mobile wireless carrier entering the marketplace at the national, or even regional, level.  Rather, the history of the wireless industry in the last two decades is replete with nothing but rampant consolidation, including many notable and well-backed MVNO failed ventures.[22]  If anything, what Dish is attempting to do is launch not one, but two highly speculative business ventures:  the first venture is an MVNO, which have a verifiable and notoriously high churn rate; and the second is a nationwide, facilities-based 5G network built from the ground-up, which it plans to accomplish in less than seven years.

Unlike service providers in other tech industries such as e-commerce, content development, or software, where new industry actors can scale quickly to reach some level of market maturity and stable income streams, mobile wireless carriers require tens of billions of dollars of entrenched capital and assets (*e.g.*, towers, network core, FCC licenses) in order to compete effectively at the national level.[23] History has shown that this level of market maturity requires decades to achieve. [24]  It is not credible to

---

[22] *See* "Cox Hangs Up on Cell Phone Service", CNET (November 26, 2011), *see* https://www.cnet.com/news/cox-hangs-up-on-cell-phone-service/; "Disney Will Shut Down Cellphone Service", Wall Street Journal (September 28, 2007), *see* https://www.wsj.com/articles/SB119094140401842103; "ESPN to Shut Down Wireless Network Operations", MarketWatch (September 28, 2006), *see* https://www.marketwatch.com/story/espn-to-shut-down-wireless-network-operations; "Amp'd Mobile to Shut Down Service", FierceWireless (July 23, 2007), *see* https://www.fiercewireless.com/tech/amp-d-mobile-to-shut-down-service.

[23] "US Wireless Leaders Ramp Up Capital Spending Amid 5G Deployments", S&P Global (February 11, 2019) ("Combined, the four operators recorded a total capital expenditure of $55.71 billion during calendar year 2018, up from $53.72 billion in 2017, according to S&P Global Market Intelligence data.  These expenditures include any cash spent to maintain, improve or construct operators' networks, including interest.  Among the carriers, the biggest year-over-year jump came from Sprint Corp., which reported capex of $12.26 billion for the year, up from $9.68 billion in 2017."), *see* https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/us-wireless-leaders-ramp-up-capital-spending-amid-5g-deployments.

[24]  "T-Mobile Says It Has Seven Major Competitors, Which is Complete Nonsense," The Verge (April 30, 2018) ("Conventional wisdom, as well as facts and history, say that there are four major US wireless carriers:  Verizon, AT&T, T-

ND: 4830-9134-2338, v.  1

**EXHIBIT A**

believe or even argue that Dish will be able to compete against AT&T, Verizon, and New T-Mobile within seven years, let alone in the first few quarters or even years after the merger is consummated. The DOJ Complaint notes that the proposed merger of Sprint and T-Mobile is likely to incentivize collusion amongst the remaining players, fortify the barriers to entry by new market entrants, raise consumer prices, and decimate innovation and the ability for start-ups, like MVNOs, and IoT providers (and rural roaming partners) to remain or enter the marketplace.[25] RWA's comments address each of these likely harms and explain why Dish is incapable of becoming and remaining a nationwide competitor that can effectively compete against AT&T, Verizon, and New T-Mobile.

### A. Barriers to Entry

The DOJ has rightly concluded that "[g]iven the high barriers to entry in the retail mobile wireless service market, entry or expansion of other firms is unlikely to occur in a timely manner or on a scale sufficient to replace the competitive influence now exerted on the market by Sprint."[26] Even more, the DOJ recognizes that nationwide, facilities-based wireless carriers need both spectrum and network assets deployed nationwide in order to compete, and that "de novo entry by a facilities-based mobile wireless carrier is very difficult."[27] The Consent Decree's proposed solution to overcoming these undisputed barriers to entry is to allow Dish to acquire, upon approval of the deal, the Boost Mobile, Virgin Mobile, and Sprint pre-paid subscriber bases, and the Boost Mobile retail operations.[28]

---

Mobile, and Sprint. This has basically been true for two decades, and remains true today. If you want cellphone service in the US, you're likely going to have to pay one of those four companies or their subsidiaries, which includes the brands Virgin Mobile, Boost Mobile, and MetroPCS."), *see* https://www.theverge.com/2018/4/30/17302454/tmobile-sprint-merger-internet-competition.

[25] Complaint at ¶ 21.

[26] *Id*. at ¶ 23.

[27] Competitive Impact Statement at p. 7.

[28] PFJ at p. 4.

**1 0  G  S t r e e t ,  N E .  S u i t e  7 1 0  W a s h i n g t o n ,  D C   2 0 0 0 2**
**2 0 2 - 5 5 1 - 0 0 2 5   w w w . r u r a l t e l e c o m g r o u p . o r g**

Page 7

ND: 4830-9134-2338, v. 1

**EXHIBIT A**

Additionally, the DOJ recognizes that Dish intends to enter into a "Full MVNO Agreement" with New T-Mobile while it attempts to construct a facilities-based 5G network.[29]  Such a proposed solution is fraught with problems.  First, the various Sprint prepaid subscriber bases, which Dish estimates to include approximately 9.3 million users, are a fraction of Sprint's overall subscriber base.[30]  More importantly, that pre-paid subscriber base will generate only a fraction of the operating revenue Sprint currently enjoys, yet Dish must rely on this revenue-stream to re-invest in the type of new 5G network necessary to compete with AT&T, Verizon, and New T-Mobile.  Second, the subscribers Dish stands to inherit are 100% pre-paid. If the current Sprint pre-paid "churn" rate of 4.23%[31] holds firm, and there is zero evidence it would decrease under Dish management, that subscriber pool of 9.3 million customers inherited by Dish will dwindle to zero before Dish can launch services on its own 5G network, barring sales increases and better customer retention.  Notably, the PFJ only requires Sprint and T-Mobile to decommission "not…fewer than four hundred (400) Retail Locations, available to Acquiring Defendant immediately after such Decommissioning,"[32] and such decommissioning can take up to five years.  Put differently, there is no guarantee that Dish's retail footprint will ever match what Sprint/Boost/Virgin have today.  Third, while New T-Mobile is required to decommission Retail Sites, Dish is under no obligation to actually purchase them nor keep them open.  Accordingly, there is no realistic basis to

---

[29] "DISH to Become National Facilities-based Wireless Carrier," Dish Press Release (July 26, 2019), *see* http://about.dish.com/2019-07-26-DISH-to-Become-National-Facilities-based-Wireless-Carrier; *see also* "T-Mobile and Sprint Receive Clearance from Department of Justice for Merger to Create the New T-Mobile," T-Mobile Press Release (July 26, 2019), *see* https://www.t-mobile.com/news/t-mobile-sprint-merger-doj-clearance.

[30] "Press Release Details," Sprint Press Release (August 2, 2019) (As of June 30, 2019, Sprint had 54.3 million subscribers), *see* https://investors.sprint.com/news-and-events/press-releases/press-release-details/2019/Sprint-Reports-Fiscal-Year-2019-First-Quarter-Results/default.aspx.

[31] *Id*. (Sprint ended its Q1, Fiscal Year 2019 with a pre-paid churn rate of 4.23%.  By comparison, Sprint's post-paid churn rate for the same quarter was 1.74%.).

[32] PFJ at p. 16.

ND: 4830-9134-2338, v. 1

assume that Dish will be capable of operating as a legitimate fourth nationwide retail carrier starting on Day One after the merger.

The DOJ believes that the proposed merger of Sprint and T-Mobile will make it *harder* for a new competitor to emerge, and yet its proposed solution is to hope that Dish, with no guarantees or oversight, quickly scales-up a retail operation that under optimal circumstances has a shrinking subscriber base, a revenue stream a fraction the size of Sprint's today, and a non-guaranteed sales distribution system. In truth, the PFJ makes Dish nothing more than a second-tier MVNO, well behind TracFone with its 21.4 million subscribers.[33] As discussed more fully below, the cost and length of time it would take Dish to execute on its commitment to deploy a facilities-based 5G network with the depth and breadth of AT&T, Verizon, and New T-Mobile is a legitimate, and much bigger, barrier to entry than any of the hurdles faced by Dish in trying to successfully operate as a mid-sized, retail MVNO.

### B. Higher Prices

Another concern raised by the DOJ in its Complaint is the prospect of higher prices once Sprint disappears. Indeed, the DOJ predicts that the merger will usher in "increased prices and less attractive service offerings for American consumers."[34] More specifically, the U.S.'s antitrust watchdog anticipates that "[a]fter the elimination of Sprint, the industry's low-cost leader, New T-Mobile would have the incentive and the ability to raise prices," as would "the other remaining facilities-based mobile wireless carriers, Verizon and AT&T."[35] It is extremely unlikely that Dish could offer prices competitive with AT&T, Verizon, and New T-Mobile. Starting on Day One, New T-Mobile will control

---

[33] "About Us," América Móvil (Tracfone, the country's largest MVNO, will have post-merger over twice as many subscribers as Dish stands to inherit.), *see* https://www.americamovil.com/English/about-us/footprint/default.aspx.

[34] Complaint at ¶ 5.

[35] *Id.* at ¶ 21.

ND: 4830-9134-2338, v. 1

**EXHIBIT A**

the coverage footprint, network performance, and, most importantly, the wholesale access costs paid by Dish. All of these factors will impact Dish's retail offerings and price points. If Dish's wholesale access costs are increased, it will be forced to make corresponding increases to its retail prices, which will result in decreased retail competition to AT&T, Verizon, and New T-Mobile. Dish will not control its operating budget as the country's fourth nationwide service provider - - New T-Mobile will control that key metric.

### C. MVNO/Roaming

The DOJ anticipates that the proposed "merger's elimination of [MVNO competition provided by Sprint] likely would reduce future innovation."[36] This decrease in competition for the MVNO marketplace extends into the domestic roaming marketplace as well. Given that the Full MVNO Agreement between Dish and New T-Mobile has not been entered into, neither the DOJ nor the court have any idea of the terms, conditions, and prices that will affect Dish as an MVNO, and in return, the retail pricing Dish will be able to offer to consumers. The loss of Sprint and the creation of New T-Mobile is harmful to all American consumers (whether urban, suburban, or rural), but especially to those mobile wireless consumers in rural markets who are dependent upon nationwide, facilities-based mobile wireless carriers who provide out-of-market roaming to their local, rural mobile wireless carriers when those rural consumers travel to urban and suburban areas not served by the rural carrier. Today, AT&T, Sprint, T-Mobile, and Verizon all provide wholesale (to MVNOs) and roaming (to other domestic rural carriers) access. Noticeably, the Full MVNO Agreement between Dish and New T-Mobile is alleged to strictly forbid Dish from "re-selling" its 4G/LTE and 5G access on the New T-Mobile network to other

---

[36] *Id*. at ¶ 22.

ND: 4830-9134-2338, v. 1

**EXHIBIT A**

carriers[37], while Sprint, more than any of the Big Four, has been a champion of roaming deals with small and rural U.S. carriers.

The elimination of Sprint and the entry of Dish will mean the nation will go without a fourth wholesale or nationwide domestic roaming alternative to compete against AT&T, Verizon, and New T-Mobile for an extended period of time. It will take at least seven years for Dish to even approach what Sprint and T-Mobile each separately offer today. The inability of rural U.S. carriers to get competitive roaming deals (or independent or start-up telecommunications providers to get MVNO deals) with Dish will only further eliminate retail competition and innovation (provided by MVNOs and IoT providers) across the nation. What's more, Dish's complete inability to offer MVNO or roaming services could further reduce facilities-based competition in rural markets if rural carriers are unable to survive independently due to a dearth of commercially reasonable nationwide data roaming agreements offered by AT&T, Verizon, and New T-Mobile. Dish proclaims that it will offer 5G services, but as soon as Sprint is eliminated, rural carriers (and the consumers they serve) will lose a roaming option for 3G, 4G/LTE, and 5G services. Dish, by its own admission, will be years away from offering 5G services on a nationwide basis.

### D. Increased Coordination Between AT&T, Verizon and New T-Mobile

According to the DOJ's Complaint, "the merger would make it easier for the three remaining national facilities-based mobile wireless carriers to coordinate their pricing, promotions, and service offerings."[38] In turn, such increased coordination "harms consumers through a combination of higher

---

[37] "DISH's 5G Deployment: Exploring Opportunities with Rural Carriers," RWA Webinar Presented by Dish Corp. (August 29, 2019) ("But to be clear, the access to the [Full] MVNO Agreement is not available under [a RWA Carrier Member] brand."), *see* https://ruralwireless.org/rwa-webinars/.

[38] Complaint at ¶ 5.

ND: 4830-9134-2338, v. 1

prices, reduced quality, reduced innovation, and fewer choices."[39]  The proposed remedy for such ills is to have Dish fill the void left by the loss of Sprint and attempt to mimic the three remaining, and firmly-entrenched, facilities-based market participants.  Unfortunately, Dish would begin on Day One with one arm tied behind its back.  As discussed above, unlike Sprint today, Dish has no facilities-based network that it can utilize to sell capacity on a wholesale basis to MVNOs and IoT providers.  Nor can Dish enter into roaming agreements with rural carriers to allow for roaming in urban and suburban markets.  Accordingly, the merger will result in one less competitor providing wholesale MVNO access, roaming access, and nationwide facilities-based voice and data services directly to retail consumers, making this a 4-to-3 market consolidation.  The necessary network "ramp-up" by Dish will take many years to achieve, which the company acknowledges in its own submissions to the FCC.[40]  During the intervening years, Dish is very unlikely to be successful, based not only on the low margins and low retention rate of the pre-paid subscribers it plans on inheriting, but also because its mainline business of video satellite service is also losing hundreds of thousands of subscribers each quarter, which will hurt the parent company's finances for the foreseeable future.[41]  Additionally, Dish has yet to come forward with any specifics about the true cost of building a nationwide 5G network, and just as importantly, how it intends to finance such a massive project.  While Dish Chairman Charlie Ergen has stated on earnings conference calls that he believes a new network might cost as little as $10 billion, the wireless industry analysts call this figure "silly" and note that Verizon spends $15 billion per year just to maintain its

---

[39] *Id.* at ¶ 21.

[40] Dish Ex Parte (July 26, 2019), Attachment A.

[41] "Cord-Cutting Clips Dish Network's Profit," Wall Street Journal (May 3, 2019) ("'It's still a declining business,' Executive Chairman Charlie Ergen said during a conference call."), *see* https://www.wsj.com/articles/cord-cutting-clips-dish-networks-profit-11556911471.

ND: 4830-9134-2338, v. 1

**EXHIBIT A**

existing network.[42]  Post-merger marketplace collusion by AT&T, Verizon, and New T-Mobile will not only be easier, as recognized by the DOJ, but almost inevitable given the fact that Dish on Day One will be a mere shadow of Sprint and/or T-Mobile today, and those two companies took over 20 years to become what they are.

## IV. THE PROVISIONS IN THE PFJ, THE MODIFIED DEADLINES SOUGHT BY DISH FROM THE FCC, AND THE COMMITMENTS MADE BY DISH TO THE DOJ AND FCC ARE NOT ENOUGH TO MITIGATE THE HARMS LIKELY TO OCCUR FROM T-MOBILE'S ACQUISITION OF SPRINT.

The PFJ is based on a flawed premise – namely, that Dish will be able to serve as a capable replacement for Sprint.  Today, Sprint can offer nationwide roaming and MVNO access, and it can base its retail plans and operating budget on its control of its own FCC licenses and facilities-based network.  Starting on Day One, Dish can do none of these things.  Additionally, while Sprint can lease spectrum to rural carriers and roaming partners (something it has done for decades), Dish has no history of doing so, and Dish does not even control some of the spectrum it intends to use once it starts operating its own 5G network.  Each of these factors limits Dish from acting as a true "stand alone" nationwide, facilities-based mobile wireless operator, at least in the first decade of its existence.  If the DOJ thought that effective competition after the loss of Sprint could be achieved merely by the creation of a new nationwide MVNO, it would not have required Dish to comply with its "Nationwide 5G Broadband network build commitments" to the FCC.[43]  It stands to reason that the long-term success of a nationwide, facilities-based mobile wireless operator should be the focal-point of this court's review, not just the emergence of a successful, short-term, retail MVNO provider, which itself is not even

---

[42] "Dish's $10B Estimate for 5G Wireless Network Build 'Just Silly', Analyst Says," Multichannel News (July 26, 2019), *see* https://www.multichannel.com/news/10-billion-dollar-price-estimate-for-dish-5g-buildout-is-silly-analyst-says.

[43] PFJ at p. 23.

ND: 4830-9134-2338, v. 1

**EXHIBIT A**

guaranteed.

### A. The Proposed Remedies Are Not Reasonably Adequate to Assure That Antitrust Concerns Will Not Remain Post-Merger

As the DOJ states in the Competitive Impact Statement,  "the government need not prove that the settlements will perfectly remedy the alleged antitrust harms…it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms."[44]  Applying this standard, the court should find that the various settlements reached are not reasonably adequate remedies for the likely harms initially raised by the DOJ.  Furthermore, the "remedies" proposed by the DOJ in the PFJ are either insufficient, not feasible, based on faulty premises, and/or not capable of being accomplished in a timely manner.  There is no dispute about the likely competitive harms should the market decrease the number of nationwide, facilities-based mobile wireless providers from four to three. The Complaint makes this clear.

Dish, by its own admission, will not be a 100%, self-dependent, facilities-based, nationwide mobile wireless carrier until at least *six years* from now, and even achieving that goal is highly speculative and contingent on factors well outside of Dish's control.[45]  Even assuming Dish makes good on its 5G Broadband Service deployment commitments, it has only promised to offer wireless services to 75% of the country's ***population***, which is only a small fraction of the country's geography.  Sprint, which delivers 4G/LTE and 5G services today to over 90% of the country's population and has 5G services deployed to nine of the country's largest cities (with new 5G deployment increasing daily) is in a different league than Dish as Dish promises to deliver 5G services to only 75% of the country's

---

[44] Competitive Impact Statement at p. 21.

[45] Dish Ex Parte, Attachment A.  Dish never commits to deploying 5G to more than 75% of the country's population before the year 2025, and its Full MVNO Agreement with T-Mobile expires after seven years.

ND: 4830-9134-2338, v.  1

**EXHIBIT A**

population in six years' time.[46]  Moreover, as discussed in more detail below, it is questionable whether Dish has any intention of actually becoming a nationwide mobile wireless competitor.  Dish has no real-world wireless network experience to speak of, which should speak volumes to the court.  Operating a video satellite system that does not involve an interconnected, terrestrial network is akin to Dish playing checkers while AT&T, Verizon, and a New T-Mobile play 3-D chess.

> **B.  The PFJ's Proposed Enforcement Measures do not Provide a Sufficient Incentive for Dish to Meet its Buildout Obligations.**

In its July 26, 2019 Ex Parte, Dish makes various commitments to the FCC, including a promise to pay up to $2.2 billion if it is unsuccessful in meeting certain network deployment targets.[47]  Indeed, the DOJ relied on these network build-out commitments when making its decision to entrust Dish as a fourth nationwide competitor.[48]  A closer examination of these self-imposed financial penalties for failing to meet core-deployment and RAN deployment deadlines (which are tax-deductible because they are voluntary) shows that the penalties are not as striking or severe as DOJ appears to believe, and are heavily back-loaded.   For example, $200,000,000 of that potentially $2.2 billion penalty is for failure to deploy a core network (which is a key element to being a self-sufficient network operator), and this commitment does not have to be accomplished until June 2022.[49]  Similarly, if Dish fails to meet 100% of its interim build-out commitments for its AWS-4, AWS H Block, and 700 MHz licenses[50], which also

---

[46] Sprint currently offers 5G in Atlanta, Chicago, Dallas-Fort Worth, Houston, Kansas City, Los Angeles, New York, Phoenix, and Washington, DC.  See https://www.sprint.com/en/landings/5g.html.

[47] Dish Ex Parte, Attachment A.

[48] PFJ at p. 23.

[49] Dish Ex Parte, Attachment A.

[50] Having already missed its FCC-imposed interim construction deadlines for its AWS-4, 700 MHz Lower E Block, and AWS H Block licenses, Dish is currently required to build out to 70% of the population for each AWS-4 and 700 MHz Lower E Block license by March 7, 2020, and 75% of the population for each AWS H Block license by April 29, 2022. Letter from Donald K. Stockdale, Jr., Chief, FCC Wireless Telecommunications Bureau to Dish Network Corp. (July 9, 2018), see https://docs.fcc.gov/public/attachments/DOC-352379A1.pdf.  The FCC's interim license build-out deadlines, let

ND: 4830-9134-2338, v. 1

have a self-imposed deadline of June 2022, the most it will pay is $198,000,000.[51]  What this effectively means is that Dish can attempt to operate only as an MVNO and not deploy any core network or any 5G Broadband Services, and it will only face a total financial penalty of less than $400,000,000 by June 2022.  Indeed, Dish would be better off biding its time, operating only as an MVNO, and then selling its spectrum at a later date rather than invest the tens of billions of dollars needed to build a nationwide, facilities-based 5G network in several years.  With respect to building a nationwide, 5G network in seven years, it would be impossible for any carrier to accomplish that if they are starting from basically nothing, which is where Dish is starting.

### C. <u>Other Dish Commitments to the DOJ and FCC Are of Little Value or Significance</u>

In addition to relying on Dish's promise to deploy 5G to only 75% of the country's population by 2025 (leaving a quarter of the country's population without a fourth nationwide provider for at least six years), the DOJ relies on other Dish commitments that may sound impressive on paper but are highly speculative, not capable of being completed in a timely manner, or completely infeasible.  First, Dish promises to deploy services using its 600 MHz licenses on an "accelerated" basis.[52]  However, Dish only agrees to this commitment if it also gets build-out extensions for hundreds of its other FCC licenses in the 700 MHz and AWS Bands.[53]  Second, Dish offers to "waive" its flexible use rights for all of these FCC licenses and instead voluntarily consent to deploying 5G Broadband Service "as a special condition of the licenses."[54]  However, in so doing, Dish is not forgoing anything meaningful.  All it is doing is

---

alone its final build-out deadlines, are generally not that difficult to meet for established and well-intentioned wireless carriers.

[51] Dish Ex Parte, Attachment A.

[52] *Id*.

[53] *Id*.

[54] Dish Ex Parte, Attachment A.

**1 0  G  S t r e e t ,  N E .  S u i t e  7 1 0  W a s h i n g t o n ,  D C   2 0 0 0 2**
**2 0 2 - 5 5 1 - 0 0 2 5   w w w . r u r a l t e l e c o m g r o u p . o r g**

Page 16

ND: 4830-9134-2338, v. 1

waiving its right to deploy a non-5G, narrowband IoT ("NB-IoT") network that would allow it to meet its current buildout deadlines for its AWS-4, Lower 700 MHz E Block, and AWS H Block licenses. A key part of the PFJ is that the FCC extend the construction deadlines for those very same licenses. Because Dish is committed to deploying 5G and would be required to do so in the timeframe mandated by the PFJ, there is no reason Dish would choose to exercise its flexible use rights. Accordingly, its offer to waive such rights is simply a meaningless gesture.

For Dish to successfully operate as a nationwide, facilities-based mobile wireless operator, it must deploy a facilities-based network and manage that network and a correspondingly vast retail operation, day-in and day-out. Dish has no history of deploying wireless facilities on a nationwide basis, and its commitments to the DOJ and FCC that it would do so are clouded by numerous caveats. Moreover, Dish has also made commitments that seem to suggest it has no intent to be a "carrier" beyond six or seven years.

## D. Various Dish Commitments Provide It An Opportunity to Exit the Mobile Marketplace In Six or Seven Years.

The Tunney Act requires a reviewing court to determine that any consent decree entered into between the defendants and the DOJ is in the public interest. Whatever proposed settlement is reached must have some reasonable expectation of addressing the antitrust concerns raised by the U.S. government. In the present case, the Complaint is unequivocal in determining that a 4-to-3 consolidation of the marketplace is inherently anticompetitive and against the public interest. Should Sprint be allowed to exit the marketplace, a legitimate fourth facilities-based, truly nationwide, competitive carrier needs to take its place. RWA's comments list numerous reasons why Dish is unable to meet this burden. In addition, Dish by its own words, has created specific opportunities to exit the marketplace. For example, Dish never actually agrees to acquire and deploy 800 megahertz spectrum

**EXHIBIT A**

currently held by Sprint. According to the terms of the PFJ, New T-Mobile is definitely required to divest "all of Sprint's 800 MHz spectrum holdings."[55] However, Dish is not mandated to acquire any of the divested 800 MHz licenses, so long as it pays a financial penalty. The PFJ stipulates that Dish can bypass its option to purchase this spectrum and instead "pay a penalty of $360,000,000 to the United States" government.[56] However, even the entirety of this financial penalty can be waived if Dish "has deployed a core network and offered 5G Service to at least 20% of the U.S. population over DISH's facilities-based network within three (3) years of the closing of the divestiture of the Prepaid Assets,"[57] a goal that can be accomplished by Dish deploying rudimentary service to just the top six or seven Metropolitan Statistical Areas,[58] which means the rest of the nation is stuck with only three nationwide, facilities-based competitors who can act in concert to raise pricing. Similarly, just as with the Boost Retail Locations and the 800 MHz licenses, Dish is not obligated to purchase any New T-Mobile Decommissioned Cell Sites. What the PFJ demands is that New T-Mobile divest no fewer than 20,000 Cell Sites, but Dish is under no obligation to actually purchase any of these 20,000 Cell Sites.[59]

In its July 26, 2019 Ex Parte, Dish also "consents" within six years of the transaction closing "not to sell its AWS-4 and 600 MHz spectrum" or "lease, directly or indirectly, to any of the three largest wireless providers, or any combination thereof, traffic accounting for more than 35% of the

---

[55] PFJ at p. 5.

[56] *Id*. at 12.

[57] *Id*.

[58] The U.S. Census Bureau estimates the current U.S. Population at 327 million people. The combined populations of the New York-Newark, Los Angeles-Long-Beach-Anaheim, Chicago, Dallas-Fort Worth-Arlington, Houston, Washington-Alexandria-Arlington, and Miami-Fort Lauderdale-West Palm Beach is nearly 70 million people. *See* https://www.census.gov/topics/population/data.html.

[59] PFJ at p. 13.

ND: 4830-9134-2338, v. 1

network capacity on its 5G network."[60]  These are peculiar voluntary commitments.  They suggest that Dish wants to be able to exit the mobile wireless industry after six years, and just prior to when its Full MVNO Agreement with T-Mobile expires.  After seven years, if Dish has a radio access network ("RAN") that cannot operate on a geographic level competitive with AT&T, Verizon, or New T-Mobile, it will be forced to rely on roaming agreements, just like RWA's members.  And because the Full MVNO Agreement with New T-Mobile expires after seven years, New T-Mobile has no incentive to extend whatever initial pricing it has extended to Dish after such date, which means that Dish cannot rely on New T-Mobile coverage long-term.  Accordingly, Dish has sought specific language that makes it entirely possible to sell its entire spectrum portfolio (and subscriber base) to one of the three remaining legacy carriers and face no Department of Justice or Federal Communications Commission repercussions.

## V.    CONCLUSION

Prior to a court adopting any proposed consent decree, 15 U.S.C. § 16(e)(1) requires a court to first make a public interest determination.  When making this determination, a court is obligated to consider:

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from the determination of the issues at trial.[61]

---

[60] Dish Ex Parte at p. 4.

[61] 15 U.S.C. § 16 (e)(1)(A) and (B).

ND: 4830-9134-2338, v. 1

**EXHIBIT A**

As demonstrated above, the proposed merger is not in the public interest.  In the present case, the competitive impact of the PFJ is rather straight forward.  First, there is no guarantee that New T-Mobile, together with AT&T and Verizon, will promote MVNO and roaming access to other companies, refrain from raising prices, or abstain from coordinating their efforts, in large part because Sprint, a wireless company which has been operating nationwide for decades, will cease to exist, and Dish, which has zero experience constructing or operating a commercial, terrestrial mobile wireless network, will not be a facilities-based operator for at least three years, if at all.  Second, all of the court-imposed checks-and-balances and Dish-proposed voluntary financial penalties do nothing to address the actual level of consumer choice in the marketplace or benefit consumers in any way.  Potential enforcement mechanisms administered by the FCC and DOJ come many months or even years after they are triggered and the consumer harms are incurred.  Additionally, the potential monetary "fines" go to the U.S. Treasury, which also does nothing to aid American consumers.  Third, some of the terms contained in the PFJ, if not "ambiguous" on their face, at least raise eyebrows about Dish's intent to quickly scale-up a retail operation comparable to that of Sprint or deploy a facilities-based wireless network the size and breadth of Sprint's.  It is worth reminding the court that Dish has already failed to meet FCC construction build-out deadlines in the recent past, and has admitted it will be unable to offer any type of MVNO or roaming access to consumers, rural carriers, or innovative IoT providers in the short and medium terms.  Finally, all of these harms likely to emerge from the merger between Sprint and T-Mobile, which Dish will be incapable of mitigating, will not be localized and in fact will be felt across

ND: 4830-9134-2338, v.  1

**EXHIBIT A**

the country.  For all of these reasons, RWA respectfully requests that the court reject the PFJ submitted by the DOJ and the Plaintiff States.

Respectfully submitted,

The Rural Wireless Association, Inc.

By: _____

Carri D. Bennet
*General Counsel*
Daryl Zakov
*Assistant General Counsel*

October 11, 2019

ND: 4830-9134-2338, v. 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, STATE OF
KANSAS, STATE OF NEBRASKA, STATE OF
OHIO, STATE OF OKLAHOMA, STATE OF
SOUTH DAKOTA, STATE OF LOUISIANA,
STATE OF FLORIDA, STATE OF COLORADO,
STATE OF ARKANSAS, and STATE OF TEXAS

       Plaintiffs,

vs.

DEUTSCHE TELEKOM AG, T-MOBILE US,
INC., SOFTBANK GROUP CORP., and SPRINT
CORPORATION

       Defendants.

