**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>         *Plaintiffs*,<br><br>    v.<br><br>DEUTSCHE TELEKOM AG, *et al.*,<br><br>       *Defendants*. | No. 1:19-cv-02232-TJK |

## HAROLD FURCHTGOTT-ROTH'S BRIEF AS AMICUS CURIAE

Hogan Lovells US LLP

Robert Toll
390 Madison Avenue
New York, NY 10017
(212)918-3807
robert.toll@hoganlovells.com

*Counsel for Amicus Curiae*

Harold Furchtgott-Roth
Furchtgott-Roth Economic Enterprises
1800 M Street, NW
Suite 800N
Washington, DC 20036
(301) 219-3904
hfr@furchtgott-roth.com

*Amicus Curiae*

## TABLE OF CONTENTS

A.      The relevant antitrust issue is whether consumer welfare is enhanced by the proposed merger relative to consumer welfare without the proposed merger ...........3

B.      The relevant antitrust issue for this Court is whether the Proposed Final Judgment is in the public interest................................................................................................4

C.      Opponents of the Proposed Final Judgment offer no empirical evidence that it will harm consumers ...................................................................................................6

D.      Opponents of the Proposed Final Judgment have not provided alternative measures of the consequent consumer benefits................................................................6

E.      Rapid technological advancement in the communications industry means that present market conditions have little predictive power ...............................................7

F.      Should any analyses supporting the Proposed Final Judgment be incorrect, they are far more likely to have understated than to have overstated the underlying competition facing the proposed merging parties .........................................................8

G.      Substantial harms to the communications sector and the broader economy would likely follow if the Tunney Act review in this proceeding is rejected ..........................9

i

T-Mobile US, Inc. has proposed to acquire Sprint Corporation.  After extensive review of the proposed acquisition,[1] the Federal Communications Commission ("FCC") found the proposed acquisition to be in the public interest, subject to certain conditions.[2] The Antitrust Division of the Department of Justice as well found that with certain conditions, outlined in the Proposed Final Judgment,[3] the proposed acquisition will not harm competition.[4] I understand that this Court is reviewing the Proposed Final Judgment under the Tunney Act. I have reviewed various documents in this proceeding, including certain recently filed amicus briefs, and can offer a unique perspective to this Court as the Court considers the public interest benefits of the Proposed Final Judgment.

As an economist and former FCC commissioner,[5] I have reviewed in some capacity almost all major mergers before the FCC over the past quarter century. I have written extensively about the merger review process in the communications sector.[6] I have advised a wide range of firms on wireless services for decades. I have no interest in the outcome of this proceeding

---

[1] *In the Matter of Applications of T-Mobile US, Inc., and Sprint Corporation, et al.*, Mem. Op. and Order, Declaratory Ruling, and Order of Proposed Modification ¶ 4, WT Docket No. 18-197, FCC 19-103 (rel. Nov. 5, 2019) (the "FCC Order"); Response of Plaintiff United States to Public Comments on the Proposed Final Judgment at 8 (Nov. 6, 2019), ECF No. 42 ("DOJ Response to Comments").

[2] FCC Order ¶¶ 9-11.

[3] Proposed Final Judgment (July 26, 2019), ECF No. 2-2 (the "PFJ").

[4] *See, e.g.*, Fifth Amended Complaint, (Nov. 27, 2019), ECF No. 50 (the "DOJ Complaint"); PFJ; Competitive Impact Statement at 8 (July 30, 2019), ECF No. 20 (the "CIS").

[5] *Biography of Harold Furchtgott-Roth*, Fed. Commc'ns Comm'n, https://www.fcc.gov/biography-harold-furchtgott-roth (last visited Jan. 23, 2020).

[6] *See, e.g.*, Harold Furchtgott-Roth, *A Tough Act to Follow*, AEI Press, 2006; *see also* Testimony of Harold Furchtgott-Roth, Hr'g on Regulated Industries, Antitrust Modernization Comm'n, Dec. 5, 2005.

beyond a desire to see competition in the communications marketplace continue to flourish, and I am not being compensated for this brief.[7]

Recently-filed amicus briefs from opponents, in particular from several economists (the "Opponent Commentators"),[8] do not alter my opinions. At its core, the Opponent Commentators find the following: (1) they are skeptical of Dish's behavior; and (2) they want this court to overturn the considered opinions of not one but two federal agencies—the Department of Justice and the FCC—that have found the Proposed Final Judgment and the proposed acquisition not to harm competition and to be in the public interest. To support their position, Opponent Commentators selectively cherry-pick from the substantial record before both the Department of Justice and the FCC. The Department of Justice and the FCC had access to the same information—and substantially more not cited by Opponent Commentators. Based on the broader record, the Department of Justice and the FCC reached one conclusion. Based on a selective, narrower record, Opponent Commentators would have this Court not accord the federal expert agencies deference and would instead have this Court reverse their considered findings and conclusions.

