# EXHIBIT A

JCKTSTA1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   STATE OF NEW YORK, *et al.*,
3
                    Plaintiffs,              New York, N.Y.
4
            v.                               19 Civ. 5434(VM)
5
   DEUTSCHE TELEKOM AG, *et al.*,
6
                    Defendants.
7  ------------------------------x

8                                            December 20, 2019
                                             9:05 a.m.
9
   Before:
10
                        HON. VICTOR MARRERO,
11
                                             District Judge
12

13
                            APPEARANCES
14

15 MUNGER, TOLLES & OLSON LLP
        Attorneys for Plaintiffs State of California
16 BY:  GLENN POMERANTZ
        KURUVILLA JOSEPH OLASA
17      KYLE W. MACH

18 STATE OF CALIFORNIA
   Department of Justice
19 Office of the Attorney General
        Attorneys for  State of California
20 BY:  PAULA L. BLIZZARD

21 STATE OF NEW YORK
   Office of the Attorney General
22      Attorneys for State of New York
   BY:  ELINOR R. HOFFMANN
23      BEAU W. BUFFIER

24

25

JCKTSTA1                          Scott Morton - Direct

1    discuss with your Honor that I think we agree -- Mr. Gelfand

2    and I agreed we should defer that until after we get the

3    witnesses on and off the stand and then take up these other

4    issues afterwards.

5              THE COURT:  Sure.

6              MR. POMERANTZ:  Your Honor, we call Professor Scott

7    Morton as our next witness.

8     FIONA SCOTT MORTON,

9         called as a witness by the Plaintiffs,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. POMERANTZ:

13             THE COURT:  State your name and spell it for the

14   record.

15             THE WITNESS:  Fiona Scott Morton, F-I-O-N-A  S-C-O-T-T

16   M-O-R-T-O-N.

17             THE COURT:  All right.  Mr. Pomerantz, yesterday you

18   gave us an estimate of your time with this witness, can we have

19   your reconsidered estimate?

20             MR. POMERANTZ:  Shorter.  I hate to predict, but I

21   think it will be shorter than the estimate I gave.

22             THE COURT:  Thank you, proceed.

23             MR. POMERANTZ:  May I approach, your Honor?

24             THE COURT:  Yes.

25   Q.  Good morning, Professor Scott Morton.

JCKTSTA1                        Scott Morton – Direct

A.  Good morning.

            THE COURT:  Mr. Pomerantz, as has been the practice to

date with expert witnesses, the plaintiffs have submitted the

curriculum vitae for Professor Scott Morton.  I have reviewed

it very closely, and I am persuaded that the witness should be

permitted to testify as an expert for the areas in which she

has been presented.  Is there any objections from defendants on

this score?

            MR. GELFAND:  Yes, your Honor, we object not because

of the qualifications, Professor Scott Morton is clearly a

qualified economist, but based on the reports that were

submitted and what we have learned through deposition and then

what we see in the slides that were provided yesterday, it

seems clear to us that the areas that she's going to testify

about are not really expert areas that she's qualified to talk

about.  So that's point one.

            Point two is that a piece of it, really half of it, so

I think they're proffering her to talk about a critique of our

efficiency calculations, and her opinion about that is based

entirely -- well, not entirely, there are a couple of pieces

that are not, but mostly on the testimony of Dr. Kolodzy who

testified yesterday.  Dr. Kolodzy testified that he did

sensitivity analyses that you could think about maybe the model

could have done this or could have done that, but every time he

was asked a question is this going to happen, what is your

1    opinion about whether this value is correct or not, do you know

2    the right value, is this technology going to be employed by the

3    parties, every time he was asked that question, your Honor, he

4    said I don't know, I'm simply presenting scenarios or

5    possibilities, however he worded it, and he gave no opinion as

6    to any of these technologies being employed by the companies,

7    what the values of those technologies would be, whether there's

8    going to be any spectrum available.

9         And I'm sure Professor Scott Morton will readily admit

10   she's not an expert in engineering or in wireless networks, she

11   has to rely on Dr. Kolodzy.  But given Dr. Kolodzy's waffling

12   and inability to make any predictions, I don't think it's a

13   proper basis under Rule 703 for Professor Scott Morton to rely

14   on.  So that's going to be half of our objections.

15        The other half is I believe she's going to testify

16   unless the examination has been modified, about the likelihood

17   that DISH is going to be successful and reach a certain amount

18   of competitiveness or something like that.  That's really not

19   in her bailiwick, your Honor, she has no experience reviewing

20   business plans and predicting whether a business plan and

21   wireless industry is going to succeed or not.  She hasn't done

22   any analysis of cash flow or net present value or anything like

23   that.

24        I think she is going to give her views, I have no

25   doubt about that, that DISH has got risks, maybe they won't do

1   this, maybe they won't do that, but that's in the Court's

2   realm, your Honor, that doesn't help the Court to give opinions

3   to the Court about how you can think about, for example, the

4   fact that DISH has in the past supposedly missed a deadline or

5   two when they were dealing with the FCC on other licenses.

6        So I apologize for the long speech, your Honor, I just

7   want to make clear that we don't agree that any of the

8   testimony that's about to be provided is either within her

9   expertise or is supported by a valid basis under Rule 703.

10       THE COURT:  Thank you.

11       Mr. Pomerantz, briefly.

12       MR. POMERANTZ:  Yes.  I think what your Honor will see

13  is that what Professor Scott Morton is doing is responding

14  precisely to what Professor Katz did in his efficiencies

15  analysis.  Professor Katz takes inputs from engineering people

16  at T-Mobile, and particularly Mr. Kapoor, and then he does some

17  additional analysis with those inputs to come up with his

18  calculations of efficiencies.  Professor Scott Morton will

19  directly respond to that by taking alternative inputs that she

20  received from Dr. Kolodzy and then responding to what Professor

21  Katz did.

22       In addition, she will look at some of the assumptions

23  that Professor Katz had to rely upon to reach his efficiencies

24  calculations and assess whether those were reasonable or not in

25  view of:  Are they the kind of assumptions that economists

1   would reasonably rely on?  This is directly responsive to what

2   Professor Katz testified to, and there is as similar a

3   relationship between Professor Katz and Mr. Kapoor as there is

4   between Professor Scott Morton and Dr. Kolodzy.  So I think

5   what your Honor will find is this is directly responsive and

6   appropriate testimony from a trained economist.

7          With respect to DISH, I think your Honor will see that

8   we have a very narrow set of questions that are designed only

9   with respect to what an economist would view the potential

10  entry of a company like DISH into this particular market, and

11  the kind -- the way that an economist would look at a remedy

12  that creates the kind of entanglements that we see here.

13         A lot of things that Mr. Gelfand was referring to are

14  not part of this examination.  And I would ask that we be

15  allowed to proceed, if he has an objection to a particular

16  question or to a particular exhibit or demonstrative, we could

17  take it up at the time, but I think your Honor will find that

18  this is directly responsive to what they did.

19         THE COURT:  All right.  Thank you.  Let's proceed with

20  the examination.  I already indicated yesterday that I have

21  some skepticism about some of the proffered testimony as it

22  relates to DISH.  To the extent that they are based on economic

23  considerations and properly within the scope of economists, I

24  have no problem with that.  To the extent it goes into

25  speculations and predictions about whether or not DISH will be

1    operationally successful, I think that that would cross the

2    line, so let's proceed.

3            MR. POMERANTZ:  Thank you, your Honor.  I think you

4    will find, by the way, if this goes 90 minutes or so, about 80

5    of those minutes will be on topics other than DISH and ten

6    minutes or less will be on DISH.

7            THE COURT:  Whether it's only ten minutes, if it's

8    inappropriate, it's still inappropriate.

9            MR. POMERANTZ:  Fair point, and accepted.

10   BY MR. POMERANTZ:

11   Q.  Professor Scott Morton, in preparing for your testimony

12   today, did you create some slides to help describe your

13   opinions?

14   A.  Yes, I did.

15   Q.  So let's go to the next slide.

16           Could you briefly describe to the Court what is are

17   reflected on this slide.

18   A.  Yes.  My assignment today is to evaluate Professor Katz's

19   efficiency claims, and these fall into three buckets:  Network

20   costs -- that's the cost of building the network -- speed, and

21   a small bucket of non-network costs.  I'm also going to

22   evaluate the competitive impact of DISH's proposed entry as a

23   facilities-based carrier.

24   Q.  And what are your bottom line conclusions?

25   A.  My bottom line conclusions are that Professor Katz's

1  efficiency claims are neither merger specific nor are they

2  verifiable, that Professor Katz's estimate of how much

3  consumers value additional speed is unreliable, and that DISH's

4  entry would not be, under the merger guidelines description of

5  timely, likely and sufficient to replace the competitive

6  significance of Sprint.

7  Q.  Now in analyzing the various information you considered to

8  come up with these opinions, did you prepare reports of your

9  analysis and opinions?

10  A.  Yes, I did, two reports, they're quite lengthy, and I am

11  happy to say we won't be going through most of that material

12  today.

13           MR. POMERANTZ:  Your Honor, I have placed the reports

14  in front of Professor Scott Morton in the event she needs to

15  refer to them during my examination or Mr. Gelfand's.  I think

16  your Honor has a copy of them as well.  We're not offering them

17  into evidence, I think they're there to assist the examination.

18  Q.  We're going to go through some of your analysis in a little

19  bit of detail, but at a high level, what framework did you

20  apply to reach the opinions you reached in this matter?

21  A.  At a high level what we're interested in in efficiencies is

22  whether the efficiencies are cognizable.  Under the merger

23  guidelines, efficiencies have to be cognizable, which means

24  they're verifiable and merger specific, in order to offset any

25  anticompetitive harm.

JCKTSTA1                          Scott Morton - Direct

1    Q.  What information did you rely upon to in order to reach

2    your opinions?

3    A.  The information I relied upon was my own training and

4    experience in conducting economic analysis in both the public

5    and private sector, the academic literature in this area, the

6    record in the case, of course I relied on Dr. Kolodzy for some

7    engineering inputs.  And as my charge was to evaluate Professor

8    Katz's efficiencies, I spent a good deal of time with his

9    model.

10   Q.  When you say reviewed the record in this case, did you

11   review documents created by T-Mobile or Sprint that were

12   created during the ordinary course of their business

13   activities?

14   A.  Yes, I did.

15   Q.  And are those kinds of documents helpful to an economist in

16   evaluating something like efficiencies?

17   A.  Yes, they are.

18   Q.  Why are they?

19   A.  They're helpful because they're in some sense market

20   tested, they're reflective of behavior that the firm has

21   actually carried out in the marketplace, and therefore, it's

22   possible to see that that's a reliable way of understanding

23   competition or the industry practices.

24   Q.  Now sometimes parties that want to merge create documents

25   for purposes of regulatory review or on occasion court

JCKTSTA1                     Scott Morton – Direct

1    proceedings.  Would an economist typically rely on those as

2    well?

3    A.   Yes, an economist would.  When the document or model that's

4    been created in the course of regulatory review comes up, it's

5    subjected to more scrutiny because it hasn't been market

6    tested.  And so an economist needs to look to see whether it is

7    consistent with ordinary course documents, it's consistent with

8    economic principles and so forth.

9            MR. GELFAND:  Objection, your Honor, this is exactly

10   what I was talking about.  Your Honor knows how to look at

11   documents that were created in different contexts and evaluate

12   their credibility.  Professor Scott Morton's entire report was

13   created with the idea with this litigation in mind.  It is not

14   within the purview of an economist to tell the Court how to

15   judge the credibility of documents that were created with a

16   merger in mind versus ordinary course business documents.  So

17   that would be an example where I just don't think the testimony

18   is of assistance to the Court.

19           THE COURT:  Thank you.  Overruled.

20           MR. POMERANTZ:  Your Honor, if you want me to respond.

21           THE COURT:  No, let's proceed.  But the Court

22   acknowledges that there are going to be lots of areas here

23   where the testimony is going to be close to the line, just be

24   aware that I am aware.

25           MR. POMERANTZ:  Thank you, your Honor.

1    BY MR. POMERANTZ:

2    Q.  Let's turn to efficiencies.  From an economist perspective,

3    what is an efficiency?

4    A.  An efficiency is something that the merging parties can do

5    that enhances competition and helps consumers.

6    Q.  And so the merger guidelines that the Court has seen on a

7    number of occasions from both sides' experts discuss

8    efficiencies.  How does an economist evaluate merger

9    efficiencies?

10   A.  As I mentioned before, and this document details,

11   cognizable efficiencies, those that are allowed to offset the

12   anticompetitive harm, are merger specific, that arise from the

13   merger itself, and they have to be verifiable.

14   Q.  What does an economist mean when he or she says that an

15   efficiency is merger specific?

16   A.  Professor Katz covered this also.  It has to be an

17   efficiency that is achievable through the merger itself and not

18   something that the standalone firms can do on their own.

19   Q.  And are benefits that arise due to technological

20   developments, are those merger specific efficiencies?

21            MR. GELFAND:  Objection vague, lack of foundation.

22            THE COURT:  Lay a foundation.  Clarify the question.

23   Q.  Can technological developments be merger specific

24   efficiencies?

25   A.  Merger specific efficiencies have to occur because of the

JCKTSTA1                          Scott Morton - Direct

merger and not something that would happen anyway.  So if

technological developments are occurring and they're not caused

by the merger, standalone firms will have them also.  So a

merger specific efficiency, in terms of technological

developments, has that to be caused by the merger.

Q.  And how do you determine whether an improvement or benefit

is merger specific in an industry where technology is

constantly improving?

A.  I think I have a demonstrative for that.  It's again

something that Professor Katz covered.  The issue is not

whether you look at the standalone firms today and the combined

firm tomorrow.  If technology is moving along, then you need to

look at apples-to-apples comparison, which is the firms

tomorrow and the combined firm tomorrow.

Q.  So I think what you are referring to, and I was a little

slow on the uptake here, is this slide and the next slide.  So

if you could explain to the Court what is happening here.

A.  Yes, we could look at T-Mobile and Sprint today, and they

have certain speeds and capacity and technology.  And if we

compared that to new T-Mobile in the future, new T-Mobile in

the future will be much better, it will have 5G and different

kinds of handsets and capabilities, but that would not be the

appropriate way to think about efficiencies.  What we really

need to do is move T-Mobile and Sprint into the future also so

we're comparing apples to apples; all three entities have

JCKTSTA1                          Scott Morton - Direct

1    access to the same technology and are in the same year with the

2    same state of technology.

3    Q.  So we have just discussed merger specificity.  Now you also

4    said that efficiencies have to be verifiable.  Again, what does

5    an economist mean when he or she says that an efficiency has to

6    be verifiable?

7    A.  As the horizontal merger guidelines say, efficiencies can't

8    be vague or speculative, we have to be able to verify them by

9    reasonable means using our economist tool kit and available

10   evidence.

11   Q.  So now let's turn to the efficiencies that Professor Katz

12   has claimed in this matter.  Could you briefly explain, using

13   this chart, what efficiencies are claimed by Dr. Katz in his

14   testimony?

15          MR. GELFAND:  Your Honor, we object to this for the

16   following reasons:  We looked at this last night.  We can't

17   figure out what it is.  It cites to three different tables in

18   Dr. Katz's report which have a variety of numbers, some are low

19   bound of efficiencies, some high bound of efficiencies.

20   Plaintiffs put no numbers on this graph.  We have no way to

21   determine whether this is the low bound, the upper bound, the

22   middle bound.  We just can't figure it out.  And it certainly

23   does not reflect the information in a fair way that is in the

24   tables that are cited.

25          I also point out this was never presented in Professor

JCKTSTA1                    Scott Morton - Direct

1    Scott Morton's report, it's been produced for the first time

2    for us yesterday, and therefore, we think it's a meaningless

3    demonstrative exhibit that's of no assistance.

4            THE COURT:  Mr. Gelfand, you will have sufficient

5    opportunity during your cross to examine all of these

6    questions.  And I think if you object now to every item that is

7    going to be coming up, we're going to be here all day, so I

8    think it's better if you reserve your concerns for your

9    cross-examination.  Again, I'm sensitive to the issues that you

10   raise.  To the extent you have questions about what the

11   document means, the witness is here to explain, and you will

12   have your chance to challenge.

13           MR. GELFAND:  I appreciate that, your Honor, but I do

14   think I need to point out to the Court when we're objecting as

15   the documents come up.  I will keep them short.

16   BY MR. POMERANTZ:

17   Q.  What efficiencies has Professor Katz claimed in his

18   analysis and testimony here in this courtroom?

19   A.  These are the efficiencies that Professor Katz has

20   calculated.  They fall, as I said, into three buckets, speed,

21   cost of the network, and non-network cost efficiencies, and he

22   calculated them over time through 2024.

23   Q.  Did you and your team put together this chart?

24   A.  Yes, we added up the numbers from Professor Katz's report.

25   Q.  Based on your review of Professor Katz's reports and the

JCKTSTA1                    Scott Morton - Direct

1   tables cited, do you believe that these graphs accurately

2   reflect both the time period in which Professor Katz predicts

3   the efficiencies will occur and the amount of the efficiencies

4   divided up into three categories?

5        MR. GELFAND:  Object to question, your Honor.  It

6   doesn't make any sense.  It can't possibly reflect it when the

7   tables that are cited have different values.  It doesn't say

8   what values are being used.  I apologize, your Honor.

9        MR. POMERANTZ:  Your Honor, that is exactly what

10  cross-examination is all about.

11        THE COURT:  I agree.  Let's proceed.

12  Q.  Do you remember the question?

13  A.  I think it was about accuracy.  I believe these were taken

14  from Professor Katz, and it was his number I'm reflecting here.

15  Q.  Now the little red bar down at the bottom which refers to

16  non-network cost efficiencies, do we have any plans of going

17  through that today?

18  A.  We do not.

19  Q.  All right.  So are the efficiencies that Professor Katz has

20  claimed the same every year across the five-year period that he

21  examined?

22  A.  No, they grow over time.

23  Q.  Is it relevant to your analysis when the efficiencies are

24  predicted to occur?

25  A.  Yes, it is.  It is relevant because, as the merger

1   guidelines say, delayed benefits from efficiencies are given

2   less weight.  Why is that?  They're further in the future, and

3   they're inherently more difficult to predict, they're

4   inherently more speculative as we go out in time.

5   Q.  So I want to first focus on the network cost efficiencies

6   component of Professor Katz's testimony here.  Does Professor

7   Katz provide a model with a calculation of these efficiencies?

8   A.  Yes, he does.

9   Q.  What is that model based on that?

10  A.  That model is based on, originally, T-Mobile's 4G

11  congestion planning model, augmented.  I believe Professor Katz

12  and Compass Lexecon helped T-Mobile build a 5G module and

13  include some Sprint analysis.

14  Q.  And did you evaluate the economic results of Professor

15  Katz's model?

16  A.  Yes, I did.

17  Q.  So let's turn to the next slide.  What does Professor

18  Katz's model predict regarding the economics of the standalone

19  firms and the merged firm?

20  A.  What his model predicts is that the standalone firms will

21  have dramatically higher per subscriber per month cost of

22  marginal cost of capacity relative to the combined firm.

23  Q.  And I am not sure if we have it on this slide, but is this

24  for a particular year that Professor Katz analyzes?

25  A.  I believe so.

JCKTSTA1                    Scott Morton - Direct

1    Q.  And do you recall if that's 2024?

2    A.  I think so, yes.

3    Q.  And so for T-Mobile, he predicts that the marginal costs

4    for the standalone and T-Mobile will be about 25 times greater

5    than the merged firm?

6    A.  That's correct.

7    Q.  And for Sprint he predicts it will be -- the standalone

8    Sprint will have about 11 times greater marginal costs than the

9    merged firm?

10   A.  That's correct.

11   Q.  Now we heard a lot of testimony about Sprint's current

12   situation, financially and competitively, compared to

13   T-Mobile's.  But Professor Katz predicts that the standalone

14   T-Mobile will have much higher network costs in the future than

15   standalone Sprint.  Do you understand why Professor Katz

16   reaches that result?

17   A.  Yes, I do.  Sprint doesn't have a capacity problem, they

18   have less coverage.  That's the reason that people are

19   concerned about, well, how their competitive position is

20   described.  T-Mobile needs access to more capacity.  And this

21   model generates, in my opinion, a very unrealistic path forward

22   for T-Mobile.

23        MR. GELFAND:  Objection, your Honor, there's no

24   foundation for her to give an opinion about whether that is

25   unrealistic or not.  This is outside her area of expertise.

1              THE COURT:  Overruled.

2   Q.  So let's look at the T-Mobile side of this chart.  What is

3   driving the difference in cost between new T-Mobile and

4   standalone T-Mobile?  Is there a big drop in new T-Mobile's

5   costs after the merger?

6   A.  The primary factor that's creating this enormous difference

7   is the rising cost of standalone T-Mobile.

8   Q.  I think Professor Katz covered this in some detail, so I

9   don't think we need to, but could you briefly describe how

10  Professor Katz arrives at the numbers we see here for new

11  T-Mobile, T-Mobile and Sprint?

12  A.  Yes, he takes his congestion model and he has a baseline of

13  what the network looks like, he expands to 90 percent of demand

14  and then again to 100 percent of demand.  The engineers give

15  him the solutions for 90 and 100, and he subtracts, takes the

16  difference, and values that.  That gives him an economic

17  measure of the marginal cost of the network capacity, and I

18  agree with Professor Katz that that is a good way to think

19  about marginal costs.

20  Q.  So I take it that your testimony is going to be that there

21  is some flaws in the analysis we see that are reflected on the

22  screen right now?

23  A.  That's correct.

24  Q.  And those flaws primarily relate to the large costs for the

25  standalone firms.

JCKTSTA1                    Scott Morton - Direct

1  A.  That's correct.

2  Q.  So let's go and look at those flaws.  We heard some

3  testimony yesterday from Dr. Kolodzy about the way the model

4  works on a site-by-site level.  Did you read that or hear that?

5  A.  Yes, I did.

6  Q.  So I want to focus on the economic implications of that.

7  Let me go to the next slide.

8        What does this slide describe about the economic

9  implications of the model that the defendants are relying on

10  for their efficiencies defense here?

11  A.  What it shows is that the choices that a carrier has to

12  give itself more capacity are only partially reflected in the

13  model.  Dr. Kolodzy described what the model recommends in the

14  top half of this demonstrative, spectrum overlays, small cells,

15  cell splits, that kind of thing.  The model does not have as a

16  choice that the standalone firm can go out and purchase new

17  spectrum, that they could deploy new technology, that they

18  could increase the amount of refarming of spectrum over from 4G

19  to 5G, that they could develop partnerships like the one Sprint

20  has with Altice, none of these options are contained in the

21  network congestion model.

22  Q.  And why do these kinds of restrictions or limitations on

23  the model matter from an economic perspective?

24  A.  They're very important from an economic perspective because

25  limiting the standalone firms from, for example, buying

JCKTSTA1                        Scott Morton - Direct

1    spectrum or using new technology in a dynamic industry

2    essentially freezes them.  So they're stuck with what they have

3    in 2019 and they aren't able to go through to 2024 and buy

4    spectrum or deploy new technology.  And this is not an

5    economically sensible approach because in the ordinary course,

6    we see that indeed firms do that.

7    Q.  How does freezing the standalone firms affect costs that

8    are then generated by the model, that's that skyrocketing cost

9    that we saw on the prior slide.

10   A.  Because the model only gives standalone firms to access to

11   about half of the options that they need, they're constrained,

12   and that means that their costs go up in a very dramatic way

13   because they do not have access to other less costly options.

14   Q.  So I want to go first to the first restriction that the

15   defendants have placed on their model, the restriction about

16   the standalone firms not being able to purchase new spectrum.

17   I don't want to go into the factual predicate for that, several

18   witnesses have done that, including Dr. Kolodzy yesterday.  Did

19   you evaluate what happens from an economic perspective if you

20   actually added spectrum to the standalone firm's options?

21   A.  Yes, I did.  If you add spectrum to the standalone firm's

22   options, their marginal cost of capacity drops dramatically.

23   Q.  In this particular area, what analysis did Dr. Kolodzy do

24   that you relied upon to make these economic calculations?

25   A.  Dr. Kolodzy took spectrum and he added it to the congestion

1  model and calculated the solutions that would be needed to meet

2  demand with that extra spectrum in place.  What I am doing is

3  taking Professor Katz's economic model and using those

4  solutions and valuing them to obtain the marginal covelets of

5  increased capacity.

