# EXHIBIT B

JCITSTA1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     STATE OF NEW YORK, *et al.*,
3
                    Plaintiffs,              New York, N.Y.
4
             v.                              19 Civ. 5434(VM)
5
     DEUTSCHE TELEKOM AG, *et al.*,
6
                    Defendants.
7    ------------------------------x

8                                            December 18, 2019
                                             8:30 a.m.
9
     Before:
10
                         HON. VICTOR MARRERO,
11
                                             District Judge
12

13
                              APPEARANCES
14

15   MUNGER, TOLLES & OLSON LLP
          Attorneys for Plaintiffs State of California
16   BY:  GLENN POMERANTZ
          KURUVILLA JOSEPH OLASA
17        KYLE W. MACH

18   STATE OF CALIFORNIA
     Department of Justice
19   Office of the Attorney General
          Attorneys for  State of California
20   BY:  PAULA L. BLIZZARD

21   STATE OF NEW YORK
     Office of the Attorney General
22        Attorneys for State of New York
     BY:  ELINOR R. HOFFMANN
23        BEAU W. BUFFIER

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

JCIPSTA2                          Ergen — Cross

1    Q.   Okay.  And if I could pull up the transcript, page 1615,

2    this is the transcript from yesterday, lines 16 through 25.

3    And the court asked you:  "There's been a lot of testimony in

4    this trial on this issue of DISH's commitments to the FCC, and

5    allegations that DISH has made commitments to the FCC which it

6    has then either backed away from or not implemented in good

7    faith.  What is behind that, and what is your answer?"

8             And you responded:  "Maybe we'll go into more detail

9    on that, but the short answer is that we've never missed a

10   final milestone commitment from the FCC for a terrestrial

11   build-out, and we've met the ones we've needed to."

12            Do you see that?

13   A.   Yes, I do.

14   Q.   So let's focus for the minute on this word "terrestrial,"

15   which you mentioned several times yesterday and was on your

16   slides.  Do you see that?

17   A.   Yes.

18   Q.   Okay.  Now, you added the word "terrestrial" repeatedly

19   because you have, in fact, missed final satellite deadlines;

20   isn't that correct?

21   A.   That's true.

22   Q.   Can I see Plaintiff's Exhibit 1303, please.

23            So this is a Memorandum and Opinion Order from the FCC

24   dated July 29th, 2010, issued by the International Bureau; do

25   you see that?

JCIPSTA2                        Ergen - Cross

1   A.   Yes.

2   Q.   And if you look at the first paragraph, in the middle, it

3   says that, the second sentence:  Applicants have an established

4   pattern of missing satellite implementation milestones as

5   defined by section 25.159(d), are prohibited by that rule from

6   filing applications for new satellites until they rebut the

7   presumption that they acquired one or more of their licenses

8   for speculative purposes.

9          Do you see that?

10  A.   Yes.

11  Q.   In an almost three-year period, from December 2006 through

12  September 2019, EchoStar did not implement five of its licensed

13  satellites.  Further, EchoStar currently has five authorized

14  but unbuilt satellites.  Under these circumstances, EchoStar

15  cannot file additional applications until it rebuts the

16  presumption that it engaged in speculative activity.

17  Because -- and EchoStar, in fact, has not rebutted the

18  presumption and it is prohibited -- I was reading the next

19  sentence above, but that's okay -- it is prohibited from filing

20  additional applications for new satellites at this time.

21         Do you see that?

22  A.   Yes.

23  Q.   And when the FCC was referring to "speculative activity,"

24  that was getting licenses or permissions from the FCC, not

25  acting on them and reselling them later; is that right?

JCIPSTA2                        Ergen - Cross

1   A.  Not exactly.

2   Q.  Would some people call it hoarding?  Is it different from

3   hoarding spectrum?

4   A.  No, it's in the -- in the satellite -- terrestrial

5   build-out, the reason we use terrestrial build-out is that the

6   terrestrial rules at the FCC are materially different than the

7   satellite rules.

8            The satellite licenses, it's based on the -- the

9   terrestrial, in auction you pay billions of dollars for the

10  right to spectrum.  In satellites, in this time frame, it's a

11  first-come, first-serve basis; so companies tend to apply for

12  licenses because it's first-come, first-serve.

13           And then you have obligations to meet, or you will

14  lose those licenses.  And that's what happened to DISH, or

15  EchoStar, which is our sister -- which is a sister company.

16  That's what happened here, which is, EchoStar applied for

17  licenses and didn't ultimately built those satellites, and so

18  they -- normally, you would just give those licenses back.  You

19  just give those licenses back, and that's generally what we did

20  here.

21  Q.  Let's look at another FCC order.  Can we turn to

22  Plaintiff's Exhibit 1305, please.  This is another order from

23  the FCC.  This one is dated another year later, July 16th,

24  2011.  And if I look at the first paragraph of this one, in the

25  middle, it says "EchoStar did not meet license conditions

JCIPSTA2                    Ergen – Cross

1   requiring it to complete its critical design review two years

2   after grant and to complete construction of the satellite

3   within four years of grant."

4           Do you see that?

5   A.  Yes.

6   Q.  Okay.  "Instead, EchoStar decided not to construct the

7   authorized new satellite, but rather, seeks to use the

8   eight-year-old, in-orbit EchoStar 8 satellite to meet the

9   milestone deadlines."

