# EXHIBIT D

319

JCAVSTA5                        Langheim - direct

1    A.   Correct.

2    Q.   Let's turn, please, to page 3 of that document.  And here

3    is an email from Mr. Boorman.  Is Mr. Boorman also a member of

4    your team?

5    A.   Yes, he is.

6    Q.   And he starts his email by saying:  We just texting you

7    after a call with Peter and Braxton.  Do you see that?

8    A.   Yeah.

9    Q.   And did you understand that Peter and Braxton to refer to

10   Peter Ewens and Braxton Carter, two executives at T-Mobile?

11   A.   Yes.

12   Q.   Did you understand Mr. Boorman to be relaying the

13   conclusions that he received from the T-Mobile executive team?

14   A.   Yeah.

15   Q.   Do you see the paragraph that begins with "Also"?

16   A.   Yeah.

17   Q.   Mr. Boorman reported:  Also, they very skeptical that much

18   network would be built, as it takes so long and needs billions.

19   Right?

20   A.   Correct.

21   Q.   And so you understood at that time that's the view of

22   Mr. Boorman and of the T-Mobile executive team; correct?

23   A.   Correct.  Yes.

24   Q.   Let's please turn to Exhibit 402.

25   A.   Mr. Mach, may I highlight one sentence which is very

320

JCAVSTA5                    Langheim - direct

1   important in this context on this exhibit?

2           The granularity of the buildout.  Because it's very

3   important to understand this is June; this is before we got the

4   final remedies with the DOJ that we negotiated in August on the

5   table.  There's a very important sentence in there, which is:

6   The way cherry-picking -- meaning building your network in top

7   25 markets, for example, or starting in New York City -- is via

8   limiting granularity.  You can't bid just Manhattan; you would

9   have to bid New York City metro area.

10          It was a problem until June.  Before then, the roaming

11  agreement and the MVNO was amended.

12  Q.  Thank you, sir.

13          So we'll look at some of the other reasons that your

14  team offered for the views that they shared.

15  A.  Yeah.

16  Q.  Let's move on to Exhibit 402 please.  I'm sorry, that is --

17  yes, Exhibit 402.

18          Here we have another email from Mr. Pohlmann, right,

19  sir?

20  A.  Yes.

21  Q.  And Mr. Pohlmann is reporting another conversation with

22  Mr. Carter and Mr. Ewens of T-Mobile, right?

23  A.  Yeah.

24  Q.  And Mr. Pohlmann told you --

25          MR. MACH:  A little further down, Mr. Nichols, where

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

321

JCAVSTA5                         Langheim - direct

1    it says "First and foremost."  Thank you.

2    Q.  Mr. Pohlmann told you --

3              MR. MACH:  Right below that, Phil.

4    Q.  Charlie has no real team to run a wireless business of

5    substance, and so far did not appear with any partners,

6    financial sponsors, etc.  That is not to say there won't be

7    any.  Right?

8    A.  Yeah.

9    Q.  And then below that, Mr. Pohlmann told you that Charlie

10   appears to be interested to solve his FCC milestones.  Spectrum

11   at a discount is worth having, but he did not seem to be too

12   intrigued on Boost, right?

13   A.  That's Mr. Pohlmann's view, yes.

14   Q.  What did you understand Mr. Pohlmann's view to be there?

15   A.  What you are saying all along, which is that a network

16   build of DISH is unlikely.

17   Q.  And where it said impact to Newco, do you see that, sir?

18   A.  Yeah.

19   Q.  And at the bottom where it says "impact to Newco," there's

20   a bullet that says:  All in all, they put less weight on any

21   significant network build over the next ten years and

22   respective second order effects.  Do you see that?

23   A.  Yes.

24   Q.  And again, your understanding, that he is relaying --

25   relaying his conversation with the T-Mobile team, right?

322

JCAVSTA5                        Langheim — direct

1    A.  Yes.

2    Q.  And you understood him to be saying that according to the

3    T-Mobile team, it was not likely to be a significant network

4    build by DISH over the next ten years, right?

5    A.  I was pushing the team's many times in that time period of

6    coming to a conclusion, because I was worried, that's the

7    reason why we have done the work.

