# EXHIBIT F

JCBTSTA1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     STATE OF NEW YORK, et al.,
 3
                    Plaintiffs,              New York, N.Y.
 4
              v.                             19 Civ. 5434(VM)
 5
     DEUTSCHE TELEKOM AG, et al.,
 6
                    Defendants.
 7   ------------------------------x
```

```
 8                                           December 11, 2019
                                             9:00 a.m.
 9
     Before:
10
                         HON. VICTOR MARRERO,
11
                                             District Judge
12
```

```
13                         APPEARANCES

14

15   MUNGER, TOLLES & OLSON LLP
          Attorneys for Plaintiffs State of California
16   BY:  GLENN POMERANTZ
          KURUVILLA JOSEPH OLASA
17        KYLE W. MACH

18   STATE OF CALIFORNIA
     Department of Justice
19   Office of the Attorney General
          Attorneys for  State of California
20   BY:  PAULA L. BLIZZARD

21   STATE OF NEW YORK
     Office of the Attorney General
22        Attorneys for State of New York
     BY:  ELINOR R. HOFFMANN
23        JEREMY KASHA
          BEAU W. BUFFIER
24

25
```

1              THE COURT:  Yes, you may.

2              The clerk will swear in the witness.

3    CARL SHAPIRO,

4         called as a witness by the Plaintiffs,

5         having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. POMERANTZ:

8              THE COURT:  State your name and spell it for the

9    record.

10             THE WITNESS:  Carl Shapiro, Carl with a C,

11   S-H-A-P-I-R-O.

12             THE COURT:  Before Mr. Pomerantz starts, let me just

13   indicate that we are taking this case in a different protocol

14   than you may have been familiar with when you testified as an

15   expert, and the parties essentially laid a foundation for your

16   expertise to testify to the subject.  If there is no objection

17   to Professor Shapiro testifying on this subject, the Court will

18   admit you and allow you to testify as an expert without going

19   into the details of your 20 pages of CV, which will save us a

20   lot of time.  I have read the 20 pages and I am sufficiently

21   impressed and we'll accept that you're an expert in this area

22   and allow you to testify in that context.

23             Yes?

24             MR. CARY:  Your Honor, we have no objection.

25             THE COURT:  Okay.

JCBTSTA5                      Shapiro - Direct

1           MR. POMERANTZ:  So will offer into evidence the CV at

2      the end of the examination, your Honor.

3           THE COURT:  All right.

4      BY MR. POMERANTZ:

5      Q.  So Professor Shapiro, good afternoon.

6           In preparing for your testimony today, did you create

7      some slides to help describe your opinions to the Court?

8      A.  Yes, I did.

9      Q.  So I'm going to control the clicker, but you tell me if you

10     need me to move back or forward as we move along.

11          Let's go to the first slide here.  What was your

12     assignment in this case?

13     A.  Well, as indicated here, the first part was to identify the

14     relevant market or markets in which to analyze this proposed

15     merger, then measure market shares and concentration in those

16     markets, and how the merger would affect concentration, and

17     then go on and analyze the likely competitive effects of the

18     proposed merger in those markets.

19     Q.  We'll spend quite a of time going through your conclusions

20     in detail, but what is the bottom line conclusion on the likely

21     competitive effects of this proposed merger?

22     A.  As indicated here, I believe that it is likely -- the

23     merger is likely to substantially lessen competition and harm

24     consumers in the market for retail mobile wireless

25     telecommunications services -- and this would be both in the

United States as a whole and in a number of local markets

within the United States -- unless the merger would generate

substantial cognizable efficiencies.

Q.  We'll spend the next hour or so, maybe two, going through

the basis of that conclusion, but based on that conclusion,

what does that mean to consumers?

A.  So your Honor, this slide depicts some calculations I have

done to show the type of harm or the magnitude of harm, I

should say, that consumers could suffer as a result of price

increases following the merger and caused by the merger.

        The upper panel, as you see in the heading there, if

the new T-Mobile, Verizon and AT&T together coordinate and

simply avoid price declines, so if prices stabilize rather than

decline for the next year, that would itself, if that is the

impact, then annual consumer harm resulting from that in one

year, annual, would be $8.7 billion.  That is calculated off a

revenue base for those three firms in this market nationally of

138 billion.  So that's one mode of analysis, the coordinated

effects mode that we'll be talking about, or coordinated

effects as a type of specious of effect from the merger.

        The second panel relates to unilateral price

increases, so this doesn't involve AT&T and Verizon raising

price, or stabilizing price, I should say, this is simply if

the new T-Mobile sets higher prices themselves as a result of

the merger, in that case we have a smaller revenue base, about

1    42.8 billion as shown here annual revenue base, but I

2    calculated a larger percentage increase, for reasons we'll get

3    into, and so the harm calculated with that method is $4.6

4    billion a year.

5    Q.  All right.  So we'll go now through this in detail, but at

6    a high level, what analysis did you perform to reach the

7    conclusions that you just described?

8    A.  I followed what I would call the standard techniques and

9    methods that antitrust economists use to analyze horizontal

10   mergers.  And these are I think laid out in the horizontal

11   merger guidelines from the Justice Department and the Federal

12   Trade Commission, and that's the framework which is the

13   standard framework that antitrust economists use, and that's

14   what I did here.

15   Q.  I want to be careful here and make sure we always define

16   terms.  You used the term "horizontal merger."  There's also a

17   "vertical merger," correct?

18   A.  Indeed.

19   Q.  And this is a horizontal merger that we're evaluating here,

20   correct?

21   A.  Yes, that simply means that the merging parties are

22   competitors.

23   Q.  They're in the same level of the market?

24   A.  They're in the same market.

25   Q.  So what are the horizontal merger guidelines?

JCBTSTA5                          Shapiro - Direct

1    A.  So these are guidelines issued by the two federal antitrust

2    enforcement agencies, updated now and again, that describe for

3    the business community and for the courts how they analyze

4    horizontal mergers, typically as part of the Hart-Scott-Rodino

5    review process by which these agencies review proposed mergers.

6    Q.  All right.  And the slide that we have on the screen here

7    has a date at the bottom of August 19, 2010.  Is that the most

8    recent revision to the horizontal merger guidelines?

9    A.  Yes, it is.

10   Q.  Did you have any role in that revision process?

11   A.  Yes.  This is during the time when I served as the chief

12   economist at the Justice Department, and I look a lead on the

13   DOJ side in organizing efforts to do the updating for these

14   guidelines.  There was a comparable team -- large teams on both

15   sides, but a comparable team at the Federal Trade Commission.

16   Q.  And in performing your analysis in this case, what

17   information did you rely upon?

18   A.  Well, there's a number of different sources, and they're

19   detailed in great length in my reports, but certainly a lot of

20   data that has been made available to me and my team that

21   supports me and the economists supporting me on this, documents

22   that have been produced in discovery, depositions, public

23   information in some cases.  Those are the main ones that come

24   to mind.

25   Q.  And did you also rely upon certain economic literature and

1    training in this area?

2    A.  Certainly.

3    Q.  Why did -- you said one of the categories of information

4    that you considered were documents produced by the parties in

5    this case, correct?

6    A.  Yes.

7    Q.  So documents produced by T-Mobile and Sprint, correct?

8    A.  Yes.

9    Q.  Why did you consider those documents in connection with

10   your analysis?

11   A.  Well, in my experience, the documents, particularly in

12   larger firms where they're doing strategy analysis and forth,

13   are very informative about how the companies view the markets,

14   how competition plays out.  For example, we were just talking

15   about MVNOs, mobile virtual network operators, and it's part of

16   my analysis, certainly, and it's helpful for me to see how

17   T-Mobile, for example, uses MVNOs.

18   Q.  Is one way to refer to these documents as ordinary course

19   of business documents?

20   A.  Yes, that's a term commonly used, particularly by lawyers.

21   Q.  Well, I'm a lawyer, so I will keep using it.  Are ordinary

22   course of business documents typically relied upon by a

23   economists when they evaluate mergers?

24   A.  Absolutely.  The advantage is they're not prepared for

25   litigation, or we hope at least, they're a depiction of how the

1    executives or companies see the market, not stilted in some way

2    for litigation.

3    Q.   Now I said before we started your examination that you had

4    prepared to two reports in this matter.  Could you briefly

5    describe at a very high level what the nature is of each of

6    those reports?

7    A.   It's a nice fat report.  The first report that was filed in

8    September really lays out my analysis of the case, why I

9    ultimately reached the conclusions that you will hear about

10   that the merger is likely to generate anticompetitive effects;

11   so going through all the elements that we talked about, there's

12   tendencies to all these things.

13          And the second report, my reply report, was in

14   response to economic experts for T-Mobile and Sprint who didn't

15   totally agree with me, and so I defended myself, effectively,

16   in replying to what they said, and that's my reply report.

17          I also was able to update some of the data,

18   particularly I think most important, your Honor, the market

19   share data.  The first report only had data through June of

20   2018, and the second report has data through December of 2018.

21   Q.   What steps do antitrust economists typically take to

22   analyze a merger such as the one we're facing here?

23   A.   Well, again, we're still at a pretty high level.  There's

24   defining relevant market and measure market shares and

25   concentration, that's kind of one set of tasks.  Then there's

JCBTSTA5                        Shapiro - Direct

1  evaluating competitive effects in those markets, that's a

2  second set.  And then if those two steps indicate a concern

3  about competition, then we would typically go to a third step

4  and see whether there are mitigating factors, such as would

5  entry save the day, new firms coming into the market, or

6  efficiencies.

7  Q.  So briefly, what was your conclusion regarding the first

8  step, that is, the relevant market and the market shares and

9  concentration?

10  A.  So the relevant market here is the -- as you know, your

11  Honor, retail mobile wireless telecommunications services,

12  that's the product market.  We have a national geographic

13  market, and in my view also a number of local of markets as

14  well.  So that's the market definition piece.

15         And then we have market shares.  Is that still the

16  question?

17  Q.  Yes.

18  A.  Market shares.  These markets are highly concentrated, but

19  I will talk about the national market to save time now.  It

20  will be significantly more concentrated as a result of

21  combining T-Mobile and Sprint.  So that's the first large chunk

22  of what we'll work on, that piece.

23         (Continued on next page)

24

25

JCBPSTA6                          Shapiro - Direct

1    Q.  All right.  And then what was your conclusion about, with

2    regard to the second step, that is the anticompetitive effects?

3    A.  So we break this up into coordinated effects and unilateral

4    effects, and we'll be spending time on those.  Both of those

5    are a concern here.  Coordinated effects, and this reflects the

6    numbers I showed you a few minutes ago, your Honor.

7            Coordinated effects will be concerns of softening the

8    competition between the remaining big three, namely, new

9    T-Mobile, Verizon and AT&T.  And I think there are reasons to

10   be quite concerned about that.  I'll tell you that.

11           Unilateral effects would be simply new T-Mobile

12   raising price because they're no longer competing against

13   Sprint.  They've acquired Sprint.  That also was a concern in

14   this case.  So on both of those fronts, my analysis indicated

15   the merger is likely to generate anticompetitive effects.

16   Q.  And then the third step that you described, did you

17   consider whether there were any mitigating factors that would

18   prevent or reverse those anticompetitive effects?

19   A.  So yes, I did.  So I mentioned, in particular, entry and

20   efficiencies are the two -- or remedy would also come in here.

21   So the efficiencies, I have not myself analyzed.  Another

22   expert, Professor Fiona Scott Morton from Yale will be

23   analyzing the efficiencies that the parties have claimed; so

24   I'm not doing that part of the overall analysis.

25   Q.  And then did you do any analysis relating to an entry or

1    any remedies in this case?

2    A.  Right.  So I did look at entry.  I think it's clear that

3    there are very high entry barriers into the markets, especially

4    nationally, and but I also considered DISH, the DISH

5    arrangement.  DISH is planning to be an entrant; so that's part

6    of the analysis.  Again, that part I also share with Professor

7    Scott Morton.

8            I am looking in the near term at the effect of DISH as

9    they come in for the first two, three years, and she is looking

10   at a longer term in terms of their build-out plans and possible

11   entry as a network operator.

12   Q.  All right.  So with that background, let's now go through

13   each of those three steps in a little more detail, and we'll

14   start with relevant markets.  What are the components of a

15   relevant antitrust market?

16   A.  As I indicated, we would have a product component and a

17   geographic component.

18   Q.  And what are your conclusions regarding the product market

19   in this case?

20   A.  So retail wireless -- retail mobile wireless

21   telecommunication services would be the mouthful, but that's

22   the term we're using, I'm using, as the relevant product or

23   service in this case.

24   Q.  All right.  And so let's start with the product.  Does a

25   product market typically include every single substitute of a

JCBPSTA6                              Shapiro - Direct

1    product?

2    A.  No, no.  It does not.  So, for example, your Honor, if we

3    had a merger between two companies that made beer, we might

4    very well have a market for beer.  Although, we would

5    understand that hard liquor would be a substitute, to some

6    degree, or maybe soft drinks would be too, right, to some

7    degree, but those are more distant substitutes.  So the idea is

8    to capture a set of reasonable substitutes that will be

9    informative for analyzing the merger, not all substitutes.

10   Q.  All right.  And what was your conclusion regarding the

11   relevant geographic market in this case?

12   A.  Well, there is a national market for these services, and

13   there are also a number of local markets.  I've used the

14   cellular market areas or CMAs as my local markets.

15   Q.  And where -- I'm sorry.  I didn't mean to interrupt.

16   A.  Go ahead.

17   Q.  Where does CMAs, where does that concept come from?

18   A.  Well, this originally comes from the Federal Communication

19   Commission, FCC, based on the original license areas for

20   spectrum, but it's over the years the standard way in which the

21   Federal Trade Commission has analyzed local markets and

22   competition in this industry.

23   Q.  Okay.  So let's drill down a little bit deeper.  Is there

24   any kind of a test that antitrust economists typically use to

25   help identify the appropriate relevant antitrust market?

JCBPSTA6                          Shapiro - Direct

1    A.  Yes.  We have something called the hypothetical monopolist
2    test.
3    Q.  And what is that?
4    A.  So this test is designed -- well, first off, it's been a
5    standard tool for 30 or 40 years now for antitrust economists.
6    It's designed to do what I said before, which is identify
7    reasonable substitutes for merger analysis but not all
8    substitutes.
9          So, you know, in the beer merger, we would end up with
10   beer, very possibly.  We don't know that ahead of time but
11   that's the idea.  Let's draw some boundaries so we capture a
12   reasonable set of substitute that is informative for the
13   analysis.
14   Q.  All right.  And the defendants have retained two economists
15   to testify in this case.  You responded to them in your reply
16   report, correct?
17   A.  Yes.
18   Q.  Did either of them identify a different test, a different
19   way of going about and defining a relevant market?
20   A.  No.
21   Q.  Okay.  And so how does an economist apply the hypothetical
22   monopolist test to define the relevant product markets?
23   A.  Well, a key concept here is the notion of a candidate
24   market and then the hypothetical monopolist.  Those are the
25   elements.

1          So if I give an example, sticking with beer, suppose

2     we had a merger between two companies that were really quite

3     strong in selling light beer.  We might say, well, is there a

4     market for light beer that we would analyze that merger in?  So

5     you would take light beer as a candidate market.  You don't

6     know if it's going to end up being the market yet, that's why

7     it's a candidate.  And then you ask if a single firm, that's

8     the hypothetical monopolist, controlled all the sales of light

9     beer, would they significantly raise price above the current

10    levels?

11         Current levels are based on some degree of

12    competition; so a monopolist would probably raise price, but

13    how much?  If the hypothetical monopolist would raise price at

14    least 5 percent, then the candidate market is going to pass the

15    test.  If not, it's going to fail the test.

16         Now, what's that going to come down to, you imagine

17    you raise the price of light beer, some people will buy less of

18    it.  The normal rule of law of economics, if the price goes up,

19    people buy less.  But then what's left?  If a lot of people

20    would say, hey, light beer went up 5 percent, I'm buying

21    regular beer, then a lot of people would move out, and this

22    price increase would not be profitable.  The monopolist would

23    lose some of these sales.

24         So if a lot of people would shift to regular beer,

25    then light beer would fail the test.  And that would reflect

JCBPSTA6                    Shapiro - Direct

the fact that there's really quite a close substitute, regular
beer, and it would be a mistake to not include that.  So that's
how you do the test.

        Now, suppose you were testing all beer.  You'd say,
well, if we raise the price of all beer, would very many people
stop drinking beer or reduce their usage?  And we probably
would find, I would think, that that would be profitable for
the hypothetical monopolist even though some people would shift
from beer to soft drinks or hard liquor.  So in that case, all
beer would satisfy the test.  Light beer might not.

        You start with a candidate market.  You do this test
until you have a group of substitutes that's large enough so
the test is satisfied.  So that's how it goes.  That's as
simple as I can make it.
Q.  What candidate product market did you start with here?
A.  So I started with the market, the retail mobile wireless
telecommunication services, and I ran the test and it was
satisfied; so I didn't have to keep expanding beyond that.
Q.  And what specifically did you include in what we're calling
retail mobile wireless telecommunications services?
A.  All right.  So now we have to get kind of into the weeds a
bit because we want to measure these things and, you know, I
need to be very precise, at least as precise as I can be with
the available data.

        So first, retail, we're talking about basically

JCBPSTA6                          Shapiro - Direct

consumers and not large businesses.  So that's what we mean by

retail, and I'm not going to include the enterprise sales,

which are a separate category that are tracked.

Q.  Let me just stop you for one second.  When you use the word

"enterprise," that means the same thing as large businesses?

A.  Yes, it does.

Q.  And they buy in a different way than consumers?

A.  Yes, they often buy through a procurement process.  It's a

different category of customer than retail customers.

Q.  All right.  So then what else did you specifically end up

including in retail mobile wireless telecommunication services?

A.  So then for the consumers, I'll call them, I then also have

to decide, well, which lines or devices am I going to include

in the market?  And so I have included, basically, cell phones

but not what are called connected devices and not what are

called internet of things, these other categories of devices.

So a connected device would be like a smartwatch.  I've not

included those.  I am sticking with devices that are basically

well suited and designed to handle data and voice services and

mobility.

Q.  Does the candidate product market that you just described,

did it satisfy the hypothetical monopolist test?

A.  Yes, it did.

Q.  And how did you reach that conclusion?

A.  So there's two ways we can see that more quantitatively.

JCBPSTA6                          Shapiro - Direct

1    First, we -- I think you've already seen a fair bit of

2    evidence, your Honor, that we have seen that competition among

3    the large four, the four MNOs, over the past several years.

4    Floor plans for exactly these devices for consumers has driven

5    the price down substantially more than 5 percent; so

6    competition has lowered price quite a bit.  We're all

7    benefiting from that.

8            That tells me if you took away the competition and you

9    had a single firm setting the prices, it would be profitable to

10   set them quite a bit higher, more than 5 percent, because the

11   competition has caused prices to go down more than 5 percent.

12   So we can see the direct effects of competition, lowering

13   price.  The hypothetical monopolist would set a higher price;

14   so that's a fairly easy and indirect way to see that this group

15   of products satisfies the test.

16   Q.  All right.  And did you apply any other methods to evaluate

17   whether the proposed product market satisfies the hypothetical

18   monopolist test?

19   A.  Yes, I did.  There is another quantitative method that

20   economists have developed that I applied.

21   Q.  Could you describe that method, please?

22   A.  Yes, sure.  So what we do is we ask -- we have a form that

23   we've developed, and it involves asking -- really, we're trying

24   to figure out to what extent to the firms compete with each

25   other directly, and if there's a lot of that, then this market

JCBPSTA6                         Shapiro - Direct

1    will pass the test.

2            If they're competing with more distant products than

3    they can market, may not pass the test.  So we ask if one of

4    the firms, let's take T-Mobile in our case, raise their price,

5    they're going to lose some customers.  Some of those customers

6    will go to the other firms in our candidate market, other cell

7    phone suppliers, AT&T, Verizon, Sprint.  Some will leave the

8    market entirely, drop their cell phone service, let's say.

9            We have a quantitative test that says how many people

10   would have to leave this market entirely in order for the test

11   to fail, and that depends on the profit margins that come into

12   this calculation.

13           And so I used -- I applied that test, and with the

14   profit margins we've got here, if T-Mobile alone were to raise

15   the price, more than 80 percent of the lost customers would

16   have to move outside the market in order for this group not to

17   pass the test, such as dropping their cell service or maybe

18   getting a smartwatch instead, something not in my market, and

19   that is an implausibly high number.

20           From all of the evidence we see, that when one of

21   these firms raises or lowers their price, predominantly they're

22   winning business from the other firms involving the products in

23   the market that we're looking at; so this test is also

24   satisfied.  When we do this test, this candidate market

25   satisfies the test.

JCBPSTA6                          Shapiro - Direct

1    Q.  All right.  So now, let's move from the product market that
2    we were just talking about to the geographic market.  How does
3    an economist apply the hypothetical monopolist test to the
4    geographic market?
5    A.  We do exactly the same thing.  It's the same idea, but
6    applied to geography.  So if we had a merger of grocery stores,
7    we might say, oh, these two companies, they both have grocery
8    stores in Brooklyn, maybe a high share in Brooklyn.  Is that a
9    market, or do we need to have a broader market or a narrower a
10   part of Brooklyn?
11         So you would ask if the price went up in Brooklyn,
12   would people go and buy their groceries someplace else?  Would
13   people leave the market.  Same idea.  Here, when you start with
14   the United States as the candidate market, it's undisputed that
15   if the price of cell service in the United States went up, very
16   few people would get service somewhere else, and so the test is
17   easily satisfied.
18   Q.  So I think you answered the question.  You apply the
19   hypothetical monopolist test to the national market consisting
20   of the entire United States?
21   A.  Yes.
22   Q.  And your conclusion was?
23   A.  That the test is easily satisfied in that market.  Again,
24   the key point being if the price went up in the United States,
25   almost nobody would go get service outside the United States as

1  a substitute.  That's not plausible.

2  Q.  All right.  So we've had some discussion already during the

3  course of this trial about local markets; so let's turn to

4  local markets.  You also ended up defining some local markets

5  in this case, correct?

6  A.  Yes.

7  Q.  Why did you define local markets, as well as the national

8  market?

9  A.  Because some dimensions of competition take place locally,

10  and those are best analyzed in local markets.

11  Q.  And if you didn't analyze the local markets in addition to

12  the national market, what would happen?

13  A.  Well, you would just -- you would miss those dimensions of

14  competition or you could miss them.  You could very easily do

15  so.

16       So to give an example, suppose that we had two of our

17  carriers -- suppose we had a merger with four national

18  carriers.  Two of them, or the only two -- this is an extreme

19  case, but just to get the idea across, but the only two to

20  serve a certain locale of a certain area.  The other two

21  national didn't cover that area.

22       If you look at national market share, you would miss

23  the fact that there would be a merger to monopoly in that local

24  area.  You need to look at the local market in order to capture

25  that or see whether that is a problem.  And in fact, we're

JCBPSTA6                          Shapiro - Direct

1    going to see the market shares vary quite a bit from one region

2    to another.  If they were the same everywhere, it wouldn't

3    really -- this wouldn't get us so far, but there are

4    significant differences.

5    Q.  And what aspects of competition take place at the local

6    level?

7    A.  Well, certainly the investments to provide local service,

8    service quality in a given area, the cell towers, the

9    purchasing and deployment of spectrum; so network quality

10   varies quite a bit from one locale to the other.  So those are

11   an important dimension of local competition.  Retail stores is

12   another clear example, and there are local promotions as well.

13   Q.  Now, do the business documents of T-Mobile and Sprint that

14   you considered in this case support the conclusion that certain

15   important aspects of competition take place locally?

16   A.  Yes, they do.

17   Q.  All right.  I just want to look at a couple of the

18   documents that you relied upon in reaching your opinions.  This

19   is Exhibit 160.  It's in your binder.  Professor Shapiro, just

20   at anytime you need to look at an exhibit that I put on the

21   screen, it's also in your binder.

22   A.  Thank you.

23   Q.  Is this an example of a document that you looked at in

24   connection with assessing local quality?

25   A.  Yes.  So this, Sprint is touting the fact that it has fast

1    speed in Boston; so that's a local area, faster than the

2    others.  So that's a good example of what I was talking about.

3    Q.  If you look at the box in the lower left-hand corner of

4    this slide, there are these bar charts, and I think it says

5    "fastest download speeds" and I can't read the white writing

6    here, but I think this is a test run by somebody independent of

7    any of these companies, some third party; do you see that?

8    A.  I can't read the white writing either, but I get -- I hear

9    you.

10   Q.  Okay.  And is it your understanding that -- and I'm

11   assuming again.  I can't read it.  I'm assuming that yellow in

12   this particular chart is Sprint?

13   A.  That, actually, I can read.  I'm proud of myself.  Now, I

14   took off my glasses.  So yellow is Sprint is the highest, and

15   AT&T and T-Mobile and Verizon are shown there with slower

16   download speeds in this chart.

17   Q.  And because things like spectrum and towers vary from

18   location to location, this particular speed chart would look

19   different if you were looking at Denver or Seattle or Dallas,

20   right?

21   A.  Certainly.

22   Q.  All right.  So now, let's go to the next document.  Could

23   you just briefly describe what this document is, and how it

24   affected your local market analysis?

25   A.  Well, this document, your Honor, is illustrative of a

JCBPSTA6                         Shapiro - Direct

1    different dimension of local competition, namely, retail

2    stores.  You can see the box on the right, 300 stores, 100

3    stores.  This is a T-Mobile document from a few years ago, and

4    you can see what they say, "Spend to strength in

5    high-performing markets;" so they're opening stores in areas

6    where they have, it says, 700 megahertz license markets or

7    newly expended covered.  So they've got some strength in terms

8    of their network, and it's 300 stores.

9            The lower panel is spend to opportunity, Greenfield

10   markets; so there is where they can have good coverage but they

11   need distribution.  So retail stores are clearly a dimension of

12   competition that occurs locally.

13   Q.  So using these two exhibits, these two examples, one of

14   speed and one of retail locations, why would it be a problem in

15   this case if we only defined a national market and only looked

16   at competition at the national level?

17   A.  Because we would be missing these local dimensions of

18   competition.  In particular, if we're going to -- we are going

19   to see, your Honor, some quite high market shares for the

20   merging firms in certain local markets, considerably higher

21   than their national average.  So the concern is that in those

22   markets, because they have a high share and the concentration

23   will go up a lot in those areas, the anticompetitive effects

24   will be greater there on the dimensions where they compete

25   locally, which we've identified.

JCBPSTA6                        Shapiro - Direct

1   Q.  So as a matter of antitrust economics, does it make sense
2   to define a national market and also to define local markets
3   that are contained within that same national market?
4   A.  It does.  I find talking to people, some people find this
5   counter intuitive, but it is correct as a matter of economics
6   and merger analysis.
7        The way to do this is you -- the national market will
8   be a good market to analyze dimensions of competition that
9   occur nationally, and by and large, the national plans and the
10  basic plans and pricing by the nationwide carriers are done
11  nationally, and I think that's agreed by all.
12       But at the same time, there are dimensions of
13  competition that take place locally, and if you didn't define
14  local markets, you would not be properly evaluating those
15  dimensions of competition.  So since competition with different
16  dimensions occurs with a different geographic scope, it is
17  informative and correct to define the two types of geographic
18  markets.
19  Q.  All right.  So what local area did you select as your
20  candidate geographic market?
21  A.  So these are the cellular market areas, the CMAs, that we
22  talked about briefly already.
23  Q.  All right.  So let's look at an example of a CMA.  I put on
24  the slide -- I'm sorry, on the screen a slide that, on the top,
25  says New York City CMA.  Using this slide, could you just

1   explain a little more what a CMA is?

2   A.  Well, the whole country is divided into these CMAs.  This

3   happens to be a metropolitan one in the New York area; so, you

4   know, there's going to be adjacent CMAs.  This is the New York

5   one.  It's just shown on the map.  I don't have more to say

6   than that.

7   Q.  How many -- do you recall how many CMAs there are in the

8   United States?

9   A.  700-something.

10          MR. POMERANTZ:  And, your Honor, I think in the report

11  it's 734.  I don't think there will be any dispute about that.

12  Q.  Have CMAs been used as geographic markets in prior merger

13  reviews?

14  A.  Yes, they have, regularly.

15  Q.  Okay.  And what did you --

16  A.  The FCC has done that and the DOJ used CMAs in the AT&T and

17  T-Mobile merger some years ago.

18  Q.  And does the FCC regularly use CMAs in merger reviews?

19  A.  Yes, that's what the FCC does.  I thought that's what --

20  Q.  I might have said FTC.  I meant FCC.

21  A.  I said FCC.

22  Q.  I think we both either got it right or wrong.

23          What did you find when you conducted the hypothetical

24  monopolist on the CMAs as the candidate markets?

25  A.  They satisfied the test.

JCBPSTA6                          Shapiro - Direct

1   Q.  And how did you reach that conclusion?

2   A.  So it's the same calculation we had before.  We asked if

3   T-Mobile raised the price of their services in the New York

4   region, in this one shown, they would lose a bunch of

5   customers.  Would at least 80 percent of those customers move

6   out and get service outside the candidate market, the products

7   I've talked about, and this region?

8           And, no, it's not plausible that people who are living

9   in New York, in response to a 5 percent price increase, are

10  going to go get service that doesn't cover New York.  The

11  hypothetical monopolist here is the only one providing service

12  here in this region.  So it's very -- this CMA satisfies the

13  test as a geographic market.

14  Q.  Now, has Sprint previously expressed the view that it is

15  informative to define a national market, as well as local

16  markets in this very industry?

17  A.  Yes, that would be back at the time of the -- I believe

18  they did that during the AT&T/T-Mobile merger review in 2011.

19  Q.  All right.  So let's look at what Sprint said.  Could you

20  just explain this slide to the Court?

21  A.  Of course.  So if you see the blown-up parts, this is

22  Sprint Nextel, they were called then, I guess, petition to

23  deny -- petition to the FCC to deny the AT&T/T-Mobile merger.

24  Q.  Hold on one second, Professor Shapiro.  I'll try to be

25  better for this because I'm not saying, for the record

1    purposes, what the exhibit is, and I probably should do that as

2    we pull up each slide.  This is Exhibit 655.

3              MR. POMERANTZ:  One other thing, your Honor, for, I

4    guess, housekeeping purposes.  We're going to get to some

5    slides that have a whole bunch of numbers on them, like HHIs,

6    and I don't want to have Professor Shapiro read every single

7    number into the record; so that we have them in the record

8    right now.  These are not exhibits.  There will be certain

9    slides, which I'll try to remember, I'll ask the other side to

10   stipulate that that particular slide will come into evidence;

11   so that we can get it in more easily in front of your Honor.

12             THE COURT:  All right.

13             MR. POMERANTZ:  Not this one, but we're getting to it

14   very soon.

15             THE COURT:  Let me ask, just for my own curiosity and

16   totally unrelated to this litigation.

17             MR. POMERANTZ:  Okay.

18             THE COURT:  This exhibit contains 377 pages, by my

19   count.  How many of those pages are you going to be using for

20   your case here?

21             MR. POMERANTZ:  Well, so far as I know, it's not even

22   a matter of pages.  It may be a matter of lines.  In other

23   words, if you want to --

24             THE COURT:  You get my point.

25             MR. POMERANTZ:  Yes, I get your point, and I can work

1    with the other side.  I just don't want to put it in there and

2    say you left out the most important counter-piece of evidence.

3    But once we finish the examination, I'm happy to work with the

4    other side and give you like a paragraph or a page, whatever it

5    is, that's necessary for the record.

6              THE COURT:  If you had read the Court's individual

7    practices on this point, you would have done it the other way

8    around.

9              MR. POMERANTZ:  I apologize, your Honor.  I'm sorry.

10              THE COURT:  No need to apologize.  It's my own

11    personal quirk about these kinds of situations, where we're

12    tearing down a forest in order to get a couple of lines of

13    evidence into a case.

14              MR. POMERANTZ:  I hope it's the only one of your

15    individual rules that I missed.  We've been working fast, and I

16    apologize, your Honor.  We'll try to deal with that going

17    forward.

18    BY MR. POMERANTZ:

19    Q.  All right.  So we were on this one paragraph, four lines

20    from Exhibit 655.  Could you just briefly explain them to the

21    Court?

22    A.  So the heading there, I think, makes the key point that

23    Sprint is saying regarding that merger, that it would increase

24    concentration in the wireless industry and harm competition in

25    national and local markets alike.  So that's the point, that

JCBPSTA6                        Shapiro - Direct

1    this is like -- Sprint took the same view that I think is
2    correct and am taking here, that it makes sense to define a
3    national and a local market.

4         And the quote, that paragraph 28 quote, is from a
5    joint declaration by a number of economists that Sprint
6    retained that made the same point.  It's not that some believe
7    there is only a single relevant market in which to analyze the
8    effects of a merger, that is not correct.

9    Q.  All right.  And then this next slide is also from that same
10   time period, but this one was submitted by Mr. Alling of
11   T-Mobile, and briefly, if you could explain to the Court what
12   this is?

13   A.  Right.  So this is, again, before the FCC, and I'm just
14   going to read this sentence:  "Supports T-Mobile's view that
15   wireless providers compete for customers on a local basis."

16   Q.  All right.  And just one more.  This is from something that
17   T-Mobile previously used with -- about CMAs.  I think it's in
18   connection with the California Public Utilities Commission.
19   Could you briefly describe what this is?

20   A.  All right.  So this is, as you say, and they're urging the
21   commission here, meaning the California Public Utilities
22   Commission, they're saying should follow the FCC's lead in
23   defining relevant markets as local, and they specifically
24   mention CMAs, as well as CEAs, a related concept.

25        And they have some rationale for why it's important to

1    define a local market, but specifically CMAs, they're

2    advocating for.

3    Q.  And just to be clear, this is something that T-Mobile

4    itself submitted, correct?

5    A.  Yes, that's right.

6    Q.  All right.  So T-Mobile here says that CMAs is the relevant

7    geographic market, and you also are here saying in this court

8    that CMAs are the -- are a relevant geographic market, correct?

9    A.  That's correct.

10   Q.  Why did you pick CMAs rather than some other region as your

11   local geographic market?

12   A.  Well, this has been the standard practice in the industry.

13   It fits with the -- I can do this with the data I have

14   available that we'll talk about from the -- we'll talk about to

15   measure market shares.

16          Ultimately, you want to measure market shares.  That's

17   where this is going to.  If we can't measure market shares,

18   we've got some problems; so it's workable and practical, and

19   those are the main things.  It's also worth noting that the

20   companies, in some cases, refer to CMAs in their own planning

21   documents as markets as well.

22   Q.  Well, let's look at a couple of those documents.  Could you

23   briefly explain this document to the Court and how it supports

24   your selection of CMAs?

25   A.  So this is Exhibit 911, a T-Mobile document from 2016, and

1    they're talking about launching in 305 markets.  It says MSAs

2    there.  The CMAs, your Honor, consist of MSAs, which are

3    metropolitan areas, and rural areas, RSAs.  Together, they form

4    the CMAs.  So the MSA is a CMA.  It's a little confusing.

5              And they talk about license owned includes nine of top

6    10, 26 of top 30 metro areas, CMA-based ranking.  So they're

7    just using these for the purpose of their planning and

8    reporting.

9    Q.  All right.  So I want to show you one more document.

10             MR. POMERANTZ:  It's a Verizon, document, your Honor.

11             Verizon designated it as highly confidential.  So,

12   Mr. Nichols, I want to turn off the public screens, if we can.

13   I'll tell you what, let me just use the binders if I may.

14   Let's not worry about the screens, Mr. Nichols.

15   Q.  Professor Shapiro, can you look in the binder at

16   Exhibit 1235?

17   A.  Yes, this is slide 13.  So understanding the

18   confidentiality, this is a Verizon document, and they are also

19   talking about capital planning.

20   Q.  Hold on one second, Professor Shapiro.

21   A.  Oh, should I not --

22   Q.  Hold on.  I want to make sure we're all on the same page.

23   What page of Exhibit 1235 are you on?

24   A.  It says --

25   Q.  The page, look at the bottom right-hand corner.

JCBPSTA6                          Shapiro - Direct

1    A.  This is slide 13, but internally it's page 30 of

2    Exhibit 1235.

3    Q.  Just so we're clear, on the bottom right-hand corner where

4    there's a typed number?

5    A.  Oh, I see.  I get it.  Page 30.

6    Q.  What?

7    A.  Page 30.

8    Q.  Just wait for second so that I can get there and so that

9    the Court can get there.

10           All right.  And so, Professor Shapiro, without

11   discussing the substance of what's on this page, I think you're

12   just referring to the reference to CMAs, correct?

13   A.  Yes, in the context of an important decision being made by

14   Verizon.

15           MR. POMERANTZ:  All right.  So, your Honor, I'll just

16   give a moment so you can see that, and I think we're done.

17           Now, I guess I'm going to have to ask everybody in the

18   audience to close their eyes for a second so I can quickly flip

19   through one slide here, but -- or, Phil, did you get me through

20   this?  Okay.  I'll just kind of go really fast here.

21           All right.

22           THE WITNESS:  Now you're going to make them all want

23   to look.

24           (Pause)

25           MR. POMERANTZ:  That's okay.

1          THE COURT:  Mr. Pomerantz, perhaps this material is

2     cumulative at this point.

3          MR. POMERANTZ:  I'm just going to go past it.  I'm

4     just trying to figure out how to get past it.  I have no more

5     questions to ask on this subject.  I want to go to slide 14.

6     Q.  So let's turn to the next subject, which is the

7     concentrations in this market.  What did you -- where did you

8     get the data that you used to then calculate the market shares

9     in the markets that you have now defined?

10    A.  So we have data from all four of the large MNOs.  We have

11    data on their subscribers and their revenues that are relevant

12    to measure these things.  We have data from U.S. Cellular,

13    which is the largest regional.  We have data from TracFone,

14    which is the largest MVNO, and we have some data from the FCC

15    as well.

16    Q.  All right.  So let's look at the market shares.  Could you

17    briefly explain this chart to the Court?

18    A.  So this is, first off, national market shares, and we're

19    measuring this.  This is our most recent data from

20    December 2018.  If you look at the rows, they are the different

21    mobile network operators.  You see the four big players listed,

22    and then the others, which would be the regionals are lumped

23    together in one row.  So those are the suppliers we're

24    measuring.

25          We're going to -- I note, of course, there are MVNO

JCBPSTA6                         Shapiro - Direct

1   subscribers.  They are attributed to these MNOs.  I'll talk

2   about that later, why I did it that way.  Then for each of

3   those suppliers, we've got to now look at the columns.  The

4   first pair of columns counts number of subscribers, which is

5   how the data comes, which you should think of as number of

6   lines.  So a family with multiple lines would be counted as

7   multiple subscribers here.  So let's look at those.

8          Those columns, if you see the total, there's close to

9   300 million subscribers in the United States, and then if you

10  look at the shares, you could see Verizon is the lead with

11  around 32 percent, and we go down from there.  T-Mobile and

12  Sprint having 23 percent, and about 15 percent respectively.

13  So that's the subscriber shares.

14         Then before we -- but I also mentioned share based on

15  revenue.  There are advantages and disadvantages of both those

16  metrics.  I'm showing you both.  So the revenue -- and you can

17  see -- by the way, this is -- the monthly revenue here is $13

18  million.  That's the total there under the revenue line.

19         And then again, you can see the shares, and they're a

20  little different, right?  And it's, as I'm sure you -- worth

21  knowing, T-Mobile's share is 20.6, instead of the subscriber

22  share is 23.2, and Sprint's share of revenue is also slightly

23  smaller, 13.8 rather than 14.7.  That reflects the fact that

24  they, on average, are earning a bit less per subscriber.  They

25  tend to be -- especially Sprint has a lower price, and so we

1    get these different shares in revenue.

2              So that's the basic market exercise, the first half of

3    this table.

4    Q.  Okay.  So let's stop with the upper.  Now, the lower half

5    is some calculations you used related to HHIs, and our

6    discussion with the Court on Friday at the pretrial conference

7    let's us all know that the Court understands HHIs.

8              So rather than having any explanation of what they are

9    and why they matter, if you could go to the basic calculations

10   themselves?

11   A.  Okay.  First off, before I get to HHI, there's a row there,

12   combined share; so that means T-Mobile and Sprint put together.

13   So that would be the share of the new T-Mobile that we're

14   getting.  As you can see, that's 37.8 percent subscriber share,

15   34.4 percent revenue share.  I consider that informative, as

16   well as the HHI measures.

17             And then the HHI measures, let me just focus on the

18   subscriber shares, since that's the one I prefer to use.

19   Without the merger, as of December 2018, we'd have around 2500,

20   and it goes up by 679, that's a large amount, to 3186 with the

21   merger, and you can see the revenue shares.  The Herfindahl

22   numbers are slightly different but not significantly so, in my

23   view.

24   Q.  All right.  So the threshold in the merger guidelines for a

25   presumption of an enhancement of market power is a 200 increase

1    in HHIs and a 2500 total post-merger HHIs, correct?

2    A.   That's correct.

3    Q.   Now, does it make a difference to an economist, and the way

4    you look at these numbers, whether the increase in the HHI is

5    201, just one over the 200 threshold, or 679?  Does that matter

6    to you as an economist?

7    A.   Well, certainly.  These metrics, the higher the number, the

8    more concerning, everything else equal.  So these are, you

9    know, very substantial increases in HHI, and that's -- look,

10   that's what you get when you add a 23 percent player and a

11   15 percent player.  That's what you get.  You get roughly a 700

12   point increase in the Herfindahl.

13            Another way to think about it, your Honor, is the 200

14   Herfindahl change threshold, that would occur if you had two

15   ten percent firms merging.  You would get a 200 increase in

16   Herfindahl.  It's a lot more than that.  If it's 23 and 15, you

17   get a 600 or so point increase.  So it is significantly

18   different, far above the threshold.

19   Q.   All right.  Now, let's go over a few of the issues that had

20   been raised by the defendants' economist relating to these

21   calculations and HHIs.  Defendants have suggested that

22   connected devices should be included in the market.  Do you

23   agree with that?

24   A.   No, I don't.  Again, that would be smartwatches, a tablet

25   or my mother's emergency -- personal emergency device.  I don't

JCBPSTA6                           Shapiro - Direct

1    think it should be included.  I explained earlier why.

