## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No.  1:19-cv-02232-TJK |
| ) | |
| DEUTSCHE TELEKOM AG, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

### RESPONSE OF DEFENDANT DISH NETWORK CORPORATION TO *AMICI*

Steven L. Holley (admitted *pro hac vice*)
Bradley P. Smith (D.C. Bar No. 468060)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
holleys@sullcrom.com
smithbr@sullcrom.com

*Counsel for Defendant DISH*
*Network Corporation*

February 3, 2020

TABLE OF CONTENTS

Page

TABLE OF CONTENTS..................................................................................................... i

INTRODUCTION ............................................................................................................ 1

I.      THE PROPOSED FINAL JUDGMENT IS IN THE PUBLIC INTEREST ...................... 1

II.     DISH'S RESPONSE TO *AMICI* ........................................................................ 5

        A.      The Court Should Not Permit the *Amici* to Selectively Incorporate Portions of the
                Trial Record in Another Case .................................................................... 6

        B.      The *Amici*'s Arguments Regarding the Supposed Insufficiency of the DOJ
                Remedy Are Unpersuasive ........................................................................ 6

CONCLUSION............................................................................................................... 16

**INTRODUCTION**

Pursuant to the Minute Order entered by the Court on January 10, 2020 (the "Order"), DISH Network Corporation ("DISH") submits this response to briefs filed by *amici* with permission of the Court, to the extent those briefs address DISH's role as the purchaser of divested assets in the proposed merger of T-Mobile and Sprint. The carefully-crafted remedy imposed by the United States addresses the competitive harm alleged to result from the merger by, among other things, facilitating and accelerating DISH's entry into the consumer mobile wireless market. The longer it takes for DISH to acquire the divested assets, the longer it will take for DISH to become a competitive force in the consumer mobile wireless market. As a result, DISH urges the Court to enter the Proposed Final Judgment without delay.

**I.   THE PROPOSED FINAL JUDGMENT IS IN THE PUBLIC INTEREST**

As the United States has explained, the Proposed Final Judgment "provides for a substantial divestiture which, when combined with the mobile wireless spectrum already owned by DISH [], will enable DISH to enter the market as a new 5G mobile wireless services provider and a fourth nationwide facilities-based wireless carrier."[1] Having DISH competing head-to-head with AT&T, Verizon, and New T-Mobile will "provide substantial long-term benefits for American consumers" and thus "the public interest is well-served by the proposed remedy."[2] DISH agrees. Among other things, the Proposed Final Judgment imposes a number of structural remedies that will ensure that DISH's operation of Sprint's prepaid wireless business post-divestiture provides vigorous competition in the near term as DISH builds out its own facilities-based 5G network.

---

[1] Response of Plaintiff United States to Public Comments on the Proposed Final Judgment, ECF 42 at 1-2 ("DOJ Tunney Act Response").

[2] *Id.* at 3.

DISH has a long history and track record of injecting competition into a number of consumer-facing communications markets, utilizing new technologies, and providing valuable products and services to millions of customers. The DISH story began back in 1980, as a modest three-person operation selling large satellite dishes out of the back of a truck. The advent of Direct Broadcast Satellite ("DBS") technology in the 1980s allowed for the transmission of television signals to smaller satellite dishes. Capitalizing on this new technology, DISH launched its own satellite into orbit in 1995, despite having no prior experience doing so, and successfully operated one of the earliest U.S. commercial DBS satellites. DISH subsequently began competing against incumbent monopoly cable providers by offering services with disruptive pricing and packaging, along with innovative technology, which helped DISH quickly gain market share.

Since 1995, DISH and its affiliates have successfully launched and operated more than 20 satellites, and DISH has grown into a Fortune 250 company with approximately 16,000 employees.[3] In the transition from a team of three to one of thousands, DISH has developed expertise in all aspects of consumer-facing communications businesses, from customer service to IT, billing, and installation, among other things. DISH has continued to innovate since its founding, bringing competition to pay-TV markets. In 2015, DISH launched the first live-streaming "linear" over-the-top service, Sling TV. Sling TV has been a market leader, providing choice and competition for consumers. As of December 2018, DISH served more than 12 million pay-TV households nationwide,[4] representing more than 25 million people.

