UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA *et al.*,

    *Plaintiffs*,

v.

DEUTSCHE TELEKOM AG *et al.*,

    *Defendants*.

Civil Action No. 19-2232 (TJK)

## MEMORANDUM OPINION

Defendants T-Mobile and Sprint, the third and fourth largest mobile wireless carriers in the country, agreed to merge their businesses into a single entity called New T-Mobile. ECF No. 50 ("Fifth Amended Complaint" or "FAC") ¶¶ 4–5, 11. But the Department of Justice and several states sued to block the merger, alleging that it would hurt competition in the domestic retail mobile wireless market by leaving only three national facilities-based carriers. *See generally id.* The parties reached agreement on remedies that they argue would permit the merger to happen without potentially harming competition, and the United States moved for entry of final judgment under the Tunney Act. For the reasons explained below, the Court granted the motion and entered their proposed final judgment.

**I.    Background**

    **A.    The Mobile Wireless Market**

Mobile wireless carriers sell a service that allows cell phones and other internet-enabled mobile devices, like tablets and smart watches, to have mobile, wireless access to the internet. *See* FAC ¶ 12. They do so by building network infrastructure—such as cell sites and radio transmitters and receivers—across a large geographic footprint so that mobile devices on their

networks can transmit and receive signals over certain frequencies of spectrum. *Id.* ¶ 13. Mobile wireless carriers must obtain licenses for this spectrum from the Federal Communication Commission (FCC). *Id.*; *see also Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 328 (D.D.C. 2011). The need for both extensive network infrastructure and scarce spectrum makes it hard for new carriers to enter the market. *See* ECF No. 20 ("Competitive Impact Statement" or "CIS") at 7.

The country has four facilities-based mobile wireless carriers that offer nationwide service: Verizon Communications, Inc., AT&T Inc., T-Mobile US, Inc. ("T-Mobile"), and Sprint Corporation ("Sprint"). FAC ¶¶ 3–4; CIS at 5–6. Other carriers, called mobile virtual network operators ("MVNOs"), also exist, but they do not operate their own wireless networks and facilities. MVNOs offer cell service to consumers in much the same way mobile wireless carriers do, but they must first buy network capacity from one of the four facilities-based carriers. FAC ¶ 13. In this way, MVNOs effectively act as wholesale buyers of wireless service, which they then resell as retailers. *See id.*

Mobile wireless carriers, whether facilities-based or MVNOs, offer two types of retail service plans: postpaid and prepaid. About 30% of retail customers purchase prepaid plans. *Id.* ¶ 18. Prepaid customers "tend to be even more value conscious, on average, than postpaid subscribers," and include customers who may not have ready access to credit. *Id.* ¶¶ 4, 18. T-Mobile sells postpaid services under the T-Mobile brand and prepaid services mainly under its Metro by T-Mobile brand; Sprint likewise sells postpaid services under its Sprint brand and prepaid services primarily under its Boost Mobile and Virgin Mobile brands. *Id.* ¶¶ 8, 10.

**B. The Proposed Merger and Alleged Harm to Competition**

In April 2018, Sprint and T-Mobile agreed to combine their businesses in an all-stock transaction. *Id.* ¶ 11. The merged firm, New T-Mobile, would be owned 42% by Deutsche

Telekom AG ("Deutsche Telekom"), T-Mobile's controlling shareholder, and 27% by SoftBank Group Corp. ("Softbank"), Sprint's controlling shareholder. *Id.* ¶¶ 7, 9, 11.

New T-Mobile would account for "roughly one-third of the national retail mobile wireless service market," and the merger would reduce the number of facilities-based carriers from four to three. *Id.* ¶ 16. The United States argues that the merger would reduce competition in three ways. First, Sprint and T-Mobile are innovators in the wireless market that have driven down prices and improved the quality of offerings of their competitors, so after the merger, the market would lose some of this effect on the remaining competitors. *See* CIS at 7; FAC ¶¶ 5, 17, 21. Second, shrinking the market from four to three facilities-based wireless providers would make it more vulnerable to coordination on the part of the remaining market participants. CIS at 7; FAC ¶¶ 5, 21. And finally, head-to-head competition between Sprint and T-Mobile has led to noteworthy innovation in the MVNO market, which would be lost post-merger. CIS at 7; FAC ¶¶ 18–20, 22.

