**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>DEUTSCHE TELEKOM AG, *et al.*,<br><br>*Defendants*. | Case No. 1:19-cv-02232 (TJK) |

**DEFENDANT DISH NETWORK CORPORATION'S**
**OPPOSED MOTION FOR RELIEF FROM JUDGMENT**

Defendant DISH Network Corporation ("DISH"), through its undersigned counsel, respectfully moves this Court to modify the final judgment dated April 1, 2020 (the "Final Judgment"), pursuant to Federal Rule of Civil Procedure 60(b).  DISH seeks an extension of the 800 MHz Spectrum License Transfer provision of Section IV.B.1 of the Final Judgment until June 30, 2024, effectuated by modifying Section IV.B.1 to require divestiture within *four* years after the closing of the divestiture of the Prepaid Assets or within five (5) business days of the approval of the transfer of the 800 MHz Spectrum Licenses by the Federal Communications Commission ("FCC"), whichever is later.  A Memorandum of Points and Authorities, the Declaration of John Swieringa and exhibits thereto, and a Proposed Order accompany this Motion.

August 17, 2023                    Respectfully submitted,


                                   /s/  *Adam S. Paris*
                                   Adam S. Paris
                                   Bradley P. Smith
                                   SULLIVAN & CROMWELL LLP
                                   125 Broad Street
                                   New York, New York 10004
                                   Telephone:  (212) 558-1660
                                   Facsimile:  (212) 291-9623
                                   smithbr@sullcrom.com
                                   parisa@sullcrom.com

                                   *Attorneys for DISH Network Corporation*

**LCVR 7(M) STATEMENT**

Pursuant to Local Rule 7(m), DISH's counsel conferred via telephone with counsel for T-Mobile on June 12, 2023, and the Antitrust Division of the United States Department of Justice (the "Division") on July 28, 2023.  In June, July, and August 2023, DISH also had a series of separate conversations with the plaintiff state attorneys general (the "Plaintiff States").  T-Mobile's counsel have stated that they oppose the motion.  By a letter dated July 28, 2023, the Division indicated that it does not take a position on DISH's motion at this time.  DISH met on June 14, 2023; July 20, 2023; July 21, 2023; July 26, 2023; July 27, 2023; August 4, 2023; and August 7, 2023 with representatives of Plaintiff States Colorado, Kansas, Nebraska, South Dakota, Texas, Florida, Arkansas, and Ohio, respectively, to request their consent to the Motion.  The content of the Motion was described to the foregoing Plaintiff States.  As of the filing of the Motion, no Plaintiff State has taken a position on the Motion.

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ......................................................................................................5

    A.    The T-Mobile/Sprint Merger ...............................................5

    B.    The Final Judgment and LPA ...............................................6

    C.    A Series of Crises Disrupt the Global Economy ...................................8

    D.    DISH Diligently Complies with the Final Judgment ...........................10

    E.    T-Mobile Threatens To Terminate the LPA .......................................12

ARGUMENT ..................................................................................................................14

I.    LEGAL STANDARD...............................................................................................14

II.    UNPRECEDENTED TURBULENCE IN THE GLOBAL CAPITAL MARKETS RENDER DISH'S PURCHASE SUBSTANTIALLY MORE ONEROUS THAN ANTICIPATED WHEN THE FINAL JUDGMENT WAS ENTERED AND DENYING DISH THE 800 MHZ SPECTRUM WOULD BE DETRIMENTAL TO THE PUBLIC INTEREST, WARRANTING A MODEST MODIFICATION TO THE FINAL JUDGMENT .......................................................................16

    A.    DISH'S ACQUISITION OF THE 800 MHZ SPECTRUM LICENSES IS NOW SUBSTANTIALLY MORE ONEROUS THAN ANTICIPATED IN EARLY 2020 ................................................................17

    B.    NOT GRANTING DISH AN EXTENSION WOULD AFFIRMATIVELY HARM THE PUBLIC INTEREST ..................................................18

III.    DISH COULD NOT ANTICIPATE THE UNPRECEDENTED CHANGES TO THE FINANCIAL MARKETS .............................................................................20

IV.    A 10-MONTH EXTENSION IS SUITABLY TAILORED TO RESOLVE THE PROBLEMS CREATED BY THE UNFORSEEN CHANGED CIRCUMSTANCES ..........................................................................22

CONCLUSION...............................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Council of the Blind* v. *Mnuchin,*
878 F.3d 360 (D.C. Cir. 2017) ...........................................................................19, 20

*Chambers* v. *NASCO, Inc.,*
501 U.S. 32 (1991) ..........................................................................................14

*Everybody Counts, Inc.* v. *N. Ind. Reg'l Plan. Comm'n,*
2010 WL 3656020 (N.D. Ind. Sept. 9, 2010) ..............................................17

*Grier* v. *Goetz,*
402 F. Supp. 2d 876 (M.D. Tenn. 2005) .....................................................17

*Holland* v. *N.J. Dep't of Corr.,*
246 F.3d 267 (3d Cir. 2001) .........................................................................19

*Horne* v. *Flores,*
557 U.S. 433 (2009) .......................................................................................15

*LaShawn A. ex rel. Moore* v. *Fenty,*
701 F. Supp. 2d 84 (D.D.C. 2010) ...............................................................17

*N.Y. State Ass'n for Retarded Children, Inc.* v. *Carey,*
706 F.2d 956 (2d Cir. 1983) .........................................................................14

*Nat'l L. Ctr. on Homelessness & Poverty* v. *U.S. Dep't of Veterans Affs.,*
842 F. Supp. 2d 127 (D.D.C. 2012) ..............................................................14

*New York* v. *Microsoft Corp.,*
531 F. Supp. 2d 141 (D.D.C. 2008) .........................................................19, 23

*NLRB* v. *Harris Teeter Supermarkets,*
215 F.3d 32 (D.C. Cir. 2000) ........................................................................18

\* *Rufo* v. *Inmates of Suffolk Cnty. Jail,*
502 U.S. 367 (1992) ...............................................................................15, 17, 21

*Twelve John Does* v. *District of Columbia,*
861 F.2d 295 (D.C. Cir. 1988) ......................................................................19

---

\*   Pursuant to Local Rule 7(a), an asterisk in the margin to the left of the case identifies cases or authorities on which counsel chiefly relies.

