**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | Civil Action No. 1:19-cv-02232-TJK |
| *Plaintiffs*, | |
| v. | |
| DEUTSCHE TELEKOM AG, et al., | |
| *Defendants*. | |

**T-MOBILE'S AND DEUTSCHE TELEKOM'S OPPOSITION TO**
**DISH'S MOTION FOR RELIEF FROM JUDGMENT**

**TABLE OF CONTENTS**

<b>Page</b>

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

TIMELINE OF EVENTS .................................................................................................... 3

BACKGROUND ................................................................................................................ 5

    A.    The T-Mobile/Sprint merger brought enormous benefits to consumers ................. 5

    B.    The Final Judgment requires T-Mobile to proceed to auction if DISH does not acquire the 800 MHz spectrum licenses. .............................................................. 7

    C.    The License Purchase Agreement requires DISH to acquire the 800 MHz spectrum licenses within five business days of FCC approval. ............................. 9

LEGAL STANDARD .......................................................................................................... 10

ARGUMENT .................................................................................................................... 12

I.    DISH is a party to the Final Judgment and must satisfy the same modification standard as any other party. ......................................................................................................... 12

II.    Modification of the Final Judgment is not warranted. ..................................................... 13

    A.    DISH does not need "relief" from the Final Judgment. ....................................... 13

    B.    Rising interest rates are not unforeseeable and do not warrant modification of the Final Judgment. ...................................................................................................... 14

        1.    The Final Judgment bars DISH from pointing to "hardship or difficulty" as grounds to modify the Final Judgment. ................................................. 15

        2.    DISH's purported inability to obtain financing is a foreseeable business risk that was accounted for in the Final Judgment and addressed in the LPA. ....................................................................................................... 16

    C.    DISH's requested modification would harm the public interest and T-Mobile.... 20

        1.    DISH's requested modification is contrary to the public interest. ............. 20

        2.    DISH's requested modification is unfair and harmful to T-Mobile. ........ 23

    D.    The harms DISH says it will suffer absent a modification are unsupported and irrelevant. ........................................................................................................... 25

III.    DISH's proposed modification is not "suitably tailored to the changed circumstance.".. 27

CONCLUSION ................................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Everybody Counts, Inc. v. N. Ind. Reg'l Plan. Comm'n*,
  2010 WL 3656020 (N.D. Ind. Sept. 9, 2010) .......................................................19

*Grier v. Goetz*,
  402 F. Supp. 2d 876 (M.D. Tenn. 2005), *order clarified*, 421 F. Supp. 2d 1080 (M.D.
  Tenn. 2006) ........................................................................................................19

*Holland v. N.J. Dep't of Corr.*,
  246 F.3d 267 (3d Cir. 2001)................................................................................12

*Horne v. Flores*,
  557 U.S. 433 (2009)............................................................................................19

*In the Matter of Applications of T-Mobile Us, Inc., & Sprint Corp., for Consent to
  Transfer Control of Licenses & Authorizations, Applications of Am. H Block Wireless
  L.L.C., Dbsd Corp., Gamma Acquisition L.L.C., & Manifest Wireless L.L.C. for
  Extension of Time*,
  34 F.C.C. Rcd. 10578, 2019 WL 6210958 (2019).................................................3

*LaShawn A. ex rel. Moore v. Fenty*,
  701 F. Supp. 2d 84 (D.D.C. 2010), *aff'd sub nom. LaShawn A. ex rel. Moore v. Gray*,
  412 F. App'x 315 (D.C. Cir. 2011)......................................................................19

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020)..................................................................3

*New York v. Microsoft Corp.*,
  531 F. Supp. 2d 141 (D.D.C. 2008) .....................................................................12

*NLRB v. Harris Teeter Supermarkets*,
  215 F.3d 32 (D.C. Cir. 2000) ........................................................................ *passim*

*Pigford v. Veneman*,
  292 F.3d 918 (D.C. Cir. 2002) .............................................................................27

\*   *Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992)...............................................................................3, 11, 14

*Segar v. Mukasey*,
    508 F.3d 16 (D.C. Cir. 2007) ............................................................................15, 23

*United States v. Baroid Corp.*,
    130 F. Supp. 2d 101 (D.D.C. 2001) ...................................................... *passim*

\* *United States v. Caterpillar, Inc.*,
    227 F. Supp. 2d 73 (D.D.C. 2002) ........................................................ *passim*

\* *United States v. Signature Flight Support Corp.*,
    607 F. Supp. 2d 56 (D.D.C. 2009) ............................................................ 1, 16-17

\* *United States v. W. Elec. Co.*,
    46 F.3d 1198 (D.C. Cir. 1995) ...............................................................11, 27

**Other Authorities**

47 C.F.R. § 20.22 ......................................................................................................24

Federal Rule of Civil Procedure 60(b)(5) ...........................................................11, 19

Defendants T-Mobile US, Inc. ("T-Mobile") and Deutsche Telekom AG ("Deutsche Telekom") submit this Opposition to DISH Network Corporation's ("DISH's") Motion for Relief from Judgment, ECF No. 94 (the "Motion").

## PRELIMINARY STATEMENT

DISH's Motion boils down to this:  interest rates are about 5% higher now than they were three years ago, meaning that the cost of financing a $3.6 billion purchase would be about $180 million more per year than in 2020.  This higher interest, according to DISH, prevents it from "responsibly" financing the acquisition of the 800 MHz spectrum licenses at issue right now, but DISH speculates that the situation may get better in ten months.  As of December 31, 2022, DISH had $17.9 billion in stockholders' equity according to its most recent Form 10-K.  Bennett Decl., Ex. A at F-4 (DISH 2022 10-K).

Omitted from DISH's brief is any mention of the following language on page 2 of the Final Judgment (ECF No. 85):  "Defendants will not later raise any claim of hardship or difficulty as grounds for asking the Court to modify any of the provisions contained below."  DISH's Motion is predicated on exactly that:  "[T]he turmoil in global capital markets in the years following the entry of the Final Judgment has made DISH's compliance substantially more onerous than anticipated in early 2020."  Mot. at 3.  Citing identical language in an antitrust consent decree, Judge Roberts rejected a motion to modify a final judgment to extend a deadline by a year based on a 75% reduction in the value of an asset caused by the financial crisis in 2008.  *United States v. Signature Flight Support Corp.*, 607 F. Supp. 2d 56, 58-61 (D.D.C. 2009).

Also omitted from DISH's Motion is any mention of an important contractual provision between the parties that precludes DISH's argument.  In the parties' License Purchase Agreement ("LPA")—a separate but related agreement governing DISH's acquisition of the 800 MHZ spectrum licenses that was approved by the Department of Justice ("DOJ") and contemplated by

the Final Judgment—DISH agreed that its purchase of the 800 MHz spectrum licenses "is not in any way contingent upon or otherwise subject to Purchaser's consummation of any financing arrangements."  Bennett Decl., Ex. B § 5.6(b) (LPA).  The possibility that DISH might find it "more onerous than anticipated" to obtain financing was not only foreseen by the parties but specifically addressed and prohibited as a basis for not performing on their contract.

