# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEUTSCHE TELEKOM AG, et al.,<br><br>*Defendants*. | Civil Action No. 1:19-cv-02232-TJK |

## DECLARATION OF STEVE SHARKEY IN SUPPORT OF T-MOBILE'S AND DEUTSCHE TELEKOM'S OPPOSITION TO DISH'S MOTION FOR RELIEF FROM JUDGMENT

I, Steve Sharkey, declare as follows:

1. I am Vice President of Government Affairs, Engineering and Technology Policy at T-Mobile US, Inc. ("T-Mobile"). The following is based on my personal knowledge and information obtained from business records.

2. I submit this declaration in support of T-Mobile's and Deutsche Telekom's Opposition to DISH's Motion for Relief from Judgment.

3. Available information shows that T-Mobile's acquisition of Sprint Corporation ("Sprint") has enhanced competition in various respects and created a best-in-class wireless network at compelling prices. For example, as T-Mobile stated to the Federal Communications Commission ("FCC") in its Second Annual Progress Report on T-Mobile's 5G Network, Rural 5G Coverage and In-Home Broadband Commitments, dated May 31, 2022:

> T-Mobile already has deployed 5G service to more areas of the country than a standalone T-Mobile or a standalone Sprint was projected to do by 2024.
> . . .
> T-Mobile has 30% more nationwide 5G coverage than AT&T and four times the 5G coverage of Verizon; these advances support T-Mobile's efforts to bring the benefits of 5G and greater competition to consumers in small towns and underserved rural communities across the country.
> . . .
> Legacy T-Mobile and legacy Sprint customers have continued to have access to the same or better rate plans as prior to the merger. The price per GB for T-Mobile's lowest priced plans has decreased from $15 per GB pre-merger to $3-4 per GB for comparatively priced plans post-merger.
> . . .
> T-Mobile's low prices and innovative offerings have forced a competitive response from other wireless providers and benefited consumers in the form of more choice, lower prices, better service, better coverage and more data. Over the past two years, T-Mobile has played a major role in helping to stimulate this increased competition to the benefit of consumers. For example: [1] At least one competitor initially imposed a $10 surcharge for its 5G service, but later eliminated that fee to follow T-Mobile's lead in not charging extra for 5G. [2] After T-Mobile's launch of Magenta MAX, competitors rolled out similar plans in response. [3] T-Mobile's unprecedented 5G deployment has forced competitors to expand and

enhance their own 5G deployments to keep pace, as evidenced by the enormous success of the Commission's recent spectrum auctions.

4. At the time of the T-Mobile/Sprint merger, the Sprint network had approximately 45,000 radios capable of using 800 MHz spectrum, and T-Mobile's network did not have any radios capable of using 800 MHz spectrum.

5. As part of the integration of the T-Mobile and Sprint networks, beginning on April 2, 2020, T-Mobile began converting Sprint towers to the T-Mobile network or decommissioning those towers and offering them to DISH in accordance with the Final Judgment.

6. In anticipation of the sale of its 800 MHz spectrum licenses, T-Mobile decommissioned the vast majority of the 800 MHz radios on the towers it acquired from Sprint. The only Sprint towers from which T-Mobile did not remove 800 MHz radios were those necessary to fulfill the FCC T-Mobile minimum use license requirements.

7. T-Mobile is not fully using the 800 MHz spectrum to offer mobile wireless services. T-Mobile would not be able to fully use the spectrum to offer mobile wireless services without widespread deployment of 800 MHz radios.

8. 800 MHz frequency is considered low-band spectrum.

9. The cost is not meaningfully different to deploy radios that can transmit on multiple low-bands.

10. Other operators besides AT&T or Verizon could readily obtain radios and antennas to deploy the 800 MHz spectrum.

11. The currently underutilized 800 MHz frequency band is immediately adjacent to other spectrum used to provide mobile broadband services and could be used to provide a variety of services. These services include mobile wireless service, service to utilities and other critical

infrastructure businesses, private network operations, and service for business applications such as asset tracking in supply chain management or drones.

