**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Case No. 1:19-cv-02232 (TJK) |
| | ) | |
| DEUTSCHE TELEKOM AG, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

**BRIEF OF BURNS & MCDONNELL ENGINEERING COMPANY, INC. AS AMICUS
CURIAE IN OPPOSITION TO DEFENDANT DISH NETWORK CORPORATION'S
MOTION FOR RELIEF FROM JUDGMENT**

James E. Tysse
D.C. Bar No. 978722
AKIN GUMP STRAUSS HAUER
  & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 887-4571
Fax: (202) 887-4288
Email: jtysse@akingump.com

Michael Weisbuch (*admission pending*)
D.C. Bar No. 1743257
AKIN GUMP STRAUSS HAUER
  & FELD LLP
100 Pine Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 765-9526
Fax: (415) 765-9502
Email: mweisbuch@akingump.com

*Counsel for Burns & McDonnell
Engineering Company, Inc.*

August 25, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5), Rule 29(a)(4) of the Federal Rules of Appellate Procedure, and Rule 26.1(a) of the Federal Rules of Appellate Procedure, I, the undersigned, counsel of record for Burns & McDonnell Engineering Company, Inc., certify that to the best of my knowledge and belief, Burns & McDonnell Engineering Company, Inc. is a wholly owned subsidiary of Burns & McDonnell, Inc.

*/s/ James E. Tysse*
James E. Tysse
AKIN GUMP STRAUSS HAUER
   & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 887-4571
Fax: (202) 887-4288
Email: jtysse@akingump.com

*Counsel for Burns & McDonnell*
*Engineering Company, Inc.*

**TABLE OF CONTENTS**

IDENTITY AND INTEREST OF AMICUS CURIAE .................................................................. iv

INTRODUCTION ...............................................................................................................1

ARGUMENT ....................................................................................................................2

    I.    THE BMCD GROUP STANDS READY TO PARTICIPATE IN A SPECTRUM AUCTION—AND MAXIMIZE THE SPECTRUM'S DIVERSE BENEFITS. ........................................................................... 2

    II.    THERE IS NO REASON TO THINK THAT DISH WILL BE ABLE TO PURCHASE THE SPECTRUM WITHIN TEN MONTHS.................................. 5

    III.    GRANTING DISH'S MOTION WOULD NOT SERVE THE REMEDIAL PURPOSES OF THE FINAL JUDGMENT OR THE PUBLIC INTEREST. ............................................................................................. 7

CONCLUSION...................................................................................................................9

# TABLE OF AUTHORITIES

Comments of Utilities Telecom Council, *In re Implementing the National Broadband Plan by Studying the Communications Requirements of Electric Utilities to Inform Federal Smart Grid Policy*, Dep't of Energy (July 12, 2010) ................................................................................................................2

DISH Network Corporation Q2 2022 Earnings Call Transcript (Aug. 3, 2022) ...........................8

DISH Network Corporation Q4 2022 Earnings Call Transcript (Feb. 23, 2023) ......................7, 8

EchoStar Corporation Q2 2023 Earnings Call Transcript (Aug. 8, 2023)....................................7

Lahart, Justin, *Time to Get Used to Higher Rates*, THE WALL STREET JOURNAL (Mar. 7, 2023) ...................................................................................................6

Meyer, Dan, *Dish Network's private 5G plans underscore its fiscal future*, SDXCENTRAL (May 9, 2023)..........................................................................................8

The Editorial Board, *The Return of High Interest Rates*, THE WALL STREET JOURNAL (Aug. 22, 2023) ...............................................................................6

Timiraos, Nick, *Why the Era of Historically Low Interest Rates Could Be Over*, THE WALL STREET JOURNAL (Aug. 20, 2023) ..........................................................6

Vanguard, *We likely won't see Fed rate cuts until 2024* (June 15, 2023) ....................................6

**IDENTITY AND INTEREST OF AMICUS CURIAE**[1]

Burns & McDonnell Engineering Company, Inc. ("Burns & McDonnell") is a 100% employee-owned engineering, architecture, construction, environmental, and consulting solutions company. Headquartered in Kansas City, Missouri, Burns & McDonnell has a significant presence in almost every state, with more than 70 offices and nearly 14,000 employees. For well over a century, Burns & McDonnell has built critical infrastructure in nearly every industry vertical that is essential for our economy,[2] working to make our communities successful and guided by the principle that safe and robust essential infrastructure is the foundation of a flourishing society.

