# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

DEUTSCHE TELEKOM AG, *et al.*,

*Defendants*.

Case No. 1:19-cv-02232 (TJK)

## DEFENDANT DISH NETWORK CORPORATION'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR RELIEF FROM JUDGMENT

Steven L. Holley
Bradley P. Smith
Sean P. Fulton
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-1660
Facsimile:  (212) 558-3588
holleys@sullcrom.com
smithbr@sullcrom.com
fultons@sullcrom.com

Adam Paris
SULLIVAN & CROMWELL LLP
1888 Century Park East, 21st Floor
Los Angeles, California  90067-1725
Telephone:  (310) 712-6600
Facsimile:  (310) 712-8800
parisa@sullcrom.com

September 1, 2023

*Attorneys for DISH Network Corporation*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ..........................................................................................................6

I.    THE OPPOSITION FORGETS THAT DISH'S REQUEST FOR
MODIFICATION IS REVIEWED IN VIEW OF THE PURPOSE
UNDERLYING THE FINAL JUDGMENT:  PROMOTING COMPETITION ...............6

II.    A MODEST MODIFICATION IS NECESSARY TO ACCOMPLISH THE
INTENDED PURPOSE OF THE FINAL JUDGMENT......................................9

        A.    DISH Is Entitled To Seek Relief from the Final Judgment ....................................9

        B.    Unprecedented Global Financial Turmoil Was Not, and
Could Not Be, Contemplated by the Final Judgment ...........................................12

                1.    The Parties Only Waived Their Right To Claim Hardship Insofar
As Such a Claim Would Prevent Them from Carrying Out the
Purposes of the Final Judgment .................................................................12

                2.    An Unprecedented Rise in Interest Rates Resulting from War in
Europe and a Global Pandemic Was Not a Foreseeable Business
Risk ..........................................................................................................14

        C.    A Modest 10-Month Extension Would Not Be Unfair to T-Mobile ...................15

        D.    The Harm to Competition Cited by DISH Is Apparent and Highly
Relevant ....................................................................................................18

CONCLUSION.....................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chrysler Corp.* v. *United States*,
316 U.S. 556 (1942).................................................................................................7

*Holland* v. *New Jersey Dep't of Corr.*,
246 F.3d 267 (3d Cir. 2001)....................................................................................7

*New York* v. *Microsoft Corp.*,
531 F. Supp. 2d 141 (D.D.C. 2008)......................................................................6, 7

\*   *Rufo* v. *Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992)..........................................................................................*passim*

*United States* v. *Baroid Corp.*,
130 F. Supp. 2d 101 (D.D.C. 2001)........................................................................8

*United States* v. *Caterpillar, Inc.*,
227 F. Supp. 2d 73 (D.D.C. 2002).....................................................................13, 14

*United States* v. *Signature Flight Support Corp.*,
607 F. Supp. 2d 56 (D.D.C. 2009).....................................................................13, 14

*United States* v. *United Shoe Mach. Corp.*,
391 U.S. 244 (1968)................................................................................................7

*United States* v. *Volvo Powertrain Corp.*,
758 F.3d 330 (D.C. Cir. 2014)...............................................................................13

*United States* v. *W. Elec. Co.*,
46 F.3d 1198 (D.C. Cir. 1995)................................................................................10

**Rules**

Federal Rule of Civil Procedure 60(b)......................................................................13

**Other Authorities**

*T-Mobile Completes Merger with Sprint to Create the New T-Mobile*, T-MOBILE
(Apr. 1, 2020), https://tinyurl.com/TMOMerger...................................................16

T-Mobile US, Inc., Annual Report (Form 10-K) (Feb. 14, 2023),
https://tinyurl.com/TMO10-K-2023 ......................................................................18

\*   Pursuant to Local Rule 7(a), an asterisk in the margin to the left of the case identifies cases or authorities on which counsel chiefly relies.

Defendant DISH Network Corporation ("DISH"),[1] through its undersigned counsel, respectfully submits this reply memorandum of law in further support of its Motion for Relief from Judgment (ECF No. 94; the "Motion" or "Mot.").

## PRELIMINARY STATEMENT

T-Mobile is now the largest wireless carrier by market capitalization in the United States.  It gained 54 million subscribers through its merger with Sprint and, as of July 27, 2023, estimates that it has already achieved $7.5 billion in merger synergies. At its core, T-Mobile's Opposition (ECF No. 106; the "Opposition" or "Opp.") is an attempt to protect this enviable status from the competition that the Final Judgment was designed to restore.

T-Mobile wants the Court to view DISH's Motion as nothing more than an ordinary commercial dispute.  The Opposition reads as if the Court's evaluation of this Motion were just an exercise in contract interpretation.  But the Opposition's rhetoric about how contracts ought to be read obfuscates the key principle relevant to the Court's analysis of the Final Judgment:  preserving competition.  T-Mobile cannot deny what it told the Federal Communications Commission ("FCC") just two weeks ago in its joint application with DISH seeking the FCC's consent to the transfer of the 800 MHz spectrum licenses:  "The terms of the Final Judgment are designed to facilitate DISH's entry into the wireless market as a facilities-based provider and . . . [t]he 800 MHz spectrum licenses contemplated by this transaction will **substantially enhance DISH's ability to do so**."  Ex. 10 at 2 (emphasis added).[2]

---

[1]  Capitalized terms used but not defined herein have the meanings given to them in the Motion.

