# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

    *Plaintiff,*

v.

DEUTSCHE TELEKOM AG, et al.,

    *Defendants.*

Case No. 1: 19-cv-02232 (TJK)

## BRIEF OF PHOENIX CENTER FOR ADVANCED LEGAL & ECONOMIC PUBLIC POLICY STUDIES IN SUPPORT OF DISH NETWORK CORPORATION'S OPPOSED MOTION FOR RELIEF FROM JUDGMENT

LAWRENCE J. SPIWAK
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015
Tel: (202) 274-0235
Email: lspiwak@phoenix-center.org
Counsel for Phoenix Center

September 1, 2023

**CORPORATE DISCLOSURE STATEMENT:**

Pursuant to Local Civil Rule 7(o)(5), Rule 29(a)(4) of the Federal Rules of Appellate Procedure, and Rule 26.1(a) of the Federal Rules of Appellate Procedure, the Phoenix Center for Advanced Legal & Economic Public Policy Studies submits the following corporate disclosure statement. The Phoenix Center is a non-profit 501(c)(3) non-stock corporation organized under the laws of Maryland. As such, the Phoenix Center has no parent companies and no one holds an ownership interest in the Phoenix Center.

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Email: lspiwak@phoenix-center.org
Tel: (202) 274-0235

# **TABLE OF CONTENTS:**

**Page:**

CORPORATE DISCLOSURE STATEMENT ................................................................. vi

TABLE OF AUTHORITIES ............................................................................................ x

INTEREST OF AMICUS CURIAE .................................................................................. 1

INTRODUCTION ............................................................................................................. 1

ARGUMENT

I.    Granting DISH's Reasonable Request is In the Public Interest ............................... 3

II.    Relief is Required to Achieve the Intended Result of both the Final Judgment and the FCC's Conditional Approval of the Merger ............................... 7

III.    T-Mobile Wants to Circumvent the DOJ's and FCC's Policy Decisions that Four Firms are Necessary to Protect Consumers ..................................................... 8

CONCLUSION ................................................................................................................ 10

CERTIFICATE OF SERVICE ........................................................................................ 11

# TABLE OF AUTHORITIES:

**Page(s):**

## CASES:

*Rufo v. Inmates of Suffolk Cnty. Jail*..................................................................................7
    502 U.S. 367 (1992).

*United States v. Western Electric Co.*................................................................................7
    46 F.3d 1198 (D.C. Cir. 1995).

*New York State Assn. for Retarded Children Inc. v. Carey* ...............................................9
    706 F.2d 956 (2nd Cir.), *cert. denied* 464 U.S. 915 (1983).

## STATUTES AND REGULATIONS:

Clayton Act Section 7, 15 U.S.C. § 18 ............................................................................5, 8

Communications Act Section 310(d), 47 U.S.C. § 319(d) ..............................................5, 8

## ADMINISTRATIVE MATERIALS:

*FCC Sprint/T-Mobile Merger Order* ....................................................................................4
    *In the Matter of Applications of T-Mobile US, Inc., and Sprint Corporation for Consent to Transfer Control of Licenses and Authorizations; Applications of American H Block Wireless L.L.C., DBSD Corporation, Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time,* FCC 19-103, MEMORANDUM OPINION AND ORDER, DECLARATORY RULING, AND ORDER OF PROPOSED MODIFICATION, 34 FCC Rcd. 10578 (rel. November 5, 2019).

NATIONAL SPECTRUM STRATEGY.......................................................................................8
    National Telecommunications and Information Administration, United States Department of Commerce (available at: https://www.ntia.gov/issues/national-spectrum-strategy).

## MISCELLANEOUS

Beard, T. Randolph, Ford, George S., Spiwak, Lawrence J. and Stern, Michael ................ 4
    *Wireless Competition Under Spectrum Exhaust,* 65 FEDERAL COMMUNICATIONS LAW JOURNAL 79 (2012) (available at: https://www.phoenix-center.org/FCLJSpectrumExhaust.pdf).

Ford, George S., Koutsky, Thomas M. and Spiwak, Lawrence J. ........................................ 3
    *Competition After Unbundling: Entry, Industry Structure, and Convergence,* 59 FEDERAL COMMUNICATIONS LAW JOURNAL 331 (2007) (available at: https://www.phoenix-center.org/papers/FCLJCompetitionAfterUnbundling.pdf).

Kaminski, Robert .......................................................................................................... 5, 6
    CAPITAL ALPHA PARTNERS TELECOM & MEDIA SCORECARD (March 2023) (available at at: https://research.capalphadc.com/SingletrackCMS__DownloadDocument?uid=d9f682c5-9359-4ef2-8493-ad3c886eeae1&docRef=beb81540-9485-44f1-b88a-e0a4aff651a0&jobRef=e8d38ffa-7506-4235-b4d3-cd75e44ff6ce).

