UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, et al,

Plaintiffs,

v.

Case No. 1:19-cv-02232 (TJK)

DEUTSCHE TELEKOM AG, et al.,

Defendants

## BRIEF FOR AMICI CURIAE BENTON INSTITUTE FOR BROADBAND & SOCIETY, NEW AMERICA'S OPEN TECHNOLOGY INSTITUTE, AND PUBLIC KNOWLEDGE IN SUPPORT OF DISH'S MOTION FOR RELIEF FROM JUDGMENT

Andrew Jay Schwartzman
D.C. Bar. No. 210096
525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
Telephone: (202) 812-3210
andyschwartzman@gmail.com
*Counsel for the Benton Institute for Broadband & Society, New America's Open Technology Institute and Public Knowledge*

September 1, 2023

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Local Rule 7(o)(5) and Rules 29(a)(4)(A) and 26.1 of the

Federal Rules of Appellate Procedure, the Benton Institute for Broadband &

Society, New America's Open Technology Institute and Public Knowledge

Computer & state that they are non-profit organizations under 501(c)(3) of the

Internal Revenue Code that have not issued shares or debt securities to the public.

## STATEMENT OF AMICI CURIAE INDEPENDENCE

Pursuant to Local Rule 7(o)(5) and FRAP 29(a)(4)(E), the Benton Institute for Broadband & Society, New America's Open Technology Institute and Public Knowledge state that: (i) no party's counsel authored the brief in whole or in part; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and (iii) no person other than the amici curiae and their counsel contributed money that was intended to fund preparing or submitting the brief.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT**....................................................i

**STATEMENT OF AMICI CURIAE INDEPENDENCE** ................................... ii

**TABLE OF CONTENTS** ..................................................................... iii

**TABLE OF AUTHORITIES** ..................................................................iv

**INTRODUCTION AND INTERESTS OF THEAMICI**……………….…..….1

**ARGUMENT** ...................................................................................4

**I.    GRANT OF THE MOTION UNAMBIGUOSLY SERVES THE PUBLIC INTEREST** ....................................................................5

**II.   COMPLETION OF DISH'S ORAN NETWORK USING 800 MHz SPECTRUM WILL HAVE COMPELLING COMPETITIVE BENEFITS AND GREATLY ENHANCE U.S. NATIONAL SECURITY INTEREST** ........................................................11

**III.  AMICUS BURNS & MCDONNELL'S FLAWED AND ASPIRATIONAL PROPOSAL TO OBTAIN 800 MHz SPECTRUM IS NOT PRO-COMPETITIVE, WOULD IMPAIR DISH'S ABILITY TO CREATE A VIABLE NETWORK, COULD BE IMPLEMENTED BY USING OTHER AVAILABLE LOW-BAND SPECTRUM.** ..................15

**CONCLUSION**................................................................................19

## TABLE OF AUTHORITIES

**Cases:**

*Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 366 (1992). . . . . . . . . . . . . . . . . . . 4

**Legislative Materials:**

15 USC §16(e)(1)(B) (Tunney Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

P.L. 116-24 (Secure and Trusted Communications Networks Act of 2019). . . . . 14

P.L. 117-167 (Chips and Science Act of 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

"Investigative Report on the U.S. National Security Issues Posed by Chinese Telecommunications Companies Huawei and ZTE," (October 12, 2012) . . . . . . 13

**Administrative Materials:**

Comments of the National Telecommunications and Information Administration, Docket 21-63 (July 16, 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Common Cause, et. al., Petition to Deny, Docket 18-197 (August 27, 2018)  . . . . 3

Letter from Public Interest Spectrum Coalition to FCC Chairman Wheeler, (February 24, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Letter from Public Interest Spectrum Coalition to FCC Chairman Wheeler, (February 24, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Letter from Public Knowledge to Chief, FCC Wireless Communications Bureau, Docket 18-120 (May 8, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Letter from Public Knowledge, et al. to U.S. Department of Justice, October 11, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Letter from Schools, Health & Libsary Coalition  to Chairwoman Jessica

