**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., *Plaintiffs*, v. DEUTSCHE TELEKOM AG, et al., *Defendants*. | Civil Action No. 1:19-cv-02232-TJK |

**<u>CERTAIN PLAINTIFF STATES' OPPOSITION TO DISH NETWORK CORPORATION'S OPPOSED MOTION FOR RELIEF FROM JUDGMENT</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii
PRELIMINARY STATEMENT.............................................................................................. 1
LEGAL STANDARD............................................................................................................ ..2
ARGUMENT......................................................................................................................... ..3
    A.    DISH Fails to Meet its Burden of Establishing a Significant Change in Circumstances . ..3
    B.    DISH is Subject to the *Rufo* Standard Despite Being a Divesture Buyer………………….6
    C.    DISH Has Not Proffered a Plan for or Expressed Actual Ability to Acquire the Spectrum in the Requested 10-Month Timeframe …………………………………………………..7
    D.    DISH's Attempt to Delay the Prompt Divestiture of the 800 MHz Spectrum is Not in the Public Interest……………………………………………………………………………..8
    E.    DISH Fails to Demonstrate that Its Proposed Modification is not Suitably Tailored to the Alleged Changed Circumstances ……………………………………………………………8
CONCLUSION...................................................................................................................... .9

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*New York v. Deutsche Telekom AG,*
   439 F. Supp. 3d 179, 204 (S.D.N.Y. 2020)……………………………………………..2

*New York v. Microsoft Corp.,*
   531 F. Supp. 2d (D.D.C. 2008) ........................................................................................5,7

*Richardson v. Edwards,*
   127 F.3d 97 (D.C.Cir.1997)……………………………………………….…………..3

\*   *Rufo v. Inmates of Suffolk Cnty. Jail,*
   502 U.S. 367 (1992)……………………………………………………………..passim

\*   *United States v. Baroid Corp.,*
   130 F. Supp. 2d (D.D.C. 2001) ..................................................................................passim

*United States v. Signature Flight Support Corp.,*
   607 F. Supp. 2d (D.D.C. 2009)……………………………………………………...…5,6,7

\*   *United States v. W. Elec. Co.,*
   46 F.3d 1198 (D.C. Cir. 1995)………………………………………………………...…2,3

**Other Authorities**

15 U.S.C. 15(c)………………………………………………………………………………1

E. Allen Farnesworth, Farnesworth on Contracts § 9.6, at 552–58 (1990)……………………..3,6

Letter from Phil Weiser, Colorado Attorney General, et al. to Amy Klobuchar, Chair of U.S. Senate Subcommittee on Competition Policy, Antitrust, & Consumer Rights, et al. (June 18, 2021), https://www.naag.org/wp-content/uploads/2021/06/Final-State-Antitrust-Enforcement-Venue-Act-Endorsement.pdf....................................................................................................................1

Moore, Jeff. *The state of wireless competition is looking good*. Fierce Wireless, (August 14, 2023), https://www.fiercewireless.com/wireless/state-wireless-competition-looking-good-moore........................................................................................................................6

Stephen Calkins, *Perspectives on State and Federal Antitrust Enforcement,*
53 Duke L.J. 673, 680 (2003)……………………………………………….…………...…….1

\* Pursuant to Local Rule 7(a), an asterisk in the margin to the left of the case identifies cases or authorities on which counsel chiefly relies.

Plaintiff States of Kansas, Nebraska, and Oklahoma submit this Opposition to DISH Network Corporation's ("DISH's") Motion for Relief from Judgment, ECF No. 94 (the "Motion") in accordance with the Order entered by the Court on August 21, 2023. Plaintiff States of Kansas, Nebraska, and Oklahoma have met and conferred with the U.S. Department of Justice, along with other Plaintiff States.

## PRELIMINARY STATEMENT

On April 1, 2020, this Court entered the Final Judgment to resolve a lawsuit ("the Complaint") joined by Plaintiff States of Kansas, Nebraska, Ohio, Oklahoma, South Dakota, Louisiana, Florida, Colorado, Arkansas, and Texas, and filed by the Antitrust Division of the U.S. Department of Justice (the "Division"). The Complaint alleged the merger between T-Mobile and Sprint violated Section 7 of the Clayton Act in that the consummation of the merger would have resulted in lost competition in the Retail Mobile Wireless Service market. To remedy the lost competition resulting from the merger, the Final Judgment required the divesture of certain assets from T-Mobile and Sprint, including the 800 MHz Spectrum Licenses at issue in the pending motion.

