UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEUTSCHE TELEKOM AG, et al.,<br><br>*Defendants*. | Civil Action No. 1:19-cv-02232-TJK |

**UNITED STATES' RESPONSE TO
DEFENDANT DISH NETWORK CORP.'S MOTION FOR RELIEF
FROM JUDGMENT AND MOTION FOR MODIFICATION OF FINAL JUDGMENT**

On April 29, 2018, T-Mobile agreed to acquire Sprint in a transaction valued at approximately $26 billion.[1] In 2019, after extensive investigation, the Justice Department's Antitrust Division, the Federal Communications Commission, and the Attorneys General of ten states determined that the merger should be blocked absent substantial modifications to the merger, including the divestiture of certain assets and myriad additional terms and provisions.[2] Those settlement provisions, and DISH's agreement to be bound by the terms of the settlement, were memorialized in the Final Judgment that was entered by the Court in this matter on April 1, 2020. The specific terms of the Final Judgment were an important consideration in these

---

[1] *See* ECF No. 20 (CIS) at 1.
[2] *See* ECF No. 85 (Final Judgment); *In re Applications of T-Mobile US, Inc., & Sprint Corp.*, 34 F.C.C. Rcd. 10578, 2019 WL 6210958 (Nov. 5, 2019) (FCC Order); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020).

1

enforcers' exercise of discretion not to file a lawsuit to block the merger outright.[3] Since the merger eliminated Sprint as a nationwide facilities-based mobile wireless carrier, the proponents of the settlement designed the Final Judgment to preserve competition "by enabling the entry of another national facilities-based mobile wireless network carrier."[4]

Deutsche Telekom, T-Mobile, Sprint, and DISH, all of whom are defendants under the Final Judgment, agreed that the purpose of the Final Judgment "is to remedy [ ] the loss of competition" from T-Mobile's acquisition of Sprint as "alleged in the Complaint" and to "preserve competition by enabling the entry of another national [mobile wireless company]."[5] And all Defendants have agreed that "the Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore all competition harmed by the challenged conduct."[6]

Among other things, the Final Judgment provides DISH an option to purchase 800 MHz spectrum from T-Mobile.[7] If DISH elects not to exercise the option, the Final Judgment requires T-Mobile to auction the spectrum to another buyer. In establishing this option framework, the Final Judgment allows DISH the opportunity to use the spectrum to build a competitive facilities-based mobile wireless network to replace the competition lost by T-Mobile's acquisition of Sprint while at the same time providing a path for the sale of the spectrum to another buyer to make productive use of those assets.

---

[3] *See* CIS at 2 ("The primary purpose of the proposed Final Judgment is to facilitate DISH building and operating its own mobile wireless services network by combining the Divestiture Package of assets and other relief with DISH's existing mobile wireless assets, including substantial and currently unused spectrum holdings, to enable it to compete in the marketplace.").
[4] *See* CIS at 2.
[5] Final Judgment at 2.
[6] *Id*. § XVIII.B.
[7] *See generally* Final Judgment § IV.B.

The parties have represented to the United States that they are engaged in a commercial dispute regarding this option. At bottom, DISH would like an extension of the option to buy the spectrum until June 30, 2024. T-Mobile has asserted that DISH has lost its opportunity to exercise the option and that the spectrum should be sold pursuant to an auction as soon as possible.

The United States files this response to DISH's motion because it seeks a modification of the Final Judgment in this matter. This order's complexity, requiring ongoing supervision and including myriad entanglements between the divestiture buyer and the merged firm, increases the risk that the consent decree may fail to protect the competition lost by the elimination of Sprint as a competitor. As further discussed below, changed circumstances justify an order modification to maximize the likelihood the Final Judgment creates a fourth national mobile wireless company and to ensure the risk of failure is not borne by the public.

The critical facts are straightforward.

- *One*, DISH is more likely to succeed as a national carrier if it obtains the 800 MHz spectrum that is the subject of the dispute.

- *Two*, the extraordinary and unforeseen macroeconomic events over the last three years justify an order modification.

- *Three*, DISH has not said whether it will be able to exercise the option at any time.[8]

---

[8] *See* ECF No. 106 (Opposition of T-Mobile and Deutsche Telekom) at 27 ("DISH likewise offers no commitment to actually acquire the spectrum[.]"); *see generally* ECF No. 119 (Reply of DISH). DISH has represented to the United States that it is willing to make a $100 million advance payment to T-Mobile, creditable to the purchase of the spectrum, if its option is extended until April 1, 2024. The United States takes no position on whether this amount is appropriate.

