**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, *et al.*,

               *Plaintiffs*,

v.

DEUTSCHE TELEKOM AG, *et al.*,

               *Defendants*.

Case No. 1:19-cv-02232-TJK

**UNOPPOSED MOTION OF THE UNITED STATES FOR
PARTIAL TERMINATION OF AMENDED FINAL JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 60(b) and Section XVII of the Amended Final Judgment ("AFJ") in this matter, Plaintiff the United States respectfully moves for termination of certain provisions in the AFJ to relieve Defendant EchoStar Corporation ("EchoStar") of the obligation to build and operate a mobile wireless radio network. EchoStar will continue as a mobile wireless services provider, and all the other provisions of the AFJ will remain in place until it expires on April 1, 2027. No party to this case opposes this motion.

The Final Judgment, proposed on July 26, 2019 and entered by the Court on April 1, 2020, sought to address the harm the Antitrust Division alleged would result from the merger of T-

1

Mobile US, Inc. ("T-Mobile") and Sprint Corporation ("Sprint").[1]  Among other provisions, the

AFJ required EchoStar Corporation[2] to enter as a new provider of mobile wireless services and to

build and operate a new nationwide mobile wireless radio network using spectrum that it had spent

many years and billions of dollars acquiring but had not previously put into use. Since then,

EchoStar acquired the Boost wireless business from Sprint, launched its service on T-Mobile's

network, and built, by June 2023, a new 5G mobile wireless radio network covering 70% of the

United States population.

EchoStar has not, however, been able to satisfy the FCC that it met separate buildout

requirements agreed to with the FCC at the same time as the initial Final Judgment was proposed.

Under these FCC commitments, which were due to be met by June 2025, EchoStar agreed that its

network would cover a certain percentage of the population within each individual license area, not

just nationally. By September 2024, EchoStar recognized that, while it expected to meet the June

2025 deadlines for many spectrum license areas, it might not meet them for a substantial number of

license areas. In September 2024 the FCC granted extensions to these deadlines, contingent on

EchoStar meeting interim commitments in December 2024 and June 2025.

Although EchoStar has asserted that it met its December 2024 interim commitments and

would meet those due in June 2025, in May 2025 the FCC expressed concern that EchoStar had not

done so, and that, by extension, it would not meet the original June 2025 deadlines. Under the

FCC's licensing rules, failure to meet buildout deadlines for any spectrum license results in

---

[1] The current Amended Final Judgment was entered on October 23, 2023 (Dkt. 139) after the Court granted the parties' consent motion to modify the original consent decree. (Dkt. 138)
[2] On December 31, 2023, EchoStar Corporation acquired DISH Network Corporation, the entity named in the Amended Final Judgment. *See* EchoStar Corp. 2023 Annual Report/10-K (Feb. 29, 2024), available at https://ir.echostar.com/static-files/c0c6367b-a6dc-455c-87c4-5d30a5127048.

2

automatic forfeiture of the license, and EchoStar's failure to meet its June 2025 deadlines could have resulted in automatic forfeiture of several hundred spectrum licenses across the country in multiple spectrum bands. Automatic forfeiture of this spectrum would have forced EchoStar to shut down the radio network it built pursuant to the AFJ, and the prospect of this forfeiture led EchoStar to express doubt in its SEC filings about its ability to continue as a going concern, raising the prospect of bankruptcy, liquidation, and its exit as a mobile wireless services provider.

To avoid the consequences that would have flowed from forfeiture, in September 2025 EchoStar agreed to sell the bulk of the spectrum supporting its radio network in separate transactions with AT&T Inc. ("AT&T") and Space Exploration Technologies, Inc. ("SpaceX"). After EchoStar announced these transactions, the FCC announced that it would be taking steps to conclude its compliance investigations, and it approved EchoStar's spectrum sales to AT&T and SpaceX on May 12, 2026. Because these transactions will effectively foreclose EchoStar's ability to operate a nationwide mobile wireless radio network, the United States now moves to terminate the portion of the AFJ that requires EchoStar to build and operate its radio network.

Entry of the proposed Second Amended Final Judgment is in the public interest because it aligns the requirements of this Court's order with the consequences of EchoStar's failure to have satisfied the FCC that it met its buildout obligations. The United States has determined that there is no available outcome that would allow EchoStar to continue as a mobile radio network operator, and that the proposed transactions represent the best outcome for competition under the circumstances. Rather than entering bankruptcy and exiting altogether, EchoStar can now remain in business as a mobile wireless services provider for years after the AFJ expires on April 1, 2027. In conjunction with the agreement to acquire EchoStar's spectrum, AT&T agreed to host

EchoStar's mobile wireless customers on AT&T's network at least until 2031, with extensions at EchoStar's option through 2035. EchoStar will also be able to offer its subscribers SpaceX's planned "direct-to-cell" ("D2C") mobile satellite service when that service is expected to come online in 2028, relying on the spectrum it is acquiring from EchoStar.

Termination of the requirement that EchoStar operate its radio network can be accomplished with targeted revisions to Section VIII of the AFJ. The proposed changes are set forth in the accompanying proposed Order and are shown in the blacklined copy of the AFJ attached as an exhibit. All other requirements and provisions of the AFJ would remain in place for the full term of the decree.

While the Tunney Act calls for a public notice and comment period before the Court can enter a consent decree settling an antitrust case, it does not explicitly apply to terminations or modifications of such decrees. *See* 15 U.S.C. § 16(b)-(h). However, under these circumstances the United States proposes a period of 30 days for the public to provide comments via the Department of Justice website. As described in the accompanying materials, the United States will post this entire filing on the Antitrust Division's website along with a notice announcing this filing and inviting any interested persons to submit comments to Antitrust Division within 30 days of publication. After the 30-day period expires, United States will file with the Court its response to any comments received, along with a compilation of all such comments and its motion for entry of the proposed order, unless the United States withdraws its motion. The United States reserves the right to withdraw its consent to the motion at any time prior to entry of the Second Amended Final Judgment.

For these reasons, and as discussed in the accompanying memorandum, the United States respectfully moves for partial termination of the Amended Final Judgment after public comments are received and filed with the Court. No party to this case opposes this motion.

Dated: May 19, 2026

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

_____/s/_____
Frederick S. Young (D.C. Bar No. 421285)
Eva Rhule (D.C. Bar No. 90028844)
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7000
Washington, D.C. 20530
(202) 725-2503
Frederick.young@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, *et al.*,

        *Plaintiffs*,

v.

DEUTSCHE TELEKOM AG, *et al.*,

        *Defendants*.

Case No. 1:19-cv-02232-TJK

**MEMORANDUM IN SUPPORT OF**
**UNOPPOSED MOTION OF THE UNITED STATES FOR**
**PARTIAL TERMINATION OF AMENDED FINAL JUDGMENT**

## I.    Introduction

The United States respectfully files this Memorandum in Support of its Unopposed Motion for Partial Termination of Amended Final Judgment. The Amended Final Judgment ("AFJ") entered in this case sought to address the harm the Antitrust Division alleged would result from the merger of T-Mobile and Sprint. Among other requirements, the AFJ required EchoStar Corporation[1] to enter as a new provider of mobile wireless services and to build and operate a new, nationwide mobile wireless radio network using spectrum that it had spent billions of dollars

---

[1] On December 31, 2023, EchoStar Corporation acquired DISH Network Corporation, the entity named in the Amended Final Judgment. *See* EchoStar Corp. 2023 Annual Report/10-K (Feb. 29, 2024), *available at* https://ir.echostar.com/static-files/c0c6367b-a6dc-455c-87c4-5d30a5127048l.

acquiring but had not yet put into use.