No. 1:19-cv-02232-TJK

**BRIEF OF AMICUS CURIAE BY**

**THE RURAL WIRELESS ASSOCIATION, INC., NEW AMERICA'S**

**OPEN TECHNOLOGY INSTITUTE, AND CONSUMER REPORTS**

# EXHIBIT B

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, *et al.*<br><br>     *Plaintiffs,*<br><br>   v.<br><br>DEUTSCHE TELEKOM AG, *et al.*<br><br>     *Defendants.* | Case No. 1:19-cv-5434 (VM) (RWL)<br><br>ECF Case<br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br><u>**PUBLIC VERSION**</u> |

**EXHIBIT B**

## TABLE OF CONTENTS

### [PROPOSED] FINDINGS OF FACT

I. INDUSTRY OVERVIEW ......................................................................... 2

    A. Mobile Wireless Networks Must Meet Increasing Consumer Demand ....................... 2

    B. A Growing Array of Providers Compete As Retail Mobile Wireless Providers .......... 4

II. THE WORLD WITH THE MERGER WILL BE BETTER FOR CONSUMERS THAN THE WORLD WITHOUT THE MERGER .................................................................. 6

    A. The Merger Will Make New T-Mobile a More Formidable Competitor and Enable DISH to Be a Disruptive New Entrant ................................................................. 6

    B. Without the Merger, the Parties Will Be Competitively Constrained and Consumers will Suffer as a Result ............................................................................ 13

III. RELEVANT MARKETS AND CONCENTRATION ........................................ 17

    A. The Relevant Product Market Includes MNOs and MVNOs ................................... 17

    B. The Relevant Geographic Market is the United States, Not CMAs ........................... 18

    C. The Post-Merger Herfindahl-Hirschman Index Is Below 2,500 ............................... 19

IV. ECONOMIC EVIDENCE CONFIRMS THE MERGER BENEFITS CONSUMERS ... 19

    A. Adverse Unilateral Effects are Unlikely ............................................................ 20

    B. Coordinated Interaction is Unlikely .................................................................. 21

### [PROPOSED] CONCLUSIONS OF LAW

I. PLAINTIFFS HAVE NOT ESTABLISHED A PRESUMPTION OF ILLEGALITY .... 24

II. THE MERGER IS UNLIKELY TO SUBSTANTIALLY LESSEN COMPETITION ... 25

    A. The Transaction Will Result in Lower Prices and Higher-Quality Wireless Services for Consumers ............................................................................................ 26

    B. Sprint Is Losing Competitive Significance ......................................................... 27

    C. DISH Will Immediately Be a Disruptive New Entrant ........................................... 27

    D. The Transaction Is Not Likely to Produce Adverse Unilateral Effects or Coordinated Interaction ........................................................................................... 28

III. THE MERGER SHOULD NOT BE PERMANENTLY ENJOINED ........................ 29

# EXHIBIT B

## TABLE OF AUTHORITIES

**Federal Cases**

*California v. Am. Stores*,
495 U.S. 271 (1990)....................................................................................................30

*Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.*,
403 F. Supp. 3d 191 (S.D.N.Y. 2019)......................................................................25

*Consol. Gold Fields, PLC v. Anglo Am. Corp. of S. Africa Ltd.*,
713 F. Supp. 1457 (S.D.N.Y. 1989)..........................................................................30

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)....................................................................................................30

*FCC v. WNCN Listeners Guild*,
450 U.S. 582 (1981)....................................................................................................30

*FTC v. Arch Coal*,
329 F. Supp. 2d 109 (D.D.C. 2004) ...................................................... 24, 26-27, 29

*State of New York v. Kraft Gen. Foods, Inc.*,
862 F. Supp. 1030 (S.D.N.Y. 1993)..........................................................................29

*United States v. AT&T Inc.*,
310 F. Supp. 3d 161 (D.D.C. 2018)......................................................................26, 29

*United States v. Baker Hughes, Inc.*,
908 F.2d 981 (D.C. Cir. 1990)..........................................................................23, 26, 28

*United States v. Country Lake Foods, Inc.*,
754 F. Supp. 669 (D. Minn. 1990)............................................................................26

*United States v. Gen. Dynamics Corp.*,
415 U.S. 486 (1974)..................................................................................23-24, 26-27

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)....................................................................................................25

*United States v. Int'l Harvester Co.*,
564 F.2d 769 (7th Cir. 1977) ....................................................................................27

**EXHIBIT B**

*United States v. Long Island Jewish Med. Ctr.*,
  983 F. Supp. 121 (E.D.N.Y. 1997) .......................................................................27

*United States v. M.P.M., Inc.*,
  397 F. Supp. 78 (D. Colo. 1975).........................................................................27

*United States v. Marine Bancorp.*,
  418 U.S. 602 (1974)........................................................................... 23-24

*United States v. Waste Mgmt. Inc.*,
  743 F.2d 976 (2d Cir. 1984)............................................................... 28-29

**Other Authorities**

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) ...... 24-25, 28

**EXHIBIT B**

## [PROPOSED] FINDINGS OF FACT

1.   The pending merger of T-Mobile and Sprint will result in American consumers—urban, suburban, and rural alike—paying lower prices for higher-quality wireless services.  The combined company ("New T-Mobile") will have substantially more capacity and a drastically lower cost structure than would either standalone company, enabling it to super-charge its Un-carrier strategy and aggressively compete for customers from AT&T and Verizon.

2.   Plaintiffs have failed to carry their burden to prove that the world with this merger is likely to be substantially less competitive than the world without it.  The record evidence before the Court establishes that this merger will increase, not decrease, competition.  This determination is fortified by the entry of DISH, which will compete on Day 1 while simultaneously building its own network using its substantial (and currently unused) spectrum holdings to create a new high-capacity nationwide 5G network.

3.   Both the Federal Communications Commission ("FCC") and the Antitrust Division of the Department of Justice ("DOJ") have already concluded that the transaction before the Court is procompetitive and in the public interest.[1]  Those expert agencies conducted lengthy and exhaustive investigations into the transaction.[2]  The FCC concluded that the merger will "deliver benefits directly to [] customers, while also yielding dynamic competitive benefits as [T-Mobile and Sprint] create a strong alternative to" Verizon and AT&T.[3]  The FCC emphasized that "[b]uilding leading 5G networks is of critical importance to our nation . . . and holds the potential . . . to create three million new jobs . . . and $500 billion in GDP."[4]  The DOJ similarly found the

---

[1] Ex. 5385 (FCC Order), at 4, 168; Ex. 5386 (DOJ Response to Public Comments on PFJ), at 10; Ex. 5363 (DOJ PFJ). (References to exhibit page numbers refer to the page numbers of the exhibits themselves, not the underlying documents if different.)

[2] Ex. 5385 (FCC Order), at 4; Ex. 5386 (DOJ Response to Public Comments on PFJ), at 10.

[3] Ex. 5385 (FCC Order), at 168.

[4] Ex. 5385 (FCC Order), at 3 (quotation marks omitted); *see also* Trial Transcript ("TT") 1144:25-1149:7 (Ray).

1

**EXHIBIT B**

transaction before the Court to be procompetitive, in part because the merger and related

conditions would "provide substantial long-term benefits for American consumers by ensuring

that large amounts of currently unused or underused spectrum are made available to American

consumers in the form of advanced 5G networks" and would result in "stronger 5G competition

and expanding output."[5]

4.   Because Plaintiffs failed to carry their burden of proving that this merger will

substantially lessen competition and that enjoining this merger is in the public interest, the Court

denies their request for a permanent injunction and finds as follows.

## I.   INDUSTRY OVERVIEW

### A.   Mobile Wireless Networks Must Meet Increasing Consumer Demand

5.   A mobile wireless network consists of cell sites (radio equipment typically located on

towers or rooftops) that send and receive radio signals from mobile wireless devices using radio

spectrum licensed from the FCC, and other components that connect the cell sites with one

another and with other communications networks, such as the Internet.[6]

6.   A mobile wireless network operator ("MNO")—a wireless service provider that

operates its own wireless network—must provide pervasive coverage for its customers

nationwide and sufficient capacity to support the data usage that its customers demand, at the

speeds that those customers expect, and at a cost that allows it to compete effectively.[7]

7.   An MNO's ability to meet growing consumer demand depends significantly on the

type of spectrum it has available.[8]  Mobile wireless networks must generally operate on their

---

[5] Ex. 5386 (DOJ Response to Public Comments on PFJ), at 4, 35.
[6] TT 1149:18-1152:21 (Ray); Ex. 8180 (Ray Dem.), at 2.
[7] TT 1143:1-25 (Ray); Ex. 5060, at 6-7; Ex. 5078, at 6, 15.
[8] TT 1172:8-1173:6 (Ray); 506:21–507:6 (Bluhm); Ex. 5060, at 13.

Case 1:19-cv-02232-TJK-RWL Document 63-1 35 Filed 01/24/20 Page 51 of 153
Case 1:19-cv-05434-VM-RWL Document 357 Filed 01/08/20 Page 7 of 40

**EXHIBIT B**

own spectrum frequencies to avoid interference.[9]  Spectrum is a scarce and costly resource.[10] The FCC controls access to spectrum and allocates it by weighing the interests of different users, including the U.S. military and other government users as well as, among many others, television and radio broadcasters.[11]

8.     The spectrum used for mobile wireless networks is classified into three groups by frequency range—low-band, mid-band, and mmWave—and each group has distinct characteristics.  Low-band spectrum penetrates buildings and propagates well, including over distances up to 18 miles, and thus requires fewer expensive towers and associated equipment.[12] But low-band spectrum is the most scarce.[13]  Without low-band spectrum, achieving widespread coverage requires significant and potentially prohibitive operating expenditures.[14]  Mid-band spectrum does not propagate or penetrate buildings as well as low-band spectrum.[15]  mmWave spectrum has an effective range of just 200-300 yards and it cannot penetrate buildings and other obstacles.[16]

9.     The mobile wireless industry is transitioning to the fifth generation of mobile wireless technology, referred to as "5G."[17]  5G will allow far greater speeds and lower latency, enabling new applications, such as unlimited high-definition video, automated vehicles, and augmented and virtual reality.[18]  5G will also enable applications not yet developed or even imagined, just as occurred in the industry's last generational transition to 4G/LTE.[19]

---

[9] TT 1149:18-1153:1 (Ray).
[10] TT 939:4-9 (Legere); 1152:22-1155:3, 1179:10-1180:5, 1225:3-12, 1254:6-11 (Ray).
[11] TT 1149:18-1155:3, 1223:15-1225:2 (Ray).
[12] TT 1152:22-1155:3 (Ray); Ex. 8180 (Ray Dem.), at 3; *see* TT 498:17-25 (Bluhm); Ex. 6003, at 9-10.
[13] TT 1152:22-1155:3 (Ray); 2133:25-2134:2 (Kolodzy).
[14] TT 499:15-22, 506:21-507:6 (Bluhm).
[15] TT 1152:22-1155:3 (Ray); Ex. 8180 (Ray Dem.), at 3; *see* Ex. 6003, at 9-10.
[16] TT 1152:22-1155:3 (Ray); 1478:21-1479:1 (Kapoor); Ex. 8180 (Ray Dem.), at 3.
[17] TT 1026:7-20, 1027:8-1028:7 (Sievert).
[18] TT 926:19-929:6 (Legere); 1157:19-1159:1 (Ray).
[19] TT 2214:12–2215:2 (Scott Morton); 157:19-1159:1 (Ray); *see also* Ex. 5385 (FCC Order), at 26-27.

10. MNOs must stay ahead of ever-increasing consumer demand for mobile wireless data and add capacity or the quality of their networks will degrade.[20] Industry sources, including T-Mobile, Verizon, AT&T, Cisco, and Ericsson, predict data usage growth of at least 30% each year for the foreseeable future.[21] 5G will place further demands on mobile networks.[22] 5G users are expected to demand more than five times the data as 4G/LTE users.[23] The more data customers demand from a fixed amount of network capacity, the lower the speed.[24] Adding capacity allows an MNO to maintain or improve performance, but it is costly.[25]

**B. A Growing Array of Providers Compete As Retail Mobile Wireless Providers**

11. Verizon and AT&T are the two largest U.S. MNOs[26] and have superior spectrum positions.[27] Verizon also provides wired broadband Internet and television under its Fios brand.[28] AT&T similarly provides wired broadband Internet and cable television under the U-Verse brand and satellite television under the DirecTV brand. AT&T also owns major video content providers, including HBO and CNN.[29]

12. T-Mobile is the third largest U.S. MNO.[30] T-Mobile was able to build a nationwide 4G/LTE network due in significant part to the about $3 billion in spectrum and the $3 billion "breakup fee" it received from AT&T when the companies abandoned a previous attempted merger.[31] T-Mobile also used the increased financial wherewithal to acquire MetroPCS (with its

---

[20] TT 920:6-22 (Legere); 1144:1-21 (Ray); Ex. 5400, at 6; Ex. 5060, at 4, 7.

[21] Ex. 8181, at 19-21; *see also* Ex. 7052, at 1; Ex. 7002, at 3; Ex. 5385 (FCC Order), at 220; Ex. 5411.

[22] TT 239:25-241:6 (Höttges); 1442:20-1447:6 (Kapoor); Ex. 5281; Ex. 5060, at 5.

[23] Ex. 8180 (Ray Dem.), at 4; TT 1157:4-12 (Ray); TT 502:17-22 (Bluhm); *see also* Saw Dep. 195:19-25.

[24] TT 1162:18-1163:14 (Ray).

[25] TT 920:23-921:10 (Legere); 1163:15-1164:10 (Ray); 1457:18-1459:9, 1468:9-23 (Kapoor); Ex. 5400, at 18, 22; Ex. 8180 (Ray Dem.), at 5-8; Ex. 9999 (Kapoor Dem.), at 8.

[26] TT 44:16-44:24 (Sole); 237:1-16 (Höttges); Ex. 1258 (Shapiro Dem.), at 15; Ex. 8181 (Katz Dem.), at 13.

[27] TT 259:15-260:7 (Höttges); 1089:25-1090:7 (Sievert); Ex. 5303, at 21.

[28] TT 1067:4-1068:2 (Sievert); Ex. 5200, at 4.

[29] TT 1068:3-15 (Sievert); Ex. 5197, at 3-4; Ex. 5200, at 4; Ex. 5306, at 5.

[30] TT 167:10-12 (Höttges); Third Amended Complaint ("AC") ¶ 17; Ex. 1258 (Shapiro Dem.), at 15; Ex. 8181 (Katz Dem.), at 13.

[31] TT 915:23-917:4 (Legere); 162:15-163:4, 234:2-20 (Höttges); *see also* 1249:3-1252:6 (Ray).

4

Case 1:19-cv-02232-TJK Document 63-1 Filed 01/24/20 Page 53 of 153
Case 1:19-cv-05434-VM-RWL Document 357 Filed 01/08/20 Page 9 of 40

**EXHIBIT B**

network and spectrum) and to purchase more spectrum from Verizon.[32]  These resources

significantly increased T-Mobile's network quality and capacity, enabling T-Mobile to launch its

"Un-carrier" strategy, focused on eliminating customer "pain points."[33]  These included

"restrictive contracts,"[34] "confusing rate plans,"[35] international roaming charges,[36] and, from

2016, data overage charges by introducing unlimited data plans.[37]  The Un-carrier strategy also

features aggressive pricing and value propositions[38] aimed at maximizing the long-term value of

the company.[39]  "Un-carrier" is a distinct and valuable pro-consumer brand identity,[40] a key

factor in T-Mobile's attracting and retaining subscribers.[41]  T-Mobile's success has put pressure

on its network capacity and ability to maintain its Un-carrier strategy.[42]

13.  Sprint is the fourth largest U.S. MNO.[43]  Sprint offers "an inferior product," which

has led to a "vicious cycle" of churn, decreased revenues, and inability to invest in network

improvements, followed by more churn.[44]  A key issue for Sprint is poor coverage and

consistency.[45]

14.  Retail mobile wireless services are also sold by regional MNOs such as U.S. Cellular

and mobile virtual network operators ("MVNOs") like TracFone, the largest MVNO with 22

million subscribers.[46]  MVNOs contract with MNOs for network access, which they then use to

---

[32] TT 915:23-917:4 (Legere); Ex. 5010, at 12-13.
[33] TT 884:2-886:7; 915:23-919:5 (Legere); 1056:23-1057:21 (Sievert); Ex. 5010, at 7, 12, 15, 27; *see also* Exs. 5015, 5017, 5021, 5023, 5035, 5036, 5039, 5042, 5054, 5088, 5117, 5127, 5149, 5192, 5290 (Un-carrier moves).
[34] TT 884:2-886:7 (Legere); Ex. 5103, at 7.
[35] Ex. 5103, at 7.
[36] TT 884:2-886:7 (Legere); Ex. 5021.
[37] TT 896:3-897:12 (Legere); Ex. 5127 (T-Mobile ONE Press Release).
[38] TT 235:21-236:25 (Höttges); 922:18-923:6 (Legere).
[39] TT 1057:22-1061:18 (Sievert); Ex. 5020, at 2, 6; Ex. 5033, at 3-4.
[40] TT 884:2-886:7, 897:13-898:2, 909:7-909:17, 1018:10-1020:1 (Legere).
[41] TT 909:18-911:1 (Legere); 1088:23-1090:10 (Sievert); *see* Ex. 5219, at 14.
[42] TT 918:4-919:5, 920:6-22, 922:18-923:6 (Legere); Ex. 5375 at 2, 15-20; Ex. 5312, at 7; Ex. 5358, at 6-7.
[43] TT 167:6-12 (Höttges); Ex. 1258 (Shapiro Dem.), at 15.
[44] TT 1395:11-23 (Combes).
[45] TT 129:6-131:1, 146:21-148:12 (Rittgers); 499:7-14, 506:21-508:3, 510:18-511:2 (Bluhm); Ex. 6066, at 19-20.
[46] TT 645:6-15 (Shapiro); Ex. 5294, at 1.

provide mobile wireless services to their retail customers.[47] Large cable companies—Comcast, Charter, and Altice—have also recently begun to offer retail mobile wireless services.[48] These operators use their own infrastructure, such as proprietary wireless routers in customers' homes and WiFi hot spots, to provide mobile wireless broadband,[49] and use agreements with one or more MNOs to provide nationwide coverage where WiFi is not available.[50]

## II. THE WORLD WITH THE MERGER WILL BE BETTER FOR CONSUMERS THAN THE WORLD WITHOUT THE MERGER

15. The merger will result in a network with significantly more capacity and a lower cost of adding incremental capacity. New T-Mobile will thus have significantly lower marginal costs and significantly higher quality than the standalone networks,[51] which, in turn, will generate billions of dollars of consumer benefit in the form of lower prices and better services.[52]

### A. The Merger Will Make New T-Mobile a More Formidable Competitor and Enable DISH to Be a Disruptive New Entrant

16. **New T-Mobile.** New T-Mobile will have an unprecedented high-quality, low-cost network,[53] a fact undisputed at trial. Each merging party has assets that fix the other's main competitive challenge: T-Mobile's low-band spectrum addresses Sprint's coverage problems, Sprint's mid-band spectrum addresses T-Mobile's capacity problems.[54] Combining those complementary assets creates a network with double the total capacity, and three times the 5G

---

[47] TT 543:15-25 (Boubazine); Ex. 5294, at 1; Ex. 8181 (Katz Dem.), at 8.
[48] TT 812:21-24, 865:25-866:2 (Schwartz); 538:13-17 (Boubazine); 982:14-17, 1013:10-25 (Legere); 1072:6-15 (Sievert); Ex. 5303, at 18-19; Ex. 5306, at 6-7; Ex. 8139, at 1-2.
[49] TT 850:7-851:25 (Schwartz).
[50] TT 1071:1-1072:15 (Sievert); 539:16-18 (Boubazine).
[51] TT 1784:17-1785:9 (Katz); 1434:18-25; 1501:14-1502:23 (Kapoor).
[52] TT 1784:17-1785:9 (Katz); 1025:15-1026:3, 1029:7-1030:7, 1040:20-1041:18 (Sievert); 1159:2-1160:22 (Ray); Ex. 5197, at 6; Ex. 5236, at 52, 55; Ex. 5241, at 2; Ex. 5248, at 10; Ex. 5277, at 7, 8.
[53] TT 923:12-925:4 (Legere); 1023:16-1024:4 (Sievert); 1145:3-1149:7 (Ray); 1784:17-1785:9 (Katz); Ex. 5284, at 9-10; *see also* Ex. 8180 (Ray Dem.), at 11.
[54] TT 1177:25-1179:9 (Ray); Ex. 5242 at 3-4; Ex. 5248 at 14.

Case 1:19-cv-02232-TJK   Document 63-1   Filed 01/24/20   Page 55 of 153
Case 1:19-cv-05434-VM-RWL   Document 357   Filed 04/03/20   Page 51 of 40

**EXHIBIT B**

capacity, of the two standalone networks.[55]  Costs, however, will not increase proportionately.[56]
The combined network will thus have a much lower marginal cost than either standalone
network.[57]  The merger will also greatly increase network quality, with speeds fifteen times
greater than today and with better consistency across the network.[58]

17.  The capacity of a wireless network is determined by (1) the number of cell sites,
multiplied by (2) the amount of spectrum deployed per site, multiplied by (3) the efficiency with
which the deployed spectrum transmits information (spectral efficiency).[59]  New T-Mobile
increases each element.[60]  First, New T-Mobile adds about 11,000 Sprint cell sites to its network,
realizing significant synergies from decommissioning the rest of Sprint's cell sites (which will
then be offered to DISH).[61]  Second, the combination of T-Mobile's and Sprint's spectrum
portfolios multiplies capacity by deploying Sprint's spectrum on T-Mobile's towers, and T-
Mobile's spectrum on the retained Sprint towers.[62]  Third, New T-Mobile will have greater
spectral efficiency because, with its greater capacity, New T-Mobile can deploy the more
spectrally efficient 5G sooner to more people, without degrading 4G/LTE user experiences.[63]
New T-Mobile will also be better able to use the merging parties' spectrum across both time
(*e.g.*, T-Mobile's network in a location may be congested, while Sprint's is not) and space (*e.g.*,
using Sprint's mid-band spectrum to serve users close to the cell site and conserving T-Mobile's

---

[55] TT 923:12-925:4, 928:25-929:6 (Legere); 1184:10-1185:8, 1188:12-1189:4 (Ray); 1301:7-14 (Claure); Ex. 8180 (Ray Dem.), at 11-12; *see also* TT 1027:8-1028:7 (Sievert); Ex. 5385 (FCC Order), at 73; Ex. 5386 (DOJ Response to Public Comments on PFJ), at 4.
[56] TT 1024:5-18 (Sievert); 1197:24-1198:6 (Ray); 1784:17-1785:9 (Katz); 1847:6-1852:14 (Katz); Ex. 5277, at 31, 33; Ex. 8181 (Katz Dem.), at 33, 38.
[57] TT 923:23-924:3 (Legere); 1434:18-25; 1501:14-1502:23 (Kapoor); 1848:13-1849:5, 1842:25-1844:11, 1866:17-1869:3, 1887:15-19 (Katz); Ex. 5385 (FCC Order), at 105-106; Ex. 5386 (DOJ Response to Public Comments on PFJ), at 20 & n.31.
[58] TT 923:12-925:4 (Legere); 1191:9-23 (Ray); Ex. 8180 (Katz Dem.), at 60.
[59] TT 1043:13-1046:24 (Sievert); 1165:9-1166:2 (Ray); Ex. 8180 (Ray Dem.), at 6, 8.
[60] TT 923:12-925:4 (Legere); 1181:3-1185:8, 1166:3-25 (Ray).
[61] TT 1043:13-1046:24 (Sievert); TT 1168:24-1169:15, 1184:10-1185:8 (Ray); Ex. 5363 (DOJ PFJ), at 13.
[62] TT 928:25-929:6 (Legere); 1027:8-1028:7, 1030:14-25, 1035:25-1036:8, 1044:17-1046:15 (Sievert); Ex. 5236, at 71; Ex. 5241, at 3; Ex. 5248, at 14.
[63] TT 1180:6-23 (Ray); 1483:3-20 (Kapoor).

7

# EXHIBIT B

low-band spectrum to ensure high performance on the "edge" or outer limit of the cell site).[64]

18. Sustained growth in user demand will eventually require New T-Mobile to add capacity, but New T-Mobile will be able to do so more cheaply than either standalone company could because it will have more spectrum and improved spectral efficiency.[65]

19. Massive capacity and lower marginal costs will give New T-Mobile a strong incentive to attract new customers through lower prices and higher quality.[66] New T-Mobile's business plan contemplates passing on the benefits of the merger to consumers by lowering prices and improving quality to take share from competitors.[67] In T-Mobile's words, the merger will "supercharge the Un-carrier strategy" and allow T-Mobile to continue to be disruptive.[68] "[B]ecause of the rapidly expanding capacity of [the] network and the rapidly falling costs that flow from that capacity, [New T-Mobile is] going to be able to take price competition, lower prices and a better quality product to AT&T and Verizon, and increasingly, to big cable."[69] T-Mobile has already announced its first "New T-Mobile Un-carrier move": a plan at 50% of the cost of its cheapest current plan, providing unlimited talk and text and 2GB of data for $15 per month, which will be offered to all consumers the day the merger closes.[70]

20. The merger will achieve substantial cost savings. T-Mobile projects $43.6 billion in net cost savings by 2024 on a net present value basis,[71] the majority of which ($25.7 billion)

---

[64] TT 1171:13–1173:6 (Ray); 1849:6-1852:14 (Katz); Ex. 8181 (Katz Dem.), at 39; Ex. 5385 (FCC Order), at 107.
[65] TT 1176:18-1177:18 (Ray); 1887:20-1888:5 (Katz).
[66] TT 1034:12-25 (Sievert); TT 758:12-19 (Shapiro) 1847:16-1848:4 (Katz); 1849:6-1852:14 (Katz); Ex. 5236, at 52; Ex. 5277, at 7.
[67] TT 926:17-18, 935:9-14 (Legere); 1023:16-1024:4, 1025:15-1026:3 (Sievert); 185:24-186:17, 262:12-14 (Höttges); 744:10-24 (Shapiro); 1901:2-25 (Katz); Ex. 5197, at 6.
[68] TT 918:4-919:5 (Legere); 1057:6-21 (Sievert); 345:7-16, 367:21-369:20 (Langheim); 242:15-246:19 (Höttges); Ex. 5197, at 5, 12; Ex. 5236, at 60; Ex. 5241, at 3, 4; Ex. 5277, at 4.
[69] TT 1023:16-1024:4, 1023:23-1024:2 (Sievert); 1175:24-1176:14 (Ray); Ex. 5197, at 6; Ex. 5236, at 73; Ex. 5277, at 4.
[70] TT 1090:11-1092:5 (Sievert); Ex. 5387.
[71] TT 1031:25-1032:17 (Sievert); Ex. 5241, at 12; Ex. 5277, at 31.

8

Case 1:19-cv-02232-TJK Document 63-1357 Filed 01/24/20 Page 57 of 153
Case 1:19-cv-05434-VM-RWL Document 357 Filed 01/03/20 Page 13 of 40

**EXHIBIT B**

come from decommissioning redundant network infrastructure.[72] T-Mobile has provided its synergy assessments to investors.[73]

21. The merger will also increase competition for in-home broadband,[74] for which currently most Americans only have one or at most two choices.[75] New T-Mobile will use part of the increased network capacity from the merger to launch a new in-home broadband service at a lower price than the incumbents.[76] New T-Mobile's in-home broadband will reach underserved rural areas, reducing the "digital divide."[77] Existing broadband providers will need to respond to this threat by reducing their prices, benefitting all in-home broadband consumers.[78] This will challenge cable companies in particular, including those that testified against the merger.[79]

22. T-Mobile's successful integration of the MetroPCS network in 2013 verifies that the expected benefits of the combination with Sprint are likely to be realized and accomplished on schedule.[80] Plaintiffs' expert testified that successful prior mergers can be relevant "real world proof" that anticipated benefits are verifiable.[81] Integrating the Sprint network will be similar to integrating the MetroPCS network, with the same types of benefits.[82] In some respects, it will be easier, as more than 80% of Sprint handsets are compatible with the T-Mobile network, versus none with MetroPCS at the time.[83] T-Mobile completed the integration early (by almost a year)[84] and exceeded projected synergies (by $2–3 billion).[85] The MetroPCS integration enabled T-

---

[72] TT 1044:10-1047:13 (Sievert); Ex. 5277, at 31, 33.
[73] Ex. 5236 (Ratings Agency Presentation), at 44.
[74] Ex. 5385 (FCC Order), at 125-27; Ex. 5241, at 4, 30, 31.
[75] TT 1054:17-1056:1 (Sievert); 1303:7-1304:5 (Claure); Ex. 5277, at 21.
[76] TT 926:19-929:6 (Legere); 1054:17-1056:1 (Sievert); Ex. 5277, at 21, 24; Ex. 5248, at 9; Ex. 5336, at 4-5, 11-12.
[77] TT 1159:2-1160:1 (Ray); Ex. 5277, at 4, 20-21; Ex. 5385 (FCC Order), at 120.
[78] TT 1054:17-1056:1 (Sievert).
[79] TT 1303:9-1304:5 (Claure).
[80] TT 1200:19-1201:2 (Ray); 1062:1-1065:18 (Sievert); 250:20-251:14 (Höttges); 1886:23-1887:14 (Katz).
[81] TT 734:13-23 (Shapiro).
[82] TT 1062:1-16 (Sievert); 1202:5-20, 1203:18-1206:6 (Ray); Ex. 5248 at 22-23; Ex. 5251 at 13-14; *compare* Ex. 5010, at 28 (MetroPCS cost synergies), *with* Ex. 5277, at 31-37 (projecting Sprint cost synergies).
[83] TT 222:2-12 (Höttges); 1204:12-1206:6 (Ray).
[84] TT 1203:14-17 (Ray).
[85] TT 1063:2-17, 1064:17-1065:18 (Sievert); 1201:3-9 (Ray).

Case 1:19-cv-02232-TJK   Document 63-1357   Filed 01/24/20   Page 58 of 153
Case 1:19-cv-05434-VM-RWL   Document 357   Filed 01/03/20   Page 14 of 40

**EXHIBIT B**

Mobile to give customers better service at lower prices[86] and to almost double MetroPCS's subscribers.[87]

23. T-Mobile's commitments to the FCC and to the DOJ—which essentially lock in the existing business plan for the New T-Mobile[88]—provide additional certainty beyond the economic incentives discussed above that New T-Mobile will build a network with these capacity and coverage benefits.[89] Within six years, New T-Mobile's network will give 99% of Americans access to download speeds at or above 50 Mbps and 90% at or above 100 Mbps.[90] T-Mobile also committed that, for at least three years after the merger is closed, New T-Mobile will make the same or better rate plans available as those offered by T-Mobile or Sprint as of February 2019.[91]

24. In addition to the verification provided by T-Mobile's previous experience realizing similar efficiencies and its commitments to the FCC and DOJ, T-Mobile also quantified those efficiencies using a capacity planning model, which it uses in the ordinary course to project when and where capacity will be constrained and to identify the most cost-efficient way to add capacity before congestion degrades customer experience.[92] T-Mobile's model predicts congestion with 99.4% accuracy and is used to forecast out for five years.[93] T-Mobile updated the model to account for 5G and incorporate the assets it would acquire from Sprint.[94] The model confirms that the New T-Mobile network will have much lower costs and higher quality than the standalone networks in each year for at least the next five years.[95]

---

[86] TT 1063:23-1064:16 (Sievert); 1201:10-1202:20, 1271:22-1272:12 (Ray); 1503:3-22 (Kapoor).
[87] TT 1202:21-1203:12 (Ray).
[88] TT 1209:23-1210:10 (Ray).
[89] TT 931:15-932:22 (Legere); 1093:22-1094:8 (Sievert).
[90] Ex. 5385 (FCC Order), at 12; Ex. 8180 (Ray Dem.), at 16.
[91] TT 934:13-935:8 (Legere); Ex. 5385 (FCC Order), at 12.
[92] TT 1432:9-1433:16, 1433:25-1434:8 (Kapoor).
[93] TT 1438:24-1439:2, 1469:8-21 (Kapoor).
[94] TT 1470:22-1480:6 (Kapoor).
[95] TT 1434:18-25, 1438:24-1439:2 (Kapoor).