I find the following:

- The relevant antitrust issue is whether consumer welfare is enhanced by the proposed merger relative to consumer welfare without the proposed merger;

- The relevant antitrust issue for this Court is whether the Proposed Final Judgment is in the public interest;

---

[7]     Under Local Rule 7(o)(5) of this Court and Federal Rules of Appellate Procedure Rule 29(a)(4)(E), *amicus curiae* states that (i) undersigned counsel did not author this brief in whole or in part; (ii) no party or party's counsel contributed any money that was intended to fund preparing or submitting this brief; and (iii) no other person other than *amicus curiae* contributed money that was intended to fund preparing or submitting this brief.

[8]     *See* Brief of Amici Curiae Nicholas Economides, John Kwoka, Thomas Philippon, Robert Seamans, Hal Singer, Marshall Steinbaum, and Lawrence J. White in Support of Plaintiffs (Jan. 24, 2020), ECF No. 60-1.

- Opponents of the Proposed Final Judgment offer no empirical evidence that it will harm consumers;

- Opponents of the Proposed Final Judgment have not provided alternative measures of the consequent consumer benefits;

- Technology has advanced, and prices have fallen, more rapidly in the communications industry than expected;

- To the extent the analyses supporting the Proposed Final Judgment were incorrect, they are far more likely to have understated than to have overstated the underlying competition facing the proposed merging parties; and

- Substantial harms to the communications sector and the broader economy would likely follow if the Tunney Act review in this proceeding is rejected.

**A. The relevant antitrust issue is whether consumer welfare is enhanced by the proposed merger relative to consumer welfare without the proposed merger**

In evaluating a merger from an economic perspective, the relevant issue is whether consumer welfare as a whole is likely to be improved or harmed. The potential benefits of the merger should be weighed against its potential harms. That is ultimately the issue the Department of Justice addressed in its Proposed Final Judgment. That is also the issue the FCC addressed under a "public interest" standard in its review of the proposed merger. I have seen nothing in the record to suggest that the overall weighing of evidence by either the Department of Justice or the FCC was incorrect.

Without evaluating overall economic welfare, some commenters have suggested that the merger should be rejected if even one of the conditions of the Proposed Final Judgment fails to materialize. For example, commentators suggest that if DISH, a party to the Proposed Final Judgment, does not fully build out a 5G network, the proposed merger should be rejected.[9] In particular, Opponent Commentators state:

---

[9]     *See* App. of Public Comments Received, Vol. 1, Ex. 12, at 7-15 (Nov. 6, 2019), ECF No. 42-1 (the "Economist Comments").

> [E]ven if Dish meets its commitments to build a 5G network covering 70 percent of the population—and we are highly skeptical that Dish will ever build out its network—it still would not replace Sprint, which currently reaches over 90 percent of Americans.[10]

Opponent Commentators make this statement despite substantial safeguards and oversight of DISH in the Proposed Final Judgment. Opponent Commentators make this statement without evaluating whether the other provisions of the Proposed Final Judgment would be sufficient to improve consumer welfare absent a DISH network. Moreover, Opponent Commentators offer no evidence that DISH will not build out its network, despite DISH having a very strong financial incentive to do so. Instead, Opponent Commentators resort to an assertion summed in one sentence: "Based on experience there is good reason to doubt that Dish will ever deploy its own facilities-based network."[11] Opponent Commentators would have the Court reject the Proposed Final Judgment "[b]ased on experience," without even specifying what that "experience" is.

My own "experience" is different. Over the past quarter century, I have heard many characterizations of DISH, some flattering, some not. The word "uncompetitive" has never been one of those characterizations. DISH became a major company precisely because it has been and continues to be competitive.