6  Q.  So if you could use this slide that I just put on, slide 15

7  here, to explain your part of that analysis.  What did you do

8  with the information that had been provided to you?

9  A.  So Professor Katz's economic model lets him take the output

10 from the engineers and calculate this marginal cost of

11 capacity.  And you see that the blue bars represent his

12 answers.  When I take Dr. Kolodzy's engineering solutions and I

13 place them in that same economic model, you can see that the

14 marginal costs of capacity drops dramatically.  The light green

15 is adding 10 megahertz of spectrum and the gray is adding 30

16 megahertz of spectrum.

17 Q.  Let's take one example so we're clear what this chart

18 reflects.  Let's take 2022.  Could you go through the three

19 bars in 2022 and explain to the Court what this chart reflects?

20 A.  Yes.  So the $6.21 again is Professor Katz's output, what

21 he calculates from Mr. Kapoor's solutions.  Then if we add 10

22 megahertz of spectrum and give that to standalone T-Mobile, we

23 imagine that they bought it, for example, then Dr. Kolodzy

24 calculates what congestion release solutions would be needed,

25 and I put that in the model and I get $1.60 as the marginal

JCKTSTA1                    Scott Morton - Direct

1   cost per subscriber per month.  If you increase that to 30

2   megahertz, you see the marginal costs difference drops

3   dramatically down to 40 cents.

4   Q.  And from the materials that you have reviewed, is 10

5   megahertz of spectrum a lot of spectrum for a wireless carrier

6   like T-Mobile?

7   A.  Well, I know that T-Mobile has 100 megahertz today, so

8   that's about a ten percent increase.

9   Q.  Now as an economist, does this slide reveal a problem with

10  the way that Professor Katz has calculated marginal costs and

11  his efficiencies?

12          MR. GELFAND:  Objection, your Honor.  There's no basis

13  to say there's a problem because there's no evidence in the

14  record that either the 10 megahertz or the 30 megahertz

15  scenarios are realistic, and there's no evidence in record

16  about what that is or how that should be involved.

17          THE COURT:  If you have any questions, Mr. Gelfand,

18  you can put that in your bucket of questions for the witness.

19          MR. GELFAND:  It's an ever-increasing bucket, your

20  Honor.

21  BY MR. POMERANTZ:

22  Q.  Do you have the question in mind, Professor Scott Morton?

23  A.  I think do.  This is a fundamental problem with the

24  economic model because it rules out ordinary business decisions

25  that we see in the real world.

1  Q.  Could you give us an example to explain why this is a

2  problem?

3  A.  Suppose you ask me to model Starbucks going forward to

4  2024, but you told me that I had to eliminate the possibility

5  that Starbucks could build new stores.  Now more people want

6  coffee, and we get long lines at the Starbucks stores because

7  I'm not allowed to let Starbucks build more stores.  And this

8  is something that is contradicted by what Starbucks is actually

9  doing, and that is important to include in an economic model

10 what the firms are actually doing.

11 Q.  And do economists look at what firms are actually doing in

12 order to try to model what they might do in the future?

13 A.  Yes, they do.

14 Q.  So I don't want you to go over this document at all,

15 because this is something that I believe both Professor Katz

16 reviewed in his testimony and that Dr. Kolodzy reviewed in his.

17 Is this a document that you did rely on in your evaluation of

18 Professor Katz's economic analysis?

19 A.  Yes, it is.

20 Q.  Why did you find this document informative?

21 A.  Because it shows an ordinary course pattern of T-Mobile

22 purchasing spectrum over many years.

23 Q.  Now the Court has heard T-Mobile witnesses come in and

24 testify about other sources of spectrum.  Have you either heard

25 or read some of that testimony?

1    A.  Yes, I have.

2    Q.  Let me put one example on the screen, this is Mr. Höttges.

3    Does Professor Katz's economic analysis allow for the

4    possibility that T-Mobile could lease spectrum from anyone,

5    whether it be DISH or anyone else?

6    A.  No, it does not.

7    Q.  And let me put another document on here.  This is a

8    document that you relied on in your analysis of Professor

9    Katz's model.  How did this document inform your analysis of

10   the reliability of Professor Katz's efficiencies analysis?

11   A.  Well, we have seen this kind of assumption of no ability to

12   get spectrum before.  This is a document from the AT&T/T-Mobile

13   merger where again the parties say we're going to assume we

14   can't get any spectrum and that's the reason that we have to

15   merge.

16   Q.  And what actually happened after this 2011 merger?  Did

17   AT&T and T-Mobile obtain more spectrum?

18   A.  Yes, they did.

19           MR. POMERANTZ:  And for the record, that's

20   Exhibit 211.

21   Q.  So now let's turn not to the assumption about no spectrum

22   for the standalone firms but to other assumptions that are in

23   Professor Katz's model.  Did you test Professor Katz's analysis

24   to see how it reacts to changes in these other assumptions that

25   we put on the screen?

JCKTSTA1                    Scott Morton – Direct

1    A.  Yes, I did.

2    Q.  And you've divided the assumptions into two different

3    categories, is that right?

4    A.  Yes, one category is assumptions about the kinds of

5    technology that the standalone firms could deploy, could they

6    deploy dynamic spectrum sharing, millimeter wave, spectral

7    efficiency, this kind of thing.

8           The other category is demand assumptions, how quickly,

9    for example, will people purchase 5G handsets.

10   Q.  Where did Professor Katz get his inputs that fed into the

11   these assumptions?

12   A.  I believe he obtained his technology inputs from

13   Mr. Kapoor.

14   Q.  And did you use alternative inputs to test these

15   assumptions?

16   A.  Yes, my inputs for these assumptions come from Dr. Kolodzy

17   again.

18   Q.  So when you use the alternative assumptions that were

19   provided to you by Dr. Kolodzy, does this chart reflect what

20   you found?

21   A.  Yes, it does.

22   Q.  Could you briefly explain what this chart reflects.

23   A.  Yes.  You can see, your Honor, in the solid bars for both

24   Sprint and then T-Mobile the output of Professor Katz's

25   calculations, what the marginal cost of capacity would be for

JCKTSTA1                    Scott Morton – Direct

1    the standalone firms, and then in black we have the combined

2    firm.

3          If you change the assumptions to those that

4    Dr. Kolodzy talked about yesterday in terms of access to

5    technology and adoption of 5G, and you can calculate the

6    marginal cost of capacity again, you get the hashed bars, and

7    you will notice that they are considerably lower than the solid

8    bars.  So Sprint's marginal costs drop by a lot and T-Mobile's

9    drop really dramatically.

10          This means that if we were to look at the efficiencies

11   from the merger and we were to use the hashed bars, we would

12   see that the combined firm has very low marginal cost and so

13   does T-Mobile, and Sprint's are a little bit bigger.  So the

14   difference between the combined firm and the standalone firm

15   has really shrunk because the hashed bars are close to the same

16   height.

17          MR. GELFAND:  Sorry, your Honor, I know I'm trying the

18   Court's patience, but this came from Professor Scott Morton's

19   report, it reflects a lot more than what Dr. Kolodzy testified

20   to yesterday, I will talk about that in cross-examination, but

21   we object to this demonstrative as not accurately reflecting --

22          THE COURT:  You want to do your cross-examination now,

23   it may save some time?

24          MR. GELFAND:  Thank you, your Honor.

25          THE COURT:  Yes.

1    BY MR. POMERANTZ:

2    Q.  So you just testified about the difference between the hash

3    lines for standalone Sprint and standalone T-Mobile versus the

4    hash lines for new T-Mobile over on the right side of the

5    screen.

6    A.  That's correct.

7    Q.  Does the difference between the new T-Mobile hash line

8    boxes and the standalone ones, does that matter to an

9    efficiencies analysis?

10   A.  It does, because the point of a merger-specific efficiency

11   is something that the merged firm can obtain uniquely and the

12   standalone firms cannot.  But if the standalone firms have

13   access to spectrum and technology and the other things that

14   Dr. Kolodzy analyzed, then they actually can achieve quite a

15   lot of efficiencies as standalone firms.

16   Q.  And we previously discussed spectrum in the earlier part of

17   this examination.  Does this chart that's in front of the Court

18   right now, which is figure 39 from your rebuttal report, slide

19   20, does this make any assumptions about spectrum availability?

20   A.  No, it does not.  The first chart we looked at was solely

21   about adding spectrum and what that would do to the claimed

22   efficiencies.  This chart is other technologies and demand

23   assumptions.  And so the two are actually not overlapping.

24   Q.  Now are the numbers you present in this graph a corrected

25   efficiencies number that the Court should accept?

A.  No, this is actually not correct efficiencies because, for

example, Professor Katz's model is not designed to go out this

far.  And it's inherently asking the wrong question because

it's leaving out partnership with Altice and leaving out things

like the combination of partnerships with Altice spectrum and

all the technology improvements that you would want to do

together in a good model.

Q.  Do your conclusions about the model that defendants have

offered in this case depend on Dr. Kolodzy's revised inputs for

technology and spectrum?

A.  I'm using them to illustrate that the model is very

sensitive, so the answer to the model gives you is really

different if you put in spectrum or put in the technology

changes.  I am not taking a position that one of these is the

right answer, that's something nobody can know in 2024, but if

we're thinking about how reliable are the efficiencies and are

they speculative, it's important to understand whether they

change a lot when the inputs change.  And what my graph shows

is when you change the inputs, you get a really big change in

the efficiencies.

Q.  All right.  Now the way this process worked in this case is

that the merging parties came up with their explanation of

efficiencies then you analyzed that and responded.  Is that a

common approach for antitrust economists who evaluate mergers?

            MR. GELFAND:  Objection, your Honor, that's asking a

JCKTSTA1                        Scott Morton - Direct

 1    for a legal conclusion about how these cases are litigated.

 2              THE COURT:  Rephrase the question.

 3    Q.  Let me go to here.  We're on the horizontal merger

 4    guidelines.  Does an economist approach an analysis of merger

 5    efficiencies by first trying to find out what the merging

 6    parties plan to do with the merged assets?

 7    A.  Yes.  As you can see from the horizontal merger guidelines,

 8    the standard practice is it's incumbent upon the merging firms

 9    to substantiate the efficiency claims.  And that is just

10    logical because it's only the merging firms who know what they

11    plan to do; they know if they plan to close a factory or

12    produce a new product.  They have some plans of how they're

13    going to use the assets that they're getting.

14    Q.  I want to turn to a different subject.  I put on the screen

15    testimony from Professor Katz about whether the model that he

16    is using is a part of the ordinary course of the company's

17    business.  Do you see that?

18    A.  I do.

19    Q.  Let's first focus on why we're even talking about whether

20    this model is or is not in the ordinary course.  Why does that

21    matter?

22    A.  It matters to an economist, again, because ordinary course

23    documents, models, whatever they may be, are market tested.  If

24    they're actually being used by companies, then we know that

25    they reflect the industry and competition.  When they're not

1  ordinary course, if they're developed just for regulatory

2  review, then they're subject to a higher degree of scrutiny

3  because we don't know that the market has tested them.  We're

4  going to compare them to ordinary course documents, we're going

5  to compare them to economic analysis.

6  Q.  And I've put on the screen section 10 from the merger

7  guidelines.  Is the principle that you just articulated set

8  forth in the merger guidelines themselves?

9  A.  Yes, it is.  It's not that efficiencies sort of brought

10 forward in the merger process are disregarded, they're regarded

11 by an economist, but they're viewed more skeptically because

12 they have not met that market test of actually being used in

13 practice.

14 Q.  And why does it matter in this particular case whether

15 T-Mobile's model is used in the ordinary course in the same way

16 that Professor Katz and the defendants are using it in this

17 case?

18 A.  Well, the economics of the model really depend -- you saw,

19 your Honor, that the efficiencies went out to 2024.  In the

20 ordinary course, this network congestion model that T-Mobile

21 had for LTE was not used to make network improvements five

22 years in the future.  Mr. Kapoor and others have said the model

23 is rerun every year and it's a short-run model.  So this is one

24 of the reasons why an economist would not want to use a model

25 that was not actually functioning as a long-run model to

1   calculate long-run efficiencies.

2           Secondly, that model wasn't used for 5G at all, and

3   here we have a major shift in the industry toward 5G, and the

4   model is predicting 5G in 2024 and it's never been used for

5   that.

6   Q.  And has T-Mobile itself previously described this model as

7   not being an ordinary course model?

8   A.  Yes, they have.

9   Q.  And could you explain to the Court what's on the screen.

10  A.  Yes.  This is a letter that T-Mobile sent to the Department

11  of Justice explaining that the 5G engineering model was not

12  developed in the ordinary course by T-Mobile because they

13  didn't have any 5G network so they didn't need a model to plan

14  congestion on it.  And in particular, the T-Mobile counsel say

15  that any model created in the ordinary course would not have

16  attempted to model as far into the future, and that makes

17  sense, given what we heard from Mr. Kapoor.

18  Q.  So this letter from T-Mobile's counsel to the Department of

19  Justice makes exactly the two points that you made, that the

20  model was not used for 5G and it was not used to model that far

21  out in the future?

22  A.  That's correct.

23          MR. GELFAND:  Objection, your Honor.

24          THE COURT:  I think that went over the top,

25  Mr. Pomerantz.

JCKTSTA1                        Scott Morton - Direct

1    Q.  From your perspective as an economist, why does it matter

2    that the model used by Professor Katz was not used in the

3    ordinary course at T-Mobile either for 5G or to predict four to

4    five years out in the future?

5    A.  Because then we need to understand -- he has these very

6    extreme assumptions that generate really high costs for the

7    standalone firms, and if this is not an ordinary course model,

8    then there needs to be some economic explanation for why those

9    assumptions are a good idea, why they're reasonable.

10   Q.  So we have been focusing on T-Mobile, let's talk about

11   Sprint.  Could you talk about the testimony from Mr. Saw in his

12   deposition and how that relates to your considerations of the

13   ordinary course use of this model.

14   A.  Yes.  Professor Katz is using the model for Sprint's

15   congestion, but Sprint did not have a congestion model because

16   they didn't have a congestion problem.  And we can see here

17   that Mr. Saw from Sprint says we don't have plans to use a

18   model like this because we don't have a congestion challenge.

19   So the model is not representing Sprint's ordinary course

20   activities.

21   Q.  So what is your conclusion about Professor Katz's model

22   that he uses to analyze network efficiencies?

23   A.  The model is not reliable.  It does not address what the

24   standalone firms could do.  It artificially constrains the

25   standalone firms, and therefore the results are neither merger

1    specific nor are they verifiable.

2    Q.  All right.  So now let's turn to the other component of

3    efficiencies that Professor Katz addresses, which is network

4    speed efficiencies.  Did you also analyze this claim?

5    A.  Yes, I did.

6    Q.  To make sure we're all on the same page, what improved

7    speeds are we talking about here?

8    A.  We're talking again about the merger-specific improved

9    speeds.  Professor Katz's model gives him speeds for the

10   standalone firms and speed for the combined firms, and the

11   merger-specific increase is the difference between those two.

12   Q.  So let's look at the components of Professor Katz's

13   analysis.  How does Professor Katz go about calculating the

14   network speed efficiencies in this case?

15   A.  Two inputs.  One is the additional speeds that I just

16   mentioned predicted by the model as comparing the standalone

17   firms and the combined firm, and then he needs a way to figure

18   out how much consumers value that additional speed, and he uses

19   an estimate from research article in the economics literature

20   to do that.

21   Q.  Now you were just previously describing the model that he

22   used and the concerns you have about whether the mergers are --

23   the efficiencies are merger specific or verifiable.  Is it the

24   same model that he uses to take his input on additional speeds?

25   A.  That's correct.  Congestion and speed are closely related

JCKTSTA1                        Scott Morton - Direct

1  in that model, so if you have higher congestion you have lower

2  speed, and that's the model that is generating the speeds used

3  here.

4  Q.  And the concerns that you just raised in your prior

5  testimony, are those same concerns raised with respect to speed

6  as well?

7  A.  They are.

8  Q.  So let's now go to the second box at the bottom here, which

9  is the value of additional speed, and you say from the Nevo

10 article.  Do you see that?

11 A.  I do.

12 Q.  That's Professor Katz's contribution to the calculation of

13 network speed efficiencies, correct?

14 A.  He's going to use information from that article to attempt

15 to value the merger-specific speed increases, yes.

16 Q.  Do you believe he has placed a reasonable value on that

17 speed difference?

18 A.  No.

19 Q.  And why not?

20 A.  He is taking a setting with very low speeds and

21 extrapolating out really far in a way that I think is not

22 economically appropriate.

23 Q.  So let's step back.  Do you think that mobile wireless

24 consumers value faster speed?

25 A.  Yes, but they value the speed insofar as it lets them do

1    something.  So it's not that consumers value speed per se, they

2    value user experience, they value the thing they want to do.

3    And if speed lets them do that thing, then the speed is

4    valuable.

5    Q.  And is there a term in economics for the principle you just

6    articulated?

7    A.  Yes, it's called derived demand.

8    Q.  Can you briefly explain the related principle of

9    diminishing marginal returns?

10   A.  Yes, diminishing marginal returns is a very common economic

11   concept, and it goes to the idea that a consumer gets less

12   value the more they have of something.  So suppose I were to

13   give you a shirt, you might value that; the second shirt

14   perhaps a little bit less.  By the time I gave you the 12th or

15   13th or 14th shirt, your value for that shirt is starting to go

16   down because you have so many of them.  This is true of almost

17   all goods.  It's just the way consumers behave.

18   Q.  So let's go to our favorite analogy in this case, and

19   that's cars and roads.  Can you tell us what this chart is

20   showing about diminishing marginal returns and derived demand?

21   A.  Yes.  So let's imagine that I was driving to work in the

22   first lane on this chart.  There's congestion on that lane and

23   I'm only driving 25 miles an hour.  Let's imagine I'm offered a

24   chance for there to be a second lane, how much would I pay for

25   that second lane on the road?  Well, the second lane lets me go

JCKTSTA1                     Scott Morton - Direct

1    at 65, that's pretty great, and I'm willing to pay to go at 65.

2              Now I'm going close to speed that I want to be

3    traveling at, and we could ask:  Does the consumer want to pay

4    for a third or fourth lane of traffic?  And that's the bottom

5    chart.  And the answer is well, what would happen I'm going

6    pretty close to the speed I would like to travel at, maybe the

7    additional lanes lets me get up to 68.  That's a relatively

8    small improvement in my experience, I therefore have a

9    relatively low willingness to pay for incremental lanes of

10   traffic.  So the first lane is very valuable, the second, third

11   and additional lanes are less valuable.  That's diminishing

12   returns.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

JCKPSTA2                        Scott Morton - Direct

Q.  And how does this car-and-lane analogy translate to
wireless speed for mobile phones?
A.  Well, let's go to the next chart.  Probably the most
popular use case that requires speed with a mobile phone is
watching video.  High definition video streaming requires a
certain speed, and if the user wants to stream high definition
video, then she's going to be happier and happier as her speed
goes up to that level that she needs to watch the movie.

        If the speed is slow, the movie is buffering, it's
going the way it's supposed to, and the experience is not very
good.  But as the speed gets faster, the movie plays like it's
supposed to and that's valuable to the consumer.

        Once the consumer is watching the moving like it's
supposed to play, additional speed becomes less valuable,
perhaps not valuable at all.  The consumer experience is
unchanged.  She is watching the movie, that's all good.  And
speeds above the level needed to watch the movie no longer have
much value to the consumer.  That's diminishing returns.
Again, you can see the shape of the curve here.
Q.  Now, we've heard a lot about video streaming in this case
already.  What kind of speeds are needed for standard
definition video that one may watch today?
A.  Three megabits per second.

        MR. GELFAND:  Objection, your Honor, lack of
foundation.  She's not an expert on network speeds and

JCKPSTA2                              Scott Morton - Direct

1   applications.

2                MR. POMERANTZ:  You Honor, this information comes

3   directly from Professor Scott Morton's report.  We're not

4   making it up here.  She looked into this in order to assess the

5   very principle that she's raising here, which is, at what point

6   do consumers value speed and at what point does that become

7   less of a value to consumers.  It's exactly that point.

8                THE COURT:  Overruled.

9   BY MR. POMERANTZ:

10  Q.  If you could explain this chart and start with the standard

11  definition and high definition video on the left?

12  A.  So today, there are two levels of video watching that are

13  common and popular in that standard definition, and the more

14  fine, high definition video, more pixels, and the speeds needed

15  for those are three and six megabits per second.

16               We've heard a little bit in this case about a video

17  format that is not popular now but might be in the future.

18  That's 4K video.  The speed required for that is about 25

19  megabits per second.

20  Q.  And if I recall, I think it was Mr. Kapoor who testified

21  about the number of T-Mobile users who, right now, had the

22  ability to access 4K video; do you recall his testimony?

23  A.  Yes.  I think he said there were 10,000 handsets out of 80

24  million that could look at 4K video.

25  Q.  All right.  Now, according to Professor Katz, what kind of

JCKPSTA2                        Scott Morton - Direct

1  speeds will be available through the standalone firms in the

2  future?

3  A.  Here, I show Professor Katz's projected 5G speeds.  We see

4  that in 2021, he's predicting standalone T-Mobile will be at

5  127 megabits per second, and Sprint at 210 megabits per second,

6  on average.

7          I did skip over current speeds, which are themselves

8  already well above high definition video, the video format that

9  is popular today.  Those speeds are 31 and 24 and that, as I

10  said, is considerably bigger than six.

11  Q.  Okay.  So what Professor Katz predicts is that by 2021,

12  standalone T-Mobile's speed will be 127?

13  A.  Yes.

14  Q.  And standalone Sprint's will be 210, correct?

15  A.  Yes.

16  Q.  Okay.  And what do the two bars on the right reflect?

17  A.  This is the combined firm in 2021 and then again in 2024,

18  where Professor Katz's model predicts that speeds will be 380

19  megabits per second and then 660 megabits per second.

20  Q.  Let's stay with 2021, since we have the comparables from

21  Professor Katz.  So we have standalone T-Mobile at 127,

22  standalone Sprint at 210, and new T-Mobile at 380, correct?

23  A.  Yes.

24  Q.  Has Professor Katz identified a reliable way to measure the

25  difference in value to consumers between the standalone Sprint

1   and T-Mobile numbers and the new T-Mobile number?

2   A.  No, he has not because these are very high speeds beyond

3   anything anybody is using today.

4   Q.  All right.  So now, let's go to this chart.  This is a

5   chart that looks at the analysis that Professor Katz did

6   relating to the Nevo article, correct?

7   A.  Yes, it is.

8   Q.  And can you explain to the Court what this is reflecting,

9   starting with the left and moving your way right?

10  A.  Yes.  Your Honor, what is happening in the Nevo article is

11  that those authors have a dataset of home broadband use from

12  2012; so these are people at home, watching Netflix or similar

13  activities.  And what that paper does is it looks at the value

14  those people place on additional speed.

15          Now, on the chart, what I've shown is that the average

16  speed in his dataset is 15 megabits per second; so that means

17  only some people are below, some people are above, but the

18  average speed is 15 megabits per second.  And this is a time

19  when multiple devices might be streaming in a household, and

20  the value of speed around 15 could be substantial and, indeed,

21  Dr. Nevo finds evidence that people value speed.

22          What's then happening is that Professor Katz has

23  standalone Sprint and standalone T-Mobile out here at 222 and

24  285 in the year 2024, and he is extrapolating the estimate from

25  the 15 megabits per second for home broadband in 2012 to the

1    difference between the standalone firms and new T-Mobile,

2    which, as you can see, are enormously bigger.  Right?  That's

3    just a whole different category of speed out there.

4    Q.  And do you believe that that extrapolation by Professor

5    Katz, the way he relied on the Nevo article, is reasonable?

6    A.  No, I do not.

7    Q.  And why not?

8    A.  Because we don't know -- consumers have diminishing returns

9    to speed.  They're able to watch -- the current use case is

10   video.  They're able to watch video at much slower speeds than

11   this.  So it's just unclear how you would value what a consumer

12   would do with the difference between 285 and 660.

13          We don't know what they're going to do.  It's far in

14   the future.  We don't have any data, and what Professor Katz is

15   doing is taking a 15 megabits estimate and saying, oh, I'll

16   just apply it out here, and I think that there's no economic

17   foundation for doing that.