10          Do you see that?

11  A.  Yes.

12  Q.  And the FCC denied your request for a waiver of the

13  completing construction milestone, correct?

14  A.  Correct.

15  Q.  Thank you.  Let me turn to the next page, page 2, paragraph

16  4.  At the top line it says "Now, in its third milestone date

17  completing construction, EchoStar states that it has changed

18  its business plans."

19          Do you see that?

20  A.  Yes.

21  Q.  So you changed your business plans and decided, instead,

22  not to finish and meet the construction milestone, correct?

23  A.  That's correct.

24  Q.  Okay.  Now, I want to turn to some other testimony from

25  yesterday.  If I could pull up the transcript again from page

JCIPSTA2                          Ergen - Cross

1    1617, lines 18 and 19.  You were talking about companies

2    criticizing DISH, and you were referring to them -- sorry, do

3    you have it?  There you go.  Okay.

4          You were talking about -- noting again that, of

5    course, you had not, in your view, you have not missed any

6    terrestrial build-out dates or milestones, but that the FCC had

7    approved the merger.  And they approved the merger because they

8    believe it's in the public interest, and they don't believe

9    DISH is a bad company, as some people might want to whisper.

10         Do you see that?

11   A.  Yes.

12   Q.  And you were talking about companies who were whispering

13   quietly about DISH's bad behavior to the FCC; that's what you

14   thought was going on, right?

15   A.  I don't know that that's exactly right, but we're a pretty

16   small company compared to the incumbents, and they do not want

17   us in the business, just like the cable companies did not want

18   us in the television business, and so they know that we'll

19   provide real competition.

20         And one of the ways that these companies try to stop

21   you is they try to pass laws to stop you.  They try to use

22   regulatory agencies against you, and it is not beyond them, as

23   I said yesterday, to be sneaky about it.  Sometimes they

24   normally -- they may use third parties to do it.

25         It's a tough business, but the fact is, we haven't

1686

JCIPSTA2                        Ergen - Cross

1    missed a terrestrial final milestone at the FCC, that I'm aware

2    of, from a license perspective.  The fact is that in this

3    merger, the FCC found DISH to be a credible and financially and

4    savvy enough company to -- "savvy" may not be the right word,

5    but a company that can compete in this business.

6            So the good news is that some of those sneaky

7    campaigns weren't factual and didn't work.

8    Q.  Can I get Plaintiff's Exhibit 1306.  I'm not interested, at

9    the moment, in taking about sneaky campaigns.  Let's talk about

10   Chairman Pai.  This is a statement of Commissioner Ajit Pai --

11   he was a commissioner at the time; he's now the Chairman of the

12   FCC -- on abuse of the designated entity program.  And this is

13   not a whisper, is it, Mr. Ergen?

14   A.  This is a statement by the Commissioner.

15   Q.  Yes.  Now the Chairman, right?

16   A.  That's correct.

17   Q.  In fact, what he states is that this designated entity

18   program, in the second paragraph, "The discounts that were

19   received came through the FCC's designated entity program,

20   which is intended to make it easier for small businesses to

21   purchase spectrum and compete with large corporations.  DISH,

22   however, has annual revenues of almost 14 billion, a market

23   capitalization of over 32 billion and over 14 million

24   customers.  Its participation makes a mockery of the designated

25   entity program."

JCIPSTA2                         Ergen - Cross

1       Do you see that?

2   A.  Yes, I do.

3   Q.  You would agree with me that that's not a whisper by some

4   third party, right?  That is the Chairman of the FCC

5   criticizing DISH for abuse of the designated entity program,

6   correct?

7   A.  That is a statement by the then-Commissioner Pai.

8   Q.  And if you look down a little farther, in fact,

9   commissioner, then-Commissioner Pai, refers to DISH's actions

10  as shenanigans; do you see that?

11  A.  I see the word "shenanigans," yes.

12  Q.  Do you doubt that he's referring to DISH's actions with

13  respect to this designated entity program?

14  A.  He's talking about giant corporations.  I read that to --

15  giant corporations, we're probably not a giant corporation;

16  so -- but it's certainly corporations.  So I read that that

17  he's talking about several companies.  Perhaps DISH was one of

18  them.

19  Q.  All right.  Let's go back up.

20  A.  It's logical that DISH was one of them.

21  Q.  It's logical that DISH was one of them?

22  A.  When I read it, he talks about giant corporations.  The

23  Commissioner, obviously, did not like the designated entity

24  program, which was passed by Congress and the FCC, and he

25  thinks that giant corporations engaged in some kind of

JCIPSTA2                         Ergen - Cross

1  shenanigans, and perhaps it's logical, given the context that

2  DISH was one of the giant corporations he was referring to.

3  Q.  And he says:  "The American people should be outraged by

4  this.  I certainly am."  Do you think he's talking about

5  anybody other than DISH right there?

6            MR. GELFAND:  Your Honor, I object to this line of

7  questions as hearsay, it's five years old, it has no probative

8  value.  It's a different issue.  It seems to be some kind of

9  404 evidence, and I object to the line of questioning, your

10  Honor.

11            THE COURT:  Overruled.

12            MS. BLIZZARD:  Thank you, your Honor.

13            THE COURT:  I understand part of the purpose of the

14  questioning to be impeachment and not necessarily substance.