8             And please consider this is June.  This is not August.

9    A lot of things have changed fundamentally.

10            But it's fair what you are saying, that the conclusion

11   of the team is what they are -- what they are writing here on

12   the letter.

13   Q.  Thank you.

14            And he then makes this reference to second order

15   effects.  Do you see that?

16   A.  Yes.

17   Q.  And did you understand that to be a reference to pricing

18   effects against T-Mobile?

19   A.  Yes, that's -- that's the thing that worries me the most.

20   It means that the second order price impact is that we

21   believe -- I believe, I strongly believe, by building out that

22   network, in combination with the MVNO agreement, prices will

23   fall even beyond what we have forecasted ourselves in the S-4

24   filing.  That's a second order impact.

25            It's not only that you offload customers from the MVNO

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

323

JCAVSTA5                    Langheim – direct

1   to your own network, then we lose obviously revenues, but it's

2   also the impact that if you have a new network, you want to

3   just get customers on.  How do you get customers on?  You lower

4   price, and then the prices are coming down in the market.

5   That's the second order impact.

6   Q.  Right.

7           So the concern that is being discussed here when it

8   talks about second order effects is the concern that DISH will

9   be a price competitor that pulls prices down, right?

10  A.  Yes.

11  Q.  And the report here is that neither this member of your

12  team nor the T-Mobile team believed at that time that that

13  would occur?

14  A.  In June, correct, yes.

15  Q.  Now, you've mentioned the commitments that were made to the

16  DOJ a couple of times.

17  A.  Yeah.

18  Q.  So let me touch on this a little bit with this document and

19  the one we just looked at.

20          So the commitments to the DOJ didn't give DISH any

21  additional partners to build its network, right?

22  A.  What do you mean which partners?  Money -- strategic

23  partners or --

24  Q.  Sure.  So it says:  Charlie has no real team to run a

25  wireless business of substance, and so far did not appear with

324

JCAVSTA5                    Langheim - direct

1    any partners, financial sponsors, etc.  Do you see that?

2    A.  Yes.  Correct.

3    Q.  So the deal with the DOJ didn't give Charlie a team to run

4    a wireless business of substance, did it?

5    A.  This is Philipp Pohlmann, a 38-year old MNA process

6    execution person, not a strategic head of strategy.  He's

7    writing this.

8         My personal experience on this one is different.  You

9    can hire a team.  DISH is in the business of talking to

10   consumers, having subscription business.  So I don't -- I

11   disagree with this.  That there are no team in the world that

12   is building this network out, I think we will see otherwise.

13   Q.  I understand that you're saying that you disagree with

14   Mr. --

15   A.  I just -- exactly.  I disagree with this particular line

16   here.

17   Q.  But you would agree that the concern that Mr. Pohlmann is

18   raising is not solved by the DOJ commitments; correct?  It

19   doesn't do anything to give Charlie a team?

20   A.  Yeah, that's fair.

21   Q.  And if you look back, please, to the document we just

22   looked at, which was Exhibit 401.

23   A.  Yeah.

24        MR. MACH:  And on page 3 of 401, Mr. Nichols, if you

25   could go there.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JCAVSTA5                    Langheim - direct

1   Q.  So Mr. Boorman, when he said he was skeptical that much

2   network would be built, he said:  They very skeptical that much

3   network would be built, referring to the T-Mobile team, right?

4   A.  Yes.

5   Q.  As it takes so long and needs billions, right?

6   A.  Correct.

7   Q.  So the commitments to the FTC didn't -- I'm sorry, the

8   commitments to the DOJ didn't change how long it takes to build

9   a wireless network, did it?

10  A.  It changed one very important thing:  That DISH can now

11  build out city by city.  So you start in New York, service the

12  customers in New York, and you don't worry that your customer

13  that is traveling to Florida on holiday, the phone is not

14  working.  So the national roaming, the link between the MVNO

15  and the network buildout is a real game-changer.  The DOJ has

16  been very smart on this.  That's the reason why he now doesn't

17  have to start from scratch, build a network countrywide.

18          I'm sorry.

19  Q.  You're talking about the possibility that he builds one

20  city or another city or a third city?