2    Q.  All right.  And in any event, how would including connected

3    devices in the market effect these national market shares?

4    A.  Well, that's our next slide.

5    Q.  Well, then I should go there.  Okay.

6    A.  So, your Honor, the middle column here is the one you just

7    saw.  This is subscriber counts that we just had with the

8    Herfindahl, going up from 2507 to 3186.  If we include

9    connected devices, it's true that T-Mobile and Sprint's shares

10   each falls a little bit.  We still have a Herfindahl going out

11   from 2558 to 3169; so it's not a material difference.

12          MR. POMERANTZ:  All right.  Your Honor, I would move

13   slides 15 and 16 into evidence at this time.

14          MR. CARY:  No objection, your Honor.

15          THE COURT:  Admitted without objection.

16          MR. POMERANTZ:  Thank you, your Honor.

17          (Plaintiff's Exhibits Slides 15 and 16 received in

18   evidence)

19   BY MR. POMERANTZ:

20   Q.  Now, defendants have also suggested that enterprise

21   accounts, or large business accounts, should be included in the

22   relevant market; do you agree?

23   A.  No, I don't.  Mostly, these are what are called corporate

24   liable, which means the company is paying for it, and I don't

25   think, if you ran my hypothetical as I did, the hypothetical

JCBPSTA6                        Shapiro - Direct

1    monopolist test would be satisfied without including those.

2    Q.  All right.  Now, in addition to calculating the market

3    shares at the present time, or as of the end of 2018, did you

4    also calculate projected national market shares in 2020?

5    A.  Yes, I did.

6    Q.  All right.  So turning to this chart, maybe you can use

7    this to explain what you did?

8    A.  So first all, let me explain.  The numbers I showed your

9    Honor for December 2018, that's a year ago.  So it's a fair

10   question.  Well, are they out of date?  Has the market changed,

11   or is it predictably going to change in a significant way that

12   we don't want to use those numbers from a year ago?  That's my

13   most recent data; so I'm looking into that question.  So that

14   is about in looking at trends and doing projections.

15           This chart here shows the trends of the market shares.

16   In some industries, the market shares move a lot.  Maybe one

17   firm is really growing and another firm is really dropping.

18   You'd want to take that into account.  That's not the case

19   here.  These are quite stable.  These are subscriber market

20   shares.  They're quite stable, as you can see.

21           In fact, the only real change you see here is the

22   little bump up in the blue, which is AT&T, in early 2017, which

23   we think is actually just an artifact of they changed -- it

24   looks like they changed the way they reported, and so they

25   reclassified a bunch of devices.  So we have stable market

1  shares for the last three years.

2  Q.  Now, the Court has heard a lot of testimony in just the

3  first few days of this trial about Sprint's situation in the

4  market in recent years.  What does this slide tell you about

5  Sprint's situation?

6  A.  Well, you can see their share is virtually unchanged.

7  Perhaps it's gone down one percentage point.  This is

8  subscriber share again, and we've also looked at revenue share;

9  so it's quite stable.

10  Q.  All right.  So then how did you go about calculating market

11  shares for 2020?

12  A.  What I wanted to do was come up with a market share for

13  2020 so we could say what they'll probably be next year, rather

14  than just what they were a year ago, based on actual data.  So

15  I did -- so the standard thing, which is just to do some

16  projections, I used the last year or so of the trend to -- the

17  last four quarters, to project, and you can see here the

18  projection.  So I'm projecting out two years from the end of my

19  data, which is the end of 2018, to the end of 2020.  And

20  unsurprisingly, it stays pretty flat because the shares have

21  been so stable.

22  Q.  Now --

23  A.  And then what I do is I take the projected shares here in

24  2020, and I use that to calculate Herfindahles and the like.

25  That's where we're going.

1    Q.  Yes.  So before we get to your calculations for 2020, are

2    the projections that you're doing on this slide 18, these

3    dotted lines going forward, are those projections consistent

4    with the defendant's own submissions during this merger?

5    A.  Yes, they are, and I'm very much aware that the defendants

6    have -- are making the argument that Sprint is in trouble and

7    declining, and of course, that's something I want you to look

8    at.  If I'm going to do these projections and use market shares

9    and the documents that Sprint and T-Mobile themselves put in to

10   DOJ and the FCC, showed stable shares, and the materials their

11   economist put in also showed stable shares going out several

12   years.  So this is what the other data show as well.

13   Q.  So your own analysis, plus the data put in by the

14   defendants in connection with the merger review by the federal

15   authorities, do not predict that Sprint will not be viable two

16   years from now, correct?

17   A.  The market share projections don't show anything of the

18   like.  The historical data don't show that, and the market

19   share projections, mine and the ones from the merging parties,

20   do not show any such decline.

21   Q.  And you've reviewed a lot of documents in this case,

22   including public statements by Sprint executives to the federal

23   government and to the SEC.  Did any of the Sprint statements

24   publicly say that we're not going to be viable in two years?

25   A.  Not that I can recall.

JCBPSTA6                          Shapiro – Direct

1    Q.  All right.  So you said that you then calculated HHIs for

2    2020.  What did that show?

3    A.  Well, I'm pretty sure that's our next slide.

4    Q.  Well, then I should go there.

5    A.  Though the right-hand column here uses the projected shares

6    for the four big carriers for 2020 and then recalculates the

7    Herfindahles, there's no significant difference.  The level of

8    Herfindahl, the post-merger Herfindahl and the increased

9    Herfindahl are slightly higher with the projections, but

10   basically there's no difference.

11             MR. POMERANTZ:  All right.  Your Honor, again, I'd

12   like to go back and move into evidence slides 16, 17, 18 and

13   19.

14             MR. CARY:  No objection, your Honor.

15             THE COURT:  Admitted without objection.

16             (Plaintiff's Exhibits Slides 16, 17, 18 and 19

17   received in evidence)

18             MR. POMERANTZ:  Thank you.

19   BY MR. POMERANTZ:

20   Q.  Let's turn to local markets and the shares and HHIs.  I

21   take it you looked at both those shares and HHI as well?

22   A.  Yes, the data allowed us to do calculations at the CMA

23   level.

24   Q.  All right.  So let's look at, first, what does this chart

25   reflect?

JCBPSTA6                        Shapiro - Direct

1   A.   This chart, your Honor, is a list of all the CMAs in the 13

2   litigating states, plus the District of Columbia, that trigger

3   the structural presumption based on Herfindahl indices that's

4   found in the horizontal merger guidelines.  That is to say, a

5   post-merger Herfindahl of at least 2500 and an increase in the

6   Herfindahl of at least 200.

7   Q.   All right. And if you look at the next, I think, four

8   slides, here's the first one, what does this slide show?

9   A.   So this lists the CMAs in California, and this is actually,

10  the first one, it's a good example.  It's a big CMA because of

11  the population in the LA area.  The buy share is actually

12  57 percent between the two firms there, and the increased

13  Herfindahl you can see, 1281, post-merger Herfindahl 4158.  So

14  we've calculated that for each of these CMAs.  This page shows

15  California and then subsequent pages show other states and DC.

16        MR. POMERANTZ:  So I'll just quickly flip through

17  them.  Your Honor, we won't have any testimony on them.  22 is

18  Connecticut, Hawaii, Illinois; 23 is Maryland, Massachusetts,

19  Michigan; 24 is Minnesota, New York, Oregon; and 25 is

20  Pennsylvania, Virginia, Wisconsin.  We would ask to move into

21  evidence slides 20, 21, 22, 23, 24 and 25.

22        MR. CARY:  Your Honor, we wouldn't object to the

23  inclusion of these, but we would like the backup so that we can

24  also introduce it if, we need to do so, in recalculating these

25  summary slides.

1              MR. POMERANTZ:  My understanding is that the backup is

2       provided, is already provided in connection with Professor

3       Shapiro's report, but I will -- maybe you can confirm that,

4       Professor Shapiro.

5       A.   These numbers are out of my report.  I believe the one

6       thing we did was added the shares so we can report the combined

7       share.

8              MR. CARY:  So again, we haven't been in a position to

9       validate those numbers, and if Mr. Pomerantz will stipulate

10      that he will not object if we want to introduce that backup

11      material at a later date, if we find some inaccuracies, we will

12      not object.

13             MR. POMERANTZ:  So stipulated.

14             THE COURT:  All right.  Yes, admitted.

15             (Plaintiff's Exhibits Slides 20, 21, 22, 23, 24 and 25

16      received in evidence)

17      BY MR. POMERANTZ:

18      Q.   Now, let's go to slide 26, and if you could just briefly

19      explain this one?

20      A.   Okay.  So this is illustrative, your Honor, of instead of

21      looking at dozens and dozens of CMAs, these are the top 10 CMAs

22      in the plaintiffs' states based on number of subscribers, and

23      it shows just the numbers that were in those long charts,

24      namely, for each CMA.  The combined shares are actually shown

25      down at the bottom.

1           So the first is New York.  Combined share of Sprint

2    and T-Mobile in New York is 58 percent, subscriber counts

3    again.  Then it shows the post-merger Herfindahl, New York

4    4284, and so forth for the other cities.

5           What is notable, I think, is that all of these cities,

6    these top 10 CMAs, the post-merger Herfindahl is above the

7    national level.  So this is indicating that Sprint and

8    T-Mobile's shares are larger in these cities than they are on

9    average nationally.

10   Q.  All right.  And to move this along, I'm going to skip some

11   slides.

12   A.  Actually, what I just said isn't quite right.  Their

13   markets are more concentrated, the next slide will show, with

14   the increase in Herfindahl because that's about the shares of

15   the merging firms.  That shows that the increase in the

16   Herfindahl in all of these markets are higher than the national

17   average, and that goes along with the two firms having higher

18   shares, the higher combined shares than they do nationally, as

19   indicated in the -- with the names of the cities.

20   Q.  Okay.  So let's step back from all of these numbers and

21   just, what does your analysis of market shares and

22   concentrations tell you about the impact of this merger in

23   local markets?

24   A.  So we have a large number of local markets, CMAs, where the

25   merger will combine two firms with, in many cases, nearly

1    50 percent.  At least 40 to 50 percent combined share will lead

2    to very highly concentrated market and will cause really a very

3    large increase in the Herfindahl index.  We've got 800 to 1400

4    roughly on this chart.

5    Q.  Would your analysis of market concentration in local

6    markets change significantly if you looked at a smaller

7    geographic region, such as a county rather than a CMA?

8    A.  No, it would not.  In my reply report, I present analysis

9    based on the county level Herfindahl indices, and shows that

10   one tends to get similar but, if anything, slightly higher

11   increases in the Herfindahl index if you do it at that level,

12   county rather than CMA.

13   Q.  Okay.  So let's skip slides 28 and 29.  All right.  So

14   let's go to MVNOs.  How did you account for MVNOs, like

15   TracFone, in the market share calculations that we just

16   presented to the Court?

17             THE COURT:  Mr. Pomerantz, to the extent you're going

18   to a different topic, why don't we break at this point for 10

19   minutes?

20             MR. POMERANTZ:  That would be fine, your Honor.

21             (Recess)

22

23

24

25

JCBTSTA7                        Shapiro - Direct

1              THE COURT:  Thank you.  Be seated.

2              Mr. Pomerantz, you may resume.

3              MR. POMERANTZ:  Thank you, your Honor.  We were just

4    about to discuss MVNOs.

5    BY MR. POMERANTZ:

6    Q.  Professor Shapiro, how did you account for MVNOs like

7    TracFone in the marker share calculations that we just

8    presented to the Court?

9    A.  As I mentioned, I attributed MVNO subscribers to the MNOs,

10   the network operators that are providing the underlying

11   services that the MVNOs are reselling.

12   Q.  And why did you treat MVNOs in this manner?

13   A.  The underlying principle here, your Honor, is that when

14   we're measuring markets shares in the merger analysis we want

15   to measure the ability of different firms to independently

16   compete to serve the customers.  And MVNOs do not have the

17   ability to independently compete because they rely so heavily

18   on the network operators in order to provide service.  That's

19   the guts of it, but we'll go through more detail.

20   Q.  So I think you put together this chart to go through the

21   more detail, so could you use this chart to explain to the

22   Court why MVNOs are not independent competitors, in your view?

23   A.  Yes.  So you see I set them side by side with TracFone as

24   my example.  They're the largest MVNO by far.  The first

25   bullet, they're paired here, the MVNOs have massive investments

1   in cellular networks, billions of dollars a year.  I will talk

2   about TracFone, as an example, does not invest in a cellular

3   network; very different creature.

4           For that reason, the second bullet, of course of

5   carriers compete on network quality, improving speeds, making

6   investments and so forth.  It's a critical dimension of

7   competition.  MVNOs just cannot compete on that dimension.

8   They don't have their own investments and their own networks,

9   so they're not able to compete on that critical dimension.  So

10  they look very different as businesses and business models, and

11  the MVNOs cannot compete on network quality.

12  Q.  The next two points on each side referred to cost margins

13  and marginal cost, and I think you put together this chart to

14  help explain these points.

15  A.  Go back, actually.  I think that's a little too fast,

16  because --

17  Q.  I think the judge liked my way more than yours, but go

18  ahead.

19  A.  I don't know.  The point is if we look at price cost

20  margins, T-Mobile, as an example, had about a 50 percent price

21  plus margin.  This is a marginal cost, they're incremental

22  costs of serving the subscriber, while TracFone has a very thin

23  margin, it's about one percent, which is to say 99 percent of

24  their revenues are going to the costs, the marginal costs of

25  serving the customer.  That's a very thin margin.

JCBTSTA7                          Shapiro - Direct

1          And that goes along with the point there about low

2     versus high marginal costs, a critical element for an economist

3     of a firm's ability to compete is its marginal costs.  Firms

4     that have high marginal costs are disadvantaged.  So the

5     network marginal cost, using Metro here to go along with

6     T-Mobile as their prepaid brand, is $1.75 per subscriber per

7     month.  And TracFone has a much higher cost.  They have to pay

8     a wholesale price to whatever the MNO is that they're using,

9     and that's 14.75, on average.  So very, very different.  They

10     have a much higher marginal cost, so that's a big disadvantage

11     that the MVNO inherently faces.

12          So those points go together as the MVNOs have very

13     different economics, thin margins, and this very much limits

14     their ability to compete.

15          Now you can go to the next slide.

16     Q.  Go ahead.

17     A.  So this, if you look at the title, your Honor, if we take a

18     subscriber, TracFone subscriber, who is making money?  We're

19     following the money here.  Who is actually making money on that

20     subscriber, and how much?  Well, TracFone makes some money, but

21     so does -- let's suppose this is a subscriber carried on the

22     T-Mobile network, served by the T-Mobile network, so we can see

23     who is actually making money on the subscriber.

24          So let's look at the TracFone column first.  And this

25     is from TracFone, the data we got from them.  So the ARPU, the

1    monthly average revenue per user, $25.70.  After deducting

2    their costs, the profit margin is only about 29 cents.  That's

3    our calculation.  Why is it so low?  Or one percent, basically,

4    one percent margin.  That's what I referred to earlier on the

5    previous slide.  Why is it so low?

6            First, they have to pay a substantial fee to

7    T-Mobile --

8    Q.  That's the 12.50 you have on the slide?

9    A.  That's the 12.50, or on average it's larger for them, but

10   that's the same concept, the wholesale price.

11           And they also have other costs, most notably

12   subscriber acquisition costs that they have to account for.

13   And so when you take away those other costs, they have a very

14   thin margin, one percent of their revenue, roughly.

15           Now to go to T-Mobile, that same subscriber, again the

16   TracFone customer served by T-Mobile, T-Mobile will get on

17   average for its MVNO subscriber it's serving, they get 12.50 a

18   month.  That's essentially the wholesale price they're getting.

19   And they have a very low cost, less than a dollar of marginal

20   cost of serving the customer.  These are the marginal network

21   costs.  So they have a margin that's $11.52.

22           So on this customer, who is really making the money?

23   It's T-Mobile, not TracFone.  For that reason, the underlying

24   economics is telling us it would make no economic sense to

25   assign that customer to TracFone when there's market shares,

1   the money is being made by T-Mobile, and that's what I have

2   done.

3   Q.  So let's go back now to your prior slide, and I think we

4   have covered all the bullet points except the last one on each

5   column.  So if you could address:  Why does it matter that

6   MVNOs are heavily dependent on MNOs?

7   A.  Well, the -- it's easier to think first in the longer run.

8   Merger is a fundamental structural change of the industry.  The

9   MVNOs need to sign contracts, and they're dependent on the

10  MNOs, but it also means that the MNOs can lever control of the

11  MNO and limit them.  I think the key point is market shares --

12  you're trying to measure independent competitors, I think the

13  key point is that an MVNO is not a competitor for the MNO that

14  is serving it.  They're partners, they're not competitors.  And

15  that, again, points to attributing the subscribers to the MNOs.

16  Q.  Let's look at some of the underlying ordinary course of

17  business documents that you reviewed in connection with this

18  issue, and let's start with Exhibit 1031.

19          Could you explain how this document, which is a

20  T-Mobile document, relates to the opinions you just gave about

21  MVNOs.

22  A.  So you see this is an MVNO strategy review document from

23  T-Mobile about two years ago.  I have chosen to highlight the

24  title there of the slide that they're describing MVNOs as their

25  partners.  That is, I think, an important point.  There's

1    underlying economics that we have been talking about.  And

2    point of this slide is the three main levers that they have to

3    steer these partners, and the levers are -- you can see the

4    three grayish boxes, they have pricing and contract, network,

5    and they have distribution.

6    Q.  So let's go -- I take it the way this slide is laid out

7    there's a red, yellow, green, and red would be where you wanted

8    to stop or deter the MVNO, yellow is neutral, and green is you

9    want to grow the relationship, as you see at the top.  So if

10   you go down the red column and briefly explain the levers that

11   an MNO has against an MVNO that affects the MVNO's ability to

12   compete.

13   A.  So pricing, so this is wholesale pricing now, if you want

14   to harvest the relationship or wind it down, T-Mobile would

15   increase the pricing when they can, which would be at contract

16   expiration.  And they can also take a hard line in enforcing

17   contract terms.  That's the second point there.

18   Q.  And then on the network?

19   A.  Well, since the network quality available to the MVNO is

20   only what the MNO is offering them, they could degrade that, I

21   will say, or they say reduce network priority, so they could

22   choose to give lower priority and therefore lower quality

23   service to the MVNO.

24   Q.  And so we see some distribution restrictions as well, and

25   they're in the record, so we won't belabor the point.

1          Let's, if we can then, look at the next slide, and if

2     you can just address what this is saying.

3     A.   So this is an article from a industry outlet, I guess,

4     where the Verizon --

5          MR. CARY:  Your Honor, we're going to object to

6     reading this document into the record.  This is just some

7     random press article quoting some random third party from some

8     random fourth company.  I guess it's Verizon purportedly, but

9     we have not basis for that.  This is not the kind of, I would

10    think, scientific evidence that an expert economist would rely

11    upon.

12         MR. POMERANTZ:  Your Honor, we're not offering it as

13    an exhibit in the case, however, it is the kind of information

14    that an economist would use.  It doesn't have to be scientific.

15    In fact, here, as we heard some prior testimony, Fierce

16    Wireless is one of the publications in this industry that

17    business people read and rely upon.  I forget which witness it

18    was, but one of the witnesses in particular testified about

19    Fierce Wireless.  And this is just one of the little pieces of

20    information that Professor Shapiro relied on.  It was cited in

21    his report in footnote 75, as indicated on the slide.

22         THE COURT:  Thank you.  Overruled.  To extent the

23    document is not coming into evidence but it was part of what

24    the professor considered, along with a hundred other books and

25    treatises I presume that he read and prepared for this report

1    and would not have been admitted into evidence either, but he

2    did consult them.

3         MR. POMERANTZ:  That's correct, your Honor.

4    BY MR. POMERANTZ:

5    Q.  Professor Shapiro, if you could please proceed.

6    A.  So the idea is that Verizon sees TracFone as their prepaid

7    product.  Going beyond the particular quote, the reality is

8    that has been Verizon's strategy is to generally not have its

9    own prepaid brand but to use TracFone to reach that segment.

10   Q.  So we heard testimony already in this case about how Sprint

11   has Boost as its prepaid brand and T-Mobile has Metro as its

12   prepaid brand, is it your understanding that historically

13   Verizon has not had its own prepaid brand but instead used

14   TracFone as its prepaid brand?

15   A.  They definitely have not had their own prepaid brand

16   historically.  They did launch a brand, I think it's very small

17   still, but they have used TracFone for this purpose.

18   Q.  So now let's move on to Exhibit 655.  This is a declaration

19   of Mr. Kolinoski, who is employed by Sprint, and his deposition

20   actually was taken in this case as well.  He is still employed

21   by Sprint.  Did you consider Exhibit 655 in evaluating whether

22   MVNOs are competitors to their MNO hosts?

23   A.  Yes.  So this is just another illustration of the same

24   point that Mr. Kolinoski, on behalf of Sprint, viewed Cox,

25   which is an MVNO utilizing Sprint's network, not a direct

1   competitor; same idea, they're a partner instead of a

2   competitor.

3   Q.  And the next slide is also a quote from Mr. Kolinoski.  Did

4   you rely on this?

5   A.  Yes.  This is more recent now from 2016, and it's this --

6   again the key economic idea is that the MNO is using MVNO, as

7   he said, to reach niches of customers not typically targeted by

8   Sprint.  To get to incremental business, this is their

9   strategy, and I would say that fits with the idea of the MVNO

10  being their partner, not their competitor.

11  Q.  One more, and this is from AT&T.

12          MR. POMERANTZ:  And again, your Honor, we're not

13  offering this into evidence here.

14  Q.  But is this something else that you relied on in connection

15  with your analysis in this case?

16  A.  Yes, it's the same idea, that AT&T, in describing their

17  MVNO relationship, said in the second part:  MVNO solutions are

18  incremental to our other businesses, that's the goal, as

19  opposed to being directly competitive.

20  Q.  So now what are the implications of the way that MNOs treat

21  MVNOs for the calculation of market shares in this matter?

22  A.  Well, what I have been -- as I said, I attributed MVNO

23  subscribers to the network operators, and I have been seeking

24  in the last part of my testimony to explain why I think this is

25  clearly the correct approach as a matter of economics,

JCBTSTA7                        Shapiro – Direct

1    antitrust economics.

2    Q.  So we have now a T-Mobile document, Exhibit 813.  Is this a

3    document that you considered in your analysis?

4    A.  Yes, it is.

5    Q.  And why is this document relevant to your MVNO analysis?

6    A.  This maybe is icing on the cake, if you will.  This is

7    simply showing when T-Mobile measured shares, in this case

8    nationwide prepaid shares, they are reporting the four

9    carriers.  As indicated in the highlight, all carriers include

10   MVNO activity.  So in this instance, they attributed the MVNO

11   subscribers to the carriers, as I am doing.

12   Q.  And you're referring to the box, that says "special notes,"

13   and then you highlighted something next to it that says "all

14   carriers include MVNO activity," correct?

15   A.  Correct.

16   Q.  And this is a T-Mobile document, correct?

17   A.  Yes, from 2017.

18   Q.  And one last one.  I do not want you to talk about any of

19   the arrows or numbers, but if you would just please explain to

20   the Court how this, another T-Mobile document, supports your

21   views about how MVNOs should be treated for market share

22   calculations.

23   A.  So this is another T-Mobile document, it's about what they

24   call internal migrations, and my sole point here is that they

25   are including in what they call internal migrations customers

1    switching or moving between the brands -- their own brands,

2    T-Mobile and Metro.  And they have an MVNO here in the lower

3    part of the diagram, and they are including MVNO as calling it

4    an internal migration.  That's the whole point here.

5    Q.  So defendants' economists have argued that MVNOs should be

6    treated as separate competitors when calculating market shares.

7    How do you respond?

8    A.  I think I responded pretty fully.  I think it's not correct

9    as a matter of economics, by which I mean measuring market

10   shares in a way that accurately reflects the ability of the

11   firms to compete independently and basically their competitive

12   impact in the market.  Furthermore, it's inconsistent with how

13   the FCC has generally analyzed these markets over the years,

14   and how the -- I don't know about DOJ, I should not say that,

15   FCC.

16   Q.  Let's move on to anticompetitive effects.  What are the

17   different kinds of anticompetitive effects that can be

18   generated by a merger between companies, between competitors?

19   A.  So we generally think of these two large buckets of

20   possible anticompetitive effects, coordinated effects and

21   unilateral effects.  I mentioned them briefly at the beginning

22   of my testimony this afternoon.

23   Q.  So let's go to coordinated effects first.  What are

24   coordinated effects in a merger analysis?

25   A.  Coordinated effects refer to -- I'm not going to keep

1   saying it, but we mean by these anticompetitive coordinated

2   effects, I mean as a result of the merger, the merged firm and

3   its remaining competitors will compete less aggressively than

4   they would otherwise have.  So not just the firm, the merged

5   firm itself, but with its competitors they will pull their

6   punches more.  That's the concern.

7   Q.  And are coordinated effects a standard element of merger

8   analysis?

9   A.  Absolutely.  For many years they were the predominant

10  element, and then unilateral effects have taken on a bigger

11  role in the last 20 years.

12  Q.  Let's start with the way the merger guidelines address

13  coordinated effects.  Could you briefly describe what's on this

14  slide.

15  A.  This is a quote from the merger guidelines, "Coordinated

16  interaction involves conduct by multiple firms that is

17  profitable for each of them only as a result of the

18  accommodating reactions of the others."

19          So there's this notion of accommodation, or it's not

20  simply one firm changing its behavior, we have got a change in

21  the behavior of several firms, more than one, anyhow, typically

22  the largest firms, that were concerned about, by which we mean

23  compete less aggressively.

24  Q.  And so we're absolutely clear here, in this particular

25  matter we're not saying that coordinated effects means that new

1   T-Mobile is going to call up AT&T and Verizon and say let's fix

2   the price at a higher level, that's not what you're addressing

3   here in this particular analysis, correct?

4   A.   No, it's not simply -- it's not just about expressed

5   cartels, it's really a much more general concept that there

6   will be weaker competition, that the firms won't go after each

7   other as much as the merger.

8   Q.   So did you have an opportunity to read the testimony of

9   Mr. Solé from this particular trial earlier this week?

10  A.   Yes, I know he was on the witness stand on Monday.

11  Q.   All right.  And I am not asking you about the substance of

12  this document, I'm going to ask you to read it, but do you

13  understand this was one of the documents that he was asked to

14  testify about on Monday?

15  A.   Yes.

16  Q.   And this is Exhibit 566.  Does Exhibit 566 address the

17  general idea of coordinated effects?

18  A.   Yes, it's talking about the benefit of a consolidated

19  market being a higher price, $5 ARPU he mentions here, and he

20  mentions the three players, obviously new T-Mobile, AT&T and

21  Verizon.  So this is exactly the concept that we're talking

22  about, higher prices set by the big players after a merger that

23  consolidates the market.

24  Q.   What is the basic concern regarding coordinated effects in

25  this case?

JCBTSTA7                          Shapiro - Direct

1    A.  In this case, to distill it down I would say, my central
2    concern is that after the merger the remaining three big
3    carriers will not, as I guess I said, not fight so hard, not
4    press so hard with lower prices, they will pull their punches,
5    because Sprint will be gone and T-Mobile will be a much bigger
6    market share.
7    Q.  Have you heard the term "parallel accommodating conduct" in
8    connection with coordinated effects analysis?
9    A.  Yes, that's a term used in the merger guidelines.
10   Q.  What is it?
11   A.  So it refers one flavor of coordinated effects, which is
12   really what I have been talking about in the sense it does not
13   necessarily involve any agreement or prior understanding among
14   the firms, in this case, the big three carriers, but simply a
15   lessening of competition by virtue of the greater concentration
16   in the market and just a mutual awareness that they could all
17   benefit by competing less.
18   Q.  How do economists analyze the likelihood of coordinated
19   effects following a merger?
20   A.  So we do this sort of in two big parts, this analysis.
21   First we try to assess the market in which this is happening,
22   and is this market vulnerable and susceptible to competitive
23   effects?  So we look at the market, and then we look at:  How
24   is the merger changing things?  Is the merger really going to
25   make this a greater danger?  Those are the two big pieces.

1  Q.  So now if we look at this slide, this is from the merger

2  guidelines again, is this the approach taken in the horizontal

3  merger guidelines relating to what you were just describing?

4  A.  Yes.  So this lays it out.  I won't read it, your Honor,

5  but item two here is what I said:  Is the market vulnerable,

6  susceptible to coordinated conduct?  That's one.

7          And then:  If so, is the merger going to make it

8  worse?  And one element that will make it worse is increase in

9  concentration, there are other elements we'll talk about.

10 Q.  Let's start with the first thing that you said, which is

11 the susceptibility of the post-merger market to coordination.

12 How does an antitrust economist determine whether an industry

13 is generally susceptible to coordinated effects?

14 A.  There's been decades of research on this issue with

15 concerns about oligopolies going to back to genesis of the

16 antitrust laws.  So we have a slide here to describe a number

17 of factors that economists look at.  And it's kind of a

18 checklist approach, which is industries are so different we

19 have things we systematically look at to assess whether a

20 market is susceptible to coordinated effects, and I listed

21 items here that tend to make a market more susceptible.  It's

22 not yes or no, it's not like you need all these, these are just

23 things economists have found it's useful to look at.

24 Q.  And does the relevant market for retail mobile wireless

25 telecommunications have features that you believe make it

JCBTSTA7                        Shapiro - Direct

1    susceptible to coordination?

2    A.  Yes, quite a few, and we can go through those on this list.

3    Q.  If you could.

4    A.  So small number of firms, or basically going from four to

5    three in terms of nationwide carriers, so that's small.

6           Similarity among larger firms.  Well, after the merger

7    particularly we would have three similarly-sized firms in terms

8    of market shares.  They are different in some other respects,

9    but we would have that situation.  We saw the market shares

10   earlier.  They will all be in the 30s.

11          Inelastic demand.  What that means is if they manage

12   to pull their punches and keep prices up, would they lose

13   business as a group?  Inelastic demand means no, they will not

14   lose much.  Here it's not disputed that the demand for cell

15   service overall is quite inelastic.  Most people will get the

16   service, even if it costs a bit more.  So that would be a

17   factor that would apply in this industry as raising concerns.

18          Higher barriers to entry.  Could other firms come in

19   easily?  Not at all here.

20          Predicable or stable demand.  We're going to talk more

21   about this, I think, but the basic idea is if a group of firms

22   are trying to coordinate, it's natural for them to be looking

23   out and seeing:  Are the other guys going along?  Are they kind

24   of cheating on the deal; quote, unquote "cheating."  If demand

25   is pretty stable, along with the last point that you could

JCBTSTA7                        Shapiro - Direct

1    watch each other in realtime pretty closely, then it's easier

2    to hold that together and the coordination to persist.  So here

3    we have quite stable demand.  I understand, of course,

4    technology changes a lot.  This is not a static industry, I

5    don't mean that, but demand is not fluctuating a great deal

6    from one month to the next.  That applies here.

7              Absence of large buyers.  This is a consumer market,

8    so the -- there are no large buyers.  Even the enterprise

9    people, who are still small in the overall market, are in a

10   separate segment.

11             So all these points are -- all these factors are

12   pointing towards concerns.

13             The transparent pricing and rapid monitoring, this is

14   the same idea I mentioned in the context of predictable, stable

15   demand, which is if the firms are feeling each other out and

16   not competing too much, then if one firm is thinking maybe I

17   will get a jump on the other guys by lowering the price, how

18   much of a jump can you get?  If they find out quickly and

19   respond, you don't gain very much.  So if the prices can be

20   monitored rapidly and have rapid responses, the prices are

21   transparent, that tends to support coordination.  And we have

22   that here, and we will talk about that a little more.

23             So those were all these elements.  I am aware that the

24   economists on the other side have pointed out that there's some

25   complexity in pricing.  There are a lot of different components

1    of pricing, I expect to be asked about it, and I agree that is

2    a factor that, everything else equal, could push the other way,

3    but looking at these in total and with many other things we'll

4    talk about, I think this is definitely a market that is

5    susceptible to coordinated effects.

6    Q.   I want to briefly look at a few documents that go to this

7    last point, which is the transparency of pricing in this

8    industry and the ability to rapidly monitor what your

9    competitor is doing.  Is this one, Exhibit 1021, one of the

10   documents you relied upon in this matter in connection with

11   this very point?

12   A.   Yes.  So it's a T-Mobile document, Executive Dashboard Key

13   Metrics is the title of it.  And you see weekly promotion

14   overview post-paid.  And so they're tracking Sprint, Verizon,

15   AT&T on multiple dimensions.  And you could see some of the

16   complexity I mentioned.  My key point is that they are doing

17   this on a weekly dashboard here weekly reports.  That's quite

18   rapid.

19   Q.   This next one, is this another regular document that you

20   have seen in their productions, and what does it tell you?

21   A.   Again, the T-Mobile document, again executive dashboard,

22   and they're monitoring particularly these porting trends.  So I

23   think you heard about this.  Porting is when a person moves

24   their number from one carrier to another.  So that's something

25   they're pretty interested in:  Are they gaining port-ins and

1    port-outs?  And they have a weekly view of port-ins and

2    port-outs by carrier.  So that's a lot of detail.  In a lot of

3    industries it's more the fog of war:  I lost customers, I don't

4    know what happened.  Here they know a lot quickly, and that

5    tends to support coordination.

6    Q.  And this document, does it relate to the same point about

7    monitoring and also transparency of pricing?

8    A.  Yes, exactly.

9    Q.  And this one here?

10   A.  Sorry, I wasn't looking.  I didn't understand.  There's a

11   point about signaling, a slightly related point, which is you

12   could monitor and then signal.  So there's a clear mutual

13   awareness among the big players of what they're doing and

14   trying not to trigger an overreaction, say no need to panic,

15   they say.  They don't want the other firm to think they're

16   doing something dramatic on an ongoing basis, because that

17   would trigger a response that would be essentially bad for both

18   or all of them, because it would be like initiating a price

19   war.  They don't want that to happen, so they're signaling.

20   That's the type of thing that we look at when talking about

21   coordinating effects.

22   Q.  You were just discussing Exhibit 777, and the next one,

23   Exhibit 856, is of a similar nature?

24   A.  Again a signaling example.

25   Q.  So let's turn now to the second part of your analysis of

1  coordinated effects, which is whether the merger itself is

2  likely to increase the danger of anticompetitive coordination

3  in this market.

4  A.  Okay.

5  Q.  Why would the proposed merger between T-Mobile and Sprint

6  make coordination more likely?

7  A.  So there are three reasons, all of them quite strong, in my

8  view.  First, the merger will significantly increase

9  concentration, and that creates inherent dangers.  That's one.

10      Second, Sprint will be eliminated as a competitor.

11  And they have been a disruptive force.  We call them a

12  maverick.  I will talk about that term in a moment.

13      And T-Mobile has also been rather disruptive, and they

14  will go from being the scrappy number three to being the market

15  leader.  And that is transformation that will tend to raise the

16  concerns about coordinated effects.  So those three reasons.

17  Q.  Let's go to the first one.  How does increased market

18  concentration affect the likelihood of coordination?

19  A.  Well, this is the intuitive idea that if there are fewer

20  players, not as many have to coordinate.  And when the players

21  are bigger, in terms of the market share, they are happier with

22  the status quo.  And if they were to start a price war, they

23  would be more at risk, basically, because they would have more

24  to lose.  So it's just the general idea of market concentration

25  as related to less competition.

JCBTSTA7                          Shapiro - Direct

1    Q.  And how does that concern, the number of competitors, et

2    cetera, relate to the HHIs that we were previously talking

3    about and the changes in HHIs?

4    A.  Well, that's the link between that quantitive measurement

5    of market shares we spent a while on with those large increases

6    in Herfindahl tendencies, 600, 700, highly concentrated market,

7    3,000 plus after the merger.  So that directly links to this

8    concern.  And going back to the guidelines, back to 1982,

9    that's been the linkage, the Herfindahl and coordinated

10   effects.

11   Q.  So let's go to your second and third reasons about the

12   concerns about this merger and its effects on coordination,

13   both of which relate to the maverick concept.  Could you

14   explain what a maverick is in the context of coordinated

15   effects?

16   A.  Certainly.  So the term is used in the literature,

17   sometimes also use the term "disruptive firm."  Basically it's

18   a firm that tends to initiate competitive moves and is less

19   likely to go along with coordination by others, or let's say

20   with price increases or other moves that are not in favor of

21   consumers.  So the firms that have been disruptive have been

22   lowering prices, and it's often a smaller firm, could be, or a

23   firm with lower costs, for example, or a firm that has some

24   other -- those would be two good examples, yeah.

25   Q.  So T-Mobile likes to say that being a maverick is in their

1    DNA, it's parts of their culture.  Does the way that the merger
2    guidelines and antitrust economists look at the concept of
3    maverick, does it have anything to do with the corporate
4    culture of a particular firm?
5    A.  It's not about that, no, it's really about the economic
6    incentives facing the firm.  If you have a firm with a
7    relatively small share but has the prospect to grow that, they
8    may figure look, we're going to cut price, we could pick up
9    some share doing that.  The attribute there that makes them a
10   maverick is a small share, or in my other example, the cost,
11   it's not about cooperate culture.  So this is important because
12   when you have a merger, the incentives of the firms are going
13   to change.  And so a firm that has been a maverick might not be
14   one anymore.  That's what I'm concerned about here for
15   T-Mobile.
16   Q.  So I want to go back to slide 45.  So what is the role of
17   maverick?  We see that in the next to last line here.  What is
18   the role of maverick firms in a merger analysis?
19   A.  Well, the last sentence here is worth my referencing.  It
20   says:  An acquisition eliminating the maverick firm --
21   explained elsewhere -- in a market vulnerable to coordinated
22   conduct is likely to cause adverse coordinated effects.
23        So the idea is if a market is susceptible, and I
24   explained that this one is, to eliminate a maverick firm is
25   inherently worse.  I'm giving a little overlay here, but we'll

1    talk about Sprint, for example, they have been a low price

2    firm.  T-Mobile has their uncarrier strategy.  If you eliminate

3    a maverick for a moment -- let me stick with Sprint, because

4    it's the firm being eliminated -- it's inherently worrisome in

5    terms of coordinated effects if you're in a market where such

6    effects -- it's vulnerable, it's susceptible.  So it's a really

7    central part of coordinated effects analysis.  It's not the

8    only path for one to find these effects in analysis, but it's a

9    central one, and it's identified here in the merger guidelines.

10   Q.  Let's skip forward six slides to slide 51.

11        You said both Sprint and T-Mobile have been mavericks.

12   Let's start with Sprint.  How will the elimination of Sprint as

13   a maverick increase the danger of coordination?

14   A.  So we're on the left-hand side here, your Honor, then we'll

15   turn to T-Mobile next.

16        So I just listed here some of the ways -- significant

17   ways in which Sprint has acted as a maverick, and let me

18   translate that, meaning engaged in competitive initiatives that

19   have been pro-consumer and have put pressure on the other

20   firms.  So they have this cut-your-bill-in-half promotion, this

21   was around 2015 where they offered to -- well, I think you

22   heard about it -- where they offered to -- if you moved from

23   one of the other carriers you only paid 50 percent, and that

24   triggered responses.  They were one of the leaders with

25   T-Mobile in introducing low cost unlimited plans.  That

1   triggered responses.  So they have been initiating these

2   competitive modes and triggering responses, some by T-Mobile,

3   some by AT&T and Verizon.

4          They also were the first to get into cell phone

5   leasing.  They have been supportive of eSIM technology.  I

6   don't know how much you heard about that yet, but this is

7   mostly with Google Prime now.  It's a way for the cell phone to

8   be able to automatically shift from one carrier to another.  So

9   this is a pro-competitive technology that Sprint has been

10  supportive of and the other carriers have not.  So that's

11  initiating the competitive move in that sense.  And they both

12  have done that with MVNOs with giving them core control, some

13  additional autonomy, a little bit, some additional scope of

14  action, I will say.

15         So these are all dimensions in which Sprint has been a

16  maverick, initiated competitive moves.  So naturally if they're

17  gone as an independent firm, that's not happening.  So we

18  worry:  Is somebody else going to do that?  Who is going to do

19  that without Sprint to do it?  It's the concern.

20  Q.  Let's turn to T-Mobile.  How will the transformation of

21  T-Mobile into new T-Mobile increase the danger of coordination?

22  A.  So again I listed some ways in which T-Mobile has been a

23  maverick.  I think they're rather proud of it, and I applaud

24  them and their CEO for shaking up the industry.  They have put

25  a lot of pressure on AT&T and Verizon over the years, competed

1    with Sprint, too, we'll talk about that a little more.  The

2    whole uncarrier strategy, there's been a lot of pieces to it.

3    They eliminated long-term contracts, the low cost unlimited

4    plans, eliminated overcharges and others.

5            So they have initiated a lot of moves, and it's

6    generated enormous value for the consumers; not just their

7    consumers, but AT&T and Verizon subscribers also benefit

8    because they have been forced to respond.  So again, now the

9    question is not they will be eliminated, T-Mobile, but they're

10   going to be transformed.  They will have the largest market

11   share, and one just has to ask whether they will have the same

12   incentives to compete when they are the market leader as

13   opposed to number three trying to gain ground.

14   Q.  And Professor Shapiro, you mentioned the CEO of T-Mobile,

15   Mr. John Legere, right?

16   A.  Yes.

17   Q.  He has a rather big personality, right?

18   A.  Yes.

19   Q.  And the way you're looking at this, does this have anything

20   to do with Mr. Legere's personality or Mr. Sievert, who is

21   about to succeed him, or Mr. Kerry, who might succeed

22   Mr. Sievert, or whoever the head of it is, does this have

23   anything to do with the personality of the individual or does

24   it have to do the economic incentives of the company?

25   A.  As I said, it's not about corporate culture or about

1    individual leaders, at least in my analysis.  I will testify as

2    an economist here, so I'm talking about the economic

3    incentives.  And this is deep in the DNA of an antitrust

4    economist:  If this merger goes through, what will the

5    incentives of these firms be?  They're going to be trying to

6    make profits, where will that take us?  It's all about economic

7    incentives and capabilities.

8    Q.   How do MVNOs factor into your analysis of the likelihood of

9    coordination among new T-Mobile, Verizon and AT&T?

10   A.   So I have accounted for the MVNOs in my analysis of

11   coordinated effects.  I hope you will remember, your Honor, I

12   said a while ago that because the MVNOs have these really low

13   margins, they cannot initiate price cuts.  They can't

14   significantly lower price because that will put them under

15   water.  They're basically on very thin margins as resellers.

16          So if new T-Mobile, AT&T and Verizon pull their

17   punches, don't lower prices as much, without the mavericks

18   pushing -- without Sprint, let's say, to push them down, the

19   MVNOs will not disrupt that.  They can't be the one to initiate

20   the price increases.  They don't have the margin.  They would

21   be under water.  So this type of coordination in the MVNOs, I'm

22   not saying they're going to be coordinated or part of it, but