DISH's steady growth and entry into new markets is proof of the company's ability to successfully deploy new technologies to the benefit of consumers across the country. The remedy

---

[3] DISH Network Corporation Annual Report (10-K), at 22 (Feb. 13, 2019).

[4] *Id*. at 1.

proposed by the Antitrust Division of the U.S. Department of Justice ("DOJ") ensures that DISH will be able to continue this trend and become an aggressive mobile wireless competitor immediately following its acquisition of the Sprint divestiture assets.  DISH will begin with approximately 9 million Boost subscribers, along with the strong Boost brand and trademarks. The divestiture will only be consummated once New T-Mobile can provision new DISH customers on the superior New T-Mobile network, which will provide an enhanced experience compared to today's inferior Sprint network.

A number of elements included in the DOJ remedy will support DISH's ability to operate the divested assets on a competitive basis in the near term.  First, the wholesale agreement between DISH and New T-Mobile provides more attractive economics than traditional mobile virtual network operator ("MVNO") agreements, including a low wholesale rate that is unprecedented in the industry, a "price deflator" that provides a mechanism for that wholesale rate to decline further over time, marketing and partnering flexibility, and interconnected core networks that will provide customers with a seamless experience when they transition between the DISH and New T-Mobile coverage footprints.  DISH will have unlimited capacity on the New T-Mobile network for the first three years, further incentivizing DISH to aggressively expand its subscriber base.  DISH's operation of the divested assets will be aided by a Transition Services Agreement, under which New T-Mobile will be required to provide services to DISH (at cost) that will enable DISH to operate the divested assets effectively from the outset, and exert competitive pressure on New T-Mobile and other wireless carriers from the moment of acquisition.

DISH also has made commitments to the Federal Communications Commission ("FCC") regarding its deployment of a new facilities-based wireless network, with associated financial penalties in the unlikely event DISH fails to meet those commitments.  The FCC commitments, which have been incorporated into the Proposed Final Judgment, include offering 5G broadband

service to 70 percent of the U.S. population by mid-2023. Again, the DOJ remedy provides additional support for these buildout requirements: as DISH builds out its own network, it will have access to at least 20,000 towers being decommissioned by New T-Mobile, and at least 400 Sprint retail stores, both of which will aid DISH in growing its footprint. Under the DOJ remedy, DISH also has the option to purchase all of Sprint's 800 MHz spectrum licenses (approximately 13.5 MHz of nationwide spectrum), consisting of spectrum that is already standardized in handsets and available for use.

DISH provided its internal business plan to the United States during a thorough and extensive due diligence process conducted by the DOJ. The DISH plan demonstrates that the building blocks described above will be immediately effective in bringing enhanced competition to consumer mobile wireless customers across the country. DISH will be able to provide Boost customers with competitive prices and better service than they currently receive starting the day the divestiture is consummated. The combination of the wholesale agreement with New T-Mobile and DISH's own network buildout will allow DISH to "forward price." Specifically, while the wholesale agreement will provide attractive economics, DISH will simultaneously be building out its own facilities-based network and putting its customers onto that network, which will cost DISH less than having customers use New T-Mobile's network. This will enable DISH to price its wireless services at attractive levels now, knowing that its costs in the future will be much lower. The DISH business plan also demonstrates that the DOJ remedy will enable DISH to aggressively grow its subscriber base. Thus, as INCOMPAS noted, "[t]his creative settlement not only remedies

the effects of what would otherwise be an increase in market concentration, but affirmatively improves the competitive conditions in that market to boot."[5]

## II.    DISH'S RESPONSE TO *AMICI*

Seven *amicus* briefs were filed in response to the Court's Order.  Of those, four (INCOMPAS, Prepaid Wireless Group, Harold Furchtgott-Roth, and Robert E. Wheeler) support entry of the Proposed Final Judgment.  Two of these (INCOMPAS and Harold Furchtgott-Roth) specifically recognized the benefits that would result from DISH's entry into the consumer mobile wireless market by virtue of the DOJ remedy.  As INCOMPAS explained, "[t]he Proposed Final Judgement would result in better service and lower prices for wireless customers and smaller providers alike, including those in rural America."[6]   Similarly, former FCC Commissioner Furchtgott-Roth noted that DISH has spent the last "quarter century" as a disruptor.[7]   DISH is therefore well-positioned to inject new competition into the consumer mobile wireless market using, among other things, the tools provided by the DOJ remedy.