### C. Procedural History

The United States and five states filed this action against Sprint, Softbank, Deutsche Telekom, and T-Mobile on July 26, 2019, alleging that the proposed merger violated Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18. ECF No. 1 ¶ 25. At the same time, the United States filed a proposed Final Judgment ("PFJ"), consented to by Defendants, that would settle the case. ECF Nos. 2, 2-2. Since then, the parties moved to amend the complaint five times, each time to add more states as plaintiffs. ECF Nos. 26, 33, 40, 43, 49. The operative Fifth Amended Complaint includes as plaintiffs the United States, Kansas, Nebraska, Ohio, Oklahoma, South Dakota, Louisiana, Florida, Colorado, Arkansas, and Texas.

The proposed Final Judgment places conditions on the merger that the United States argues would alleviate its anticompetitive effects. Primarily, the proposed Final Judgment

3

facilitates the entry of a new wireless network provider—DISH Network Corp. ("DISH"). Because DISH's participation is vital to the success of the proposed Final Judgment, DISH has agreed to be bound by it as a party-defendant. ECF No. 2 ¶¶ 2–3; ECF No. 16 at 5. DISH, currently a satellite television provider, already controls substantial spectrum that would facilitate its entry into the retail mobile wireless market. *See* CIS at 2, 4. Under the proposed Final Judgment, New T-Mobile will divest to DISH almost all of Sprint's prepaid wireless business and certain spectrum licenses. The proposed Final Judgment will also provide DISH an exclusive option to acquire cell sites and retail stores decommissioned by New T-Mobile. *Id.* at 8–9. The divestiture of Sprint's prepaid businesses, including employees, customers, and intellectual property, will "provide an existing business" to DISH that will enable it to offer retail mobile wireless service. *Id.* at 9. Sprint and T-Mobile will also offer certain transition services to DISH that will ease its entry and prevent disruption for Sprint's existing prepaid customers. *Id.* at 10.

In return, the proposed Final Judgment requires DISH to offer nationwide postpaid retail wireless service within one year of the divestiture of the prepaid assets. *Id.* The ultimate goal of the proposed Final Judgment is for DISH to operate as a national facilities-based mobile wireless carrier, thereby ensuring that the number of these carriers remains the same. *Id.* at 2–3. Sprint and T-Mobile have made commitments to facilitate DISH's entry as a mobile wireless carrier, and DISH has promised to offer next-generation 5G service to 70% of Americans by June 14, 2023. Letter from Jeffrey H. Blum, S.V.P. for Public Policy & Government Affairs, DISH, to Donald Stockdale, Chief, Wireless Telecommunications Bureau, FCC (DISH) (July 26, 2019), https://www.fcc.gov/sites/default/files/dish-letter-07262019.pdf; *see* CIS at 11; PFJ at 23–24. Because building a national facilities-based network takes time, DISH will first enter the market

as a "Full MVNO"—an MVNO with some of its own facilities.  *See* CIS at 5, 11.  The proposed Final Judgment requires T-Mobile and Sprint to permit DISH to operate as a Full MVNO on New T-Mobile's network for at least seven years.  *Id.* at 11.  Finally, the proposed Final Judgment contains several reporting requirements and provisions preventing New T-Mobile from reacquiring the divested assets and providing for monitoring and enforcement of the final judgment.  *Id.* at 13–17; PFJ at 24–34.  The proposed Final Judgment will last for seven years, unless the United States and Defendants notify the Court after five years that it is no longer necessary or in the public interest.  PFJ at 36.