*United States* v. *Signature Flight Support Corp.*,
  607 F. Supp. 2d 56 (D.D.C. 2009) .......................................................18

\* *United States* v. *W. Elec. Co.*,
  46 F.3d 1198 (D.C. Cir. 1995) ................................................ *passim*

*Vanguards of Cleveland* v. *City of Cleveland*,
  23 F.3d 1013 (6th Cir. 1994) ...............................................................24

**Administrative Decisions**

*In the Matter of Pol'ys Regarding Mobile Spectrum Holdings Expanding the
  Econ. & Innovation Opportunities of Spectrum Through Incentive Auctions*,
  29 F.C.C. Rcd. 6133 (2014) ..................................................................11

**Statutes**

Clayton Act Section 7, 15 U.S.C. § 18 ........................................................6

**Rules**

\* Federal Rule of Civil Procedure 60(b) ......................................15, 19, 21

**Other Authorities**

Edwin Bennion *et al.*, *Exploring Price Increases in 2021 and Previous Periods of
  Inflation*, 11 BEYOND THE NUMBERS: PRICES & SPENDING 7 (U.S. Bureau of
  Labor Statistics, Oct. 2022), https://tinyurl.com/3sduzek5...................................9

Alfred Kammer *et al.*, *Ukraine Is Reverberating Across World's Regions*, IMF
  (Mar. 15, 2022), https://tinyurl.com/IMF-Ukraine ....................................9

*DISH Is Building the Future of 5G Networking*, DISH (last visited Aug. 16,
  2023), https://planetdish.com/dish-wireless/ .........................................10

*DISH Network Corporation and EchoStar Corporation to Combine*, DISH
  (Aug. 8, 2023), https://tinyurl.com/MergerPR.........................................23

*DISH's Smart 5G Wireless Network Is Now Available to Over 20 Percent of the
  U.S. Population*, DISH (June 15, 2022), https://tinyurl.com/4jk83att....................7

Eric Milstein & David Wessel, *What Did the Fed Do in Response to the Covid-19
  Crisis?*, BROOKINGS (Dec. 17, 2021), https://tinyurl.com/yc8p4h7k .......................9

*Exclusive Prime Member Deal*, DISH (July 26, 2023),
  https://tinyurl.com/Amazon-Boost-Infinite ...........................................23

*Federal Reserve Issues FOMC Statement*, FEDERAL RESERVE (July 26, 2023),
  https://tinyurl.com/FedJulyHike ..........................................................9

*Global Activity and Inflation*, FEDERAL RESERVE (May 27, 2022),
https://tinyurl.com/FedUkraine ........................................................................................9

*Global Economic Prospects*, WORLD BANK 4 (June 2023),
https://tinyurl.com/WorldBankGlobalEcon ......................................................................9

Jason Leigh, *Gauging the Success of the T-Mobile-Sprint Merger Three Years In*,
INT'T DATA CORP. (Apr. 2023), https://idcdocserv.com/US50542623 ...............................12

Jean-Marc Natal and Philip Barrett, *Interest Rates Likely to Return Toward Pre-
Pandemic Levels When Inflation is Tamed* (Apr. 10, 2023),
https://tinyurl.com/IMF-Rates ........................................................................................23

Note, *Lending in the Time of Coronavirus*, 135 HARV. L. REV. 1885, 1896 (2022) ....................8

Reinhardt Krause, *Why Dish Has Plenty Of 'Wood To Chop' After EchoStar
Merger*, INVESTORS BUS. DAILY (Aug. 10, 2023),
https://tinyurl.com/MSonDISHMerger ..............................................................................23

T-Mobile US, Corp., Annual Report (Form 10-K) (Feb. 14, 2023),
https://tinyurl.com/T-MobileAnnualReport22.................................................................12

T-Mobile US, Corp., Current Report (Form 10-Q) (June 30, 2023),
https://tinyurl.com/T-Mob10Q.........................................................................................5

United Nations Conference on Trade and Development, *Multiple Crises Unleash
One of the Lowest Global Economic Outputs in Recent Decades, Says Report*,
UNCTAD NEWS (Jan. 25, 2023), https://tinyurl.com/4smddcfu.........................................8

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT DISH NETWORK CORPORATION'S OPPOSED MOTION
FOR RELIEF FROM JUDGMENT**

Defendant DISH Network Corporation ("DISH"), through its undersigned counsel, respectfully submits this memorandum of points and authorities in support of its Opposed Motion for Relief from Judgment.

## PRELIMINARY STATEMENT

On April 1, 2020, this Court entered the Final Judgment, which the Antitrust Division of the U.S. Department of Justice (the "Division") described as "designed to preserve competition by enabling the entry of another national facilities-based mobile wireless network carrier." (Competitive Impact Statement at 2.)  The Division explained that the Final Judgment's "primary purpose . . . is to facilitate DISH building and operating its own mobile wireless services network by combining the Divestiture Package of assets and other relief with DISH's existing mobile wireless assets . . . to enable it to compete in the marketplace." (*Id.*)  Among other provisions, the Final Judgment requires T-Mobile to divest certain of its assets—including the 800 MHz Spectrum Licenses—to DISH in order to facilitate DISH's facilities-based network deployment to ameliorate the anticompetitive effects of T-Mobile's otherwise unlawful acquisition of Sprint.  As the Division explained, divestiture of the 800 MHz Spectrum Licenses "would add to DISH's existing spectrum assets in order to ensure DISH has sufficient spectrum to meet its buildout and service requirements and provide mobile wireless service to customers." (*Id.* at 9.)

Just as the Final Judgment came into force, COVID-19 upended the global economy, and the government spending and supply-chain disruptions that followed caused interest rates to skyrocket.  The Federal Reserve raised rates more than 525 basis points beginning in early 2022 through today.  Nevertheless, since the Final Judgment was entered in 2020, DISH has

continued to comply with all of its obligations, including by agreeing to effective interest rates higher than 12% from lenders and other terms in order to obtain billions of dollars in funding that was critical to DISH meeting its 5G facilities-based wireless network deployment obligations, which the company certified it had exceeded on July 14, 2023.  However, due to macroeconomic conditions that are no fault of DISH, it is especially difficult today for DISH to responsibly secure further financing to purchase the 800 MHz Spectrum Licenses.

On June 30, 2023, the Division exercised the discretion provided to it under the Final Judgment and informed this Court that the deadline for T-Mobile to divest the 800 MHz Spectrum Licenses to DISH was "extended to August 30, 2023 or within five (5) business days of the approval by the FCC of the transfer of the 800 MHz Spectrum Licenses, whichever is later." (ECF No. 93 at 2.)  DISH and T-Mobile thus proceeded this week to seek regulatory approval from the FCC for the transfer of the 800 MHz Spectrum Licenses from T-Mobile to DISH.  The timeline for FCC approval is uncertain.  However, as of today, DISH has not yet secured the financing necessary to complete the acquisition.  DISH therefore seeks an extension to June 30, 2024 of the fixed outside date under the Final Judgment for completion of the 800 MHz Spectrum License transfer.

This 10-month period beyond the current August 30, 2023 deadline will provide DISH with time it needs to raise additional capital and obtain financing as it continues to expand and monetize its network, necessary prerequisites to DISH being able to complete the 800 MHz Spectrum License acquisition as anticipated.  Although the 800 MHz divestiture obligation falls on T-Mobile, the Final Judgment gives DISH the first opportunity to acquire the licenses, and DISH is merely seeking additional time to secure the financing it needs to consummate the acquisition after the parties receive FCC approval.