Also omitted from DISH's Motion are numerous public statements by the company's senior executives that while DISH may like to acquire the 800 MHz spectrum licenses, they are not essential to DISH's business.  For example, DISH consistently told investors that the 800 MHz spectrum might be a "nice to have," but is not a "must have."  Bennett Decl., Ex. C at 13 (DISH Q2 2022 Earnings Call); Bennett Decl., Ex. D at 8 (DISH Q4 2022 Earnings Call).  DISH also recently told shareholders that "we're asset rich. So, arguably, we have spent $34 billion for spectrum that has gone up in value.  We're building a world-class network.  There is not another network in the world that is as advanced as ours."  Bennett Decl., Ex. E at 16 (DISH Q1 2023 Earnings Call).

Contrary to the case law, DISH argues that as a divestiture buyer, it is entitled to special treatment under the law and is excused from the normal legal standard for obtaining a modification of the Final Judgment.  Mot. at 3, 19-20.  But DISH omits from its Motion any mention of *United States v. Baroid Corp.*, 130 F. Supp. 2d 101 (D.D.C. 2001), where Judge Lamberth applied the normal standard to a request by a divestiture buyer to be relieved of a consent decree obligation. The divestiture buyer there had not even been joined as a defendant in the proceeding and was supported by the United States in its motion, yet was still held to the same standard as the other consent decree defendants.  *See Baroid*, 130 F. Supp. 2d at 102 n.1; *United States v. Baroid Corp.*, 93-cv-02621 (D.D.C), ECF No. 72 ("JOINT MOTION by plaintiff USA, Non Party DIAMOND

PRODUCTS to modify final judgment"). DISH was joined as a Defendant here precisely so it could be held to the obligations in the Final Judgment to the same extent as the other Defendants.

Modifying a Final Judgment is an "extraordinary remedy," *NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 35 (D.C. Cir. 2000), that requires "a significant change in circumstances warrant[ing] revision of the decree," *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 366, 383 (1992). And even then, the proposed modification must be "suitably tailored to the changed circumstance." *Id.* DISH's Motion, not joined by the DOJ or any State plaintiff, fails to meet the *Rufo* standard and should be denied.

## TIMELINE OF EVENTS

A timeline of events may be of assistance to the Court:

- April 29, 2018: Sprint and T-Mobile executed their merger agreement.

- July 26, 2019: The DOJ filed its Complaint and Proposed Final Judgment, ECF Nos. 1, 2. By this time the LPA had already been negotiated by T-Mobile and DISH. Sharkey Decl. ¶ 13.

- October 16, 2019: The FCC consented to the merger, subject to certain commitments. *In the Matter of Applications of T-Mobile Us, Inc., & Sprint Corp., for Consent to Transfer Control of Licenses & Authorizations, Applications of Am. H Block Wireless L.L.C., Dbsd Corp., Gamma Acquisition L.L.C., & Manifest Wireless L.L.C. for Extension of Time*, 34 F.C.C. Rcd. 10578, 2019 WL 6210958 (2019).

- February 10, 2020: The United States District Court for the Southern District of New York denied certain States' challenge to the merger. *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020).

- April 1, 2020: This Court entered the Final Judgment, and the merger closed.

- July 1, 2020: T-Mobile completed divestiture of the Prepaid Assets, as defined in the Final Judgment, to DISH. *See* ECF No. 93 at 2.

- June 15, 2022: DISH announced that its 5G network was offering service to more than 20% of the United States population, thereby relieving DISH of any penalty under the Final Judgment for choosing not to acquire the 800 MHz spectrum licenses. Mot. at 7 (citing Final Judgment § IV.B.2).

- August 3, 2022:  DISH described the 800 MHz spectrum as a "nice to have," but not a "must have."  Bennett Decl., Ex. C at 13 (DISH Q2 2022 Earnings Call).

- January 11, 2023:  T-Mobile began outreach to DISH regarding preparing the joint FCC filings to assign the 800 MHz spectrum licenses to DISH.  Bennett Decl., Ex. Q (Jan. 11, 2023 N. Victory E-Mail to P. Michalopoulos).

- February 23, 2023:  DISH again described the 800 MHz spectrum as a "nice to have," but not a "must-have."  Bennett Decl., Ex. D at 8 (DISH Q4 2022 Earnings Call).

- March 6, 2023:  T-Mobile sent a draft of the Public Interest Statement for the FCC filings to DISH, but DISH did not provide substantive comments or engage in preparing the joint filings for the FCC.  Bennett Decl., Ex. F (Mar. 6, 2023 M. Scanlan E-Mail to J. Blum).

- March 13, 2023:  DISH asked the DOJ for a 60-day extension of the divestiture requirement under the Final Judgment (*i.e.*, from July 1, 2023 to August 30, 2023) and a corresponding 60-day extension under the LPA to file its FCC application (*i.e.*, from April 1, 2023 to June 1, 2023), noting T-Mobile's consent to both requests.  ECF No. 94-5.

- April 1, 2023:  DISH's original FCC application filing deadline under the LPA. Bennett Decl., Ex. B § 1 (LPA) (defining "Filing Deadline" and "Merger Closing Date").

- June 1, 2023:  DISH's extended FCC application filing deadline under the LPA, which DISH breached.  *See* ECF No. 94-7.

- June 1, 2023:  T-Mobile notified DISH that it was in breach of the LPA because it had not filed the required FCC applications and requested that DISH cure its breach within the 30 days afforded to it under the LPA.  ECF No. 94-7.

- June 14, 2023:  DISH announced that it satisfied its commitment to the FCC to provide 5G broadband service to more than 70% of the U.S. population.  *See* Mot. at 10; Bennett Decl., Ex. G (DISH Press Release, June 15, 2023); Final Judgment § VIII (obligating DISH to comply with network build-out commitments made to the FCC).

- June 30, 2023:  The DOJ extended T-Mobile's deadline to divest the 800 MHz spectrum licenses by 60 days until the later of August 30, 2023 or within five business days of FCC approval of transfer of the licenses.  Notice of 60-Day Extension, ECF No. 93.

- July 1, 2023:  Expiration of DISH's 30-day cure period under the LPA.  Bennett Decl., Ex. B § 7.1(a)(v) (LPA).

- July 1, 2023 or within five business days of FCC approval, whichever is later: T-Mobile's original deadline to divest the 800 MHz spectrum licenses to DISH. Final Judgment § IV.B.1.

- July 6, 2023: T-Mobile agreed not to terminate the LPA until August 11, 2023, *i.e.*, 14 days after receiving DOJ's position on termination of the LPA on July 28. Bennett Decl., Ex. H (July 6, 2023 J. Hughes E-mail to H. Johnson).

- July 28, 2023: After hearing from both DISH and T-Mobile and reviewing the matter for several weeks, the DOJ declined by letter dated July 28, 2023 to exercise any right it may have to withhold consent to T-Mobile's termination of the LPA. ECF No. 94-10.

- August 1, 2023: T-Mobile further agreed to provide DISH seven days' notice before terminating the LPA. Bennett Decl., Ex. I (Aug. 1, 2023 M. Nelson E-mail to J. Blum).

- August 10, 2023: T-Mobile terminated the LPA, effective August 17, 2023, but gave DISH a further opportunity to cure its continuing breach by jointly filing with T-Mobile the applications with the FCC. ECF No. 94-11.