12. Several potential auction participants have expressed interest in purchasing the 800 MHz spectrum licenses from T-Mobile. To date, T-Mobile has not engaged in discussions with these potential purchasers due to a non-solicitation clause in the July 1, 2020 License Purchase Agreement between DISH and T-Mobile.

13. By the time the DOJ filed its complaint and Proposed Final Judgment in the above-captioned matter, DISH and T-Mobile had already negotiated the License Purchase Agreement, which was reviewed and approved by the DOJ.

14. T-Mobile's area-wide 800 MHz spectrum licenses will begin expiring in March 2028 with the vast majority expiring in June 2028 unless the license holder builds a radio network in each licensed area covering at least 50 percent of the population and capable of providing service. It is likely that any purchaser of the spectrum licenses would require some time to meet these renewal requirements, and the longer it takes T-Mobile to sell these licenses, the more difficult it may be for a buyer to meet those requirements. That could affect the purchase price for the licenses.

15. Under FCC rules, the 800 MHz spectrum licenses are treated by the FCC as counting as part of T-Mobile's spectrum holdings. Because of the FCC's spectrum screen process, this subjects certain of T-Mobile's spectrum acquisitions to a more detailed "enhanced factor" review than if the 800 MHz spectrum licenses were not counted as part of T-Mobile's holdings. "Enhanced factor" review means the FCC will more heavily scrutinize the proposed acquisition.

16. In some geographic areas, the inclusion of the 800 MHz spectrum licenses in T-Mobile's spectrum holdings causes T-Mobile to exceed a regulatory threshold set by 47 C.F.R. § 20.22, which means that T-Mobile may be prevented from acquiring more low-band spectrum

in those areas for technical reasons, even if acquisition of such spectrum would benefit consumers. And even where T-Mobile is not prevented from acquiring additional low band spectrum by the regulatory threshold, it will be subject to the more detailed "enhanced factor" review described in the previous paragraph.

17.   These FCC limitations are affecting T-Mobile's ability to acquire spectrum that it would use to the benefit of consumers.  For example, T-Mobile reached an agreement to acquire certain 600 MHz spectrum held by Columbia Capital, but the acquisition is currently undergoing an extended approval process, and T-Mobile has been required to restructure the transaction due to the threshold set by 47 C.F.R. § 20.22.  T-Mobile intends to use the spectrum to offer mobile wireless services, including increasing 5G performance in areas preferentially covered by low-band spectrum, including in buildings and rural areas.

18.   DISH has opposed T-Mobile's acquisition of the Columbia Capital spectrum on the grounds, among others, that T-Mobile already has substantial spectrum holdings, which under FCC rules includes the 800 MHz spectrum.  The grounds on which DISH is opposing this acquisition would apply to any acquisition of low-band spectrum by T-Mobile.  DISH has also asked the FCC to delay approving the Columbia Capital transaction until this dispute over the 800 MHz spectrum licenses is resolved.

19.   Inclusion of the 800 MHz spectrum licenses in T-Mobile's spectrum holdings has resulted in a delay of the Columbia 600 MHz spectrum purchase approval.

20.   T-Mobile estimates its financial cost to keep and maintain the 800 MHz spectrum licenses for an additional ten months to be at least $215.7 million, including about $6.3 million of direct expenses for network and equipment and about $209.4 million for T-Mobile's cost of capital.

21. DISH did not make an application to the FCC to acquire the 800 MHz spectrum licenses by the April 1, 2023 deadline in the License Purchase Agreement, nor by the June 1, 2023 deadline as extended by agreement with T-Mobile and the consent of the DOJ.

22. As of August 24, 2023, DISH has refused to provide T-Mobile with any assurances that DISH would ultimately be able to perform under the License Purchase Agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 25, 2023.

_____
Steve Sharkey