As explained below, Burns & McDonnell has an interest in the underlying controversy. The utility industry is building wireless networks that require partnerships (suppliers and operators) and access to spectrum across the country. With those needs in mind, Burns & McDonnell, those it has engaged with for financing, and potential utility and industry partners (the "BMcD Group") is a potential and credible purchaser of the 800 MHz Spectrum Licenses at issue (the "Spectrum"), and has been planning to purchase the Spectrum at auction. If successful, the BMcD Group is committed to leveraging the nationwide Spectrum for targeted community benefit, enabling critical infrastructure operators like electric utilities to deploy wireless broadband networks. Not only will this bolster the reliability, resiliency, and security of our nation's critical infrastructure, but these infrastructure operators are in an excellent position to aid in closing the digital divide with 5G and Open Radio Access technologies because of their commitments to serving all their customers with essential goods and services. The BMcD Group also sees value

---

[1] No party's counsel authored this brief in whole or in part, and no person other than amicus and its counsel contributed money that was intended to fund the preparation or submission of this brief.

[2] The industry verticals in which Burns & McDonnell builds critical infrastructure include: Aviation, Retail, Federal & Military, Manufacturing, Oil, Gas & Chemicals, Renewables, Electric Power Generation, Transmission & Distribution, Telecommunications, Transportation, and Water.

in unlocking portions of the Spectrum for regional and smaller carriers to enable stronger, localized competition and consumer choice.  In sum, if DISH Network Corporation ("DISH") fails to timely complete the license transfer by the deadline set by the Final Judgment (as already extended) and the BMcD Group acquires the Spectrum, the planned use of the Spectrum will serve the public interest by providing essential services to critical markets nationwide and promoting wireless and broadband competition.

Contrary to DISH's contentions, denying DISH's motion will neither result in one of two incumbent carriers acquiring the Spectrum nor lead to associated competitive harms.  Indeed, DISH itself has indicated that acquiring the spectrum would be "nice to have" (not a "must have") for the company.  Accordingly, granting DISH's motion would neither further the aims of the Final Judgment nor serve the public interest.  Instead, it would result in the Spectrum laying fallow for at least an additional 10 months beyond the three years and 60 days DISH has already had to utilize the spectrum, and prejudice the BMcD Group, potential partners and clients, and other third parties that want to intensively acquire, deploy, and use the Spectrum to serve the public good.

## <u>INTRODUCTION</u>

DISH's motion for relief from judgment—which would extend the deadline for DISH to complete the Spectrum transfer by another 10 months, beyond the 60-day extension DISH already received, and the three years that have already elapsed—should be denied. Burns & McDonnell is uniquely positioned to refute one of DISH's primary arguments: that the extension is necessary to preserve competition because, if T-Mobile must auction the Spectrum, "[a]ny other likely acquirer would be one of the two remaining facilities-based nationwide wireless carriers," i.e., AT&T or Verizon. Mot. at 4. That is wrong. AT&T and Verizon are likely ineligible to participate in the auction mandated by the Final Judgment, while the BMcD Group (likely along with other bidders) has plans, with American-led financing, to try to acquire the Spectrum at auction. Furthermore, Burns & McDonnell has over 125 years of experience building critical infrastructure for our country and, therefore, together with the BMcD Group, has the design, construction, and operational experience to put the Spectrum to good use quickly while promoting competition in the wireless industry (among other industries) and bolstering our nation's critical infrastructure and private networks.