[2]  Unless otherwise noted, all exhibits refer to the declaration of John Swieringa filed in support of the Motion.  (ECF No. 94-2; "Swieringa Decl.")

This key admission undermines the entire Opposition.  In entering the Final Judgment, this Court permitted T-Mobile to acquire Sprint (taking the number of incumbent nationwide wireless carriers from four to three) on the condition that competition would be restored by enabling DISH to enter the market and grow into a robust, fourth nationwide wireless carrier.  To accomplish that goal, the Final Judgment required a series of divestitures from T-Mobile to DISH, including providing DISH with the option to purchase the 800 MHz spectrum licenses at issue here.  DISH has maintained—including in its recent FCC filings—that the 800 MHz spectrum licenses are important to enabling it to compete as a fourth facilities-based nationwide wireless carrier.  Modifying the Final Judgment to give DISH a modest extension of time to purchase the 800 MHz spectrum licenses will further competition, as T-Mobile itself admits.  Put simply:  the relief requested by DISH is in the public interest and will further the goals of the Final Judgment.

T-Mobile's objection to DISH's extension request should be seen for what it is:  an attempt by the market leader to hinder a nascent competitor, one that has taken on the Herculean task of building a modern nationwide facilities-based wireless network in a period of unprecedented economic turmoil.  Rising to the challenge, DISH recently achieved the milestone of covering more than 73% of the nation's population with network access—a multi-billion-dollar undertaking.  The Opposition does not (and could not) deny that divesting the 800 MHz spectrum licenses to DISH is pro-competitive, that an extension would help achieve the Final Judgment's goal of restoring competition to pre-merger levels, and that there is no company other than DISH that can use the 800 MHz spectrum licenses to operate a fourth nationwide wireless network.  As such, T-Mobile's objections to DISH's requested relief fail for at least the following seven reasons:

*First*, the Opposition misconstrues the relevant legal standard set out in *Rufo* v. *Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992). *Rufo* and its progeny require that courts consider whether the proposed change to a consent decree serves either to effectuate, or to thwart, the basic purpose of the consent decree. Here, DISH's proposed modification will help effectuate the purpose and goals of the Final Judgment by giving DISH more time to obtain financing to acquire the 800 MHz spectrum licenses, which will help DISH compete more effectively.

DISH is listed as a "defendant" in the Final Judgment so that the Antitrust Division (the "Division"), and ultimately the Court, can supervise the process by which DISH becomes a fourth nationwide facilities-based mobile wireless network operator. The Division deemed the series of divestitures and arrangements between DISH and T-Mobile required under the Final Judgment as necessary to fulfill that goal. The Final Judgment thus serves an important function in ensuring that T-Mobile does not hamper DISH's ability to compete. Indeed, the Final Judgment includes provisions that require ongoing monitoring to ensure that T-Mobile does not take such action. Final Judgment § XII. As a result, DISH is not a defendant to this action in a traditional sense. And DISH's Motion is not an example of an antitrust defendant trying to shirk its prior commitments after already gaining the benefit of an otherwise anticompetitive transaction. Rather, DISH is trying to avail itself of an important element of the remedy crafted by the Division to promote competition. Unfortunately, it is T-Mobile that is attempting to escape its obligation to divest the 800 MHz spectrum licenses to DISH—the only viable challenger to a three-player oligopoly—by opposing DISH's reasonable extension request.

*Second*, the Opposition turns the Final Judgment inside out by arguing that, because it only requires T-Mobile to divest, not DISH to acquire, the 800 MHz spectrum licenses, DISH may not seek relief from the Final Judgment as a matter of law. The Opposition cites no authority

for this novel proposition, which ignores the overarching goal of the Final Judgment, *i.e.*, to restore the competition in the wireless market that was lost when T-Mobile absorbed Sprint.   The Opposition's relentless focus on the parties' License Purchase Agreement ("LPA") also ignores that the source of the parties' divestiture obligations is the Final Judgment, from which all rights and obligations under the LPA are derived.   This is not a plain-vanilla contract dispute.

*Third*, DISH is not foreclosed from asserting that unprecedented interest rate hikes were not contemplated by the Final Judgment and therefore require its modification.   The intention of the Final Judgment provision cited in the Opposition (Opp. at 1, 15) was to prevent the parties from claiming "hardship" to lessen its commitment to restore competition, not to preclude DISH from seeking a modest extension of time that will give DISH the opportunity to purchase the 800 MHz spectrum licenses that will enable DISH to better meet that commitment.   T-Mobile's cavalier attitude toward unprecedented interest rate hikes notwithstanding, the global financial turbulence resulting from the COVID-19 pandemic and a war in Europe was certainly not foreseeable by DISH when the Division commenced this action in mid-2019.   But those events have seriously impaired DISH's ability to close the purchase of the 800 MHz spectrum licenses in the near term.