Ford, George S. .................................................................................................................. 6
    *Does High Market Concentration Contribute to Inflation?,* THE CENTER FOR GROWTH AND OPPORTUNITY AT UTAH STATE UNIVERSITY (MARCH 9, 2023) (available at: https://www.thecgo.org/research/does-high-market-concentration-contribute-to-inflation).

Ratnam, Gopal .................................................................................................................... 8
    *FCC Spectrum Auction Authority Lapses Amid Questions on Military Need,* ROLL CALL (March 10, 2023) (available at: https://rollcall.com/2023/03/10/fcc-spectrum-auction-authority-lapses-amid-questions-on-military-need).

Sutton, John ....................................................................................................................... 3
    SUNK COSTS AND MARKET STRUCTURE (1991).

**INTERESTS OF AMICUS CURIAE:**

The Phoenix Center is a non-profit 501(c)(3) research organization that studies the law and economics of the digital age. The Phoenix Center has conducted significant scholarly research about the relationship between spectrum availability and the structure of U.S wireless markets. The Phoenix Center, therefore, has an established interest in the outcome of this proceeding and believes that its perspective on the issues will assist the Court to decide the motion before it.[1]

**INTRODUCTION:**

Prior to the Sprint/T-Mobile merger, the U.S. wireless market was characterized by an equilibrium number of four firms. Although T-Mobile could have made the argument that the mobile wireless market could profitably sustain only three firms, it did not. As such, because both the Department of Justice and Federal Communications Commission determined that four firms were viable, the Government imposed structural remedies on T-Mobile to divest, among other assets, licenses for spectrum in the 800 MHz band to

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of the brief. No person other than *Amicus Curiae* or its counsel made a monetary contribution to the preparation or submission of this brief.

DISH Network in the hope that DISH could complete its then-nascent mobile wireless network and sustain the structural equilibrium at four firms. Since the Final Judgment was approved by this Court, several "Black Swan" events have hit the U.S. economy—including the Covid pandemic, inflation and massive interest rate hikes (the latter two mostly the consequence of Federal Government actions)—which have made it difficult for DISH to obtain the financing necessary to acquire the spectrum pursuant to the deadlines established in the Final Judgment. To this end, DISH is requesting this Court to grant it a reasonable, one-time ten-month extension to allow the financial markets to settle down.

As detailed below, three inter-related reasons support this Court's granting of DISH's motion. First, the caselaw is clear that when "changed factual conditions make compliance with the decree substantially more onerous" or "when a decree proves to be unworkable because of unforeseen obstacles, or when enforcement of the decree without modification would be detrimental to the public interest," modification is appropriate. Second, arguing over whether the parties should have anticipated these Black Swan events when they negotiated the License Purchase Agreement is a distraction. This Court has an obligation to ensure that the intent of the Final Judgment is carried out—i.e., the U.S. Government believes it necessary that wireless markets be characterized by four—and not three—national facilities-based firms. Today, only DISH offers the opportunity for a plausible fourth firm. Finally, it is readily apparent that T-Mobile's opposition to DISH's motion is intended to thwart the intent of the Final Judgment. T-Mobile would clearly prefer to let DISH wither on the vine (and deprive the market of a fourth provider)

and profit further by selling its valuable spectrum on the secondary market to a less-threatening buyer.

**ARGUMENT:**

**I.  Granting DISH's Reasonable Request is In the Public Interest**

Like prices, the number of firms operating in a market is an equilibrium.  A market's equilibrium structure does not emerge out of thin air and is not governed by wishful thinking; the structural equilibrium is a function of the size of the market, the intensity of price competition, and the amount of fixed-and-sunk costs required to offer services.  In markets characterized by high fixed and sunk costs, such as the telecommunications industry, few firms in equilibrium are to be expected.  *See* John Sutton, SUNK COSTS AND MARKET STRUCTURE (1991) ch. 2; George S. Ford, Thomas M. Koutsky and Lawrence J. Spiwak, *Competition After Unbundling: Entry, Industry Structure, and Convergence*, 59 FEDERAL COMMUNICATIONS LAW JOURNAL 331 (2007).  If there are more firms in a market than the equilibrium can support, then some firms will be unprofitable and will be forced to exit, often through mergers and acquisition (if permitted).  If there are fewer firms than the equilibrium dictates, then entry will occur until the equilibrium is reached.  Absent additional entry, say due to entry barriers or government policies, incumbent firms may charge high prices and earn above normal profits.