Rosenworcel (June 23, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States Department of Justice, Ex Parte Submission, Docket 12-269 1 (May 14, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States Department of Justice, Ex Parte Submission, Docket 09-51(January 4, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Other Sources:**

Ars Technica, "AT&T admits defeat on T-Mobile takeover, will pay $4 billion breakup fee" (December 19, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Consumer Reports, New America's Open Technology Institute and Rural Wireless Association, Inc. Amicus Curiae Brief (January 29, 2020 (ECF 71) . . . . . . . . . . 3

Fierce Wireless, "NTIA asks for input on how to spend $1.5B to promote open RAN," (December 14, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Light Reading, "There's a 'lack of urgency' around AT&T's 5G build – analyst" (August 24, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

National Telecommunications and Information Administration,  "Open RAN Security Report" (May 23, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Select Spectrum. Wireless Spectrum Licenses in Location Monitoring Services (LMS) Ideal for Precision Location Monitoring Applications Available Nearly Nationwide, " . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

T-Mobile,"We changed wireless for our customers," https://www.t-mobile.com/our-story/un-carrier-history (accessed August 28, 2023) . . . . . . . . . . 9

Womble Bond Dickinson, "Escalation of U.S. Crackdown on Chinese Technology and Telecoms: Emerging Issues (August 30, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 1:19-cv-02232-TJK |
| | ) | |
| DEUTSCHE TELEKOM AG, et al.; | ) | |
| | ) | |
| Defendants. | ) | |

_____

## INTRODUCTION AND INTERESTS OF THE AMICI

Amici Curiae Benton Institute for Broadband & Society, New America's Open Technology Institute and Public Knowledge appear in support of the pending Motion for Relief from Judgment (ECF 94)(the Motion) of DISH Network Corporation (DISH).

The Benton Institute for Broadband & Society (Benton) is a non-profit, operating foundation.  Its primary mission is to bring open, affordable, high-capacity and competitive broadband to all people in the U.S. to ensure a thriving democracy. For over 40 years Benton has provided information and analysis about communications policy, including universal service. In recent years, Benton's activities strengthen local, state, and national leadership by providing the timely

information, rigorous evidence, practical guidance, and advocacy support needed to articulate and implement a broadband for all agenda.[1]

New America's Open Technology Institute ("OTI") is a 501(c)(3) public interest organization dedicated to closing the digital divide and ensuring that all Americans have equitable access to open and secure communications networks. OTI advocates for competitive markets. It has worked with the FCC and the U.S. Department of Justice on numerous regulatory matters pertaining to the wireless industry, including other proceedings that involved T-Mobile, Sprint, and DISH. OTI advocates for competitive markets. It was previously granted leave by this Court to appear as an amicus curiae in opposition to approval of the then-Proposed Final Judgment. (ECF 71).

Public Knowledge (PK) is a non-profit organization that promotes freedom of expression, an open internet, and access to affordable communications tools and creative works. PK's advocacy work encompasses a wide array of technology-based issues, including spectrum management. Public Knowledge carefully considers the consequences of how spectrum access is managed and advocates for diverse approaches to spectrum access that expand unlicensed use, encourage competition, and prevent the largest companies from hoarding spectrum access at

---

[1]This brief reflects the institutional view of the Benton Institute for Broadband & Society, and, unless obvious from the text, is not intended to reflect the views of its individual officers, directors, or advisors.

the public's expense.  It was a signatory to a Petition to Deny filed with the FCC

opposing the proposed sale of Sprint to T-Mobile and joined in the aforementioned

Tunney Act comments.