State attorneys general actively pursue significant antitrust enforcement actions on behalf of consumers in their respective States.[1] Congress has expressly provided State attorneys general authority to pursue federal antitrust violations as *parens patriae*. 15 U.S.C. 15(c). Most recently, Congress has put state enforcers on an even playing field with their federal counterparts by providing them protection from venue transfers, thereby allowing all government enforcers a choice of where to prosecute their cases.

The state attorney general's role in antitrust enforcement is heightened in instances where the markets are local in nature. Stephen Calkins, *Perspectives on State and Federal Antitrust Enforcement*, 53 Duke L.J. 673, 680 (2003). And in cases involving wireless telecommunications services, relevant local antitrust markets exist because "consumers likely rely primarily on local services in the area in which

---

[1] *See, e.g.*, Letter from Phil Weiser, Colorado Attorney General, et al. to Amy Klobuchar, Chair of U.S. Senate Subcommittee on Competition Policy, Antitrust, & Consumer Rights, et al. (June 18, 2021), https://www.naag.org/wp-content/uploads/2021/06/Final-State-Antitrust-Enforcement-Venue-Act-Endorsement.pdf.

1

they live and/or work." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 204 (S.D.N.Y. 2020). Accordingly, Plaintiff States have an interest in this Final Judgment acting as *parens patriae* to protect the public interest and the welfare of its state consumers, particularly in markets of such importance to consumers.

To that end, Plaintiff States have interest in ensuring antitrust Final Judgments are honored absent a showing "a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *United States v. Baroid Corp.*, 130 F. Supp. 2d 101, 104 (D.D.C. 2001) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 393 (1992); *United States v. Western Elec. Co.*, 46 F.3d 1198, 1202–03 (D.C.Cir.1995)).

For the reasons explored below, including to protect the interests of our State consumers, the Court should deny DISH's Opposed Motion for Relief from Judgment.

## LEGAL STANDARD

Under antitrust law, there are two methods to modify a consent decree: (1) when the parties agree to the modification, the court need only find the modification is in the public interest, or (2) when the parties disagree over the modifications, the party seeking the modification must show "a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 393 (1992. In the instant case, because T-Mobile, DISH, and the government Plaintiffs disagree regarding the proposed modification, DISH must follow the *Rufo* method of modification and establish a significant change in circumstances to warrant a revision.

"Modification may be warranted when changed factual conditions make compliance with the decree substantially more onerous, when the decree proves to be unworkable because of unforeseen obstacles, or when enforcement of the decree without modification would be detrimental to the public interest." *Rufo* at 368. DISH must demonstrate to this Court that compliance with the decree is <u>more</u> than

merely inconvenient.

DISH is also not able to rely on "a change in circumstances that were anticipated, or should have been anticipated, at the time the consent decree was signed." *United States v. Baroid Corp.*, 130 F.Supp.2d 101, 105 (D.D.C. 2001) (citing *United States v. W. Elec. Co.*, 46 F.3d 1198, 1204 (D.C. Cir. 1995)).

Furthermore, the fact that this is a consent judgment and not a court-imposed resolution arguably heightens DISH's burden. A consent judgment is, at its core, a contract. *Richardson v. Edwards*, 127 F.3d 97, 102 (D.C. Cir. 1997); *Baroid Corp.*, 130 F. Supp. 2d at 104. Other parties have relied on the terms of the contract and have reasonable expectations that they will be followed. Permitting DISH to modify the consent decree based on circumstances that were anticipated or should have been anticipated would defy contract interpretation, which should be the basis of the Court's analysis, *Id.* at 104–05. *See generally* E. Allen Farnesworth, *Farnesworth on Contracts* § 9.6, at 552–58 (1990) (explaining that contract law disallows modification when parties should anticipate the "business risks which are fairly to be regarded as part of the dickered terms").