- *Four*, even if the Court were to deny DISH'S motion today, it likely would take T-Mobile months to auction the spectrum and obtain FCC approval for the transfer to an alternative buyer.
- *Five*, the defendants agreed in a subsidiary contract between them that either party could walk away from the 800 MHz spectrum sale after April 1, 2024, subject only to a termination fee payable by DISH.

On these facts, a limited order modification would support the goal of the option provision in the Final Judgment.

Thus, the United States respectfully requests that if the Court grants DISH's request to modify the Final Judgment in this matter, that the Court give DISH until April 1, 2024, to exercise the option. To facilitate the orderly divestiture of the 800 MHz spectrum, DISH has agreed to (i) waive any right to seek additional extensions so that the spectrum does not lie fallow for an unknown period, *see* DISH Reply at 5, and (ii) it has represented to the United States that it will waive its right to enforce the non-solicitation clause in the License Purchase Agreement so that T-Mobile can concurrently conduct the auction process. The United States believes these proposals by DISH are consistent with the stated goals of the Final Judgment. The United States also respectfully requests that the Court reaffirm in any order modification that Section XVI.D of the Final Judgment prohibits T-Mobile from terminating the License Purchase Agreement, without the consent of the United States in its sole discretion.[9]

---

[9] The United States has attempted to confer with the other parties in this action. DISH and the State of Colorado consent to this motion. T-Mobile, Deutsche Telekom, and the States of Kansas, Nebraska, and Oklahoma oppose. The States of Arkansas, Florida, Ohio, and South Dakota take no position on the motion. The State of Louisiana has not responded to inquiries about this motion.

**FACTUAL BACKGROUND**

The Final Judgment provides that T-Mobile must "within three (3) years after the closing of the divestiture of the Prepaid Assets or within five (5) business days of the approval by the FCC of the transfer of the 800 MHz Spectrum Licenses, whichever is later, [] divest the 800 MHz Spectrum Licenses in a manner acceptable to the United States, in its sole discretion, after consultation with the affected Plaintiff States." Final Judgment § IV.B.1. If DISH does not purchase the 800 MHz spectrum, T-Mobile "shall conduct an auction of the 800 MHz Spectrum Licenses within six (6) months of [DISH's] declining to purchase the licenses." Final Judgment § IV.B.4.

In order to effectuate the sale of the 800 MHz from T-Mobile to DISH, the parties entered into a License Purchase Agreement ("LPA"), which was disclosed to the United States pursuant to § XVI.D of the Final Judgment. The LPA required DISH to apply to the FCC for transfer of the 800 MHz licenses by April 1, 2023, so that the transfer could be complete by July 1, 2023, the original deadline under § IV.B.1 of the Final Judgment.

On March 13, 2023, DISH requested that the United States grant a 60-day extension of its deadline under Section IV.B.1 of the Final Judgment, which the United States granted. The parties have been unable to resolve their dispute over the purchase of the 800 MHz spectrum. On August 16, 2023, DISH and T-Mobile filed an application with the FCC for DISH to acquire the 800 MHz spectrum.[10] As long as the application before the FCC remains pending, T-Mobile will remain in compliance with the Final Judgment's requirement to divest the licenses "within five (5) business days of the approval by the FCC of the transfer of the 800 MHz Spectrum

---

[10] *See* ECF No. 94-12 (FCC Form 603, Ex. 1, Description of Transaction and Public Interest Statement).

Licenses."[11] The FCC does not have a statutory deadline within which it must act on the parties' application. The Final Judgment thus anticipated that the need for FCC review may delay the transaction date.

If DISH's option period expires or if DISH declines to acquire the spectrum outright, T-Mobile must conduct an auction to identify a proposed alternative buyer. Final Judgment § IV.B.4. That alternative purchaser must be approved by the FCC. The non-solicitation provision of the LPA prohibits T-Mobile from conducting a spectrum auction to identify an alternative buyer to DISH while the option is pending.[12]

Like the Final Judgment, the LPA between DISH and T-Mobile anticipated the possibility that review at the FCC could delay the divestiture of the spectrum for an unknown period of time. Under the LPA, the outside date, as that term is defined in the LPA, for the sale of the spectrum to DISH is April 1, 2024. After that date, either party to the LPA can walk away from the transaction subject only to DISH's payment of a termination fee.[13]

## ARGUMENT

### I. A modest extension of the deadline for DISH to acquire the spectrum licenses until April 1, 2024, will serve the competition goals of the Final Judgment.