Although EchoStar built a new 5G wireless radio network covering 70% of the United States population, as required in the AFJ, last May the FCC opened investigations into whether EchoStar had met or would be able to meet separate network buildout commitments it made to the FCC at the same time the AFJ was filed. Under the FCC's licensing rules, failure to meet buildout deadlines for any spectrum license would result in automatic forfeiture of the license, and the prospect of broad spectrum forfeitures risked plunging EchoStar into bankruptcy, liquidation, and exit as a mobile wireless services provider. To avoid these consequences, EchoStar agreed in September 2025 to sell the bulk of its spectrum holdings – including spectrum it used to build its radio network – in separate transactions with AT&T and SpaceX. The FCC approved EchoStar's spectrum sales to AT&T and SpaceX on May 12, 2026.

The United States now respectfully moves for termination of the portion of the AFJ that requires EchoStar to build and operate a mobile wireless network, while leaving in place the remainder of the AFJ for the remaining months until it expires on April 1, 2027.[2] As explained below, the United States has determined that under the circumstances these transactions represent the best available outcome for competition. Rather than entering bankruptcy and exiting altogether as a mobile wireless provider, EchoStar can now remain in business as a mobile wireless services provider for years after the AFJ ends and can offer its subscribers SpaceX's planned "direct-to-cell" ("D2C") mobile satellite service when that service is expected to come online in 2028.

No party opposes this modification to the AFJ, and these changes are within the reaches of

---

[2] For the avoidance of doubt, the United States does not suggest here that T-Mobile is responsible for the circumstances necessitating this partial termination of the Amended Final Judgment, or that T-Mobile has violated the Amended Final Judgment.

the public interest. Accordingly, the Court should grant this motion and enter the proposed order once the period for public comment has expired and the United States files those comments with the Court along with its response.

## II.    Background

### A.   EchoStar's Buildout Obligations in the AFJ and to the FCC

The Court entered the Final Judgment in this matter on April 1, 2020,[3] and it entered the Amended Final Judgment on October 23, 2023.[4] The Final Judgment was intended to remedy the harm the United States alleged would result from the merger of T-Mobile and Sprint,[5] with relief that included requiring EchoStar to enter as a new mobile wireless services provider and to build and operate a new nationwide mobile wireless radio network using spectrum that it had acquired previously but had not put into use.[6]

To enable it to build this network, however, EchoStar needed to obtain extensions from the FCC on its deadlines for completing the buildout of three of the four spectrum bands it planned to use in its network. As the FCC explained in its Order approving the spectrum license transfers from Sprint to T-Mobile, EchoStar's deadlines at that time were to deploy its AWS-4 and Lower

---

[3] Dkt. 84.

[4] Dkt. 139. In August 2023, EchoStar (then known as DISH) moved for a modification to the Final Judgment to obtain more time to purchase certain 800 MHz spectrum from T-Mobile pursuant to Final Judgment Sec. IV.B, which required EchoStar to exercise its option within three years from July 1, 2020. After the motion was briefed, the parties reached a settlement reflected in a proposed Amended Final Judgment, which gave EchoStar until April 1, 2024, to exercise its option, contingent on timely payment by EchoStar of a nonrefundable $100 million extension fee and EchoStar's agreement to seek no further extensions. *See* Consent Motion to Modify Final Judgment (Dkt. 137). The Court granted the consent motion to modify and entered the Amended Final Judgment on October 23, 2023. (Dkt. 138, 139) EchoStar paid the extension fee as required but did not acquire the spectrum.

[5] *See* Complaint, July 26, 2019 (Dkt. 1); Competitive Impact Statement, July 30, 2019 (Dkt. 20).

[6] *See* Competitive Impact Statement, July 30, 2019 (Dkt. 20).

700 MHz E Block licenses to cover and offer service to 70% of the population of each license's service area by March 7, 2020, and to deploy its AWS H Block licenses to cover and offer service to 75% of the population by April 29, 2022.[7] In return for these extensions, EchoStar agreed to build a new 5G network by June 14, 2023, provide download speeds of at least 35 Mbps to at least 70% of the United States population (as verified by a drive test), deploy at least 15,000 5G sites, and deploy at least 30 MHz of downlink 5G spectrum averaged over all EchoStar 5G sites deployed nationwide.[8] EchoStar also agreed to deploy its 600 MHz band spectrum on its new network by June 14, 2023, four years earlier than the existing June 14, 2027, interim construction milestone for these licenses.[9] The AFJ incorporated EchoStar's June 14, 2023 AWS-4, 700 MHz, H Block, and Nationwide 5G Broadband network build commitments.[10] EchoStar satisfied each of these commitments.[11]

In addition to these nationwide commitments, however, EchoStar was required by the FCC to cover a percentage of the population within each spectrum license area.[12] EchoStar was to offer

---

[7] *See* Memorandum Opinion and Order (WT Docket No. 18-197), Nov. 5, 2019, at 162 ("FCC T-Mobile/Sprint Order"), *available at* https://docs.fcc.gov/public/attachments/FCC-19-103A1.pdf.
[8] *See id.*
[9] *See* FCC T-Mobile/Sprint Order at 163. *See also* Letter from J. Blum (EchoStar) to D. Stockdale (FCC) (Jul. 26, 2019) ("EchoStar Commitment Letter"), *available at* https://www.fcc.gov/sites/default/files/EchoStar-letter-07262019.pdf.
[10] AFJ at VIII.A.
[11] *See* Letter from J. Blum (EchoStar) to M. Dortch (FCC) (Mar. 13, 2024) (EchoStar certifying that "as of June 14, 2023, it has deployed a nationwide 5G network with at least 70 percent of the U.S. population having access to download speeds equal to or greater than 35 Mbps, as verified by a drive test using the methodology approved by the Wireless Telecommunications Bureau"), *available at* https://www.fcc.gov/ecfs/document/10313057349090/1.
[12] These FCC commitments represented extensions on license-area-specific conditions to which EchoStar agreed when it acquired the spectrum years earlier. *See generally* "FCC Areas" webpage (noting that the FCC assigns "area-based radio licenses"), *available at* https://www.fcc.gov/oet/maps/areas. The FCC may use different boundary areas for different spectrum bands, for example, dividing the country into 175 spectrum license Economic Areas for

5G Broadband Service to at least 75% of the population in each 600 MHz license area by June 14, 2025.[13] Moreover, if EchoStar satisfied certain nationwide milestones by June 2023, it would have until June 14, 2025, to meet the required 70% or 75% coverage in each AWS-4, Lower 700 MHz E Block, and AWS H Block license area.[14]

### B.   EchoStar's Compliance with its FCC Buildout Obligations

By September 2024, however, EchoStar recognized that, while it expected to meet the June 2025 deadlines for many spectrum license areas in some bands, it might not meet the June 2025 deadlines for a substantial portion of its spectrum license areas. EchoStar therefore sought extensions from the FCC,[15] proposing to increase its population coverage to either 80% or 85% for approximately 477 license areas[16] in return for extensions for its deadlines for approximately 1,016 license areas.[17] EchoStar proposed that it would receive 18-month extensions from June 14, 2025

---

certain bands, and into 416 spectrum license Partial Economic Areas for other bands. *See id.*; *see also* https://transition.fcc.gov/bureaus/oet/info/maps/areas/maps/bea.pdf (map of Economic Area boundaries); https://docs.fcc.gov/public/attachments/DA-14-759A4.pdf (map of Partial Economic Area boundaries).