**EXHIBIT B**

25. None of these benefits would be realized without the merger.[96]

26. **DISH.**  DISH has a substantial spectrum portfolio, including substantial low-band spectrum, making it uniquely positioned to enter the retail mobile wireless market.[97]  DISH has more low-band spectrum than Sprint and more mid-band spectrum for downlink use than Verizon.[98]  The divestiture provides DISH with more than 9 million subscribers and retail infrastructure.[99]  It gives DISH the successful Boost brand and it allows DISH to assume existing contracts with master dealers with approximately 7,500 retail locations complementary to DISH's stores, to assume contracts with prepaid subscribers served by these brands, and to employ hundreds of Boost personnel.[100]  DISH will also have the option to acquire all company-owned or operated retail locations New T-Mobile decommissions—a minimum of 400 stores.[101]

27. At the outset, DISH will provide services to an unlimited number of subscribers using the high-quality New T-Mobile network under a nationwide Master Network Services Agreement ("MNSA").[102]  This agreement lasts at least seven years and has an unprecedentedly low wholesale rate that declines over time, on a much higher-quality network than Sprint's network.[103]  DISH will thus have a low cost structure, on a better network, with which to price aggressively on a sustained basis and win customers.[104]

28. Meanwhile, DISH will build out a standalone mobile 5G broadband network using

---

[96] TT 930:23-931:14, 1014:18-1015:12 (Legere); 1032:18-20, 1093:13-16 (Sievert).
[97] TT 938:14-939:3 (Legere); 1137:15-1138:17 (Sievert); 1215:10-15 (Ray); 1575:7-1576:3 (Ergen); 1753:15-1754:6 (Cullen); Ex. 5386, at 22.
[98] TT 1214:12-1215:2, 1215:10-15 (Ray); 1137:15-1138:17 (Sievert).
[99] TT 116:6-7 (Rittgers); 1597:2-14 (Ergen); Ex. 1205, at 4.
[100] TT 146:13-20 (Rittgers); 1590:9-23; 1597:2-14 (Ergen); 1753:12-14 (Cullen); Ex. 1205, at 11; Ex. 5363 (DOJ PFJ), at 4.
[101] Ex. 5363 (DOJ PFJ), at 5, 16; Ex. 5385 (FCC Order), at 15.
[102] TT 129:14-131:1; 149:8-150:15; 152:22-153:3 (Rittgers); 1086:24-1087:11 (Sievert); Ex. 1205, at 13.
[103] TT 1086:24-1087:11 (Sievert); 1591:9-1593:11 (Ergen); Ex. 5363 (DOJ PFJ), at 19.
[104] TT 1086:24-1088:15 (Sievert); 1651:18-1653:3 (Ergen); Ex. 5386 (DOJ Response to Public Comments on PFJ), at 30-31.

**EXHIBIT B**

its spectrum to cover at least 70% of the U.S. by 2023.[105]  DISH was already in the process of deploying a narrowband "Internet of Things" network, with about 1,000 towers.[106]  Network infrastructure companies, large U.S. technology companies, and cloud service providers have submitted proposals to DISH for 5G network equipment.[107]  DISH has an extensive team of experienced engineers and business people working on its retail mobile wireless business.[108] DISH plans to deploy 50,000 cell sites by 2025.[109]  It has identified over 32,000 towers on which it could quickly deploy its equipment and has master agreements with the owners of those towers.[110]  DISH also will have available all of the cell sites that New T-Mobile decommissions (around 35,000 sites).[111]

29.  DISH's entry, through the deployment of its unused spectrum, will further increase the amount of wireless capacity in the market, *in addition to* that which will result from combining Sprint and T-Mobile.[112]  The MNSA will give DISH flexibility to focus and prioritize its network buildout.[113]  With no legacy technologies to support, DISH's network costs will be comparatively low.[114]  From day one, DISH will have the incentive to attract customers with low prices anticipating the "owner economics" it will have with its network.[115]

30.  If DISH does not honor its commitments to the FCC and DOJ to enter the retail wireless market and build its 5G network, it would suffer significant fines, lose billions of dollars

---

[105] TT 1614:17-1615:15 (Ergen); Ex. 5385 (FCC Order), at 163; Ex. 7202, at 3-4.
[106] TT 1580:1-8 (Ergen).
[107] TT 1756:22-1758:2 (Cullen).
[108] TT 1576:24-1578:16 (Ergen); 1750:22-1751:18 (Cullen).
[109] Ex. 7199 (DISH Business Plan), at 17.
[110] TT 1755:24-1756:6 (Cullen).
[111] TT 930:18-25 (Legere); 1168:24-1169:15 (Ray); Ex. 5363 (DOJ PFJ), at 13.
[112] TT 1137:15-1138:17 (Sievert); Ex. 5386 (DOJ Response to Public Comments on PFJ), at 28-29.
[113] TT 1595:23-1596:9 (Ergen); 363:4-365:4 (Langheim); Ex. 5386, at 25-26.
[114] TT 1086:24-1088:15 (Sievert); 1620:21-1623:5 (Ergen); 1761:20-1762:10 (Cullen); Ex. 5386, at 28.
[115] TT 1611:10-1612:21 (Ergen).

Case 1:19-cv-02232-TJK   Document 63-1   Filed 01/24/20   Page 61 of 153
Case 1:19-cv-05434-VM-RWL   Document 357   Filed 01/03/20   Page 17 of 40

**EXHIBIT B**

of spectrum,[116] and could be held in contempt of court.[117]  And, penalties for noncompliance

aside, DISH has a strong profit incentive to build the 5G network it has committed to build.[118]

    **B.**   **Without the Merger, the Parties Will Be Competitively Constrained and Consumers will Suffer as a Result**

31.  **Standalone T-Mobile.**  In contrast to the transformative network enabled by the

merger, standalone T-Mobile would need to make increasingly expensive network investments to

increase capacity.[119]  T-Mobile will face the prospect of raising prices to finance this investment,

reducing quality, or some combination.[120]  Without the merger, customers would suffer as T-

Mobile will be handicapped in its ability to "continue to grow and win customers."[121]

32.  The looming capacity crunch at T-Mobile and its likely adverse effects on

competition are apparent, and have been for some time.  In 2015, AT&T concluded that T-Mobile

would have "significant underutilized capacity" and would "price aggressively and gain share

until ~2020" but, after that (absent the merger), "the industry [would] return[] to relatively

symmetric capacity utilization," and less aggressive pricing.[122]

33.  Plaintiffs' experts conducted "sensitivities" as to theoretical alternative strategies that

T-Mobile might follow to acquire new capacity, but offered no opinions regarding whether T-

Mobile would, or feasibly could, actually pursue those strategies.[123]  Primarily, those experts

suggested T-Mobile might acquire new spectrum, but the FCC concluded that it "generally

agree[s] with [T-Mobile and Sprint] that commenters have not identified forthcoming spectrum

---

[116] Ex. 5363 (DOJ PFJ), at 12; Ex. 5385 (FCC Order), at 6, 166-68; Ex. 5386 (DOJ Response to Public Comments on PFJ), at 4, 26.

[117] Ex. 5363 (DOJ PFJ), at 34-35.

[118] TT 1565:9-13, 1730:1-1731:10 (Ergen).

[119] TT 1545:25-1546:12 (Kapoor); Ex. 5312, at 7; Ex. 5219, at 13.

[120] TT 922:4-923:6 (Legere); 1228:11-25 (Ray); 1842:25-1844:11, 1844:15-1845:21 (Katz); Ex. 5375, at 20.

[121] TT 918:4-923:6 (Legere); 239:25-241:6 (Höttges).

[122] Ex. 7000, at 4.

[123] TT 2126:18-21 (Kolodzy); 2228:12-15 (Scott Morton); *see also* TT 2231:1-2233:6, 2233:17-2235:7, 2235:8-2236:16 (Scott Morton).

auctions or other sources that could enable the standalone companies to acquire the equivalent to what they each would gain through the proposed transaction, or on a similar timeframe."[124] Similarly, AT&T has observed that "potential new . . . spectrum does not change this dynamic" of loss of capacity leading to less aggressive pricing.[125] T-Mobile's primary need is mid-band spectrum, and such spectrum is "very hard to come by in the U.S."[126] The only mid-band spectrum with a scheduled auction is CBRS,[127] which is "experimental" and "plagued with challenges," including that it is available only when the Department of Defense is not using it.[128] Its power limitations make it unable "to provide broad coverage" and "expensive to deploy."[129] Plaintiffs' engineering expert did not attempt to quantify the impact of these limitations.[130] The only other foreseeable FCC auction is for "C-band" spectrum, but the timing and outcome of any auction is speculative.[131] C-band is also higher frequency than Sprint's mid-band spectrum and therefore would require many more cell sites, and using C-band spectrum would also require new phones for all users and new radios, which presently do not even exist.[132] Likewise, very little spectrum has historically been available on the secondary market, and secondary spectrum transactions are becoming less frequent as industry-wide capacity needs have increased.[133]

34. Plaintiffs' engineering expert conceded it is speculative that T-Mobile would acquire any spectrum.[134] T-Mobile would need to outbid Verizon and AT&T, among others, both of which have significantly greater financial resources than T-Mobile and face the same need for

---

[124] Ex. 5385, at 114.
[125] Ex. 7000, at 5, 17.
[126] TT 1152:22-1155:3 (Ray); Ex. 5385 (FCC Order), at 114.
[127] TT 2133:18-24 (Kolodzy).
[128] TT 1223:8-1225:2 (Ray).
[129] TT 1223:8-1225:2 (Ray); 2130:7-2131:6 (Kolodzy); Ex. 5219, at 13.
[130] TT 2132:9-20 (Kolodzy).
[131] TT 1219:2-1221:7 (Ray); 2134:3-5 (Kolodzy).
[132] TT 1221:8-1222:6 (Ray); 2101:15-2102:8 (Kolodzy).
[133] TT 1225:3-12 (Ray).
[134] TT 2133:6-10, 2134:3-15, 2135:12-18 (Kolodzy).

spectrum to add capacity to their own networks.[135]  Even if T-Mobile could acquire more spectrum, that spectrum alone would not come close to enabling consumer benefits comparable to the merger with Sprint.[136]

35.  Nor would it be economically feasible for T-Mobile to build enough new cell sites (including small cells) to "densify" its network as an alternative to the merger, because building the hundreds of thousands of cells required would cost hundreds of billions of dollars.[137]

36.  Standalone T-Mobile would face additional challenges with the transition to 5G because it will still need to serve its current 4G/LTE subscribers.  T-Mobile will need to repurpose 4G/LTE spectrum to 5G while it is in use, which will strain its limited spectrum.[138] Although Plaintiffs' experts hypothesized that T-Mobile might use dynamic spectrum sharing someday, that technology uses rather than expands capacity, is unproven, and "in no manner or form" would address T-Mobile's capacity limitations.[139]  Plaintiffs' engineering expert conceded the technology has substantial inefficiencies and that these were not reflected in his modeling.[140]

37.  **Standalone Sprint.**  Sprint will be a significantly diminished competitor without the merger.[141]  Sprint has been losing Sprint-branded phone subscribers over the past several years.[142]  Sprint's post-paid churn is higher than it has ever been[143] and is double that of AT&T, Verizon, and T-Mobile.  Its churn among post-paid phone subscribers in the third quarter of 2019 was 1.91% and is expected to be even greater in the fourth quarter of 2019.[144]  At that rate, Sprint

---

[135] TT 1219:24-1221:7 (Ray); 227:15-228:18 (Höttges).
[136] TT 1137:15-1138:17 (Sievert).
[137] TT 1217:23-1218:12, 1168:5-23 (Ray).
[138] TT 1180:6-23 (Ray).
[139] TT 1216:13-1217:12 (Ray); 1499:10-22 (Kapoor); Bluhm Dep. at 72:14-73:6.
[140] TT 2140:18–2141:3 (Kolodzy).
[141] TT 1832:8-1833:13 (Katz).
[142] TT 103:1-16 (Solé); Ex. 6068, at 3.
[143] TT 103:17-23 (Solé).
[144] TT 1383:2-1383:21 (Combes).

Case 1:19-cv-02232-TJK Document 63-1 Filed 01/24/20 Page 64 of 153
Case 1:19-cv-05434-VM-RWL Document 357 Filed 01/03/20 Page 20 of 40

**EXHIBIT B**

would have to replace almost a quarter of its subscribers in one year just to stay even.[145]

38.  Sprint's decline is mainly due to its poor network quality, particularly its poor geographic coverage, poor in-building penetration, and inconsistency within its footprint.[146] Sprint's network deficiencies are driven by a lack of low-band spectrum, poor technological decisions, and a history of underinvestment in its network.[147]  There is no realistic way, aside from the merger, to break the "vicious cycle" of poor network quality leading to subscriber losses and reduced network investment, leading to even worse network quality.[148]  Sprint cannot obtain low-band spectrum through spectrum auctions, as none are foreseen.[149]  Sprint has largely abandoned its previous unsuccessful strategy of offering aggressive "step-up" price promotions while it tried to improve its network.[150]  Sprint is increasing prices, and without the merger it will continue to do so and will retreat from nationwide service, becoming at most a regional MNO.[151] In sum, Sprint's competitive significance will continue to diminish.

39.  **<u>DISH without the merger.</u>**  Absent the merger and attendant remedies, consumers would be deprived of the benefits of the capacity and competition DISH would bring into the market, as DISH otherwise has no plan to enter the retail mobile wireless market and would likely sell enterprise services rather than consumer services.[152]

---

[145] TT 1383:22-1384:5 (Combes).
[146] TT 129:6-131:1, 146:21-148:12 (Rittgers); 499:7-22, 506:21-508:3, 510:18-511:2 (Bluhm); Ex. 6066, at 19-20.
[147] TT 510:6-513:15 (Bluhm); 1280:10-22, 1284:23-1285:11, 1288:12-1289:13, 1373:13-1374:8, 1379:21-1381:18 (Combes); 1278:4-20, 1283:16-1284:22, 1362:11-1364:10 (Claure); Ex. 1202, at 9, 10; Ex. 1205, at 13; Ex. 6003, at 2; Ex. 6021, 4; Ex. 6034, at 11-13, 18; Ex. 6066, at 33-37; Ex. 6068, at 2, 8; Saw Dep. 72:20-73:21.
[148] TT 532:12-533:2 (Bluhm); 1300:4-1301:14 (Claure); 1395:11-23, 1397:19-1399:25, 1400:9-1402:11 (Combes); Ex. 6068, at 8; Ex. 6091, at 14.
[149] TT 515:1-5 (Bluhm); 2133:25-2134:5 (Kolodzy).
[150] TT 1285:12-1287:19 (Claure); 1397:4-18, 1426:3-6 (Combes); 91:9-93:5 (Sole); Ex. 6066, at 23.
[151] TT 1300:4-1301:14, 1312:18-1313:14 (Claure).
[152] TT 1762:21-1763:13 (Cullen); *see also* 1358:1-1359:13 (Claure).

**EXHIBIT B**

## III. RELEVANT MARKETS AND CONCENTRATION

### A. The Relevant Product Market Includes MNOs and MVNOs

40. The relevant product market is retail mobile wireless services.[153] As MVNOs and cable companies provide consumers the same types of services as MNOs, MVNOs are market participants when assessing market shares.[154] MVNOs and MNOs all compete.[155] As noted, TracFone has more than 22 million subscribers.[156] Comcast, Charter, and Altice are successful recent entrants.[157] Comcast has attracted about 2 million subscribers in about two years,[158] more retail subscribers than AT&T and Verizon gained, combined, over the same period.[159]

41. MVNOs are independent competitors. MVNOs control their prices and customer service and can control network quality through the terms of their arrangements with the MNOs.[160] MVNOs' pricing can be lower than MNOs' pricing. For example, Altice offers a $30 per-line, per-month plan that includes "unlimited everything, including data,"[161] an offer Altice considers a "disruptive value proposition."[162] Current Altice customers receive a further $10 per-month, per-line discount.[163] Not surprisingly, T-Mobile and the other MNOs now consider these entities to be their competitors, and vice versa.[164] MVNO costs have declined over time, and Plaintiffs' economic expert, Dr. Carl Shapiro, conceded that MVNOs are "acting very

---

[153] TT 627:15-18 (Shapiro).
[154] TT 812:21-813:4, 858:3-859:19 (Schwartz); 199:16-200:1 (Höttges); 287:8-16 (Langheim); 1071:1-1072:15 (Sievert); 1798:18-1799:4, 1801:2-1802:23 (Katz); 140:19-141:4 (Rittgers).
[155] TT 859:12-859:19, 861:25-862:3 (Schwartz); 573:18-24, 576:1-7 (Boubazine); 1081:13-14 (Sievert).
[156] TT 1080:9-12, 1080:22-24 (Sievert).
[157] TT 812:21-813:4 (Schwartz); 573:22-24, 575:15-17 (Boubazine); 1071:1-1074:1, 1079:4-16 (Sievert); Ex. 5334, at 4; Ex. 7070, at 1; ; Ex. 6028, at 2.
[158] TT 812:25-813:1, 816:16-18 (Schwartz); 140:19-141:4 (Rittgers); *see* Ex. 5303, at 18.
[159] TT 812:25-913:1, 816:16:18 (Schwartz); 982:9-22 (Legere); 1071:1-1072:15 (Sievert).
[160] TT 863:5-13 (Schwartz); 1801:24-1802:12 (Katz).
[161] TT 587:23-588:12 (Boubazine); Ex. 7070, at 1.
[162] TT 588:13-14 (Boubazine).
[163] TT 588:8-11 (Boubazine); Ex. 7070, at 1.
[164] TT 1079:22-1080:21, 1081:13-1082:14 (Sievert); 575:18-577:2, 578:11-579:8 (Boubazine); 1799:1-4, 1803:16-1804:8 (Katz); 287:8-16 (Langheim); 859:4-19, 861:25-862:3 (Schwartz); *see* Ex. 5120, at 23-25; Ex. 5197, at 3; Ex. 5495 at 1.

17

Case 1:19-cv-02232-TJK-RWL Document 63-1357 Filed 01/24/2020 Page 66 of 153
Case 1:19-cv-05434-VM-RWL Document 357 Filed 01/03/20 Page 22 of 40

**EXHIBIT B**

competitively" today.[165]

42. MVNOs will benefit from the high-quality networks with substantial excess capacity of New T-Mobile and DISH through lower wholesale prices and higher quality.[166]

### B. The Relevant Geographic Market is the United States, Not CMAs

43. The relevant geographic market is the United States.[167] Pricing for wireless plans is national and based on national competition.[168] It is not practical to price locally given that most advertising is national and the ease of online shopping.[169] Pricing and network quality do not vary geographically based on the number of providers, market concentration, or market shares.[170] Efforts to market locally "never work" and are a "complete and total waste of time,"[171] because there "is a consumer marketplace for national pricing, consumers buy national pricing, consumers are programmed to see offers on national media, they're programmed to see offers on . . . websites. The country is more mobile than it's ever been before, customers are traveling from market to market, from area to area, and they don't have any tolerance for inconsistent pricing in this particular industry."[172]

44. Furthermore, to meet customer expectations, network quality must be substantially consistent across the United States.[173] T-Mobile makes network decisions at a national level and has a national performance standard.[174] Local competitive conditions do not influence T-

---

[165] TT 544:5-12 (Boubazine); 770:3-10 (Shapiro).
[166] *See, e.g.*, Ex. 5294 (TracFone comments to FCC), at 2 ("TracFone expects that the strong 5G network to be built by the New T-Mobile, with the additional coverage, speed and capacity can only improve the wholesale market for MVNOs"); Ex. 5385 (FCC Order), at 130 ("New T-Mobile's vastly increased network capacity will likely give it incentives to offer appealing terms and reasonable prices to wholesale service customers so as to put that capacity to productive use by carrying as much revenue-generating traffic as it can").
[167] TT 624:10-14 (Shapiro); 1797:21-25 (Katz).
[168] TT 991:2-9 (Legere); 1085:9-11 (Sievert); 393:24-394:15, 395:25-396:7 (Hayes); 90:18-91:1, 97:6-97:19 (Sole); 143:22-144:10 (Rittgers); 415:14-416:5 (Miglionico).
[169] TT 1085:12-1086:15 (Sievert); 395:25-396:7 (Hayes); 143:22-144:7 (Rittgers).
[170] TT 795:12-21 (Shapiro); 1789:21-1792:8 (Katz).
[171] Freier Dep. 92:7-19; TT 394:23-395:2 (Hayes).
[172] Freier Dep. 244:14-245:6.
[173] TT 505:22-506:9 (Bluhm).
[174] TT 1226:12-25 (Ray); 1467:15-25 (Kapoor).

Case 1:19-cv-02232-TJK   Document 63-1357   Filed 01/24/20   Page 67 of 153
Case 1:19-cv-05434-VM-RWL   Document 357   Filed 01/03/20   Page 23 of 40

**EXHIBIT B**

Mobile's choice of areas to upgrade its network.[175]

45.  Cellular Market Areas ("CMAs") are not relevant geographic markets.[176] Differences in shares in CMAs (or in shares using any other measure of geography) do not provide useful information for purposes of assessing competition.[177]  There is no significant correlation between pricing, quality, and other factors, such as retail store presence, with different CMA-level concentration levels.[178]  Two marketing professionals that Plaintiffs called in their case were not even familiar with the term "CMA."[179]

### C.  The Post-Merger Herfindahl-Hirschman Index Is Below 2,500

46.  Plaintiffs contend that shares of subscribers are the appropriate measure of market share for HHI purposes.[180]  When subscribers are properly assigned to their retail provider, whether it be an MNO, MVNO, or cable company, the combined nationwide post-merger HHI based on subscriber shares in November 2018 is 2,301 and the change in HHI is 335.[181]

## IV.  ECONOMIC EVIDENCE CONFIRMS THE MERGER BENEFITS CONSUMERS

47.  The merger will result in a network with significantly more capacity, and significantly lower marginal costs and higher quality that consumers value, than the two parties' standalone networks,[182] and will facilitate DISH's entry as a disruptive competitor.[183]

48.  Plaintiffs' economic expert, Dr. Shapiro, proposed two potential theories of competitive harm:  unilateral effects and coordinated effects.[184]  Although he conceded that

---

[175] TT 1227:1-18 (Ray).
[176] TT 1788:15-1789:12 (Katz).
[177] TT 1789:21-1790:18, 1791:12-22 (Katz).
[178] TT 1790:19-1792:8, 1794:19-1797:20 (Katz); Ex. 8181 (Katz Dem.), at 6.
[179] TT 144:15-16 (Rittgers); 415:5-6 (Miglionico).
[180] TT 647:4-23 (Shapiro).
[181] TT 1805:14-17 (Katz); Ex. 8181 (Katz Dem.), at 13.
[182] TT 1784:16-1785:9 (Katz); Ex. 8181, at 2 (Katz Dem.).
[183] TT 1784:16-1785:9 (Katz); TT 1561:17-1565:13 (Ergen); 116:2-117:22, 129:6-131:1, 145:5-7, 145:23-146:20, 148:21-150:15, 150:21-151:10, 152:22-153:3 (Rittgers); 1215:19-1216:4 (Ray); Ex. 5386, at 10-16.
[184] TT 616:4-617:4 (Shapiro); 622:1-15 (Shapiro).

Case 1:19-cv-02232-TJK   Document 63-1357   Filed 01/24/20   Page 68 of 153
Case 1:19-cv-05434-VM-RWL   Document 357   Filed 01/03/20   Page 24 of 40

EXHIBIT B

"[q]uality is really important," Dr. Shapiro did not "offer[] specific opinions about how [quality] will be affected."[185]  Rather, the analysis for both his theories focused only on nominal prices, because, in his words, "[t]hat is what the tools we have do."[186]  In particular, Dr. Shapiro explained that his concern was "not that [the merging parties] will raise price, it's that they will pull back from some of the price cuts or … quality improvements at the same price."[187]  This opinion conflicts with industry data indicating that prices are flattening and may begin to rise.[188]

49.  Dr. Shapiro also agreed that "efficiencies . . . would generally [cause] the firm to compete more aggressively . . . includ[ing through] lower prices . . . improved quality . . . enhanced service . . . and new products entering the market" and that "an appropriate antitrust analysis of mergers should incorporate an analysis of cognizable efficiencies."[189]  Nonetheless, Dr. Shapiro assumed that no cognizable efficiencies from the transaction would be credited.[190]

## A.  Adverse Unilateral Effects are Unlikely

50.  The merger is unlikely to have adverse unilateral effects, *i.e.*, increased quality-adjusted prices as a result of the loss of competition between T-Mobile and Sprint.  Dr. Shapiro attempted to quantify the likelihood of unilateral effects using "upward pricing pressure."[191]  Using this formula, all mergers among competitors with positive margins will exhibit some upward pricing pressure, but this alone does not show a merger is anticompetitive.[192]  The analysis only measures market conditions at the time of the merger; it is not a projection.[193]

51.  The theoretical upward pricing pressure analysis fails to consider many factors that

---

[185] TT 691:22-692:16 (Shapiro).
[186] TT 692:3-6 (Shapiro).
[187] TT 808:13-17 (Shapiro).
[188] TT 1863:21-1864:25 (Katz); 772:3-773:12 (Shapiro).
[189] TT 730:3–20 (Shapiro).
[190] TT 706:11-16 (Shapiro).
[191] TT 698:15-699:4 (Shapiro).
[192] TT 738:8-739:3 (Shapiro).
[193] TT 737:12-22 (Shapiro).

Case 1:19-cv-02232-TJK Document 63-1 Filed 01/24/20 Page 69 of 153
Case 1:19-cv-05434-VM-RWL Document 357 Filed 04/08/20 Page 25 of 40

**EXHIBIT B**

affect a real-world firm's prices, such as potential reputational damage, changes in business strategy or business model by competitors,[194] or repositioning of competitors.[195] These are important here, both because T-Mobile's Un-carrier brand is closely associated with offering more value and lower prices,[196] and because repositioning is common, as Verizon's new prepaid offering shows.[197] The failure of Dr. Shapiro's theoretical framework to capture real-world market forces is demonstrated starkly by his model's illogical prediction that DISH would increase the price for the acquired Boost brand well above TracFone's price, despite DISH's costs being considerably lower than TracFone's.[198] These limitations and unrealistic predictions undermine Dr. Shapiro's opinion that the merger will result in adverse unilateral effects.[199]

52. In addition, efficiencies—such as lower marginal costs or higher quality—can offset any upward pricing pressure.[200] Using Dr. Shapiro's methodology, Defendants' economic expert, Dr. Michael Katz, actually analyzed this merger's efficiencies and found these would more than offset any upward pricing pressure and "generate tens of billions of dollars" passed on to consumers as benefits.[201] Moreover, modeling the acquisition of hypothetical new spectrum and the use of dynamic spectrum sharing did not reduce standalone T-Mobile's marginal costs.[202]

## B. Coordinated Interaction is Unlikely

53. The merger is unlikely to facilitate coordinated interaction.[203] Prices are not uniform. They are, in the words of one of Plaintiffs' third-party witnesses, "all over the place."[204]

---

[194] TT 739:6-742:13 (Shapiro); 1890:6-1891:15 (Katz).
[195] TT 739:16-740:2 (Shapiro).
[196] TT 918:4-919:5 (Legere); 1088:21-1090:10 (Sievert).
[197] TT 740:3-14 (Shapiro).
[198] TT 1891:25-193:10 (Katz).
[199] TT 1891:16-24 (Katz).
[200] TT 743:2-23 (Shapiro).
[201] TT 1887:15-19, 1893:19-1899:14, 1901:6-25, 1902:15-1905:6, (Katz); Ex. 8181 (Katz Dem.), at 69.
[202] TT 1876:5-1877:11 (Katz).
[203] Coordinated interaction on a CMA level would be even more unlikely, given the impossibility of coordinating at that level, further demonstrating the impropriety of CMA-based and other arbitrary geographic "markets."
[204] TT 852:15-853:5 (Schwartz).



[205] suggesting the merger will not lead to coordination.

Moreover, Dr. Shapiro noted that, under his coordinated effects analysis, competitors should "welcome" the merger.[206]  They do not.  AT&T has been working with third parties to thwart the merger.[207]  And ███████████████████████████████████████████████████

████████████████████████████████████████████████████████ [208]

54.  DISH's immediate entry into the market, initially using the low-cost MNSA to service its subscribers and over time with a nationwide network of its own, along with cable companies and MVNOs, would make coordination difficult and unlikely.[209]

55.  Significant post-transaction asymmetry in capacity utilization also makes coordinated interaction unlikely.[210]  As Verizon noted ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ [211]  Firms with low marginal costs and significant available capacity have no incentive to coordinate.  Rather, they maximize profits by competing aggressively to obtain customers to fill that capacity.[212]

56.  Prices are also less transparent than Plaintiffs suggest.  Mobile wireless services are often bundled with other services, making pricing for the mobile wireless component opaque by definition and thus difficult to coordinate on.[213]  For example, AT&T and Verizon (and the cable companies) bundle mobile service with Internet, television, and wired phone service.[214]  AT&T is

---

[205] Ex. 8089, at 1.
[206] TT 690:19-691:1 (Shapiro).
[207] Exs. 7014, 7015 (AT&T email with CWA and attachment).
[208] Ex. 7057, at 3; Ex. 5385 (FCC Order), at 84.
[209] TT 1815:5-1816:12 (Katz); 2314:18-21 (Shapiro); 1561:17-1562:19 (Ergen); *see* Ex. 7000, at 4.
[210] TT 760:9-761:6 (Shapiro).
[211] Ex. 7057 (████████████████████), at 18.
[212] TT 1821:9-1823:17 (Katz).
[213] TT 1082:15-1083:13 (Sievert); 1825:1-1826:22 (Katz) 844:10-18 (Schwartz); 1603:25-1604:16 (Ergen).
[214] TT 1082:15-1083:13 (Sievert); 844:10-18 (Schwartz).

Case 1:19-cv-02232-TJK   Document 63-1   Filed 01/24/20   Page 71 of 153
Case 1:19-cv-05434-VM-RWL   Document 357   Filed 04/03/20   Page 27 of 40

EXHIBIT B

also a content provider, incentivizing it to bundle its own content (such as HBO) with wireless.[215]

57.  Finally, because customers value network quality as well as price, successful coordination requires agreement on both price (including the value of bundled services) and network quality.[216]  Coordination on network quality would be nearly impossible.  Improving network quality requires billions of dollars in investments over many years.[217]  Successful coordination requires more than general knowledge about competitors' network strategies; it requires granular information about competitors' investments and capacity utilization that MNOs lack.[218]  An MNO relying on coordinated pricing would be at risk of being outmaneuvered in network investment that its rivals make without it knowing, ultimately finding itself at a serious competitive disadvantage for an extended period of time as it struggles to catch up.[219]  These pressures are reflected in ███████████████████████████████████████

████████████████████████████████████████[220]  The lumpy investments needed for the upcoming 5G transition will also make coordination difficult due to first-mover advantage[221] and long lead times involved in network investments.[222]

## [PROPOSED] CONCLUSIONS OF LAW

58.  It is Plaintiffs' burden to prove that the merger is "*likely* to lessen competition *substantially*."  *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 985 (D.C. Cir. 1990) (emphasis added).  Assessing this question requires the Court to compare the future state of competition without the merger to the future state of competition with the merger.  *See United States v. Marine Bancorp.*, 418 U.S. 602, 623-26 (1974); *United States v. Gen. Dynamics Corp.*,

---

[215] TT 1816:13-1817:7 (Katz); 1824:22-1827:16 (Katz).
[216] TT 1821:9-1822:14 (Katz).
[217] TT 1084:17-18 (Sievert); TT 1144:13-14 (Ray); 1469:23-1470:3 (Kapoor).
[218] TT 1084:6-16 (Sievert); 1817:13-1821:8 (Katz).
[219] TT 1817:13-1821:8 (Katz); 1829:14-1830:11 (Katz).
[220] Ex. 7057 (███████████████████), at 22.
[221] Ex. 7041.
[222] TT 1144:13-14 (Ray); TT 1817:13-1821:8 (Katz).