**B. The relevant antitrust issue for this Court is whether the Proposed Final Judgment is in the public interest**

Opponents to the Proposed Final Judgment, and in particular the Opponent Commentators, overstate DISH's role in the proposed transaction, and the role this Court has in

---

[10]    *Id.* at 2.

[11]    Brief of Amici Curiae Nicholas Economides, John Kwoka, Thomas Philippon, Robert Seamans, Hal Singer, Marshall Steinbaum, and Lawrence J. White in Support of Plaintiffs, at 10, *State of New York, et al. v. Deutsche Telekom AG, et al.*, No. 1:19-cv-05434 (S.D.N.Y. Jan. 22, 2020) (ECF No. 377); *see also* Economist Comments at 10 ("For the reasons offered below, we are highly skeptical that Dish will ever deploy its own facilities-based network.").

reviewing the Proposed Final Judgment. There is no requirement that DISH replace Sprint as a competitor or that the market be restored to "*ex ante* competitive conditions."[12] The goal of the Proposed Final Judgment is to address the likely anticompetitive effects of an acquisition,[13] and this Court's review is to determine whether that Proposed Final Judgment "is in the public interest."[14] Perfect matches between a remedy and the alleged violations are not required.[15]

The public interest standard is a different standard than the standard applied in the merits phase of a contested antitrust case (or, for that matter, the public interest standard applied by the FCC[16]), because it follows a careful review of all competitive effects by the relevant expert agency or, as in this case, expert agencies.[17] The question for the Court is thus simply whether the remedy that the United States has selected is reasonable.[18] The standard of review also reflects the recognition that mergers which have gone through this screening are generally good, not bad, for society. This is especially true for communications mergers, which are often necessary to reallocate resources quickly in response to a rapidly technologically evolving

---

[12]    *See* Economist Comments at 2.

[13]    *See United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 76 (D.D.C. 2014)

[14]    15 U.S.C. § 16(e)(1); *see also United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 16-17 (D.D.C. 2007).

[15]    *See SBC Commc'ns, Inc.*, 489 F. Supp. 2d at 16-17.

[16]    *Compare* FCC Order ¶¶ 39-42 (explaining that the public interest standard considered by the FCC is a competitive analysis "somewhat broader" than the competitive analysis conducted by the DOJ) *with United States v. Microsoft*, 56 F.3d 1448, 1461 (D.C. Cir. 1995) (noting that the DOJ has "broad discretion to settle with the defendant within the reaches of the public interest") *and SBC Commc'ns, Inc.*, 489 F. Supp. 2d at 3, 15-16 (explaining that the Court's role is to determine whether there is a "factual foundation" supporting the reasonability of the proposed settlement, and not to determine if the settlement resolves every alleged antitrust violation).

[17]    *See, e.g.*, *United States v. American Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982); *U.S. Airways*, 38 F. Supp. 3d at 76.

[18]    *See SBC Commc'ns, Inc.*, 489 F. Supp. 2d at 15-16.

market. Spectrum and other resources necessary to deploy next generation wireless technology are limited and expensive.[19] In some cases, mergers like the proposed acquisition can be necessary to facilitate more efficient use of these limited resources.

### C. Opponents of the Proposed Final Judgment offer no empirical evidence that it will harm consumers

In evaluating the Proposed Final Judgment, both the FCC and the DOJ weighed substantial empirical and evidence from a wide range of parties. From the parties opposed to the Proposed Final Judgment, I have not seen empirical evidence, much less empirical evidence demonstrating consumer harm.

### D. Opponents of the Proposed Final Judgment have not provided alternative measures of the consequent consumer benefits

The Proposed Final Judgment offers substantial benefits to the American consumer unavailable absent the acquisition.[20] In particular, relative to the no-merger scenario, the Proposed Final Judgment will create immediate incremental capacity, allow greater investment in 5G network equipment, more efficiently use scarce existing spectrum resources, enable more rapid deployment of 5G services, and lower prices for those 5G services.[21] Many residential consumers may drop fiber-based broadband in favor of wireless services from the new

---

[19]     *See, e.g.*, Public Interest Statement of T-Mobile US, Inc. and Sprint Corporation, WT-Docket 18-197, *In the Matter of Applications of T-Mobile US, Inc., and Sprint Corporation, et al.*, at 19-20 (June 18, 2018).