18   Q.  And to bring it back to our favorite analogy, where we're

19   looking at the cars and the lanes and you put up a slide, which

20   I won't go back to, but which had speeds at 25 and then 65 and

21   68, using that analogy, how does that relate to what Professor

22   Katz is doing with the Nevo article?

23   A.  Suppose that -- so the Nevo paper, article is about the

24   consumer driving at 25 and feeling congested and valuing going

25   up to 65 miles an hour.  And that's, as I said, a valid

1    exercise, and the consumer does appreciate going from 25 to

2    65 miles an hour.

3            When you extrapolate it, however, it's like the

4    consumer is on a 20-lane highway already, and we're going to

5    ask whether the consumer values having another 20 lanes to the

6    20-lane highway.  And if she's on the 20-lane highway driving

7    70 already, it's not clear why -- how do you value the

8    additional 20 lanes beyond that.

9    Q.  And is it fair to say that what Professor Katz failed to do

10   is to consider diminishing marginal returns?

11   A.  Yes, that's correct.

12           THE COURT:  Let me interject here for a moment.

13   Beyond the question of whether or not there is an economic

14   model to explain what might happen in the future, what about

15   looking at the reality of what has been transpiring in

16   telecommunications over the last 10, 15 years?

17           If you go back to the time when a mobile phone was a

18   brick, could you have conceived at that time that that brick,

19   10 years out, would be showing movies, getting internet,

20   shopping?

21           THE WITNESS:  Right.

22           THE COURT:  Do you take that into account?

23           THE WITNESS:  Yes, I take your point, your Honor.  I

24   think that as time goes forward, this is a dynamic, fast-moving

25   industry, with lots of innovation and something will happen.

JCKPSTA2                        Scott Morton - Direct

1   There's a lot of reason to think that these speeds will be

2   useful.  A lot of the time in commercial applications,

3   factories, autonomous vehicles and things like that are

4   applications that we've all read about, but that's different

5   than saying I've got an anticompetitive merger, and I'm going

6   to find some cognizable efficiencies.

7           I have to be able to grasp those.  I have to be able

8   to say what they are and how much consumers value them today in

9   order to say, well, we're sure we're getting this.  The kinds

10  of innovation we're going to get tomorrow is we don't know what

11  it is.  I mean, it will probably be exciting, but could anybody

12  predict exactly what it will be, whether it will be in this

13  market or a market like autonomous vehicles, I think we don't

14  know.

15          MR. POMERANTZ:  And I'm sorry, your Honor, were you --

16          THE COURT:  Well, we don't know, but in this field,

17  again, you could look at science fiction and make a prediction

18  that ideas that would have been fiction five years ago are now

19  reality.  You probably don't know about the Dick Tracy watches.

20          THE WITNESS:  I am a little young for that, your

21  Honor, you're right.  But, yes, I take your point, and I do not

22  disagree with the idea that there will be innovation here.  The

23  question is, we've got a relevant market of retail wireless

24  communications and what's going to happen to the consumers in

25  that market, and those consumers are the ones that we're

worried about.  And innovation could occur literally anywhere

in any way because it's so uncertain, the future.

BY MR. POMERANTZ:

Q.  Professor Scott Morton, I want to follow up on the Judge's

questions with this chart in front of us, chart 33.  So the

standalone Sprint and standalone T-Mobile companies, they might

innovate in some unknown way in the future, correct?

A.  Absolutely.

Q.  And the new T-Mobile might innovate in some unknown way in

the future, correct?

A.  That's right.  In my answer to the Court I did not talk

about merger specificity.  So, your Honor, one of the things

that is really important, that Mr. Pomerantz has reminded me

of, is while fantastic innovations will happen in the future,

no doubt there's an important question about whether we need

this merger to get them or whether Verizon by itself and

T-Mobile by itself is going to be able to innovate just as

well.

Q.  And that's the merger specificity part of the efficiencies

analysis.

        Verifiable, why does the -- why do economists look to

verifiability, and how does that relate to the Judge's

question?

A.  Verifiability says, look, you can't assert an efficiency by

itself.  You have to back it up with some means that a third

1    party can verify that it's true and give some quantification so

2    that we know how to compare it to potential harms from a

3    merger.

4         And here, saying that there's going to be innovation

5    in the future is, as your Honor pointed out, undoubtedly true,

6    but if we don't know who it's going to benefit, what type it

7    is, it might not even be speed, it might be the latency that

8    turns out to be really important to innovation, I have no idea.

9    But that means that we don't have a verifiable situation here.

10   We have just a lot of uncertainty and speculation.

11   Q.  And here in this case, the defendants didn't come in and

12   just say we innovate a lot and we're in a dynamic industry.

13   They actually presented a model that you evaluated, correct?

14   A.  That's correct.

15   Q.  All right.  Let's go to the last subject that you're going

16   to -- that we're going to be discussing today, and that's the

17   proposed DISH remedy.  And let me put up Professor Katz's

18   testimony in which he was asked about whether he had reached

19   any conclusions about the competitive effects of the

20   transaction before the Court, and he specifically references

21   then that the transaction will facilitate the entry of DISH.

22   Did you see or read this testimony?

23   A.  Yes, I did.

24   Q.  All right.  Did you also consider the competitive impact of

25   the potential entry of DISH into the market, like Professor

1  Katz did?

2  A.  Yes, I did.

3       MR. GELFAND:  Objection, your Honor.  Professor Scott

4  Morton did not do a competitive effects analysis in this case.

5  She testified that she deferred to Professor Shapiro on that.

6  So basically, what she's done with DISH is she said, well, I

7  don't think it's going to be as big a competitor as Sprint.

8       But just to be clear, the question I believe that

9  Mr. Pomerantz just asked is, did you look at its competitive

10  significance, which is outside the scope of her report and

11  outside the area that she's offering here.

12       MR. POMERANTZ:  Your Honor, actually, she has offered

13  significant testimony, both through her reports and in

14  depositions, about the -- whether the entry of DISH into the

15  market would be timely, likely and sufficient, which is the

16  standard set forth in the merger guidelines and in some case

17  law.  And I'm just following up on that in the similar way that

18  the defendants addressed this issue with Professor Katz.

19       THE COURT:  All right.  Overruled.

20  BY MR. POMERANTZ:

21  Q.  So what framework would you use, as an economist, in order

22  to analyze whether the entry of a competitor can resolve the

23  competitive concerns of a merger?

24  A.  As you alluded to, we used the framework from the

25  horizontal merger guidelines.  Entry is -- it's necessary that

JCKPSTA2                        Scott Morton - Direct

1    entry is timely, likely and sufficient in its magnitude to

2    counteract the competitive effects of concern in the

3    transaction.

4    Q.  And in order to do the analysis that you just testified to

5    and that's reflected in section nine of the merger guidelines,

6    do you have to do a comparison?

7    A.  A comparison of -- yes.  So let's say your transaction

8    involves a reduction in competition, then you would want to

9    compare the entrant to that lost competition.  The goal of the

10   entry is to restore the lost competition; so if the transaction

11   has resulted in less competition, you want the entry to be of

12   sufficient magnitude and character to restore that lost

13   competition.

14   Q.  And so what is the comparison that would need to be done in

15   this case?

16   A.  The comparison here is whether -- since we're losing Sprint

17   as an independent competitor, whether DISH would come in and

18   replace the competitive impact of Sprint.

19   Q.  And based upon your analysis of the evidence that was

20   provided to you during the course of this proceeding, what is

21   your bottom-line opinion on whether entry by DISH would be

22   timely, likely and sufficient in its magnitude, character and

23   scope?

24            MR. GELFAND:  Objection, your Honor.  There is no

25   foundation.  She has not testified as to any analysis of what

JCKPSTA2                          Scott Morton - Direct

1   the competitive significance of Sprint is in the market and, in

2   fact, she's deferring to Professor Shapiro for that analysis.

3   So she can -- I think what she's really testifying to is

4   whether DISH is going to look like Sprint in terms of some

5   metric, like number of subscribers.

6           She did not do a competitive analysis of Sprint in the

7   market.  She was very clear at her deposition, and I believe

8   it's clear in her report that she defers to Professor Shapiro

9   for that.  So I do object for lack of foundation, outside the

10  scope of her expert report.

11          MR. POMERANTZ:  Your Honor, I think that's a mistake

12  as to what Professor Scott Morton has done, but I'll bring that

13  out as to lay a foundation.

14          THE COURT:  Proceed.

15  BY MR. POMERANTZ:

16  Q.  Professor Scott Morton, did you analyze the entry of -- the

17  potential entry of DISH as a potential new competitor in the

18  market as part of your work in this matter?

19  A.  Yes, I did.

20  Q.  And did Professor Shapiro also analyze that?

21  A.  Yes, he did.

22  Q.  And what's the difference between what the two of you did?

23  A.  Professor Shapiro looked at the short-term entry of DISH as

24  an MVNO, and my assignment was to look at the longer-term entry

25  of DISH as it built out its facilities.

1  Q.  And what kind of evidence did you rely upon to do that kind

2  of analysis?

3  A.  I relied upon DISH's business plan, upon my analysis of the

4  industry, entry barriers, and what's needed to compete in that

5  industry, and also, I relied upon the competitive impact of

6  Sprint.

7  Q.  And based upon your consideration of that evidence, what

8  opinion did you reach about DISH's likely entry into the

9  market?

10         MR. GELFAND:  Objection, lack of foundation, your

11  Honor.

12         THE COURT:  Overruled.

13  A.  I concluded that DISH's entry is neither timely, likely nor

14  sufficient in magnitude to counteract the competitive loss.

15  Q.  All right.  One last topic.  This is a section of the

16  antitrust division policy guide to merger remedies.  You're

17  familiar with this guide, aren't you?

18  A.  Yes, I am.

19  Q.  And the first sentence here refers to the merged firm's

20  incentive not to promote competition with itself; do you see

21  that?

22  A.  I do.

23  Q.  And there's other provisions in this section.  And this

24  concerns how economists look at remedies for a merger that

25  might be anti-competitive, correct?

JCKPSTA2                          Scott Morton - Direct

1  A.  That's correct.

2  Q.  All right.  And as an economist, is it relevant to your

3  analysis of DISH's entry into the market whether DISH will be

4  an independent competitor from T-Mobile?

5  A.  It absolutely does.  Your Honor, this is a really key

6  point, that DISH is not going to be an independent competitor.

7  And the remedies guidelines are very skeptical of a situation

8  where the entrant is tied to the incumbent firm because of just

9  what it says here, the merged firm's incentive not to promote

10  competition with itself.

11         And so competitors who rely on the merged firm for key

12  inputs are likely to be disadvantaged in the long term, and

13  that's a kind of a harm to competition that doesn't occur when

14  competitors are completely independent and are able to choose

15  prices, decide on their costs and their strategies in an

16  independent way.

17         MR. GELFAND:  I'm sorry, your Honor.  Professor Scott

18  Morton just contradicted herself just a few minutes ago.

19         THE COURT:  You can bring that out in your

20  cross-examination, Mr. Gelfand.

21  Q.  One last slide.  What does this slide reflect regarding

22  your concerns about the remedy in this case?

23  A.  The remedy in this case lasts for seven years, and during

24  that time, DISH and T-Mobile -- new T-Mobile are entangled in a

25  way that is very difficult for them to compete independently.

1          So, for example, DISH gets the quality that T-Mobile

2    chooses to give to its Metro plan.  DISH gets the wholesale

3    cost that's half of what T-Mobile chooses to charge for its

4    most popular unlimited plan.  So prices and quality between the

5    two are really tied together in a way that stops them from

6    running independently.

7    Q.  Now, there's been testimony in this case that the kind of

8    entanglements that you're talking about will be completely

9    resolved by the appointment of a monitor to monitor the

10   agreements that the parties have reached with the Department of

11   Justice and the FCC.

12          How do you view whether a monitor can resolve the

13   competition problems that arise from the relationship between

14   DISH and T-Mobile going forward?

15          MR. GELFAND:  Objection, outside the scope of economic

16   expertise.

17          THE COURT:  Sustained.

18          MR. POMERANTZ:  All right.  No further questions, your

19   Honor.

20          THE COURT:  Why don't we take the morning break at

21   this point.

22          MR. GELFAND:  Thank you, your Honor.

23          (Recess)

24          THE COURT:  Thank you.  Be seated.  All right.

25   Mr. Gelfand, now you can begin.

1          MR. GELFAND:  Thank you, your Honor.  I'm grateful for

2     that.

3          Before I begin with my questioning, I'd like to

4     introduce the Court Tobias Kraft, one of the lawyers in our

5     firm who's been assisting with the case.

6          THE COURT:  Okay.

7     CROSS-EXAMINATION

8     BY MR. GELFAND:

9     Q.  Professor Scott Morton, before the break, a few minutes

10    before the break, you had mentioned a division between you and

11    Professor Shapiro, where Professor Shapiro looked at the

12    competitive effects, I think in what you called the short term,

13    and your analysis was of DISH as a facilities-based competitor.

14    Do I remember that right, or correct me if I've got it wrong?

15    A.  Yes, we divided it essentially by MVNO versus a

16    facilities-based carrier, that's right.

17    Q.  So he had responsibility for looking at the competitive

18    effects while this MVNO agreement was in place?

19    A.  Well, the MVNO agreement lasts for seven years; so that's

20    not quite right.  But DISH's plan, of course, is to transition

21    to building its own facilities within that seven years, and

22    that's the part that I am tasked with analyzing.

23    Q.  And the last part of your testimony, when you mentioned, I

24    think, some guideline that says sometimes it's a concern when

25    there's this entanglement, that was intended to apply to the

1    MVNO agreement, correct?

2    A.  As I said, the MVNO agreement lasts for seven years, and so

3    that is a significant entanglement, yes.

4    Q.  Okay.  But any impact that that would have on competition

5    in the next couple of years, that would be in Professor

6    Shapiro's division of responsibilities?

7    A.  I'm not quite sure what you're driving at.  It's a long

8    MVNO agreement, seven years, and there's some distinction

9    between just the immediate impact when the Boost customers ride

10   on the T-Mobile network, as I understand it.

11           And my responsibility was to think about whether DISH

12   was entering as an independent competitor and, of course, that

13   requires them to build facilities if they're going to be an

14   independent competitor.

15   Q.  Okay.  But just to be clear on this, the part where it's

16   the short-term DISH competing as an MVNO, that would be in the

17   short term, that would be Professor Shapiro's responsibility,

18   correct?

19   A.  Yes.

20   Q.  Okay.  Thank you.

21           Now, I want to just make sure, for the Court, that we

22   have a clear idea of what you did and didn't do in this case.

23   You've testified that you looked at efficiencies, but you did

24   not analyze the relevant product market, for example, correct?

25   A.  That's right.

JCKPSTA2                        Scott Morton – Cross

1   Q.  And you did not analyze what the relevant geographic market

2   is?

3   A.  I relied on Professor Shapiro for that, yes.

4   Q.  You did not analyze what the competitive effects of the

5   transaction would be, correct?

6   A.  The issue of competition is throughout my report; so I

7   would say broadly.  I mean, that's my area of research

8   interest; so competition is definitely included in my report.

9   Q.  Did you do any analysis of unilateral effects in your

10  reports?

11  A.  No, I did not.

12  Q.  You relied on Professor Shapiro for that?

13  A.  For unilateral effects, I relied on Professor Shapiro, yes.

14  Q.  And you didn't do any analysis of coordinated effects,

15  correct?

16  A.  Of coordinated effects?

17  Q.  Yes.

18  A.  No, I did not.

19  Q.  You relied on Professor Shapiro?

20  A.  Yes, that's correct.

21  Q.  And you didn't do any analysis of market share, correct?

22  A.  No.  The market share analysis was not part of my

23  assignment.

24  Q.  And you didn't do any analysis of diversion ratios?

25  A.  That's correct.

JCKPSTA2                        Scott Morton - Cross

1   Q.  You didn't do any analysis of the competitive significance

2   of any particular player in the retail mobile wireless industry

3   as of today, correct?

4   A.  That's not quite right because I analyzed the question of

5   whether DISH would replace Sprint as an independent competitor

6   and restore the lost competition, and that necessarily involved

7   looking at the role of Sprint and the potential role of DISH.

8   Q.  What analysis did you do of the role of Sprint in the

9   current market?  Did you analyze any diversion ratios between

10  Sprint and other competitors?

11  A.  No.  I read Professor Shapiro's report to learn about those

12  things.

13  Q.  All right.  Did you analyze whether Sprint is a price

14  constraint on any other competitors?

15  A.  Price -- use price constraint?  I'm not sure I understand

16  the question.

17  Q.  Did you analyze whether Sprint's activities in this market

18  constrain the pricing of any other retail mobile wireless

19  players?

20  A.  In general, yes, this will be true in an oligopoly, like

21  this one, where you have only four competitors and they're

22  competing on price to get consumers, yes.

23  Q.  I didn't ask whether it would be true in general.  I just

24  want to know whether, in your reports, you did any analysis of

25  the particular role Sprint plays as a competitive constraint in

JCKPSTA2                          Scott Morton - Cross

1    the market?

2    A.  As I said, comparing Sprint and DISH, I have to look at

3    Sprint's role, and this is a very standard setting for firms, a

4    relevant market, their competing price and quality, and that

5    general principle is throughout my report, as I said.

6    Q.  The general principle throughout your report.  Is there any

7    part of your report that we can turn to and say here's the

8    analysis of the competitive significance of Sprint in today's

9    market?

10   A.  I think the section of my report where I compare Sprint and

11   DISH would be the place to look.

12   Q.  And you're not an engineer?

13   A.  That's correct.

14   Q.  So you rely on Dr. Kolodzy for the engineering information?

15   A.  That's correct.

16   Q.  I asked you at your deposition how many matters you have

17   worked on in your career involving the mobile wireless

18   industry, and you said two, right?

19   A.  Yes, the AT&T, T-Mobile merger and this one, that's

20   correct.

21   Q.  And do you recall also telling me that, because of all the

22   changes in the market, the circumstances of AT&T, T-Mobile in

23   2011 are not relevant to today's situation?

24   A.  I wouldn't say that they're not relevant.  The facts have

25   changed; so, of course, if we're thinking about whether there

1    are cognizable efficiencies, then those would need to be

2    updated to reflect current technology and standards and so

3    forth.  It is the same market.  It is the same retail wireless

4    market, with the same general price and quality competition.

5    Q.  Can we go to slide 11 from Professor Scott Morton's

6    presentation, please.

7              Okay.  Professor, this is a slide you showed to the

8    Court, and you testified that this slide, which was -- do I

9    have it correct that this was taken directly from your report?

10   A.  That's correct.

11   Q.  Okay.  And you testified that this slide represented the

12   changes that would occur to the various cost calculations if

13   you were to inject into the model the sorts of things that

14   Dr. Kolodzy had told you could be injected into the model.  Do

15   I have that right?

16   A.  His engineering inputs, that's correct.

17   Q.  Okay.  And do feel free, if you wish, to turn to paragraph

18   186, page 109 of your rebuttal report, if you wish.

19   A.  Sorry, was that paragraph?

20   Q.  Paragraph 186.

21             MR. POMERANTZ:  Your Honor, may I just go get my copy

22   of the report?

23             THE COURT:  Yes.

24             MR. GELFAND:  These are your copies?  Now I've got to

25   get my copies.

JCKPSTA2                          Scott Morton - Cross

1             THE WITNESS:  Okay.

2    BY MR. GELFAND:

3    Q.  Okay.  Are you there?

4    A.  Yes.

5    Q.  All right.  And in that paragraph, you say:  "I now combine

6    my adjustments to 5G spectral efficiency, 5G congestion

7    thresholds, mmWave offload factor, DSS implementation and 5G

8    forecasted data usage and device penetration, to show the

9    impact of Professor Katz's estimates when these assumptions are

10   considered jointly.  Correct?

11   A.  Yes, that's correct.

12   Q.  So if we go back to the slide -- slide 11 I think it was,

13   Mr. Klein -- that reflects all of those adjustments, correct?

14   A.  That's right.

15   Q.  All right.  Let's take those one by one.  The first one was

16   spectral efficiency.  Dr. Kolodzy did not testify about

17   spectral efficiency yesterday, did he?

18   A.  I read his testimony, and I don't recall.  But he included

19   it in his analysis, and it's included in my report.

20   Q.  The Court did not hear any analysis from Dr. Kolodzy about

21   spectral efficiency, correct?

22   A.  I don't know.

23   Q.  You don't know of any measurement of spectral efficiency

24   that was provided by Dr. Kolodzy yesterday?

25   A.  I don't know.

JCKPSTA2                          Scott Morton - Cross

1    Q.  Okay.  Now, let's take the next item from your report,

2    which was 5G congestion thresholds, and if we could pull up the

3    trial testimony from Dr. Kolodzy at page 2141, starting at line

4    25 and going to the end of the page and carrying over.  Thank

5    you, Mr. Klein.

6            And starting at line 25, we see a question:

7            "Turning to congestion thresholds, you testified that

8    you did a sensitivity analysis on the congestion thresholds

9    T-Mobile applied in its 5G model, correct?"

10           And he said:  "That is correct."

11   "Q.  And for that analysis, you were just running sensitivities

12   to show how sensitive the model is to changes in the congestion

13   thresholds, right?"

14           He said:  "That is correct."

15           "And you're not covering any opinion today on what

16   congestion criteria standalone T-Mobile would, in fact, use for

17   5G, correct?"

18           And he said:  "I am not offering opinion as to the

19   exact value, but I was offering an opinion that I thought the

20   value that was selected seemed to be too high, given the state

21   of what the usage of the 5G network might be and the

22   applications that might be out there."

23           So Dr. Kolodzy did not offer any particular value of

24   the congestion threshold, correct?

25   A.  I'm sorry, do you mean value in dollars, or value in terms

JCKPSTA2                         Scott Morton - Cross

1    of the level that he was proposing?

2    Q.  What value did you take from Dr. Kolodzy when you prepared

3    your adjusted slide 11 that you showed the Court?

4    A.  I took his engineering outputs when he applied a lower

5    level, and I -- and then I took those and put them into the

6    economic model to calculate the network marginal costs.

7    Q.  So when he gave you a value for that, do you remember what

8    the value was?

9    A.  So I think I'm not supposed to talk about congestion

10   threshold numbers in open court, but in particular, what he

11   gave me --

12   Q.  I appreciate that.  Thank you.

13   A.  -- was all the solutions, the remedies to congestion, that

14   those are, of course, many, sales blitz, radio and different

15   things, and then those get put into the economic model; so it

16   isn't one number that he's giving me.

17   Q.  Okay.  But you found some numbers to put into your model,

18   correct?

19   A.  Well, I got them from Dr. Kolodzy.  I didn't find them.

20   Q.  Fair enough.  But you got the numbers from Dr. Kolodzy, and

21   Dr. Kolodzy testified that he's not making a prediction that

22   any of those numbers will, in fact, apply to standalone

23   T-Mobile; isn't that right?

24   A.  That's correct.  What he says in the portion you

25   highlighted is that it seemed like a rather extreme assumption

1  to him, that's a technology assumption.

2          I'll say, from the economics side, the assumption the

3  standalone firm is using is extremely costly to it, and so you

4  would want to see, in the ordinary course, some benefit to

5  doing that.  And I believe Dr. Kolodzy was questioning whether

6  the benefit was really there.

7  Q.  The next item from your report was mmWave offload factor.

8  That's millimeter wave offload factor, correct?

9  A.  Yes.

10 Q.  And, in fact, Dr. Kolodzy did not testify about that factor

11 yesterday, correct?

12 A.  I don't recall.

13 Q.  All right.  Do you know if he provided any value to the

14 Court that could be used in looking at the millimeter wave

15 offload factor?

16 A.  I don't know.

17 Q.  Okay.  The next one is DSS implementation, correct?

18 A.  Yes.

19 Q.  Okay.  And if we could pull up the trial transcript at

20 2137, lines 3 to 15, Mr. Klein.

21          And there Dr. Kolodzy was asked:

22          "And you're not offering any opinion on what, in fact,

23 standalone T-Mobile would do in the real world, are you?"

24          And his answer was:  "Well, I can't comment on what

25 they're going to do in the real world.  All I was doing was

JCKPSTA2                          Scott Morton - Cross

1    saying they could do something on this order, and it would make

2    an impact.

3    "Q.  But you don't have sufficient information to provide such

4    an opinion, correct?

5    "A.  Provide such an opinion as to if a real network was

6    deployed and they used -- put down in the spectrum what the

7    impact would be, is that the question?

8    "Q.  Whether what T-Mobile, as a standalone company, will in

9    fact do in the real world."

10            And he said:  "I can't predict what the company is

11   going to do."

12            correct?