15            MS. BLIZZARD:  Thank you, your Honor.

16            THE WITNESS:  Can you repeat the question?  I'm sorry.

17  BY MS. BLIZZARD:

18  Q.  There's no question pending, Mr. Ergen.

19  A.  Okay.

20  Q.  So after DISH's shenanigans, the FCC did a thorough

21  investigation of how DISH had set up shell companies to

22  fraudulently participate in the designated entity program,

23  correct?

24  A.  That is not correct.

25            MR. GELFAND:  Your Honor, I object.

JCIPSTA2                    Ergen - Cross

1    A.   That is not correct.

2         MR. GELFAND:  If the purposes is impeachment, he did

3    not testify about this particular program.  The impeachment is,

4    apparently, of testimony about not missing terrestrial

5    deadlines.  That would be the impeachment.

6         THE COURT:  At this point, sustained.

7         MS. BLIZZARD:  Your Honor, if I may?

8         THE COURT:  Yes.

9         MS. BLIZZARD:  He did testify that the FCC thought

10   they were, quote, a good company, and I can bring that one up,

11   if you would like also, your Honor.  But that was his

12   testimony, and I think I'm entitled to bring in testimony that

13   the FCC has very serious concerns about DISH's behavior.

14        THE COURT:  Proceed.

15        MS. BLIZZARD:  Thank you, your Honor.

16   BY MS. BLIZZARD:

17   Q.   Can I bring up Plaintiff's Exhibit 1308.  So this is a

18   memorandum opinion and order from the FCC from August 2015

19   evaluating this designated entity dispute.

20        I need to see what page I need to go to.  And let me

21   actually jump to -- this is the actual memorandum and opinion

22   and order, which is very lengthy, but let me jump to the

23   statement by Chairman Pai, which would be Plaintiff's Exhibit

24   1309, because he summarizes here the findings.

25        So this is the statement of Commissioner Pai that was

JCIPSTA2                         Ergen — Cross

1   attached to that order, and he says, in the second paragraph:

2   "Having completed that investigation, my colleagues and I now

3   conclude that the two companies, Northstar Wireless and SNR

4   Wireless, are controlled by DISH and, thus, are ineligible for

5   any small business discounts.  They now owe the U.S. government

6   $3.3 billion."

7           Do you see that?

8   A.  Yes, I do.

9   Q.  And then if you go down, there's a paragraph that says,

10  here's what the FCC found, here's what the staff found.  "DISH

11  maintains an extensive level of control over SNR and Northstar,

12  thus, eliminating any possibility that they are independent

13  small businesses."

14          Do you see that?

15  A.  Yes.

16  Q.  Okay.  To begin, SNR and Northstar are deeply indebted to

17  DISH.  Combined, the two companies generated revenues of zero

18  dollars leading up to the FCC spectrum auction.  As a result of

19  their spectrum purchase, now owe DISH approximately 10

20  billion."

21          Do you see that?

22  A.  Yes.

23  Q.  Okay.  And, in fact, Chairman Pai notes in this order that

24  the behavior appeared to be bid rigging and suggested that the

25  antitrust division look into it; do you recall that?

JCIPSTA2                         Ergen - Cross

1    MR. GELFAND:  I object, your Honor.  This is getting
2  even farther afield.  This, apparently, is some kind of
3  commissioner statement that went along with an FCC decision.
4  It seems to be out of context, seems to be now drifting into a
5  different subject matter.  We've not had an opportunity to
6  question the witness about this.  I just think this is really
7  far afield from what we're talking about.
8    THE COURT:  You can question the witness on your
9  redirect.
10    MS. BLIZZARD:  Thank you, your Honor.
11  BY MS. BLIZZARD:
12  Q.  If I could now turn to Commissioner O'Reilly that was
13  attached to this and part of the same FCC order.  This is part
14  of Exhibit 1310.
15    And Commissioner O'Reilly is still a commissioner on
16  the FCC, right?
17  A.  He is.
18  Q.  And in the middle of that first paragraph, it talks
19  about -- it also describes the strategic bidding strategy
20  employed not only by the DISH designated entities, but also
21  DISH's wholly owned subsidiary, American AWS 3 Wireless; do you
22  see that?
23  A.  Yes.
24  Q.  And Commissioner O'Reilly's concern, which is down a few
25  paragraphs, is that he's not sure he agrees with the decision

JCIPSTA2                        Ergen – Cross

1  that this matter should not be referred to the Department of

2  Justice.  But in the interest of finality, he agrees.

3         Do you see that?

4  A.  Yes.

5  Q.  And he was concerned about bid rigging, was he not,

6  strategic bidding?  Strategic bidding strategy that he

7  referenced in the paragraph above?

8  A.  Was there a question?  I'm sorry.

9  Q.  We'll move on.  Let's talk a little bit about the DOJ and

10  FCC negotiations in this case, can we?

11         We talked yesterday that you negotiated with Mr. Makan

12  Delrahim, the head of the DOJ's antitrust division, correct?

13  A.  I did have several discussions with him, yes.

14  Q.  And if I could bring up Plaintiff's Exhibit 1278 and, in

15  fact, you conducted a lot of these negotiations or these

16  discussions with Mr. Delrahim by texting directly with him; is

17  that correct?