21  A.  Yes.  Exactly.

22  Q.  But in terms of what it would cost and how long it would

23  take to build out a nationwide network, that is not changed by

24  the DOJ commitments, is it?

25  A.  Yeah, but it helps him -- without these -- these remedies

326

JCAVSTA5                          Langheim – direct

1    on the table, doing it standalone, without offering a customer

2    from day one, coverage on the whole of the United States, that

3    may be a very tough undertaking.  So this is -- this is the

4    real game-changer.

5         Second, it will cost billions.  But it will cost much

6    less to build a 5G network only, which was building out a 2G,

7    3G, 4G, 5G network.  So, yes, of course, it will still cost

8    billions.  You have to ask him, but eight to ten billions is a

9    number that I've seen in the press.  But it's very worthwhile

10   now doing it, very worthwhile economically to do that, because

11   he has this MVNO at record low prices with us and a roaming

12   agreement between these two agreements that he has the network

13   and the -- and the MVNO, that makes it economically so

14   attractive for him.

15   Q.  Let's go to Exhibit 346 please.

16        Exhibit 346 is an email from Mr. Pohlmann that

17   attaches the impact analysis that your team prepared in

18   response to your request, right?

19   A.  Yes.

20   Q.  And the result of your team's impact analysis at that time

21   was that DISH was not likely to build its own wireless network,

22   as you said, right?

23   A.  I don't see the full document, but I trust you're right on

24   this.

25   Q.  It should be in your binder, if you need it, just to be

327

JCAVSTA5                         Langheim - direct

1    clear.

2            Let's go to page 3 of Exhibit 346.

3    A.  Yeah.

4    Q.  And you see here it's the executive summary and key

5    conclusions?

6    A.  Yeah.

7    Q.  And where it says larger network buildouts beyond 50

8    percent rather destroy NPV, what does that mean?

9    A.  It would mean that if DISH would build out more than 50

10   percent of the United States, it may have a negative NPV.

11   Q.  "NPV" means?

12   A.  It's --

13   Q.  Net present value?

14   A.  -- net present value of this network.  But you always have

15   to see this company is a package.  So you can't afford a

16   negative NPV on a network buildout if you -- if you safeguard

17   something else which is very important for your company, has a

18   lot of value, which is $21 billion of spectrum that he has

19   invested.

20           And even if he loses some money on a network build,

21   but safeguards 21 billion of market cap, which is a spectrum

22   that he has acquired by this agreement, then fulfilling his

23   promises *vis-à-vis* the FCC, this still could be economically

24   something that may be attractive.

25   Q.  Let's take a look in a little bit more detail about what

328

JCAVSTA5                    Langheim - direct

1    your team said here.  The bullet point below that, it starts

2    with:  Unless he MVNO taker -- I assume it's probably "the MVNO

3    taker."

4    A.  Yeah.

5            MR. MACH:  Phil, could you highlight that, down to the

6    next line as well please.  Thank you.

7    Q.  The consensus of your team was that unless the MVNO taker

8    finds a significant lever to improve network economics, the

9    outside end view doesn't provide a lot of rationale for

10   substantial buildout, right?

11   A.  Yes.

12   Q.  And then this slide specifically discusses the possibility

13   that DISH would be the MVNO taker, as it's referred to here,

14   right?

15   A.  Yes.

16   Q.  And down below where it says:  Charlie has significant

17   current spectrum position valued at 20 billion.

18   A.  Yes.

19   Q.  Do you see that?

20   A.  Yeah.

21   Q.  Your team concluded that an organic business case would

22   need to match that based on assumptions in this document that

23   would not be justified.  Do you see that?

24   A.  Yeah.

25   Q.  And your team -- if you turn to the next page, sir --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

329

JCAVSTA5                        Langheim - direct

1  analyzed three different possible scenarios of what DISH would

2  do.

3  A.  Yeah.

4  Q.  Right?  One called Charlie doesn't do much, right?  That's

5  where DISH doesn't build much of a network, right?

6  A.  Yeah.

7  Q.  One called the central case?

8  A.  Yes.

9  Q.  And one called the poor case?

10  A.  Yes.

11  Q.  And the poor case was called the poor case because that

12  would be a poor result for DT; is that correct?