23   they also can't restrain it.  So the concern is not reduced by

24   recognizing that there are MVNOs out there.  I have done that.

25   I recognized them.

JCBTSTA7                         Shapiro - Direct

Q.  So based on your coordinated effects analysis, how are
consumers going to be harmed?
A.  So that's the slide here, your Honor, now, potential harm
to consumers.  So the specific scenario, new T-Mobile, Verizon,
AT&T coordinate to avoid price declines in 2020.  So I have
been telling the story a bit already, which is without -- after
the merger, instead of having prices go down, they just stand
pat, they pull their punches, as I have been calling it.

        Now why would that harm consumers?  Well, consumers
would be missing out on the price reductions that would
otherwise take place.  So I have a way of quantifying that.  We
can look at what the price reductions have been over a several
year period as reported by the FCC, and that's the middle row
here.  This is the most recent data we have from them on this,
that's why it's 2014 to 2017.  It's the ARPU, the ARPU have
been declining at a rate of 6.3 percent a year.

        So I will call it an illustrative calculation for your
Honor based on the scenario.  If the coordination involves
prices stay where they are instead of going down 6.3 percent,
and it's just the three big players who do that, that would
cause annual consumer harm of 8.7 billion.  That's taking the
6.3 percent and multiplying it by that revenue base of 138
billion.  There's so much money in these markets.  These are
huge markets.  That's a lot of consumer harm simply by avoiding
price increases for one year.

1    Q.  So now let's turn to unilateral effects, the other kind of

2    anticompetitive effect.  Just briefly, if you could explain

3    what unilateral effects are.  And I put on the screen another

4    provision in the horizontal merger guidelines relating to

5    unilateral effects.

6    A.  So as I say here, a merger between firms selling

7    differentiated products may diminish competition by enabling

8    the merged firm to profit by unilaterally raising the price of

9    one or both products above the premerger level.

10        So here we're talking about T-Mobile and Sprint,

11    they're selling differentiated products.  The unilateral means

12    the merged firm, new T-Mobile, would set higher prices than

13    T-Mobile and Sprint would otherwise set if they weren't

14    combined.  So unilateral, we're focusing very much on T-Mobile

15    and Sprint.  The coordinated effects discussion, there was a

16    lot about AT&T and Verizon, now we can kind of put them aside a

17    bit in the sense they're out there, they're competing, but

18    let's take their prices as given, and just looking at T-Mobile

19    and Sprint combining, would that create incentive to raise

20    price?

21        And that's what the effects are about, and I am going

22    to explain why I believe it would.  The idea is rather simple,

23    I think, and intuitive.  After the merger, if T-Mobile raises

24    their price, they won't have to worry about losing customers to

25    Sprint, they own Sprint.  That's what we're talking about.

JCBTSTA7                              Shapiro – Direct

1    Q.  Let's step back for a second and focus on the term "higher

2    prices" in the context of a unilateral price effect.  How in

3    this context should we interpret the term "higher prices?"

4    A.  It means higher prices with the merger than without the

5    merger.  In this industry, where price has been coming down,

6    what I'm really thinking about is prices will stop coming down

7    or won't go down as fast.  So it's prices with the merger

8    compared to without.  And that's what this -- we'll get into

9    some quantification here -- that's what the techniques are

10   focused on is the difference between the merger with or without

11   the merger, not over time.

12   Q.  And bottom line, what is your conclusion regarding

13   unilateral price effects?

14   A.  So there are -- I expect there to be significant unilateral

15   price effects associated with this merger, and that will harm

16   consumers.

17   Q.  What are the factors that drive you to that conclusion?

18   A.  The central element of that conclusion is that there is

19   significant direct competition between T-Mobile and Sprint that

20   will be eliminated.

21                (Continued on next page)

22

23

24

25

JCBPSTA8                          Shapiro - Direct

1    Q.  Now, wouldn't there be a loss of head-to-head competition
2    between the merging parties in any horizontal merger?
3    A.  Yes, there would be.  So we need to -- it's desirable, to
4    the extent we can, to quantify the extent of this loss of
5    competition.  It's the same idea of the Herfindahles, your
6    Honor.  Any horizontal merger will raise the Herfindahl in the
7    relevant market.  We don't make a big deal of it if those
8    changes are small or if the Herfindahl is low.
9          In this case, we need to see how big is this effect,
10   how much do they compete directly, and that's what we want to
11   quantify and that's what I'm going to do.
12   Q.  So what evidence did you look at to help determine the
13   extent of the head-to-head competition between T-Mobile and
14   Sprint?
15   A.  Well, there's a lot of company documents that naturally
16   talk about competition, and let me be clear here, of course,
17   they each compete with AT&T and Verizon.  What we were just
18   trying to quantify is the extent to which they compete with
19   each other.  So we have documents, and then I have data that I
20   particularly like.
21   Q.  All right.  Okay.  We're not going to go over that data too
22   much here.  Were you able to quantify the extent of
23   head-to-head competition between T-Mobile and Sprint?
24   A.  Yes.  So the way we do that is through something we call a
25   diversion ratio, and basically it runs like this:  If T-Mobile

JCBPSTA8                        Shapiro - Direct

1    raises their price, they're going to lose some customers.

2    They're going to lose customers basically to AT&T, Verizon and

3    Sprint.  We want to measure how many would they lose to Sprint.

4    If they're losing a lot to Sprint, then that's significant

5    head-to-head competition.

6              So the diversion ratio is of the customers they lose,

7    what share go to Sprint, and then we do the same thing in the

8    opposite direction.  If Sprint raised the price, what share of

9    the customers they lose would go to T-Mobile; so that way, we

10   can quantify the head-to-head competition through this measure

11   called the diversion ratio.  You may have seen in other cases,

12   maybe not, something in the conversation called

13   cross-elasticity of demand.  It's the same idea.

14             THE COURT:  Mr. Pomerantz, let me interrupt here

15   because a lot of questioning that you have been asking have

16   raised some questions of my own, which perhaps at this point --

17             MR. POMERANTZ:  That's more important than mine, your

18   Honor.

19             THE COURT:  There's an assumption that I think is

20   implicit in your analysis that essentially if the merger goes

21   forward, Verizon and AT&T and now the new T-Mobile are

22   essentially going to sit on their hands.  You say that they're

23   not going to compete as aggressively.

24             THE WITNESS:  That would be the coordinated effects

25   part.

JCBPSTA8                      Shapiro - Direct

1              THE COURT:  Yes, the coordinated effect.  Is there

2    evidence or experience about head-to-head competition between

3    Verizon and AT&T, under current conditions?  In other words,

4    they don't just sit back and see the scrappy ones down below

5    fighting one another and they just sort of take a back approach

6    and do nothing.

7              What is the likelihood that, in a merger situation,

8    AT&T and Verizon will see that, won't want to have T-Mobile in

9    their league, so to speak, and take actions, whatever they may

10   be, to compete even more aggressively in order to increase

11   their market and lower T-Mobile's?

12             THE WITNESS:  Well, what we've --

13             THE COURT:  Let me amend that by saying something

14   else.  Part of the assumption also seems to be that price is

15   everything and that competition could not take place in other

16   ways.

17             And I think you alluded to something else, which is

18   the third point, that these firms don't increase prices the way

19   that we've seen Sprint do it, by cutting things in half

20   immediately and then boasting about it, and two years later it

21   turns out it was counterproductive.  That experience is out

22   there.

23             So to what extent do you assume somehow, if there's

24   going to be price increases, it necessarily will be in the

25   aggressive way that Sprint did it and/or to what extent are

JCBPSTA8                        Shapiro - Direct

1    these price increases in a market that's really not

2    transparent, that they find ways of increasing prices through

3    other kinds of services, by bundling, for example, so that it

4    doesn't appear on the surface that you're really paying higher,

5    but you really are because you're paying a little bit more for

6    another service and a little bit less for wireless?  So all of

7    these complications may somehow raise questions about the

8    analysis you've given, at least in my mind.

9            THE WITNESS:  Your mind is the one that matters.  So

10   the first point, so no doubt Verizon and AT&T do compete

11   against each other.  They're the two leaders.  What I think the

12   evidence shows, as I've read it and seen it, your Honor, is

13   that they have been rather reactive or passive, and so that's

14   the flip-side of what I said --

15           THE COURT:  That's not been a danger or threatened,

16   the way that this merger would, because now they're going to be

17   less, they will have less of a market share or one, T-Mobile,

18   is going to have larger share than they?

19           THE WITNESS:  Well, if you want to be the No. 1 firm,

20   you're not No. 1 anymore, if you're Verizon, after this.

21   T-Mobile would have a somewhat higher share.  I don't think I

22   would call that threatened, though.  Under the coordinated

23   effects analysis I've just been through, it might be welcomed

24   because you wouldn't have to face scrappier No. 3 and No. 4

25   anymore.  So I don't think of this as threatening Verizon.  It

JCBPSTA8                          Shapiro - Direct

1    might be welcome.

2              In any event, on the coordinated effects part --

3              THE COURT:  If they welcome it, would that not suggest

4    that they would try to find ways of either making sure that

5    they retain their market share or that they increase it at the

6    expense of T-Mobile?

7              THE WITNESS:  Well, so I think, to the extent that

8    Verizon reacted to this merger by saying, hey, we're used to

9    being No. 1, and we don't like it anymore, and they responded

10   with price cuts, say, well, that would be against the

11   coordinated effects theory.  Okay?  That's not -- we don't

12   really know about that exactly because what we've seen -- what

13   I can go on is the historical record, is AT&T and Verizon have,

14   as I said, been more reactive or passive.  They haven't been

15   initiating these moves.

16             My analysis is they would have some interest, as would

17   AT&T, in not competing as much after the merger due to the

18   market consolidation, but we can't predict these things

19   perfectly.  So that's your first question.  Can I go onto the

20   the --

21             THE COURT:  Yes, please.  Go ahead.

22             THE WITNESS:  Then you said there's a lot about price

23   competition, and actually we often get criticized, like, price,

24   price, price with you people.  Right?  Quality is really

25   important here.  I think you're going to hear it a lot.

JCBPSTA8                         Shapiro - Direct

1          THE COURT:  That is my question precisely.  It may not

2     be just price.  Quality is important.

3          THE WITNESS:  So the bulk of my analysis of

4     coordinated effects and unilateral effects is about prices.

5     That is what the tools we have to do, and I'm presenting that

6     to you.

7          The quality competition, which is really through

8     network investment, I mean, the biggest thing -- I'm not

9     offering specific opinions about how that will be affected.  I

10    did mention the local markets, and so the concern would be, in

11    local markets that are very highly concentrated, there would be

12    a slower investment going on because it wouldn't be as

13    competitive.  Okay?  But I don't have a way to quantify that,

14    but I think I would certainly agree, quality competition is

15    very important here and technology is changing.  So I just

16    can't quantify that for you.

17         THE COURT:  All right.

18         THE WITNESS:  And then, well, I guess maybe I answered

19    your other -- oh, the hidden fees in the bundling.

20         THE COURT:  Transparency, price increases.

21         THE WITNESS:  Right.  So there are -- as I

22    acknowledge, there is a fair bit of complexity of the pricing

23    and bundling, equipment discounts; so that's the reality of

24    this business.  I think you were picking up on the possibility

25    of hidden fee increases.  I haven't really looked at those.

JCBPSTA8                      Shapiro - Direct

I've been thinking more about the other side, which is if one

company lowers the price, will the others respond quickly.

        And when that happens, if that's going to happen, it's

not worth starting a price war, you know.  After a week, you

guys notice you've got your comparative intelligence.  I lower

a price.  Where does it get me?  You match it in a week.  So

that's been my point.  I've not looked at hidden fees through

bundling.  It's not something I analyzed.

        THE COURT:  Thank you.

        MR. PARKER:  Thank you, your Honor.

BY MR. PARKER:

Q.  So we're talking about diversion ratios, which is looking

at when -- you know, how many consumers would switch, let's

say, from T-Mobile to Sprint.  They would be diverted,

depending on what happens to price.  When a consumer moves from

T-Mobile to Sprint or Sprint to T-Mobile, that may be based on

whatever factors that consumer values, correct?

A.  Certainly.

Q.  And so when you are looking at diversion ratios, people who

are moving from one to another, would that look at the factors

that are important to the consumer, whatever might be important

to them?

A.  Well, if we're tracking people who are actually switching,

it would be based on their -- you know, their situation, you

know, the quality offered by the different suppliers, prices

JCBPSTA8                    Shapiro – Direct

and so forth.

          So I'm going to track subscribers switching from one
firm to another.  That's going to be my primary data.
Q.  And to just go to the Judge's questions to you.  So when
somebody is moving from T—Mobile to Sprint or to another
carrier, that would include the factors of price, quality and
whatever other things that the consumer or the consumers on
average value, correct?
A.  Yes.  So when we track these movements, it would be all
factors that matter to the consumer would be built in because
we're looking at the consumer's choices.
Q.  All right.  So I think we were looking at diversion ratios.
You had explained what they are, and I wanted to ask you, in
specifically with this matter, what data did you rely on to
calculate the diversion ratios?
A.  So we have a number of sources of data here, your Honor.
We have porting data, which measures when people move their
service, move their phone number from one service to another,
and we have that from -- we have porting data from the FCC and
porting data from Comlink and porting data that the parties
track on their own, from their own business, you know,
experience when they're porting people in and out.

          And then I have switching data, which is when people
switch carriers but may not necessarily keep the same phone
number.

JCBPSTA8                        Shapiro - Direct

1    Q.  All right.  And do Sprint and T-Mobile rely on switching
2    data in their ordinary course of business?
3    A.  Yes, they do.  It's a natural thing to track.  It's like
4    wins and losses, port in, port out.  This is a common thing in
5    their documents.
6    Q.  Let's turn now to this slide.  Could you explain this
7    slide, and what you found when you looked at this switching
8    data?
9    A.  Certainly.  So these are measuring diversion ratios, let
10   me -- again, between the two firms.  That's the key thing we
11   want to measure, to quantify, the extent to which they compete
12   directly with each other.
13              So let's look at the left-hand side.  That's the
14   diversion from T-Mobile to Sprint.  So they're around
15   40 percent.  That's telling us that when people switch away
16   from T-Mobile, 40 percent of them end up at Sprint.  I'm doing
17   this at the firm level.  I'm adding all the brands together.
18              Okay.  And the switches within the firm are not
19   counted as switches.  That's just different products within the
20   same firm.  So that's quite a large number.  It's a very large
21   number, your Honor.  Remember, Sprint's market share is about
22   15 percent and, yet, when people leave T-Mobile, 40 percent of
23   them go to Sprint.  That's quite striking, actually, in terms
24   of the extent of direct competition.
25              THE COURT:  To what extent is the Boost factor?

JCBPSTA8                          Shapiro - Direct

1          THE WITNESS:  Yes.  So we're going to show this by

2    brand in a moment.  A significant part of this is Boost, and so

3    when I evaluate the effects, I have to account for the Boost

4    divestiture; so these will overstate -- these don't -- these do

5    include Boost, and I have to break that out, and I'm getting

6    there.  That's exactly right.

7          And likewise, in the other direction -- oh, the four

8    sources are listed there.  Local number portable, that's the

9    FCC data.  Comlink is a commercial service that tracks the

10   port.  Parties have their own porting, and Facebook is the

11   switching data that is not just porting but others switching.

12   I will tend to use the Facebook data in the subsequent

13   analysis, but they're very close here.

14         And then in the other direction, people leaving

15   Sprint, around half of them end up at T-Mobile.  And you're

16   quite right, your Honor, a significant part of that involves

17   prepaid; so this would be leaving perhaps -- Sprint here is all

18   the brands; so it would include Boost going to Metro is what

19   would be included in these numbers.

20   BY MR. PARKER:

21   Q.  And what do these numbers tell you about the head-to-head

22   competition between T-Mobile and Sprint?

23   A.  It's significant, and it's larger than one would expect

24   just based on the market shares.

25   Q.  Okay.  And then did you also look at diversion ratios by

JCBPSTA8                          Shapiro - Direct

1    brand?  I take it that's what you did?

2    A.  Right.  So that --

3    Q.  And before we get to the slides, did you consider another

4    source of switching data to measure the competitive effects

5    here?

6    A.  Yes.  So there's another source of data.  It's called

7    Harris X that I looked at.  I decided not to use it, rely on

8    it, and I expect to be questioned about that.  It's a survey.

9    These data are actual switches, okay, that are observed.  It's

10   a survey; so it's self reported, which is neither here nor

11   there.

12           I prefer actual data to surveys when I have it, but

13   one of the things they do and ask in that survey is if you

14   switch, where did you switch?  Did you port your number?  And

15   people say "yes" or "no."  And for the people that say they

16   ported, the data don't line up very well with the actual

17   porting data; so I don't consider that as reliable.  It does

18   lead to some lower numbers.  I think that's why the merging

19   parties like it instead, but I stand by these.  I think they're

20   more reliable.

21   Q.  All right.  So let's look at it by brand now.  What did you

22   find when you measured the diversion ratios at the brand level?

23   A.  Right.  So let's talk about Boost and Sprint just because

24   your Honor asked about it, and you do see significant diversion

25   there.

JCBPSTA8                    Shapiro - Direct

1          So the Metro, you see if you look at the Metro, from

2     Metro to Boost is 30 percent, which is a lot.  Boost's market

3     share is not that big.  A lot of Metro people, people who leave

4     Metro, are going to Boost and, likewise, Boost to Metro.  Down

5     at if bottom is 45 percent; so there's quite a lot of

6     competition in prepaid.  It's what we'd expect.  I mean,

7     prepaid is a segment.

8          We're not defining it as a separate market, but it is

9     a distinct segment, and there's more switching within that.  We

10    don't really need to get into these numbers, your Honor.  I

11    just wanted to put them in the record, your Honor, and I do

12    need these numbers for the analysis that is going to come

13    because I have to account for the Boost divestiture; so I have

14    to break out Boost.

15    Q.  All right.  So you were talking about a calculation.  So

16    economists have a method for using these diversion ratios to

17    estimate the magnitude of the unilateral price increases that

18    could arise from a merger?

19    A.  Yes.  So in terms of the quantification, I said we can

20    measure direct competition through these diversion ratios.

21    We've done that, and then we have a method to build on that and

22    estimate or get to evaluate, to quantify how much upward

23    pricing pressure is what we call it, the merger will cause.  So

24    how much incentive the elimination of competition between

25    T-Mobile and Sprint, how much incentive that will create for

JCBPSTA8                        Shapiro - Direct

the merged company to set higher prices for the brands they
control.  So that's this upward pricing pressure metric
that's -- that I'm going to calculate, and it builds upon the
diversion ratios.
Q.  All right.  And do the merger guidelines use upward pricing
pressure?
A.  Yes.  We have a slide here, your Honor.  It says, when they
can, the agencies assess the value of diverted sales.  That's
sales going from one firm to another.  In this case, T-Mobile,
Sprint, which can serve as an indicator of the upward pricing
pressure on the first product resulting from the merger.  So
that's the merger between the two products that I referred to
that.

        So yes, the merger guidelines include this metric of
upward pricing pressure, and that's what I've calculated.
Q.  And then could you -- how do economists compute upward
pricing pressure?
A.  So we take the diversion ratios we've talked about, which
is measuring head-to-head competition, and then the other thing
we need is the profit margins because that's going to determine
how much incentives are created by this, by putting the two
products or by combining the two firms, and then we're going to
need the prices of the product.  So we need diversions, margins
and prices, three inputs, and we've got those all here; so I
did the calculation.

JCBPSTA8                          Shapiro - Direct

1   Q.  And is this a common approach for economists to use in

2   assessing unilateral effects for a horizontal merger?

3   A.  Yes, it's quite common, especially the last 10 years, since

4   it's in the guidelines.

5   Q.  So before the 2010 revision, it wasn't in the guidelines

6   and it was added in 2010?

7   A.  Well, there were elements of this that agencies were

8   practicing, but it wasn't in the guidelines.  It was put in the

9   guidelines, and it's been used more since then.

10  Q.  Did you calculate the upward pricing pressure metric here?

11  A.  Yes, I did.

12  Q.  All right.  If you could briefly describe this slide to the

13  Court?

14  A.  So we do this at the brand level; so we're trying to

15  measure this pressure for each of the three brands that the

16  merged company will control, T-Mobile post-paid, Metro and

17  Sprint post-paid.  Boost is not here in this chart because they

18  will be divesting Boost, and I've accounted for that.

19          So the key column is the one labeled Upward Pricing

20  Pressure as a percent; so that percent is -- think about it as

21  being applied to the monthly prices, the $40 for T-Mobile

22  post-paid.  So this is the metric that we've calculated, I've

23  calculated, and the key numbers are the 21 percent, 30 percent

24  and the 16 percent.

25          And economically, it's as though there's going to be

JCBPSTA8                        Shapiro - Direct

pressure for the T-Mobile to raise prices unilaterally,

economically comparable to if new T-Mobile's costs went up by

these amounts as a fraction of its price -- of its ARPU; so

these are quite high numbers, 21, 30 and 16.  Those are the

pricing pressure metric.  I can't really bring it home in terms

of the implication until we get to the last column; so that's

probably the next question.  So that's the metric that's

calculated, those three numbers.

Q.  All right.  So if you could then take us through the

analysis here, all the way to the right-hand column, and

discuss how you did it and what the -- and how you used the

passthrough rates?

A.  So this upward pricing pressure is not itself a prediction

of a price increase.  It's what I think of as a rather elegant

method, but it doesn't lead to a price increase prediction.

One needs to introduce an additional assumption to get to a

price increase.

        So we need to introduce an assumption about what

percentage of this pressure will be passed through to

consumers.  And I've assumed 50 percent as a passthrough, which

is a standard assumption in the literature, which goes along

with a straight line or linear demands.  It's an assumption.  I

think of it as sort of a neutral assumption, 50 percent.

        Applying that, we then take the numbers in the upward

pricing pressure column, we cut them in half, and we get the

JCBPSTA8                        Shapiro - Direct

1   price increase that's the final column.  So with that

2   additional assumption of a 50 percent passthrough rate, then we

3   would have implied price increases for each of the brands.  I

4   mean, these are significant price increases, 11, 15 and

5   8 percent, that would be resulting from the merger.

6           Again, the incentive for new T-Mobile to raise price

7   on its own, taking as given the prices that Verizon and AT&T

8   are setting.  So they're still competing.  They're in the

9   market, absolutely, but we're taking as a given their prices

10  and just looking at the results of the combination, the

11  unilateral incentives caused by it.

12  Q.  And how do these percentage price increases translate into

13  consumer harm?

14  A.  So if we take those percentage price increases, multiply

15  them by annual revenue for each of the three brands that new

16  T-Mobile will control, we get a bottom line annual consumer

17  harm of $4.6 billion.

18  Q.  And you said that these calculations and your upward

19  pricing pressure calculations, they already take into account

20  the Boost divestiture, correct?

21  A.  This all does, yes.  The last couple of slides have

22  accounted for the Boost divestiture.

23  Q.  And do your calculations also account for MVNOs?

24  A.  Yes, in that I have accounted for the fact that T-Mobile

25  will be making money on MVNO subscribers and that affects the

JCBPSTA8                        Shapiro - Direct

1    incentive.  I have not assumed any increases in wholesale

2    prices, however; so that's not part of the analysis.  Those are

3    taken as a given.

4    Q.  All right.  So you said earlier in your testimony that

5    after you go through and assess and determine whether there's a

6    likelihood of anticompetitive effects, which you have found,

7    you then look to see whether there's any mitigating factors and

8    the first one you mentioned was entry.  What is involved in

9    analyzing entry?

10   A.  Well, the basic question is:  Will entry save the day?

11   We've determined that there are significant likely

12   anticompetitive effects.  Haven't accounted for entry yet,

13   though.  Will entry by new firms be sufficient?  Well, timely,

14   likely and sufficient are the words we're going to use to

15   either deter those effects so they won't happen, or to

16   counteract them rapidly.  That's the question.  To restore

17   competition essentially that's lost.

18   Q.  All right.  And I think you said timely, likely and

19   sufficient.  I take it that comes from the merger guidelines?

20   A.  Yes, that's right.  That's the standard analysis we do.

21   Q.  Okay.  So I want to put aside for a moment DISH as a

22   potential entrant.  So putting DISH aside for the moment, would

23   entry into the national market for retail mobile wireless

24   telecommunications services be timely, likely and sufficient to

25   deter or counteract the adverse anticompetitive effects that

JCBPSTA8                          Shapiro - Direct

1    you have found from this merger?

2    A.  So putting aside DISH, the answer is absolutely not.  It

3    takes years to enter.  It's usual hugely expensive, and we're

4    talking about Sprint, a company that has 45, 50 million

5    subscribers, covers 93 percent of the country.  That's not -- I

6    just don't see that happening anytime soon; so it doesn't seem

7    timely.  It doesn't seem likely that it would be sufficient.

8    This is a very hard market to enter and nobody's entered this

9    market -- no new nationwide carriers have come in for years.

10   It just, entry is not going to save the day.

11   Q.  And what about entry into the local markets?

12   A.  Well, the trend has been the opposite.  There were more

13   regional carriers years ago, and they were rolled up or

14   acquired.  All of the regional MNOs together have maybe a

15   percent and a half, if I remember, small share of the overall

16   market.  It just doesn't seem like that's very plausible, and

17   even if there were entry in some local markets, which I

18   wouldn't expect there to be, it wouldn't solve the question

19   about another local market.

20   Q.  So I want to go back to the Judge's question about, well,

21   would Verizon and AT&T compete when the new T-Mobile comes in

22   as the new market leader by lowering their price?  I take it

23   that if we went instead of from four to three, we went from

24   three to two, one could argue that that remaining competitor

25   would lower its price, and there would still be some

1    competition, correct?

2    A.  You would want to consider that.  There is still some

3    competition if it's not one.

4    Q.  So if we went instead of from four to three, we went from

5    three to two, and they were competing on the quality and price,

6    from an antitrust economist's perspective, would there be a

7    serious concern about the likelihood of anticompetitive

8    effects?

9    A.  Well, I mean, if you took all my analysis and applied it to

10   a three to two rather than from a four to three, somehow

11   imagine that, the concerns would be greater.  I'm not sure

12   where you're going, frankly.  The fact that there's remaining

13   competitors is not a get-out-of-jail-free card in terms of a

14   merger.  In other words, it's not simply merges to monopoly

15   that we're concerned about.

16   Q.  Right.  I guess what I was trying to get at was that, of

17   course it's possible that the remaining merger would price

18   compete, but that's true in every merger theoretically, you

19   have to look at the facts of the case, and you have to look at

20   the underlying economic incentives?

21   A.  That's true.  That's true, and that's why I was telling the

22   Judge that, historically, AT&T and Verizon have not been the

23   ones who have been initiating price cuts or these competitive

24   moves, and so it would be a change for them to do that.

25   Q.  All right.  Let's go now to the next potential mitigating

1  factor, which is efficiencies.  Have you analyzed the -- we

2  understand that the defendants are making efficiency claims in

3  this case; you understand that, correct?

4  A.  I sure do.

5  Q.  Have you analyzed the efficiency claims that have been made

6  by the merging parties?

7  A.  No, that's not part of my analysis.  Professor Scott Morton

8  have been analyzing the efficiency claims put forward by the

9  merging parties, and I'm relying on her for that part of the

10  analysis.

11  Q.  So in your analysis, have you accounted for efficiencies in

12  terms of the anticompetitive effects analysis?

13  A.  Well, the analysis I did was not crediting efficiencies, or

14  I guess the way you put it is, treating the efficiencies as not

15  cognizable in the language of the merger guidelines.  So that's

16  what I've been doing.

17  Q.  All right.  Have you estimated the magnitude of

18  efficiencies that would be required for the merger to benefit

19  consumers, rather than to harm them?

20  A.  Yes, I have.  For the unilateral effects part of my

21  analysis, we have a method to do that, and I've implemented it.

22  Q.  And what is that amount?

23  A.  So we have, as I said, in unilateral price effects, this

24  upper pricing pressure metric I described, tells the incentive

25  of the merge firm to raise price.  Well, if the merge firm can

JCBPSTA8                    Shapiro - Direct

1    lower its costs through efficiencies, that could be offset or

2    even overcome.  So we have a way of calculating how much of a

3    cost saving the merged firm would have to be able to achieve in

4    order to neutralize the upper pricing pressure, and I've done

5    that calculation.

6    Q.  All right.  And I've put up on the screen slide 64.  Could

7    you explain slide 64 to the Court?

8    A.  Certainly.  So this is, again, the three brands -- at the

9    brand level again for the three brands that will be controlled

10   by new T-Mobile.  If you see there in the middle, the upper

11   pricing pressure metric that we talked about earlier.  Then

12   I've added the marginal cost of serving -- this is per

13   subscriber per month; so it's comparable units to the ARPU.

14   And then I've calculated how much of a drop, a reduction in

15   marginal costs new T-Mobile would have to achieve, brand by

16   brand, to offset the upward pricing pressure, and that's what's

17   reported in the final column.

18   Q.  All right.  So just to make sure we understand this chart,

19   t-Mobile post-paid would have a marginal cost of $12.75,

20   correct?

21   A.  That's their current marginal cost.

22   Q.  And how much would that marginal cost need to come down

23   because of efficiences, to reduce the upward pricing pressure?

24   A.  So it would need to come down quite a lot, $11.47, bringing

25   it down to around a buck 50; dramatically lower than what it

JCBPSTA8                    Shapiro - Direct

is.  So that's something like a 90 percent reduction in
marginal costs, and again, economists think of marginal costs
as the types of costs that drive pricing.  That's why we're
using marginal costs.  So that's a very -- that's a large
percentage cost reduction.

        I should point out there's a note here, but I don't
want it submerged.  I'm measuring marginal costs not including
subscriber acquisition costs because it does not appear that
the efficiencies that are claimed would significantly apply to
subscriber acquisition costs.  We have calculations in my
report that do the other calculation.

        Then we see the same thing here for the other two
brands, and these are just very large price reductions for
Sprint post-paid.  They'd have to -- marginal costs would have
to drop even more as a percentage down to just, you know, 15
cents or something, and it's not possible -- well, they'd have
to drop even more than $7.95 for the Metro brand.  So using the
standard metric, it would seem very difficult for the
efficiencies to be of a magnitude to offset the upward pricing
pressure.  To neutralize -- they might partially offset it, but
to fully neutralize it so that consumers were not harmed, looks
like it would be very difficult.
Q.  All right.  And I'll put off the rest of the efficiencies
issues until Professor Scott Morton testifies.

        Now, I want to turn to the last subject of your direct

JCBPSTA8                          Shapiro - Direct

1    examination, which is the proposed remedies that the parties

2    have negotiated with the federal authorities, and I want to

3    focus on two of them, and the first one is price commitments.

4    Are you aware of the parties' price commitments to the FCC?

5    A.  I am.

6    Q.  And how do these commitments effect your analysis of the

7    merger?

8    A.  Well, what I'm asking when I look at any remedy is, does it

9    restore the competition that's lost due to the merger, any

10   merger remedy?  And a price commitment may help consumers.

11   We'll talk about that, but it does not restore competition.

12   It's a form of regulation.  It's a patch that is trying to put

13   a patch onto when the wound is a loss of competition, a

14   significant loss of competition.  So I don't tend to think of

15   this type of short-term price commitment as restoring that

16   competition.  It doesn't serve that function.

17   Q.  And even if the commitments would do nothing to restore the

18   competition that's lost because of this merger, would it at

19   least protect consumers from post=merger price increases?

20   A.  No, I don't -- well, it might protect consumers from

21   post-merger price increases if it's enforceable, but that's not

22   going to protect consumers from loss of competition because

23   consumers would still be denied the price decreases that would

24   result without the merger.

25   Q.  So if you could explain that.  I put a chart up there.

JCBPSTA8                          Shapiro - Direct

1    Could you explain to the Court what you mean when that it

2    wouldn't protect them from lower price, you know, from the loss

3    of lower prices?

4    A.   So this is a conceptual depiction, your Honor.   On the

5    horizontal axis are the prices of cell service plans.   They

6    have been coming down.   I already mentioned the ARPUs and the

7    FCC data.   They've been coming down due to competition.

8         Let us imagine, for the purposes of a point, that they

9    would continue to come down due to competition if there's no

10   merger.   That's the blue line continuing.   And the price

11   commitment, suppose it's very effective and prices are frozen.

12   Let's just say we're talking about T-Mobile's prices right now,

13   not getting into Verizon and AT&T.   That's not protecting

14   consumers.   Consumers would have had lower prices and, instead,

15   the prices are frozen or stabilized.   These price commitments

16   simply cannot replace competition.   Competition does wonderful

17   things and regulation cannot replace it.

18   Q.   Right.   And we've seen a lot of evidence of prices going

19   down just in the last three days.   What about recently, what

20   has happened to prices very recently in this market, as best

21   you can tell?

22   A.   Well, we have a slide just to illustrate what I'm talking

23   about, and the prices have been coming down.   This is a

24   comparison over a year ago to last month of plan prices by

25   T-Mobile.   These are some of the leading plans, and the magenta

1  plan went down from 40 to 35.  The magenta plus plan went down

2  from 50 to 43.  So this is common.

3          The price commitment to not raise price wouldn't

4  create an incentive -- wouldn't replace this type of price drop

5  that is being driven by competition.

6  Q.  All right.  So now, let's turn to the very last subject

7  here, which is DISH.  Have you considered whether the proposed

8  remedy involving DISH would restore the competition that would

9  otherwise be lost from this merger?

10  A.  I have, but I also should clarify, I have shared this part

11  of the analysis with Professor Scott Morton.  I've looked at

12  the impact of the DISH remedy, DISH arrangement over the next

13  two, three years, and Professor Scott Morton has evaluated it

14  over a longer period of time during which DISH has plans to

15  build out its network.

16  Q.  All right.  And how does this analysis of DISH relate to

17  your more general analysis about entry?

18  A.  So I am asking here, again, in the next few years, will

19  DISH's presence, as arranged through these -- through this,

20  I'll call it the settlement, I don't know what I'm supposed to

21  call it, will that be timely, likely and sufficient as an

22  entrant, initially as an MVNO, to replace the competition

23  that's lost due to the acquisition, the elimination of Sprint?

24  So I'm still asking that question, is this adequate to replace

25  the lost competition?

JCBPSTA8                           Shapiro - Direct

1    Q.   And in your view, is DISH likely to be able to satisfy the

2    requirements of timely, likely and sufficient?

3    A.   So, no, I don't think it does the trick, and I think I

4    break it up.   In the short term, DISH will be -- well, they're

5    going to come out of the box with about nine million

6    subscribers from Boost subscribers, and they're an MVNO.   I

7    mean, just right away.   Of course, they have plans to build; so

8    they're different than other MVNOs in that respect.   But right

9    away, that's what their market presence will be.   So that is

10   not coming close to replacing Sprint for various reasons.

11   Q.   So let's go a year out from now?

12   A.   Okay.

13   Q.   Do you recall what DISH projects in terms of the number of

14   subscribers that would be on its own network, versus the number

15   of subscribers that it would be handling through the MVNO with

16   new T-Mobile?

17   A.   So according to DISH's own plans that we've had from

18   September, as I recall the numbers, during 2020, the first,

19   let's say, the next year, only 2 percent of their subscribers

20   would be on their own network, and during 2021, it grows to

21   something like 10 or 12 percent.

22   Q.   All right.   So over the next two years, we'll still have

23   the vast majority of the subscribers that DISH would be serving

24   being -- getting their network services through the MVNO with

25   the new T-Mobile?

JCBPSTA8                          Shapiro - Direct

1    A.  Through the master network services agreement with new

2    T-Mobile.  So that's really what we're talking about in terms

3    of the entity that's been enabled for the next couple of years

4    through this arrangement.  And while they're building, you

5    know, I'm assuming they follow the business plan as it's been

6    presented.  That's what I'm doing here.

7    Q.  I think Professor Scott Morton may not make that

8    assumption, but you are making that assumption?

9    A.  Correct.  That is exactly the point.

10   Q.  Why does it matter to your analysis, at least looking at

11   the first two or three years, why does it matter to you that

12   DISH will be Reliant on the new T-Mobile network?

13   A.  So there's several elements.  I mean, I'm calling them an

14   MVNO just in the sense that they are not the new T-Mobile to

15   provide the services; so we had a long discussion about the

16   limited way in which MVNOs can compete, and a lot of that, not

17   all of that but a lot of that, applies to DISH.

18          Most notably, they cannot compete independently on

19   quality until they have their own network, and they're going to

20   have much higher marginal costs.  Boost, in DISH's hands, will

21   have much higher marginal costs than Boost has had as part of

22   Sprint, and that makes them a weaker competitor.  Higher

23   marginal costs make any company a weaker competitor.

24   Q.  And in your MVNO analysis that you testified to a little

25   while ago, you were showing that the MNO, the new T-Mobile,

JCBPSTA8                          Shapiro - Direct

1  would be making money with respect to each new subscriber that

2  the MVNO, here DISH, brought in, correct?

3  A.  That's correct.  Certainly, there's a wholesale price that

4  DISH will be paying to new T-Mobile under their agreement,

5  yeah.

6  Q.  And at the same time, new T-Mobile and DISH are competing

7  with each other to go find those subscribers, correct?

8  A.  That's true.

9  Q.  How does that effect new T-Mobile's incentives vis-a-vis

10 DISH?

11 A.  Right.  So new T-Mobile would have some -- have muted

12 incentives to go after subscribers of DISH because when they

13 grab a DISH -- if they convince a DISH subscriber to come to

14 new T-Mobile, they lose the wholesale fee on that.  So it's

15 just DISH and new T-Mobile will be very much entangled as

16 business entities.  They won't be separate, independent

17 competitors by any means.

18         This particular component means that the new T-Mobile

19 won't compete as hard, to the extent they would be getting

20 customers from DISH.  The bigger fact is that DISH is so

21 reliant on new T-Mobile, that, you know, they just won't have

22 autonomy and independence.  The same point I made about MVNOs.

23         THE COURT:  You're saying there's a built-in conflict

24 of interest?

25         THE WITNESS:  Yes, exactly, which I translate as muted

JCBPSTA8                        Shapiro - Direct

1    incentives to compete because I'm thinking about competition.

2             THE COURT:  Mr. Pomerantz, we're almost at the end of

3    the day.  Two more minutes?  Have you completed your

4    examination on these issues?

5             MR. POMERANTZ:  I have about two more minutes to go.

6             THE COURT:  Oh, all right.  I'll give you two minutes.

7             MR. POMERANTZ:  Thank you, your Honor.

8             MR. CARY:  Your Honor, I believe that the chart that

9    Mr. Pomerantz is putting on the screen --

10            MR. POMERANTZ:  Okay.  Get it off.  Get it off.

11   Sorry.  My apologies.  Do you have the ability to turn it off?

12   Thank you.  Okay.  I apologize.

13   BY MR. PARKER:

14   Q.  In your view, will DISH be at a competitive disadvantage

15   due its reliance on new T-Mobile?

16            MR. CARY:  It's back on the screen.

17            MR. POMERANTZ:  I think it's off to the public.  Only

18   people with really good eyesight can see.

19   A.  So in addition to -- I call Boost in DISH's hands, Boost

20   DISH, to distinguish them from Boost in Sprint's hand, Boost

21   Sprint.

22            So not only will Boost in DISH's hands be very reliant

23   on new T-Mobile, they will have substantially higher marginal

24   costs, and I won't read the numbers because I guess it's

25   confidential.  But the Boost DISH column here, the bigger one,

JCBPSTA8                        Shapiro - Direct

1    this is reflecting the -- basically the wholesale price, the

2    rate that DISH has agreed to pay new T-Mobile per subscriber

3    per month, and that is, you know, substantially larger than the

4    column on the left, which is the -- this is network marginal

5    cost, is what's being measured for Boost in 2019 as a part of

6    Sprint.

7                MR. POMERANTZ:  Your Honor, like we did with the

8    Altice witness, I would ask permission to submit something

9    like, I guess, an interrogatory response to put these two

10   numbers into the record?

11               THE COURT:  Yes.

12               MR. CARY:  Can you turn off the screen?

13               MR. POMERANTZ:  Yes, yes.

14   BY MR. POMERANTZ:

15   Q.  So what about over the longer term, what's going to happen

16   to this market with DISH's potential entry over the longer

17   term?

18   A.  So if we go back to timely, likely --

19               MR. CARY:  Your Honor, I'm going to object to this

20   question as it's beyond the scope of the reports that Professor

21   Shapiro submitted to us in which he claimed he was only doing

22   analysis for a year or two.  He's now extending that analysis

23   while previously disclaiming that that was his responsibility,

24   and that belonged to Professor Scott Morton.

25               MR. POMERANTZ:  Your Honor, I think if I may ask, I

JCBPSTA8                      Shapiro - Direct

1    think Professor Shapiro is only going to reiterate what's in

2    his report and pass the baton to Professor Scott Morton.  If

3    Mr. Cary thinks it's gone beyond that, he can entertain a

4    motion to strike.

5          THE COURT:  Why don't we put the answer off until

6    tomorrow morning.

7          MR. POMERANTZ:  That's fine.  Thank you, your Honor.

8          THE COURT:  Let him sleep on it.

9          I'm sorry, let me ask questions that I've asked

10   earlier.  You may step down.

11         (Witness temporarily excused)

12         Mr. Pomerantz, who's on deck and how long?

13         MR. POMERANTZ:  I think that will go to Mr. Schwartz

14   next; is that right?  I don't see Sarah here.  Okay.  So we're

15   going to go to Mr. Schwartz, who's from Comcast, and that will

16   be our last witness that we're calling in our case.  And then I

17   believe it's Mr.~Legere and Mr. Sievert.

18         MR. CARY:  Mr.~Legere and Mr. Sievert will follow,

19   yes.

20         THE COURT:  All right.  How long do you expect with

21   Mr. Schwartz?

22         MR. POMERANTZ:  Less than an hour.  I'm not sure.

23   Between 30 minutes and 60 minutes, your Honor.  It's not my

24   witness, but I think it's between 30 and 60 minutes, your

25   Honor.

JCBPSTA8                          Shapiro – Direct

1           THE COURT:  Anything else?

2           MR. PARKER:  Your Honor, Richard Parker for Deutsche

3  Telekom.  Yesterday we had the dust up about PX1034.  We

4  deferred it to see if Mr. Ewens was going to testify.  He is

5  not; so we took the liberty of summarizing our position in a

6  three-page letter brief to you with some attachments, and we

7  hope that's helpful to the Court.  I'm sure the plaintiffs will

8  respond in due course, and the matter will be ripe for

9  decision.

10          THE COURT:  All right.  Thank you.  Good evening.

11          MR. POMERANTZ:  Thank you, your Honor.

12          THE COURT:  Can I have your attention, please?  In

13  terms of time used, I want to share my numbers with you, to the

14  extent that it might be helpful in how you prepare for the

15  proceedings.  The plaintiffs' number is now 13 and the

16  defendants -- 13, plus change.  Defendants' roughly three plus,

17  three and a half hours.  All right?

18          (Adjourned to December 12, 2019, at 9:00 a.m.)

19

20

21

22

23

24

25