The *amici* that criticize DISH's role in the proposed transaction simply repeat claims made in comments submitted in the Tunney Act process, to which the United States has fully and persuasively responded.[8]   These claims mischaracterize elements of the DOJ remedy, allege that DISH has underused its spectrum assets in the past, and discount DISH's extensive experience in

---

[5] *See* Brief of INCOMPAS as *Amicus Curiae* in Support of Defendants, ECF 69 at 2 ("INCOMPAS Brief").

[6] *Id.* at 2.

[7] Harold Furchtgott-Roth's Brief as *Amicus Curiae*, ECF 72 at 4 ("DISH became a major company precisely because it has been and continues to be competitive.").

[8] *See* DOJ Tunney Act Response at 19–31.

consumer-facing communications businesses.  These claims are without merit, as DISH will establish in addressing each of them in turn.

> **A.** **The Court Should Not Permit the *Amici* to Selectively Incorporate Portions of the Trial Record in Another Case**

As a threshold matter, DISH agrees with the United States that the *amici* who seek to incorporate trial testimony from a proceeding in another jurisdiction, the U.S. District Court for the Southern District of New York,[9] should be barred from doing so.[10]  Nevertheless, in the event the Court decides to consider such trial testimony, DISH responds below to the incomplete and misleading portions of testimony relied on by the *amici*.  In doing so, DISH necessarily relies on portions of other trial testimony ignored by the *amici*.  DISH, however, does not concede that any of the trial testimony is appropriately considered in this Tunney Act proceeding.

> **B.** **The *Amici*'s Arguments Regarding the Supposed Insufficiency of the DOJ Remedy Are Unpersuasive**

As explained above, the Proposed Final Judgment will facilitate DISH's entry as the nation's fourth facilities-based wireless provider, ensuring competition in the market for consumer mobile wireless service, all to the benefit of American consumers.  Certain of the *amici* attempt to cast doubt on DISH's ability and incentive to compete in this market, but their criticisms are unfounded.

The Rural Wireless Association, New America's Open Technology Institute, and Consumer Reports (together, "RWA") submitted an *amicus* brief that is based on a false premise— that "there is no factual distinction between a 'traditional' MVNO agreement and the proposed Full MVNO Agreement" called for in the DOJ remedy because "DISH's core network and

---

[9] *State of New York et al. v. Deutsche Telekom AG et al.*, No. 1:19-cv-05434-VM (S.D.N.Y.).

[10] *See* Response of Plaintiff The United States to Briefs *Amicus Curiae* at 7-10.

physical RAN would, under even the best of circumstances, not be operational for years after the divestiture."[11]  That premise is fundamentally wrong for at least two reasons.  As an initial matter, pursuant to DISH's FCC commitments, DISH must deploy a core network *no later than* June 14, 2022.[12]  And, as DISH Chairman Charlie Ergen testified in the New York trial, DISH anticipates deploying its core network *this year*:  "we're going to [] build out our first core and our first city in 2020."[13]

Further, as explained above, there are a number of material elements of the wholesale agreement between DISH and New T-Mobile that distinguish it from a "traditional" MVNO.  As Mr. Ergen testified at the New York trial, the parties agreed to "an unprecedented low price from T-Mobile in comparison to any deal they had ever done."[14]  In addition, DISH and New T-Mobile will have interconnected core networks, allowing DISH to provide a seamless experience for consumers switching between the New T-Mobile and DISH 5G networks.   As Mr. Ergen explained:

> Most MVNO deals you just use someone else's network, and you're just selling a
> mirror image of their network.  But if you can get interconnected core, if you could
> have your own core, which is basically the thing that routes your traffic and data
> and manages your subscribers, and you can interconnect that into T-Mobile's core,
> then your network is in fact your network and you get the data, you own the phone
> number, you do the SIM card, the customer, your brand name comes up on the

---

[11] Brief of *Amici Curiae* the Rural Wireless Association, Inc., New America's Open Technology Institute, and Consumer Reports, ECF 71 at 8–9 ("RWA Brief").