In accordance with the Antitrust Procedures and Penalties Act (the "Tunney Act"), 15 U.S.C. § 16(b)–(h), shortly after it submitted the proposed Final Judgment, the United States filed a Competitive Impact Statement describing the alleged anticompetitive effects of the proposed merger and the remedial effects of the proposed Final Judgment; its conclusions are summarized above.  As required by the Tunney Act, the United States published the initial complaint (which is identical to the FAC, except that the FAC includes additional plaintiff states), the CIS, and the proposed Final Judgment in the *Federal Register* on August 12, 2019, and opened a 60-day public comment period beginning that same day.  ECF No. 41 at 1–2; *see* United States et al. v. Deutsche Telekom AG et al.; Proposed Final Judgment and Competitive Impact Statement, 84 Fed. Reg. 39,862 (Aug. 12, 2019).  The parties also published a summary of the proposed Final Judgment in *The Washington Post* on August 3–9, 2019.  ECF No. 41 at 1–2.  Thirty-two comments were submitted.  On November 6, 2019, the United States filed the comments, ECF Nos. 42-1, 42-2, 42-3, and its response, ECF No. 42, with the Court.  Under 15 U.S.C. § 16(d), the Court excused publication of the comments and response in the *Federal Register*.  The United States instead published the comments and response on the Department of

Justice's website and published a link to the comments in the *Federal Register*. *See* Minute Order of November 5, 2019. Having satisfied the procedural requirements of the Tunney Act, the United States moved for entry of the proposed Final Judgment under 15 U.S.C. § 16(e). ECF No. 44.

Under the Court's authority to structure Tunney Act proceedings, *see* 15 U.S.C. § 16(f), it also permitted interested parties to file amicus briefs. Minute Order of January 10, 2020. Seven amicus briefs were filed. The Court determined a hearing was unnecessary. *See* 15 U.S.C. § 16(e)(2); *see also United States v. US Airways Grp., Inc.*, 38 F. Supp. 3d 69, 76 (D.D.C. 2014) ("A court can make its public interest determination based on the competitive impact statement and response to public comments alone.").[1]

## II. Legal Standard

The Tunney Act requires that, before entering final judgment, the Court "determine that the entry of such judgment is in the public interest." 15 U.S.C. § 16(e). The Act instructs the Court to consider these factors:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered,

---

[1] After this action was filed, several states that are not parties here mounted a separate challenge to the merger in the Southern District of New York, alleging that it violated Section 7 of the Clayton Act. *See New York v. Deutsche Telekom AG*, No. 19 Civ. 5434 (VM), 2020 WL 635499, at *1 (S.D.N.Y. Feb. 11, 2020); *see also* ECF Nos. 54, 66. After a bench trial, the court rejected that challenge. *Deutsche Telekom AG*, 2020 WL 635499 at *1–4; *see also* ECF No. 82. But that case has little, if any, relevance to this action. Unlike in that case, the Court is not "tasked with deciding whether the merger as a whole runs afoul of the antitrust laws." *US Airways*, 38 F. Supp. 3d at 75 (cleaned up). Indeed, as explained below, the legal inquiry here is narrower and the United States' views are entitled to substantial deference. *Compare United States v. Baker Hughes Inc.*, 908 F.2d 981, 982–83 (D.C. Cir. 1990) (discussing the burden-shifting framework that applies in Section 7 horizontal merger cases) *with United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995) (noting that a court must give "due respect to the [government's] perception of the market structure and its view of the nature of its case" in a Tunney Act proceeding).

> whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

*Id.* The D.C. Circuit has observed that a district court's Tunney Act review should not be merely an act of "judicial rubber stamping." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C. Cir. 1995) (citation and internal quotation omitted). Rather, this Court must "make an independent determination as to whether or not entry of a proposed consent decree is in the public interest." *Id.* (cleaned up). Still, the Circuit has instructed district courts to approve proposed consent decrees so long as they are "within the *reaches* of the public interest." *Id.* at 1457–58 (emphasis in original) (citation and internal quotation omitted). This is "in part because of the constitutional questions that would be raised if courts were to subject the government's exercise of its prosecutorial discretion to non-deferential review." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 743 (D.C. Cir. 2016) (citation and internal quotation omitted).