Modifying the Final Judgment to allow for a 10-month extension of the fixed deadline would further the goals articulated by the Division and is warranted for at least three reasons:

*First*, the turmoil in global capital markets in the years following the entry of the Final Judgment has made DISH's compliance substantially more onerous than anticipated in early 2020.  As described more fully below, the COVID-19 pandemic, the war in Ukraine, the failures of large regional banks, and other macroeconomic dislocations have led to substantial inflation that central banks in the United States and elsewhere have combatted by raising interest rates dramatically over the past eighteen months.  The dramatic increase in interest rates has made it significantly more expensive for DISH to finance a purchase of the 800 MHz Spectrum Licenses, rendering its ability to responsibly do so within the timeline provided by the Final Judgment substantially more difficult than DISH—or other parties to the Final Judgment—ever could have anticipated.

*Second*, a refusal to modify the Final Judgment would harm the public interest. DISH stepped in as a buyer of the at-issue spectrum in order to help address the anticompetitive effects of T-Mobile's acquisition of Sprint; DISH is not itself a merger party, nor is it a "defendant" to this matter in the traditional sense.  Thus, the standard for final judgment modification ought not be as rigorous as it would be if T-Mobile were the party seeking to revise its obligations under a consent decree.  Here, if DISH is not granted a reasonable extension of the purchase period, its ability to utilize this element of the Division's remedy to provide the facilities-based competition envisioned by the Final Judgment will be harmed.

As an initial matter, DISH would lose the opportunity to purchase a finite resource that is an important component of a competitive network offering.  DISH currently has

significantly less of this important low-band spectrum (22.4 MHz on average) than the three nationwide incumbent carriers (each hold more than 45 MHz). DISH is also constrained in many service areas by uplink capacity (the speed at which a device can transmit data to the network infrastructure), and acquisition of the 800 MHz Spectrum Licenses will enhance DISH's network by doubling its uplink capacity in many of those service areas. In addition, not only will DISH have to pay a financial penalty to T-Mobile if it is unable to purchase the 800 MHz Spectrum Licenses, it also will lose the more than $1 billion that it has already invested in deploying radios compatible with this 800 MHz spectrum on its towers.

If DISH is not granted this extension and is unable to purchase the 800 MHz spectrum, T-Mobile is obligated under the Final Judgment to auction these licenses. However, an auction by T-Mobile of the 800 MHz spectrum to another buyer likely will not serve the purposes of the Final Judgment or the public interest. Any other likely acquirer would be one of the two remaining facilities-based nationwide wireless carriers, compounding the market power of AT&T, Verizon, and T-Mobile, and such a transaction (if even possible) would harm—not promote—competition. Any interested parties other than a nationwide incumbent carrier likely will be unable (or not have a need) to purchase all of the licenses, leaving some or all of the spectrum in T-Mobile's hands. T-Mobile has publicly touted the benefits of its acquisition of Sprint, including its enhanced spectrum position and financial success. Requiring DISH either to acquire the 800 MHz Spectrum Licenses under current financial conditions, or to forego a purchase because of these conditions, while T-Mobile continues to reap the benefits of its merger, would not serve the public interest. In sum, the most effective means of carrying out the remedial purposes of the Final Judgment is to grant DISH the 10-month extension it seeks.

*Third*, the requested modification is suitably tailored to the current situation.  A 10-month extension is a reasonable amount of time for market and other conditions to improve and for DISH to arrange the necessary financing to complete the 800 MHz acquisition.  Just last week, DISH announced an all-stock merger with EchoStar Corp.  Upon closing—which is expected to occur in Q4 2023, well within DISH's proposed extension timeline—the EchoStar merger will enhance DISH's financial position and thus improve DISH's access to capital markets.  While that merger will provide DISH with an infusion of capital, it will not be enough in itself to complete the 800 MHz transaction, nor will it improve DISH's financial position sufficiently to close the spectrum transaction immediately.  But, the anticipated closing of this transaction, among other expected developments described below, demonstrate why additional time to complete this transaction is warranted.  And, should market conditions improve before DISH's proposed June 30, 2024 deadline, enabling DISH to proceed with the acquisition sooner, DISH will not be foreclosed from doing so—and indeed, DISH would be motivated to do so.  According to its latest earnings release, T-Mobile has $6.6 billion in cash (or cash equivalents) on hand,[1] and will not be harmed by holding onto the 800 MHz spectrum for now.

## STATEMENT OF FACTS

### A.   The T-Mobile/Sprint Merger

On April 29, 2018, Defendant T-Mobile agreed to acquire Defendant Sprint in an all-stock transaction valued at approximately $26 billion.  (ECF No. 1 ¶ 11.)  The United States filed a civil antitrust complaint on July 26, 2019, seeking to enjoin the transaction.  (ECF No. 1.)  The Complaint alleged that the likely effect of the acquisition would be to lessen competition substantially for retail mobile wireless service in the United States, resulting in increased prices

---

[1]   T-Mobile US, Inc., Current Report (Form 10-Q) at 46 (June 30, 2023), https://tinyurl.com/T-Mob10Q.  T-Mobile's cash on hand increased by $2.1 billion since the end of 2022. *Id.*

and less attractive service offerings for American consumers, in violation of Section 7 of the

Clayton Act, 15 U.S.C. § 18.  (*Id.*)

B.      **The Final Judgment and LPA**

On April 1, 2020, the Court entered the Final Judgment, which "requires structural

relief in the form of divestitures designed to ensure the development of a new national facilities-

based mobile wireless carrier competitor [DISH] to ultimately remedy the anticompetitive harms

that flow from the change in the market structure that otherwise would have occurred as a result

of the merger" of T-Mobile and Sprint.  (Competitive Impact Statement at 8.)  The Final Judgment

is "intended to ensure that DISH can begin to offer competitive services and grow to replace Sprint

as an independent and vigorous competitor in the retail mobile wireless service market."  (*Id.* at

3.)