- August 15, 2023: DISH responded for the first time to T-Mobile's March 6, 2023 draft of the Public Interest Statement for the FCC applications by providing edits. Bennett Decl., Ex. R (Aug. 15, 2023 J. Blum E-mail to N. Victory et al.).

- August 16, 2023: DISH and T-Mobile filed applications with the FCC requesting approval of the assignment of T-Mobile's 800 MHz spectrum to DISH. *See* ECF No. 94-12.

- August 17, 2023: DISH filed the instant Motion seeking a ten-month extension of its option to acquire the 800 MHz spectrum under the Final Judgment.

- August 19, 2023: T-Mobile notified DISH that it was again in material breach of the LPA for several reasons beyond those set forth in T-Mobile's June 1 letter. Bennett Decl., Ex. J (Aug. 19, 2023 Notice of Default).

## BACKGROUND

### A.    The T-Mobile/Sprint merger brought enormous benefits to consumers.

T-Mobile and Sprint announced their planned merger on April 29, 2018. Bennett Decl., Ex. K (Merger Announcement). The merger combined uniquely complementary portfolios of wireless spectrum, dramatically increasing capacity while reducing costs; allowed for a faster transition to 5G technology; and made the combined company more competitive against the

industry leaders, Verizon and AT&T.  The merger was transformative for the industry and for consumers, creating greater competition and enhanced benefits to consumers.  After exhaustive year-long investigations, the DOJ, several States, and the Federal Communications Commission ("FCC") agreed that the merger would improve the availability of 5G services to U.S. consumers and that the acquisition was in the public interest, provided T-Mobile would divest certain assets and meet other commitments.  *See, e.g.*, Memorandum Opinion, ECF No. 86 ("Mem. Op.") at 4; T-Mobile Letter Regarding Amicus Briefs, ECF No. 79 at 2.

Under the Final Judgment, T-Mobile divested Sprint's entire prepaid wireless business to DISH, along with other assets, and entered into a long-term agreement permitting DISH to use T-Mobile's wireless network at low cost while DISH built its own network.  *See* Final Judgment §§ IV.A, VI.  DISH suggests in its brief that it acquired the divestiture business essentially as a public service, *see* Mot. at 19-20, but DISH is a public company that must act in the interests of its shareholders.  Like most divestiture buyers, it obtained extremely favorable terms and was presented with a unique and exclusive business opportunity.  DISH bought this business because it deemed the opportunity to be profit-maximizing for its shareholders.  *See* Trial Tr. (C. Ergen) at 1564:10–19, *New York v. Deutsche Telekom AG*, No. 19-cv-5434-VM (Jan. 24, 2020 S.D.N.Y.), ECF No. 390 ("[W]e get the immediate advantage of T-Mobile scale, in terms of their network, and we get their network without having to spend any costs to build that network. . . .  And as we move customers -- as we add customers to that network and move customers to that network, they're materially less expensive than what we have to pay T-Mobile."); *id.* at 1565:9–19 ("Q. And do you believe that constructing the 5G network will be profitable to DISH and will be good for the shareholders of your company?  A. Yes, we do.  We think it's -- we wouldn't do it if we didn't think that was the case.").

In short, the merger has delivered on its promise of enhancing competition in the market and creating a best-in-class wireless network at compelling prices. For its part, DISH states it has met its network buildout and service obligations to date, including rolling out 5G service on its own network to at least 70% of the U.S. population over the past three years. *See* Mem. Op. at 4; Final Judgment §§ IV.B.2, VIII.A; Mot. at 7, 10.

**B.      The Final Judgment requires T-Mobile to proceed to auction if DISH does not acquire the 800 MHz spectrum licenses.**

The Court entered the Final Judgment on April 1, 2020. The Final Judgment requires T-Mobile to divest certain 800 MHz spectrum licenses within three years of divesting the Prepaid Assets or within five business days after the FCC approves the transfer of the 800 MHz licenses, whichever is later. Final Judgment § IV.B.1. DISH, the "Acquiring Defendant" in the Final Judgment, has what is in effect an option to purchase these licenses, but the Final Judgment does not require DISH to purchase them. The Final Judgment's intent was to make them available to DISH if it needed them to meet its network build-out requirements, and if not, to make sure they were made available to another buyer that could put them to use for consumers. *See* Competitive Impact Statement, ECF No. 20 ("Competitive Impact Statement") at 9.

Under Section IV.B.1 of the Final Judgment, DISH was required if it chose to buy the spectrum licenses to "make [a] timely application to the FCC for the transfer of the spectrum to comply with this Paragraph." "Timely application" is not defined but in context plainly means that DISH should have filed sufficiently before July 1, 2023 to obtain FCC approval by then. *See* Final Judgment § IV.B.1; Notice of 60-Day Extension, ECF No. 93 (explaining that T-Mobile divested the Prepaid Assets on July 1, 2020 and the third anniversary of the divestiture was thus July 1, 2023).

Instead, DISH requested a 60-day extension of the Final Judgment's deadlines and related deadlines in the LPA between DISH and T-Mobile.  *See* ECF No. 94-5.  On June 30, 2023, the DOJ granted DISH's request to extend T-Mobile's deadline to divest the 800 MHz licenses by 60 days, and implicitly DISH's obligation to make a timely application by 60 days, the maximum allowed under the Final Judgment.  *See* Notice of 60-Day Extension, ECF No. 93; Final Judgment § IV.B.1.  Pursuant to this extension, "the deadline for T-Mobile to comply with its obligation to divest the 800 MHz Spectrum Licenses is extended to August 30, 2023 or within five (5) business days of the approval by the FCC of the transfer of the 800 MHz Spectrum Licenses, whichever is later."  Notice of 60-Day Extension, ECF No. 93 at 2.

Although the Final Judgment was not intended to require DISH to purchase the 800 MHz spectrum licenses, it provided for a penalty if DISH failed to purchase the licenses while not meeting a 20% network build-out requirement.  *See* Final Judgment § IV.B.2; Competitive Impact Statement at 9 ("DISH may, at its option, elect not to acquire the spectrum if DISH can meet certain network buildout and service requirements without it.").  DISH says it is now relieved of this penalty because it met its build-out requirement.  *See* Mot. at 7.

If DISH declines to buy the 800 MHz spectrum licenses, the Final Judgment directs T-Mobile to auction the spectrum within six months, subject to a reserve price equal to DISH's agreed purchase price.  Final Judgment § IV.B.4; *see also* Competitive Impact Statement at 9 ("In such case [as DISH elects not to acquire the spectrum], T-Mobile will auction the 800 MHz spectrum licenses.").  The Final Judgment does not prohibit T-Mobile from proceeding to auction before DISH declines to buy the 800 MHz spectrum licenses.  As described further below, that restriction comes from the LPA.

The Final Judgment's requirements were extensively negotiated by the parties, with many trade-offs agreed to by each side.  T-Mobile agreed to various concessions, relying on the limitations and commitments from the Plaintiffs and DISH.  One key limitation was DISH's commitment that it "will not later raise any claim of hardship or difficulty as grounds for asking the Court to modify any of the provisions" of the Final Judgment.  Final Judgment at 2.

### C. The License Purchase Agreement requires DISH to acquire the 800 MHz spectrum licenses within five business days of FCC approval.