By contrast, DISH offers no persuasive reason to believe that it is *ever* likely to purchase the Spectrum, even with its requested 10-month extension. Because it is at best uncertain whether macroeconomic trends will dramatically improve in less than a year, DISH presents no realistic plan by which it will attain the needed capital.

While DISH seeks further delay—beyond the three years and 60 days already afforded—the valuable Spectrum lies fallow. That not only harms competition in the wireless industry, but also hinders needed improvements for our nation's critical infrastructure. This Court should provide certainty on next steps and let the process set forth in the carefully negotiated Final

Judgment unfold by denying DISH's motion and requiring T-Mobile to proceed with auctioning the Spectrum expeditiously.  The BMcD Group is capable of participating in the auction; is capable of acquiring all of the Spectrum should the auction structure require; and, if it is successful, is committed to realizing the Spectrum's full potential quickly.  Because the public interest in allowing the Spectrum to be put to good use promptly outweighs any possible benefit from further delay, the Court should deny DISH's motion.

## ARGUMENT

I.    **THE BMCD GROUP STANDS READY TO PARTICIPATE IN A SPECTRUM AUCTION—AND MAXIMIZE THE SPECTRUM'S DIVERSE BENEFITS.**

In seeking a second extension to complete a divestiture transaction with T-Mobile, DISH argues that the auction process set forth in the Final Judgment will result in heightened market power for AT&T, Verizon, or T-Mobile.  Not so.  As explained below, the BMcD Group is an interested purchaser of the Spectrum if DISH fails to complete the transfer by the deadline and T-Mobile holds the contemplated auction.

The BMcD Group members have demonstrated the value of building private networks, the critical infrastructure industry is actively building such networks, and these interested parties desire spectrum to continue effectuating the benefits such networks afford the entities, their customers, and consumers generally.  However, until more spectrum becomes available nationwide, critical infrastructure entities, such as utilities, cannot move forward.  Utilities have broadly communicated their need for more low-band spectrum capacity, which is critical for security, reliability, and resilience—and thus critical to our country's future.[3]  The BMcD Group

---

[3] *See, e.g.*, Comments of Utilities Telecom Council, *In re Implementing the National Broadband Plan by Studying the Communications Requirements of Electric Utilities to Inform Federal Smart Grid Policy* (July 12, 2010), Dep't of Energy, https://www.energy.gov/gc/articles/comments-utilities-telecom-council.

is representing the market need and industry sentiment by bringing together financing for the (already active) utilities and partners who are ready to participate in the auction should DISH fail to complete the timely transfer.

If it is the successful bidder, the BMcD Group has a clear vision and stated plan for how the Spectrum should be used to promote competition and fortify critical infrastructure. Burns & McDonnell would work with the BMcD Group and leverage its over 125 years of experience in building critical infrastructure across every essential economic sector to implement a unified approach to deliver the Spectrum to markets in need, including to maintain and improve infrastructure. Utilities will leverage the towers and backhaul they use today. Industry partners will supply the equipment and operate the Spectrum.

This infrastructure and collaborative effort would be aligned to have broad and significant impact across the country in a timely manner. Our country faces generational challenges in modernizing critical infrastructure and in connecting underserved communities. The BMcD Group is committed to solving those problems, and the Spectrum is key to digitizing aging infrastructure and closing the digital divide. The BMcD Group also intends to further the federal government's goals of advancing 5G and Open Radio Access Networks. And the BMcD Group plans to leverage the Spectrum to secure the electric grid against potential cyber-attacks and other threats, increase the reliability and resiliency of infrastructure in the face of natural disasters, and prepare our country for changing demands in broadband connectivity, electrification, and renewables. All these efforts will be driven by enabling entities like utilities, cooperatives, and smaller network operators to deploy networks that support critical operations while leveraging strategic spectrum and infrastructure capacity to deliver broadband, enterprise, and public safety services. In short, the BMcD Group plans to put the Spectrum, a critical strategic asset, to its best

use for our country while promoting wireless competition, consistent with the purposes underlying the Final Judgment.