*Fourth,* the Opposition reads as if DISH has done nothing to further the Final Judgment's objective.   But as described in the Motion, DISH has built the nation's first and only greenfield Open RAN 5G network, which today covers more than 246 million people (more than 73% of the nation's population) with more than 16,000 cell sites deployed.   DISH has invested billions of dollars in that network, and has borrowed billions of dollars at historically high interest rates to fund construction.   DISH has also inaugurated another first—a lifetime non-promotional $25 a month unlimited wireless plan, a disruptive price point that benefits consumers and

competition alike.  But DISH's work to realize the pro-competitive goals of the Final Judgment is far from over.  Competitive networks require frequencies on which to operate; they especially need low-band spectrum like the 800 MHz band, which provides greater capacity and thus makes a large contribution to avoiding network congestion.  And the 800 MHz spectrum licenses also provide important spectrum for "uplinks," transmissions **from** the customers' devices to the network— another necessary resource for DISH's network.  DISH can compete effectively only if network congestion is avoided and network quality is high; acquiring the 800 MHz licenses will help DISH achieve these goals.

*Fifth,* the modest extension requested will likely be effective in allowing DISH to fund the purchase.  The extension's efficacy is not solely dependent upon interest rates going down on any particular timetable, although market experts anticipate they likely will.  As DISH explained in the Motion, there are a number of other factors that will improve DISH's financial position in the near term—including DISH's expanded network coverage, a recent distribution agreement with Amazon, other forthcoming device and distribution partnerships, and the recently announced merger with EchoStar Corporation.  These factors render the additional time reasonable and suitably tailored to enable DISH to responsibly finance the 800 MHz spectrum purchase within ten months. Mot. at 22–23.  Further, if the Motion is granted, DISH agrees not to seek any further extension beyond June 30, 2024.

*Sixth*, the modest extension of time requested by DISH would not be unfair to T-Mobile.  T-Mobile is making a fortune from its acquisition of Sprint, so it is poorly situated to solicit sympathy.  The Final Judgment is concerned with the public interest, not T-Mobile's private financial interests or those of its shareholders.  And even if increased costs to T-Mobile were relevant, they are wildly overstated in the Opposition.  Opp. at 23.  In reality, the costs of

preserving the 800 MHz frequencies until their eventual sale were ones T-Mobile would bear anyway.  Even in T-Mobile's telling, these costs are no more than $6.3 million in total.

*Seventh*, declining to extend the 800 MHz divestiture deadline would harm the public interest—not just DISH in its capacity as a market participant.  The Opposition seeks to portray DISH's request for an extension of time as concerned solely with protecting DISH's corporate interests.  Opp. at 25–26.  The relevant legal consideration is the public interest—here, promoting competition in the highly concentrated market for nationwide facilities-based wireless service.  Nor would that objective be achieved through the purchase of the frequencies by an entity such as the "*amicus*" Burns & McDonnell (ECF No. 111)—a company that does not have a single commercial spectrum license and is not a facilities-based carrier.

In sum, absent an extension of time to facilitate DISH's acquisition of the 800 MHz licenses, DISH's ability to replace Sprint as a nationwide facilities-based wireless carrier will be hindered—harming competition, contravening the public interest, and undermining the purpose of the Final Judgment.

## **ARGUMENT**

## I.    THE OPPOSITION FORGETS THAT DISH'S REQUEST FOR MODIFICATION IS REVIEWED IN VIEW OF THE PURPOSE UNDERLYING THE FINAL JUDGMENT:  PROMOTING COMPETITION

There is no dispute that *Rufo* provides the relevant standard for determining whether relief from the Final Judgment is appropriate.  *See* Mot. at 15, 20–21; Opp. at 12.  What the Opposition gets wrong is that the cases following *Rufo* do not draw an arbitrary distinction based on whether the party moving for relief is the plaintiff or the defendant.  Courts recognize that requests for modification of a consent decree must be reviewed to ensure that the result is consistent with the decree's intended purpose.  *See, e.g.*, *New York* v. *Microsoft Corp.*, 531 F. Supp. 2d 141, 168 (D.D.C. 2008) ("[T]he Supreme Court cases discussed above suggest that a

government enforcer may move to modify a consent decree in order to 'accomplish its intended result.'"); *Holland* v. *New Jersey Dep't of Corr.*, 246 F.3d 267, 284 (3d Cir. 2001) ("Courts have extended a decree or parts of a decree when a change in circumstances thwarted the basic purpose and intent of the decree.").

For example, in *Chrysler Corp.* v. *United States*, 316 U.S. 556, 562 (1942), the Court was tasked with reviewing whether a district court abused its discretion in extending certain consent decree deadlines at the government's request.  The Court held "that the test to be applied in answering this question is **whether the change served to effectuate or to thwart the basic purpose of the original consent decree**." *Id.* (emphasis added).  Over 20 years later, the Supreme Court again underscored this core principle.  *United States* v. *United Shoe Mach. Corp.*, 391 U.S. 244 (1968).  In *United Shoe*, the Court held that a consent decree "may **not** be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree (the elimination of monopoly and restrictive practices) have **not** been fully achieved." *Id.* at 248 (emphases added).

It was in light of the goals of a consent decree—not some arbitrary distinction between plaintiffs and defendants—that Judge Kollar-Kotelly found that a situation in which "a government enforcer . . . move[s] to modify a consent decree in order to 'accomplish its intended result'" is "qualitatively different from one in which an enjoined party seeks relief from a judgment." *Microsoft*, 531 F. Supp. 2d at 168.  The same reasoning applies here, where DISH (the divestiture buyer) seeks a one-time extension of a deadline in order to enable it to effectuate the objectives of the Final Judgment.