A horizontal merger is, by definition, a reduction in the number of firms in a market.  The Sprint/T-Mobile merger combined the third and fourth largest facilities-based national wireless carrier into one provider, reducing the number of nationwide, facilities-based providers from four firms into three roughly equal-sized firms.  Although T-Mobile

could have convinced the reviewing agencies that Sprint's struggles to operate profitably revealed that the equilibrium number of firms was three, *c.f.,* T. Randolph Beard, George S. Ford, Lawrence J. Spiwak and Michael Stern, *Wireless Competition Under Spectrum Exhaust*, 65 FEDERAL COMMUNICATIONS LAW JOURNAL 79 (2012), T-Mobile failed to do so.  As such, both the Department of Justice ("DOJ") and the Federal Communications Commission ("FCC")—after respectively undertaking comprehensive independent reviews of the transaction—made the affirmative policy decision that four national facilities-based providers were required to protect consumers.  *See, e.g., FCC Sprint/T-Mobile Merger Order* at ¶ 163 ("In the absence of any conditions …. Staff found that the transaction will likely lead to price increases in each year modeled.")

But what to do?  Entry—particularly *greenfield* entry—into the mobile industry is neither easy, cheap nor quick.  Not only does entry require investing billions of dollars in communications networks infrastructure and customer acquisition, but a new entrant also requires access to sufficient electromagnetic radio spectrum—a highly-prized but limited resource.  If both the DOJ and the FCC determined the prospect for new entry was unlikely, then the Sprint/T-Mobile transaction—just like the failed AT&T/T-Mobile merger a few years earlier—was doomed.  The DOJ's and the FCC's solution came in the form of DISH Network.

Around the time of the merger, DISH announced plans to construct a nationwide greenfield network.  However, DISH had yet to deploy a single 5G tower and the wireless technology it sought to utilize was unknown and untested.  DISH Motion at 10. So, while DISH's potential entry was welcomed, industry veterans knew that there was

no guarantee of success. To increase the odds of that DISH would be a viable competitor—and, by extension, sustain a four firm market structure—the DOJ and the FCC required T-Mobile to divest Boost Mobile to DISH (which would mitigate customer acquisition costs) and to sell DISH a significant amount of spectrum in the 800 MHz band. Having thus sufficiently comforted themselves that these structural remedies would provide a legitimate chance of viable entry from DISH, the FCC found that the transaction would serve the public interest (*see* 47 U.S.C. § 310(d)) and the DOJ concluded that the merger was unlikely to substantially lessen competition (*see* 15 U.S.C. § 18). This Court signed off on these expert decisions when it approved the Final Judgment.

Although there was great skepticism that DISH would succeed, through a combination of spectrum bands not widely deployed by incumbent carriers, utilizing a novel network architecture (Open RAN), and coordinating a complex technological vendor ecosystem, DISH nonetheless managed to meet its buildout requirements in time to meet the mandated deadlines. DISH Motion at 10. *See also* Robert Kaminski, CAPITAL ALPHA PARTNERS TELECOM & MEDIA SCORECARD (March 2023) at 17 ("We had questioned DISH's level of interest in being a network operator and instead expected the company to flip the spectrum. In meeting its first deadline, DISH has demonstrated proof of concept and appears to intend to meet the rest.").

Which brings us to the dispute at bar. Under the License Purchase Agreement (LPA), DISH is entitled to purchase the 800 MHz spectrum from T-Mobile for approximately $3.6 billion. LPA Section 2.1. As noted above, the DOJ believed that by imposing this

structural remedy, this 800 MHz spectrum would go a long way towards helping DISH become a viable facilities-based competitor in the market. *See, e.g.,* Kaminski, *supra* ("Given DISH's [current] spectrum configuration and device requirements, it may take longer for the company to have a competitive offering on par with AT&T, Verizon, and T-Mobile.")

As sophisticated businesses, both T-Mobile and DISH understood when they entered into the LPA that financial markets can ebb and flow over time.  However, no reasonable businessperson could have anticipated the multiple "Black Swan" events that occurred since the LPA was executed.  With the onslaught of Covid (complete with its complete shutdown of the U.S. economy), the once-in-a-generation inflation caused by the Federal Government's massive spending after the pandemic, *see generally,* George S. Ford, *Does High Market Concentration Contribute to Inflation?,* THE CENTER FOR GROWTH AND OPPORTUNITY AT UTAH STATE UNIVERSITY (March 9, 2023), and the subsequent interest rates hikes by the Federal Reserve Bank to control this inflation, both American consumers and businesses are now trying to adjust to the highest interest rates in forty years.  DISH is therefore requesting a reasonable, ten-month one-time extension to allow it to find reasonable financing to complete the 800 MHz spectrum divestiture.