The amici have appeared in numerous other FCC proceedings, including as

members of the larger Public Interest Spectrum Coalition to support policies

creating competition in wireless.  Of immediate relevance, amici opposed approval

of the T-Mobile/Sprint transaction.  OTI and PK were signatories to a Petition to

Deny filed with the FCC opposing the proposed sale of Sprint to T-Mobile.[2]  They

also joined in the submission of Tunney Act comments to the Department of

Justice opposing approval of the T-Mobile/Sprint Transaction.[3]  OTI appeared as

amicus in this Court in opposition to approval of the Final Judgment.[4]

In the wake of the disapproval of the proposed sale of T-Mobile to AT&T in

2011, which amici also opposed, they strongly supported policies to insure that T-

Mobile would become a strong competitor.  As was the case after that transaction

---

[2]See Petition to Deny of Common Cause, Consumers Union, New America's
Open Technology Institute, Public Knowledge and Writers Guild of America,
West, Inc., Docket 18-197 (August 27, 2018,) available at
https://www.fcc.gov/ecfs/document/10827862305575/1 (acessed on September 1,
2023)..

[3]Letter from Public Knowledge to U.S. Department of Justice, October 11,
2019.  Available at
https://publicknowledge.org/policy/comments-to-the-doj-on-the-t-mobile-sprint-tu
nney-act/ (accessed on August 30, 2023).

[4]See Amicus Brief of Consumer Reports, New America's Open Technology
Institute and Rural Wireless Association, Inc. (January 29, 2020. (ECF 71).

was scuttled, amici now believe the public's interest in having a fully competitive

fourth national wireless carrier cannot be fulfilled unless DISH's pending motion is

approved.

## ARGUMENT

DISH and T-Mobile appear to agree that the applicable legal standard is that

established in *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 366, 383 (1992):

modification of a decree is permissible when compliance "proves unworkable

because of unforseen obstacles, or when enforcement of the decree without

modification would be detrimental to the public interest."  Motion, p; 15;

T-Mobile's and Deutsche Telekom's Opposition to DISH's Motion for Relief from

Judgment, (Opposition), p. 11 (ECF 105).  Any such modification should be

"suitably tailored" Motion, pp. 22ff; Opposition, p. 11.[5]  Denial of the Motion

would undoubtedly be detrimental to the public interest because it would frustrate

a core remedial goal of this Court's Final Judgment.  It would also harm national

security.  No alternative use for the spectrum here at issue would do those things.

---

[5]The relief requested unquestionably meets the "suitably tailored" standard.
It seeks a modest 10 month extension in the context of extraordinary and
unforeseeable events.

## I.     GRANT OF THE MOTION UNAMBIGUOUSLY SERVES THE PUBLIC INTEREST

In evaluating the public interest under the Tunney Act, the most important component here is the consideration of "the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint...."[6]

Amici appear here as representatives of the consumer interests whose welfare is on the line.  From the public interest perspective, what matters here is that DISH's ability to be an effective competitor will be, at the least, significantly impaired if it lacks access to the 800 MHz spectrum which it expected to have and has expended considerable capital to be able to use.  T-Mobile's quibbling over whether DISH's CEO has indicated in various unsworn public statements that it does not "need" this spectrum is very much beside the point.  Opposition, p. 2. Whether "must have" or just "nice to have," DISH will undoubtedly be far less likely to succeed in getting its foothold in the wireless market without this low band spectrum.  Such an outcome would be contrary to the public interest.

As stated above, amici had opposed the sale of T-Mobile to AT&T.

---

[6]15 USC §16(e)(1)(B).  It is worth mention that the harms alleged here by T-Mobile are not encompassed in the statutory language, as it is most assuredly not " alleging specific injury from the violations set forth in the complaint...."  It was the putative defendant in this proceeding.

Notably, because the sale to AT&TT was not consummated, T-Mobile received $3 billion in break-up compensation that afforded it much needed low-band spectrum.[7]  T-Mobile also obtained additional low-band spectrum as the beneficiary of a divestiture requirement imposed on Verizon as a condition of Verizon's acquisition of low-band spectrum from several cable operators.[8]  In both these cases, amici supported the license transfers because they were pro-competitive.  Similarly, amici supported T-Mobile's proposal for a competitive set-aside of a wide band of 600 MHz spectrum in the incentive auction of broadcast spectrum conducted in 2017.