## ARGUMENT

**A. DISH Fails to Meet its Burden of Establishing a Significant Change in Circumstances**

In order to warrant a modification, DISH must show that there has been such a significant change in circumstances as to make the judgment (a) exceedingly onerous to comply with, (b) impractical because of unforeseeable circumstances, or (c) detrimental to the public interest. *Rufo* at 368. But DISH can make no such showing here. The judgment contemplates two outcomes: one outcome under which DISH purchases the spectrum and another under which DISH does not. Final Judgment, ECF 85, *see* ¶ IV.B.2 (penalty if DISH elects not to purchase); ¶ IV.B.3. (forfeiture of spectrum at expiration); ¶ IV.B.4. (auction of spectrum); Mot. at 11. DISH itself has even contemplated not purchasing the spectrum, claiming publicly that it is not a necessity. See Bennett Decl., Ex. C at 13, ECF No. 107-3 (DISH Q2 2022 Earnings Call). The consent judgment's explicit recognition that DISH might not purchase the 800

3

MHz spectrum in the end makes it hard to argue that the company's inability to execute the purchase was unanticipated. And the company's explicit recognition *nearly a year ago* that it might not purchase the spectrum further highlights that everyone involved knew this was a possibility—there is nothing "unanticipated" about it.

Furthermore, the change in circumstances DISH relies on to establish that purchasing the spectrum at this time is now onerous and impractical do not compel a judgment modification. In instances where a party anticipated changing conditions that would make performance of the Final Judgment more onerous, that party carries a "heavy burden" to convince a court that a modification is warranted. *Western Elec. Co., Inc.*, 46 F.3d at 1204. DISH relies heavily on market change, rising interest rates, COVID-19, and the War in Ukraine to unsuccessfully justify a modification to the judgment. Mot. at 8-9. But by April 2020, *when the judgment was signed*, the effects of the global pandemic were readily acknowledged by the international community. The potential for a long-lasting and economically inconvenient pandemic had to be in contemplation at that time, nearly three months after the first reported U.S. COVID case; two months after the February 20, 2020, stock market crash; and a month after the various government, school, and travel shutdowns began across the country. Moreover, COVID affected everyone; although the global economic impacts of COVID-19 have not been de minimis, DISH has not claimed and cannot shown itself to be uniquely or singularly affected by these circumstances in any way that warrants special solicitude to DISH over other potential spectrum buyers.

Additionally, market changes and variable interest rates are normal costs of doing business and foreseeable risks in obtaining financing. DISH's motion refers to generalized macroeconomic hardships it endures because of the COVID-19 pandemic, the Ukrainian war, and bank failures. Mot. at 2-3. It is unclear from DISH's motion whether references to these events are independent reasons for DISH's inability to secure responsible financing, or if they are merely contributors to the current inflation and interest rate environment. Regardless, such generalized statements of macroeconomic events are

4

insufficient to demonstrate that the purchase of the 800MHz spectrum licenses is now substantially more onerous than anticipated when the final judgment was negotiated and entered. DISH also fails to demonstrate how these events have specifically hampered their ability to secure responsible financing, beyond causing increasing interest rates. These purported "changes to financial markets" are far too general to justify such extraordinary relief. *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 179–80 (D.D.C. 2008). To allow modification of the judgment based upon these circumstances would be to defy standard contract law and to allow every other company with an agreement to do the same.

Furthermore, DISH's arguments now arguably violate the agreement itself. The company certified it would not claim hardship or difficulty in asking the Court to modify the Final Judgment. Final Judgment, ECF. 85, at 2. However, DISH's alleged changed circumstances are exactly that—difficulty obtaining financing at "responsible" rates due to changes in the financial market, a cost and risk of doing business DISH *chose* to make. That DISH explicitly waived its right to seek modification on those grounds indicates not just that it likely understood and contemplated potential future risks, but that it explicitly chose to waive any protection from those risks as a condition of receiving the benefit of the consent judgment. DISH cannot now beseech the Court for more time because of their reluctance to obtain financing.