As T-Mobile's prior advocacy to the FCC demonstrates, DISH needs sub-GHz spectrum in order to compete effectively. In 2013, T-Mobile petitioned the FCC to impose rules on the auction of 600 MHz spectrum to enable T-Mobile and other insurgent competitors to challenge AT&T and Verizon. As T-Mobile explained then: "Put simply, a carrier can cover more area and offer better in-building service using lower-band spectrum with fewer cell sites. These

---

[11] *See* Final Judgment § IV.B.1.
[12] *See* ECF No. 107-2 § 5.4(c) (LPA).
[13] *Id.* § 7.1(a)(ii).

characteristics allow systems operating in lower-band spectrum to provide the same geographic coverage at a lower cost than higher-band spectrum."[14] T-Mobile's basic point remains true 10 years later: there is no more cost-effective way for DISH to catch up to the Big Three carriers and replace the competition that was lost when T-Mobile acquired Sprint than to purchase the 800 MHz spectrum.

The United States supports the minor modification described herein in order to "tighten the decree in order to accomplish its intended result" rather than "relieve the [enjoined] party of the decree's constraints." *United States v. W. Elec. Co.*, 46 F.3d 1198, 1202 (D.C. Cir. 1995). This is not a case of an enjoined party seeking to dilute the final judgment in a manner that thwarts its purpose and risks harm to American consumers. *Cf. New York v. Microsoft Corp.*, 531 F. Supp. 2d 141, 168 (D.D.C. 2008) ("The Moving States are correct that the instant situation is qualitatively different from one in which an enjoined party seeks relief from a judgment, and that the Supreme Court cases discussed above suggest that a government enforcer may move to modify a consent decree in order to 'accomplish its intended result.'"). As the D.C.

---

[14] Ex parte submission of T-Mobile USA, Inc., *In re Policies Regarding Mobile Spectrum Holdings*, FCC WT Docket 12-269 at 3-4 (May 13, 2013). *See also* Comments of T-Mobile USA, Inc., *In re Policies Regarding Mobile Spectrum Holdings*, FCC WT Docket 12-269 at 14 (Nov. 28, 2012) ("There is no dispute that the lower band spectrum is uniquely valuable, but there is currently little lower band spectrum left for assignment, and the lion's share of the available spectrum is under the control of the two largest carriers."); Comments of T-Mobile USA, Inc., *In re Policies Regarding Mobile Spectrum Holdings*, FCC WT Docket 12-269 at 15 (Nov. 28, 2012) (internal citations omitted) ("The Commission has consistently recognized that spectrum below 1 GHz is more valuable than spectrum above 1 GHz because its more favorable propagation characteristics allow for better coverage inside buildings and across larger geographic areas, including those with adverse climates and challenging terrain. Lower-band spectrum also provides higher spectral efficiency over a given area than higher-band spectrum, and systems operating in lower-band frequencies can deliver more received signal power to locations within a same-size cell as systems operating in higher-band spectrum. Importantly for competition, these characteristics allow systems operating in lower-band spectrum to provide the same geographic coverage at a lower cost than higher-band spectrum.").

Circuit has explained, a "party seeking modification of a consent decree may meet its initial burden by showing either a significant change in factual conditions or in law." *W. Elec. Co.*, 46 F.3d at1203-04 (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). Modification "may be warranted when changed factual conditions make compliance with the decree substantially more onerous," although modification should ordinarily not be granted where a party relies upon events that *actually were anticipated* at the time it entered into a decree." *Id.* (citing *Rufo*, 502 U.S. at 385) (emphasis added). A modification "may be warranted when changed factual conditions make compliance with the decree substantially more onerous"; "when a decree proves to be unworkable because of unforeseen obstacles"; "or when enforcement would be detrimental to the public interest." *See NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 35 (D.C. Cir. 2000). Once a movant has established either a change in fact or law warranting modification of a consent decree, the proposed modification should be "*suitably tailored* to the changed circumstance." *W. Elec. Co.*, 46 F.3d at 1204 (emphasis in original).

      The modification and clarification suggested by the United States to further the intended effect of the Final Judgment fit well within this standard and the case law. In *Western Electric*, the D.C. Circuit affirmed Judge Greene's modification of the final judgment that led to the breakup of the old AT&T monopoly phone system, over the objection of a party to the decree. Recognizing that the AT&T consent decree "had a profound national impact," "reached far 'beyond the parties involved directly in the suit," and "has significantly affected the public," the D.C. Circuit "acknowledged the difference between decrees that "give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those

that involve the supervision of changing conduct or conditions and are thus provisional and tentative." 46 F.3d at 1203 (citing *United States v. Swift*, 286 U.S. at 114).