[13] EchoStar Commitment Letter at Attachment A p.2 (Commitment 2). These final construction milestones were not incorporated into the AFJ since they represent core FCC requirements for spectrum licensees that EchoStar had long before committed to meet, under penalty of possible forfeiture of the spectrum.

[14] EchoStar Commitment Letter at Attachment A p.3-4 (Contingent Extensions, V(A), V(B), and V(C)). The applicable Final Construction Milestones are stated in the CFR. *See, e.g.,* 47 CFR § 27.14(q)(2) (requiring coverage of 70% percent of the population in each AWS-4 license area).

[15] *See generally* Letter from J. Blum (EchoStar) to M. Dortch (FCC) (Sep. 18, 2024) ("EchoStar Extension Letter"), *available at* https://www.fcc.gov/ecfs/document/1091867842711/1.

[16] *See* EchoStar Extension Letter at Appendix A and D (Accelerated and Expanded Licenses to 85% or 80% Coverage for identified 700, AWS-4 and AWS H Blocks), Appendix B and E (Accelerated and Expanded Licenses to 85% or 80% Coverage for identified 600 MHz blocks), and Appendix C and F (Accelerated and Expanded Licenses to 85% or 80% Coverage for identified AWS-3 blocks).

[17] *See* EchoStar Extension Letter at Appendix G-1 (Extension Period Licenses for identified 700, AWS-4 and AWS H Blocks), Appendix G-2 (Extension Period Licenses for identified 600 MHz blocks), and Appendix G-3 (Extension Period Licenses for identified AWS-3 blocks).

to December 14, 2026 if it met the expanded 80% or 85% nationwide coverage by December 31, 2024,[18] and that it would receive further 18-month extensions to June 14, 2028 if EchoStar satisfied additional interim requirements by December 31, 2024 or June 14, 2025.[19] In September 2024 the FCC's Wireless Bureau granted extensions to these deadlines, contingent on EchoStar meeting its interim commitments in December 2024 and June 2025.

EchoStar notified the FCC that it met its interim deadlines in December 2024[20] and claimed that it was thus entitled to the initial 18-month extension to December 2026. But the FCC never determined that EchoStar had met its December 2024 interim deadlines, and industry participants raised substantial questions to the FCC about whether EchoStar had met those deadlines[21] and whether EchoStar's September 2024 extensions had been properly granted.[22] On May 9, 2025, FCC Chairman Brendan Carr notified EchoStar he had "directed agency staff to begin a review of

---

[18] *See* EchoStar Extension Letter at Attachment A p.4.

[19] *See* EchoStar Extension Letter at Attachment A p.4 (these interim commitments included expanding EchoStar's nationwide coverage and increasing the number of its 5G Sites).

[20] *See* "EchoStar Corporation 5G Buildout Status Report" at 1, attached to Letter from J. Blum (EchoStar) to J. Taubenblatt (FCC) (Jan. 10, 2025), *available at* https://www.fcc.gov/ecfs/document/1011082930532/1.

[21] *See* Letter from D. Goldman (SpaceX) to M. Dortch (FCC) at 2 (May 6, 2025) (questioning whether EchoStar had satisfied its band-specific buildout commitments), *available at* https://www.fcc.gov/ecfs/document/1041417129693/1.

[22] *See* Petition for Reconsideration of VTel Wireless, Inc. at 7-8 (WT Docket No. 22-212, filed Oct. 21, 2024) (noting that the Wireless Bureau granted EchoStar's extension two days after it was filed without giving VTel or other interested parties any opportunity to comment, and arguing that the Wireless Bureau did not have the authority to grant the extensions and that EchoStar failed to establish the extensions were warranted), *available at* https://www.fcc.gov/ecfs/document/1021167931859/1; *see also id.* at 7 (noting the Wireless Bureau did not issue a written decision, instead adding a notation in the FCC's licensing database that the extension is "granted contingent on the applicant meeting in full" the commitments made in its application") (internal citation omitted). *See generally* Monitoring EchoStar's Compliance with Conditions Granting an Extension of Time to Complete Construction of Facilities and Buildout Commitments, FCC WT Docket No. 22-212, https://www.fcc.gov/ecfs/search/search-filings/results?q=(proceedings.name:(%2222-212%22))&page=1&limit=50.

EchoStar's compliance with its federal obligations to provide 5G service throughout the United States per the terms of its federal spectrum licenses," and that while EchoStar had claimed to satisfy its new December 2024 buildout obligation, "questions remain regarding these submissions."[23] Moreover, "to help inform the FCC's thinking about EchoStar's use of spectrum," Chairman Carr "also asked agency staff to issue a public notice seeking comment on the scope and scale of MSS utilization in the 2 GHz band that is currently licensed to EchoStar or its affiliates."[24]

As EchoStar knew, under the FCC's rules, its failure to meet its construction deadlines would result in it immediately forfeiting the spectrum blocks for which it was not in compliance.[25] Automatic forfeiture is a well-known consequence of failing to meet the FCC's construction

---

[23] Letter from B. Carr (FCC) to C. Ergen (EchoStar) May 9, 2025 (attached as Ex. 99.1 to EchoStar's May 13, 2025, 8-K SEC filing) (going on to note that the "terms of the deal were clear. The FCC structured the buildout obligations to prevent spectrum warehousing and to ensure that Americans would gain broader access to high-speed wireless services, including in underserved and rural areas. To ensure that EchoStar's commitments were credible, the FCC provided that EchoStar's failure to meet its new buildout requirements could result in the loss of its spectrum licenses and significant financial payments."), *available at* https://ir.echostar.com/static-files/31f3efd9-c8a8-46c9-926e-634502de1e04.

[24] *See id.* The FCC has approved EchoStar's AWS-4 spectrum for use in terrestrial wireless networks, as well as for D2C Mobile Satellite Services (MSS) provided by satellite directly to a subscriber's handset. EchoStar's AWS-4 spectrum represents a portion of the "2 GHz band" referred to above.