Case 1:19-cv-02232-TJK  Document 63-1357  Filed 01/24/20  Page 72 of 153
Case 1:19-cv-05434-VM-RWL  Document 357  Filed 04/03/20  Page 28 of 40

**EXHIBIT B**

415 U.S. 486, 498-504 (1974); *see also* U.S. Dep't of Justice & Fed'l Trade Comm'n, *Horizontal Merger Guidelines* § 1 (2010) ("*HMG*").  "[P]laintiffs have the burden on every element of their Section 7 challenge, and a failure of proof in any respect will mean that the transaction should not be enjoined."  *FTC v. Arch Coal*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004).

## I.   PLAINTIFFS HAVE NOT ESTABLISHED A PRESUMPTION OF ILLEGALITY

59.  Where the FCC and DOJ have conducted thorough investigations and concluded a transaction would be procompetitive,[223] the logic underlying the presumption does not hold, and finding one would be unwarranted and unprecedented.

60.  In the absence of FCC and DOJ findings, Plaintiffs establish a presumption by proving that the merger "would produce a firm controlling an undue share of the relevant market and would result in a significant increase in the concentration of the market."  *Arch Coal*, 329 F. Supp. 2d at 116.  Plaintiffs must define the relevant market with sufficient specificity so the Court can determine which sales are relevant to calculating market shares.  *See Gen. Dynamics*, 415 U.S. at 494-504.

61.  A relevant market has product and geographic dimensions.  The relevant product market is retail mobile wireless communications.  All participants who earn revenue in the market must be included.  *HMG*, §§ 5.1, 5.2.  As MVNOs and cable operators earn substantial revenues in the relevant market, control their own pricing, and compete aggressively, their subscribers should be attributed to them when calculating market share.[224]  *See id.*  The relevant geographic market is "the area in which the goods or services are marketed to a significant degree by the acquired firm."  *Marine Bancorp.*, 418 U.S. at 621.  The parties agree the United States is a relevant geographic market.[225]

---

[223] FOF ¶ 3.
[224] FOF ¶¶ 40-41
[225] AC ¶¶ 39-40; TT 621:12-14 (Shapiro).

Case 1:19-cv-02232-TJK  Document 63-1  Filed 01/24/20  Page 73 of 153
Case 1:19-cv-05434-VM-RWL  Document 357  Filed 04/03/20  Page 29 of 40

**EXHIBIT B**

62. Within the national market and properly assigning MVNO and cable company subscribers, the post-merger HHI is below 2,500,[226] the level that the DOJ would consider presumptively anticompetitive in its investigation process. *HMG*, § 5.3.

63. Defining geographic markets based on CMAs or other arbitrary local areas is not appropriate here. Local variations in service quality are relevant to market definition only if those variations result from strategic decisions based on local competitive conditions, which is not the case here.[227] *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 575-76 (1966) (affirming national geographic market despite local nature of service, due to "national planning" and a "national schedule of prices, rates, and terms"). There is no evidence in the record that CMAs are relevant to competitive conditions. An analysis that would find a single city block, a zip code, or any other arbitrary geographical area from a city block to the entire United States to be a relevant geographic market—as Dr. Shapiro conceded his analysis would find[228]—is not creditable. *See Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 201-02 (S.D.N.Y. 2019) (antitrust plaintiff must establish "precise geographic boundaries of effective competition") (quoting *Concord Assocs., L.P. v. Entm't Properties Tr.*, 817 F.3d 46, 52-53 (2d Cir. 2016)). Here, virtually all strategic decision-making concerning prices and network quality are made at a national level,[229] and Plaintiffs presented no specific evidence about how the merger would affect competition at a local level. Accordingly, there is no sound basis to assess the effect of the merger in local geographic markets.

## II.  THE MERGER IS UNLIKELY TO SUBSTANTIALLY LESSEN COMPETITION

64. Courts compare the world with the merger to the world without the merger using

---

[226] FOF ¶ 46.
[227] FOF ¶¶ 43-45.
[228] TT 779:2-780:19 (Shapiro); 1788:15-1789:8 (Katz).
[229] FOF ¶¶ 43-45.

Case 1:19-cv-02232-TJK Document 63-1357 Filed 01/24/20 Page 74 of 153
Case 1:19-cv-05434-VM-RWL Document 357 Filed 04/03/20 Page 30 of 40

**EXHIBIT B**

several factors, including: the "prospect of efficiencies," *Baker Hughes*, 908 F.2d at 985-86; "excess capacity," *id*. at 985; a "company's weak competitive stature," *id*. at 984; "changing market conditions," *id*. at 985-86; and possible entry by a new competitor, *see id*. at 984-87. These factors are not considered individually and in isolation; rather, "[t]he Supreme Court has adopted a totality-of-the-circumstances approach" for claims under Section 7. *Baker Hughes*, 908 F.2d at 984. Thus, the Court must engage in a "comprehensive inquiry into the future competitive conditions in a given market." *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 190 (D.D.C. 2018); *see also Gen. Dynamics*, 415 U.S. at 498. The core legal and factual issue is thus whether the transaction as currently constructed will reduce competition.

### A. The Transaction Will Result in Lower Prices and Higher-Quality Wireless Services for Consumers

65. The transaction will result in consumers paying lower prices for higher-quality network services because the New T-Mobile network will have substantially more capacity than the combined capacity of the networks that either company could deploy on standalone basis.[230] This will give New T-Mobile the ability and incentive to continue its disruptive Un-carrier strategy to the benefit of its own customers and to the customers of its competitors.[231]

66. Evidence of efficiencies is "relevant to the competitive effects analysis of the market required to determine whether the proposed transaction will substantially lessen competition." *Arch Coal*, 329 F. Supp. 2d at 151. Courts recognize that capacity increases and cost savings can show that a merger is procompetitive. *United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669, 674, 680 (D. Minn. 1990) (merger unlikely to lessen competition where it would "enable [the new company] to increase its capacity substantially" and "result in lower plant and transportation costs and other savings," enabling the new company "to become a lower-cost

---

[230] FOF ¶¶ 18-19.
[231] FOF ¶¶ 18-19.

producer capable of effective competition with the market leader").

67.  This merger will enable New T-Mobile to be a lower-cost competitor with a higher-quality network, strengthening competition.[232]  *See, e.g.*, *United States v. M.P.M., Inc.*, 397 F. Supp. 78, 93 (D. Colo. 1975) (permitting a merger between third and fourth largest firms where the "service offered" by the new firm "was superior to that offered by either of the previously independent companies alone").  The capacity increases and cost savings from this merger are verifiable based on the ample evidence discussed herein, as fortified by FCC and DOJ oversight and enforcement.[233]  *United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 149 (E.D.N.Y. 1997) (efficiencies verified when part of a legally-binding commitment to New York Attorney General).  Any contention that the merger benefits could be achieved through other means is "speculative," as Dr. Kolodzy conceded in his testimony.[234]  The "hypothetical possibility" of a different transaction "proves nothing."  *Gen. Dynamics*, 415 U.S. at 509-10.

**B.  Sprint Is Losing Competitive Significance**

68.  "In responding to [the government's] statistical showing of concentration," it is appropriate to consider a merging party's "weakness as a competitor."  *United States v. Int'l Harvester Co.*, 564 F.2d 769, 773 (7th Cir. 1977); *see also Arch Coal*, 329 F. Supp. 2d at 157 ("[w]eak competitive status remains relevant").  Sprint's future competitive position is "considerably weaker than its past [] ability," and, absent the transaction, Sprint's competitive position would decline.[235]  *See Gen. Dynamics*, 415 U.S. at 501-04.

**C.  DISH Will Immediately Be a Disruptive New Entrant**

69.  Not only is entry relevant to "appraising whether a merger will substantially lessen

---

[232] FOF ¶¶ 3, 15-20, 23, 25, 47-49.
[233] *See, e.g.*, FOF ¶¶ 15-25, 47, 52.
[234] TT 2134:3-14, 2137:3-7 (Kolodzy).
[235] FOF ¶¶ 3738.

27

competition," "it may override all other factors." *United States v. Waste Mgmt. Inc.*, 743 F.2d 976, 982-83 (2d Cir. 1984). DISH's entry is likely to deter or counteract any competitive effects of concern that might arise, and to do so timely.[236] *See id.*

70. The size of the Boost business acquired by DISH relative to Sprint is not dispositive. "Entry by one or more firms operating at a smaller scale may be sufficient if such firms are not at a significant disadvantage." *HMG*, § 9.3. DISH has substantial advantages as a new entrant because, for example, it has unused spectrum and will be able to deploy a 5G network without the burden of legacy costs of older technologies, *e.g.*, 2G, 3G, and LTE.[237] In any event, DISH's entry must be evaluated under the totality of the circumstances, not in isolation. *See Baker Hughes*, 908 F.2d at 988 (rejecting an effort to "improperly narrow the section 7 inquiry" by "channeling what should be an overall analysis of competitiveness into a determination of whether a defendant has shown particular facts").

**D. The Transaction Is Not Likely to Produce Adverse Unilateral Effects or Coordinated Interaction**

71. Plaintiffs have failed to prove that the transaction is likely to result in adverse unilateral effects or coordinated interaction. Simply incanting "4 to 3" (even as DISH's entry alone makes "3" inaccurate) neither substitutes for proof of a Clayton Act violation, nor has real economic meaning—Dr. Shapiro agreed, for example, that not all "4 to 3" mergers are anticompetitive.[238]

72. Because of the low marginal cost and high quality of the New T-Mobile network driven by the increase in network capacity,[239] the merger will not lead to higher prices or lower quality due to unilateral effects.

---

[236] FOF ¶¶ 2, 26-30, 47, 54.
[237] FOF ¶¶ 26, 29.
[238] TT 732:17-22 (Shapiro).
[239] FOF ¶¶ 15-16, 19-24, 47.

Case 1:19-cv-02232-TJK Document 63-1357 Filed 01/24/20 Page 73 of 153
Case 1:19-cv-05434-VM-RWL Document 357 Filed 01/03/20 Page 33 of 40

**EXHIBIT B**

73. Nor will the merger increase the risk of adverse coordinated effects. To assess the likelihood of post-merger coordination, the Court looks to "market conditions, on the whole" to determine "whether would-be coordinators could wield anticompetitive power by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *AT&T*, 310 F. Supp. 3d at 246 (quotation marks omitted).

74. That is unlikely here. Prices and network investment decisions are not transparent.[240] *See Arch Coal*, 329 F. Supp. 2d at 140-41 (coordination unlikely because of opaque pricing). DISH is entering with strong incentives to expand.[241] *See, e.g.*, *Waste Mgmt.*, 743 F.2d at 982-83. There are "key differences" among competitors, including T-Mobile's Un-carrier brand identity and the asymmetric capacity the merger creates.[242] *See AT&T*, 310 F. Supp. 3d at 247. Sprint's competitive weakness makes it unlikely to be a "maverick."[243] *See Arch Coal*, 329 F. Supp. 2d at 147 (acquired firm not a maverick as its "weaknesses . . . make it unlikely that [it] will become any more competitive in the marketplace than it is right now").

75. That AT&T, Altice, and Comcast worked against the merger in the regulatory process—and Altice and Comcast even testified against the merger at trial[244]—further suggests that the merger would lead to more competition, not less. *See, e.g.*, *AT&T*, 310 F. Supp. 3d at 214 ("[T]hird-party competitor witnesses have an incentive to oppose a merger that would allow [their competitor] to increase innovation while lowering costs.").

## III. THE MERGER SHOULD NOT BE PERMANENTLY ENJOINED

76. States act as private parties when they seek injunctive relief under the Clayton Act. *State of New York v. Kraft Gen. Foods, Inc.*, 862 F. Supp. 1030, 1033 (S.D.N.Y. 1993). An

---

[240] FOF ¶¶ 56-57.
[241] FOF ¶¶ 29-30, 47, 54.
[242] FOF ¶¶ 12, 51, 55.
[243] FOF ¶¶ 37-38.
[244] FOF ¶ 53 (AT&T opposition); TT 537:15-605:24 (Altice testimony); 812:5-874:17 (Comcast testimony).

injunction thus does not "automatically follow[] a determination" of a violation; Plaintiffs must show "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-93 (2006); *see also California v. Am. Stores*, 495 U.S. 271, 295-96 (1990) ("[T]hat a district court has the power to order divestiture in appropriate cases [brought by private plaintiffs] does not, of course, mean that such power should be exercised in every situation in which the [federal] Government would be entitled to such relief[.]").  The Court's public interest analysis is not limited to considering the effects of the merger on competition; rather, the Supreme Court "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination" of a violation.  *eBay*, 547 U.S. at 392-93.  Public interest analysis goes beyond the merger's competitive effects.  *See, e.g.*, *Consol. Gold Fields, PLC v. Anglo Am. Corp. of S. Africa Ltd.*, 713 F. Supp. 1457, 1463-64 (S.D.N.Y. 1989).

77.  Enjoining the merger would not be in the public interest:  It would deny consumers the benefits of New T-Mobile's network, the faster and more robust deployment of 5G, the entry of DISH, and enhanced rural services including in-home broadband.[245]

78.  In that determination, the Court gives due regard to the decision of the FCC that allowing the merger to proceed is *in the public interest* and its reasons for so finding.[246]  A uniform federal policy set by the FCC relating to spectrum deployment, broadband, and mobile wireless networks is itself in the public interest.  *See FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596 (1981) (holding that the FCC's "judgment regarding how the public interest is best served is entitled to substantial judicial deference").

---

[245] FOF ¶¶ 16-19, 21, 26-30.
[246] FOF ¶ 3.  *See generally* Ex. 5385 (FCC Order).

# EXHIBIT B

Dated:  January 8, 2020

Respectfully submitted,

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

_____
George S. Cary (*pro hac vice*)
David I. Gelfand (*pro hac vice*)
Mark W. Nelson (*pro hac vice*)
gcary@cgsh.com
dgelfand@cgsh.com
mnelson@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:  (202) 974-1500
Facsimile:  (202) 974-1999

*Counsel for Defendant T-Mobile US, Inc.*

**EXHIBIT B**

WILMER CUTLER PICKERING
HALE AND DORR LLP

Hallie B. Levin
hallie.levin@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone:  (212) 295-6710
Facsimile:  (212) 230-8888

*Counsel for Defendant T-Mobile US, Inc.*

**EXHIBIT B**

WILSON SONSINI GOODRICH & ROSATI

Joshua H. Soven (*pro hac vice*)
jsoven@wsgr.com
Wilson Sonsini Goodrich & Rosati
1700 K Street, NW 5th Floor
Washington, DC 20006-3817
Telephone:  (202) 973-8827
Facsimile:  (202) 973-8899

*Counsel for Defendant Deutsche Telekom AG*

**EXHIBIT B**

GIBSON, DUNN & CRUTCHER LLP

Richard G. Parker (*pro hac vice*)
rparker@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:  (202) 955-8503
Facsimile:  (202) 530-9518

*Counsel for Defendant Deutsche Telekom AG*

**EXHIBIT B**

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

_____
Steven C. Sunshine
Julia K. York (*pro hac vice*)
steve.sunshine@skadden.com
julia.york@skadden.com
1440 New York Avenue NW
Washington, D.C. 20005
Tel.: (202) 371-7000
Fax:  (202) 393-5760

Karen Hoffman Lent
karen.lent@skadden.com
4 Times Square
New York, NY 10036
Tel.: (212) 735-3000
Fax: (212) 735-2000

*Counsel for Defendant Sprint Corp.*

**EXHIBIT B**

MORRISON & FOERSTER LLP

_____

Grant J. Esposito
David J. Fioccola
gesposito@mofo.com
dfioccola@mofo.com
250 West 55th Street
New York, NY 10019
Tel.: (212) 468-8000
Fax: (212) 468-7900

David L. Meyer (*pro hac vice*)
Brad S. Lui (*pro hac vice*)
dmeyer@mofo.com
blui@mofo.com
2000 Pennsylvania Avenue, NW, Suite 6000
Washington, D.C. 20006-1888
Tel.: (202) 887-1500
Fax: (202) 887-0763

*Counsel for Defendants SoftBank Group Corp.*
*and Sprint Corporation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, STATE OF
KANSAS, STATE OF NEBRASKA, STATE OF
OHIO, STATE OF OKLAHOMA, STATE OF
SOUTH DAKOTA, STATE OF LOUISIANA,
STATE OF FLORIDA, STATE OF COLORADO,
STATE OF ARKANSAS, and STATE OF TEXAS

      Plaintiffs,

vs.

DEUTSCHE TELEKOM AG, T-MOBILE US,
INC., SOFTBANK GROUP CORP., and SPRINT
CORPORATION

      Defendants.

No. 1:19-cv-02232-TJK

**BRIEF OF AMICUS CURIAE BY**

**THE RURAL WIRELESS ASSOCIATION, INC., NEW AMERICA'S**

**<u>OPEN TECHNOLOGY INSTITUTE, AND CONSUMER REPORTS</u>**

# EXHIBIT C

**EXHIBIT C**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STATE OF NEW YORK,<br>STATE OF CALIFORNIA,<br>STATE OF CONNECTICUT,<br>DISTRICT OF COLUMBIA,<br>STATE OF HAWAII,<br>STATE OF ILLINOIS,<br>STATE OF MARYLAND,<br>COMMONWEALTH OF MASSACHUSETTS,<br>STATE OF MICHIGAN,<br>STATE OF MINNESOTA,<br>STATE OF OREGON,<br>COMMONWEALTH OF PENNSYLVANIA,<br>COMMONWEALTH OF VIRGINIA, *and*<br>STATE OF WISCONSIN,<br><br>          *Plaintiffs*,<br><br>        v.<br><br>DEUTSCHE TELEKOM AG,<br>T-MOBILE US, INC.,<br>SPRINT CORPORATION, *and*<br>SOFTBANK GROUP CORP.,<br><br>          *Defendants*. | Case No. 1:19-cv-5434-VM-RWL<br><br>ECF Case |

**PLAINTIFF STATES' PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

# EXHIBIT C

## TABLE OF CONTENTS

**Page**

I.  SECTION 7 BARS MERGERS THAT *MAY* SUBSTANTIALLY LESSEN COMPETITION ...................................................................................................1

II.  RELEVANT MARKETS ......................................................................................2

III.  THE MERGER IS PRESUMPTIVELY ILLEGAL ............................................4

    A.  The Merger Is Presumptively Unlawful Based on Market Structure Alone............5

        1.  MVNOs' Customers Should Be Attributed to Their Partner MNOs ...........6

IV.  EVIDENCE REGARDING ANTICOMPETITIVE EFFECTS REINFORCES THE PRESUMPTION OF ILLEGALITY .........................................................8

    A.  The Merger Will Increase Coordinated Interaction ..................................8

        1.  The Merger Makes Coordinated Interaction More Likely..........................9

        2.  The Relevant Market Is Vulnerable to Coordinated Interaction................10

    B.  New T-Mobile Will Be Able To Unilaterally Raise Its Prices Post-Merger .........11

    C.  Defendants' Internal Documents Show That This Merger Is Anticompetitive.............................................................................................13

V.  DEFENDANTS' REBUTTAL CASE.................................................................14

    A.  Defendants' Weakened Competitor Defense............................................14

    B.  Defendants' Efficiencies Defense..............................................................17

        1.  Defendants' Efficiencies Estimates Are Not Ordinary Course..................19

        2.  The Montana Model's Estimates Are Unverifiable and Speculative.........19

        3.  Prof. Katz Did Not Accurately Model Network Speed Efficiencies .........22

        4.  Defendants' Efficiencies Are Not Merger-Specific...................................23

    C.  Defendants' Remedies-Based Defense ......................................................25

VI.  PERMANENT INJUNCTION ............................................................................29

i

# EXHIBIT C

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Brown Shoe v. United States*,
    370 U.S. 294 (1962)............................................................................................1, 2

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)..............................................................................................1

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990)..............................................................................................1

*California v. Fed. Power Comm'n*,
    369 U.S. 482 (1962)..........................................................................................1, 30

*CBS Broad., Inc. v. EchoStar Commc'ns Corp.*,
    276 F. Supp. 2d 1237 (S.D. Fla. 2003) ...............................................................28

*Chicago Bridge & Iron Co. N.V. v. FTC*,
    534 F.3d 410 (5th Cir. 2008) ...............................................................................8

*Consol. Gold Fields PLC v. Minorco S.A.*,
    871 F.2d 252 (2d Cir. 1989).................................................................................5

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006)............................................................................................29

*Ford Motor Co. v. United States*,
    405 U.S. 562 (1972)............................................................................................25

*FTC v. Cardinal Health, Inc.*,
    12 F. Supp. 2d 34 (D.D.C. 1998) .......................................................................26

*FTC v. CCC Holdings, Inc.*,
    605 F. Supp. 2d 26 (D.D.C. 2009) ..........................................................10, 19, 27

*FTC v. Elders Grain*,
    868 F.2d 901 (7th Cir. 1989) ...............................................................................1

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ................................................................... *passim*

*FTC v. Penn State Hershey Med. Ctr.*,
    838 F.3d 327 (3d Cir. 2016)...........................................................................17, 18

# EXHIBIT C

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*FTC v. ProMedica Health Sys., Inc.*,
2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ........................................................15, 18, 26

*FTC v. Staples, Inc.*,
190 F. Supp. 3d 100 (D.D.C. 2016) ........................................................................25, 26, 27

*FTC v. Staples, Inc.*,
970 F. Supp. 1066 (D.D.C. 1997) ........................................................................................12

*FTC v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) ................................................................................. *passim*

*FTC v. Tronox Ltd.*,
332 F. Supp. 3d 187 (D.D.C. 2018) ...............................................................................11, 18

*FTC v. Univ. Health, Inc.*,
938 F.2d 1206 (11th Cir. 1991) .....................................................................................9, 13, 18

*FTC v. Warner Commc'ns Inc.*,
742 F.2d 1156 (9th Cir. 1984) .............................................................................................1

*FTC v. Wilh. Wilhelmsen Holding ASA*,
341 F. Supp. 3d 27 (D.D.C. 2018) ......................................................................................18

*Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*,
476 F.2d 687 (2d Cir. 1973) ................................................................................................30

*Heerwagen v. Clear Channel Commc'ns*,
435 F.3d 219 (2d Cir. 2006) ..................................................................................................2

*Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*,
902 F.2d 1074 (2d Cir. 1990) ..............................................................................................30

*Kaiser Alum. & Chem. Corp. v. FTC*,
652 F.2d 1324 (7th Cir. 1981) .............................................................................................15

*In re: LightSquared, Inc.*,
511 B.R. 253 (S.D.N.Y. 2014) .............................................................................................29

*Nat. Res. Def. Council v. EPA*,
643 F.3d 311 (D.C. Cir. 2011) .............................................................................................26

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) ..........................................................................................29, 30

# EXHIBIT C

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*New York v. Actavis, PLC*,
2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) ....................................................................30

*ProMedica Health Sys., Inc. v. FTC*,
749 F.3d 559 (6th Cir. 2014) ..............................................................................5, 14, 15

*R.C. Bigelow, Inc. v. Unilever N.V.*,
867 F.2d 102 (2d Cir. 1989)...........................................................................................5

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943).......................................................................................................26

*Six Western Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) .....................................................................2

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) ..............................................................................4, 17, 18

*Stanley Works v. FTC*,
469 F.2d 498 (2d Cir. 1972)................................................................................1, 8, 13

*State of N.Y. v. Kraft Gen. Foods, Inc.*,
926 F. Supp. 321 (S.D.N.Y. 1995) ...........................................................................8, 12

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
290 F. Supp. 3d 507 (E.D. Va. 2018) ............................................................................15

*Teamsters Local 445 v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008)...........................................................................................2

*United States v. Aetna Inc.*,
240 F. Supp. 3d 1 (D.D.C. 2017) ...............................................................14, 15, 25, 27

*United States v. Am. Express Co.*,
838 F.3d 179 (2d Cir. 2016)...........................................................................................3

*United States v. Anthem, Inc.*,
236 F. Supp. 3d 171 (D.D.C. 2017) ...................................................................... *passim*

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) .............................................................................4, 17, 19

*United States v. Bazaarvoice, Inc.*,
2014 WL 203966 (N.D. Cal. 2014) ...............................................................................26

iv

# EXHIBIT C

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*United States v. Conn. Nat'l Bank*,
   418 U.S. 656 (1974)..................................................................................................3

*United States v. Franklin Elec. Co.*,
   130 F. Supp. 2d 1025 (W.D. Wis. 2000) ...............................................................25

*United States v. H&R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ........................................................9, 10, 18, 26

*United States v. Marine Bancorporation Inc.*,
   418 U.S. 602 (1974)..................................................................................................2

*United States v. Pabst Brewing Co.*,
   384 U.S. 546 (1966).............................................................................................2, 3

*United States v. Penn-Olin Chem. Co.*,
   378 U.S. 158 (1964)..................................................................................................1

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963)...................................................................................... *passim*

*United States v. Radio Corp. of Am.*,
   358 U.S. 334 (1959)............................................................................................1, 30

*United States v. Rockford Mem'l Corp.*,
   717 F. Supp. 1251 (N.D. Ill. 1989) .......................................................................18

**FEDERAL STATUTES**

15 U.S.C. § 18................................................................................................................1

**FEDERAL REGULATIONS**

47 CFR § 22.909 ...........................................................................................................3

**OTHER AUTHORITIES**

Areeda & Hovenkamp, *Antitrust Law* ......................................................................8, 9

Dep't of Justice & FTC, Horizontal Merger Guidelines...............................................3

**EXHIBIT C**

## I.   SECTION 7 BARS MERGERS THAT *MAY* SUBSTANTIALLY LESSEN COMPETITION

1.      Section 7 of the Clayton Act is a "prophylactic measure," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977), designed "to arrest incipient threats to competition," *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170–71 (1964). Congress enacted Section 7 in response to "what was considered to be a rising tide of economic concentration in the American economy," and "sought to assure the . . . courts the power to brake this force at its outset." *Stanley Works v. FTC*, 469 F.2d 498, 503 (2d Cir. 1972).

2.      "To show that a merger is unlawful, a plaintiff need only prove that its effect '*may* be substantially to lessen competition.'" *Cal. v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) (quoting 15 U.S.C. § 18). These words reflect Congress's "concern . . . with probabilities, not certainties." *Brown Shoe v. United States*, 370 U.S. 294, 323 (1962). Section 7 thus "does not require proof that a merger or other acquisition will cause" anticompetitive effects. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 192 (D.D.C. 2017). Rather, "a section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984); *Brown Shoe*, 370 U.S. at 325. Any "doubts are to be resolved against the transaction." *FTC v. Elders Grain*, 868 F.2d 901, 906 (7th Cir. 1989).

3.      Congress has "entrusted to the courts" responsibility for Clayton Act enforcement, and that responsibility may not be "frustrated by an administrative agency." *California v. Fed. Power Comm'n*, 369 U.S. 482, 490 (1962). This Court must make its own independent determination of whether this merger should be enjoined. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 332 & n.8, 350-51, 372 (1963) (enjoining bank merger even though Comptroller of Currency approved it); *United States v. Radio Corp. of Am.*, 358 U.S. 334, 337, 346 (1959) (antitrust suit could proceed despite prior FCC approval because "Commission action was not intended to prevent

1

**EXHIBIT C**

enforcement of the antitrust laws in federal courts"); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 2000 WL 264295, at \*23–24 (S.D.N.Y. Mar. 9, 2000) ("[USDOJ] at times countenances a higher level of anti-competitive behavior than do the courts, and, therefore, it is the responsibility of this Court to undertake its own evaluation of the merger.").

## II.   RELEVANT MARKETS

4.      Determining the relevant markets affected by a merger "is a necessary predicate to a finding of a violation of the Clayton Act." *Brown Shoe*, 370 U.S. at 324. A "relevant market consists of a relevant product market and a relevant geographic market." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006), *overruled on other grounds by Teamsters Local 445 v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008).

5.      Plaintiffs have shown, and Defendants did not contest at trial, that retail mobile wireless telecommunications services is a relevant product market. Shapiro[1] 625:21–630:25.

6.      A geographic market "encompasses the geographic area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Heerwagen*, 435 F.3d at 228. Where firms compete on a "regional and national basis," there may be "more than one relevant geographic market." *United States v. Marine Bancorporation Inc.*, 418 U.S. 602, 621 (1974); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549, 551–52 (1966) (nation, state, and tri-state); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 49, 52 (D.D.C. 2015). A showing that a merger may substantially lessen competition in *any* geographic market establishes a § 7 violation. *Pabst*, 384 U.S. at 549; *Anthem*, 236 F. Supp. 3d at 179, 193, 254–59.

---

[1] All citations to trial transcripts are cited by witness testimony. All references to "native" versions of the trial exhibits are cited with "-N".

**EXHIBIT C**

7.      As Defendants have conceded, the nation is a relevant geographic market for assessing the effects of this merger. Katz 1797:21-25; Shapiro 624:10-14, 631:18–632:1.

8.      Cellular Market Areas ("CMAs"), which correspond to the original FCC licenses areas for spectrum are also relevant geographic markets. Shapiro 624:17-22. CMAs include Metropolitan Statistical Areas ("MSAs") and Rural Statistical Areas defined by the Office of Management and Budget. 47 CFR § 22.909; Shapiro 643:1-4. The FCC and DOJ have used CMAs to assess competition in the wireless industry. PX1211 p.29; Shapiro 637:12–21.

9.      Geographic "markets need not—indeed cannot—be defined with scientific precision." *Sysco*, 113 F. Supp. 3d at 48 (quoting *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974)); *Pabst*, 384 U.S. at 549. A "rough approximation," *Conn. Nat'l Bank*, 418 U.S. at 669, or a "workable compromise" is sufficient. *Phila. Nat'l Bank*, 374 U.S. at 361.[2] In *Anthem*, for example, the court used "Core-Based Statistical Areas," "aggregations of zipcodes . . . developed by the Office of Management and Budget," to evaluate a merger. 236 F. Supp. 3d at 254.

10.      "To define the relevant market, [the Second Circuit] often applies a 'hypothetical monopolist test' ('HMT') asking whether a hypothetical monopolist acting within the proposed market would be substantially constrained from increasing prices by the ability of customers to switch to other producers." *United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016); Dep't of Justice & FTC, Horizontal Merger Guidelines § 4.1.1 ("HMG").

11.      Prof. Shapiro explained, and Prof. Katz did not dispute, that CMAs satisfy the HMT. Shapiro 637:23-25; Katz 1994:24–1995:2.

12.      Sprint has previously claimed that competition for wireless services can be assessed in

---

[2] Defendants incorrectly focus on the "precis[ion]" with which Plaintiffs must identify local markets. Pretrial Mem. at 19. But the cases Defendants cite simply explain that a *product market*, standing alone, is insufficient because it does not capture geographic dimensions of competition. They do not depart from the binding Supreme Court precedent cited above.

Case 1:19-cv-02232-TJK   Document 63-1   Filed 01/24/20   Page 95 of 153
Case 1:19-cv-05434-VM-RWL   Document 358   Filed 01/03/20   Page 10 of 38

EXHIBIT C

national *and* local markets. Shapiro 638:14–642:9; PX655 pp. 17, 163-64. And the evidence confirms that key aspects of competition in this industry are local. *First*, as Prof. Katz conceded, network performance and, thus, quality-adjusted prices, vary locally. Katz 1980:6–1982:2; Sole 97:3–97:19, Legere 992:1-20. Defendants believe that local network quality impacts consumers' selection between carriers, and advertise based on their networks' local characteristics. PX155; PX159–161; PX410 p. 222; PX959. *Second*, Defendants offer local promotions and compete to expand the number and quality of their retail stores. Staneff Dep. 169:5-7, 173:2–175:18, 194:25–201:20; PX1074 pp. 51, 67; PX1111 p. 14; PX911 pp. 32–34, PX949 p. 10, PX967 p. 1.