[20]     *See, e.g.*, FCC Order ¶¶ 206-208; *see also, e.g.*, CIS at 11-12; DOJ Response to Comments at 1-3, 13-15, 22, 24-25, 28-29.

[21]     *See, e.g.*, FCC Order ¶¶ 3-8.

company.[22] These and other consumer benefits from the Proposed Final Judgment are substantial, and opponents have not provided alternative measures of the benefits.

### E. Rapid technological advancement in the communications industry means that present market conditions have little predictive power

Of the transactions involving communications services reviewed by both the FCC and one of the federal antitrust agencies over the past quarter century or more, it is impossible to point to an approved merger in which consumer welfare was demonstrably harmed.  The inexorable market forces have reinforced the following: ever advancing technology, ever increasing consumer welfare, and ever changing and expanding market definitions.  For example, looking back at a few examples of what were considered large, serious merger reviews at the time—such as WorldCom/Sprint,[23] AOL/TimeWarner,[24] and AT&T/SBC and Verizon/MCI[25]—we can now see that the markets those companies (e.g., long-distance service, dial-up internet, instant messaging) participated in no longer exist.

---

[22]    *See, e.g.*, Joint Opposition of T-Mobile US, Inc. and Sprint Corporation, App. J, WT Docket 18-197, *In the Matter of Applications of T-Mobile US, Inc., and Sprint Corporation, et al.* (Sept. 17, 2018).

[23]    *See* Complaint, *United States v. WorldCom, Inc. and Sprint Corp.* (D.D.C. June 26, 2000) (available at https://www.justice.gov/atr/case-document/file/516831/download).

[24]    *In the Matter of Applications of Time Warner Inc. and America Online, Inc.*, Mem. Op. and Order ⁋ 18, CS Docket 00-30 (rel. Jan. 22, 2001).

[25]    *See* Plaintiff United States' Response to Public Comments at 3-6, *United States v. SBC Commc'ns, Inc. and AT&T Corp.*, No. 1:05CV02102 (EGS) and *United States v. Verizon Commc'ns and MCI, Inc.*, No. 1:05CV02103 (EGS) (D.D.C. Mar. 21, 2006), https://www.justice.gov/atr/case-document/file/510046/download; *see also SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1.

**F. Should any analyses supporting the Proposed Final Judgment be incorrect, they are far more likely to have understated than to have overstated the underlying competition facing the proposed merging parties**

As noted above, historically mergers in the communications services sector have been accompanied by unanticipated rapid technological advances and price reductions to the benefit of consumers.

In addition, opponents of the Proposed Final Judgment inaccurately state that the proposed merger is a "4-to-3 merger."[26] It is not for several reasons including the following:

1. The FCC's current "mobile telephony/broadband definition" was adopted in 2008,[27] when wireless services were primarily 2G and 3G, and most wireless traffic was handled by cellular networks.[28] Today, the vast majority of consumer wireless traffic travels over Wi-Fi,[29] yet Wi-Fi providers—primarily wireline companies and cable companies—are not included in the FCC's market definition for wireless services.[30]

2. For more than 20 years, the United States has had robust mobile virtual network operators ("MVNOs"). These MVNOs have tens of millions of subscribers[31] and discipline wireless services, particularly for prepaid services.

---

[26]    *See, e.g.*, App. of Public Comments Received, Vol. 1, Ex. 2 at 2 (Nov. 6, 2019), ECF No. 42-1 (American Antitrust Institute); App. of Public Comments Received, Vol. 2, Ex. 2 at 12 (Nov. 6, 2019), ECF No. 42-2 (Rural Wireless Association).

[27]    *See In the Matter of Sprint Nextel Corp. and Clearwire Corp.*, Mem. Op. and Order, 23 FCC Rcd. 17570 ₧ 39 (rel. Nov. 7, 2008); *see also In the Matter of Implementation of Section 6002(b) of the Omnibus Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions with Respect to Commercial Mobile Services,* Twelfth Report, 23 FCC 2241 ₧₧ 14, 26 (2008).

[28]    *See* Harold Furchtgott-Roth, "WiFi Helps Define the Relevant Market for Wireless Services," at 10, Oct. 25, 2018, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3260271.

[29]    *See id.* at 23, Table 6.

[30]    *See id.* at 4-8.