13   A.  I see that.

14   Q.  And you took one of his values for how this DSS impacts the

15   model, and you plugged it into your analysis when you did that

16   slide that appeared at slide 11, correct?

17   A.  I did because the economic model that Professor Katz

18   developed makes the assumption that there is no DSS.  It's not

19   that the firm optimizes by choosing the lowest-cost solutions

20   and chooses not to use DSS.  They're not allowed to consider

21   it.  It's eliminated from the model.  So that's a bias.

22            I mean, the firm might or might not use DSS, but it

23   should be in a model because it's a real technology that's

24   being brought forward now and that firms have already announced

25   that they're going to use.  So it's not -- we don't know what

1    T-Mobile is going to do, but we do know that zero and

2    eliminating it is not the correct answer.

3    Q.  Okay.  Professor, I just want to be clear, since you have a

4    long answer there, that you took a value from Dr. Kolodzy and

5    plugged it into the model to get your adjusted values on slide

6    11, correct?

7    A.  That's correct.

8    Q.  All right.  Thank you.  And then you also talked about 5G

9    forecasted data usage and device penetration, right?

10   A.  Yes.

11   Q.  And that's something that you looked at to adjust the

12   marginal cost numbers that appear on slide 11, correct?

13   A.  Again, Dr. Kolodzy takes values, puts them into the

14   engineering model.  The engineering model gives me outputs that

15   I put into the economic model and come out with the marginal

16   costs.

17   Q.  And data usage would be a reflection of consumer demand; is

18   that right?

19   A.  Of consumer demand, did you say?

20   Q.  Yes.

21   A.  Yes, in part, and competition.

22   Q.  Okay.  And if we could go to trial testimony at page 2145,

23   lines 3 through 9, please, Mr. Klein.

24           MR. POMERANTZ:  Is this Dr. Kolodzy?

25           MR. GELFAND:  I'm sorry, Dr. Kolodzy.

1          MR. POMERANTZ:  No, that's fine.  If you can tell us

2     who the witness is.

3          MR. GELFAND:  That was Dr. Kolodzy's testimony.  I'm

4     sorry.

5     BY MR. GELFAND:

6     Q.  Okay.  And in that portion of Dr. Kolodzy's testimony he

7     was asked:

8          "I want to be clear.  You don't have expertise in

9     evaluating consumer demand, do you?"

10          And he said:  "No"

11          "And you aren't offering any opinion on what consumer

12     demand will be in the future, are you?

13          "No, I am not."

14          Are you aware of Dr. Kolodzy's testimony on that

15     point?

16     A.  I didn't recall it, but I see it there.

17     Q.  Okay.  Thank you.

18          And I'm just going to do one more, if I could, from

19     Dr. Kolodzy trial transcript at 2126, lines 18 to 21.  If you

20     could bring that up, Mr. Klein.

21     "Q.  And you're not offering any opinions today on whether the

22     standalone firms will pursue the strategies reflected in your

23     sensitivity analysis, correct?"

24          And he said:  "No, I am not."

25          Are you familiar with that testimony from Dr. Kolodzy?

1   A.  I don't recall it.  The economic version of that is a

2   little bit different because the way the model --

3   Q.  Professor, professor, please.

4         MR. POMERANTZ:  Your Honor.

5   Q.  Do you recall the testimony?

6         MR. POMERANTZ:  He shouldn't be interrupting the

7   witness' answer.

8         THE COURT:  Did the witness answered the question?

9   What was the question?

10        MR. GELFAND:  I'm sorry, your Honor?

11        THE COURT:  What was the question?

12  BY MR. GELFAND:

13  Q.  The question is:  Were you aware that Dr. Kolodzy gave this

14  testimony yesterday?

15  A.  I don't recall it.

16  Q.  All right.  Thank you.

17        Let's talk about spectrum acquisitions.  So one of

18  your criticisms of the modeling work that was done is that it

19  doesn't incorporate the acquisition of any new spectrum in the

20  standalone companies, correct?

21  A.  That's correct.

22  Q.  And you're not an expert on spectrum, can we agree on that?

23  A.  I'm not as an engineering matter, no.

24  Q.  And you've never worked on any spectrum auctions?

25  A.  That's correct.  Auctions is not my area.

JCKPSTA2                          Scott Morton - Cross

1    Q.  You've never worked on any project relating to the

2    acquisition of spectrum, correct?

3    A.  Both the AT&T, T-Mobile merger and this merger involve the

4    question of a wireless carrier buying inputs, and spectrum is

5    possibly the most important input for a wireless carrier.  So

6    this is an economic point that definitely applies to spectrum,

7    as it would apply to any input.

8    Q.  That's fair.  Other than those two matters that we've

9    discussed, though, you haven't worked on any matters involving

10   spectrum acquisition?

11   A.  I don't recall any.

12   Q.  And you're not offering any actual opinion on how much

13   spectrum Sprint or T-Mobile are likely to acquire if they

14   remain standalone companies, correct?

15   A.  No, I'm not predicting the future like that, definitely.

16   Q.  All right.  And are you aware that Dr. Kolodzy acknowledged

17   that there is no low-band spectrum coming up for auction in the

18   foreseeable future?

19   A.  I don't recall.

20   Q.  Well, let's just show it for a moment.  I won't do this too

21   many more times, but if we could go to the trial transcript at

22   2133, starting at line 25, please.

23            And again, this is Dr. Kolodzy:

24   "Q.  And there are no low-band spectrum options."

25            I have to confess.  I don't know whether he said

JCKPSTA2                          Scott Morton - Cross

1   "options" or "auctions."  I think either one works, but --

2              "There are no low-band spectrum options anticipated at

3   all?"

4              And he answered:  "That is correct."

5              "So whether T-Mobile or Sprint could acquire any

6   low-band or mid-band spectrum at auction is speculative,

7   correct?"

8              And he said:  "Yes, it is speculative."

9              Were you aware of that?

10  A.  They could get low-band spectrum other places, but in terms

11  of whether I'm aware of it, I see it there.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. GELFAND:

2    Q.  And low band spectrum is the spectrum that Sprint

3    desperately needs to improve its coverage, correct?

4    A.  I don't know about the desperate part.  I certainly read

5    documents that said Sprint would like that spectrum, yes.

6    Q.  If we could go to figure 19 on page 76 of your rebuttal

7    report.

8         MR. GELFAND:  If you could pull that up, Mr. Klein.

9    Q.  Do I have that right, page 76, figure 19?

10   A.  I don't think so.

11   Q.  Page 68, I apologize.

12        This was a table that you included in your report.  Do

13   you recall that?

14   A.  Yes, I do.

15   Q.  It was an attempt to catalog the spectrum auctions that

16   have taken place over the last ten years, right?

17   A.  That's correct.

18   Q.  If you look at the column titled "Sprint," Sprint won none

19   of those auctions, correct?

20   A.  That's correct.

21   Q.  You included a sensitivity, and you even showed a slide, I

22   don't recall what the slide number was.  I will try to figure

23   that out quickly here.  It showed the scenarios where the

24   standalone companies could buy -- I think standalone T-Mobile

25   could buy 10 megahertz or 30 megahertz.  Do you remember that?

JCKTSTA3                         Scott Morton - Cross

1    A.  Yes.

2    Q.  Do you happen to remember what slide number it was?

3    A.  No, sorry.

4         MR. GELFAND:  I think they're unnumbered.  Your Honor.

5    We'll go with the screen.

6    Q.  You presented this slide to the Court?

7    A.  It says 7 in the little corner of my screen.

8    Q.  Okay, thank you.  So slide 7, thank you.  Adding spectrum.

9         And the sensitivities you did were around 10 megahertz

10   and 30 megahertz, correct?

11   A.  Yes, that's right.

12   Q.  What kind of spectrum was that in those scenarios?  Was it

13   millimeter wave spectrum?

14   A.  I think it was mid band spectrum.

15   Q.  Do you know which part of the mid band?

16   A.  No.

17   Q.  It wasn't low band spectrum?

18   A.  As far as I recollect, it was not.

19   Q.  And these numbers of 10 megahertz and 30 megahertz were

20   selected just to be illustrative?

21   A.  I think they are of a magnitude that's important, but not

22   so large as to be -- I mean they're 10 percent and 30 percent

23   of T-Mobile's current spectrum holdings.  That seems like, for

24   the next five years, a reasonable range to consider.

25   Q.  Do you have any idea how much it would cost to acquire, for

JCKTSTA3                        Scott Morton - Cross

example, 30 megahertz of mid band spectrum?

A.  Well, what is really important is that the model doesn't

let the firm figure out that cost.  The model doesn't have a

cost for spectrum in it because spectrum is ruled out.  If

spectrum costs were known, they could be in the model and

compared to very expensive cell splits.  The very expensive

cell splits, because they occur everywhere in the country,

might --

Q.  We're getting off track now.

        Do you have any idea how much 30 megahertz of spectrum

would cost a wireless carrier in today's market if it were even

available?

A.  I do not, but I also think there's a lot of qualifications

on the type of other aspects of that spectrum that would create

some variation around what that number would be.

Q.  Would it surprise you if it costs tens of billions of

dollars to acquire 30 megahertz of spectrum?

A.  Certainly I have seen documents from the standalone firms

that are in the 5 to 10 billion range.  That's how much we

expected to spend on spectrum, so that sounds reasonable.

Q.  You expect to spend on 30 megahertz of spectrum?

A.  Looking forward to satisfy spectrum needs, that's the kind

of document I'm talking about, reference those levels of

numbers.

Q.  Do you recall what documents you saw that said satisfying

JCKTSTA3                          Scott Morton - Cross

1    spectrum needs would cost 5 to $10 billion?

2    A.  I believe these are confidential documents, so I'm not sure

3    I should -- I do recall, but I'm not sure I should say it.

4    Q.  I'm grateful for that.

5          And you are not offering an opinion to how much

6    spectrum is available on the secondary market, correct?

7    A.  No, I'm relying on Dr. Kolodzy.

8    Q.  Do you know what Dr. Kolodzy said about spectrum available

9    on the secondary market?

10   A.  I remember he talked about DISH and the upcoming C band and

11   CBRS action, and something about a new initiative of Chairman

12   Pai to get yet more spectrum out there.

13   Q.  You talked a little bit about the efficiencies framework

14   that is set forth in the merger guidelines.  Do you remember

15   that?

16   A.  Yes, I do.

17   Q.  And would you agree that one of the ways to verify

18   efficiencies is to look at prior transactions that are

19   comparable or similar in nature?

20   A.  That's one possibility, but I would say to the extent that

21   the prior transactions are not a pattern or that they did

22   differ in their scope or nature, then they become less helpful

23   to that inquiry.

24   Q.  So did you -- were you aware T-Mobile previously acquired a

25   company called Metro PCS?

JCKTSTA3                        Scott Morton - Cross

1    A.  Yes, I'm aware of that.

2    Q.  Actually I think it was a merger.

3           You did not do any analysis of whether the

4    T-Mobile/Metro PCS merger resulted in a cognizable

5    efficiencies, did you?

6    A.  No, that was not part of my assignment.

7           MR. GELFAND:  I would like to put up a slide, if I

8    could.  Mr. Klein, could you put up the demonstrative that we

9    sent to the other side yesterday, please.

10          Oh, we did not?

11          I apologize, we're not going to use that.  Sorry, your

12   Honor, we plead sleep deprivation.

13   Q.  Let me ask you this, Professor.  I want to understand -- I

14   want the Court to understand very clearly what your role was

15   here.  I will ask you the following question:  The network

16   model that has been presented to the Court by my client, it

17   does a couple of things, tell me if you agree with this or not.

18   It looks at what the future new T-Mobile is going to look like

19   in terms of capacity, speed, marginal cost, so that's one thing

20   it looks at.  Can we agree on that?

21   A.  I wouldn't say that -- it goes through a process of

22   calculating congestion solutions and proposing answers of

23   technology or other solutions, and it goes out five years.  But

24   that's not a prediction, the model wasn't used to predict the

25   firm five years out, it was used to figure out what to deploy

JCKTSTA3                           Scott Morton - Cross

1    next year.  So I don't actually think that it predicts the

2    future, that's the whole problem.

3    Q.  That's a helpful clarification of your view.  But it does

4    calculate or model what a possible new T-Mobile would look like

5    over the next five years in terms of capacity, speed, marginal

6    cost, correct?

7    A.  I think I have the same answer.  I think in the short term

8    the LTE portion of this model that was used in the ordinary

9    course does tell us what capacity solutions the firm is likely

10   to choose the next year.  But once we start going out five

11   years in the future, technology is going to change, spectrum

12   positions might change, demand might change, it might be a

13   whole range of things that cause the model to not be doing in

14   2024 what it's predicted to do in 2019, because in the ordinary

15   course it was reestimated every year.

16   Q.  I understand that.  But it does have a calculation of what

17   that company is going to look like in 2024, correct?

18   A.  So how about the following:  We agree it has a calculation.

19   You think it's what the company looks like, I don't think it's

20   what the company would look like.

21   Q.  That's fair.  But in the analysis that you have done, you

22   don't have an analysis like you did with the standalone

23   companies to do the sensitivity on the standalone companies, do

24   you, or do you?

25   A.  I think I don't understand your question, because we just

JCKTSTA3                    Scott Morton – Cross

went through the sensitivities as applied to the standalone

firms and the merged firm.  So if we're talking about the

graphs that we just reviewed, all of them compare the

standalone firms and the merged firm.

Q.  And in doing that, when you put into the model these

various things that you got from Dr. Kolodzy, are you putting

them into just the standalone part of the model or are you also

putting them into the new T-Mobile part of the model?

A.  I see your question.  So the standalone firms -- I'm just

putting them into the standalone firms, for example, spectrum,

because the combined firm has an enormous amount of spectrum

that it just obtained from Sprint.  So in fact, the combined

firm does not have very much congestion, and therefore, giving

the combined firm more spectrum doesn't accomplish anything

compared to giving it to the standalone firms.  And indeed, the

model is asymmetric because in merger gives the combined firm

this enormous trove of spectrum, and that costs $26 billion,

but the standalone firms don't get to spend billions of dollars

buying spectrum, which is what they would normally do.  As we

discussed, in a standalone case they would go and spend

billions of dollars also getting spectrum.  So the model is

asymmetric and I'm fixing that asymmetry.

Q.  I'm trying to get it in terms that we can all agree on,

because it's important in my view for the Court to understand

what the comparison is here.  And I apologize for what might be

JCKTSTA3                    Scott Morton - Cross

1    a repeat question, but if I understand your answer correctly,

2    and maybe without giving all the rationale for why you did it,

3    but if I understand your answer correctly, when you do the

4    Kolodzy adjustments, if I can call them that, you only do the

5    Kolodzy adjustments to the part of the model that is looking at

6    the standalone firms, you don't do the Kolodzy adjustments to

7    the part of the model that is looking at in you T-Mobile,

8    correct?

9    A.   Because new T-Mobile has so much spectrum, I am trying to

10   fix that asymmetry, and yes, I only give it to the standalones.

11   Q.   Thank you.  Then would you agree with me that the way this

12   model works is it has these two paths, what do the two

13   standalone firms look like going into future and what does new

14   T-Mobile look like going into the future, and the fundamental

15   logic of the model is to compare the costs of those two future

16   worlds, right?

17   A.   That's correct.

18   Q.   Okay.  And if there's a big difference and in the marginal

19   cost from one to the other, then that is potentially a

20   cognizable efficiency.  If there's not much of a difference,

21   it's not much of an efficiency.

22   A.   If the model were a verifiable model doing the things

23   that -- fixing the things that I pointed out, and if the inputs

24   were correctly specified so that every firm had a choice of all

25   the available ordinary course choices, then your statement is

JCKTSTA3                          Scott Morton - Cross

1   exactly right, yes.

2   Q.  All right.  And the reason you think these efficiencies are

3   not cognizable is because when you do the Kolodzy inputs on the

4   standalone companies, the difference at the end of the day

5   almost disappears between the two in terms of marginal cost.

6   That's the basic logic of what you're saying, correct?

7   A.  When combined for using spectrum they almost disappear for

8   T-Mobile, and they're substantially smaller for Sprint.

9   Q.  But still not zero for Sprint.

10  A.  For Sprint I believe if you look at the charts will see the

11  hash bars are positive.  Much smaller, but not zero.

12  Q.  So I do want to -- well, I want to ask you about quality,

13  if I could, for a couple of minutes.

14          You talked about the value of quality, and you used

15  the lanes of traffic, which is a metaphor we have been using.

16  A.  Speed.

17  Q.  Speed.  To be clear, when you were giving that example and

18  it went from one lane to two lanes and then to four lanes, you

19  kept the same number of cars?

20  A.  That's correct.

21  Q.  So that analogy that you were drawing there didn't take

22  into consideration the possibility that as a result of having a

23  four lane highway, maybe people would drive more often and

24  there would be more cars on the road?

25  A.  That's a more complicated model, what you're describing.

JCKTSTA3                        Scott Morton - Cross

1    I'm asking the question:  Does a particular consumer -- so I'm

2    driving to work in my car, does that person value an additional

3    lane?  And to do that, we'll hold everything else constant,

4    because that's the narrow question we're asking.

5    Q.   I think you testified, but I want to make sure we

6    understand this, that this diminishing marginal return concept

7    that you had, that what I think you testified -- I wrote it

8    down that what matters is how much consumers would value that

9    today.  Is that what your testimony was?

10   A.   If it was about shirts or traffic, then there's no time

11   element, I'm giving you a 12th and a 13th shirt, and at some

12   point your value of those shirts is diminishing.

13   Q.   But to do a proper analysis, which I think we all agree

14   this merger analysis exercise is looking at the future world

15   when there are more cars on the highway or more apps on the

16   phone or new technologies that are consuming more and more data

17   and going faster and faster, you would agree with me, would you

18   not, that what matters is not how a consumer today who just

19   likes to watch Star Wars on her phone, that's not what matters

20   so much, what matters is how is the consumer of the future is

21   going to value that additional speed.  You would agree with

22   that, right?

23   A.   You have said very well, Mr. Gelfand, the exact problem

24   with Professor Katz's analysis.  He is taking that person

25   watching Star Wars and applying it to the future at 300

JCKTSTA3                    Scott Morton - Cross

megabits per second, when you correctly point out we would want

a long look at the future; what is the consumer doing, how much

data does she consume, what are the use cases, how could we

evaluate the value she is getting from incremental speed from

250 to 300, for example.

Q.  So we agree on that, and you disagree that Professor Katz's

model can capture that in any way.  You have not endeavored to

place any value on additional speed, right, you're not offering

your own empirical work to say that speed in the future is

going to have some particular value?

A.  No, as I discussed in my direct testimony, it's the role of

the merging parties to bring forward what it is they're going

to do, and therefore, why it's enhancing competition and

helping consumers.

Q.  So I'm not asking so much how the Court process works, I'm

just asking you:  You have not attempted in any empirical way

or economic analysis, or you haven't done anything to figure

out what the value of that additional speed might be in the

future, right?

A.  No, the previous answer was an economic answer, that the

economist in my position is waiting to hear from the merging

parties what it is that their plans are, what the economics of

that is, how they're going to deploy their new assets, and then

it is my role to evaluate that to see if it's a cognizable

efficiency.  So no, I'm not one putting forward the model.

1    Q.  But you acknowledge there is going to be some value to

2    additional speed, right?

3    A.  I think, as the Court pointed out, almost certainly there

4    will be, but the issue is:  Is it, for example, merger

5    specific?  If speeds get faster and all kinds of fantastic

6    things get invested and we have four wireless carriers and we

7    have a lot of choice, that's terrific, and enormous consumer

8    value is created, but it's not because of the merger.  So we

9    have to learn somehow that this merger is going to give

10   consumers value, and that both means we need merger specific

11   speed increases and then something to do with those speed

12   increases, and neither of those have come forth in the record

13   in a verifiable way.

14   Q.  So I would like to go to one of your slides, and I think

15   it's the paragraph with the different speeds for the standalone

16   companies.

17   A.  Figure 41?

18   Q.  Which one?

19   A.  Figure 41 from my report?

20           MR. POMERANTZ:  32 in our deck.

21           MR. GELFAND:  Slide 32 in Professor Scott Morton's.

22           Thank you.  I'm not going to get high grade on the

23   smoothness of the transition there.

24   Q.  I want to look at this slide for a moment.  Now you had

25   testified about this hypothetical user who wanted to watch Star

JCKTSTA3                     Scott Morton - Cross

1    Wars, do you remember?

2    A.  Yes.

3    Q.  And that hypothetical user only needed six megabits per

4    second to watch Star Wars, correct?

5    A.  About that, yes.

6    Q.  That's not a representative user in today's world, is it?

7    A.  I don't know the distribution between standard definition

8    video and high definition video, so I couldn't tell --

9    certainly high definition is popular, they're both popular, so

10   in terms of video use cases in the mobile setting, I think

11   those two would be my leading examples.

12   Q.  In your slide here you have the current speeds of T-Mobile

13   and Sprint, which are average speeds, I assume.

14   A.  Yes.

15   Q.  And T-Mobile is at 31 megabits per second, correct?

16   A.  That's right.

17   Q.  And Sprint is at 24 megabits per second, correct?

18   A.  That's correct.

19   Q.  So those two companies have invested the money needed to

20   create a network that would operate at significantly higher

21   speeds than 6 megabits per second, correct?

22   A.  That's right.

23   Q.  And they wouldn't invest in that if the speed had no value

24   to consumers.  Would that be an economist prediction?

25   A.  My understanding here is going to veer into the lay

JCKTSTA3                        Scott Morton - Cross

1    understanding of how the engineering works, but if you take

2    these speeds and then you interact them with perhaps things

3    like the nature of the back haul of the user, the kind of

4    server the user is getting the video from, the location of that

5    server, that sort of stuff, that you might end up with a speed

6    that is not as high as the one that T-Mobile is delivering.  So

7    watching the video depends on more than what T-Mobile is doing,

8    it depends on a lot of other things, and the possibility of

9    something going wrong might cause T-Mobile therefore to invest

10   above what the video speed is in order to try to help the user

11   experience to some degree.

12   Q.  So you can't look at something like, well, video takes six

13   megabits per second, so a user who just wants to watch video,

14   they won't value any additional speed.  That wouldn't be a fair

15   to do it in light of what you just said.

16   A.  It is diminishing, and I believe the increment needed above

17   let's say six to have a good quality video does not require

18   going up to 200.  I'm talking about relatively modest increases

19   over the level that the technology requires.

20   Q.  Now over to the right we have a standalone T-Mobile in the

21   year 2021, and that's at 127 megabits per second, correct?

22   A.  I see that.

23   Q.  And we have a standalone Sprint, which is at 210 megabits

24   per second, correct?

25   A.  I see that.

JCKTSTA3                         Scott Morton - Cross

1    Q.  And then the network model that Professor Katz relied on

2    has new T-Mobile at 380 megabits per second in that period,

3    correct?

4    A.  Yes.

5    Q.  So the network model that Professor Katz has relied on

6    makes calculations saying that standalone T-Mobile and

7    standalone Sprint are going to be at those lower speeds, and

8    new T-Mobile is going to be at that higher speed, correct?

9    A.  That's right, and that's related to the congestion.

10   Congestion slows down speeds.  Because Professor Katz's model

11   has a lot of congestion that the firms can't resolve in a cost

12   effective manner, it's going to have slower speeds.

13   Q.  That's excellent.  So if we look at the standalone

14   companies in that model, what you have done to criticize

15   Dr. Katz is you say well, the standalone models, we're going to

16   let them do all the things that Dr. Kolodzy says maybe they

17   could do, correct?

18   A.  So here we're talking about speed, and you just shifted

19   gears to the marginal cost of expanding the network.

20   Q.  Actually talking about speeds right now.

21   A.  Okay.

22   Q.  And part of what you're saying is that Dr. Kolodzy -- well,

23   let me ask you that question then.  Would the Kolodzy inputs,

24   if applied to the standalone companies, would they bring the

25   speed up to the speed that Professor Katz has calculated for

JCKTSTA3                        Scott Morton - Cross

1    the new T-Mobile?

2    A.  I have not done that calculation in my report.  They would

3    bring the speeds up definitely, because there's less

4    congestion, but I don't know to exactly what number.

5    Q.  So you have no sensitivity analysis to suggest that that

6    gap in speeds could be closed with any of the Kolodzy inputs,

7    you just haven't done the analysis?

8    A.  It would close it by logic, but I have not provided a table

9    or a chart in my report about that, that's correct.