18  A.  I did engage in some texts.

19  Q.  Okay.  And for the public screen, we have blacked out the

20  phone numbers and just left the area codes, but I would think

21  on your screen, or certainly in your binder, you have the full

22  phone numbers.  So the number that begins -- that says "Charlie

23  Ergen" and "303," that's you, correct?

24  A.  Is there an exhibit?

25  Q.  Yes.  Why don't you go to 1278, that might help you, in the

JCIPSTA2                    Ergen - Cross

1    A.  Yes.

2    Q.  Okay.  You would not have been including other companies

3    that have MVNO arrangements like Comcast, Charter or TracFone,

4    correct?

5    A.  I would not have been thinking of them in that way.

6    Q.  And you don't think of them in that way because they don't

7    have facilities-based services, and they don't have owner

8    economics, correct?

9    A.  They are different from the four that you mentioned in that

10   regard.

11   Q.  So the four-to-three would be Sprint, T-Mobile, AT&T and

12   Verizon?

13           THE COURT:  Asked and answered.

14           MS. BLIZZARD:  Thank you, your Honor.

15   Q.  Do you recall that Mr. Delrahim, at one point, gave you his

16   personal e-mail address?

17   A.  He did.

18   Q.  And he sent that to you in a text message, right?

19   A.  I believe he sent me his -- I believe I asked him for his

20   e-mail address, and he gave me his Department of Justice e-mail

21   address and he gave me his personal e-mail address.

22   Q.  But my question was, that was in a text message to you,

23   right?

24   A.  I believe so.

25   Q.  And you don't have any idea why he was giving you his

1698

JCIPSTA2                      Ergen - Cross

1    personal e-mail address, do you?

2    A.  I do not.

3    Q.  In your discussions with Mr. Delrahim, did you ever have

4    the impression -- you, yourself, have the impression he was

5    trying to keep discussions off of his official DOJ e-mail

6    address?

7    A.  I did not.

8              MR. PARKER:  Objection.  That calls for speculation

9    about what Mr. Delrahim had in mind.

10             THE COURT:  Sustained.

11             MS. BLIZZARD:  Your Honor, let me rephrase the

12   question.  I'm not asking about what Mr. Delrahim had in mind.

13   I'm asking what, in his discussions, Mr. Ergen had in mind when

14   he was given the personal e-mail address.

15             MR. PARKER:  She's talking about impression.

16             THE COURT:  Sustained.

17             MR. PARKER:  Impression is another word for

18   speculation.

19             THE COURT:  Sustained.

20   BY MS. BLIZZARD:

21   Q.  So do you recall you sent a proposed remedy to Mr. Delrahim

22   on May 27th?  We looked at that e-mail yesterday.  Do you

23   recall that?

24   A.  I do.

25   Q.  Okay.  But you didn't send it to his personal e-mail, did

JCIPSTA2                        Ergen - Cross

1   you?

2   A.  I did not.

3   Q.  Now, in addition to these discussions with the Department

4   of Justice, you also needed to get DISH's FCC spectrum

5   build-out deadlines extended, correct?

6   A.  In the particular remedy, we did not need to do that

7   because we were prepared to finish our IoT network, which would

8   have met our commitment.  So we did not need to change our

9   licenses to compete.

10  Q.  You didn't need to change your licenses to complete your

11  internet of things network, that's what you're saying?

12  A.  I'm saying two things, to be clear.  One is that we didn't

13  need to change our licenses because we were down the path of

14  finishing our IoT network, and we didn't need to change our

15  licenses to compete because we had something called a

16  flexible-use license, which meant that we could do IoT, but we

17  also could do broadband with that license; so it was a very

18  flexible license.

19  Q.  But if the Department of Justice wanted you to enter

20  quickly with a consumer mobile broadband network, you could not

21  do both, that and deploy your internet of things network, in

22  time to meet your FCC deadlines, correct?

23  A.  That's not true.

24  Q.  So why did you negotiate with the FCC to extend your FCC

25  deadlines?

JCIPSTA2                          Ergen - Cross

1   A.  We were going to need -- we were interested in the

2   850 megahertz spectrum, and we were going to need FCC approval

3   for that.  And so we wanted to be -- so with the meeting with

4   the FCC, they had things that they wanted, and they wanted

5   to -- this is my recollection.

6           They wanted to make sure that a broadband network was

7   built -- they were desirous of a broadband network being built

8   as soon as possible, and were less interested in an IoT

9   network; so in that negotiation, we agreed to build a much more

10  robust network, obviously, with nine million subscribers, and

11  to forego our IoT network to build a more robust network with

12  the totality of the deal that gave us the tools to compete

13  with, day one, with the rest of the industry.  So it was a bit

14  of a negotiation, I guess, would be the answer.

15  Q.  So your testimony is that the FCC wanted you to build a

16  more robust consumer mobile broadband network faster, correct?

17  That's what they wanted, and so you had to change your

18  deadlines to meet that request, yes?

19  A.  We -- it's a little more complicated because we already had

20  deadlines.  The narrow band IoT network would have met those

21  deadlines; so we voluntarily, in the interest of getting --

22  because we thought this deal was good for our company, and we

23  thought it was good for competition, we took our deadlines and

24  made them broad -- we took the flexible-use license and made it

25  a specific license to broadband, which since we weren't

JCIPSTA2                    Ergen — Cross

1  building a broad network at the time, would require that if it

2  was a broadband license, the time would need to be extended.