13  A.  Yes.

14  Q.  And the poor case scenario that's discussed is one where

15  DISH builds a network that would cover 80 percent of the U.S.

16  population in ten years, right?

17  A.  Yeah.

18  Q.  And your team concluded at the very bottom of this slide,

19  where it says MVNO NPV?

20  A.  Yeah.

21  Q.  MVNO NPV two billion, largely because four million subs

22  does not justify the CAPEX for network.  We think this case is

23  very unlikely.  Buildout not realistic; funding, negative NPV.

24  Right?

25  A.  Yeah.

330

JCAVSTA5                    Langheim - direct

1   Q.  Now, you mentioned a minute ago the DOJ commitments, we

2   talked about that?

3   A.  Yeah.

4   Q.  Now, when it says buildout not realistic, the DOJ

5   commitments, again, don't change its need to actually

6   physically build its network, right?

7   A.  That is true.  But it changed the economic incentive.  This

8   is an analysis based on June.  The analysis based in August

9   would look differently; and you know that because you've seen

10  my files.  We come to different conclusions later on,

11  reflecting on the remedies that he has achieved with the

12  regulator.

13  Q.  Well, you're referring to the possibility that Mr. Ergen

14  can lose his spectrum if he doesn't meet -- strike that.

15          I'm sorry.

16          You're referring to the possibility that DISH could

17  lose its spectrum if it doesn't meet its buildout commitments,

18  is that what you're referring to?

19  A.  He may not -- how we say.  DISH may not lose its spectrum,

20  but its market capitalization may come down over time because

21  investors are getting worried that sitting on all the spectrum,

22  not building it out, what's the case.  That is actually what is

23  happening over the last three to four years to DISH, market cap

24  come down, investors are worried.

25          So some stage, I know neglect that this is all history

331

JCAVSTA5                    Langheim - direct

1    for a second, at some stage it may very well make sense

2    economically to do something if you, at the same time, de-risk

3    the 21 billion of spectrum value that you have.  That's all I'm

4    saying.

5    Q.  I'm sorry, I didn't understand that.

6            You're saying that if it weren't for the fact that the

7    spectrum is at risk, in your view, because of commitments to

8    the FCC, then you would agree that he's probably not going to

9    build the network?

10   A.  I apologize, Mr. Mach, I'm not clear.

11           First of all, this is all history.  This is no longer

12   the case today.  But I will answer your question in any case.

13           They may have, in my view, in my view, even the

14   possibility that despite building out a network may lose you

15   money, you may still want to do it, because the 21 billion

16   spectrum value may be at risk.  Because at some stage you have

17   to build it out, would the regulator allow that.  This spectrum

18   is being sold to Verizon, to one of the bigger guys, saying,

19   What's happening to Sprint and T-Mobile.  Haven't this company

20   promised to build it out.

21           So at some stage you may even take an economic bad

22   decision, losing two billion, in order to safeguard the 21

23   billion that is at risk here.  That's all I'm saying.

24   Q.  Right.  Just to be clear, the 20 billion you're talking

25   about is the spectrum, right?

332

JCAVSTA5                          Langheim - direct

1    A.  Yes.

2    Q.  So you're saying the risk that the FCC would take the

3    spectrum away changes the calculation in your view?

4    A.  Yeah.

5    Q.  Okay.  Let's turn please to Exhibit 347.

6          Now, here we're to June 10th, 2019.  And your team is

7    still discussing the possibility of DISH building a network,

8    right?

9    A.  Yes.

10   Q.  And here you have another email from Mr. Boorman, right?

11   A.  Yeah.

12   Q.  And at the bottom of the first page there is -- there are

13   some conclusions about your analysis from Mr. Boorman, right?

14   A.  Yeah.

15   Q.  And Mr. Boorman said:  We have to make a basic assumption.

16   If we believe the FCC will waive/flex existing buildout

17   commitments if DISH builds under the remedy, then negative NPVs

18   are okay, as long as they save the 20 billion spectrum value,

19   right?