```
1                          INDEX OF EXAMINATION
2    Examination of:                              Page
3    JAY BLUHM
4    Direct By Mr. Buffier  . . . . . . . . . . . 454
5    Cross By Mr. Sunshine  . . . . . . . . . . . 504
6    Redirect By Mr. Buffier  . . . . . . . . . . 525
7
8    ABDEL HAKIM BOUBAZINE
9    Direct By Mr. Kasha  . . . . . . . . . . . . 537
10   Cross By Mr. Sunshine  . . . . . . . . . . . 572
11   Redirect By Mr. Kasha  . . . . . . . . . . . 603
12
13   CARL SHAPIRO
14   Direct By Mr. Pomerantz  . . . . . . . . . . 614
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    PLAINTIFF EXHIBITS

 2  Exhibit No.                              Received

 3   425, 437, 720, 436, 649, 447, 729, 695, . . . 534

 4          733, 1202 and 1255

 5  0321    . . . . . . . . . . . . . . . . . 607

 6  0232 and 0233   . . . . . . . . . . . . . 607

 7  Slides 15 and 16  . . . . . . . . . . . . 649

 8  Slides 16, 17, 18 and 19  . . . . . . . . 653

 9  Slides 20, 21, 22, 23, 24 and 25  . . . . . 655

10

11                    DEFENDANT EXHIBITS

12  Exhibit No.                              Received

13   6003    . . . . . . . . . . . . . . . . 534

14  7063, 7070 and 7076   . . . . . . . . . . 608

15

16

17

18

19

20

21

22

23

24

25
```

JCCPSTA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
STATE OF NEW YORK, *et al.*,

                    Plaintiffs,              New York, N.Y.

          v.                                 19 Civ. 5434(VM)

DEUTSCHE TELEKOM AG, *et al.*,

                    Defendants.
------------------------------x

                                             December 12, 2019
                                             9:07 a.m.

Before:

                    HON. VICTOR MARRERO,

                                             District Judge


                         APPEARANCES


MUNGER, TOLLES & OLSON LLP
     Attorneys for Plaintiffs State of California
BY:  GLENN POMERANTZ
     KURUVILLA JOSEPH OLASA
     KYLE W. MACH

STATE OF CALIFORNIA
Department of Justice
Office of the Attorney General
     Attorneys for  State of California
BY:  PAULA L. BLIZZARD

STATE OF NEW YORK
Office of the Attorney General
     Attorneys for State of New York
BY:  ELINOR R. HOFFMANN
     BEAU W. BUFFIER

JCCPSTA1

```
 1                              APPEARANCES
                                (continued)
 2
    STATE OF WISCONSIN
 3  Consumer Protection and Antitrust Unit
          Attorneys for State of Wisconsin
 4  BY:  GWENDOLYN J. COOLEY

 5  COMMONWEALTH OF MASSACHUSETTS
    Office of the Attorney General
 6  Public Protection and Advocacy Bureau
          Attorneys for Commonwealth of Massachusetts
 7  BY:  WILLIAM T. MATLACK

 8  OFFICE OF THE ATTORNEY GENERAL STATE OF VIRGINIA
          Attorneys for the Commonwealth of Virginia
 9  BY:  SARAH OXENHAM ALLEN

10  CLEARY GOTTLIEB STEEN & HAMILTON, LLP
          Attorneys for Defendants T-Mobile and Deutsche Telekom
11  BY:  DAVID I. GELFAND
          GEORGE CARY
12
    WILMER CUTLER PICKERING HALE & DORR, LLP
13        Attorneys for Defendants T-Mobile and Deutsche Telekom
    BY:  HALLIE B. LEVIN
14
    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
15        Attorneys for Defendant Sprint
    BY:  KAREN HOFFMAN LENT
16        STEVEN C. SUNSHINE