[12] *See* Letter from Jeffrey H. Blum, DISH, to Donald Stockdale, FCC, at 3 (July 26, 2019), https://www.fcc.gov/sites/default/files/dish-letter-07262019.pdf.

[13] Direct Examination of Charles Ergen, Transcript at 1634:13–14, *State of New York et al. v. Deutsche Telekom AG et al.*, No. 1:19-cv-05434-VM (S.D.N.Y.) ("Transcript").

[14]*Id.* at 1591:19–20; *see also* Direct Examination of Michael Sievert, Transcript at 1087:5–10 ("And the benefits of that are getting passed on to them in the form of an unprecedented MVNO arrangement with the lowest prices that we've ever offered, and prices that decline over time, as our scale advantages are materialized; so it's very important and something that we've never done, but it was insisted upon as a remedy.").

phone.  The customer would have no knowledge that you ever are on somebody else's network.

So the second thing that this does for DISH, it allows us, rather than build [out] the entire country and then have to build the whole country up before we turn our signal on and start getting customers, we can go city by city by city.  And because we have our core, we can go on our network on a city-by-city basis, and every time we light up the city we reduce our cost to owner economics.  So this means we can be – not only this means we can be competitive day one, but also means we make money day one; maybe not day one, but we can make money day 365, for sure.[15]

RWA also attempts to cast doubt on DISH's ability to be successful in the consumer mobile wireless market by alleging that DISH has "*zero* experience" operating as an MVNO.[16]  First, this statement fails to take into account DISH's forty years of experience in the pay-TV market:  DISH already has its own extensive infrastructure for serving customers, including billing, IT, installation, and thousands of customer service agents.  DISH will be able to leverage its significant experience serving existing customers when operating its new wireless business.  Further, more than 400 current Boost employees and 7,500 Boost retail stores operated by independent dealers will be transferred to DISH as part of the divestiture, and these Boost employees and dealers collectively have very significant wireless experience.  Moreover, New T-Mobile will be required to provide transition services to DISH that will make it easier for DISH to integrate the divested assets into its existing corporate systems.[17]  DISH also has significant experience deploying a wireless network; it has spent the last two years building a nationwide narrowband Internet of Things ("IoT") network.  DISH's experience, combined with the broad range of assets included in

---

[15] Direct Examination of Charles Ergen, Transcript at 1594:1–10, 1594:13–22.

[16] RWA Brief at 8.

[17] *See* Proposed Final Judgment, at IV.A.4, ECF 2-2 (July 26, 2019) ("Proposed Final Judgment").

the DOJ remedy, will put DISH in position to serve customers immediately upon the closing of the divestiture.

Any divestiture that involves setting a divestiture buyer up in a new line of business implies, by necessity, a new entrant. If DISH had provided mobile wireless services to consumers for decades, it would already be an incumbent and, thus, likely not a suitable buyer for the divested assets. But, with its forty years of experience in a number of consumer-facing communications businesses, DISH is a uniquely well-situated new entrant in the consumer mobile wireless market that will have all the tools required to compete against AT&T, Verizon, and New T-Mobile—as the United States concluded after extensive due diligence.

RWA also claims that DISH's commitment to provide coverage to 70 percent of the U.S. population is insufficient. As the United States explained, however, that commitment represents the *floor* for DISH's ultimate coverage. Such a commitment was included in the Proposed Final Judgment to backstop DISH's already strong incentives to build out its own facilities-based wireless network using its significant spectrum holdings. And, DISH has already publicly announced plans to exceed certain FCC spectrum deployment benchmarks by providing service to 20 percent of the U.S. population by 2021 instead of 2022, and providing service to 50, not 20, percent of the U.S. population by 2022.[18]

RWA seeks to characterize the onerous financial penalties DISH would face for missing deployment benchmarks as "relatively small" and "scant"[19] to support its misguided assertion that DISH will not have sufficient economic incentives to build out its own 5G network. This argument fails to recognize that DISH would be subject to more than $2 billion in penalties if it does not

---

[18] *See* Direct Examination of Charles Ergen, Transcript at 1635:2–1636:3.