Thus, the Court's public interest analysis is circumscribed. It "must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case." *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003); *see also United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15–16 (D.D.C. 2007) (concluding that "the relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable"). The Court's inquiry should also not venture beyond the allegations and issues identified in the complaint. *US Airways*, 38 F. Supp. 3d at 76 (noting that "a [district] court 'cannot look beyond the complaint in making the public interest determination

unless the complaint is drafted so narrowly as to make a mockery of judicial power'" (quoting *SBC Commc'ns*, 489 F. Supp. 2d at 15)). *But see United States v. CVS Health Corp.*, 407 F. Supp. 3d 45, 52–54 (D.D.C. 2019) (concluding that a district court can consider potential harm to competition not specifically alleged in the complaint). The Court is expressly precluded from making "*de novo* determination[s] of facts and issues." *W. Elec.*, 993 F.2d at 1577 (citation and internal quotation omitted).

Additionally, the Court must bear in mind that a consent decree flows from a negotiated settlement, not a trial on the merits. *Archer-Daniels-Midland*, 272 F. Supp. 2d at 6. The Court has not received "findings that the [merger would result] in illegal practices"; therefore, the Court should not "measure the remedies in the decree as if they were fashioned after trial." *Microsoft*, 56 F.3d at 1460–61. Indeed, "[r]emedies which appear less than vigorous may well reflect an underlying weakness in the government's case." *Id.* at 1461. The upshot of all this is a review standard that exudes deference: "[T]he Court's function is not to determine whether the resulting array of rights and liabilities is the one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (emphasis in original) (citation and internal quotation omitted).

## III.     Analysis

The Court finds that the proposed Final Judgment is reasonably designed to remedy the alleged loss of competition that the merger would otherwise cause in the United States' retail mobile wireless market; it is thus in the public interest.

As discussed above, Plaintiffs allege that, without the proposed remedies, the merger would substantially reduce competition in the retail mobile wireless market. *See* FAC ¶¶ 3–6. In general, their reasoning is not complicated. The merger would eliminate one of only four national facilities-based wireless carriers. CIS at 7. Therefore, head-to-head competition in this

already concentrated market would suffer. *Id.* Moreover, high barriers to entry make it extremely unlikely that a new market entrant would appear out of the blue and compete meaningfully with the three remaining giants. *See id.* at 7–8. Entry would require, at a minimum, a massive investment in spectrum and network infrastructure across the entire country. *See id.*

To avoid this potential loss of competition, the parties offer a series of remedies intended to replace one competitor with another. Where once there was Sprint, they say, there will soon be DISH. Specifically, the proposed Final Judgment includes several steps—outlined in clear, unambiguous language—that will facilitate DISH's entry into and competition in the national retail mobile wireless market. New T-Mobile will have to divest to DISH nearly all of Sprint's prepaid wireless business. PFJ at 6–11; *see also* CIS at 8–9. This, the parties claim, will facilitate DISH's entry into the mobile wireless market by providing it with employees, intellectual property, and an existing customer base. CIS at 8–10. New T-Mobile will also have to offer DISH the opportunity to acquire certain spectrum licenses from Sprint as well as any retail stores that the merged firm decides to decommission. PFJ at 11–13, 16–18. According to the United States, DISH will have to use these assets to compete by offering retail mobile wireless services, including in the postpaid market. CIS at 10. It represents that the Full MVNO Agreement will provide DISH with "the necessary network assets, access, and services" while it builds out its own facilities-based network. CIS at 11. It also notes that the proposed Final Judgment itself incorporates DISH's commitments to the FCC to build out its network, and a monitoring trustee will oversee the divestiture and DISH's fulfillment of these build-out requirements. *Id.* at 11, 13. The United States also touts its enforcement provisions, *see* PFJ at 34–36, which give it authority to seek the Court's intervention if it discovers violations up to five

9

years after the proposed Final Judgment has expired. *See* CIS at 14–17. Finally, the United States represents that "the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint." *Id.* at 18–19.

Public commenters and amici (together, "commenters") voice many concerns with these measures. The Court spent considerable time evaluating their views, detailed in hundreds of pages of public comments, amicus briefs, and responsive filings from the parties.[2] Almost all commenters opposing the merger focus on whether DISH will ultimately emerge as a genuine competitor in the mobile wireless market. These materials have helped clarify complex aspects of the transaction and the market for the Court and have shed considerable light on potential weaknesses of the proposed Final Judgment. However, as discussed below, the problem the merger's opponents face is that their arguments, and the predictive judgments on which they are based, run headlong into the parties' representations and the deferential standard this Court must apply.