To effectuate that purpose, the Final Judgment required the merged entity to enter

into a series of divestitures and arrangements with DISH, including a divestiture of the 800 MHz

Spectrum Licenses.  In particular, the Final Judgment requires T-Mobile and Sprint "within

three (3) years after the closing of the divestiture of the Prepaid Assets or within five (5) business

days of the approval by the FCC of the transfer of the 800 MHz Spectrum Licenses, whichever is

later, to divest the 800 MHz Spectrum Licenses in a manner acceptable to the United States, in its

sole discretion, after consultation with the affected Plaintiff States."  (Final Judgment § IV.B.1.)[2]

The Final Judgment contemplates a short potential delay in the divestiture, and authorizes "[t]he

United States, in its sole discretion, after consultation with the affected Plaintiff States, [to] agree

---

2       Relevant excerpts of the Final Judgment are attached as Ex. 1 to the declaration of John
        Swieringa ("Swieringa Decl.") filed in support of this motion.  All other exhibits also refer to
        the Swieringa Declaration.

to one or more extensions of this time period not to exceed sixty (60) calendar days in total, and will notify the Court in such circumstances." (*Id.*)

If DISH chooses not to acquire the 800 MHz Spectrum Licenses, then it must "pay a penalty of $360,000,000 to the United States" *but* will not be required to do so if "it has deployed a core network and offered 5G Service to at least 20% of the U.S. population over DISH's facilities-based network within three (3) years of the closing of the divestiture of the Prepaid Assets." (*Id.* § IV.B.2.)  On June 15, 2022, DISH announced its 5G network was offering service to more than 20% of the United States population, so the $360 million penalty is no longer applicable.[3]

If DISH does not acquire the 800 MHz Spectrum Licenses, then T-Mobile:

> [S]hall conduct an auction of the 800 MHz Spectrum Licenses within six (6) months of [DISH] declining to purchase the licenses. In such auction, [T-Mobile] will not divest the 800 MHz Spectrum Licenses to any other national facilities-based mobile wireless network operator, without the prior written approval of the United States, in its sole discretion, after consultation with the affected Plaintiff States, and will not be required to divest the 800 MHz Spectrum Licenses at a price that is lower than the price the [DISH] originally agreed to pay for such licenses.  In addition, [T-Mobile] may apply to the United States to be relieved from the commitment to sell the 800 MHz Spectrum Licenses if (i) Acquiring Defendant declines to purchase the 800 MHz Spectrum License and (ii) the sale of the 800 MHz Spectrum Licenses is no longer needed fully to remedy the competitive harms of the merger, as determined by the United States in its sole discretion, after consultation with the affected Plaintiff States.  (Final Judgment § IV.B.4.)

The divestiture of the 800 MHz Spectrum Licenses was memorialized in a License Purchase Agreement, dated July 1, 2020, between DISH and T-Mobile.  (Ex. 2; hereinafter, the "LPA.")  Under the LPA, DISH agreed to purchase the 800 MHz Spectrum Licenses for roughly

---

[3]   *DISH's Smart 5G Wireless Network Is Now Available to Over 20 Percent of the U.S. Population*, DISH (June 15, 2022), https://tinyurl.com/4jk83att.

$3.5 billion, subject to certain conditions to closing specified in the agreement. (*Id.* at §§ 2.1(a);

6.1–6.2.)  In the event that T-Mobile terminates the LPA, then DISH "shall pay to [T-Mobile] a

termination fee of $71,794,777 in cash."  (*Id.* at § 7.1(c).)

### C.    A Series of Crises Disrupt the Global Economy

As reported by the United Nations Conference on Trade and Development, "[a]

series of severe and mutually reinforcing shocks—the COVID-19 pandemic, the war in Ukraine,

and resulting food and energy crises, surging inflation, [and] debt tightening—battered the world

economy in 2022."[4]

The first of these shocks was COVID-19, which was not even on the horizon in

July 2019 when DISH originally consented to entry of the Final Judgment.  By mid-March of

2020, COVID-19's rapid spread around the world had caused national lockdowns and other wide-

scale social distancing measures, which, over time, disrupted the global financial system.  By the

end of 2020, "the annual number of companies defaulting on their debt was on its way to eclipsing

the same for any year of the Great Recession."[5]  The unprecedented degree to which the world

economy slowed down led to wild fluctuations in asset prices, "rendering it nearly impossible to

value firms with any degree of certainty."[6]

In order to stabilize financial markets, the Federal Reserve injected trillions of

dollars into the economy through "large purchases of U.S. government and mortgage-backed

securities and lending to support households, employers, financial market participants, and state

---

[4]    United Nations Conference on Trade and Development, *Multiple Crises Unleash One of the Lowest Global Economic Outputs in Recent Decades, Says UN Report*, UNCTAD NEWS (Jan. 25, 2023), https://tinyurl.com/4smddcfu.

[5]    Note, *Lending in the Time of Coronavirus*, 135 HARV. L. REV. 1885, 1896 (2022), https://harvardlawreview.org/print/vol-135/lending-in-the-time-of-coronavirus/.

[6]    *Id.*

and local governments."[7]  At the same time, ongoing economic complications from the pandemic and numerous international supply chain disruptions caused the largest period of inflation since 2008.[8]  Seeking to curb high inflation, the Federal Reserve increased interest rates over 525 basis points starting in January 2022.[9]  After growing 1.1% in 2023, the U.S. economy is projected to decelerate to 0.8% in 2024, mainly because of the impact of the sharp rise in interest rates over the past year and a half.[10]  Just as the world was recovering from the COVID-19 pandemic, another crisis struck:  Russia invaded Ukraine.  The Federal Reserve notes that "[g]lobal geopolitical risks have soared since Russia's invasion of Ukraine," causing "a drag on the global economy while pushing up inflation."[11]

Resulting increases in commodity prices caused additional rapid inflation, which the Federal Reserve and other world banks sought to combat by raising interest rates.[12]  Such conditions led to tighter credit conditions, which in turn has strained the banking sector, "result[ing] in even tighter credit conditions for . . . businesses."[13]

---

[7]   Eric Milstein & David Wessel, *What Did the Fed Do in Response to the Covid-19 Crisis?*, BROOKINGS (Dec. 17, 2021), https://tinyurl.com/yc8p4h7k.

[8]   Edwin Bennion *et al.*, *Exploring Price Increases in 2021 and Previous Periods of Inflation*, 11 BEYOND THE NUMBERS: PRICES & SPENDING 7 (U.S. Bureau of Labor Statistics, Oct. 2022), https://tinyurl.com/3sduzek5.

[9]   On July 26, 2023, the Federal Reserve increased interest rates by 25 basis points and indicated that additional rate hikes may be coming before the end of the year.  *Federal Reserve Issues FOMC Statement*, FEDERAL RESERVE (July 26, 2023), https://tinyurl.com/FedJulyHike.

[10]   *Global Economic Prospects*, WORLD BANK 4 (June 2023), https://tinyurl.com/WorldBankGlobalEcon.

[11]   Dario Caldara *et al.*, *The Effect of the War in Ukraine on Global Activity and Inflation*, FEDERAL RESERVE (May 27, 2022), https://tinyurl.com/FedUkraine.

[12]   Alfred Kammer *et al.*, *How War in Ukraine Is Reverberating Across World's Regions*, IMF (Mar. 15, 2022), https://tinyurl.com/IMF-Ukraine.