DISH and T-Mobile separately entered into the LPA regarding DISH's purchase of the 800 MHz spectrum.  The LPA was contemplated by the Final Judgment and was finalized, though not executed, before the Proposed Final Judgment was presented to the Court.  *See, e.g.*, Final Judgment § XVI.D; Sharkey Decl. ¶ 13.  The LPA provided that DISH would buy the 800 MHz spectrum from T-Mobile for approximately $3.6 billion.  *See* Bennett Decl., Ex. B § 2.1 (LPA).  In order to do so, DISH was required to file applications with the FCC by April 1, 2023 seeking transfer of the 800 MHz spectrum licenses, which would have permitted FCC approval by the July 1, 2023 divestiture deadline in the Final Judgment.  *See* Bennett Decl., Ex. B § 5.5(a) (LPA).  The LPA requires DISH to complete the purchase of T-Mobile's 800 MHz spectrum licenses within five business days of FCC approval.  *See* Bennett Decl., Ex. B § 2.3(a) (LPA).  At DISH's request, and with the DOJ's knowledge, T-Mobile agreed to extend DISH's deadline to file its FCC application to June 1, 2023.  ECF No. 94-5.  DISH breached this contractual obligation.

In the LPA, DISH represented that it would use "commercially reasonable efforts to ensure that the Financing is available" at closing (*i.e.*, within five days of FCC approval).  Bennett Decl., Ex. B § 5.6(a) (LPA).  DISH also agreed to keep T-Mobile "informed in reasonable detail of the status of its efforts to arrange any Financing," which it has not done.  Bennett Decl., Ex. B § 5.6(a) (LPA); Bennett Decl., Ex. J (Aug. 19, 2023 Notice of Default).  DISH further agreed that its

"obligation to consummate the transactions hereunder is not in any way contingent upon or otherwise subject to [DISH's] consummation of any financing arrangements." Bennett Decl., Ex. B § 5.6(b) (LPA).

Prior to termination and provided that DISH is not in breach of its contractual obligations, the LPA prohibits T-Mobile from soliciting other potential buyers to purchase the 800 MHz spectrum licenses. Bennett Decl., Ex. B § 5.4(c) (LPA). T-Mobile can terminate the LPA if, among other reasons, DISH materially breaches the LPA and fails to cure its breach within 30 days of receiving written notice of the breach. Bennett Decl., Ex. B § 7.1(a)(v) (LPA). If T-Mobile terminates the LPA due to DISH's material breach, DISH must pay T-Mobile a termination fee of $71,794,777, representing about 2% of the purchase price. Bennett Decl., Ex. B § 7.1(c) (LPA).

DISH values the option to purchase the 800 MHz spectrum under the LPA as an asset worth $1.7 billion in its public financial statements. Bennett Decl., Ex. L at 16 (DISH Q2 2023 Form 10-Q). This translates to an implied value of $5.3 billion for the 800 MHz spectrum licenses, which DISH could have purchased for approximately $3.6 billion if it had abided by the timeline in the LPA and the Final Judgment. Bennett Decl., Ex. E at 14 (DISH Q1 2023 Earnings Call) (acknowledging that DISH values underlying spectrum at least at about $5.3 billion); Bennett Decl., Ex. B § 2.1 (LPA) (setting a purchase price of $3,589,738,864).

## LEGAL STANDARD

Consent decrees memorialize carefully negotiated and bargained-for "commitments voluntarily made and solemnized by a court decree." *NLRB,* 215 F.3d at 35 (citing *Twelve John Does v. District of Columbia*, 861 F.2d 295, 298 (D.C. Cir. 1988)). Modification of a consent decree is therefore an "extraordinary remedy." *Id.* Modification requests are to be "approached with caution" and are properly granted only in narrow circumstances. *United States v. Caterpillar, Inc.*, 227 F. Supp. 2d 73, 80 (D.D.C. 2002).

10

The Supreme Court, and subsequent cases within this Circuit, have articulated a clear standard. "[A] party seeking modification of a consent decree [under Rule 60(b)(5)] bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383; *United States v. W. Elec. Co.*, 46 F.3d 1198, 1203 (D.C. Cir. 1995) (applying *Rufo* standard to antitrust consent decree); *Baroid*, 130 F. Supp. 2d at 104-05 (where one party objects to modification of a consent decree, the question is whether "a significant change in facts or law warrants revision of the decree and [whether] the proposed modification is suitably tailored to the changed circumstances"). In demonstrating a "a significant change in circumstances," the party seeking modification bears the burden of showing that: (1) "changed factual conditions make compliance with the decree substantially more onerous;" (2) the decree has become "unworkable because of unforeseen obstacles;" or (3) "enforcement would be detrimental to the public interest." *NLRB*, 215 F.3d at 35 (quoting *Rufo*, 502 U.S. at 384).

These routes to relief are narrow. "[A] party seeking a modification to an antitrust consent decree cannot rely on a change in circumstances that [was] anticipated, or should have been anticipated, at the time the consent decree was signed." *Baroid*, 130 F. Supp. 2d at 105. Such foreseeable circumstances include ordinary business risks that later materialize, "which are fairly to be regarded as part of the dickered terms." *Caterpillar*, 227 F. Supp. 2d at 89 (quoting *Baroid*, 130 F. Supp. 2d at 105). Basic principles of contract interpretation apply. *Baroid*, 130 F. Supp. 2d at 104 ("[T]he Supreme Court and this Circuit have recognized that, in interpreting a consent decree in the antitrust context, courts should generally adhere to contract-based rules of interpretation." (citing cases)).

"Self-imposed hurdles and hurdles inherent in a consent decree's entry do not count as 'obstacles.'" *NLRB*, 215 F.3d at 36. Rather, the kinds of unforeseen obstacles that might warrant modification are those "largely beyond the defendants' control and not contemplated by the court or parties" when entering the consent decree. *See id.* (quoting *Philadelphia Welfare Rts. Org. v. Shapp*, 602 F.2d 1114, 1121 (3d Cir. 1979)). To warrant modification, an obstacle must not only be unforeseen; it must make the consent decree "unworkable" as written. *See id.* at 36.

## ARGUMENT

I.  **DISH is a party to the Final Judgment and must satisfy the same modification standard as any other party.**

DISH's proposition that the legal standard should apply less rigorously to it than any other Defendant ignores directly contrary legal precedent. *See* Mot. at 3, 19 (citing *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141 (D.D.C. 2008) and *Holland v. N.J. Dep't of Corr.*, 246 F.3d 267 (3d Cir. 2001)). In *Baroid*, the Court applied the *Rufo* standard to a joint modification request from a divestiture defendant and the DOJ and denied that request. *Baroid*, 130 F. Supp. 2d at 104-05. DISH's reliance on *Microsoft* and *Holland* is misplaced. In *Microsoft*, the court merely questioned whether a plaintiff (*i.e.*, a government enforcer) may have a different standard, but noted that applying the *Rufo* standard to a government enforcer "may well be correct." *Microsoft*, 531 F. Supp. 2d at 169. It declined to resolve the issue. *Id*. In *Holland*, the Third Circuit applied a different standard to a plaintiff in an institutional reform case, but confirmed that "defendants" are subject to the *Rufo* standard. *Holland,* 246 F.3d at 284 n.16. DISH is plainly a Defendant to the Final Judgment, and *Rufo* applies. *See Baroid*, 130 F. Supp. 2d at 104-05.