DISH argues that if it "is not granted this extension and is unable to purchase the 800 MHz spectrum," "[a]ny other likely acquirer [at auction] would be one of the two remaining facilities-based nationwide wireless carriers, compounding the market power of AT&T, Verizon, and T-Mobile." Mot. 4. DISH further states that "[a]ny interested parties *other* than a nationwide incumbent carrier likely will be unable (or not have a need) to purchase all of the licenses, leaving some or all of the spectrum in T-Mobile's hands." *Id.*; *see also id.* at 20 (arguing other parties "will likely not be in a position to purchase the nationwide footprint of licenses"). And DISH speculates that "it could be years before any [other] owner of this spectrum would be able to put it to use for consumers." *Id.* at 20.

These assertions are wrong. As a threshold matter, AT&T and Verizon are very *unlikely* to be the eventual Spectrum purchasers. Under the terms of the Final Judgment, T-Mobile "will not divest the 800 MHz Spectrum Licenses to any other national facilities-based mobile wireless network operator, without the prior written approval of the United States, in its sole discretion, after consultation with the affected Plaintiff States." Judgment 13. It is unlikely that the government would approve Verizon or AT&T's participation in the auction—particularly now that it is aware that alternative, competitive third parties such as the BMcD Group are prepared to bid on the Spectrum.

Beyond that, as noted above, utilities and rural broadband providers have a need across the entire country. Among such entities and the BMcD Group—which is not a nationwide incumbent carrier—there is desire to bid at auction for not just some, but *all* the Spectrum to strengthen critical infrastructure and close the digital divide, backed by American-led financing. For that reason,

denying DISH's motion will not compound T-Mobile's market power either.  DISH overlooks not only the BMcD Group, but also numerous categories of other potentially interested parties, including regional carriers, internet service providers, cable companies, social media companies, virtual network operators that deploy dedicated mobile wireless networks, and the critical infrastructure industry (including electric utilities).  Such parties and industries would all be well served by a competitive auction and subsequent deployment of the Spectrum.  That makes it even less likely that an auction would "leav[e] some or all of the spectrum in T-Mobile's hands."  Mot. 4.

In sum, Burns & McDonnell understands and respects the potential and importance of the Spectrum and, together with the BMcD Group, is ready to add significant value through the company's operational expertise.  An auction would not be harmful to competition because the BMcD Group (among other likely potential bidders) is prepared to participate in the auction and, if successful, to put the Spectrum to its highest and best use.  By contrast, extending DISH's exclusive right to complete the transfer for at least another 10 months (which, including the prior 60-day extension, would be a full year beyond the three years it was already afforded) would plainly prejudice potential bidders, such as the BMcD Group, who are prepared to act in accordance with the Final Judgment's terms.

## II.    THERE IS NO REASON TO THINK THAT DISH WILL BE ABLE TO PURCHASE THE SPECTRUM WITHIN TEN MONTHS.

DISH's motion should be denied for an additional reason:  There is no guarantee that DISH will be better positioned in 10 months than it is after the past three years—and thus no reason to prejudice competitors and the public interest with additional delay.

DISH does not offer a concrete plan by which it will purchase the Spectrum.  DISH argues (based on macroeconomic predictions) that interest rates will decrease, enabling DISH to access

capital more easily.  Even if such a dramatic economic turnaround were possible, it is speculative at best.  DISH points to "market experts" who "anticipate the economic environment will improve over the next year, as inflation is reigned in and interest rates fall as a result."  Mot. 23.  But no one can confidently predict the end of a war, whether bank failures will occur, or other economic events that could impact interest rates.  Needless to say, experts have differing views on whether rates will materially decrease in the next 10 months.  Some predict that any incremental rate cut "is unlikely until 2024,"[4] while others "question whether rates will *ever* return to the lower levels that prevailed before 2020 even if inflation returns to the [federal reserve]'s 2% target over the next few years."[5]  On Tuesday, the Wall Street Journal editorial board, in an opinion piece titled "The Return of High Interest Rates," acknowledged that "[w]e don't know which way interest rates will go," but told readers not to "be surprised if a new era of higher interest rates is dawning."[6] In sum, even if global economic conditions improve (no sure thing), DISH cites no expert or other competent evidence indicating that its "access to capital markets" will materially "eas[e]" in less than a year.  Mot. 23.