*Baroid*—the only case cited by the Opposition on this point—does not hold otherwise.  The ultimate question before Judge Lamberth was whether all relevant parties

consented—and thus the public-interest standard applied—or whether there was disagreement—and thus the *Rufo* standard applied.  *United States* v. *Baroid Corp.*, 130 F. Supp. 2d 101, 103–04 (D.D.C. 2001).  The court never considered whether the proposed modification would serve the purposes of the consent decree because the court concluded that the Division "should have anticipated" the changed circumstances upon which the motion was based, *id.* at 105, something that certainly cannot be said of DISH vis-à-vis the Covid-19 pandemic, the war in Ukraine, and resultant rising interest rates.  The full impact of these calamitous events became clear only after the parties agreed on the time period that DISH seeks to extend.

Again, there is no dispute that the purpose of the Final Judgment is "to preserve competition by enabling the entry of another national facilities-based mobile wireless network operator."  Final Judgment at 2.  This should be the touchstone for the Court's inquiry into the appropriateness of the requested extension of time.  Yet the Opposition tries to frame the Motion as a party's request for modification of a contractual undertaking, and suggests that DISH "was made a Defendant to the Final Judgment precisely because those obligations needed to be enforceable."  Opp. at 12–13.  The Opposition gets it backwards.  DISH's willingness to step in to replace the competition lost from T-Mobile's acquisition of Sprint was critical to the deal's approval: the Division recognized that the merger of T-Mobile and Sprint was so anticompetitive that it required substantial divestitures that would facilitate the entry of a fourth facilities-based nationwide wireless carrier to remedy those anticompetitive effects.

This Court adopted that reasoning when it signed the Final Judgment.  *See* Final Judgment at 2 ("AND WHEREAS, the purpose of this Final Judgment is to preserve competition by enabling the entry of another national facilities-based mobile wireless network operator; AND WHEREAS, Plaintiffs require Divesting Defendants to make certain divestitures for the purpose

of remedying the loss of competition alleged in the Complaint."). The divestiture buyer was named as a "defendant" so that the Division, and ultimately the Court, could help ensure that DISH succeeded in replacing Sprint as the fourth nationwide facilities-based mobile wireless network operator. The Motion easily satisfies *Rufo*'s standards.

## II. A MODEST MODIFICATION IS NECESSARY TO ACCOMPLISH THE INTENDED PURPOSE OF THE FINAL JUDGMENT

The Opposition devotes most of its energy to an attempt to rewrite history, mischaracterizing the events that led to this Motion. T-Mobile does not succeed, however, in undermining any of the three *Rufo* factors established by DISH in the Motion: On account of events wholly beyond DISH's control, (1) the situation on the ground has made DISH's compliance with the Final Judgment substantially more "onerous," and (2) DISH's compliance is at present "unworkable" due to events that could not have been foreseen by anyone at the time the relevant provisions were agreed upon; and (3) refusing the requested modification would be "detrimental to the public interest." *See Rufo*, 502 U.S. at 384.

### A. DISH Is Entitled To Seek Relief from the Final Judgment.

The Opposition first suggests that DISH somehow lacks standing to seek relief from the Final Judgment because "[t]he Final Judgment does not require DISH to buy the 800 MHz spectrum licenses." Opp. at 13–14. The Opposition cites no authority for this proposition, and denying DISH standing here would be completely at odds with "[t]he primary purpose of the proposed Final Judgment . . . to facilitate **DISH** building and operating its own mobile wireless services network." Competitive Impact Statement at 2 (emphasis added). According to the Opposition, T-Mobile is the only party that could seek relief from the 800 MHz spectrum divestiture requirements of the Final Judgment because it is the only party "required" to complete the divestiture. But the Division did not leave the sole right to seek relief from the Final Judgment

in the hands of the very party that would reap the benefits of the merger's anticompetitive effects in the absence of the Final Judgment.  To the contrary, the Division made clear that providing DISH the option to purchase the 800 MHz spectrum was necessary to "ensure **DISH** has sufficient spectrum to meet its buildout and service requirements and provide mobile wireless service to customers."  Competitive Impact Statement at 9 (emphasis added).  Under the Final Judgment, DISH was the intended beneficiary of the divestiture, so the Opposition's notion that DISH has no standing to seek the modification of provisions of the Final Judgment designed to enable DISH to compete more effectively is nonsensical.

The Opposition then argues that the Court should deny relief because "DISH does not argue that it is unable to obtain financing altogether or even that it cannot obtain the spectrum without the extension."  Opp. at 14.  Again, the relevant *Rufo* standard is "onerousness": "[I]mpossibility is not the test."  *United States* v. *W. Elec. Co.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995).  Modification of a consent decree may be warranted "when changed factual circumstances make compliance with the decree substantially more onerous."  *Id.*

DISH demonstrated in its Motion that financing the 800 MHz spectrum licenses under current financial conditions is indeed substantially more onerous.  Mot. at 17–18.  Even at an increased cost, according to T-Mobile, of "only" $180 million per year (which is understated, as described below), a five-year corporate note would cost DISH an incremental $900 million in interest payments above what it would have incurred to raise the same amount of money in 2021, a burden that would hamper the pro-competitive goals of the Final Judgment.  And this increase would be over and above the billions of dollars in expenses that DISH has already incurred, and will continue to incur, as it builds its 5G network.  That network will be materially enhanced by having the 800 MHz frequency licenses.