T-Mobile's response is essentially "so what"?  T-Mobile argues that both DISH and T-Mobile are sophisticated business entities and went into the LPA and Final Judgment with their eyes open.  T-Mobile August 25, 2023, Opposition, *passim*.  If the transaction at bar was a mere pre-Covid commercial arrangement, then perhaps T-Mobile has a point.  But that is not the case before this Court.  This mandatory divestiture is part of a

Consent Decree aimed at maintaining an equilibrium number of four in the mobile wireless industry and this objective is being hindered by a staggering 525-basis point increase in interest rates in just over eighteen months. The U.S. economy is now operating in uncharted waters. Caselaw dictates that when "changed factual conditions make compliance with the decree substantially more onerous" or "when a decree proves to be unworkable because of unforeseen obstacles, or when enforcement of the decree without modification would be detrimental to the public interest," *Rufo v. Inmates of Suffolk Cnty. Jail,* 502 U.S. 367, 384 (1992) (citations omitted), modification is appropriate. DISH's reasonable request for a one-time modification of the Final Judgment certainly meets this standard.

## II. Relief is Required to Achieve the Intended Result of both the Final Judgment and the FCC's Conditional Approval of the Merger

As noted in the preceding section, the unanticipated Black Swan events which occurred after the Final Judgment was approved provide legitimate reasons for modification. Accordingly, T-Mobile's squabbling about whether the parties should have accounted for potential Black Swan events in the LPA is a distraction to this Court's primary function—specifically, that as time goes by and market conditions change, this Court must adapt and modify the Final Judgment to ensure that the intended goals of the decree are achieved. *Rufo,* 502 U.S. at 381 (1991); *United States v. Western Electric Co.,* 46 F.3d 1198, 1202 (D.C. Cir. 1995) (a court should modify a consent decree "in order to accomplish its intended result") (*citing U.S. v. United Shoe Machining Corp.*, 391 U.S. 244, 252 (1968)).

And what is the unambiguous "intended result" of the Final Judgment?  That the U.S. wireless market be characterized by *four—and not three—*national wireless networks.  Indeed, had T-Mobile made a better case, the DOJ and the FCC after conducting their exhaustive reviews could have simply concluded that three firms were sufficient.  The DOJ and FCC did not.  Instead, the DOJ and FCC found T-Mobile's advocacy deficient and thus went out of their way to impose structural remedies on T-Mobile to ensure the transaction met the requirements of the Clayton Act and Communications Act.  Accordingly, to guarantee that the intended result of the Final Judgment is achieved (i.e., an equilibrium of four facilities-based firms), this Court must respect the DOJ and the FCC's policy decisions and grant DISH's reasonable one-time request to modify the Final Judgment.

### III. T-Mobile Wants to Circumvent the DOJ's and FCC's Policy Decisions that Four Firms are Necessary to Protect Consumers

It is impossible to operate a nationwide facilities-based wireless network without adequate spectrum.  This problem is not unique to DISH.  It is an industry-wide problem.

As the popularity of mobile-wireless services places increasing demands on the networks of wireless providers, obtaining sufficient radio spectrum to meet that demand is proving difficult.  Not only is there no new commercial spectrum in the pipeline (although efforts are continually underway to find solutions, *see, e.g.,* National Telecommunications and Information Administration, United States Department of Commerce - National Spectrum Strategy), but as of the time of this writing Congress has yet to reauthorize the FCC's spectrum auction authority (*see, e.g.,* Gopal Ratnam, *FCC Spectrum Auction Authority Lapses Amid Questions On Military Need,* ROLL CALL

- 8 -

(March 10, 2023)). The scarcity of spectrum makes any significant block of useful commercial spectrum (such as the 800 MHz spectrum at issue in this case) extremely valuable.

T-Mobile, who is a seasoned player in the U.S. wireless industry, understands this dynamic all too well. Faced with the choice of either selling the 800 MHz spectrum to DISH at a price negotiated in 2020 (and, in so doing, create a fourth wireless network competitor as the DOJ and FCC intended) or selling the spectrum to another, less-threatening buyer at today's market prices, it is not hard to figure out T-Mobile's preferred strategy: as a rational actor, the later scenario makes a lot more business sense. Accordingly, let us be very clear what is going on in this dispute: to paraphrase the Second Circuit in *New York State Assn. for Retarded Children Inc. v. Carey,* T-Mobile is attempting to rob the Final Judgment of so much of its force to maintain an equilibrium of four firms that T-Mobile's argument amounts to nothing more than a "reversal under the guise of readjusting" the FCC and DOJ's structural remedies. 706 F.2d 956, 968 (2nd Cir.), *cert. denied* 464 U.S. 915 (1983) (*citing Swift & Co. v. United States,* 276 U.S. 106, 119 (1931).

## CONCLUSION:

For the reasons set forth herein, the Phoenix Center requests this Court to grant Defendant DISH Network Corporation's Opposed Motion for Relief.

Respectfully submitted,

s/ *Lawrence J. Spiwak*
Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Email:  lspiwak@phoenix-center.org
Tel: (202) 274-0235

Dated:  September 1, 2023

## **CERTIFICATE OF SERVICE:**

I hereby certify that, on September 1, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email:  lspiwak@phoenix-center.org