It is hard to overstate the importance of low-band spectrum.  Regardless of DISH's public posture in unsworn statements, amici urge this Court to recognize that the failure to obtain low-band spectrum is critical to the competitive benefits contemplated in the Final Judgment.  Similarly, a central premise of amici's support of T-Mobile's 600 MHZ acquisition was that a large portfolio of low band spectrum is essential for a carrier to offer a competitive service in the marketplace. That is because only low-band spectrum (below 1,000 MHz) readily penetrates

---

[7]Ars Technica, "AT&T admits defeat on T-Mobile takeover, will pay $4 billion breakup fee" (December 19, 2011), available at https://arstechnica.com/tech-policy/2011/12/att-admits-defeat-on-t-mobile-takeover-will-pay-4-billion-breakup-fee/#:~:text=AT%26T%20says%20it%20will%20%22recognize,roaming%20agreement%20with%20Deutsche%20Telekom.%22 (accessed September 1, 2023).

[8]*Id.*

buildings, trees and other obstacles; and only low-band spectrum carries voicxe

calls and data very long distances.  Because that means fewer towers and cell cites

are needed, it greatly reduces the cost of the infrastructure and siting needed to

cover rural and other less populated areas.  Thus, what amici and their coalition

said at the time is highly relevant to the matter now at issue: .

> Without more meaningful protections against spectrum concentration
> than the FCC has adopted so far, AT&T and Verizon can use future
> auctions to prevent other carriers from gaining access to the spectrum
> necessary to compete.  The upcoming 600 MHZ incentive auction
> provides what may be the FCC's final opportunity to prevent the two
> dominant carriers from monopolizing the low-band spectrum needed
> to compete in a broadband data world.  Because AT&T and Verizon
> already control nearly three-quarters of the nation's uniquely valuable
> low-band spectrum, only a spectrum reserve of 40 megahertz or more
> can prevent the two dominant carriers from using the 600 MHZ
> auction to extinguish the handful of wireless broadband competitors
> that continue to offer consumers an alternative for wireless voice and
> data services.[9]

Because of these and other transactions, as shown in Attachment A, a chart

prepared by an independent trade press publication,[10] T-Mobile now has a

---

[9]Letter from Public Interest Spectrum Coalition to FCC Chairman Wheeler, (February 24, 2015), available at https://www.fcc.gov/ecfs/document/60001019823/1 (quoting Policies Regarding Mobile Spectrum Holdings, 29 FCC Rcd 6133, 6165 (2014). ("We agree with the Antitrust Division of the DOJ, one of our nation's expert antitrust agencies: there is a risk of foreclosure in downstream wireless markets"); Ex Parte Submission of the United States Department of Justice, Docket 12-269 (Apr. 11, 2013), available at https://www.justice.gov/sites/default/files/atr/legacy/2013/04/15/295780.pdf (accessed September 1, 2023).

[10]The chart accompanied this article: Light Reading, "There's a 'lack of urgency' around AT&T's 5G build – analyst"(August 24, 2023), available at

substantial portfolio of low-band, mid-band and mid/high-band spectrum that is

superior to the other national wireless carriers.[11]  DISH needs low-band spectrum;

the 800 MHz spectrum that T-Mobile must sell is perfectly suited to meet that

need.

Amici's past advocacy to insure, inter alia, that T-Mobile had the low-band

spectrum needed to build a robust network may have contributed to T-Mobile's

subsequent success.[12]  Whether or not that was the case, forced to become self-

sufficient, T-Mobile successfully adopted aggressive and highly innovative

---

https://www.lightreading.com/5g-and-beyond/theres-lack-of-urgency-around-atandts-5g-build---analyst/d/d-id/786232

[11]Because spectrum of different frequencies has different propagation qualities, carriers need a mix of spectrum holdings to provide good service.  Mid-band has greater throughput and is particularly needed for denser urban areas. Because low-band spectrum travels farther, it is especially important in less-populated areas, which is where DISH must deploy to go from covering about three-quarters of the country to reach full CONUS coverage.