The circumstances in *United States v. Signature Flight Support Corp.*, 607 F. Supp. 2d 56 (D.D.C. 2009), are remarkably similar to those here, and that case weighs heavily against DISH's arguments. The consent judgment in *Signature* required one of the defendants to sell one of two businesses operating at the Indianapolis airport before a date certain. *Id.* at 58. And that defendant "to raise no claim of hardship or difficulty as grounds for asking the court to release it from" the divestment obligation. *Id.* at 59. However, before the business in question could be sold, the 2008–09 economic downturn intervened, and bids received for the airport business were significantly less lucrative than anticipated. *Id.* at 58. Nonetheless, a judge in this very District ruled that the "hardship or difficulty" waiver language

5

"show[ed] that the parties contemplated the possibility of difficulty selling the [business], and that they allocated to [the defendant] the risk that" such difficulties might arise. *Id.* at 59. Thus, the court denied the modification request.

DISH preemptively tries to distinguish *Signature* by arguing that seeking additional time is different from discharging it of any obligation at all (which is what the *Signature* defendant requested). Reply Mem. at 13-14, ECF No. 119. But nothing in *Signature* depended on the nature of the requested modification. Rather, the case depends entirely on the party's explicit waiver of a particular *argument*—the same argument that DISH waived here. Thus, DISH's attempt to distinguish the case is simply a distinction without a difference. Read correctly, *Signature* protects the original intent of the parties and the legal effect of a judgment.

The judgment in this case was not ambiguous and the intent of the parties was clear: either DISH makes the purchase of spectrum by a specified time or the spectrum may go up for auction. DISH cannot rely on the foreseeable business risks and claim impracticability as a basis for modification. *See Baroid* 103 F. Supp. 2d at 105; Farnesworth, *supra* § 9.6, at 552–58. Because DISH relies on world events and economic stress experienced by every person and business on the face of the globe—classic business risks that should always be in contemplation in any contract—DISH fails to meets its burden to establish a significant, unforeseeable change in circumstances. Thus, no modification is warranted.

### B. DISH is Subject to the *Rufo* Standard Despite Being a Divesture Buyer

DISH suggests that it should be held to a lesser standard when addressing its modification request because it is a divestiture buyer and the consent decree was not the result of its own misconduct. Mot. at 19-20. DISH's arguments are misguided and no case law supports DISH's position on this. In fact, the argument is directly contradicted by *Baroid*, where a divestiture buyer sought modification of a consent decree and was held to the *Rufo* standard. 130 F. Supp. 2d at 104–05. Regardless of whether DISH is the divestiture buyer or the seller, it must meet the same legal standard.

DISH argues that denial of additional time to purchase spectrum is not in the public interest because it would lose significant investment and it would "hamper" its ability to compete. Mot. at 16. DISH's public interest arguments are misguided because DISH is a private actor. Unlike government antitrust enforcers, including state enforcers, who steadfastly promote competition, private actors like DISH are differently situated. While government enforcers may move to modify a consent decree in order to accomplish its purpose, *New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 168-169 (D.D.C. 2008), private parties are not afforded the same flexibility. DISH has failed to point to any case law saying otherwise.

DISH further argues that if it does not purchase the spectrum, T-Mobile will either sell it at auction or attempt to keep it, which would not further the purpose of the Final Judgment. Mot. at 16. At this point in time, with DISH's abject failure to make any assurances or concrete plans to purchase the spectrum, it is in the best interest of the public for the spectrum to be sold at auction. The Final Judgment not only anticipates the spectrum being sold at auction to serve the public interest, but also provides timelines in recognition that stalling tactics to effectuate the purchase of the spectrum do not further the public interest. Final J. 4:12 and 36, ECF No. 85.

### C. DISH Has Not Proffered a Plan for or Expressed Actual Ability to Acquire the Spectrum in the Requested 10-Month Timeframe

Importantly, DISH does not claim they are unable to obtain the requisite financing necessary to purchase the spectrum at this time. DISH instead asserts that it would not be "responsible" for DISH to do so. DISH's argument relies on the fact that interest rates have risen higher than DISH originally anticipated. Mot. at 17. Essentially, DISH argues that it is no longer practicable to obtain the financing required to purchase the spectrum at this time. *Cf. Signature*, 607 F. Supp. 2d at 58 ("Signature asserts that it received bids of 'up to $20 million' . . . for the . . . facility in September 2008, but that by November 2008 'several bidders had dropped out' and only two bidders submitted bids, in the amount of $5 million . . . and $7 million . . . .").