That standard is justifiably and appropriately onerous when a party attempts to avoid the requirements of the original order. In *United States v. Signature Flight Support Corp.*, which involved a Final Judgment that was entered in October 2008, the Court rejected the merged firm's request for additional time to divest the assets covered by the decree, which would have allowed the merged firm to continue to operate and profit from facilities that were supposed to compete with one another. [15] In denying the defendants' request, the court observed that the merged firm could not reasonably claim an unforeseen change in circumstances due to the financial environment at the time because the 2008 Financial Crisis was well underway in July 2008 when the merging defendants agreed to the divestiture.[16] Moreover, the requested delay was four times longer than the original divestiture period.

Here, the suggested extension is a fraction of the original divestiture period, the preferred outcome under the Final Judgment was for the spectrum to be divested to DISH, and no one involved in negotiating the Final Judgment in July 2019 could have foreseen the global pandemic and resulting macroeconomic environment that have weakened DISH's ability to purchase the spectrum, as detailed in DISH's briefs. If the Court agrees with DISH's explanation for why it is unable to purchase the option, then those circumstances are sufficient to justify the minor adjustments sought here that seek to make the order more effective.

---

[15] *See generally United States v. Signature Flight Support Corp.,* 607 F. Supp. 2d 56 (2009).
[16] *See, e.g.,* Michael M. Grybaum, *A January to Remember as a Dismal Start,* N.Y. TIMES, Jan. 18, 2008, at C1, *available in* Lexis+; Vikas Bajaj and Louise Story, *Mortgage Crisis Spreads Beyond Subprime Loans,* N.Y. TIMES, Feb. 12, 2008, at A1, *available in* Lexis+; Robin Sidel, Greg Ip, Michael M. Phillips and Kate Kelly, *The Week That Shook Wall Street: Inside the Demise of Bear Stearns,* WALL ST. J., Mar. 21, 2008, at A1, *available in* Lexis+.

T-Mobile hangs its argument on *United States v. Baroid*, but that case is distinguishable.130 F. Supp. 2d 101, 103–04 (D.D.C. 2001). In *Baroid*, the United States requested a modification to the decree that would have *loosened* the remedies imposed by the decree—and potentially diminished competition—after the divestiture buyer experienced difficulty competing as a standalone competitor. It asked the court to allow a sale of the divested assets to an incumbent market participant, something the original order prohibited because it increased market concentration. Thus, the modification would have contradicted the original purpose of the consent decree. Moreover, the Court found that the United States had not actually attempted to show that there was a "significant change in facts or law" that warranted modification. *See id.* at 105.

The United States' proposed modification here differs substantially from those in the cases T-Mobile cites. Those cases did not involve government support for a modification that further promoted the competitive purpose of the consent decree. And unlike the circumstances in those cases, the T-Mobile/Sprint settlement's proponents likely did not expect the macroeconomic conditions that ensued as a result of the COVID-19 pandemic. The United States' proposed modification does not contradict or vitiate the Final Judgment. Rather, it is a small adjustment that makes the Final Judgment more likely to be effective and meet its goals based on changed, unforeseen circumstances.

Further, an extension of DISH's time to exercise the spectrum option to April 1, 2024, would preserve the essence of T-Mobile's bargain with the United States because that date falls within the consent decree's anticipated timeframe to accomplish the sale of the 800 MHz spectrum. *See Pigford v. Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002) (reversing grant of modification and remanding for district court to consider in its "considerable discretion" an

appropriate modification that "preserve(s) the essence of the parties' bargain") (citing *Western Electric*, 46 F.3d at 1207).  Under the terms of the Final Judgment, T-Mobile knew that the sale of the spectrum could take as long as the three years, *see* Final Judgment § IV.B.1, plus a 60-day extension, *see* Final Judgment § IV.B.1, plus the six months provided for an auction under Section IV.B.4, plus whatever additional time the FCC may take to review the application(s) for the transfer of the licenses.

Moreover, T-Mobile and DISH both understood that the sale of the 800 MHz spectrum might not be completed by April 1, 2024. T-Mobile and DISH specifically contemplated an outside date of April 1, 2024, at which point either party could walk away from the deal (although DISH would still have to pay the break-up fee). This modification delays the divestiture no longer than potential scenarios that the parties recognized could occur.

T-Mobile will not be harmed so long as it can begin to concurrently explore alternative purchasers in the interim. It is unclear whether another purchaser will successfully obtain regulatory approval to purchase and use the spectrum, how long such approvals may take, or whether a successful purchaser at auction will even use the spectrum for mobile wireless service. In short, there has never been, and there is not now, any guarantee that T-Mobile can complete the sale of the 800 MHz licenses to another purchaser substantially before April 1, 2024, even if it starts that process today.