[25] *See, e.g.*, EchoStar Commitment Letter at 2 ("EchoStar is willing to accept the terms of Attachment A, including the significant voluntary contributions (up to $2.2 billion) and potential license forfeitures for failure to meet certain commitments."); FCC T-Mobile/Sprint Order at 6 ("In connection with certain effectuating extensions and modifications of its licenses, EchoStar has committed to provide 5G mobile broadband services and deploy a fast, nationwide network, and is subject to significant financial consequences, in addition to potential forfeiture, should it fail to satisfy its buildout obligations."); FCC Wireless Bureau, "Order of Modification and Extension of Time to Construct" at 7, 8 (DA 20-1072, Sept. 11, 2020) (bureau order memorializing final approval of EchoStar's commitments and license modifications, summarizing "the revised license terms and buildout deadlines that involve automatic license termination under section 27.14" as to EchoStar's AWS-4, Lower 700 E Block, and AWS H Block licenses, and noting that EchoStar's 600 MHz licenses are "subject to earlier, automatic termination").

deadlines.[26] The FCC opened its reviews of EchoStar's compliance on May 12, 2025, inviting public comment on "whether it should reconsider its decision to grant an extension of the construction deadlines for certain licenses held by EchoStar, or whether there are other measures or actions that it should consider taking with respect to EchoStar's licenses."[27]

In its own comments in these proceedings filed on May 28, 2025, EchoStar explained that "interrupting EchoStar's ongoing deployment would threaten its viability as a wireless provider and endanger the video and satellite services upon which millions of consumers rely" and that "the FCC's public notices introduce the possibility of reversing prior grants of authority to EchoStar and have materially adversely affected EchoStar by creating uncertainty over its spectrum rights and effectively freezing its ability to make decisions regarding its 5G network buildout."[28] As

---

[26] *See generally* 47 CFR § 27.14 on "Construction requirements" (repeatedly noting forfeiture as a consequence of failing to meet construction deadlines); *see also* 47 CFR § 27.14(q)(6) (noting that "failure by any AWS-4 licensee to meet" the applicable AWS-4 Final Buildout Requirement "will result in forfeiture of the license and the licensee will be ineligible to regain it"). *See also* "Wireless Telecommunications Bureau Reminds Wireless Licensees of Construction Obligations" at 1 (DA 17-573, June 12, 2017), *available at* https://docs.fcc.gov/public/attachments/DA-17-573A1.pdf (FCC issuing general reminder of the need to meet construction obligations, noting that these obligations "serve the important purpose of ensuring that scarce spectrum resources are put to use and deployed in a manner that serves all communities" and promote the Commission's goal of making spectrum "available, so far as possible, to all the people of the United States" regardless of where they live," and that the "Commission has taken and will continue to take steps to facilitate the rapid deployment of wireless broadband and other services.").

[27] *See* "Wireless Telecommunications Bureau Seeks Supplemental Comment on VTel's Petition for Reconsideration of the Extension of Construction Deadlines for Certain Licenses Held by EchoStar Corporation" at 2 (DA 25-404, May 12, 2025) (calling into question buildout for licenses in, *inter alia,* the AWS-4, Lower 700 MHz E Block, 600 MHz, and AWS H Block bands), *available at* https://docs.fcc.gov/public/attachments/DA-25-404A1.pdf; "Space Bureau Opens New Docket to Explore EchoStar Corporation's Use of 2 GHz MSS Spectrum" at 1-2 (DA 25-405, May 12, 2025) (noting that EchoStar is the "current and sole licensee" for use of AWS-4 in both satellite and terrestrial service, and that "questions have been raised about whether the 2 GHz band is being used for MSS, notwithstanding the premise of the Commission's past decisions"), *available at* https://docs.fcc.gov/public/attachments/DA-25-405A1.pdf.

[28] *See* EchoStar 8-K SEC filing (May 28, 2025), *available at* https://ir.echostar.com/static-

discussions with the FCC continued,[29] EchoStar told its investors in its August 2025 quarterly SEC

filing that:

- the "FCC's review of our compliance with network build-out requirements could lead to the loss or impairment of certain of our existing spectrum licenses";

- "to protect our interest in our Wireless Licenses and other assets we may take one or more actions that may negatively impact the value of your investment in our securities, including, under certain circumstances," filing for bankruptcy;

- such actions could "negatively impact your investment"; and

- EchoStar's cash situation "raises substantial doubt about our ability to continue as a going concern." [30]

Against this backdrop, on August 25, 2025, EchoStar agreed to sell to AT&T the

company's 3.45 GHz and 600 MHz spectrum licenses – a total of 50 MHz of nationwide spectrum

– for $22.6 billion.[31] Separately, in a transaction originally announced on September 8, 2025 and

then amended on November 6, 2025, SpaceX agreed to acquire all of EchoStar's spectrum in the

---

files/b4cb4b5a-eac8-4b03-8d74-6b3cd094c81e. EchoStar went on to default on interest payments on corporate notes for funding obtained using its spectrum as collateral, though it retained the option to cure those defaults within 30 days. *See* EchoStar 8-K SEC filing (May 30, 2025), *available at* https://ir.echostar.com/static-files/18f665dc-41d1-4330-b325-739730dcbc12; EchoStar 8-K SEC filing (June 2, 2025), *available at* https://ir.echostar.com/static-files/2f2a0483-69fa-47af-9272-b91ca58d4656.

[29] *See* EchoStar 8-K SEC filing (June 27, 2025) (reporting that EchoStar had made certain interest payments on its debt, which would "further extend the timeline for EchoStar to explore an acceptable resolution of the FCC's stated concerns in a manner that minimizes disruption to the Company's businesses and lifts the regulatory uncertainty created by the inquiries"), *available at* https://ir.echostar.com/static-files/7a4c36f7-c092-4b68-940b-fdc262355ac3.

[30] *See* EchoStar Corporation 10-Q SEC Filing (Aug. 7, 2025) at i, *available at* https://ir.echostar.com/static-files/d17be236-edf8-4afd-8b8f-8e7cba755827

[31] *See* PR Newswire, "EchoStar Announces Spectrum Sale and Hybrid Mobile Network Operator (MNO) Agreement, Steps Toward Resolving Federal Communications Commission's (FCC) Inquiries," *available at* https://www.prnewswire.com/news-releases/echostar-announces-spectrum-sale-and-hybrid-mobile-network-operator-mno-agreement-steps-toward-resolving-federal-communications-commissions-fcc-inquiries-302538317.html.

AWS-4, H-block and AWS-3 bands for a total of ~$19.6 billion, consisting of $8.5 billion in cash and the remainder in SpaceX stock.[32] Also on September 8, EchoStar received a letter from FCC Chairman Brendan Carr stating that the FCC would be taking steps to conclude the investigations prompted by the FCC's May 9 letter described above,[33] going on to note that FCC approval would be needed for EchoStar's AT&T and SpaceX transactions to proceed.[34]

### C. EchoStar's New Identity From its Spectrum Sales and Business Agreements

Although EchoStar is selling its spectrum, these transactions include business agreements

---

[32] *See* "EchoStar Announces Spectrum Sale and Commercial Agreement with SpaceX," EchoStar press release Sept. 8, 2025 ("EchoStar Sept. 8, 2025 Press Release") (also noting "the definitive agreement provides for SpaceX to fund an aggregate of approximately $2 billion of cash interest payments payable on EchoStar debt through November of 2027"), *available at* https://ir.echostar.com/news-releases/news-release-details/echostar-announces-spectrum-sale-and-commercial-agreement-spacex; "EchoStar Agrees to Sell Full Unpaired AWS-3 Spectrum License Portfolio to SpaceX (Nov. 6, 2025), *available at* https://www.prnewswire.com/news-releases/echostar-agrees-to-sell-full-unpaired-aws-3-spectrum-license-portfolio-to-spacex-302606455.html.