13.     T-Mobile previously asserted that competition in the wireless industry takes place locally and should be assessed in CMAs. PX1242 p.25; PX1042 p. 11. And CMAs (or MSAs, which relate to CMAs) are used as relevant local markets by Mobile Network Operators ("MNOs"). PX155 p. 3 n.2 (network claim measured in relevant MSA); PX160-161 p. 2 n.2; PX92 p. 7 (expansion in MSAs); PX908 p. 24; PX911 p. 19; PX1235 p. 30; DX7057 pp. 7, 53.

14.     Prof. Katz agrees that wireless competition "takes place at the local level" and that Defendants compete with each other within CMAs. Katz 1976:21–1977:20. But he does not identify any local market in which to assess that competition. Instead, he simply claims that *CMAs* are not informative markets, even though he has previously asserted that wireless competition *should* be evaluated in CMAs. PX1296 pp.144–46; Katz 1979:2–1982:2.

## III.     THE MERGER IS PRESUMPTIVELY ILLEGAL

15.     Courts employ a burden-shifting framework when evaluating whether a merger is barred by § 7. *E.g.*, *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017); *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 785 (9th Cir. 2015).

16.     The Supreme Court has held that the "intense congressional concern" with market concentration that pervades Section 7 "warrants dispensing . . . with elaborate proof of market

4

Case 1:19-cv-02232-TJK  Document 63-1 358  Filed 01/24/20  Page 96 of 153
Case 1:19-cv-05434-VM-RWL  Document 358  Filed 01/03/20  Page 21 of 38

**EXHIBIT C**

structure, market behavior, or probable anticompetitive effects" in some cases. *Phila. Nat'l Bank*, 374 U.S. at 363. "Specifically . . . a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Id.*

17.     "[U]nless defendants meet their burden of rebutting [plaintiffs'] presumption, the merger must be enjoined." *R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107-08 (2d Cir. 1989).

A.     **The Merger Is Presumptively Unlawful Based on Market Structure Alone**

18.     A merger resulting in a company with a market share of 30% or more is presumptively illegal. *Consol. Gold Fields PLC v. Minorco S.A.*, 871 F.2d 252, 260 (2d Cir. 1989).

19.     As a result of this merger, New T-Mobile will have a market share of 37.8% in the national market when measured by subscribers and 34.4% when measured by revenue. Shapiro 647:11-16; PX1258, sl. 1. New T-Mobile will also exceed the 30% threshold in dozens of CMAs within the Plaintiff States.  In some of these CMAs, New T-Mobile will have a market share of *over 50%*, and in many it will approach this figure. Shapiro 656:20–657:4; PX1258, sl. 7-11.

20.      Mergers that result "in highly concentrated markets that involve an increase in the [Herfindahl-Hirschman Index ("HHI")] of more than 200 points" are *also* presumptively anticompetitive. HMG § 5.3; *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568 (6th Cir. 2014); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001). "[A] post-merger market is highly-concentrated" if the post-merger "HHI is 2,500 or greater." *Anthem*, 236 F. Supp. 3d at 207; HMG § 5.3.

21.     In the national market, the merger would result in an HHI of 3,186—an increase of 679 points. Shapiro 647:17-23, 653:1-10; PX1258, sl. 1. In fact, Prof. Katz's own calculations

5

Case 1:19-cv-02232-TJK Document 63-135 Filed 01/24/20 Page 97 of 153
Case 1:19-cv-05434-VM-RWL Document 358 Filed 01/03/20 Page 12 of 38

**EXHIBIT C**

demonstrate that after using his preferred metric of revenue shares, assigning separate market shares to mobile virtual network operators ("MVNOs"), and accounting for the Boost divestiture, the post-merger HHI in the national market is 2,611, and the increase is 313. PX1320 p. 10; Shapiro 2276:11–2278:21.

22.     In 106 CMAs within the Plaintiff States, the HHI would increase by 200 points or more and would exceed 2,500, often dramatically so. Shapiro 653:20–656:9; PX1258, sl. 7-11.

### 1.     MVNOs' Customers Should Be Attributed to Their Partner MNOs

23.     MVNOs are companies that purchase network access from the national carriers on a wholesale basis and resell that access to their customers. Schwartz 813:8–814:1; Boubazine 539:5–13; Kalinoski Dep. 10:4–10.

24.     The FCC and DOJ have recognized that MVNOs and MNOs are not similarly situated from a competitive standpoint. Shapiro 2270:3–15 (relying on FCC report stating that "following widespread industry practices," the FCC would be "attribut[ing] the subscribers of MVNOs" to their MNO partners); PX1261, ¶ 16 (USDOJ Complaint, which declines to include MVNOs in its discussion of market shares post-merger); PX1211, ¶ 78 (FCC Order) ("As in previous transactions, we will exclude MVNOs . . . when computing initial concentration measures.").

25.     T-Mobile's CEO, John Legere, and Chief Technology Officer, Neville Ray, described T-Mobile's MVNOs' customers as *T-Mobile*'s customers at trial. Legere 912:18-25, Ray 1143:1-6. And Sprint agrees that an MVNO "is not a direct competitor" to its partner MNO. PX655 p. 372; PX585 p. 2 ("The success…of [Sprint's] MVNOs is success to Sprint.").

26.     Mr. Legere has referred to Comcast and Charter, two of the most well-known MVNOs, as "irrelevant" and "irrelevant squared." PX131 p. 9; Legere 983:11–984:7. And Defendants did not put forward any trial exhibits showing an MNO responding to a promotion by one of its MVNOs. *Cf.* Schwartz 817:16–818:1 (Comcast has seen no evidence of MNOs responding to its

# EXHIBIT C

offers); Miglionico 428:16-21 (Sprint provides port-in offers "to every wireless competitor out there…as long as they're not with Sprint or…an MVNO of Sprint").

27.   When calculating market shares, it is appropriate to focus on economic reality and to combine the shares of entities that are not independent competitors to each other. In *Anthem*, the court held that it was correct to combine the market shares of Anthem with the market shares of certain Blue Cross Blue Shield licensees ("Blues"). 236 F. Supp. 3d at 208, 210. The evidence showed that "Anthem and the other Blues work together to win national business," that Anthem's documents combined the market share of the Blues with its own market share, and that Anthem "receives income from the other Blues" for access to the Anthem network. *Id.* at 210.

28.   Applying this guidance, MVNOs are not independent competitors from their MNO hosts. *First*, MNOs use MVNOs as marketing partners to reach customers they would otherwise struggle to reach. PX585; PX587; PX640; PX813; Thygesen Dep. 43:11-25. *Second*, Defendants count their partner MVNOs' subscribers as their own. PX813 pp. 77, 79 (market shares of "Carriers include MVNO activity"; migrations between T-Mobile's brands and its MVNOs are "internal migrations"); PX892-N, slides 3, 13; Thygesen Dep. 15:20–25 (T-Mobile calls customers of its MVNOs T-Mobile subscribers "in the ordinary course")*;* Miglionico 428:18–21 (referring to MVNOs as "subsidiar[ies] of Sprint"); PX170, at 42 (10-K including wholesale subscribers in Sprint's subscriber count). *Third*, an MVNO's success inures to the benefit of its partner MNO. PX585. MNOs bring in substantial revenue from their MVNO partners, because MVNOs must pay for every customer they acquire. PX1031; Kalinoski Dep. 12:9–23.

29.   Consistent with the wealth of evidence showing that MVNOs are not independent competitors, Prof. Shapiro appropriately attributed the market shares of MVNOs to the MNOs that provide the underlying network access. Shapiro 658:6-11–668:15.

7

**EXHIBIT C**

**IV. EVIDENCE REGARDING ANTICOMPETITIVE EFFECTS REINFORCES THE PRESUMPTION OF ILLEGALITY**

30.      Defendants have not shown that there is something unusual about this market that would render the presumption inapplicable. Rather, because of the high levels of market concentration that will result if Sprint and T-Mobile merge, this merger "is so inherently likely to lessen competition substantially" that it is presumptively unlawful and must be "enjoined in the absence of evidence clearly showing that [it] is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 362. "[T]he whole point of [this presumption is] to simplify merger litigation by basing illegality on concentration unless the defendant c[an] show decisive factors indicating that concerns about competition [a]re unwarranted." Areeda & Hovenkamp, *Antitrust Law* § 925. "[T]he antitrust policy conclusion that there is a significant relationship between the threat of high oligopoly prices and a reduction in the number of firms in the market has significant theoretical support." *Id.*; *see also Phila. Nat'l Bank*, 374 U.S. at 363.

31.      Defendants have not shown any "decisive factors" indicating that the presumption should not apply to this market. To the contrary, the evidence reinforces the presumption that this merger will lead to the kinds of coordinated and unilateral effects that will harm consumers.  In fact, even absent the presumption, the wealth of evidence of the unilateral and coordinated effects that would result if the Proposed Merger is not enjoined (*see infra* Part IV) would satisfy Plaintiff States' obligation to make out a prima facie case. *See Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 433 (5th Cir. 2008).

**A.      The Merger Will Increase Coordinated Interaction**

32.      Evidence that a merger will "enhanc[e] the likelihood of coordinated interaction by competitors" supports a finding that a merger is anticompetitive. *State of N.Y. v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 359 (S.D.N.Y. 1995); *see Anthem*, 236 F. Supp. 3d at 215.

8

Case 1:19-cv-02232-TJK   Document 63-1   35   Filed 01/24/20   Page 100 of 153
Case 1:19-cv-05434-VM-RWL   Document 358   Filed 01/03/20   Page 15 of 53

**EXHIBIT C**

### 1.    The Merger Makes Coordinated Interaction More Likely

33.    "Merger law rests upon the theory that, where rivals are few, firms will be able to coordinate their behavior. . . [to] achieve profits above competitive levels." *H.J. Heinz Co.*, 246 F.3d at 715; *see Stanley Works*, 469 F.2d at 507 ("[T]he greater the concentration in the market the greater is the likelihood that parallel policies of mutual advantage, not competition, will emerge."); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991). Eliminating a "particularly aggressive competitor that plays a disruptive role in the market," can increase the likelihood of coordinated interaction, particularly if that competitor had the "incentive to take the lead in price cutting." *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 79 (D.D.C. 2011).

34.    Defendants argue that this merger will not promote coordination but, rather, will allow them to better compete against their larger rivals, AT&T and Verizon.  But Defendants have not shown anything unique about the wireless industry that makes coordination unlikely.  Absent evidence that there are "'structural market barriers to collusion' that are unique to the . . . industry," a court must apply the "ordinary presumption of collusion." *H.J. Heinz Co.*, 246 F.3d at 724–25 (reversing district court's conclusion that presumption was defeated because merger would allow two smaller rivals to compete with a larger rival). As the D.C. Circuit explained, given the well-established risk of tacit collusion in concentrated markets, "[it] is a central object of merger policy to obstruct the creation or reinforcement by merger of such oligopolistic market structures in which tacit coordination can occur." *Id.*

35.    As noted *supra* ¶¶ 18, 20, this merger will significantly increase market concentration. Indeed, both Defendants and third parties view it as a "four-to-three" merger. Höttges 200:2–201:9; Legere 979:4–980:18; Ergen 1696:22–1697:10; PX370 p. 2; PX412 ███████.

36.    This increased concentration will reduce the carriers' incentives to compete with one another and drive prices up relative to where they would have been without the merger. Sprint's

**EXHIBIT C**

Chief Marketing Officer has indicated the merger will allow all three remaining carriers to increase their revenue. Sole 74:2–80:16; PX566. Deutsche Telekom ("DT") has noted that a "4>3 [merger is] in the interest of all mobile players." PX 329 p. 23; PX339 p. 120. And Mr. Legere called "4 to 3" a "big prize[]" and told T-Mobile's Board that Verizon and AT&T are "slowing their competitiveness" *because* of the merger. Langheim 290:4–291:20; PX410 p. 1337, PX370 p. 2.

37.     Sprint led the charge in introducing low-cost unlimited plans, was the first to introduce cell-phone leasing, and has an established strategy of being the low-price leader, such that its elimination will increase the likelihood of coordinated effects. PX170 pp. 33–34; PX111 p. 44; PX525 p. 4; PX535; Sole 25:4–26:8, 30:5-20, 36:15–42:18; Shapiro 680:10–681:19.

38.     While T-Mobile has historically also been an aggressive competitor, New T-Mobile will match the scale of Verizon and AT&T, and the economic incentives that previously encouraged it to act as a maverick will change. Shapiro 678:11–679:15; 681:20–683:7. As T-Mobile's former Chief Marketing Officer explained, larger carriers have less upside from cutting prices and more to lose. Sherrard Dep. 68:13–69:24, 72:17–73:22. And, though T-Mobile has argued that New T-Mobile's greater scale and lower network costs will incentivize it to lower its prices, Verizon and AT&T today have more scale and lower network costs than T-Mobile, and *higher* prices. Sievert 1135:23–1137:10. Mike Sievert, T-Mobile's incoming CEO, has a duty to maximize New T-Mobile's profits for shareholders and will raise prices if it would be profitable for T-Mobile in the long run. Sievert 1094:20-23, 1098:5-11.

### 2.     The Relevant Market Is Vulnerable to Coordinated Interaction

39.     Other market conditions, in addition to high concentration, can also be a "recipe for price coordination." *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 60 (D.D.C. 2009); *see also H&R Block*, 833 F. Supp. 2d at 78.

10

**EXHIBIT C**

40.     The market for retail telecommunications is characterized by high barriers to entry, inelastic demand, minimal consumer purchasing power and price transparency—all conditions that make it vulnerable to coordinated interaction. Shapiro 672:24–675:12, 703:18–704:19.

41.     Prices in this market are highly transparent. PX184; PX175; Staneff Dep. 53:23–55:3; PX924 pp.8, 36; PX1021 pp.28–31; PX554; PX514; Sole 31:15–32:4; Shapiro 675:6–676:5.

42.     Defendants have not shown that the market for retail mobile wireless services lacks high barriers to entry. Indeed, Prof. Katz conceded as much. Katz 1816:2–3; *see also* Shapiro 703:21–704:10 (noting that "no new nationwide carriers have [entered] for years").[3]

43.     Indications that market participants "have already shown an awareness that implicit coordination would be beneficial" can also support a finding that a market is susceptible to coordination. *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 209 (D.D.C. 2018); *see* HMG § 7.2 (prior attempts to coordinate "suggest that successful collusion was difficult pre-merger but not so difficult as to deter attempts, and a merger may . . . make success more likely").

44.     Defendants have repeatedly attempted to "signal"—or interpret perceived signals from— other MNOs regarding their competitive intentions. These "signals" are meant to facilitate coordinated interactions amongst the MNOs, and convey MNOs' awareness of the market's susceptibility to coordination. PX410 p. 13; PX459; PX647 pp. 1-2; PX777; PX856; PX1318; Langheim 278:22–279:10; Shapiro 676:9-24; Roettgering Dep. 44:20–47:22.

**B.      New T-Mobile Will Be Able To Unilaterally Raise Its Prices Post-Merger**

45.     Unilateral anticompetitive effects can occur when a merger's elimination of a competitor allows the remaining firm to charge higher prices or provide lower quality because it no longer

---

[3] These high barriers to entry have prevented cable companies like Comcast and Charter from acquiring significant market share. Schwartz 816:16–817:15. The cable companies do not expect this to change. Schwartz 871:18–872:19. Nor did Defendants in the months preceding the merger and the concomitant investigation and litigation. PX410 p. 856 ("TMUS has no concern or doesn't see impact on post-paid phone business from Cable MVNO").

Case 1:19-cv-02232-TJK Document 63-1 35 Filed 01/24/20 Page 103 of 153
Case 1:19-cv-05434-VM-RWL Document 358 Filed 01/08/20 Page 18 of 58

# EXHIBIT C

faces the risk that consumers will defect to the eliminated rival. *See* HMG § 6.1. Unilateral effects "may alone constitute a substantial lessening of competition." *Anthem*, 236 F. Supp. 3d at 216; *see Kraft Gen. Foods, Inc.*, 926 F. Supp. at 359.

46.     The risk of unilateral effects is magnified when the merging firms are "close competitors," even if they are not each other's "closest competitor." *Anthem*, 236 F. Supp. 3d at 216; HMG § 6.1. The danger that a merger will result in unilateral effects—and permit the combined company "to increase prices or otherwise maintain prices at an anti-competitive level"—is particularly acute when the merger would "eliminate significant head-to-head competition between the two lowest cost and lowest priced firms." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1082 (D.D.C. 1997).

47.     Generally speaking, Sprint and T-Mobile offer lower prices than Verizon and AT&T. Höttges 168:21–169:25; Sole 46:8–47:11

48.     Qualitative evidence shows that Defendants are close competitors. DT Board Member Thorsten Langheim agrees that Sprint and T-Mobile "compete[] rigorously head to head." Langheim 275:10-13. T-Mobile carefully monitors Sprint's competitive moves. Langheim 275:20–280:5, 287:17-288:12; PX410 pp. 8, 156-57, 1227; PX8112 p.14; PX913; PX977; PX837; Legere 994:24–998:5. It moved up the launch of its unlimited plan to beat Sprint. Sievert 1110:16–1113:4; PX898; PX535 p.1. And it has planned or provided offers directed at Sprint customers or local markets where Sprint is performing well. PX888; PX907; PX908 pp. 2, 6; PX914; PX967; PX554; PX890 p. 3; Legere 997:23–999:16. Sprint also competes aggressively with T-Mobile. PX514; PX525 p.4; PX527 p.11; Sole 24:19–26:8, 62:10–64:24; PX770. This competition extends to Defendants' prepaid brands. Rittgers 127:11–129:3; PX461; PX559; PX504 p.2; PX507; PX916; McLaughlin Dep. 217:17-25.

EXHIBIT C

49.     However, T-Mobile has downplayed its competition with Sprint in its public statements for strategic reasons. PX301; Legere 998:8–1002:16; PX890 p. 3; PX1001 p.1; Sievert 1113:18-25; PX339 p. 120; PX301; Sherrard Dep. 140:22–143:14. Sprint is aware of this tactic. PX554.

50.     Using a variety of sources of industry switching data, Prof. Shapiro quantified the extent of head-to-head competition between T-Mobile and Sprint and found that the two companies are very close competitors: Approximately 40% of the customers who switch away from T-Mobile switch to Sprint, and around 50% of the customers who switch away from Sprint switch to T-Mobile. Shapiro 693:19–695:24, 696:21-24.

51.     Based upon this quantification, Prof. Shapiro calculated that, even after the Boost divestiture, the elimination of direct competition between Sprint and T-Mobile will result in significant upward pricing pressure on New T-Mobile. Shapiro 698:15–702:22; PX1320, sl. 19. Prof. Shapiro's calculations are affected only minimally by incorporating certain adjustments proposed by Prof. Katz. PX1320, slide 19; Shapiro 2292:14–2293:19.

### C.     Defendants' Internal Documents Show That This Merger Is Anticompetitive

52.     Though unnecessary for a plaintiff to prevail, evidence that a merger is *intended* to reduce competition also supports a finding that the merger is anticompetitive. *See H.J. Heinz Co.*, 246 F.3d at 717; *Univ. Health, Inc.*, 938 F.2d at 1220 n.27; *Stanley Works*, 469 F.2d at 504.

53.     The evidence shows that DT—T-Mobile's controlling shareholder—has precisely those kinds of anticompetitive motives. Since at least 2010, DT and T-Mobile have been interested in pursuing a merger with Sprint, and Defendants have repeatedly engaged in merger negotiations. Höttges 187:18-25; Claure 1320:13-22, PX332, PX339 p. 120. Throughout this nine-year span, DT's reasons for pursuing a merger with Sprint have not materially changed. Höttges 188:4-7. These motives include what DT describes as the "'Rule of 3'—potential to reduce price competition." PX1034 p. 8; Höttges 197:6–198:9; Höttges Dep. 101:16-24; Ewens Dep. 20:11–

13

**EXHIBIT C**

21:22. Indeed, Mr. Langheim expressed the view that "if [T-Mobile] can't get 4-3 consolidation the industry is headed for commoditization"—that is, that because wireless services would become more of a commodity, prices would fall—"and DT should limit their exposure in the US." PX796, Ewens Dep. 73:7–77:2. And DT's head of M&A has emphasized that one of the potential benefits of a merger between Sprint and T-Mobile would be "market repair." PX382.

54.     DT also supports the merger because it will ensure that "cable c[annot] buy Sprint and use it against T-Mobile." PX303 p. 2; Langheim 348:6-11; PX343; PX339 p. 120.

## V.     **DEFENDANTS' REBUTTAL CASE**

55.     Defendants raise three defenses: (1) a weakened competitor defense, (2) an efficiencies defense, and (3) a remedies-based defense. Defendants fail to carry their burden each.

56.     In considering Defendants' arguments, this Court should accord little weight to evidence that "could arguably be subject to manipulation" or that may simply be an effort to "improve [a] litigation position." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 79–80 (D.D.C. 2017).

57.     Defendants' actions make clear why courts discount potentially self-serving testimony. Mr. Langheim, on behalf of DT, submitted a declaration in support of the 2011 AT&T/T-Mobile merger averring that the transaction would benefit T-Mobile's customers and U.S. consumers, even though he in fact believed the merger would hurt competition.  Langheim 299:12–300:16.

### A.     **Defendants' Weakened Competitor Defense**

58.     Defendants' first rebuttal argument is that Sprint is so weak that it will not be a meaningful competitor in the future and, therefore, that eliminating Sprint as a competitor will not substantially lessen competition.[4] This defense—often termed the "weakened competitor" or "flailing firm" defense—has been dubbed the "Hail-Mary pass of presumptively doomed

---

[4] Plaintiff States do not understand Defendants to be asserting a failing firm defense.

**EXHIBIT C**

mergers," *ProMedica*, 749 F.3d at 572, and is "probably the weakest ground of all for justifying a merger," *Kaiser Alum. & Chem. Corp. v. FTC*, 652 F.2d 1324, 1338–41 (7th Cir. 1981).

59.     To prevail on a weakened competitor defense, Defendants must show that: (1) Sprint's market share will decline so dramatically that it would undermine Plaintiff States' prima facie case, and (2) the purported weakness giving rise to this decline cannot be resolved by any means other than the merger. *ProMedica*, 749 F.3d at 572; *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 290 F. Supp. 3d 507, 515–16 (E.D. Va. 2018) (requiring an "imminent, steep plummet" in market share to prevail); *Aetna Inc.*, 240 F. Supp. 3d at 92; *FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281, at *58 (N.D. Ohio Mar. 29, 2011).

60.     Likely due to the stringency of these requirements, defendants sometimes try to avoid calling arguments about a merging entity's weakness what they truly are: a flailing firm defense. Instead, these defendants argue that evidence related to the merging entity's weakness is simply relevant to the competitive-effects analysis. But courts have rejected efforts to make an end-run around the high bar the weakened competitor defense imposes. *See, e.g.*, *Steves & Sons, Inc.*, 290 F. Supp. 3d at 510–11, 513, 517.

61.     Sprint's market share has been stable the past few years, and will remain so for at least the next several years. Shapiro 650:2–652:20; PX1258 sl. 3–4.

62.     Over the past four fiscal years, Sprint's revenue and subscriber totals have also remained stable, with some increases.[5] At the same time, Sprint's EBITDA has increased by 29.4%, and its EBIT has increased three-fold. PX1315 p. 2; Solomon 2004:23–2005:24, 2007:16-24.

63.     Sprint executives have recently and repeatedly assured investors of the company's

---

[5] While Sprint reported that wireless service revenue declined during the past two quarters, Sprint has told investors that the declines were due to one-off events that are unlikely to recur (an accounting change and an adjustment based on an error Sprint made with respect to government subsidies). PX115 p. 5; PX214 p. 5; Solomon 2015:7–2017:23. Absent these idiosyncrasies, Sprint's wireless service revenue would have remained stable. *Id.*

# EXHIBIT C

stability. PX104; PX632; PX1256; Claure 1327:23–1328:19, 1330:8–1331:24, 1332:14-23;

Solomon 2011:18–2012:10. In 2018, Sprint even touted the "best profitability in company

history" after securing "its highest annual operating income" ever. PX109 p. 1.

64.     These positive results have occurred despite Sprint's acknowledgement that the pendency

of the merger has made it "harder to compete." PX123 p. 8; *see also* PX170 p. 15; Solomon

2012:20–2015:3. Sprint has also limited and altered its spending on network improvements due

to the merger. Davies Dep. 94:22–96:4; PX1202; Bluhm 497:9–498:6.

65.     These positive results also belie Sprint's self-serving predictions about its future. Sprint is

financially stable. *See supra* ¶¶ 62–63. And it has a considered strategy to prioritize 48 markets

(covering approximately 70% of the U.S. population) for 5G expansion, while also improving its

network in the remaining markets. Combes 1424:25–1425:15; PX1202 pp.12–17. Under this

plan, Sprint would continue to be a national carrier, covering 93% of the U.S. population.

66.     Sprint's current situation compares quite favorably to T-Mobile's in 2011. T-Mobile was

hemorrhaging customers and had high churn and an inferior network. PX394, PX1263; Legere

905:5-20, 941:18–942:25; Langheim 292:1–295:10. Sprint, by contrast, has held steady at over

50 million total subscribers for years, and it possesses an extremely valuable trove of mid-band

spectrum that Sprint has told another judge in this Court will allow it to "leap-frog" its

competitors as it deploys 5G. PX648 ¶¶ 24–25; PX1315 p. 2.

67.     Just as T-Mobile overcame the challenges it faced in 2011, Sprint can overcome the

challenges it is currently facing. Indeed, Sprint has developed a plan to spend approximately $5

billion a year over five years to improve its network,[6] PX425 p. 12; Bluhm 456:7-16, 458:4–

---

[6] Sprint spent the first $5 billion in 2018, and has already observed significant network improvements. PX436-N, pp. 2, 17; Bluhm 467:19–472:1. There is a lag between network investment and improved customer perception, such that one would not yet expect to see a substantial improvement in the public's perception of Sprint's network based on this expenditure. PX437-N, pp. 74–75; Bluhm 444:16–446:9, 460:19–461:8.

460:2; Combes 1407:25–1408:25; Solomon 2024:14-16, and its adjusted operating cash flow, as forecasted in its Board-approved plan of record, will be more than sufficient to fund this level of investment, Solomon 2020:11-18, 2026:17-22. Should Sprint require additional funds, it has $10.9 billion of near-term sources of debt available, as well as cash on its balance sheet and additional borrowing capacity. PX1315 p. 8; Solomon 2031:7–2032:21, 2064:21-22, 2065:19–2066:2. Softbank's Founder and CEO Masayoshi Son has stated that he is willing to pay back all Sprint's bonds. PX469; Claure 1318:18–1319:12. With the right leadership and a commitment to innovation, Sprint can follow T-Mobile's precedent and strengthen its competitive position.

68.     Sprint also has a number of strategic alternatives to a merger with T-Mobile, including a merger or MVNO arrangement with a cable company. PX196 p. 5; Claure 1342:23–1343:2; PX220 p. 14. In 2018 Sprint also contemplated a merger with DISH, proposing that the merged company could sell spectrum for financing while still deploying the country's best 5G network. PX252; Claure 1343:22–1344:12; Cullen 1770:6–1771:14, 1775:19-22.

### B.     Defendants' Efficiencies Defense

69.     Defendants' efficiencies defense rests on the claim that the merged firm will have a superior network, with greater capacity and lower costs, than the standalone firms could achieve. Defendants purported to quantify these cost efficiencies by developing a model that projects dramatically lower marginal congestion relief costs for the merged firm compared with the standalone firms by 2024. Scott Morton 2188:20–2189:10.

70.     "The Supreme Court has never expressly approved an efficiencies defense to a § 7 claim," and circuit courts that have entertained this defense have made clear that it is highly disfavored. *St. Alphonsus*, 778 F.3d at 788–89, 790 ("We remain skeptical about the efficiencies defense"); *accord FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 348 (3d Cir. 2016); *Anthem*, 855 F.3d at 353; *see also* Plaintiffs' Pretrial Mem. at 18-19. No court has held that the

17

**EXHIBIT C**

benefits generated by a merger are sufficient to overcome a presumption of illegality. *See Anthem*, 236 F. Supp. 3d at 236–37.

71. Defendants must show that any alleged efficiencies are "sufficient to overcome the presumption of anticompetitive harm." *Sysco Corp.*, 113 F. Supp. 3d at 86; *see also Penn State Hershey Med. Ctr.*, 838 F.3d at 350. Where, as here, "the potential adverse competitive effect of a merger is likely to be particularly substantial, extraordinarily great cognizable efficiencies would be necessary." HMG § 10; *St. Alphonsus*, 778 F.3d at 790. Efficiencies outside the relevant market are irrelevant to this inquiry. *See* Plaintiffs' Pretrial Mem. at 4–5 n.2, 18-19.

72. Defendants bear the burden of showing that: (1) the claimed efficiencies are "verifiable, not merely speculative," *St. Alphonsus*, 778 F.3d at 791; (2) the efficiencies are "merger-specific. . . which is to say that the efficiencies cannot readily be achieved without the concomitant loss of a competitor," *id*. at 790-91; *see also H.J. Heinz Co.*, 246 F.3d at 721–22; and (3) the claimed efficiencies will benefit customers, *Univ. Health, Inc.*, 938 F.2d at 1222.

73. For alleged efficiencies to be deemed verifiable, "the court must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior." *H.J. Heinz Co.*, 246 F.3d at 721. This rigorous analysis requires that efficiencies be "reasonably verifiable by an independent party"; the testimony of "experienced executives" alone will not suffice. *H&R Block*, 833 F. Supp. 2d at 89, 91; *see also Tronox Ltd.*, 332 F. Supp. 3d at 215-17; *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 73 (D.D.C. 2018).

74. Courts view projections of efficiencies created "outside of the usual business planning process" with great skepticism. HMG § 10; *see ProMedica Health Sys., Inc.*, 2011 WL 1219281, at *40; *United States v. Rockford Mem'l Corp.*, 717 F. Supp. 1251, 1289 (N.D. Ill. 1989).

Case 1:19-cv-02232-TJK   Document 63-1 35   Filed 01/24/20   Page 110 of 153
Case 1:19-cv-05434-VM-RWL   Document 358   Filed 01/08/20   Page 25 of 58

EXHIBIT C

75.     Less weight is given to efficiencies that are remote in time, "because they are…more difficult to predict." HMG § 10; *see also CCC Holdings*. 605 F. Supp. 2d at 76; *Anthem*, 855 F.3d at 358 (efficiencies too speculative when renegotiations would take 3-5 years to complete).

### 1.     Defendants' Efficiencies Estimates Are Not Ordinary Course

76.     In early 2018, T-Mobile did not have a capacity/congestion planning model for 5G that it used in the ordinary course of its business. Scott Morton 2203:6-17; Kapoor 1314–1513:25; PX75 pp. 2-3 & n.3; PX81 pp. 2-3. Instead, Prof. Katz made his efficiencies calculations using the "Montana" congestion planning model, which was created at counsel's direction over the course of six months *after* Defendants' Boards had already evaluated and approved the merger in April 2018. Kapoor 1514:12–1518:3; Ray Dep. 107:3-10; Kapoor Dep. 65:19–66:8; PX81.