[31]    *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions with Respect to Mobile Wireless, Including Commercial Mobile Services,* Twentieth Report, 32 FCC Rcd. 8968 ¶ 16 (2017); *see also* Comments of Tracfone Wireless, Inc., *In the Matter of Applications of T-Mobile US, Inc., and Sprint Corporation, et al.*, WT Docket 18-197, at 1 (Sept. 13, 2018) ("With approximately 22 million subscribers, TracFone is the largest prepaid mobile virtual network operator ("MVNO") in the United States.").

3. Cable companies, particularly Comcast,[32] Charter,[33] and Altice[34] have launched facilities-based wireless services that attracted millions of customers. These facilities-based services focus on Wi-Fi offerings, and these Wi-Fi offerings are a central part of the customer wireless experience.[35] Indeed, the threat of new technologies that allow customers to bypass the traditional services offered by wireless carriers has been recognized by Sprint[36] and T-Mobile.[37]

If these and other factors were fully considered, the analyses supporting the Proposed Final Judgment likely *understate* the extent of competition faced by the merging parties.

**G. Substantial harms to the communications sector and the broader economy would likely follow if the Tunney Act review in this proceeding is rejected**

Parties to acquisitions rely upon the predictability of federal actions, after careful antitrust review by professional staff of those acquisitions. Courts have generally given deference to these careful reviews. In a rapidly technologically evolving market such as communications, these transactions in reliance on predictable federal actions are important for the efficient allocation of resources. When harmful, federal antitrust agencies have blocked proposed mergers. In the past

---

[32]    Comcast Corp., Current Report (Form 8-K) (Jan. 23, 2020).

[33]    Charter Commc'ns, Inc., Quarterly Report (Form 10-Q), at 38 (Oct. 25, 2019).

[34]    Altice USA, Inc., Quarterly Report (Form 10-Q), at 15 (Nov. 5, 2019).

[35]    *See, e.g.*, *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions with Respect to Mobile Wireless, Including Commercial Mobile Services,* Twentieth Report, 32 FCC Rcd. 8968 ¶ 16 (2017).

[36]    Sprint Corp., Annual Report (Form 10-K), at 3 (May 26, 2017) ("The wireless industry also faces competition from other communications, cable, and technology companies seeking to increase their brand recognition and capture customer revenue with respect to the provision of wireless products and services, in addition to non-traditional offerings in mobile data.").

[37]    T-Mobile US, Inc., Annual Report (Form 10-K), at 9 (Feb. 8, 2018) ("We face intense and increasing competition from other service providers as industry sectors converge, such as cable, telecom services and content, satellite, and other service providers. Companies like Comcast and AT&T (and AT&T's proposed acquisition of Time Warner, Inc.) will have the scale and assets to aggressively compete in a converging industry.").

25 years, there have been dozens of major transactions in the communications sector,[38] all of which, having been approved by federal antitrust authorities, were expeditiously confirmed by courts when necessary. These transactions have substantially benefitted the American economy as the communications sector has contributed disproportionately to American economic growth.[39] To have a federal antitrust agency's decision substantially delayed or reversed would have a chilling effect on future transactions, both in the communications sector and in other sectors of the economy. The harmful economic consequences of raising the costs and risks associated with transactions in the American economy are substantial.

Dated: January 24, 2019

Respectfully submitted,

Hogan Lovells US LLP

_____/s/_____
Robert Toll
390 Madison Avenue
New York, NY 10017
(212)918-3807
robert.toll@hoganlovells.com

*Counsel for Amicus Curiae*

Harold Furchtgott-Roth
Furchtgott-Roth Economic Enterprises
1800 M Street, NW
Suite 800N
Washington, DC 20036
(301) 219-3904
hfr@furchtgott-roth.com

*Amicus Curiae*

---

[38]    For a list of major transactions in the communications sector reviewed by the FCC, *see* https://www.fcc.gov/proceedings-actions/mergers-transactions/general/major-transaction-decisions.

[39]    *See, e.g.*, Harold Furchtgott-Roth and Jeffrey Li, "The Contribution of the Information, Communications, and Technology Sector to the Growth of the U.S. Economy: 1997-2007," Hudson Institute (Aug. 2014), http://hudson.org/research/10545-the-contribution-of-the-information-communications-and-technology-sector-to-the-growth-of-u-s-economy-1997-2007.