10   Q.  And you haven't done any analysis to suggest whether

11   standalone T-Mobile or standalone Sprint, if left to their own

12   devices without this merger, would continue to invest and

13   improve these speeds and get faster and faster, you have not

14   done that analysis, have you?

15   A.  Well, I have in the sense at that it's very important that

16   competition drives investment, and so if you have got more

17   competition, you're likely to have these firms investing in the

18   network and investing in speed.  So all else equal, I would say

19   that competition would get us faster speeds, to the extent

20   they're valued in the marketplace, of course.

21   Q.  Well, that's a big qualification at the end there, a very

22   big qualification.  Do you have a view as to whether they would

23   be valued in the marketplace such that companies in the

24   standalone world would invest and try to create those faster

25   speeds?  Do you have a view on that?

JCKTSTA3                          Scott Morton - Cross

A.   I think that my view is divided into two buckets.  There

are many applications I read about that seem to be business

applications that are not in our relevant market here.  And

there may be great value to those that I haven't studied, so

autonomous vehicles and factories and things like that,

Internet of Things.

          In terms of consumer applications, I have heard only a

couple of words like augmented reality, but no business that is

doing that with data that you could assess to see whether

consumers would value it.  So I have an opinion, as the court

has pointed out, that someone is going to invent things in the

future that are marvelous, that I'm pretty confident about, but

as to whether we could specify those and measure them today, I

don't think so, not in the consumer wireless side.

Q.   It was interesting what you just said.  So you think that

on the business application side of this industry there could

be demands for higher and higher speeds, correct?

          That's what you just said.

A.   I'm just saying the record -- I have read more examples or

speculation about businesses adopting technology that requires

low latency, it's not really about the speed, it's about the

latency, but those are outside the market so I have not been

spending time thinking about that.

Q.   But it's the same network, right?

A.   I don't know.

1    Q.  So if Verizon, for example, were using the same network to

2    satisfy its business enterprise customers as well as its retail

3    wireless services customers and they had a demand to increase

4    speeds in order to satisfy the enterprise side of the business,

5    they would end up delivering those higher speeds on consumer

6    sides as well, right?

7    A.  It would depend on competition and demand.  If consumers

8    didn't demand it, maybe they would throttle the consumers to a

9    level that let consumers do what was valuable to them and save

10   the capacity for higher value uses.

11   Q.  I think you mentioned autonomous cars.  Those are used by

12   consumers, right?

13   A.  Well, my understanding of the way this proceeding works is

14   that we have a relevant market, and those are the consumers

15   with their handsets, and the autonomous vehicles aren't in it.

16   But as you pointed out earlier in my cross-examination, that

17   wasn't part of my analysis, so I should probably stop there.

18   Q.  I asked you a question and you mentioned autonomous cars.

19   These are autonomous cars that would be used by the same

20   consumers who might have handsets, right?

21        MR. POMERANTZ:  Objection, your Honor, relevance.

22   There's nothing about autonomous cars that's relevant in this

23   case.

24        THE COURT:  Sustained.

25        MR. GELFAND:  Your Honor, might I have a moment to

JCKTSTA3                        Scott Morton – Cross

1    consult with my colleagues?

2              THE COURT:  Sure.

3              MR. GELFAND:  Thank you.

4              (Pause)

5              MR. GELFAND:  Your Honor, I have no further questions,

6    thank you.

7              THE COURT:  Thank you.

8              MR. POMERANTZ:  Your Honor, I have no further

9    questions for Professor Scott Morton.

10              THE COURT:  Thank you, you're excused.  You may step

11    down.

12              THE WITNESS:  Thank you, your Honor.

13              MR. POMERANTZ:  Your Honor, I have two exhibits to

14    offer into evidence, Exhibit 211 and Exhibit 75.

15              THE COURT:  Mr. Gelfand?

16              MR. GELFAND:  Could I reserve on that, your Honor?  I

17    will say no objection now and I will come back if we have

18    anything.  We may have a relevance objection to both of those

19    documents, your Honor.  May I come back to that?

20              THE COURT:  You may.  Do you have any documents,

21    exhibits to offer?

22              MR. GELFAND:  I do not.

23              THE COURT:  All right.  Thank you.

24              Next, Mr. Pomerantz.

25              MR. POMERANTZ:  Your Honor, we call Professor Carl

JCKTSTA3                    Shapiro - Direct

1    Shapiro as our next and last witness.

2     CARL SHAPIRO,

3          called as a witness by the Plaintiffs,

4          having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MR. POMERANTZ:

7               MR. MACH:  May I approach, your Honor?

8               THE COURT:  Yes.

9               MR. POMERANTZ:  May I approach, too, and provide

10   Professor Shapiro with his reports?

11              THE COURT:  Yes.  Mr. Pomerantz, what's your estimate

12   of the time for this witness?

13              MR. POMERANTZ:  I think I'm still in the same range I

14   was yesterday, probably in the 45 minute range, give or take.

15              THE COURT:  All right.  Proceed.

16   BY MR. POMERANTZ:

17   Q.  Good morning, Professor Shapiro.

18   A.  Good morning, Mr. Pomerantz.

19   Q.  Have you had an opportunity to review the testimony of

20   Professor Katz in this case?

21   A.  Yes, I have.

22   Q.  And have you had a chance to consider responses to some of

23   the specific testimony that Professor Katz offered?

24   A.  I have.

25   Q.  And we're going to take some time this morning to go

JCKTSTA3                          Shapiro – Direct

1    through a few of those items of testimony by Professor Katz and

2    get your response.  Is there anything in the testimony that you

3    heard or read from Professor Katz or any other testimony from

4    this case that you have read or heard about that that has

5    caused you to revise any of your opinions in this matter?

6    A.  No, the bulk of what Professor Katz testified to was not a

7    surprise because we had back and forth already, so my opinions

8    remain unchanged.

9           MR. POMERANTZ:  And do we have the slide ready to go?

10   Q.  So this is testimony from Professor Katz on the subject of

11   CMAs and whether they are a relevant geographic market in this

12   case.  Have you had an opportunity to review this testimony?

13   A.  Yes, I have.

14   Q.  And while Professor Katz at the top discusses the fact that

15   competition does take place at the local level, he disagrees

16   with your opinion that CMAs are an appropriate market.  Do you

17   see that?

18   A.  I do.

19   Q.  What is your reaction?

20   A.  Well, I think it's helpful in terms of focusing the

21   differences between us on his acknowledgment that competition

22   takes place at the local level.  I've emphasized when I was

23   here before, the network quality and investment, the retail

24   stores and local promotions as examples of that, but I stand by

25   my view that look, and therefore, I think it's very important

1  to define some local market to capture that competition, and so

2  the issue is really are CMAs acceptable or reasonable or is

3  there some problem with them.  That's how I see the issue.

4  Q.  And you just said that you felt that it was important that

5  in some way it would capture the competition that is happening

6  locally.  Why is that important?

7  A.  Well, if we didn't define local markets at all, then we

8  would miss, for example, areas such as New York City where the

9  two firms have particularly high market shares and high

10 diversions.  We would be just missing important dimensions of

11 competition by looking at the national market shares, so I

12 think that would be a mistake.

13 Q.  So why did you pick CMAs as the relevant geographic market

14 to capture local competition?

15         MR. CARY:  Your Honor, I object.  This is not rebuttal

16 testimony, this is the exact same testimony that he gave in his

17 opening.

18         THE COURT:  Sustained.

19 Q.  During Professor Katz's testimony the judge asked Professor

20 Katz about whether any work had been done to compare CMAs to

21 some other region, such as counties or congressional districts.

22 Did you include such an analysis in your report?

23 A.  Yes, I did.

24         MR. CARY:  Your Honor, I object.  Again, we're going

25 back over the same ground that he covered originally, and if he

JCKTSTA3                         Shapiro - Direct

1    wanted to amplify on it originally, Professor Katz could have

2    responded, but he's repeating the prior testimony.

3              THE COURT:  Sustained.

4              MR. POMERANTZ:  Your Honor, just to be clear, this is

5    not repeating prior testimony.  Your Honor asked a very

6    specific question.  Dr. Katz said to you I don't know -- he

7    knew that Professor Shapiro had done the analysis at a county

8    level and that he had not.  He did not tell you that Professor

9    Shapiro had done that analysis.  When I had Professor Shapiro

10   on the stand at the outset of this case, he did not offer you

11   the results of his analysis at the county level.  That only

12   came up in response to your Honor's question.  I would like

13   your Honor to at least have that information as you consider

14   the issues in the case.

15             THE COURT:  My recollection is that Dr. Shapiro

16   testified that you could have the competition even at a block

17   level or a zip code, so I don't don't see that there's any

18   material difference between zip codes, block by block, election

19   district or a county.  As far as I'm concerned, he testified to

20   this issue.

21             MR. POMERANTZ:  The difference is that he has done HHI

22   calculations at the county level, not at those other levels,

23   and that's not in the record right now.

24             When your Honor asked is there a difference if you

25   looked at it at the county level, the relevant question here

JCKTSTA3                       Shapiro - Direct

1    is:  Is there a difference in the concentrations such that you
2    might come to a different conclusion as to, for example, the
3    presumption in this case.  Professor Shapiro has actually done
4    the HHI calculations at the local level, the county level, one
5    the regions your Honor selected, and all we're trying to do is
6    to make sure the evidence in this case provides the answer at
7    the HHI level to the question that your Honor posed and that
8    Professor Katz did not answer.

9            THE COURT:  All right.  Since I posed the question,
10   let him answer it.

11           MR. POMERANTZ:  Thank you, your Honor.

12           MR. CARY:  Your Honor, I would like to point out one
13   other fact, and then of course Professor Shapiro should answer,
14   this is exactly the problem with trying to backfill their case
15   in rebuttal.  There has been work done at various levels.
16   Professor Asker looked at zip code data, he noticed that there
17   were wide variations of HHIs in zip codes, counties, CMAs, et
18   cetera.  If this was going to become a centerpiece of Professor
19   Shapiro's analysis, perhaps we would have called Professor
20   Asker.  Again, the only point is this should be rebuttal, not
21   backfilling the case.

22           THE COURT:  Your objection is noted, let's move on.
23   BY MR. POMERANTZ:
24   Q.  Professor Shapiro, I put on the screen a slide that I know
25   you created.  Could you just explain to Court what this slide

JCKTSTA3                          Shapiro - Direct

1    reflects?

2    A.  Certainly.  Your Honor, so this is the top ten CMAs in the

3    country within the plaintiffs' states by number of subscribers.

4    The blue bars are at the CMA level.  So that is what I showed

5    you last time I was here, this is the HHI level, and the main

6    point was that in all ten of these heavily populated CMAs, the

7    post-merger would be well above the 2500 threshold.

8           Now the question that has arisen is if you looked at

9    counties, how would it come out?  So what I did is I looked at

10   the county level -- so take New York, I looked at the county

11   level, the green bar is a bit higher than the blue bar.  What

12   did I do?  I looked at each county and calculated the HHI in

13   that county, and then you have to add up a bunch of counties

14   within the New York CMA.  So I did that, counting the counties

15   that had more people more heavily, which is weighting by

16   population.

17          So in this case, New York, I see that while, when you

18   break it down more narrowly, the level of Hirfindahl is

19   somewhat higher when you break down to the county level, that

20   depicted on the green bar being taller than the blue bar.  Then

21   if you look at all ten of these, I think maybe nine or all ten,

22   the green bar is a bit higher than the blue bar.

23          So the conclusion here is that when one does look at

24   the county level, which we can do with these data, you also

25   find very highly concentrated markets after the merger in these

JCKTSTA3                    Shapiro - Direct

CMAs.

Q.  All right.  And then the next slide here, if you could

briefly explain what this shows.

A.  So this is exactly the same type of analysis, looked at the

county level with the green bars rather than the CMA level with

the blue bars, same ten CMAs, but it's on the vertical axis

here we're measuring the increase in Hirfindahl.  Last time I

was here I told you we could see these are very large increases

in the Hirfindahl in all ten of these, that was the blue bar,

they're all 800 or more.  And if you break it down to the

county level, again you see it's slightly larger increases in

the Hirfindahl.

        So my overall point here is that it's not critical to

my analysis of market concentration, I want to look at the CMA

level.  One could look more narrowly, I have done that, and the

same issues arise as I already reported at the CMA level.

Q.  Now still sticking with the local geographic markets,

Professor Katz testified that there was no statistically

significant relationship between average speed, number of

company-owned stores and save desk offers on the one hand and

HHIs at the CMA level on the other hand.  What is your

response?

A.  So as I believe -- well, in my view, this methodology --

these are a number of progression analyses that Professor Katz

ran, and I believe this methodology is inappropriate and

JCKTSTA3                        Shapiro - Direct

1  uninformative for the purposes at hand, the question for the

2  Court, which is to evaluate the effect of a merger that

3  increases the Hirfindahl.  This is a well-recognized problem in

4  the economics literature, and I believe reading Professor

5  Katz's trial testimony that he acknowledged that with the

6  caveat that there are serious limitations to this type of

7  analysis for reasons that I said have been very well developed

8  in the economics literature, particularly over the past 25 or

9  30 years.

10        I could illustrate those with an example.  Suppose

11  that we observe that Verizon decides to -- as a market leader,

12  decides to build out their network in a particular area, and

13  they already have a big market share and they decided to build

14  on strength by adding to their network in a certain city, and

15  they gain share because of that.  That's pro-competitive.

16        What Professor Katz will see in his data is that the

17  Hirfindahl will go up when the Verizon gains share.  When the

18  number one firm gains share, the Hirfindahl goes up.  So he

19  will see this city, let's say, or CMA, that the Hirfindahl will

20  be high and speeds will be high.  And so he says look, a high

21  Hirfindahl goes along with high speeds, what is the problem

22  with high Herfindahl?  But that is a completely different

23  exercise than asking:  In that same CMA, in that same

24  circumstance, what if Sprint and T-Mobile were to merge?  It's

25  a completely different question, and his observations do not

1    address that question.  So they are not informative regarding

2    this merger.

3    Q.  All right.  Let's turn now to MVNOs.  You read Professor

4    Katz's testimony regarding MVNOs?

5    A.  I did.

6    Q.  And you read that Professor Katz disagreed with you about

7    how to treat MVNOs for the purposes of measuring market shares,

8    correct?

9    A.  Yes, we disagree about that.

10   Q.  He said that the MVNOs should be assigned their own market

11   shares, correct?

12   A.  That is correct.

13   Q.  What is your response?

14   A.  So just to compare to make sure we understand the

15   difference, for a subscriber -- an MVNO subscriber I attributed

16   that subscriber to the company that's being -- network operator

17   who is actually providing the network services.  So I think

18   that I strongly disagree with Professor Katz's view on this,

19   and I believe he's departing from a core principle, which is

20   the market shares should measure the independent ability of

21   firms to compete, and he has not following that principle.

22   Q.  So let's look at some testimony that Professor Katz

23   provided on the issue of MVNOs.  He stated yes, they buy

24   wholesale services from somebody else, but almost every firm

25   ends up buying inputs from somebody else.  Do you recall

JCKTSTA3                        Shapiro - Direct

reading that testimony?

A.   I do.

Q.   And what's your response?

A.   Well, it really matters who you are buying your inputs

from.  He says "somebody else," but let's talk about who that

somebody is.  Let me give an example.  Suppose I am running a

railroad, trying to serve people with a railroad, and I need to

buy railroad cars, passenger cars.  There are a number of

suppliers, so I'm dependent on that input.  Yes, I buy that

input.  Suppose your Honor, if I may, that you are also running

a railroad -- maybe I'm getting into trouble, Mr. Pomerantz is

running a railroad, and we each have to buy railroad cars, of

course.

        Now suppose that Mr. Pomerantz owns the track, and I

don't have have track, and if I'm going to serve people I have

to run my railroad cars on his track.  That's a whole different

matter than buying railroad cars.  I'm dependent on him, and in

the way that you described when I was last here, your Honor,

he's going to have a conflicts of interest, he's going to want

to make money on his own customers.  If he makes his track

available to me, he will only do that if that serves his

interest, and that's not independent competition.  So it really

matters who you are buying the inputs from, and the MVNOs are

getting the track the network from the MNOs, they are not

independent.

JCKTSTA3                    Shapiro - Direct

Q.  Is Professor Katz's approach to MVNOs consistent with how
the FCC has treated MVNOs when the FCC has studied this
industry?

            MR. CARY:  Your Honor, I object.  During Professor
Katz's testimony we saw the plaintiffs pull out a document from
another aspect of FCC review, and that was the spectrum screen
that they used in local markets.  We're now getting another
quote randomly from an FCC document and asking this witness to
talk about the FCC.  Unlike Professor Katz, who was chief
economist at the FCC, this witness was not at the FCC, this
document is irrelevant, and this, again, is part of their
relitigating their case trying to backfill their arguments.

            MR. POMERANTZ:  Your Honor, first of all, to be
continually accused of backfilling is just totally
inappropriate here.  Professor Katz took a position.  Rebuttal
is to rebut what he said.  This particular statement by the FCC
is something that Professor Shapiro cited in his reports.

            MR. CARY:  Exactly, your Honor.

            MR. POMERANTZ:  This is a direct response to it.  The
fact that it's in his report but we didn't bring it out, now
that we have Professor Katz's testimony, this rebuts what he
said because the FCC expressly disagrees with Professor Katz,
and this is something that an economist typically would rely
upon because Professor Katz relied upon it -- sorry, Professor
Shapiro relied upon it here.

1          THE COURT:  All right.  Overruled.  To the extent the

2     testimony goes to rebuttal of Professor Katz, I will allow it.

3     A.  Well, I think the quote is powerful, actually, informative,

4     because it says following widespread industry practices, the

5     commission generally attributes the subscribers of MVNOs to

6     their host facilities-based service providers, including when

7     it calculates markets concentration metrics.

8          And I should add that this is in the annual report

9     from the FCC that analyzes competitive market conditions in --

10    I guess they're calling it mobile wireless, including

11    commercial mobile services.  So I think it's meaningful.  The

12    expert agency is taking this view, and I think Professor Katz's

13    view is not only inconsistent with the fundamental economic

14    principle I described a moment ago, but is an outlier in terms

15    of how this industry has been analyzed in the past.

16    Q.  And Professor Shapiro, has T-Mobile itself attributed MVNO

17    subscribers to the host MVNOs in a way that is inconsistent

18    with what Professor Katz testified to in this case?

19    A.  So yes, they have.  I see you pulled up the next exhibit.

20         MR. CARY:  Your Honor, I'm going to object again.

21    This is a document which shows T-Mobile tracking usage on their

22    network, wholesale and retail.  This case is about retail.  The

23    fact that they tracked in wholesale categories who is riding on

24    their network is irrelevant to the question of this case, which

25    is in the retail market, and it's again backfilling and trying

JCKTSTA3                    Shapiro - Direct

1    to get new evidence in on a point where they had the burden and
2    they had the case in chief.  I object.

3            MR. POMERANTZ:  Your Honor, first of all, that could
4    be brought out in cross-examination.  Secondly, they were the
5    ones who actually elicited testimony from Professor Katz about
6    the wholesale market because it relates to the retail market.
7    And in fact, that's their position here, that these MVNOs are
8    actually competing down at the retail level.  So this testimony
9    and this document, which is a document that Professor Katz
10   relied on in his examination, this is not just something that
11   we pulled out from some file box, this is something they used
12   in his examination, and I think it's proper rebuttal.

13           THE COURT:  Overruled.

14   A.  So just to be clear what document we're talking about, this
15   is, as it indicates, T-Mobile market planning model.  This is
16   something that Professor Katz relied upon in his analysis.  And
17   the point is -- it's a specific point that it's highlighted
18   here for the year 2018 on the display, and particularly over on
19   the right-hand side, which has been made in larger image, that
20   the T-Mobile in this planning document ends up calculating the
21   subscriber shares for the MNOs, and they have included in those
22   calculations of shares the subscribers who are MVNO
23   subscribers.  They also in this case included some additional M
24   to M, so it doesn't exactly line up with the market, the
25   relevant market, but it makes the point.

JCKTSTA3                          Shapiro - Direct

Q.  Now I want to turn to Altice.  Do you recall reading or

reading this testimony from Professor Katz, "If you look at an

MVNO that is also a cable MSO, so you look at someone like

Altice or Comcast, they bring a lot to the table."

        Do you see that?

A.  I do.

Q.  How do you respond?

A.  So first, I think it's useful, your Honor, to distinguish

these types of MVNOs, the cable ones, which has really

historically been Comcast, Charter, and then a slightly

different creature, Google Fi, from the other MVNOs like

TracFone who don't have these types of facilities like the

cable company.

        In terms of market shares, the total market share of

these cable-type companies as MVNOs, including Google, is only

around one percent of the market.  So whether you -- if you

want to treat them somewhat differently or think of this

somewhat differently, because they do have some facilities that

bring some things to the table that TracFone does not, it would

not matter in terms of concentration, because that group

collectively is about slightly over -- I think it's

1.2 percent.

        So in terms of the importance in terms of subscriber

count of the MVNOs, they're relatively small, and it's TracFone

and the other MVNOs that have the real numbers.  So I agree

1    that they do bring something more to the table because they

2    have some facilities and can offer some bundled deals for

3    customers, with their cable customers in their footprints, but

4    they are still heavily dependent on the MVNOs.

5    Q.  So Professor Katz is offering a view that Altice should be

6    viewed as an independent competitor of let's say Sprint who it

7    has a deal with, correct?

8    A.  Yes, that seems to be his view.  Certainly he wants to

9    attribute their subscribers to them as -- attribute that to

10   their own market share rather than to Sprint, which is carrying

11   their traffic.

12   Q.  I want to focus on Altice, and I want to look at whether

13   they really should be viewed as an independent competitor to

14   Sprint.

15            MR. CARY:  Your Honor, I'm going to object to this

16   document and this line of inquiry.  This is demonstrative of

17   the prejudice that we are undergoing here.  Dr. Shapiro

18   testified in his initial testimony about the irrelevance of

19   MVNOs in calculating his market shares.  We have had testimony

20   here from Altice, we have had testimony here from Sprint that

21   have addressed this relationship.  They're now pulling one fact

22   out of the contract which is tens of pages long to try to make

23   the point.  Had they made it originally we could have had the

24   Sprint witnesses and the Altice witnesses address it.  They

25   chose not to make it initially, they're now bringing it in to

 1    substantiate their case, and we object.  We think it's unfair.

 2              MR. POMERANTZ:  Your Honor, Professor Katz was fully

 3    aware of this contract when he offered his testimony about

 4    Altice.  Because he offered his testimony about Altice that

 5    they should be treated as an independent competitor, we have

 6    every right to come in here and show that, in fact, Professor

 7    Katz had access to evidence that shows they're nothing close to

 8    an independent competitor.  What this provision provides, and

 9    what Professor Shapiro would explain if permitted, is if Altice

10    were to take a customer from Sprint or Sprint were to take a

11    customer from Altice, they had to pay each other money.

12              MR. CARY:  Your Honor, I object to Mr. Pomerantz doing

13    his closing argument.

14              MR. POMERANTZ:  I would rather have Professor Shapiro

15    testify to it.

16              THE COURT:  Overruled.

17    A.  So I think the question is to explain what's on the slide

18    here.

19    Q.  Yes, please.

20    A.  I lost track.  Your Honor, this is from, as you could see,

21    master wireless wholesale agreement between Altice and Sprint.

22    And what I'm doing here is highlighting a provision, as

23    Mr. Cary points out in that agreement, and I'm going to read it

24    just so we all get it.

25              For each Sprint subscriber -- purchaser, that's

JCKTSTA3                          Shapiro - Direct

Altice --

Q.  Carl --

A.  I'm not supposed to do that?

        MR. POMERANTZ:  Could we take this down from the
public screen?

        MR. MACH:  It's not on the public screen.

Q.  The Court can see the text, so testify without giving
specifics.

A.  Without the specific numbers?

Q.  Yes.

A.  Let me -- the idea that's in here, and your Honor can read
it, is the arrangement specifies that -- so Altice is planning
to launch, and they did launch a couple months ago, so when
they launch, if they get a subscriber that ports from Sprint,
then they are required to pay an amount of money shown here to
Sprint.  That's what Sprint negotiated with them.  And
furthermore, after some period of time, that arrangement would
be reciprocal, that is to say, if the subscriber ended up going
back in the other direction, the money would go from Sprint to
Altice.