3            But we didn't need to extend it if we'd have just

4  finished our IoT network.  I'm not sure I'm clear.  I hope

5  that's clear.

6  Q.  Well, I think we can at least agree you needed to -- you

7  did enter into some negotiations with the FCC to alter the

8  build-out deadlines on your spectrum licenses; can we agree on

9  that?

10  A.  We agreed to two things, one was to alter the license, and

11  then altering the license to a more narrow license for

12  broadband.  And in that, I think you're correct that in

13  narrowing to a broadband license, by definition, we had to

14  extend the deadline because the deadline was like eight months

15  away.  So you, obviously, couldn't build a broadband network in

16  eight months.

17  Q.  Okay.  You obviously couldn't build a broadband network in

18  eight months.  Okay.

19            On June 10th, which I'll represent to you is the day

20  before this lawsuit was filed, on June 10th, Mr. Delrahim asked

21  you to contact members of Congress, specifically the Senate, to

22  speak to Chairman Pai about the deal, correct?

23  A.  I think what he said -- I wouldn't say -- I think he

24  wanted -- I think he said I should talk to my -- I can't

25  remember if he said my Senate friends or Washington friends.

JCIPSTA2                          Ergen - Cross

1   Q.  Can we have Exhibit 1278 again, at page 1222, to refresh

2   your recollection about what Mr. Delrahim asked you to do.

3   "Today would be a good day to have your Senator friends contact

4   the chairman."  Do you see that?

5   A.  Yes.

6   Q.  And "the Chairman" would be Chairman Pai, correct?

7   A.  That's correct.

8   Q.  And, in fact, you reached out to Senator Gardner of

9   Colorado, correct?

10  A.  I did.

11  Q.  And you also spoke with Senate Majority Leader Mitch

12  McConnell, correct?

13  A.  I did.

14  Q.  And you asked the -- see if I can see page 23 -- sorry,

15  1278, page 23 -- Exhibit 1278, page 23.  Part of the way down,

16  you say -- that's where you confirm:  "Very good.  Talked with

17  Leader McConnell by phone as well."

18          Do you see that?

19  A.  Yes.

20  Q.  And you asked the Senators to contact Chairman Pai and say

21  that they supported DISH's efforts to negotiate with the FCC,

22  correct?

23  A.  That's not correct.  I asked Senator Gardner to contact the

24  Chairman because he knew our -- he was our state Senator from

25  Colorado.  He was our -- I'd known him for probably 15 years.

JCIPSTA2                    Ergen — Cross

1   He had been our congressional representative; so he knew our

2   company.  He knew our plans.  He'd been to our office many

3   times.  So he knew how serious we were about entering the

4   business.

5          So I asked him —— and he's also on the Senate commerce

6   committee, which has some oversight to the FCC; so he knew the

7   Chairman, and I asked him to reach out to him in that context.

8   I don't believe I asked Leader McConnell to reach out to

9   anyone.

10  Q.  So you're saying here, when you are reporting back to

11  Mr. Delrahim, this is what we have on the screen is a text

12  message, again, between you and Mr. Delrahim, correct?

13  A.  Yes.

14  Q.  And you say:  "Very good.  Talked with Leader McConnell by

15  phone as well," and you're saying you didn't talk to him about

16  the Sprint/T-Mobile merger?

17  A.  I told him that the Sprint/T-Mobile merger was going on and

18  that DISH might be involved in that in some fashion, but I did

19  not ask him —— I think your question was —— or your statement

20  was, did I ask him to reach out to the Chairman, and that is

21  not true.

22  Q.  Okay.  So when Mr. Delrahim said —— asked you to reach out

23  to your Senator friends and have your Senator friends contact

24  the chairman, Chairman Pai, you reached out to Leader

25  McConnell, but you didn't take the next step of asking him to

JCIPSTA2                        Ergen - Cross

1   contact Chairman Pai?

2   A.  I did not.  In full -- I also reached out to Senator

3   Bennet, who was the other Colorado Senator, who knows our

4   company very well, but was unable to reach him; so I didn't

5   have a conversation with him.

6   Q.  Can I have the litigation depo at page 150, lines 1 through

7   20, please.

8            And I was asking you about this series of events, and

9   actually, on line 8 I say:

10           So again, I am not asking you for why he was doing it,

11  why Mr. Delrahim was suggesting that you reach out to your

12  Senator friends, I'm asking what your understanding was of why

13  he was asking you to.

14           And your response is:  I think because we were talking

15  about 5G, pretty sophisticated technology that is not

16  necessarily well understood at this time frame, even at the FCC

17  and even by the Chairman.

18           So you believed that the FCC, at that time, didn't

19  have -- the FCC chairman did not have an understanding of the

20  5G technology; so it would be helpful for the Senators to talk

21  to him?

22           MR. PARKER:  Your Honor, I don't believe this is

23  impeachment.  I don't know why we're reading this deposition

24  here.  I object.

25           THE COURT:  Ms. Blizzard?

JCIPSTA2                        Ergen – Cross

1    A.   Okay.

2    Q.   Okay.  DISH and new T-Mobile have a seven-year agreement

3    where new T-Mobile will provide services to DISH, correct?

4    A.   That's true.

5    Q.   Okay.  And at the same time that they are proceeding under

6    this contract, you're going to be competing for wireless

7    customers, correct?