20   A.  Yes.

21   Q.  And that's what we were just discussing.

22   A.  Yes.

23   Q.  Mr. Boorman then went on to say:  My read is this won't

24   work.  Maybe they flex a bit, but if the FCC gives in, everyone

25   else sues.  So I'm happy to consider the MVNO as a game he can

333

JCAVSTA5                    Langheim - direct

1    play; but it's economically illiterate to argue he actually

2    builds it, therefore 70 percent is not relevant.

3            Do you see that, sir?

4    A.  Yes, I see.

5    Q.  Mr. Boorman continues and says:  In the end, DISH might

6    build something the lawyers can use, but not something

7    customers can use.  But if I'm wrong about this, 20 percent is

8    a reasonably cautious approach.  Do you see that?

9    A.  Yeah.

10           Mr. Mach, we are discussing now for ten minutes stuff

11   that happened in June that has been overruled by the DOJ

12   remedies.  We can dwell on this for hours.  I don't deny that

13   my team was skeptical about a buildout without the MVNO

14   agreement that we finally signed without the national roaming

15   and without obviously having a gun to DISH's head of building

16   it out no matter what.

17   Q.  Mercifully, we won't dwell on it for ten more hours.

18   A.  Okay.  Sorry.

19   Q.  We will, however, look at one more document, okay?

20   A.  Please.

21   Q.  Could you please turn with me to Exhibit 405.  And do you

22   recognize Exhibit 405 as another compilation of your notes that

23   you created in your role at DT?

24   A.  Yeah.

25   Q.  A few pages in on page 17, you pasted in an analysis that

334

JCAVSTA5                    Langheim - direct

1   was created by your colleague Mr. Boorman, right?

2   A.   I do have here in front of me an email, your impact

3   analysis, yeah, it says on my note files.

4   Q.   I'm sorry, sir, I can't hear you.

5   A.   I'm lost.  I just grabbed the binder.  What document are

6   you referring to?  Sorry about this.

7   Q.   So we are on Exhibit 405.

8   A.   Yeah, 405.  I have it.

9   Q.   And here you have Mr. Boorman sending you an analysis

10  concerning the possibility that DISH would build again, right?

11  A.   So what page are you on?

12  Q.   Sure.  I'm on page 17.

13  A.   17.

14  Q.   Thanks for your patience.

15  A.   So it's an email from Joe, 10th of June.

16          Okay.  I have it in front of me.

17  Q.   Here you have -- it says:  Joe impact analysis, because it

18  was analysis by Mr. Boorman, right?

19  A.   Yes.

20  Q.   On page 17.

21          And at the top it says:  So DISH has to build, but the

22  business case, our negative case, is just not credible, right?

23  A.   Sorry.  I'm too slow now.  Yeah, I see that here.

24  Q.   And in that first paragraph he gives an explanation for why

25  the business case, the negative case, is not credible, right?

335

JCAVSTA5                    Langheim - direct

1    A.  Yeah.

2    Q.  He says:  I think these assumptions are just too

3    optimistic.  As 5G arms race continues crews are scarce, U.S.

4    zoning is painful and slow.

5    A.  Yeah.

6    Q.  He goes on to talk about the capital expenditures of

7    T-Mobile, Verizon, and AT&T.  Do you see that?

8    A.  Yes.

9    Q.  And then he says:  Even assuming the assumptions are right,

10   DISH burns 15 billion over ten years, and they have horribly

11   negative terminal value.  You need tens of billions of subs to

12   justify it.  Do you see that?

13   A.  Yes.

14   Q.  And then he concludes:  A big bill just isn't going to

15   happen.  Right?

16   A.  Correct.  In June.

17   Q.  Right.  So he gives some reasons here, right?  He says, for

18   example:  U.S. zoning is painful and slow.

19   A.  Yes.

20   Q.  DOJ commitments don't change the nature of zoning for

21   building a tower or other facilities, right?