17  GIBSON DUNN
          Attorneys for Defendant Deutsche Telekom
18  BY:  RICHARD G. PARKER

19  MORRISON & FOERSTER, LLP
          Attorneys for Defendants SoftBank and Sprint
20  BY:  DAVID L. MEYER

21  CLEARY GOTTLIEB STEEN & HAMILTON, LLP
          Attorneys for T-Mobile US
22  BY:  MARK W. NELSON

23
    T-MOBILE
24  BY:  LAURA BUCKLAND, Senior VP Litigation & IP

25
```

JCCPSTA1

1                    (Trial resumed; in open court)

2                    THE COURT:  Good morning.  Thank you.  Be seated.  One

3    moment, Mr. Pomerantz.

4                    (Pause)

5                    All right.  Let me begin by something that I wanted to

6    reference.  Yesterday, I was informed that there had been a

7    large number of requests by counsel, and perhaps others, to

8    bring in coffee cups into the courtroom in addition to whatever

9    other beverage containers you may have.  I indicated that that

10   would not be welcome.  There are a number of good reasons for

11   that.

12                   Coffee cups, when they're hot, tend to sometimes stain

13   the tables; similarly, sometimes soda cans tend to create

14   possible stains on the woodwork.  There are cases that I've

15   heard where somebody has knocked over a coffee cup and has

16   ruined papers on the tables.  So for those practical reasons,

17   we ask that you not bring coffee cups or soda cans into the

18   courtroom.  Water bottles are fine.

19                   One last reason is that it's a question of aesthetics.

20   We don't want to have the courtroom turned into a cafeteria.

21   In our increasingly indecorous and uncivil society would like

22   to think that there's one last bastion where decorum and

23   civility and dignity still prevail, and that's the courtroom.

24   So for that additional reason, I would appreciate if you not

25   bring anything other than water for a beverage.

JCCPSTA1

1             Mr. Pomerantz, let us begin with your order of the

2    day.  You gave us some indication yesterday.  If there is

3    anything that has changed, please let us know, and also, what

4    is your understanding of the amount of time remaining on your

5    case?

6             MR. POMERANTZ:  I believe that I will be -- I will try

7    to stay within my two-minute estimate for completing the

8    examination of, at least direct examination of, Professor

9    Shapiro.

10            After we finish him, all of our examinations, we will

11   then go to Mr. Schwartz from Comcast.  I think the estimates

12   are roughly 45 each side on that one.

13            Dave, is that right?

14            MR. GELFAND:  Yes.  Yes, your Honor.

15            MR. POMERANTZ:  So I think -- and then that is the

16   last witness that we are calling in our case in chief.  They

17   are then going to be calling Mr.~Legere and Mr. Sievert as

18   their first two witnesses, and I think we all believe that will

19   take us through the end of today and maybe into tomorrow.

20            MR. CARY:  That's right, your Honor.

21            THE COURT:  I project that we'll go until 5:30 today

22   as well.  All right.  Thank you, Mr. Pomerantz.

23            MR. POMERANTZ:  If I may ask, I think we are equal

24   offenders of the coffee cup rule, can we have until at least

25   the first break to clear the courtroom?

JCCPSTA1                      Shapiro - Direct

1              THE COURT:  Yes.

2              All right.  Let me remind the witness that you took an

3      oath to tell the truth yesterday.  You remain under oath.

4              Mr. Pomerantz.

5              MR. POMERANTZ:  Thank you, your Honor.

6       CARL SHAPIRO, resumed.

7      DIRECT EXAMINATION CONTINUED

8      BY MR. POMERANTZ:

9      Q.  Professor Shapiro, have you heard the term "quality

10     adjusted prices"?

11     A.  Yes.

12     Q.  And do you recall using that term in your initial report in

13     this matter?

14     A.  Yes, I think I did.

15     Q.  Could you turn to paragraph 223 of your initial report, and

16     the first sentence says -- no, Phil; you don't need to pull it

17     up -- "Throughout this section, I discuss how the merger would

18     create incentives for new T-Mobile to charge higher prices."

19     Do you see that?

20     A.  Yes, I do.

21     Q.  And then I want to go to the top of the next page.  The

22     first point there we've already talked about.  The second

23     point:  "Furthermore, the decline in prices without the merger

24     could involve quality adjusted prices, taking the form of

25     faster service or more data usage.  Likewise, what appear here

JCCPSTA1                      Shapiro - Direct

1    as higher prices resulting from the merger could involve higher

2    quality adjusted prices, such as would arise if lower quality

3    service or a slower improvement in service quality over time."

4              Could you explain how you use "quality adjusted

5    prices" in your analysis of prices in this market?

6    A.  Certainly.  So first, what is the quality we're talking

7    about?  It's usually speed or data, how much data you're

8    allowed to use, sort of other non-priced features of plans that

9    consumers value.

10             And so what we've observed in recent years is not only

11   have the monthly charges that people pay gone down some, and I

12   talked about that.  At 6.3 percent a year, we have significant

13   increases in quality of service.  Notably, people are using

14   more data and they're allowed to use more data without paying

15   more charges, without paying overage charges.  And I think that

16   is a form of quality.

17             And I think T-Mobile is certainly emphasizing for

18   itself the argument that they will improve quality for their

19   efficiency claims.  So we agree that quality is an important

20   dimension of competition, and one of my concerns is that the

21   improvement in quality that would take place with competition

22   will not take place as much after the merger.

23             THE COURT:  What about convenience to the consumer as

24   part of what they will look for in determining whether to stay

25   with one company versus another?  Convenience, service may be

JCCPSTA1                    Shapiro - Cross

1    offered from one but not from another, such as we talked about

2    yesterday in bundling.

3            THE WITNESS:  Yes, so quality would have a number of

4    different dimensions.  I've been emphasizing speed or perhaps

5    breadth of coverage.  If it's one-stop shopping or convenience

6    for the customer, in terms of buying a group of services

7    together, cable companies certainly do this.  That could -- if

8    it's a convenience for the customer, then that's pro-consumer.

9    That's fine.  If it's forcing people to maybe pay for things

10   they don't really want or hidden charges, that's another

11   matter.

12           MR. POMERANTZ:  I have no further questions, your

13   Honor.

14           THE COURT:  All right.  Thank you.

15   CROSS-EXAMINATION

16   BY MR. CARY:

17   Q.  Good morning, Professor.

18   A.  Good morning, Mr. Cary.

19   Q.  George Cary for T-Mobile and Deutsche Telekom.

20           Dr. Shapiro, you talked yesterday about the horizontal

21   merger guidelines.  Is it the case that in the horizontal

22   merger guidelines, changes in market share and concentration

23   are an initial screen for potential anticompetitive effects

24   arising from a transaction?

25   A.  I say they are a screen in the sense that if the

1    Herfindahles are very low, it's unlikely there will be a

2    challenge.

3    Q.  Right.  And so if the Herfindahls were higher, that's an

4    occasion for the Department of Justice or the FTC to take a

5    closer look, right?

6    A.  To take a closer look or reach a presumption of an

7    anticompetitive market.

8    Q.  Well, the Department of Justice and the FTC, when they're

9    looking at mergers, they don't rest on a presumption.  They

10   take a detailed look at the characteristics of the market to

11   determine if there are going to be anticompetitive effects,

12   don't they?

13   A.  Yes.  As part of the overall analysis, one would typically

14   include competitive effects, as I have done.

15   Q.  Right.  Now, do you agree that in recent decades,

16   industrial organization scholars and courts have been more apt

17   to stress that high concentration can be compatible with

18   vigorous competition and efficiency market performance?

19   A.  Well, let me take them in turn.  I think in terms of

20   industrial organization, the economic literature, the answer is

21   yes and not necessarily related to mergers, though.  We've come

22   to understand better that some markets may be highly

23   concentrated and be quite competitive, nonetheless.

24          So, for example, Boeing and Airbus, there's only two

25   of them, but they often compete very vigorously.  So that's in

JCCPSTA1                         Shapiro - Cross

terms of we have understood that.  The relationship between

concentration and mergers is still concerning for the reasons

I've talked about.

            In terms of the courts, I think there's been a decline

in the structural presumption, the strengths of it over time,

but I suspect you don't want me to talk too much about the law.

Q.  Fair enough.  Now, you would agree that an appropriate

antitrust analysis should put less weight on market shares and

concentration, and more on an integrated approach; is that

fair?

A.  I guess I don't quite know what you mean by the "less" and

"more" there.  I guess I would put it this way, that the -- a

full analysis should include competitive effects, and part of

that -- but with significant concerns being raised.  If you've

got high Herfindahls, high increases in Herfindahls, high

diversions and the maybe other elements, such as high entry

barriers, those trigger concerns, but yes, you do a full

analysis.

Q.  And a full analysis takes into account efficiencies; does

it not?

A.  Yes, it does.

Q.  And that's because efficiencies can make a firm more

competitive, right?

A.  Correct.

Q.  It creates an ability and incentive to compete more

JCCPSTA1                          Shapiro – Cross

1    aggressively if you realize efficiencies through a merger,

2    correct?

3    A.  Yes, that's correct.  Merger, specific efficiencies,

4    particularly ones that lower marginal costs economists would

5    generally effect those to cause the firm to compete more

6    aggressively, everything else equal.

7    Q.  Right.  So that more aggressive competition can include

8    lower prices, correct?

9    A.  Yes, it can.

10   Q.  And improved quality?

11   A.  It could.

12   Q.  Enhanced service?

13   A.  Yes.

14   Q.  And new products entering into the market?

15   A.  These are all subspecies of efficiencies that can occur and

16   arise in mergers, yes.

17   Q.  And you agree that an appropriate antitrust analysis of

18   mergers should incorporate an analysis of cognizable

19   efficiencies generated by the merger, correct?

20   A.  That is what I do as an antitrust economist, yes.

21   Q.  In fact, you've written that an antitrust economist surely

22   should take into account efficiencies, haven't you?

23   A.  I might have said "surely."  I'm not disputing it.

24   Q.  Now, when looking -- you mentioned the term merger

25   specific.  When looking at merger specificity, only

1    alternatives to the merger that are practical in the business

2    situation faced by the firm should be considered in terms of

3    defining whether it's merger specific or not; is that right?

4    A.  I think that's the general tone, I would say.  That's in

5    the horizontal merger guidelines.  I don't have the specific

6    language in my head, but one does not want to include purely

7    theoretical possibilities that are not practical or at all

8    likely to arise.

9    Q.  Right.  And you've written that the inquiry into merger

10   specificity should be a realistic one, correct?

11   A.  That seems reasonable, yes.

12   Q.  Focusing on what will happen with and without the merger,

13   correct?

14   A.  Yes, both regarding the efficiencies that are going to be

15   achieved and what would happen without the merger.

16   Q.  So would you agree with me that there are some efficiencies

17   that are very difficult to achieve without a merger?

18   A.  You mean as a general proposition?

19   Q.  As a general proposition.

20   A.  We're not talking about this case in particular?

21   Q.  As a general proposition.

22   A.  That can happen, yes.

23   Q.  Particularly if you have the integration of the parties'

24   unique and hard-to-trade assets, that would be an example,

25   correct?

JCCPSTA1                        Shapiro - Cross

1    A.  I would say, yes.  Hard to trade, I think I would put it in

2    terms of efficiencies or combining assets in a way that could

3    not be accomplished through some other means such as a contract

4    or a partnership arrangement.  If that's what "hard to trade"

5    means, then I'll buy -- I'll accept that.

6    Q.  And you've called these synergies in your academic work,

7    right?

8    A.  That's the word I like to use.

9    Q.  So synergies allow a firm to make output in cost choices

10   that wouldn't be feasible otherwise, correct?

11   A.  Yes, again, we're using the term synergies in this specific

12   sense of what I'll also call more in the legal setting,

13   cognizable efficiencies.

14   Q.  Right.  You would agree with me that not all horizontal

15   mergers between competitors are anticompetitive?

16   A.  I do.

17   Q.  And you would agree with me that, in fact, not all

18   four-to-three mergers between horizontal competitors are

19   anticompetitive, would you?

20   A.  I wouldn't have a general rule concluding all four-to-three

21   mergers are anticompetitive.  One would need to look at it.

22   Market share might be small, for example.

23   Q.  Right.  So one of the reasons that a four-to-three merger

24   might not be anticompetitive is because it generates

25   merger-specific cognizable efficiencies, right?

JCCPSTA1                        Shapiro - Cross

1    A.   That's fair.

2    Q.   Now, in response to one of Mr. Pomerantz's questions, you

3    quantified consumer harm, and I just want to be very clear

4    about this.  Without looking at the efficiencies generated from

5    a transaction, you cannot testify under oath that there will be

6    consumer harm from this transaction; is that right?

7    A.   I believe I was clear that my -- all of my analyses, I am

8    not crediting the efficiencies claimed by the merging parties

9    because I'm relying on Professor Scott Morton's analysis that

10   they do not qualify under the stringent standards we've just

11   been talking about.

12   Q.   You have not, yourself, examined the efficiencies to form a

13   view?

14   A.   That is correct.  I am relying on Professor Scott Morton

15   for that part of the overall analysis.

16   Q.   So you've done half the analysis, and she's done the other

17   half; is that right?

18   A.   I am not in a position to quantify the relative

19   contributions.

20   Q.   All right.  Let me put it this way, then.  Your analysis

21   does not provide a complete assessment of the competitive

22   effects of the merger, correct?

23            THE COURT:  Asked and answered.

24   Q.   You would agree that the Court, in reaching a decision

25   about the merger, should account for the efficiencies,

JCCPSTA1                          Shapiro – Cross

1    notwithstanding that you have not, correct?

2    A.  If you mean by "account for the efficiencies" the Court

3    should seriously consider the claimed deficiencies and the

4    arguments against them, yes.

5    Q.  Now, one of the terms that you used in talking about

6    efficiencies was "verifiable," I believe, correct?

7    A.  Yes.

8    Q.  One of the ways that a Court or an economist, an academic

9    economist looking at a merger, the agencies, might determine

10   whether a merger generated verifiable efficiencies was to look

11   at historical experience, right?

12   A.  That happens, yes.

13   Q.  So if a firm has previously engaged in a merger, and if

14   that merger generated efficiencies in a comparable market

15   situation, you would credit that as a way to verify

16   efficiencies?

17   A.  I think that would be relevant.  It doesn't address merger

18   specificity, but it does address verifiability.

19   Q.  You would consider that real-world proof that the

20   efficiencies are verifiable?

21   A.  Well, of course, it depends on how comparable this prior

22   experience is to the current one that's being evaluated, but

23   it's relevant.

24   Q.  Yes.  And you would also agree with me that if the firm

25   that is proposing the new merger is applying the same standard

JCCPSTA1                          Shapiro – Cross

1  cookbook that it applied in the past merger, that that would

2  make it even more of a proof point in terms of their

3  applicability of the efficiencies, correct?

4  A.  Well, I think if I understand what you mean by standard

5  cookbook, that would suggest the current claim deficiencies are

6  very similar in terms of what's involved to the ones that have

7  been achieved in the past; so that would support comparability

8  and, therefore, make that evidence more relevant.

9  Q.  The fact that efficiencies would not be realized right away

10  does not mean that you should simply ignore the efficiencies,

11  right?

12  A.  No.  They would be counted less because they're discounted

13  and maybe less certain, but I wouldn't ignore them.

14  Q.  Right.  It could be that efficiencies that happened in year

15  two, three, four and off into the future are sufficiently large

16  that even if there's upward pricing pressure in year one, those

17  efficiencies would make the merger pro-consumer, correct?

18  A.  Well, it is possible.  What you'd want to do is look at

19  possible consumer harm in earlier years.  It's kind of

20  difficult, but balance that against consumer benefits later

21  with a proper discounting, and often there can be extra costs

22  and extra harms during a transition period.  You'd want to

23  include that too.

24  Q.  You'd want to look at the whole thing, the entire

25  transaction?

JCCPSTA1                          Shapiro – Cross

1   A.  Well, yes, with recognizing that the farther out you look,

2   the more speculative things tend to get by their nature.

3   Q.  Okay.  You would agree with me that cost reductions in

4   future years could cause a firm to lower prices in the first

5   year, after a merger, if there are sufficient linkages between

6   the first year and future years, correct?

7   A.  Certain specific type of linkages would -- could, in

8   theory, cause that connection to occur, that's correct.

9   Q.  And one of those linkages might be the impact on a firm's

10  reputation if they were to raise the price in year one, in

11  advance of realizing merger efficiencies in the future,

12  correct?

13  A.  I'm not following you there.  I thought you were talking

14  about an incentive to lower the price at the beginning, and now

15  you're talking about raising the price; so you threw me off.

16  Q.  I'm sorry.  Let me try it again.  One reason that a firm

17  that is going to realize efficiencies in the future might not

18  raise prices in year one, would be the impact on its

19  reputation, correct?

20  A.  Well, I think that would be a general proposition if a firm

21  raises a price -- if a firm raises a price and makes more money

22  in year one, I think that's what you're talking about, a price

23  increase that's profitable, might a firm not do that because it

24  might harm its reputation.

25  Q.  Exactly.  I think you testified to that in your deposition,

1    didn't you?

2    A.  So I think, as a general rule, that could be a factor

3    effecting price.  I don't think firms just maximize profit

4    based on a quarter or year at a time, notwithstanding what

5    people say about the financial markets.

6    Q.  Right.  So now your analysis in this case, your unilateral

7    effects analysis, was only done for, or at least reported for,

8    the year 2020 in your report; is that right?

9    A.  I think that's right.  Although, I think there's kind of a

10   hybrid of 2019 and '20; so we have to use 2019 data.

11   Q.  Right.  So it's a one-year analysis, correct?

12   A.  It's an analysis of the upward pricing pressure caused by

13   the merger.  That's the way this methodology works.  It's not a

14   projection about what's going to happen in years in the future.

15   It's what can we tell based on this merger and what we know

16   about the products and how closely they're competing now.

17   Q.  For a one-year period?

18   A.  It's not -- no, that's not -- the methodology is measuring

19   the market conditions or the pressure at the time of the

20   merger.  It's not a projection.  It's an evaluation of the

21   merger, like measuring Herfindahls.  You measure at a

22   particular point in time.

23   Q.  I see.  Okay.  So it's not even good for a full year.  It's

24   the day after the merger, given historical conditions, this is

25   what your UPP would indicate; is that fair?

JCCPSTA1                    Shapiro – Cross

A.  Well, no, I don't agree with that.  It's a measure of the
upward pricing pressure from the merger based on current
conditions and that has durability, but of course, conditions
will change.  But it's beyond, I think, our capabilities
usually to know what the diversion ratio will be two or three
years from now.  You know what it was based on switching
historically, so you use those data.

Q.  Okay.  So let's talk about your unilateral effects analysis
and the UPP work that you performed.

        First, let's start with some understanding, a little
more understanding about the model that you've employed.  Is it
correct that the model that you've employed would generate
upward pricing pressure in any horizontal merger?  It's an
automatic, almost mechanical mathematical result in any
horizontal merger?

A.  In any horizontal merger, one would have –– so long as the
two firms had positive diversion between them, their products
and positive margins, you would have some positive upward
pricing pressure.  That's why we need to quantify it the same
as we want to quantify Herfindahls.

Q.  Right.  So you would also agree with me, though, that not
every horizontal merger is illegal?  We've established that,
right?

A.  I'm glad I get to testify about the law.  I usually don't
get to do that.

JCCPSTA1                        Shapiro - Cross

1   Q.  Let me rephrase the question.  Not every four-to-three

2   transaction is anticompetitive; we've agreed to that?

3   A.  We have.

4   Q.  Now, the UPP analysis has a lot of limitations, right?

5   A.  Sure.  I love it, but sure.

6   Q.  In fact, I think at your deposition you said we could spend

7   the whole day talking about its limitations, didn't you?

8   A.  Okay.

9   Q.  You said it was --

10  A.  Maybe I was hoping we'd spend the day that way, instead of

11  other questions, but go ahead.

12  Q.  You said it was an infinite list?

13  A.  It's a tool.  Of course, there's limitations.  That's why

14  the economic literature is actively working to make it better

15  and better.

16  Q.  Right.  One such limitation is that it does not account for

17  the repositioning of firm products or services in the relevant

18  market after the merger, correct?

19  A.  The UPP takes the products as given because that's what we

20  have data on, is the diversions between the brands that have

21  been in the market.  So that is correct, it does not account

22  for how products may be repositioned in the future.

23  Q.  And repositioning can mitigate upward pricing pressure,

24  correct?

25  A.  I guess it could, or it could exacerbate it.  You'd have to

JCCPSTA1                      Shapiro - Cross

1    be more specific about what you mean by the type of

2    repositioning.

3    Q.  Well, for example, you're aware that Verizon recently came

4    out with a prepaid product, right?

5    A.  Yes, I think it was last year.

6    Q.  That would be an example of repositioning?

7    A.  Well, I don't think so.  I think it's a new brand, isn't

8    it?  I thought that was a new brand for them, unless I'm

9    mistaken.

10   Q.  Would you consider that new entry into the prepaid segment,

11   then?

12   A.  New entry.  It's a brand.  I think of it as a brand entry,

13   but look, it's very similar to repositioning.  I don't want to

14   overstate the difference.

15   Q.  Okay.

16   A.  It's just they didn't move an existing brand; they just

17   created a new one, if I understand it correctly.

18   Q.  Exactly.  So that would be an example of a strategic

19   decision that is not taken into account by the UPP analysis?

20   A.  That's fair.

21   Q.  And the UPP analysis does not take into account new entry,

22   right?

23   A.  That's correct.

24   Q.  And the UPP analysis does not take into account

25   reputational effects that might flow from actually raising

1   prices pursuant to that upward pricing pressure, correct?

2   A.   I think, in this case, it mostly does because the upper

3   pricing pressure we're talking about does not involve raising

4   prices.  It involves not lowering prices, as I've said a few

5   times.  I don't think that reputational argument comes in; so I

6   think the analysis that I've done is not subject to that

7   criticism.

8   Q.   That wasn't my question, though, Dr. Shapiro.  My question

9   was whether the UPP analysis itself takes that into account,

10  and we will talk about your --

11  A.   I said, as applied here, I believe it does.

12          THE COURT:  Mr. Cary, I'm going to pause at this

13  moment.  I need to take a call.

14          MR. CARY:  Yes, your Honor.

15          THE COURT:  I'll be right back.

16          (Recess)

17          THE COURT:  All right.  Thank you.  Apologies for the

18  inconvenience and interruption.  Let's proceed.  Mr. Cary.

19          MR. CARY:  Thank you, your Honor.

20  BY MR. CARY:

21  Q.   Can you bring up tab one, page 52, please.

22          Dr. Shapiro, I asked you a question about the

23  reputational effects on the UPP, and I'd like to refer you to

24  your deposition.  Do you recall I asked you:  "So just to be

25  clear on the testimony, the impact on reputation could be such

1    a linkage that" -- meaning a linkage between the first year and

2    future years per our previous conversation -- "that would

3    prevent a firm from exercising upward pricing pressure in the

4    short term when it's going to be realizing efficiencies after a

5    year, correct?"

6         And you answered:  "So the upward pricing pressure

7    index talks about internalizing the competition between the two

8    firms.  Because it is based on diversion and margins, it is not

9    an analysis that incorporates longer-term effects of

10   reputation.  It's not part of the methodology.  It's not trying

11   to do everything."

12        Do you recall that question and that answer?

13   A.  I do now.

14   Q.  So, Dr. Shapiro, one of the things that the UPP analysis,

15   the way you used it, does not take into account is

16   efficiencies, correct?

17   A.  Well, the UPP analysis is for accounting for efficiencies

18   usually, and then we have the compensating marginal cost

19   reduction that works with it to account for efficiencies, and I

20   did both of those.

21   Q.  Right.  So if you did the complete analysis and quantified

22   the efficiencies, those efficiencies would offset the upper

23   pricing pressure, and it could be that the transaction would

24   end up being net pro-competitive for consumers, right?

25   A.  Are you asking in general or about this specific

JCCPSTA1                    Shapiro - Cross

1    transaction?

2    Q.  I'm asking about -- you've testified you didn't do the

3    analysis of the efficiencies in this specific transaction; so

4    I'm just asking about how the UPP test works.

5    A.  Okay.  So, in general, it works by, yes, you calculate the

6    upward pricing pressure, you calculate the cost savings that

7    would be required to neutralize or offset that, and then if you

8    have cognizable efficiencies, you see whether they're

9    sufficient, large enough, as has been identified as required,

10   to offset the upward pricing pressure, and that's the way the

11   whole analysis works as a group.

12   Q.  Right.  And you testified, I believe, yesterday, in

13   response to one of Mr. Pomerantz's questions, that the upward

14   pricing pressure is comparable to costs going up in terms of

15   pushing prices up, right?

16   A.  Yes, that's -- some of my writings on this explain that

17   it's like a cost increase for the merged firm and that's

18   creating the upward pricing pressure; that's correct.

19   Q.  Right.  So the converse of that would be if you have cost

20   reductions, it reduces the upward pricing pressure, correct?

21   A.  If you have reduction in marginal costs that would offset

22   or count against the upward pricing pressure and if they're

23   large enough, they could neutralize it.

24   Q.  Right.  And it's really a one-for-one tradeoff in that

25   regard; is that right?

1    A.  I'm not sure what you mean by that.

2    Q.  Well, if you're attributing a dollar of imputed costs that

3    are pushing prices up and then you have a dollar of

4    efficiencies, it's a direct one-to-one comparison, right?

5    A.  The compensating marginal cost reduction, what we presented

6    to your Honor as the required cost reduction, marginal cost

7    reductions, in the literature it's called compensating marginal

8    cost reduction, is subtracted from the upward pricing pressure

9    and you look at the net.

10   Q.  Right.  So the passthrough to consumers for the cost

11   savings is equivalent to the passthrough to consumers of price

12   increases, right?

13   A.  We haven't been talking about passthrough.  We're just

14   talking about the pricing pressure index.  It's a different

15   topic, passthrough.  Just to be clear, that's not what we were

16   talking about.

17   Q.  Well, you did testify yesterday about the way that the

18   passthrough works in the UPP analysis, right?

19   A.  So I said you take the UPP analysis and then you apply a

20   passthrough rate to get a price increase that would be

21   indicated.

22   Q.  Right.  So my question is whether you would apply the same

23   passthrough rate to any efficiencies realized?

24   A.  Yes, you would.

25   Q.  Thank you.

1    A.  So long as they're cognizable.

2    Q.  Right.  Would you agree with me, Dr. Shapiro, that the

3    diversion numbers that you use in your UPP analysis are not

4    going to be helpful if they are not representative of the

5    market?

6    A.  I don't quite know what you mean by "representative of the

7    market."  It sounds like a bad thing not to have, but what do

8    you mean by that?

9    Q.  Well, the data that you used did not purport to represent

10   all switching in the entire cellular market, correct?

11   A.  The data are not a complete census of all switches.

12   Q.  Right.  So in order to be reliable, in terms of the upward

13   pricing pressure, the subset that you used has to be

14   representative of the larger set, right?

15   A.  Well, it has -- what we -- to be reliable, or ideally, I'll

16   put it that way, it would accurately measure the diversions if

17   one or observing all of them rather than just a subset.

18   Q.  Right.  And if the sample that you're using is distorted in

19   some way, then it can't be relied upon to generate diversion

20   ratios purporting to show the market as a whole?

21   A.  Well, distorted, again, if it's -- if it's significantly

22   different, then the true diversion ratios, then that's -- then

23   you have an inaccuracy.  I don't know which direction that

24   would go in, but I would accept that as a principle.

25   Q.  The data that you used was -- that you put up on the screen

JCCPSTA1                        Shapiro - Cross

1    was porting data, and it was Facebook data, correct?

2    A.   That's correct.

3    Q.   Are you aware -- well, first, do you know how the Facebook

4    data is generated?

5    A.   In a general sense, I could describe it, yes.

6    Q.   Go ahead, please?

7    A.   If you want me to.

8    Q.   Yes.

9    A.   Yes?  So as I understand it, I can try and get a look at my

10   report, it has more details, if you want.  But basically, when

11   people have the Facebook app and they switch carriers, Facebook

12   is able to detect that, and they put that data together and

13   make it available.

14   Q.   Is it correct that Facebook data only captures about

15   60 percent of the wireless subscribers?

16   A.   I believe that's correct, yes.

17   Q.   And the Facebook data, is it correct that the Facebook data

18   tends toward a younger demographic?

19   A.   I'd have to look here to check that.  I believe that, in my

20   mind, that used to be true of Facebook, but it isn't

21   necessarily true anymore.  Now they have Instagram, but I can

22   look here for more detail, if you want me to answer more

23   specifically.

24   Q.   Why don't we move on because, again, my time is a little

25   bit limited.  But if the Facebook data were skewed younger

JCCPSTA1                        Shapiro - Cross

1    demographically, then they wouldn't represent the entire

2    population, right?

3    A.   Well, it doesn't represent the entire population.   It's

4    only 60 percent.   We already established that.

5    Q.   Okay.   And to the extent -- are you aware that T-Mobile's

6    demographics tend to skew towards the younger demographic as

7    well?

8    A.   That sounds right to me.   I don't know how significant that

9    is.

10               (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. CARY:

2    Q.  Okay.  So to the extent that you used the Facebook data in

3    your UPP analysis, it would overstate the presence of T-Mobile,

4    correct?

5    A.  It might.  There was a whole back and forth between me and

6    Professor Katz on this, and I addressed that in my reply

7    report, but I take your point.  We have quantified that, and I

8    have analysis of that in my reply report.

9    Q.  Dr. Shapiro, is it correct that port-in data also does not

10   represent -- actually before we move on from the Facebook data,

11   were you in the courtroom when Ms. Rittgers of Boost testified

12   with respect to Boost's experience with Facebook data?

13   A.  I was not in the courtroom, no.

14   Q.  So you didn't hear her say that they used that data on one

15   occasion --

16               THE COURT:  Asked and answered.

17   Q.  Okay.

18               THE COURT:  He could not have heard it since he was

19   not in the courtroom.

20               MR. CARY:  He might have read the transcript, but

21   that's fair, your Honor.

22               THE COURT:  Did you read the transcript?

23               THE WITNESS:  I did.

24               THE COURT:  Do you want to ask your question?

25               THE WITNESS:  He's good at this.

JCCTSTA2                    Shapiro - Cross

1    BY MR. CARY:

2    Q.  Dr. Shapiro, you're aware Ms. Rittgers indicated, at least

3    in her experience Facebook, is not a reliable indicator of

4    trends in the wireless industry, correct?

5    A.  I looked at her testimony, I don't believe -- I think it's

6    called Facebook -- something like flow data, I'm not sure she's

7    talking about the same Facebook data, I thought it was Facebook

8    analytics.  Am I mistaken?  I'm not sure, but I thought it

9    might be a different data set.

10   Q.  We'll compare and get back to you.

11   A.  Okay.

12   Q.  So let's move on to port-in data.  You're aware that

13   port-in data does not capture the entire market, right?

14   A.  You mean all switches?  I think you mean that.

15   Q.  Yes.

16   A.  That is correct.

17   Q.  Actually since you brought up switching, let me go on a

18   slight diversion, no pun intended.  Switching and diversion are

19   not the same thing, are they?

20   A.  Well, switching is -- what do you mean by diversion?  It

21   was a little unclear what the question is.

22   Q.  For an economist, diversion has a pretty precise meaning

23   that is different from all switching, right?

24   A.  Well, diversion ratios relate to price switching.

25   Economists are interested in diversions, could be quality

1    switching or other reasons, so there are different types of

2    diversion.  Diversion ratio is about pricing.  Switching data

3    does not just measure price switching, it captures all

4    switching.

5    Q.  So the focus should be on price-based switching, not all

6    switching, correct?

7    A.  Well, for the purpose of the diversion ratios as defined,

8    since it's price-based switching, we would be -- we're most

9    interested in the price-based switching, that's correct.

10   Q.  But your data captures all switching?

11   A.  That's correct, yes.

12   Q.  Port-in data, it only captures switches among people who

13   port their number, correct?

14   A.  That correct.

15   Q.  That's not everybody, is it?

16   A.  Not everybody who switches.

17   Q.  Right.

18   A.  Right.  Some people get a new number when they switch.

19   Q.  Again, it's a sample.

20   A.  Correct.

21   Q.  And to the extent it's a sample, it is only useful to

22   extent it is representative of all price-based switching,

23   correct?

24   A.  Again, I wouldn't put it that way, I would say one would

25   be -- it could be a source of concern if you had reason to

JCCTSTA2                        Shapiro - Cross

1    believe there was a significant difference between diversion
2    measured this way and if you had a complete census of all the
3    switches.
4    Q.  And again you read Ms. Rittgers' testimony, she indicated
5    that the port-in data was not representative of the entire
6    market, correct?
7    A.  I don't remember exactly what she said about that, but both
8    companies track and use the port-in data in the normal course
9    of business, and I considered it informative, but it's not
10   perfect.
11   Q.  It's not perfect, and when companies take account of it,
12   they adjust for what they know about its imperfections, don't
13   they?
14   A.  It depends the usage you're talking about.  I'm not sure
15   what adjustments you're referring to.
16   Q.  Isn't it the case, Dr. Shapiro, that the port-in data
17   underrepresents certain switches to MVNOs, for example?
18   A.  That could be.  Some of these data sources don't track the
19   MVNO's separately, so it's not in the data.
20   Q.  So to the extent that Verizon, for example, has more MVNO
21   customers than AT&T, T-Mobile, Sprint and others, then it would
22   understate switches to Verizon, given the way you're
23   calculating market shares, which is to treat the MVNO with its
24   carrier.