[19] RWA Brief at 6, 11.

meet its nationwide deployment obligations, in addition to running the risk of spectrum license forfeitures.  As Mr. Ergen testified at the New York trial, if DISH fails to build out as required by the FCC commitments, "then everything that we have done as a company for 39 years, $12 billion of spectrum assets that we purchased, over $2 billion of fines to the American government would come into play, it would be financial suicide, so we're not suicidal."[20]

Furthermore, T-Mobile President Mike Sievert testified at the New York trial about the significant advantages DISH will have over incumbents because of DISH's ability to build out a pure 5G network, while simultaneously getting the benefit of New T-Mobile's network under the wholesale agreement:

> [DISH] can focus as they roll out on 5G only, on contemporary technology.  They can outsource all of the cost and complexity of legacy technologies to us, and this is a big issue, and it's a big part of what drives cost. . . .  [W]hen we build 5G, we have to build it in such a way that 2G, 3G and 4G are also supported because we have tens of millions of customers on those technology.  They don't.  They can outsource all that complexity to us.  They can do a pure play 5G network and take advantage of things we can't that are lower cost.  I would – you know, virtualized cores, those kinds of things.  So that's a huge advantage for them.[21]

A group of economists ("Economic *Amici*") question whether DISH will make use of these advantages to build out its 5G network based on their contention that DISH "has chosen warehousing spectrum rather than building in the past."[22]  But, as Mr. Ergen testified at the New York trial, DISH has "never missed a final milestone commitment from the FCC for a terrestrial build-out[.]"[23]  Based on its due diligence investigation, the DOJ determined that DISH will indeed

---

[20] Direct Examination of Charles Ergen, Transcript at 1565:4–8.

[21] Direct Examination of Michael Sievert, Transcript at 1087:19–23, 1087:25–1088:7.

[22] Brief of *Amici Curiae* Nicholas Economides, John Kwoka, Thomas Philippon, Robert Seamans, Hal Singer, Marshall Steinbaum, and Lawrence J. White in Support of Plaintiffs, ECF 70 at 3 ("Economists' Brief").

[23] Direct Examination of Charles Ergen, Transcript at 1615:23–24.

build out a 5G network, and that topic was addressed in considerable detail during the New York

trial.

Among other evidence, DISH presented detailed internal business plans setting forth its

customer and revenue projections through 2025.  In addition, DISH provided the comprehensive

5G Request for Proposal ("RFP") it sent to vendors in July 2019.  The RFP is the culmination of

more than six months of work by DISH's engineering and business teams, and provides vendors

the opportunity to work with DISH in building its 5G virtualized network.[24]  More than 80 vendors

responded to the RFP, demonstrating the significant industry interest in DISH's new 5G network.[25]

And three of the largest banks in the world—J.P. Morgan, Deutsche Bank, and Morgan Stanley—

provided letters to DISH stating that each was "highly confident" it could raise $10 billion for

DISH to fund the buildout of its 5G network.[26]  Moreover, as DISH has explained, from day one

it will be able to provision customers on New T-Mobile's network, which is superior to the Sprint

---

[24] *Id.* at 1605:15–22 ("And then the other big piece of information I think that got them very comfortable was we had put together an RFP.  It had taken us over six months to put together an RFP for the vendors for this new 5G virtualized network that is relatively new, from a technology point of view, and they wanted to see that.  And it was so – I think it was so comprehensive, and I think that that gave them a great degree of confidence, from an engineering perspective, we knew what we were doing.").

[25] Direct Examination of Thomas Cullen, Transcript at 1757:12–22 ("So serendipitously, that draft was ready in July, and once the deal was announced on Friday, the 26th of July, we updated the RFP over the weekend and sent that RFP out broadly on the 29th of July.  And when I say broadly, that is, we didn't only send it to the traditional telecom infrastructure companies, of which there are only a few.  We also sent it to large U.S. technology companies, as well as cloud service providers to get their inputs as to how they would move forward in a virtualized 5G world.  As a result of that, we've – you know, we met with – there were 86 responses to that.").