For example, some commenters allege that the value of DISH's spectrum assets and the nature of the FCC's build-out requirements will not adequately encourage DISH to build a facilities-based wireless network, rather than simply re-selling those spectrum assets. *See, e.g.*, ECF No. 42-1 at 132–34,[3] ECF No. 70 at 3–4. They also allege that DISH has warehoused spectrum before and argue that this conduct reflects what DISH is likely to do again. *See id.*; *see*

---

[2] Although the Court's analysis here focuses exclusively on the comments and briefs opposing the merger, it considered those supporting the merger as well, which it notes accounted for most of the comments.

[3] Because the three volumes of public comments, ECF Nos. 42-1, 42-2, 42-3, each contain many individual filings, the Court cites to page numbers in each volume's ECF header.

*also* ECF No. 42-1 at 79–81, ECF No. 42-2 at 15–17. But as the United States argues, these critics do not sufficiently credit the measures in the proposed Final Judgment that alter DISH's incentives. *See* ECF No. 42 at 22 ("The economics of DISH's entry under the proposed Final judgment are fundamentally different—and more favorable to DISH—than what was available to DISH before the proposed Final Judgment."). For example, if DISH fails to meet its build-out requirements, it would not only face up to $2.2 billion in penalties from the FCC, but it would also automatically lose some of its spectrum licenses. *Id.* at 24. Moreover, "DISH's commitment to the FCC that it will not sell certain of its spectrum licenses for six years," *id.* at 24 n.54, also supports the United States' position. And DISH would also face penalties that this Court could impose if it violates these commitments. *Id.* at 24, 24 n.56. While it is true that even stronger measures would motivate DISH even more, it does not follow that without them DISH is, in fact, likely to renege on its obligations or that the proposed Final Judgment is unreasonable. *See id.* at 20 ("These commenters' line of argument also fails to address what incentive DISH could have to acquire $20 billion in spectrum license and spend billions of dollars on the divesture in this matter and risk billions more in fines, only to sit on these assets. The more logical inference, which aligns with DISH's economic incentives, is that DISH will deploy its spectrum and enter the mobile wireless market.").[4]

---

[4] In reaching its conclusions here, the Court did not consider the district court's decision to approve the merger in *New York v. Deutsche Telekom AG*, No. 19 Civ. 5434 (VM), 2020 WL 635499 (S.D.N.Y. Feb. 11, 2020), or any of the evidence in that case. Still, the Court notes that the judge there, after a bench trial, assessed DISH's incentives and intentions similarly, *see Deutsche Telekom AG*, 2020 WL 635499, at *37–38 ("The[] potential penalties constitute strong disincentives for DISH to skirt compliance. . . . And though DISH's amassing of unused spectrum over the past seven years has been criticized as a form of speculative hoarding, the evidence at trial suggested that DISH's storage of spectrum is better understood as careful preparation to ensure DISH possessed the most critical resource to compete in an industry with high barriers to entry.").

Other commenters argue that, even if DISH intends to enter the mobile wireless market, the remedies in the proposed Final Judgment are too piecemeal to enable it to fully replace the competition lost as a result of the merger. For example, one commenter argues that the prepaid assets to be divested are, for one reason or another, not profitable enough and that the Full MVNO Agreement is not as helpful as the United States claims. *See* ECF No. 71 at 8–11.[5] But the United States does not suggest that DISH's operation under the Full MVNO Agreement is the end of the story. Rather, remedies like that agreement are intended to enable DISH to enter the marketplace quickly, but also to encourage it to expand its presence over time. For example, the United States explains that "the Prepaid Assets, coupled with required network support from T-Mobile[,] . . . will provide an existing business, with assets including customers, employees, and intellectual property, that will enable DISH" to participate in the market while enhancing DISH's incentives to build out a facilities-based network. ECF No. 42 at 9. And the United States retains the authority to police the prepaid divestiture and ensure "that it can and will be operated by DISH as a viable, ongoing business that can compete effectively in the retail mobile wireless service market." *Id.* at 10. For its part, DISH agrees, adding that the Full MVNO Agreement's "low wholesale rate" from which DISH will benefit "is unprecedented in the industry." ECF No. 78 at 3. Moreover, the United States points out that that agreement is intended to be transitional. *See* ECF No. 42 at 12. Unlike "traditional MVNO agreements," the one here is designed to permit DISH "to construct its own network facilities and carry a portion