[13]   *Id.*

### D.      DISH Diligently Complies with the Final Judgment

Since the Court entered the Final Judgment, DISH has made steady progress deploying its 5G wireless network, which has been an enormous undertaking.  In 2020, DISH had not yet deployed a single 5G tower and the wireless technology it sought to utilize was unknown and untested.  Nonetheless, and against the backdrop of the COVID-19 pandemic and substantial supply chain issues, as of June 14, 2023, DISH's network is offering 5G broadband service to more than 73 percent of the United States population, covering more than 246 million Americans, with more than 16,000 deployed 5G sites.  (Swieringa Decl. ¶ 3.)  This accomplishment cannot be overstated:  DISH has constructed a greenfield wireless network using spectrum bands not widely deployed by incumbent carriers, utilizing a novel network architecture (Open RAN), and coordinating a complex technological vendor ecosystem.[14]  At the same time, DISH also completed another technology transition—it migrated millions of Boost customers from the legacy Sprint CDMA network to T-Mobile's network on an accelerated timeline that T-Mobile announced post-merger, which required DISH to incur hundreds of millions of dollars in additional, unanticipated expenses to ensure its customer base retained service.  (Swieringa Decl. ¶ 4.)

DISH's 5G deployment efforts also included significant financial investments, specifically relating to the 800 MHz spectrum.  These investments reflect the competitive importance of the 800 MHz frequencies as valuable low-band and uplink spectrum that is important to enhance DISH's network offerings.  (Swieringa Decl. ¶ 6.)  Wireless spectrum is a finite, limited resource.  To compete, carriers need a mix of low-, mid-, and high-band spectrum.  As the Division has recognized, low-band spectrum (generally defined as frequencies below 1 GHz) "has superior propagation characteristics, permitting better coverage in both rural areas and

---

[14]   *DISH Is Building the Future of 5G Networking*, DISH (last visited Aug. 16, 2023), https://planetdish.com/dish-wireless/.

buildings." (*Ex Parte* Submission of the U.S. Dep't of Just., WT Dkt. No. 12-269, at 12 (filed

Apr. 11, 2013), *In the Matter of Pol'ys Regarding Mobile Spectrum Holdings Expanding the Econ.*

*& Innovation Opportunities of Spectrum Through Incentive Auctions*, 29 F.C.C. Rcd. 6133

(2014).)  Indeed, the Division noted that a consideration of low-band spectrum concentration has

been an important component of previous wireless investigations, and that this "factor is

particularly important for determining a carrier's ability to compete in offering coverage across a

broad service area, including its ability to provide coverage efficiently in rural areas." (*Id.* at 13–

14 (emphasis added).)

   Carriers also need uplink spectrum to ensure consumers have the ability to send

transmissions to a carrier network.  But in many areas nationwide, DISH's uplink capacity is

constrained. (Swieringa Decl. ¶ 5.)  DISH's acquisition of the 800 MHz spectrum from T-Mobile

will double its uplink capacity in those areas, making DISH's offerings more competitive. (*Id.*)

   Recognizing the importance of this spectrum for its network deployment, DISH has

already spent more than <u>$1 billion</u> to support the 800 MHz spectrum on its network. (Swieringa

Decl. ¶ 6.) Specifically, DISH included radios compatible with 800 MHz on the more than 16,000

towers it has already deployed, meaning 800 MHz spectrum can be made available to customers

immediately upon acquisition of the licenses. (*Id.*)  Without a reasonable extension, DISH's

investment will be lost, further damaging its competitive position in the market against the three

large and entrenched nationwide wireless incumbents.

   As a result of the significantly changed financial conditions described above, DISH

faces substantial capital constraints that prevent it from responsibly acquiring the 800 MHz

Spectrum Licenses on the timetable originally anticipated.  While DISH was able to raise a total

of $3.5 billion of debt in November 2022 and January 2023 for capital spending, it was forced to

agree to effective interest rates above 12% and other burdensome conditions.  (Swieringa Decl. ¶ 8.)  DISH agreed to such terms because the funding was critical to meet its deployment commitments under the Final Judgment.

In contrast, the T-Mobile/Sprint merger has improved T-Mobile's market position. In its 2022 Annual Report, T-Mobile reported that "[p]ostpaid revenues increased $3.4 billion, or 8%."[15]  Additionally, T-Mobile reported that "[t]he Merger greatly enhanced [their] spectrum position," and "[a]s a result of the Merger, [they] have achieved, and expect to continue to achieve, significant synergies and cost reductions."[16]  The increased revenue and cost reductions have led to an increase of $107 billion in T-Mobile's market capitalization value post-merger, resulting in a higher market capitalization than the two other incumbents, AT&T and Verizon.[17]

### E.    T-Mobile Threatens To Terminate the LPA

As permitted by the Final Judgment, DISH wrote the Division on March 13, 2023 "to request a 60-day extension of the 800 MHz Spectrum License Transfer provision of Section IV.B.1 of the Final Judgment."  (Ex. 3 at 1.)  "To ensure the extension is effectuated in accordance with the existing commercial agreement approved by the Division between DISH and T-Mobile," DISH also sought "a corresponding 60-day extension of the Filing Deadline in Section 5.5(a) of the [LPA]."  (*Id.*)

On March 30, 2023, DISH and T-Mobile mutually agreed that "until such extension is either granted or denied, neither DISH nor T-Mobile will give a notice of breach for a failure under Section 5.5(a) of the [LPA] to make the FCC Applications by the Filing Deadline."  (Ex. 4

---

[15]   T-Mobile US, Inc., Annual Report (Form 10-K) at 33 (Feb. 14, 2023), https://tinyurl.com/T-MobileAnnualReport22
[16]   *Id.* at 6.
[17]   Jason Leigh, *Gauging the Success of the T-Mobile-Sprint Merger Three Years In* at 3, INT'L DATA CORP. (Apr. 2023), https://idcdocserv.com/US50542623.

at 2.)  The parties further agreed that, "[i]n the event that a 60-day extension is granted," they would amend "the LPA to modify the definition of Filing Deadline to accommodate the new deadline." (*Id.*)

By letter dated June 1, 2023, and before the Division had acted on DISH's extension request, T-Mobile notified DISH "that it is in material breach of the [LPA] with respect to its obligations in Section 5.5 thereunder" and provided a "thirty-day period to cure such material breaches and make all filings necessary to obtain the FCC Consents no later than June 30, 2023." (Ex. 5 at 1–2.)  DISH notified the Division of T-Mobile's letter purporting to notice a breach of the LPA, and DISH's position that T-Mobile could not terminate the agreement without first obtaining the consent of the United States.  By letter dated June 20, 2023, the Division invited DISH and T-Mobile to submit their respective positions "on the interpretation of Section XVI.D of the Final Judgment as it pertains to whether the Division must consent to the termination of the parties' July 1, 2020 [LPA]," which the parties did by the June 28, 2023 deadline (Ex. 6 at 1.)  On June 30, 2023, DISH also responded to T-Mobile's breach letter, explaining that "T-Mobile cannot terminate the LPA . . . without first obtaining the consent of the United States" and that DISH needed additional time to acquire the 800 MHz licenses.  (Ex. 7 at 1–2.)