DISH made a business decision to obtain assets of substantial value and has enjoyed highly favorable contract terms from T-Mobile at an attractive price. With that business opportunity came the obligations in the Final Judgment, and DISH was made a Defendant to the Final Judgment

precisely because those obligations needed to be enforceable. *See* Competitive Impact Statement at 14-15, ECF No. 20 ("The proposed Final Judgment also contains provisions designed to promote compliance and make the enforcement of the Final Judgment as effective as possible. . . .  DISH has agreed to be joined to this action for purposes of the divestiture. . . .  [T]he proposed Final Judgment imposes certain obligations on DISH to ensure that the divestitures take place expeditiously . . . .").  DISH was not merely a passive recipient of assets, but directly subject to several specific requirements regarding how it was to use those assets; thus, the intent for the Final Judgment to bind DISH is plain from the face of the Final Judgment.  *See* Final Judgment §§ IV.B.1, IV.F, VII, VIII, XV.C (imposing requirements on DISH, including requiring DISH to make a timely application to the FCC, offer postpaid service, and meet its FCC build-out commitments).

## II.     Modification of the Final Judgment is not warranted.

### A.     DISH does not need "relief" from the Final Judgment.

As an initial matter, DISH will be in compliance with the Final Judgment as entered regardless of whether it purchases the 800 MHz spectrum licenses.  That alone distinguishes this case from all of the cases cited in DISH's Motion in which a defendant seeks relief from a consent decree.  DISH therefore can make no showing that "changed factual conditions make *compliance* with the decree substantially more onerous" or that the decree has become "*unworkable* because of unforeseen obstacles." *See NLRB*, 215 F.3d at 35 (quoting *Rufo*, 502 U.S. at 384) (emphasis added).

What is at issue here is whether DISH will be given more time to exercise an option available to it under the Final Judgment.  The Final Judgment does not require DISH to buy the

800 MHz spectrum licenses.  Not acquiring the licenses, as DISH reports it cannot "responsibly" do, is consistent with DISH's obligations, and it needs no "relief" from the Final Judgment.

Moreover, DISH does not argue that it is unable to obtain financing altogether or even that it cannot obtain the spectrum without the extension.  *See* Mot. at 19.  It claims only that it cannot do so "responsibly."  DISH does not need a modification to comply with the Final Judgment: it simply wants to extend its three-year option under the Final Judgment so that T-Mobile has to bear the carrying costs over the next ten months instead of DISH.  *See* Mot. at 23.

In fact, the relief DISH asks for is not sufficient to give DISH the extra time it seeks to decide whether to acquire the 800 MHz spectrum licenses.  On August 16, 2023, DISH finally fulfilled its obligation to file the FCC applications with T-Mobile to transfer the spectrum licenses as required under the Final Judgment and the LPA.  If the FCC grants the applications, DISH will either complete the purchase within five business days as required by the LPA or it will not.  If it chooses not to complete the purchase, T-Mobile will be entitled to terminate the LPA and proceed to auction the spectrum licenses.  In addition, on August 19, 2023, T-Mobile notified DISH of several other material breaches, each of which would entitle T-Mobile to terminate the LPA unless DISH cures on or before September 18, 2023.  *See* Bennett Decl., Ex. J (Aug. 19, 2023 Notice of Default).  All of this is the case regardless of DISH's requested relief, which will have no effect on the LPA.  DISH has neither cited a case in which a court nullified private contract terms in the context of modifying a consent decree, nor asked the Court to do so here.

## B.    Rising interest rates are not unforeseeable and do not warrant modification of the Final Judgment.

Both the Final Judgment and the LPA expressly foresee and foreclose DISH's argument that rising interest rates warrant modification of the Final Judgment.  There has been no "significant change in circumstances warrant[ing] revision" of the Final Judgment since it was

entered in April 2020.  *See Rufo*, 502 U.S. at 383; *Baroid*, 130 F. Supp. 2d at 105 ("party seeking a modification to an antitrust consent decree cannot rely on a change in circumstances that [was] anticipated, or should have been anticipated, at the time the consent decree was signed").  Financial hardship—whether it comes in the form of macroeconomic changes, such as higher interest rates, less cash on hand, or an impaired asset—is not only a foreseeable business risk generally, but the Final Judgment excludes it as a basis for modification.  Contrary to DISH's repeated statements that it could not have anticipated a rise in interest rates, DISH specifically agreed in the LPA that its purchase obligation would not be contingent on its ability to obtain financing and informed investors of the impact rising interest rates could have on its financing abilities.  Those facts alone should end this inquiry.

> ### 1.    The Final Judgment bars DISH from pointing to "hardship or difficulty" as grounds to modify the Final Judgment.

The Final Judgment precludes DISH from "raising any claim of hardship or difficulty as grounds for asking the Court to modify any of the provisions contained below."  Final Judgment at 2.  This clause should be the beginning and the end of the Court's analysis and is fully dispositive of DISH's motion.  Consent decrees are court-approved contracts and "courts should generally adhere to contract-based rules of interpretation." *Baroid,* 130 F. Supp. 2d at 104; *Caterpillar*, 227 F. Supp. 2d at 79 ("Consent decrees are treated as contracts and interpreted under principles of contract law.").  Every provision in a contract should be given effect. *Segar v. Mukasey*, 508 F.3d 16, 22 (D.C. Cir. 2007) (directing district court to vacate its interim injunction and give effect to a footnote in the parties' consent decree because "it is a 'cardinal principle of contract construction that a document should be read to give effect to all its provisions and to render them consistent with each other'") (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) (cleaned up)).  This Court should not condone DISH's attempt to renege on its plain commitment.

Courts have rejected similar modification requests.  In *Signature Flight Support*, Judge Roberts properly rejected a defendant's attempt to modify a consent decree to excuse its divestiture obligation after it received unexpectedly low bids due to the unanticipated 2008 financial crisis. 607 F. Supp. 2d at 59-60.  The Court explained that "[t]he final judgment was negotiated in the midst of troubling economic news, and the parties specifically countenanced the possibility that [the defendant] would have difficulty selling the [divestiture assets]."  *Id.* at 59.  The Court emphasized that the final judgment "specifically state[d]" that the defendant would "later raise no claim of hardship or difficulty" as grounds for modification.  *Id.*

Similarly, in *Caterpillar*, Judge Kennedy rejected a defendant's proposed modification in part because "the parties included a provision in the decree establishing that neither technical nor financial difficulties would constitute a 'force majeure' excusing defendants from complying with the decree."  *See* 227 F. Supp. 2d at 83.  The Court reasoned that "[r]egardless of whether defendants are relying on the force majeure provision, . . . the provision clearly indicates that the parties contemplated cost increases."  *Id.*  "Where a consent final judgment contemplates the occurrence of the circumstances that form the basis of a party's motion to modify the final judgment, the parties contemplated the 'changed circumstances' and the final judgment should be enforced contrary to the movant's request."  *Signature*, 607 F. Supp. 2d at 59-60.