Nor does DISH offer any assurance that the current motion is its last request for relief from the Final Judgment—or that it will not be seeking another modification when conditions have not significantly improved by next year.  Although the Final Judgment unambiguously requires an

---

[4] Vanguard, *We likely won't see Fed rate cuts until 2024* (June 15, 2023), https://institutional.vanguard.com/insights-and-research/perspective/we-likely-wont-see-fed-rate-cuts-until-2024.html.

[5] Nick Timiraos, *Why the Era of Historically Low Interest Rates Could Be Over*, THE WALL STREET JOURNAL (Aug. 20, 2023) (emphasis added), https://www.wsj.com/economy/central-banking/why-the-era-of-historically-low-interest-rates-could-be-over-49bcdc59;  Justin Lahart, *Time to Get Used to Higher Rates*, THE WALL STREET JOURNAL (Mar. 7, 2023), https://www.wsj.com/articles/time-to-get-used-to-higher-rates-684cf7ae (experts believe "any expectation that the U.S. will eventually return to the low-rate regime that prevailed prior to the pandemic could be for naught").

[6] The Editorial Board, *The Return of High Interest Rates*, THE WALL STREET JOURNAL (Aug. 22, 2023), https://www.wsj.com/articles/return-of-high-interest-rates-central-banking-federal-reserve-u-s-economy-290da4d0.

auction if the contemplated transaction between DISH and T-Mobile fails by the deadline set forth in the Final Judgment, *see* Judgment 12-13, DISH has publicly indicated that there is "not a [particular] date" by which DISH and T-Mobile must conclude a deal.[7]  At the same time, DISH has indicated that the companies are attempting to negotiate an alternative, unapproved "win-win" transaction, which could conceivably require further modification of the structure approved by the Department of Justice.[8]

Although DISH believes that an extension will "allow the capital markets to return to an even keel" and "afford DISH the opportunity to validate its position in the marketplace and thereby restore lender confidence," Mot. 22, that is hardly a guarantee that those predictions will come to pass by 2024.  More to the point, such predictions contrast sharply with the BMcD Group's plans to participate in the auction for the Spectrum at the price determined by the settlement with an American-led financing team.  In short, while "DISH cannot responsibly finance the $3.5 billion purchase of the 800 MHz Spectrum Licenses at this time," Mot. 17, the BMcD Group plans to do just that.  As a result, the BMcD Group is well-positioned to unlock the Spectrum and deploy it without delay for industries in need.

## III.   GRANTING DISH'S MOTION WOULD NOT SERVE THE REMEDIAL PURPOSES OF THE FINAL JUDGMENT OR THE PUBLIC INTEREST.

The Final Judgment specified a time limit for DISH to complete the transfer for a reason: to ensure timely transfer of the Spectrum.  Because DISH has been unable to complete the transfer

---

[7] EchoStar Corporation Q2 2023 Earnings Call Transcript (Aug. 8, 2023), available at https://www.capitaliq.com/CIQDotNet/Transcripts/Detail.aspx?keyDevId=1848602890&companyId=38893720 (stating that there are "negotiations going on at the highest levels" regarding a potential deal that "doesn't affect [DISH's] balance sheet"); *see also* DISH Network Corporation Q4 2022 Earnings Call Transcript (Feb. 23, 2023), available at https://blinks.bloomberg.com/screens/DOCV%20TRAN%20RT000000003003864285 (indicating that DISH may view the Spectrum as a source of "short-term gains" rather than as a long-term strategic asset).