Further, T-Mobile's $180 million per year figure significantly underestimates the actual cost to DISH if it had to finance the $3.6 billion now.  One way to look at the effect of increased rates on DISH's ability to borrow is to look at its cost to raise debt before and after the Federal Reserve raised interest rates.  In 2021, DISH raised $5.25 billion in secured debt at a blended average rate of about 5.5%.  Reply Decl. of John Swieringa ¶ 2.  In late 2022, DISH raised $2 billion in secured debt at an effective rate of about 12.25%.  *Id.* ¶ 2.  While the Federal Reserve has increased the federal funds rate by about 5%, DISH's cost of borrowing increased by 6.75%.  That translates to approximately $243 million in increased interest payments per year (or $1.215 billion in additional interest over a five-year note), an amount "substantially more onerous" than reasonably contemplated when the Final Judgment was entered.  *Id.* ¶ 2.

The Opposition also argues, in disregard of this Court's power, that the Court's decision on the Motion "will have no effect on the LPA."  Opp. at 14.  T-Mobile appears to suggest that it will terminate the LPA after an FCC decision no matter what the Court decides here.  *Id.*[3]  Even if T-Mobile were to attempt such a maneuver, it would fail because the parties' primary obligations arise from the Final Judgment not the LPA, which was executed to further the objectives of the Final Judgment and remains constrained by, and subservient to, the Final Judgment.  It is the Final Judgment, not the LPA, that requires T-Mobile and Sprint "within three (3) years after the closing of the divestiture of the Prepaid Assets or within five (5) business days of the approval by the FCC of the transfer of the 800 MHz Spectrum Licenses, **whichever is**

---

[3]    In fact, on August 19, 2023, T-Mobile sent DISH a purported notice of default claiming that "DISH's filing of the Motion . . . amounts to a material breach of the [LPA]."  Opp. Ex. J, ECF No. 107-10, at 2.  DISH responded by confidential letter dated August 31, 2023, explaining that DISH's request for more time to consummate the 800 MHz spectrum license purchase was consistent with its obligations under both the Final Judgment and the LPA.  DISH is willing to provide the Court with a copy of the confidential letter for *in camera* review upon request.

**later**, to divest the 800 MHz Spectrum Licenses in a manner acceptable to the United States, in its sole discretion, after consultation with the affected Plaintiff States."   Final Judgment § IV.B.1 (emphasis added).   If the Court grants DISH's Motion, then T-Mobile's obligation to divest to DISH will continue until June 30, 2024.   Consistent with this reality, the Division recently stated that it would "afford no weight to consequences caused by T-Mobile's termination of the LPA before the Court has had the opportunity to rule on the motion."  Ex. 8.

     **B.**    **Unprecedented Global Financial Turmoil Was Not, and Could Not Be, Contemplated by the Final Judgment.**

     DISH could not have anticipated the unprecedented turbulence in the global capital markets that has rendered DISH's purchase of the 800 MHz spectrum licenses "substantially" more "onerous" than anticipated when the Final Judgment was entered.   The Opposition argues that (i) "[t]he Final Judgment bars DISH from pointing to 'hardship or difficulty' as grounds to modify the Final Judgment," Opp. at 15–16, and (ii) "DISH's purported inability to obtain financing is a foreseeable business risk that was accounted for in the Final Judgment and addressed in the LPA," Opp. at 16–20.  Both arguments fail.

     **1.**    **The Parties Only Waived Their Right To Claim Hardship Insofar As Such a Claim Would Prevent Them from Carrying Out the Purposes of the Final Judgment.**

     The Opposition selectively cites the Final Judgment to argue that it "precludes DISH from 'raising any claim of hardship or difficulty as grounds for asking the Court to modify any of the provisions contained below.'"  Opp. at 15.  Yet T-Mobile omitted the critical opening clause, which explains the requirement:   "Defendants have represented to Plaintiffs that **the divestitures and other relief required by this Final Judgment can and will be made and carried out**."  Final Judgment at 2 (emphasis added).  The entire purpose of the Motion is to ensure that the Final Judgment will be "carried out."  The parties agreed not to claim hardship or difficulty

as grounds for asking the Court to modify the Final Judgment in order to prevent evasion of their divestiture commitments, not to stymie efforts to effectuate those commitments. If DISH wished to avoid paying for the 800 MHz spectrum licenses, it could simply pay the termination fee and be done with it. That is the antithesis of the relief requested by DISH in its Motion. DISH is asking for a modest extension of time only to enable a purchase of the 800 MHz spectrum licenses, which will advance the pro-competitive purposes of the Final Judgment.

The Opposition also wrongly seeks to render an entire section of the Final Judgment superfluous. *See United States* v. *Volvo Powertrain Corp.*, 758 F.3d 330, 340 (D.C. Cir. 2014) ("[C]onsent decrees, like contracts, should be interpreted so that no provisions are superfluous."). The Final Judgment provides that "[t]he Court retains jurisdiction to enable any party to this Final Judgment **to apply to the Court at any time** for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, **to modify any of its provisions**, to enforce compliance, and to punish violations of its provisions." Final Judgment § XVII (emphases added). Any modifications must satisfy Federal Rule of Civil Procedure 60(b)(5) and the *Rufo* standard, which essentially require a showing of unexpected hardship. It is impossible to read the "Whereas" clauses of the Final Judgment to foreclose modification based on hardship when Section XVII plainly allows for any party to seek modification that *requires* a showing of hardship.