[12]Amici's support for T-Mobile's success continues to this day.  The FCC has taken the position that legislative obstacles preclude it from allowing T-Mobile to  deploy a large band of 2.5 GHz spectrum which T-Mobile bought at auction. Amici have spoken out in support of T-Mobile on this issue.  See, Letter from Public Knowledge to Chief, FCC Wireless Communications Bureau, Docket 18-120 (May 8, 2023), available at https://www.fcc.gov/ecfs/document/105082242903804/1 (accessed August 31, 2023).  See also Letter to Chairwoman Jessica Rosenworcel from Schools, Health & Libsary Coalition (June 23, 2023), available at https://www.shlb.org/uploads/Policy/National%20BB%20Plan/SHLB%202.5%20 GHz%20Letter%20-%20June%202023.pdf (Benton and OTI are members of this organization.)

marketing and sales practices that enabled it to become a profitable and effective competitor.[13]

The current situation is similar to what T-Mobile faced in 2011, and amici here adopt a consistent position.  The nation must have at least four national competing mobile networks to have effective competition, and each of those networks must have sufficient spectrum to compete.  Once this Court issued its Final Judgment, amici became deeply invested in DISH's ability to be a successful competitor and thus fulfill the stated consumer welfare goal of the Final Judgment, which was to insure creation of a fourth national facilities-based provider.  That principle underlies amici's support of the Motion, notwithstanding their prior position opposing the issuance of the Final Judgment as well as their various actions supporting T-Mobile's efforts to become more competitive.

T-Mobile attempts to present this as a contractual dispute between two private parties that was negotiated at arms-length.  While it is true that DISH "enjoyed highly favorable contract terms from T-Mobile at an attractive price," Opposition, p. 12, that was because this was set forth as an inducement

---

[13]T-Mobile now invites consumers to examine how it has accomplished these goals.  "We changed wireless for our customers," https://www.t-mobile.com/our-story/un-carrier-history (accessed August 28, 2023). ("We set out to relieve our customers' pain points and ended up changing the wireless industry for good. Look back and at how the Un-carrier grew with each industry-shattering move.")

for DISH to undertake the risk of trying to do what no one had ever done before: create a new national facilities-based network from scratch. Moreover, the reason this unusual arrangement was devised, with the direct involvement of the Department of Justice, was to afford T-Mobile an extremely favorable opportunity at an attractive price to make an acquisition that T-Mobile earnestly desired, and which the Justice Department had previously argued was in violation of the Clayton Act.

Viewed in that context, T-Mobile's claim that the proposed extension is against the public interest because the 800 MHz spectrum "could be put to better use" Opposition, p. 21, is simply wrong. As the Final Judgment made clear, there is no "better use" for this spectrum than for it to be used in the creation of a fourth competitive national network. If the point were simply to insure divesture of of excessive spectrum, the Final Judgment could have permitted a standard divestment remedy. Instead, the Final Judgment explicitly directed sale to DISH to enhance competition and consumer welfare.

By contrast, sale at auction to Verizon or AT&T, the two strongest likely bidders, could not possibly enhance consumer welfare. Nor, as discussed below, would sale to a buyer in "another field," *id.*, advance the

public interest goal.  Moreover, it is hard to see how a sale to another party could deploy the 800 MHz spectrum faster than DISH, which already has a network covering three-quarters of the country and which has been designed and configured with this specific spectrum band in mind.

T-Mobile's claim that it faces unfair harm from granting any extension to DISH is singularly misplaced.  It ignores entirely the context of the entry of the Final Judgment.  The harm that T-Mobile has already avoided was the disapproval of what would have otherwise been the anti-competitive acquisition of Sprint.  Balanced against that massive benefit, which has proved to be highly profitable, T-Mobile's inability to realize the price it agreed to receive for 10 more months, pales into insignificance.

## II.   COMPLETION OF DISH'S ORAN NETWORK USING 800 MHz SPECTRUM WILL HAVE COMPELLING COMPETITIVE BENEFITS AND GREATLY ENHANCE U.S. NATIONAL SECURITY INTERESTS.

Because DISH has designed and constructed its Greenfield 5G network as the first to exclusively employ ORAN (Open Radio Access Network) technology, grant of DISH's motion will promote competition as well as provide a significant and unique benefit to U.S. national security.