7

The rise and fall of interest rates are a foreseeable and anticipated business risk of investment. The impracticability of the consent decree due to an anticipated business risk or one that should have been anticipated does not warrant relief from judgment. *See Baroid*, 130 F. Supp. 2d at 105. It is certainly foreseeable that a company similarly situated to DISH, which does not have the capital to purchase the spectrum outright, would need to obtain financing and that interest rates can fluctuate at substantial cost to the company.

### D. DISH's Attempt to Delay the Prompt Divestiture of the 800 MHz Spectrum is Not in the Public Interest

DISH has gone on record stating that they do not need the 800 MHz spectrum from T-Mobile to be a competitor; it would only be "nice to have." See Bennett Decl., Ex. C at 13, ECF No. 107-3 (DISH Q2 2022 Earnings Call). These statements strongly imply that DISH's competitive abilities and position would not be affected by their failure to purchase the spectrum and, therefore, no modification would be needed. In other words, no significant change in circumstances exists by DISH's own account.

The 800 MHz spectrum should not be held in escrow on the *possibility* that the financial markets will improve DISH prospects enough that it can exercise the purchase option. The spectrum should be auctioned and put into use to provide essential communications services to consumers.

### E. DISH Fails to Demonstrate that Its Proposed Modification is Suitably Tailored to the Alleged Changed Circumstances

DISH optimistically suggests that a 10-month extension will be enough time for business conditions to return to an "even keel" Mot. at 22. However, DISH provides no basis for their reasoning and assumes that residual effects of world events that have lasted for years can be remedied in the next 10 months. DISH offers no explanation or real evidence to support their position or that they will be in a sufficiently improved financial position to purchase the 800 MHz. spectrum license. In fact, the information DISH relies on for this assertion provides absolutely no time frame for when we might see a decline in interest rates.

On one hand, DISH argues that the economic impacts of the COVID-19 global pandemic and the

Ukrainian-Russian war are so significant, egregious, persistent, and uniquely affecting DISH's financial wellbeing that they were unable to purchase the spectrum within the allotted timeframe. While on the other hand, DISH argues that the aforementioned economic effects will dissipate so quickly that everything will be hunky-dory in 10 months. These predictions are unsubstantiated.

DISH also claims that the 10-month extension will be enough time for a recent partnership with Amazon and an all-stock merger with EchoStar to become profitable. Mot. at 23. However, the merger with EchoStar is "expected" to close at the end of the calendar year. The deal has not been finalized. DISH's reliance on the EchoStar merger is based on conjecture and is not a guarantee—more wishful thinking. Lastly, the partnership with Amazon is a new development as of July 26, 2023. To anticipate a two-month old venture to be profitable enough to purchase the spectrum is tremendously optimistic. Because DISH relies on mere conjecture, expectations, and potential outcomes, as opposed to concrete facts and evidence, a 10-month extension is not suitably tailored to the changed circumstances.

## CONCLUSION

For the foregoing reasons, the Court should deny DISH's Opposed Motion for Relief from Judgment.

Dated: September 18, 2023

Respectfully submitted,

STATE OF KANSAS

By: */s/ Sarah Dietz*
Sarah Dietz, Assistant Attorney General
(KS Bar No. 27457)
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
sarah.dietz@ag.ks.gov

STATE OF NEBRAKSA

By: */s/ Joseph M. Conrad*
Joseph M. Conrad
Assistant Attorney General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68508
P: (402) 471-3840
Joseph.Conrad@nebraska.gov

STATE OF OKLAHOMA

By: */s/ Robert J. Carlson*
Robert J. Carlson  (OK Bar No. 19312)
Senior Assistant Attorney General
Consumer Protection Unit
Office of the Oklahoma Attorney General
15 West 6th St., Suite 1000
Tulsa, OK 74119
T: 918-269-6308
Robert.carlson.oag.ok.gov