Finally, while T-Mobile argues that DISH's motion is barred by the Final Judgment's preclusion of any Defendant's raising any "claim of hardship or difficulty as grounds for asking the Court to modify any of [the Final Judgment's] provisions," Final Judgment Preamble, the hardship clause does not apply to the United States itself.

**II.     DISH's requested modification is not suitably tailored to the present circumstances because it does not serve the dual purposes of the spectrum divestiture provision.**

DISH's request for an extension of its time to acquire the 800 MHz spectrum to June 30, 2024, is not suitably tailored to the present circumstances as required by *Rufo*, 502 U.S. at 383 (requiring courts to "consider whether the proposed modification is suitably tailored to the changed circumstance"). The United States submits that April 1, 2024, the "outside date" in the defendants' LPA provides a more suitable outer bound for an extension here, especially when combined with T-Mobile's ability to auction the spectrum to an alternative, standby buyer in the interim.

DISH has not provided further explanation for how or why it will be able to exercise its option by June 30, 2024. Without additional modification, an extension alone undermines the Final Judgment's auction provision. The Final Judgment envisions that, should DISH fail to acquire the spectrum, another buyer puts it to productive use as quickly as possible. DISH has represented to the United States that DISH is willing to irrevocably waive its right to enforce the non-solicitation provision of the LPA that prevents T-Mobile from engaging other potential purchasers until DISH declines to exercise the option. If so, a modest extension of DISH's time to acquire the 800 MHz spectrum should not prevent T-Mobile from auctioning and divesting the spectrum as soon as reasonably practicable, because T-Mobile will be free to conduct an auction and begin the process of seeking regulatory approval for the alternative buyer before April 1, 2024.[17]

---

[17] Finally, as DISH appears to acknowledge in its reply brief, DISH should be required to waive any rights to seek additional modifications. Reply at 5.

12

### III. The Court should clarify that the United States must consent to termination of the License Purchase Agreement.

The district court has the power to clarify the terms of a consent decree. *United States v. Volvo Powertrain Corp.*, 758 F.3d 330, 344 (D.C. Cir. 2014) ("As a general rule, 'a party may ask the district court to issue an order clarifying . . . a consent decree." (internal citations and quotations omitted); *United States v. Microsoft Corp.*, 147 F.3d 935, 942 (D.C. Cir. 1998) (holding district court had authority to clarify its decree). The Final Judgment in this case specifically states that "the Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment[.]" Final Judgment § XVII. In construing the decree, the Final Judgment provides that it "should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore all competition harmed by the challenged conduct." Final Judgment § XVIII.B.

Section XVI.D of the Final Judgment prohibits the Divesting Defendants, including T-Mobile and Deutsche Telekom, from terminating agreements related to its obligations under the Final Judgment "without obtaining the consent of the United States in its sole discretion." To date, Defendants have taken different positions on whether this provision requires the Antitrust Division's consent to termination of the LPA. The United States respectfully requests the Court clarify that Section XVI.D prohibits the Divesting Defendants from terminating the LPA absent prior consent of the Antitrust Division.

## CONCLUSION

The United States submits that a minor modification is justified in these circumstances to effectuate the purpose of the Final Judgement in restoring competition lost as a result of T-Mobile's acquisition of Sprint. Specifically, the United States requests the Court: (1) change

13

the deadline in Section IV.B of the Final Judgment from "within three (3) years after the closing of the divestiture of the Prepaid Assets or within five (5) business days of the approval by the FCC of the transfer of the 800 MHz licenses, whichever is later" to "by April 1, 2024 or within five (5) business days of the approval by the FCC of the transfer of the 800 MHz licenses, whichever is later"; and (2) clarify that Section XVI.D of the Final Judgment prohibits T-Mobile from terminating the LPA without the consent of the United States. This proposal is based on DISH's representation in its reply brief that it will not seek additional relief from the April 1, 2024, deadline and its representation to the United States that it will waive its non-solicitation rights under the LPA. The United States does not oppose the Court incorporating those requirements in the Court's order.

The United States submits this modification is suitably tailored to the changed circumstances and would allow DISH an appropriate amount of extra time due to extraordinary economic circumstances while preserving the essence of T-Mobile's bargain and ensuring that valuable spectrum be put into use as soon as practicable.

Dated: September 18, 2023                    Respectfully submitted,

/s/ Jared A. Hughes
Jared A. Hughes
Assistant Chief
Frederick S. Young (D.C. Bar No. 421285)
Ashley Kaplan
Trial Attorneys

Antitrust Division
Media, Entertainment & Communications Section
U.S. Department of Justice
450 Fifth Street NW, Suite 7000
Washington, D.C. 20530
Telephone: (202) 307-2869