[33] *See* EchoStar Corporation 8-K SEC Filing (Sep. 9, 2025) at 3 (also attaching Letter from B. Carr (FCC) to C. Ergen (EchoStar) stating that he had "asked FCC staff to bring the agency's investigation to conclusion," including "direct[ing] FCC staff to: (1) dismiss VTel's petition for reconsideration; (2) confirm that EchoStar holds exclusive terrestrial and MSS rights over the AWS-4 spectrum to which it is currently licensed; and (3) find that relevant FCC buildout and other related obligations have been satisfied by EchoStar in view of the company's current FCC milestones."), *available at* https://ir.echostar.com/static-files/3e5fc713-bbd0-472e-bf75-7cecf1282c48.

[34] Notwithstanding the FCC's September 8, 2025, letter, EchoStar remains subject to possible FCC enforcement action if it does not complete its transactions with AT&T and SpaceX, as the FCC has not formally concluded its enforcement proceedings. Rather, the FCC considers the matters of EchoStar's requests for extensions of its 600 MHz buildout conditions and its notices of compliance with them "moot" in light of its approval of the transfers of EchoStar's licenses to AT&T and SpaceX, respectively, as well as the new buildout deadlines it set for each. *See* AT&T/EchoStar Order, *infra* n.46, at ¶ 57 n.184; SpaceX/EchoStar Order, *infra* n.46, at ¶ 70 n.212. The FCC similarly declined to make any substantive findings about EchoStar's extension request or the adequacy of its justifications in response to VTel's petition. Rather, the FCC dismissed the petition for lack of standing. *See* "Order on Reconsideration" at ¶ 7 (DA 26-469, May 12, 2026), *available at* https://docs.fcc.gov/public/attachments/DA-26-469A1.pdf.

that will enable EchoStar to continue to compete as a provider of mobile wireless services for years after the AFJ expires on April 1, 2027.[35] AT&T is one of two mobile network operators (with T-Mobile) hosting Boost subscribers and has been doing so since 2021, in an agreement (in contrast with EchoStar's arrangement with T-Mobile) reached outside the context of the AFJ.[36] As part of their spectrum transaction, AT&T and EchoStar have extended their existing mobile virtual network operator ("MVNO") agreement to 2031, with further extensions available at EchoStar's option to 2035.[37] EchoStar also will receive from AT&T substantially lower rates,[38] and its subscribers will receive a higher quality of service.[39] Under the updated AT&T MVNO agreement, EchoStar will continue to use its own core network, provisioning platform, billing systems, and other assets it owns, allowing it to operate with significant independence, relying on AT&T only for its radio network.[40] EchoStar and AT&T argue that the favorable rates and increased technical benefits EchoStar would receive from AT&T will enable it to continue to compete with the Big 3

---

[35] *See* "Description of Transaction, Public Interest Showing, and Related Demonstrations" (Sept. 18, 2025) ("AT&T/EchoStar Public Interest Statement"), *available at* https://www.fcc.gov/ecfs/document/101651096172/1; "AT&T's Purchase of EchoStar Spectrum - Submission by AT&T to US Department of Justice (Antitrust Division)" (Sept. 30, 2025) ("AT&T White Paper"), *available at* https://www.fcc.gov/ecfs/document/11240042701978/2.

[36] *See* "EchoStar and AT&T Sign Strategic Network Services Agreement" (July 19, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1001082/000100108221000019/EchoStar-20210714ex991dd8634.htm.

[37] *See* EchoStar 8-K SEC Filing (Aug. 25, 2025), *available at* https://ir.echostar.com/static-files/9b081f3a-6d9f-48a6-b350-735a9052ffc3.

[38] AT&T White Paper at 12 (in return for "EchoStar agreeing to certain volume commitments," AT&T "will provide EchoStar with much better rates than EchoStar receives today" when using AT&T's radio network).

[39] AT&T White Paper at 13 ("EchoStar customers can be provisioned and managed on AT&T's Quality of Service Class Identifier (QCI) 8, which is the equivalent service priority of an AT&T postpaid customer.").

[40] *See* EchoStar 10-Q SEC Filing (Sept. 30, 2025), *available at* https://www.sec.gov/Archives/edgar/data/1415404/000110465925107277/tmb-20250930x10q.htm.

carriers, even without its own radio network.[41]

In connection with their transaction, SpaceX and EchoStar are entering a long-term commercial agreement that will enable EchoStar's Boost Mobile subscribers – through its cloud-native 5G core – to access SpaceX's next generation Starlink D2C service.[42] On September 19, 2025, SpaceX filed an application seeking to launch and operate a new non-geostationary orbit ("NGSO") mobile satellite service ("MSS") system of up to 15,000 satellites operating at altitudes ranging between 326 km to 335 km to provide connectivity to mobile devices.[43] SpaceX plans to build new Starlink satellites to carry EchoStar's spectrum and to have them launched and ready to provide initial satellite mobile broadband service as early as next year.[44] EchoStar emphasizes that the SpaceX transaction will allow it to offer SpaceX's D2C service to its customers, further

---

[41] *See* AT&T/EchoStar Public Interest Statement at 22 (asserting that "[r]ather than exiting the market, EchoStar will emerge from this Transaction as a stronger competitor than it is today"); AT&T White Paper at 11 (noting that "EchoStar will continue to maintain its network core and therefore be able to provide differentiated offerings to its customers," and "the transaction and the new hybrid-MNO arrangement will materially enhance EchoStar's ability to compete in numerous ways").

[42] *See* "Amended Description of the Transaction, Public Interest Showing and Related Demonstrations" (Nov. 10, 2025) (noting "the transaction will also empower [EchoStar] to introduce its own D2C service to complement its wireless offerings, making its Boost service even more compelling"), *available at* https://www.fcc.gov/ecfs/document/111051875814/5; *see also* EchoStar Sept. 8, 2025 Press Release (noting the transaction "allows for the combination of AWS-4 and H-block spectrum from EchoStar with the rocket launch and satellite capabilities from SpaceX to realize the direct-to-cell vision in a more innovative, economical and faster way for consumers worldwide").

[43] *See* "Space Bureau and Wireless Telecommunications Bureau Accept for Filing Application of SpaceX Requesting NGSO MSS Authorization and Supplemental Coverage From Space Authorization and Seek Comment on Waivers" (DA 25-1018, Dec. 5, 2025), *available at* https://docs.fcc.gov/public/attachments/DA-25-1018A1.pdf.