77.     To build the Montana model, T-Mobile—under the direction of outside counsel—substantially modified its existing 4G congestion planning tool for litigation purposes, adding a 5G module, a Sprint standalone scenario, and a New T-Mobile scenario. Scott Morton 2188:10-13; Kapoor 1512:13-1514:11; PX81. Sprint does not use a congestion-based network planning model in the ordinary course of its business at all, making the Montana model a particularly unreliable means of measuring its marginal costs. Kapoor 1481:6-17; Scott Morton 2204:14-20.

78.     Because this model was created outside the usual business planning process, the Court should view Defendants' efficiencies estimates with great skepticism.

### 2.     The Montana Model's Estimates Are Unverifiable and Speculative

79.     The Montana model recommends congestion solutions through 2024 based on data from 2018, but the ordinary course model (onto which T-Mobile grafted the 5G, New T-Mobile and Sprint standalone modules) is used to make capacity deployment plans only up to 18 months in advance. Moreover, in the ordinary course, T-Mobile semiannually updates the data inputs on which congestion calculations are based. Kapoor 1522:11–1531:2; Scott Morton 2202:19–

19

Case 1:19-cv-02232-TJK-R Document 63-1 358 Filed 01/24/20 Page 111 of 153
Case 1:19-cv-05434-VM-RWL Document 358 Filed 01/08/20 Page 26 of 58

**EXHIBIT C**

2203:5; PX1214.

80.     The static nature of the Montana model renders Defendants' projections of efficiencies through 2024 speculative and unreliable. Scott Morton 2187:23–2188:4. *First,* because its input data is static for five years, the Montana model has no "memory" of and cannot accurately account for the capacity effects of solutions implemented in prior years.  For example, to address congestion in year 2, the model will simply recommend the year 1 solutions again, and then layer on additional solutions to address demand increases in year 2.   This flaw will necessarily exaggerate T-Mobile's costs. Kolodzy 2119:7–2121:5; Kapoor Dep. 165:3-8; PX1314, slide 20. *Second*, as the Montana model's projections get further out in time, the extent to which they are based on an inaccurate representation of the physical network increases, rendering the model's results more and more unreliable. Kolodzy 2117:19–2121:5; PX1314 p. 20.

81.     The Montana model fails to account for the fact that the integration of Sprint and T-Mobile's network may be delayed, even though Defendants have acknowledged this possibility, and notwithstanding the fact that T-Mobile's last major acquisition is currently failing to meet its goals. Höttges 222:13-25; Combes Dep. 193:9–194:11; Ewens Dep. 196–199; PX300 p. 3.

82.     The Montana model artificially increases the costs, and constrains the performance, of standalone Sprint and T-Mobile by assuming that neither firm will acquire any new spectrum during the five years it models. Katz 1950:11-1952:5; Ray Dep. 79:6-10; Scott Morton 2191:8–2192:22, 2195:1-10. This assumption provides a significant advantage to the combined firm in Prof. Katz's calculation of efficiencies—spectrum valued at approximately $26 billion—without accounting for the possibility of any spectrum acquisitions by standalone Sprint or T-Mobile. Scott Morton 2246:5-22. Indeed Prof. Katz conceded that New T-Mobile's "additional" spectrum is the principal advantage it has over standalone T-Mobile. Katz 1947:7-20. But, this

20

assumption is unrealistic and inconsistent with historical business practices; Sprint and T-Mobile have obtained spectrum every year for the past seven years and intend to continue to do so. Kolodzy 2102:9–2103:6; Combes 1413:6-8; Sievert 1124:20–1125:2; PX1121; PX1314, slide 13. And the FCC plans to auction hundreds of megahertz of desirable mid-band spectrum later this year, including CBRS and C-band spectrum. Kolodzy 2092:3–2095:25; 2100:13–2101:1.1

83.     The Montana model also ignores advances in technology that would increase the efficiency of Defendants' use of their existing spectrum, thereby increasing the costs associated with standalone Sprint and T-Mobile. For example, the Montana model ignores a technology called DSS that would more efficiently transition spectrum between 4G and 5G. Kolodzy 2104:11–2108:24; PX1314, slides 14-17; Scott Morton 2234:17–2235:2; Kapoor Dep. 106:24–108:14. This static view of technology is yet another reason the Montana model's projections are unreliable. Scott Morton 2191:11-21; Kolodzy 2103:7–2104:10; Bluhm 487:7-18.

84.     Prof. Katz admits that his calculations for standalone T-Mobile and Sprint require accurate models of T-Mobile and Sprint's future behavior, and that business plans inform that behavior. Katz 1962:15–1963:12. But T-Mobile has not yet determined its standalone plan if the merger is enjoined and does not know if that plan will meet "some or all of the objectives that [Defendants are] trying to meet with the Sprint merger." Höttges 231:11-14; Langheim 350:12-22. Moreover, since Sprint provided its data to T-Mobile, Sprint has been developing alternative plans for its standalone future, which rely on different spectrum and technology than the network plans and data used in the Montana model. These differences would impact the Montana model's results. Kapoor Dep.198:12-199:4, 199:16-24; Kolodzy 2122:19-2124:12.

85.     The "congestion threshold"—the calculated speed below which the model triggers congestion solutions—that T-Mobile modeled for 5G is significantly and unreasonably larger

# EXHIBIT C

than the threshold that T-Mobile used for 4G. The 5G congestion threshold T-Mobile selected is based on the speeds necessary to stream 4K video, a screen resolution that is a tiny percentage of phones used on T-Mobile's network, and is unlikely to be visibly superior to existing resolutions. Kapoor 1538:8–1542:1; DX 5060 p. 17; Ray Dep. 40:20–44:16; Kolodzy 2111:5–2113:14. This choice of congestion threshold artificially inflates the costs estimated by the model. Kolodzy 2113:15–2114:25; PX1314 p. 29. This inflation of costs is exacerbated by the questionable way the model handles leakage of 5G onto LTE-only sites.  Kolodzy 2115:10-12216:22.

86.     Once Prof. Katz's model is adjusted to accommodate more realistic predictions regarding standalone T-Mobile and Sprint—like the acquisition of spectrum—Defendants' projected efficiencies decrease dramatically. Scott Morton 2192:21–2193:16, 2200:11-20; Kolodzy 2088:13–2091:20, 2106:6–2107:1; PX1314 pp 3–57. Defendants' projected efficiencies are therefore speculative and unverifiable.

87.     Prof. Katz has no opinion on the merger's competitive effects if his numbers are incorrect.  Katz 1925:3-23.

### 3.     Prof. Katz Did Not Accurately Model Network Speed Efficiencies

88.     Prof. Katz relied on this flawed Montana model to calculate the efficiencies consumers might experience as a result of improved network speed. Scott Morton 2205:2–2206:10.

89.     Prof. Katz's attempt to value any merger-specific increases in speed is speculative as his calculation is based on an article studying dramatically slower speeds (15 megabits per second) in a much different environment than those standalone Sprint and T-Mobile will offer in 2024. Scott Morton 2205:2–2214:8. This distinction is important: Prof. Katz's analysis assumes that consumers derive tremendous quantifiable benefits beyond those that will already occur from the 5G networks that will be built by standalone T-Mobile and Sprint. *Id*. But mobile wireless customers value speed only insofar as it enhances their user experience. *Id*. For example, once a

22

customer has the speed necessary to watch a video on his phone without interference, additional speed loses practical impact, and thus value. *Id*. Prof. Katz's work does not properly model this.

90.     The possibility that future products, services or technologies will rely on greater speeds and bring quantifiable consumer value is too speculative to justify an anticompetitive merger. Scott Morton 2214:12–2216:2; 2216:19–2217:14. Such possible future technologies would need to be merger-specific in order to be credited as efficiencies. *Id*. at 2216:9-18.

#### 4.     Defendants' Efficiencies Are Not Merger-Specific

91.     Efficiencies are not cognizable if some or all of the benefits could be achieved via "alternatives that are practical in the business situation faced by the merging firms" and that would not harm competition. HMG § 10.

92.     Prof. Katz's analysis of merger specificity did not address "potential options that might bring similar benefits that don't involve a transaction of some form between T-Mobile and Sprint," as Defendants must to establish an efficiencies defense. Katz 1973:5-8, 1972:24–1973:4.

93.     Sprint has a variety of means of achieving consumer-enhancing improvements to its standalone performance. It has the opportunity to "leapfrog" its competition as a standalone firm. PX648, ¶¶ 24–25. And it has considered the possibility of a merger with Comcast, Charter or DISH in the past. *See supra* ¶ 66. Prof. Katz did not consider such transactions. Katz 1973:9-13.

94.     Mr. Legere admitted that alternative transactions could bring T-Mobile equivalent benefits to the Sprint merger. For example, Mr. Legere has never thought that a merger between T-Mobile and Sprint "[would be] superior to" a merger between T-Mobile and DISH. Legere 956:21–957:3. And that transaction would result in a "deep nationwide spectrum position," much like the Sprint merger. Legere 951:14–956:6; *see* Höttges 226:9–227:6; PX334. Mr. Legere believed in 2017 that it would be "easy" to buy DISH. PX378. Alternatively, T-Mobile could lease spectrum from DISH, providing it with the "principal advantage" of the Sprint merger,

# EXHIBIT C

without the anticompetitive effects. Cullen 1766:1–1767:19; Legere 963:2-18; Katz 1947:7-20.

95.     If the merger with Sprint is not consummated, DT's employees acknowledge that T-Mobile has a strong stand-alone future. DT will continue to invest in the company, and T-Mobile will be able to acquire new spectrum and towers, and continue to offer attractive products to customers. Legere 958:19–961:1; Langheim Dep. 246:18–247:3.[7]

96.     T-Mobile and Sprint do not need to merge in order to compete with AT&T and Verizon. Today, more than 130 million customers choose T-Mobile and Sprint's offerings instead of Verizon or AT&T. Legere 912:23–25 (84M); Claure 1336:13–14 (50M). Indeed, T-Mobile announced in late 2017, when its merger negotiations with Sprint had reached an impasse, that it did not need to merge with Sprint to compete vigorously with Verizon and AT&T. T-Mobile's Chief Financial Officer, told investors that as T-Mobile continued to "scale and evolve…we believe AT&T and Verizon will shrink. We'll come up and there will be an equilibrium." PX92 p. 13. T-Mobile also engaged in strategic planning sessions in which it laid out several plans for T-Mobile's future, including a scenario in which T-Mobile would become the largest wireless player in the U.S. Legere Dep. 176:9–180:8; PX1045 at 76. And while T-Mobile witnesses claim that New T-Mobile will be better able to compete against Verizon and AT&T, Mr. Sievert admitted that those two companies have already "been forced to respond over and over to what [T-Mobile has] done." Sievert 1136:22–1137:5.

97.     Finally, while Defendants claim that some of the merger's efficiencies are attributable to spectrum constraints that Sprint and T-Mobile will face if they remain standalone companies, similar claims have been made—and proven wrong—in the past. Katz 1943:10–1947:1; Kapoor

---

[7] In 2017, once a merger with Sprint no longer seemed possible, T-Mobile and DT repeatedly expressed their enthusiasm for T-Mobile's standalone future. Sievert 1114:7–1121:1; PX325; PX1067.

Case 1:19-cv-02232-TJK   Document 63-1   Filed 01/24/20   Page 116 of 153
Case 1:19-cv-05434-VM-RWL   Document 358   Filed 01/08/20   Page 31 of 38

**EXHIBIT C**

Dep. 156:21–157:22; PX211 p. 44, PX332 p. 4. And T-Mobile believes it has "multiple paths to extend capacity," that are not dependent on this merger. Langheim Dep. 259:24–262:3; PX760.

### C. Defendants' Remedies-Based Defense

98.     Defendants' final defense is that their agreements with the FCC and USDOJ resolve any anticompetitive effects the merger would otherwise have. To evaluate this defense, the Court must assess whether these remedies will "replace the competition lost by the merger." *Aetna Inc.*, 240 F. Supp. 3d at 60; *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972).

99.     *Defendants* bear the burden of showing that the proposed remedies will restore competition to pre-merger levels. *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 137 n.15 (D.D.C. 2016); *see also Sysco*, 113 F. Supp. 3d at 72; *Aetna Inc.*, 240 F. Supp. 3d at 60; *United States v. Franklin Elec. Co.*, 130 F. Supp. 2d 1025, 1033 (W.D. Wis. 2000).

100.    **FCC Commitments:** To secure FCC approval, Defendants committed to: (1) divest Boost Mobile; (2) freeze rate-plan prices for three years; and (3) build a nationwide 5G network on a prescribed schedule; including a slightly quicker rollout in some rural markets. PX1211, ¶¶ 25–32. Unsurprisingly, given that the FCC's focus is not competition, these commitments do not "negate" the merger's anticompetitive effects. *Staples, Inc.*, 190 F. Supp. 3d at 137 n.15. *First*, Boost as a standalone brand with 9 million customers is insufficient to replace Sprint, a company that has been a robust competitor for decades. *Second*, a commitment to freeze prices means little in a market where "[f]ierce competition . . . has led to falling prices" for years. *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 65 (D.D.C. 1998). *Third*, Sprint and T-Mobile are *already* selling 5G service in markets throughout the country and have comprehensive standalone plans to compete as 5G leaders. Sole 80:22–83:16; PX648 pp.7–8; Langheim 368:12–14; PX131. In any event, improved coverage in certain markets cannot justify an increase in market concentration nationwide, or the anticompetitive effects that concentration generates. *See*

**EXHIBIT C**

*Phila. Nat'l Bank*, 374 U.S. at 370.

101.    **DISH Deal:** USDOJ reviewed the transaction as originally proposed—and as modified by Defendants' FCC commitments—and concluded that it was an anticompetitive 4-to-3 merger that would result in "increased prices and less attractive service offerings for American consumers." PX1213, ¶ 5. But USDOJ opted to approve the transaction after facilitating a deal ("the DISH deal") between Defendants and DISH, a satellite TV provider, that was primarily intended to allow DISH to enter the market as a fourth retail wireless competitor.[8] PX5363; PX254 p.179.

102.    In evaluating whether the DISH deal is an adequate remedy, this Court must ask whether DISH's entrance into the market will be "timely, likely, and sufficient in its magnitude, character and scope to deter or counteract the competitive effects of concern." HMG § 9.

103.    The relevant time frame for assessing "timeliness" is "two to three years." *Staples, Inc.*, 190 F. Supp. 3d at 133; *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *70 n.19 (N.D. Cal. 2014); *H&R Block*, 833 F. Supp. 2d at 73 n.28; *ProMedica Health Sys.*, 2011 WL 1219281, at *31. This Court must ask whether, "in the near term," DISH will be able to "step into [Sprint's] shoes" and "maintain . . . the pre-merger level of competition." *Sysco*, 113 F. Supp. 3d at 73.

104.    Courts have rejected arguments that a new competitor is likely or sufficient to resolve the competitive risks of a merger where the new competitor is projected to be significantly smaller than the acquired firm. *See, e.g.*, *Sysco Corp.*, 113 F. Supp. 3d at 73. Courts have also found relevant a new entrant's lack of relevant expertise or brand recognition, disadvantages a new

---

[8] Certain key aspects of the remedy negotiated by USDOJ, and the extensions to DISH's build-out deadlines, are dependent on further action by the FCC. Ergen 1709:2–1712:13; PX1211 n.15 & ¶ 395. The timeline for FCC action is uncertain, as is its ultimate conclusion. Until the FCC acts, this Court cannot predict what its decision will be. *See Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 321 (D.C. Cir. 2011); *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943).

Case 1:19-cv-02232-TJK Document 63-1 Filed 01/24/20 Page 118 of 153
Case 1:19-cv-05434-VM-RWL Document 358 Filed 01/03/20 Page 33 of 38

# EXHIBIT C

entrant may face with respect to distribution and personnel, and whether there have been high barriers to entry in the relevant market historically.[9] *See, e.g.*, *Staples, Inc.*, 190 F. Supp. 3d at 134; *Sysco Corp.*, 113 F. Supp. 3d at 76–77; *Aetna Inc.*, 240 F. Supp. 3d at 64–65, 72–73.

105.    Finally, remedies involving a new entrant must provide for an "*independent* competitor." *Sysco*, 113 F. Supp. 3d at 77. A "continuing relationship[]" between a defendant and a new entrant "can be a problem." *Id.*; *Aetna Inc.*, 240 F. Supp. 3d at 60; *CCC Holdings*, 605 F. Supp. 2d at 49.

106.    DISH's entrance into the market will not be timely, likely, or sufficient to replace the competitive significance of Sprint and, thus, to mitigate the anticompetitive effects of the merger. Scott Morton 2179:25–2180:6, 2221:13–14; *see also* Shapiro 703:21–704:10, 711:16–712:10.

107.    DISH is a satellite TV provider with no experience in the retail mobile wireless industry, no retail wireless subscribers, no retail wireless network, no retail wireless stores, no brand associated with retail wireless services, and no towers capable of communicating with handsets. Ergen 1566:7:1568:9; Cullen Dep. 31:22–32:6, 32:19–34:4, 35:17-19, 35:22.

108.    According to DISH's own projections, in two to three years, the company will still pale in comparison to Sprint. DX7199. Today, Sprint has about 45 million subscribers, and its network covers 93% of the population. Shapiro 703:21–704:10. In two years, DISH projects that it will have ███████████████████████████████████████. DX7199 p. 6. DISH's FCC commitments, moreover, require DISH's network to cover just 20% of the population by mid-2022. DX7202. ████████████████████████████████████████

---

[9] DISH EVP of Corporate Development Thomas Cullen testified that the wireless industry's high barriers to entry would likely keep DISH from ever entering the retail market absent the DISH deal. Cullen 1762:21–1763:13. And Mr. Ergen testified that DISH originally opposed the merger because it believed that a transition from four market participants to three would prevent any potential competitor—DISH included—from entering the market. Ergen 1584:21–1585:18, 1741:14–1742:15; *see* Blum Dep. 42:22–44:12; PX73; PX74; PX82; PX13–PX26; PX259.

**EXHIBIT C**

███████████████████████████████████████████████████████████████.

DX7199 p. 6. By 2023, DISH has committed simply to cover 70% of the population with its network. DX7202.

109.    DISH has offered no concrete explanation as to how it arrived at the subscriber and revenue numbers in its models. Although DISH justified its numbers by referencing negotiations with potential partners, Ergen 1652:7–18, none of those deals has been finalized, and DISH lacks any firm financing commitments. Cullen 1768:19–1769:2; Ergen 1628:9–14, 1668:7–24.

110.    DISH will be dependent on numerous third parties (tower companies, handset manufacturers, tech companies, etc.) to succeed. Cullen 1754:17–1755:8, 1756:22–1757:20, 1759:8–17, 1761:6–15; Ergen 1578:17–1579:13. If any of these companies falls behind schedule, those delays could disrupt DISH's deployment. *See id.*; PX97.

111.    Although DISH told the FCC in 2012 that it planned to enter the retail wireless market, now—more than seven years later—DISH still has not built a mobile broadband network for consumers. PX37 (2012 Letter); Ergen 1728:17–1729:10.

112.    DISH has repeatedly failed to meet FCC-imposed deadlines, even when it has faced harsh consequences for doing so. Ergen 1681:18–21; PX1303; PX1305; PX1177. DISH has also found ways to subvert and make an "end-run[]" around certain FCC regulatory regimes, including its decision to "abuse" the FCC's designated entity program. PX1306; *see* PX1308–PX1310.

113.    At least two federal courts have found that testimony offered by DISH Chairman Charles Ergen, was untruthful or not credible. *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 276 F. Supp. 2d 1237, 1244 (S.D. Fla. 2003), *overruled on other grounds by* 450 F.3d 505 (11th Cir. 2006); *In re: LightSquared, Inc.*, 511 B.R. 253, 319 (S.D.N.Y. 2014).

114.    Defendants have expressed skepticism about whether DISH seriously intends to build a

28

# EXHIBIT C

nationwide network. PX346; PX347; PX375; PX401; PX402; PX403; Claure 1346:4-1348:22.

115. For at least the next seven years, DISH will be reliant on New T-Mobile to provide mobile wireless service to some, if not all, of its customers. DX5363, pt. VI; DX7207; Ergen 1715:15–24. DISH will also rely on New T-Mobile to provide transition services. *Id.* In exchange, DISH will pay some portion of its revenue to New T-Mobile. *Id.*; Ergen 1717:2–7. For these reasons, DISH will not be an *independent* competitor. Ergen 1719:4–1722:2; Shapiro 714:9–715:1; Scott Morton 2222:2–2223:6. Even as DISH and New T-Mobile are contractually obligated to work together to provide wireless service to DISH's customers, DISH and New T-Mobile will be competing against one another for customers. *Id.* This scenario will give rise to an inherent conflict of interest. *Id.*

116. In sum, there is considerable reason for this Court to doubt whether DISH will build the promised network; and, even if it does, DISH's most optimistic projections still fall well short of being timely, likely, or sufficient to replace the lost competition that Sprint has long provided.

## VI. **PERMANENT INJUNCTION**

117. Courts consider four factors in deciding whether to issue a permanent injunction: (1) "irreparable injury"; (2) inadequacy of remedies at law; (3) "the balance of hardships"; and (4) whether "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The first two are satisfied if a merger "threatens to reduce competition" and will cause ongoing economic harm to consumers. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660–62 (2d Cir. 2015).

118. This merger threatens to reduce competition and cause ongoing economic harm to consumers in the form of higher quality-adjusted prices relative to where prices would be absent the merger. The upward pricing pressure caused by the loss of head-to-head competition between Sprint and T-Mobile would cause $4.6 billion in consumer harm if New T-Mobile passes on only

**EXHIBIT C**

*half* of this pressure to consumers. Shapiro 698:15–702:22; PX1320, slide 19. And if, as a result of coordinated interaction, Verizon, AT&T, and New T-Mobile hold prices steady for a single year, it would cost consumers approximately $8.7 billion. Shapiro 668:23–675:12, 684:1-25.

119. Defendants' pre-trial brief did not identify any hardships faced by Defendants from issuance of an injunction, and the fact that an injunction would require Defendants to continue to "compete with other firms in the market is what the antitrust laws require, not a cognizable harm." *New York v. Actavis, PLC*, 2014 WL 7015198, at *45 (S.D.N.Y. Dec. 11, 2014). By contrast, denying an injunction would cause billions of dollars of harm to consumers.

120. In considering the public interest, the Court's analysis must be tethered to the purposes of the Clayton Act. *See* Plaintiffs' Pretrial Mem. at 27–29. An injunction that curbs an antitrust violation is consistent with the public interest. *See Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 699 (2d Cir. 1973) ("[D]oubts as to whether an injunction . . . is necessary to safeguard the public interest" against an antitrust violation "should be resolved in favor of granting the injunction," regardless of whether the plaintiff is the government or a "private attorney general."). This reflects the well-established proposition that a "reduction in competition must be considered against the public interest." *Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074, 1080 (2d Cir. 1990); *Actavis,* 787 F.3d at 662.

121. A federal agency's determination that a merger is in the "public interest" is not controlling. *Radio Corp. of Am.*, 358 U.S. at 337, 346 (prior FCC approval under a public interest standard not controlling); *Fed. Power Comm'n*, 369 U.S. at 485–86, 490; *Phil. Nat. Bank*, 374 U.S. at 332 & n.8, 350-52.

# EXHIBIT C

Dated this 8th day of January, 2020.
Respectfully submitted,

FOR PLAINTIFF STATE OF
NEW YORK

LETITIA JAMES
Attorney General

CHRISTOPHER D'ANGELO
Chief Deputy Attorney General,
Economic Justice Division
(*pro hac vice* forthcoming)

Beau Buffier
Beau.Buffier@ag.ny.gov
Elinor R. Hoffmann
Elinor.Hoffmann@ag.ny.gov
Morgan J. Feder
Morgan.Feder@ag.ny.gov
Michael Jo
Michael.Jo@ag.ny.gov
Jeremy R. Kasha
Jeremy.Kasha@ag.ny.gov
Beatriz Marques
Beatriz.Marques@ag.ny.gov
Amber Wessels-Yen
Amber.Wessels-Yen@ag.ny.gov
James Yoon
James.Yoon@ag.ny.gov
New York State Office of the      Attorney
General
28 Liberty Street
New York, NY 10005
Tel:  (212) 416-8262

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General

KATHLEEN FOOTE
Senior Assistant Attorney General

MICHAEL JORGENSON
Supervising Deputy Attorney General

Paula L. Blizzard
Paula.Blizzard@doj.ca.gov
Adam Miller
Adam.Miller@doj.ca.gov
Nicole Gordon
Nicole.Gordon@doj.ca.gov
Michael Battaglia
Michael.Battaglia@doj.ca.gov
Brian Wang
Brian.Wang@doj.ca.gov
California Office of the Attorney General
455 Golden Gate Avenue Suite 11000
San Francisco, CA 94102
Tel:  (415) 510-4400

MUNGER, TOLLES & OLSON LLP

Glenn D. Pomerantz
Glenn.Pomerantz@mto.com
Kyle W. Mach
Kyle.Mach@mto.com
Kuruvilla J. Olasa
Kuruvilla.Olasa@mto.com
Sarah G. Boyce
Sarah.Boyce@mto.com
Lauren E. Ross
Lauren.Ross@mto.com
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel:  (213) 683-9100

31

**EXHIBIT C**

*Attorneys for Plaintiff State of California ex rel. Xavier Becerra*

32

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, STATE OF
KANSAS, STATE OF NEBRASKA, STATE OF
OHIO, STATE OF OKLAHOMA, STATE OF
SOUTH DAKOTA, STATE OF LOUISIANA,
STATE OF FLORIDA, STATE OF COLORADO,
STATE OF ARKANSAS, and STATE OF TEXAS

      Plaintiffs,

vs.

DEUTSCHE TELEKOM AG, T-MOBILE US,
INC., SOFTBANK GROUP CORP., and SPRINT
CORPORATION

      Defendants.

No. 1:19-cv-02232-TJK

**BRIEF OF AMICUS CURIAE BY**

**THE RURAL WIRELESS ASSOCIATION, INC., NEW AMERICA'S**

**OPEN TECHNOLOGY INSTITUTE, AND CONSUMER REPORTS**

# EXHIBIT D

**EXHIBIT D**

 **Department of Justice**

STATEMENT OF

**MAKAN DELRAHIM**
**ASSISTANT ATTORNEY GENERAL**
**ANTITRUST DIVISION**
**U.S. DEPARTMENT OF JUSTICE**

BEFORE THE

**SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND**
**ADMINISTRATIVE LAW**
**COMMITTEE ON THE JUDICIARY**
**U.S. HOUSE OF REPRESENTATIVES**

FOR A HEARING ENTITLED

**"OVERSIGHT OF THE ENFORCEMENT OF THE ANTITRUST LAWS"**

**NOVEMBER 13, 2019**

**The Department was not notified of the new scope of the hearing until Friday November 8, 2019. Because of the late notice of the change, we are unable to clear written testimony specific to the hearing's narrowed subject matter. The Department respectfully requests the opportunity to supplement Assistant Attorney General Delrahim's written testimony after the hearing with cleared testimony on the new subject matter, as it deems necessary.**

**STATEMENT OF
MAKAN DELRAHIM
ASSISTANT ATTORNEY GENERAL
ANTITRUST DIVISION
UNITED STATES DEPARTMENT OF JUSTICE**

**BEFORE THE
SUBOMMITTEE ON ANTITRUST, COMMERCIAL
AND ADMINISTRATIVE LAW
COMMITTEE ON THE JUDICIARY
UNITED STATES SENATE
FOR A HEARING ENTITLED
"OVERSIGHT OF THE ENFORCEMENT OF THE ANTITRUST LAWS"
NOVEMBER 13, 2019**

Chairman Cicilline, Ranking Member Sensenbrenner, and distinguished members of the Subcommittee, it is an honor for me to appear before you today on behalf of the Antitrust Division of the Department of Justice. This Committee enables our efforts to enforce the antitrust laws effectively, in order to ensure that our markets continue to be competitive and benefit American consumers. I want to thank Chairman Cicilline and Ranking Member Sensenbrenner in particular for your steadfast support of the Division's efforts.

History has taught us that properly functioning competitive markets result in innovation, lower prices, and higher quality goods and services. As the Assistant Attorney General for the Antitrust Division, I take immense pride in the important work of the Division's antitrust enforcement and competition advocacy, which support the free-market competition at the heart of the American economy. Cognizant of the importance of our mission, we at the Antitrust Division strive to maximize the effectiveness of our efforts to protect the American consumer.

Despite limited resources to address ever-evolving and complex markets, the Division has risen to the occasion. My testimony today will review our extensive efforts in criminal and civil enforcement, our work in competition advocacy and policy, and our efforts to promote competition internationally.

Criminal Enforcement
Our criminal program also has been very active. We had 102 pending grand jury investigations at the close of FY 2019, the highest total since 2010. In addition to two trials this fall, we are preparing for two trials scheduled to begin between January and February. Since April alone, we have announced the first charges in six investigations.[1]

---

[1] All statistics are up to date as of November 1, 2019.

1

**EXHIBIT D**

The Division's work protects more than the interests of consumers; it protects the interests of taxpayers as well. Five South Korean companies pleaded guilty, and agreed to enter into civil settlements, for rigging bids on U.S. government fuel supply contracts.[2] Together the companies must pay over $150 million in criminal fines and an additional $200 million in civil damages for their involvement in a decade-long bid-rigging conspiracy affecting contracts to supply fuel to the U.S. Army, Navy, Marine Corps, and Air Force bases in South Korea. The civil recoveries are the largest the Antitrust Division has obtained under Section 4A of the Clayton Act, which permits the United States to obtain treble damages when it has been injured by an antitrust violation.

These cases, which also resulted in pending charges against seven executives, required cooperation among the Antitrust Division's civil and criminal sections, the Department of Justice's Civil Division, the U.S. Attorney's Office for the Southern District of Ohio, and agents from the Federal Bureau of Investigation and Department of Defense. These cases will help set an example for how separate criminal and civil investigations can satisfy the twin objectives of holding companies and individuals accountable for their criminal conduct while expanding the Division's Section 4A recovery efforts. Moreover, the charges arising out of this investigation protect the integrity of our Defense Department's acquisition process and help ensure the U.S. military receives goods and services at the best possible prices.

In another example of the Division's commitment to safeguarding taxpayer dollars, in September, a former city official and a former executive were each sentenced to 12 months in prison after they pleaded guilty to a fraud scheme involving the federally funded Detroit Demolition program.[3]

To further these efforts, just last week, on November 5th, the Deputy Attorney General joined me in announcing the establishment of the Procurement Collusion Strike Force (PCSF). The PCSF is a partnership composed of the Antitrust Division, the U.S. Attorneys' Offices for thirteen districts around the country, the FBI, and the Inspectors General for several federal agencies. Combining the experience and expertise of these partner agencies, the PCSF will lead a coordinated national response to combat antitrust crimes and related schemes in procurement at all levels of government—federal, state, and local. Specifically, the PCSF's objectives will be, first, to deter and prevent antitrust and related crimes on the front end of the procurement process, thereby protecting taxpayer dollars before they are lost to criminal conduct, and second,

---

[2] Press Release, U.S. Dep't of Justice, More Charges Announced in Ongoing Investigation into Bid Rigging and Fraud Targeting Defense Department Fuel Supply Contracts for U.S. Military Bases in South Korea (Mar. 20, 2019), https://www.justice.gov/opa/pr/more-charges-announced-ongoing-investigation-bid-rigging-and-fraud-targeting-defense.