        So I guess I want to make two points about that.
First, it very explicitly is an example of how the MNO, in this
case Sprint, can control and influence the ability of the MVNO
to compete by imposing this cost.  And of course what Sprint, I
would think, is trying to do is they're happy if Altice gets a

JCKTSTA3                    Shapiro - Direct

1    customer from Verizon because then Sprint gets their profit

2    margin on that customer.  But they don't want to lose their own

3    customers to Altice, so they put in this fee.  So it's a type

4    of steering, and they're partners, as they describe it.

5            The other thing that I think is worth noting is that

6    we have a situation where the companies agree to pay each other

7    if they get business from each other.  If they were genuine

8    competitors of each other, that would be a blatantly

9    anticompetitive customer allocation agreement.  But they are

10   partners here, they are not direct competitors.

11   Q.  Let's turn to Professor Katz's calculations of HHIs.  He

12   offered testimony, which you probably saw, which calculated

13   HHIs at the national level and came up with a post-merger HHI

14   of under 2500.  Do you recall that?

15   A.  I do.

16   Q.  So I will skip two slides here and skip this one to this

17   one.  Can you explain to the Court what this chart is.

18   A.  Yes, I can.  First, your Honor, you will see from the

19   source this is taken from Professor Katz's rebuttal report, the

20   one where he responded to my original work, and, as indicated,

21   it's revenue shares and concentration measures.

22           And the key thing is that there are two rows here, and

23   let's start with the second row, which is MVNOs as independent

24   entities.  So this is what Professor Katz put in his report.

25   And he's using, remember -- I should back up.  The title,

1    Revenue Shares, his preferred measure of market shares is to

2    use revenues.  I've reported both to you, but I explained why I

3    thought the subscriber counts were somewhat better, but he

4    likes revenue shares, and that's what he put here.

5           So using revenue shares -- and he likes MVNOs as

6    independent entities, that's his point, that's where we

7    disagree.  That's the second row.  Using the measure in the

8    report he found that the post-merger Hirfindahl was 2611 and

9    the increase in Herfindahl was 313.  He was contrasting that

10   with the row above that, which is using -- what I think is

11   using the correct method of MVNOs attributed to MNOs, which led

12   to a higher increase in Hirfindahl and a higher-post merger

13   Hirfindahl and higher combined shares.  But by his own

14   preferred approaches, namely using revenue shares and treating

15   MVNOs as an independent entity, he also finds, again,

16   post-merger Herfindahl 2611, increase in Herfindahl of 313.

17   This is from his report.

18          (Continued on next page)

19

20

21

22

23

24

25

1   Q.  So to be clear, I want to make sure it's clear what

2   happened here in the courtroom.  Professor Katz came into this

3   courtroom and only offered concentration measures based on

4   subscribers, correct?

5   A.  Well, the -- what I know -- what I have in my mind and

6   remember, he has very colorful demonstratives with pie charts

7   that showed market shares with subscriber counts.

8   Q.  But in his report, he didn't do it that way; he only did it

9   by revenue share, correct?

10             MR. CARY:  Object as asked and answered and leading,

11   your Honor.

12             THE COURT:  Overruled.

13   A.  So this table was based on his preferred metric of revenue

14   shares.  I can't recall, there might have been some backup

15   materials where he calculated by subscriber shares.  It wasn't

16   in the table that I'm remembering from his main body of his

17   report.

18   Q.  All right.  So if we calculate HHIs by revenue share, but

19   treat MVNOs as Professor Katz treats them, then the post-merger

20   HHI is 2611 and the change is 313, correct?

21   A.  Yes, that's what I said.  That's correct.

22   Q.  Now, do Dr. Katz's testimony in trial here about market

23   shares and HHIs change your views on how the merger will change

24   market concentration?

25   A.  No, not fundamentally.  You know, there's, obviously, some

1    back and forth about the specific metrics.  In the end, I
2    think, if you kind of pull back from that a little bit, your
3    Honor, it's a four-to-three merger among nationwide carriers in
4    this country, and that is inherently troubling for reasons I've
5    talked about.  And nothing Professor Katz said has caused me to
6    alter that view.
7    Q.  All right.  Let's move on to another topic, a related
8    topic, and this concerns how to view Sprint's market share in
9    making market share calculations.  I've put up on the slide
10   here the testimony from Professor Katz about Sprint's
11   performance; do you see that?
12   A.  I do.
13   Q.  And does this testimony -- by the way, the testimony comes
14   from transcript page 1841, lines 19 to 24.
15       Does this testimony by Professor Katz change your view
16   about whether the elimination of Sprint will harm consumers?
17   A.  No, it does not.  I stand by my view that Sprint has been a
18   disruptive influence, a maverick I called them.  They've been a
19   low priced -- they've offered low prices, and I expect that to
20   continue, if the merger does not go forward, and I did myself
21   projections to support that conclusion that Sprint would
22   continue to be a significant competitive influence if this
23   merger does not take place.
24   Q.  All right.  So Professor Katz testified that Sprint is
25   going to have a limited ability to compete in the future,

1   correct?

2   A.  He did.

3   Q.  And he then tried to project out, or he at least tried to

4   project out, some market shares based upon that decline,

5   correct?

6   A.  He offered some share projections and revenue projections,

7   yes.

8   Q.  And you looked at that issue in connection with your

9   report, correct?

10   A.  Yes, I did.

11   Q.  Could you please explain to the Court what this slide

12   reflects?

13   A.  Yes.

14          MR. CARY:  I need to object again.  This is a slide

15   that Professor Katz had submitted at the FCC using projections

16   from Sprint's business plans in early 2019.  They don't reflect

17   current data.

18          If Professor Katz were here, he could explain exactly

19   what this was.  They chose not to cross-examine him with his

20   own work but to, instead, get it in through the back door,

21   through Professor Shapiro, when we don't have an opportunity to

22   bring Professor Katz in to explain exactly what these numbers

23   represent.

24          Professor Katz has shown you the actual data during

25   the relevant period and used Professor Shapiro's technique to

JCKPSTA4                        Shapiro – Direct

1    project further.  To go back into an early report at the FCC

2    and come up with new numbers at this stage, we believe, is

3    beyond the scope of rebuttal and inappropriate, and we object.

4            MR. POMERANTZ:  Your Honor, this information was set

5    forth in Professor Shapiro's report.  Nothing was hidden from

6    the other side.  They chose to have Professor Katz come in here

7    and testify to predictions about Sprint's market share going

8    forward that they knew were inconsistent with what he had said

9    to the FCC earlier in the review process.

10           If they want to cross-examine Professor Shapiro about

11   that, they can.  If they wanted to clarify that with Professor

12   Katz, they could have, but it doesn't deprive us of showing

13   through rebuttal testimony to rebut what they did in this

14   courtroom.  They provided an estimate from Professor Katz of a

15   decline in revenue share that is inconsistent with what he had

16   previously told the FCC.

17           MR. CARY:  Your Honor, that's exactly the point.  This

18   draft or this table was in Professor Shapiro's initial report.

19   He didn't present it.  Therefore, there was no reason for

20   Professor Katz to go through things that were not in dispute

21   and talk about them.

22           Had he presented it, Professor Katz would have made

23   the point that these were just projections from Sprint's plan,

24   and he was attempting to be conservative.

25           THE COURT:  Thank you.  Overruled.  Mr. Cary, you'll

1    have the opportunity to cross-examination Professor Shapiro,

2    and you can bring these matters out at that time.

3          MR. CARY:  Thank you, your Honor.

4    A.  So what this slide depicts is -- I'll just read the title,

5    Sprint's projected subscriber share based on submissions that

6    Professor Katz made to the FCC in connection with this merger,

7    and these went out from -- until 2021, and I would just

8    basically say stable.

9          I should note for the record, so there's no confusion,

10   these shares are smaller than the ones that I am putting

11   forward, and I believe that's because Professor Katz has

12   attributed the -- has given MVNOs -- he has a different way of

13   measuring the shares with the MVNOs in particular.  So my point

14   is, not about the level.  It's about the stable Sprint share,

15   as projected, as shown here, and this is consistent with the

16   projections for subscriber share that I produced and presented

17   to the Court last week.

18   Q.  All right.  So let's now move on to coordinated effects.

19   You have read Professor Katz's testimony about coordinated

20   effects, correct?

21   A.  Yes, I have.

22   Q.  And I've put up on the screen here some of that testimony

23   by Professor Katz; do you see that?

24   A.  I do.

25   Q.  And he talks about how difficult it would be to coordinate

JCKPSTA4                        Shapiro - Direct

1  in this industry because of complexity; do you see that?

2  A.  I do.

3  Q.  How do you respond?

4  A.  I guess I just go back, your Honor, to what I've seen in

5  the documents, which is -- well, I should say I agree there's a

6  fair bit of complexity here.  You look at the plans and the

7  features.  So we agree about that, but I've seen in the

8  documents a lot of competitive intelligence activities, and as

9  I -- and I would emphasize that the companies monitor each

10  other closely on a high-frequency basis, daily or weekly.

11        They're watching each other, and because it's a

12  consumer market, the companies can see what they're each

13  offering to consumers.  So there is complexity, but there's

14  close monitoring.  And I am concerned -- would be concerned

15  about coordination or pulling punches on a number of

16  dimensions.  You know, it doesn't have to be all of them.

17        I kind of got the impression from Professor Katz's

18  testimony that he thought, well, if they tried to restrict

19  competition on one dimension, it would just come out somewhere

20  else.  He didn't say it this way; so admittedly, this is my

21  interpretation, that somehow it wouldn't matter very much or it

22  wouldn't be successful.  And I don't think that's consistent

23  with the monitoring activities here and what we see in other

24  industries, where there is successful coordination or even

25  collusion, even on some dimensions, even when companies compete

JCKPSTA4                          Shapiro - Direct

1    on many.

2    Q.  And have you seen examples of coordination in complex

3    industries in your economic work?

4    A.  So, yes, this does come up.  We see it.  Coordination, it's

5    hard to know exactly when it's happening, to be honest, or for

6    us to measure it.  But for cartel cases, real hard core cartel

7    cases, we see coordination even in industries that are very

8    complicated.

9            There was a cartel in the air cargo industry, where

10   they agreed to fix fuel surcharges, one component of -- while

11   they competed on many dimensions.  So this is something that

12   happens in other industries, and companies find it profitable.

13   Q.  So did you create a couple of slides to try to explain how

14   the merger might affect the coordination and how that compares

15   to complexity in the marketplace?

16   A.  Yes, I did.

17   Q.  All right.  So let's look at those.  So what are you trying

18   to depict here?

19   A.  I'm simply trying to depict that if the firms are

20   monitoring each other and watching each other, there is some

21   complexity.  If there's four companies, they each have to keep

22   an eye on three, and the arrows here depict watching each other

23   in both directions.

24           Now, traditionally, markets with a few firms like this

25   have always been a concern to industrial organization

1    economists.  And four is -- so this just sort of gives a sense

2    of the complexity of monitoring with four companies.

3    Q.  So if there's a merger, and there's only three companies,

4    how does that affect your concerns about coordinated effects?

5    A.  So the number of arrows has gone down quite a bit,

6    actually.  If there's three companies, you only need to keep an

7    eye on two of them.  I mean, it's, I think, a straightforward

8    point, but it relates to complexity and monitoring.

9              THE COURT:  Let me ask, Mr. Shapiro, because this

10   raises an obvious question that DISH might ask.  What are we,

11   chopped liver?

12             THE WITNESS:  I believe I get your reference.  Right.

13   So I, in my analysis and discussion of coordinated effects, I

14   have not been thinking that DISH would be part of this club, if

15   it were -- if they were coordinating.

16             So the question then arises, that I've addressed and I

17   know you all have to as well, your Honor, is if DISH is not

18   playing along, will this coordination still be profitable and

19   still harm consumers?  And I think the answer is yes.

20             And one reasons is DISH, starting off, at least for

21   the first couple of years, they're starting off with a

22   3 percent market share with Boost, about nine million

23   subscribers, and it's all in prepaid.  Now, they're going to

24   grow that over time.  So you know, the combined market share of

25   these three firms is well into the 90s, and so even if they

JCKPSTA4                        Shapiro – Direct

1    lose some sales to DISH, because they're not competing as hard,

2    if they make more money on the 90-plus percent of subscribers

3    that they serve, that's still going to pay.

4         So we tend to think if you have a small firm, who's

5    not part of a coordinating group, if they're small, unless they

6    can grow enormous, really quite dramatically, they probably

7    will not restrain or defeat that coordination; so that's how I

8    think about DISH.

9         THE COURT:  But I think implicit in what you're saying

10   is what you've also suggested, unless they grow dramatically.

11   Are you discounting that as a possibility?

12        THE WITNESS:  Okay.  So when I said unless they grow

13   dramatically, if we think of coordination, let's think first of

14   a one-year time frame, say.  If there were some less

15   competition among these three big firms, for DISH to grow from

16   3 percent to 5 percent, for example, you know, it might very

17   well not make that coordination unprofitable.  That wouldn't

18   document as dramatic growth.

19        So if we're thinking -- I sense in your question, we

20   think about DISH growing over a multiyear period as they built

21   out their network, that is not the growth that would be

22   relevant for the question I was addressing, which is:  Could

23   they take advantage of this coordination in a shorter period of

24   time?

25        So, yeah, so one could ask, over a longer period of

JCKPSTA4                    Shapiro - Direct

1    time, well, I would be concerned then about harm to consumers

2    for several years from the coordination when DISH would grow

3    some but not very much, and then we'd get into Professor Scott

4    Morton's territory about the longer-range effects of DISH.

5    BY MR. POMERANTZ:

6    Q.  Maybe if we can follow up on that immediately.  Could you

7    switch us to slide 21.

8           So this is -- we were going to address this in a

9    different segment, but I think it's directly responsive to the

10   questions posed by the Court.

11          Does this comparison of Sprint and DISH, I want you to

12   focus more on the DISH side of this.  Does this help to explain

13   why or whether DISH is likely to grow dramatically in the short

14   term in order to -- and would counteract the risks of

15   coordinated effects?

16   A.  So, yes, it's comparing Sprint and DISH, just to be clear.

17   This slide was prepared for that purpose.  And for a number of

18   reasons, you know, DISH is not going to look anything like

19   Sprint anytime soon, in terms of its subscriber shares and it

20   has these higher costs.

21          So this means that DISH will be less -- much less able

22   to discipline coordination among AT&T, Verizon and T-Mobile

23   than Sprint has been doing in the -- recently.  And so from

24   that point of view, which again is -- the relevant issue in the

25   merger is will DISH replace Sprint, in this case, in terms of

JCKPSTA4                      Shapiro - Direct

1  discipline and coordination by the other three, and I don't

2  believe it will, certainly for the next few years.

3  Q.  Could you bring us back to slide 16.

4         Okay.  This is testimony by Professor Katz when he was

5  discussing coordinated effects, and he compared it to sitting

6  on a balloon; do you recall that?

7  A.  Yes, I do, and yes, I see this.

8  Q.  All right.  And have you seen examples of this in this case

9  that relate to Dr. Katz's point he's making here using the

10 balloon example?

11 A.  Yes.  I guess I have seen examples where there was

12 communication or signaling on specific dimensions of

13 competition that was going on.

14 Q.  All right.  So just to give one example, could you explain

15 to the Court how this relates to the coordinated effects

16 concerns that you have and that Professor Katz disagreed with?

17 A.  Certainly.  So this is an e-mail.  They were talking about

18 having an end date on the promotion of the iPhone, and it says:

19 "to signal our competition, that it was really just our turn to

20 run our promo."  So this is a signaling.

21        And I think in terms of Professor Katz's quote, let's

22 suppose this was successful in terms of limiting that

23 promotion.  So it, as I said that, it wouldn't last for a

24 longer period of time, and they said so they wouldn't panic was

25 their word.  So if it was successful -- so my view would be if

JCKPSTA4                      Shapiro - Direct

1     that was coordination, or we had this after the merger, same

2     idea, then consumers might have gotten the promotional rate on

3     the iPhone for a week, or whatever it was, rather than a month

4     or a longer period of time, and that would constitute harm,

5     that would cause harm to consumers notwithstanding that --

6     well, I guess Professor Katz, with his balloon analogy, is

7     suggesting at least, well, don't worry about it very much

8     because they'll be competing on some other dimension, and I

9     just don't think that fits with this evidence.

10              THE COURT:  Mr. Cary?

11              MR. CARY:  Yes, your Honor.  I was going to object and

12    move to strike this last testimony.  Again, this was the

13    subject of the direct original testimony.  We had Mr. Sievert

14    and others that are on this e-mail chain who could testify and

15    explain this, if Professor Shapiro brought it up in time.  And

16    therefore, I object to the use of the document and move to

17    strike the testimony.

18              THE COURT:  Mr. Pomerantz?

19              MR. POMERANTZ:  Yes.  Okay.  Two things.  Mr. Mach

20    just whispered to me that he actually questioned Mr. Sievert

21    about this document; so we actually do have Mr. Sievert's

22    response on this document.

23              But what we were trying to do was use this document to

24    explain why Professor Shapiro disagrees with the testimony of

25    Professor Katz that he used by using the balloon example.  And

JCKPSTA4                        Shapiro - Direct

1    what he was looking at is a specific example in this case that

2    is inconsistent with what Professor Katz was saying.

3            THE COURT:  All right.  Overruled.

4            MR. POMERANTZ:  And for the record, that was

5    Exhibit 777.

6    BY MR. POMERANTZ:

7    Q.  Let's turn to unilateral effects.  Now, you heard, or you

8    read, Professor Katz had a variety of criticisms about your

9    unilateral effects analysis?

10   A.  Yes, I did.  I read that.

11   Q.  And among other things, he criticized your diversion ratios

12   and how you used them in your unilateral effects analysis; do

13   you recall that?

14   A.  I do.

15   Q.  So if you could use this pricing example from the record to

16   explain why Professor Katz is wrong in the way he analyzed your

17   unilateral effects analysis, and why you still have concerns

18   about unilateral effects?

19   A.  Okay.  So let's talk about T-Mobile's pricing incentives

20   and the unilateral pricing incentives.  And again, we're asking

21   how will those change because -- when they're facing Sprint as

22   a competitor, compared to after they acquire Sprint.

23            So here, we have T-Mobile is in the middle here in the

24   pricing.  Let's look at the top row, the two lines per month

25   price, $120.  Before the merger, or now or in recent years, it

JCKPSTA4                        Shapiro - Direct

might be reasonable for them to say, well, maybe we should

lower our price because we're not the lowest.  Sprint is lower

and that will -- if we don't lower it, we might lose customers

to Sprint.  And if we do lower it, maybe we'll get some of

their customers.  So that's part of the calculus of lowering

that price, and that can happen over time.

        Of course, AT&T is also in the picture.  I'm not

ruling them out, but we want to focus on what's changing from

the merger, which is Sprint is going to go away here.  So as I

said, they might be very well tempted to lower their price to

either capture customers from Sprint or avoid losing customers

to Sprint, who's lower priced.

        Now, after the merger, we basically take away the

Sprint column and the calculus changes.  For T-Mobile, they go,

well, if we lower our price, it's not like we're going to get

customers from Sprint.  We own them.  They're not there

anymore.  We still might get some customers from AT&T, but it's

just less attractive to do so.

        So that's the guts of it and the diversions that we're

talking about here.  So it's very important, then, when they

lower their price, how many of the customers they would be

picking up from Sprint or keeping from going to Sprint, and

that's what we've measured.

        And the diversions I've calculated fit with a lot of

the other evidence here, which is that Sprint and T-Mobile are

1    quite close competitors, closer than you would think, just

2    looking at their market shares.  And so that's why this whole

3    diversion and upward pricing pressure way of measuring things,

4    I think, is both well suited to unilateral effects and adds a

5    lot to what we get from the other main metric, namely, the

6    Herfindahl measurement.

7    Q.  Okay.  And just so that we're clear, this is completely

8    separate from whether AT&T and Verizon might have an increased

9    risk of coordinating with T-Mobile, correct?

10   A.  Yes.  I thought we were just talking about unilateral

11   effects here.  So I am aware in that analysis, AT&T is in the

12   market, Verizon is in the market, but I'm taking their prices

13   as given and just focusing on eliminating Sprint.

14   Q.  Now, Professor Katz says that you failed to make an

15   adjustment using the Facebook data when you calculated

16   unilateral effects.  Did you read that testimony?

17   A.  Yes.  This goes specifically to the diversion ratios that I

18   just talked about.

19   Q.  Okay.  So what's your response to Professor Katz's

20   testimony about your use of Facebook data?

21   A.  So there's two responses I'd like to give.  First, and this

22   is in my -- clearly stated in my reply report, that I do not

23   believe any such adjustment is needed.  I stand by the

24   calculations I gave, and I explained in detail the basis for

25   that view in my reply report.

1          We had had a back -- exchange on this, but I also then

2    went further in the reply report.  It's now cited here by this

3    demonstrative to show that there's really very little at stake

4    in this particular back and forth between me and Professor

5    Katz.  So what -- again, straight out of my reply report, your

6    Honor.

7          This is the brand-level diversions, which we had to do

8    it at the brand level to properly account for Boost.  And the

9    first column here, where it just says "Facebook," those are the

10   numbers I used in my analysis that I presented to the Court.

11   If one makes the adjustments that Professor Katz has been

12   advocating, then you would use the second column.

13         I should be clear.  What's being reported here is the

14   upward pricing pressure.  That's how the divergence gets used

15   to ultimately measure these concerns about higher prices, and

16   these are small differences.  Again, I don't think this

17   adjustment was necessary, but if you made it, it would not in

18   any significant way change the results of my analysis or my

19   opinion.

20   Q.  All right.  Let's turn to DISH.  This is testimony from

21   Professor Katz about DISH, and he testified that DISH does not

22   have to fully replace Sprint for the deal to strengthen

23   competition and benefit consumers; do you see that?

24   A.  I do.

25   Q.  What's your response?

1    A.  So I think it's just to crystalize where we agree and where

2    we disagree.  I understand him to be saying that the reasons --

3    he is counting on efficiencies.  I think he's saying

4    ultimately, look, the deal is going to create a bunch of

5    efficiencies, and he says that here and between that and the

6    DISH, it's good enough to protect consumers, or maybe more than

7    good enough.  I don't want to characterize.  He's putting the

8    two together.

9          And so I think my part of this analysis is to look at

10   DISH and what its impact will be on competition in the near

11   term, especially.  And so there's -- and my point is simply

12   DISH falls far short of replacing Sprint for the next few

13   years, and so if you -- in order to conclude that consumers

14   will be protected during that period of time, despite Sprint's

15   absence, you would need to have significant efficiencies.

16   Q.  And this is a slide that we looked at previously when we

17   were discussing coordinated effects.  How does this relate now

18   to your response to Professor Katz about DISH?

19   A.  So it's this point about falling far short.  I just --

20   DISH, during the next two, three years, certainly two years, is

21   going to be predominantly serving customers over its own

22   network.  I gave the data.  Only 2 percent of their subscribers

23   will be on their own network in 2020.  They will have higher

24   costs.

25          This is a -- the prepaid segment that they're starting

1    with those subscribers tend to churn much more quickly than

2    post-paid; so they're going to have to run to stay in place, as

3    it were.  They have to deal with that.  And they're still

4    heavily dependent on T-Mobile's network.  So this is -- this is

5    nothing -- they don't look anything like Sprint.  I understand

6    that they've got these plans to build out, and I'm not looking

7    at the longer term.  But I'm concerned about consumers and the

8    impact in the near term.

9    Q.  All right.  One more topic.

10         The Court asked Professor Katz a question about what

11    you are predicting about what will happen to prices in the

12    future, and Professor Katz did his best to explain what he

13    thought your position was about prices in the future.

14         I wanted to give you a chance to answer the Judge's

15    question about what you believe will happen to prices in the

16    future because of this merger.

17         And I thought it would be helpful for you, in

18    explaining your answer, to have an example of a current

19    T-Mobile program that's being offered in the market right now.

20    If you could explain what's going to happen, using this as an

21    example?

22    A.  Okay.  Thank you.  So first, what is this?  We just pulled

23    this off the web yesterday or the day before.  It's just meant

24    to illustrate the type of plan that T-Mobile is offering.

25    "Magenta," it says, "our signature unlimited plan packed with

JCKPSTA4                        Shapiro - Direct

1     benefits," and it's $35 per line.  So that's where we are now.

2            My view, expectation, hope, your Honor, is that if we

3     don't have the merger, we continue to have the four companies

4     compete vigorously.  That T-Mobile will, because of competitor

5     pressure, offer even better terms to consumers in the future.