8    A.   Yes, we are.

9    Q.   And DISH will be trying to steal customers from new

10   T-Mobile, right?

11   A.   We will.

12   Q.   And I assume, based on your knowledge of the industry and

13   general business, that T-Mobile will be trying to steal

14   customers from DISH, correct?

15   A.   I believe they will.

16   Q.   Okay.  And certainly, DISH would rather that any customer

17   be a DISH customer than a new T-Mobile customer, right?

18   A.   That is correct.

19   Q.   And the opposite would be true --

20   A.   I should say, just to be clear, if they pay their bill, we

21   wish them to be a DISH customer.  If they don't pay their bill,

22   we wish them to be a T-Mobile customer.

23   Q.   Understood.  And the opposite would also be true, right,

24   that T-Mobile wants the customers that pay their bills and

25   wants the ones that don't to go to DISH, correct?

JCIPSTA2                    Ergen — Cross

1   A.  That's right.

2   Q.  Okay.  But T-Mobile will be getting some revenue from DISH

3   to support its customers under this seven-year agreement,

4   correct?

5   A.  When we use the T-Mobile network, they will receive some

6   revenue from DISH, even though that customer will be DISH's

7   customer.

8   Q.  And would you agree with me that DISH will put its

9   interests above T-Mobile and vice versa, T-Mobile will put its

10  interests above DISH's?

11  A.  I think that will generally be the case.

12  Q.  Now, despite this need to work together going forward, DISH

13  and T-Mobile have a long history, in fact, of not getting

14  along; would you agree with that?

15  A.  There have certainly been times when we did not get along.

16  Q.  And DISH has publicly accused T-Mobile of trying to stifle

17  competition, agreed?

18  A.  I think we may have said that.

19  Q.  Okay.  Would you like to see where you said it?

20  A.  Sure.  I'm here to answer any question I can for you.

21  Q.  All right.  Let's just -- very quickly, can I have

22  Plaintiff's 269?

23          Okay.  And this is an e-mail actually transmitting to

24  Matthew Pearl at the FCC from DISH employees, and it says:

25  "Please find attached for your reference an as-copy filed of

JCIPSTA2                          Ergen - Cross

1   DISH's response to T-Mobile's letter regarding DISH's build-out

2   plans."

3           Do you see that?

4   A.  I do.

5   Q.  And then if I could flip to the first page of the letter,

6   this is a letter to Donald Stockdale at the Wireless Bureau

7   responding to a letter from T-Mobile.

8           And then you say, I believe in the first paragraph,

9   the last sentence of the first paragraph:  "The T-Mobile letter

10  is a blatant attempt to stifle competition, factually

11  inaccurate, legally without merit, and should be disregarded in

12  its entirety."

13          Do you see that?

14  A.  I do.

15  Q.  And that was a true statement when you submitted it to the

16  FCC?

17  A.  I believe so.

18  Q.  Do you still feel that way about T-Mobile?

19  A.  I still feel the way about that particular document.

20  Q.  Okay.

21  A.  I mean, look, do our company -- me, personally, want to

22  compete against T-Mobile?  We can't wait, and I hope I get done

23  today because I'm going to go back and figure out ways to

24  compete with them on the plane, and I'm going to figure out in

25  the middle of the night tonight how to compete, and that's what

JCIPSTA2                         Ergen - Cross

1    we're trying to do.

2              And so does that mean we get along with T-Mobile?  No,

3    we probably don't.

4    Q.  And yet, at the same time, under the seven-year MVNO

5    agreement, you're going to have to get along with T-Mobile at

6    some level, right?

7    A.  We're going to have to make sure we're protected from any

8    mischief that they might try to cause, and I think that --

9    look, I think that's a possibility.  And I think, in this

10   particular case, the Department of Justice appointed a monitor

11   Mr. Ullyot, that we talked about yesterday, and for the sole

12   purpose of making sure that that doesn't happen.

13             THE COURT:  Let me jump in at this point on what you

14   just indicated.

15             THE WITNESS:  Sure.

16             THE COURT:  You said before that T-Mobile is going to

17   get paid for customers that use the DISH Network?

18             THE WITNESS:  Yes.

19             THE COURT:  But they're DISH's customers; so that's on

20   a plus side financially for T-Mobile.

21             Now, on the other side, are there costs that T-Mobile

22   will be incurring in carrying out its commitments to the DOJ,

23   for example, in providing a network at wholesale, below-market

24   price?

25             THE WITNESS:  So T-Mobile -- I'll make it really

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JCIPSTA2                          Ergen - Cross

1    simple.  If we charge -- T-Mobile charges us two ways.  One is

2    by the megahertz at a low rate or a bucket of unlimited plans

3    at a rate.  They will make revenue -- I'm just going to give a

4    simple example, and this by no means is -- okay.

5         But if we may pay them 50 cents of every dollar of

6    revenue we receive.  Right?  That's a made-up number, but it's

7    just to give you a ratio.  They then have costs for that 50

8    cents.  They have to maintain the network.  They have to build

9    the network.  They have to invest in the network, but if that

10   was their customer, right, they might have made 90 cents on the

11   customer.  Right?

12        So they're torn between trying to make 90 cents and

13   only maybe making 40 cents.  Right?  They'd much rather make

14   the 90 cents.  The great thing about this particular

15   transaction that the Justice Department put in place is that

16   while they may make 40 cents on that customer, when we build

17   our network, as we build our city out, and that customer is

18   solely on our network, they now make zero on that customer.