22   A.  But you can start in Manhattan and don't have to start

23   nationwide; so you do it then over seven years.  We have an

24   MVNO agreement that is covering you for seven years.  So you

25   can do it city by city, which before the full remedy package

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

336

JCAVSTA5                     Langheim - direct

1   wasn't available to DISH, that's the reason why they have
2   struggled for the last five years to find a way to build a
3   network.
4   Q.  You can do it maybe city by city, but you'd still have to
5   resolve zoning in each of those places, right?
6   A.  It's different when you want to do this for 350 million
7   pops or just for 10 million customers in New York.  So you
8   start with one and the focus is on that, yeah.
9   Q.  Right.  Needless to say, a network that covered 10 million
10  pops would be far short of a nationwide network, right?
11  A.  Yes.  Yes.
12  Q.  He also mentions:  As 5G arms race continues, crews are
13  scarce.  Right?
14  A.  Crews?
15  Q.  Crews are scarce.  That's in his analysis, right?
16  A.  Can you highlight it for me?  Crews are scarce.  Yes.
17  Sorry.  Yes.
18  Q.  And that is not a problem that is solved by any DOJ
19  commitment, right?
20  A.  Correct.
21  Q.  And your team actually gave other reasons that aren't
22  resolved by the DOJ commitments, right?
23  A.  Yes.
24  Q.  Let's go to 403.  I think this will be the last document we
25  look at on this topic.

337

JCAVSTA5                    Langheim - direct

1           Here we have an email from Mr. Pohlmann to you and
2      other members of your team, right?
3      A.  Yes.
4      Q.  The headings are a little bit confusing, because it goes A,
5      A, C, A.  But I want to ask you what occurs below the last A in
6      the middle of the -- below knock-on effects, the last A.
7           MR. MACH:  And let's capture the next two bullet
8      points as well there, Phil.
9      Q.  And do you see Mr. Pohlmann says knock-on effects into the
10     market?
11     A.  Yes.
12     Q.  And again, you recognize this as asking the question of
13     whether DISH is going to have the potential to competitively
14     price its product compared to T-Mobile, right?
15     A.  Yes.
16     Q.  And again, he says:  You can guess what the U.S. team's
17     answer to all of the above is directionally, right?
18     A.  Yes.
19     Q.  I'm sorry.  Skip the point here.
20          The first A, the question is:  How significant of a
21     network will the buyer set up in seven years, right?
22     A.  Yeah.
23     Q.  You see that, sir?
24     A.  Yes, I see that.
25     Q.  I'm sorry.  I skipped over that.

338

JCAVSTA5                    Langheim - direct

1          So then the U.S. team, it's the second bullet, says:

2    Most importantly, they have little confidence that Charlie or

3    any other buyer will have ability and incentive to build a

4    meaningful fourth network, right?  That's what they reported?

5    A.  Yes.

6    Q.  And then they included arguments here.  They say:  The key

7    arguments are capital intensity, complexity, time, and team

8    requirements, as well as MVNO mechanics.  Right?

9    A.  Yes.

10   Q.  And then there's this parenthetical, minimum buildout areas

11   are New York rather than a block of Manhattan.  Right?

12   A.  Yes.

13   Q.  And that's what you're referring to about the change with

14   the DOJ commitments, there could be more cherry-picking?

15   A.  Cherry-picking is possible, yes.

16   Q.  And that could solve the MVNO mechanics issue that is

17   listed here in Mr. Pohlmann's email is what you're saying,

18   right?

19   A.  Can you rephrase that question?

20   Q.  Sure.  So Mr. Pohlmann's email says:  Key arguments are

21   capital intensity, complexity, time, and team requirements, as

22   well as MVNO mechanics.  Right?

23   A.  Yeah.

24   Q.  And the last one, MVNO mechanics, I think your point is,

25   could be addressed by the changes that you're referring to.

339

JCAVSTA5                          Langheim - direct

1   Right?

2   A.   Now I see where you're going.  Yes.

3   Q.   Okay.  But the FCC agreement doesn't change the time and

4   team requirements, for example, the other key points there.

5   A.   I think smart people will figure out that this remedy is

6   very attractive, and DISH will be a very valuable company a few

7   years down the road.  This will entice enough smart guns to

8   join this company.

9        I think it's always tough to join something if you

10  have doubts.  But I believe that this is not about -- my

11  personal view.  Capital intensity, we always have discussions

12  about it.  If you want to have my view, I think to build out a

13  5G network only may cost you about 8 to $10 billion, but you

14  have to ask that question Mr. Ergen and DISH.