25   A.  I guess I need to look at each of these sources.  I don't

1    have memorized exactly how they treated the MVNOs, that's it's

2    not uniform.  For example, Comlink, they have a proprietary

3    method of calculating these things, so I don't believe that

4    there's -- I'm not aware of any bias here, I don't believe the

5    issue was brought up by the experts on your side.

6    Q.  Where did you hear that from?

7    A.  From what I remember, from their rebuttal reports is what

8    I'm saying.

9    Q.  Finally, UPP does not purport to give a precise dollar

10    figure for what will happen after the merger, isn't that fair?

11    A.  UPP is an indication, as the term upward pricing pressure,

12    and in itself does not indicate price changes.  One still needs

13    to apply a passthrough rate in order to get to that step.

14    Q.  But even there what we're talking about with UPP is to show

15    direction, it's not to measure a precise price increase that

16    will result from a transaction, right?

17    A.  It's not just to show direction, because as you pointed out

18    earlier, we would always have some upper pricing pressure.  The

19    magnitude is important.  This is a quantification method.  So

20    it is not just a direction, but it is not itself coming up with

21    a price prediction, price increase prediction.

22    Q.  Would you agree with me, Dr. Shapiro, that the UPP test, in

23    terms of its robustness, gains its robustness and elegance

24    eschewing attempts to estimate magnitudes?

25    A.  Well, I'm pretty sure that's something that I wrote.

JCCTSTA2                        Shapiro - Cross

1    Q.   I'm sure it is, too.

2    A.   But I need to see the context, because the magnitude of

3    upward pricing pressure does matter, and I expect that what I

4    was referring to in that writing was the magnitude of the price

5    effects, which requires a passthrough, as I have been saying.

6    Q.   And again, the passthrough rate that you used was not one

7    that you derived from a statistical analysis of the

8    marketplace, right?

9    A.   That is correct.

10   Q.   It was just one that you picked?

11   A.   Well, it's a standard one based on linear demand, it's

12   50 percent.  It has a simplicity to it.  A hundred percent

13   would be full passthrough, zero percent would be none, it's in

14   the middle.  It's commonly used.

15   Q.   Let's move to coordinated effects.  The prospect of

16   cognizable merger specific efficiencies can make coordinated

17   effects less likely also, right?

18   A.   Yes.

19   Q.   In fact, you talked yesterday in explaining to his Honor

20   how the UPP works -- I'm sorry, how the hypothetical monopoly

21   test works, to switch subjects, how the hypothetical monopoly

22   test works, yesterday you gave the example of beer, right?

23   A.   I did.

24   Q.   And in fact, you have written about beer merger when you

25   were the deputy assistant attorney general for antitrust, the

JCCTSTA2                         Shapiro - Cross

1   DOJ reviewed the MillerCoors transaction in 2008.

2   A.  I was not there at the time for that.

3   Q.  No, but you wrote about it when you arrived there the next

4   year, correct?

5   A.  No, what happened was there's an annual report that the

6   economists group there publishes in the industrial

7   organization, that annual report included -- what was the

8   transaction MillerCoors.

9   Q.  MillerCoors?

10  A.  MillerCoors transaction.  One of the sections of that

11  report covered that transaction because it was handled within

12  the last year, but since I was not there for that transaction

13  that is a section -- I was not part of or an author of that

14  section of the paper.

15  Q.  Your name was on the paper overall, but that particular

16  chapter --

17  A.  I suspect the paper indicates what I just said; but if not,

18  I'm telling you that is the case.

19  Q.  That was a transaction in which the national brewers of the

20  United States consolidated from three to two, correct?

21          Anheuser-Bush, MillerCoors.

22  A.  Okay.  Yes, that's right.  I'm thinking -- okay, go on.

23  Q.  The report that has your name on it that we just talked

24  about --

25  A.  It's not my paper, just to be clear.  You can use -- its my

1   name on it, but that's misleading.

2   Q.  Okay.  Ken Heyer, Carl Shapiro, Jeffrey Wilder, the year in

3   review, economists of the antitrust division 2008/2009 35

4   review of the industrial organization.  That's the paper we're

5   talking about.

6   A.  If you want to show me a copy of the paper I will see

7   whether -- I believe we were careful and said I wasn't

8   contributing to that section, I can't say for sure.

9   Q.  I will take your word for it.  I need to identify the paper

10  I'm talking about first.  They called it Heyer paper, if you

11  prefer.

12  A.  I'm happy to have my name associated with the other

13  sections of the paper.

14  Q.  That report indicates that the reason that that three to

15  two transaction was approved was because of the prospect of

16  significant cognizable efficiencies, correct?

17  A.  I would have to look at it.

18  Q.  And why don't we turn to tab 19 in your binder at page 3.

19         I apologize, Dr. Shapiro it's not in your binder.

20  A.  There is no tab 19.

21  Q.  I just realized that.

22         MR. CARY:  May I approach, your Honor?

23         THE COURT:  Yes.

24         THE WITNESS:  Thank you.

25  A.  Yes, says here:  Shapiro joined the division in March 2009

1    and was not a party to any decisions made prior to that time.

2    Q.  Yeah, it's clear you were not party to the decision, it

3    doesn't indicate that you weren't an author of that section of

4    the report.

5    A.  But you have to understand what this is is a report from

6    the antitrust division economists about what they did in the

7    last year.

8    Q.  In any event, you see that the document indicates -- and

9    we'll bring it up on the screen -- that the prospect of

10   significant cognizable efficiencies discussed below made net

11   anticompetitive coordinated effects even less likely?

12          MR. POMERANTZ:  Your Honor, if he could direct us to

13   where in the article you're reading from.

14          THE COURT:  What page?

15          MR. NIKELS:  351.

16   A.  If there's a question, I didn't catch it, Mr. Cary.

17   Q.  The question was:  Isn't it true that in that transaction

18   the DOJ concluded that the prospect of significant cognizable

19   efficiencies made net anticompetitive coordinated effects less

20   likely?

21   A.  I see that, but we happen to know that this was incorrect

22   because later when Anheuser-Bush went to merge -- acquire part

23   of Modello, the antitrust division challenged that transaction,

24   and the complaint includes information about coordination

25   between Anheuser-Bush and Miller that had happened after this

JCCTSTA2                              Shapiro - Cross

1    merger.  This is a mistake in the enforcement action that they

2    did not challenge this merger.

3    Q.  Was the Microsoft Yahoo transaction also a mistake by the

4    antitrust division?

5    A.  Microsoft Yahoo transaction?  What transaction is that?

6    Q.  That was another three to two transaction, this time while

7    you were at the DOJ.

8    A.  I'm having trouble -- I'm not sure what transaction you're

9    referring to.  Could you be more specific?

10   Q.  Why don't we move on to other aspects of coordinated

11   interaction.  You gave us a list yesterday of factors that make

12   a market susceptible to coordinated effects, right?

13   A.  Yes, I did.

14   Q.  You did not give us a list of factors that make a market

15   less susceptible to coordinated interaction, right?

16   A.  Well, it's the same set of factors.

17   Q.  Well, let's see if there are some others.

18   A.  Sorry, if I --

19   Q.  Would you agree with me that if a firm gets more capacity

20   so that it is no longer bumping up against capacity

21   constraints, it could produce more output before marginal costs

22   start to turn up, and that could make coordination, all other

23   things equal, less likely?

24   A.  That's reasonable.

25   Q.  Do you agree that firms can increase -- by increasing

1    capacity, could lower their marginal costs?

2    A.  That could happen, yes.

3    Q.  And if you do lower your marginal costs by increasing your

4    capacity, that would make it more profitable to sell more units

5    by lowering price, all else equal, correct?

6    A.  I think so.  All else equal, yes, that sounds correct.

7    Q.  Do you agree that where firms have asymmetrical capacity

8    utilization that that is a factor that is disruptive of

9    coordination?

10   A.  I think it's going to depend on the circumstances.  That

11   could happen, yes.

12   Q.  If one firm has greater excess capacity than others, that

13   firm has a greater incentive than others to cut its price,

14   correct?

15   A.  Well, all else equal, I think that's correct.  The firms

16   that did not have any excess capacity would not have an

17   incentive to cut their price because they would not be able to

18   accommodate the increased demand resulting from the price

19   decrease.

20   Q.  And in that context, it's also the case that that firm's

21   rivals have less of an ability to discipline that firm as well,

22   correct?

23   A.  I'm not quite understanding that.

24   Q.  You've got a firm with excess capacity and they drop price,

25   the other firms would have less of an ability to discipline

JCCTSTA2                         Shapiro – Cross

1    that firm.

2    A.   Why?  What is it about the other firms we're talking about,

3    the fact that they don't have much excess capacity?

4    Q.   Yes, sir.

5    A.   I see.  I think that's not clear, because if one firm

6    lowers their price to gain customers, the other firms don't

7    need excess capacity to respond because they're trying to gain

8    back the customers they had.  So they could respond that way,

9    could be quite aggressively to get the customers back, and they

10   wouldn't need any extra capacity to do that, they're trying to

11   refill -- get back to the capacity utilization rate they were

12   at before the first firm cut its price.

13   Q.   So that would be an example of competition basically.  In

14   other words, the firm that used to be capacity constrained has

15   now lost its customers to other firm that has cut price, and

16   it's responding by trying to get them back by lowering its own

17   price, correct?

18   A.   We're talking -- the whole context was coordinated effects.

19   One firm tries to gain customers, the question is:  Do the

20   other firms notice quickly respond so it actually doesn't end

21   up helping?  The second -- the other firms respond, let's say

22   they match the price cut, they don't need excess capacity in

23   order to get the customers back, and the whole thing basically

24   is a price war that didn't work out.  The whole analysis is the

25   point that the first firm might not ever cut its price because

JCCTSTA2                        Shapiro - Cross

1    the others would discipline that, and I'm saying you don't need

2    excess capacity to discipline that for the reason I just

3    explained.

4    Q.  Dr. Shapiro, I would like to refer you to tab one, page 102

5    of your binder there of your deposition.

6    A.  Okay.  Tab one, you said, page number?

7    Q.  Yes, 102.

8    A.  Okay.

9    Q.  Do you recall in your deposition I asked you the following

10   question and you gave the following answer:

11   "Q.  More precisely, for a given level of total capacity,

12   collusion is more difficult if capacity is distributed unevenly

13   across the firms.  If one firm has greater excess capacity,

14   that firm has a greater incentive than others to cut its price,

15   and its rivals have less of an ability to discipline that

16   firm."

17              Do you recall saying, "That's correct, I stand by

18   that."

19              MR. POMERANTZ:  Your Honor, I don't believe that's on

20   page 102.

21              MR. CARY:  Page 101.

22              MR. POMERANTZ:  Okay.

23              MR. CARY:  Sorry.

24              MR. POMERANTZ:  Starting what line?  You have to

25   reread it.

JCCTSTA2                          Shapiro - Cross

1           MR. CARY:  Line 6.

2     A.  Okay.  Shall I continue?

3     Q.  The question is:  Was that the question I put to you, and

4     is that the answer that I you gave?

5     A.  That's the answer I gave.  It's perfectly consistent with

6     the answer I just gave in court.

7     Q.  Okay.  Mr. Shapiro --

8           MR. CARY:  We have a document, your Honor, that is

9     confidential, so we can only put it up on the Court screen, the

10    witness' screen and the counsel table's screen, but I would

11    like to question the witness about it.

12          THE COURT:  All right.

13    Q.  Dr. Shapiro, could you please turn to tab 12 in your

14    binder.

15    A.  Okay, I am there.

16    Q.  His Honor asked you questions about quality competition and

17    coordinated interaction.  Do you recall those questions from

18    his Honor?

19    A.  Yes.

20    Q.  So this document is a 5G strategy update dated

21    September 2019 from Verizon.  Do you see that?

22    A.  I do.

23    Q.  Did you review this document in forming your opinions in

24    this matter?

25    A.  I'm not certain.

JCCTSTA2                          Shapiro - Cross

1    Q.  I would like to refer you to the executive summary.

2    A.  Okay.

3    Q.  And the executive summary, referring you to the second

4    bullet, do you see that Verizon is expressing concern about its

5    position coming under competitive pressure?

6    A.  I see that.

7    Q.  And do you see in the second to bottom bullet there where

8    Verizon expresses concern that they will be challenged by new

9    T-Mobile as a result of combination of Sprint and T-Mobile.

10   A.  They don't say it's a result of the combination, they say

11   it's new T-Mobile.  They don't compare how they're challenged

12   without the merger.

13   Q.  They say we will be challenged by the Sprint asset

14   leveraged in the new T-Mobile model, right?

15   A.  That's what they say.

16   Q.  Then it says they need, in the near term, to consider this

17   in terms of their own strategy, right?

18   A.  I see that.

19   Q.  And then they say, if you look over to the right-hand side,

20   they question whether they have to change their strategy to

21   respond, correct?

22   A.  I see that.

23   Q.  So they're not -- in this document, at least, they're not

24   saying that they're going to coordinate, they're saying they

25   have to come up with a plan to deal with the challenge posed by

1    a more powerful competitor, aren't they?

2    A.   They're talking about the challenging period coming in

3    2020.  I wouldn't expect them to write down they were planning

4    to coordinate.

5    Q.   Could we look on page 6, and I would like to refer you to

6    the right-hand side down at the bottom it says "competitive

7    landscape."  Do you see that?

8    A.   I see that now, yes.

9    Q.   And you see in the competitive landscape they're talking

10   about an emerging fourth with a new business model as a

11   competitive factor that they need to consider in defining their

12   strategy going forward.

13   A.   I see that.

14   Q.   They say that they're facing new T-Mobile as the new

15   T-Mobile uncarrier moves into the rural areas.  Do you see

16   that?

17   A.   I don't see moving in, it says new T-MO uncarrier for rural

18   mobile.

19   Q.   I would like to refer you to page 22, and in particular, we

20   saw up above on the first page we saw a reference to their

21   midterm challenges, and now this is their strategy to deal with

22   those challenges.  Right?

23   A.   Okay.  I see it's -- Verizon 5G strategy is the topic.

24   Q.   And it's adapting or changing its strategy for the shifting

25   competitive dynamics, right?

JCCTSTA2                      Shapiro - Cross

1    A.   That's the term they use, I see that.

2    Q.   Part of that network dynamic is they are no longer the

3    unchallenged leader with a superior network relative to the new

4    T-Mobile.

5    A.   I don't see that here.

6    Q.   Look at the middle bullet in the midterm challenges range.

7    A.   The no longer unchallenged part, I didn't see that here.

8            I see what you highlighted.

9    Q.   That indicates that their midterm challenge is new

10   T-Mobile's launch of their 5G offering better performance,

11   right?

12           I don't want to read the whole thing.

13   A.   I see it.

14   Q.   Okay.  So all of these aspects of the document would appear

15   to show that Verizon plans to respond more aggressively to

16   competition from new T-Mobile, doesn't it?

17   A.   More aggressively than what?

18   Q.   It is changing its strategy because it is perceiving a

19   competitor who will be more capable of bringing competition to

20   it than it was before, right?

21           That's of a fair reading of this document, isn't it?

22   A.   I guess you're reading more into this than I'm seeing

23   without reading the whole document.  The document is not

24   entitled "Response to T-Mobile," it's "5G Strategy Update."

25   This is one of the factors they would be foolish not to think

1    about, what is happening with this huge merger in their

2    industry, so they're mentioning that.  I get that.  It's one of

3    the challenges they're facing.  I get that.  I don't see that

4    it's a comparison of the merger -- the world with the merger

5    than without, which is the relevant question.  Your questions

6    are pointed in that direction.  I think you're reading too much

7    into it.  It faces challenges.

8    Q.  When they say changing they're strategy in response to

9    something, that sounds like a reaction to me, but we'll move

10   on.

11   A.  In response to what, though?

12   Q.  Let's look at page 18, maybe that will show us the

13   response.

14   A.  I'm just not seeing it.  You may be right.

15   Q.  We talked about the importance of excess capacity in terms

16   of competition and coordinated interaction.  Do you see on this

17   chart that they are showing in the post-transaction world empty

18   capacity for one player and broad capacity for another player

19   and contrasting that with the situation for Verizon and AT&T

20   today, correct?

21   A.  I see what they're doing, but all they're doing in

22   post-transaction, as far as I can see, is adding up T-Mobile

23   and Sprint.  Sprint already has a huge amount of excess

24   capacity, according to this.  So they're adding them up and

25   putting them into one row, and Dish is slightly changed for

JCCTSTA2                        Shapiro - Cross

1    some reason, their low capacity is going down for a little bit.

2    So this doesn't tell me anything about the merger other than

3    just the two firms have been joined into one.

4    Q.  Well, but if I were to tell you and if I were to represent

5    to you that it's the case that when you combine spectrum and

6    tower assets into a single network, the result is to multiply

7    the amount of available capacity within that network, then this

8    would be -- if somebody understood that who had written this,

9    this would be indicative of more capacity in the marketplace

10   post-transaction than pre, correct?

11   A.  Well, there's some interpretation of these numbers.  I'm

12   telling you what I see in front of me, added up the numbers,

13   and you're telling me that for some other reason that means

14   there's a lot of extra capacity, that's not what the numbers

15   show here, that's all.  I understand the network equation that

16   underlies your question.  That's not part of my analysis, the

17   efficiencies, but that's not on the chart.

18   Q.  Well, it is on the chart in the sense that this chart is

19   showing that the new T-Mobile has much more spectrum that

20   either of the two the networks previously, correct?

21   A.  Much more spectrum?  It has the amount, there's some slight

22   discrepancies, but basically the amount you would get by adding

23   up the two constituent components.  That's just addition.  I

24   don't understand what you're saying.

25   Q.  It's not addition, as you said, it's multiplication, right?

JCCTSTA2                        Shapiro - Cross

1    If you put the two networks together, the same amount of

2    spectrum multiplies the amount of available capacity.  Isn't

3    that the formula that underlies capacity in this market?

4    A.   Look, I am not an expert on network physics, all I'm saying

5    is what you put in front of me shows -- it's average megahertz

6    spectrum, that's what is on the vertical access here, and

7    what's on this chart is addition.  There's no multiplication

8    here.  You're telling me that this does these magical things

9    through network physics.  I understand that's part of your

10   efficiency plan.  I'm not analyzing efficiencies, but that's

11   not on this chart, that's all I'm saying.

12   Q.   What is on the chart, going back to my previous question

13   when I cited to you to your deposition testimony, is that this

14   shows asymmetry of available capacity as between Dish and new

15   T-Mobile on the one hand and Verizon and AT&T on the other

16   hand, correct?

17        It shows mostly full and full on one side and empty on

18   broad capacity on the other.  That's asymmetry, right?

19   A.   Yes, that's -- okay.

20   Q.   Let me point something else out on this chart.  You see

21   that on this chart Verizon is reporting that Dish has more mid

22   band spectrum than it does?

23   A.   That Dish does.  I see, 71 versus 70, yes.

24   Q.   Please don't use --

25   A.   Sorry.  Okay.  Who knows what these units are, it's just

JCCTSTA2                        Shapiro - Cross

1    numbers.

2    Q.  Are you also noticing that Dish has more low band spectrum

3    than Sprint?

4    A.  Okay, I see what you're referring to.

5    Q.  You're aware, are you not, Professor Shapiro, that Dish's

6    low band spectrum is totally unencumbered and will be devoted

7    all to 5G, right?

8    A.  "Unencumbered" means not being used yet?

9    Q.  Not used, correct.

10   A.  I think Dish has been holding onto spectrum for a while,

11   yes.

12   Q.  Whereas Sprint has to accommodate on its low band spectrum

13   2G and 3G users, therefore cannot convert that spectrum to and

14   5G without disadvantaging those 2G and 3G users.

15   A.  I accept that.

16   Q.  Dish is not part of the coordinated group that you have

17   included in your analysis, is that right?

18   A.  That's true.

19   Q.  You do believe that Dish's presence in the market as an

20   MVNO, all else equal, will reduce the incentives to coordinate,

21   don't you?

22   A.  To some degree, in comparison with if they didn't exist in

23   the market at all.

24   Q.  Right.  And the divestiture of Boost to Dish also is a

25   factor, all else equal, that disrupts coordination in the

JCCTSTA2                          Shapiro - Cross

1   market, correct?

2   A.  Well, I don't want to have more to say than the previous

3   answer.  I don't think it will disrupt coordination, but it

4   would -- I think what I said was have some probably small

5   moderating impact on the coordination.

6   Q.  Well, I think what you said was it reduces the benefits of

7   coordinating among the other three.

8   A.  That's fine.  That's the same idea, yes.

9   Q.  And that's true for the presence of the other MVNOs as

10  well, isn't it?

11  A.  Well, they have some impact, but for reasons I explained on

12  my direct testimony, because the primary concern about

13  coordination is to not lower prices, and since MVNOs cannot

14  initiate price cuts, given their cost structure, I don't

15  believe it will -- they will have -- MVNOs will have any

16  meaningful impact in preventing that type of coordination,

17  although other types they could possibly have more of an

18  impact.

19  Q.  You said that the MVNOs cannot initiate price reductions?

20  Are you familiar with TracFone's prices?

21  A.  With TracFone's prices?

22  Q.  Yeah.

23  A.  Yeah, we showed their ARPU of around $25 a month.

24  Q.  What is Verizon's ARPU?

25  A.  Much higher.

JCCTSTA2                        Shapiro – Cross

1    Q.  Much higher?

2    A.  Right.

3    Q.  TracFone can initiate price reductions, right?

4    A.  So maybe I need to be clear.  What I mean by that term is

5    given their margin is so small, about one percent or less, they

6    can't lower the price and still be making money.  That's what I

7    meant by initiating a price reduction.  They're acting very

8    competitively.  They're basically thin resellers with no

9    margins.  They can't lower the price further.  That's what I

10   meant by initiated a price cut.

11   Q.  But if others were to raise prices, they would be in a

12   position to discipline those price increases during the period

13   that their wholesale agreement is in place with a fixed price.

14   A.  That's why we need to distinguish between this coordination

15   to raise prices versus coordination to simply hold prices fixed

16   and not lower them.  I was talking about the latter.  That's

17   what I emphasized in my direct testimony.  You want to talk

18   about the former, coordination to raise prices, nominal prices.

19   Q.  Let's be very clear about this:  Are you or are you not

20   predicting that there will be coordination to raise prices as a

21   result of this transaction?

22   A.  So the coordination will be that -- my first and foremost

23   concern is the coordination to stop the price reductions that

24   consumers have been benefiting from.  I think I have been quite

25   clear about this.  And that was the calculation with the

JCCTSTA2                     Shapiro – Cross

1    6.3 percent of preventing price reductions for the next year.

2    That is, in merger lingo, higher prices as a result of the

3    merger than not.  So we call that raising prices, but to be

4    more precise, it means not lowering them.  That's the first and

5    foremost pricing concern about coordinated effects.  And the

6    MVNOs and Dish -- well, let's say the MVNOs like TracFone, they

7    cannot disrupt that type of coordination, given their wholesale

8    prices.

9    Q.  Again, I want to be clear, you are not giving the opinion

10   that as a result of this transaction AT&T, Verizon and T-Mobile

11   will coordinate to raise prices above current levels?

12           MR. POMERANTZ:  Objection, your Honor, asked and

13   answered.

14           THE COURT:  Sustained.

15   Q.  Well, let's go to your chart.

16           MR. CARY:  And again, I apologize, your Honor, we have

17   some numerical confusion because the deck that was used

18   yesterday was different from the one provided to us.

19   Q.  But I'm looking for what we have in our tab 14.  This is

20   your chart from yesterday illustrating your point about --

21   A.  I think the public display is still off.

22           Excuse me.

23   Q.  Yes.  So this is the chart you had yesterday to illustrate

24   your point about the price increments not preventing an

25   anticompetitive effect that prices will not fall as rapidly as

JCCTSTA2                        Shapiro - Cross

1    they otherwise would, correct?

2    A.   Correct.

3    Q.   Now I want a better understanding of this line.  It says

4    planned prices, but it has no numbers on the vertical axis.

5    This is a hypothetical that you're reporting to us?

6    A.   I called it conceptual.

7    Q.   Conceptual.  Okay.  And in your conceptual you show that

8    the line has fallen, right?

9    A.   The blue -- yes, the plan prices under this illustration

10   are falling from one year to the next.

11   Q.   So I'm going to put up another hypothetical.  Now in this

12   hypothetical the line is not falling, it's slightly increased

13   but mostly flat, right?

14   A.   I see what you've done.

15   Q.   In this hypothetical, since you told us you you're not

16   predicting the three carriers network operators are going to

17   coordinate to raise prices, in this scenario price commitment

18   would preclude the anticompetitive --

19        MR. POMERANTZ:  Objection, your Honor, he misstated

20   the testimony about higher prices.

21        THE COURT:  Clarify, Mr. Cary.

22   Q.   In this example, the price commitment would prevent --

23   strike that.

24        In this example, the consumer harm that you showed in

25   your conceptual drawing does not exist, right?

1   A.  That is true.  As you've drawn it, you have eliminated it.

2   Q.  Well, it wasn't me who eliminated it.  Are you aware of the

3   producer price index?

4   A.  Certainly.

5   Q.  The producer price index is generated by the Department of

6   Labor statistics?

7   A.  That's correct.

8   Q.  And so if we go to the next chart, this chart shows the

9   producer price index for the period from 2018 to 2019 for

10  cellular and wireless communication.  Doesn't that indicate

11  that prices have been flat over that last year?

12  A.  That's what you're showing.

13  Q.  And in terms of your analysis of this industry, you have

14  seen documents where carriers have in fact predicted that

15  prices would be flat or turning up as a result of capacity

16  constraints, have you not?

17  A.  I have seen some things like that, but I don't even know

18  what price we're measuring here now.  I understand ARPU.  I

19  don't know what this index is.  What are we measuring?  Are we

20  measuring dollars per gigabyte or usage?  I don't know what

21  we're measuring.

22  Q.  It shows the producer price index is the source, down at

23  the bottom says for --

24  A.  Price of what?

25  Q.  Wireless telecommunication carriers.

JCCTSTA2                         Shapiro - Cross

A.   That seems rather broad to me.  I just want to know what
we're measuring.  If you tell me it flattened out, what to make
of it.  Because the BLS, they have a consumer price index, they
have a producer price index, these tend to be pretty broad
buckets, and I would not tend to go there, but maybe this is a
good measure.  But I can't tell because I need to see what is
in this bucket that wireless industries -- I don't know what
we're including here.

Q.   But you didn't look at the real data, the BLS on wireless
carriers, in coming up with your conceptual drawing which
showed the decline, right?

A.   I used -- I think that that is not -- I'm not -- actually I
might have looked at those data, I can't remember, but much
better data that I did look at I've got in my reply report a
number of different measures of data of price drops.  The ARPU
is a good one, that's been dropping.  What's really dramatic is
the price drops dollar per gigabyte, because the usage is going
up so much and we're not paying more per month.  So in terms of
quality adjusted prices, it's dropping more rapidly than I
showed in my diagram, and certainly not flattening out.

Q.   In terms of the ARPUs, the reality there is there was a big
drop between 2013 and 2014, and even that then started to
moderate, correct?

A.   I think there was -- I think in terms of we measured 2014
to 2017, that was the most recent three-year period from the

JCCTSTA2                         Shapiro - Cross

1   FCC data.  There might have been a larger drop before that, but

2   then I wouldn't have been picking that up if I remember my time

3   period right.

4   Q.  I think I misspoke, 2014 and '15 it went down and

5   flattened, isn't that right?

6   A.  So I could accept there are some other measures that

7   show -- I used the 6.3 percent annual drop, there are some

8   other measures that show somewhat smaller drops, but the

9   history is pretty clear here that prices have generally been

10  falling and quality adjusted prices have been falling a lot.

11  Q.  You gave us another illustration yesterday.  Tab 14,

12  please.  Do you recall this illustration you gave us?

13  A.  I do.

14  Q.  Now when this was put on the screen you said that this was

15  evidence that prices had declined significantly from

16  November 2018 to November 2019, right?

17  A.  Well, those are the dates at which these screen shots

18  were -- I have to double-check, but yes, I put this forward as

19  indicating a reduction in plan price by T-Mobile, yes.  I don't

20  know that I said -- I don't exactly what dates those reductions

21  actually went into force, this is just, I believe, what was

22  observed at these different dates.

23  Q.  Observed by you?

24  A.  I have to check my reply report.  I think it would be going

25  to website.  I would have to double-check that.

JCCTSTA2                          Shapiro - Cross

1              Should I look it up or not?

2    Q.  Well, let me ask, are you aware -- I don't know how well

3    you could read this, I'm having a little bit of trouble.

4              MR. CARY:  Maybe we could make the names of plans a

5    little bigger so everybody could see the names of the plans.

6              THE WITNESS:  Yep.

7    Q.  Do you see that it shows -- let's take the middle one, it

8    says Magenta $40, per line.

9    A.  I see that.

10   Q.  Are you aware that there was no Magenta plan in November of

11   2018?

12   A.  No, my understanding was that this was, again, the plans

13   that were offered at those times.  If that's not correct, it's

14   a mistake and I have to withdraw it.  That's my understanding.

15   Q.  Let's look on the right side, the November 4, 2019.  Are

16   you aware that this is a promotional plan, not the wrap rate

17   plan?

18   A.  I don't know the details here.  I guess I can tell you more

19   detail what I do know, but I am not sure promotional -- I

20   thought this was signature unlimited plan, my understanding was

21   this was a primary offering by T-Mobile.

22   Q.  The offering is primary, but the pricing is promotional

23   pricing.

24   A.  And is it any different than the one in the previous year

25   in that respect?

JCCTSTA2                    Shapiro - Cross

1   Q.  Yes, the previous year was a wrap rate.

2              Turn to tab 9 at page 5.

3   A.  Okay.  I see that.

4   Q.  This is a document -- this is the real document that shows

5   prices of T-Mobile's post-paid plans, right?

6   A.  I don't know.  I'm not familiar with this document.

7   Q.  I'm going to refer you to the T-Mobile One plan, which was

8   the plan that was in place in November of 2018, because there

9   was no Magenta plan at that time, and I will refer you to the

10  bottom where it is showing the price.  Do you see that?

11  A.  I see that.

12  Q.  And this is for four lines.  Do you see that over on the

13  left there, four lines for 140?

14  A.  I do.

15  Q.  And four lines at 140 is how much per line?

16  A.  $35.

17  Q.  So the price in November of 2018, $35, is the same as the

18  price in November 2019 that you showed on your exhibit for $35,

19  correct?

20  A.  Well, I don't know what -- I'm not following, to tell you

21  the truth.  You're slowing me a document that says they have

22  the One plan and it was $35 a line for this four line as shown

23  here, and now I think you're telling me that was their -- what

24  the promotional rate is in November 2018?

25  Q.  Yes, sir.

JCCTSTA2                        Shapiro - Cross

1   A.  Okay.  Okay.  If you're telling me that, and you're telling

2   me that the $35 rate that was in my exhibit was also a similar

3   promotional rate a year later, is that what you're saying?

4   Q.  Yes, sir.

5   A.  Well, then if that's all true, then this would not

6   illustrate what I was putting it forward to, and that would

7   need to be corrected.  I may be missing something here, but I'm

8   following you and taking your representations, that's my

9   reaction.

10  Q.  Okay.  You spoke yesterday about geographic market

11  definition.

12  A.  Yes.

13  Q.  And you used a slide that showed a map of the New York

14  metro that I would like to put up on the screen.

15         So the CMA that's on the screen is the New York CMA,

16  and you've testified that you believe that that is a relevant

17  geographic market for antitrust purposes for examining this

18  transaction?

19  A.  Yes, that's a relevant geographic market, the New York CMA.

20  Q.  And you came to that conclusion by applying the

21  hypothetical monopoly test?

22  A.  I applied that test to this region and it was satisfied.

23  Q.  Did you apply that test for smaller regions within the New

24  York CMA?

25  A.  No, I did not do that.  I did not need to do that to reach

JCCTSTA2                    Shapiro - Cross

1   the conclusions that this was a relevant market.

2   Q.  So let's take an example of the Bronx.  We have circled a

3   couple of geographies here, what is supposed to be the Bronx

4   but it's in the wrong place, should be lower and to the left.

5   The map is a little small.  Would you agree with me that

6   applying the hypothetical monopoly test that you are using to

7   define markets that the Bronx would satisfy that test?

8   A.  I think it would.

9   Q.  And would you agree with me that Manhattan would satisfy

10  that test?

11  A.  I think it would.

12  Q.  Would you agree with me that a subsection of Manhattan

13  would satisfy that test?

14  A.  Yes, some would, yes.

15  Q.  Would you agree with me that a zip code would satisfy that

16  test?

17  A.  I expect it would because people want service where they

18  live in their homes and where they work.

19  Q.  Would you agree with me that a city block would satisfy

20  that test?

21  A.  Small regions would satisfy that test.  It would not be as

22  informative, but it would satisfy the test.

23  Q.  So the extent to which the definition is informative is

24  relevant to you, right?

25  A.  I don't understand the question.

JCCTSTA2                          Shapiro – Cross

1    Q.   There could be different levels of information provided by

2    looking at different geographic areas.

3    A.   Certainly.

4    Q.   Now you are testifying -- well, let me go a step further.

5    You would agree that a city block would satisfy the

6    hypothetical monopoly test?

7    A.   I think it would in this industry, yes.

8    Q.   Would you agree with me that the Northeast region would

9    satisfy the hypothetical monopoly test?

10   A.   Yes.

11   Q.   Would you agree with me that the Eastern United States

12   would satisfy the hypothetical monopoly test?

13   A.   Yes.

14   Q.   Would you agree that the entire of the United States

15   satisfies the test?

16   A.   I would.  I do.

17   Q.   Basically everything from a city block to the United States

18   of America would satisfy the test?

19   A.   That is correct.

20   Q.   And then applying the methodology that you used, if we went

21   down to a city block and we found Herfindahls above 2,500, you