[26] *See* Direct Examination of Charles Ergen, Transcript at 1625:2–8 ("[T]he second thing is I personally have been dealing with the bankers that I've dealt with for years and talking about our plans and made sure that we've gotten what we would call highly confident letters from several banks, that indicate that they are highly confident they can raise – that they could raise for us $10 billion.  So that would be way more than enough for us to build our network.").

network, while simultaneously building out a standalone virtualized 5G network that will not need

to support legacy technologies.[27]  This freedom to focus exclusively on new 5G technology will

enable DISH to provide a better product at a lower price, and the incentive to buildout its own

network quickly given the attractive "owner economics" of that network.[28]  Notably, there is

nothing in the record of the New York trial that rebuts DISH's assertion that it will offer attractive

prices to consumers at the outset based on its significantly lower future costs.

The Economic *Amici* selectively rely on testimony in the New York trial from Sprint CEO

Marcelo Claure and Deutsche Telekom Director Thorsten Langheim as support for the proposition

that DISH will not actually deploy its planned 5G network.  The cherry-picked snippets of

testimony ignore the complete testimony of these two executives concerning DISH's incentives

and ability to compete with incumbent wireless carriers.  In the words of Mr. Claure:

> [A]nd through the negotiation with the DOJ and the FCC, we pretty much put on a
> silver platter for a company like DISH to come in, have access to the network, have
> customers, have access to our stores, have access to the commission, towers with
> equipment.  So I believe there's a difference between having two competitors,
> which will happen if this merger doesn't get approved, to one that will have four
> viable competitors fighting for the American consumer.[29]

And, in the words of Mr. Langheim:

> [T]he remedy package is a deal of the century for Dish.  It gets you all what you
> need . . . [T]he package is fantastic for someone who wants to enter the market.

---

[27] *Id.* at 1564:10–16 ("One is we get the immediate advantage of T-Mobile scale, in terms of
their network, and we get their network without having to spend any costs to build that network.
And then we get the added advantage of building our own network on a city-by-city basis with
new technology, new architecture, clean sheet of paper, so it's materially less expensive to build
and much more flexible.").

[28] *Id.* at 1564:17–19 ("And as we move customers – as we add customers to that network and
move customers to that network, they're materially less expensive than what we have to pay
T-Mobile."), 1608:18–21 ("[B]ecause as we enter with a better product and as we enter with the
ability to get owner economics, then we're . . . getting in with a lower price, at least initially with
as good a product.").

[29] Direct Examination of Marcelo Claure, Transcript at 1313:20–1314:3.

The pricing of the MVNO has come down to a level where the remedy taker can be extremely aggressive in the market.  On top of it, they got something which we call in the industry a national roaming agreement and an obligation to build out the network.  This is the key thing that links the MVNO and the network build out, and that makes it very feasible economically to build out.  You are effective from day one with the MVNO, you can build on the network piece by piece by piece and have the national roaming as a link between them so that the customer doesn't see any difference.  He is on the best network in the U.S., and that allows them to build out this network economically, in our view.[30]

The Economic *Amici* also point to statements from Deutsche Telekom's Chief Executive Officer Timotheus Hottges suggesting that a wireless carrier in the U.S. would need more than 80 million subscribers to compete effectively against the incumbents as support for the notion that DISH cannot be successful.  As an initial matter, the Economic *Amici* fail to explain why DISH will need at least 80 million subscribers to "replace the lost competition from Sprint,"[31] when Sprint *today* has only 55 million subscribers.  Further, this argument ignores all the benefits DISH will have relative to Sprint today.  While building out its own pure 5G network, DISH will get to utilize the superior New T-Mobile network, with the scale advantages that network brings.  As T-Mobile's President Mr. Sievert explained, "[f]irst and foremost, they get the advantage of our scale.  I mean, we are going to scale the new T-Mobile to a much more significant scale, with higher capacity and lower cost.  And the benefits of that are getting passed on to them in the form of an unprecedented MVNO arrangement with the lowest prices that we've ever offered, and prices that decline over time, as our scale advantages are materialized[.]"[32]

---

[30] Cross Examination of Thorsten Langheim, Transcript at 364:8–9, 364:19–20, 363:12–24.