---

[5] To the extent this commenter alleges competitive harm in the market for domestic roaming services, *see, e.g.*, ECF No. 71 at 11–12; ECF No. 42-2 at 53–54, the Court agrees with the United States' observation that this allegation is outside the scope of the operative complaint. *See* ECF No. 42 at 38–39; *see also US Airways*, 38 F. Supp. 3d at 76.

of its traffic on these facilities while relying on the wholesale provider to carry the remainder of the MVNO's traffic." *Id.* at 11.

Still other commenters argue that DISH's lack of relevant experience is problematic, or that its undertaking here—building out a facilities-based wireless network almost from scratch— is by its very nature simply too daunting. *See* ECF No. 42-1 at 77–79, 89–108. However, these commenters do not cast enough doubt on DISH's prospects of success to call into question whether the proposed Final Judgment is in the public interest. As DISH explains, it "provided its internal business plan to the United States during a thorough and extensive due diligence process," and that its plan "demonstrates that the DOJ remedy will enable DISH to aggressively grow its subscriber base." ECF No. 78 at 4. For its part, United States represents that "[t]he proposed Final Judgment is the culmination of a comprehensive, fifteen-month investigation," ECF No. 42 at 8, and that the FCC was also provided access to DISH's plans, *see id.* at 21 (explaining that "DISH had provided the FCC with a proposal on how it planned to meet [the final milestones]"). Clearly, in light of the terms of the proposed Final Judgment, the Department of Justice found these plans satisfactory, and it represents the FCC did as well. *See id.* at 41 n.120 (noting that the FCC "explain[ed] that the proposed Final Judgment 'would enable DISH to emerge as a nationwide facilities-based provider that would be capable of supplying, among other things, robust wholesale wireless services to MVNOs'"). The commenters simply have not explained why the United States' predictions based on comprehensive information provided by DISH—backed up by the coercive enforcement mechanisms in the proposed Final Judgment—should be so discounted as to warrant rejecting

the settlement.[6] *See Microsoft*, 56 F.3d at 1460 (observing that "a court should not reject an agreed-upon modification unless it has exceptional confidence that adverse antitrust consequences will result" (citation and internal quotation omitted)).

Finally, other commenters argue that even if DISH replaces the lost competition, it will come too late. They point out that the relevant Merger Guidelines require entry to be, among other things, "timely." ECF No. 71 at 7–11; *see also FTC & DOJ Horizontal Merger Guidelines* (2010) § 9 (specifying that a merger is unlikely to enhance market power if entry is "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern"). As the United States explains, however, the proposed Final Judgment's wholesale agreement will allow DISH to begin competing immediately even while it scales up. ECF No. 42 at 28. Moreover, "the proposed Final Judgment's requirement that DISH begin offering postpaid plans within one year ensures that DISH will begin to restore the lost competition promptly." *Id.* To be sure, Sprint's entire competitive impact may not be replaced as quickly as commenters—or even the Court—would like. But that does not render the proposed Final Judgment unreasonable or inconsistent with the public interest.[7]

---

[6] Again, the Court notes that the judge in the New York proceeding reached a similar conclusion regarding DISH's plans on the record before it, *see Deutsche Telekom AG*, 2020 WL 635499, at *36 (noting that DISH's "extensive preparations and regulatory remedies indicate that [DISH] can sufficiently replace Sprint's competitive impact").