Also on June 30, 2023, the Division filed a notice informing the Court that it had exercised its discretion under Section IV.B.1 of the Final Judgment and extended the deadline for T-Mobile to divest the 800 MHz Spectrum Licenses to DISH "to August 30, 2023 or within five (5) business days of the approval by the FCC of the transfer of the 800 MHz Spectrum Licenses, whichever is later."  (ECF No. 93.)

By letter dated July 28, 2023, the Division "decline[d] to exercise any right it may have to withhold its consent to T-Mobile's termination of the [LPA] according to the terms of that

agreement." (Ex. 8 at 1.)  However, the Division made clear that its decision was "separate from whether an order modification might be justified," explaining that it "continues to have concerns that the divestiture of the 800 MHz spectrum to DISH may be so important to DISH replacing the competition lost by T-Mobile's acquisition of Sprint that changed facts and circumstances may justify an order modification." (*Id.*)  While the Division recognized the importance of the 800 MHz spectrum to DISH, it declined to "take a position on the merits of any potential motion" until such a motion was filed. (*Id.*)

On August 10, 2023, T-Mobile notified DISH by letter of its unilateral termination of the LPA, effective on August 17, 2023, unless DISH "prepare[d] and file[d] with the FCC all applications and notifications necessary to obtain the FCC Consents." (Ex. 9 at 1.)  Acting in good faith to comply with the Final Judgment and to avert T-Mobile's termination of the LPA, on August 16, 2023, DISH and T-Mobile filed with the FCC all applications and notifications necessary to obtain FCC Consents for the transfer of the 800 MHz spectrum. (Ex. 10.)

## ARGUMENT

## I.  LEGAL STANDARD

"The power of a court of equity to modify a decree of injunctive relief . . . is long-established, broad, and flexible." *United States* v. *W. Elec. Co.*, 46 F.3d 1198, 1202 (D.C. Cir. 1995) (quoting *N.Y. State Ass'n for Retarded Children, Inc.* v. *Carey*, 706 F.2d 956, 967 (2d Cir. 1983) (Friendly, J.)).  This Court's authority to modify the Final Judgment is inherent in its power to enter judgments.  As courts in this District have explained, the judicial power to make such modifications is not "governed by . . . rule or statute, 'but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Nat'l L. Ctr. On Homelessness & Poverty* v. *U.S. Dep't of Veterans Affs.*, 842 F. Supp. 2d 127, 131 (D.D.C. 2012) (quoting *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 43 (1991)).

Additionally, the Final Judgment explicitly states that "[t]he Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, [or] to modify any of its provisions . . . ."  (Final Judgment § XVII.)

In determining whether relief is warranted, the Court should evaluate whether such relief is required to achieve the "intended result" of the Final Judgment.  *See W. Elec.*, 46 F.3d at 1202.  A federal court's inherent authority to modify its own injunctive order is codified in Federal Rule of Civil Procedure 60(b)(5).  "[T]he court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or ***applying it prospectively is no longer equitable***; or (6) ***any other reason that justifies relief***."  Fed. R. Civ. P. 60(b) (emphases added).

Under this Rule, relief is available when the moving party demonstrates that "changed factual conditions make compliance with the decree substantially more onerous . . . when a decree proves to be unworkable because of unforeseen obstacles, or when enforcement of the decree without modification would be detrimental to the public interest."  *Rufo* v. *Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992) (citations omitted).  This is a disjunctive, tripartite test—meeting any single one of these three conditions may justify the modification of a judgment.  *Cf. Horne* v. *Flores*, 557 U.S. 433, 454 (2009) ("Use of the disjunctive 'or' makes it clear that each of [Rule 60(b)(5)]'s three grounds for relief is independently sufficient.").

II.   **UNPRECEDENTED TURBULENCE IN THE GLOBAL CAPITAL MARKETS
RENDER DISH'S PURCHASE SUBSTANTIALLY MORE ONEROUS THAN
ANTICIPATED WHEN THE FINAL JUDGMENT WAS ENTERED AND
DENYING DISH THE 800 MHZ SPECTRUM WOULD BE DETRIMENTAL TO
THE PUBLIC INTEREST, WARRANTING A MODEST MODIFICATION TO
THE FINAL JUDGMENT**

The changed circumstances in this case—substantial inflation that led to rising interest rates and the associated capital market's reaction—make modification proper under both the "substantially more onerous" and "detrimental to the public interest" prongs of the requisite standard.  Each constitutes an independent basis for the Court to modify the Final Judgment in the modest fashion that DISH respectfully requests.  DISH is not a typical consent decree defendant seeking relief from agreed-upon obligations designed to remedy some misconduct or anticompetitive action on DISH's part.

Rather, DISH is a divestiture buyer that agreed to take on the challenging task of competing with AT&T, Verizon, and T-Mobile—a hugely complex and expensive endeavor—and DISH is merely seeking additional time to exercise its option to complete an acquisition for an important network input, in which it has already made a very substantial investment.  Without additional time, DISH likely will be unable to purchase the 800 MHz Spectrum Licenses, depriving its network of valuable low-band and uplink spectrum that will ultimately hamper its competitive offerings.  And, it will be forced to abandon nearly $1 billion of investments it has made in anticipation of an acquisition of this important resource.  If DISH does not purchase the spectrum, T-Mobile will either auction the spectrum or may petition to keep it.  Neither of these outcomes would further the Final Judgment's purpose of "ensur[ing] that DISH can begin to offer competitive services and grow to replace Sprint as an independent and vigorous competitor in the retail mobile wireless service market in which the proposed merger would otherwise lessen competition." (Competitive Impact Statement at 3.)

A.      **DISH's Acquisition of the 800 MHz Spectrum Licenses Is Now Substantially More Onerous Than Anticipated in Early 2020.**

It is not necessary to show impossibility in order to obtain relief from a judgment; it is enough to demonstrate that compliance has become substantially more onerous. *W. Elec.*, 46 F.3d at 1206 (citing *Rufo*, 502 U.S. at 382, 384–85, 387). Changes in the financial environment that make compliance substantially more onerous are sufficient to warrant modification. *LaShawn A. ex rel. Moore* v. *Fenty*, 701 F. Supp. 2d 84, 102 (D.D.C. 2010) (stating that "[f]inancial constraints are a legitimate concern," while concluding movant in that case "failed to demonstrate that financial circumstances warrant[ed] modification"), *aff'd sub nom. LaShawn A. ex rel. Moore* v. *Gray*, 412 F. App'x 315 (D.C. Cir. 2011); *Grier* v. *Goetz*, 402 F. Supp. 2d 876, 885 (M.D. Tenn. 2005) (holding that "modification is warranted due to the serious fiscal crisis" in state Medicaid program), *order clarified*, 421 F. Supp. 2d 1080 (M.D. Tenn. 2006); *Everybody Counts, Inc.* v. *N. Ind. Reg'l Plan. Comm'n*, 2010 WL 3656020, at *3 (N.D. Ind. Sept. 9, 2010) (holding a "financial crisis" to be one of "two unforeseen factual conditions warrant[ing] modification," because it caused "severe budget constraints, which [modification proponent] did not anticipate when it entered into the consent decree" and which "render[ed] [its] compliance with the consent decree more onerous").