2.     **DISH's purported inability to obtain financing is a foreseeable business risk that was accounted for in the Final Judgment and addressed in the LPA.**

Even if the Final Judgment did not have the hardship clause, rising interest rates are precisely the sort of known and foreseeable business risk that are "fairly to be regarded as part of the dickered terms."  *See Baroid*, 130 F. Supp. at 105; *Caterpillar*, 227 F. Supp. 2d at 89.  Courts have repeatedly held that such foreseeable changes in economic circumstances do not warrant modification of a final judgment.  *See, e.g.*, *Baroid*, 130 F. Supp. 2d at 105 (denying motion to

16

modify brought jointly by divestiture buyer and DOJ to permit divestiture buyer to sell divested assets because "it was surely within the comprehension of [DOJ] to foresee the possibility that a company with very little market share would find it difficult to compete"); *Caterpillar*, 227 F. Supp. 2d at 89 (denying motion to extend defendant's time to comply with consent decree requirement on the basis of unexpected expense of compliance because defendant was "a sophisticated company with extensive regulatory experience" and "should have been aware" of the regulatory risks and compliance costs that materialized); *Signature*, 607 F. Supp. 2d at 59-60 (denying motion to modify to extend defendant's time to divest asset even though bids were 75% less than anticipated due to 2008 global financial crisis).

DISH presents no evidence warranting a deviation from this general rule. To transform this routine and widely known financial risk into a purportedly "unforeseen" event, DISH points to two serious events that have affected the U.S. market and deeply affected every U.S. business: COVID-19 and the Ukraine war. But DISH does not claim that these events themselves led to DISH's purported inability to "responsibly" finance the acquisition, as could be the case, for example, if a war had led to destruction of DISH's wireless network. Even assuming these events contributed to higher interest rates, higher interest rates, whatever their cause, have always been a known risk of financing. Moreover, COVID-19 was well underway at the time this Court entered the Final Judgment in April of 2020. If rising interest rates due to recent events warranted modifications of consent decrees, the floodgates would be open for any company affected by the events of the last three years to ask courts to rewrite binding consent decrees under the guise of unforeseen events. DISH cannot and does not make such a sweeping claim; it simply strings together a list of unwelcome world developments and attempts to tether them to its foreseeable failure to obtain timely financing.

In fact, DISH and T-Mobile predicted and planned for this possibility. DISH and T-Mobile acknowledged and negotiated this risk in the LPA and DISH has acknowledged this risk to investors.  Under the LPA, DISH's "obligation to consummate the transactions hereunder is not in any way contingent upon or otherwise subject to [DISH's] consummation of any financing arrangements."  Bennett Decl., Ex. B § 5.6 (LPA).  And DISH itself has repeatedly identified the possibility of interest rate changes in its securities disclosures.  In February 2020, for example, DISH stated the following in its Form 10-K:  "We may need additional capital, which may not be available on acceptable terms or at all, to continue investing in our business and to finance acquisitions and other strategic transactions. . . .  Adverse changes in the credit markets, including rising interest rates, could increase our borrowing costs and/or make it more difficult for us to obtain financing for our operations or refinance existing indebtedness."  Bennett Decl., Ex. M at 70 (DISH 2019 10-K).  DISH's claim now that its "commitment to purchase the spectrum from T-Mobile to remedy antitrust issues arising out of the merger with Sprint was predicated upon the parties' reasonable expectation that DISH would be able to finance the transaction responsibly under market conditions anticipated at the time," Mot. at 21, is simply not true.

Despite substantial case law to the contrary, DISH's promise in the LPA, and DISH's statements to investors, DISH argues that "[c]hanges in the financial environment that make compliance substantially more onerous are sufficient to warrant modification."  *See* Mot. at 17 (citing cases).  But DISH's cited cases fall far short of supporting its claim.

First, all of these cases involved defendants providing public services seeking modification of institutional reform consent decrees designed to cure illegal federal and state institutional practices, such as state healthcare programs and compliance with the Americans with Disabilities Act.  Those defendants are not analogous to DISH, a private party seeking relief from an antitrust

consent decree.  *See Horne v. Flores*, 557 U.S. 433, 450 (2009) ("Because of [the particular] features of institutional reform litigation [including federalism concerns and the long duration of consent decrees], federal courts must take a 'flexible approach' to Rule 60(b)(5) motions brought in this context[.]").

Second, only one of DISH's cited cases, *Grier v. Goetz*, granted a contested modification on financial hardship grounds, and it did so in circumstances substantially more extreme than those present here and apparently absent a hardship clause in the applicable consent decree.  *See Grier v. Goetz*, 402 F. Supp. 2d 876, 893 (M.D. Tenn. 2005), *order clarified*, 421 F. Supp. 2d 1080 (M.D. Tenn. 2006) (permitting state healthcare program's requested modification after discovering unprecedented $650 million budgetary shortfall when "public interest in long-term reform to systematic problems in TennCare also supports modification").

DISH's other cited cases are equally unhelpful to it:  *LaShawn* only acknowledged that while financial constraints facing the District of Columbia's child welfare system were a "legitimate concern," they did not "warrant modification."  *LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 102 (D.D.C. 2010), *aff'd sub nom. LaShawn A. ex rel. Moore v. Gray*, 412 F. App'x 315 (D.C. Cir. 2011).   And *Everybody Counts* granted the parties' joint request for modification of a consent decree addressing the quality and availability of transit services for persons with disabilities on the basis that the parties agreed they did not foresee the changed circumstances.  *Everybody Counts, Inc. v. N. Ind. Reg'l Plan. Comm'n*, 2010 WL 3656020, at *3 (N.D. Ind. Sept. 9, 2010).   There is no such agreement here, and, in any event, in this Circuit, a different standard applies when all parties agree to modify a consent decree.  *Baroid*, 130 F. Supp. 2d at 103 ("In the antitrust field, two standards govern the modification of a consent decree.  If all

parties to the agreement consent to the modification, a court need only review the modification to ensure that it is in the 'public interest.'" (citing *W. Elec. Co.*, 900 F.2d 283)).

Finally, all three of these cases involved defendants seeking relief from compliance that had become onerous, not defendants like DISH seeking more time to take advantage of an optional benefit in a consent decree. *See supra* at II.A.

The public interest and integrity of the consent decree process is at stake here: if readily foreseeable and planned for business risks were enough to warrant modification of a consent decree, the finality of settlements would be undermined. The benefit that a party obtains by settling is certainty of the outcome over the uncertainty of winner-take-all litigation. But parties would be discouraged from entering into consent decrees that subject them to uncertain obligations that may later morph to suit the prevailing interests of their counterparties. In the Final Judgment, the parties agreed and this Court ordered that T-Mobile would maintain the 800 MHz spectrum licenses for three years—not for as long as it takes DISH to decide interest rates are "reasonable," Mot. at 18— then proceed to auction or be relieved of the divestiture obligation entirely. DISH points to no unforeseen changes in circumstances that would justify the "extraordinary remedy" of modifying this Court's Final Judgment. *See NLRB*, 215 F.3d at 35.

### C. DISH's requested modification would harm the public interest and T-Mobile.

DISH remarkably and incorrectly conflates the public interest with DISH's own business interests, wholly ignoring that the public interest, consumers, and T-Mobile would be harmed if DISH's request is granted. *See* Mot. at 3, 18-20.