[8] *Id.*

over the past three years, the Final Judgment now requires an auction to ensure that a transfer occurs as intended.  DISH can participate in the auction if it is able to raise the funds.  DISH can also seek to contract with whichever entity acquires the Spectrum to use some portion of it—potentially resulting in a transaction that better balances DISH's financial constraints and any desire to use the Spectrum.  In other words, if the BMcD Group acquires the Spectrum, it will not preclude DISH from benefiting from the Spectrum.  But DISH should not be afforded even more time (beyond the prior extension, plus any additional delay resulting from the FCC approval decision process) to lock up the ongoing exclusive right to purchase the Spectrum.

That is especially so because the auction will significantly benefit the public—including by serving as a competitive process that reveals the best market-based user of the Spectrum, and by promoting consumer competition in the wireless industry.  Although DISH argues that consumers will be harmed if its motion is not granted, it has elsewhere noted that it is already providing "5G broadband service to at least 70 percent of the United States population," Mot. 22, and publicly acknowledged it views the Spectrum as a "nice to have" that is not critical for DISH.[9] DISH also has indicated that it might use the Spectrum for private network applications, rather than for consumer applications.[10]  Conversely, if the BMcD Group wins the auction, it plans to unlock consumer choice by making spectrum available to those in need, such as regional carriers and internet providers (particularly in underserved and unserved areas), in addition to working

---

[9] DISH Network Corporation Q4 2022 Earnings Call Transcript (Feb. 23, 2023), *supra* note 7; DISH Network Corporation Q2 2022 Earnings Call Transcript (Aug. 3, 2022), available at https://blinks.bloomberg.com/screens/DOCV%20TRAN%20RT000000002988538141.

[10] Dan Meyer, *Dish Network's private 5G plans underscore its fiscal future*, SDXCENTRAL (May 9, 2023), https://www.sdxcentral.com/articles/analysis/dish-networks-private-5g-plans-underscore-its-fiscal-future/2023/05/ (quoting DISH statements regarding purported competitive advantages with respect to private network applications).  Under the Final Judgment, if DISH acquires the Spectrum and is providing nationwide retail mobile wireless services, DISH is not required to use the Spectrum solely for nationwide mobile wireless service.  *See* Judgment 12.

with partners to modernize our aging infrastructure and enable private networks for utilities so they can offer enhanced services to their customers.  The BMcD Group would be competing against all carriers by allowing utilities to use the Spectrum to serve the public.  Of course, the goals that the BMcD Group has for the Spectrum cannot be accomplished while the Spectrum sits unused or underused and DISH attempts, for a fourth year, to make financing arrangements.

For all these reasons, an auction would be neither harmful to competition nor unfair to DISH.  Indeed, it would likely lead to significant public benefits (and could even benefit DISH).  By contrast, the additional delay and uncertainty of another 10-month (at least) extension would harm the public interest.  The benefits of maintaining the Final Judgment as written thus substantially outweigh any further delay.

## CONCLUSION

For the foregoing reasons, this Court should deny DISH's motion for relief from the Final Judgment.

Dated:  August 25, 2023                          Respectfully submitted,

                                                 /s/ James E. Tysse
Michael Weisbuch (*admission pending*)           James E. Tysse
D.C. Bar No. 1743257                             D.C. Bar No. 978722
AKIN GUMP STRAUSS HAUER                          AKIN GUMP STRAUSS HAUER
  & FELD LLP                                        & FELD LLP
100 Pine Street, Suite 3200                      2001 K Street, N.W.
San Francisco, CA 94111                          Washington, D.C. 20006
Tel: (415) 765-9526                              Tel: (202) 887-4571
Fax: (415) 765-9502                              Fax: (202) 887-4288
Email: mweisbuch@akingump.com                    Email: jtysse@akingump.com

*Counsel for Burns & McDonnell Engineering Company, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 25, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record via electronic mail.

*/s/ James E. Tysse*
James E. Tysse
AKIN GUMP STRAUSS HAUER
    & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 887-4571
Fax: (202) 887-4288
Email: jtysse@akingump.com

*Counsel for Burns & McDonnell*
*Engineering Company, Inc.*