Neither of the cases cited in Opposition warrant a different result. In both *Signature Flight Support* and *Caterpillar*, the divesting defendant—*i.e.*, the party that had engaged in anticompetitive behavior—was the party seeking relief from judgment. *United States* v. *Signature Flight Support Corp.*, 607 F. Supp. 2d 56, 57 (D.D.C. 2009); *United States* v. *Caterpillar, Inc.*, 227 F. Supp. 2d 73, 76 (D.D.C. 2002). In both cases, allowing modification based on the claimed financial hardship would not have served the remedial purposes of the consent decree. *See*

*Signature Flight Support*, 607 F. Supp. 2d at 59 ("Signature explicitly agreed to raise no claim of hardship or difficulty as grounds for **asking the court to release it from its obligation to divest the FBO.**") (emphasis added); *Caterpillar*, 227 F. Supp. 2d at 86 ("[D]efendants have not shown that the proposal would completely offset the extra emissions," the harm that the consent decree was designed to remedy).[4]   DISH is not asking to be relieved of any obligation imposed on it by the Final Judgment.   To the contrary, DISH is trying to further the Final Judgment's objectives by requesting limited additional time in which to purchase the 800 MHz spectrum licenses.

## 2.    An Unprecedented Rise in Interest Rates Resulting from War in Europe and a Global Pandemic Was Not a Foreseeable Business Risk.

The Opposition asserts that "rising interest rates are precisely the sort of known and foreseeable business risk[s] that are 'fairly to be regarded as part of the dickered terms.'"   Opp. at 16.   As explained in the Motion, and as T-Mobile is well aware, we are experiencing the fastest increase in interest rates in 40 years.   Mot. at 17–18.   While the cases cited by T-Mobile may stand for the proposition that general changes in economic conditions are not sufficient to warrant modification of a consent decree, none of those cases stand for the proposition that an unforeseeably large increase in interest rates, brought about by a global pandemic that upended the world economy for two years and a war in Europe, cannot constitute "changed circumstances" sufficient to justify a modification of the Final Judgment.   Nor does T-Mobile account for the fact that the billions of dollars that DISH would need to borrow to finance this purchase are on top of the billions DISH has already borrowed to execute on its network deployment, which DISH has done precisely in order to carry out its obligations to further the Final Judgment's objectives.

---

[4]   In addition to finding that the defendant's proposed modification would not serve the purpose of the consent decree, Judge Kennedy found that the parties explicitly contemplated cost increases because the consent decree included provisions stating that neither technical nor financial difficulties would excuse compliance.   *Caterpillar*, 227 F. Supp. 2d at 82–83.

The Opposition goes on to speculate that, "[i]f rising interest rates due to recent events warranted modifications of consent decrees, the floodgates would be open for any company affected by the events of the last three years to ask courts to rewrite binding consent decrees under the guise of unforeseen events."  Opp. at 17.  That is a strawman.  Nothing in DISH's request for a modest extension of time would have such momentous consequences.  DISH seeks a one-time, ten-month extension of the deadline for purchasing the 800 MHz spectrum licenses, a purchase that will further the remedial purposes of the Final Judgment.  Granting such a modest modification at the request of a divestiture buyer that has already undertaken enormous efforts at great expense to comply with the Final Judgment is reasonable and appropriate and will not create a bad precedent for future consent decrees.

### C.    A Modest Ten-Month Extension Would Not Be Unfair to T-Mobile.

The Opposition complains that the "requested modification is unfair and harmful" to T-Mobile, and claims that T-Mobile would be forced to bear the "financial cost to keep and maintain the 800 MHz spectrum licenses for an additional ten months," and be subject to additional regulatory scrutiny as a result.  Opp. at 23–24.  This argument fails for at least two reasons.

*First*, as explained above, this Court's determination of whether modification of the Final Judgment is appropriate turns on whether such a modification would promote competition in the nationwide facilities-based mobile wireless network space, which is the objective of the Final Judgment.  T-Mobile has not cited any authority for the proposition that T-Mobile's private financial interests should be viewed as outweighing the public interest.  The Final Judgment requires T-Mobile to divest certain assets to remedy the anticompetitive harm that T-Mobile caused with its highly profitable acquisition of Sprint, and the fact that the divestiture may cost T-Mobile more money than it anticipated is trumped by the Final Judgment's pro-competitive goals.