ORAN technology uses open source software and equipment that allows interoperation between cellular network equipment provided by

different vendors.  This will allow any hardware and software in the network

to interoperate both seamlessly and securely regardless of its originating

vendor.[14]

Fostering an ORAN environment has important economic and

competitive benefits.[15]  ORAN's open interface allows smaller vendors to enter

the hardware market, leading to cost reduction and innovative designs.

Because multiple vendors' equipment can be used interchangeably, network

operators are not locked into a monoculture; most equipment used an current

networks necessarily must be from one manufacturer.  In western economies,

_____

[14]For example, Apple's computers use proprietary hardware and software.
This has many advantages, but has disadvantages as well.  By contrast, Windows
systems are open source.  This allows customers to purchase and install external
and internal drives, network, graphics and similar cards and other equipment from
any vendor.  And anyone access and modify Windows code, enabling much more
competition and innovation in software development.

[15]While Burns & McDonnell vaguely says that "it intends to further the
federal government's goals of advancing 5G and Open Radio Access Networks,"
Brief of Burns & McDonnell Engineering Company, Inc., p. 3 (ECF 111), that
unenforceable aspiration falls far short of a definitive commitment to build an all
ORAN network as opposed to merely using ORAN technology for some small part
of this yet-to-be designed network.  Nor is it clear that its putative partners,
including regional providers which currently do not use ORAN as well as an
unknown number of notoriously risk-averse electric utilities, will agree to install an
ORAN network.  Moreover, even if this hypothetical network were all-ORAN, the
development of a bespoke highly specialized private network for at most a few
hundred customers would have few of the competitive benefits generated by
DISH's already partially-installed consumer network designed to serve tens of
millions of users.

for all practical purposes, there are only two available vendors - Motorola and Ericsson.

A no less important benefit of completing DISH's ORAN network is that it adds tremendously to our nation's security.[16]  For more than a decade, intelligence officials have reported with increasing concerns the threat posed by the Chinese government's potential to use Chinese manufactured telecommunications equipment to collect data on U.S. citizens;  capture and disrupt U.S. military communications, including communications about the U.S.'s nuclear weapons;  and steal corporate intellectual property and trade secrets.

Because of the historically anti-competitive duopoly in telecommunication network equipment, over the last two decades two Chinese companies - Huawei and ZTE -  began to penetrate the U.S. market, offering much cheaper equipment.  Smaller regional and rural local telecommunications providers began to install this equipment, but national securities concerns quickly began to arise.  By 2012, the House Permanent

---

[16]According to the National Telecommunications and Information Administration (NTIA), "Open RAN offers important cybersecurity advantages,..." "Open RAN Security Report" (May 23, 2023), available at https://ntia.gov/report/2023/open-ran-security-report (accessed September 1, 2023).

Select Committee on Intelligence issued a scathing report on the national security implications raised by the use of Huawei and ZTE equipment.[17]

`         In response to the growing threat, Congress enacted the Secure and Trusted Communications Networks Act of 2019,[18] requiring carriers to "rip and replace" Huawei and ZTE equipment in their networks.  Congress provided $1.9 billion to reimburse the cost of doing so.[19]  Even with the removal of the ZTE and Huawei equipment, there is continuing concern that various components made by Huawei and ZTE remain in parts of the legacy U.S. telecommunications networks.  One of the major benefits of DISH's greenfield network is that it has been designed from the ground up not to include any Chinese made equipment or components.

         One of the challenges to addressing the national security threat to telecommunications networks is the lack of alternative equipment vendors. DISH's vender-neutral ORAN network helps to pave the way for future

---

[17]"Investigative Report on the U.S. National Security Issues Posed by Chinese Telecommunications Companies Huawei and ZTE (October 12, 2012), https://intelligence.house.gov/sites/intelligence.house.gov/files/documents/huawei-zte%20investigative%20report%20(final).pdf (accessed August 31, 2023).