[44] *See* "SpaceX Says Faster Starlink Cell Service is Coming in 2027—but First It Must Clear 1 Big Hurdle" (Mar. 2, 2026) (reporting that SpaceX announced Starlink Mobile V2 will debut in mid-2027), *available at* https://www.inc.com/chloe-aiello/spacex-faster-starlink-cell-service-2027-elon-musk/91310620.

bolstering its competitiveness among the major wireless service providers, who are also adding

D2C connectivity to their own services.[45]

Following a notice-and-comment period, the FCC approved both transactions on May 12,

2026.[46] The FCC found that the AT&T transaction served the public interest because AT&T plans

to deploy the spectrum to improve its 5G networks' coverage, capacity, and performance

throughout the country, including rural areas.[47] The FCC further found that the improved MVNO

arrangement between EchoStar and AT&T "has the potential to lower EchoStar's costs while still

allowing it to maintain control of its core network, including the customer-facing functions of a

facilities-based provider, and that the arrangement will also provide Boost Mobile with expanded

coverage and increased speeds, ultimately resulting in better service and lower prices for Boost

---

[45] *See* "EchoStar Announces Spectrum Sale and Commercial Agreement with SpaceX," EchoStar Sept. 8, 2025 Press Release. *See also* "AT&T and AST SpaceMobile Announce Definitive Commercial Agreement" (May 15, 2024) (noting that "AT&T and AST SpaceMobile have entered a definitive commercial agreement to provide a space-based broadband network direct to everyday cell phones"), *available at* https://about.att.com/story/2024/ast-spacemobile-commercial-agreement.html; "Verizon Completes its First Satellite to Cellular Enabled Video Call with AST SpaceMobile BlueBird 2" (Feb. 24, 2025) (noting that "Verizon and AST are building the fastest satellite to device network"), *available at* https://www.verizon.com/about/news/verizon-ast-spacemobile-bluebird-2; "First SpaceX Satellites Launch for Breakthrough Direct to Cell Service with T-Mobile" (Jan. 3, 2024) (noting that "the new service will leverage SpaceX's constellation of satellites with Direct to Cell technology and T-Mobile's industry-leading wireless network"), *available at* https://www.t-mobile.com/news/un-carrier/first-spacex-satellites-launch-for-breakthrough-direct-to-cell-service-with-t-mobile.

[46] Memorandum Opinion and Order, Applications of AT&T Mobility II LLC and EchoStar Corporation for Consent to Assign Licenses (DA 26-470, May 12, 2026), *available at* https://docs.fcc.gov/public/attachments/DA-26-470A1.pdf ("AT&T/EchoStar Order"); Memorandum Opinion and Order, Applications of Spectrum Business Trust 2025-1, Space Exploration Technologies Corp., and EchoStar Corporation for Consent to Assign Spectrum and Earth Station Licenses (DA 26-471, May 12, 2026) *available at* https://docs.fcc.gov/public/attachments/DA-26-471A1.pdf ("SpaceX/EchoStar Order").

[47] AT&T/EchoStar Order ¶ 2.

Mobile's wireless customers."[48] As for the SpaceX/EchoStar transaction, the FCC explained the benefits will include, in the near term, improved D2C services, resulting in increased mobile connectivity in hard-to-reach areas; and in the longer term, enhanced wireless competition, with the potential for SpaceX's D2C service to compete with incumbent terrestrial providers.[49]

### D. The Impact of the Transactions on the Amended Final Judgment

In light of these transactions and the events that led to them, the AFJ should be amended to terminate EchoStar's radio network obligations. As shown in the accompanying blackline, this can be accomplished by terminating EchoStar's obligations pursuant to Sections VIII.B and VIII.C of the AFJ and one sentence in Section VIII.A. The proposed Order implements these changes by stating:

- "The obligations stated in the second sentence of Section VIII.A and in Sections VIII.B-VIII.C of the Amended Final Judgment are hereby terminated. All other provisions of the Amended Final Judgment shall remain in effect."

Although the proposed transactions will necessarily result in EchoStar shutting down its radio network, the United States has determined that there is no available outcome that would allow EchoStar to continue as a mobile radio network operator and that the proposed transactions represent the best outcome for competition under the circumstances. One of the United States' goals for the AFJ was to foster the deployment of a fourth mobile wireless radio network using EchoStar's fallow spectrum. But while EchoStar built the network called for in the AFJ, the uncertainty over its compliance with its FCC buildout conditions has led to the situation today. And while EchoStar itself will no longer own these spectrum licenses, the spectrum will be used by

---

[48] *Id.*¶ 50.
[49] SpaceX/EchoStar Order ¶ 2.

AT&T to provide service to both its own customers and EchoStar's.

It is worth noting, as well, that many of the provisions in the AFJ have either already been satisfied or are on the verge of being completed. T-Mobile divested and EchoStar acquired Sprint's Boost Mobile business,[50] thus fostering EchoStar's entry as a new provider of wireless services. EchoStar also met the requirement to build its own mobile core network by June 14, 2023,[51] which has enabled it to have much greater control over its customer relationship than a traditional MVNO, including control over its customer provisioning, billing and services.

The AFJ also helped ensure that T-Mobile's new 5G network would be built as promised and that American consumers would reap those benefits.[52] T-Mobile has reported meeting its three-year commitments associated with the merger and on the progress it has made towards its 6th year milestones,[53] which will be assessed by a drive test to be conducted later this year.[54]

Many of the AFJ's other requirements have already expired. For example, the provisions requiring T-Mobile to make its decommissioned retail locations and cell sites available to EchoStar, which allowed EchoStar the opportunity to acquire those assets as it developed its

---

[50] *See* "T-Mobile Closes Deal with EchoStar to Divest Sprint Prepaid Business," *available at* https://www.t-mobile.com/news/un-carrier/t-mobile-closes-deal-with-EchoStar-to-divest-sprint-prepaid-business.

[51] *See* "FCC confirms that EchoStar is meeting 5G deployment commitments," *available at* https://www.rcrwireless.com/20231003/featured/fcc-confirms-that-EchoStar-is-meeting-5g-deployment-commitments.

[52] *See* AFJ at Section VIII(A) (requiring T-Mobile to abide by its network build commitments to the FCC, subject to verification by the FCC).

[53] *See* T-Mobile, "Fifth Annual Progress Report" at 1, 2 (May 30, 2025), *available at* https://www.fcc.gov/ecfs/document/105301128720489/1.

[54] *See* T-Mobile, "Methodology for T-Mobile Drive Tests to Verify Compliance with T-Mobile/Sprint Merger Commitments" at 1, 2 (Jan. 8, 2020) (calling for drive tests to be completed within 9 months of the 6th anniversary of the closing date of the T-Mobile/Sprint merger, i.e., within 9 months from April 1, 2026), *available at* https://www.fcc.gov/sites/default/files/t-mobile-drive-test-methodology-01082021.pdf.

wireless business, expired on July 1, 2025.[55] EchoStar held the option of acquiring the 800 MHz

spectrum from T-Mobile for more than three years, until April 1, 2024.[56] And the transition

services agreement enabled EchoStar to call on T-Mobile's support until July 1, 2023, as it stood

up its Boost Wireless business.[57]

Provisions of the AFJ that are not affected by this partial termination and that will remain in

effect include:

- The provisions that prohibit EchoStar from selling, or require advance notice of any sale of, its mobile wireless assets or business to the Big 3 carriers;[58]

- The requirement that EchoStar provide notice of transactions involving wireless services or the divestiture assets that are not otherwise subject to the reporting requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976;[59]

- Protections for MVNOs that were using T-Mobile or Sprint at the time of the transaction;[60]

- Technical requirements relating to eSim technology that supports easier subscriber switching among carriers;[61]

- EchoStar's Full MVNO relationship with T-Mobile remaining in place through the AFJ's expiration on April 1, 2027;[62]

- Continued oversight of T-Mobile's compliance with its radio network buildout commitments to the FCC; [63]

---

[55] *See* AFJ at Section IV(C)(1) (i.e., five years after the prepaid asset divestiture on July 1, 2020); AFJ at Section IV(D)(1) (same).