[3] Press Release, U.S. Dep't of Justice, Former Executive at Adamo Group Sentenced for Conspiracy to Commit Honest Services Fraud in Connection with the Detroit Demolition Program (Sept. 10, 2019), https://www.justice.gov/opa/pr/former-executive-adamo-group-sentenced-conspiracy-commit-honest-services-fraud-connection; Press Release, Former City of Detroit Building Authority Official Sentenced for Bribery Conspiracy in Connection with Detroit Demolition Program (Sept. 23, 2019), https://www.justice.gov/opa/pr/former-city-detroit-building-authority-official-sentenced-bribery-conspiracy-connection.

to facilitate more effective investigation and prosecution of these crimes on the back end of the procurement process.

The Division's commitment also extends to policing consumer markets that impact Americans at the grocery store. This fall, after nearly a year of litigation, StarKist Co. was sentenced to pay a $100 million, statutory maximum criminal fine for its role in a conspiracy to fix prices for canned tuna sold in the United States.[4] This result exemplifies the Division's commitment to protecting consumers when collusion affects items that stock kitchen shelves, along with the Division's resolve to hold corporate violators to account at a litigated sentencing.

The Division's recent investigations have also included international conspiracies involving electronic components. In July, NHK Spring Co., a Japanese manufacturer of suspension assemblies used in hard disk drives, agreed to plead guilty and pay a $28.5 million fine for its role in a global price-fixing conspiracy.[5]

As American consumers purchase more online, they should know that the antitrust laws protect them from collusion in online markets. In January, a former e-commerce executive pleaded guilty to conspiring to fix the prices of posters sold online and was sentenced to serve six months.[6] This indictment is part of the Division's first online marketplace prosecution involving algorithmic pricing tools. The Division has also worked to prosecute companies and executives who fixed prices for customized promotional products sold through websites. The conspiracy not only corrupted online markets, but was carried out using social media platforms and encrypted messaging applications such as Facebook, Skype, and WhatsApp. To date, 11 defendants have been charged; five individuals and four companies have pleaded guilty, resulting in jail time for each executive and corporate criminal fines totaling nearly $10 million.[7]

Another recent criminal investigation resulted in significant prison sentences for guilty executives. At the beginning of the summer, two freight transportation executives were sentenced for their role in a conspiracy to fix prices of international freight forwarding services. The price fixing agreement, which raised prices by as much as 20 percent, victimized everyday consumers sending gifts and household goods to loved ones for the holidays. The CEO of a Louisiana-based freight-forwarding company was sentenced to 18 months' imprisonment, and the company's manager was sentenced to 15 months. Each executive also was sentenced to pay a $20,000 criminal fine and three years of supervised release. In October, a third freight executive pleaded guilty for her role in the price-fixing conspiracy and will be sentenced at a later date.

---

[4] Press Release, U.S. Dep't of Justice, StarKist Ordered to Pay $100 Million Criminal Fine for Antitrust Violation (Sept. 11, 2019), https://www.justice.gov/opa/pr/starkist-ordered-pay-100-million-criminal-fine-antitrust-violation.
[5] Press Release, U.S. Dep't of Justice, Japanese Manufacturer Agrees to Plead Guilty to Fixing Prices for Suspension Assemblies Used in Hard Disk Drive, https://www.justice.gov/opa/pr/japanese-manufacturer-agrees-plead-guilty-fixing-prices-suspension-assemblies-used-hard-disk.
[6] Press Release, U.S. Dep't of Justice, Former E-Commerce Executive Pleads Guilty to Price Fixing; Sentenced to Six Months (Jan. 28, 2019), https://www.justice.gov/opa/pr/former-e-commerce-executive-pleads-guilty-price-fixing-sentenced-six-months.
[7] Press Release, U.S. Dep't of Justice, E-Commerce Company Pleads Guilty to Antitrust Charge (June 27, 2019), https://www.justice.gov/opa/pr/e-commerce-company-pleads-guilty-antitrust-charge.


**EXHIBIT D**

Additionally, in June, a district court unsealed the indictment of two Norwegian shipping executives charged with participating in a long-running conspiracy to allocate certain customers and routes, rig bids, and fix prices for the sale of international ocean shipments.  These executives remain fugitives.

The Division continues its effort to prosecute wrong-doing in the financial services industry.  Last spring, two broker-dealers pleaded guilty to rigging bids for American Depository Receipts, negotiable securities that represent the shares of foreign stocks and enable Americans to invest in foreign companies, and were sentenced to pay criminal fines of more than $5 million collectively.[8]  In addition, a former trader at one of the broker-dealers pleaded guilty for his participation in the bid-rigging conspiracy and is scheduled to be sentenced later this month.

The Antitrust Division also continues its efforts to identify and prosecute unlawful conduct in the generic pharmaceuticals industry—which is of vital importance to many Americans.  To date, two executives have pleaded guilty to criminal antitrust violations,[9] and a company, Heritage Pharmaceuticals Inc., was charged and entered into a deferred prosecution agreement with the Antitrust Division.[10]

Since April, two individuals have pleaded guilty in the Division's investigation into bid rigging at online auctions for surplus government equipment, which protects our government from paying unlawfully inflated prices.[11]  These prosecutions have put on notice companies that engage in anticompetitive conduct to the detriment of our government and taxpayers.

Criminal enforcement of the Sherman Act is an essential tool to protect competition and consumers.  Criminal enforcement can be resource intensive, but it is one of our most powerful deterrents against serious violations such as price-fixing, bid-rigging, and market allocation that unambiguously disrupt the integrity of the competitive process, harm consumers, and reduce faith in the free-market system.  Such harmful agreements among competitors are subject to a rule of per se illegality, and individuals who engage in such conduct—including high-level executives—appropriately face criminal accountability along with the corporations they serve.

---

[8] Press Release, U.S. Dep't of Justice, Second New York Broker-Dealer Pleads Guilty to Rigging Bids for Financial Instruments in Violation of Antitrust Law (June 14, 2019), https://www.justice.gov/opa/pr/second-new-york-broker-dealer-pleads-guilty-rigging-bids-financial-instruments-violation; Press Release, U.S. Dep't of Justice, New York Broker-Dealer Pleads Guilty To Violating U.S. Antitrust Laws by Rigging Bids for Financial Instruments (May 10, 2019), https://www.justice.gov/opa/pr/new-york-broker-dealer-pleads-guilty-violating-us-antitrust-laws-rigging-bids-financial; Press Release, U.S. Dep't of Justice, Former Financial Services Executive Pleads Guilty to Rigging Bids for financial Instruments in Violation of Antitrust Law (June 27, 2019), https://www.justice.gov/opa/pr/former-financial-services-executive-pleads-guilty-rigging-bids-financial-instruments.

[9] Press Release, U.S. Dep't of Justice, Former Top Generic Pharmaceutical Executives Charged with Price-Fixing, Bid-Rigging and Customer Allocation (Dec. 14, 2016), https://www.justice.gov/atr/case-document/file/918276/download

[10] Press Release, U.S. Dep't of Justice, Pharmaceutical Company Admits to Price Fixing in Violation of Antitrust Law, Resolves Related False Claims Act Violations (May 31, 2019), https://www.justice.gov/opa/pr/pharmaceutical-company-admits-price-fixing-violation-antitrust-law-resolves-related-false.

[11] Press Release, Texas Bidder Pleads Guilty to Rigging Bids at Online Auctions for Surplus Government Equipment (Apr. 10, 2019), https://www.justice.gov/opa/pr/texas-bidder-pleads-guilty-rigging-bids-online-auctions-surplus-government-equipment.

**EXHIBIT D**

The threat of prison for corporate decision-makers cannot easily be dismissed as the cost of doing business and thus serves as a powerful deterrent.

Given the importance of the per se rule to our criminal program, it is notable that a number of criminal defendants this past year tried to argue that the rule of reason applies to anticompetitive conduct that has long been condemned as categorically illegal. Unlike the per se standard, the rule of reason requires the court to evaluate the pro-competitive features of a restrictive business practice against its anticompetitive effects in order to determine whether the practice is unlawful. In each such case, the court ruled that the Division's application of the per se rule was correct. One noteworthy case involves heir location providers, a service to identify people who may be entitled to an inheritance from someone who died without a will. The service providers enter into contracts with those people to help secure their inheritances in exchange for a fee.

The Division charged an heir location services provider and its co-owner with entering a conspiracy with another provider to suppress and eliminate competition between them on estates they both pursued. The charge alleged that the two companies agreed that when they contacted the same heir, the first company to contact the heir would win the business and the second would not compete for that and certain remaining heirs. In exchange, the first would share a portion of the contingency fees ultimately collected from those allocated heirs. The Division was surprised when the district court agreed with defendants that they should be tried under the rule of reason and granted a motion to dismiss on statute of limitations grounds. Subsequently, the Tenth Circuit reversed the district court's dismissal and ruled it did not have jurisdiction to address the application of the rule of reason, but encouraged the district court to reconsider its rule of reason order. In February of this year, in a victory for the Division and for consumers, the district court reconsidered and found that the per se standard applied. Both defendants pleaded guilty in July.

When I addressed you last December, I described the Division's efforts prosecuting bid rigging and fraud relating to real estate foreclosure auctions. To date, 140 individuals have been charged, of whom more than 120 have pleaded guilty and 12 individuals were convicted after trial. Those efforts continue. Last winter, nine real estate investors were sentenced for their role in a conspiracy to rig bids at public real estate foreclosure auctions in Southern Mississippi.[12] One defendant awaits trial in Sacramento. Our enforcement efforts will continue to protect competition in such markets and hold accountable investors who conspire to line their pockets through illegal bid rigging and fraud while diverting money from the homeowners and mortgage holders entitled to any proceeds.

On July 11, the Division announced policy changes to incentivize corporate compliance. Division prosecutors, consistent with Department of Justice policy, now consider corporate compliance programs at the charging stage in criminal antitrust investigations. Crediting compliance at charging is the next step in our efforts to deter antitrust violations and reward good corporate citizenship. A company with a robust compliance program can actually prevent crime or detect it, minimizing harm to consumers early and saving precious taxpayer resources. In

---

[12] Press Release, U.S. Dep't of Justice, Nine Real Estate Investors Sentenced for Rigging Bids at Mississippi Public Foreclosure Auctions (Feb. 21, 2019), https://www.justice.gov/opa/pr/nine-real-estate-investors-sentenced-rigging-bids-mississippi-public-foreclosure-auctions.

concert with these changes, to promote transparency, we also announced revisions to our Division Manual.  For the first time, we published a public guidance document that outlines what Division prosecutors look for when evaluating antitrust compliance programs.

Stepping back, the provisions of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 (ACPERA) have substantially strengthened the Antitrust Division's ability to detect and prosecute anticompetitive cartel activity through its Corporate Leniency Policy.  Leniency applications have led to the majority of the Antitrust Division's international cartel prosecutions, resulting in substantial fines, prison sentences, and opportunities for recovery for victims.  Several provisions of ACPERA are set to expire on June 22, 2020 pursuant to a sunset provision in the original legislation.  An extension of ACPERA will allow the Department of Justice and victims of criminal antitrust violations to continue to benefit from this successful program.  The Department supports the reauthorization of ACPERA and the elimination of the sunset provision.

More broadly, the Division will continue diligently to detect and deter collusion that harms American consumers, and we will remain focused on industries that have profound effects on Americans' lives.

<u>Civil Enforcement</u>

*Mergers*

Mergers can be an important tool for increasing productivity in the U.S. economy—by combining complementary assets or increasing scale—but they also can threaten harm to competition.  Protecting American consumers and businesses from anticompetitive mergers is an essential element of the Division's mission.  Though our resources have limits, we review, and when necessary challenge, mergers whose scope and complexity span the U.S. economy, including healthcare, advanced technology, and U.S. Government procurement.  We continue to invest substantial portions of our limited resources to our merger review program to protect consumers, as well as taxpayers, and preserve competition.

On July 26, 2019, we announced[13] that the Department of Justice and attorneys general for five states[14] had reached a settlement with T-Mobile and Sprint regarding their proposed merger. The settlement requires a substantial divestiture package in order to enable a viable facilities-based competitor to enter the market.  To obtain merger clearance, the companies promised to sell Sprint's prepaid business and certain spectrum assets to Dish Network. The merger and accompanying divestiture expand output significantly by ensuring that large amounts of currently unused or underused spectrum are made available to American consumers in the form of high quality 5G networks.

---

[13] Press Release, U.S. Dep't of Justice, Justice Department Settles with T-Mobile and Sprint in Their Proposed Merger by Requiring a Package of Divestitures to Dish (July 26, 2019), https://www.justice.gov/opa/pr/justice-department-settles-t-mobile-and-sprint-their-proposed-merger-requiring-package.

[14] Four additional states have since joined the settlement.  *See* Press Release, U.S. Dep't of Justice, Justice Department Welcomes Arkansas Joining T-Mobile/Sprint Settlement (Nov. 8, 2019), https://www.justice.gov/opa/pr/justice-department-welcomes-arkansas-joining-t-mobilesprint-settlement.



In addition to securing divestitures and remedies, the Division—even with its constrained resources—remains willing and able to litigate when a proposed acquisition is likely to substantially lessen competition in a relevant market. For instance, the United States filed a complaint in August to enjoin a proposed merger between Sabre and Farelogix. The Division's investigation found that the merger would eliminate head-to-head competition to provide booking services to airlines and that Sabre seeks to acquire Farelogix to eliminate a disruptive competitor that has introduced new technology to the travel industry and is poised to grow significantly. We look forward to litigating the case and preventing Sabre from stifling competition in the travel industry.

In September, the Division filed suit to block the merger between two of only four North American manufacturers of rolled aluminum sheet for automotive applications.[15] In a novel approach for the Division, we agreed with the defendants to refer the matter to binding arbitration. Alternate dispute resolution is an important tool that the Antitrust Division can and will use, in appropriate circumstances, to maximize the effectiveness of its enforcement resources in protecting American consumers.

At the beginning of the summer, we also pursued an injunction against the merger between Quad/Graphics and LSC Communications. The Division's thorough investigation uncovered evidence that the merger would combine the only two significant providers of magazines, catalogs, and book printing services, and would deprive publishers and consumers the benefits of competition that has spurred lower prices, improved quality, and greater printing output. The parties abandoned their planned merger rather than continue with litigation.[16]

A prominent example of our efforts in healthcare is our review of the CVS Health Corporation, the nation's largest retail pharmacy chain, and its $69 billion agreement to acquire Aetna, the nation's third-largest health insurance company. Prior to the agreement, the two companies competed vigorously in the sale of individual prescription drug plans under Medicare's Part D program. On October 10, 2018, the Division filed a proposed settlement that requires Aetna to divest its nationwide individual prescription drug plan business to WellCare along with other tools Wellcare needs to compete effectively.[17] On October 25, 2018, the district court entered an order allowing the transaction to close and the settlement provisions to take effect during the pendency of the Tunney Act review process, which requires a public comment period and district court review of consent decrees. After an unusually lengthy review, the district court approved the settlement as well within the public's interest, on September 4, 2019;[18] meanwhile Wellcare completed its acquisition on November 30, 2018.

---

[15] Press Release, U.S. Dep't of Justice, Justice Department Sues to Block Novelis' Acquisition of Aleris (Sep. 4, 2019), https://www.justice.gov/opa/pr/justice-department-sues-block-noveliss-acquisition-aleris-1.

[16] Press Release, Quad/Graphics and LSC Communications Abandon Merger After Antitrust Division's Suit to Block (July 23, 2019), https://www.justice.gov/opa/pr/quadgraphics-and-lsc-communications-abandon-merger-after-antitrust-division-s-suit-block.

[17] Press Release, U.S. Dep't of Justice, Justice Department Requires CVS and Aetna to Divest Aetna's Medicare Individual Part D Prescription Drug Plan Business to Proceed with Merger (Oct. 10, 2018), https://www.justice.gov/opa/pr/justice-department-requires-cvs-and-aetna-divest-aetna-s-medicare-individual-part-d.

[18] United States v. CVS Health Corp., Civ. No. 18-2340, 2019 U.S. Dist. LEXIS 150645 (D.D.C. Sept. 4, 2019).

**EXHIBIT D**

As another example of the Division's continued vigilance in protecting competition in healthcare and related markets, on May 30, the Division obtained divestitures from Amcor's $6.8 billion acquisition of Bemis.[19] The competitors were two of only three significant suppliers of heat-seal, coated medical packaging products that are critical to the safe transportation and use of medical devices, and the divestiture will ensure ongoing competition in those markets.

In addition to price and quality effects, the Division also evaluates mergers for their effects on innovation. In February 2019, the Division secured divestitures from Thales in order for it to proceed with its proposed $5.64 billion acquisition of Gemalto.[20] Prior to this transaction, Thales and Gemalto were the world's leading providers of General Purpose Hardware Security Modules (GP HSMs), which are components important to complex encryption solutions used to safeguard sensitive government and corporate data. Successful entry into this market requires significant time and capital to design and develop offerings with comparable functionality, interoperability, and reliability. Competition also promotes improvements and upgrades to the quality and functionality of existing offerings. The Division secured the divestiture of the Thales GP HSM business, including certain intellectual property and research capabilities, to preserve competition to quickly develop innovative data security solutions and bring them to market.

Government procurement programs (and taxpayers) also benefit from competition to provide high-quality, low-cost goods and services—including procurement of mission critical technologies for the U.S. military. On June 20, 2019, the Division announced that it had required divestitures in a proposed merger between Harris and L3 Technologies.[21] Both companies were the only DoD suppliers of U.S. military-grade image intensifier tubes for night vision devices such as goggles and weapon sights. Under the proposed settlement, Harris must divest its entire night vision business, including its manufacturing facility, to an acquirer approved by the United States. In so doing, the divested business will preserve competition that has resulted in lower prices, higher quality, and shorter delivery times and has promoted innovation of image intensifier tubes with higher sensitivity and resolution.

The Hart-Scott-Rodino (HSR) Act—which imposes notification and waiting period requirements for transactions meeting certain size thresholds—is critical to modern antitrust enforcement because it allows the DOJ and FTC to identify and challenge anticompetitive mergers before transactions close. As such, the Division must protect the integrity of the HSR process. On June 10, the Antitrust Division filed a complaint and reached a settlement with Cannon and Toshiba for their scheme to evade the waiting period required by the HSR Act for

---

[19] Press Release, U.S. Dep't of Justice, Justice Department Requires Amcor to Divest Medical Flexible Packaging Assets in Order to Proceed with Bemis Acquisition (May 30, 2019), https://www.justice.gov/opa/pr/justice-department-requires-amcor-divest-medical-flexible-packaging-assets-order-proceed.

[20] Press Release, U.S. Dep't of Justice, Justice Department Requires Divestiture of Thales' General Purpose Hardware Security Module Business in Connection With its Acquisition of Gemalto (Feb. 28, 2019), https://www.justice.gov/opa/pr/justice-department-requires-divestiture-thales-general-purpose-hardware-security-module.

[21] Press Release, U.S. Dep't of Justice, Justice Department Requires Harris and L3 to Divest Harris's Night Vision Business to Proceed with Merger (June 20, 2019), https://www.justice.gov/opa/pr/justice-department-requires-harris-and-l3-divest-harris-s-night-vision-business-proceed.

8



**EXHIBIT D**

Canon's acquisition of a Toshiba subsidiary.[22]  The transacting parties created a special purpose company to hide the transaction and evade the HSR Act waiting period so that Toshiba could quickly improve its financial statement after the public discovery of financial irregularities at the company.  To resolve the charges, the companies agreed to pay $2.5 million each to settle the charges and to implement HSR compliance programs and comply with inspection and reporting requirements, among other obligations.

*Conduct*

The Division also continues to investigate, and when appropriate, challenge conduct that may unlawfully deprive consumers of the benefits of robust competition.

On November 15, 2018, the Antitrust Division and the North Carolina Attorney General's Office announced a settlement with Atrium Health (formerly, Carolinas HealthCare System) resolving litigation that had commenced with a June 2016 complaint.[23]  Atrium used its market power in the Charlotte, N.C. area to prevent health insurers from encouraging consumers to choose healthcare providers that offer better overall value.  The restrictions also constrained insurers from providing consumers and employers with information regarding the cost and quality of alternative health benefit plans.  The settlement prevents Atrium from enforcing anticompetitive steering restrictions in its contracts with health insurers or otherwise preventing or penalizing procompetitive steering by insurers in the future.

The Division has found some ways to leverage its limited resources to stay vigilant against anticompetitive conduct.  As one example, on May 20, the Division filed an unopposed motion to intervene in a private antitrust class action challenging alleged agreements between Duke University and the University of North Carolina not to compete for each other's medical faculty.[24]  The Department joined the parties' proposed settlement agreement for the limited purpose of obtaining the right to enforce an injunction designed to prevent the maintenance or recurrence of any unlawful no-poach agreements.  This case is also an example of the Division's ongoing efforts against no-poach agreements to ensure that labor markets across the economy are free from anticompetitive conduct and that workers receive the benefits of robust competition for their labor.

Of course, our work against anticompetitive conduct involves numerous industries.  A recent example in media, on June 17, the Antitrust Division reached settlements with CBS, Cox, E.W. Scripps, Fox, and TEGNA to resolve a lawsuit brought as part of an ongoing investigation

---

[22] Press Release, U.S. Dep't of Justice, Canon Inc., Toshiba Corporation Agree to Pay $5 Million for Violating Federal Antitrust Laws (June 10, 2019), https://www.justice.gov/opa/pr/canon-inc-toshiba-corporation-agree-pay-5-million-violating-federal-antitrust-laws.

[23] Press Release, U.S. Dep't of Justice, Atrium Health Agrees to Settle Antitrust Lawsuit and Eliminate Anticompetitive Steering Restrictions (Nov. 15, 2018), https://www.justice.gov/opa/pr/atrium-health-agrees-settle-antitrust-lawsuit-and-eliminate-anticompetitive-steering.

[24] Press Release, U.S. Dep't of Justice, Justice Department Seeks to Intervene in Private Class Action to Enforce Prohibition on Unlawful "No-Poach" Agreements (May 20, 2019), https://www.justice.gov/opa/pr/justice-department-seeks-intervene-private-class-action-enforce-prohibition-unlawful-no-poach; the Division also filed a statement of interest in this case, as described, below.


**EXHIBIT D**

into exchanges of competitively sensitive information in the broadcast television industry.[25]  The Division already had reached settlements with seven other broadcast television companies resulting from the same investigation last November and December.[26]  By exchanging information, the broadcasters were better able to anticipate their competitors' inventory levels and pricing conduct, which in turn helped inform the stations' own pricing strategies and negotiations with advertisers.  As a result, the information exchanges distorted the normal price-setting mechanism in the spot advertising process and harmed the competitive process.  The Division obtained a settlement agreement from the parties that prohibits the sharing of such competitively sensitive information.

As announced in July, the Department of Justice has opened a broad inquiry into competition involving digital platforms.  We are reviewing whether and how market-leading online platforms have achieved market power and whether they have been engaging in practices that have reduced competition, stifled innovation, or otherwise harmed consumers.  We are considering the widespread concerns that consumers, businesses, and entrepreneurs have expressed about search, social media, and some retail services online.  We are making this review a priority of the Division, and we are proceeding in an objective and fair-minded manner and will wait to see where the evidence leads before reaching a decision on next steps.  Depending on the nature of any antitrust concerns that the evidence may present, we could look to both law enforcement and policy options as solutions.  We have been meeting with consumers, competitors and other participants in the digital markets to learn from their perspectives, and we welcome further input from not only those market stakeholders, but also from members of Congress, particularly this Subcommittee.  While I cannot comment on the existence or progress of any specific investigations, I can assure the Subcommittee that the Division is working hard and expeditiously on this important issue to reach the right outcome under the law.  Based on our expertise and our especially talented attorneys and economists, including our investigations of various matters in the digital economy and the evolving media and communications landscape over the past two decades, the Antitrust Division is well positioned to conduct this review.

### *Historic Decrees and Judgments*

When I addressed this Committee last fall, I spoke to you about the start of our Judgment Termination Initiative.  Those efforts are now moving at full pace, and we have made great progress in eliminating legacy judgments that clog court dockets, burden defendants, and no longer serve to protect competition.  Our review of over a thousand such "legacy" judgments

---

[25] Press Release, U.S. Dep't of Justice, Justice Department Reaches Settlement with Five Additional Broadcast Television Companies, Including One National Sales Representative Firm, In Ongoing Information Sharing Investigation (June 17, 2019), https://www.justice.gov/opa/pr/justice-department-reaches-settlement-five-additional-broadcast-television-companies-0.

[26] Press Release, U.S. Dep't of Justice, Justice Department Requires Six Broadcast Television Companies to Terminate and Refrain from Unlawful Sharing of Competitively Sensitive Information (Nov. 13, 2018), https://www.justice.gov/opa/pr/justice-department-requires-six-broadcast-television-companies-terminate-and-refrain-unlawful; Press Release, U.S. Dep't of Justice, Justice Department Reaches Settlement With Nexstar Media Group Inc. in Ongoing Television Broadcaster Information Exchange Investigation (Dec. 13, 2018), https://www.justice.gov/opa/pr/justice-department-reaches-settlement-nexstar-media-group-inc-ongoing-television-broadcaster.

EXHIBIT D

considers changes in conditions since their entry to determine whether these decrees are necessary to protect competition and consumers or, in some cases, if they are affirmatively harmful to competition.  We have posted for public comment judgments proposed for termination in nearly 80 district courts throughout the country and have already been granted hundreds of terminations in over 70 district courts from Alaska to the Virgin Islands.  For instance, we obtained termination of a 93-year old judgment that prohibited defendants from activities related to the sale of amusement park tickets here in Washington, D.C.; this summer, a Chicago federal court terminated dozens of decades-old judgments, including several relating to telegraphs, phonographs, and railroad strikes.

Relatedly, we have been reviewing the Paramount Consent Decrees, which for over seventy years have regulated how certain movie studios distribute films to movie theatres.  As part of our review, we received more than 75 public comments[27] from members of the motion picture industry and the antitrust community.  These comments will better inform our analysis of the continued effectiveness of the Paramount Decrees.

Nearly 80 years ago, the Division entered into consent agreements with The American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI) to address competitive concerns arising from the market power each organization acquired through the aggregation of public performance rights held by their member songwriters and music publishers.  The ASCAP decree was last amended in 2001, and the BMI decree in 1994 –a surprisingly long time ago when we think about how dramatically the music industry has changed in recent years.  In light of this history, the Division recently opened a new review of both consent decrees,[28] and the public comment period ended on August 9.  We received over 800 comments.  The Division is reviewing those comments and continues to discuss the relevant issues with key stakeholders in the matter and will consider all information when determining whether to keep, modify, sunset, or terminate those decrees.

Competition Advocacy and Policy

In addition to our direct enforcement efforts, the Division has implemented a wide range of initiatives designed to advance competition both nationally and internationally.  Although our policy and advocacy efforts do not always draw the same interest from outside observers as our enforcement cases, often they are just as essential in protecting American consumers and businesses.  Let me describe a few of them.

*Appellate: Amicus Initiative*

While the vast majority of the Division's resources are devoted to directly enforcing the antitrust laws, the amicus program is a valued complement to enforcement.  Private litigation is an important aspect of the antitrust regime that Congress created, and in particular its treble damage provision provides an additional tool to deter anticompetitive acts.  The Division's

---

[27] *Paramount Consent Decree Review Public Comments 2018*, U.S. DEP'T OF JUSTICE, https://www.justice.gov/atr/paramount-consent-decree-review-public-comments-2018.

[28] Press Release, U.S. Dep't of Justice, Department of Justice Opens Review of ASCAP and BMI Consent Decrees (June 5, 2019), https://www.justice.gov/opa/pr/department-justice-opens-review-ascap-and-bmi-consent-decrees.



**EXHIBIT D**

involvement in these cases, however, is important in providing guidance to the courts, to ensure they reach sound interpretations of the antitrust laws – which apply in both private and government cases – enabling effective and appropriate enforcement.

Through amicus filings, the Division is able to address developments in the case law earlier and more frequently, offering us the opportunity to have an outsized impact with our resources.  The Division weighs in not out of a desire to support any particular party, but rather with an eye to assisting courts in interpreting and applying the antitrust laws according to up-to-date economic principles, thereby ensuring that robust competition can flourish throughout the U.S. economy.

In FY 2018, the Division filed five statements of interest in the district courts and eight amicus briefs in the U.S. Supreme Court and lower appeals courts in cases where the United States is not a party, as compared to just three such amicus briefs and no statements of interest in FY 2017.  So far in FY 2019, the Division has filed eight statements of interest and nine amicus briefs.

These briefs touch on diverse aspects of U.S. antitrust law and related doctrines.  To illustrate, the Division has weighed in three times this fiscal year through statements of interest on the topic of no-poach agreements, whereby firms agree not to poach one another's employees. The Division articulated the general rule to courts in the Western District of Pennsylvania[29] and the Middle District of North Carolina[30] that such agreements are per se unlawful unless they are ancillary to a separate legitimate transaction or collaboration.  To the Eastern District of Washington, the Division explained that franchisor-franchisee businesses relationships are often legitimate collaborations with both vertical and horizontal elements and accordingly a no-poach agreement may need to be reviewed under the rule of reason to determine whether it is anticompetitive.[31]  Consistent with the Division's position, this summer the Western District of Pennsylvania court adopted the per se rule for naked no poach allegations at the pleading stage in *In re Railway Industry Employee No-Poach Antitrust Litigation*.[32]

As another example of the doctrines addressed by these filings, the Division urged the Seventh Circuit in *Viamedia v. Comcast* to adopt the "no economic sense" test for unilateral

---

[29] Statement of Interest of the United States, In Re: Railway Industry Employee No-Poach Antitrust Litigation, No. 2:18-mc-00798-JFC (W.D. Pa. Feb. 8, 2019), https://www.justice.gov/atr/case-document/file/1131056/download.

[30] Statement of Interest of the United States, Seaman v. Duke University, No. 1:15-cv-462 (M.D.N.C. Mar. 7, 2019), https://www.justice.gov/atr/case-document/file/1141756/download (also arguing that the state action doctrine does not apply).

[31] Corrected Statement of Interest of the United States of America, Stigar v. Dough Dough, No. 2:18-cv-244 (E.D. Wash. Mar. 8, 2019), https://www.justice.gov/atr/case-document/file/1141731/download.

[32] In Re: Railway Industry Employee No-Poach Antitrust Litigation, No. 2:18-mc-00798-JFC, 2019 U.S. Dist. LEXIS 102906 (W.D. Pa. June 20, 2019).



refusal to deal claims under Section 2.[33]   In May, the Division filed a brief[34] in *Mountain Crest v. Anheuser-Busch InBev & Molson Coors*, also being heard by the Seventh Circuit.  In September, the Circuit issued a decision thanking the Division for its comments and adopting the Division's views that Mountain Crest's claims went beyond the Ontario, Canada government's restrictions not to sell beer in packages with more than six containers, and therefore were not entirely exempted from Sherman Act scrutiny by the act of state doctrine.[35]

### *Competition Advocacy with the States*

The Division has a long history offering a competition perspective on the effects of state legislation or regulation to state government officials upon request.  Often in the form of an advocacy letter, the Division generally "promote[s] reliance on competition rather than on regulation where appropriate and to ensure that where regulation is appropriate, it is aligned as much as possible with competition principles."[36]

During the current fiscal year, the Division has submitted five such letters either independently or jointly with the FTC.  Each letter builds on prior advocacy and enforcement efforts by one or both agencies.  In one letter, the Division discouraged Texas from restricting which entities are permitted to develop facilities for the transmission of electricity in Texas.[37]  In two joint letters, the Division and FTC staff encouraged Alaska[38] and Tennessee[39] to consider our longstanding guidance on curtailing or repealing certificate-of-need laws that may suppress healthcare competition.  In another joint DOJ-FTC letter, the agencies encouraged Nebraska to consider our past guidance on removing unnecessary restrictions on the distribution method automobile manufacturers choose to bring their vehicles to market for consumers.[40]  In another letter from October, the Department encouraged Virginia to consider the Department's prior advocacy for ways to facilitate competition by legitimate certifying bodies, while also allowing hospitals and insurers independently to decide and compete on whether to consider a physician's

---

[33] Brief for the United States as Amicus Curiae in Support of Neither Party, Viamedia Inc. v. Comcast Corp., No. 18-2852 (7th Cir. Nov. 8, 2018), https://www.justice.gov/atr/case-document/file/1110056/download.