6     And so one way that could happen is they might lower this $35 a

7     line to 30.  I'm not -- that's not a specific prediction.  It's

8     just an example of how competition can lead to real benefits

9     for real consumers and real households.

10           So harm would arise that because of the merger, they

11    stay pat at $35 because they don't have to face Sprint, and all

12    the other reasons I've given.  Consumers are losing that $5 a

13    month.  They would have gained that lower price, and they don't

14    get it.  That's real harm.  So that would be a price -- just in

15    terms of price, that would be a harm to consumers resulting

16    from the merger and loss of competition, and I'm definitely

17    concerned about that.

18           There's also a non-price side to it.  Let me just give

19    an example based on this, their plan now.  So they say Netflix

20    on us, basic, one screen in standard definition, SD.  So that's

21    a nice goody.  I like Netflix.  Particularly, as usage goes up,

22    you know, people like -- Professor Scott Morton was talking

23    about high definition.  It seems to me the type of thing the

24    competition can deliver for consumers in the future would be

25    extra goodies, maybe.  Again, not a specific prediction.  Just

JCKPSTA4                        Shapiro - Direct

1    an example.

2          Competition would press them to offer two screens or

3    high definition, okay, as part of their package and the

4    companies pull their punches.  Maybe it's coordinated effects

5    and they don't offer that, that would be a form of consumer

6    harm because quality would not go up.  It would stay where it

7    is.  So those are tangible things that I'm concerned about that

8    will hurt consumers as a result of this merger.

9          THE COURT:  Let me ask Professor Shapiro.  You're

10   concerned that in the post-merger world, that T-Mobile will

11   sort of pull -- you used "pull their punches," in the realm of

12   possibilities.  Is it also possible that rather than pulling

13   their punches, they may go out in the ring, like Rocky, and

14   say:  Come on out?

15         THE WITNESS:  Well, look, I think that's --

16         THE COURT:  Essentially, that's what Mr.~Legere said

17   in his testimony, that he is looking forward to being out there

18   in the ring with the two big guys.

19         THE WITNESS:  Right.  Well, he's already in the ring.

20   It's just as scrappy No. 4.  Look, I understand T-Mobile's

21   basic point here, which is, they're claiming they will become a

22   stronger competitor to go after the big guys.  Okay?

23         The way antitrust economists think about these things,

24   and it's certainly it's used through all of my testimony, the

25   merger guidelines, decades of research, for that matter, is we

JCKPSTA4                        Shapiro - Direct

```
 1    tend to think, and we have empirical basis for this, that when
 2    we go from four to three -- well, when we go from six to five
 3    to four, as we start to slim down the number of competitors,
 4    we're more concerned, generally concerned competition will
 5    lessen.  And that's why economists worked on this for decades
 6    that ultimately lead to the Philadelphia National Bank
 7    Presumption, actually, in the law.  This is where it started in
 8    the '50s.
 9              So that's our sort of bedrock principle.  Now, but we
10    understand that that might not apply in every case, and if a
11    company is going to achieve a lot of efficiencies because of
12    this deal, that might be the exception, and those things
13    happen.
14              THE COURT:  Let me ask you.  That's precisely my
15    point.  Are you aware of specific instances in the last, let's
16    say, 20, 30 years, where four-to-three mergers have produced
17    sufficient benefits to justify their merger?
18              THE WITNESS:  You mean in any industry?
19              THE COURT:  Yes, just generally.
20              THE WITNESS:  That's a tough one.  I think, yes, there
21    would be some.  I would say there would be some.  I don't have
22    things off the top of my head, but, you know, there's sometimes
23    where it is a struggling firm -- I mean, the types of things
24    that T-Mobile is arguing, those are not crazy concepts in
25    general.  Those happen.  Okay?  I'm not denying that.  It's a
```

JCKPSTA4                         Shapiro - Direct

1    question about this case.

2           THE COURT:  All right.  I think that I saw in one of

3    the briefs there was a footnote that listed a dozen or so

4    four-to-three mergers that have been approved, or not objected

5    to, and the suggestion was that there's nothing inherently

6    wrong about going from four to three, and that there may be

7    some instances, again, in the realm of possibilities where four

8    to three could produce efficiencies sufficient to justify the

9    merger.

10          THE WITNESS:  Again, it can happen.  What the economic

11   research has been showing the last 10 years or so, your Honor,

12   is that mergers, unfortunately, in the United States have

13   generally been too lax; so there's a lot of evidence that

14   mergers have gone through, hospital mergers, for example,

15   airlines mergers, other industries, not this one, where -- a

16   beer I mentioned, actually did come up already, where it's -- I

17   think there's a growing view, not a consensus yet, that merger

18   enforcement has been too lax, and so there's a lot of studies

19   of mergers.

20          Some four-to-threes have worked out fine.  A lot of

21   them have not as well, and so we have the presumptions that are

22   based on our empirical work, generally.  We have evidence from

23   this industry, as well in other countries that I won't refer

24   to, but you know, we're in uncharted territory with the

25   four-to-three of the nationwide carriers here.  So I think we

1    need to fall back, to some degree, on our presumptions, but I

2    haven't entirely done that.  I've looked at the effects in

3    detail as well.

4                THE COURT:  Thank you.

5                Mr. Pomerantz.

6    BY MR. POMERANTZ:

7    Q.  So one of the reasons why a four-to-three merger may not be

8    anti-competitive is because of efficiencies, correct?

9    A.  That is correct.  That would be the primary reason.

10   Q.  And an economist would only credit those efficiencies if

11   they were both merger-specific and verifiable, correct?

12   A.  That is correct.

13   Q.  And so to the extent that this merger is being justified

14   based upon efficiencies, you'd have to look at those kinds of

15   issues, at least from an economist's perspective, correct?

16   A.  Yes, and that's exactly what Professor Scott Morton did

17   earlier this morning.

18   Q.  Now, another reason why a four-to-three merger may be --

19   may not be a problem for competition is if one of the two

20   parties that are merging is so weak that they would be an

21   irrelevant competitor, a meaningless competitor in the future,

22   correct?

23   A.  That's correct.

24   Q.  And there is a very high test that economists apply before

25   they would ever credit that kind of a defense, correct?

JCKPSTA4                         Shapiro - Direct

1    A.  Well, we -- antitrust economics is a practical area.  We

2    basically do economics to try to -- I think you were referring

3    to the failing firm defense.  So that's something economists at

4    the antitrust division, for example, look and see whether those

5    stringent requirements are met.

6           But more often, in my experience at least,

7    particularly when I was with the antitrust division, is it's

8    more of something called a flailing firm defense, that they're

9    just weak.  And that's one reason I looked at the projected

10   market share, to see how much there is behind that argument.

11   Q.  And if you didn't have the kind of efficiencies that

12   economists recognize, or a flailing or failing firm, then what

13   do economics teach us about four-to-three mergers?

14   A.  Well, and this is what I was trying to explain to the

15   Judge, that we have decades of experience that, as a general

16   principle, we see four to three as definitely in the zone that

17   is worrisome, in terms of loss of competition and that

18   underlies the market share thresholds, which have been in the

19   merger guidelines since 1968.  Changed a bit, but it's because

20   of that deep empirical work in the field that that has been

21   translated into practice, at least at the agencies through

22   these structural presumption, the Herfindahls, and so that's

23   based on, basically, the knowledge in my field.

24          MR. POMERANTZ:  No further questions, your Honor.

25          THE COURT:  Thank you.  Mr. Cary, how long do you need

JCKPSTA4                          Shapiro – Direct

1    with the witness?

2                MR. CARY:  45 minutes, your Honor.

3                THE COURT:  All right.  Let's take the lunch break

4    then.

5                (Luncheon recess)

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JCKTSTA5                          Shapiro – Cross

                          AFTERNOON SESSION

                             (1:30 p.m.)

            THE COURT:  Welcome back, Mr. Cary.

            MR. CARY:  Thank you, your Honor.

            Your Honor, we went back and took advantage of the

lunch break to go through the questions that were asked and

compared them to the earlier trial testimony, and I'm hoping

that I will be able to shorten this examination relative to my

prediction.

            THE COURT:  That's good, thank you.

CROSS-EXAMINATION

BY MR. CARY:

Q.  Professor Shapiro, good afternoon.

A.  Good afternoon, Mr. Cary.

Q.  I will ask you a series of questions, and so we can all get

out of here, given the last day of trial, I request that you

stay very closely to my question, if that you would be okay

with you.

A.  Yes, sir.

Q.  Thank you.  I would like to start by asking you whether you

calculated Sprint's revenue share to be 13.8 percent at the end

of the year 2018 in your report, correct?

            And I can put on the screen a demonstrative or the

report to help you speed through this.

            MR. POMERANTZ:  What page?

JCKTSTA5                          Shapiro - Cross

1              MR. CARY:  This is Shapiro reply report, page 171,

2      figure 37.

3      Q.  Do you see where it shows Sprint's retail share at 13.8?

4      A.  I do.

5      Q.  And this is for the end of the year 2018, correct?

6      A.  December 2018.

7      Q.  And in your report you also made a prediction that Sprint's

8      revenue share would be 11 percent by the end of the year 2020,

9      is that correct?

10             I refer you to Shapiro initial report figure 34, tab

11     4, page 294.  Do you see that?

12     A.  I do.

13     Q.  Is that in your report?  Was that your projection?

14     A.  This looks correct.  Are you showing me figure 34 from my

15     first report?

16     Q.  Yes, sir.

17     A.  I'm not disputing it's there.  If you pull out, I could

18     confirm.

19             Yes, that looks correct.

20     Q.  Thank you very much.  I would like to refer you to the

21     slide that you put up with respect to Altice in your direct

22     testimony today.

23             MR. CARY:  Mr. Klein, if you could get to tab 31, page

24     9.

25             Not public, please.

JCKTSTA5                    Shapiro – Cross

1          MR. POMERANTZ:  Your Honor, just to be clear, I made

2    one error and Professor Shapiro made one error in terms of

3    saying something on the record that should not have been on the

4    record, so I ask after the proceeding to work with counsel and

5    the court reporter to have that portion deemed under seal.

6          THE COURT:  All right, granted.

7    Q.  So Dr. Shapiro, you explained through this demonstrative

8    that the Altice-Sprint contract has a clause that penalizes

9    Altice when it takes a Sprint customer, is that correct?

10   A.  Correct.

11   Q.  Isn't it true that there are many MVNO contracts that do

12   not include such a clause?

13   A.  I think that's correct, yes.

14   Q.  In fact, this clause is pretty unusual, is it not?

15   A.  I have not done a survey, I can't speak to the frequency

16   with which this type of clause occurs.

17   Q.  Altice has -- well, let me put it this way, your report did

18   not contain any analysis of how prevalent this is, correct?

19   A.  I think that's correct.

20   Q.  Altice has an incentive to compete with Verizon, doesn't

21   it?

22   A.  Well --

23   Q.  It has to get its customers somewhere, right, Professor?

24   A.  Sorry, what?

25   Q.  It has to get its customers somewhere, and Verizon has a

JCKTSTA5                    Shapiro - Cross

1    lot of customers, right?

2    A.  Certainly, yes, that's true.

3    Q.  And if Verizon responds to competition from Altice by

4    lowering its prices generally, that might harm Sprint, correct?

5    A.  I think your logic is correct.

6    Q.  And Altice would not take into account the impact of

7    Verizon's price reduction on Sprint, would it?

8    A.  Well, they're not the same company as Sprint, I'm not quite

9    sure what they would take into account.

10   Q.  Fair enough.  As a separate company they would not have a

11   particular interest in watching out for Sprint.

12        You said Boost's incentives would change in two ways

13   post-divesture.  Do you remember that testimony?

14   A.  Why don't you tell me specifically what you're referring

15   to, please.

16   Q.  When you spoke you said the first post-merger Boost in the

17   context of DISH would have an incentive to decrease price,

18   because unlike the premerger Boost, it would not internalize

19   the value of sales lost by Sprint when the Boost price is

20   lowered, right?

21        MR. POMERANTZ:  Your Honor, was that stated today?

22        MR. CARY:  No, I'm sorry that was in Professor

23   Shapiro's initial report at paragraph 258.

24        MR. POMERANTZ:  Your Honor, I want to make sure that

25   it's responsive to something that Professor Shapiro said today,

1    because that's all that he should be asking about.

2                 THE COURT:  Thank you.

3                 Mr. Cary?

4                 MR. CARY:  Well, Professor Shapiro testified to the

5    various incentives of MVNOs, and he testified to the incentives

6    of DISH post merger, so I'm pursuing it.

7                 THE COURT:  All right.

8                 MR. POMERANTZ:  Your Honor, I don't see the

9    connection, but if maybe he will follow up and we'll see the

10   connection.

11                THE COURT:  Subject to connection.

12                THE WITNESS:  I'm supposed to answer it?

13                THE COURT:  Yes.

14                THE WITNESS:  Thank you.

15   A.  So I see this paragraph.  This is part of the analysis of

16   upward pricing pressure.

17   Q.  Right.  So again, to repeat the question, the post-merger

18   Boost would have an incentive to decrease price, because unlike

19   the premerger Boost, it would not internalize the value of

20   sales lost by Sprint when the Boost price is lowered.  Is that

21   right?

22   A.  That's correct.  You read that correctly.

23   Q.  So before the divesture, when Boost is owned by Sprint,

24   they will take into account the effects of their pricing on the

25   rest of Sprint, correct?

JCKTSTA5                    Shapiro - Cross

1              MR. POMERANTZ:  Your Honor, this is specifically

2    looking at Boost.  This was not all the subject of the

3    examination here today.

4              MR. CARY:  The examination was about DISH.  DISH will

5    be Boost, boost will be DISH post-divesture.  That's what the

6    divesture is all about.  So he was asked about DISH's

7    incentives to coordinate and to compete.  DISH will be

8    competing through Boost, your Honor.

9              THE COURT:  All right.  Overruled.

10   A.  I agree that -- if I remember the question -- that Boost

11   will not go to be part of Sprint, and therefore the same direct

12   internalization of the cost of capturing Sprint subscribers

13   would not apply to Boost in DISH's hands.

14   Q.  After the divesture when Boost/DISH is an MVNO, they won't

15   take into account the effects of their pricing on the rest of

16   Sprint, correct?

17   A.  That's correct.  That's the point of this.  This is one

18   side of the balancing here in this paragraph, that's correct.

19   Q.  That is one difference between Boost being a division of

20   Sprint and Boost being owned by DISH and being an MVNO,

21   correct?

22   A.  Correct.

23   Q.  And in your view, the post-merger Boost would have a

24   separate incentive, you say, to increase price because it would

25   have higher marginal cost as an MVNO reselling new T-Mobile's

JCKTSTA5                              Shapiro - Cross

1   network than Boost did, right?

2   A.  That is correct.

3   Q.  But you did not account for any change in the post-merger

4   Boost business model or business strategy, such as operating at

5   lower margins in your UPP analysis, correct?

6   A.  The UPP analysis studies the effect of the merger on price

7   incentives, so I don't know what you're referring to about

8   lower margin.  That's what the analysis is about, pricing and

9   margins.

10  Q.  Right.  But you did not -- in applying your UPP analysis,

11  you did not take into account any changes in post-merger

12  Boost's business model or business strategy, such as operating

13  on lower margins, correct?

14  A.  The analysis shows exactly what would happen to the

15  margins, and that's what I put in my analysis.

16  Q.  You did not take into account the fact that MVNOs operate

17  on much thinner margins than MNOs in doing your upward price

18  calculation, correct?

19  A.  The upward pricing -- excuse me, the upward pricing

20  pressure analysis is designed to isolate the effect of the

21  change of ownership, and so that takes other things as given,

22  and that's what I did.

23  Q.  And the other thing it took as given was the Boost margins

24  would remain where they were.

25  A.  No, I did not take Boost margins as given.  The whole

JCKTSTA5                    Shapiro - Cross

1    analysis is about the pricing, which given the costs, which I

2    also accounted for, showed in the margins.  The margins are

3    endogenous in that sense.

4    Q.  Let me be more precise.  You did not take into account the

5    fact that MVNOs operate on much thinner margins than MNOs when

6    you calculated your UPP.

7    A.  This is simply about Boost.  The whole methodology is about

8    Boost and how price incentives change as a result of ownership

9    changes, and that's exactly what I did.

10   Q.  Could you answer my question, please.

11   A.  I don't understand what you mean.  Taking into account some

12   other firm's pricing incentives, that's not what the analysis

13   does.

14   Q.  You did not attribute the typical margin for an MVNO to

15   Boost when you calculated the upward pricing pressure.

16   A.  That's correct.  I looked at the margins, how they would --

17   excuse me, the pricing, how it would be affected by the merger.

18   That's what this methodology does.

19   Q.  To be clear, the answer to my question was, "That's

20   correct."

21           THE COURT:  Asked and answered.

22   Q.  Is that right?

23           THE COURT:  Asked and answered.

24   Q.  And you also did not account for the possibility that

25   post-merger DISH would set its prices based on marginal costs

JCKTSTA5                        Shapiro - Cross

1  and the projection it will have in the future, correct?

2  A.  My calculations did not include that element of pricing,

3  but I addressed it in some detail in my reply report because

4  Professor Katz brought it up in his report, and I explained why

5  that did not change my results.

6  Q.  Your results are only for one year in your UPP analysis,

7  correct?

8  A.  I think we covered this last time I was here, and I don't

9  think of there being a particular time frame --

10 Q.  Professor Shapiro, could I please ask, we're all trying to

11 get out of here, is it correct that your UPP analysis only

12 accounted for one year?

13          MR. POMERANTZ:  Your Honor, I did not ask any

14 questions that this question would be relevant to.

15          MR. CARY:  Your Honor, he asked him a series of

16 questions about unilateral effects, so I'm responding to his

17 questions on unilateral effects.

18          MR. POMERANTZ:  Your Honor, I asked specific questions

19 about unilateral effects, and they had nothing to do with the

20 questions Mr. Cary asked.

21          THE COURT:  Subject to connection.

22          You can answer.

23 A.  Okay.  The UPP analysis -- the elements are based on

24 diversions margins and prices.  Necessarily we need to use

25 historical data for that purpose, which is what I did.  So it's

JCKTSTA5                        Shapiro - Cross

1    not keyed to any particular time frame, so I don't know what

2    else to say in response to your question about one year.

3    Q.  Your analysis of coordinated effects was limited to just a

4    year or two, correct?

5    A.  Well, I think generally I find it more difficult to predict

6    effects going out many years, but the overall nature of the

7    problem that I identified about coordinated effects is more

8    long lasting because it goes to the underlying structural

9    change in this industry.

10   Q.  Professor Shapiro, do you recall that we had a deposition

11   and I asked what the time frame was for your analysis, and you

12   testified that the coordinated effects analysis, I think of it

13   as a year or two out.

14          Do you recall that?

15   A.  Yes, and that's what I was trying to say in my previous

16   answer, which is the specifics of the analysis are based on the

17   market as we see it now.  Three years, four years out, it's

18   harder to tell exactly what would happen, but the underlying

19   structure analysis is a longer-term thing.

20   Q.  And you talked in response to Mr. Pomerantz's questions

21   about coordinated interaction, correct?

22   A.  We addressed coordinated interaction.

23   Q.  Is it correct that where there is bundling of products,

24   let's say wire line from AT&T and wireless from AT&T, that that

25   could be a way for AT&T to lower prices in wireless in a

JCKTSTA5                          Shapiro - Cross

1    non-transparent way?

2    A.   Well, I think it could be less obvious or visible, the

3    price reduction, if it occurred that way, but if it's known to

4    consumers, I would expect it still to be observable to the

5    competitors with their competitive intelligence units.

6    Q.   Would you agree that since the price of the bundle is

7    usually less than the sum of the component prices, a bundle of

8    two products is effectively a way of offering to customers a

9    discount who would buy the other at a small incremental price

10   than the standalone prices?

11   A.   I didn't actually understand the structure of your

12   question, but I will say that I think it's immediate that if

13   they offer -- if a company offered a bundle, and the bundled

14   price is less than the sum of let's say two component prices,

15   one could think of that as a discount in comparison with buying

16   the products à la carte.

17          THE COURT:  Mr. Cary, let me ask Professor Shapiro a

18   question concerning the issue of the timing of any coordination

19   in the real world of cutthroat competition.  If there's going

20   to be coordination of price, let's say, in the context of a

21   transaction like this one, is it more likely that companies

22   would act in the long term rather than in the short term?

23          In the short term there will be a lot of focus and

24   attention and interest of the public and regulators and

25   everybody that will be concerned about reputation and promises

JCKTSTA5                         Shapiro – Cross

1    made.  What are the chances that they're not going to do

2    anything in the short term?

3              THE WITNESS:  Well, I certainly agree with all the

4    attention, and you asked a similar question when I was here

5    last time about wouldn't it be odd if T-MO raised the price

6    next week after the merger.

7              So I think there is scrutiny, there's public relations

8    issues, and those are heightened following the merger, for

9    sure.  Let me give the example of how consumers could be harmed

10   if T-Mobile does not lower the price from 35 to $30 for the

11   magenta line.  I will use that as an illustrative example.

12   That doesn't require them to do anything.  They just sit at 35.

13   So if we're losing out the benefits of the $30 deal, that will

14   happen soon, and it wouldn't create any of these public

15   relations issues that you raise.

16             THE COURT:  Mr. Cary.

17   BY MR. CARY:

18   Q.  Would you agree with me that the presence of DISH under the

19   advantageous MVNO agreement with T-Mobile reduces the benefits

20   of coordination among the three MNOs?

21   A.  Yes, I agree.

22   Q.  Professor Shapiro, you're not purporting to quantify the

23   extent to which coordination will be a greater danger after

24   this merger than before, correct?

25   A.  I am not quantifying that, that is correct.

JCKTSTA5

1           MR. CARY:  I have no further questions, your Honor.

2           THE COURT:  Thank you.

3           Mr. Pomerantz?

4           MR. POMERANTZ:  No further questions, your Honor.

5           THE COURT:  Thank you, you may step down, you're

6    excused.

7           THE WITNESS:  Thank you, your Honor.

8           THE COURT:  Mr. Pomerantz.

9           MR. POMERANTZ:  I think we have a handful of matters

10   to clean up before we all depart.  I think Mr. Mach has a few

11   and then I might have one or two.

12          THE COURT:  Mr. Mach.

13          MR. MACH:  Thank you, your Honor.

14          Your Honor, as my colleague mentioned, the parties

15   together have talked about and tried to identify open items

16   that exist that your Honor should be aware of.  If history is

17   any guide, the parties will think of even more before we walk

18   out the door today.  I hope I can speak for everyone, we will

19   work to resolve those as efficiently as possible, ideally

20   without burdening the Court in any respect, but certainly to

21   the most minimal degree.

22          The first item that is still open that we wanted to

23   make sure that your Honor is aware of is that even though trial

24   is over, there will be some additional evidence coming into the

25   record through deposition designations.  The deposition

JCKTSTA5

designations come in, in some instances, with documents that weren't used in the trial, but will be put in the record through those designations.  The parties I think have agreed to submit those next Friday.  We will work to limit the objections on the designations and the documents to the greatest degree possible in the course of negotiating those down.

The second item is that there are a handful of documents that the parties are actively negotiating on certain discrete issues.  There is, for example, the declaration of Mr. Boubazine, there are some documents where there are redactions to make, things of that nature.  I think we can resolve those shortly and get those documents into the record before your Honor.

The third item is that the plaintiffs would like to, just for clarity of the record, formally offer the documents that were subject to the two motions that were briefed before the Court.  Those five documents that I think were subject to those letters are 1034, 339, 329, 800 and 802, and I tried to pull those numbers directly from the letter briefs in order to identify what the documents are.

THE COURT:  All right.

(Plaintiffs' Exhibits 1034, 339, 329, 800 and 802 received in evidence)

MR. MACH:  We also have two documents from the examination of Professor Katz that are subject to objections

JCKTSTA5

1    that we were not able to resolve.  Those were documents that I

2    used with Professor Katz in his examination.  I understand that

3    the defendants have objections to Exhibit 1296 and

4    Exhibit 1263.  I will, with your Honor's permission, hand the

5    podium to them to raise whatever objections that they have, and

6    with your permission we would like to argue those issues before

7    you at this moment.

8                THE COURT:  All right.

9                MR. CULLEY:  Good afternoon, your Honor, Daniel Culley

10   for Deutsch Telekom.