19        So when you put those factors together, that they make

20   materially less money than they otherwise would if it was their

21   customer, and then as our network is being built out and those

22   customers switch to our network and they make nothing, they are

23   not going to want DISH to have customers.  And from a practical

24   point of view, the fact that we ride on their network is not

25   really a competitive factor because they are not going to want

JCIPSTA2                         Ergen – Cross

1    DISH to get customers, but, you know, certainly, in the long

2    run, they do not.

3         THE COURT:  All right.  Are you suggesting that,

4    bottom line, that, on balance, this deal is going to cost

5    T-Mobile more than it is going to give them benefits?

6         THE WITNESS:  It will.  It will, because as we compete

7    with them and they have less customers than they otherwise

8    would have, that would be one way that will cost them, and the

9    second way it will cost them is they won't be able to raise

10   their prices as much as they otherwise might be able to.

11        So it's going to hit them in the ability to raise

12   price, and it's going to hit them in lost customers, thus, lost

13   revenue.

14        THE COURT:  Let's pursue that for a moment.  Now,

15   putting your concern aside about mischief, which the DOJ is

16   going to be monitoring, if T-Mobile decides that it's going to

17   start a war with DISH for customers, that would not be

18   mischief, that's competition.

19        THE WITNESS:  They could do that under this agreement.

20        THE COURT:  And if, looking at their bottom line, they

21   see that over the course of the next three to seven years it's

22   going to cost them tens of millions of dollars for this

23   agreement, why is there not an incentive for them to work

24   competitively within the rules to put you out of business?

25        THE WITNESS:  I think they'll try.  I think they'll

JCIPSTA2                      Ergen - Cross

1      try.

2                  THE COURT:  They will.

3                  THE WITNESS:  Look, competition is always a concern,

4      but as a company, I mean, we compete against AT&T and Verizon

5      and T-Mobile in video today, and we compete against AT&T in

6      satellite television, and so we do pretty well.  The -- the

7      point I was going to make is --

8                  THE COURT:  AT&T does not have an agreement with you

9      that is a negative for them.

10                 THE WITNESS:  Yes.  No, my point is that I do believe

11     T-Mobile will try to compete, and I think, outside of mischief,

12     they will try their darnedest to out-market us, get customers

13     and be aggressive in the marketplace.

14                 I was going to say the -- I lost my train of thought.

15     The difference is that as we get -- if they lower their price,

16     our formula -- we talked about that deflater yesterday as one

17     of the parts.  That formula, because of the buckets that are in

18     that formula, our price, if they lowered their price for their

19     popular packages, our price would go down as well.

20                 So they can't do what -- it would be difficult for

21     them to lower their price and enter a price war and eliminate

22     us as a competitor.  They would certainly have an impact on the

23     industry.  It certainly would reduce our profits as well, but

24     it wouldn't eliminate us as a competitor because there's a

25     formula that protects us.

JCIPSTA2                      Ergen - Cross

1          THE COURT:  All right.  Proceed.

2          (Continued on next page)

JCITSTA3                          Ergan – Cross

 1              THE COURT:  All right, you may proceed.

 2              MS. BLIZZARD:  Thank you, your Honor, I will try to

 3    move a little faster here.

 4    BY MS. BLIZZARD:

 5    Q.  One quick question on dynamic calling spectrum sharing,

 6    DSS.  You know what that is, right, Mr. Ergan?

 7    A.  I do.

 8    Q.  And you testified at your deposition that DISH intends to

 9    use dynamic spectrum sharing.  Do you recall that?

10    A.  I think that at the time of the deposition it was one of

11    the things -- it's one of the technologies that we're looking

12    at.  With the addition of some of the high level engineers that

13    we talked about yesterday, we are probably a little less

14    optimistic about dynamic spectrum sharing, but it's still AN

15    option for us, but we have other options.

16    Q.  I'm going to move on.  Let's talk a few more moments about

17    broken promises and some of the missed deadlines which we

18    started with.

19              MR. PARKER:  I object to that characterization.

20              THE COURT:  Sustained.  Ms. Blizzard, have we not

21    exhausted this topic already?

22              MS. BLIZZARD:  Sadly, we haven't, your Honor.

23              MR. PARKER:  For the record, I think we have, your

24    Honor.

25    BY MS. BLIZZARD:

JCITSTA3                          Ergan — Cross

1    Q.  Mr. Ergan, has a federal court ever found that you failed

2    to uphold promises that you had made to the court under penalty

3    of perjury?

4    A.  I can remember a case years ago where a judge found that I

5    personally had broken a promise.

6    Q.  And that case was *CBS Broadcasting v. EchoStar*, correct?

7    A.  It was a case with -- I remember it was in Miami, and I

8    remember it was a case against broadcasters, it might have been

9    a lot of broadcasters or might have just been CBS, I don't

10   remember.

11   Q.  And that district court found in its findings of fact that

12   you had made a formal pledge under penalty of perjury to

13   terminate certain subscribers from EchoStar services, correct?

14   A.  That's my recollection.

15   Q.  And the court found that the promise was in fact made in an

16   effort to dissuade this court from issuing a preliminary

17   injunction, correct?

18   A.  I don't remember the exact details of why they found it,

19   but they certainly felt like that I personally had broken a

20   promise.