15       You have much more conviction of doing this if you

16  know what kind of remedy you have at the end.  And this remedy

17  from a shareholder perspective on the team U.S. side is

18  terrible.  So it means it's very attractive for DISH.  And

19  therefore, you will find financing partners, you will find

20  people that are attractive to this.  So a lot of change after

21  June.  We will solve some of these questions that have been

22  raised many times before by parties.

23  Q.   Sir, let's just hone in on one more question.

24       The DOJ commitments don't change, just to use a

25  specific example, the team requirement, right?  The team that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

340

JCAVSTA5                         Langheim - direct

1   DISH needs does not change --

2   A.  I think it's much more attractive for people to join, so I

3   think that changed.  If you have a winning proposition, you

4   will find people.  You will find capital for doing it.  I think

5   this is the thing that has changed.

6   Q.  Now, has your team considered the possibility that what

7   DISH is actually doing is just trying to get time to hold on to

8   its spectrum without actually building the network?

9   A.  I've heard that argument before June or at the beginning of

10  the year or last year, yes, I did.

11  Q.  And actually, if you see here, the next bullet point below

12  where we've highlighted, your team concluded that Charlie is

13  mostly interested in resolving his milestone issue, gain two to

14  three years, keep his status as a poker player, and be a seller

15  when spectrum becomes scarce, right?  That was the team's

16  conclusion at the time?

17  A.  The team's conclusion, but not mine.  I would disagree with

18  that.

19  Q.  But now DISH has made promises that it will build its

20  network that didn't exist before, right?

21  A.  Yes.

22  Q.  But you know, sir, don't you, that DISH has a history of

23  broken promises in the industry?

24  A.  Well, if you read the press, some people complaining about

25  this.  And I think I have also been complaining about this,

JCAVSTA5                      Langheim - direct

1    that this spectrum that DISH has, the wonderful 100 megahertz,

2    is not coming to play.  These are tools that we would have

3    loved to get our hands on.

4    Q.  Sir, if you could focus on my question.  My question is

5    just whether you agree that DISH has a history of broken

6    promises in the industry?

7    A.  Personally, we've never had any broken promises with DISH,

8    number one.  Number two, I have read the press, yes, and it

9    looks like that DISH is a tough negotiator, and some people

10   claim that this company has broken promises.

11            MR. MACH:  Mr. Nichols, could you please bring up

12   Exhibit 376.

13   Q.  This is a text message thread between you and Mr. Legere,

14   right?

15   A.  Yes.

16   Q.  I'm sorry it's so difficult to read.  It's how it was

17   produced.

18   A.  I think I now need to grab the -- what was this exhibit?

19   Q.  376.

20            And at the bottom of the first page of exhibit 376,

21   there's a text message from you to Mr. Höttges and Mr. Legere.

22   Do you see that?

23   A.  Yes.

24   Q.  And you write:  I understand your frustration, and I do

25   understand PAI's view.  DISH has a history of lawsuits with

342

JCAVSTA5                          Langheim – direct

1    many different parties and broken promises.  You have been a

2    counterpart to PAI with a reliable buildup commitment.

3              Do you see that, sir?

4    A.  Yes.

5    Q.  So does that refresh your recollection --

6    A.  Doesn't it states in the view of many?

7    Q.  Okay.  That's fair.  It was not your view?

8    A.  I do what everybody is doing, reading the press and

9    concluding that this is -- I was always frustrated about the

10   following, Mr. Mach, which is, we needed tools, we needed

11   spectrum.  There were 100 megahertz of spectrum.  So I, of

12   course, complained a little bit about it.  Do I know what the

13   agreement of DISH is with the FCC and whether there are any

14   broken promises?  I don't really know, and I should not judged

15   it.  If I have done so, then this was wrong.

16   Q.  Let's turn to Exhibit 1177.

17             MR. PARKER:  What was the number?

18             MR. MACH:  1177, counsel.

19   Q.  You have 1177 in front of you, sir?

20   A.  Now I have it, yes.

21   Q.  I will represent to you this is a document that the

22   plaintiff states retrieved from the FCC's public website.

23             And if you turn to page 7 of the document.

24   A.  Page 7, yes.

25   Q.  You can see that this is a letter signed by an attorney for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300