22   would say that the transaction is anticompetitive on the city

23   block.

24   A.   No, I would not.

25   Q.   You would not?

JCCTSTA2                    Shapiro – Cross

1   A.  No.

2   Q.  Why wouldn't you?

3   A.  Because as I --

4   Q.  Withdraw that question.

5          There are wide variations in Hirfindahls within CMAs,

6   correct?

7   A.  I don't know what you mean by "within."  I have looked at

8   things at the county level and there is some variation there,

9   so I'm not quite sure what you mean.

10  Q.  Let's take Washington DC, for example.  Within the

11  Washington DC CMA there's a county with a Herfindahl of around

12  3,000 and another county with a Herfindahl of around 8,000,

13  right?

14  A.  I don't know that.  I don't have that county level CMAs

15  memorized, happily enough.

16  Q.  But your position is --

17  A.  County level Hirfindahls, I meant to say.

18  Q.  To the extent that the entire CMA has a certain Hirfindahl,

19  you would condemn the transaction even in counties where the

20  Hirfindahl is much lower, right?

21  A.  Finding high concentration and changes in concentration in

22  CMA levels I think is informative about the danger to

23  competition associated with consolidation in those regions.

24  The fact that there's variation within the CMA in terms of

25  market shares and Hirfindahls does not undermine that point, in

1    my view.

2    Q.  There's wide variations within the CMA and there's wide

3    variations across CMAs, right?

4    A.  I think that is true, yes.  To be clear, we're talking

5    about in let's say the levels of Hirfindahl and the change in

6    Hirfindahl, the two metrics we're focusing on.

7    Q.  Right.

8    A.  Yes.

9    Q.  Now economists looking at mergers across geographic markets

10   occasionally will do an analysis of the pricing across those

11   markets to determine whether those really are areas of

12   competitive concern, don't they?

13   A.  Could you be more specific?  To a lot of things that sounds

14   reasonable, but I'm not sure what you meant.

15   Q.  So one of the ways that economists looking at mergers that

16   are in multiple markets, one of the techniques that they use to

17   determine whether there are going to be anticompetitive effects

18   is to look at markets where there are high concentration and

19   other markets where there are low concentration and see whether

20   there's a differential in the competitive outcomes in those two

21   geographies, right?

22   A.  Well, that is a method used for some purposes, but that's

23   not so good for merger analysis, really, because we want --

24   much better would be to look at the effective mergers in

25   different local markets, if I could.

JCCTSTA2                        Shapiro – Cross

1   Q.  I was going to get to that as well.  And that's another

2   technique, to look at cross markets to see if concentration is

3   correlated with performance, and they look within the market to

4   see whether over time with mergers there's a change in

5   performance or exit and entry, right?

6   A.  Those two types of methodologies are definitely included in

7   literature, yes.

8   Q.  Not only the literature, but in the real world analysis of

9   mergers by the DOJ of FCC.

10  A.  In those cases those techniques can be and are used, that's

11  correct.

12                (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

JCCPSTA3                          Shapiro - Cross

1    Q.  Now, here we have a situation, for example, where you have,

2    let's say, Milwaukee, Wisconsin, where the pre-merger HHI is

3    2000, and then you have Rochester, New York, where the HHI is

4    close to 4000, 3788 to be precise.  Did you look to see whether

5    the competitive outcomes in Rochester v. Milwaukee are any

6    different as a result of those differences in HHIs?

7    A.  I have not looked across CMAs in the way you've described.

8    I don't think that would be a fruitful line.  I have not done

9    that.

10   Q.  Okay.  And if you looked, for example, in Miami, when

11   T-Mobile bought Metro PCS, the market shares went up.  Did you

12   look to see whether competitive performance in Miami was better

13   or worse as a result of that increase in concentration?

14   A.  I have not conducted case studies in different CMAs that --

15   it could be informative, I'm not quite sure how you would do

16   it.  It's not part of the analysis I presented to the Court.

17              THE COURT:  Mr. Cary, how much longer do you think you

18   need on this subject?

19              MR. CARY:  Your Honor, if you're looking for a time to

20   take a break, this would be it.

21              THE COURT:  All right.  Let's take a ten-minute break.

22              (Recess)

23              THE COURT:  Thank you.  Be seated.

24              Mr. Cary, do you want to resume, please.

25              MR. CARY:  Yes, your Honor.  Thank you.

JCCPSTA3                    Shapiro – Cross

1          THE COURT:  Before you proceed, let me acknowledge

2     that the Court received a memorandum from defendants dated

3     December 11th, regarding that controversy related to

4     Exhibit No. 1034.

5          Plaintiffs, do you contemplate a response to this

6     memorandum?

7          MR. POMERANTZ:  Yes, your Honor, we do.  If we may

8     have until Monday to submit the response?

9          THE COURT:  All right.

10         MR. POMERANTZ:  Thank you.

11         THE COURT:  Mr. Cary?

12         MR. CARY:  Your Honor, may I approach?

13         THE COURT:  Yes.

14         MR. CARY:  Thank you.

15    BY MR. CARY:

16    Q.  Professor Shapiro, I've handed you a press release

17    announcing the introduction of the magenta plan, consistent

18    with our last conversation about your pricing comparison.  I

19    wanted to refer you to page 3 of 7, where it says:  Introducing

20    magenta, new name, same price, more benefits.

21         And I just wanted to put this before you, pursuant to

22    our conversation about your pricing data.  You don't need to do

23    anything with it, but I will be introducing it into evidence.

24    A.  All right.

25    Q.  So before we broke, we were talking about geographic

JCCPSTA3                    Shapiro – Cross

1   market, and I just wanted to confirm a few things with you.

2   You are aware that T-Mobile and Sprint price nationally, right?

3   A.  I think generally their pricing plans are national, yes.

4   Q.  So the price that a consumer gets in Milwaukee with a 2000

5   Herfindahl is the same price as they get in New York City with

6   a 3800 Herfindahl; there's no difference relative to the

7   concentration ratio, correct?

8   A.  Before we would factor in local promotions and the like,

9   that's correct.

10  Q.  And the local promotions, have you looked at the magnitude

11  of those local promotions?

12  A.  I've seen some documents related to them, some localization

13  plans and the like, yes.

14  Q.  Is it fair to describe the total dollar value of those

15  local promotions as miniscule?

16  A.  I don't -- that sounds rather demeaning.

17  Q.  Very, very, very small, right?

18  A.  I don't know what you mean by that.  I've seen individual

19  documents, if I remember them right, that were talking about

20  promotions in the millions, single-digit millions and handfuls

21  of CMAs, for example.  If that's miniscule, that's the sort of

22  thing that I've seen.

23  Q.  You know that T-Mobile's marketing budget is in the

24  billions, right?

25  A.  I don't know off the top of my head their marketing budget,

JCCPSTA3                    Shapiro - Cross

1    but I'm saying in specific CMAs I don't think that's minuscule

2    when you look at it, but I accept that in the overall scheme of

3    this industry or the total revenues, you know, in the whole

4    country, it's a small -- it's a small item compared with, you

5    know, the national efforts in terms of pricing and marketing.

6    I'm not disputing that.

7    Q.   It's about 2 percent or less, right?

8    A.   I don't know that number.

9    Q.   Have you studied whether the amount that is spent in

10   high-concentration CMAs, as a percentage of revenue, is

11   different from the low-concentration CMAs?

12   A.   I've not related the spending to Herfindahls.  I've seen

13   how it relates to strategy.  Sometimes building on strength.

14   Usually companies are marketing where their speed is good.

15   Q.   My question was with respect to Herfindahls.

16   A.   So, no, I have not related it to Herfindahls.

17   Q.   Right.  And in terms of where their speed is good, where

18   their speed is good, the consumer there gets higher-quality

19   service, right?

20   A.   That's usually what's being touted in terms of the

21   promoter -- not the discounting but in terms of the messaging.

22   Q.   Right.  So the messaging is you're getting more for less,

23   not less for less?

24   A.   Well, for example, the Boston, the thing we showed for

25   Boston with the higher speeds, there was touting the higher

JCCPSTA3                        Shapiro - Cross

1    speeds.

2    Q.  Right.  And it's your view, actually, as expressed in

3    deposition, that higher market share will tend to be associated

4    with higher quality network performance, right?

5    A.  Certainly, yes.  That's why the overlap, when we have CMAs

6    where the two companies have a high combined share, we're

7    especially worried.

8    Q.  But CMAs where one company has a low share and another has

9    a high share, and they can improve their performance by adding

10   those network assets together, consumers are going to get more

11   for less, right?

12   A.  Well, if there are merchant-specific efficiencies, those

13   could very well arise at the CMA level, and that would offset

14   the effects I've talked about.

15   Q.  You do understand, do you not, that T-Mobile has a single

16   national standard for its network performance?

17   A.  I'm not quite sure what you mean by a "single national

18   standard."

19   Q.  What I mean is that they set a floor of megabits per second

20   that is their benchmark, below which if the speeds fall, they

21   will invest.  Are you familiar with that?

22   A.  I've seen documents about their investment plans, and I

23   understand that element.  I wasn't quite sure about whether

24   they go and successfully bring up all these areas to that

25   benchmark, but I get the point.

JCCPSTA3                        Shapiro - Cross

1   Q.  The point is that they don't set -- that benchmark that

2   they try to achieve everywhere is not set by reference to local

3   competitive conditions, correct?  It's a national standard?

4   A.  Yes, what you've described, it sounds to me like the floor

5   may be set, or at least aspirationally, set on a national

6   basis, but of course, you do a lot better in some areas to

7   attract customers who are located there and particularly care

8   about the speed in that area.

9   Q.  You don't have any evidence -- you don't have any evidence

10  that T-Mobile strives to achieve higher performance in a

11  particular area because of competitive conditions in that area,

12  do you?

13  A.  I think there's plenty of documented evidence that

14  T-Mobile, when they're thinking of investing, that they're

15  looking at their local performance and they want to improve

16  their speeds in certain areas.

17  Q.  Okay.  Well, we'll have Mr. Kapoor who will come in and

18  testify and explain that they have a uniform national standard.

19  A.  Well, that's --

20          MR. POMERANTZ:  Objection, your Honor.  He's not --

21          THE COURT:  Sustained.

22  Q.  In any event, you don't have any evidence that their

23  investment decisions at T-Mobile are based upon CMA-level

24  concentration?

25  A.  No, I don't think that's how their planning is done.  I

JCCPSTA3                    Shapiro - Cross

1    agree with that.

2              MR. CARY:  Okay.  Thank you, Dr. Shapiro.

3              Oh, your Honor, I need to introduce --

4              THE COURT:  Yes, some documents, exhibits?

5              MR. CARY:  Okay.  Your Honor, at this time, we'd like

6    to move Defendant's Exhibits 7057 and Defendant's Exhibit 5489

7    into evidence.

8              MR. POMERANTZ:  Your Honor, I think Exhibit 7057 is a

9    Verizon document.

10             MR. CARY:  Correct.

11             MR. POMERANTZ:  Am I correct?

12             MR. CARY:  Yes.

13             MR. POMERANTZ:  And I believe -- so with respect to

14   Verizon, Verizon has provided a certification, a declaration

15   that would establish -- intended to try to establish the

16   business records exception, and they have provided us with a

17   declaration signed by Verizon that attempts to satisfy it.

18             We, too, have obtained a declaration from Verizon that

19   attempts to establish the business record exception for other

20   Verizon documents.  We have asked them to agree -- they both

21   establish it or they both don't.  It's the same declaration.  I

22   think it's word for word the same declaration.  It's just

23   simply different documents.

24             I will not object to them offering the Verizon

25   document in this manner, so long as it goes both ways, your

JCCPSTA3                        Shapiro - Redirect

1    Honor.

2              MR. CARY:  Your Honor, I'm not aware or familiar with

3    the documents that Mr. Pomerantz is talking about.  When those

4    documents come up, we'll take a look at them, and if they're

5    legitimate business records, you know, we'll deal with it.

6              This document, obviously, is.  It's their 5G strategy

7    update for their core team.  I think we've established a

8    predicate for this.  If Mr. Pomerantz can do the same for his

9    documents when we see them, we wouldn't object.

10             MR. POMERANTZ:  Your Honor, I would ask that you

11   reserve your ruling on this.  There is no Verizon witness here

12   to lay any foundation.  They could have deposed a Verizon

13   witness in this matter.  They did not.  I think we can work it

14   out, but I want it to go both ways.

15             THE COURT:  All right.  Let's proceed.  I will assume

16   that if the principle is the same for both documents, then I

17   will ask that they be admitted on the same basis.

18             MR. CARY:  Thank you, your Honor.

19   REDIRECT EXAMINATION

20   BY MR. POMERANTZ:

21   Q.  Professor Shapiro, a few follow-up questions.  Mr. Cary

22   started his examination with unilateral effects and, in

23   particular, he asked you questions about UPP, upward pricing

24   pressure.  Is upward pricing pressure, or UPP analysis, a

25   methodology that is widely used by antitrust economists?

1    A.  Yes, it is.

2    Q.  In fact, is it so widely used that it was expressly added

3    to the merger guidelines?

4    A.  Yes.  Although, I would think it goes both ways.  The

5    presence in the merger guidelines has spurred additional usage

6    as well.

7    Q.  And is it fair to say that both the FTC and the DOJ use UPP

8    analysis when they're assessing unilateral effects in a merger?

9    A.  Yes, when it's appropriate.  Of course, it has to fit the

10   case.  The UK's Competition and Markets Authority also does

11   this similar thing.

12   Q.  And just in general terms, why do antitrust economists, the

13   FTC and the DOJ use UPP to analyze price effects of a

14   horizontal merger?

15   A.  So this is -- in terms of quantifications that are workable

16   in practice and in court, we have Herfindahls.  We've had those

17   for a long time.  Herfindahls fit better with coordinated

18   effects, that's really where they come from intellectually in

19   this field.

20           Unilateral effects have become increasingly a large

21   part of merger enforcement over the past 20 years, and this

22   methodology is a way of quantifying them.  It's better than

23   Herfindahl for that.  The change in Herfindahl is also

24   informative for coordinated effects -- excuse me, for

25   unilateral effects.

JCCPSTA3                    Shapiro - Redirect

                 But this is our best methodology that's relatively
simple.  It may not feel that way to you, your Honor, but
relatively simple for quantifying these things.  There are more
complicated methodologies, such as merger simulation, but this
one is relatively simple.  Many people even believe it is quite
reliable.  There is still some academic debate about that, and
it's workable in practice.

Q.  All right.  Let me turn to a different subject, the subject
that Mr. Cary concluded on, and that is local markets and, in
particular, CMAs.  The defendants have retained two economists
to look at your initial testimony, correct, your initial
report?

A.  Yes, that's correct.

Q.  And that's Dr. Katz and Dr. Asker, correct?

A.  Yes.

Q.  And they're both here today, correct?

A.  Yes, I believe so.

Q.  Did either Dr. Katz or Dr. Asker, say in their reports that
there is no local market that's a relevant market for assessing
this merger?  Did either of them say that affirmatively?

A.  Well, as best -- in my mind, what they say in their reports
that responded to mine, they criticized my use of CMAs as local
markets.  I don't know that they said there could not be any
local market, but they were attacking this use of CMAs.

Q.  Okay.  So that's the point.  That is, they didn't say there

JCCPSTA3                    Shapiro - Redirect

 1   is no local market competition out there; they just said that

 2   CMAs may not be the right way to define that local market,

 3   correct?

 4   A.   That is how I have remembered and responded to their

 5   reports, yes.

 6   Q.   And then, did they identify a different way to define the

 7   local market, like it should be a county or a borough or a

 8   neighborhood or a street?  Did they define a different local

 9   market?

10   A.   No, they did not.

11   Q.   Okay.  Now, Mr. Cary suggested that there may be smaller

12   regions than a CMA that may satisfy the HMT, the hypothetical

13   monopolist test.  Do you remember that question?

14   A.   And I acknowledged that there would be.

15   Q.   And then Mr. Cary also asked you whether there would be a

16   larger region than a CMA that would satisfy the hypothetical

17   monopolist test, and you agreed with that, too, correct?

18   A.   Yes, such as the United States.

19   Q.   So does that mean that because there are smaller local

20   markets that satisfy the test and larger regional markets that

21   satisfy the test, does that mean that the CMA is not a relevant

22   market for analyzing this merger?

23   A.   No, it does not.  That question, I think, goes to that it's

24   informative to look at these geographic regions.  They do

25   satisfy the test, but since other regions do, you want to look

JCCPSTA3                    Shapiro - Redirect

1    at this region if it's informative.  And I've explained, I

2    hope, on the witness stand here why I believe it is regarding

3    local dimensions of competition.

4    Q.  All right.  And then when we turn to the national market,

5    Mr. Cary noted that there are wide variations of HHIs in

6    various local markets; do you remember that?

7    A.  I do.

8    Q.  And then he also noted that nominal prices, that is, let's

9    say, the rate plans, those are set nationally by T-Mobile and

10   Sprint; do you remember that?

11   A.  I do.

12   Q.  Now, are we missing something here with respect to why the

13   local HHIs vary significantly compared to the national?  If we

14   just look at the nominal prices that are set nationally, are we

15   missing something there?  Is there something that explains why

16   the HHIs vary so much locally compared to the national market?

17   A.  Well, there's a -- I think we understand why.  It's not

18   because prices are different in one area over the other, it's

19   national pricing.  So one of my exhibits I showed in the

20   New York CMA, the combined share of the merging firms is

21   58 percent.

22   Q.  Are you referring to a slide?

23   A.  I am.

24   Q.  What's the number on the slide?

25   A.  Slide 26 from the deck we presented yesterday.

1  Q.  Mr. Nickels, could you put slide 26 up?

2          Okay.  Yes?

3  A.  Yes, that's the one.  So, your Honor, hopefully you can see

4  this.  We saw this before.  So just look at New York.  So the

5  combined share is 58 percent for the two firms.  That's

6  substantially larger than their national combined share, which

7  I think is about 38 percent.

8          So that is not because of local promotions in

9  New York.  It's not because of price differences.  It's, I

10  infer, that it's the quality.  It's the speed, that I think

11  they've got -- they're more competitive in New York CMA than in

12  the country as a whole because of the quality of their service

13  in this area.  And we see considerable variation, and this is

14  why certainly unilateral effects locally would be particularly

15  concerned, and -- in a CMA such as New York because the

16  combined share is so high.

17  Q.  All right.  And if we could, Mr. Nickels, if you could put

18  slide six up on the screen.  So this is another slide.  This is

19  Plaintiff's Exhibit 160, that we looked at during the course of

20  your direct examination.  Mr. Cary was asking you questions

21  about whether T-Mobile tries to come up with the same quality

22  requirements across the United States.

23          In fact, all of the carriers have differences in their

24  qualities in different localities around the country, correct?

25  A.  That's the reality of this industry, yes.

1    Q.  And, in fact, the carriers compete with each other locally

2    based on quality, correct?

3    A.  I think so.  Yes, they do.

4    Q.  And Exhibit 160 is an example of how Sprint is using its

5    speed in the Boston area to compete for consumers in Boston,

6    correct?

7    A.  Yes, that's what I think this is about.  It's a press

8    release touting their speed in Boston.

9    Q.  Now, Mr. Cary also asked you some questions about

10   competition relating to AT&T and Verizon; do you remember that?

11   A.  Yes.

12   Q.  And he showed you a Verizon document, strategy document

13   that addressed 5G, correct?

14   A.  I recall that.

15   Q.  And he was trying to suggest from that document, I think

16   through his questioning, whether Verizon would really have any

17   interest in coordinating with AT&T and the new T-Mobile if this

18   four-to-three merger actually occurred; do you remember that

19   line of questioning?

20   A.  I do.

21   Q.  So he selected one document that was produced to the

22   parties and to us by Verizon.  I'm going to ask you to look at

23   a different document.

24   A.  Okay.

25   Q.  Can you, Mr. Nickels, put this only on the private screen,

1    not publicly.

2              Could you take a look at Exhibit 1234?

3              MR. POMERANTZ:  Your Honor, would you like a copy?  I

4    have a --

5              THE COURT:  Yes.

6              MR. POMERANTZ:  And, Mr. Nickels, if you could

7    highlight the first sentence of the top e-mail.

8    BY MR. POMERANTZ:

9    Q.  Now, I'm not going to ask you to read it out loud,

10   Professor Shapiro, but is it fair to state that the contents of

11   that first sentence would not suggest that this -- that Verizon

12   is opposed to the merger?

13   A.  I very much agree with that, based on this sentence that I

14   will not read.

15   Q.  And indeed, is it fair to say that you read this first

16   sentence as being totally consistent with the testimony that

17   you have provided here with respect to coordinated effects?

18             MR. CARY:  Your Honor, I'm going to object to the

19   question, and I'm going to move to strike the last answer as

20   well.  This is a document -- it took us a minute to read it,

21   but this is a document not within Verizon, but to a Boston

22   Consulting Group, and I think we're now getting into that area

23   of the conversation.  This document, upon review, seems to be

24   Boston Consulting Group trying to sell their services to help

25   Verizon strategize, and Verizon is saying, no thank you.  It's

1    not a business record.

2            MR. POMERANTZ:  Your Honor, to the contrary.  You can

3    see the document.  The top e-mail is from Verizon.  It is not

4    from Boston Consulting Group, and this is somebody, a senior

5    executive at Verizon, offering a view about the merger.  It's

6    clearly a business record, and we have a -- in fact, a

7    declaration on this very document from Verizon that is

8    identical to the declaration that they have offered for the

9    documents they seek to enter into evidence from Verizon.

10           MR. CARY:  Your Honor, the difference is apparent on

11   the face of these documents.  One document is the official

12   Verizon strategy update, with facts and figures and data and

13   proposals for the company to move forward in response to a

14   competitive threat.

15           The other is one individual's e-mail to a third-party

16   consultant, who's soliciting him for business to consult and

17   strategize, and the Verizon executive says, no, thank you, and

18   expresses a personal opinion.  It is not a document created in

19   the ordinary course of business by someone with knowledge of

20   the facts, kept in the ordinary course, and used as a

21   decision-making document as the Verizon plan is.

22           MR. POMERANTZ:  Your Honor, to the contrary.  The

23   evidence here is exactly the opposite of what Mr. Cary just

24   said.  Verizon has sworn, in a declaration, that this is a

25   business record, No. 1, and No. 2, Mr. Cary is looking at a

JCCPSTA3                      Shapiro - Redirect

1    document that he relied on and then assuming things, as opposed

2    to actually getting testimony from Verizon, if he wanted to

3    offer it, saying all the things that he just said.

4           They had the opportunity to do that.  They didn't take

5    the deposition.  We both have declarations that say exactly the

6    same thing, which establish the business records exception.

7           THE COURT:  Do we know who Mr. --

8           MR. POMERANTZ:  I would ask you not to say the name.

9           THE COURT:  The individual who is sending this, where

10   he places in the organization, whether he has authority to make

11   the statement like this and have that statement be attributed

12   to Verizon?

13          MR. POMERANTZ:  Yes, I understand.  And again, I don't

14   want to -- I understand that he is a -- I want to say the title

15   is Senior V.P. of Marketing.  I may not have it quite accurate,

16   but he's of that level.

17          MR. CARY:  So, your Honor, I think that makes the

18   point, a marketing guy responding to a consulting group saying

19   we want to work for you, as opposed to 60 pages --

20          THE COURT:  I'm going to agree with the defense.

21   This, as I see, is somewhat different than the principle that

22   applies to the prior Verizon document.

23          MR. POMERANTZ:  Your Honor, if I may.  As you allowed

24   some briefing on the other exhibit, I really do think that

25   there is no basis under the rules and under the evidence that

JCCPSTA3                    Shapiro - Redirect

1    we have here, to include theirs and not ours, and I would like

2    the opportunity, if I may, to brief it.

3            THE COURT:  If you wish to brief and spend your

4    valuable time on those technical issues, which on appeal, as

5    you know, Court rulings are very seldom reversed, you may.  But

6    I just don't think it's a productive use of your time.  There

7    are material differences that I see between the two issues,

8    but --

9            MR. POMERANTZ:  No, your Honor, I certainly don't want

10   to waste our time right now.  I certainly understand your

11   message.  I just want to be clear that what this document says

12   goes to the heart of the issue in this case.

13           MR. CARY:  Your Honor?

14           THE COURT:  Let's not prolong it.  The other thing is

15   that Verizon may tell you that this is a business document, but

16   the business document, as you know, is a legal principle under

17   the rules of evidence, and it's to the Court to determine

18   whether or not something is or is not a business record, and I

19   am not necessarily bound by a determination of a third party.

20           MR. POMERANTZ:  I'll move on, your Honor.

21           THE COURT:  All right.

22   BY MR. POMERANTZ:

23   Q.  Professor Shapiro, Mr. Cary was asking you questions about

24   spectrum and the difference between addition and

25   multiplication; do you recall that testimony?

JCCPSTA3                    Shapiro – Redirect

1    A.  I do.

2    Q.  I think it was something about the law of physics, and I

3    think what he said was that if you combine the spectrum of

4    T-Mobile and Sprint, you get excess capacity through

5    multiplication, not addition.  Do you recall that line of

6    questions?

7    A.  Yes.

8    Q.  So if you combine the spectrum of AT&T and Verizon, then

9    you would also get excess capacity through multiplication and

10   not addition, correct?

11   A.  If the same principles apply, that sounds correct, yes.

12   Q.  And if you combined the spectrum of AT&T and Verizon and

13   T-Mobile and Sprint, you would get an even higher result from

14   that multiplication rather than addition, correct?

15   A.  As I understand the formula, unless there was some other

16   factor, yes.

17   Q.  Do you think that the fact that you can combine these

18   companies, whether it's AT&T and Verizon or the entire industry

19   into a monopoly, do you think the fact that that multiplication

20   leads to, let's say, better service?  Do you think -- as an

21   economist, do you think that that answers the question of

22   whether there will be a substantial lessening of competition?

23           MR. CARY:  Your Honor, I'm going to object on the

24   basis of foundation.  This witness has testified that he's not

25   their efficiencies expert, he is not looked at the physics,

1    he's not looked at the network combinations, and he, therefore,

2    cannot answer that question without any scientific foundation.

3            THE COURT:  All right.  Mr. Pomerantz, perhaps you

4    want to take another stab at the foundation.

5            MR. POMERANTZ:  Your Honor, Mr. Cary asked him that

6    same question, only he limited it to T-Mobile and Sprint, and

7    he very much asked him multiplication versus addition, and what

8    that means to the antitrust analysis -- the economic analysis

9    here.

10           I'm just going to the next step.  It's hard for me to

11   imagine how there cannot be foundation for Professor Shapiro to

12   answer this question, when Mr. Cary elicited the exactly the

13   same testimony, but he chose to limit just to T-Mobile and

14   Sprint, and I'm trying to show the logic of his argument and

15   what that means to competition.

16           I have an antitrust economist on the stand, and his

17   whole point is to talk about how do economists look at these

18   kinds of issues in the context of assessing whether competition

19   is improved or lessened?

20           THE COURT:  All right.  Thank you.  Overruled.

21           MR. POMERANTZ:  Thank you.

22   A.  I feel like after all that, I'm supposed to have something

23   really good to say.  But, look, if you accept those network

24   physics and those formulas, and this is, I think, the important

25   part of the efficiency claims, those could qualify as

JCCPSTA3                          Shapiro - Redirect

1    efficiencies, but we would always want to see whether they

2    would be of a magnitude to offset the anticompetitive effects,

3    and you're talking about, as the industry increasingly

4    consolidates, that it would be a heavier and heavier lift.

5    BY MR. POMERANTZ:

6    Q.  All right.  Let me turn to a different subject.  You

7    understand that defendant's position is that after this merger,

8    the prices for new T-Mobile's services will go down?

9    A.  I'm sorry, I lost you.  The absence of the merger, is that

10   what you said?

11   Q.  No, I'm sorry.  Defendant's position.

12   A.  I didn't hear that.

13   Q.  You understand that defendant's position is that after the

14   merger, new T-Mobile's prices will go down?

15   A.  I do.

16   Q.  And you understand that their position is based upon the

17   efficiencies that they claim will arise from the transaction?

18   A.  I think it is.

19   Q.  Now, you say that if new T-Mobile does not have the kind of

20   efficiencies that are claimed by the defendants here, the kind

21   of efficiencies that are recognized by economists and the law,

22   then new T-Mobile's prices will go up, as compared to the

23   prices that would prevail without the merger, correct?

24   A.  Yes, that's what I'm saying.

25   Q.  So they say prices will go down, and we say prices will go

JCCPSTA3                    Shapiro – Redirect

1  up, correct?

2  A.   Again, up could mean not falling as rapidly, but up,

3  compared with the merger not taking place.

4  Q.   Okay.  So if we are right, that new T-Mobile's prices will

5  go up, what do economics tell us about whether AT&T and Verizon

6  would have any incentive to lower their prices?

7  A.   So even if we just took the unilateral effects part of my

8  analysis, that the new T-Mobile would raise the price of their

9  brands, the -- what are normal, I would say, standard way of

10  thinking about oligopoly is that AT&T and Verizon -- first off,

11  they would welcome that because they've got a competitor

12  raising price, and they would tend to raise their price

13  somewhat without any coordination, just to -- in response

14  somewhat.  So it would tend to be a broader set of price

15  increases.  This is what the merger simulation models and our

16  oligopoly models typically say.

17  Q.   So if there are no cognizable efficiencies in this case, do

18  economics tell us that not only will new T-Mobile raise its

19  price compared to pre-merger, but AT&T and Verizon have no

20  incentive to lower their price?

21  A.   That's correct.  They have no incentive to lower their

22  price, and they would tend to have some incentive to partially

23  follow the price increase that T-Mobile would initiate as a

24  result of the merger.

25         MR. POMERANTZ:  Your Honor, I have no further

JCCPSTA3                    Shapiro - Redirect

1    questions.  Oh, I'm sorry.  I have to move into evidence a

2    bunch of exhibits.  Okay.  911, 655, 1042, 1242, 1235, 1031,

3    585, 813, 892, 1021, 273 and 856.

4            THE COURT:  Any objections?  No?  These are admitted

5    without objection.

6            MR. CARY:  We have no objection.  We were just looking

7    over the list to make sure the other one isn't in there.

8            (Plaintiff's Exhibits 911, 655, 1042, 1242, 1235,

9    1031, 585, 813, 892, 1021, 273 and 856 received in evidence)

10           MR. CARY:  Your Honor, we also have the press release

11   handed up, which we will mark as Defendant's 5490, and we move

12   that in.

13           MR. POMERANTZ:  Your Honor, we would object to that.

14   While we had an agreement that we would withdraw objections to

15   press releases that were on the exhibit list, this is the first

16   time we had any notice.  And we knew which ones those were.

17   This is the first time we were aware of this one being used as

18   an exhibit in the case.

19           MR. CARY:  Your Honor, the only reason we used it as

20   an exhibit is because Dr. Shapiro put up that erroneous exhibit

21   that showed -- purported to show differences in prices for a

22   plan that didn't exist a year ago.  This press release is the

23   announcement of the plan to demonstrate that it didn't exist a

24   year ago; so that's why it wasn't on the list.  We were using

25   it to -- in response to the witness' testimony.

1          MR. POMERANTZ:  Your Honor, if I may ask.  I may not

2    have any objection.  I saw it for the first time this morning.

3          THE COURT:  Do you want to wait on this one?

4          MR. POMERANTZ:  If I could wait until tomorrow morning

5    and just let your Honor know?

6          THE COURT:  All right.  Mr. Cary, did you have any

7    further questions?

8          MR. CARY:  No, your Honor.

9          THE COURT:  Let me just ask one question.

10         Dr. Shapiro, coming back to the issue of unilateral

11   moves and whether or not T-Mobile would likely raise prices,

12   one difficulty that I have with this unilateral strategy is

13   that, and I alluded to this yesterday, it is unlikely that a

14   competitor in these circumstances is going to be so bold as to

15   on day one or day two or month one following the merger, say

16   we're going to increase our prices, period.

17         It seems counterintuitive that if they're going to do

18   that and know that the competition is going to also raise

19   prices and lose reputation, I think we talked about that

20   earlier, that they wouldn't do that.

21         If they're going to do it, they would probably say to

22   their customers, we're going to double the speed or we're going

23   to have many more network outlets, or we're going to give you a

24   plan that will combine other improvements to service, but for

25   that, you might have to pay a little bit more.

1          There, conceivably, could be some people that say,

2     yeah, that sounds reasonable, and that's a way of raising

3     prices.  And if the other side then comes back and says, all

4     right, they raised prices by this means, we're going to tinker

5     with a package that we'll say, yeah, we also will raise prices

6     but we're going to give you more speed.  Isn't that a more

7     plausible scenario than just having a competitor raise price

8     from day one?

9          THE WITNESS:  Absolutely.  Look, first off, when you

10    have a high-profile merger like this, I don't think the

11    company, even if they thought it was in their interest, just in

12    terms of the demand elasticities, are going to come right out

13    and raise prices.  It would look -- let me just emphasize, the

14    primary concern I've identified is not that they will raise

15    price, it's that they will pull back from some of the price

16    cuts or other initiatives and price cuts.  I also mean quality

17    improvements at the same price.

18         So they could -- there's no real reputational harm if

19    they just sit back, don't offer new deals.  The next cool thing

20    that I mentioned, Sprint and T-Mobile both as being Mavericks,

21    making pro-consumer.  If they just pull back on those, it's not

22    like consumers were going to go, hey, what happened?  Where's

23    that offer I thought I was going to get?  People don't think

24    that way.

25         So it's not really raising price.  Sitting back and

JCCPSTA3                    Shapiro - Redirect