[31] Economists' Brief at 3.

[32] Direct Examination of Michael Sievert, Transcript at 1087:2–8.

Finally, the Economic *Amici* selectively quote from Mr. Ergen's testimony in the New York trial to support the proposition that the DOJ remedy includes "entanglements that will likely prevent Dish from succeeding as a facilities-based carrier."[33]  This twists what Mr. Ergen actually said.  He noted DISH's successful track record competing against AT&T and Verizon in the pay-TV market today, as well as elements of the DOJ remedy that will safeguard DISH from being adversely affected by any such alleged "entanglements."  As Mr. Ergen testified in the New York trial:

> [C]ompetition is always a concern, but as a company, I mean, we compete against AT&T and Verizon and T-Mobile in video today, and we compete against AT&T in satellite television, and so we do pretty well. . . .  The difference is that as we get – if [T-Mobile] lower[s] their price . . . because of the buckets that are in that formula, our price, if they lowered their price for their popular packages, our price would go down as well.
>
>  . . . They would certainly have an impact on the industry.  It certainly would reduce our profits as well, but it wouldn't eliminate us as a competitor because there's a formula that protects us.[34]

The Economic *Amici* also ignore the role of the DOJ Monitoring Trustee, whose appointment has already been approved by this Court.  He "has full authority to subpoena, to spend money, to hire engineers, so that T-Mobile, under penalty of contempt—so T-Mobile isn't going to cause mischief."[35]  The Proposed Final Judgment and agreements between DISH and New T-Mobile provide further protections against any harm to DISH as a result of alleged "entanglements."  New T-Mobile is prohibited from limiting DISH's subscriber growth because (1) DISH has unlimited access to capacity on New T-Mobile's network; (2) DISH can price its products and services any way it desires; (3) New T-Mobile must support eSIM which makes it

---

[33] Economists' Brief at 10.

[34] Cross Examination of Charles Ergen, Transcript at 1722:3–25.

[35] Direct Examination of Charles Ergen, Transcript at 1592:17–19.

easier for customers to switch to DISH; and (4) DISH can partner with any company to sell wireless services that use New T-Mobile's network as long as DISH owns the brand(s). Further, New T-Mobile cannot impede DISH's 5G deployment because the Proposed Final Judgment expressly provides that New T-Mobile "shall not otherwise unreasonably delay, impede, or frustrate DISH's ability to use the Full MVNO Agreement and Divesting Defendants' networks to become a nationwide facilities-based retail mobile wireless services provider."[36]  Nor can New T-Mobile "interfere with [DISH's] efforts to deploy a nationwide facilities-based mobile wireless network, or to operate that network."[37]  The DOJ Monitoring Trustee has wide latitude to enforce these provisions, and New T-Mobile risks contempt of court if it violates the terms of the Proposed Final Judgment.  As INCOMPAS noted, given the many protections afforded DISH under the DOJ remedy, the Court need not "concern itself with the supposed dependence of DISH on T-Mobile."[38]

---

[36] Proposed Final Judgment at VI.B.6.

[37] *Id.* at VIII.B.

[38] INCOMPAS Brief at 5.

## **CONCLUSION**

The Proposed Final Judgment fully addresses the competitive harm alleged to result from the merger of T-Mobile and Sprint and advances the public interest by enabling DISH to become a fourth facilities-based provider of consumer mobile wireless services.  DISH urges the Court to enter it without delay.

Dated: February 3, 2020                                Respectfully submitted,


                                                    /s/  *Steven L. Holley*
                                                   Steven L. Holley (admitted *pro hac vice*)
                                                   Bradley P. Smith (D.C. Bar No. 468060)
                                                   Sullivan & Cromwell LLP
                                                   125 Broad Street
                                                   New York, New York  10004-2498
                                                   Telephone:  (212) 558-4000
                                                   Facsimile:  (212) 558-3588
                                                   holleys@sullcrom.com
                                                   smithbr@sullcrom.com

                                                   *Counsel for Defendant DISH*
                                                   *Network Corporation*