[7] A few other commentators' concerns can be addressed more summarily. One argues that the operative complaint and the CIS "are silent on key elements of the relevant market's structure." ECF No. 42-1 at 39. For example, the commenter points to the United States' failure to include pre- and post-merger market concentration measures in the CIS. *Id.* at 39, 44, 46–47. Thus, he argues, the public cannot meaningfully comment. *Id.* at 46–47. But the Tunney Act does not require this information to be included in the CIS. *See* 15 U.S.C. § 16(b). The United States has provided the information required by statute; no more is needed. *Cf. Archer-Daniels-Midland*, 272 F. Supp. 2d at 8 ("The government is not required to include in the CIS information concerning every potential antitrust concern that it has discarded as baseless after

14

Still, the Court does not mean to suggest that the points raised by the commenters are meritless. It is, for example, cause for concern that at least some of the remedies proposed are better characterized as behavioral instead of structural—and are therefore generally considered less effective.[8] It is possible, in the end, that the United States may wind up being wrong and its critics right that the proposed remedies do not fully restore any competition lost as a result of the merger. But the Court's task is not to assess whether the proposed Final Judgment is perfect. Rather, the Court must determine whether, after considering the parties' representations and after affording all due deference to the government, the proposed Final Judgment is "within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (emphasis in original) (citation and internal quotation omitted).

Upon consideration of the requisite statutory factors, *see* 15 U.S.C. § 16(e)(1), the Court finds that it is. As discussed above, the proposed Final Judgment includes provisions reasonably designed to incentivize DISH to enter and compete in the retail mobile wireless market. The United States predicts, with adequate foundation, that is precisely what will happen, *see* CIS at 2–3, and its prediction is entitled to considerable deference, *see United States v. Iron Mountain,*

---

investigation."). Another commenter points to purported communications between the Department of Justice and DISH as evidence that the remedies in the proposed Final Judgment may not be adequate. ECF No. 71 at 14–15. The Court appreciates that "Congress enacted the Tunney Act against the backdrop of a long history of concern about the Justice Department's process for settling antitrust cases." *United States v. Blavatnik*, 168 F. Supp. 3d 36, 37–38 (D.D.C. 2016). But whatever may be said of them, the alleged communications do not approach the "strong showing of bad faith or improper behavior" that would warrant "inquir[ing] into the mental processes of administrative decisionmakers," *Microsoft*, 56 F.3d at 1459 (internal quotation omitted).

[8] *Compare* the commenters' views at ECF No. 42-1 at 20–21, 73–75 (arguing that the remedies are behavioral) *with* those of the United States, ECF No. 42 at 31 (arguing that "[t]he overall objective of the remedy is profoundly structural, as it is designed to stand up a fourth nationwide, facilities-based wireless carrier").

*Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016). The terms of the proposed Final Judgment are detailed and contain specific timelines; "they are clear and specific regarding the assets to be divested, how the divestitures will occur, to whom the assets may be divested, the circumstances in which modifications may be made, and how the judgments can be enforced," *SBC Commc'ns*, 489 F. Supp. 2d at 24. Moreover, the proposed Final Judgment—which will remain in effect while DISH ramps up—includes enforcement measures as well as oversight by an independent trustee. The Court also retains the power to make modifications if necessary. Other courts in this District have found similar enforcement and modification provisions sufficient. *See, e.g.*, *Iron Mountain, Inc.*, 217 F. Supp. 3d at 151–52 (enforcement); *Archer-Daniels-Midland*, 272 F. Supp. 2d at 6 (modification). And finally, the United States' conclusion that trial was a gamble not worth taking is not unreasonable. *See SBC Commc'ns*, 489 F. Supp. 2d at 23 ("Success at trial was surely not assured, so pursuit of that alternative may have resulted in no remedy at all.").

For all these reasons, the Court holds that entering the proposed Final Judgment is in the public interest. *See United States v. Newpage Holdings Inc.*, No. 14-CV-2216 (TSC), 2015 WL 9982691, at *7 (D.D.C. Dec. 11, 2015) (noting that "the court's role here is limited to evaluating whether the Proposed Final Judgment[] provides a reasonably adequate remedy for the harms alleged in the Complaint, and the court will defer to the United States' predictions regarding the effect of its proposed remedies"); *see also United States v. Enova Corp.*, 107 F. Supp. 2d 10, 18 (D.D.C. 2000) ("It is plainly not for the Court to second-guess the government's predictions concerning the impact of the merger or the proposed remedies.").

## IV. Conclusion

For all the above reasons, the Court granted Plaintiffs' Motion for Entry of Final Judgment, ECF No. 84, in a separate order and entered Final Judgment, ECF No. 85.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: April 14, 2020