DISH cannot responsibly finance the $3.5 billion purchase of the 800 MHz Spectrum Licenses at this time. Among other things, COVID-19 and the Ukraine War upended global capital markets, led to substantial inflation, and caused the fastest rate-raising cycle in 40 years—indeed, upwards of 5% higher—as the Federal Reserve has tried to rein in inflation. Those interest rate hikes led to tighter credit conditions, which in turn led to the collapse of several major banking institutions, which led to even tighter credit conditions for DISH and other potential borrowers. Consequently, to meet the June 2023 buildout milestones set forth in the Final

Judgment, DISH recently incurred expensive debt, which, among other things, has impacted the market's view of DISH's ability to fund, build, and operate a mobile network.

These cascading changes to the market have made it substantially more difficult to secure financing for the 800 MHz spectrum that is anywhere near on par with the terms anticipated when the Final Judgment was entered. Put simply, DISH's acquisition of the 800 MHz spectrum now is substantially more onerous than DISH—or any of the parties—could have predicted when the Final Judgment was entered.

Moreover, DISH's actions to date have all been in furtherance of the Final Judgment. The current condition of the financial markets are not "self-imposed." *See NLRB* v. *Harris Teeter Supermarkets*, 215 F.3d 32, 35–37 (D.C. Cir. 2000) (denying vacature of consent decree where the defendant's motion cited harms inherent to all injunctive restraints); *United States* v. *Signature Flight Support Corp.*, 607 F. Supp. 2d 56, 59–60 (D.D.C. 2009) (denying modification of judgment where defendant did not want to sell at a loss due to difficult market conditions that "the parties specifically countenanced"). To the contrary, DISH remains firmly committed to carrying out its obligations under the Final Judgment. It just needs additional time to obtain financing on reasonable terms necessary to complete the transaction. Indeed, if DISH is able to make the acquisition before the end of the 10-month extension, it has the incentive to do so at its earliest opportunity to improve its competitive position in the market. Because its ability to exercise this option is substantially more onerous due to these changed market conditions, the Court should grant DISH's request for a 10-month extension.

## B.   Not Granting DISH an Extension Would Affirmatively Harm the Public Interest.

While the burden of compliance is an independent reason to grant the requested relief, the Court should also grant the motion because a modest extension is in the public interest.

The D.C. Circuit has held that the "'public interest' is a 'significant reason' undergirding Rule 60(b)(5)'s 'flexible' modification standard." *Am. Council of the Blind* v. *Mnuchin*, 878 F.3d 360, 368 (D.C. Cir. 2017); *see Twelve John Does* v. *District of Columbia*, 861 F.2d 295, 298 (D.C. Cir. 1988) (explaining that "courts sitting in equity are obliged to consider the interests of all those affected by a decree" when considering a modification request).  The public interest in promoting competition—the very concept underlying the Final Judgment—strongly supports modification of the Final Judgment to afford DISH additional time to complete the 800 MHz Spectrum Licenses transaction.

This is <u>not</u> a classic Rule 60(b) scenario, where a defendant—the subject of the injunctive relief—seeks modification or termination of the order.  To the contrary, DISH stepped into this action in order to help remedy the competitive harm that would otherwise result from a T-Mobile/Sprint merger.  *New York* v. *Microsoft Corp.*, 531 F. Supp. 2d 141, 168–69 (D.D.C. 2008) (recognizing that the analysis may turn on the party seeking relief); *see also Holland* v. *N.J. Dep't of Corr.*, 246 F.3d 267, 284 n.16 (3d Cir. 2001) ("The Supreme Court has set a more rigorous standard for defendants seeking modification because defendants usually seek modification 'not to achieve the purposes of the provisions of the decree, but to escape their impact.'").  The goal of the Final Judgment was to "remedy the anticompetitive harms that flow from the change in the market structure that otherwise would have occurred as a result of the merger" of T-Mobile and Sprint.  (Competitive Impact Statement at 8.)  If the extension is denied, DISH may be unable to purchase the 800 MHz Spectrum Licenses, and may also have to pay a penalty to T-Mobile.  That penalty improves T-Mobile's financial position—which has already benefitted substantially from T-Mobile's acquisition of Sprint—while simultaneously limiting DISH's ability to develop into a "new national facilities-based mobile wireless carrier competitor . . . ." (*Id.*)  And, in addition to

the penalty, DISH will lose all of the capital—more than $1 billion—it has invested to make its network compatible with the 800 MHz spectrum.  That DISH—the party that took on the burden of remedying T-Mobile's and Sprint's anticompetitive behavior—will be harmed by strict compliance with the Final Judgment is alone grounds for modification of the Final Judgment.  *See Am. Council of the Blind*, 878 F.3d at 368 (holding that when third parties "will unquestionably be affected" by an injunction, a district court may permissibly consider those costs "as part of the overall 'public interest'").

And, the harm to the public interest runs even deeper.  The terms of the Final Judgment require that T-Mobile either auction the 800 MHz Spectrum Licenses or petition to retain them if DISH does not complete the transaction.  Neither of those outcomes would serve the public interest.  Any party interested in the 800 MHz spectrum would likely be a nationwide incumbent wireless carrier, and any divestiture of these assets to an existing provider (assuming that the Division would sign off on such a divestiture) would harm competition.  To the extent there are any interested parties other than DISH and the big-two carriers, those parties will likely not be in a position to purchase the nationwide footprint of licenses, leaving some or all of the spectrum in T-Mobile's hands.  And, DISH is not aware of any other party that has deployed 5G radios compatible with this spectrum (including T-Mobile) nationwide, meaning it could be years before any owner of this spectrum would be able to put it to use for consumers.  (Swieringa Decl. ¶ 7.)  In sum, the most effective means of promoting competition and implementing the Final Judgment is to grant DISH the modest extension it seeks.

## III.    DISH COULD NOT ANTICIPATE THE UNPRECEDENTED CHANGES TO THE FINANCIAL MARKETS

As the Supreme Court has observed, "[o]rdinarily . . . modification [of a judgment] should *not* be granted where a party relies upon events that *actually were* anticipated at the time it

entered into a decree." *Rufo*, 502 U.S. at 385 (emphases added).  But a party seeking modification is "not required to anticipate every exigency that could conceivably arise during the life of a consent decree," and when parties to a consent decree did not "actually . . . anticipate[]" material exigencies that subsequently render performance under the decree onerous, it would hardly be equitable to hold them strictly to it.  *Id*.

Here, the market turmoil that came after the Final Judgment was crafted in 2019 and entered in April 2020 is a substantial change that neither the parties nor this Court reasonably anticipated at the time of entry.  DISH's commitment to purchase the spectrum from T-Mobile to remedy antitrust issues arising out of the merger with Sprint was predicated upon the parties' reasonable expectation that DISH would be able to finance the transaction responsibly under market conditions anticipated at the time.  But a global pandemic shocked the world economy, and a major land war in Europe roiled capital markets as inflation surged.  The confluence of these unprecedented public-health and geopolitical events, and the Federal Reserve's rate-hiking response to the economic fallout, understandably upset the parties' reasonable expectations.

DISH could not have anticipated the possibility that the COVID-19 pandemic would occur, or that it would have dire consequences for the economy in general and capital markets in particular.  But even if DISH could have speculated that economic conditions might deteriorate precipitously, the "focus of Rule 60(b)(5) is *not* on what was *possible*, but on what the parties and the court *reasonably anticipated*."  *W. Elec.*, 46 F.3d at 1205 (emphases added).  In *Rufo*, for example, "a rapid increase in the jail population beyond projections—certainly something that was *possible*, something the parties *knew* could occur" warranted a modification of the decree because the parties did not *actually* reasonably anticipate that such an exigency *would* occur.  *Id*. (emphases added) (citing *Rufo*, 502 U.S. at 375).

So too here.  The parties to the decree did not *actually* anticipate the combined effects of a global pandemic, the Ukraine war, and the highest inflation in decades.  Nor could they.  To hold otherwise—that DISH *should* have anticipated the economic mayhem resulting from two extraordinary events—would essentially mandate omniscience.  It would set an insurmountable bar to the modification of judgments, effectively rendering the changed-circumstances prong a dead letter.  *See W. Elec.*, 46 F.3d at 1202 ("If the rule were so restricted, it would never be successfully invoked:  whatever actually occurs after entry of the decree is necessarily something that could have occurred.").

## IV.    A 10-MONTH EXTENSION IS SUITABLY TAILORED TO RESOLVE THE PROBLEMS CREATED BY THE UNFORSEEN CHANGED CIRCUMSTANCES

While future economic conditions cannot be known with certainty, the Federal Reserve's actions appear to have dampened the acceleration of inflation with the expectation that market volatility will abate in the future.  A 10-month extension is suitably tailored to the significantly changed circumstances that caused DISH to file this motion:  the additional time would allow the capital markets to return to an even keel, and it would afford DISH the opportunity to validate its position in the marketplace and thereby restore lender confidence.  The modest additional time would be sufficient to complete the 800 MHz spectrum transaction for at least three reasons:

- *First*, DISH's fulfillment of its obligation to provide 5G broadband service to at least 70 percent of the United States population in mid-June with a continued deployment of 5G voice service throughout its footprint will enable the company to begin more aggressively marketing and monetizing its wireless service.

- *Second*, on July 26, 2023, DISH announced that Amazon (the second largest U.S. retailer) will begin selling DISH's Boost Infinite service, which should expand

DISH's market position.[18]   DISH continues to work towards other device and distribution partnerships.

- *Third*, on August 8, 2023, DISH and EchoStar announced their all-stock merger.[19] The deal is expected close towards the end of this calendar year and will result in a "combined company [with] greater resources and . . . financial flexibility."[20]  Wall Street analysts expect the deal's "creative financial engineering" to "incrementally help[] reduce [DISH's] financing burden," given EchoStar's "strong" balance sheet with "negative net debt including $1.7 billion of cash at March 31."[21]

- *Fourth*, market experts anticipate the economic environment will improve over the next year, as inflation is reigned in and interest rates fall as a result, thereby easing DISH's access to capital markets.[22]

Thus, an additional 10 months would merely enable DISH to do what it sought to do *ab initio*:  responsibly finance a purchase the 800 MHz Spectrum Licenses in order to compete in the retail mobile wireless service market.  Such a modification is "suitably tailored."  *See, e.g.*, *Microsoft*, 531 F. Supp. 2d at 181–85 (D.D.C. 2008) (two-year extension of consent decree

---

[18]   *Boost Infinite Brings Its $25/Month Unlimited Postpaid Plan to Amazon with Exclusive Prime Member Deal*, DISH (July 26, 2023), https://tinyurl.com/Amazon-Boost-Infinite.

[19]   DISH Network Corp., Current Report (Form 8-K) (Aug. 8, 2023).

[20]   *DISH Network Corporation and EchoStar Corporation to Combine*, DISH (Aug. 8, 2023), https://tinyurl.com/MergerPR.

[21]   Reinhardt Krause, *Why Dish Has Plenty Of 'Wood To Chop' After EchoStar Merger*, INVESTORS BUS. DAILY (Aug. 10, 2023), https://tinyurl.com/MSonDISHMerger (first quoting TD Cowen analyst Gregory Williams, then quoting Morgan Stanley analyst Benjamin Swinburne, and finally quoting Raymond James analyst Ric Prentiss).  While the EchoStar transaction will provide DISH with an infusion of capital that will improve its overall financial position, it does not provide the roughly $3.5 billion needed to close the 800 MHz spectrum transaction.

[22]   Jean-Marc Natal and Philip Barrett, *Interest Rates Likely to Return Toward Pre-Pandemic Levels When Inflation is Tamed* (Apr. 10, 2023), https://tinyurl.com/IMF-Rates.

"suitably tailored" to "unforeseen delay" constituting "changed circumstances"); *accord Vanguards of Cleveland* v. *City of Cleveland*, 23 F.3d 1013, 1019–20 (6th Cir. 1994) (extension of consent decree "for a relatively short period of time, approximately two years" held "suitably tailored" to "lower than expected minority pass rates" on promotional exams). And T-Mobile, which has publicly touted its enhanced spectrum position and decreased costs resulting from the merger, can hardly say it will be prejudiced by the extension.

## <u>CONCLUSION</u>

For all the foregoing reasons, DISH respectfully requests that the Court modify Section IV.B.1 of the Final Judgment to require divestiture by June 30, 2024, which is within four years after the closing of the divestiture of the Prepaid Assets—rather than the current three-year timeline—or within five (5) business days of the approval by the FCC of the transfer of the 800 MHz Spectrum Licenses, whichever is later.

Date:  August 17, 2023

By: */s/ Adam S. Paris*
Adam S. Paris
Bradley P. Smith
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212) 558-1660
Facsimile:  (212) 291-9623
smithbr@sullcrom.com
parisa@sullcrom.com

*Attorneys for DISH Network Corporation*

## CERTIFICATE OF SERVICE

Pursuant to Local Civil Rule 5.4(d), I hereby certify that, on August 17, 2023, I caused the foregoing Motion for Relief from Judgment and Memorandum of Points and Authorities in Support to be electronically filed via the Court's CM/ECF system, which effected service of the document upon all counsel of record.

/s/ *Bradley P. Smith*
Bradley P. Smith