### 1. DISH's requested modification is contrary to the public interest.

As an initial matter, the DOJ and this Court have already determined that the Final Judgment is in the public interest as written. *See* Mot. and Mem. of the United States In Support of Entry of Final Judgment, ECF No. 44 at 5 ("As explained in the CIS and the Response to

Comments, entry of the proposed Final Judgment is in the public interest."); Mem. Op. at 16 ("For all these reasons, the Court holds that entering the proposed Final Judgment is in the public interest."). That is, the DOJ and the Court concluded that the three-year period was sufficient time for DISH to acquire the spectrum, if it needed it. The Final Judgment likewise contains timing provisions designed to ensure timely use of the spectrum for consumers. For instance, the Final Judgment permits a single 60-day extension to the 800 MHz divestiture period. And T-Mobile cannot sit on the spectrum following DISH's decision not to acquire it; the auction must take place within six months. Final Judgment § IV.B.4.

Contrary to the public interest goal of timely using valuable spectrum to serve consumers, today consumers are receiving little benefit from T-Mobile's 800 MHz spectrum. T-Mobile has already decommissioned the vast majority of its 800 MHz radios in anticipation of the sale of its 800 MHz spectrum licenses under this Court's Final Judgment. As a result, while T-Mobile is utilizing the spectrum sufficiently to meet the minimum standards for maintaining the licenses, the 800 MHz licenses are underutilized with investments and/or improvements deferred pending resolution of the spectrum's ultimate ownership. *See* Sharkey Decl. ¶¶ 6-7, 11. If the licenses were sold to another buyer, they could be put to better use either in the field of cell phone communications or perhaps in another field like wireless broadband networks. In fact, several potential auction participants have already expressed interest in purchasing the 800 MHz spectrum licenses from T-Mobile. Sharkey Decl. ¶ 12. One potential auction buyer, amicus curiae Burns & McDonnell Engineering Company, Inc. ("Burns & McDonnell"), states that it has been "planning for years" to purchase the spectrum if DISH does not buy it. Mot. for Leave to Participate in Briefing as Amicus Curiae, ECF No. 99 at 2. Burns & McDonnell reports that it would "leverage the nationwide spectrum for targeted community benefit enabling critical

infrastructure operators like electric utilities to deploy wireless broadband networks." *Id.* at 2-3. The sooner the licenses are sold, the better.

DISH portrays itself as a benevolent actor in carrying out the Final Judgment's purpose—indeed, the only actor who can play this role—arguing that without an extension, "its ability to utilize this element of the Division's remedy to provide the facilities-based competition envisioned by the Final Judgment will be harmed." Mot. at 3. But DISH does not even commit to purchasing the spectrum licenses. DISH only refers to losing the "opportunity" to purchase the spectrum. Mot. at 3. Despite DISH's self-serving characterization, the purpose of the Final Judgment was never to "require[] T-Mobile to divest . . . the 800 MHz Spectrum Licenses . . . to DISH." Mot. at 1. And it certainly was not to ensure the transfer of the 800 MHz spectrum licenses to DISH regardless of how long it might take for DISH to be in a position to "responsibly" finance the acquisition. To the contrary, the Final Judgment effectively gave DISH a three-year option to purchase T-Mobile's 800 MHz spectrum licenses should DISH need the spectrum to meet its three-year network build-out commitments. *See* Final Judgment § IV.B.2; Competitive Impact Statement at 9 ("DISH may, at its option, elect not to acquire the spectrum if DISH can meet certain network buildout and service requirements without it.").

Finally, DISH argues that an auction or retention of the spectrum by T-Mobile would be unlikely to serve the public interest, but DISH's statement is nothing more than speculation. *See* Mot. at 20. DISH has no knowledge of what would happen in an auction and a potential buyer has already come forward to oppose DISH's Motion. The Final Judgment already represents the DOJ's and this Court's assessment that, if DISH did not purchase the 800 MHz spectrum licenses within three years, the public interest would be best served by T-Mobile either conducting an auction or being relieved of the obligation to do so by the DOJ. Final Judgment § IV.B.4.

If DISH were correct that it is the only buyer that can serve the public interest, the Final Judgment would have mandated that purchase, and the auction provision in the Final Judgment would be superfluous.  Instead, the Final Judgment reflects the public interest value of a timely auction to ensure the spectrum is put to good use.  And the reserve price on the auction reflects the valuable property interest T-Mobile has in the asset by not requiring T-Mobile to divest it at auction for less than DISH has agreed to pay.  The Court should not interpret the intent of the Final Judgment in a way that disregards some of its terms.  *See Segar*, 508 F.3d at 22.  Moreover, DISH itself can participate in the auction and take another run at it then, without holding up the entire process in the meantime.

### 2.     DISH's requested modification is unfair and harmful to T-Mobile.

DISH's requested extension would also impose significant and unfair burdens on T-Mobile. T-Mobile's financial cost to keep and maintain the 800 MHz spectrum licenses for an additional ten months would be at least $215.7 million, including about $6.3 million of direct expenses for network and equipment and about $209.4 million for T-Mobile's cost of capital.  *See* Sharkey Decl. ¶ 20.  This exceeds the approximately $180 million in increased annual financing cost that DISH seeks to reduce somewhat by waiting to see if interest rates go down to the level they were at in 2020 in the next ten months.  And if DISH were to decide not to purchase the licenses after obtaining an extension, and it may very well decide not to, the value of the licenses at auction may be reduced because the licenses begin expiring in March 2028, with the vast majority expiring in June 2028, unless the holder of the licenses satisfies the FCC's renewal requirements.  *See* Sharkey Decl. ¶ 14.  Any buyer needs sufficient time to fulfill these requirements.  Having less time available could make it more expensive to do so and less attractive to potential buyers.  Delay would therefore also likely narrow the field of potential bidders for the spectrum, as fewer potential bidders would be able to meet the build-out deadline as the time to do so decreases.

Forcing T-Mobile to continue holding the 800 MHz spectrum licenses also imposes regulatory burdens that unfairly harm T-Mobile's ability to acquire other spectrum that it could use to improve its network quality and benefit consumers.  Under FCC rules, the 800 MHz spectrum licenses T-Mobile is holding in anticipation of divestiture are counted as part of T-Mobile's "attributable" spectrum holdings.  This causes T-Mobile to exceed, or exacerbates overage of, the FCC's "spectrum screen" in some geographic areas and subjects T-Mobile's proposed spectrum acquisitions to heightened "enhanced factor" review, delaying and potentially preventing T-Mobile from deploying spectrum for the benefit of consumers.  *See* Sharkey Decl. ¶ 15.[1]  The 800 MHz spectrum also pushes T-Mobile's spectrum portfolio over a regulatory threshold that may prevent T-Mobile from acquiring "low-band" 600 MHz spectrum in many markets on technical grounds, even though T-Mobile's acquisition of such spectrum would benefit consumers.  *See* Sharkey Decl. ¶ 16; 47 C.F.R. § 20.22(c).

Incredibly, while simultaneously asking this Court to require T-Mobile to hold on to the 800 MHz licenses for DISH's benefit, DISH is advocating to the FCC that T-Mobile should not be permitted to acquire certain other spectrum because of its low-band holdings—citing, among other things, T-Mobile's 800 MHz spectrum.  Specifically, T-Mobile reached an agreement to acquire certain 600 MHz spectrum held by Columbia Capital, but is currently undergoing an extended approval process and has already been required to restructure its acquisition due to the regulatory threshold under 47 C.F.R. § 20.22.  Sharkey Decl. ¶ 17.  With remarkable temerity, DISH has opposed T-Mobile's acquisition in part on the basis of T-Mobile's 800 MHz holdings,

---

[1] *See* FCC, *Fact Sheet: FCC Mobile Spectrum Holding Rules* (May 15, 2014), available at: https:// docs.fcc.gov/public/attachments/DOC-327110A1.pdf ("The current spectrum screen considers the total amount of spectrum suitable and available for mobile broadband held in a market by a wireless provider.  The screen can trigger a more detailed competitive analysis by the FCC.").

even citing its own desire for an extension here as a "dispute" regarding the Final Judgment that should cause the FCC not to act on T-Mobile's acquisition from Columbia Capital.  Sharkey Decl. ¶ 18.[2]  This regulatory and legal gaming should not be countenanced; it is unfair to consumers and unfair to T-Mobile, which simply wants to comply with the terms of the Final Judgment it agreed to and proceed to an auction.

**D.     The harms DISH says it will suffer absent a modification are unsupported and irrelevant.**

For all of the above reasons, the Court should deny DISH's Motion, and the Court need not even reach DISH's proffered "harms" that it will purportedly suffer absent an extension.  But in any event, none of these supposed harms withstand scrutiny.

First, DISH says it has less low-band spectrum than the three nationwide incumbent carriers and acquisition of the spectrum licenses would enhance its uplink capacity.  Mot. at 4, 11. DISH provides no real factual support for the extent of or the impact of its purportedly "constrained" uplink capacity or the actual consumer benefit that would result from DISH "doubling" its uplink capacity.  *See* ECF 94-2 ¶ 5 (declarant stating only that uplink capacity is constrained and acquisition of the spectrum licenses would "double" it).  And this is contrary to the statements DISH has made to investors, that it does not need the spectrum and has met its FCC network build-out commitments without it.  Bennett Decl., Ex. O at 13 (DISH Q1 2021 Earnings Call) ("We have enough spectrum to . . . grow."); Bennett Decl., Ex. C at 13 (DISH Q2 2022 Earnings Call)

---

[2] *See* Bennett Decl., Ex. N at 2 (June 26, 2023 Ex Parte FCC Filing by DISH) ("DISH also asked the Commission to consider other developments relevant to low-band spectrum that could impact the public interest analysis of the Columbia Capital transaction.  DISH and T-Mobile are currently in a dispute regarding the Department of Justice-administered merger remedy under which DISH has an option to purchase certain 800 MHz spectrum from T-Mobile. Given that that dispute implicates substantial low-band spectrum, the Commission should refrain from deciding on the Applications until the 800 MHz issues are resolved.").

(describing 800 MHz spectrum as "nice to have," not "must have"); Bennett Decl., Ex. D at 8 (DISH Q4 2022 Earnings Call) (same); Bennett Decl., Ex. P at 9 (DISH Q3 2022 Earnings Call) ("And so we're obviously in a very good position with the spectrum portfolio we have today."); Bennett Decl., Ex. S at 10 (DISH Q2 2021 Earnings Call) ("I think we're less than 2 years away from . . . critical mass.  We're going to cover 70% of the country[.]");  Mot. at 10 ("[A]s of June 14, 2023, DISH's network is offering 5G broadband service to more than 73 percent of the United States population[.]").

Second, DISH says it will have to pay a financial penalty to T-Mobile if it does not purchase the spectrum licenses.  Mot. at 4, 19-20.  This is true regardless of DISH's modification request.  DISH has filed the requisite FCC application to acquire the licenses, and if it does not close within five business days of approval of that application, it will breach the LPA and owe T-Mobile the termination fee anyway.  Bennett Decl., Ex. B § 7.1(c) (LPA).  DISH's requested modification of the Final Judgment will not alter that.

Third, DISH says it will "lose the more than $1 billion that it has already invested in deploying radios compatible with this 800 MHz spectrum on its towers."  Mot. at 4.  But DISH does nothing to explain the $1 billion figure it puts forth.  *See* ECF No. 94-2 ¶ 6.  It does not say that the $1 billion was spent exclusively to make the towers compatible with 800 MHz spectrum, as opposed to compatible with a wide range of other spectrum, too.  And even if some of the expense was incremental to make the towers compatible with 800 MHz spectrum, DISH does not say what that amount was or why it incurred that expense without taking adequate steps to ensure that it would be able to acquire the spectrum licenses to go along with it.  It is not meaningfully more expensive to deploy radios that can transmit on multiple low-band spectrums than it is to deploy radios that can transmit on one low-band spectrum.  *See* Sharkey Decl. ¶ 9.

Even if DISH were to suffer "harm" by enforcement of the Final Judgment as originally entered, that is the deal DISH struck.  And it was part of a deal that was very favorable to DISH and very costly to T-Mobile.  DISH's suggestion that it is a mere "third party" being harmed by the Final Judgment is absurd. Mot. at 20.  It actively negotiated the Final Judgment and presented it for entry by the Court.  That it wishes it tried to bargain for a different deal three years after the fact is beside the point.  *See Caterpillar*, 227 F. Supp. 2d at 86 (acknowledging all parties to a consent decree are entitled to—or required to—live with the "benefit of [the] bargain" reflected in the consent decree).

## III.    DISH's proposed modification is not "suitably tailored to the changed circumstance."

DISH's motion should also be denied because its requested relief is not and never can be "suitably tailored to the changed circumstance."  *See Caterpillar*, 227 F. Supp. 2d at 80 (quoting *Rufo*, 502 U.S. at 380-81, 393); *W. Elec. Co.*, 46 F.3d at 1207.  The Court cannot fashion relief that will provide DISH lower interest rates.  The proposed ten-month extension is not suitably tailored to the changed circumstances of increased financing costs, because DISH provides only unsubstantiated speculation and no real assurances that financing will be available to it ten months from now or any time soon.  DISH likewise offers no commitment to actually acquire the spectrum: it simply asks the Court to kick the can down the road while it crystal-ball gazes about what the future might look like in June of 2024 when it may or may not purchase the spectrum.

All the while, T-Mobile must incur substantial costs and burden it never agreed to incur, and the public is harmed as valuable spectrum lies fallow and potential purchasers in the intended spectrum auction are sidelined.  But to be suitably tailored to changed circumstances, a requested modification must protect all parties' interests and "preserve the essence of the parties' bargain." *Pigford v. Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002).  There is no way to "suitably tailor"

DISH's requested modification to address all of these issues, and the Final Judgment should operate as intended with T-Mobile proceeding to auction.

## CONCLUSION

For the foregoing reasons, the Court should deny DISH's Motion.

Dated: August 25, 2023

Respectfully submitted,

*/s/ David I. Gelfand*
David I. Gelfand (D.C. Bar No. 416596)
Daniel P. Culley (D.C. Bar No. 988557)
Elsbeth Bennett (D.C. Bar No. 1021393)
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1500
Email:     dgelfand@cgsh.com
           dculley@cgsh.com
           ebennett@cgsh.com

*Counsel for T-Mobile US, Inc. and
Deutsche Telekom AG*