*Second*, even if the Court were to consider T-Mobile's asserted increased costs in analyzing the Motion, the evidence T-Mobile submits of such increased costs demonstrates that they are wildly overstated. For starters, while arguing that T-Mobile has waited years to divest the 800 MHz spectrum licenses and that an additional ten months will impose some sort of unjust burden, the Opposition fails to mention that, under the express terms of the LPA, the **earliest** that divestiture could have closed was five months ago: April 1, 2023.[5] *See* LPA § 2.3(a), ECF 107-2 ("[I]n no event shall the Closing [of the 800 MHz spectrum divestiture] occur earlier than the third anniversary of the [Sprint–T-Mobile] Merger Closing Date.").[6] Moreover, the LPA plainly envisioned a longer divestiture process: the LPA defines April 1, 2024 to be the "outside date," after which time either party can terminate the agreement, reflecting the parties' understanding at the time the LPA was executed that the spectrum license transfer might take until the second quarter of 2024 to be completed.[7] At a minimum, T-Mobile understood that it would not be able to divest the spectrum to DISH until April 2023 and might even have to wait **until April 2024**. Further, T-Mobile acknowledges that its "direct expenses for network and equipment" will be $6.3 million for those ten months, seven of which were already contemplated by the LPA. Opp. at 23. T-Mobile also cites a $209.4 million "cost of capital." *Id.* T-Mobile provides no rationale

---

[5]   For the same reason, the amicus brief of Burns & McDonnell is factually incorrect in claiming that DISH has had "three years and 60 days . . . to utilize the spectrum." Amicus Br., ECF No. 111, at v., 1.

[6]   The Sprint–T-Mobile merger closed on April 1, 2020. *T-Mobile Completes Merger with Sprint to Create the New T-Mobile*, T-MOBILE (Apr. 1, 2020), https://tinyurl.com/TMOMerger2.

[7]   See LPA § 7.1(a)(ii), ECF 107-2 (defining the "Outside Date" as "the first anniversary of the Filing Deadline," which in turn is defined as "the third anniversary of the Merger Closing Date," which is defined as "April 1, 2020").

for or explanation of this figure, although it is clear this money will not be used to maintain the 800 MHz spectrum licenses.

Likewise, the express terms of the Final Judgment provide for an elongated timeline.  The Final Judgment ordered T-Mobile to divest the 800 MHz spectrum "within three (3) years after the closing of the divestiture of the Prepaid Assets or within five (5) business days of the approval by the FCC of the transfer of the 800 MHz Spectrum Licenses, **whichever is later**."  Final Judgment § IV.B.1. (emphasis added).  The three-year anniversary of the Prepaid Assets divestiture was July 1, 2023, but, as authorized by the Final Judgment (*id.*), the Division granted a 60-day extension to August 30, 2023 (ECF No. 93).  And because FCC approval has not yet been obtained, the divestiture timetable remains within the bounds of the Final Judgment.  DISH's request for a ten-month extension of the deadline serves only to ensure *ex ante* that DISH has sufficient time to arrange financing once the FCC issues its decision on the parties' transfer-of-control applications.  An extension until June 30, 2024—just 90 days beyond the LPA's "outside date," and consistent with what the Final Judgment contemplated—is not going to impose any major financial burden on T-Mobile beyond what was already baked into the Final Judgment and the LPA *ab initio*.

*Third*, T-Mobile's acquisition of the 600 MHz spectrum held by Columbia Capital would be subject to increased regulatory scrutiny regardless of the 800 MHz dispute.  T-Mobile announced its intent to acquire Columbia Capital spectrum in September 2022, before DISH had any ability to purchase the 800 MHz spectrum (no sooner than April 1, 2023).[8]  T-Mobile made a

---

[8]   T-Mobile US, Inc., Annual Report (Form 10-K) at 45 (Feb. 14, 2023), https://tinyurl.com/TMO10-K-2023 ("On August 8, 2022, we entered into License Purchase Agreements to acquire spectrum in the 600 MHz band from Channel 51 License Co LLC and LB License Co, LLC in exchange for total cash consideration of $3.5 billion. The closing of this purchase was still awaiting FCC final approval as of December 31, 2022.").

business decision to pursue the 600 MHz transaction knowing that it would continue to hold the 800 MHz spectrum licenses for at least another seven months. DISH's action did not trigger the increased regulatory scrutiny that T-Mobile now cites as grounds to deny the Motion. Opp. at 24–25. Indeed, the FCC did not put this transaction out for Public Notice for months, until April 19, 2023, indicating the agency was already engaged in a heightened review.

### D.   The Harm to Competition Cited by DISH Is Apparent and Highly Relevant.

The Opposition argues that "the Court need not even reach DISH's proffered 'harms' that it will purportedly suffer absent an extension." Opp. at 25. As DISH made clear in its Motion (Mot. at 18–20), denial of an extension of time to enable DISH to purchase the 800 MHz spectrum licenses would harm competition and, accordingly, the public interest. Contrary to T-Mobile's suggestions, there is no other divestiture buyer remotely capable of purchasing the at-issue spectrum and building out a nationwide facilities-based wireless network, as DISH is currently doing.

Amicus Burns & McDonnell is a prime example of this disconnect. Even as it professes a desire to step into the breach and fill the competitive gap, it would be starting from scratch: it does not hold even a single commercial spectrum license in any of the country's hundreds of markets and is not a wireless carrier today. Swieringa Reply Decl. ¶ 5. In fact, Burns & McDonnell does not even pretend that its acquisition of the 800 MHz spectrum licenses could transform it into a national facilities-based mobile wireless carrier with any ability to compete against T-Mobile. Rather, as T-Mobile concedes and Burns & McDonnell itself forthrightly states, the spectrum would only be used to "enabl[e] critical infrastructure operators like electric utilities to deploy wireless broadband networks." Amicus Br., ECF No. 111, at iv. In sum, even assuming that Burns & McDonnell's unidentified "Group" of financing, utility, and industry partners could consummate a purchase of the 800 MHz spectrum licenses, only by some miraculous

metamorphosis could these companies fill the competitive void left by Sprint.  Any benefit from Burns & McDonnell's acquisition of the spectrum would be outside the national facilities-based mobile wireless market and therefore would not offset the loss to competition caused when T-Mobile swallowed its closest competitor.

None of T-Mobile's challenges to DISH's arguments about adverse effects on competition hold water.  T-Mobile first disputes DISH's statement "that uplink capacity is constrained and acquisition of the spectrum licenses would 'double' it."  Opp. at 25.  DISH does not need to provide a detailed explanation of uplink capacity for this Court to reach the conclusion that—regardless of the precise contours of DISH's constrained uplink capacity—having twice as much uplink capacity would be better for consumers, and for competition, as it would better enable signals to move from a consumer's device to a cellular tower, a critical component of wireless network operation.

DISH's statements concerning the importance of the 800 MHz spectrum licenses to augment its limited uplink capacity, and thereby promote competition, are consistent with public statements made to DISH's investors.  *See, e.g.*, Statement of Charles Ergen (Chairman), Q1 2023 Earnings Call, DISH, at 6 (May 8, 2023) (ECF No. 107-5) ("800 megahertz is extremely important for us to be able to compete. . . . [F]rom a competitive point of view, that's important low band, particularly uplink spectrum.").  T-Mobile's suggestion to the contrary rests on cherry-picked quotations from investor calls.  DISH has consistently maintained that the spectrum is competitively important.

The Opposition argues that "DISH does nothing to explain the $1 billion figure it puts forth."  Opp. at 26.  DISH submitted evidence that the $1 billion was spent on "radios compatible with 800 MHz on more than 16,000 towers it has already deployed."  Swieringa Decl.

¶ 6; *see* Swieringa Reply Decl. ¶ 4.  That cost represented solely the expense of the 800 MHz deployment; other frequencies were not included in this figure.  Swieringa Reply Decl. ¶ 4; *see* Swieringa Decl. ¶ 6.

Further, the Final Judgment is ultimately about competition and low prices for consumers.  But low prices require low marginal costs.  The 800 MHz frequencies are instrumental to reducing DISH's marginal costs because they will help avoid network congestion—a key driver of costs.  Swieringa Reply Decl. ¶ 6.  For this reason, the 800 MHz spectrum licenses—a swath of both low band and uplink spectrum—will boost DISH's ability to offer consumers highly competitive low prices.  As T-Mobile knows, wireless spectrum is a finite resource, and there is not additional nationwide, suitable, and available low-band spectrum for 5G deployment in the pipeline.  *Id.* ¶ 7.  If the 800 MHz licenses were to go to another buyer, DISH would not be able to simply buy other low-band and uplink spectrum at its convenience.  *Id.* ¶ 7.

Critically, T-Mobile's factual quibbles cannot erase its own admission that the 800 MHz spectrum is competitively significant to DISH.  Just two weeks ago, in seeking joint approval for the assignment to DISH of the 800 MHz licenses, T-Mobile stated that "[t]he terms of the Final Judgment are designed to facilitate DISH's entry into the wireless market as a facilities-based provider and grant of the instant Application would further this important objective and enhance competition in the mobile wireless marketplace by making DISH a stronger competitor in the offering of mobile voice and broadband services."  Ex. 10 at 2.  T-Mobile further joined DISH in stating:  "As DISH continues to deploy and increase coverage with this first-of-its-kind network, it will expand the availability of competitive services offered to both consumer and business customers.  The 800 MHz spectrum licenses contemplated by this transaction will substantially enhance DISH's ability to do so."  Ex. 10 at 2.  The Court need go no further than

T-Mobile's own admissions to find that competition would be harmed if DISH's ten-month extension request is denied.

## **CONCLUSION**

For the foregoing reasons, and for the reasons stated in its Motion, DISH respectfully requests that the Court modify Section IV.B.1 of the Final Judgment to require divestiture by June 30, 2024, which is within four years after the closing of the divestiture of the Prepaid Assets or within five business days of the approval by the FCC of the transfer of the 800 MHz Spectrum Licenses, whichever is later.

Date:  September 1, 2023

By:  */s/ Steven L. Holley*
Steven L. Holley
Bradley P. Smith
Sean P. Fulton
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-1660
Facsimile:  (212) 558-3588
holleys@sullcrom.com
smithbr@sullcrom.com
fultons@sullcrom.com

Adam Paris
SULLIVAN & CROMWELL LLP
1888 Century Park East, 21st Floor
Los Angeles, California  90067-1725
Telephone:  (310) 712-6600
Facsimile:  (310) 712-8800
parisa@sullcrom.com

*Attorneys for DISH Network Corporation*

**CERTIFICATE OF SERVICE**

Pursuant to Local Civil Rule 5.4(d), I hereby certify that on September 1, 2023, I caused the foregoing Reply Memorandum of Law in Further Support of DISH's Motion for Relief from Judgment to be electronically filed via the Court's CM/ECF system, which effected service of the document upon all counsel of record.

*/s/ Sean P. Fulton*
Sean P. Fulton