[18]P.L. 116-124

[19]See Womble Bond Dickinsgon, "Escalation of U.S. Crackdown on Chinese Technology and Telecoms: Emerging Issues (August 30, 2023), available at https://www.womblebonddickinson.com/us/insights/articles-and-briefings/escalati on-us-crackdown-chinese-technology-and-telecoms-emerging (accessed September 1, 2023).

installations by other companies that will use the highly secure ORAN

technology.  This diversification also minimizes threats from supply chain

disruptions that are especially dangerous when there are only two suppliers.

As NTIA told the FCC,

> Open RAN could enhance supply chain security by creating additional
> resilience and redundancy in global telecommunications equipment
> manufacturing by facilitating the emergence of new vendors. In
> addition, Open RAN can prevent vendor lock-in by allowing operators
> to mix and match hardware and software from a number of vendors,
> creating additional diversity, resilience, and redundancy.[20]

The recently enacted Chips and Science Act of 2022 provides $1.5 billion "to

bolster open RAN technology because it promotes the usage of interoperable

equipment and reduces the industry's reliance upon proprietary RAN

solutions such as those sold by many of the leading wireless suppliers."[21],

## III. AMICUS BURNS & MCDONNELL'S FLAWED AND ASPIRATIONAL PROPOSAL TO OBTAIN 800 MHz SPECTRUM IS NOT PRO-COMPETITIVE, WOULD IMPAIR DISH'S ABILITY TO CREATE A VIABLE NETWORK, COULD BE IMPLEMENTED BY USING OTHER AVAILABLE LOW-BAND SPECTRUM.

---

[20]Comments of the National Telecommunications and Information Administration,Docket 21-63 (July 16, 2021) at p. 8, available at https://www.fcc.gov/ecfs/document/10716158214177/1 (accessed August 31, 2023).

[21]Fierce Wireless, "NTIA asks for input on how to spend $1.5B to promote open RAN," (December 14, 2022), available at https://www.fiercewireless.com/5g/ntia-asks-input-how-spend-15b-promote-open-ran

As set forth above, amici believe that the pro-competitive outcome contemplated in the Final Judgment depends on DISH's successful deployment of a new national facilities-based network.  The strong likelihood that Verizon or AT&T would emerge as successful bidders if T-Mobile were to put the 800 MHz  spectrum to auction is indubitably contrary to promoting competition.  And the belated appearance of amicus Burns & McDonnell similarly fails to provide an avenue to increased competition in the wireless market.

First, it is quite uncertain that Burns & McDonnell or any other bidder in a hypothetical auction could or would outbid Verizon or AT&T.  Leaving aside the deepness of their pockets, the 800 MHz spectrum is worth more to AT&T and Verizon than it is to others.  This well-established principle of auction theory is called "foreclosure value."  As the Assistant Attorney General for the Antitrust Division has explained to the FCC,

> When market power is not an issue, the best way to pursue this goal in allocating new resources is typically to auction them off, on the theory that the highest bidder, i.e., the one with the highest private value, will also generate the greatest benefits to consumers.  But that approach may not lead to market outcomes that would ordinarily maximize consumer welfare due to the presence of strong wireline or wireless incumbents, since the private value for incumbents in a given locale includes not only the revenue from use of the spectrum but also any benefits gained by preventing rivals from improving their services and thereby eroding the incumbents' existing businesses. The latter might be called

"foreclosure value" as distinct from "use value." The total private value of spectrum to any given provider is the sum of these two types of value. *However, the "foreclosure value" does not reflect consumer value; to the contrary, it represents the private value of foreclosing competition by, for instance, forestalling entry or expansion that threatens to inject additional competition into the market.*[22]

Second, even if Burns & McDonnell and the electric utilities on whose behalf it claims to act could prevail in such an auction, that outcome would not come close to furthering the stated objective of facilitating the creation of a fourth national facilities based wireless provider. Whatever societal benefit there may be in the construction of a private network for utilities, it does nothing to provide wireless consumers with the benefit of a new public mobile network service with consequential price competition and increased choices as to service and service providers. Thus, it would not advance this Court's objective in approving the Final Judgment.

Third, unlike DISH's aggressive effort to expand its nascent, but extant network, Burns & McDonnell's hypothetical network does not currently exist, and will not be deployed as easily as Burns & McDonnell suggests. Its brief

---

[22]Ex Parte Submission of the United States Department of Justice, Docket 09-51, pp. 10-11 (January 4, 2010) (emphasis added), available at https://www.fcc.gov/ecfs/document/6015504395/1. See also Parte Submission of the United States Department of Justice, Docket 12-269, p. 1 (May 14, 2014) ("I write today to confirm that the Department stands by the views articulated in those April 2013 comments, and that no intervening developments in the industry have affected the compelling economic rationale for well-defined, competition-focused rules concerning acquisitions by the most spectrum-rich providers.")

offers little more than the rhetorical assurance that it has a "clear vision and stated plan for how the Spectrum should be used,..." Brief of Burns & McDonnell Engineering Company, Inc., p. 3. The notion that it can cobble together a national network from the assets of an unknown number of electric utilities or regional providers is a daunting one, and is something that has never before been tried.  The blithe assurance that "[u]tilities will leverage the towers and backhaul they use today...," and that "[i]ndustry partners will supply the equipment and operate the Spectrum,..," id., downplays the complicated logistical and contractual challenges such a project would pose. Indeed, simply saying that the utilities "will supply the equipment" elides the fact that the hypothesized 5G 800 MHz equipment is at this point 'vaporware" that has not been designed, much less that procurement has begun or the equipment is being manufactured.

Finally, and perhaps most importantly, unlike DISH, Burns & McDonnell does not need T-Mobile's 800 MHz spectrum to create its imagined network.  DISH has already designed and installed 800 MHz equipment configured for this specific spectrum on more than 16,000 5G towers throughout the country.  Burns & McDonnell can accomplish its goal using any of several swathes of low-band spectrum.  There are almost

certainly a number of incumbents with assets in the 600-900 MHz bands who

would be willing and able to lease, or perhaps even sell spectrum for the kind

of private network Burns & McDonnell contemplates.[23]

## CONCLUSION

There are powerful and compelling reasons for this Court to find that

the modest relief DISH seeks is manifestly in the public interest because it

will advance the consumer welfare objectives that underlay this Court's

issuance of the Final Judgment.

Respectfully submitted,

*/s/ Andrew Jay Schwartzman*
Andrew Jay Schwartzman
D.C. Bar. No. 210096
525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
Telephone: (202) 812-3210
andyschwartzman@gmail.com
*Counsel for the Benton Institute for*
*Broadband & Society, New America's Open*
*Technology Institute and Public Knowledge*

September 1, 2023

---

[23]For example, one broker's website currently lists a substantial quantity (4 MHz) of spectrum in the 900 MHZ band for sale or lease.  The spectrum covers "portions of 49 states offering nearly nationwide coverage...[and] cover[s] a population of over 258 million in both urban and rural markets...."  "Wireless Spectrum Licenses in Location Monitoring Services (LMS) Ideal for Precision Location Monitoring Applications Available Nearly Nationwide, " www.selectspectrum.com/assets/documents/pdf/LMS_SpectrumSummary_230320 .pdf (accessed on August 31, 2023).

# ATTACHMENT A



USM holdings in Covered Markets (~32M Pops)
V/L Subs: Retail branded postpaid + prepaid. AT&T excludes connected devices. TMUS/US
ow Band <1 GHz, Mid-Band 1-2 GHz, Mid/High-Band 2-6 GHz
:able Co. includes CMCSA, CHTR, ATUS, Cox, Mediacom, and CMCSA-Midcontinent Joint V
ιssumes DISH does not exercise option to purchase 13.5 MHz of 800 MHz spectrum from
ource: Raymond James, FCC, AllNet Labs, Company documents

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2023, I electronically filed the foregoing

Brief Amici Curiae via the Court's CM/ECF system, which effected service of the

document upon all counsel of record.

*/s/ Andrew Jay Schwartzman*
Andrew Jay Schwartzman