[56] *See* AFJ at Section IV(B)(1).

[57] *Id.* at Section IV(A)(4) (transition services agreement to run for an initial term of two years from the date of the prepaid asset divestiture on July 1, 2020, with an available extension of one additional year).

[58] *Id.* at Section XVI(B).

[59] *Id.*

[60] *Id.* at Section VII(A).

[61] *Id.* at Section VII(F).

[62] *Id.* at Section XIX.

[63] *Id.* at Section VIII(A).

- Continued oversight by the Monitoring Trustee to monitor compliance with these remaining provisions;[64] and

- Continuation of the Division's own compliance inspection rights and enforcement powers until the AFJ expires.[65]

### III.   Argument

Entry of the proposed Second Amended Final Judgment is in the public interest because it aligns the requirements of this Court's order with the consequences of EchoStar's failure to have satisfied the FCC that it met its buildout obligations. Under all the circumstances described above, the United States has determined that there is no available outcome that would allow EchoStar to continue as a mobile radio network operator, and that the proposed transactions represent the best outcome for competition. Rather than entering bankruptcy and exiting altogether, EchoStar can now remain in business as a mobile wireless services provider for years after the AFJ is due to expire in less than a year and can offer its subscribers SpaceX's planned D2C mobile satellite service when that service is expected to come online in 2028.

### A.   Termination of EchoStar's Radio Network Obligation is in the Public Interest

#### 1.  The Court's Jurisdiction and Legal Standard

This Court has jurisdiction to modify the AFJ pursuant to AFJ Section XVII, Federal Rules of Civil Procedure 60(b)(5) and 60(b)(6)[66] and the Court's inherent authority to enforce its lawful

---

[64] *Id.* at Section XII.

[65] *Id.* at Section XIV.

[66] The Tunney Act governs the procedures for judicial approval of consent decrees filed by the Antitrust Division. Although by its terms the Tunney Act is not applicable to consent decree modification proceedings, the Second Circuit has held that it can provide "useful guidance" to the court with respect to decree modifications. *See United States v. Am. Cyanamid*, 719 F.2d 558 at 565 & n.7 (2d Cir. 1983).

orders.[67] Where the parties to a consent decree later consent to a proposed modification, the issue

before the Court is whether the modification is in the public interest.[68] As the D.C. Circuit has

held, "when all parties to a decree assent to a particular modification, the relevant inquiry for the

court is whether the resulting array of rights and liabilities comports with the 'public interest.'"[69]

This public interest standard is the same standard that a federal district court applies in reviewing

an initial consent judgment in a federal government antitrust case.[70] The "relevant inquiry" for the

Court is limited to determining "whether there is a factual foundation for the government's

decisions such that its conclusions regarding the proposed settlement are reasonable."[71]

The D.C. Circuit has advised that a district court "should not reject an agreed-upon

modification unless 'it has exceptional confidence that adverse antitrust consequences will

---

[67] *See United States v. W. Elec. Co.,* 46 F.3d 1198, 1202 (D.C. Cir. 1995) (noting that the court's equity power "to modify a decree of injunctive relief" is "long-established, broad, and flexible").
[68] *See United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 143 (D.D.C. 1982) (finding that modification of an existing 1956 decree to require the breakup of the Bell System was in the public interest), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983), and *amended sub nom. United States v. W. Elec. Co.*, 714 F. Supp. 1 (D.D.C. 1988), *aff'd in part, rev'd in part sub nom. United States v. W. Elec. Co.*, 900 F.2d 283 (D.C. Cir. 1990), and *modified sub nom. United States v. W. Elec. Co.*, 890 F. Supp. 1 (D.D.C. 1995), *vacated as moot,* 84 F.3d 1452 (D.C. Cir. 1996).
[69] *United States v. W. Elec. Co.*, 900 F.2d at 309 (citations omitted) (finding that the district court erred by not applying the public interest standard to the court's review of the Bell Operating Companies' unopposed motion to lift a restriction in the decree). *See also United States v. Paramount Pictures, Inc.*, 2020 WL 4573069, at *3 (S.D.N.Y. Aug. 7, 2020) (citing *United States v. Loew's Inc.*, 783 F. Supp. 211, 213 (S.D.N.Y. 1992) (explaining that the court's role is to determine whether consent termination of a decree is "in the public interest").
[70] *See* 15 U.S.C. § 16(e)(1); *United States v. W. Elec.*, 900 F.2d at 295; *United States v. Am. Tel. & Tel.* 552 F. Supp. at 147 n.67 (D.D.C. 1982).
[71] *United States v. XCL Res. Holdings, LLC*, No. 25-CV-00041, 2026 WL 29073, at *5 (D.D.C. Feb. 4, 2026), *judgment entered,* No. 25-CV-00041, 2026 WL 352678 (D.D.C. Feb. 4, 2026) (quoting *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15–16 (D.D.C. 2007)); s*ee also United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements).

result.'"[72] Similarly, it is "not up to the court to reject an agreed-on change simply because the proposal diverge[s] from *its* view of the public interest."[73] "The court should also bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities 'is the one that will *best* serve society,' but only to confirm that the resulting settlement is 'within the *reaches* of the public interest.'"[74] The district court's analysis, therefore, "must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."[75]

## 2.  Termination of Portions of the AFJ Meets this Legal Standard

The proposal to terminate portions of the AFJ to relieve EchoStar of its radio network obligation is within the reaches of the public interest. As discussed above, the substantial uncertainty as to whether EchoStar had satisfied the FCC that it had met its buildout obligations threatened to lead to EchoStar's license forfeiture, bankruptcy and exit from the market as a mobile wireless services provider. Under these circumstances, the United States is satisfied that there was no scenario in which EchoStar was going to be able to continue to operate its radio network. Compared to the bankruptcy and liquidation that could have resulted had the FCC's review of EchoStar's compliance continued and the AT&T and SpaceX transactions not occurred, the United States has determined that these spectrum sales represent the outcome that is least detrimental to

---

[72] *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (quoting *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993)).

[73] *United States v. W. Elec. Co.*, 993 F.2d at 1577 (emphasis in original).

[74] *Microsoft Corp.*, 56 F.3d at 1460 (quoting *W. Elec. Co.*, 900 F.2d at 309 (emphasis in original) (citations omitted)). *See also United States v. Baroid Corp.*, 130 F. Supp. 2d 101, 103 (D.D.C. 2001) (noting that if all parties consent to the modification, the public interest standard "is necessarily deferential, as the expertise of the Antitrust Division must be respected").

[75] *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003).

competition. EchoStar will continue to provide mobile wireless services to its millions of subscribers, using its own core network and other facilities, and it is well positioned to do so long after the AFJ expires early next year.  The United States therefore submits that it is in the public interest to terminate EchoStar's radio network obligation, while preserving the remaining terms of the AFJ until it expires next year.

Courts have found entry of unopposed motions for consent decree modifications to be in the public interest when the motions were occasioned by developments after entry of the original decree. In one of its decisions in the wake of the break-up of the Bell System, the D.C. Circuit stated that a district court is to approve an uncontested modification "so long as the resulting array of rights and obligations is within the *zone of settlements* consonant with the public interest *today*."[76] After noting that the district court's task was to "determine whether the Department's views were well enough substantiated that it (the Department) could reasonably conclude that removal of the ban was in the public interest," the Court reviewed the Department of Justice's assessment of conditions at the time and affirmed entry of the modification.[77]

Other consent modifications have been entered when they were occasioned by later developments that prevented the relief in the consent decree from operating as originally designed. For example, after a consent decree was entered in 1996 to remedy the United States' concerns that

---

[76] *See United States v. W. Elec. Co.*, 993 F.2d at 1576 (quoting *W. Elec. Co.*, 900 F.2d at 307 (emphasis in original)). Three years after the break-up, the parties agreed to remove a provision in the consent decree that restricted the regional operating companies from entering the market for information services. After previously reversing the district court for denying that consent motion to modify and failing to use the correct public interest test, 990 F.2d at 307, the D.C. Circuit affirmed the district court's subsequent decision to enter the modification. 993 F.2d at 1578, 1582 (also noting the Department of Justice cited, *inter alia*, the impact from "current conditions" in regulation).

[77] *See id.,* 993 F.2d at 1578.

the American Bar Association had restrained competition among professional personnel at ABA-approved law schools and limited competition from non-ABA-approved schools,[78] the ABA was ordered to take steps to limit the influence of law school personnel in the accreditation process, including having the ABA's House of Delegates review and approve certain aspects of the accreditation process.[79] After the Final Judgment was entered, however, the Department of Education ("DOE") determined that allowing the House to act as the final decision-maker for accreditation activities did not conform to provisions of the Higher Education Act and DOE regulations, and the court entered the parties' consent motion to modify the House's role to conform to the DOE's determination.[80] Similarly, the court entered the parties' unopposed consent decree modification to permit a defendant milk producer to retain a plant that was to have been divested, when the parties later found the plant was difficult to sell.[81]

As set forth above, the proposed termination of EchoStar's radio network obligations can be accomplished with simple revisions to the AFJ, as reflected in the accompanying blacklined AFJ and proposed order. This proposed modification leaves intact the remaining provisions of the AFJ until the AFJ expires next year.[82]

---

[78] *See United States v. Am. Bar Ass'n*, 135 F. Supp. 2d 28 (D.D.C. 2001).

[79] *Id.* at 30.

[80] *Id.* at 31 (going on to note that "[t]o hold otherwise would be nonsensical, as it would suggest that altering a judgment to bring it into compliance with federal law is not in the public interest").

[81] *See United States v. Dairy Farmers of Am., Inc.,* No. 1:20-CV-02658, 2020 WL 8370839, at *1 (N.D. Ill. Dec. 17, 2020). The final judgment had contemplated that DFA might be permitted to retain the plant if there was no qualified buyer, so that the plant could remain in the market during the pandemic. Final Judgment, Dairy Farmers of Am., Inc., No. 1:20-CV-02658, Section V.G.

[82] *See United States v. Am. Bar Ass'n*, 135 F. Supp. 2d 28, 31-32 (D.D.C. 2001) (holding that modification of the decree "only inasmuch as necessary" to comply with Department of Education accreditation rules was "squarely within the public interest").

**B.      Proposed Procedures for Public Notice and Comment**

Although the Antitrust Procedures and Penalties Act ("Tunney Act"), 15 U.S.C. § 16(b)-(h), does not by its terms apply to the modification and termination of consent decrees,[83] the United States recognizes that seeking public comment may nevertheless be appropriate here.[84]

The United States submits that the following procedures would be appropriate to allow interested persons to comment specifically on the proposed partial termination of the Amended Final Judgment:

1.  Today, the United States filed the Motion along with this memorandum in support, the proposed Second Amended Final Judgment, a blackline showing changes between the Amended Final Judgment and the Second Amended Final Judgment, the United States' Explanation of Procedures and a Proposed Order.

2.  Plaintiff United States will post its entire filing on the Antitrust Division's website along with a notice announcing this filing and inviting any person wishing to submit comments concerning the proposed partial termination to the United States Department of Justice, Antitrust Division within 30 days of publication.

---

[83] *See United States Am. Cyanamid*, 719 F.2d at 565 & n.7 (noting that nevertheless the Tunney Act can provide "useful guidance" to the court with respect to decree terminations).

[84] The parties filed a previous consent motion to modify the AFJ to extend the deadline for EchoStar to acquire certain 800 MHz spectrum from T-Mobile, which the Court granted after the parties suggested that further public comment was not necessary. *See* Consent Motion to Modify Final Judgment at 5-6, Dkt. 137 (Oct. 18, 2023); Order Granting Consent Motion to Modify Final Judgment, Dkt. 138 (Oct 23, 2023). The United States suggests inviting public comment here because the proposed termination of EchoStar's radio network obligations represents a more substantial modification to the AFJ than the previous consent motion.

3. After the 30-day period expires, United States will file with the Court its response to any comments received, along with a compilation of all such comments and its motion for entry of the proposed order, unless the United States withdraws its motion.

4. The United States requests that the Court not rule upon the Motion or enter the proposed order until the United States submits its response to comments and the comments received and moves for entry of the proposed order.

5. The United States reserves the right to withdraw its consent to the motion at any time prior to entry of an order partially terminating the AFJ.

These procedures are intended to notify all potentially interested persons that a motion to terminate EchoStar's radio network obligation is pending and provide them with an opportunity to comment on this partial termination.

## IV.   Conclusion

For the foregoing reasons, partial termination of the AFJ is in the public interest, and the United States respectfully moves for entry of the proposed order after completion of the procedures outlined above.

Dated: May 19, 2026                         Respectfully submitted,

                                            FOR PLAINTIFF
                                            UNITED STATES OF AMERICA


                                            _____/s/_____
                                            Frederick S. Young (D.C. Bar No. 421285)
                                            Eva Rhule (D.C. Bar No. 90028844)
                                            U.S. Department of Justice
                                            Antitrust Division
                                            450 Fifth Street NW, Suite 7000
                                            Washington, D.C. 20530
                                            (202) 725-2503
                                            Frederick.young@usdoj.gov

23

**CERTIFICATE OF SERVICE**

I, Frederick S. Young, hereby certify that on May 19, 2026, I caused a copy of the

foregoing Unopposed Motion of the United States for Partial Termination of Amended Final

Judgment, together with the memorandum in support, attachments and proposed Order, to be

served upon all counsel of record via the Court's CM/ECF system.

/s/

Frederick S. Young (D.C. Bar No. 421285)
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 7000
Washington, D.C. 20530
(202) 725-2503
Frederick.young@usdoj.gov