[34] Brief for the United States as Amicus Curiae in Support of Neither Party, Mountain Crest, LLC v. Anheuser-Busch InBev SA/NV, No. 18-2327 (7th Cir. May 8, 2019), https://www.justice.gov/atr/case-document/file/1161171/download.

[35] *Mountain Crest, LLC v. Anheuser-Busch InBev SA/NV*, No. 18-2327, 2019 U.S. App. LEXIS 26840 (7th Cir. Sept. 5, 2019).

[36] U.S. DEP'T OF JUSTICE, ANTITRUST DIVISION MANUAL, ch. 5 (5th ed. 2018), https://www.justice.gov/atr/file/761151/download.

[37] Letter from Daniel E. Haar, Acting Chief, Competition Pol'y & Advocacy Section, Antitrust Div., U.S. Dep't of Justice to Rep. Travis Clardy, Tex. House of Reps. (April 19, 2019), https://www.justice.gov/atr/page/file/1155881/download.

[38] Letter from Daniel Haar, Acting Chief, Competition Pol'y & Advocacy Section, Antitrust Division, and Bilal Sayed, Director, Office of Pol'y Planning, Fed'l Trade Comm'n, to Sen. David Wilson, Alaska State S. (Mar. 11, 2019), https://www.justice.gov/atr/page/file/1146346/download.

[39] Letter from Daniel Haar, Acting Chief, Competition Pol'y & Advocacy Section, Antitrust Division, and Bilal Sayed, Director, Office of Pol'y Planning, Fed'l Trade Comm'n, to Rep. Martin Daniel, Tenn. House of Reps. (Mar. 7, 2019), https://www.justice.gov/atr/page/file/1146241/download.

[40] Letter from Daniel Haar, Acting Chief, Competition Pol'y & Advocacy Section, Antitrust Division, and Bilal Sayed, Director, Office of Pol'y Planning, Fed'l Trade Comm'n, to Sens. Tony Vargas and Brett Lindstrom, Neb. State S. (Mar. 14, 2019), https://www.justice.gov/atr/page/file/1146236/download.

Maintenance of Care status when making business decisions.[41]  In each of these letters, the Division seeks to bring a competition perspective to the state's policy discourse that might not otherwise be fully heard and that might encourage more pro-consumer policies.

### *Thought Leadership*

Through workshops and roundtables, the Division provides a forum for industry participants, academics, consumer advocates, and other interested parties to discuss important developments in particular business sectors, the appropriate scope of various legal doctrines, or recent advancements in our understanding of relevant economic principles.

The Division hosted a workshop in September to discuss the role of antitrust labor markets in promoting robust competition for the American worker.  The workshop explored the practical considerations that antitrust enforcers and private litigants face in bringing cases that involve labor markets, including approaches to defining labor markets, labor restraints arising out of competitor collaborations, and statutory and non-statutory antitrust exemptions for labor union activities.  This workshop highlighted the Division's commitment to protecting workers through addressing competition issues in our society's evolving labor markets.

The Division held two other important events this past spring.  In April, the Division held a public roundtable to discuss the Antitrust Criminal Penalty Enhancement and Reform Act (ACPERA), which reduces the civil damages exposure of a company granted leniency under the Antitrust Division's Leniency Policy if the company provides civil plaintiffs with timely, satisfactory cooperation.[42]  The roundtable provided a public forum for the Division to engage with the antitrust community and gain insights from judges, attorneys, academics, the business community, and other interested stakeholders on the topic of ACPERA.  The Division also received written comments from members of the public on the efficacy of ACPERA.

In early May, the Division held a public workshop to explore industry dynamics in media advertising and the implications for antitrust enforcement and policy, including merger enforcement.[43]  The workshop covered different types of television and online advertising, and highlighted, among other develops in the industry, the role of online and mobile advertising networks.  Panelists discussed a range of topics, including the economics of advertising, developments in advertising technologies, and the competitive dynamics of media advertising in light of the rise of digital advertising. The Division is working on its analysis of the workshop and anticipates issuing a report summarizing key information discussed at the hearings, as well as public comments, later this year.

---

[41] Letter from David Lawrence, Chief, Competition Pol'y & Advocacy Section, Antitrust Division, to Hon. Sam Rasoul, Vir. House of Delegates (Oct. 22, 2019), https://www.justice.gov/atr/page/file/1212231/download.

[42] Roundtable on Antitrust Criminal Penalty Amendment and Reform Act (ACPERA), ANTITRUST DIV., U.S. DEP'T OF JUSTICE, https://www.justice.gov/atr/events/public-roundtable-antitrust-criminal-penalty-enhancement-reform-act-acpera (last updated June 10, 2019).

[43] Public Workshop on Competition in Television and Advertising, ANTITRUST DIV., U.S. DEP'T OF JUSTICE, https://www.justice.gov/atr/public-workshop-competition-television-and-digital-advertising (last updated June 26, 2019).

**EXHIBIT D**

The Division derives important lessons from our engagement with experts and thought leaders, including through these workshops, complementing the expertise we develop through investigations and enforcement.  In recent remarks, I highlighted one such lesson: in markets with zero-cost products, the antitrust laws still protect competition and consumers because the antitrust laws protect both the price and non-price components of competition.[44]

For digital markets in particular, where consumers often pay nothing, price effects alone do not provide a complete picture of market dynamics.  Harms to innovation and quality are also important dimensions of competition that can have far reaching effects.  Privacy, for example can be an important dimension of quality, and so by protecting competition, we can have an impact on privacy and data protection.  The Division has the legal tools to address such concerns and is up to the task of ensuring that our technology markets are competitive and provide the highest quality, most innovative, and most affordable products for American consumers.

### *Staff Education & Enrichment*

Whether in our enforcement or policy efforts, I am a firm believer that key to our success is maintaining a talented and devoted staff.  The Division must continue to attract and retain bright, talented, and passionate individuals—whether they be attorneys, economists, paralegals, or support staff.

One way we will draw talent is through the recently established James F. Rill Fellowship Program.[45]  The Fellowship is designed to provide elite candidates of the Honors Program with a special opportunity to participate in antitrust enforcement actions and in the development and implementation of antitrust policy.  Our inaugural Rill fellow recently began at the Division.

As I told the Subcommittee last December, the Division also recently established the Jackson-Nash Addresses, a lecture series to inspire and educate Division staff and the public about cutting-edge issues and developments in the field.[46]  The most recent Jackson-Nash Address given by the Nobel Prize winning economist Paul Romer provided valuable insights into innovation, competition, and possible threats facing the modern digital economy.

We also have recently launched a rotation program, which provides the opportunity for Division attorneys to spend a one-year detail in the Appellate, Competition Policy & Advocacy, and International sections as a means to broaden their expertise and experience as well as help balance Division needs and resources.  Six Division attorneys will be on detail in the first year of this program.

---

[44] Makan Delrahim, Assistant Att'y General, Antitrust Div., U.S. Dep't of Justice, "…AND Justice for All": Antitrust Enforcement and Digital Gatekeepers, Remarks as Prepared for the Antitrust New Frontiers Conference (June 11, 2019), https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-antitrust-new-frontiers.

[45] *The James F. Rill Fellowship*, ANTITRUST DIV., U.S. DEP'T OF JUSTICE, https://www.justice.gov/oarm/james-f-rill-fellowship (last updated May 22, 2019).

[46] Press Release, U.S. Dep't of Justice, Antitrust Division Establishes the "Jackson-Nash Address" and Announces Professor Alvin Roth as Inaugural Speaker (Feb. 8, 2018), https://www.justice.gov/opa/pr/antitrust-division-establishes-jackson-nash-address-and-announces-professor-alvin-roth.

<u>International</u>

International engagement continues to be a top priority for the Antitrust Division. Through both case-specific cooperation and forward-thinking policy initiatives, the Division's International Program has spent the past year working with enforcers from around the world to encourage effective competition law development and enforcement.  The Division's investigative teams continued to cooperate closely with their international counterparts. In FY 2019, the Division cooperated with 11 international counterparts on 20 different merger matters. For civil non-merger matters, the Division cooperated with 4 international counterparts on 5 different matters.  On the criminal side, Division staff collaborated with at least 18 jurisdictions on cross-border investigations and global cartel enforcement.

When I spoke to this Committee last December, I described for you the proposal we introduced last June, the Multilateral Framework on Procedures in Competition Law Investigation and Enforcement (MFP), part of our partnership with leading antitrust agencies around the world to develop a core set of norms which would establish fundamental due process principles with meaningful review mechanisms.  With the proliferation of antitrust agencies around the world, American businesses have faced antitrust reviews that are conducted pursuant to varying standards and processes in the areas of attorney client privilege to transparency to confidentiality to non-discrimination, among others.  I am pleased to report that our proposal has become a reality. At the request of several partner agencies, we implemented the framework through the International Competition Network (ICN) to take advantage of existing structures and to reduce administrative burdens.  In April, the ICN's Steering Group unanimously approved the framework, which has come to be known as the Framework on Competition Agency Procedures (CAP).  The CAP came into effect in May with 70 founding competition agencies.  Adopting the CAP is a remarkable and historic achievement for antitrust enforcement.  It sends a clear signal that competition agencies across the globe—despite differences in their structures and proceedings, as well as the legal systems in which they operate—are committed to procedural fairness.

One particularly important principle in the CAP relates to attorney-client privilege.  The CAP seeks to obtain participating agencies' commitment to recognize applicable privileges, including the attorney-client privilege.  This is a critical procedural norm to ensure that American businesses are treated fairly by competition agencies around the world.  The Division has gone to great lengths to secure proper recognition of the privilege and appropriate treatment of materials subject to it by foreign competition authorities.  For example, in negotiating the United States-Mexico-Canada Agreement, the Division succeeded in adding a clause recognizing the privilege. The U.S. Trade Representative has also included it in the negotiating objectives for competition policy chapters for future trade agreements.

Over the past year, the Division has continued to maintain and expand its relationships with competition agencies around the globe.  During FY 2018, we participated in over 60 meetings with fellow enforcement agencies at home and abroad.  We participated in the ICN's workshops focused on key enforcement areas, including cartels, unilateral conduct, mergers and advocacy.  We also were a part of the OECD's biannual Competition Committee meetings,

16

**EXHIBIT D**

during which we discussed the digital economy, competition issues relating to intellectual property licensing, labor, education and fintech markets, and legal privilege and judicial review in antitrust proceedings, among other topics.  We also continue to provide technical assistance to other enforcement agencies around the globe, offering programs on topics such as merger enforcement, economic investigative tools, and leniency programs.

In terms of future initiatives, the Division, with the Federal Trade Commission, will host the ICN Annual Conference in 2020. The ICN Annual Conference is the most important conference for global competition agencies and is regularly attended by a majority of ICN's 139 member-agencies.  This will be the first time that the United States antitrust agencies will host the conference. We are excited to demonstrate Division's global leadership on competition policy, showcasing our multilateral efforts to promote fundamental due process through the CAP, and engage with the world on a range of other policy issues, including digital platform economy, cartel enforcement, and merger policy.

Conclusion

Having had the honor of serving as the AAG of the Antitrust Division for over two years, I continue to find the experience deeply rewarding.  I am enormously grateful to work collaboratively with this Committee, and alongside the dedicated women and men of the Antitrust Division, as we protect American consumers.  I am proud of the work we have done, but I recognize that we still have a lot more to do to ensure that Americans continue to benefit from a competitive economy.  We will continue to leverage our limited resources to the fullest in order to meet the coming challenges, knowing the importance of our work in every American's life.

Mr. Chairman, thank you for the opportunity to testify here today.  I look forward to further discussion of these issues.

17

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, STATE OF
KANSAS, STATE OF NEBRASKA, STATE OF
OHIO, STATE OF OKLAHOMA, STATE OF
SOUTH DAKOTA, STATE OF LOUISIANA,
STATE OF FLORIDA, STATE OF COLORADO,
STATE OF ARKANSAS, and STATE OF TEXAS

       Plaintiffs,

vs.

DEUTSCHE TELEKOM AG, T-MOBILE US,
INC., SOFTBANK GROUP CORP., and SPRINT
CORPORATION

       Defendants.

No. 1:19-cv-02232-TJK

**BRIEF OF AMICUS CURIAE BY**

**THE RURAL WIRELESS ASSOCIATION, INC., NEW AMERICA'S**

**OPEN TECHNOLOGY INSTITUTE, AND CONSUMER REPORTS**

# EXHIBIT E

**EXHIBIT E**

**Questions for the Record from the Honorable David N. Cicilline, Chairman, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary**

**Questions for the Honorable Makan Delrahim, Assistant Attorney General, Antitrust Division, U.S. Department of Justice**

Conduct Enforcement

1.    The *Financial Times* recently reported that criminal prosecutions for price-fixing have reached a historic low for the third consecutive year.[1] According to this report, the Trump Administration's Antitrust Division has brought fewer criminal antitrust prosecutions than any administration in the last 50 years. Is it your view that market participants are no longer engaging in price-fixing at the rates they previously had?

2.    Why has criminal enforcement been at a historic low for the past three consecutive years?

3.    Since your time leading the Antitrust Division, how many monopolization cases under Section 2 of the Sherman Act has the Division brought?

4.    Please identify, to the nearest 10 hours, the number of attorney hours that the Antitrust Division has devoted since January 2017 to its own enforcement actions.

5.    Please identify, to the nearest 10 hours, the number of attorney hours that the Antitrust Division has devoted since January 2017 to any Section 2 investigations.

Merger Enforcement

6.    Please identify the performance objectives for section chiefs.

7.    Are any section chiefs evaluated based on the number of settlements they reach? If so, do you believe that this incentivizes reaching settlements over litigation?

8.    How does the Division incentivize staff to recommend and litigate cases where it finds there has been—or is likely to be—harm to competition, even where that litigation may end in a loss?

9.    How does the Division factor in litigation risk when deciding whether to challenge a merger?

10.   Is it appropriate for the Division to consider litigation risk when deciding whether to file a complaint in a merger or a case of anti-competitive conduct if the Division otherwise believes the transaction or conduct is illegal under antitrust law?

---

[1] Kadhim Shubber, *US price-fixing prosecutions at historic low for third straight year*, FIN. TIMES (Nov. 5, 2019), https://www.ft.com/content/a3b75c80-fe74-11e9-be59-e49b2a136b8d.

**EXHIBIT E**

11. How do you think the Division should analyze transactions involving a private equity buyer? Do these transactions raise any unique issues?

12. What percentage of the Division's second requests in the last six months have been issued for transactions involving or relating to the marijuana industry?

13. For each of the transactions relating to the marijuana industry in which the Antitrust Division has issued a second request, please identify:

   a. Whether the transaction fell above the HSR threshold;

   b. The pre-merger market share and predicted post-merger market share for the companies involved in the transaction; and

   c. The attorneys reviewing the transaction and which section or office they work in.

Digital Markets

14. According to Columbia Law School Professor Tim Wu, dominant technology platforms have completed more than 350 mergers and acquisitions to date. Many of these involved Facebook and Google acquiring actual and nascent competitors. Professor Wu observed, "As with a basketball referee who never calls a foul, the question is whether the players have really been faultless—or whether the referee is missing something."[2] How do you respond to the Professor Wu's criticism that the antitrust agencies have been missing something when it comes to merger enforcement in digital markets?

15. In June 2019, Google announced its $2.6 billion acquisition of Looker Data Sciences, a leading startup in data analytics and business intelligence. The American Antitrust Institute and other experts observed that the deal risked eliminating an important competitor to Google and urged the DOJ to scrutinize several aspects of the proposed transaction. In November, the DOJ approved the transaction without pursuing a second request. The UK's Competition Markets Authority, by contrast, has initiated a full investigation into the transaction.

   a. How many attorneys at the Antitrust Division worked on reviewing the Google-Looker transaction?

   b. How many outside parties did the Antitrust Division interview as part of its review of this transaction?

   c. What factors led the Antitrust Division to conclude that this acquisition did not warrant a more in-depth investigation?

---

[2] Tim Wu & Stuart A. Thomson, *The Roots of Big Tech Run Disturbingly Deep*, N.Y. TIMES (June 7, 2019), https://www.nytimes.com/interactive/2019/06/07/opinion/google-facebook-mergers-acquisitions-antitrust.html.

d.      The American Antitrust Institute identified three issues for the Antitrust Division to examine: (1) whether the acquisition would eliminate Looker as an independent competitor in data analytics and business intelligence tools; (2) whether the acquisition would harm competition in the broader cloud infrastructure market; and (3) whether the acquisition would enhance Google's incentive to withhold Looker's services to rivals. Does the Antitrust Division believe the acquisition will not have any of these effects? If so, please describe the evidence in support of this belief.

16.     Do you believe that antitrust enforcers' past reluctance to view concentrated control over data as an entry barrier was a mistake? If yes, what are you doing to make sure the Division does not repeat this error?

17.     How many full-time technologists are on the staff of the Antitrust Division?

Qualcomm

18.     In 2016, the FTC filed suit to challenge illegal monopolization by Qualcomm. This year DOJ took the remarkable step of intervening in the case—to file briefs in defense of Qualcomm. Please explain why it is a good or proper use of agency resources to intervene to defend an alleged monopolist in a monopolization case brought by another federal agency.

19.     As has been publicly reported, Qualcomm was your former client. You did not sign the Antitrust Division's amicus brief in favor of Qualcomm in *Federal Trade Commission v. Qualcomm* but you did sign the Antitrust Division's amicus brief in favor of Qualcomm in *Karen Stromberg, et al. v. Qualcomm*. What accounts for this discrepancy?

20.     What involvement did you have with the Division's decision to file its statement of interest and subsequent brief in *FTC v. Qualcomm*?

21.     Since 1948, the Antitrust Division and the Federal Trade Commission have relied on a formal clearance process to allocate primary areas of enforcement responsibility and to avoid overlap and duplicative activity. In light of the Division's recent filing in *FTC v. Qualcomm*, what is the current status and scope of the clearance process? If certain types of activity or certain types of cases are not governed by the clearance process, please identify those instances, the reasons why, and whether this is a departure from past Division process.

T-Mobile/Sprint

22.     Did the staff memorandum and staff attorneys reviewing the Sprint/T-Mobile transaction unanimously recommend blocking the merger?

**EXHIBIT E**

23.     The Department of Justice recently reached a settlement that will allow T-Mobile to acquire Sprint. As several leading economists noted in a court filing, the DOJ's proposed settlement does not address the significant anti-competitive effects that the DOJ outlines in its complaint.[3] Why do you believe that Dish, a company with no history or experience in this market, will be a robust competitor as envisioned by the settlement?

24.     These experts also noted that Dish has "repeatedly failed to meet" prior requirements stipulated by the Federal Communications Commission.[4] As these experts note, a T-Mobile attorney previously observed that "Dish has a track record of price increases for its services, speculative warehousing of spectrum, and failing to meet FCC-imposed deadlines to construct the facilities required."[5] In light of Dish's failure to meet previous build-out requirements, why do you believe Dish will be successful in building out a 5G network, despite lacking experience and presence in the market?

25.     As noted in the economists' comments, even if Dish meets its commitments to build a 5G network covering 70 percent of the population, it would not replace Sprint, which currently reaches over 90 percent of Americans.[6] How would you justify DOJ's settlement to Americans who were covered by Sprint's network but will not be covered by Dish's network?

26.     The DOJ has repeatedly cited the fact that Dish is committing to build a 5G network as a factor in favor of approving the transaction. But the DOJ's complaint is clear that the transaction will harm some parties. Although the complaint states that the merging parties may offer some benefits to rural subscribers, it does not address the fact that the merger will harm other consumers. Is it your view that benefits to one set of customers can justify anti-competitive harms to another set of customers? If so, please describe the circumstances in which you view this to be the case.

27.     If it is your view that benefits to one set of customers can justify anti-competitive harms to another set of customers, how do you reconcile this position with *Philadelphia National Bank*, where the Supreme Court rejected the idea that some prospective economic or social benefits could remedy anti-competitive harm resulting from an illegal transaction?[7]

---

[3] Nicholas Economides et al., Economists' Tunney Act Comments on the DOJ's Proposed Remedy in the Sprint/T-Mobile Merger Proceeding, https://www.justice.gov/atr/page/file/1214781/download.

[4] *Id.* at 9-10.

[5] *Id.* at 9-10.

[6] *Id.*

[7] United States v. Philadelphia Nat. Bank, 374 U.S. 321, 370 (1963).

4

**EXHIBIT E**

28.     You have been deeply critical of the use of behavioral remedies, observing that they are "merely temporary fixes for an ongoing problem."[8] Yet the Division's proposed remedy includes a long list of commitments that T-Mobile must undertake for seven or more years to help Dish. These include offering operational support, handling billing support, and meeting specific traffic management requirements. The success of the remedy is contingent on the merging firms adhering to these behavioral conditions, yet this requires the merging firms to act against their economic interest by helping Dish

   a.     As a law enforcement agency, how is the Justice Department equipped to oversee and evaluate the relationship between T-Mobile and Dish in the years ahead?

   b.     How is this settlement warranted in light of your criticisms of behavioral remedies and commitment to structural remedies?

29.     Nine states and the District of Columbia are suing to block the Sprint/T-Mobile merger. Has the Antitrust Division, at any time, made any formal or informal commitment to support T-Mobile/Sprint in their litigation against the state attorneys general? If so, please describe this commitment.

30.     Based on comity and respect for the states challenging the deal, would you be willing to ask the court to delay approving your settlement until the trial court in New York has issued a decision regarding the state's challenge to the Sprint/T-Mobile transaction?

31.     The states' litigation recently revealed text messages between you and executives at Dish. In one of these texts, you wrote to Dish Chairman Charlie Ergen, "Today would be a good day to have your Senator friends contact the chairman," referring to FCC Chairman Ajit Pai.[9]

   a.     Please identify all other transactions in which you have offered merging parties political advice on how to secure approval for their merger.

   b.     Do you believe it is appropriate for the Assistant Attorney General of the Antitrust Division to offer merging parties political advice on how to secure approval for their merger?

   c.     Why did you undertake this action?

---

[8] Makan Delrahim, Assistant Att'y Gen., U.S. Dep't of Justice, Remarks at the Federal Telecommunications Institute's Conference in Mexico City (Nov. 7, 2018), https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-federal-institute.

[9] Sheila Dang, *Dish founder Ergen says he asked for senator's help on T-Mobile/Sprint*, REUTERS (Dec. 18, 2019), https://www.reuters.com/article/us-sprint-corp-m-a-t-mobile-us-dish-netw/dish-chief-ergen-says-he-asked-for-senators-help-on-t-mobile-sprint-idUSKBN1YM2D3.

**EXHIBIT E**

32.    The trial also revealed that you gave Mr. Ergen your personal email address.[10]

    a.    Why did you give Mr. Ergen your personal email address?

    b.    Did Mr. Ergen send any emails to you about the Sprint/T-Mobile transaction at your personal email address?

    c.    Please identify all other instances during your tenure as AAG in which you have given your personal email address to parties whose transaction or conduct is being reviewed by the Antitrust Division.

33.    Did you receive any commitment, gifts, or other benefit from Dish, Sprint, or T-Mobile in exchange for your work facilitating the Sprint/T-Mobile transaction?

34.    Please identify what steps you are taking to ensure that you are complying with government record-keeping requirements when you use your personal cell phone or personal email account to discuss Antitrust Division matters.

Vertical Integration

35.    In its challenge to the AT&T/Time Warner transaction, the Justice Department argued that the merger would undermine competition despite the existence of new distribution channels available through Netflix, Amazon Prime, Sling TV, and other companies. Yet, in its recent press statement announcing that the Antitrust Division would be filing to terminate the *Paramount Pictures* consent decree, the Division cited the existence of new technology and distribution channels as a reason why the Paramount decrees were no longer necessary. Why, in your view, is the existence of new distribution channels insufficient to check the anti-competitive incentives created by the vertical merger of AT&T/Time Warner, but sufficient to check the anti-competitive incentives created by vertical integration in the film industry?

36.    The Writers Guild of America noted in its submitted comment to the Antitrust Division that "large theatrical distributors wield significant market power over theater owners" and that just three companies are likely to account for more than two-thirds of annual box office receipts. Given the degree of control wielded by distributors, what led the Antitrust Division to conclude that vertical integration by dominant distributors will not result in anti-competitive practices like block-booking and circuit dealing?

---

[10] Erik Larson, *Texts Show DOJ Effort to Enlist Senators in T-Mobile Deal*, BLOOMBERG (Dec. 19, 2019), https://www.bloomberg.com/news/articles/2019-12-18/doj-antitrust-head-told-dish-to-enlist-senators-in-t-mobile-deal.

**EXHIBIT E**

Monopsony and Labor

37.     Do you believe that anti-competitive restraints on workers that deliver some consumer benefits are permissible under the antitrust laws? If so, please explain why.

38.     In its recent amicus filing in *William Morris Endeavor Entertainment, LLC v. Writers Guild of America, West, Inc.*, the Antitrust Division argued that—contrary to the view of the Writers Guild of America—certain individuals participating in the alleged group boycott are not covered by the labor exemption. The Division's argument seems to rest on the proposition that producers (or some producers) who are Guild members do not fall within the labor exemption either because they are not employees or because they operate in product rather than labor markets, or some combination of the two. How is this position consistent with the Supreme Court's holding in *American Federation of Musicians v. Carroll*?[11]

39.     Do you believe that the Court's holding in *Carroll* does not apply to coordination at issue here—a boycott called by the WGA involving its own members—and that producers operate in product markets and do not fall within the labor exemption? If so, how does this position reflect the business model of talent agencies, which involves aggregating bargaining power across multiple producers?

40 U.S.C. § 559

40.     40 U.S.C. § 559 states: "An executive agency shall not dispose of property to a private interest until the agency has received the advice of the Attorney General on whether the disposal to a private interest would tend to create or maintain a situation inconsistent with antitrust law." Please provide a full list of matters on which executive agencies have consulted with the Attorney General on antitrust matters pursuant to this statutory provision.

Amicus Program

41.     Please identify, to the nearest 10 hours, the number of attorney hours that the Antitrust Division has devoted since January 2017 to statements of interest and amicus briefs in cases where the United States is not a party and where its participation has not been requested by a court.

42.     What effect has the Division's amicus program had on its ability to fulfill its obligation to enforce the antitrust laws?

---

[11] Am. Fed'n of Musicians of U. S. & Canada v. Carroll, 391 U.S. 99, 115 (1968).



EXHIBIT E

<u>Expert Costs</u>

43.     Please describe each step of the process by which the Antitrust Division selects an economic expert or consulting firm to retain, including any processing for setting up competitive bidding, for negotiating fees, and for determining fees.

44.     Please describe how contracts for outside experts and consulting firms are structured.

45.     Please identify any features of the current contract structure that might incentivize outside experts and consulting firms to complete their work in a more or less cost-effective manner.

46.     Please identify what processes the Antitrust Division has in place to monitor and review the work performed by outside economic experts and consulting firms.

47.     In its November 2019 report, the Justice Department's Office of Inspector General identified several instances where the Federal Trade Commission (FTC) failed to fully document the process by which it selects experts.[12] Please identify what steps the Division has taken to ensure this process is fully documented.

<u>Political Influence</u>

48.     Earlier this year, the FTC opened an antitrust investigation of Facebook.[13] Reports suggest DOJ has also recently opened its own separate probe of Facebook.[14] What role, if any, did Attorney General William Barr play in deciding that the Antitrust Division would conduct an antitrust investigation into Facebook?

49.     Has Attorney General William Barr attended or otherwise been involved in any of the reviews of mergers involving the marijuana industry?

50.     If the Antitrust Division suspects anti-competitive conduct in a particular industry, what is the standard process for opening and conducting an investigation?

51.     If the Antitrust Division suspects anti-competitive conduct in the agriculture industry, is it standard process for attorneys from the Transportation, Energy, and Agriculture Section to write the preliminary investigation memo?

---

[12] Federal Trade Commission Office of Inspector General, Audit of Federal Trade Commission Expert Witness Services, OIG Report No. A-20-03 (Nov. 14, 2019), https://www.ftc.gov/system/files/documents/reports/final-report-audit-expert-witness-services/final_ftc_oig_report_on_expert_witnesses-redacted_11-14-19.pdf.

[13] Lucas Matney, *Facebook says it's under antitrust investigation by the FTC*, TECHCRUNCH (July 24, 2019), https://techcrunch.com/2019/07/24/facebook-says-its-under-antitrust-investigation-by-the-ftc.

[14] David McLaughlin, *Attorney General Barr Seeks DOJ Facebook Antitrust Probe*, BLOOMBERG (Sept. 25, 2019), https://www.bloomberg.com/news/articles/2019-09-25/attorney-general-barr-sought-doj-facebook-antitrust-probe.



52.    MLex has reported that the investigation memorandum in the automakers investigation was written by the policy staff at the Competition Policy and Advocacy Section at the Division.[15] Was this a departure from standard practice and, if so, what accounted for it?

53.    When the Antitrust Division sends out letters to parties informing them that the Division has initiated an investigation, is it standard practice for attorneys from the relevant enforcement section to be the signatories to these letters? For example, would lawyers from the Transportation, Energy, and Agriculture Section sign a letter to agriculture companies that were the subject of an investigation?

54.    Did attorneys from the Defense, Industrials, and Aerospace Section sign the letter to the automakers stating that the Antitrust Division was investigating them? If not, why not?

55.    Did the Justice Department contact the California Attorney General's office or the California Air Resources Board when deciding whether to initiate the investigation? Has the DOJ been in touch with them since initiating the investigation?

56.    If no, then why not? If the DOJ is investigating whether the emissions standards agreement that automakers entered into with California constitutes anti-competitive collusion, is understanding California's involvement—specifically when and how California was involved in drafting the emissions agreement—not imperative to getting the relevant facts?

57.    For all cases in which the Division has filed statements of interest or amicus briefs, please identify any outside parties that the Antitrust Division consulted.

58.    Please identify each official within the Antitrust Division who has attended meetings in the White House complex since January 2017 and please describe the circumstances of each meeting.

Travel Costs

59.    Please identify the travel costs associated with each speech you have given and conference you have attended during your tenure at the Antitrust Division.

---

[15] Leah Nylen, *Probe of automakers' California emissions deal took uncommon route through DOJ*, MLEX (Oct. 24, 2019), https://mlexmarketinsight.com/insights-center/editors-picks/antitrust/north-america/probe-of-automakers-california-emissions-deal-took-uncommon-route-through-doj.

**EXHIBIT E**

Morale

60.    The 2018 Federal employee viewpoint survey reports that the Antitrust Division's employee engagement dropped from a score of 74% in 2015 to a score of 59% in 2018. According to the survey, employee engagement evaluates factors that lead to an engaged workforce, including supporting employee development and communicating agency goals. By comparison, for 2018, the government-wide average was 68% and the FTC score was 83%. What accounts for the Division's below average score? What are you doing to address this significant decline in employee engagement?