11               On Exhibit 1296 that Mr. Mach mentioned, this was

12   comments that -- a declaration that Dr. Katz filed on behalf of

13   AT&T in an FCC matter about spectrum, and we object on hearsay

14   ground to that declaration.  Mr. Mach told me that he intends

15   to offer this statement as an inconsistent statement of a

16   declarant witness, but there is nothing inconsistent between

17   the statement that Dr. Katz made in that declaration and the

18   statements that he made on the stand; one was about the

19   spectrum purchase market, the other is about the retail market,

20   and Mr. Mach laid no foundation whatsoever to connect those two

21   during his examination of Dr. Katz.

22               And even if it were a prior inconsistent statement,

23   only the very specific statements that Mr. Mach read, which are

24   already in the transcript and in the record, would be

25   admissible, not the entire document as a whole.

JCKTSTA5

1          THE COURT:  Thank you.

2          Mr. Mach?

3          MR. MACH:  Thank you.  My colleague is correct, we

4     think that the statements that were made under oath by

5     Professor Katz are a prior inconsistent statement admissible

6     under 801(d)(1).  And I see that the focus of the issue is

7     whether they were indeed inconsistent.  We believe they were

8     clearly inconsistent because your Honor will recall that

9     Dr. Katz testified that CMAs are not an appropriate level at

10    which to address competition in court in this matter.  In that

11    declaration he testified that CMAs not only were possible but

12    were in fact the appropriate place to address competition.

13         I do not expect that the parties will reach agreement

14    on the substantive implication or the degree of contradiction

15    within those documents, but the way that issue is resolved

16    under the rule is through cross-examination of Dr. Katz, both

17    parties have had the opportunity to examine him, and the

18    document is simply not hearsay under 801(d)(1) on account of

19    the at least facial contradiction on the document, and no more

20    is required to get the document in under that exception.

21         THE COURT:  Thank you.

22         Anything else?

23         MR. CULLEY:  I note again, your Honor, even if it was

24    the case that Mr. Mach asserts they're inconsistent, only the

25    specific statements that he asserts are inconsistent and

JCKTSTA5

1    already in the trial transcript should be admitted and not the

2    entire document.

3         THE COURT:  All right.  Thank you.  I'm inclined to

4    allow the document to be admitted.  I think there is facial

5    inconsistency.  However, the problem is that the context in

6    which the statements were made were not part of the testimony

7    initially.  So if we take them in isolation, they are

8    inconsistent, but if you give the explanation of the context,

9    perhaps they're not.  And I think rather than engaging in a

10   mini trial on that issue, it is best to follow the same rule

11   that I indicated this morning, in bench trials the Court should

12   err in the direction of admitting documents rather than

13   excluding.

14        (Plaintiffs' Exhibit 1296 received in evidence)

15        MR. MACH:  Thank you, your Honor.  We also have the

16   document 1263.

17        MR. CULLEY:  On Exhibit 1263 again we're objecting on

18   hearsay grounds, your Honor.  It's the 2011 AT&T presentation

19   to the Department of Justice regarding the AT&T/T-Mobile

20   merger.  It was a presentation submitted by AT&T.  In that

21   merger, AT&T had control of the antitrust strategy, and the

22   plaintiffs have not laid any foundation about what input, if

23   any, that T-Mobile had into that presentation.  It is a

24   third-party statement about the document.  And Professor Katz

25   said he had not seen the document, it was during the

JCKTSTA5

examination of Professor Katz, and in fact, Mr. Cary objected

to the use of the document, and I believe your Honor said we

should move on.  So that was the resolution of that document

during the course of the examination.

THE COURT:  Thank you.

Mr. Mach?

MR. MACH:  Just for the assistance of the Court,

Mr. Nikels, could I ask you to bring up the cover page of 1263.

Your Honor, this is a familiar issue now, and that's

the standard of proof that's required to satisfy Federal Rule

of Evidence 901.  Federal Rule of Evidence 901 gives a variety

of different ways that a party can establish that something is

what they purport it to be.  And here we have a variety of

different ways to do that.

As your Honor mentioned this morning, of course, there

is also Second Circuit precedent that tells us that

circumstantial evidence is sufficient to meet that burden.  And

the facts that the Court should be aware of here are, first,

facially the document is presented by AT&T and T-Mobile.  This

is something that appears page after page after page on this

document.  We also have a history with this document from the

investigation phase of this case, and that is that, in the

investigation phase of the case, the defendants were asked to

provide materials that were submitted to the Department of

Justice on behalf of a party -- on behalf of this party, this

JCKTSTA5

1    is T-Mobile, in the transaction that is at issue in this slide

2    deck.  This slide deck specifically was provided and

3    specifically identified as one of those documents that was

4    provided on behalf of T-Mobile at that time in the

5    investigation phase of the case.

6          So this is evidence that clearly meets the standard.

7    And on questioning with Dr. Katz, Dr. Katz acknowledged that he

8    had a role in reviewing presentations that were submitted to

9    the Department of Justice, and he did not hesitate in agreeing

10   that the positions shown here were presented to the Department

11   of Justice at that time.  I think that the minimal burden to

12   get the document in is easily satisfied here.

13         THE COURT:  Thank you.

14         MR. CULLEY:  So Mr. Mach raised the logos on the front

15   of the document.  I don't know how much experience Mr. Mach has

16   in merger advocacy, but that is a common technique that the

17   parties use simply to present who is merging.  And I don't

18   think we can draw any inference from that as to what

19   contributions, if any, were made by each of the parties to a

20   presentation that was submitted by AT&T.

21         On the document request that Mr. Mach mentioned,

22   that's not my recollection of the document request, which were

23   broad all document requests related to the specific things.

24   And in any event, the fact that the merging parties did not

25   extremely narrowly construe their responses to discovery in an

JCKTSTA5

1    event to be amicable and move the matter along and not raise

2    unnecessary objections should not be used against them here to

3    try to admit specific documents in evidence.

4            THE COURT:  All right.  Thank you.  On this document,

5    again, I will follow the rule of allowing admissibility.  If

6    there are any objections on the content, they go to the weight.

7            (Plaintiffs' Exhibit 1263 received in evidence)

8            MR. MACH:  Thank you, your Honor.  I think that

9    addresses the items on my list.  My colleague, Mr. Pomerantz,

10   has a few open items.

11           THE COURT:  Thank you.

12           MR. PARKER:  Your Honor, Mr. Mach offered some

13   documents that were in the letter that you ruled on this

14   morning but I don't believe you ruled on, so I would like at

15   some point an opportunity to object to those documents; not

16   revisiting the one that you ruled on, but the other three

17   documents.

18           THE COURT:  I understand.  In fact, there was on my

19   open list I did not make specific reference to Exhibits 339,

20   800 and 801, although it was my intent to indicate that to the

21   extent the documents are related, my ruling would apply not

22   only to 329 but to the other three as well.

23           MR. PARKER:  The others were not used with a witness

24   in court, and I thought that was a criterion.  I understand

25   what you're saying on the testimony underlying it, but 329 was

JCKTSTA5

1   used in court, the others were not.  I think that's
2   disqualifying.
3            THE COURT:  Mr. Mach?
4            MR. MACH:  As I mentioned at the top of the clean-up
5   items, your Honor, the parties have a stipulation that was put
6   on the record in the pretrial conference that in order to enter
7   the record a document doesn't have to be used in court, it
8   could also be used in a deposition designation, and the
9   documents that we raised in the letter I think were used in the
10  depositions of people like Mr. Ewens, Mr. Langheim and
11  Mr. Wittig, and they could come in that way, they don't have to
12  meet the standards that counsel is raising.
13           MR. PARKER:  And those folks basically knew nothing
14  about the documents except they thought it was a McKinsey
15  document.  I am sorry, I didn't realize that testimony has been
16  designated, but I think the record is at least highly ambiguous
17  and does not meet the standard your Honor has been applying of
18  control and adoption.  I don't think it's anywhere close.
19           THE COURT:  Thank you.  I made the ruling on this and
20  given the indication for the reasons why.
21           Anything else, Mr. Pomerantz?
22           MR. POMERANTZ:  Not relating to that issue, different
23  issues.
24           THE COURT:  All right.
25           MR. GELFAND:  Your Honor, I do have two exhibit

JCKTSTA5

1    issues, if I might.  There two were two exhibits Mr. Pomerantz

2    tried to move into evidence at the end of Professor Scott

3    Morton's testimony, and I reserved on those.  We went back and

4    looked, Exhibit 211 we had not raised an objection, and

5    therefore I have no objection to the admission of that document

6    into evidence.

7            THE COURT:  Admitted without objection.

8            (Plaintiffs' Exhibit 211 received in evidence)

9            MR. GELFAND:  Exhibit 75 is a letter from counsel

10    about a legal privilege issue.  We think it's irrelevant, and

11    therefore we have a relevance objection to that document.

12            MR. POMERANTZ:  Your Honor, as your Honor has seen in

13    the evidence, whether the complete model that the defendants

14    used to try to prove their efficiencies was used in the

15    ordinary course or not is a matter of relevance in this case,

16    under the guidelines and otherwise.

17            That letter was a letter sent on behalf of the

18    defendants to the Department of Justice and very specifically

19    takes the position that the model was not created in the

20    ordinary course for precisely the reasons that Professor Scott

21    Morton addressed in her testimony, that is, that it addresses

22    5G, which is not part of the ordinary course model, and that it

23    is used to project four or five years out in the future.  This

24    is not Professor Scott Morton or us saying it, it's the

25    defendants themselves saying that to the Department of Justice.

JCKTSTA5

1    I think it's not only relevant but highly relevant to one of

2    the factors that it is to be considered under the merger

3    guidelines.

4              MR. GELFAND:  Briefly, your Honor, there is no dispute

5    about the facts about how that model was created, and the way

6    it's characterized by counsel in exchange for a third party is

7    not relevant.

8              THE COURT:  Thank you, Mr. Gelfand.  You know that the

9    rules of relevance under the federal rules are fairly ample,

10   and I'm inclined to rule that if your objection is based solely

11   on relevance, I will overrule.

12             (Plaintiff's Exhibit 75 received in evidence)

13             MR. POMERANTZ:  Thank you, your Honor.  I want to

14   formally move into evidence various slides or demonstratives

15   that we used during the course of the proceeding that we have

16   not yet moved into evidence with exhibit numbers.  I will put

17   these on the record.  I would like to have the opportunity to

18   leave to my colleagues the chance to double-check it, and if

19   they think that anything is incorrect, first raise it with us

20   and we'll probably resolve it; if not, we could come back, but

21   I think they're agreed to.

22             If I may, for Professor Scott Morton I went over these

23   with Mr. Gelfand beforehand, we're going to mark them as

24   Exhibit 1319, and they are the following slides as we presented

25   them, slide 13, slide 15, slide 20, slide 32, and slide 33.

JCKTSTA5

1        MR. GELFAND:  No objection, your Honor.

2        THE COURT:  All right.  Admitted without objection.

3        (Plaintiffs' Exhibit 1319 received in evidence)

4        MR. POMERANTZ:  Then with respect to Professor Shapiro

5   during his case in chief testimony the following exhibits --

6   the following slides I believe have already been agreed upon

7   without objection on the record.  We'll give Mr. Cary a chance

8   to review this after this proceeding.  We have now marked them

9   as Exhibit 1258, and they are the following slides: 15, 16,

10   17, 18, 19, 20, 21, 22, 23, 24, and 25.

11        Separately, the very last slide that we used was a

12   slide that had a couple of figures on it that were

13   confidential, and therefore Professor Shapiro was not able to

14   testify to them in court.  I would ask -- I showed this to

15   Mr. Cary if he wants a chance to go back and review it, but we

16   would mark that slide, slide 69, separately as Exhibit 1322.

17        MR. CARY:  Your Honor, consistent with Mr. Pomerantz's

18   reservation of our rights to do due diligence, no objection.

19        THE COURT:  Admitted without objection.

20        (Plaintiffs' Exhibits 1258 and 1322 received in

21   evidence)

22        MR. POMERANTZ:  With respect to the testimony today of

23   Professor Shapiro, I would offer as exhibits demonstratives

24   Exhibit 1320, the two slides related to county level HHIs,

25   which are slides 2 and 3, the page from Professor Katz's

JCKTSTA5

1    report, which has been mark as slide 10, the prior submission

2    by Professor Katz to the FCC related to Sprint's projected

3    market shares, slide 12.

4            MR. CARY:  On that one I think we would object, your

5    Honor.  Again, Mr. Pomerantz could have laid the proper

6    foundation for that slide with Professor Katz.  He chose not to

7    do that.  At this point it's just a random slide without any

8    explanation to what it is or what it isn't, more importantly,

9    so I would object to that one.

10           MR. POMERANTZ:  And your Honor, I think Professor

11    Shapiro addressed that in his subsequent testimony today

12    regarding where it came from and why he was relying upon it.

13           MR. CARY:  Right.  He testified that it came from an

14    FCC filing, but he didn't explain where the data came from.

15           THE COURT:  Sustained as to this one.

16           MR. POMERANTZ:  One more on this one, which is the

17    comparison of the Facebook data with the adjustment, without

18    the adjustment, and how it relates to upward pricing pressure.

19           MR. CARY:  No objection to that one.

20           MR. POMERANTZ:  And that's slide 19.

21           THE COURT:  All right.

22           MR. POMERANTZ:  From Dr. Kolodzy's testimony, these

23    are the slides that we're seeking to admit, I think this has

24    been agreed among counsel but in case it hasn't been fully

25    agreed upon, but I think I was told it was, slides 1, 2, 3, 4,

JCKTSTA5

5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20 and
29.

MR. CARY:  No objection.

THE COURT:  Admitted without objection.

(Plaintiffs' Exhibits 1320 received in evidence)

THE COURT:  From Mr. Solomon's testimony, we'll mark
as Exhibit 1315 slides 5, 6, 7, 16, 17, 18 and 25.

MS. LENT:  Your Honor, I think we agreed to this
yesterday, and there's a new exhibit that's been entered.  I
don't know the exhibit number off the top of my head, but these
were marked as Exhibit 1315.

MR. POMERANTZ:  Yes.

MS. LENT:  Okay.

MR. POMERANTZ:  We're getting the exhibit number.  I
think it's on the record which slides were agreed upon, but
this is on an exhibit number so the record is clear.  And last,
Dr. Kolodzy's CV is Exhibit 1316.

(Plaintiffs' Exhibits 1315 and 1316 received in
evidence)

MR. POMERANTZ:  One other issue before we get to the
schedule going forward is I know I speak on behalf of Mr. Cary
and everyone here, your staff is terrific.  They made our lives
a lot easier over the last two weeks.  The court reporters have
suffered through a lot of fast talkers, your clerk really
helped us out a lot.  And it was a really stressful two weeks,

JCKTSTA5

1    and your staff made it a lot less stressful, so we jointly

2    thank you.

3            MR. CARY:  Absolutely, your Honor.

4            MR. PARKER:  The one I have, your Honor -- sorry, your

5    Honor, I got two things, one was my own mistake.  After

6    Mr. Ergan's testimony I offered Exhibit 8141 but misspoke and

7    said it was 4141, it is in fact 8141.  It was certainly my

8    error.

9            THE COURT:  All right.

10            (Defendant's Exhibit 8141 received in evidence)

11            MR. PARKER:  One other point, not to belabor, but

12    document 339 is a hundred page document, and I don't have any

13    record it was used in the deposition at all.  That was the

14    point I was making.

15            MR. MACH:  We'll go and confirm the status of 339 and

16    we can resolve that.  I don't have that record in front of me,

17    your Honor.

18            MR. PARKER:  That's fine, your Honor.

19            THE COURT:  Let me come back to that issue because I

20    may have misspoken when I addressed this issue.  I believe I

21    said Exhibit 801, and it's really 802.

22            MR. MACH:  Thank you, your Honor.

23            THE COURT:  Mr. Gelfand?

24            MR. POMERANTZ:  Apparently when I gave you the slides

25    from Dr. Kolodzy's examination I didn't give you the exhibit

JCKTSTA5

1    number for those slides, and that is Exhibit 1314.

2              (Plaintiffs' Exhibit 1314 received in evidence)

3         MR. GELFAND:  Your Honor, two other things.  First of

4    all, obviously I join in Mr. Pomerantz's thanks to the Court

5    and the courtroom personnel.  I also want to acknowledge the

6    very large team of people who worked on the defense effort as

7    well.  And as your Honor knows, the most important among them

8    are the legal assistants, and we have two of them in the

9    courtroom today that I will like to introduce your Honor to,

10   Alicia DeLalla and also Korinna Garfield.  I would like to

11   acknowledge their tremendous effort in working with the Court

12   and keeping things organized and clean.

13        THE COURT:  Thank you.

14        MR. GELFAND:  The other thing that we need to do is a

15   housekeeping matter but a very important one, your Honor.  I

16   just seek your Honor's guidance.  There are some exhibits in

17   this case that are very confidential and contain

18   forward-looking strategic and competitively sensitive

19   information, both for the parties and for third parties.  We

20   made tremendous efforts, and I think we accomplished a lot even

21   pretrial with the help of Magistrate Judge Lehrburger and just

22   working together most of those issues were resolved, but there

23   are still some documents that will eventually be in the record

24   of this case that we will need to have confidentiality sealing

25   protections for, and I would just ask your Honor to provide us

JCKTSTA5

1    guidance on how you would like us to do that.

2            THE COURT:  To the extent they're subject to the

3    protective order, submit them either to myself or to Magistrate

4    Judge Lehrburger and they will be marked as confidential and

5    sealed, and they will be entered into the record as sealed

6    documents.

7            MR. GELFAND:  Thank you very much, your Honor.

8            MR. POMERANTZ:  Just a couple more points.  Usually at

9    the end of most trials I thank my colleagues on the other side,

10   but this time I really mean it.  They have been terrific to

11   work with as adversaries, and I hope I find myself on the same

12   side of the case someday with all of them.  They have really

13   been wonderful to work with.  I also want to thank my

14   colleagues from New York and California and the other states

15   for inviting me and my colleagues from our firm on this

16   venture.  It's been quite a ride.

17           So to end is the schedule going forward.  I don't

18   think that we have an agreement on a couple of things, so I

19   will state our position and let someone from the other side

20   address it.

21           What we would propose is that written submissions be

22   filed the week of January 6 and that we hold closing arguments

23   the week of January 13.

24           In terms of written submissions, your Honor made clear

25   at the outset that you did not want post-hearing briefs, and if

JCKTSTA5

1    the way this case has gone over the last two weeks has not

2    persuaded you otherwise, I will not try to argue otherwise

3    here.  We would like the opportunity, but if your Honor doesn't

4    feel that you need a brief from each side, then we respect

5    that.

6          We also discussed proposed findings and conclusions,

7    and your Honor did indicate at the outset that was something

8    you were more open to consider.  What we did at the outset of

9    this case is we asked your Honor to defer the submission of

10    findings, which your rules typically would require in advance

11    of trial, and we asked to defer that until after the trial so

12    that we could put evidentiary citations in with the findings of

13    fact.

14          So to the extent that we'll not have any briefing, we

15    would request the opportunity to submit proposed findings and

16    conclusions to your Honor, and we thought it might be helpful

17    for you to have those at least a few days in advance of

18    whenever the closing arguments are.  For that reason, plus some

19    holiday vacations that some of us have planned, including

20    myself, what we would ask for is that whatever written

21    submissions your Honor would permit would be the week of

22    January 6 and the closings would be the week of January 13.

23          THE COURT:  All right.  Mr. Gelfand?

24          MR. GELFAND:  Thank you, your Honor.  We discussed

25    this in the defense group, and it is abundantly clear to us

JCKTSTA5

1    that your Honor heard a great deal of evidence over the last

2    two weeks and has a full appreciation and understanding of the

3    record.  We propose no post-trial written submissions of any

4    sort, including no findings and no conclusions.  And we would

5    ask, given the importance of this transaction and the fact that

6    it has been pending for an extraordinarily long time, that we

7    have post-trial arguments the week of January 6 and not wait

8    until later in January, and we would suggest two hours per

9    side.  Thank you, your Honor.

10            MR. POMERANTZ:  The transaction has been pending since

11   April 29 of 2018.  I don't think one week is going to make a

12   difference here.  I think it would be helpful and healthy for

13   all of us to have a little bit of time to give your Honor

14   something in writing that your Honor can use as a guide in

15   whatever form your Honor would like.  And I think in terms of

16   my personal schedule and other schedules, I think the week of

17   January 13 is a somewhat better week so we are prepared to

18   present your Honor with cogent closing arguments.

19            THE COURT:  All right.  Thank you.

20            Coming back to the question of briefs and briefing, my

21   problem with a case like this is that the word "brief" is an

22   oxymoron.  And consequently, if we want to move things along

23   and get an expeditious resolution, it would be best to forego

24   that process and follow the Court's inclination to have oral

25   arguments.  Two hours each is acceptable to both sides, I will

JCKTSTA5

1    be glad to accommodate that.  I would have no problem with the

2    parties submitting proposed findings of fact and conclusions of

3    law a week before the closing arguments, and in terms of time,

4    I think the second week in January would probably be more

5    realistic.

6            MR. POMERANTZ:  I appreciate that.  Two hours is fine

7    with us.  We're fine with the two hours.  And I just I guess in

8    terms of the timing here, I would propose the findings and

9    conclusions be due sometime in the middle of the week of

10    January 6, and that the closing arguments be sometime in the

11    middle of the week of January 13.

12            THE COURT:  Mr. Gelfand.

13            MR. GELFAND:  That schedule is fine, your Honor.  We

14    propose a page limit on the findings and conclusions so we

15    don't end up with telephone books, and our suggestion would be

16    30 pages for findings of fact and 20 pages for conclusions of

17    law, double spaced, of course.

18            MR. POMERANTZ:  We're fine with that, your Honor.

19            THE COURT:  I would ask that you have 30 pages

20    combined for both findings of fact and conclusions of law each.

21            Anything else?

22            MR. POMERANTZ:  Just the dates.

23            THE COURT:  Let's look at the calendar.

24            LAW CLERK:  January 8 for the findings, and

25    January 15.

JCKTSTA5

1          MR. POMERANTZ:  That's fine for the plaintiff states,

2     looking down here.

3          MR. BUFFIER:  Yes.

4          THE COURT:  January 8 and January 15.

5          MR. GELFAND:  That's acceptable, your Honor.

6          THE COURT:  All right.  Given the amount of time that

7     each side has spent on the trial, let me give you a final

8     tally.  The plaintiffs used up roughly 29 hours and the

9     defendants roughly 25.  So the defendants ended up with fewer

10    hours of trial, but Mr. Gelfand, if you wish to even the score,

11    you are free to do a self-evaluation on the efficiency and

12    quality of your presentations.

13         MR. GELFAND:  Thank you, your Honor, I think I can

14    complete that self-evaluation within the four hours allotted.

15         THE COURT:  Thank you all very much.  I would also

16    want to express my appreciation to both sides for the

17    extraordinarily high level of cooperation and professionalism

18    that you all have displayed which enabled us to conclude the

19    trial within even less than the time allotted and without going

20    into the extra days that we had indicated at the beginning of

21    trial might be possible.  So for that, I thank you all and wish

22    you all the very best for the holidays, and we will see you in

23    January.

24         MR. POMERANTZ:  Thank you, your Honor.

25         (Adjourned)

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                        Page

 3    FIONA SCOTT MORTON

 4    Direct By Mr. Pomerantz  . . . . . . . . . .2174

 5    Cross By Mr. Gelfand . . . . . . . . . . .2224

 6    CARL SHAPIRO

 7    Direct By Mr. Pomerantz  . . . . . . . . .2259

 8    Cross By Mr. Cary . . . . . . . . . . .2303

 9                     PLAINTIFF EXHIBITS

10    Exhibit No.                           Received

11     1034, 339, 329, 800 and 802  . . . . . . .2316

12     1296    . . . . . . . . . . . . . . . . .2319

13     1263    . . . . . . . . . . . . . . . . .2322

14     211  . . . . . . . . . . . . . . . . . .2324

15     75   . . . . . . . . . . . . . . . . . .2325

16     1319    . . . . . . . . . . . . . . . . .2326

17     1258 and 1322  . . . . . . . . . . . . .2326

18     1320  . . . . . . . . . . . . . . . . . .2328

19     1315 and 1316  . . . . . . . . . . . . .2328

20     1314    . . . . . . . . . . . . . . . . .2330

21                     DEFENDANT EXHIBITS

22    Exhibit No.                           Received

23     8141  . . . . . . . . . . . . . . . . . .2329

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300