21   Q.  And following a bench trial the court made a finding that

22   you had later elected to break a promise that you made under

23   penalty of perjury to the court, correct?

24   A.  Again, I just remember that it was a very embarrassing time

25   for me, because nobody wants a court to find that they have

JCITSTA3                          Ergan - Cross

1    found that they believe you had broken a promise.

2    Q.  More recently, in United States Bankruptcy Court here in

3    the Southern District of New York, did a court find that your

4    testimony was not credible?

5    A.  They did, but the good news is that history has proven my

6    testimony to be very, very, very credible.

7    Q.  So the courts -- the bankruptcy court at that time found

8    that your testimony concerning a certain bid as a personal

9    investment was not credible.  Do you recall that, that finding?

10   A.  My recollection was that the court found that our

11   motivation for not pursuing a particular transaction was not

12   credible because there was no interference, and I think the

13   company at that time was called LightSquared, but today called

14   Ligado, and yet here we are three years later and the NTIA, the

15   Department of Defense, the federal transportation agency have

16   said that what we said in our due diligence, that there was

17   interference, was absolutely correct, that the judge didn't

18   find it credible, but many places in the government have found

19   that our due diligence was in fact accurate.

20   Q.  But I'm not interested in the substance of LightSquared.

21   The issue is not the substance of whether your analysis is

22   right, the issue is, and what the court found was what you told

23   the court, your testimony, was not credible; not the substance,

24   but your testimony was not credible.  Do you recall that?

25   A.  Well, again, the recollection I have is the credibility was

JCITSTA3                        Ergan - Cross

1    about -- again, there was probably -- there were parts of my

2    testimony that the judge did not find credible, but that

3    sometimes happens.  I think judges have to decide which

4    witnesses are credible and which ones aren't, and in this

5    particular case the judge did make some -- I just recall made

6    some mention of my credibility.

7    Q.  Okay.  And in fact, the court found that you, Mr. Ergan,

8    failed to testify truthfully about the reasons for your, quote,

9    "no vote," and that was significant and part of a troubling

10   pattern of non-credible testimony.

11            Do you recall that?

12   A.  Again, I think what you just said is exactly what I

13   remember, which is that we had uncovered in due diligence there

14   was interference problems with the LightSquared satellites, and

15   we were the only -- of all the companies that had done due

16   diligence, our company found and therefore we were no longer

17   interested in purchasing or buying that company out of

18   bankruptcy, the judge found that wasn't credible.  Later, as we

19   sit here today, many parts of the U.S. government have found

20   our due diligence was exactly correct.  And so while I would

21   prefer that the judge didn't find our company not credible in

22   that bankruptcy trial, I'm somewhat -- I feel somewhat

23   vindicated that history has shown that we in fact were

24   credible.

25            MS. BLIZZARD:  Mr. Nikels, do we have the LightSquared

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JCITSTA3                          Ergan - Cross

1    opinion?

2    Q.  This is the opinion you were talking about?

3            Can we go on page, I believe it's 319.

4            THE COURT:  Ms. Blizzard, is there something new about

5    what you are showing?

6            MR. PARKER:  Your Honor, I don't see how this --

7            MS. BLIZZARD:  I was just trying to refresh

8    Mr. Ergan's recollection that the issue was not the substance,

9    the issue was that when what was said to the court was not --

10           THE COURT:  I think the question was asked and

11   answered, let's move on.

12           MS. BLIZZARD:  All right, your Honor.

13   BY MS. BLIZZARD:

14   Q.  Mr. Ergan, do you recall back in 2012 you were seeking to

15   acquire certain AWS spectrum, do you recall that?

16   A.  I think we first started to acquire spectrum in 2011.

17   Q.  And in 2012, in the course of an FCC proceeding, you told

18   the FCC that you planned to enter into the wireless market to

19   support American consumers if you were allowed to get the

20   spectrum.  Do you recall that?

21   A.  I have a general recollection of that.  Yes, I think that's

22   accurate.

23   Q.  And even though you told the FCC that in 2012, to this day

24   DISH has not built out a network to support mobile broadband

25   for consumers, correct?

JCITSTA3                    Ergan - Redirect

1   A.  Well, we have built --

2   Q.  Yes or no, Mr. Ergan.

3   A.  We built a network -- ask the question again, I will make

4   sure I respond to it.

5   Q.  Despite telling the FCC in 2012 that you plan to enter the

6   wireless market for American consumers for broadband, that

7   today, the end of 2019, DISH has not built a mobile broadband

8   network for consumers.  As we sit here today, that network does

9   not exist, correct?

10  A.  We have not built that network yet.

11          MS. BLIZZARD:  Thank you, no further questions, your

12  Honor.

13  REDIRECT EXAMINATION

14  BY MR. PARKER:

15  Q.  Good morning, Mr. Ergan.

16  A.  Good morning.

17  Q.  Let me go back on some of what Ms. Blizzard has talked

18  about, but first I want to give some context.  Why are you

19  agreeing to build a 5G network?

20  A.  That's what we're going to need.  We're going to need a 5G

21  network with broadband to compete against -- if this merger is

22  allowed, to compete against the three big incumbents.

23  Q.  And you're doing it in order for commercial purposes

24  because you believe it is a profitable investment, am I right?

25          MS. BLIZZARD:  Objection, leading, your Honor.