```
 1    not lowering prices or improving quality quickly, that would be
 2    the more realistic scenario.  Also, I don't think of these
 3    things as happening in a week or quarter after the merger.  A
 4    merger is basically a permanent change in the industry, and if
 5    it's for PR reasons or reputational reasons, you know,
 6    companies would take time.  They have to deal with transitions.
 7    It's a complicated situation.  I'm not predicting that, oh,
 8    this is what's going to happen a week or month after the
 9    merger.  That's not how I think about it.
10              THE COURT:  All right.
11              MR. POMERANTZ:  Your Honor, may I ask one follow-up
12    question to your Honor's question?
13              THE COURT:  Sure.
14    REDIRECT EXAMINATION  RESUMED
15    BY MR. POMERANTZ:
16    Q.  So, Professor Shapiro, I had asked you, I think in my first
17    question this morning, about something called quality adjusted
18    prices.  And so in response to the Court's question, if new
19    T-Mobile after the merger does not raise its nominal price, the
20    rate plans have exactly the same dollar figures in there, is
21    there anything that new T-Mobile could do after the merger to
22    effect quality adjusted prices in a way that would be
23    meaningful to the consumers, that is, that might be, in fact,
24    of lesser value to the consumer even though the nominal price
25    doesn't change?
```

JCCPSTA3                    Shapiro – Redirect

A.  Well, there are a lot of non-price dimensions such as, you

know, the speed, how much throttling you would get if you

exceed a certain amount of usage, things like that.  So not

improving those elements over time would cause consumer harm.

        THE COURT:  All right.  Thank you.  You may step down.

You're excused.

        (Witness excused)

        Next witness?

        MR. POMERANTZ:  Your Honor, our next witness is

Mr. Schwartz from Comcast.  Give me a minute to rearrange.

        MR. GELFAND:  Your Honor, while we're waiting, as our

Honor knows, I'm a fan of introductions.  I would like to

introduce the Court to Tamara Wiesebron, a lawyer from my firm.

        THE COURT:  Welcome.

        MR. POMERANTZ:  Your Honor, this is my colleague,

Ms. Sarah Boyce and she'll be questioning the witness.

        THE COURT:  Welcome.

        MS. BOYCE:  Good morning, your Honor.  My name is

Sarah Boyce from Munger, Tolles and Olson, on behalf of the

State of California.  The States would like to call Mr. Samuel

Schwartz on behalf of Comcast.

        THE COURT:  The clerk will swear in the witness.

 SAMUEL SCHWARTZ,

     called as a witness by the Plaintiffs,

     having been duly sworn, testified as follows: